34

United States District Court
Southern District of Texas
FILED

MAR 3 0 2004

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ROYAL SURPLUS LINES | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-109 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF ROYAL'S REPLY TO BISD'S RESPONSE TO ROYAL'S
MOTION TO COMPEL WRITTEN DISCOVERY RESPONSES**

TO THE HONORABLE ANDREW S. HANEN,
UNITED STATES DISTRICT JUDGE:

Plaintiff Royal Surplus Lines Insurance Company (Royal) files its Reply to BISD's Response

to Royal's Motion to Compel Written Discovery Responses, respectfully showing:

**I.    SUMMARY OF REPLY**

1.    In this insurance coverage dispute, Royal has served several sets of discovery on its

insured, BISD, so that Royal may determine the basics of BISD's insurance claim and positions in

this lawsuit, including (1) the "how, when and where" of BISD's loss; (2) BISD's contentions as to

the cause of the alleged water damage and mold damage at the schools; and (3) BISD's contentions

as to when such damage manifested. BISD continues to refuse to respond with any substance, but

instead hides behind stock objections and the curious posture that "BISD does not yet know what

it contends". BISD's position of "not having a position" is particularly transparent in light of BISD's

past representation to the Court that this case should be set for trial on March 1, *2004*. The Court

should not permit BISD to lay behind the log until trial, but instead should (1) order that BISD provide complete and sworn responses, and produce all responsive documents, to all outstanding discovery requests within fourteen (14) days, (2) order that BISD will not be permitted to offer any evidence in support of any contention that it fails to disclose in response to Royal's discovery, and (3) order that BISD will not be permitted to offer or use any documentary evidence, which is responsive to outstanding discovery requests, but that has not produced to Royal within fourteen (14) days.

## II.    ROYAL'S INTERROGATORIES TO BISD

2.    Royal served very precise discovery aimed at learning BISD's contentions as to the timing, scope, and cause of the alleged mold contamination. In Royal's Motion, Royal provided the Court several examples of BISD's interrogatory "responses", which made it clear that BISD is still trying to "hide the ball" as to BISD's contentions and claims. Since the filing of Royal's Motion, BISD continues to refuse to supplement its discovery responses *or even provide a verification for its responses*. In responding to Royal's Motion to Compel, BISD simply addresses Royal's complaints as to BISD's interrogatories (Royal's Motion, pp. 6-11) by stating that BISD "has complied in good faith to answer all of its interrogatories."[1] *See* BISD's Response, at ¶ 3.

3.    In light of BISD's position that it has "complied in good faith to answer" all 19 of Royal's interrogatories, and its refusal to supplement its responses, the issue is ripe for a ruling by the Court. Contrary to BISD's statements, and as set forth fully in Royal's Motion, BISD's unsworn responses are not complete and do not comply with the federal rules. Two examples of BISD's *lack* of "good faith" follow:

---

[1] BISD also admitted in its March 18, 2004 Response that it failed, in response to Royal's Interrogatory No. 2, to identify the person who answered the interrogatories on behalf of BISD. Although BISD represented that it would

**INTERROGATORY NO. 3**: For each "occurrence" or "loss" made the basis of BISD's Subject Claim, please identify (i) the **date** the occurrence or **loss "commenced"** at Aiken or Besteiro, (ii) the date the occurrence or loss was **reported** to Royal, (iii) the date the occurrence or loss was **discovered**, (iv) the **cause(s)** of the occurrence or loss, (v) the **resulting damage** (including the particular area of the school alleged to have been damaged), and (vi) what, if anything, has been done to date to **repair**, remediate, minimize, remove or mitigate the claimed damage.

**RESPONSE**  BISD objects to subparts (i), (iii), (iv), and (v) of this interrogatory because they, in whole or in part, require the testimony of experts. Expert reports are not due at this time. BISD will produce its expert reports in accordance with the Federal Rules of Civil Procedure and the Orders of the court in this case. Additionally, pursuant to FRCP 33(d), information responsive to this request can be derived or ascertained from Defendant's business records, which are available for inspection and copying at the offices of Defendant's attorneys.

4.       With Interrogatory No. 3, Royal seeks to find out BISD's precise contentions as *when* each claimed loss commenced, *when* each loss was discovered, the *cause* of each loss, and the *damage* resulting from each loss. BISD's objection that the interrogatory requires expert testimony is without merit for two reasons. First, Royal is simply asking for what BISD *contends*, not what evidence supports the contention. Second, BISD's expert designation has long passed (March 1, 2004), but the response has not been timely supplemented.

5.       BISD's position that Royal should simply look to "Defendant's business records" pursuant to Rule 33(d) is faulty. Rule 33(d) is not applicable when a party is asked to identify its contentions. Rule 33(d) only applies when the "burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served." **Royal is trying to find out what BISD contends**. When reviewing BISD's 20,000-30,000 business records (comprised of documents created by dozens of entities over the course of more than ten years), how is *Royal* supposed to ascertain what *BISD* contends about *BISD's* insurance claim? The suggestion that Royal is supposed to somehow identify BISD's contentions by studying BISD's entire document production is absurd.

---

"immediately" supplement its response to Interrogatory No. 2, BISD has failed to supplement or verify its interrogatory

6. Furthermore, even if Rule 33(d) was applicable to contention interrogatories such as Interrogatory No. 3, BISD has not complied with the Rule's requirement that the responding party's "specification of the records from which the answer may be derived or ascertained" be "in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained." BISD has not, of course, directed Royal to a letter, memorandum, expert report, or other document that identifies when each claimed loss occurred, when the resulting damage was discovered, what caused the damage, or other basic information about BISD's claim for more than $10 million.[2] Royal should be forced to guess what BISD contends, and then simply wait until trial to find out it if it guessed correctly. If BISD's true position is that it does not know the answer to the questions posed by this interrogatory, BISD should so state in its discovery response. If BISD so swears in response to Royal's discovery, the Court should preclude BISD from adducing any evidence that contradicts BISD's position that it "does not know."

7. Another interrogatory, Interrogatory No. 19 also illustrates BISD's continuing gamesmanship:

> **INTERROGATORY NO. 19:** Is it BISD's position that:
>
> (iii)   The contractors involved in the construction of the Subject Schools defectively "design[ed], "construct[ed]", and "acted after the construction" with regard to "design, plumbing, improper inspections, roofing systems, building envelope system, structural systems, HVAC (heating, ventilating, air conditioning) systems, electrical, mechanical, air conditioning, condensate drainage, and numerous other design deficiencies and construction deficiencies . . ." [¶ 4.3 of BISD's Original Third-Party Petition in Cause No. 2003-08-4078-E].

---

responses.

[2]   Indeed, with other interrogatories, Royal has identified certain findings and conclusions reached by engineering firms hired by BISD, and asked BISD to indicate whether it agrees with the findings and conclusions as to, among other things, the cause of the mold at the schools. BISD has also refused to answer these interrogatories. *See* Exhibit E to Royal's Motion, Interrogatories Nos. 16, 17, and 18.

(iv)    "BISD's property [the Subject Schools] has been contaminated with pollution, various molds, mold spores, mildew, bacteria, fungus and other toxic materials, which was caused by the negligent construction, supervision, design, selection, repair, inspection, and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment and the use of improper materials in the construction of the schools." [¶ 5.2 of BISD's Original Third-Party Petition in Cause No. 2003-08-4078-E] ....

(v)    "As a result of the negligent construction, supervision, inspection, design and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and the use of improper materials in the construction of the schools, excess moisture has developed throughout the schools resulting in the growth of harmful molds, mold spores, bacteria, fungi, and their resulting harmful products and pollutants of these molds, mold spores, bacteria, and fungi were released into [the Subject Schools]." [¶ 5.4 of BISD's Original Third-Party Petition in Cause No. 2003-08-4078-E] . . . .

(x)    The conduct of the contractors involved in the design and construction of the Subject Schools was "a proximate cause of the actual damages suffered by BISD . . . not to exceed . . . $28,000,000.00 plus attorney's fees." [¶ 9.7 of BISD's Original Third-Party Petition in Cause No. 2003-08-4078-E]

If you disagree with any statement [(i) - (x)], please identify all facts and evidence (including documents and witnesses) that you claim controverts or refutes such statement.

**RESPONSE**  BISD objects to subparts [(i)-(x)] of this interrogatory because they, in whole or in part, require the testimony of experts. Expert reports are not due at this time. BISD will produce its expert reports in accordance with the Federal Rules of Civil Procedure and the Orders of the court in this case. Additionally, pursuant to FRCP 33(d), information responsive to this request can be derived or ascertained from Defendant's business records, which are available for inspection and copying at the offices of Defendant's attorneys.

8.    Interrogatory No. 19 quotes contentions made *by BISD* in another lawsuit in which BISD has made claims against architects and construction contractors for the same damage made the basis of BISD's claims against Royal.  With this interrogatory, Royal asks whether BISD's position in this lawsuit is the same as BISD's position in the Cameron County lawsuit involving the contractors who worked at Aiken and Besteiro. Just as BISD's objections and response to Interrogatory No. 3 are baseless and inappropriate under the Federal Rules, so too are the objections and response made by BISD in response to Interrogatory No. 19.  If BISD intends, in the two lawsuits, to take conflicting positions as to the cause of the mold and water damage at the schools, BISD said so state, and then be prepared to explain to Royal and a jury why it has done so.

9.      In light of well-settled Texas law that it is *the insured* who carries the initial burden "to plead and prove that the benefits sought are covered by the insurance policy at issue,"[3] the Court should order BISD to provide complete and sworn responses to all of Royal's interrogatories, including Interrogatory Nos. 3 and 19.  Any contentions and evidence not disclosed by BISD to Royal should be precluded from being adduced at trial or otherwise.

### III.    REQUEST FOR ADMISSIONS

10.     In response to very specific Request for Admissions aimed at discovering whether the parties' differ with respect to the cause and timing of the mold and other claimed damage, BISD refuses to take any positions, despite the expert deadline having passed.  Examples include BISD's refusal to unequivocally admit or deny the following, among dozens of others:

1.      Admit that Aiken and Besteiro have been contaminated with pollution, various molds, mold spores, mildew, bacteria, fungus and other toxic materials due to the negligent construction, supervision, design, selection, repair, inspection, and installation of the schools' condensate drain systems, HVAC systems, roof systems, building envelope systems, drain site systems, and plumbing systems.

2.      Admit that Aiken and Besteiro have not been contaminated with pollution, various molds, mold spores, mildew, bacteria, fungus and other toxic materials due to the negligent construction, supervision, design, selection, repair, inspection, and installation of the schools' condensate drain systems, HVAC systems, roof systems, building envelope systems, drain site systems, and plumbing systems.

5.      Admit that the defective design and construction of Aiken and Besteiro is the legal cause of water damage and contamination of Besteiro and Aiken by various molds, microbes, and fungi.

11.     Admit that, as a result of contractors failing to adequately and responsibly construct, supervise, inspect, design, and install the schools' condensate drain systems, HVAC systems, roof systems, building envelope systems, drain site systems, and plumbing systems, the claimed damages to BISD's property resulted.

25.     Admit that at least some of the damage at Aiken that is made the subject of BISD's Subject Claim was caused by or resulted from corrosion, fungus, decay, or deterioration.

33.     Admit that at least some of the damage at Aiken that is made the subject of BISD's Subject Claim was caused by or resulted from faulty, inadequate or defective design, specifications, workmanship, repair, or construction of the school.

---

[3]  *Fiess v. State Farm Lloyds*, 2003 WL 21659408, (S.D. Tex. June 4, 2003) (citing *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 260 F.3d 455, 471 (5th Cir. 2001)) (additional citations omitted).

11.     Royal is entitled to know what BISD contends in <u>this</u> lawsuit as to, among other things, the cause and timing of the alleged mold and water damage. In its March 18, 2004, Response, BISD states that it "has in good faith responded to all of [Royal's] requests for admission with the information available." (*See* BISD Response, ¶ 5). BISD refuses to admit or deny those requests pertaining to the cause and timing of the claimed loss and damages. The Court should order BISD to supplement all its responses so that Royal can determine what exactly BISD is contending in this lawsuit. Like with Defendant's interrogatory responses, if BISD's position truly is that it does not know the answer to the timing and causation questions, and thus cannot admit or deny the requests for admissions, then the Court should preclude BISD from offering any evidence contrary to this position. That is, BISD should not be permitted to later come forward with any evidence as to the cause and timing of the claimed loss or alleged damages.

## IV.     ROYAL'S REQUESTS FOR PRODUCTION

12.     In response to Royal's Motion to Compel, BISD makes numerous misstatements and fails to address the substance of any of the issues raised in Royal's Motion. BISD baldly asserts that Royal misrepresented facts to the Court. The allegations are void of any factual support – or truth. During a visit to Mr. Ramon Garcia's Edinburg office on February 12, 2004, Royal's counsel, Stephen Wedemeyer, inspected all documents made available to him by BISD. (*See* **Exh. K**, Affidavit of Stephen Wedemeyer, at ¶4.) The only documents made available to Mr. Wedemeyer by Mr. Baltazar Salazar and Mr. Garcia's legal assistant were documents stored in or on top of two file cabinets. (*Id.*) Mr. Wedemeyer reviewed <u>all</u> such documents. (*Id.*) Contrary to BISD's suggestion to the Court, no one told Mr. Wedemeyer that additional responsive documents existed or could be made available by BISD, other than oversized blueprint drawings located in Mr. Salazar's Houston office. (*Id.*)

13.     Most of the materials made available for inspection by BISD on February 12, 2004, were documents previously provided to Royal in hard copies or on CD-ROMS before the instant action was filed in June 2003. (*Id.* at ¶5.)  Some new materials were provided, including 220 deposition exhibits from depositions taken in a state court lawsuit (*Castillo v. Carroll Dusang*) to which BISD is a party and that involves the Aiken and Besteiro schools. (*Id.* at ¶5.)  The depositions from such lawsuit, however, were not provided. (*Id.*)

14.     During Mr. Wedemeyer's inspection, he selected for copying all the documents made available that had not been previously produced to Royal before or during this lawsuit. (*Id.* at ¶6.)  Many of the documents made available to Royal's counsel on February 12, 2004, were documents created *long after* February 2003. (*Id.*)  BISD erroneously suggests to the Court that "most, if not all, of the documents which Plaintiff has requested have been available to Royal since February 2003."  First, regardless of when created, many documents requested by Royal have still not been produced.  Second, some, but certainly not all, documents requested have not been available to Royal since February 2003.  Some of the historical records relating to the construction of the schools and the long-term problems with leaking roofs and poor indoor air quality (high humidity and mold) were provided to Royal between January 2003 and April 2003, but the repairs and remediation of the school were not completed until at least February 2004.  Indeed, the bids were not received until approximately June 2003 and the actual repair/remediation work is not believed to have begun until the Fall of 2003.  Two of the categories of documents that Royal has vigorously pursued are documents that depict what repairs have been made, and how much was paid for such repairs.  Obviously, many of the requested materials were created long after February 2003 and *could not* have been provided to Royal a year ago, as BISD suggests.  Examples include: (1) the May 9, 2003 Project Manual for the "Remediation and TDLR Modifications" at Aiken and Besteiro; (2) various

addenda to the May 9, 2003 project manual, including addenda dated May 16, 2003, May 23, 2003, and August 22, 2003; (3) documents pertaining to BISD's borrowing money in or around September 2003; and (4) accounting ledgers (reports) generated by BISD in December 2003. (*Id.*)

15.    In its written discovery responses and initial disclosures, BISD indicated that certain documents would be made available for inspection by Royal at the law offices of Ramon Garcia. (*See Id.;* **Exh. B** [Request for Production Nos. 31, 33 34, 35, 37, 39], and **Exh. L** [BISD's Initial Disclosures]).   When Mr. Wedemeyer inspected BISD's production on February 12, 2004, many of these documents were not produced, despite promises by BISD, including without limitation: (i) depositions of BISD employees and/or experts taken in the *BISD v. Carroll Dusang* lawsuit or *the Castillo v. Carroll Dusang* lawsuit [Exh. B, Nos. 34, 35]; (ii) BISD's interrogatory responses in the *Castillo v. Carroll Dusang* lawsuit [Exh. B, No. 37]; (iii) BISD's interrogatory responses in the *American Standard v. BISD* lawsuit [Exh. B, No. 39]; (iv) the CIGNA policy issued to BISD [**Exh. L**, BISD's Initial Disclosures, at p. 8], and (v) all proofs of loss and notices of loss provided to CIGNA by BISD. [Exh. B, 1st RFP Nos. 31, 33]. (*See* **Exh. K** at ¶7.)

16.    On March 23, 2004, BISD hand-delivered an additional box of documents to Royal that BISD claims supports its damages claim. (*Id.* at ¶8.)  Included in the supplemental production are three white, three-ringed notebooks containing documents. (*Id.*)  These notebooks were not made available to Mr. Wedemeyer in Edinburg on February 12, 2004, nor were they "overlooked" by counsel during his document inspection. (*Id.*)  Indeed, some of the documents in the notebooks appear, on their face, to have been created *on or after* the date of the inspection, February 12, 2004. (*Id.*)  Examples include meeting notes from BISD's February 12, 2004 construction meeting with the architect and other contractors involved with the then-ongoing school renovations.

17.     BISD's abuse of the discovery process is typified by its responses to Royal's First Request for Production No. 9 and Second Request for Production No. 1. First Request No. 9 asks that BISD produce any documents that supports any contention by BISD that Cavazos Insurance is or was Royal's agent in connection with any of the Royal policies or the subject insurance claim. In its response to the Request No. 9 (Exh. B), BISD states that responsive documents will be made available for inspection at counsel's office.  BISD then goes on to list numerous categories of documents, most or all of which are blatantly unrelated to the discovery request relating to Cavazos Insurance, including BISD loan documents, BISD accounting records, EFI's engineering report to BISD, and two CD-ROMs containing approximately 20,000 pages of documents. (Exh. B). If ever there was an attempt to hide the ball, this response is it. Unless BISD identifies specific documents upon which it intends to rely, BISD should be precluded from offering any documentary "proof" of any purported agency relationship.

18.     With its Second Request for Production No. 1 to BISD, Royal requested a single specific document referenced in BISD's counterclaim, as follows: "In ¶ 42 of BISD's Original Answer and Original Counterclaim, BISD alleges that it is entitled to 'exemplary, punitive and multiple damages' because Royal has engaged in 'securing execution of a document by deception'. Please produce the document that BISD alleges was secured by deception." In response to this precise request, BISD, again, essentially directed Royal to BISD's entire production, including the two CD-ROMs containing approximately 20,000 pages of documents. (Exh. B) BISD's response is abusive and should not be tolerated. Unless BISD identifies a specific document that it claims was "secured by deception," BISD should be precluded from offering any documentary "proof" in support of any such claim.

19.    In its First Request for Production No. 71 to BISD, Royal requested the production of any settlement agreements, compromises, indemnity agreements, releases or any similar agreement between BISD and any other person or entity that relates to (1) water damage, mold or other fungal contamination at, or the construction or maintenance of one or more of the Subject Schools since 1994, or (2) the events and issues giving rise to this lawsuit and/or the Subject Claim. Although BISD responded that no such documents exist (Exh. B), BISD has indicated in response to interrogatories in a related state-court lawsuit (**Exh. M**) that BISD was paid $170,000 by RBM Engineering, the entity that apparently designed the HVAC system in one or both of the subject schools. BISD should be ordered to supplement its production immediately.

20.    In paragraph 4 of its Response, BISD represents to the Court that it has "made a complete disclosure in good faith of all the documents requested for production by Plaintiff." In light of this representation, the Court should order, and BISD should not object to an order, that BISD produce all responsive documents to Royal's outstanding discovery requests within fourteen (14) days, and order that BISD will not be permitted to offer any documentary evidence that is responsive to Royal's discovery but not produced by the end of the fourteen (14) day period.

## V.  CONCLUSION

21.    For all the reasons provided herein and in Royal's Motion, Plaintiff Royal Surplus Lines Insurance Company asks that the Court overrule all of BISD's objections to Royal's six separate sets of written discovery (which are all "stock" objections) and order BISD to, within fourteen (14) days, (1) provide clear, complete, and sworn discovery responses, and (2) produce all responsive documents to Royal's six separate sets of written discovery.

22.    Royal also asks that the Court preclude BISD from offering or adducing any contention, issue or evidence in support thereof that BISD has not fully and completely responded to a written discovery request thereon.

Respectfully submitted,

_____  x *By permission*
Jay W. Brown
State Bar No. 03138830
SDT No. 1314
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile:  (713) 960-1527

**ATTORNEY-IN-CHARGE FOR PLAINTIFF
ROYAL SURPLUS LINES INSURANCE
COMPANY**

**OF COUNSEL:**

BEIRNE, MAYNARD & PARSONS, L.L.P.
Stephen R. Wedemeyer
State Bar No. 00794832
S.D.T. No. 19797
John V. Trevino, Jr.
State Bar No. 24003082
S.D.T. No. 23860
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile:  (713) 960-1527

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record on March 29, 2004.

Baltazar Salazar                                                             *Via CM/RRR*
1612 Winbern
Houston, Texas 77004

Craig S. Smith                                                              *Via CM, RRR*
LAW OFFICE OF CRAIG S. SMITH
14493 S.P.I.D., Suite A, P.M.B. 240
Corpus Christi, Texas  78418

Ramon Garcia                                                              *Via CM, RRR*
LAW OFFICE RAMON GARCIA, P.C.
222 W. University
Edinburg, Texas 78539

*Attorneys for Defendant BISD*

_____
Jay W. Brown

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **ROYAL SURPLUS LINES**<br>**INSURANCE COMPANY,** | § <br> § <br> § | |
| **Plaintiff,** | § <br> § | |
| **vs.** | § <br> § | **CIVIL ACTION NO. B-03-109**<br>**JURY DEMANDED** |
| **BROWNSVILLE INDEPENDENT**<br>**SCHOOL DISTRICT,** | § <br> § <br> § | |
| **Defendant.** | § | |

### AFFIDAVIT OF STEPHEN R. WEDEMEYER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day, personally appeared Stephen R. Wedemeyer, who, being duly sworn upon his oath according to law, did depose and state the following:

1.    My name is Stephen R. Wedemeyer. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. As one of the attorneys representing Plaintiff Royal Surplus Lines Insurance Company ("Royal") in the above-styled lawsuit, I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

2.    I am with the law firm of Beirne, Maynard & Parsons L.L.P., which represents Royal in the captioned cause.

3.    After making several requests to inspect BISD's business records that BISD offered to make available for inspection and copying, BISD permitted Royal to inspect documents in the Edinburgh office of one of BISD's attorneys, Mr. Ramon Garcia, on February 12, 2004.

4.    During my visit to Mr. Ramon Garcia's Edinburg office on February 12, 2004, I inspected all documents made available to me by Mr. Baltazar Salazar and Mr. Garcia's legal

#503855.1



EXHIBIT _K_

assistant. The only documents made available to me were documents stored in or on top of two file cabinets. I reviewed <u>all</u> such documents. No one told me that additional responsive documents existed or could be made available by BISD upon request by Royal, other than oversized blueprint drawings located in Mr. Salazar's Houston office.

5.    Most of the materials made available for inspection by BISD on February 12, 2004, were documents previously provided to Royal in hard copies or on CD-ROMS before the instant action was filed in June 2003. Some new materials were provided, including 220 deposition exhibits from depositions taken in a state court lawsuit (*Castillo v. Carroll Dusang*) to which BISD is a party and that involves the Aiken and Besteiro schools. The depositions from such lawsuit, however, were not provided.

6.    During my inspection, I selected for copying all the documents made available that had not been previously produced to Royal before or during this lawsuit. These documents included documents created long after February 2003. *The documents made available on February 12, 2004, included documents that were created after BISD produced documents to Royal on CD-ROM in April 2003, but before BISD served its discovery responses on Royal in January 2004.* Examples include: (1) the May 9, 2003 Project Manual for the "Remediation and TDLR Modifications" at Aiken and Besteiro; (2) various addenda to the May 9, 2003 project manual, including addenda dated May 16, 2003, May 23, 2003, and August 22, 2003; (3) documents pertaining to BISD's borrowing money in or around September 2003; and (4) accounting ledgers (reports) generated by BISD on December 2, 2003 (according to the date on the ledgers).

7.    In its written discovery responses and initial disclosures, BISD indicated that certain documents would be made available for inspection by Royal at the law offices of Ramon Garcia. When I inspected BISD's production on February 12, 2004, many of these documents were not produced as promised by BISD, including without limitation: (i) depositions of BISD employees and/or experts taken in the *BISD v. Carroll Dusang* lawsuit or *the Castillo v. Carroll Dusang* lawsuit; (ii) BISD's interrogatory responses in the *Castillo v. Carroll Dusang* lawsuit; (iii) BISD's interrogatory responses in the *American Standard v. BISD* lawsuit; (iv) the CIGNA policy issued to BISD, and (v) all proofs of loss and notices of provided to CIGNA by BISD pertaining to the two schools.

8.    On March 23, 2004, BISD hand-delivered an additional box of documents to Royal that BISD claims supports its damages claim. Included in the supplemental production are three white, three-ringed notebooks containing documents. These notebooks were not made available to me in Edinburg on February 12, 2004, nor were they "overlooked" by counsel during my document inspection. Indeed, some of the documents in the notebook appear, on their face, to have been created on or after February 12, 2004. Examples

include meeting notes from BISD's February 12, 2004 construction meeting with the architect and other contractors involved with the then-ongoing school renovations."

FURTHER AFFIANT SAYETH NOT.

_____
STEPHEN R. WEDEMEYER

SWORN TO AND SUBSCRIBED this 29th day of March, 2004.

_____
NOTARY PUBLIC IN AND
FOR THE STATE OF TEXAS

**CANDY CAMBRON**
Notary Public, State of Texas
My Commission Expires 04-30-2005

**IN THE UNITED STATES DISTRSTICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
<u>BROWNSVILLE DIVISION</u>**

| | | |
|---|---|---|
| ROYAL SURPLUS LINES | § | |
| INSURANCE COMPANY, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-109 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
|     Defendant | § | |

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S INITIAL
DISCLOSURES PURSUANT TO FEDERAL
<u>RULES OF CIVIL PROCEDURE 26(a)(1)</u>**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

      Defendant, Brownsville Independent School District, files this their initial disclosures

pursuant to Federal Rules Civil Procedure 26(a)(1) as follows:

**(A)    The name and, if known, the address and telephone number of each individual likely to
have discoverable information that the disclosing party may use to support its claims or
defenses, unless solely for impeaching, identifying the subjects of information:**

        Raul Vasquez
        Brownsville Independent School
        Mr. Vasquez is a BISD facilities/maintenance employee. He was the former Besteiro
        principal. He has knowledge about the condition of the school, complaints regarding
        same, maintenance of the school and related issues.

        Oscar Tapia
        Brownsville Independent School
        Mr. Tapia is the BISD facilities/maintenance administrator. He has knowledge about
        the condition of the schools, complaints regarding same, maintenance of the school
        and related issues.

        Fred Anthony Fuller
        Brownsville Independent School
        Mr. Fuller is a BISD employee. He has knowledge about the claimed damages and
        related issues.



**EXHIBIT _____L_____**

Mr. Hector Gonzalez
Brownsville Independent School
Mr. Fuller is a BISD employee. He has knowledge about the claimed damages and
related issues.

Sam Garcia
Brownsville Independent School
Mr. Garcia is a BISD employee. He is the principal of Aiken. He has knowledge
about the condition of the school, complaints regarding same, maintenance of the
school and related issues.

Steve Vera
Brownsville Independent School
Mr. Vera is a BISD employee. He is an AC/EMS programmer. He has knowledge
about energy management, heating, cooling and humidity problems at the schools and
related issues.

Jaime Condit, AIA
Brownsville Independent School
Mr. Condit is the BISD construction manager for Aiken.

Reynaldo Castillo
Brownsville Independent School
Mr. Castillo is BISD head custodian. He has knowledge about the condition of the
school, maintenance of the school and related issues.

Satterfield and Pontikes
Houston, Texas 77002
They remediated both Aiken & Besteiro schools.

Kenny Robertson
Brownsville Independent School
Mr. Robertson is a BISD maintenance foreman.

Gabriel Delgado
Brownsville Independent School
Mr. Delgado is a BISD maintenance employee.

Gabriel Alberta
Brownsville Independent School
Mr. Alberta is a BISD maintenance employee.

Conrad Ingle
Brownsville Independent School
Mr. Ingle is a BISD maintenance employee.

J. P. Villarreal
Brownsville Independent School
Mr. Villarreal is a BISD energy manager

Marilyn Del Bosque
Brownsville Independent School
Ms. Bosque is a BISD energy manager

E. Garcia
Brownsville Independent School
Ms. Garcia is a BISD teacher and mother of Gerardo Garcia.

Aracely Alvarado
Brownsville Independent School
Mr. Alvarado is a BISD employee.

N. Lopez
Ms. Barge
Brownsville Independent School
Ms. Barge is a BISD teacher

Rick Anderson, P.C., CIAPQ
Lee A. Burckle, P.E.
Engineering and Fire Investigations
9700 Richmond, Suite 201
Houston, Texas 77042
866-464-2127
Conducted an investigation of the two schools. Plaintiff has a copy of their report.

Perry Gonzales
J. Crespo
Jerry Arellano
Ambiotec Environmental Consultants, Inc.
1101 East Harrison Avenue
Harlingen, Texas 78550
956-423-7807
Provided technical assistance in the evaluation of potential mold contamination at the two schools. Plaintiff has a copy of Ambiotec's May 2002 report.

3

Frank Gamez
Josh Ramirez
City of Brownsville Health Department
Agency that may have investigated humidity related problems at the schools.

H. W. Holder
Nancy L. Hardy
Doug Hubbard
Bob Johnson
Assured Indoor Air Quality
750 N. St. Paul, Suite 888
6616 Forest Park Road
Dallas, Texas 75235
214-855-0222
Conducted an investigation of the two schools. Plaintiff has a copy of AIAQ's
November 2001 and January 2002 reports and other documents.

David A. Weeks, P.E., DEE, QEP
Paul Barton
Justin Deville
John Palm
Brett Tarkington
M. Wood
N. Reynolds
Bryan Bishop
Records custodian
Center for Toxicology and Environmental Health
356 Oaks Trail, Suite 105
Garland, Texas 75043
972-203-2011
Entity retained by Cigna to conduct investigation of the two schools. Plaintiff has a
copy of the report.

William A. Ashton, R. S.
Texas Department of Health
601 W. Sesame Dr.
Harlingen, Texas 78550
956-423-0130
Agency that made numerous inspections of the schools and issued various reports
relating to problems with the schools.

Richard Shimsky, P.E.
J. Neil Murphy, P.E.
Matt Dillman
Coastal Engineering, Inc.
191 North Travis
San Benito, Texas 78685
HVAC contractors

Environmental Microbiology Laboratory, Inc.
1150 Bayhill Dr., Suite 100
San Bruno, California 94066
650-829-5800
Laboratory that analyzed samples from the schools.

Aerotech Laboratories, Inc.
2020 West Lone Cactus Drive
Phoenix, Arizona 85027
602-780-4800
Laboratory that analyzed samples from the schools.

Mody K. Boatwright, P.E.
Boatwright Engineering, Inc.
629 Santa Monica
Corpus Christi, Texas 778411
Conducted an investigation of Aiken for problems

Jerry Mercer, P.E.
Rimkus Consulting Group
1431 Greenway Drive, Suite 100
Irving, Texas
972-518-0900
Investigated claim at the schools for GAB. Plaintiff has the December 2002 report to GAB.

Daniel Bridge, Ph.D., CIH
Rimkus Consulting Group
Eight Greenway Plaza, Suite 500
Houston, Texas 77046
713-621-3550
Investigated Aiken for mold and prepared a report dated **July 26, 1999**.???

Dennis Nickoloff
GAB Robins, N.A., Inc.
632 Ed Carey Dr., Suite 700
Harlingen, Texas 78550
956-423-0770
Retained by Royal to investigate/adjust claimed loss

Royal Surplus Lines Insurance Company, Plaintiff
(Including Mark Schwartz)
945 E. Paces Ferry Road, Suite 1800
Atlanta, GA 30327
Third Party Contractors, including but not limited to:
Stotler Construction Company and Loyal Stotler
Coastal Engineering, Inc. and Richard Shimsky, P.E.
Coastal Engineering Employers, Inc.
D. Wilson Construction Company, Inc., Bill Wilson and Sabio Lopez
Alamo Controls, Inc. and Robert W. Gleason, P.E.
CRC Engineering, Inc. and Charles R. Clark, P.E.
RBM Engineering, Inc. and Robert H. Beasely, P.E.
Victoria Air Conditioning, Ltd, and Bill Myrick
American Standard
The Trane Company and Stu Werner
Wrightway Construction, Inc.
Larry Wunsch & Associates, Inc.
Mijares Mora Architects
Rio Filters Supply, LLC
Tex Air Company, LLC
Mac's Installation, Inc.
Coupland-Morand Engineers
Moreco Ltd.
Newman Sports Flooring
Quality Hardwoods

Central Power & Light Company
539 North Carancahua Street
Corpus Christi, Texas 78401
4520 Spicewood Springs Road
Austin, Texas
P.O. Box 180
Tulsa, Oklahoma 74101
1 Riverside Plaza
Columbus Ohio 43217
Provided electrical power for BISD for the two schools.

6



Past and current BISD School Board members
Knowledge about the condition of the two schools, complaints regarding same and related issues.

Past and current BISD maintenance personnel
Knowledge about the condition of the two schools, complaints regarding same, maintenance of the schools, and related issues.

Past and current BISD administrators
Knowledge about the condition of the two schools, complaints regarding same, maintenance of the schools, and related issues.

Past and current students, faculty and staff at Aiken and Besteiro schools
Knowledge about the condition of the two schools, complaints regarding same, maintenance of the schools, and related issues.

**(B)** **A copy of, or a description by category and location of all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment:**

BISD may use the following categories of documents to support its claims or defenses;
- Insurance policies issued by Royal;
- Letters between Royal and BISD;
- invoices for work performed at the schools;
- Estimates for future work to be performed at the schools;
- Receipts for payment for work performed at the schools;
- Reports concerning investigations or analysis of the schools;

These documents are available for inspection at the offices of BISD's attorneys

**(C)** **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered:**

- past repair and reconstruction costs
- present repair and reconstruction costs
- future repair and reconstruction costs
- past remedial costs to clean up moisture build-up and contamination
- present remedial costs to clean up moisture build-up and contamination
- future remedial costs to clean up moisture build-up and contamination

7

- past costs to repair construction defects and compliance with ADA building codes
- present costs to repair construction defects and compliance with ADA building codes
- future costs to repair construction defects and compliance with ADA building codes
- costs to retain professional architects
- costs to retain professional engineers
- costs to retain independent contractors
- costs for past inspections for mold and humidity testing in the buildings
- costs for present inspections for mold and humidity testing in the buildings
- costs for future inspections for mold and humidity testing in the buildings
- costs of labor to properly remediate contaminated schools
- equipment replacement costs
- relocation costs for temporary facilities for both schools
- costs associated with busing students to temporary facilities
- loss of funding from the State of Texas based on loss of average daily attendance
- attorneys' fees
- treble damages under the Texas Insurance Code
- punitive/exemplary damages for beach of the duty of good faith and fair dealing
- 18% penalty under §21.55 of the Texas Insurance Code
- all applicable interest

BISD has not computed its damages at this time because they require, in whole or in part, opinions of experts. Expert reports are not due at this time. BISD will produce its expert reports in accordance with the Federal Rules of Civil Procedure and the orders of the court. However, documents supporting BISD's damages are available for inspection and copying under Fed R. P. 34.

**(D)   For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment:**

Except for the Cigna insurance policy, the insurance agreements are those issued by Royal and which are in Royal's possession. The Cigna policy is available for inspection and copying under Fed. R. P. 34.

Defendant makes these disclosures based on the information reasonably available at this time. Defendant reserves the right pursuant to FRCP 26(e) to supplement, amend or correct these disclosures.

8

Respectfully submitted:

**LAW OFFICES OF BALTZAR SALAZAR**
1612 Winbern
Houston, Texas 77004
(713) 655-1300
(281) 749-8104 (Telefax)

BY: _____
    BALTAZAR SALAZAR
    State Bar No. 00791590
    Federal Bar No.

CATHERINE W. SMITH
State Bar No. 18547080
Federal Bar No. 19360
RAMON GARCIA
State Bar No. 07641800
Federal Bar No. 3936
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 W. University Drive
Edinburg, Texas 78539
(956) 383-7441
(956) 381-0825 (Telefax)

CRAIG S. SMITH
State Bar No. 18553570
Federal Bar No. 19327
**LAW OFFICE OF CRAIG S. SMITH**
14493 S.P.I.D., Suite A, P.M.B. 240
Corpus Christi, Texas 78418
(361) 949-6906
(361) 949-0843 (Telefax)

ATTORNEYS FOR BISD

9

## CERTIFICATE OF SERVICE

I, BALTAZAR SALAZAR, hereby certify that this initial Rule 26 disclosure was served by certified mail, return receipt requested on the attorney-in-charge for Royal Surplus Lines Insurance Company on this the 16th day of January, 2004:

Mr. Jay Brown
**Beirne, Maynard & Parsons, L.L.P.**
1300 Post Oak Blvd.
Suite 2500
Houston, Texas  77056-3000

BALTAZAR SALAZAR

10

## CAUSE NO. 2003-08-4078-E

| | | |
|---|---|---|
| AMERICAN STANDARD AND THE TRANE | § | IN THE DISTRICT COURT |
| COMPANY, ET AL, | § | |
|     *Plaintiffs* | § | |
| | § | |
| VS. | § | |
| | § | 357TH JUDICIAL DISTRICT |
| BROWNSVILLE INDEPENDENT SCHOOL | § | |
| DISTRICT | § | |
|     *Defendant/Counter Plaintiff* | § | |
|     *Third Party Plaintiff* | § | |
| | § | |
| AL CARDENAS MASONRY, INC., ET AL, | § | |
|     *Third Party Defendants* | § | CAMERON COUNTY, TEXAS |

**DEFENDANT/COUNTER PLAINTIFF BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S OBJECTIONS, ANSWERS AND RESPONSES TO COUNTER DEFENDANT AMERICAN STANDARD AND THE TRANE COMPANY'S INTERROGATORIES AND REQUESTS FOR PRODUCTION**

TO:    Counter Defendant American Standard and The Trane Company, by and through its attorney of record Mr. J. K. Leonard, BALL & WEED, P.C., Trinity Plaza II, Suite 500, 745 East Mulberry, San Antonio, Texas 78212.

      COMES NOW Defendant/Counter Plaintiff Brownsville Independent School District, in the above-styled and numbered cause and submits these Objections, Answers and Responses to Counter-Defendant American Standard and The Trane Company's Interrogatories and Request for Production as propounded to it by said Defendant's attorney of record.

Respectfully submitted,

By:_____
RAMON GARCIA
State Bar No. 07641800
CATHERINE W. SMITH
State Bar No. 18547080
**LAW OFFICE OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas 78539
(956) 383-7441 and (956) 381-0825 Fax

BALTAZAR SALAZAR
State Bar No. 00791590
**LAW OFFICES OF BALTAZAR SALAZAR**
1612 Winbern
Houston, Texas 77004
(713) 655-1300
(713) 807-1930 (Fax)

EXHIBIT 



## CERTIFICATE OF SERVICE

I, CATHERINE W. SMITH, do hereby certify that on this the ____ day of November, 2003, a true and correct original of the above and foregoing Defendant/Counter Plaintiff Brownsville Independent School District's Objections, Answers and Responses to Counter Defendant American Standard and The Trane Company's Interrogatories and Requests for Production was sent by U. S. Certified Mail, Return, Receipt Requested to the following:

Mr. J. K. Leonard
Mr. William Ford
Mr. Christopher Strawn
Ms. Anna Whorton Schenecker
**BALL & WEED**
Trinity Plaza II, Suite 500
745 East Mulberry
San Antonio, Texas 78212-3191
Counsel for American Standard, Inc. and The Trane Company

and a copy to:

Mr. Baltazar Salazar
**ATTORNEY AT LAW**
1612 Winbern
Houston, Texas 77004
Counsel for BISD

Mr. Moises Hernandez
**GARCIA & HERNANDEZ, L.L.P.**
P.O. Box 5729
McAllen, Texas 78502
Counsel for Al Cardenas Masonry

Mr. Ricardo R. Reyna
Mr. Tom Mailloux
**BROCK & PERSON, P.C.**
1506 Bexar Crossing
San Antonio, Texas 78232-1587
Counsel for Alamo Controls, Inc.

Mr. Robert Guerra
Mr. Rafael Garcia
**THORNTON, SUMMERS, BIECHLIN, DUNHAM & BROWN, L.L.C.**
418 East Dove Avenue
McAllen, Texas 78503
Counsel for Alamo Controls, Inc.

2



Mr. George H. Lugrin, IV
Ms. N. Jerae Carlson
**WESTMORELAND HALL, P.C.**
Williams Tower, 64th Floor
2800 Post Oak Blvd.
Houston, Texas 77056-6125
Counsel for CRC Engineering, Inc.

Mr. David M. Driscoll
**AINSA HUTSON, L.L.P.**
5809 Acacia Circle
El Paso, Texas 79912
Counsel for Carroll Dusang & Rand, Inc.

Mr. Rollins Koppel
**ATTORNEY AT LAW**
Skaggs & Koppel Building
312 East Van Buren Avenue
P.O. Box 2878
Harlingen, Texas 78551
Counsel for Coastal Engineering Employers, Inc.

Mr. Robert F. Scheihing
Mr. R. Scott Westlund
**ADAMI, GOLDMAN & SCHUFFIELD, INC.**
9311 San Pedro, Suite 900
San Antonio, Texas 78216
Counsel for Coastal Engineering Employers, Inc.

Mr. Jose Gamez
**MEREDITH, DONNELL & ABERNATHY**
Water Tower Centre
612 Nolana, Suite 560
McAllen, Texas 78504
Counsel for Coastal Engineering and Sechrist-Hall Company

Mr. Lino Ochoa
Mr. John Griffith
**GRIFFITH, HILL & OCHOA, L.L.P.**
One Park Place
100 Savannnah, Suite 500
McAllen, Texas 78503
Counsel for D. Wilson Construction Company

Mr. Keith N. Uhles
Mr Ewing Sikes, III
**ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.**



55 Cove Circle
P.O. Box 3509
Brownsville, Texas 78523-3509
Counsel for Mac's Insulation, Inc.
Mr. William Luyties
Mr. Paul Goldberg
**LORANCE & THOMPSON**
2900 North Loop West, Suite 500
Houston, Texas 77092
Counsel for Mijares Mora Architects

Mr. Rick Fancher
Ms. Margery Huston
**BARKER, LEON, FANCHER & MATTHYS, L.L.P.**
Tower II – Suite 1200
555 North Carancahua Street
Corpus Christi, Texas 78478
Counsel for Rio Mechanical, Inc.

Mr. John E. Pipkin
**JOHNSON, FERGUSON, PIPKIN & PHILLIPS**
4900 Woodway, Suite 1100
Houston, Texas 77056
Counsel for Rio Mechanical, Inc.

Mr. Marc Young
**COKINOS, BOSIEN & YOUNG**
1500 Liberty Tower
2919 Allen Parkway
Houston, Texas 77019
Counsel for Rio Filter Supply

Mr. William A. "Rusty" Faulk, Sr.
Mr. Daniel P. Whitworth
**RENTFRO, FAULK & BLAKEMORE, L.L.P.**
185 Ruben M. Torres Boulevard
Brownsville, Texas 78520
Counsel for Roberto J. Ruiz, Architect, Inc.

Mr. David Benjamin
**O'CONNELL & BENJAMIN, L.L.P.**
153 Treeline Park, Suite 200
San Antonio, Texas 78209
Counsel for Sechrist-Hall Company

Ms. Cindy Garcia
**THE GARCIA LAW FIRM, P.C.**
201 North 1st Street
Harlingen, Texas 78550
Counsel for Stotler Construction Company

Mr. Charlie J. Cilfone
**SHELTON & VALADEZ**
600 Navarro, Suite 500
San Antonio, Texas  78205-1860
Counsel for Superheat Air Balancing Co., Inc.

Mr. Robert Martin
**MAGENHEIM, BATEMAN & HELFAND, P.L.L.C.**
3600 One Houston Center
1221 McKinney Street
Houston, Texas  77010
Counsel for Victoria Air Conditioning

Mr. Marcel Notzon, III
**ALVAREZ, NOTZON & GUTIERREZ, L.L.P.**
415 Shiloh Drive
Laredo, Texas  78045
Counsel for Wright Way Construction

Mr. Robert Skipworth
**ATTORNEY AT LAW**
310 North Mesa, Suite 600
El Paso, Texas  79901
Counsel for Zamora Engineering, Inc.



CATHERINE W. SMITH



### OBJECTIONS, ANSWERS, AND RESPONSES
### TO INTERROGATORIES AND REQUESTS FOR PRODUCTION

**INTERROGATORY NO.1:**

Describe any and all inspections of the Building and/or Product at issue in this litigation.    For each inspection, state the name, address and title of each person and/or entity making such inspection, the dates of such inspection, and the results thereof.

**ANSWER:**

Al Cardenas Masonry, Inc.
Alamo Controls, Inc.;
Carroll Dusang And Rand, Inc.;
Coastal Engineering    Employers, Inc.;
Coastal Engineering,  Inc.;
Coupland-Morand Engineers, Inc.;
Crc Engineering, Inc.;
D. Wilson Construction Company;
H. D. Grant Grant Company, Inc.;
Larry Wunsch & Associates, Inc.;
Mac's Insulation Company, Inc.;
Mijares Mora Architects, Inc;
Rio Filter And Manufacturing Supply, L.L.C.;
Rio Mechanical, Inc.;
Roberto J. Ruiz, Architect, Inc.;
Sechrist-Hall Company;
Stotler Construction Co`mpany;
Superheat Air Balancing Co. Inc.;
Victoria Air Conditioning, Inc.;
Wrightway Construction, Inc.;
Zamora Engineering, Inc.
Suntex Mechanical Contractors

The above companies inspected the facilities at varies times from 1993-to present.

Assured Indoor Air Quality, L.P.
6616 Forest Park Road
Dallas, Texas  75235

EFI Report
9700 Richmonds, Suite 201
Houston, Texas  77042

Ambiotec Environmental Consultant, Inc.
P.O. Box 2565
1101 East Harrison Avenue
Harlingen, Texas  78551

**INTERROGATORY NO. 15:**

Describe in detail any settlement, agreement, deal, or other understanding of any kind whatsoever, reached with any other person, firm, corporation, partnership, or legal entity in respect to this lawsuit, (verbal, written or otherwise) including, but not limited to "Mary Carter" Agreements. This interrogatory seeks but is not limited to information concerning agreements or understandings of any kind whatsoever, including, past, present, or future settlements, deals, agreements, or understandings.

**ANSWER:**

BISD has settled with RBM Engineering for $170,000.00 and said agreement will be forwarded as a supplemental.

BISD reserves the right to supplement.

**INTERROGATORY NO. 16:**

Please specify in detail the total amount of damages that you are seeking herein, and, in connection with same, please specify the amount sought for each element of damage which is inclusive of this total figure, as well as the amount of damages sought from each Defendant.

**ANSWER:**

Please refer to Interrogatory No. 8.

**INTERROGATORY NO. 17:**

Identify each potential party to this suit, and, if you have asserted any claims or made any demands against any person(s) and/or entity as a consequence of the incident made the subject of this lawsuit, other than the Defendants named herein, identify such persons or entities, and state the factual basis upon which you asserted a claim, the amount of damages or monetary relief you demanded as a consequence thereof.

**ANSWER:**

Al Cardenas Masonry, Inc.
Alamo Controls, Inc.;
Carroll Dusang And Rand, Inc.;
Coastal Engineering   Employers, Inc.;
Coastal Engineering,  Inc.;
Coupland-Morand Engineers, Inc.;
Crc Engineering, Inc.;
D. Wilson Construction Company;
H. D. Grant Grant Company, Inc.;
Larry Wunsch & Associates, Inc.;
Mac's Insulation Company, Inc.;
Mijares Mora Architects, Inc;
Rio Filter And Manufacturing Supply, L.L.C.;
Rio Mechanical, Inc.;
Roberto J. Ruiz, Architect, Inc.;

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS,<br>FERNANDO DE PENA,<br>VALENTIN PAZ and<br>ANDRUS & PAZ, a Partnership<br><br>vs.<br><br>BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, NOE SAUCEDA,<br>and EDDIE ERRISURIZ, JR. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | B-02-143 |

United States District Court
Southern District of Texas
FILED

MAR 3 0 2004

Michael N. Milby
Clerk of Court

DEFENDANTS' JOINT REPLY
TO PLAINTIFF'S RESPONSE TO SUPPLEMENTAL MOTION
TO STRIKE PLAINTIFF'S EXPERT TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA

and EDDIE ERRISURIZ, JR., Defendants in the above-styled and numbered cause and file and serve

their Joint Reply to Plaintiffs' Responses to Supplemental Motion to Strike Plaintiffs' Expert

Testimony be precluded from testifying at time of trial.

**I.**

Attached as Exhibit "1" to this Reply is Stephen Andrus' deposition, Volume III. The

Deposition was taken on March 10, 2004. See subpoena and notice as Exhibit "2". Plaintiff's

testimony as an expert is limited to the damages allegedly suffered by Plaintiffs, page 22, lines 9 -

23; page 25, line 19 to page 26, line 7; page 26, lines 16 to 25 of Exhibit "1", deposition of Stephen

Andrus.

Defendant refers the Court to the following testimony in support of Defendants' Supplemental Motion to Strike. In the deposition subpoena, he was asked to bring all documents which he reviewed in reaching his calculations that he gave to Dr. Horner. He brought none.

Andrus indicates that he based his opinions as to how much he would have earned from the receipts from previous years. Yet, he had no documents to support this except for a typewritten or handwritten sheet with his final calculation. See Horner's Exhibits "8" and "9", attached as Exhibit "3". He admitted that these receipts do not accurately reflect his wages, see pages 42 - 44.

Andrus Deposition, Exhibit "1" - Page 40, lines 14 to 23:

Q     No. I just – that's all I want to know is what you shared with him. I'm not asking you to interpret for me what Mr. Horner meant when he wrote this.
A     Okay. What I think you're asking for and what I shared with him was that just because this is what I received that year doesn't mean it was earned that year. Some of it was in the form of what an insurance company and the IRS would consider a loan and not earned income.

Dr. Horner then based his calculations on these inaccurate estimates provided by Andrus.

On pages 57, line 20 to page 59, line 3, he admitted that he prepared Horner No. 9 using his "best professional opinion to render his opinions that were given without reference to any accepted industry standard or doctrine.

He specifically states that he based his calculations for what the Plaintiffs would have earned during the temporary ban for the entire school year 2001-2002, without taking into account the five month period when the salesmen would have been allowed on the campuses.

Andrus Deposition, Exhibit "1" - Page 59, Line 12 to Page 60, Line 13:

Q     Are all of these figures that you've given in Horner No. 9 for a year?
A     Yes, they are.
Q     And is it specifically the year – what year?

A      It is my best professional opinion based on my experience of what I feel these producers would have done in the school year 2001/2002.

Q      Okay. Did you take into account any sales that they would have made in August, September until October when they were no longer allowed to go on to the campuses and then again in February, March, April, May when they were allowed to go back on to the campuses?

A      No.

Q      Okay. Did you take into consideration any other sales that they would have made at other locations during 2001 and 2002?

A      Yes.

Q      Where is that reflected in this document?

A      It's reflected with what I'm implying here. These individuals were working their nature markets. Their natural markets being what they wanted to do, their location of preference, which was Brownsville School District.

Q      Okay. So this only took into consideration the sales that they lost at Brownsville Independent School District; is that right?

A      Yes.

He also states that he did not take into account any sales that were made off the Brownsville Independent School District campus to employees or at other campuses.

Andrus Deposition, Exhibit "1" - Page 61, Line 1 - 9:

Q      Okay. Other than that, you don't have anything else that reflects any sales that were made once you were allowed back on the campuses or prior to the time you learned that you couldn't go on to the campuses?

A      Well, that's not what this report is about.

Q      Okay. And you don't have any other kind of documents, you didn't supply any other information to Mr. Horner regarding what those earnings were?

A      That specifically, no.

He states on page 63, that he did not take into account, or examine any of Mr. De Pena or Paz's commission statements.

Andrus Deposition, Exhibit "1" - Page 63, line 9 to 21:

Q      Did you look at Mr. De Pena's commission statement?

A      No.

| Q | Okay. And when you prepared Mr. Paz's, you didn't look at his commission statements, right? |
| A | No, but I would know exactly what his overwrites are. |
| Q | Okay. So you just looked at what their overwrites were? |
| A | Mr. Paz wasn't personally producing. |
| Q | Okay. Mr. De Pena, though, was and you didn't look at what his overwrites were? |
| A | Correct. |

He also stated that he used only three of his agents when calculating an annual amount for sales used in Horner's Exhibits "8" and "9"; yet he has dozens of people working for him and one of the agents that he used to support his calculation is a broker and not just an agent. See pages 65, 66, and 67 of Andrus' deposition, Exhibit "1". His quote of national average of $240,000 was based on no documentation to support that figure. See pages 67 and 68 of Andrus' deposition, Exhibit "1". On page 72 he again states that the 10% attrition rate he used was based solely from his experience as/was the growth rate. See pages 70, 71 and 72 of Andrus' deposition, Exhibit "1". He admitted he had a negative growth rates for the years 2002 to 2003, yet he did not take this into account.

Andrus Deposition, Exhibit "1" - Page 73, Line 22 to Page 74, Line 1:

| Q. | But you don't have any documentation to show the jury as to how you came up with the ten percent attrition rate? |
| A | No. Other than if your attrition rate goes too high, the companies don't want you. |

Specifically he admits there was no research available as to attrition rates in other companies.

Andrus Deposition, Exhibit "1" - Page 74, line 4-7:

| Q | Okay. You didn't look at any research as to what other companies had – what their attrition rates were? |
| A | There's none available. |

He also admits that he did nothing to adjust his figures when Andrus & Paz changed their ownership arrangement and disbanded Andrus & Paz. Also, he did not take into account that he had started focusing on marketing as opposed to sales in 2002-2003. See pages 75 to 76 of Andrus deposition, Exhibit "1".

Further, his calculations were based on 15 years for the lost earnings. This was unfounded and not based on any research or standard in the industry. This figure was then changed to 25 years by Dr. House with no rational given. Andrus specifically states on page 88, line 9, he has no idea what the average annuity rate would be and he states on page 88, line 20

Andrus Deposition, Exhibit "1" - Page 88, Line 20 - 25:

Q    So, for instance, the commissions that you claim that you lost during the 2001/2002 school year as a result of the incident the subject of this lawsuit, you don't have any idea how long you would have been earning commissions on those annuities?

A    Correct.

As for copies of the documents prepared after Dr. Horner's deposition he admits that these were prepared afterwards to try to justify the 10% that he had previously given to Horner. Even so, these documents are inaccurate and speculative, given that he did not take into account his negative growth rates from 2003 and that he only used one annuity company to render his opinion.

As evident from reviewing the Plaintiff's deposition, he examined solely his commissions as a means of determining what his loss profits would be for the 2002-2003 school year. He did not take into consideration the other months that the Plaintiffs were capable of selling. His figures did not take into account expenses for overhead or for any type of sales made off campuses. Further, in his deposition he admits that you cannot tell from past sales what commissions were earned in a

specific year, so how could he possibly calculate his lost profits for a five month period.

Further, he testified that he did not review commissions statement from the lost profits for Mr. Paz, Mr. De Pena or Andrus & Paz. Instead, he used his own commissions in order to make that determination. Based on this, it is clear that the calculations that he gave to Dr. Horner are based on mere speculation.

Plaintiffs in their Response rely on a case styled *Mississippi Chemical Corp. v. Dresser-Rand Company*, 287 F.3d 359, 373-74 (5th Cir. 2002).

This case was based in Mississippi. The law in Texas is clear that lost profits cannot be based on speculation or conjecture. *See Trayler Brothers, Inc. v. Garcia*, 1999 Tex. App. – LEXIS 158, Civ. App. San Antonio, 1999; *Fraud Tech, Inc. v. Choice Point, Inc.*, 102 S.W.3d 366 (Civ. App. – Ft. Worth 2003); *TEX. Instruments, Inc. v. Teletron Energy MGT, Inc.*, 877 S.W.2d 276 (Tex. 1994); *Coffel v. Stryker Corp.*, 284 F.3d 625 (5th Cir. Tex. 2002); *Burkhart Grob Luft v. E-Sys.*, 257 F.3d 461 (5th Cir. Tex. 2001). The case relied on by Plaintiff is based on Mississippi laws compared to the Texas laws that the Defendants have cited. Mr. Andrus should be struck as an expert as his testimony is based on speculation and as it is indicated by his testimony that he looked at only his commissions to determine the lost profits for his two partners and the company. Further, Andrus admitted that he had no industry standard or research to support the 10% attrition and growth rate that he cited. Dr. Horner's reliance on Mr. Andrus' lost profits, speculative growth rates, percentages, and the number of years that a client would keep an annuity as 25 versus 15 are all sheer speculation and would prejudice a jury causing the jury to give credence to this testimony as accurately reflecting damages that the Plaintiffs suffered in this case.

WHEREFORE, PREMISES CONSIDERED, Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, JR., pray that Plaintiffs' experts testimony be precluded from testifying and/or offering evidence and further all reports or other documentation prepared by Dr. Stephen M. Horner be precluded from evidence at time of trial, and for such other and further relief to which Defendant may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016
*Attorneys for Brownsville Independent School District*

By _____
**ELIZABETH G. NEALLY**
Texas Bar No. 14840400
Federal Bar No. 8044
**RICARDO MORADO**
Texas Bar No. 14417250
Federal Bar No. 1213

**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
1534 East 6th Street, Suite 200
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893
*Counsel for Defendants Noe Sauceda and Eddie Errisuriz, Jr.*

By _____
**EILEEN M. LEEDS**
State Bar No. 00791093
Federal Bar No. 16799
**CHARLES WILLETTE, JR.**
State Bar No. 21509700
Federal Bar No. 1937

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing DEFENDANTS' JOINT REPLY TO PLAINTIFFS' RESPONSE TO SUPPLEMENTAL MOTION TO STRIKE PLAINTIFFS' EXPERT TESTIMONY has been served on counsel of record as follows:

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

on this 30th day of March, 2004.

Elizabeth G. Neally    *R. Morado*

# EXHIBIT "1"

Deposition of Stephen M. Andrus
March 10, 2004

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
                            )(
VS.                         )(  B-02-143
                            )(
BROWNSVILLE INDEPENDENT     )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
ERRISURIZ, JR.              )(

---

ORAL DEPOSITION OF
STEPHEN M. ANDRUS
MARCH 10, 2004
Volume 3

---

ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced

as a witness at the instance of the DEFENDANT, taken in

the above styled and numbered cause on MARCH 10, 2004,

from 9:40 a.m. to 11:46 a.m. and 1:17 p.m. to 3:16

p.m., before LOU ZUNIGA, Certified Court Reporter

No. 2198, in and for the State of Texas, at the offices

of J. Arnold Aguilar, 1200 Central Boulevard, Suite

H-2, Brownsville, Texas, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**2**

APPEARANCES

FOR THE PLAINTIFFS:

J. ARNOLD AGUILAR
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

ELIZABETH G. NEALLY
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

EILEEN LEEDS
WILLETTE & GUERRA
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78520

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**3**

INDEX

                                                  PAGE

Appearances .................................  2

STEPHEN M. ANDRUS
Examination by Ms. Neally ......................  4
Examination by Ms. Leeds ..................... 104
Examination by Ms. Neally .................... 155

Changes and Signature Page ..................... 166

Reporter's Certificate .......................... 168

Attached to the end of the transcript:  Stipulations


EXHIBITS
                                                  PAGE
NUMBER  DESCRIPTION                              IDEN.

11    Handwritten documentation              5
      (11A)  Attrition rate
      (11B)  Growth rate projections
      (11C)  New sales schedule
      (11D)  1099 Income, 1998 through 2002
      (11E)  Income received, 2000 through 2002

12    Affidavit with handwritten notes      5

13    Exhibit A of Subpoena Duces Tecum      5

14    1998 through 2002 Income tax returns   6

15    List of Vendors                       26

16    Losses for Fernando De Pena           62

17    Resume                               165

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**4**

1              STEPHEN M. ANDRUS,
2      having been duly sworn, testified as follows:
3                  EXAMINATION
4      BY MS. NEALLY:
00:00 5      Q.  Could you please state your full name for the
00:00 6  record?
00:00 7      A.  Stephen Matthew Andrus.
00:00 8      Q.  Mr. Andrus, you understand that you're here
00:00 9  today because your attorney has designated you as an
00:00 10  expert in this case now?
00:00 11      A.  Yes.
00:00 12      Q.  Okay.  I'll try not to be redundant to prior
00:00 13  questions that have been asked.  We did serve a
00:00 14  subpoena on you with the deposition notice.  Do you
00:00 15  have any documents responsive to the deposition notice
00:00 16  -- I mean to the subpoena?
00:00 17          MR. AGUILAR:  The only thing I could think
00:00 18  of that you don't already have looking at your -- if I
00:00 19  may?
00:00 20          MS. NEALLY:  Yes.
00:00 21          MR. AGUILAR:  -- looking at your -- that
00:00 22  you don't already have was some of these notes, these
00:00 23  little notes.
00:00 24          MS. NEALLY:  Okay.  Let's mark these as
00:00 25  Exhibit 1 and then the affidavit -- I'm sorry, Exhibit

HILL & ROMERO
CERTIFIED COURT REPORTERS

5

00:00 1  11, we'll mark these three pages of notes. And then
00:00 2  Exhibit 12 is a copy of your affidavit along with some
00:00 3  handwritten notes on it. Do you have a copy of the --
00:01 4  I should have put that subpoena in there, too.
00:01 5          MR. AGUILAR: I have the duces tecum
00:01 6  notice. Is that what you're talking about?
00:01 7          MS. NEALLY: Yeah, the duces tecum.
00:01 8          (Exhibit Nos. 11 - 13 marked).
00:01 9      Q. Okay. So as far as, "Any and all documents
00:01 10 that you received, reviewed, created including notes
00:01 11 and computer-generated files and calculations in
00:01 12 reaching the conclusions that you provided to Dr.
00:01 13 Stephen M. Horner in this lawsuit" and "Any and all
00:01 14 documents that you intend to rely on or will review
00:01 15 prior to rendering any opinion concerning your damages
00:01 16 or the damages for other plaintiffs in this case in the
00:01 17 trial of this cause" or "Any and all documents which
00:01 18 establish that you are qualified to act as an expert to
00:01 19 render opinions reached in Dr. Stephen M. Horner's
00:01 20 report in this case," these documents that we
00:01 21 previously have been supplied in response to discovery
00:02 22 as well as Exhibits 11 and 12 encompass all the
00:02 23 documents that you have; is that correct?
00:02 24     A. I believe so.
00:02 25     Q. Okay. Before we move on to these, let me ask a

HILL & ROMERO
CERTIFIED COURT REPORTERS

6

00:02 1  few questions -- a few more questions. You have
00:02 2  provided us with a copy of your 2002 income tax return;
00:02 3  is that right? Or 2001?
00:02 4      A. I believe have my 2002 as well.
00:02 5      Q. Yeah. So we have copies of your 2001, 2002,
00:02 6  2000, '99 and '98 income tax returns; is that correct?
00:02 7      A. I'm not sure how far back but I did provide, I
00:02 8  believe, whatever you asked for.
00:02 9      Q. Okay. Let me ask you to take a look at -- go
00:02 10 ahead and take a look at '98 -- I'm sorry, '99. Is
00:02 11 that your income tax return, your signature on the
00:03 12 bottom of it? Here's '98. Let's start with '98.
00:03 13     A. This one here is '99 and that is my signature.
00:03 14 This is '98 and that is my signature as well. And on
00:03 15 the 2000 return that's my signature also. And for
00:03 16 2001, that's my signature as well.
00:04 17     Q. Let me show you what was provided as 2002.
00:04 18     A. Is this a different 2002 or haven't we looked
00:04 19 at that?
00:04 20     Q. No.
00:04 21     A. That is 2002 and that's my signature.
00:04 22         MS. NEALLY: Let's mark -- 1998 through
00:04 23 2002, let's mark those as Exhibit 14.
00:04 24         (Exhibit No. 14 marked).
00:04 25         MS. NEALLY: I'm going to mark them all

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

00:04 1  together.
00:04 2          MS. LEEDS: Oh, okay.
00:05 3          MS. NEALLY: Is this your only copy of
00:05 4  them?
00:05 5          MS. LEEDS: Yes.
00:05 6      Q. Okay. You're still a partner with the Texas --
00:05 7  I mean, Texas --
00:05 8          MS. NEALLY: What is it called?
00:05 9          MS. LEEDS: Teachers' Agency.
00:05 10     Q. -- The Teachers' Agency?
00:05 11     A. The Teachers' Agency, Inc. now and, yes, I am
00:05 12 one of the owners.
00:05 13     Q. Okay. And your partners remain Mr. Chavez, Mr.
00:05 14 Paz and Mr. De Pena?
00:05 15     A. We have added another partner recently.
00:05 16     Q. Okay. What's his name?
00:05 17     A. His name is Shaun Osborn.
00:05 18     Q. And when was he added?
00:05 19     A. First of March.
00:05 20     Q. Is he exclusively an insurance agent with The
00:05 21 Teachers' Agency or does he have another job?
00:05 22     A. He's a Teachers' Agency owner. That's what he
00:05 23 does.
00:05 24     Q. Okay. Does he have a specialty?
00:05 25     A. His specialty is cafeteria plans.

HILL & ROMERO
CERTIFIED COURT REPORTERS

8

00:05 1      Q. Okay. Did he used to work with Mr. Chavez?
00:06 2  No?
00:06 3      A. Not until just recently.
00:06 4      Q. Okay.
00:06 5      A. Recently meaning the last six months.
00:06 6      Q. Okay. What's the percentage of interest that
00:06 7  you-all have in the partnership now that you have
00:06 8  added --
00:06 9      A. Mine is 32.
00:06 10     Q. Okay. And the others?
00:06 11     A. Dino is 32, Shaun is 15, Valentin is 15 and
00:06 12 Fernando is six.
00:06 13     Q. I'm assuming you're in the process of preparing
00:06 14 your 2003 income tax returns?
00:06 15     A. Yes and no.
00:06 16     Q. Okay. Any idea how much money you made off of
00:07 17 The Teachers' Agency last year?
00:07 18     A. I received a salary of 14,000, which started
00:07 19 midyear, and dividends I received 20,000, and I have no
00:07 20 idea what our K-1s will reflect until we receive those
00:07 21 back from the CPA.
00:07 22     Q. Okay. How about -- any idea what your overhead
00:07 23 was for The Teachers' Agency last year?
00:07 24     A. Somewhere, including salaries, a little over
00:07 25 200,000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

9

00:07 1    Q. How many employees did you have in 2003?
00:08 2    A. It varied depending on the time of the year.
00:08 3    Q. Okay. Well, what was the variation?
00:08 4    A. Well, there was the four partners. Anywhere
00:08 5  from six to ten.
00:08 6        MR. AGUILAR: And just for the record, the
00:08 7  purpose of this deposition was because defendants
00:08 8  wanted an opportunity to be able to depose Mr. Andrus
00:08 9  on areas relating to his designation as an expert and I
00:08 10  believe we were going to be limiting it to that area.
00:08 11        MS. NEALLY: Right. And that has to do
00:08 12  with his damages and what his damages are.
00:08 13        MS. LEEDS: It also has to do with the
00:08 14  information that he gave the experts, so to the extent
00:08 15  that he has knowledge of those numbers we can inquire
00:08 16  what those are.
00:08 17        MR. AGUILAR: Okay.
00:08 18    Q. The six employees that you had you said, who
00:09 19  would those be; those would be the constant persons,
00:09 20  right? There's none part-time or none seasonal, I
00:09 21  suppose?
00:09 22    A. We really don't have any seasonal employees but
00:09 23  there's the four partners that are salaried so they're
00:09 24  considered employees. We have an office manager. We
00:09 25  have secretaries and our secretarial staff has grown.

HILL & ROMERO
CERTIFIED COURT REPORTERS

10

00:09 1    Q. Okay. How many secretaries do you have now?
00:09 2    A. Three.
00:09 3    Q. Okay. How many did you have in 2003?
00:09 4    A. At times, one; maximum, four.
00:09 5    Q. When did you have four secretaries?
00:10 6    A. Late December.
00:10 7    Q. And why did you have four in late December?
00:10 8    A. We had an additional need.
00:10 9    Q. Why did you have an additional need?
00:10 10    A. We received -- we were awarded a proposal and
00:10 11  needed to grow to fulfill the servicing requirements to
00:10 12  meet our obligations to service that group.
00:10 13    Q. Okay. And what was the group that you got the
00:10 14  proposal on?
00:10 15    A. Los Fresnos.
00:10 16    Q. The school district?
00:10 17    A. The school district.
00:10 18    Q. Okay. And was that for their cafeteria plan?
00:10 19    A. Yes.
00:10 20    Q. Okay. What company was that with?
00:10 21    A. Colonial.
00:10 22    Q. Okay. So in order to do the -- was their
00:10 23  enrollment also in December?
00:10 24    A. No. Their enrollment was -- I believe it was
00:10 25  supposed to started September 1st, but at the request

HILL & ROMERO
CERTIFIED COURT REPORTERS

11

00:11 1  of the district, it was challenging for them to prepare
00:11 2  everything, so we did a short plan year and then made
00:11 3  the permanent one effective in October, October 1, I
00:11 4  believe.
00:11 5    Q. Okay. Was this something that you actually
00:11 6  participated in or is this something that Shaun and Mr.
00:11 7  Chavez took care of?
00:11 8    A. I didn't participate in the enrollment of the
00:11 9  cafeteria plan.
00:11 10    Q. Okay. Have you had any other proposals that
00:11 11  have been awarded since your last deposition?
00:11 12    A. Yes.
00:11 13    Q. Which -- what companies?
00:11 14    A. Los Fresnos.
00:11 15    Q. The city?
00:11 16    A. No, the school district.
00:11 17    Q. And when was that?
00:11 18    A. Same time frame.
00:11 19    Q. Okay. In what capacity? Is this the same
00:11 20  cafeteria plan or something different?
00:11 21    A. No, we were awarded their 457 plan.
00:12 22    Q. What's 457?
00:12 23    A. It's a retirement -- it's an Internal Revenue
00:12 24  Code.
00:12 25    Q. Okay. How is it different from a 403(B)?

HILL & ROMERO
CERTIFIED COURT REPORTERS

12

00:12 1    A. That is a question you will need to be more
00:12 2  specific. I could go on for hours on how it's
00:12 3  different.
00:12 4    Q. Well, is it an annuity? How do you make --
00:12 5    A. Annuities can be offered in a 457, yes.
00:12 6    Q. Okay. Is 457 something that you offer to
00:12 7  people -- strike that. Do you need -- is it an
00:12 8  exclusive award, an exclusive proposal for 457?
00:12 9    A. It can be.
00:12 10    Q. And is it with Los Fresnos?
00:12 11    A. Yes.
00:12 12    Q. Okay. What other proposals have you been
00:12 13  awarded since we last deposed you?
00:13 14    A. We've been granted business but I don't believe
00:13 15  it was public entities where you have to go through the
00:13 16  RFP or the RFQ status where it was actually awarded.
00:13 17    Q. Okay.
00:13 18    A. We just went in and sold the concept to the
00:13 19  employer and they said, go ahead, you have our graces
00:13 20  to write the business.
00:13 21    Q. Okay. Name the employers that you've been able
00:13 22  to do that with.
00:13 23        MR. AGUILAR: Before you do that, let me
00:13 24  ask you, is there some proprietary protection rights
00:13 25  that either the employer or you as the company need to

HILL & ROMERO
CERTIFIED COURT REPORTERS

3

00:13 1  rely on? In other words, does the employer require
00:13 2  that in order for you to do that business that you not
00:13 3  identify them for any reason?
00:13 4          MS. LEEDS: Object to the sidebar.
00:14 5      Q. And again, please answer my question. I'm the
00:14 6  one posing the question.
00:14 7          MR. AGUILAR: Well, I don't want him to
00:14 8  violate --
00:14 9          MS. NEALLY: Well, I don't --
00:14 10         MS. LEEDS: This is a court-ordered
00:14 11 deposition.
00:14 12         MR. AGUILAR: I understand.
00:14 13         MS. LEEDS: You can instruct him not to
00:14 14 answer the question --
00:14 15         MS. NEALLY: Right.
00:14 16         MS. LEEDS: -- but you cannot give him
00:14 17 coaching.
00:14 18         MR. AGUILAR: I can't determine whether to
00:14 19 instruct him not to answer until -- unless I know that
00:14 20 particular question.
00:14 21         MS. LEEDS: Well, you can't ask him
00:14 22 questions here.
00:14 23         MR. AGUILAR: Since I can't tell at this
00:14 24 point, I'm just going to have to instruct him not to
00:14 25 answer.

HILL & ROMERO
CERTIFIED COURT REPORTERS

14

00:14 1          MS. LEEDS: Good. We'll go to the court
00:14 2  again.
00:14 3      Q. We are fully entitled to know -- we need to
00:14 4  determine your damages and your ability to write other
00:14 5  business and to have other either -- the proposals and
00:14 6  things that you're working on now are completely
00:14 7  relevant.
00:14 8          MR. AGUILAR: And you've had an
00:14 9  opportunity to ask all those questions the first and
00:14 10 second time you took his deposition.
00:14 11         MS. LEEDS: We did.
00:14 12         MR. AGUILAR: The information you're
00:14 13 objecting -- you're talking about right now, that
00:14 14 you're entitled to get into right now, has to do with
00:14 15 the basis he had for his calculations which he provided
00:14 16 to Dr. Horner. You haven't gotten into any information
00:15 17 having to do with Dr. Horner, the information you
00:15 18 provided to Dr. Horner.
00:15 19         MS. LEEDS: Yes, we have.
00:15 20         MS. NEALLY: Mr. Aguilar, I'm not going to
00:15 21 argue with you about it. You can instruct your client
00:15 22 not to answer the question but it's totally relevant.
00:15 23 And we will go back to the court and we will get this
00:15 24 addressed.
00:15 25         MS. LEEDS: We want to move along with

HILL & ROMERO
CERTIFIED COURT REPORTERS

15

00:15 1  this deposition. I don't need you to come and lecture
00:15 2  me about what questions I can ask and what questions I
00:15 3  can't ask because it is totally relevant and it's been
00:15 4  asked before and you have a duty to supplement. If
00:15 5  this gentleman is unable to go out and make other
00:15 6  business, we need to know about that. And these are
00:15 7  the exact same questions that we don't want to be
00:15 8  blind-sided about at trial. You're the one that
00:15 9  designated him as an expert and exposed him to another
00:15 10 deposition.
00:15 11         MR. AGUILAR: The reason for --
00:15 12         MS. LEEDS: Now, we'll move on to another
00:15 13 line of questions.
00:15 14         MR. AGUILAR: The reason for my comments
00:15 15 was because I was responding to comments you were
00:15 16 making. If you don't want --
00:15 17         MS. LEEDS: Object to the sidebar.
00:15 18         MR. AGUILAR: -- me to make those
00:15 19 comments, that's fine. Don't make any comments. I'll
00:15 20 instruct him not to answer that last question and we
00:15 21 can move on.
00:15 22         MS. NEALLY: Instruct him not to answer
00:15 23 and let's move on.
00:15 24         MR. AGUILAR: I already did.
00:15 25      Q. Have you written business or gotten approval

HILL & ROMERO
CERTIFIED COURT REPORTERS

16

00:16 1  from any employers who have told you that you cannot
00:16 2  disclose their names for proprietary reasons?
00:16 3      A. The duty that I have as an agency?
00:16 4          MS. LEEDS: Yes or no.
00:16 5          MR. AGUILAR: If he can answer the
00:16 6  question with a --
00:16 7          MS. LEEDS: No, he can't. It's a yes or
00:16 8  no question.
00:16 9          MR. AGUILAR: No, it's not.
00:16 10         MS. LEEDS: Yes, it is.
00:16 11         MR. AGUILAR: Go ahead and answer the way
00:16 12 you feel necessary.
00:16 13         MS. LEEDS: It's a yes or no question.
00:16 14 Because now he's going to explain a whole bunch of crap
00:16 15 that he can't say stuff. It's just have you or haven't
00:16 16 you. Have they said don't reveal them or have they
00:16 17 not?
00:16 18         MR. AGUILAR: Answer as best you can.
00:16 19         MS. LEEDS: Have they said don't reveal
00:16 20 them?
00:16 21         MR. AGUILAR: Answer as you feel is
00:16 22 necessary.
00:16 23      A. It's not my duty in the agency to go out and
00:16 24 look for business of that nature so I don't talk to
00:16 25 those employers.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**7**

00:16 1    MS. LEEDS: So the answer is no, you have
00:16 2  not been instructed not to say?
00:16 3        MR. AGUILAR: Hang on. Don't answer that
00:16 4  question. Elizabeth is asking questions. When she's
00:16 5  done, you can ask questions.
00:17 6    Q. So the answer is no, you have not spoken with
00:17 7  any employers who told you that you cannot divulge
00:17 8  their names?
00:17 9    A. That would be accurate.
00:17 10    Q. Have you been told by any of your partners that
00:17 11  you were not to answer -- disclose the names of
00:17 12  employers for whom you write business or for whose
00:17 13  employees you write business?
00:17 14    A. No.
00:17 15        MS. LEEDS: All right. Back to the old
00:17 16  question.
00:17 17        MS. NEALLY: No, we're not going to.
00:17 18  He'll just refuse to answer it and we've gotten -- he
00:17 19  shouldn't instruct his client not to answer it.
00:17 20    Q. Okay. What schools do you sell at right now?
00:17 21    A. None.
00:17 22    Q. Okay. What schools do your agents sell at
00:17 23  right now?
00:17 24    A. Brownsville, Los Fresnos, Port Isabel, Rio
00:17 25  Hondo, McAllen and probably some of the areas

HILL & ROMERO
CERTIFIED COURT REPORTERS

**18**

00:18 1  surrounding McAllen.
00:18 2    Q. And why is it you don't know which areas that
00:18 3  surround McAllen where you sell?
00:18 4    A. The agents that we have over there, it would be
00:18 5  likely for them to represent the area that they live
00:18 6  in, which wouldn't be exclusive just to McAllen, but in
00:18 7  general when you live in the Valley, McAllen is the
00:18 8  largest city so you talk about McAllen.
00:18 9    Q. How many agents do you have that work through
00:18 10  The Teachers' Agency?
00:18 11    A. I believe I answered that question at the last
00:18 12  deposition.
00:18 13    Q. Well, has it changed?
00:18 14    A. It's probably changed.
00:18 15    Q. You have more now, right?
00:18 16    A. We lose some, we gain some but we probably have
00:19 17  more.
00:19 18    Q. Okay. You lose some and you gain some and
00:19 19  that's just in the course of the business?
00:19 20    A. Yes, there are a lot of variables.
00:19 21    Q. How many agents do you have with you now?
00:19 22    A. Define with me. I think from the previous
00:19 23  depos you understand we have a wholesale and a retail.
00:19 24  Do you mean just contracted with me in any facet?
00:19 25    Q. Contracted with you in any facet.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**19**

00:20 1    A. That's hard to say and I'll tell you why. The
00:20 2  focus sometimes is picking up a broker and the business
00:20 3  may be all written through that broker where to the
00:20 4  prudent person it looks like all that business is
00:20 5  coming through one person but they may have two brokers
00:20 6  working for them, they may have ten, they may have 100.
00:20 7    Q. Okay. How many brokers do you have? You have
00:20 8  Kelly -- what's her name?
00:20 9        MS. LEEDS: Kelly Smith.
00:20 10    Q. She's a broker, right?
00:20 11    A. She is.
00:20 12    Q. Okay. Is she still with you?
00:20 13    A. Yes.
00:20 14    Q. Okay. What other brokers do you have?
00:21 15    A. Well, we have a broker out of Houston called
00:21 16  HAS.
00:21 17    Q. Okay.
00:21 18    A. And that's one that I could give you that
00:21 19  example of. I have no idea how many people they have
00:21 20  that represent them. They're a huge, huge entity.
00:21 21    Q. Okay. And how long have you had them
00:21 22  affiliated with The Teachers' Agency?
00:21 23    A. Since last summer.
00:21 24    Q. Okay. Any other brokers?
00:21 25    A. We were doing some business with an entity

HILL & ROMERO
CERTIFIED COURT REPORTERS

**20**

00:21 1  called Millin & Associates.
00:21 2    Q. Where are they out of?
00:21 3    A. San Antonio.
00:21 4    Q. Okay.
00:22 5    A. We have a relationship with an individual named
00:22 6  Joe Salazar who has a whole team of people.
00:22 7    Q. Okay. Where is he out of?
00:22 8    A. Harlingen.
00:22 9    Q. Okay. Who else?
00:22 10    A. We have Sylvia.
00:22 11    Q. Okay.
00:22 12    A. Petrarca, who you deposed.
00:22 13    Q. Does Sylvia Petrarca still work with you?
00:22 14    A. She's still contracted.
00:22 15    Q. Okay.
00:22 16    A. She will write an occasional case.
00:22 17    Q. Okay. Who else?
00:22 18    A. We have Eric Wolfe.
00:22 19    Q. How many other agents? You don't need to give
00:22 20  me their names. How many other agents do you have
00:22 21  besides the brokers that you named that are out of San
00:23 22  Antonio, Houston, Austin?
00:23 23    A. We have a pocket of a couple dozen that we
00:23 24  would consider retail agents.
00:23 25    Q. A couple dozen in the lower Rio Grande Valley?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 21

00:23 1   A. I would -- inclusive of that would be our San
00:23 2   Antonio office.
00:23 3   Q. Okay. And those are your retail agents?
00:23 4   A. Yes.
00:23 5   Q. And then you have some wholesale agents. Is
00:23 6   that the brokers?
00:23 7   A. That's the brokers.
00:23 8   Q. Okay.
00:23 9   A. And then there's a lot of names. I couldn't
00:23 10  even tell you the names of some of them.
00:23 11  Q. You mean the people that are affiliated with
00:23 12  those brokers?
00:23 13  A. That or they may be contracted to us directly.
00:23 14  Q. And why can't you tell me their names?
00:23 15  A. It's not always my job to be in contact with
00:23 16  them.
00:23 17  Q. Who do you make the money off of?
00:23 18  A. I am an employee of The Teachers' Agency as
00:23 19  well as an officer and a director, so unless an agent
00:23 20  writes --
00:23 21  Q. How much do you make in overwrites?
00:24 22  A. I don't receive an overwrite.
00:24 23  Q. At all? You just get the overwrite through the
00:24 24  company?
00:24 25  A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 22

00:24 1   Q. Okay. I asked you a little earlier about who
00:24 2   you were selling to, who -- what employers you --
00:24 3   A. Well, let me stop you there. I'm going to
00:24 4   rephrase your last question. Currently my new income
00:24 5   is derived from The Teachers' Agency. I still receive
00:24 6   commissions from business that was written in the past
00:24 7   where the structure, as we talked about in my first
00:24 8   deposition, that business still flows into me.
00:24 9   Q. Okay. What percentage of your business is
00:24 10  derived from commissions you made in the past?
00:24 11  A. I can tell you my income from 2003, a rough
00:24 12  estimate. I told you I had a salary of 14,000, I had
00:24 13  dividends of 20,000 and I had approximately 28,000 of
00:24 14  1099 income.
00:25 15  Q. Any other sources of income from 2003?
00:25 16  A. Other than passbook savings account interest,
00:25 17  that type of thing?
00:25 18  Q. Right.
00:25 19  A. I believe that's it.
00:25 20  Q. Okay. Do you have any documents with you today
00:25 21  that would prove up that you had 14,000 in salary,
00:25 22  $20,000 in dividends and 28,000 in 1099s for 2003?
00:25 23  A. That would be reflected in the company's
00:25 24  checkbook, which I don't have with me today.
00:25 25  Q. Okay. You previously indicated that when I

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 23

00:25 1   asked you earlier about what employee -- employers --
00:25 2   what employees that you were selling to, and you said
00:25 3   you don't make sales. Is that -- that's correct?
00:25 4   A. I will make an occasional sale. More and more
00:25 5   I'm stepping aside from the selling aspect as far as
00:26 6   meeting with the client, selling them a product.
00:26 7   Q. Right. And what are you devoting your time to?
00:26 8   A. Running the agency.
00:26 9   Q. Okay. And that's consistent with when you gave
00:26 10  your last deposition, is that right, even more so?
00:26 11  A. That's a fairly accurate statement.
00:26 12  Q. Okay. How about Mr. Paz, is he still teaching?
00:26 13  A. He is.
00:26 14  Q. Did you ever file a grievance with the school
00:26 15  district?
00:26 16  A. I don't believe so.
00:26 17  Q. I'm talking about BISD.
00:26 18  A. As a teacher, no, I never did.
00:26 19  Q. Or since you've been a teacher?
00:26 20  A. Well, since I've been a teacher? You mean from
00:26 21  the time I moved down here until today?
00:26 22  Q. Uh-huh.
00:27 23  MR. AGUILAR: Objection; specificity.
00:27 24  Q. Okay. Since you left teaching. You said
00:27 25  you --

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 24

00:27 1   A. Since I left teaching?
00:27 2   Q. When you were a teacher you said you didn't
00:27 3   file any. Since you left teaching you haven't filed
00:27 4   any?
00:27 5   A. Yeah. Not as an employee, I didn't. Well, I
00:27 6   grieved to the board.
00:27 7   MS. NEALLY: Objection to the
00:27 8   responsiveness of the answer.
00:27 9   MR. AGUILAR: He did answer it.
00:27 10  Q. Have you ever filed a grievance with the school
00:27 11  district? And I'm not talking about public audience.
00:27 12  I'm talking about filing a grievance with the school
00:27 13  district.
00:27 14  A. You're talking about their formal grievance
00:27 15  form, going through their procedure, no.
00:27 16  Q. Correct.
00:27 17  A. Make I take a break to get my water glass
00:27 18  filled?
00:27 19  Q. Sure.
00:27 20  (Recess).
00:28 21  Q. Okay. As I understood your attorney's
00:28 22  representations to the court, you are going to testify
00:28 23  solely about your damages and the damages to The
00:28 24  Teachers' Agency, correct?
00:28 25  A. I lost you.

HILL & ROMERO
CERTIFIED COURT REPORTERS

25

Q. My understanding of your testimony -- of your expertise range is that you are limiting your expertise to the damages that you have suffered as well as the other plaintiffs in this case?

A. What I understand we're here for today is exactly what the formal paperwork that you filed has asked me to be here for today.

MS. LEEDS: Objection; nonresponsive.

MS. NEALLY: Objection; nonresponsive.

Q. Are you planning on testifying today about the -- about losses of income of any of the other 80 -- 30 to 80 vendors who also are not allowed to go on to campuses to make sales during 2001 and 2002, the subject of this lawsuit?

A. I understand that I'm here today to respond to questions that you have concerning what information I provided to Dr. Horner.

MS. LEEDS: Objection; nonresponsive.

Q. Let me ask that question again. Do you have any opinion as to the losses of income that anyone else suffered other than the plaintiffs in this case?

A. I don't believe so.

Q. Okay. And you're not going to testify at the trial of this cause as to the losses of income of any of the other 30 to 80 vendors who were also -- had

HILL & ROMERO
CERTIFIED COURT REPORTERS

26

their letters of introduction temporarily revoked during 2001/2002, the time period, the subject of this lawsuit?

A. My intention is just to testify concerning the losses of the plaintiffs in this suit, not the additional people that represent us as a subagent or whatever in the future, that's correct.

MS. LEEDS: Objection; nonresponsive.

Q. And I'm not just limiting it to the people that work for The Teachers' Agency. I'm talking about all these other people. For instance, let me show you what we'll mark as Exhibits --

MS. NEALLY: We'll just mark it as Exhibit 15.

(Exhibit No. 15 marked).

Q. Other than the plaintiffs in this case, you don't have any opinions as to the losses of income of any of these other people or companies during that approximate five-month period when the vendors were prevented from going on to campuses to solicit sales from employees?

MS. NEALLY: Not that. Sorry.

A. Other than the people that are on this list that are plaintiffs in this lawsuit, I have no interest in representing their interest.

HILL & ROMERO
CERTIFIED COURT REPORTERS

27

Q. well, it's not an interest. You're not going to, right?

A. I don't believe so.

Q. Okay. And there are three pages to this document, so take a look at the other ones, too.

A. These two documents are carriers or companies.

Q. Correct.

A. And this is a document of individuals that sell for one or many of these companies on this document.

Q. Right.

A. Do you have a number on this one?

Q. Well, it's part of this.

A. It's part of that one, okay.

Q. And, again, my question to you is, regarding Exhibit 15, you are not going to testify in trial about the losses to any of these other companies or vendors, correct, other than the plaintiffs in this case?

A. For my lawsuit, that's correct.

Q. Okay. And you haven't done any type of calculations or review of any documents regarding what the possible damages are to the other people other than the plaintiffs in this case, correct?

A. Correct.

Q. Okay. I was handed by your attorney Exhibit 11, which is also three pages. Can you tell me what

HILL & ROMERO
CERTIFIED COURT REPORTERS

28

those documents are?

A. Are all three of these one number?

Q. One exhibit.

A. Okay. These are documents that's my writing that I used to get a basis for my calculations on growth and attrition.

Q. Are there any other documents that show your writings to determine growth and attrition that you brought with you today?

A. Yes, there is.

Q. And that would be Exhibit 12?

A. Correct.

Q. Any other documents?

A. I believe that's it.

Q. Okay. Have you had an opportunity to look at the report of Dr. Horner -- the reports of Dr. Horner?

A. Yes, I have.

Q. Okay. And do you agree with the contents of his reports, the June 30th and the September 2003?

A. Yes, I do.

Q. Is there anything in either one of the reports that you do not agree with?

A. Not that I recall.

Q. Now, have you ever read Dr. Horner's deposition? Or were you present for it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**29**

00:34 1    A. I was present during it. I don't believe I
00:34 2  thoroughly read his deposition.
00:34 3    Q. Anything during his deposition that you did not
00:34 4  agree with?
00:34 5    A. Not that I recall.
00:34 6    Q. Okay. What documents have you looked at in
00:34 7  preparation for this deposition today?
00:34 8    A. The same documents that I prepared for your
00:35 9  viewing before.
00:35 10    Q. What do you mean by that?
00:35 11    A. The documents that we turned over to you
00:35 12  before.
00:35 13    Q. Which are?
00:35 14    A. Which are a history of all of our reports.
00:35 15    Q. What do you mean a history of all reports?
00:35 16    A. The paperwork that was my own calculations of
00:35 17  my income from my income received, the log that I had
00:35 18  kept that I turned over to you.
00:35 19    Q. Okay. What's the log that you kept?
00:35 20    A. It showed where I keep track of every
00:35 21  commission check that I receive and then I had the
00:35 22  calculations where it surmises monthly, quarterly and
00:35 23  annually and shows the percentage growth.
00:35 24    Q. What does that document look like?
00:35 25    A. If I see it, I'll tell you but --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**30**

00:35 1    Q. Well, here's the --
00:35 2    A. Other than what I -- what I just described what
00:35 3  it looks like.
00:35 4    Q. Well, you said you turned it over -- this over
00:35 5  to us. Did you turn it over to us during your
00:36 6  deposition?
00:36 7    A. Well, I turned it over to my attorney.
00:36 8    Q. Okay. And what does it look like? I mean,
00:36 9  there were a lot of documents in this case.
00:36 10    A. Yes.
00:36 11    Q. What does it look like? I mean, is that
00:36 12  definitive in time to the subpoena that we requested?
00:36 13    A. It --
00:36 14    Q. And I want to make sure we're all on the same
00:36 15  field.
00:36 16    A. It has dates, check numbers and amounts on it.
00:36 17  And then it has little categories with a one, two,
00:36 18  three, four, which would be quarterly. It has months
00:36 19  on it broken down.
00:36 20    Q. Is this something you generated in a computer?
00:36 21    A. No, I generated it in a notebook by hand.
00:36 22    MR. AGUILAR: I think it's one of the
00:36 23  documents you were looking at earlier. I don't want to
00:36 24  go through your stuff, but --
00:36 25    MS. LEEDS: Well, he was supposed to

HILL & ROMERO
CERTIFIED COURT REPORTERS

**31**

00:36 1  produce everything.
00:36 2    Q. Is it these documents?
00:36 3    A. There you go.
00:36 4    Q. Okay. So this is what you're talking about,
00:36 5  this one-page document that's labeled Horner Exhibit
00:37 6  No. 8?
00:37 7    A. Yeah. Exhibit No. 8, there you go.
00:37 8    MS. NEALLY: I'll put a copy of it into
00:37 9  evidence, okay, and I'll just leave it as Horner 8.
00:37 10    Q. Okay. Any other documents that you reviewed?
00:37 11    A. Yes.
00:37 12    Q. What other documents?
00:37 13    A. My commission statements.
00:37 14    Q. Okay. Anything else?
00:38 15    A. I believe --
00:38 16    Q. And the commission statements --
00:38 17    A. I believe that was it.
00:38 18    Q. The commission statements were the notebooks
00:38 19  that were produced -- previously supplied to me; is
00:38 20  that right?
00:38 21    A. Yes.
00:38 22    Q. Did you look at any additional commission
00:38 23  statement; for instance, commission statements for 2003
00:38 24  that we have been provided with?
00:38 25    A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**32**

00:38 1    Q. Okay. You didn't look at any new documents
00:38 2  today for this deposition with the exception of -- hold
00:38 3  on. Let me rephrase that. When was Exhibit 11
00:38 4  prepared?
00:38 5    A. Give me a second to play back time in my head
00:38 6  here so I can try to calculate. November of 2003.
00:39 7    Q. November 2003, okay. How about Horner 8? When
00:38 8  was Horner 8 prepared?
00:39 9    A. Where is Horner 8? At the start of 2000 is
00:39 10  when it began.
00:39 11    Q. That's when you prepared -- started preparing
00:39 12  it?
00:38 13    A. Yes. That was the first entry in it.
00:39 14    Q. I know it's the first entry, but was this
00:39 15  prepared all in one day or did you do this in separate
00:39 16  entries?
00:39 17    A. Well, this was ongoing from 2000 through the
00:39 18  last date that you see stated on here.
00:39 19    Q. Where is the original of this document?
00:39 20    A. It's in a notebook in my office.
00:39 21    Q. Okay. And you continue to enter, for instance,
00:39 22  with 2003?
00:39 23    A. Yes, I do.
00:40 24    Q. Okay. How about Exhibit 12, when did you
00:40 25  prepare that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**33**

00:40 1  A. Sometime in November.

00:40 2  Q. Of --

00:40 3  A. Of 2003, yes. I'm sorry.

00:40 4  Q. Okay. And other than Exhibit 11 and Exhibit

00:40 5  12, in preparation for this deposition you did not look

00:40 6  at any additional documents other than those that have

00:40 7  been previously supplied to us?

00:40 8  A. That's incorrect.

00:40 9  Q. Okay. Then what other documents have you

00:40 10  looked at?

00:40 11  A. I reviewed numerous documents that I receive

00:40 12  that are trade publications, which is a constantly

00:40 13  ongoing process. And specifically my thoughts

00:40 14  naturally were involved in how it would affect some of

00:40 15  the issues at hand right now. For instance --

00:40 16  Q. I'm not asking for instance. I just want to

00:40 17  know what documents you looked at.

00:40 18  A. Okay. Trade publications.

00:40 19  Q. What trade publications? And why weren't these

00:40 20  brought today?

00:40 21  MR. AGUILAR: You don't understand what

00:40 22  he's talking about.

00:40 23  MS. NEALLY: No. I understand that he's

00:40 24  not answering my question perhaps, but I don't -- you

00:40 25  know, I've asked him -- I've asked, what documents have

HILL & ROMERO
CERTIFIED COURT REPORTERS

**34**

00:41 1  you looked at in preparation for your deposition today.

00:41 2  That's what I've asked.

00:41 3  A. It's a natural process for me to read those

00:41 4  trade publications. I didn't do it specifically to

00:41 5  prepare for today.

00:41 6  Q. Well, that's what I'm asking right now.

00:41 7  A. Okay.

00:41 8  Q. Okay. What documents have you looked at in

00:41 9  preparation for your deposition today?

00:41 10  A. Specifically for today, just what I've

00:41 11  disclosed and we have discussed.

00:41 12  Q. And there's nothing new? For instance, the

00:41 13  commissions that you earned in 2003, you didn't go back

00:41 14  and look at those?

00:41 15  A. Other than just the growth of my income or the

00:42 16  loss of my income, I do do that, yes.

00:42 17  Q. Okay.

00:42 18  MR. AGUILAR: She's only asking what you

00:42 19  reviewed to prepare for today. She didn't ask what you

00:42 20  do on a general basis.

00:42 21  Q. But going to that, you have generated new

00:42 22  documentation evidencing your income for 2003, your

00:42 23  commissions for 2003, correct?

00:42 24  A. Yes, I do keep that on a regular basis.

00:42 25  Q. For instance, this document, Horner 8, has now

HILL & ROMERO
CERTIFIED COURT REPORTERS

**35**

00:42 1  been completed to the point that it's got all of 2003

00:42 2  in it?

00:42 3  A. It would.

00:42 4  Q. And the first three months of 2004?

00:42 5  A. Probably the first month of 2004.

00:42 6  Q. Okay.

00:42 7  MS. LEEDS: What are the black marks?

00:42 8  MS. NEALLY: It's just highlighting.

00:42 9  MS. LEEDS: Do we have one that doesn't

00:42 10  have that?

00:42 11  MS. NEALLY: You can see through this one.

00:42 12  MS. LEEDS: Okay.

00:43 13  MS. NEALLY: I need it.

00:43 14  Q. Okay. Going back to Horner 8, how do we get

00:43 15  to --

00:43 16  A. Is this 8?

00:43 17  Q. This is Horner 8, actually. This is the

00:43 18  highlighted -- it's two copies of the same thing and

00:43 19  we'll keep it together so there's no question about

00:43 20  that.

00:43 21  A. So we're not on 8 anymore?

00:43 22  Q. Yeah, we're still on 8, Horner 8, okay. That's

00:43 23  this document. It's two pages because it didn't copy

00:43 24  well.

00:43 25  A. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**36**

00:43 1  Q. What did you look at to get to Figure No. 1,

00:43 2  the $6,497.86, 2000, Figure 1?

00:43 3  A. Can you point it out? I've lost you.

00:43 4  MS. LEEDS: No. 1 on Column 2000.

00:43 5  A. In 2000?

00:43 6  Q. 2000, No. 1.

00:43 7  A. Okay. 2000, No. 1 is the first quarter of

00:43 8  2000. It's a summation of the first three months of

00:43 9  the calendar year 2000.

00:44 10  Q. And what does the 6,497.86 mean? What does

00:44 11  that represent?

00:44 12  A. That's a summation of the first quarter of

00:44 13  checks that I received from my trade in the year 2000.

00:44 14  Q. Okay. So that's the total checks that were

00:44 15  written to you by the various companies that you write

00:44 16  for? Is that what you mean?

00:44 17  A. Or that I received an overwrite from.

00:44 18  MS. LEEDS: Total income from checks?

00:44 19  THE WITNESS: Yes.

00:44 20  Q. Now, is this for you personally or is this also

00:44 21  for other agents that are going to get part of the pie,

00:44 22  the agency is going to get part of the pie?

00:44 23  A. For Witache, me.

00:44 24  Q. Okay. And where's the backup for these

00:44 25  figures?

HILL & ROMERO
CERTIFIED COURT REPORTERS

37

00:45 1    A. In the commission statements.

00:45 2    Q. Okay. For instance, if I asked you right now,

00:45 3 hey, back this up for me, what do you have to do to do

00:45 4 it?

00:45 5    A. I would have to lay out all the commission

00:45 6 statements and put them in order, go through them. It

00:45 7 would be a very lengthy process.

00:45 8          (Off record.)

00:45 9    A. Or a company may be able to verify.

00:45 10         MS. NEALLY: Can we get a copy of the

00:45 11 original?

00:45 12         MR. AGUILAR: Of that?

00:45 13         MS. NEALLY: Yeah.

00:45 14         MR. AGUILAR: Do you have it?

00:45 15         MS. NEALLY: Yeah, he's got it at his

00:45 16 office. I would like a color copy of the original.

00:45 17         MR. AGUILAR: I can get you a color copy.

00:45 18         MS. NEALLY: Okay.

00:45 19         MR. AGUILAR: Let's go off the record a

00:45 20 second.

00:46 21         (Off record.)

00:46 22    Q. Okay. So for 2000, the bottom line was $4,011,

00:46 23 correct? Or -- I'm sorry, $47,011?

00:46 24    A. Right after the number four, that's correct.

00:46 25 $47,011.01.

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

00:46 1    Q. Then what does J represent?

00:46 2    A. January.

00:46 3    Q. Okay. But what -- let's see. Hold on. If I

00:46 4 add January, February and March, then I'm going to get

00:46 5 No. 1 above; is that correct?

00:46 6    A. Correct.

00:46 7    Q. Okay. And then 2001 is $72,436.44?

00:46 8    A. For an annual basis, correct.

00:46 9    Q. That's your annual income for that --

00:47 10    A. That's my annual receivable income.

00:47 11    Q. Okay. And then 2002 was $88,285.97?

00:47 12    A. Correct.

00:47 13    Q. Okay. And do you know what 2003 was?

00:47 14    A. I told you it was somewhere in the proximity of

00:47 15 28,000.

00:47 16    Q. 2003 was 28,000?

00:47 17    A. Yes.

00:47 18    Q. So when we added one, two, three and four,

00:47 19 you're going to come up with 28,000 right there?

00:47 20    A. Yes, approximately.

00:47 21    Q. Okay. And that's because you quit getting the

00:47 22 same kind of -- overwrites weren't written to you, they

00:47 23 were written to the company?

00:47 24    A. Right. And I'm not out there personally

00:47 25 producing anymore.

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

00:47 1    Q. Okay.

00:47 2    A. Much.

00:47 3    Q. Okay. The notes that are down at the bottom,

00:47 4 are those your notes or his notes?

00:47 5    A. Who is his?

00:47 6         MS. LEEDS: Horner.

00:47 7    A. Those would be Dr. Horner's notes, I believe.

00:47 8    Q. Okay. Well, it says receipts. Some on books

00:48 9 as loans, advances. What does that mean? Do you know?

00:48 10 What did you tell him about -- with regard to these

00:48 11 receipts? Is that -- hold on. Let me back up. The

00:48 12 receipts, is that what you're considering as the

00:48 13 commission statements, evidence of your income?

00:48 14    A. Yes.

00:48 15    Q. Okay. And some on books as loans, advances.

00:48 16 So with regard to these receipts, were they actual --

00:48 17 not all of them are actual receipts, some of them are

00:48 18 advances?

00:48 19    A. Are you asking me for my opinion on what I

00:48 20 think he's writing here?

00:48 21    Q. Well, I'm asking you what you told him with

00:48 22 regard to that. I'm assuming that his note is

00:48 23 something that you had told him about?

00:48 24    A. Well, I can give you my opinion on what I think

00:48 25 his note is about.

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

00:48 1         MR. AGUILAR: That would be speculation.

00:48 2    Q. What did you tell him about whether or not the

00:48 3 receipts were on the books as loans or advances?

00:49 4    A. I don't know exactly what he's writing there.

00:49 5 All I can tell you is my opinion of what I think he's

00:49 6 getting out of what I told him.

00:49 7         MS. NEALLY: Object to the responsiveness

00:49 8 of the answer.

00:49 9    Q. You can tell me what you told him as far as

00:49 10 these receipts being on the books as loans or advances,

00:49 11 can't you?

00:49 12    A. I'll tell you what I shared with him that I

00:49 13 think he's getting at here.

00:49 14    Q. No. I just -- that's all I want to know is

00:49 15 what you shared with him. I'm not asking you to

00:49 16 interpret for me what Mr. Horner meant when he wrote

00:49 17 this.

00:49 18    A. Okay. What I think you're asking for and what

00:49 19 I shared with him was that just because this is what I

00:49 20 received that year doesn't mean it was earned that

00:49 21 year. Some of it was in the form of what an insurance

00:49 22 company and the IRS would consider a loan and not

00:49 23 earned income.

00:49 24    Q. Okay. And then the next note indicates that

00:49 25 these figures -- to me indicates that these figures

HILL & ROMERO
CERTIFIED COURT REPORTERS

**41**

1 40,000 -- 47,011 in 2000, 72,000 in 2001, 88,000 in
2 2002, would not be reflective on what your 1099 would
3 be?
4    A. There's going to be a difference between this
5 and my 1099 because what I had just told you what I
6 shared with Dr. Horner that some of it is in the form
7 of a loan and not earned income.
8    Q. Okay. There's some notes in here -- for
9 instance, in 2002, April of 2002, you earned $24,357
10 and that was from some sales you made in Wyoming; is
11 that right?
12    A. Yes.
13    Q. Are you still selling in Wyoming?
14    A. Attempting to.
15    Q. Okay. And what would your earnings reflect
16 from your selling in Wyoming last year?
17    A. It would be speculation without looking at the
18 reports, but a couple of thousand.
19    Q. Okay. And then in July of 2002 it says, did
20 seminar for retiring teachers and it was split three
21 ways. Does your -- does that 17,000 accurately reflect
22 what you earned or is that something that you had to
23 split with two other people?
24    A. I had told you earlier, this is -- all these
25 numbers are checks that were written to me. This is

**42**

1 mine.
2    Q. Okay. So that's your share of that split?
3    A. Correct.
4    Q. Okay. And this is -- this Horner 8 is one of
5 the documents that you supplied to him as far as what
6 your earnings were for 2000, 2001 and 2002?
7    A. Him being Dr. Horner?
8    Q. Yes.
9    A. Yes.
10    Q. Do you have any other documents supporting how
11 you got to this $6,497 for the first quarter of 2000?
12    MR. AGUILAR: Other than what he's talked
13 about already?
14    MS. NEALLY: Right.
15    Q. Other than what you've talked about already,
16 such as tape calculations, any other handwritten notes,
17 anything like that?
18    A. Well, this is the log I use to record my
19 income. This is it.
20    Q. And you said it's kept in a notebook, correct?
21    A. Yes.
22    Q. What else is in that notebook?
23    A. I keep my checks in that notebook until I go to
24 the bank.
25    Q. Okay.

**43**

1    A. I keep a deposit slip with them and prepare it
2 as they grow until it's enough to be worth going to the
3 bank.
4    Q. Okay. Now, the other document that we have
5 marked as Horner 9 is also a document that you
6 generated; is that correct?
7    A. Correct.
8    Q. Okay. Was this typed on a computer or on a
9 typewriter?
10    A. It was probably done on a computer.
11    Q. And I'm sorry. Horner 9 is -- okay.
12    A. Do you want to ask me the question again on
13 that one? This is Horner 9?
14    Q. Right.
15    A. This was probably done on a computer.
16    Q. Okay. And do you have a copy of the computer
17 file that it was in? Did you keep a copy of it?
18    A. I kept a hard copy printed and then I provided
19 a hard copy to my attorney.
20    Q. How about on your computer, is it still on
21 there or has it been deleted?
22    A. I don't know.
23    Q. You didn't check?
24    A. I didn't check.
25    Q. Did you check on your computer at all to see if

**44**

1 you had any other documents that were reflective to the
2 subpoena?
3    A. The subpoena for today?
4    Q. Yes.
5    A. No.
6    Q. You said you prepared -- no, you didn't say.
7 You prepared this document, Horner 9, when?
8    A. It would have been sometime before my first
9 deposition. How far before then, I don't know.
10    MR. AGUILAR: It's at least November of
11 2002 because we provided it in discovery responses.
12    Q. Now that your attorney has answered for you,
13 what documents did you use in order to prepare this
14 document?
15    A. All of -- it would have consisted of numerous
16 reports out of all those commission statements. It
17 would have come from personal training, personal
18 experience and opinions of other people in the trade.
19    Q. Okay. What other people in the trade?
20    A. Managers of annuity companies, vice-presidents
21 of annuity companies.
22    Q. Can you name any of them?
23    A. Oh, I talked to Troy Stracer.
24    Q. Who is he with?
25    A. UTA. I inquired with Northern Annuity,

45

```
00:56  1   Northern Life.
00:56  2       Q. Who did you talk to there?
00:56  3       A. I don't recall. They have a couple of people
00:56  4   that I will talk to frequently.
00:56  5       Q. Okay. Who else did you talk to?
00:57  6       A. I talked to Laura Bodene.
00:57  7       Q. Who is she with?
00:57  8       A. She is with Butch Escobedo Insurance.
00:57  9       Q. Out of where?
00:57 10       A. Corpus Christi.
00:57 11       Q. Who else did you talk to?
00:57 12       A. I talked to my partners.
00:57 13       Q. The plaintiffs in this case?
00:57 14       A. Correct.
00:57 15       Q. Who else?
00:57 16       A. I have talked to Eric Wolfe.
00:57 17       Q. Who is one of your agents?
00:57 18       A. He's our director of retirement plans.
00:57 19       Q. Who else?
00:58 20       A. I talked to an individual named Bill and I
00:58 21   can't remember his last name. And he's in this
00:58 22   business and he's out of San Antonio. And it's not
00:58 23   that I don't know his last name, it's just not coming
00:58 24   to me right now.
00:58 25       Q. What agency is he with -- company is he with?
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

46

```
00:58  1       A. He's with an entity called For Texas.
00:58  2       Q. Called what?
00:58  3       A. For Texas.
00:58  4       Q. For, F-O-R, Texas?
00:58  5       A. I'm not sure. There were four individuals that
00:58  6   started the outfit, so it could be F-O-U-R, but I
00:58  7   believe it's kind of crossed over to F-O-R to mean, you
00:58  8   know, we're for Texas.
00:58  9       Q. Okay. Anything else -- anyone else that you
00:58 10   talked to?
00:58 11       A. Yes, I talked to Steve Penella.
00:59 12       Q. How do you spell his name?
00:59 13       A. If I can look on my cell phone, I could
00:59 14   probably tell you.
00:59 15       Q. Okay. We'll take a break and you can do that.
00:59 16   Who is he with?
00:59 17       A. He's with Millennium Marketing.
00:59 18       Q. Millennium?
00:59 19       A. Correct.
00:59 20       Q. Out of where?
00:59 21       A. Omaha, Nebraska.
00:59 22       Q. Who else?
00:59 23       A. Bryan Cortright.
00:59 24       Q. Can you spell his last name?
00:59 25       A. C-O-R-T-R-I-G-H-T, I believe.
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

47

```
00:59  1       Q. Out of where?
00:59  2       A. Millennium Marketing out of Omaha, Nebraska.
00:59  3       Q. Who else?
00:59  4       A. Clint Thomas.
00:59  5       Q. Who is he with?
00:59  6       A. He's with Millennium.
00:59  7       Q. Also in Omaha?
00:59  8       A. Correct.
00:59  9       Q. Who else?
00:59 10       A. An individual named Matt.
01:00 11       Q. What's his last name?
01:00 12       A. I don't know.
01:00 13       Q. Who is he with?
01:00 14       A. Millennium. I talked to various people from
01:00 15   the fast team in Minneapolis with Allianz.
01:00 16       Q. Who else?
01:00 17       A. I probably talked to somebody at a company
01:00 18   named National Health.
01:01 19       Q. Do you know the name of anyone you talked to at
01:01 20   National Health?
01:01 21       A. No. It's a company that I don't do business
01:01 22   with anymore.
01:01 23       Q. Where are they out of?
01:01 24       A. Waco.
01:01 25       Q. Okay. How about the fast team, do you know the
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

48

```
01:01  1   name of anybody you talked to with Allianz?
01:01  2       A. No.
01:01  3       Q. Anyone else?
01:01  4       A. There is a company, and I can't recall the name
01:01  5   of the company, that does research for the insurance
01:01  6   business and they cannot provide any information to me
01:01  7   without fees.
01:02  8       Q. Did they provide you any information?
01:02  9       A. No.
01:02 10       Q. Did you rely on anything they said in making
01:02 11   these calculations that you made on Horner No. 9?
01:02 12       A. No. Can I go fill my water glass again, if I
01:02 13   may?
01:02 14       Q. Sure.
01:05 15           (Recess).
01:05 16       Q. You just gave me the spelling for Steve
01:05 17   Penella, P-E-N-E-L-L-A. I would also like their phone
01:05 18   numbers. As long as you have got your cell phone out,
01:05 19   can you give me their phone numbers?
01:05 20       A. I have their cell numbers in my cell and I
01:05 21   prefer not to give you their cell numbers.
01:05 22       Q. So you're refusing not to give -- you're
01:05 23   refusing to give me their cell phone numbers?
01:05 24       A. I don't think they would appreciate it if I did
01:05 25   that so that statement is true.
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

49

01:05 1    Q.  Okay.  Any other individuals that you spoke
01:05 2  with in the preparation of Horner No. 9?
01:06 3    A.  That's all that I can recall at this time.
01:06 4    Q.  Okay.  You also -- okay.  For instance, Horner
01:06 5  No. 8, you only prepared this for yourself, right?  You
01:06 6  did not do this for Mr. Paz, Mr. De Pena, The Teachers'
01:06 7  Agency, right?  It's the commission -- the loss of --
01:06 8  your commission earnings.
01:06 9    A.  That's correct.
01:06 10    Q.  Okay.  Now, on Horner No. 9, you did prepare
01:07 11  losses for the other plaintiffs in this case, right, a
01:07 12  typewritten version of this?
01:07 13    A.  Yes, I did.
01:07 14    Q.  Okay.  And did you speak to the same people for
01:07 15  Mr. Paz, Mr. De Pena, The Teachers' Agency, when you
01:07 16  came up with what their losses were?
01:07 17    A.  Some of the content of what would have been
01:07 18  discussed with all the people that I mentioned would
01:07 19  have been to prepare all of them.  I used the same
01:07 20  process to prepare mine, just adjusted the different
01:07 21  commission levels and the different volumes that those
01:07 22  individuals did and then I threw in the factors of Mr.
01:07 23  Paz and the agency that they're not personally
01:07 24  producing so I subtracted those areas.
01:07 25    Q.  Okay.  So the answer is yes, you spoke to the

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

01:07 1  same people to generally prepare all of the losses --
01:07 2    A.  Correct.
01:07 3    Q.  -- for all of the individuals and the company?
01:07 4  You didn't speak to any additional people, correct, to
01:07 5  prepare Mr. De Pena, Mr. Paz or The Teachers' Agency?
01:08 6    A.  Not that I can recall at this time.
01:08 7    Q.  Do you have any notes from any of the
01:08 8  conversations you had with any of these individuals?
01:08 9    A.  No.
01:08 10    Q.  Okay.  Do you remember anything specific from
01:08 11  anyone that you spoke to that you put into your report?
01:08 12    A.  Yes.
01:08 13    Q.  What?
01:08 14    A.  The minimum expected growth rate.
01:08 15    Q.  Okay.
01:08 16    A.  And attrition rate.
01:08 17    Q.  What did Troy Stracer at UTA tell you was the
01:08 18  minimum expected growth rate for TPA?
01:08 19    A.  He didn't have a specific cut and dry answer
01:09 20  like that.
01:09 21    Q.  Okay.  Same thing with attrition?
01:09 22    A.  Correct.
01:09 23    Q.  Okay.  You don't remember who you spoke with at
01:09 24  North American or Northern Life & Annuity, right?
01:09 25    A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

01:09 1    Q.  Laura Bodene, who did you -- did she give you a
01:09 2  specific growth rate or attrition rate?
01:09 3    A.  Yes, she did.
01:09 4    Q.  And what did she tell you?
01:09 5    A.  She said that with her contract if the
01:09 6  attrition rate is higher than ten percent trailer
01:09 7  commissions aren't paid.  So it's rare for anyone to
01:09 8  not provide the type of service to be conducive to
01:09 9  keeping their attrition at ten percent.
01:09 10    Q.  Okay.  How about a growth rate, did she give
01:09 11  you any information regarding that?
01:10 12    A.  I don't recall.
01:10 13    Q.  And you said her contract.  You mean the
01:10 14  contract that she has with other agents or other
01:10 15  companies?
01:10 16    A.  The contract that pays her a commission.
01:10 17    Q.  With the other agents, correct?
01:10 18    A.  No, her contract through the carrier.
01:10 19    Q.  Okay.  Does yours have that same language?
01:10 20    A.  Yes, it does.
01:10 21    Q.  And your contract that -- with what carrier?
01:10 22    A.  Northern Life.
01:10 23    Q.  Any other ones?
01:10 24    A.  Not that I'm aware of.
01:10 25    Q.  Okay.  So your contract with Northern Life says

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:10 1  if you have an attrition rate over ten percent then
01:10 2  you're not going to get a rider; is that correct?
01:10 3    MS. LEEDS:  Trailer commission.
01:10 4    Q.  I mean a trailer commission.
01:10 5    A.  Can you repeat the question?
01:10 6    Q.  Your contract with Northern Life has a clause
01:10 7  in it that says if your attrition rate is higher than
01:10 8  ten percent, then you're not going to get a trailer
01:10 9  commission?
01:11 10    A.  Yes.
01:11 11    Q.  Okay.  So therefore you can't have over ten
01:11 12  percent because if it is over ten percent you're not
01:11 13  going to get a trailer commission, correct?
01:11 14    A.  Yes.
01:11 15    Q.  Okay.  She didn't give you any growth rate,
01:11 16  correct?
01:11 17    A.  I don't recall.
01:11 18    Q.  How about Eric Wolfe, who is with you, did he
01:11 19  give you a growth rate or an attrition rate?
01:11 20    A.  His professional opinion is if your growth rate
01:11 21  is only ten percent, you're sleeping.
01:11 22    Q.  Okay.  And he works for you, correct?
01:11 23    A.  Correct.
01:11 24    Q.  How about this Bill that you don't remember his
01:11 25  name who is with For Texas, did you talk to him about

HILL & ROMERO
CERTIFIED COURT REPORTERS

53

01:11 1   growth and attrition rates?
01:11 2       A. I did.
01:11 3       Q. And did he give you any opinions?
01:11 4       A. I'm sure he did.
01:11 5       Q. You don't remember them?
01:11 6       A. What I can recall from my conversations with
01:11 7   him, his opinion was real simple, if you service your
01:12 8   clients, take care of your business, you don't lose any
01:12 9   business.
01:12 10      Q. Okay. Steve Penella -- who is Millennium --
01:12 11  let me back up. Who is Millennium Marketing?
01:12 12      A. Millennium Marketing?
01:12 13      Q. Yeah, whatever it is.
01:12 14      A. It's a marketing entity.
01:12 15      Q. What do they market?
01:12 16      A. Annuities.
01:12 17      Q. Do you have any kind of a contractual
01:12 18  relationship with them?
01:12 19      A. Yes, I do.
01:12 20      Q. What is it?
01:12 21      A. I am a marketing arm for them.
01:12 22      Q. Do you sell for them?
01:12 23      A. Yes, in a sense.
01:12 24      Q. Do you have a contract with them?
01:12 25      A. I don't have a contract with them, no.

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

01:12 1       Q. Who do you have a contract with that's
01:12 2   affiliated with them and what's your commercial
01:13 3   relationship with these people?
01:13 4       A. I have a number of contracts that are through
01:13 5   them.
01:13 6       Q. Like whom?
01:13 7       A. Allianz.
01:13 8       Q. Okay. When you spoke to Steve Penella, Brian
01:13 9   Cortright or Clint Thomas, Matt, you don't know his
01:13 10  last name, did you tell them that you had a lawsuit and
01:13 11  that you were trying to figure out your damages for the
01:13 12  lawsuit?
01:13 13      A. Brian Cortright would specifically know that
01:13 14  and so would Steve Penella.
01:13 15      Q. Okay. Who did -- I'm sorry?
01:13 16      A. No, go ahead.
01:13 17      Q. Who did you -- did any of these individuals
01:13 18  give you any information that you used in preparing
01:13 19  your Exhibit 9?
01:13 20      A. Yes.
01:13 21      Q. Which ones?
01:13 22      A. The information that they give me is on an
01:13 23  ongoing constant never-ending basis. I'm attending
01:13 24  training and speaking to them on a professional level
01:14 25  which adds to my experience and expertise for my

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:14 1   ability to put together Exhibit No. 9.
01:14 2       MS. NEALLY: Object to the responsiveness
01:14 3   of the answer.
01:14 4       Q. This document was prepared sometime in November
01:14 5   or in 2002, okay, according to your attorney. What
01:14 6   information did they give you that you used in
01:14 7   preparing Exhibit 9?
01:14 8       A. That's a vague question that I can't answer.
01:14 9   You need to be more specific.
01:14 10      Q. I don't think I can be any more specific than
01:14 11  that. What information did they give you that you used
01:14 12  in preparing Exhibit No. 9? Because you had -- I asked
01:14 13  you if you had any conversations with them that related
01:14 14  to the preparation of Exhibit No. 9; you told me yes.
01:14 15  So I want to know what those conversations were as far
01:14 16  as they related to your preparing your opinions that
01:14 17  you rendered as far as your losses and the losses for
01:14 18  the other plaintiffs in this cases in Exhibit No. 9 and
01:15 19  the other documents that concern those losses.
01:15 20      A. To derive this form, Exhibit No. 9, and the
01:15 21  conversations I had with those entities is a direct
01:15 22  result of my experience with those individuals and
01:15 23  knowledge that I attained from working with those
01:15 24  individuals.
01:15 25      Q. Okay. So you didn't have any specific

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

01:15 1   conversations with any of these four people from
01:15 2   Millennium Marketing where you said, you know, help me
01:15 3   figure out what my personal flex premium first year
01:15 4   commission loss is or help me figure out what my
01:15 5   overwrites on subagents is or help me figure out my
01:15 6   personal trailers or help me figure out the permanent
01:15 7   loss of an agent. You had no conversations with them
01:15 8   with regard to that?
01:15 9       A. You asked too many questions all together and
01:15 10  I was prepared to answer the first one. Let me answer
01:15 11  the first one. It was, did I ask them any questions
01:15 12  regarding the preparation of this on something to do
01:15 13  with flex premium?
01:16 14      Q. Right.
01:16 15      A. That is something that they would come to me to
01:16 16  ask me my opinion about. So, no.
01:16 17      Q. Okay.
01:16 18      MS. NEALLY: Object to the response of the
01:16 19  answer.
01:16 20      Q. My question is simple, and I would love to get
01:16 21  out of here this morning but I need you to answer my
01:16 22  questions.
01:16 23      A. Okay.
01:16 24      Q. My questions just have to do with -- I want to
01:16 25  know who you talked to that led you -- who you talked

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 57

01:16 1 to directly, specific conversations that you had with
01:16 2 any of these individuals that had to do with the
01:16 3 opinions that you made in Exhibit No. 9, your attrition
01:16 4 rate, your growth rate as well as the other losses for
01:16 5 the other plaintiffs in this case. Now, you have
01:16 6 related to me, for instance, that Laura Bodene gave you
01:16 7 her opinion regarding attrition rates. How about any
01:16 8 of these other folks? Have any of these other folks
01:16 9 given you any opinions with regard to growth or
01:16 10 attrition rates?
01:17 11     A. The conversations with the individuals at
01:17 12 Millennium concerning growth, specifically their
01:17 13 opinion would be somewhere in the range that ten
01:17 14 percent is somebody that's not learning, not working
01:17 15 the field.
01:17 16     Q. Okay. And when did you have this conversation
01:17 17 with them?
01:17 18     A. I have a conversation with those individuals on
01:17 19 a weekly basis.
01:17 20     Q. So you can't recall a specific conversation
01:17 21 that you had with any of these individuals that you've
01:17 22 named here today that led you to write the -- to type
01:17 23 the document that's Horner 9?
01:17 24     MR. AGUILAR: Objection; mischaracterizing
01:17 25 the witness's testimony.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 58

01:17 1         MS. NEALLY: I'm asking if he recalls any
01:17 2 specific conversations he had with anybody.
01:18 3     A. I had some specific conversations, but I have
01:18 4 so many specific conversations or so many non-specific
01:18 5 conversations with those people because that's part of
01:18 6 how I learn my trade. That's part of my expertise.
01:18 7 Sometimes they come to me, sometimes I go to them.
01:18 8         MS. LEEDS: Mr. Andrus, that's
01:18 9 nonresponsive.
01:18 10     Q. So the answer is, yes, I can't recall. It's
01:18 11 very easy.
01:18 12     A. Well, I can recall some specifics, but specific
01:18 13 dates dealing with this specifically, no.
01:18 14     Q. Okay. So you can't recall any specific dates,
01:18 15 you can't recall any specific conversations that you
01:18 16 had where you then prepared this document. For
01:18 17 instance, you sat down with one of these individuals or
01:18 18 you called them on the cell phone number that you got
01:18 19 and you said, listen, I'm trying to prepare this
01:18 20 document. Can you give me some help here?
01:18 21     A. I can tell you about one specific that I talked
01:18 22 to Steve Penella about, and the knowledge base was
01:18 23 already in my head, but I asked him just for his
01:18 24 opinion about it. When it came to single premium
01:18 25 sales, the number that I used was 210,000, I believe.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 59

01:19 1     Okay. The conversation and what I asked him was people
01:19 2 that are specifically out there writing annuity
01:19 3 business, what's the industry average?
01:19 4     Q. Industry average for what; a month, a year, a
01:19 5 day? What's the industry average? What do you mean by
01:19 6 that?
01:19 7     A. Give me a starting point. Ask me a specific
01:19 8 question and I'll answer it.
01:19 9     Q. The 210,000 premium average, what is that time
01:19 10 period for?
01:19 11     A. Okay. That's for a year.
01:19 12     Q. Are all of these figures that you've given in
01:19 13 Horner No. 9 for a year?
01:19 14     A. Yes, they are.
01:19 15     Q. And is it specifically the year -- what year?
01:20 16     A. It is my best professional opinion based on my
01:20 17 experience of what I feel these producers would have
01:20 18 done in the school year 2001/2002.
01:20 19     Q. Okay. Did you take into account any sales that
01:20 20 they would have made in August, September until October
01:21 21 when they were no longer allowed to go on to the
01:21 22 campuses and then again in February, March, April, May
01:21 23 when they were allowed to go back on to the campuses?
01:21 24     A. No.
01:21 25     Q. Okay. Did you take into consideration any

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 60

01:21 1 other sales that they would have made at other
01:21 2 locations during 2001 and 2002?
01:21 3     A. Yes.
01:21 4     Q. Where is that reflected in this document?
01:21 5     A. It's reflected with what I'm implying here.
01:21 6 These individuals were working their natural markets.
01:21 7 Their natural markets being what they wanted to do,
01:21 8 their location of preference, which was Brownsville
01:21 9 School District.
01:21 10     Q. Okay. So this only took into consideration the
01:21 11 sales that they lost at Brownsville Independent School
01:21 12 District; is that right?
01:21 13     A. Yes.
01:22 14     Q. Did you do any type of research as to what
01:22 15 their sales were and what the commissions were earned
01:22 16 for August, September, October, February, March, April,
01:22 17 May when they were allowed to go on to the campuses?
01:22 18     A. Yes.
01:22 19     Q. Where is that reflected?
01:22 20     A. If you go to Section 8, Permanent Loss of an
01:22 21 Agent, Sam Sauceda is no longer with us, so he couldn't
01:22 22 go and make any sales during that time frame.
01:22 23     Q. Well, he could have in August, September,
01:22 24 October, right?
01:22 25     A. And he did.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**61**

Q. Okay. Other than that, you don't have anything else that reflects any sales that were made once you were allowed back on the campuses or prior to the time you learned that you couldn't go on to the campuses?

A. Well, that's not what this report is about.

Q. Okay. And you don't have any other kind of documents, you didn't supply any other information to Mr. Horner regarding what those earnings were?

A. That specifically, no.

Q. Where did you come up with the $99,632 for personal flex premium first year commission?

A. If you will refer to the document -- I believe there's a document that I prepared for my own, losses for my own production and it is explained in that document.

MS. LEEDS: What document is that?

Q. What document is that? And you were supposed to bring all these documents with you.

A. Let's get down -- right here. That would be my personal flex premium.

Q. Right.

A. Paragraph 1, 2, 3 -- 4. There's a ten percent growth rate for each year of experience in the business. I took the average of past production of the three people, which I had expressed to Dr. Horner,

HILL & ROMERO
CERTIFIED COURT REPORTERS

**62**

received a mean for that from my own personal people, personally producing and included a ten percent growth rate for each year of experience.

Q. Where did you get those figures?

A. From the commission statements.

Q. For those people?

A. Yes.

Q. You're talking about the same commission statements that you relied on for preparing this document?

A. Yes.

Q. Okay. And what are the three people that were producing for you?

A. Sam Sauceda, Kelly Smith and Arturo Prado. And if I make take a break again, I'm going to use the bathroom.

Q. Okay.

(Recess).

MS. NEALLY: Let me mark this as Exhibit 16.

(Exhibit No. 16 marked).

Q. Okay. This is the other document that you prepared for Mr. De Pena, right?

A. I did prepare this for Mr. De Pena, yes.

Q. So where it says, the losses I experienced were

HILL & ROMERO
CERTIFIED COURT REPORTERS

**63**

calculated using the same criteria as Mr. Andrus, in fact you're the one that prepared that; Mr. De Pena didn't?

A. Correct.

Q. Is that right? What did you use to prepare that document?

MR. AGUILAR: And you're referring to Andrus 16?

Q. Did you look at Mr. De Pena's commission statements?

A. No.

Q. Okay. And when you prepared Mr. Paz's, you didn't look at his commission statements, right?

A. No, but I would know exactly what his overwrites are.

Q. Okay. So you just looked at what their overwrites were?

A. Mr. Paz wasn't personally producing.

Q. Okay. Mr. De Pena, though, was and you didn't look at what his overwrites were?

A. Correct.

Q. Okay. You said that, Based on past performance of all my agents I calculated that the average flex premium for each working subagent would be $281,200.

A. I'm familiar with the language you're using,

HILL & ROMERO
CERTIFIED COURT REPORTERS

**64**

but can you point it out to me so I can follow along?

Q. Yes. I'm going to back to Horner 9. I'm sorry.

A. Horner 9, first paragraph.

Q. First paragraph, first sentence.

A. Okay. Yes.

Q. Okay. And you use the average of Mr. De Pena, right?

A. No.

Q. Well, it says, I used this average for Mr. De Pena who is a highly experienced agent.

A. I used it for him.

Q. Okay.

A. I didn't calculate the average based on him.

Q. Okay. When you say, based on past performance of all my agents I calculated that the average flex premium for each working subagent would be $281,200, what did you use to come up with that figure?

A. It's very simple. The three names I gave you, Arturo Prado, Kelly Smith and Sam Sauceda, I had a year history of what they could do, I added them up, divided by three.

Q. Where is the year history?

A. On the commission statements. I looked through the commission statements, added up what they had done

HILL & ROMERO
CERTIFIED COURT REPORTERS

**5**

01:37 1     for a year, divided by three, put that into
01:37 2     consideration of what an agent nationally will do,
01:37 3     which is a little different from the Rio Grande Valley,
01:37 4     and based on my experience, that's --
01:37 5     Q. Where is the documentation to support that?
01:37 6     A. In those cases of commission statements.
01:37 7     Q. Okay. I'm not talking about the commission
01:37 8     statements themselves. I'm talking about your
01:37 9     calculations to come up with that figure.
01:37 10     A. I don't have them.
01:37 11     Q. Okay. And you only used those three
01:37 12     individuals that you named, right?
01:37 13     A. Yes.
01:37 14     Q. You had other agents working?
01:37 15     A. Yes.
01:37 16     Q. You didn't use them?
01:37 17     A. Correct.
01:37 18     Q. For instance, Sylvia Petrarca is one of your
01:37 19     agents?
01:37 20     A. Yes.
01:37 21     Q. And you didn't use hers?
01:37 22     A. Correct.
01:37 23     Q. You didn't use Sam Sauceda's?
01:37 24     A. Incorrect.
01:37 25     Q. Now, I'm talking about for this $281,200.
                HILL & ROMERO
       CERTIFIED COURT REPORTERS

**67**

01:39 1     specific person, per se. Sylvia would not be one that
01:39 2     I would describe as a hot shot agent. She -- she
01:39 3     wasn't going to set the world on fire. So I kept her
01:39 4     numbers low for that reason. And based on the national
01:39 5     average of what insurance companies expect a person to
01:39 6     do nationally, not the Rio Grande, that was a number
01:39 7     based on my experience that I was comfortable with.
01:39 8     Q. Okay. And these are guesstimates; you don't
01:39 9     know exactly what they would have earned, right?
01:39 10     A. I can only speculate the future based on my
01:40 11     experience, not what -- because there is no track
01:40 12     record because of the reason this court suit is being
01:40 13     filed.
01:40 14         MS. NEALLY: Object to the responsiveness
01:40 15     of the answer.
01:40 16         MS. LEEDS: Join.
01:40 17     Q. What's the national average?
01:40 18     A. 240,000.
01:40 19     Q. Where do you get that figure?
01:40 20     A. A new agent that works 403(B)s --
01:40 21     Q. No, no, no. Wait a minute.
01:40 22     A. -- can be expected --
01:40 23     Q. Wait a minute.
01:40 24         MS. NEALLY: Object to the responsiveness
01:40 25     of the answer.
                HILL & ROMERO
       CERTIFIED COURT REPORTERS

**66**

01:37 1     A. I used Sam Sauceda.
01:38 2     Q. Well, I'm sorry. I thought you said -- Kelly
01:38 3     Smith, Mr. De Pena and --
01:38 4     A. I didn't say Mr. De Pena.
01:38 5     Q. Okay. Well, my error, okay? But you didn't
01:38 6     use Mr. De Pena when you came up with this figure?
01:38 7     A. Correct.
01:38 8     Q. Okay. You didn't use anybody else and you said
01:38 9     you had a dozen people that were working for you?
01:38 10     A. That's correct.
01:38 11     Q. All right.
01:38 12     A. I don't know if I said a dozen, but that's
01:38 13     probably about right.
01:38 14     Q. Well, at least a dozen if you don't include the
01:38 15     brokers. Kelly Smith has a number of people working
01:38 16     for her, correct?
01:38 17     A. Correct.
01:38 18     Q. All right. But you used what Kelly Smith -- a
01:38 19     figure for Kelly Smith, correct?
01:39 20     A. Yes.
01:39 21     Q. You said, Sylvia Petrarca was less experienced
01:39 22     so I used past production numbers of a comparable with
01:39 23     experienced person. Who was the comparable experienced
01:39 24     people?
01:39 25     A. That's a question of semantics. It's not a
                HILL & ROMERO
       CERTIFIED COURT REPORTERS

**68**

01:40 1     Q. My question to you is where, what document,
01:40 2     what publication do you get that figure of $240,000 and
01:40 3     why isn't it here before us today?
01:40 4     A. Experience is the best teacher of all and
01:40 5     that's based on my experience, numerous conversations,
01:41 6     trade journals. I don't have a specific document for
01:41 7     you.
01:41 8     Q. Okay. The national average -- are you still
01:41 9     talking about for annuity salespeople?
01:41 10     A. I'm talking about flex premium.
01:41 11     Q. Any specific year that it's 240,000?
01:41 12     A. I can tell you that insurance companies know
01:41 13     that a person that works 403(B) flex premium will
01:41 14     average $200 a case and will pick up 100 new clients.
01:41 15     A very, very skilled person will do over 1.2 million.
01:41 16         MS. NEALLY: Object to the responsiveness
01:41 17     of the answer.
01:41 18         MS. LEEDS: Object to the responsiveness.
01:41 19     Q. Any specific year where it's $240,000 and
01:41 20     that's the average?
01:41 21     A. No, ma'am.
01:41 22     Q. But this figure would apply for 2001, 2002,
01:42 23     2003, 2004?
01:42 24     A. Just any given year.
01:42 25     Q. Okay. What do you base your claim that Sam
                HILL & ROMERO
       CERTIFIED COURT REPORTERS

## 69

01:42 1 Sauceda would have had -- first of all, you said Sam
01:42 2 Sauceda would have produced ten percent more flex
01:42 3 premium volume than his prior year of $238,658. Is
01:42 4 $238,658 the prior year or is that what he would have
01:42 5 earned for this year, the 2001/2002 school period?
01:42 6 A. That's my fault for semantics as well. That's
01:42 7 what my professional experience calculated that he
01:42 8 would do for the year in question.
01:42 9 Q. Okay. So what did he earn the prior year?
01:43 10 A. Ten percent less than that.
01:43 11 Q. Okay.
01:43 12 MS. LEEDS: Objection; nonresponsive.
01:43 13 Q. Do you have any documentation to support that?
01:43 14 A. Yes, I do.
01:43 15 Q. Where is it?
01:43 16 A. On the commission statements.
01:43 17 Q. It's on the commission statements that have
01:43 18 previously been supplied to us?
01:43 19 A. Correct.
01:43 20 Q. You said for your personal flex premium, I
01:43 21 assumed a ten percent growth rate for each year of
01:43 22 experience in the business. What does that mean?
01:43 23 A. That means that I expect myself to write a lot
01:43 24 more than a person that is in the business one year or
01:43 25 two years. And that's a very, very conservative

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 70

01:43 1 minimum.
01:43 2 Q. But it says, I assumed a ten percent growth
01:43 3 rate for each year of experience in the business. To
01:43 4 me reading that, it would mean that you would expect --
01:43 5 since you've been in the business since 1999 you would
01:43 6 expect more than that or are you just talking about ten
01:44 7 percent per year?
01:44 8 A. Ten percent per year is what I used for that
01:44 9 calculation, which is a conservative minimum.
01:44 10 Q. But I thought you didn't write flex premium
01:44 11 except on a rare occasion.
01:44 12 A. I was teaching school until I retired from
01:44 13 public education. At that point my plan was to go out
01:44 14 and personally produce as well as manage the subagents
01:44 15 that I have.
01:44 16 Q. Okay. But by 2003 when we deposed you, you
01:44 17 were no longer personally producing; is that right,
01:44 18 except on a limited basis?
01:44 19 A. That's accurate.
01:44 20 Q. So this ten percent growth rate for your
01:44 21 experience would have been for what -- for the year
01:44 22 2001/2002?
01:44 23 A. From the time that I started selling -- I took
01:44 24 the average of what the three people, Sam, Kelly,
01:45 25 Arturo had done. For each year of experience I added

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 71

01:45 1 ten percent to take us up to the time in question,
01:45 2 which is a very conservative minimum based on my
01:45 3 ability.
01:45 4 Q. I'm lost on this one.
01:45 5 MS. LEEDS: Objection; nonresponsive.
01:45 6 Q. And you're going to have to clarify this for
01:45 7 me. When you say for each year of experience, how many
01:45 8 years of experience did you credit yourself?
01:45 9 A. Since I started in the business, I believe.
01:45 10 Q. Which would have been what?
01:45 11 A. January of '95.
01:45 12 Q. Couldn't you have -- wouldn't it have been more
01:46 13 accurate for you to have gone back and looked at what
01:46 14 you earned the year before and try to figure it out
01:46 15 from there?
01:46 16 A. Absolutely not.
01:46 17 Q. Okay. And you didn't even try to do that,
01:46 18 right? You didn't look at what you had made the year
01:46 19 before and then add ten percent on that?
01:46 20 A. I used that as part of my calculation, yes, I
01:46 21 did.
01:46 22 Q. Where?
01:46 23 A. If you will refer to whatever document it is
01:46 24 that has all the highlighter on it.
01:46 25 Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 72

01:46 1 A. Okay. I shared with you how it's a lot of
01:46 2 experienced people that gave their opinion to me that
01:46 3 ten percent growth, you're sleeping. And if I just
01:46 4 look at my income from 2000 to 2001, the increase, 54
01:46 5 percent, and the increase from 2001 to 2002, 22
01:47 6 percent.
01:47 7 Q. How about for the next year?
01:47 8 A. The next year I had a loss and there's a reason
01:47 9 for that.
01:47 10 Q. Okay. The next paragraph you say, for renewal
01:47 11 commissions for flex premium I assumed a ten percent
01:47 12 attrition rate for premium.
01:47 13 A. Correct.
01:47 14 Q. Where did you get the ten percent attrition
01:47 15 rate?
01:47 16 A. Again, from my experience.
01:47 17 Q. Okay.
01:47 18 A. I'm sorry. Can you ask that over? That threw
01:47 19 me off a little bit.
01:47 20 MR. AGUILAR: Where do you get the ten
01:47 21 percent attrition rate?
01:47 22 A. I used commission statements from real life
01:47 23 production in the Rio Grande Valley of my own business
01:47 24 because I had my own business to go back to and these
01:48 25 sheets that we provided to you today and on the

HILL & ROMERO
CERTIFIED COURT REPORTERS

3

01:48 1    affidavit of me here.
01:48 2        Q.  Okay.  Wait, wait.  Let me -- I'm asking you
01:48 3    about this report that you wrote in November 2002,
01:48 4    okay?
01:48 5        A.  Okay.
01:48 6        Q.  I don't want to know about what you came up
01:48 7    with later.  We'll get to that.
01:48 8        A.  Okay.
01:48 9        Q.  Okay?
01:48 10       A.  Fair enough.
01:48 11       Q.  So going back to this ten percent attrition
01:48 12   rate, how do you justify the ten percent attrition rate
01:48 13   that you have in this document?  Not how you came up to
01:48 14   justify it, but how did you justify it this time?
01:48 15       A.  My experience in the industry.
01:48 16       Q.  Okay.  Your experience in the industry
01:48 17   reflective of your research in what?
01:48 18       A.  My research on communicating with people that
01:49 19   do the same thing that I do, what companies expect
01:49 20   contractually, what companies expect for
01:49 21   profitability.
01:49 22       Q.  But you don't have any documentation to show
01:49 23   the jury as to how you came up with the ten percent
01:49 24   attrition rate?
01:49 25       A.  No.  Other than if your attrition rate goes too

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

01:49 1    high, the companies don't want you.
01:49 2        MR. AGUILAR:  She's asking about
01:49 3    documents.
01:49 4        Q.  Okay.  You didn't look at any research as to
01:49 5    what other companies had -- what their attrition rates
01:49 6    were?
01:49 7        A.  There's none available.
01:49 8        MS. LEEDS:  Objection; nonresponsive.
01:49 9        Q.  The answer to that will be no?
01:49 10       A.  Correct.
01:50 11       Q.  The figures that are in this document are for
01:50 12   how many years?  Is it -- you weren't going to earn
01:50 13   $797,000 for the 2001/2002 school year?
01:50 14       A.  Correct.
01:50 15       Q.  So for how many years did this document reflect
01:50 16   this was for?
01:50 17       A.  My calculations were for 15 years.
01:50 18       Q.  Where did you come up with the 15 years?
01:50 19       A.  Based on my experience in this business, you
01:50 20   never retire from this business.  Business will
01:50 21   continue forever.
01:50 22       Q.  Well, it doesn't continue forever, right?
01:50 23       A.  It can as long as --
01:50 24       Q.  People die eventually, right?
01:50 25       A.  Correct.  Yeah, you're correct, people will die

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

01:50 1    eventually.
01:50 2        Q.  Or they retire?
01:50 3        A.  They retire.  15 is a conservative minimum.
01:51 4        Q.  Okay.  And that was just something you came up
01:51 5    -- based on your experience, you didn't have any
01:51 6    documents to support that?
01:51 7        A.  That's correct.
01:51 8        Q.  You didn't do any research to support that?
01:51 9        A.  That's correct.
01:51 10       Q.  Okay.  And you have the same 15-year figure for
01:51 11   the losses for Mr. De Pena, Mr. Paz and The Teachers'
01:51 12   Agency, too, correct?
01:51 13       A.  Yes.
01:51 14       Q.  Okay.
01:51 15       A.  The Teachers' Agency being Andrus & Paz.
01:51 16       Q.  Yeah.  Now, after the November 2002 document,
01:51 17   Horner No. 9 was prepared, you and the other owners of
01:51 18   The Teachers' Agency changed the scheme of things,
01:51 19   right?
01:51 20       A.  Yes.
01:51 21       Q.  Significantly changed it, that you weren't
01:51 22   going to collect overwrites personally; it was all
01:51 23   going to go to the Teachers' Agency, right?
01:51 24       A.  That's correct.
01:51 25       Q.  And as a result of that, your earnings were

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:52 1    less for -- after you made that initial determination?
01:52 2        A.  Yes.
01:52 3        Q.  I'm assuming it's something you think is going
01:52 4    to pick back up, but at the 2003 when you incorporated
01:52 5    and changed the ownership arrangement, it did affect
01:52 6    you to the point that you made less money; is that
01:52 7    correct?
01:52 8        A.  Yes.
01:52 9        Q.  Did you go back and recalculate what your
01:52 10   earnings would be based on that?
01:52 11       A.  I don't understand your question.
01:52 12       Q.  Okay.  Once you changed the --
01:52 13       MR. AGUILAR:  Organization.
01:52 14       Q.  -- organization of the company, did you go back
01:52 15   and recalculate what your earnings would be based on
01:52 16   the reorganization of The Teachers' Agency?
01:52 17       A.  Did I have some goals?
01:52 18       Q.  No.  Did you go back and do another losses for
01:52 19   Stephen M. Andrus based on this new organization?
01:52 20       A.  No.
01:53 21       Q.  Or for any of the other plaintiffs?
01:53 22       A.  No.
01:53 23       Q.  Okay.  Let me show you -- you've read House's
01:53 24   report?
01:53 25       A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

01:53 1    Q. Okay. And you've read Horner's report, right?
01:53 2    A. Yes.
01:53 3    Q. And Horner looked at some -- the Ibbotson
01:54 4    documents reflecting the names of the 53 firms used to
01:54 5    calculate the industry premium used in Horner's
01:54 6    calculations.
01:54 7    A. This is House's report?
01:54 8    Q. I'm talking about Horner's report.
01:54 9    A. Horner's report.
01:54 10    Q. Okay. Did you go back and look at anything
01:54 11    that Horner relied on in formulating his opinions?
01:54 12    A. I didn't go back and look at anything, no, but
01:54 13    I may have had opinions myself.
01:54 14    Q. Okay. You didn't --
01:54 15        MS. NEALLY: Object to the responsiveness
01:54 16    of the answer.
01:54 17    Q. You didn't go back and look at any of the
01:54 18    documents that he relied on other than the documents
01:54 19    you produced to him?
01:54 20    A. You are correct.
01:54 21    Q. Okay. And you didn't go back and -- in
01:54 22    evaluating your questions -- other than conversations
01:54 23    that you had with people, you don't have any documents
01:54 24    here today on which you relied in reaching your ten
01:54 25    percent attrition rate or ten percent growth rate?

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

01:55 1        MS. NEALLY: Is it ten percent growth
01:55 2    rate?
01:55 3        MS. LEEDS: Uh-huh.
01:55 4        MR. AGUILAR: Other than what's already
01:55 5    been provided.
01:55 6    Q. Other than what's already been provided.
01:55 7    A. For the preparation of which document?
01:55 8    Q. I didn't -- in reaching your conclusion that
01:55 9    there was a ten percent attrition rate, ten percent
01:55 10    growth rate.
01:55 11    A. For the preparation of a document, which is
01:55 12    Exhibit 9, that is a true statement.
01:55 13        (Off record).
01:56 14    Q. Okay. Let's start with this. Let me show you
01:57 15    -- I just grabbed a handful of the voluminous
01:57 16    commission statements that you had, okay?
01:57 17    A. Uh-huh.
01:57 18    Q. I don't even know which ones I grabbed because
01:57 19    I had my hands full. This is Allianz, right?
01:57 20        MR. AGUILAR: Do you want to mark that so
01:57 21    we know which one you're talking about?
01:57 22        MS. NEALLY: Not really. I mean, I don't
01:57 23    really have any -- I just need clarification.
01:57 24        MR. AGUILAR: If you just a have quick
01:57 25    question for clarification, that's fine.

HILL & ROMERO
CERTIFIED COURT REPORTERS

79

01:57 1    Q. Okay. This is Allianz?
01:57 2    A. That's an Allianz statement, yes.
01:57 3    Q. Is this a commission statement?
01:57 4    A. That is a cover page of a commission statement,
01:57 5    yes.
01:57 6    Q. Okay. And so, for instance, this one shows
01:57 7    that you owe them $8.23, right?
01:57 8    A. That's correct.
01:57 9    Q. So would you have calculated that or
01:58 10    would you just have calculated how much money actually
01:58 11    came in to you? Let me ask it like this. You know the
01:58 12    volumes and volumes of commission statements that your
01:58 13    attorney has --
01:58 14        MS. NEALLY: And I don't know if you still
01:58 15    have them in the office.
01:58 16    Q. You don't look at the commission statements,
01:58 17    you look at the checks that actually came in to you
01:58 18    when you prepared the document that's Horner 8, right?
01:58 19    A. That's not a true statement. I looked at the
01:58 20    commission statements. Well, which one are you talking
01:58 21    about? Are you talking about Horner --
01:58 22    Q. 8.
01:58 23    A. 8?
01:58 24    Q. Yeah.
01:58 25    A. This is what we derived from the checks that

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

01:58 1    come in.
01:58 2    Q. Okay.
01:58 3    A. So that is a true statement.
01:58 4    Q. That is a true statement? This is money that
01:58 5    has actually come in?
01:58 6    A. Yeah, that's the sole purpose of this.
01:58 7    Q. So, for instance, when you look at the
01:58 8    commission statements here, which -- for instance, this
01:58 9    is 01-2002 to 1-25-2002 for CGU, okay?
01:58 10    A. Uh-huh.
01:59 11    Q. Right?
01:59 12    A. Correct.
01:59 13    Q. This reflects you had -- for that month you had
01:59 14    first year commissions of $33.15?
01:59 15    A. That's what it says.
01:59 16    Q. Okay. Renewal yearly commissions of $82.80 for
01:59 17    total year-to-date earned commission of 115 -- $115.95,
01:59 18    correct?
01:59 19    A. Correct.
01:59 20    Q. Would you get a check for $115.95?
01:59 21    A. Yes.
01:59 22    Q. And that's one of the checks that would go on
01:59 23    to that document, right?
01:59 24    A. Correct.
01:59 25    Q. And that's all you earned from CGU for the

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS

81

01:59 1  month of January 2002?
01:59 2  A.  Correct.
01:59 3  Q.  Okay.  And this would have probably been from
01:59 4  -- well, okay.  The first year of commissions would
01:59 5  have been from sales when?
01:59 6  A.  It could have been any time and that's kind of
01:59 7  a term of art.  And if you'd like for me to explain it,
01:59 8  I would be happy to.
01:59 9  Q.  No.  I want you to explain to me -- the first
01:59 10  year commissions would have come from what month, what
01:59 11  time period?
01:59 12  A.  I can't answer the way that you're wanting me
02:00 13  to with limited --
02:00 14  Q.  Can you look at this document and tell that?
02:00 15  A.  Well, if you would allow me to explain it, it
02:00 16  would make sense.
02:00 17  Q.  I doubt it, but go ahead and try.
02:00 18  A.  Okay.  First year commissions means, as far as
02:00 19  this relates, commissions that I'm getting a higher
02:00 20  percent on.  So it could have been business that I
02:00 21  wrote years past but there could be an increase on it.
02:00 22  The increase would be calculated as first year
02:00 23  commissions.  I may not have had anything to do with
02:00 24  it, the person on their own behalf may have decided to
02:00 25  increase their contributions and it would be calculated

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

02:00 1  as a first year.  So after saying that, you can
02:00 2  understand why I can't just answer that question that
02:00 3  way.
02:00 4  Q.  Okay.  Looking at this document, the direct
02:00 5  commissions that you earned, which is $278.32, these
02:00 6  are all your agents, right?
02:00 7  A.  Correct.  No, no, no.  That's incorrect.
02:00 8  Q.  Why is this in here then if they're not your
02:00 9  agents and you didn't earn a commission from them?
02:00 10  A.  Very simple.  These are my clients.
02:01 11  Q.  Those are your clients.  Are these the clients
02:01 12  that you -- that you directly sold to?
02:01 13  A.  Not necessarily.  They were clients that I
02:01 14  received a commission on, not necessarily as an
02:01 15  overwrite but as a split, and some of them directly.
02:01 16  Q.  Okay.  And you don't know which is which?
02:01 17  A.  No.
02:01 18  Q.  Okay.  The people that wrote for you during
02:01 19  this time period that were selling CGU were Fernando De
02:01 20  Pena, Arturo Prado, Valentin Paz, Shirley Gillis,
02:02 21  Eusebio Sauceda.  Is that Sam?
02:02 22  A.  That's Sam.
02:02 23  Q.  Okay.  How about like for American Funds?
02:02 24  These are your clients again?
02:02 25  MS. LEEDS:  This is for what time period?

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

02:02 1  MS. NEALLY:  3-11-02 to 3-15-02.
02:02 2  Q.  Right?
02:02 3  MS. LEEDS:  It looks like for the month --
02:02 4  it's for the month of March.
02:03 5  A.  Yes, I would consider all those my clients.
02:03 6  Q.  Okay.  Okay.  And then were you -- these are
02:03 7  your notations on here?
02:03 8  A.  No, they're not.
02:03 9  Q.  Whose are they?
02:03 10  A.  That's probably the bookkeeper for Mack Marr.
02:03 11  Q.  Who is Mack Marr?
02:03 12  A.  He's a broker/dealer.
02:03 13  Q.  Is this one of your brokers?
02:03 14  A.  No.  It's the broker/dealer.
02:03 15  Q.  Well, I don't know what a broker/dealer is.
02:03 16  What's a broker/dealer then?
02:03 17  A.  The broker/dealer is the entity that the fund
02:03 18  company reports to.  I can go into -- how detailed do
02:03 19  you want me to get --
02:03 20  Q.  What would your check be here?
02:03 21  A.  -- in explaining what a broker/dealer is?
02:03 22  Q.  What would your check be here?
02:03 23  A.  $92.36.
02:03 24  Q.  So --
02:04 25  A.  I believe -- let me go through this.  And it

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

02:04 1  may be on -- usually there's a cover page.  Because
02:04 2  these things get so full, I try to alleviate the junk
02:04 3  pages.  That one would be would be $92.36.
02:04 4  Q.  And that one would be $5.65?
02:04 5  A.  That would be $5.65, which is --
02:04 6  Q.  Part of the $92?
02:04 7  A.  It's a summation of all of these calculations
02:04 8  as a percent of my gross -- gross broker/dealer comp.
02:04 9  Q.  I'm sorry.  Your gross what?
02:04 10  A.  Broker/dealer comp.
02:04 11  Q.  Okay.  Southwestern Life, this reflects 1099
02:04 12  earnings of $3.59 for this period; year to date, $10.77
02:04 13  for 3-01-02 to -- for March, right?
02:05 14  A.  That's a March commission statement and that's
02:05 15  a year to date for that, yes.
02:05 16  Q.  $10.77?
02:05 17  A.  Correct.
02:05 18  Q.  For that company?
02:05 19  A.  For that company with that product.
02:05 20  Q.  How about this one, Columbia Universal Life?
02:05 21  What would your earnings be reflected on this one?
02:05 22  It's for period ending 12-31-02.
02:05 23  A.  Amount due again, $387.38.
02:05 24  Q.  Okay.  And was this for a full year or for how
02:05 25  much?

HILL & ROMERO
CERTIFIED COURT REPORTERS

85

02:05 1   A.  This is for -- well, I know it's a month, but
02:05 2  it will show you on here somewhere that -- what month
02:05 3  statement it is.
02:05 4   Q.  Okay.  And that's the check that would have
02:06 5  been issued to you for that time period?
02:06 6   A.  Correct.
02:06 7   Q.  Okay.
02:06 8        MS. NEALLY:  I need to break for lunch.
02:06 9        (Lunch recess).
03:36 10   Q.  Mr. Andrus, I had previously showed you some
03:36 11  commission statements.  And like, for instance, on this
03:36 12  one, you identified that these are your actual clients,
03:36 13  right?
03:37 14   A.  Yes.
03:37 15   Q.  Okay.  Any way to tell how old those people are
03:37 16  from looking at something like this?
03:37 17   A.  To some degree, yes.
03:37 18   Q.  How?  Just because you know how old they are,
03:37 19  or what?
03:37 20   A.  Well, you're talking about how old the policy
03:37 21  is, not necessarily how old the person is?
03:37 22   Q.  No, both.
03:37 23   A.  Both?  There's no way to tell how old the
03:37 24  person is except for the ones that I know on a real
03:37 25  close basis.

HILL & ROMERO
CERTIFIED COURT REPORTERS

86

03:37 1   Q.  Okay.  How about the age of the policy, how do
03:37 2  you tell that?
03:37 3   A.  The age of the policy, you can tell in part if
03:37 4  it's listed up here and there are advance offsets.
03:37 5   Q.  Okay.  And how old is Elizabeth Garza's policy?
03:37 6   A.  Well, that part of it with that company is less
03:37 7  than a year old.
03:37 8   Q.  Okay.
03:37 9   A.  Because it's an advance offset.
03:37 10   Q.  Okay.  How about these, can you tell what --
03:37 11  the rest of these, the earned commissions, can you tell
03:38 12  those?
03:38 13   A.  No.
03:38 14   Q.  You don't have any idea?
03:38 15   A.  No.
03:38 16   Q.  You don't know whether they're a year old --
03:38 17  they're two years old or five years old?
03:38 18   A.  Well, yeah, I can tell you for the most part
03:38 19  that these would have been -- most of them would have
03:38 20  been three years old.
03:38 21   Q.  Did you look at the age of any of these
03:38 22  policies or the age of the people that -- your clients
03:38 23  when you were rendering either Horner 8 or Horner 9?
03:38 24   A.  No, ma'am.
03:38 25   Q.  You didn't do any kind of study with regard to

HILL & ROMERO
CERTIFIED COURT REPORTERS

87

03:38 1  how long the average person has an annuity?
03:38 2   A.  Other than my experience in the business, I
03:38 3  guess you could say I may have contacted people
03:38 4  afterwards to confirm my beliefs, but specific
03:38 5  individuals, no.
03:38 6   Q.  No.  I'm asking if you did any research to
03:38 7  determine the average length age of an annuity.
03:39 8   A.  Not other than what I have already disclosed to
03:39 9  you.
03:38 10   Q.  Okay.  What do you believe to be the average
03:38 11  age of an annuity?
03:38 12   A.  Can you be more specific?
03:39 13   Q.  How long do people keep paying on annuities?
03:39 14  How many years are you going to keep getting renewals?
03:39 15   A.  Some people buy an annuity when they start
03:39 16  teaching and keep it their whole career.
03:39 17   Q.  Well, that wasn't my question, though, was it?
03:39 18   A.  Well, I believe it was.
03:39 19   Q.  No, it was not.  And if you read it back it's
03:39 20  going to be, what -- do you know what the average age
03:39 21  of an annuity is?
03:39 22   A.  And then I believe you asked another question.
03:39 23   Q.  No, I didn't.
03:39 24   A.  Okay.  Then let's start over.
03:39 25        MS. LEEDS:  Just answer.  What's the

HILL & ROMERO
CERTIFIED COURT REPORTERS

88

03:39 1  average age?
03:39 2   Q.  What's the average age of an annuity?
03:38 3   A.  The average age meaning --
03:39 4   Q.  What is your opinion of what the average age is
03:39 5  of an annuity, how long the average person keeps an
03:40 6  annuity?
03:40 7   A.  Okay.  Well, that's two different things,
03:40 8  though.
03:40 9   Q.  How long an average -- the person keeps an
03:40 10  annuity so that you're making renewals on it?
03:40 11   A.  There's too many variables to be able to answer
03:40 12  that question.  To give you a better idea of that, each
03:40 13  individual has their own needs.
03:40 14   Q.  And I'm not asking for a better idea.  I'm just
03:40 15  asking if you know.  If you don't know and you can't do
03:40 16  it because there's too many variables --
03:40 17   A.  In the context you asked, no.  I don't know.
03:40 18   Q.  You couldn't come up with that?
03:40 19   A.  No.
03:40 20   Q.  So, for instance, the commissions that you
03:41 21  claim that you lost during the 2001/2002 school year as
03:41 22  a result of the incident the subject of this lawsuit,
03:41 23  you don't have any idea how long you would have been
03:41 24  earning commissions on those annuities?
03:41 25   A.  Correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

89

03:41 1    Q. Okay. Let me show you some stuff that I had
03:41 2    copied from your commission statements. Is this yours?
03:41 3    Did you --
03:41 4    A. This is mine.
03:41 5    Q. Okay. When did you make up this little graph,
03:41 6    these commissions 3-21-03?
03:41 7    A. I didn't.
03:41 8    Q. Who did?
03:41 9    A. The broker/dealer.
03:41 10   Q. Okay. And that would be who in this scenario?
03:41 11   A. Pete McClure.
03:41 12   Q. And what is he?
03:41 13   A. A broker/dealer.
03:41 14   Q. He's a -- I know he's a broker/dealer. For
03:41 15   what company?
03:41 16   A. Mack Marr.
03:41 17   Q. Mack Marr?
03:41 18   A. Uh-huh.
03:41 19   Q. Okay. And is this something that he would give
03:42 20   you every single time you got your commission
03:42 21   statements from him, the kind of thing that he would
03:42 22   give you?
03:42 23   A. Yeah.
03:42 24   Q. So, for instance, your commissions for 3-21-03
03:42 25   totaled 48.62; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

90

03:42 1    A. For that commission statement, yes.
03:42 2    Q. Okay. And that was for a one-week period? Is
03:42 3    that what these are usually for?
03:42 4    A. Yes.
03:42 5    Q. Okay. These were all together. I'm assuming
03:42 6    this is for a total of a month, 3-7 to 3-21? Not quite
03:42 7    a month.
03:42 8    A. I wouldn't want to assume that because those
03:42 9    are your documents and I haven't seen them.
03:42 10   Q. Well, these are copies of documents that I got
03:43 11   from you.
03:43 12   A. Okay. But I don't know what all you have
03:43 13   there.
03:43 14   Q. For instance, this one, 3-07-03, you earned
03:43 15   $2.91 for that month -- for that week?
03:43 16   A. Correct.
03:43 17   Q. Okay. You handed us today some additional
03:43 18   documents. I want to go over those with you right now.
03:43 19   A. Okay.
03:43 20   Q. I only have one copy. This one is the
03:43 21   affidavit of --
03:43 22   A. One copy is fine with me as long as you don't
03:43 23   mind if I get a little closer to you.
03:43 24   Q. I'll hand it to you in a second. You prepared
03:43 25   this for your attorney or your attorney prepared that

HILL & ROMERO
CERTIFIED COURT REPORTERS

91

03:43 1    for you, one of the two?
03:43 2    A. The typewritten was prepared for me. The
03:43 3    handwriting, part of it is mine.
03:43 4    Q. Okay. And that's a document that was attached
03:43 5    to the Motion for Summary Judgment?
03:43 6    A. I believe so.
03:43 7    MR. AGUILAR: In response to the Motion
03:43 8    for Summary Judgment.
03:44 9    Q. Did you provide a copy of this to Mr. Horner?
03:44 10   A. I don't provide anything to Mr. Horner. I
03:44 11   provide it to my attorney.
03:44 12   Q. Do you know when this was prepared?
03:44 13   A. Probably at the time that you were doing the
03:44 14   Daubier challenge.
03:44 15   MS. NEALLY: Object to the responsiveness
03:44 16   of the answer.
03:44 17   Q. Do you know when it was prepared?
03:44 18   A. Probably just before November 2003.
03:44 19   Q. Okay. So that was after the deposition of Mr.
03:44 20   Horner, right?
03:44 21   A. Correct.
03:44 22   Q. You added this language in here, right?
03:44 23   A. Which part?
03:44 24   Q. About the average attrition rates.
03:44 25   A. This writing over here --

HILL & ROMERO
CERTIFIED COURT REPORTERS

92

03:44 1    Q. Right.
03:44 2    A. -- to the right is not mine.
03:44 3    Q. Okay.
03:44 4    A. These calculations are mine and I ran out of
03:45 5    room here and that's when I went to a big sheet of
03:45 6    paper.
03:45 7    Q. Okay. How did you come up with these figures?
03:45 8    A. If we can go on to the other one, you'll see
03:45 9    that they're the same and I can talk off of that.
03:45 10   Q. Okay. So what you're representing to me right
03:45 11   now is that the documents on Andrus 12 are the same as
03:45 12   the documents on Andrus 11?
03:45 13   MR. AGUILAR: Numbers.
03:45 14   A. The documents aren't the same but the --
03:45 15   Q. The numbers, the handwriting is the same?
03:45 16   MS. LEEDS: The data.
03:45 17   Q. The data.
03:45 18   MS. NEALLY: Thank you.
03:45 19   A. Yes.
03:45 20   Q. Okay. So where did you come up with these
03:45 21   figures?
03:45 22   A. Because this was after the testimony of Dr.
03:45 23   Horner I wanted some type of a basis to compare my
03:45 24   experience in the field using ten percent so I used the
03:46 25   commission statements of a carrier that would have had

HILL & ROMERO
CERTIFIED COURT REPORTERS

93

03:46 1 a record since that time and I compiled the number of
03:46 2 cases that were for '98 to get an idea of the attrition
03:46 3 rate for that carrier for a five-year time span.
03:46 4     Q.   What carrier did you use?
03:46 5     A.   Northern Life.
03:46 6     Q.   How much of your business is comprised from
03:46 7 your sales of Northern Life products?
03:46 8     A.   None anymore.
03:46 9     Q.   How much of your business was from sales of
03:46 10 Northern Life products?
03:46 11     A.   What I mean is it's a product I'm not selling
03:46 12 anymore and basically it hasn't been sold since
03:46 13 probably '98 except maybe on a limited basis of one
03:46 14 subagent or two subagents.
03:46 15     Q.   What kind of products were you selling for
03:46 16 Northern Life?
03:46 17     A.   TSAs.
03:46 18     Q.   Which would be?
03:46 19     A.   Tax sheltered annuity.
03:47 20     Q.   Okay. You only sold this product when?
03:47 21     A.   I quit selling it after '98 for the most part.
03:47 22     Q.   Why did you quit selling it?
03:47 23     A.   I believe we talked about this in the first
03:47 24 depo but I'll review it. The contract that I had was
03:47 25 not a lucrative contract when I began in the business

HILL & ROMERO
CERTIFIED COURT REPORTERS

94

03:47 1 and other carriers saw the value that I brought to the
03:47 2 industry and offered me more lucrative contracts.
03:47 3     Q.   Okay. So you weren't making as much money for
03:47 4 Northern Life as you were with other companies?
03:47 5     A.   Basic economic principle, I guess that would
03:47 6 be.
03:47 7     Q.   Okay. So what does -- the figures you have
03:47 8 down here at the bottom -- actually, let's look at
03:47 9 this.
03:47 10     A.   That's something different.
03:47 11     Q.   All right. Well, show me this then. '98 --
03:48 12     A.   Do you want me to basically tell you what this
03:48 13 is?
03:48 14     Q.   Yes.
03:48 15     A.   Okay. Can I have something to point with?
03:48 16 '98, there were 25 cases on the books that were written
03:48 17 by me.
03:48 18     Q.   Okay.
03:48 19     A.   I'm sorry. This is the chart that I need to
03:48 20 look at that would have compared to. Okay. This
03:48 21 correlates with Andrus 11. One is comprised of growth
03:48 22 rates, one is comprised of attrition rates. So I'm
03:48 23 sorry if that was confusing.
03:48 24     MS. LEEDS: It's still confusing. Andrus
03:48 25 11 is two pages, right -- three pages.

HILL & ROMERO
CERTIFIED COURT REPORTERS

95

03:49 1     A.   Okay. So it's all 11. Okay. If I may speak
03:49 2 about attrition rates.
03:49 3     MS. LEEDS: Why don't you put A, B and C
03:49 4 to differentiate the different pages?
03:49 5     Q.   Just put A, B and C by these different columns
03:49 6 so we know which one you're talking about.
03:49 7     A.   You don't want to make it a separate exhibit?
03:49 8     Q.   No, I don't.
03:49 9     A.   Okay. I'm going to put A. I'm going to do it
03:49 10 in blue ink and I'll circle it. I'll put B and circle
03:49 11 it.
03:49 12     MS. LEEDS: Just for clarification, is
03:49 13 this a totally different thing, the columns?
03:49 14     THE WITNESS: This has to do with growth.
03:49 15     MS. LEEDS: That's different from this and
03:49 16 this?
03:49 17     MS. NEALLY: Hold this. Let me ask a
03:49 18 question.
03:49 19     Q.   Andrus --
03:49 20     MS. NEALLY: Well, can I have another
03:49 21 exhibit, please?
03:49 22     Q.   All right. 11A is the same as the handwriting
03:49 23 on Andrus 12; is that right?
03:50 24     A.   No. 11B correlates with what's on Andrus 12.
03:50 25     Q.   Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

96

03:50 1     A.   You'll see the numbers are the same here.
03:50 2     Q.   And the numbers that you're talking about the
03:50 3 attrition rates?
03:50 4     A.   I think we confused each other with all due
03:50 5 respect. Which would you like me to talk about first,
03:50 6 how about that?
03:50 7     Q.   Just one thing would be great.
03:50 8     A.   Okay. Let's talk about this first, which is
03:50 9 Andrus 11A.
03:50 10     Q.   What is it?
03:50 11     A.   This correlates with what I was trying to get
03:50 12 at and I apologize if I've been confusing. When I
03:50 13 talked about the commission statement, the clients that
03:50 14 I had on the book, in '99 there were 25, okay?
03:50 15     Q.   For this one company?
03:50 16     A.   For this one company.
03:50 17     Q.   Okay.
03:50 18     A.   I use this company just to compare to see if I
03:50 19 was accurate in the industry standards of using a ten
03:51 20 percent attrition rate as a conservative maximum.
03:51 21 Okay?
03:51 22     Q.   Okay.
03:51 23     A.   There were 25 of my clients that year.
03:51 24     Q.   Okay.
03:51 25     A.   The next year it increased by one.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS

## 97

03:51 1    Q. But you weren't writing?
03:51 2    A. You're absolutely correct.
03:51 3    Q. Then how could it increase?
03:51 4    A. Well, somebody at their own will decided to
03:51 5  start contributing to their plan again, okay? In 2001
03:51 6  there was some attrition. So the difference between
03:51 7  '99 and 2000 was a positive four percent attrition.
03:51 8  Dropping down in 2001, I did have a negative number
03:51 9  which was minus 7.69 percent. The following year it
03:51 10  remains stagnant.
03:51 11    Q. How about this year?
03:51 12    A. This year I haven't calculated it.
03:51 13    Q. When did you calculate that, from November to
03:51 14  November?
03:51 15    A. What I did to make it so it wasn't completely
03:52 16  confusing is I grabbed December statements. And if
03:52 17  you'll let me finish, I'll tell you what I use this
03:52 18  for.
03:52 19    Q. No, I'll just ask the questions that go along,
03:52 20  okay?
03:52 21    A. Okay.
03:52 22    Q. You used the December statements, so December
03:52 23  '02 would be the 24 that you had?
03:52 24    A. Yes.
03:52 25    Q. And you still didn't have December '03 at that

## 98

03:52 1  point?
03:52 2    A. Correct.
03:52 3    Q. So we don't know what it was today?
03:52 4    A. Correct.
03:52 5    Q. Okay. What kind of policy were they? Were
03:52 6  they all the same kind of policy?
03:52 7    A. Can you define kind?
03:52 8    Q. No. You told me they were TSAs. Were they all
03:52 9  the same TSA?
03:52 10    A. No.
03:52 11    Q. What kinds were they? Was there a variety?
03:52 12    A. One was a TSA-1 group.
03:52 13    Q. Okay.
03:52 14    A. I believe there was an A Plus in there, either
03:52 15  an A Plus or Retirement Plus but I think it was A Plus.
03:52 16  And that would have been the majority of it.
03:52 17    Q. Okay. But how many companies were you writing
03:53 18  for -- do you write for now?
03:53 19    A. What I write for now? Two. Two companies I
03:53 20  think I write business.
03:53 21    Q. Okay. How about your -- The Teachers' Agency?
03:53 22    A. We're actively marketing two companies.
03:53 23    Q. Okay. Which are Allianz and what else?
03:53 24    A. Well, are we talking about flex premium or are
03:53 25  we single premium? Can you be more specific?

## 99

03:53 1    Q. I'm just talking about what kind of business.
03:53 2  You write for a lot of different companies, different
03:53 3  kinds of business, right?
03:53 4    A. Correct, but what I'm referring to here --
03:53 5    Q. Because you only looked at one company here,
03:53 6  right?
03:53 7    A. -- is the flex premium. That's correct. And
03:53 8  you didn't let me finish.
03:53 9    MS. LEEDS: Objection; nonresponsive.
03:53 10    Q. Okay. So you used this document for what?
03:53 11    A. I used this document, as I was saying, to
03:53 12  compare my numbers for business that was in place that
03:53 13  year.
03:53 14    Q. I understand that, sir. What I'm asking --
03:53 15    A. But you asked again.
03:53 16    Q. No. Maybe I wasn't clear.
03:53 17    MR. AGUILAR: Let her just finish.
03:53 18    Q. Does this document go along with one of these
03:54 19  documents? You went from there to another step, or
03:54 20  what?
03:54 21    A. This has to do with attrition.
03:54 22    Q. Okay.
03:54 23    A. This has to do with growth.
03:54 24    Q. Okay. So let's talk about the growth now.
03:54 25    A. Okay.

## 100

03:54 1    Q. The growth was -- what did you compare there?
03:54 2    A. What I have for columns are the various
03:54 3  carriers that I was selling at the time in question.
03:54 4    Q. Okay.
03:54 5    A. Actually, up through 2002. To show you what my
03:54 6  acronyms mean, ALL is Allianz, NL is Northern Life,
03:54 7  American Funds is AM Funds, UTA is United Teachers
03:54 8  Associates Insurance Company, CGU is --
03:54 9    MR. AGUILAR: Commercial General.
03:54 10    A. -- Commercial General, which is Viva now, and
03:54 11  CUL is Columbia Universal Life.
03:54 12    Q. Okay. And that's who you were writing for --
03:54 13  some of the companies you were writing for?
03:54 14    A. That's -- I'm talking about flex premium.
03:55 15    Q. Okay. So you compared flex premium for your
03:55 16  sales; is that right?
03:55 17    A. Yes.
03:55 18    Q. From 1998 until 2002?
03:55 19    A. Correct.
03:55 20    Q. Except in 1998, you didn't have any?
03:55 21    A. 25, which is where you go over --
03:55 22    Q. And that was all for Northern Life?
03:55 23    A. Correct.
03:55 24    Q. Okay.
03:55 25    A. Okay. So '99 comes around and the reason I use

STEPHEN M. ANDRUS

.01

03:55 1    '98 over here is because there's a track record. I'm
03:55 2    just trying to compare it to see if I'm accurate using
03:55 3    ten percent. I go over here. In '99 you'll see that
03:55 4    there's zeros here. That may have been a carrier that
03:55 5    I didn't pick up yet, but -- I didn't use it down here.
03:55 6        Q. Okay. I understand that.
03:55 7        A. Okay.
03:55 8        Q. So those are your total sales?
03:55 9        A. Additional sales for '99, with American Funds,
03:55 10   I sold 13; CGU, 19; Columbia Universal Life, three.
03:55 11       Q. I understand.
03:55 12       A. Okay?
03:55 13       Q. Okay. I understand. Now, it decreased
03:56 14   significantly in '02. Have you got any from '03?
03:56 15       A. I haven't done an analysis of it, no.
03:56 16       Q. In '03 would you also have sales comparable to
03:56 17   '02?
03:56 18       A. Probably because I'm not in the role of selling
03:56 19   anymore.
03:56 20       Q. Okay. So in '02 and '03 you started to step
03:56 21   down from your role of selling?
03:56 22       A. Correct.
03:56 23       Q. Okay. So then when we look at the figures that
03:56 24   you have here in column -- in 11B, this represents what
03:56 25   you projected your growth rate to be from the new sales

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

03:56 1    you had in column 11A; is that right?
03:56 2        A. You mean sheet 11A?
03:56 3        Q. In column 11A. This is 11A -- or C. I don't
03:56 4    know. You didn't label it.
03:56 5            MR. AGUILAR: This is 11A.
03:56 6            MS. NEALLY: Well, he didn't label that
03:57 7    one.
03:57 8            MR. AGUILAR: It is labeled. This one is
03:57 9    11B. You're talking about the top half and the bottom
03:57 10   half of 11B.
03:57 11           MS. NEALLY: Yeah, right. Okay, fine.
03:57 12   I've asked him to label it in three parts since he had
03:57 13   three different columns but he didn't do that.
03:57 14       Q. Okay. So for 1998 you had a ten percent
03:57 15   growth; for 1999 you had a 26 percent growth; for 2000
03:57 16   you had a negative ten; and for 2001 you had a negative
03:57 17   39?
03:57 18       A. That's all incorrect.
03:57 19       Q. Oh, I'm sorry. Is it the second figure, the
03:57 20   40, 70 --
03:57 21       A. This is case count.
03:57 22       Q. Okay.
03:57 23       A. This is percent.
03:57 24       Q. Okay. So your growth rate from '98 to '99 was
03:57 25   40 percent?

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

03:57 1        A. Correct.
03:57 2        Q. Your growth rate from '99 to 2000 was 74
03:57 3    percent?
03:57 4        A. Correct.
03:57 5        Q. And then from 2000 to 2001 it dropped down to
03:57 6    20 -- a negative 20 percent, correct?
03:57 7        A. Correct.
03:57 8        Q. And from 2001 to 2002 it dropped down to a
03:57 9    negative 80 percent?
03:57 10       A. Correct.
03:57 11       Q. And then you would expect that it would it be
03:58 12   pretty consistent for 2003, probably a zero percent?
03:58 13       A. There's probably even a negative because I'm
03:58 14   really taking a role where I don't write business
03:58 15   anymore.
03:58 16       Q. Okay. All right. Did you do any of these
03:58 17   figures for anyone besides yourself?
03:58 18       A. No.
03:58 19       Q. Okay. Would you agree with me that if we were
03:58 20   to add all of these figures together to get your growth
03:58 21   rate, it wouldn't be an accurate reflection for what
03:58 22   you would anticipate from a selling person's growth
03:58 23   rate to be?
03:58 24       A. A selling person of what caliber?
03:58 25       Q. Let's say we added these together for you and

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

03:58 1    we added -- you didn't that, though. Okay. This
03:59 2    doesn't accurately reflect what you anticipate someone
03:59 3    that was actively selling, what their growth rate would
03:59 4    be, right?
03:59 5        A. A very experienced person -- well, in answer to
03:59 6    your question, no, because I was just part-time then.
03:59 7    I wasn't even actively in the role of selling for part
03:59 8    of that.
03:59 9        Q. And not to mention that you had a negative 20
03:59 10   percent and a negative 80 percent in '01 and '02,
03:59 11   right?
03:59 12       A. That's correct.
03:59 13       Q. Okay.
03:59 14           MS. NEALLY: I'm going to pass the
03:59 15   witness.
03:59 16           EXAMINATION
03:59 17   BY MS. LEEDS:
03:59 18       Q. Mr. Andrus, you mentioned an industry standard
03:59 19   using ten percent attrition rate. Where did you get
03:59 20   the industry standard from?
03:59 21       A. Just over the years from being involved with
03:59 22   classes, continuing education, being with other people
03:59 23   in the same industry that I'm in, after the fact
03:59 24   confirming that with my cohorts, not just necessarily
04:00 25   my partners but other people in the business that I may

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 105

04:00 1  be at a seminar with.
04:00 2  Q. So is there any documented industry standard,
04:00 3  or you're just coming up with this number from
04:00 4  conversations you've had?
04:00 5  A. There probably is but I can't get my hands on
04:00 6  it.
04:00 7  Q. Do you know of one? Have you seen it published
04:00 8  somewhere?
04:00 9  A. There's a company that does that and you have
04:00 10  to belong to them and pay fees to do so.
04:00 11  Q. Who is that company?
04:00 12  A. I can get that information to you, but I don't
04:00 13  recall the name of it right now.
04:00 14  Q. But you haven't seen it?
04:00 15  A. That's correct.
04:00 16  Q. So you do not know if there is a published
04:00 17  industry standard of an attrition rate for TSA,
04:00 18  correct?
04:00 19  A. Other than what's expected in our contracts.
04:00 20  Q. Okay. So the answer is yes, right?
04:00 21      MR. AGUILAR: Objection; mischaracterizing
04:00 22  the witness's testimony.
04:00 23  Q. You do not know of a published industry
04:00 24  standard that you have seen that says that ten percent
04:00 25  attrition rate is such an industry standard?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 106

04:01 1  A. Correct.
04:01 2  Q. You said your overhead was about 200K. How
04:01 3  much of that was salaries?
04:01 4  A. 80 to 90,000.
04:01 5  Q. What was the rest on?
04:01 6  A. Garbage removal, electricity, stamps,
04:01 7  envelopes, recruiting trips, equipment. Everything it
04:01 8  takes to run a business.
04:01 9  Q. Okay. In 2002 what was your overhead?
04:02 10  A. I have no idea without looking at the --
04:02 11  looking into the books.
04:02 12  Q. Well, you reported an overhead amount to Mr.
04:02 13  Horner, did you not?
04:02 14  A. I don't recall.
04:02 15  Q. Where did you get the number that -- and I'll
04:02 16  show you where you did it. Where did you get the
04:04 17  number that you gave to him? Has --
04:04 18      MS. NEALLY: I'll find it. It's one of
04:04 19  these.
04:04 20  Q. Has Andrus & Paz dissolved yet?
04:04 21  A. No, it can't dissolve because there's still
04:04 22  some companies, number one, that haven't transferred
04:04 23  everything over as directed. It's a slow process.
04:04 24  And, number two, this lawsuit is not resolved yet.
04:04 25  Q. Is Andrus & Paz still getting overwrites?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 107

04:04 1  A. Yes.
04:04 2  Q. How much?
04:04 3  A. That's a question that I would refer to our
04:04  CFO. He's the one who keeps track of all that.
04:05 5  Q. You have no idea?
04:05 6  A. I really don't.
04:05 7      (Off record).
04:05 8  Q. Who is the CFO?
04:05 9  A. That's Valentin Paz.
04:05 10  Q. When did you start going to Los Fresnos?
04:05 11  A. When we were -- shortly after we were awarded
04:05 12  the proposal.
04:05 13  Q. When was that?
04:05 14  A. I believe it was sometime in September that the
04:05 15  proposal was awarded.
04:05 16  Q. '03?
04:05 17  A. '03, yes.
04:05 18  Q. Okay. And when did you start visiting or
04:05 19  trying to do business in Los Fresnos?
04:05 20  A. As I stated earlier with the cafeteria plan,
04:05 21  there was a plan date and it would have been just
04:05 22  shortly before that.
04:06 23  Q. So you had not ventured into Los Fresnos to try
04:06 24  to do business prior to the '03/'04 school year?
04:06 25  A. I had done a little bit as disclosed in my

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 108

04:06 1  first deposition but not anything like being awarded a
04:06 2  proposal.
04:06 3  Q. You hadn't even applied for a proposal -- I
04:06 4  mean, tried to get a cafeteria proposal going before
04:06 5  then; right?
04:06 6  A. Sure, we did.
04:06 7  Q. You did? Okay. What about Port Isabel, what
04:06 8  kind of business do you do in Port Isabel?
04:06 9  A. Right now I have a couple of agents that that's
04:06 10  closer to their home and that's where they choose to
04:06 11  solicit business.
04:06 12  Q. Is this mostly 403(B) stuff?
04:06 13  A. I would say a good part of it is.
04:06 14  Q. Who are these agents?
04:06 15  A. Bertha Zamora and Janet White.
04:07 16  Q. How long have they been with you?
04:07 17  A. Janet White has been with us a couple of years
04:07 18  now.
04:07 19  Q. Meaning two?
04:07 20  A. Correct.
04:07 21  Q. And Bertha?
04:07 22  A. Or close to two. Bertha, we picked her up I
04:07 23  believe in December of '03.
04:07 24  Q. Okay. On average how much do they generate for
04:07 25  The Teachers' Agency a month?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 09

04:07 1    A. That's a question I would have to refer to
04:07 2 Valentin Paz.
04:07 3    Q. Okay. What about Rio Hondo?
04:07 4    A. Rio Hondo may have been a couple of referrals
04:07 5 from clients that probably either one of those two
04:07 6 ladies went over there to write business with.
04:07 7    Q. Okay. How many schools in the McAllen area do
04:07 8 you have?
04:07 9    A. That, I don't know. We have two active agents
04:07 10 over in that area.
04:07 11    Q. Who?
04:07 12    A. Linda Brill and Norma Van Bogart.
04:08 13    Q. How long has Linda been with you?
04:08 14    A. Somewhere around January or February of 2002.
04:08 15 So a couple of years, both of them.
04:08 16    Q. Okay. How much do they generate a month?
04:08 17    A. That's another question I'd have to refer to
04:08 18 Valentin Paz.
04:08 19    Q. So you don't know?
04:08 20    A. Correct.
04:08 21    Q. Who has been with you the longest, agent-wise?
04:08 22    A. Valentin Paz.
04:08 23    Q. Okay. Second longest?
04:08 24    A. Fernando.
04:08 25    Q. Third longest?

## 110

04:09 1    A. I believe it would have been Kelly Smith.
04:09 2    Q. In the Rio Grande Valley who has been with you
04:09 3 the longest?
04:09 4    A. Valentin Paz.
04:09 5    Q. Other than -- other than the plaintiffs in this
04:09 6 lawsuit.
04:09 7    A. Sylvia.
04:09 8    Q. And besides Sylvia?
04:09 9    A. Well, second longest, you mean?
04:09 10    Q. Yes.
04:09 11    A. There's a -- I think we contracted a Juan
04:09 12 Garcia shortly after her so he would probably come into
04:09 13 play. He's more of the broker caliber.
04:10 14    Q. Okay. But I don't want brokers because they
04:10 15 have a bunch of people that are generating work for
04:10 16 them.
04:10 17    A. Well, not necessarily. They could be
04:10 18 individual.
04:10 19    Q. Right. Are you talking about him as an
04:10 20 individual, his personal production, or him as a broker
04:10 21 with all the people that give him production?
04:10 22    A. Well, I don't think you're interpreting the
04:10 23 term broker correctly.
04:10 24    Q. Is his personal production what you would --
04:10 25 well, is he -- has he been associated with you as a

## 111

04:10 1 producing agent to you the second longest after Sylvia?
04:10 2    A. Possibly. Going by memory it would have come
04:10 3 into that time frame.
04:11 4    Q. Where does Shaun Osborn come from?
04:11 5    A. He runs our San Antonio office.
04:11 6    Q. How did you become involved with him?
04:11 7    A. When Dino and I first joined forces we were
04:11 8 contacted by a number of carriers because of our
04:11 9 experience to do -- they wanted us to sell their
04:11 10 products, and he was one of the assistants to one of
04:11 11 the company vice-presidents and a relationship just
04:11 12 developed that we felt that he was just a quality
04:11 13 enough individual, cared about people enough that we
04:11 14 wanted to do business with him.
04:11 15    Q. And is that when you opened your San Antonio
04:12 16 office?
04:12 17    A. No, the relationship became stronger and
04:12 18 stronger and after many meetings with him we came to
04:12 19 terms and the San Antonio office was opened sometime
04:12 20 last summer.
04:12 21    Q. How much does that generate?
04:12 22    A. That's a question I would have to refer to our
04:12 23 CFO.
04:12 24    Q. Were any numbers generated by them given to Mr.
04:12 25 Horner?

## 112

04:12 1    A. No. That's after we met with Dr. Horner, I
04:12 2 believe.
04:12 3    Q. Well, you said sometime last summer. He wasn't
04:12 4 deposed until September, right, so San Antonio existed?
04:12 5    A. The office probably existed.
04:12 6    Q. Did you even tell me you had a San Antonio
04:12 7 office?
04:12 8    A. I don't recall.
04:13 9    Q. Okay. Ms. Neally has been asking you about
04:13 10 your income for 2003 and you mentioned the 14,000,
04:13 11 which was the base salary that everybody that was in
04:13 12 The Teachers' Agency was going to get paid, right?
04:13 13    A. Yes.
04:13 14    Q. And then you got about 20K from commissions?
04:13 15    A. Incorrect.
04:13 16    Q. From overwrites?
04:13 17    A. It's 20,000 from dividends.
04:13 18    Q. Dividends. Where do those come from?
04:13 19    A. The directors of the board determine if there's
04:13 20 enough profit to pay dividends.
04:13 21    Q. Oh, of The Teachers' Agency?
04:13 22    A. Yes, ma'am.
04:13 23    Q. Those are dividends from profit generated by
04:13 24 The Teachers' Agency?
04:13 25    A. Correct.

## 13

04:13 1      Q.  What was your profit last year?

04:13 2      A.  That would be a question I would refer to our

04:13 3  CFO.

04:14 4      Q.  But obviously you made a profit if you had

04:14 5  enough to pay dividends?

04:14 6      A.  Yes.  And with all due respect, we're waiting

04:14 7  for all of our records to come back from our CPA.

04:14 8      MS. LEEDS:  Objection; nonresponsive.

04:14 9      Q.  Could you have given yourself a dividend if you

04:14 10  didn't have a profit?

04:14 11      A.  No.

04:14 12      Q.  Okay.  So the answer to my question is yes, you

04:14 13  made a profit --

04:14 14      A.  Yes.

04:14 15      Q.  -- because you got dividends?

04:14 16      A.  Correct.

04:14 17      Q.  Okay.  And then 28,000 were in 1099s?

04:14 18      A.  Approximately.  That's just going off my

04:14 19  memory.

04:14 20      Q.  Okay.  And when Ms. Neally asked you where the

04:14 21  evidence of those numbers were, you said in the company

04:14 22  checkbook.  Do you recall that?

04:14 23      A.  Except for my own personal -- the 1099 stuff?

04:14 24      Q.  Uh-huh.

04:14 25      A.  But, yes, there would be a log of a dividend

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 114

04:14 1  check written to me, there would be a log of a salary

04:14 2  check written to me, so that is correct.  And yes, I do

04:14 3  remember that.

04:14 4      Q.  Okay.  Were there any dividends paid in 2002?

04:15 5      A.  No.

04:15 6      Q.  Did you get 14 grand from The Teachers' Agency

04:15 7  in 2002?

04:15 8      A.  No.

04:15 9      Q.  Actually, when we took your deposition which

04:15 10  was September and February of 2003, you had already

04:15 11  taken the step to get away from personal production,

04:15 12  right?

04:15 13      A.  Tell me the time frame again, please.

04:15 14      Q.  February 2003 and then again in March of 2003.

04:15 15      A.  That's a correct statement.

04:16 16      Q.  Am I correct in assuming from your testimony

04:16 17  here today, based on what you have answered to Ms.

04:16 18  Neally's questions on Exhibits 11 and 12, that you had

04:16 19  generated no documents for Mr. Horner regarding

04:16 20  attrition and growth rates?

04:16 21      A.  That's correct, other than Horner 9.

04:16 22      Q.  Did you generate that document?

04:16 23      A.  I generated that document, yes, ma'am.

04:16 24      Q.  Okay.  But this just says an attrition and

04:16 25  growth rate, right?  It doesn't say how you got there,

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 115

04:16 1  correct?

04:16 2      A.  You are correct.

04:16 3      Q.  Okay.  I'm talking about how you got to the

04:16 4  point where you said there's a growth rate of 10,000 --

04:16 5  of ten percent, an attrition rate of ten percent, you

04:16 6  gave Dr. Horner no documents in that regard?

04:16 7      A.  That's correct.

04:17 8      Q.  And you have based that on what you have told

04:17 9  Ms. Neally your vast experience and your conversations

04:17 10  with people in the field?

04:17 11      A.  That is correct.  There's no better teacher

04:17 12  than experience.

04:17 13      MS. NEALLY:  Objection.

04:17 14      Q.  Are we safe in saying that you have not even

04:17 15  been in this business ten years?

04:17 16      A.  Let's see.

04:17 17      Q.  It's easy to add.  '95 --

04:17 18      A.  I'm in -- I'm in my 10th year this year.

04:17 19      Q.  '95 plus ten.  You started in '95, right?

04:17 20      A.  Correct.  I'm in my 10th year.

04:17 21      Q.  Next year is 2005.  Okay.  When did you get

04:17 22  your license to sell 403(B) products?

04:17 23      A.  January of 1995.

04:17 24      Q.  Okay.  And have you been selling 403(B)

04:17 25  products continuously up until the time you decided not

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 116

04:17 1  to do personal production again?

04:18 2      A.  Except for the brief time at the very beginning

04:18 3  of my career when I was with New York Life, that would

04:18 4  be an accurate statement.

04:18 5      Q.  How many -- well, let's look at -- would you

04:18 6  mark that C so we won't go through this again?

04:18 7      A.  Sure.  Is this okay?  There we go.

04:18 8      Q.  And what is -- that other document is part of

04:18 9  this exhibit also, right, Exhibit 11?  That's the third

04:18 10  page of Exhibit 11?

04:18 11      A.  I don't know.

04:18 12      Q.  Well, when you brought them today, were there

04:18 13  three pages?

04:18 14      A.  This was part of what we brought today.

04:18 15      Q.  Okay.

04:18 16      MS. NEALLY:  I haven't seen that.  I

04:18 17  haven't asked him questions on that.

04:18 18      Q.  What do these two parts of this page have to do

04:18 19  with what you have already testified to A, B and C?

04:18 20      A.  Again, when I prepared the document before,

04:19 21  which is labeled --

04:19 22      Q.  Horner 8 -- 9?

04:19 23      A.  -- Horner 9, when I prepared these documents I

04:19 24  wanted to have something to verify my beliefs based on

04:19 25  my experience.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**117**

04:19 1    Q.  I'm just asking you what they are.  I know --
04:19 2    A.  And I'm answering.
04:19 3    Q.  Well, just -- don't give me the history.  Just
04:19 4  give me in a nutshell what it is.
04:19 5        MR. AGUILAR:  Objection; argumentative.
04:19 6  If you need to explain what it is by giving a history,
04:19 7  you can do that.
04:19 8        MS. LEEDS:  We'll be here all day.
04:19 9    A.  Well, I think the way you're asking --
04:19 10        MR. AGUILAR:  Wait a minute.  It's
04:19 11  necessary to be here all day anyway.
04:19 12    A.  Can you rephrase the question, please?
04:19 13    Q.  Yes.  I already know that these are the things
04:19 14  you sold, this is your growth rate, this is the
04:19 15  attrition rate.  What's this?
04:19 16    A.  Okay.
04:19 17        MS. NEALLY:  Why don't we mark these --
04:19 18        MS. LEEDS:  I will in a second.
04:19 19    A.  Do you want to mark them as D and E?
04:19 20    Q.  What is this?
04:19 21    A.  That is, just as the title says, my 1099 income
04:19 22  for these various years.
04:19 23    Q.  Okay.  What is this?
04:19 24    A.  This is actual income received for various
04:20 25  years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**118**

04:20 1    Q.  Okay.  I'm going to mark your 1099 income as D
04:20 2  and your actual income received as E, okay?
04:20 3    A.  Okay.
04:20 4    Q.  So these reflect different things than what's
04:20 5  on A, B and C?
04:20 6    A.  Yes.
04:20 7    Q.  Okay.  Your 1099 income for 1998 would have
04:20 8  been -- what kind of income is that, from commission
04:20 9  statements?
04:20 10    A.  I went back to look at 1099s instead of the
04:20 11  receivables that I have, which would be Horner 8.  This
04:21 12  is reflective of Horner 8.  This is reflective of
04:21 13  actually earned 1099 income.
04:21 14    Q.  What do you mean, earned 1099 income?
04:21 15    A.  This is what the company reports to the IRS --
04:21 16    Q.  Right.
04:21 17    A.  -- as earned income.
04:21 18    Q.  Right.
04:21 19    A.  And this is what they write me a check for.
04:21 20    Q.  And what's the difference?
04:21 21    A.  $3,996 in this year.
04:21 22    Q.  And where does that 3,000 come from -- go to?
04:21 23        MR. AGUILAR:  Objection; vague.
04:21 24    Q.  How can you have received 47,000 and that's not
04:21 25  what they reported?  Is that the advance loss stuff --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**119**

04:21 1    A.  Yes.
04:21 2    Q.  -- that you talked about?  Okay.  You said
04:22 3  receivables.  When you told us about Horner 8 before,
04:22 4  you didn't call this as receivables.  You said these
04:22 5  were commissions paid to you.
04:22 6    A.  That's right.
04:22 7    Q.  Okay.  So these -- these numbers should be in
04:22 8  11D as well?
04:22 9    A.  No.
04:22 10    Q.  Why not?  If they're 1099s, this was what they
04:22 11  paid to you that year, correct?
04:22 12    A.  No.
04:22 13    Q.  It's not -- a 1099 does not reflect what they
04:22 14  paid you?
04:22 15    A.  No.
04:22 16    Q.  What does it reflect?
04:22 17    A.  What was earned.
04:22 18    Q.  So before they give you the 1099 they do the
04:22 19  calculations of what they advanced to you or what you
04:22 20  owed them?
04:22 21    A.  Some companies.  Some don't.
04:22 22    Q.  Okay.  Now, in 2000 you had not started selling
04:23 23  full-time, right?
04:23 24    A.  That is correct.
04:23 25    Q.  You didn't start selling full-time until the

HILL & ROMERO
CERTIFIED COURT REPORTERS

**120**

04:23 1  middle of 2001?
04:23 2    A.  Correct.
04:23 3    Q.  So your first two years of full-time sales were
04:23 4  actually half of '01, all of '02, all of '03, right?
04:23 5    A.  And that would be two-and-a-half years, yes.
04:23 6    Q.  Okay.  Now, you had mentioned that there was a
04:23 7  decrease in '03 in terms of your income made and that
04:23 8  you had a reason for that.  What was the reason for it?
04:23 9    A.  I stopped personally producing.
04:23 10    Q.  Okay.  What else?
04:23 11    A.  The transformation of our entire organization.
04:23 12    Q.  Okay.  What else?  Well, that started in 2002
04:23 13  -- no, it didn't, did it?  You developed that in 2003.
04:23 14  The Teachers' Agency, Inc. came into being in 2003?
04:24 15    A.  Correct.
04:24 16    Q.  Okay.  So it was really in 2003 that there was
04:24 17  a major change in the corporate structure?
04:24 18    A.  That's when the corporation was formed.
04:24 19    Q.  Is that a yes?
04:24 20    A.  Yes.  Sorry.
04:24 21    Q.  Okay.
04:24 22    A.  That makes a difference.
04:24 23    Q.  So the 1099s that are reflected on 11D --
04:24 24        MR. AGUILAR:  What number is that?
04:24 25        MS. LEEDS:  11.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 121

04:24 1    MR. AGUILAR: 11 what?

04:24 2    MS. LEEDS: This is 11A, B, C, D and E.

04:24 3    It's all 11. It's Section D --

04:24 4    MR. AGUILAR: You're probably going to

04:24 5    have two 11s.

04:24 6    MS. LEEDS: -- of 11.

04:24 7    Q. Section D of Exhibit 11, the 1099s are what you

04:24 8    earned, actually earned that year?

04:24 9    A. Correct.

04:24 10   Q. Okay. That incorporates trailers, commissions,

04:25 11   overwrites, all that stuff?

04:25 12   A. For the most part.

04:25 13   Q. Okay. Where did you get these numbers?

04:25 14   A. I looked at part in my tax returns, I looked at

04:25 15   old W -- or 1099s to see what was reported, added them

04:25 16   up --

04:25 17   Q. Did you give us your 1099s?

04:25 18   A. I gave you my tax returns.

04:25 19   Q. You did not give us your 1099s, did you?

04:25 20   A. Some are inclusive of the tax return.

04:25 21   (Off record).

04:27 22   Q. You told me that the figures that are in

04:27 23   Section D of Exhibit 11, those 1099s are reflective of

04:27 24   commissions, trailers, different sources of income?

04:27 25   A. All related to my trade, yes.

## 122

04:27 1    Q. Right.

04:27 2    MS. LEEDS: Well, I just need to object

04:27 3    for the record that we have not been provided those

04:27 4    1099s that would document that income.

04:27 5    MS. NEALLY: That's okay.

04:27 6    Q. Did you give those to your attorney?

04:27 7    A. It's all inclusive in my tax return.

04:27 8    Q. Well, let me show you your tax return for 2001,

04:27 9    Mr. Andrus, and show me one 1099 that's in there.

04:27 10   A. I'm not a CPA but I believe there's a specific

04:27 11   line --

04:27 12   Q. You know, where it says 1099 on it. Show me a

04:27 13   document that says Form 1099. There are no 1099s in

04:29 14   there, are there?

04:29 15   A. I'm not finished yet.

04:29 16   Q. That's a W-2.

04:29 17   A. That is correct, it looks like the 1099s are

04:29 18   not attached to this.

04:29 19   Q. But you said yes, you gave them to your

04:29 20   attorney, right?

04:29 21   A. Well --

04:29 22   Q. Did you?

04:29 23   A. I don't think so, but --

04:29 24   Q. That's all I need, you did not give them to

04:29 25   your attorney. Thank you.

## 123

04:29 1    A. Okay.

04:30 2    Q. And Horner 8, you said this is a -- in a

04:30 3    notebook where you put down the totals you receive per

04:30 4    quarter and the totals you receive per month. Where do

04:30 5    you keep the running totals of these?

04:30 6    A. Until this year I kept it in that specific

04:30 7    book. For instance, 2002, all the running totals would

04:30 8    be in 2002's book. I didn't want to go and have to

04:30 9    recopy all this. I started a new book for 2003 to keep

04:30 10   the running totals for -- excuse me. I'm speaking on

04:31 11   the wrong year. 2004, let me use this year as an

04:31 12   example. I will have a running total book and then I

04:31 13   use the same page so that I can go in and have them all

04:31 14   compared side by side just for my own purposes.

04:31 15   Q. Okay. Did you provide those books to your

04:31 16   attorney?

04:31 17   A. No.

04:31 18   Q. Why not?

04:31 19   A. They were never requested.

04:31 20   Q. Well, I believe, Mr. Andrus, a request was made

04:31 21   of all documentation that supported your claim for

04:31 22   damages. The money you make per month, per year,

04:31 23   support your claims for damages, do they not?

04:31 24   A. I suppose.

04:31 25   Q. And wouldn't you think that a running total of

## 124

04:31 1    the money that you are making in a particular year is

04:31 2    indicative of how much you earn to be able to prove how

04:31 3    much you lost?

04:31 4    A. And that's what this is.

04:31 5    Q. And where are the documents that support Horner

04:32 6    8?

04:32 7    A. They're in the same notebook that this is in.

04:32 8    Q. But you didn't provide the notebooks with all

04:32 9    of the parts of how you came up with $6,000, right?

04:32 10   A. That's correct.

04:32 11   Q. Okay.

04:32 12   MS. LEEDS: I need to object to the

04:32 13   nonproduction of the books.

04:32 14   Q. So if you brought those books in, we could see

04:32 15   an actual addition of every 25 cent commission, dollar

04:32 16   commission per week, per month that you get for each of

04:32 17   these companies, added up to total your $1,986.70 for

04:32 18   January of 2000?

04:32 19   A. I believe that's an accurate statement.

04:32 20   Q. Okay. Instead you produced to us boxes of

04:32 21   commission statements, right?

04:32 22   A. Not instead of, no.

04:32 23   Q. Okay. Well, doesn't that reflect the same

04:33 24   thing as those boxes of commission statements?

04:33 25   A. Yes.

## 25

04:33 1    Q.  Okay.

04:33 2    A.  Not all of it but part of it.

04:33 3    Q.  Of the persons that you listed for Ms. Neally,

04:33 4  who specifically agreed with you that ten percent was

04:33 5  an industry standard attrition rate?  Not whether they

04:33 6  thought they had to make that and they wouldn't get

04:33 7  paid but actually said, the industry standards in

04:33 8  attrition is ten percent?

04:33 9    A.  Everybody I talked to agreed that that would be

04:33 10  a conservative maximum.

04:33 11    Q.  And they use the words industry standard?  Did

04:34 12  anybody use the words industry standards?

04:34 13    A.  I don't recall.

04:34 14    Q.  You actually could go back and figure out what

04:34 15  your actual attrition rate has been over the past three

04:34 16  years, couldn't you?

04:34 17    A.  It would be possible, yes.

04:34 18    Q.  But you haven't done that?

04:34 19    A.  Correct.

04:34 20    Q.  Of all of the people that you mentioned in the

04:34 21  list that you gave Ms. Neally, are any of them engaged

04:34 22  in the same kind of business you are in the same

04:34 23  geographical setting you are in?

04:34 24    A.  Which list are you referring to?

04:35 25    Q.  All the people you said you talked to.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 127

04:35 1    MR. AGUILAR:  *Objection; argumentative.*

04:35 2    MS. LEEDS:  Fine.

04:35 3    MR. AGUILAR:  If you want to define what

04:35 4  you're calling geographical similar to --

04:35 5    MS. LEEDS:  No.

04:35 6    Q.  Let me just ask you.  Are they?

04:35 7    MR. AGUILAR:  -- this geographical area,

04:35 8  then just identify it.

04:35 9    Q.  Are they?

04:36 10    A.  Can you repeat the question?

04:36 11    Q.  Yes.  Of the list you gave Ms. Neally, are any

04:36 12  of them engaged in the same business you are in the

04:36 13  same kind of geographical location as you?

04:36 14    A.  Yes.

04:36 15    Q.  Who?

04:36 16    A.  Eric Wolfe.

04:36 17    Q.  Okay.  Who else?

04:36 18    A.  Some of the insurance companies that I've

04:36 19  mentioned --

04:36 20    Q.  The insurance companies?

04:36 21    A.  -- that are located in Texas.  Yes.

04:36 22    Q.  Okay.  And they're not engaged in a kind of

04:36 23  business you are; they're not selling and running --

04:36 24  they're engaged in selling a product, right?

04:36 25    MR. AGUILAR:  *Objection; vague.*

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 126

04:35 1    A.  Okay.  Concerning compiling this information?

04:35 2    Q.  Well, you said that it's those conversations --

04:35 3    A.  But you're not talking about agents?

04:35 4    Q.  -- where you talked to -- I'm not talking about

04:35 5  agents.  I'm talking about the list you gave to Ms.

04:35 6  Neally about the people that you spoke to.

04:35 7    A.  Okay.  I got that part clear now if you could

04:35 8  rephrase the question for me.

04:35 9    Q.  Okay.  Are any of them engaged in the same kind

04:35 10  of business as you in the same geographical kind of

04:35 11  location as you?

04:35 12    A.  Well, if you consider Texas the same

04:35 13  geographical location, then yes.

04:35 14    Q.  Well, Mr. Andrus, don't -- you know, come on.

04:35 15  We're in the Rio Grande Valley and you know what I'm

04:35 16  talking about.

04:35 17    A.  I don't.

04:35 18    Q.  You don't?  You don't know what a geographical

04:35 19  location is?

04:35 20    MR. AGUILAR:  *Objection; argumentative.*

04:35 21  You need to define what --

04:35 22    MS. LEEDS:  I did.  I just did.

04:35 23    MR. AGUILAR:  Okay.

04:35 24    MS. NEALLY:  The Valley.

04:35 25    MS. LEEDS:  He says Texas is a location.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 128

04:36 1    A.  Those people with prior experience in doing

04:36 2  that --

04:36 3    Q.  Okay.  Right.  I'm not talking about that.  I'm

04:36 4  talking about now.  Who else that's running a business

04:36 5  the size of yours, doing what you're doing in an area

04:36 6  that is geographically similar to the Rio Grande

04:36 7  Valley?

04:36 8    A.  Nobody.  We have an elite niche that we're

04:36 9  bringing to the industry.  I don't believe there's

04:36 10  anybody else that does what we do.

04:36 11    Q.  Why are you -- why are you unique?

04:37 12    A.  What we specialize in is something that is a

04:37 13  very niche filled, specifically my expertise and it's

04:37 14  just not what a lot of people do.

04:37 15    Q.  Okay.  What do you consider your expertise?

04:37 16    A.  I believe I provided that documentation for you

04:37 17  with this last --

04:37 18    Q.  Tell me again.

04:37 19    A.  I can't remember.  There's a whole list.

04:37 20    Q.  Well, you're telling me you're an expert in

04:37 21  something.  What is it in?

04:37 22    MR. AGUILAR:  *Objection; argumentative.*

04:37 23    A.  There's a list of 50 different topics,

04:37 24  approximately.

04:37 25    Q.  There's 50 different topics that you're an

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 29

04:37 1   expert in?

04:37 2   A. Yes.

04:37 3   Q. Okay. So that's what you say your elite niche

04:37 4   is?

04:37 5   A. That's part of it.

04:37 6   Q. 50 different topics you are -- you have this

04:37 7   elite niche and you can't just tell me what the top --

04:38 8   A. I can tell you some of them.

04:38 9   Q. All right. Tell me.

04:38 10   A. 403(B)s.

04:38 11   Q. Okay. What else do you have an elite niche

04:38 12   in?

04:38 13   A. Enrollment services.

04:38 14   Q. Not the cafeteria plan?

04:38 15   A. Not necessarily.

04:38 16   Q. Okay. What else would that include besides the

04:38 17   cafeteria?

04:38 18   A. Enrollment services for any employee benefits.

04:38 19   Q. Okay. Why is your system unique?

04:38 20   A. Because we can handle the needs of any broker

04:38 21   that's out there.

04:38 22   Q. Okay. And there's nobody else in the Rio

04:38 23   Grande Valley that can do that?

04:38 24   A. I don't know of anybody else in the Rio Grande

04:38 25   Valley that does that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 130

04:38 1   Q. Okay. What else do you have an elite niche

04:38 2   in?

04:38 3   A. The numbers of people that we can provide for

04:38 4   an enrollment team and handle not only the Section 125,

04:38 5   but an expertise on the other side of the spectrum,

04:38 6   which is the retirement plan.

04:38 7   Q. Okay. And there's nobody else in the Rio

04:39 8   Grande Valley that can do that?

04:39 9   A. Not that I'm aware of.

04:39 10   Q. Okay. What else?

04:39 11   A. The marketing contracts that we have allow us

04:39 12   to be the agent of agents, so to say, where everybody

04:39 13   is looking at us for advice.

04:39 14   Q. Who is everybody?

04:39 15   A. Agents scattered throughout Texas.

04:39 16   Q. How far away do they call you?

04:39 17   A. I have people in Wyoming that will call me

04:39 18   occasionally.

04:39 19   Q. That's not Texas, right?

04:39 20   A. That's not Texas, no.

04:39 21   Q. Okay.

04:39 22   A. But Millennium Marketing, for example, markets

04:39 23   all over the country, and when somebody has a question

04:39 24   about a 403(B), they will refer them to me even though

04:39 25   they market 403(B) plans.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 131

04:40 1   Q. And there's nobody else in the area that you

04:40 2   know of that knows as much as you do?

04:40 3   A. Not if you put a conglomerate of marketing,

04:40 4   agency building and the areas of expertise that I hold,

04:40 5   your statement is correct.

04:40 6   MS. NEALLY: Can we get a copy of his

04:40 7   resume?

04:40 8   MR. AGUILAR: What's that?

04:40 9   MS. NEALLY: Can we get a copy of his

04:40 10   resume or --

04:40 11   MR. AGUILAR: Sure.

04:40 12   MS. NEALLY: -- or do we need to have one

04:40 13   faxed over?

04:40 14   MR. AGUILAR: As soon as we take a break,

04:40 15   just remind me.

04:40 16   Q. Are there people that do the same kind of

04:40 17   marketing that you do that make more money than you do

04:40 18   in this area?

04:40 19   A. I'm sure there is.

04:40 20   Q. Do you know who they are?

04:41 21   A. Excuse me. What you're asking has many

04:41 22   different --

04:41 23   Q. Just do you know who they are?

04:41 24   A. Well, I can't answer that.

04:41 25   Q. All right. Then you can't answer it. That's

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 132

04:41 1   easy.

04:41 2   MR. AGUILAR: Just say, I can't answer the

04:41 3   way you're asking and she will move on.

04:41 4   THE WITNESS: Okay.

04:41 5   Q. How long has Mr. De Pena been in this business?

04:41 6   A. Since 1970.

04:41 7   Q. But you're more of an expert than he?

04:41 8   A. Absolutely.

04:41 9   Q. Do you know what the average age or the average

04:41 10   number of years somebody stays in the 403 -- or this

04:41 11   business?

04:41 12   MR. AGUILAR: The question is, do you

04:41 13   know.

04:41 14   A. I can't answer that the way you phrased it.

04:42 15   Q. Okay. Have you read any publication, industry

04:42 16   or otherwise, that talks about the average number of

04:42 17   years somebody stays involved in the sales similar to

04:42 18   what you're doing?

04:42 19   A. Yes.

04:42 20   Q. What is that?

04:42 21   A. Three months.

04:42 22   Q. That is the average?

04:42 23   A. That a life insurance agent makes it.

04:42 24   Q. Okay. What about selling 403(B)s? That's not

04:42 25   quite life insurance, is it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS

133

04:42 1    A. It's all inclusive for the context that I
04:42 2 believe you're asking me.
04:42 3    Q. I'm not trying to make any context. I'm saying
04:42 4 403(B) is different than life insurance, right?
04:42 5    A. Yes, it is.
04:42 6    Q. Okay. Is three months the average number of
04:42 7 years somebody stays in the business of selling 403(B)s
04:42 8 as well?
04:42 9    A. I don't know.
04:42 10    Q. Okay. But you know that life insurance, it's
04:42 11 three months?
04:43 12    A. A life insurance agent.
04:43 13    Q. An agent. Well, that's involved in the sales
04:43 14 of life insurance policies, right?
04:43 15    A. Not necessarily. It could be a health agent,
04:43 16 it could be a life agent, they can be a disability
04:43 17 agent.
04:43 18    Q. Okay. That first -- that first conglomerate of
04:43 19 policy types?
04:43 20    A. Somebody that goes and gets a license, their
04:43 21 life expectancy is three months until they prove
04:43 22 themselves.
04:43 23    Q. Okay. Well, what about those that prove
04:43 24 themselves? Is there a publication, a document that
04:43 25 you have seen somewhere if they make three months, then

HILL & ROMERO
CERTIFIED COURT REPORTERS

134

04:43 1 they last X number of years?
04:43 2    A. Based on my training and experience, if you
04:43 3 can make it a year, you're going to stay in the
04:43 4 business.
04:43 5    Q. Did you listen to my question?
04:43 6    A. Please repeat it.
04:43 7    Q. I said, have you seen a publication --
04:43 8    A. No.
04:43 9    Q. -- that says --
04:43 10    A. No.
04:43 11    Q. -- that if you make it three months, you'll
04:43 12 stay in it X number of years?
04:43 13    A. No, ma'am.
04:44 14    Q. Okay. Going to Horner 9, that first sentence
04:44 15 that you have in the first paragraph there is
04:44 16 incorrect, isn't it?
04:44 17    MR. AGUILAR: You're talking about at the
04:44 18 very top?
04:44 19    MS. LEEDS: No, first paragraph.
04:45 20    A. Well, why is it incorrect, what part?
04:45 21    MR. AGUILAR: She's just asking you
04:45 22 whether it's incorrect.
04:45 23    Q. I'm asked you if it's incorrect, is it not?
04:45 24    A. No, I wrote it.
04:45 25    Q. I know you wrote it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

135

04:45 1    MR. AGUILAR: She's just asking you
04:45 2 whether it's incorrect or not.
04:45 3    A. It's not incorrect.
04:45 4    Q. Okay. The numbers -- when you were responding
04:45 5 to Ms. Neally's questions, the place or the origin of
04:45 6 the numbers that are contained in that paragraph were
04:45 7 derived from three agents, right?
04:45 8    A. Correct.
04:45 9    Q. So you did not take numbers from all of the
04:45 10 agents, did you?
04:45 11    A. That's correct.
04:45 12    Q. So that first sentence is inaccurate, isn't
04:45 13 it?
04:45 14    A. On the basis you're asking that, I don't
04:45 15 understand.
04:45 16    Q. It says, all agents, does it not?
04:45 17    A. Okay. That's what you're getting at is that
04:45 18 one part.
04:45 19    Q. Is that an accurate statement?
04:45 20    A. That is not accurate using all.
04:45 21    Q. Okay. That's all I'm asking.
04:45 22    A. Okay.
04:45 23    Q. You did not use all of your agents to derive
04:46 24 those numbers, did you? Correct, you did not?
04:46 25    A. That's correct. And as you were discussing --

HILL & ROMERO
CERTIFIED COURT REPORTERS

136

04:46 1 if you had geared me to that one little word I would
04:46 2 have known what you're talking about.
04:46 3    Q. Well, the statement is incorrect, is it not,
04:46 4 Mr. Andrus?
04:46 5    A. Yes, it is.
04:46 6    Q. All right. You took your three top agents and
04:46 7 took their average?
04:46 8    A. Correct.
04:46 9    Q. And extrapolated that for a year, right?
04:46 10    A. I used a year of production for those three
04:46 11 agents.
04:46 12    Q. Okay. Have you seen any document anywhere that
04:46 13 talks about what the national average is for insurance
04:46 14 agents such as Arturo Prado, Kelly Smith and Sam
04:46 15 Sauceda and what they should make in a year?
04:46 16    A. Yes.
04:46 17    Q. What publication?
04:46 18    A. I received one just two days ago. It was a
04:46 19 contest one of the companies was running. You do 1.2
04:47 20 million, you get to go to the Sandals Islands for a
04:47 21 week.
04:47 22    Q. Does that answer my question?
04:47 23    MS. NEALLY: I don't think so.
04:47 24    A. Well, in part. That's what a good agent is
04:47 25 expected to do.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**37**

04:47 1    Q. Mr. Andrus, I asked you what the national
04:47 2    average was. What a good agent is expected to do is
04:47 3    not a national average, is it?
04:47 4    A. Well, if you're asking me if I have seen
04:47 5    something in writing, no.
04:47 6    Q. Okay. That is all you had to say.
04:47 7    A. Sorry.
04:47 8    Q. So you have seen no documentation that has set
04:47 9    forth what the national average should be for an agent
04:47 10   of that type?
04:47 11   A. Correct.
04:48 12   Q. In the second paragraph you talk about Sylvia
04:48 13   Petrarca, but, again, you don't really use her real
04:48 14   numbers, do you, because you said she is a less
04:48 15   experienced agent?
04:48 16   A. That's not the reason.
04:48 17   Q. Is that what that says, she is a less
04:48 18   experienced agent?
04:48 19   A. She is a less experienced agent, yes.
04:48 20   Q. And, "so I used past production numbers of a
04:48 21   comparable experienced person"?
04:48 22   A. Yes.
04:48 23   Q. Okay. So instead of using her real numbers,
04:49 24   you used somebody else's numbers?
04:49 25   A. I didn't have real numbers for her.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**138**

04:49 1    Q. Is that a yes?
04:49 2        MR. AGUILAR: She's just asking what you
04:49 3    did.
04:49 4    Q. Instead of using her real numbers, you used
04:49 5    somebody else's numbers?
04:49 6    A. Correct.
04:49 7    Q. Do you know how long Ms. Petrarca has been
04:49 8    working in the insurance industry?
04:49 9    A. I don't, but it's been for a while.
04:49 10       MR. AGUILAR: She's only asking.
04:49 11       THE WITNESS: Sorry. Can we stop for a
04:49 12   potty break?
04:49 13       MS. LEEDS: Let's do it.
04:56 14       (Recess).
04:56 15   Q. Okay. Where is Arturo Prado now?
04:56 16   A. I don't know.
04:56 17   Q. Okay. When did he leave you?
04:57 18   A. I'm not sure, but I want to say it was around
04:57 19   the very beginning of 2001 -- in January, February of
04:57 20   2001.
04:57 21   Q. Okay. Why did he leave?
04:57 22   A. We didn't get along.
04:57 23   Q. Do you know if he's still in the area?
04:57 24   A. I don't know.
04:57 25   Q. Okay. Do you know if he's still in this kind

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**139**

04:57 1    of sales?
04:57 2    A. I don't know.
04:57 3    Q. Okay. Now, Kelly Smith is the lady up in San
04:57 4    Antonio, right?
04:57 5    A. No.
04:57 6    Q. Or Austin?
04:57 7    A. Yes.
04:57 8    Q. Okay. And Sam Sauceda was the guy that you
04:57 9    claim left, right?
04:57 10   A. Yes.
04:57 11   Q. Do you know what he's doing now?
04:57 12   A. Yes.
04:57 13   Q. What?
04:57 14   A. According to his deposition, he was selling --
04:57 15   Q. No, no, no. Not according to his deposition.
04:57 16   Do you know?
04:58 17   A. I haven't talked to him since then.
04:58 18   Q. Okay. In Paragraph 3, you indicate -- of
04:58 19   Horner 9, you indicate that Sam Sauceda would have
04:58 20   produced ten percent more than his volume the year
04:58 21   before, right?
04:58 22   A. Correct.
04:58 23   Q. And that number, 238, is the year before plus
04:58 24   ten percent?
04:58 25   A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**140**

04:58 1    Q. Okay. Where -- what documentation is there to
04:58 2    reflect the 90 percent of that 238?
04:58 3    A. In the commission statements.
04:58 4    Q. Whose commission statements?
04:58 5    A. My commission statements.
04:58 6    Q. Your commission statements.
04:59 7        (Off record).
04:59 8    Q. So when you created Horner 9, did you go back
04:59 9    and look at all of the commission statements -- your
04:59 10   commission statements that had Sam Sauceda as a --
04:59 11       MR. AGUILAR: I'm sorry. Can you start
04:59 12   the question over because you said when you got Exhibit
04:59 13   9.
04:59 14   Q. When you were --
04:59 15       MS. LEEDS: Did I say that?
04:59 16   Q. Or when you were preparing Exhibit 9, did you
04:59 17   go back -- well, let me start here. What year is that
04:59 18   for? The 90 percent of -- the number in Paragraph No.
04:59 19   3, what -- is that for a whole year?
04:59 20   A. Yes.
05:00 21   Q. Okay. What year does that 90 percent reflect?
05:00 22   A. That reflects the beginning of the school year
05:00 23   for 2000 through the summer and up to the beginning of
05:00 24   the school year for 2001.
05:00 25   Q. So it is a whole calendar year or a school

HILL & ROMERO
CERTIFIED COURT REPORTERS

**41**

1 year?
2 A. It was from the time he started with us for a
3 whole calendar year --
4 Q. Okay. And he --
5 A. -- actually, and it was a little bit after the
6 school year had started.
7 Q. And I'm sorry. What were those dates again?
8 A. Sometime fall of 2000.
9 Q. To summer of 2001?
10 A. Correct.
11 Q. Okay. So it encompassed 12 months?
12 A. Yes.
13 Q. And the 90 percent number you derived by going
14 back and looking at commissions paid to you that were
15 generated by him; is that correct?
16 A. Yes.
17 Q. And, for example, on this commission statement
18 of Columbia Universal, that would have been reflected
19 in -- for this, as an example, it says writing agent
20 Arturo Prado, you would have gone back to all the
21 commission statements that say writing agent Sam
22 Sauceda?
23 A. Yes.
24 Q. Okay. And is it your testimony that all of
25 your commission statements indicate who the producer is

HILL & ROMERO
CERTIFIED COURT REPORTERS

**142**

1 for that particular amount of dollars?
2 A. Yes.
3 Q. So that if I asked you to re-create that today,
4 you could do that, maybe not in the next hour, but you
5 could do that?
6 A. It is possible.
7 Q. How many hours did you spend figuring out that
8 90 percent?
9 A. 50, 60.
10 Q. Did you keep a running total anywhere of what
11 those numbers were?
12 A. I had a handwritten legal pad and once I put it
13 down here on Horner -- 8, was it?
14 MS. NEALLY: 9.
15 A. -- Horner 9, then I didn't keep those.
16 Q. Well, did you make a total of what the 90
17 percent was? Because what's on Horner 9 is 90 plus the
18 ten percent.
19 A. Yes, simple mathematical function and I could
20 tell you that.
21 Q. Okay. And you threw the documents from which
22 you obtained that information away?
23 A. Yes.
24 Q. Okay. So the year 2000 to 2001, he generated
25 for you $218-some thousand?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**143**

1 A. In premiums.
2 Q. Oh, in premiums. In premiums. Okay. And what
3 was his commission rate?
4 A. Which company?
5 Q. Well, who was he selling for?
6 A. CGU, Columbia, UTA.
7 Q. Do you know what he took home that year?
8 A. No.
9 Q. Okay. In Paragraph No. 4 --
10 (Off record).
11 Q. In Paragraph No. 4, you talk about for your
12 personal flex premium, correct?
13 A. Yes.
14 Q. Okay. But this has not happened, right?
15 A. Correct.
16 Q. Because you -- this personal production of
17 yours has gone way down?
18 A. Correct.
19 Q. But you prepared this before The Teachers'
20 Agency, Inc. came into being?
21 A. Correct.
22 Q. But was provided to Horner -- okay. Did you
23 give Dr. Horner -- did you make any corrections to
24 Horner 9 before Dr. Horner made his calculations?
25 A. No. That's how I turned it over to Dr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**144**

1 Horner.
2 Q. Okay. Knowing that there were incorrect
3 numbers in here as far as what you were doing and what
4 you would be doing?
5 MR. AGUILAR: Objection; vague.
6 Q. Right? You knew you weren't going to continue
7 this personal production?
8 A. At that point, correct.
9 Q. Okay. Now, renewals is something you could
10 maintain regardless of your personal production, right?
11 A. Yes.
12 Q. Do you know how many policies you still have
13 out there?
14 A. No.
15 Q. In Paragraph No. 5, you talk about the renewal
16 rate and you sort of extrapolate it out for two to 15
17 years, right?
18 A. That is correct.
19 Q. The attrition rate numbers you evaluated, were
20 they for all of the products you sold or just the flex
21 premium?
22 A. All of them.
23 Q. So are you saying the single premium policies
24 you have sold have an attrition rate of ten percent
25 also?

HILL & ROMERO
CERTIFIED COURT REPORTERS

145

A. Attrition is defined differently for that.

Q. Why?

A. Because single premium you only put into it once.

Q. Right.

A. Flex premium, the way that I'm using attrition is when they stop putting money into it, the policy could still exist.

Q. Right. But attrition means when they -- when they leave or either stop paying or take their money out?

A. Okay. But with single premium, they pay once.

Q. Correct. But they could take their money out?

A. So in regard to that, then, yes.

Q. Okay. What's the attrition rate for single premium?

A. About ten percent.

Q. Where do you get that?

A. A conservative maximum. From my experience in the industry.

Q. Do you know how many single premium policyholders you have now?

A. No.

Q. And you don't know how many you've lost over the past two years?

HILL & ROMERO
CERTIFIED COURT REPORTERS

146

A. That's correct.

Q. Did you go through Fernando De Pena's commission statements?

A. No.

Q. Where did you get the numbers for the document you prepared for him?

A. Can I see this?

Q. Uh-huh.

MS. LEEDS: Have we marked that?

MS. NEALLY: Yes.

A. There it is. Without reading this, I used the same criteria for myself except he's not receiving any overwrites off of Steve Andrus, me. And then his experience, based on my knowledge of him as an individual producer, I did not calculate that he would produce as much as I would.

Q. Based on what?

A. Based on my knowledge of him as an insurance agent.

Q. Which is -- why did you come up with that conclusion?

A. From being around him, knowing his skill, seeing what he can do.

Q. And you figured he would produce less?

A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

147

Q. Even though he's got tons more experience than you?

A. Yes.

Q. Okay. Has he expressed to you when he wants to retire?

A. In his own words, you never retire from this business.

Q. Okay. So he continues to produce until the day he dies?

A. Yes.

Q. Did he have the same percent overwrites on all these people that you put in Horner 9 as you?

A. As we discussed in my prior deposition the vertical alignment, yes.

Q. That was true up until The Teachers' Agency was formed?

A. No.

Q. I mean The Teachers' Agency, Inc.

A. No.

Q. You still continue with the same vertical alignment?

A. No.

Q. All right. Well, didn't The Teachers' Agency, Inc. change all that?

A. Yes, it did.

HILL & ROMERO
CERTIFIED COURT REPORTERS

148

Q. Okay. All the overwrites now go to the TA, Inc., right?

A. Overwrites, yes.

Q. Okay. You did not give Dr. Horner any corrections regarding how the structure of the corporation changed the way you calculated these numbers, did you?

A. I discussed it with him, yes.

Q. Did you give him any corrections regarding the numbers that you gave him?

A. No.

Q. And again, the numbers that are on Andrus 16 are numbers that you calculated and you took them out to a year?

A. Correct.

Q. These are numbers as we know of -- the period of not being able to go into the lounges was between October and February, right?

A. Correct.

Q. Did you tell Dr. Horner that?

MR. AGUILAR: Tell him what?

Q. That the period -- the relevant period of not being able to go into the lounge was from October to February?

A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

49

05:14 1    Q.  Did you discuss that with him?
05:14 2    A.  Yes, I did.
05:14 3    Q.  Tell me the nature of that discussion.
05:14 4    A.  The nature of that discussion was exactly how
05:14 5  it was happening.  I told him that at X date -- I can't
05:14 6  remember the exact date that we were allowed in, but
05:14 7  that the people that were trying to go and do business
05:14 8  again were unable to write any business and they felt
05:14 9  that the whole thing was soured at that point.  And
05:14 10  some of them expressed that it just wasn't the time to
05:15 11  do business for that year.  And then I also discussed
05:15 12  with him how the majority of the business is written in
05:15 13  the fall.
05:15 14    Q.  Anything else?
05:15 15    A.  Not that I recall at this time.
05:15 16    Q.  Have you given any presentations at BISD to
05:15 17  groups of employees?
05:15 18          MR. AGUILAR:  Since?
05:15 19    Q.  Since February of 2002.
05:15 20    A.  Groups, no.
05:15 21    Q.  What about outside of BISD, have you put on any
05:15 22  presentations?
05:15 23    A.  Yes.
05:15 24    Q.  Where?
05:15 25    A.  At the Los Fresnos office.

150

05:16 1    Q.  Office?  Explain that to me.  Was it to a group
05:16 2  of employees?
05:16 3    A.  I put on a seminar to groups of employees at
05:16 4  The Teachers' Agency office in Los Fresnos.
05:16 5    Q.  Okay.  What about besides Los Fresnos?  Oh, I'm
05:16 6  sorry.  You have a Los Fresnos office of The Teachers'
05:16 7  Agency?
05:16 8    A.  Yes.
05:16 9    Q.  Okay.  I didn't understand that.  How many
05:16 10  offices do you have?
05:16 11    A.  Three.
05:16 12    Q.  Los Fresnos, Brownsville and San Antonio?
05:16 13    A.  Correct.
05:16 14    Q.  What's your overhead in San Antonio?
05:16 15    A.  That, I would refer to Shaun.
05:16 16    Q.  Okay.  What's your overhead in Los Fresnos?
05:16 17    A.  Every expense that we have there is our
05:16 18  overhead.  We have one secretary, we lease the building
05:16 19  and we pay one-fourth of the utilities for the
05:16 20  building.
05:16 21    Q.  Do you know what that is?
05:16 22    A.  We pay $400 a month in rent, one-fourth of the
05:17 23  utilities, which also is inclusive of cleaning and
05:17 24  Internet use and phones, varies months to month.
05:17 25    Q.  Okay.

151

05:17 1    A.  We have a secretary there four hours a day,
05:17 2  Monday through Thursday, three hours on Friday.  And
05:17 3  then signage, some other miscellaneous odds and ends.
05:17 4    Q.  Okay.  And you have changed your business
05:17 5  address here in Brownsville, right?
05:17 6    A.  Since?
05:17 7    Q.  Since we took your deposition last.
05:17 8    A.  No.
05:17 9    Q.  Were you on Jefferson before?
05:17 10    A.  Yes.
05:17 11    Q.  How long have you been in that location?
05:18 12    A.  It's been a little over -- I think in May it
05:18 13  will be two years.
05:18 14    Q.  Did you prepare a document similar to Andrus 16
05:18 15  and Horner 9 for Mr. Paz?
05:18 16    A.  Showing Mr. Paz's losses, yes, I did.
05:18 17    Q.  Okay.  And did you prepare one for Andrus &
05:18 18  Paz?
05:18 19    A.  Yes, I did.
05:18 20    Q.  And did you basically use the same system that
05:18 21  you have explained as you used for De Pena?
05:18 22    A.  Yes and no.
05:18 23    Q.  Okay.  Did you take into account the fact or
05:18 24  did you tell Mr. Horner when you prepared -- well, not
05:18 25  when you prepared it, but when you -- when Mr. Horner

152

05:18 1  was going to testify regarding your calculations that
05:18 2  Andrus & Paz was basically going to be going out of
05:19 3  business as that entity and that there was another one
05:19 4  coming up?
05:19 5    A.  Yes, I explained to him how we wanted to
05:19 6  incorporate and everything would be transferred over.
05:19 7    Q.  And did you give him any corrections on the
05:19 8  numbers?
05:19 9    A.  Which numbers?
05:19 10    Q.  As to their damages over the next 15 years.
05:19 11    A.  Other than what I have in --
05:19 12    Q.  Did you give him any corrections?
05:19 13    A.  No.
05:19 14    Q.  Okay.  And yet you knew that Andrus & Paz is
05:19 15  not going to be in existence over the next 15 years;
05:19 16  it's not your plan that it be?
05:19 17    A.  That's correct.
05:20 18    Q.  Why did you think it was necessary for you to
05:20 19  generate Andrus 11 and 12?
05:20 20          MR. AGUILAR:  Objection; asked and
05:20 21  answered.
05:20 22          MS. LEEDS:  I don't think it was asked.
05:20 23          MR. AGUILAR:  Yes, it was.
05:20 24    Q.  Well, then answer it again.  Why did you think
05:20 25  it was necessary to generate those?

---

**53**

A. I wanted to give a true example of attrition and growth rate for myself.

Q. Okay. Do you think taking one company is a true example?

A. Scientifically speaking, no.

Q. Okay. As far as your growth rate, if we were to add '03 on there, you'd be in negative growth by now, right?

A. Which part are you discussing?

Q. B. That's your growth rate calculations, right?

A. This is -- no, this is 403(B) case count.

Q. Right. Isn't 11B -- which is the growth rate then? You said this is the attrition rate. A is the attrition rate. You've been talking about B as the growth rate.

A. Yes, growth rate of 403(B) case count.

Q. Okay. That's what you did to figure out if you were on the right track, right?

A. I did that as a sample. And my sample shows me that using a ten percent attrition and growth is respectively a conservative maximum and a conservative minimum because I had more than ten percent growth, I had less than ten percent attrition, so I was comfortable putting that on my affidavit.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**154**

Q. Okay. All this was done, though, after Dr. Horner testified, right?

A. Yes, ma'am.

Q. Okay. And if we added '03 to this, you would be in the negative numbers in terms of your growth rate, right?

A. For production of 403(B) policies, yes.

Q. Okay. Whatever these numbers signify you would be -- well, are you producing anything else?

A. I'm not producing hardly anything anymore.

Q. Okay. So if you want this to be your production for anything, you would be in the negative numbers in '03, right?

A. Yes.

Q. Okay. Because you're not producing anymore?

A. You are correct.

Q. Okay. So to have used a ten percent growth rate and extrapolate that out to 25 years is completely misleading, is it not?

MR. AGUILAR: Objection; argumentative, mischaracterizing the witness's testimony and multifarious.

A. I don't agree with your statement.

Q. Okay.

MS. LEEDS: Pass the witness.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**155**

EXAMINATION

BY MS. NEALLY:

Q. Your attorney produced this resume. When did you prepare this resume?

A. This weekend.

Q. Okay. And you're holding yourself out to be an expert in all of these fields; is that correct?

A. Those are my areas of expertise.

Q. Okay. And your areas of expertise are based on your experience in these fields; is that correct?

A. Experience, training.

Q. Okay. Your training with the various companies, right?

A. Companies, organizations.

Q. Okay. You were a teacher until 19 -- I'm sorry, until 2001, correct?

A. Correct.

Q. Okay. Before 2001 you were selling life insurance policies and other types of insurance products on a part-time basis, correct?

A. Correct.

Q. Okay. The majority of your experience in these areas of expertise has occurred since 2001 when you quit doing it part-time, right?

A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**156**

Q. How much recruiting did you do before 2001? How much of your time was spent recruiting before 2001?

MS. LEEDS: Is he an expert in recruiting?

MS. NEALLY: He's an expert in recruiting.

A. All of the subagents that I have under me.

MR. AGUILAR: She's asking only how much time. If you can answer it, answer it. If you can't, indicate you can't answer it.

A. What time frame?

Q. Before 2001.

A. Before 2001? A specific year before then?

Q. Before 2001 when you started doing this full-time.

MS. LEEDS: Before you started doing this full-time.

MR. AGUILAR: Hang on. One at a time.

Q. Before you started doing this full-time. You weren't doing it from 8:00 to 5:00, right?

A. Correct.

Q. Okay.

A. If there was a transition when Andrus & Paz was formed, no.

Q. I'm not asking about that. I said before 2001 and Andrus & Paz wasn't formed until the summer of 2001, I think you told me in your prior testimony.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 57

05:25 1    A. Yeah, that's correct.
05:25 2    Q. How much recruiting?
05:25 3    A. Ten percent.
05:25 4    Q. Okay. And then in 1995 that's when you started
05:25 5 -- first started selling annuities; is that right?
05:25 6    A. Yes.
05:25 7    Q. When -- what conversations did you have with
05:25 8 Mr. Horner when he changed your 15 percent --
05:25 9         MS. LEEDS: 25.
05:26 10    Q. -- to 25 -- I'm sorry, your 15 years to 25
05:26 11 years?
05:26 12    A. He explained that that was done because of
05:26 13 economic practice.
05:26 14    Q. Okay.
05:26 15    A. And that he had done some search or research on
05:26 16 how long somebody can live.
05:26 17    Q. Okay.
05:26 18    A. That there's a factor in there involved, too,
05:26 19 that renewals continue to be paid even if somebody
05:26 20 passes away.
05:26 21    Q. Okay.
05:26 22    A. And so in his best professional opinion he
05:26 23 thought 25 was more appropriate than 15.
05:26 24    Q. Renewals continue if you pass away?
05:26 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 158

05:26 1    Q. For how long?
05:26 2    A. As long as people pay on the policy.
05:26 3    Q. And how often does that happen where if
05:26 4 somebody dies they continue to pay on the policy?
05:27 5         MS. LEEDS: No, to the agent. Like in
05:27 6 De Pena, they would keep paying Gracie, his wife.
05:27 7         MS. NEALLY: Right, but we didn't have any
05:27 8 -- we were never provided any support for that.
05:27 9    Q. You explained that to him; he didn't explain it
05:27 10 to you, right?
05:27 11    A. I didn't hear the conversation between the two
05:27 12 of you.
05:27 13    Q. No. I'm talking about what you just told me.
05:27 14    A. Okay.
05:27 15    Q. Okay. That they continue after death. You
05:27 16 explained that to him; he didn't explain that to you,
05:27 17 correct?
05:27 18         MR. AGUILAR: Horner.
05:27 19    Q. I'm talking about Horner.
05:27 20    A. I explained to him if Fernando De Pena was to
05:27 21 die, I'm going to continue to receive those overwrites
05:27 22 on those policies. Fernando's commissions would
05:27 23 continue to be paid to his spouse.
05:27 24    Q. Right. But if somebody dies, you're going to
05:27 25 get the overwrites, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 159

05:27 1    A. Are you talking about an agent dying?
05:27 2    Q. No.
05:27 3         MR. AGUILAR: Agent.
05:27 4    Q. If an agent dies. You're talking about if an
05:27 5 agent dies?
05:28 6    A. I'm talking about if an agent dies. I think we
05:28 7 might be talking two different things here.
05:28 8    Q. Yeah, we are. We're talking two different
05:28 9 things. Because my thinking to myself is, excuse me,
05:28 10 if you die, you're going to continue to pay on your
05:28 11 policy. I don't think the answer to that is yes.
05:28 12 Right? Am I right?
05:28 13    A. Yeah, we were having two different
05:28 14 conversations.
05:28 15         MS. LEEDS: No, that's when you collect.
05:28 16         (Off record).
05:28 17    Q. So that was my question.
05:28 18    A. That would be one heck of a policy, wouldn't
05:28 19 it?
05:28 20    Q. Because for -- this 25 years, it's something
05:28 21 that he came up with for 25 years?
05:28 22    A. Yes, and he explained through economic practice
05:28 23 and explained the formula to me. So that was his
05:28 24 language, not mine.
05:28 25    Q. Okay. Is Sam Sauceda still getting renewals?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 160

05:28 1    A. Yes, he is.
05:28 2    Q. Okay. Do you have any idea what his renewals
05:28 3 are at this point?
05:28 4    A. No, I have no communication with him.
05:29 5    Q. The figures that you have in Exhibit --
05:29 6 Horner's 8 and 9 and Exhibits 11 and 12 -- Andrus 11
05:29 7 and 12 -- I'm talking about your handwritten and typed
05:29 8 records, okay?
05:29 9    A. Okay.
05:29 10    Q. None of these reflect the overhead that has to
05:29 11 be taken out, right? We're taking about just pure
05:29 12 income, right?
05:29 13    A. On 8, that's just receivables. 11D and E,
05:29 14 that's receivables and how it's reported for 1099s.
05:29 15    Q. Right. But that's just --
05:29 16    A. That's -- you were correct in your statement,
05:29 17 yes.
05:29 18    Q. It's just your income, it's not -- it's not
05:29 19 your take-home pay because you still have to have
05:29 20 overhead taken out of that, right?
05:29 21    A. Correct.
05:29 22    Q. Okay. Okay. One last thing I want to clear up
05:30 23 for my mind. When we look at Horner 9, which you
05:30 24 should have as an exhibit -- go ahead and pull it out.
05:30 25    A. Here it is.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 161

05:30 1    Q.  No. 1 -- No. 1 comes from the -- the figure
05:30 2    that you have there, the 99,632 comes from adding what
05:30 3    numbers together?
05:31 4    A.  That comes from going down to Paragraph 4.
05:31 5    Q.  Okay.
05:31 6    A.  The premium.
05:31 7    Q.  That's your personal --
05:31 8    A.  Business I write.
05:31 9    Q.  Right.  And that's assuming that it would
05:31 10   continue to grow at ten percent?
05:31 11   A.  No, that's just for that one year's business.
05:31 12   Q.  For that one full year's business?
05:31 13   A.  Yes, at the commission rate that I'm paid.
05:31 14   Q.  Okay.  No. 2 comes from adding --
05:31 15   A.  My commission rate times the premium.
05:31 16   Q.  Okay.  So 37,202, that's referred to on the
05:31 17   second page, right?
05:32 18   A.  It's the second paragraph under single premium,
05:32 19   which is the second sub area of the second page.
05:32 20   Q.  Okay.  And then No. 3 comes from which
05:32 21   paragraph on the first page?  You have one, three, five
05:32 22   and seven there.
05:32 23   A.  Okay.  No. 3 is personal renewals on flex
05:32 24   premium.  That's the flexible premium not in first
05:32 25   year.  So years two through 15 for everybody

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 162

05:32 1    multiplied.
05:32 2    Q.  Okay.  So that comes from that fourth
05:32 3    paragraph?
05:32 4    A.  Yes, based on the renewal commission overwrite
05:32 5    rate instead of the first year overwrite rate.
05:32 6    Q.  Okay.  Let me just go back over this for a
05:32 7    minute.  Sylvia Petrarca, you didn't have exact figures
05:32 8    on her, right?
05:32 9    A.  Correct.
05:32 10   Q.  Sam Sauceda, you did.  And then you used -- you
05:32 11   had figures on Fernando De Pena, Kelly Smith and Mr.
05:33 12   Prado?
05:33 13   A.  Yes.
05:33 14   Q.  Okay.  And those you actually went through and
05:33 15   figured out what their commissions were?
05:33 16   A.  Yes.
05:33 17   Q.  Correct?
05:33 18   A.  Correct.
05:33 19   Q.  Do you have -- did you provide us with copies
05:33 20   of those documents reflecting the commissions that were
05:33 21   earned by these individuals?
05:33 22   A.  Yes.
05:33 23   Q.  And that's --
05:33 24   A.  Well, I don't theirs.
05:33 25   Q.  Right.  That's what I'm asking.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 163

05:33 1    A.  No, I don't have theirs.  I just have my own
05:33 2    commission statements.
05:33 3    Q.  And you got it off of those documents?
05:33 4    A.  Yes.
05:33 5    Q.  Okay.  How about -- when you did the losses for
05:33 6    Mr. De Pena, the losses for Andrus & Paz and the losses
05:33 7    for Mr. Paz, you didn't have their commission
05:33 8    statements?
05:33 9    A.  No, I used my own.
05:33 10   Q.  You used your own?
05:33 11   A.  Yes.
05:33 12   Q.  Do they reflect what their commissions are on
05:33 13   your statements?
05:33 14   A.  Well --
05:33 15   Q.  It's a yes or no question.
05:33 16   A.  What they do is reflected on my commission
05:33 17   statements.
05:33 18   Q.  Their commissions, their actual commissions
05:33 19   that they earn?
05:33 20   A.  No.
05:33 21   Q.  Okay.  And is it -- you agreed with Mr. Horner
05:34 22   that Sam Sauceda would have stayed with you for 25
05:34 23   years but for BISD -- well, not actually -- but for Dr.
05:34 24   Sauceda?
05:34 25   A.  I believe there was a realistic chance he would

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 164

05:34 1    have done that.  He was very happy with us.
05:34 2    Q.  And that's just sheer speculation on your part?
05:34 3    MR. AGUILAR:  Objection; mischaracterizing
05:34 4    the witness's testimony.
05:34 5    Q.  I mean, you don't have any -- well, never mind.
05:34 6    It's speculation.
05:34 7    A.  I don't know how to prove that.
05:34 8    Q.  Yeah, you don't have any proof of that.  For
05:34 9    instance, when Mr. Prado left the beginning of 2001,
05:34 10   that was just because you didn't get along?
05:34 11   A.  We didn't get along.
05:34 12   Q.  Okay.  And he had been with you for how long
05:35 13   before he left?
05:35 14   A.  Do you have my resume handy?  I could go off
05:35 15   dates there easier.
05:35 16   Q.  It's an exhibit.
05:35 17   A.  About two-and-a-half years.
05:35 18   Q.  Were there actually any commission statements
05:35 19   for Andrus & Paz?
05:35 20   A.  Yes.
05:35 21   Q.  And that's reflected on your commission
05:35 22   statements?
05:35 23   A.  It would not be on Steve Andrus's commission
05:35 24   statements, no.
05:35 25   Q.  All right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

165

05:35 1    MS. NEALLY:  That's all the questions I
05:35 2    have.
05:35 3    MS. LEEDS:  I have nothing further at this
05:35 4    time.
05:36 5    MR. AGUILAR:  I'll reserve all questions.
6    (Exhibit No. 17 marked)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

1    I, STEPHEN M. ANDRUS, have read the foregoing
2    deposition and hereby affix my signature that same is
    true and correct, except as noted above.
3
4    _____
     STEPHEN M. ANDRUS
5
6
7
8    THE STATE OF TEXAS
9    COUNTY OF CAMERON
10   BEFORE ME, _____, on this day
     personally appeared STEPHEN M. ANDRUS, known to me or
11   proved to me to be the person whose name is subscribed
     to the foregoing instrument and acknowledged to me that
12   said witness executed the same for the purposes and
     consideration therein expressed.
13   Given under my hand and seal of office this _____
14   day of _____, 2004.
15   _____
     Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

166

CHANGES AND SIGNATURE PAGE

1
2    PAGE LINE  CHANGE          REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

168

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,            )(
FERNANDO DE PENA,             )(
VALENTIN PAZ and ANDRUS       )(
& PAZ, A Partnership          )(
VS.                           )( B-02-143
                              )(
BROWNSVILLE INDEPENDENT       )(
SCHOOL DISTRICT, NOE          )(
SAUCEDA, and EDDIE            )(
ERRISURIZ, JR.                )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. ANDRUS
MARCH 10, 2004
Volume 3

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of STEPHEN M. ANDRUS;

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

169

Certified to by me this ____ day of

_____, 2004.

LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-05
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

## $

**$1,986.70**
[1] 124: 17 <02:13>
**$10.77**
[2] 84: 12 <11:45>   84: 16 <11:46>
**$115.95**
[2] 80: 17 <11:40>   80: 20 <11:40>
**$2.91**
[1] 90: 15 <01:24>
**$20,000**
[1] 22: 22 <10:06>
**$200**
[1] 68: 14 <11:22>
**$238,658**
[2] 69: 3 <11:23>   69: 4 <11:23>
**$24,357**
[1] 41: 9 <10:31>
**$240,000**
[2] 68: 2 <11:21>   68: 19 <11:22>
**$278.32**
[1] 82: 5 <11:41>
**$281,200**
[3] 63: 24 <11:16>   64: 17 <11:17>   65: 25 <11:18>
**$3,996**
[1] 118: 21 <02:02>
**$3.59**
[1] 84: 12 <11:45>
**$33.15**
[1] 80: 14 <11:39>
**$387.38**
[1] 84: 23 <11:46>
**$4,011**
[1] 37: 22 <10:27>
**$400**
[1] 150: 22 <02:57>
**$47,011**
[1] 37: 23 <10:27>
**$47,011.01**
[1] 37: 25 <10:27>
**$5.65**
[2] 84: 4 <11:45>   84: 5 <11:45>
**$6,000**
[1] 124: 9 <02:12>
**$6,497**
[1] 42: 11 <10:33>
**$6,497.86**
[1] 36: 2 <10:24>
**$72,436.44**
[1] 38: 7 <10:27>
**$797,000**
[1] 74: 13 <11:31>
**$8.23**
[1] 79: 7 <11:38>
**$82.80**
[1] 80: 16 <11:40>
**$88,285.97**
[1] 38: 11 <10:27>
**$92**
[1] 84: 6 <11:45>
**$92.36**
[2] 83: 23 <11:44>   84: 3 <11:45>
**$99,632**
[1] 61: 10 <11:04>

'

**'01**
[2] 104: 10 <01:40>   120: 4 <02:04>
**'02**
[6] 97: 23 <01:33>   101: 14 <01:36>   101: 17 <01:37>   101: 20 <01:37>   104: 10

<01:40>   <02:04>
**'03**
[12] 97: 25 <01:33>   101: 14 <01:36>   101: 16 <01:36>   101: 20 <01:37>   107: 16 <01:46>   107: 17 <01:46>   108: 23 <01:48>   120: 4 <02:04>   120: 7 <02:04>   153: 7 <03:02>   154: 4 <03:03>   154: 13 <03:03>
**'03/'04**
[1] 107: 24 <01:46>
**'95**
[4] 71: 11 <11:26>   115: 17 <01:58>   115: 19 <01:58>   <01:58>
**'98**
[12] 6:6 <09:43>   6: 10 <09:43>   6: 12 <09:43>   6: 12 <09:43>   6: 14 <09:44>   93: 2 <01:27>   93: 13 <01:27>   93: 21 <01:27>   94: 11 <01:28>   94: 16 <01:29>   101: 1 <01:36>   102: 24 <01:38>
**'99**
[10] 6:6 <09:43>   6: 10 <09:43>   6: 13 <09:44>   96: 14 <01:31>   97: 7 <01:32>   100: 25 <01:36>   101: 3 <01:36>   101: 9 <01:36>   102: 24 <01:38>   103: 2 <01:38>

## 0

**01-2002**
[1] 80: 9 <11:39>

## 1

**1**
[11] 4: 25 <09:41>   11: 3 <09:52>   36: 1 <10:24>   36: 2 <10:24>   36: 4 <10:24>   36: 6 <10:24>   36: 7 <10:24>   38: 5 <10:27>   61: 22 <11:05>   161: 1 <03:11>   161: 1 <03:11>
**1-25-2002**
[1] 80: 9 <11:39>
**1.2**
[2] 68: 15 <11:22>   136: 19 <02:27>
**10**
[3] 1: 11  1: 16  168: 10
**10,000**
[1] 115: 4 <01:57>
**100**
[2] 19: 6 <10:01>   68: 14 <11:22>
**10125**
[1] 169: 7
**104**
[1] 3: 4
**1099**
[16] 3: 14  22: 14 <10:05>   41: 2 <10:30>   41: 5 <10:31>   84: 11 <11:45>   113: 23 <01:55>   117: 21 <02:00>   118: 1 <02:00>   118: 7 <02:01>   118: 1 <02:00>   119: 13 <02:03>   119: 18 <02:03>   122: 9 <02:08>   122: 12 <02:08>   122: 13 <02:08>
**1099s**
[14] 112: 22 <10:06>   113: 17 <01:55>   118: 10 <02:01>   119: 10 <02:03>   120: 23 <02:05>   121: 7 <02:05>   121: 19 <02:06>   121: 23 <02:08>   122: 4 <02:08>   122: 7 <02:08>   160: 14 <03:10>
**10th**
[3] 115: 18 <01:58>   115: 20 <01:58>   169: 7
**11**

**11:40**
[1] <01:40>   <02:04>
**[23]** 3:12 5:1 <09:41>   5:8 <09:42>   5:22 <09:42>   27:25 <10:13>   32:3 <10:19>   33:4 <10:21>   92:12 <01:26>   94: 21 <01:29>   94:25 <01:29>   95:1 <01:29>   114:18 <01:57>   116:9 <01:59>   116: 10 <01:59>   120:25 <02:05>   121:1 121:3 <02:05>   121:6 <02:05>   121:12 <02:05>   121:23 <02:08>   152:19 <03:00>   160:6 <03:09>   160:6 <03:09>
**'03/'04**
[1] 107: 24 <01:46>
**115**
[1] 80:17 <11:40>
**11:46**
[1] 1:17
**11A**
[9] 3:12 95:22 <01:30>   96:9 <01:31>   102:1 <01:37>   102: 2 <01:37>   102:3 <01:37>   102:3 <01:37>   102:5 121:2 <02:05>
**11B**
[6] 3:13 95:24 <01:30>   101: 24 <01:37>   102:9 <01:37>   102:10 <01:37>   153:13 <03:02>
**11C**
[1] 3:13
**11D**
[3] 3:14 119:8 <02:03>   120: 23 <02:05>   160:13 <03:10>
**11E**
[1] 3:14
**11s**
[1] 121:5 <02:05>
**12**
[14] 3:15 5:2 <09:41>   5:22 <09:42>   28:11 <10:14>   32: 24 <10:21>   33:5 <10:21>   92: 25 <01:30>   114:18 <01:57>   141:11 <02:43>   152:19 <03:00>   160:6 <03:09>   160:7 <03:10>
**12-31-02**
[1] 84:22 <11:46>
**12-31-05**
[1] 169:6
**1200**
[2] 1:20 2:4
**125**
[1] 130:4 <02:19>
**13**
[3] 3:16 5:8 <09:42>   101:10 <01:36>
**14**
[4] 3:17 6:23 <09:45>   6:24 <09:45>   114:6 <01:55>
**14,000**
[4] 8:18 <09:47>   22:12 <10:05>   22:21 <10:06>   122: 1 <01:54>
**15**
[16] 3:18 8:11 <09:47>   8:11 <09:47>   26:14 <10:11>   26: 25 17:15 <10:12>   74:17 <11:31>   74:18 <11:31>   75:3 <11:31>   144:16 <02:48>   152:10 <03:00>   152:15 <03:00>   157:8 <03:06>   157: 10 <03:07>   157:23 <03:07>   161:25 <03:13>
**15-year**
[1] 75:10 <11:32>
**155**
[1] 3:5
**16**
[6] 3:19 62:20 62:21 <11:15>   63:8 <11:15>   148:12 <02:54>   151:14 <02:59>
**165**
[1] 3:20

**16**
[1] 3:6
**168**
[1] 3:7
**17**
[2] 3:20 165:6
**17,000**
[1] 41:21 <10:32>
**19**
[2] 101:10 <01:36>   155:15 <03:04>
**1970**
[1] 132:6 <02:22>
**1995**
[2] 115:23 <01:58>   157:4 <03:06>
**1998**
[3] 3:14 3:17 6:22 <09:45>   100: 18 <01:35>   100: 20 <01:36>   102:14 <01:38>   118: 7 <02:01>
**1999**
[2] 70:5 <11:24>   102:15 <01:38>
**1:17**
[1] 1:17
**1st**
[1] 10:25 <09:51>

## 2

**2**
[3] 3:2 61:22 <11:05>   161:14 <03:12>
**20**
[3] 103:6 <01:38>   103:6 <01:38>   104:9 <01:40>
**20,000**
[3] 8:19 <09:48>   22:13 <10:05>   112:17 <01:54>
**200,000**
[1] 8:25 <09:48>
**2000**
[27] 3:14 6:6 <09:43>   6:15 <09:44>   32:9 <10:20>   32:17 <10:06>   36:2 <10:24>   36:4 <10:24>   36:5 <10:24>   36:6 <10:24>   36:8 <10:24>   36:9 <10:24>   36:13 <10:25>   37:22 <10:27>   41:1 <10:30>   42:6 <10:32>   42:11 <10:33>   72:4 <11:27>   97:7 <01:32>   102:15 <01:38>   103:5 <01:38>   119:22 <02:03>   124:18 <02:13>   140:23 <02:40>   141:8 <02:41>   142:24 <02:44>
**2001**
[34] 6:3 <09:43>   6:5 <09:43>   6:16 <09:44>   25:13 <10:09>   38:7 <10:27>   41:1 <11:02>   62:2 <11:02>   68:22 <11:22>   72:4 <11:27>   72:5 <11:27>   97:5 <01:32>   97:7 <01:32>   97:8 <01:32>   102: 16 <01:38>   103:5 <01:38>   103:8 <01:38>   120:1 <02:04>   122:8 <02:08>   138:19 <02:38>   138:20 <02:38>   140:24 <02:44>   141:9 <02:41>   141:20 <02:44>   155:16 <03:04>   155:18 <03:05>   155:23 <03:05>   156:1 <03:05>   156:2 <03:05>   156:10 <03:05>   156:11 <03:05>   156:12 <03:05>   156:23 <03:06>   164:9 <03:15>
**2001/2002**
[6] 26:2 <10:10>   59:18 <11:01>   69:5 <11:23>   70:22 <11:25>   74:13 <11:31>   88:21 <01:21>

**2002**
[35] 3:14 3:14 3:17 6:2 <09:43>   6:4 <09:43>   6:5 <09:43>   6:17 <09:45>   6:18 <09:45>   6:21 <09:45>   6:23 <09:45>   25:13 <10:09>   38:11 <10:27>   41:2 <10:30>   41:9 <10:31>   41:9 <10:31>   19 <10:32>   42:6 <10:32>   44:11 <10:36>   55:5 <10:55>   60:2 <11:02>   68:22 <11:22>   72:5 <11:27>   73:3 <11:29>   75:16 <11:32>   81:1 <11:40>   100:5 <01:35>   100:18 <01:35>   100:8 <01:35>   106:9 <01:42>   149:14 <01:49>   114:4 <01:55>   114:7 <01:57>   120:12 <02:04>   123:7 <02:11>   149:19 <02:56>
**2002's**
[1] 123:8 <02:11>
**2003**
[31] 8:14 <09:47>   9:1 <09:48>   10:3 <09:50>   22:11 <10:05>   22:15 <10:05>   22:22 <10:06>   28:19 <10:15>   31:23 <10:19>   32:6 <10:19>   32:7 <10:20>   32:22 <10:20>   33:3 <10:21>   34:13 <10:22>   34:22 <10:23>   34:23 <10:23>   35:1 <10:23>   38:15 <10:23>   38:16 <10:28>   68:23 <11:22>   70:16 <11:25>   76:4 <11:33>   91:18 <01:25>   103:12 <01:38>   112:10 <01:54>   114:10 <01:54>   112:10 <01:54>   114:14 <01:56>   120:13 <02:04>   120:14 <02:04>   123:9 <02:11>
**2004**
[9] 1:11 1:16 35:4 <10:23>   35:5 <10:23>   68:23 <11:22>   123:11 <02:11>   167:14 168:10 169:2
**2005**
[1] 115:21 <01:58>
**200K**
[1] 106:2 <01:42>
**20K**
[1] 112:14 <01:54>
**210,000**
[2] 58:25 <10:59>   59:9 <11:00>
**218-some**
[1] 142:25 <02:45>
**2198**
[1] 1:19 169:5
**22**
[1] 72:5 <11:27>
**238**
[3] 139:22 <02:39>   140:2 <02:39>
**24**
[1] 97:23 <01:33>
**240,000**
[2] 67:18 <11:21>   68:11 <11:22>
**25**
[13] 94:16 <01:29>   96:14 <01:31>   96:23 <01:32>   100:21 <01:36>   124:15 <02:13>   154:18 <03:03>   157:9 <03:06>   157:10 <03:07>   157:17 <03:07>   157:20 <03:09>   159:21 <03:09>   163:22 <03:15>
**26**
[2] 3:18 102:15 <01:38>
**28,000**
[6] 22:13 <10:05>   22:22 <10:06>   38:15 <10:28>   38:16 <10:28>   38:19 <10:28>

113:17 <01:55>
287-8898
[1] 169:8

**3**

3
[7] 1:12 61:22 <11:05>   139:
18 <02:38>   140:19 <02:40>
161:20 <03:13>   161:23
<03:13>   168:10
3,000
[1] 118:22 <02:02>
3-01-02
[1] 84:13 <11:45>
3-07-03
[1] 90:14 <01:23>
3-11-02
[1] 83:1 <11:43>
3-15-02
[1] 83:1 <11:43>
3-21
[1] 90:6 <01:23>
3-21-03
[2] 89:6 <01:22>   89:24
<01:22>
3-7
[1] 90:6 <01:23>
30
[2] 25:11 <10:09>   25:25
<10:10>
30th
[1] 28:19 <10:15>
32
[2] 8:9 <09:47>   8:11
<09:47>
3505
[1] 2:13
37,202
[1] 161:16 <03:12>
39
[1] 102:17 <01:38>
3:16
[1] 1:17

**4**

4
[5] 3:4 61:22 <11:05>   143:9
<02:45>   143:11 <02:45>
161:4 <03:11>
40
[2] 102:20 102:25 <01:38>
40,000
[1] 41:1 <10:30>
403
[1] 132:10 <02:22>
403(B
[10] 11:25 <09:53>   68:13
<11:22>   108:12 <01:47>
115:22 <01:58>   115:24
<01:58>   130:24 <02:20>
130:25 <02:20>   153:12
<03:02>   153:17 <03:02>
154:7 <03:03>
403(B)s
[5] 67:20 <11:21>   129:10
<02:18>   132:24 <02:23>
133:4 <02:23>   133:7
<02:23>
457
[5] 11:21 <09:52>   11:22
<09:52>   12:5 <09:53>   12:6
<09:53>   12:8 <09:53>
460
[1] 2:13
47,000
[1] 118:24 <02:02>
47,011
[1] 41:1 <10:30>
48.62
[1] 89:25 <01:23>

**5**

5
[4] 3:12 3:15 3:16 144:15
<02:48>
50
[2] 128:23 <02:18>   128:25
<02:18>   129:6 <02:18>   142:
9 <02:43>
53
[1] 77:4 <11:35>
54
[1] 72:4 <11:27>
5:00
[1] 156:18 <03:06>

**6**

6
[1] 3:17
6,497.86
[1] 36:10 <10:24>
60
[1] 142:9 <02:43>
62
[1] 3:19

**7**

7.69
[1] 97:9 <01:32>
70
[1] 102:20
72,000
[1] 41:1 <10:30>
74
[1] 103:2 <01:38>
78504
[1] 169:7
78520
[3] 2:5 2:9 2:14

**8**

8
[29] 31:6 <10:17>   31:7
<10:17>   31:9 <10:18>   32:7
<10:20>   32:8 <10:20>   32:9
<10:20>   34:25 <10:23>   35:
14 <10:23>   35:16 <10:23>
35:17 <10:24>   35:21
<10:24>   35:22 <10:24>   35:
22 <10:24>   42:4 <10:32>   49:
5 <10:47>   60:20 <11:03>   79:
18 <11:39>   79:22 <11:39>
79:23 <11:39>   86:23
<01:19>   116:22 <01:59>
118:11 <02:01>   118:12
<02:01>   119:3 <02:02>   123:
2 <02:11>   124:6 <02:12>
142:13 <02:43>   160:6
<03:09>   160:13 <03:10>
80
[6] 25:11 <10:09>   25:12
<10:09>   25:25 <10:10>   103:
9 <01:38>   104:10 <01:40>
104:4 <01:42>
855
[1] 2:9
88,000
[1] 41:1 <10:30>
8:00
[1] 156:18 <03:06>

**9**

9
[39] 2:9 43:5 <10:34>   43:11
<10:34>   43:13 <10:34>   44:7
<10:35>   48:11 <10:43>   49:2
<10:46>   49:10 <10:47>   54:
19 <10:54>   55:1 <10:55>   55:
7 <10:55>   55:12 <10:55>   55:
14 <10:55>   55:18 <10:55>
55:20 <10:55>   57:3 <10:57>
57:23 <10:58>   59:13

**A**

Ac
[1] 5:18 <09:42>
Action
[2] 168: 19 168: 21
Active
[1] 109: 9 <01:48>
Actively
[5] 98:22 <01:34>   104: 3
<01:39>   104: 7 <01:40>
Actual
[8] 39:16 <10:29>   39:17
<10:29>   85: 12 <01:17>   117:
24 <02:00>   118: 2 <02:01>
124: 15 <02:13>   125: 15
<02:15>   163: 18 <03:14>
Add
[5] 38:4 <10:27>   71: 19
<11:27>   103: 20 <01:39>
115: 17 <01:58>   153: 7
<03:02>
Added
[13] 7:15 <09:46>   7: 18
<09:46>   8: 8 <09:47>   38: 18
<10:28>   64: 21 <11:17>   64:
25 <11:17>   70: 25 <11:25>
91:22 <01:25>   103: 25
<01:39>   104: 1 <01:39>   121:
15 <02:06>   124: 17 <02:13>
154: 4 <03:03>
Adding
[2] 161: 2 <03:11>   161: 14
<03:12>
Addition
[1] 124: 15 <02:13>
Additional
[8] 10:8 <09:50>   10: 9
<09:51>   26: 6 <10:10>   31:22
<10:19>   33: 6 <10:21>   50:4
<10:48>   90: 17 <01:24>   101:
9 <01:36>
Address
[1] 151: 5 <02:58>
Addressed
[1] 14: 24 <09:56>
Adds
[1] 54: 25 <10:54>
Adjusted
[1] 49: 20 <10:48>
Advance
[3] 86: 4 <01:18>   86:9
<01:18>   118: 25 <02:02>
Advanced
[1] 119: 19 <02:03>
Advances
[5] 39: 9 <10:29>   39: 15
<10:29>   39: 18 <10:29>   40:3
<10:29>   40: 10 <10:30>
Advice
[1] 130: 13 <02:20>
Affect
[2] 33: 14 <10:21>   76: 5
<11:33>
Affidavit
[6] 3: 15 4:25 <09:41>   5:2
<09:41>   73: 1 <11:29>   90: 21
<01:24>   153: 25 <03:03>
Affiliated
[3] 19: 22 <10:02>   21: 11
<10:04>   54: 2 <10:53>
Affix
[1] 167: 1
Afterwards
[1] 87: 4 <01:19>
Age
[12] 86: 1 <01:18>   86: 3
<01:18>   86: 21 <01:19>   86:
22 <01:19>   87: 7 <01:19>   87:
11 <01:20>   87: 20 <01:20>
88: 1 <01:20>   88: 2 <01:20>
88: 3 <01:20>   88: 4 <01:20>
132: 9 <02:22>
Agency
[41] 7:9 <09:46>   7: 10 7:11

<09:46>   7:21 <09:46>   7:22
<09:46>   8:17 <09:47>   8:23
<09:48>   16:3 <09:57>   16:23
<09:57>   18:10 <09:59>   19:
22 <10:02>   22:5 <10:05>   23:8 <10:07>
24:24 <10:09>   26:10
<10:11>   36:22 <10:25>   45:
25 <10:39>   49:7 <10:47>   49:
15 <10:48>   49:23 <10:48>
50:5 <10:48>   75:12 <11:32>
75:15 <11:32>   75:18
<11:32>   75:23 <11:32>   76:
16 <11:33>   98:21 <01:34>
108:25 <01:48>   112:12
<01:54>   112:21 <01:54>
112:24 <01:54>   114:6
<01:55>   120:14 <02:04>
131:4 <02:21>   143:20
<02:46>   147:15 <02:53>
147:18 <02:53>   147:23
<02:53>   150:4 <02:57>   150:
7 <02:57>
Agent
[33] 7:22 <09:46>   21:19
<10:04>   56:7 <10:56>   60:21
<11:03>   64:11 65:2
<11:18>   67:2 <11:20>   67:20
<11:21>   84:23 <11:46>   109:
21 <01:49>   111:1 <01:51>
130:12 <02:20>   132:23
<02:23>   133:12 <02:23>
133:13 <02:23>   133:16 <02:24>
133:17 <02:23>   136:24
<02:28>   137:2 <02:28>   137:
9 <02:28>   137:15 <02:29>
137:18 <02:29>   139:17
<02:29>   141:19 <02:42>
141:21 <02:42>   146:19
<02:52>   158:5 <03:07>   159:
1 <03:08>   159:3 <03:08>
159:4 <03:08>   159:5
<03:08>   159:6 <03:08>
Agent-wise
[1] 109:21 <01:49>
Agents
[33] 17:22 <09:58>   18:4
<09:59>   18:9 <09:59>   18:21
<10:00>   20:19 <10:03>   20:
20 <10:03>   20:24 <10:03>
21:3 <10:04>   21:5 <10:04>
36:21 <10:25>   45:17
<10:38>   51:14 <10:50>   51:
17 <10:51>   63:23 <11:16>
64:16 <11:17>   65:14
<11:18>   65:19 <11:18>   82:6
<11:41>   82:9 <11:41>   108:9
<01:47>   108:14 <01:47>
109:9 <01:48>   126:3
<02:16>   126:5 <02:16>   130:
12 <02:20>   130:15 <02:20>
135:7 <02:26>   135:10
<02:26>   135:16 <02:26>
135:23 <02:26>   136:6
<02:27>   136:11 <02:27>
136:14 <02:27>
Ago
[1] 136:18 <02:27>
Agree
[5] 28:18 <10:14>   28:22
<10:15>   29:4 <10:15>   103:
19 <01:39>   154:23 <03:03>
Agreed
[3] 125:4 <02:14>   125:9
<02:14>   163:21 <03:14>
Aguilar
[89] 1:20 2:3 2:3 4:17
<09:41>   4:21 5:5 <09:42>   9:
6 <09:49>   9:17 <09:49>   12:
23 <09:54>   13:7 <09:55>   13:
12 13:18 <09:55>   13:23 14:8
<09:55>   14:12 <09:55>   14:
20 <09:55>   15:11 15:14
<09:56>   15:18 15:24
<09:56>   16:5 <09:57>   16:9
16:11 <09:57>   16:18

<09:57> 16:21 <09:57> 17:3
<09:57> 23:23 <10:07> 24:9
<10:08> 30:22 <10:17> 33:
21 <10:22> 34:18 <10:22>
37:12 <10:26> 37:14 37:17
<10:26> 37:19 <10:26> 40:1
<10:29> 42:12 <10:33> 44:
10 <10:36> 57:24 <10:58>
63:7 <11:15> 72:20 <11:28>
74:2 <11:30> 76:13 <11:33>
78:4 <11:36> 78:20 <11:38>
78:24 <11:38> 91:7 <01:24>
90:19 <01:20> 99:17
<01:34> 100:9 <01:35> 102:
5 102:8 <01:37> 105:21
<01:41> 117:5 <02:00> 117:
10 118:23 <02:02> 120:24
<02:05> 121:1 121:4
<02:05> 126:20 <02:16>
126:23 <02:16> 127:1
7 127:25 <02:17> 128:22
<02:18> 131:8 <02:21> 131:
11 131:14 <02:21> 132:2
<02:22> 132:12 <02:22>
134:17 <02:25> 134:21
<02:25> 135:1 <02:26> 138:
2 <02:30> 138:10 <02:30>
140:11 <02:40> 144:5
<02:47> 148:21 <02:55>
149:18 <02:56> 152:20
<03:01> 152:23 <03:01>
154:20 <03:03> 156:6
<03:05> 156:16 <03:06>
158:18 <03:08> 159:3
<03:08> 164:3 <03:15> 165:
5 <03:16>

**Ahead**
[6] 6:10 <09:43>    12:19
<09:54> 16:11 <09:57> 54:
16 <10:54> 81:17 <11:40>
160:24 <03:11>

**Alignment**
[2] 147:14 <02:53>    147:21
<02:53>

**Alleviate**
[1] 84:2 <11:45>

**Allianz**
[8] 47:15 <10:41>    48:1
<10:42> 54:7 <10:53> 78:19
<11:38> 79:1 <11:38> 79:2
<11:38> 98:23 <01:34> 100:
6 <01:35>

**Allow**
[2] 81:15 <11:40>    130:11
<02:20>

**Allowed**
[6] 25:12 <10:09>    59:21
<11:01> 59:23 <11:02> 60:
17 <11:03> 61:3 <11:03>
149:6 <02:55>

**American**
[4] 50:24 <10:49>    82:23
<11:43> 100:7 <01:35> 101:
9 <01:36>

**Amount**
[3] 84:23 <11:46>    106:12
<01:43> 142:1 <02:42>

**Amounts**
[1] 30:16 <10:17>

**Analysis**
[1] 101:15 <01:36>

**Andrus**
[50] 1:3 1:4 1:11 1:14 3:3 4:1
4:7 <09:40>  4:8 <09:40>  9:8
<09:43> 58:8 63:1 <11:15>
63:8 <11:15> 75:15 <11:32>
76:19 <11:33> 85:10
<01:17> 92:11 <11:26> 92:
12 <01:26> 94:21 <01:29>
94:24 <01:29> 95:19
<01:30> 95:23 <01:30> 95:
24 <01:30> 96:9 <01:31>
104:18 <01:40> 106:20
<01:44> 106:25 <01:43>
122:9 <02:08> 123:20

<02:12>       <02:16>
136:4 <02:27>    137:1
<02:22> 146:13 <02:51>
148:12 <02:54> 151:14
<02:59> 151:17 <02:59>
152:2 <02:59> 152:14
<03:00> 152:19 <03:00>
156:21 <03:06> 156:24
<03:06> 160:6 <03:09> 163:
6 <03:14> 164:19 <03:16>
167:1 167:4 167:10 168:3 168:
4 168:9 168:15

**Andrus's**
[1] 164:23 <03:16>

**Annual**
[2] 38:8 <10:27>    38:9
<10:27> 38:10 <10:27>

**Annually**
[1] 29:23 <10:16>

**Annuities**
[5] 12:5 <09:53>    53:16
<10:53> 87:13 <01:20> 88:
24 <01:22> 157:5 <03:06>

**Annuity**
[17] 12:4 <09:53>    44:20
<10:37> 44:21 <10:37> 44:
25 <10:37> 50:24 <10:49>
59:2 <11:00> 68:9 <11:22>
87:1 <01:19> 87:7 <01:19>
87:11 <01:20> 87:15
<01:20> 87:21 <01:20> 88:6
<01:20> 88:5 <01:20> 88:6
<01:20> 88:10 <01:20> 93:
19 <01:27>

**Answer**
[53] 13:5 <09:54>    13:14
<09:55> 13:19 13:25
<09:55> 14:22 <09:56> 15:
20 <09:56> 16:1 <09:57> 16:5
<09:57> 16:11 <09:57>
16:18 <09:57> 16:22
<09:57> 17:1 <09:57> 17:3
<09:57> 17:6 <09:57> 17:11
<09:58> 17:18 <09:58> 17:
19 <09:58> 24:8 <10:08> 24:
9 <10:08> 40:8 <10:30> 49:
25 <10:48> 50:19 <10:49>
55:3 <10:55> 55:8 <10:55>
56:10 <10:56> 56:10
<10:56> 56:19 <10:57> 56:
21 <10:57> 58:10 <10:59>
59:8 <11:00> 67:15 <11:21>
67:25 <11:21> 68:17
<11:22> 74:9 <11:30> 77:16
<11:35> 81:12 <11:40> 82:2
<11:41> 87:25 <01:20> 88:
11 <01:21> 91:16 104:5
<01:40> 105:20 113:12
<01:55> 131:24 <02:22>
131:25 <02:22> 132:2
<02:22> 132:14 <02:22>
136:22 <02:28> 152:24
<03:01> 156:7 <03:05> 156:
7 <03:05> 156:8 <03:05>
159:11 <03:09>

**Answered**
[4] 18:11 <09:59>    44:12
<10:36> 114:17 <01:56>
152:21 <03:01>

**Answering**
[2] 33:24 <10:22>    117:2
<02:00>

**Anticipate**
[2] 103:22 <01:39>    104:2
<01:39>

**Antonio**
[12] 20:3 <10:02>    20:22
<10:03> 21:2 <10:04> 45:22
<10:39> 111:5 <01:52> 111:
15 <01:52> 111:19 <01:53>
112:4 <01:55> 112:6
<01:53> 139:4 <02:39> 150:
12 <02:57> 150:14 <02:57>

**Anyway**
[1] 117:11 <02:00>

**Apologize**

[1] 96:12 <01:31>

**Appearances**
[2] 2:1 3:2

**Appeared**
[1] 167: 10

**Applied**
[1] 108: 3 <01:47>

**Apply**
[2] 68:22 <11:22>

**Appreciate**
[1] 48:24 10:46>

**Appropriate**
[1] 157:23 <03:07>

**Approval**
[1] 15: 25 <09:56>

**Approximate**
[1] 26: 19 <10:11>

**April**
[3] 41:9 <10:31>    59: 22
<11:01> 60: 16 <11:03>

**Area**
[10] 9: 10 <09:49>    18: 5
<09:59> 109: 7 <01:48> 109:
10 <01:48> 127: 7 128: 5
<02:17> 131: 1 <02:20> 131:
18 <02:21> 138: 23 <02:38>
161: 19 <03:13>

**Areas**
[8] 9:9 <09:49>    17:25
<09:58> 18: 2 <09:59> 49: 24
<10:48> 131: 4 <02:21> 155:
8 <03:04> 155: 9 <03:04>
155: 23 <03:05>

**Argue**
[1] 14: 21 <09:55>

**Argumentative**
[5] 117:5 <02:00>    126: 20
<02:16> 127: 1 <02:22> 128:
22 <02:18> 154: 20 <03:03>

**Arm**
[1] 53: 21 <10:53>

**Arnold**
[1] 1: 20 2: 3 2:3

**Arrangement**
[1] 76: 5 <11:33>

**Art**
[1] 81: 7 <11:40>

**Artemis**
[1] 2:4

**Arturo**
[7] 62: 14 <11:06>    64: 20
<11:17> 70: 25 <11:25> 82:
20 <11:42> 136: 14 <02:27>
138: 15 <02:37> 141: 20
<02:42>

**Aside**
[1] 23: 5 <10:06>

**Aspect**
[1] 23: 5 <10:06>

**Assistants**
[1] 111: 10 <01:52>

**Associated**
[1] 110: 25 <01:51>

**Associates**
[2] 20: 1 <10:02>    100: 8
<01:35>

**Assume**
[1] 90: 8 <01:23>

**Assumed**
[3] 69:21 <11:24>    70: 2
<11:24> 72: 11 <11:28>

**Assuming**
[6] 8:13 <09:47>    39: 22
<10:29> 76: 3 <11:32> 90: 5
<01:23> 114: 16 <01:56>
161: 9 <03:12>

**Attached**
[4] 1: 23 3: 8 91: 4 <01:24>
122: 18 <02:10>

**Attained**
[1] 55: 23 <10:56>

**At     ting**
[1] 4 :: 14 <10:31>

**Attending**
[1] 54: 23 <10:54>

**Attorney**
[15] 4: 9 <09:40>    27: 24
<10:13> 30: 7 <10:16> 43: 19
<10:33> 44: 12 <10:36> 55: 5
<10:55> 79: 13 <11:39> 90:
25 <01:24> 90: 25 <01:24>
91: 11 <01:25> 122: 6
<02:08> 122: 20 <02:10>
122: 25 <02:10> 123: 16
<02:12> 153: 3 <03:04>

**Attorney's**
[1] 24:21 <10:09>

**Attorneys**
[1] 168: 19

**Attrition**
[55] 3:12 28:6 <10:14>    28: 8
<10:14> 50: 16 <10:49> 50:
21 <10:49> 51: 2 <10:50> 51:
6 <10:50> 51: 9 <10:50> 52: 1
<10:51> 52: 7 <10:51> 52: 19
<10:50> 53: 1 <10:52> 57: 3
<10:57> 57: 7 <10:57> 57: 10
<10:57> 72: 12 <11:28> 72:
12 <11:28> 72: 21 <11:28>
73: 11 <11:29> 73: 12
<11:29> 73: 24 <11:30> 73:
25 <11:30> 74: 5 <11:30> 77:
25 <11:35> 78: 9 <11:36> 91:
24 <01:25> 93: 2 <01:27> 94:
22 <01:29> 95: 2 <01:29> 96:
3 <01:31> 96: 20 <01:31> 97:
6 <01:32> 97: 7 <01:32> 97:
23 <01:34> 104: 19 <01:40>
105: 17 <01:41> 105: 25
<01:41> 114: 20 <01:57>
114: 24 <01:57> 115: 5
<01:57> 117: 15 <02:00>
125: 5 <02:14> 125: 8
<02:14> 125: 15 <02:15>
144: 19 <02:48> 144: 24
<02:49> 145: 1 <02:49> 145:
6 <02:49> 145: 15 <02:50>
145: 15 <02:50> 153: 1
<03:01> 153: 14 <03:02>
153: 15 <03:02> 153: 21
<03:02> 153: 24 <03:03>

**Audience**
[1] 24: 11 <10:08>

**August**
[3] 59: 20 <11:01>    60: 16
<11:03> 60: 23 <11:03>

**Austin**
[2] 20: 22 <10:03>    139: 6
<02:38>

**Available**
[1] 74: 7 <11:30>

**Average**
[38] 59:3 <11:00>    59:4
<11:00> 59: 5 <11:00> 59: 9
<11:00> 61: 24 <11:05> 63:
23 <11:16> 64: 7 <11:17> 64:
10 <11:17> 64. 14 <11:17>
64: 16 <11:17> 67: 5 <11:20>
67: 17 <11:21> 68: 8 <11:21>
68: 14 <11:22> 68: 20
<11:22> 70: 24 <11:25> 87: 1
<01:19> 87: 7 <01:19> 87: 10
<01:19> 87: 20 <01:20> 88: 3
<01:20> 88: 4 <01:20> 88: 5
<01:20> 88: 8 <01:20> 88: 8
<01:20> 88: 9 <01:20> 91: 24
<01:25> 108: 24 <01:48>
132: 9 <02:22> 132: 9
<02:22> 132: 16 <02:22>
132: 22 <02:23> 133: 6
<02:23> 136: 7 <02:27> 136:
13 <02:27> 137: 2 <02:28>
137: 3 <02:28> 137: 9
<02:28>

**Award**
[1] 12: 8 <09:53>

**Awarded**

[8] 10: 10 <09:51>    11: 11
<09:52> 11: 21 <09:52> 12:
13 <09:53> 12: 16 <09:54>
107: 11 <01:46> 107: 15
<01:46> 108: 1 <01:47>

**Aware**
[2] 51: 24 <10:51>    130: 9
<02:19>

# B

**B-02-143**
[2] 1: 5 168: 5

**Backup**
[1] 36: 24 <10:25>

**Bank**
[3] 42: 24 <10:33>    43: 3
<10:33>

**Base**
[3] 58: 22 <10:59>    68: 25
<11:22> 112: 11 <01:53>

**Based**
[24] 59: 16 <11:01>    63: 22
<11:16> 64: 14 <11:17> 65:
15 <11:17> 65: 4 <11:18> 67:
4 <11:20> 67: 7 <11:20> 67:
10 <11:20> 68: 5 <11:21> 71:
2 <11:26> 74: 19 <11:31> 75:
5 <11:31> 76: 10 <11:33> 76:
15 <11:33> 76: 19 <11:33>
114: 17 <01:56> 115: 8
<01:57> 116: 24 <02:00> 144:
6 <02:47> 144: 24 <02:49>
146: 1 <02:50> 146: 14
<02:51> 146: 17 <02:52>
148: 18 <02:52> 162: 4 <03:13>

**Basic**
[1] 94: 5 <01:28>

**Basis**
[13] 14: 15 <09:55>    28: 5
<10:14> 34: 20 <10:23> 34:
24 <10:23> 38: 8 <10:27> 54:
24 <10:54> 57: 19 <10:58>
70: 18 <11:25> 85: 25
<01:18> 92: 15 <01:26> 93:
13 <01:27> 135: 14 <02:26>
155: 20 <03:05>

**Bathroom**
[1] 62: 16 <11:06>

**Became**
[1] 111: 17 <01:52>

**Become**
[1] 111: 6 <01:52>

**Began**
[2] 32: 10 <10:20>    93: 25
<01:28>

**Beginning**
[5] 116: 2 <01:58>    138: 19
<02:38> 140: 22 <02:40>
140: 23 <02:40> 164: 9
<03:15>

**Behalf**
[1] 81: 24 <11:41>

**Beliefs**
[2] 87: 4 <01:19>    116: 24
<02:00>

**Belong**
[1] 105: 10 <01:41>

**Benefits**
[1] 129: 18 <02:19>

**Bertha**
[3] 108: 15 <01:47>    108: 21
<01:48> 108: 22 <01:48>

**Best**
[4] 16: 18 <09:57>    59: 16
<11:01> 68: 4 <11:21> 157:
22 <03:07>

**Better**
[3] 88: 12 <01:21>    88: 14
<01:21> 115: 11 <01:58>

**Between**
[4] 41: 4 <10:31>    97: 6
<01:32> 148: 17 <02:54>
158: 11 <03:08>

**Big**
[1] 92:5 <01:25>

**Bill**
[2] 45:20 <10:38> 52:24 <10:52>

**BISD**
[4] 23:17 <10:07> 149:16 <02:56> 149:21 <02:56> 163:23 <03:15>

**Bit**
[3] 72:19 <11:28> 107:25 <01:47> 141:5 <02:41>

**Black**
[1] 35:7 <10:23>

**Blind-sided**
[1] 15:8 <09:56>

**Blue**
[1] 95:10 <01:30>

**Board**
[2] 24:6 <10:08> 112:19 <01:54>

**Boca**
[1] 2:13

**Bodene**
[3] 45:6 <10:37> 51:1 <10:50> 57:6 <10:57>

**Bogart**
[1] 109:12 <01:48>

**Book**
[5] 96:14 <01:31> 123:7 <02:11> 123:8 <02:11> 123:9 <02:11> 123:12 <02:11>

**Bookkeeper**
[1] 83:10 <11:44>

**Books**
[9] 39:8 <10:28> 39:15 <10:29> 40:3 <10:29> 40:10 <10:30> 94:16 <01:29> 106: 11 <01:43> 123:15 <02:12> 124:13 <02:13> 124:14 <02:13>

**Bottom**
[5] 6:12 <09:43> 37:12 <10:27> 39:3 <10:28> 94:8 <01:28> 102:9 <01:37>

**Boulevard**
[3] 1:20 2:4 2:13

**Boxes**
[2] 124:20 <02:13> 124:24 <02:13>

**Break**
[6] 24:17 <10:08> 46:15 <10:40> 62:15 <11:06> 85:8 <11:46> 131:14 <02:21> 138:12

**Brian**
[2] 54:8 <10:53> 54:14 <10:54>

**Brief**
[1] 116:2 <01:58>

**Brill**
[1] 109:12 <01:48>

**Bring**
[1] 61:18 <11:05>

**Bringing**
[1] 128:9 <02:17>

**Broken**
[1] 30:19 <10:17>

**Broker**
[8] 19:2 <10:01> 19:3 <10:01> 19:10 <10:01> 19: 15 <10:02> 110:13 <01:50> 110:20 <01:51> 110:23 <01:51> 129:20 <02:19>

**Broker/dealer**
[11] 83:12 <11:44> 83:14 <11:44> 83:16 <11:44> 83: 16 <11:44> 83:17 <11:44> 83:21 <11:44> 84:8 <11:45> 84:10 <11:45> 89:9 <01:22> 89:13 89:14 <01:22>

**Brokers**
[1]

**[11]** 19 < 19 <10:01> 19 1 <10:01> 19 <2 <10:02> 20 2 <10:03> 21 <10:04> 21 <10:04> 21 1 <10:04> 66 1 <11:19> 83 1 <11:44> 110 1 <01:50>

**Brought**
[6] 28 <10:14> 33 2 <10:22> 94 <01:28> 116 1 <01:59> 116 1 <01:59> 124 1 <02:13>

**Brownsville**
[14] 1 1 1 2 2 2 2 2 1 7 2 <09:53> 60 <11:02> 60 1 <11:02> 150 1 <02:57> 151 <02:58> 168 168

**Bryan**
[1] 46 2 <10:40>

**Building**
[3] 131 <02:21> 150 1 <02:57> 150 2 <02:57>

**Bunch**
[2] 16 1 <09:57> 110 1 <01:50>

**Business**
[71] 12 1 <09:54> 12 2 <09:54> 13 <09:54> 14 <09:55> 15 <09:56> 16 2 <09:57> 17 1 <09:58> 17 1 <09:58> 18 1 <09:59> 19 <10:01> 19 <10:01> 19 2 <10:01> 22 <10:05> 22 <10:05> 22 <10:05> 45 2 <10:39> 47 2 <10:41> 48 <10:42> 53 <10:52> 53 <10:53> 59 <11:00> 62 1 <11:05> 69 2 <11:24> 69 2 <11:24> 70 <11:24> 70 <11:24> 71 <11:26> 72 2 <11:28> 72 2 <11:28> 74 1 <11:31> 74 2 <11:31> 74 2 <11:31> 81 2 <11:41> 87 <01:19> 93 <01:27> 93 <01:27> 93 <01:28> 98 2 <01:34> 99 <01:34> 99 1 <01:34> 99 103 1 <01:39> 104 2 <01:40> 106 <01:42> 107 1 <01:46> 107 2 <01:46> 108 <01:47> 108 1 <01:47> 109 <01:48> 111 1 <01:52> 115 1 <01:58> 125 2 <02:15> 126 1 <02:16> 127 1 <02:17> 127 2 <02:17> 128 <02:17> 132 <02:22> 132 1 <02:22> 132 <02:23> 134 147 149 <02:55> 149 1 149 1 <02:55> 151 <02:58> 152 <03:00> 161 <03:12> 161 1 <03:12> 161 1 <03:12>

**Butch**
[1] 45 <10:38>

**Buy**
[1] 87 1 <01:20>

**Cafeteria**
[8] 7 2 <09:46> 10 1 <09:51> 11 <09:52> 13 <09:52> 107 2 <01:46> 108 <01:47> 129 1 <02:19> 129 1 <02:19>

**Calculate**
[5] 32 <10:19> 64 1 <11:17> 77 <11:35> 97 1 <01:32> 146 1 <02:52>

**Calculated**
[11] 63 <11:15> 63 2 <11:16> 64 1 <11:17> 69

**<11:23>** 79:9 <11:38> 79 <11:38> 81:22 <11:41> 81: 25 <11:41> 97:12 <01:32> 148:6 <02:54> 148:13 <02:54>

**Calculation**
[2] 70:9 <11:24> 71:20 <11:27>

**Calculations**
[17] 15:1 <09:42> 14:15 <09:55> 27:20 <10:12> 28:5 <10:14> 29:16 <10:16> 29: 22 <10:16> 42:16 <10:33> 48:11 <10:43> 65:9 <11:18> 74:17 <11:31> 77:6 84:7 <11:45> 92:4 <01:25> 119: 19 <02:03> 143:24 <02:46> 152:1 <02:59> 153:10 <03:02>

**Calendar**
[3] 36:9 <10:24> 140:25 <02:41> 141:3 <02:41>

**Caliber**
[2] 103:24 <01:39> 110:13 <01:50>

**CAMERON**
[1] 167:9

**Campuses**
[7] 25:13 <10:09> 26:20 <10:11> 59:22 <11:03> 59: 23 <11:02> 60:17 <11:03> 61:3 <11:03> 61:4 <11:03>

**Cannot**
[4] 13:16 <09:55> 16:1 <09:56> 17:7 <09:57> 48:6 <10:42>

**Capacity**
[1] 11:19 <09:52>

**Care**
[2] 11:7 <09:52> 53:8 <10:52>

**Cared**
[1] 111:13 <01:52>

**Career**
[2] 87:16 <01:20> 116:3 <01:58>

**Carrier**
[6] 51:18 <10:51> 51:21 <10:51> 92:25 <01:26> 93:3 <01:27> 93:4 <01:27> 101:4 <01:36>

**Carriers**
[1] 27:6 <10:12> 94:1 <01:28> 100:3 <01:35> 111: 8 <01:52>

**Case**
[17] 4:10 <09:41> 5:16 <09:42> 5:20 <09:42> 20:16 <10:03> 25:4 <10:09> 25:21 <10:09> 26:16 <10:11> 27: 17 <10:12> 27:22 <10:12> 30:9 <10:17> 45:13 <10:38> 49:11 <10:47> 57:5 <10:57> 68:14 <11:22> 102:21 <01:38> 153:12 <03:02> 153:17 <03:02>

**Cases**
[4] 55:18 <10:55> 65:6 <11:18> 93:2 <01:27> 94:16 <01:29>

**Categories**
[1] 30:17 <10:17>

**Cell**
[7] 46:13 <10:39> 48:18 <10:46> 48:20 <10:46> 48: 20 <10:46> 48:21 <10:46> 48:23 <10:46> 58:18 <10:59>

**Cent**
[1] 124:15 <02:13>

**Central**
[1] 1:20 2:4

**Certificate**
[1] 3:7

**CE ·IFICATION**
[1] 169:9

**Certified**
[1] 1:18 168:12 169:1

**Certify**
[2] 168:13 168:17

**CFO**
[4] 107:4 <01:45> 107:8 <01:46> 111:23 <01:53> 113:3 <01:54>

**CGU**
[6] 80:9 <11:39> 80:25 <11:40> 82:19 <11:42> 100: 8 <01:35> 101:10 <01:36> 143:6 <02:45>

**Challenge**
[1] 91:14 <01:25>

**Challenging**
[1] 11:1 <09:51>

**Chance**
[1] 163:25 <03:15>

**Change**
[3] 120:17 <02:04> 147:24 <02:53> 166:2

**Changed**
[9] 18:13 <09:59> 18:14 <09:59> 75:18 <11:33> 75: 21 <11:32> 76:5 <11:33> 76: 12 <11:33> 148:6 <02:54> 151:4 <02:58> 157:8 <03:06>

**Changes**
[2] 3:6 166:1

**Chart**
[1] 94:19 <01:29>

**Chavez**
[3] 7:13 <09:46> 8:1 <09:46> 11:7 <09:52>

**Check**
[12] 29:21 <10:16> 30:16 <10:17> 43:23 <10:35> 43: 24 <10:35> 43:25 <10:35> 80:20 <11:40> 83:20 <11:44> 83:22 85:4 <11:46> 114:1 <01:55> 114: 2 <01:55> 118:19 <02:02>

**Checkbook**
[2] 22:24 <10:06> 113:22 <01:55>

**Checks**
[8] 36:13 <10:25> 36:14 <10:25> 36:18 <10:25> 41: 25 <10:32> 42:23 <10:33> 79:17 <11:39> 79:25 <11:39> 80:22 <11:40>

**Chica**
[1] 2:13

**Choose**
[1] 108:10 <01:47>

**Christi**
[1] 45:10 <10:38>

**Circle**
[2] 95:10 <01:30> 95:10 <01:30>

**City**
[2] 11:15 <09:52> 18:8 <09:59>

**Civil**
[1] 1:22

**Claim**
[4] 68:25 <11:22> 88:21 <01:21> 123:21 <02:12> 139:9 <02:38>

**Claims**
[1] 123:23 <02:12>

**Clarification**
[3] 78:23 <11:38> 78:25 <11:38> 95:12 <01:30>

**Clarify**
[1] 71:6 <11:26>

**Classes**
[1] 104:22 <01:40>

**Clause**
[1] 52:6 <10:51>

**Cleaning**
[1] 150:23 <02:57>

**Clear**
[3] 99:16 <01:34> 126:7 <02:16> 160:22 <03:10>

**Client**
[3] 14:21 <09:55> 17:19 <09:58> 23:6 <10:06>

**Clients**
[13] 53:8 <10:52> 68:14 <11:22> 82:10 <11:41> 82: 11 <11:41> 82:11 <11:41> 82:13 <11:42> 83:5 <11:43> 85:12 <11:17> 86:22 <01:19> 96: 13 <01:31> 96:23 <01:32> 109:5 <01:48>

**Clint**
[2] 47:4 <10:40> 54:9 <10:54>

**Close**
[2] 85:25 <01:18> 108:22 <01:48>

**Closer**
[2] 90:23 <01:24> 108:10 <01:47>

**Coaching**
[1] 13:17 <09:55>

**Code**
[1] 11:24 <09:53>

**Cohorts**
[1] 104:20 <01:40>

**Collect**
[2] 75:22 <11:32> 159:15 <03:09>

**Colonial**
[1] 109:19 <01:51>

**Color**
[2] 37:16 <10:26> 37:17 <10:26>

**Columbia**
[5] 84:20 <11:46> 100:11 <01:35> 101:10 <01:36> 141:18 <02:42> 143:6 <02:45>

**Column**
[4] 36:4 <10:24> 101:24 <01:36> 102:1 <01:37> 102: 3 <01:37>

**Columns**
[4] 95:5 <01:30> 95:13 <01:30> 100:2 <01:35> 102: 13 <01:38>

**Comfortable**
[2] 67:7 <11:20> 153:25 <03:03>

**Coming**
[3] 14:5 <10:01> 45:23 <10:39> 105:3 <01:41> 152: 4 <03:00>

**Comments**
[4] 15:14 <09:56> 15:15 <09:56> 15:19 <09:56> 15: 19 <09:56>

**Commercial**
[3] 54:2 <10:53> 100:9 <01:35> 100:10 <01:35>

**Commission**
[73] 29:21 <10:16> 31:13 <10:18> 31:16 <10:18> 31: 23 <10:19> 37:1 <10:25> 37:5 <10:26> 39:13 <10:29> 44:16 <10:36> 47:6 <10:47> 49:8 <10:47> 49:21 <10:48> 51:16 <10:51> 51:23 <10:51> 52:4 <10:51> 52:9 52:13 <10:51> 56:4 <10:56> 61:11 <11:04> 62:5 <11:06> 62:8 <11:06> 64:3 <11:15> 64:24 <11:17> 64:

25 <11:17> 65:6 <11:19> 65:
7 <11:18> 69:16 <11:24> 69:
17 <11:24> 72:22 <11:28>
78:16 <11:38> 79:3 <11:38>
79:4 <11:38> 79:12 <11:39>
79:16 <11:39> 79:20
<11:39> 80:8 <11:39> 80:17
<11:40> 82:9 <11:41> 82:14
<11:42> 84:14 <11:45> 85:
11 <11:17> 89:2 <11:22> 89:
20 <11:22> 90:1 <11:23> 92:
25 <11:26> 96:13 <01:13>
118:8 <02:01> 124:15
<02:05> 124:16 <02:13>
124:21 <02:13> 124:24
<02:13> 140:3 <02:39>
4 <02:39> 140:5 <02:39>
140:6 <02:39> 140:9
<02:40> 140:10 <02:40>
141:17 <02:42> 141:21
<02:42> 141:25 <02:42>
143:3 <02:45> 146:3
<02:51> 161:13 <03:12>
161:15 <03:12> 162:4
<03:13> 163:2 <03:14> 163:
7 <03:14> 163:16 <03:14>
164:18 <03:16> 164:21
<03:16> 164:23 <03:16>

**Commissions**
[31] 22:6 <10:05> 22:10
<10:05> 34:13 <10:22> 34:
23 <10:25> 51:7 <10:50> 60:
15 <11:03> 72:11 <11:28>
80:14 <11:39> 80:16
<11:40> 81:4 <11:40> 81:10
<11:40> 81:18 <11:40> 81:
19 <11:41> 81:23 <11:41>
82:5 <11:41> 86:11 <01:18>
88:20 <01:21> 88:24
<01:22> 89:6 <01:22> 89:24
<01:22> 112:14 <01:58>
119:5 <02:02> 121:10
<02:05> 121:24 <02:08>
141:14 <02:41> 158:22
<03:08> 162:15 <03:13>
162:20 <03:14> 163:12
<03:14> 163:18 <03:14>
163:18 <03:14>

**Communicating**
[1] 73:18 <11:29>

**Communication**
[1] 160:4 <03:09>

**Comp**
[2] 84:8 <11:45> 84:10
<11:45>

**Companies**
[29] 11:13 <09:52> 26:18
<10:11> 27:6 <10:12> 27:9
<10:12> 27:16 <10:12> 36:
15 <10:25> 44:20 <10:37>
44:21 <10:37> 51:15
<10:51> 67:5 <11:20> 68:12
<11:22> 73:19 <11:29> 73:
20 <11:29> 74:1 <11:30> 74:
5 <11:30> 94:4 <01:28> 98:
17 <01:33> 98:19 <01:33>
98:22 <01:34> 99:2 <01:34>
100:13 <01:35> 106:22
<01:45> 119:21 <02:03>
124:17 <02:13> 127:18
<02:17> 127:20 <02:17>
136:19 <02:27> 155:13
<03:04> 155:14 <03:04>

**Company**
[30] 10:20 <09:51> 12:25
<09:54> 21:24 <10:04> 37:9
<10:26> 38:23 <10:28> 40:
17 <10:30> 45:25 <10:39>
47:17 <10:41> 47:21
<10:41> 48:4 <10:42> 48:5
<10:42> 50:3 <10:48> 76:14
<11:33> 83:18 <11:44> 84:
18 <11:46> 84:19 <11:46>
86:6 <01:18> 89:15 <01:22>
96:15 <01:31> 96:16
<01:31> 96:18 <01:31> 99:5
<01:34> 100:8 <01:35> 105:

9 <01:41> :5:11 <01:41>
111:11 <01:52> 113:21
<01:55> 118:15 <02:02>
143:4 <02:45> 153:3
<03:01>

**Company's**
[1] 22:23 <10:06>

**Comparable**
[4] 66:22 <11:19> 66:23
<11:20> 101:16 <01:36>
137:21 <02:29>

**Compare**
[5] 92:23 <01:26> 96:18
<01:31> 99:12 <01:34> 100:
1 <01:35> 101:2 <01:36>

**Compared**
[3] 94:20 <01:29> 100:15
<01:35> 123:14 <02:12>

**Compiled**
[1] 93:1 <01:26>

**Compiling**
[1] 126:1 <02:15>

**Completed**
[1] 35:1 <10:23>

**Completely**
[3] 14:6 <09:55> 97:15
<01:32> 154:18 <03:03>

**Comprised**
[3] 93:6 <01:27> 94:21
<01:28> 94:22 <01:29>

**Computer**
[7] 30:20 <10:17> 43:8
<10:34> 43:10 <10:34> 43:
15 <10:34> 43:16 <10:34>
43:20 <10:35> 43:25
<10:35>

**Computer-generated**
[1] 5:11 <09:42>

**Concept**
[1] 12:18 <09:54>

**Concern**
[1] 55:19 <10:55>

**Concerning**
[5] 5:15 <09:42> 25:16
<10:09> 26:4 <10:10> 57:12
<10:58> 126:1 <02:15>

**Conclusion**
[2] 78:8 <11:36> 146:21
<02:52>

**Conclusions**
[1] 5:12 <09:42>

**Conducive**
[1] 51:8 <10:50>

**Confirm**
[1] 87:4 <01:19>

**Confirming**
[1] 104:24 <01:40>

**Confused**
[1] 96:4 <01:31>

**Confusing**
[4] 94:23 <01:29> 94:24
<01:29> 96:12 <01:31> 97:
16 <01:32>

**Conglomerate**
[2] 131:3 <02:20> 138:18
<02:24>

**Conservative**
[4] 69:25 <11:24> 70:9
<11:24> 71:2 <11:26> 75:3
<11:31> 96:20 <01:31> 125:
10 <02:14> 145:19 <02:50>
153:22 <03:02> 153:22
<03:02>

**Consider**
[5] 20:24 <10:03> 40:22
<10:30> 83:5 <11:43> 126:
14 <02:16> 128:15 <02:18>

**Consideration**
[4] 59:25 <11:02> 60:10
<11:02> 65:2 <11:18> 167:
12

**Considered**

[1] 9:24 <09:50>

**Considering**
[1] 39:12 <10:29>

**Consisted**
[1] 44:15 <10:36>

**Consistent**
[2] 23:9 <10:07> 103:12
<01:38>

**Constant**
[2] 9:19 <09:49> 54:23
<10:54>

**Constantly**
[1] 33:12 <10:21>

**Contact**
[1] 21:15 <10:04>

**Contacted**
[2] 87:3 <01:19> 111:8
<01:52>

**Contained**
[1] 135:6 <02:26>

**Contains**
[1] 168:14

**Content**
[1] 49:17 <10:48>

**Contents**
[1] 28:18 <10:14>

**Contest**
[1] 136:19 <02:27>

**Context**
[4] 88:17 <01:21> 133:1
<02:23> 133:3 <02:23>

**Continue**
[13] 32:21 <10:20> 74:21
<11:31> 74:22 <11:31> 144:
6 <02:47> 147:20 <02:53>
157:19 <03:07> 157:24
<03:07> 158:4 <03:07> 158:
15 <03:03> 158:22 <03:07>
158:23 <03:08> 159:10
<03:08> 161:10 <03:12>

**Continues**
[1] 147:8 <02:53>

**Continuing**
[1] 104:22 <01:40>

**Continuously**
[1] 115:25 <01:58>

**Contract**
[13] 51:5 <10:50> 51:13
<10:50> 51:14 <10:50> 51:
16 <10:51> 51:18 <10:51>
51:21 <10:51> 51:25
<10:51> 52:6 <10:51> 53:24
<10:53> 53:25 <10:53> 54:1
<10:53> 93:24 <01:28> 93:
25 <01:28>

**Contracted**
[5] 18:24 <10:00> 18:25
<10:00> 20:14 <10:03> 21:
13 <10:04> 110:11 <01:50>

**Contracts**
[4] 54:4 <10:53> 94:2
<01:28> 105:19 <01:41>
130:11 <02:20>

**Contractual**
[1] 53:17 <10:53>

**Contractually**
[1] 73:20 <11:29>

**Contributing**
[1] 97:5 <01:32>

**Contributions**
[1] 81:25 <11:41>

**Conversation**
[5] 57:16 <10:58> 57:18
<10:58> 57:20 <10:58> 59:1
<11:00> 158:11 <03:08>

**Conversations**
[21] 50:8 <10:49> 53:6
<10:53> 55:20 <10:55> 55:
56:1 <10:56> 56:7 <10:56>
57:1 <10:57> 57:11 <10:57>
58:2 <10:58> 58:3 <10:58>

59: ,0:58> 58:5 <10:58>
58:15 <10:59> 68:5 <11:21>
77:22 <11:35> 105:4
<01:41> 115:7 <01:57> 126:
2 <02:16> 157:7 <03:06>
159:14 <03:09>

**Copied**
[1] 89:2 <01:22>

**Copies**
[6] 6:5 <09:43> 35:18
<10:24> 90:10 <01:23> 162:
19 <03:14>

**Copy**
[18] 5:2 <09:41> 5:3
<09:41> 6:2 <09:43> 7:3
<09:43> 31:8 <10:18> 35:23
<10:24> 37:10 <10:26> 37:
16 <10:26> 37:17 <10:26>
<10:35> 43:18 <10:35> 43:
19 <10:35> 90:20 <01:24>
90:22 <01:24> 91:9 <01:24>
131:6 <02:21> 131:9
<02:21>

**Corporate**
[1] 120:17 <02:04>

**Corporation**
[2] 120:18 <02:05> 148:6
<02:54>

**Corpus**
[1] 45:10 <10:38>

**Correct**
[148] 5:23 <09:42> 6:6
<09:43> 21:25 <10:04> 23:3
<10:06> 24:16 24:24
<10:09> 26:7 <10:10> 27:7
<10:12> 27:17 <10:12> 27:
18 <10:12> 27:22 <10:12>
27:23 <10:12> 28:12
<10:14> 34:23 <10:23> 37:
23 <10:27> 37:24 <10:27>
38:5 <10:27> 38:6 <10:27>
38:8 <10:27> 38:12 <10:28>
42:3 <10:32> 42:20 <10:33>
43:6 <10:34> 43:7 <10:34>
45:14 <10:38> 46:19
<10:40> 47:3 <10:40> 49:9
<10:47> 50:2 <10:48> 50:4
<10:48> 50:22 <10:49> 51:
17 <10:51> 52:2 <10:51> 52:
13 <10:51> 52:16 <10:52>
52:22 <10:52> 52:23
<10:52> 63:4 <11:15> 63:21
<11:16> 65:17 <11:18> 65:
22 <11:18> 66:7 <11:19> 66:
12 <11:19> 66:16 <11:19>
66:17 <11:19> 66:19
<11:19> 70:5 <11:24> 72:
13 <11:28> 74:10 <11:30>
74:14 <11:31> 74:25
<11:31> 74:25 <11:31> 75:7
<11:31> 75:9 <11:32> 75:12
<11:32> 75:24 <11:32> 76:7
<11:33> 77:20 <11:35> 79:8
<11:38> 80:12 <11:39> 80:
18 <11:40> 80:19 <11:40>
82:9 <11:41> 84:17 <11:46>
85:6 <11:46> 88:25 <01:22>
90:16 <01:24> 91:21
<01:25> 97:2 <01:32> 98:2
<01:33> 98:4 <01:33> 99:4
99:7 <01:34> 100:19
<01:36> 100:23 <01:36>
101:22 <01:37> 103:1
<01:38> 103:4 <01:38> 103:
6 <01:38> 103:7 <01:38>
103:10 <01:38> 104:12
<01:39> 104:20 <01:41>
105:18 <01:41> 106:1
<01:41> 108:20 <01:48>
109:20 <01:49> 112:25
<01:58> 114:15 <01:55>
114:2 <01:55> 114:15
<01:56> 114:16 <01:56>
114:21 <01:57> 115:1
<01:57> 115:2 <01:57> 115:

7 <01:57> 115:11 <01:58>
115:20 <01:58> 119:11
<02:03> 119:24 <02:04>
120:2 <02:04> 120:15
<02:04> 121:9 <02:05> 122:
125:19 <02:13> 131:5
<02:21> 135:8 <02:26> 135:
11 <02:26> 135:24 <02:26>
135:25 <02:26> 136:8 137:11
<02:28> 138:6 <02:30> 139:
22 <02:39> 141:10 <02:41>
141:15 <02:42> 143:12
<02:46> 143:15 <02:46>
143:18 <02:46> 143:21
<02:46> 144:8 <02:47> 144:
18 <02:48> 145:13 <02:49>
146:1 <02:50> 148:15
<02:54> 148:19 <02:54>
150:13 <02:57> 152:17
<03:00> 152:16 <03:03>
155:7 <03:04> 155:10
<03:04> 156:16 <03:04>
155:17 <03:05> 155:20
<03:05> 155:21 <03:05>
156:19 <03:06> 157:1
<03:06> 158:17 <03:08>
160:16 <03:11> 160:21
<03:10> 162:9 <03:13> 162:
17 <03:13> 162:18 <03:14>
167:2 168:14

**Corrections**
[5] 143:23 <02:46> 148:5
<02:54> 148:9 <02:54> 152:
7 <03:00> 152:12 <03:00>

**Correctly**
[1] 110:23 <01:51>

**Correlates**
[3] 94:21 <01:29> 95:24
<01:30> 96:11 <01:31>

**Cortright**
[4] 46:23 <10:40> 46:25
<10:40> 54:9 <10:54> 54:13
<10:54>

**Counsel**
[1] 168:17

**Count**
[3] 102:21 <01:38> 153:12
<03:02> 153:17 <03:02>

**Country**
[1] 130:23 <02:20>

**COUNTY**
[1] 167:9

**Couple**
[8] 20:23 <10:03> 20:25
<10:04> 41:18 <10:32> 45:3
<10:37> 108:9 <01:47> 108:
17 <01:47> 109:4 <01:48>
109:15 <01:49>

**Course**
[1] 18:19 <09:59>

**Court**
[8] 1:1 1:18 14:1 <09:55> 14:
23 <09:56> 24:22 <10:09>
67:12 <11:20> 168:1 168:12

**Court-ordered**
[1] 13:10 <09:55>

**Cover**
[2] 79:4 <11:38> 84:1
<11:44>

**CPA**
[3] 8:21 <09:48> 113:7
<01:55> 122:10 <02:08>

**Crap**
[1] 16:14 <09:57>

**Created**
[2] 5:10 <09:42> 140:8
<02:40>

**Credit**
[1] 71:8 <11:26>

**Criteria**
[2] 63:1 <11:15> 146:12
<02:51>

**Crossed**

[1] 46:7 <10:39>
**CSR**
[1] 169:5
**CUL**
[1] 100:11 <01:35>
**Cut**
[1] 50:19 <10:49>

## D

**Damages**
[13] 5:15 <09:42> 5:16
<09:42> 9:12 <09:49> 9:12
<09:49> 14:4 <09:55> 24:23
<10:09> 24:23 <10:09> 25:3
<10:09> 27:21 <10:12> 54:
11 <10:54> 123:22 <02:12>
123:23 <02:12> 152:10
<03:00>
**Data**
[2] 92:16 <01:26> 92:17
<01:26>
**Date**
[8] 32:18 <10:20> 80:17
<11:40> 84:12 <11:45> 84:
15 <11:46> 107:21 <01:46>
149:5 <02:55> 149:6
<02:55> 169:6
**Dates**
[5] 30:16 <10:17> 58:13
<10:59> 58:14 <10:59> 141:
7 <02:41> 164:15 <03:16>
**Daubler**
[1] 91:14 <01:25>
**Days**
[1] 136:18 <02:27>
**De**
[26] 1:3 3:19 7:14 <09:46>
49:6 <10:47> 49:15 <10:48>
50:5 <10:48> 62:23 <11:15>
62:24 <11:15> 63:2 <11:15>
63:9 <11:15> 63:19 <11:16>
64:7 <11:17> 64:11 66:3
<11:18> 66:4 <11:18> 66:6
73:2 <11:31> 75:11 <11:32> 82:
19 <11:42> 132:5 <02:22>
146:2 <02:50> 151:21
<02:59> 158:6 <03:08> 158:
20 <03:08> 162:11 <03:13>
163:6 <03:14> 168:3
**Dealing**
[1] 58:13 <10:59>
**Death**
[1] 158:15 <03:08>
**December**
[8] 10:6 <09:50> 10:7
<09:50> 10:23 <09:51> 97:
16 <01:32> 97:22 <01:33>
97:22 <01:33> 97:25
<01:33> 108:23 <01:48>
**Decided**
[3] 81:24 <11:41> 97:4
<01:32> 115:25 <01:58>
**Decrease**
[1] 120:7 <02:04>
**Decreased**
[1] 101:13 <01:36>
**DEFENDANT**
[2] 1:15 2:6
**Defendants**
[2] 2:11 9:7 <09:49>
**Define**
[4] 18:22 <10:00> 98:7
<01:33> 126:21 127:3
<02:16>
**Defined**
[1] 145:1 <02:49>
**Definitive**
[1] 30:12 <10:17>
**Degree**
[1] 85:17 <01:17>
**Deleted**
[1] 43:21 <10:35>
**Depo**

[1] 93:24 28>
**Depos**
[1] 18:23 <10:00>
**Depose**
[1] 9:8 <09:49>
**Deposed**
[4] 12:13 <09:53> 20:12
<10:03> 70:16 <11:25> 112:
4 <01:53>
**Deposit**
[1] 43:1 <10:33>
**Deposition**
[33] 1:10 1:14 4:14 <09:41>
4:15 <09:41> 9:7 <09:49>
11:11 <09:52> 13:11
<09:55> 14:10 <09:55> 15:1
<09:56> 15:10 <09:56> 18:
12 <09:59> 22:8 <10:05> 23:
10 <10:07> 28:25 <10:15>
29:2 <10:15> 29:3 <10:15>
29:7 <10:15> 30:6 <10:16>
32:2 <10:19> 33:5 <10:21>
34:1 <10:22> 34:9 <10:22>
44:9 <10:36> 91:19 <01:25>
108:1 <01:47> 114:9
<01:56> 139:14 <02:38>
139:15 <02:38> 147:13
<02:53> 151:7 <02:58> 167:
1 168:9 168:15
**Derive**
[2] 55:20 <10:55> 135:23
<02:26>
**Derived**
[9] 22:5 <10:05> 22:10
<10:05> 79:25 <11:39> 135:
7 <02:26> 141:13 <02:41>
**Describe**
[1] 67:2 <11:20>
**Described**
[1] 30:2 <10:16>
**DESCRIPTION**
[1] 3:11
**Designated**
[2] 4:9 <09:40> 15:9
<09:56>
**Designation**
[1] 9:9 <09:49>
**Detailed**
[1] 83:18 <11:44>
**Determination**
[1] 76:1 <11:32>
**Determine**
[5] 13:18 <09:55> 14:4
<09:55> 28:8 <10:14> 87:7
<01:19> 112:19 <01:54>
**Developed**
[2] 111:12 <01:52> 120:13
<02:04>
**Devoting**
[1] 23:7 <10:07>
**Die**
[4] 74:24 <11:31> 74:25
<11:31> 158:21 <03:08>
159:10 <03:08>
**Dies**
[6] 147:9 <02:53> 158:4
<03:07> 158:24 <03:08>
159:4 <03:08> 159:5
<03:08> 159:6 <03:08>
**Difference**
[4] 41:4 <10:31> 97:6
<01:32> 118:20 <02:02>
120:22 <02:05>
**Different**
[26] 6:18 <09:45> 11:20
<09:52> 11:25 <09:53> 12:3
<09:53> 49:20 <10:48> 49:
21 <10:48> 65:3 <11:18> 88:
7 94:10 <01:28> 95:4
<01:30> 95:5 <01:30> 95:12
<01:30> 95:15 <01:30> 99:2
<01:34> 99:2 <01:34> 102:
13 <01:38> 118:4 <02:01>
121:24 <02:08> 128:23

<02:18> 128:25 <02:18>
129:6 <02:18> 131:22
<02:21> 133:4 <02:23> 159:
7 <03:08> 159:8 159:13
<03:09>
**Differentiate**
[1] 95:4 <01:30>
**Differently**
[1] 145:1 <02:49>
**Dino**
[2] 8:11 <09:47> 111:7
<01:52>
**Direct**
[2] 55:21 <10:56> 82:4
<11:41>
**Directed**
[1] 106:23 <01:45>
**Directly**
[4] 21:13 <10:04> 57:1
<10:57> 82:12 <11:42> 82:
15 <11:42>
**Director**
[2] 21:19 <10:04> 45:18
**Directors**
[1] 112:19 <01:54>
**Disability**
[1] 133:16 <02:24>
**Disclose**
[2] 16:2 <09:57> 17:11
<09:58>
**Disclosed**
[3] 34:11 <10:22> 87:8
<01:19> 107:25 <01:47>
**Discovery**
[2] 5:21 <09:42> 44:11
<10:36>
**Discuss**
[1] 149:1 <02:55>
**Discussed**
[5] 34:11 <10:22> 49:18
<10:48> 147:13 <02:53>
148:8 <02:54> 149:11
<02:55>
**Discussing**
[2] 135:25 <02:26> 153:9
<03:02>
**Discussion**
[1] 149:3 <02:55> 149:4
<02:55>
**Dissolve**
[1] 106:21 <01:45>
**Dissolved**
[1] 106:20 <01:44>
**District**
[16] 1:1 1:1 1:7 2:7 10:16
<09:51> 10:17 <09:51> 11:1
<09:51> 11:16 <09:52> 23:
15 <10:07> 24:11 <10:08>
24:13 <10:08> 60:9 <11:02>
60:12 <11:02> 168:1 168:1
168:7
**Divided**
[2] 64:21 <11:17> 65:1
<11:17>
**Dividend**
[1] 113:9 <01:55> 113:25
<01:55>
**Dividends**
[10] 8:19 <09:48> 22:13
<10:05> 22:22 <10:06> 112:
17 <01:54> 112:18 <01:54>
112:20 <01:54> 112:23
<01:54> 113:5 <01:54> 113:
15 <01:55> 114:4 <01:55>
**DIVISION**
[2] 1:2 168:2
**Divulge**
[1] 17:7 <09:58>
**Document**
[52] 27:5 <10:12> 27:8
<10:12> 27:9 <10:12> 29:24
<10:16> 31:5 <10:17> 32:19

< 34:25 <10:23> 35:
3 <10:24> 43:4 <10:33> 43:
5 <10:34> 44:7 <10:35> 44:
14 <10:36> 55:4 <10:55> 57:
23 <10:58> 58:16 <10:59>
58:20 <10:59> 60:4 <11:02>
61:12 <11:04> 61:13
<11:05> 61:15 <11:05> 61:
16 <11:05> 61:17 <11:05>
62:10 <11:06> 62:22
<11:15> 63:6 <11:15> 68:1
<11:21> 68:6 <11:21> 71:23
<11:27> 73:13 <11:29> 74:
11 <11:30> 74:15 <11:31>
75:16 <11:32> 78:7 <11:36>
78:11 <11:36> 79:18
<11:39> 80:23 <11:40> 81:
14 <11:40> 82:4 <11:41> 99:
4 <01:24> 99:10 <01:34> 99:
11 <01:34> 99:18 <01:34>
114:22 <01:57> 114:23
<01:57> 116:8 <01:59> 116:
20 <01:59> 122:4 <02:08>
122:13 <02:08> 133:24
<02:24> 136:12 <02:27>
146:5 <02:51> 151:6
<02:59>
**Documentation**
[9] 3:12 34:22 <10:23> 65:5
<11:18> 69:13 <11:23> 73:
22 <11:30> 123:21 <02:12>
128:16 <02:18> 137:8
<02:28> 140:1 <02:39>
**Documented**
[1] 105:2 <01:43>
**Documents**
[55] 4:15 <09:41> 5:9
<09:42> 5:14 <09:42> 5:17
<09:42> 5:20 <09:42> 5:23
<09:42> 22:10 <10:06> 27:6
<10:12> 27:20 <10:12> 28:1
<10:13> 28:4 <10:14> 28:7
<10:13> 28:13 <10:14> 29:6
<10:15> 29:8 <10:15> 29:11
<10:15> 30:9 <10:17> 30:23
<10:17> 31:2 <10:17> 31:10
<10:17> 31:12 <10:18> 32:1
<10:19> 33:6 <10:21> 33:9
<10:21> 33:11 <10:21> 33:
17 <10:22> 33:25 <10:22>
34:8 <10:22> 42:5 <10:32>
42:10 <10:33> 44:1 <10:35>
44:13 <10:36> 55:19
<10:55> 61:7 <11:04> 61:18
<11:05> 74:3 <11:30> 75:6
<11:31> 77:4 <11:35> 77:18
<11:35> 77:18 <11:35> 77:
23 <11:35> 90:9 <01:23> 90:
10 <01:23> 90:18 <01:24>
92:11 <01:26> 92:12
<01:26> 92:14 <01:26> 99:
19 <01:34> 114:19 <01:57>
115:6 <01:57> 116:23
<01:59> 124:5 <02:12> 142:
21 <02:44> 162:20 <03:14>
163:5 <03:14>
**Dollar**
[1] 124:15 <02:13>
**Dollars**
[1] 142:1 <02:42>
**Done**
[14] 17:5 <09:57> 27:19
<10:12> 43:10 <10:34> 43:
15 <10:34> 59:18 <11:01>
64:25 <11:17> 70:25
<11:25> 101:15 <01:36>
107:25 <01:47> 125:18
<02:15> 154:1 <03:03> 157:
12 <03:07> 157:15 <03:07>
164:1 <03:15>
**Doubt**
[1] 81:17 <11:40>
**Down**
[15] 23:21 <10:07> 30:19
<10:17> 39:3 <10:28> 58:17
<10:59> 61:19 <11:05> 94:8
<01:28> 97:8 <01:32> 101:5

<01:36> 101:21 <01:37>
103:5 <01:38> 103:8
<01:38> 123:3 <02:11> 142:
13 <02:43> 143:17 <02:46>
161:4 <03:11>
**Dozen**
[5] 20:23 <10:03> 20:25
<10:04> 66:9 <11:19> 66:12
<11:19> 66:14 <11:19>
**Dr**
[23] 5:12 <09:42> 5:19
<09:42> 14:16 <09:55> 14:
17 <09:55> 14:18 <09:55>
25:17 <10:10> 28:16
<10:14> 28:16 <10:14> 28:
24 <10:15> 39:7 <10:28> 41:
6 <10:31> 42:7 <10:32> 61:
25 <11:05> 92:22 <01:26>
112:15 <01:53> 115:6
<01:57> 143:23 <02:46>
143:24 <02:46> 143:25
<02:47> 148:4 <02:53> 148:
20 <02:53> 154:1 <03:03>
163:23 <03:15>
**Dropped**
[2] 103:5 <01:38> 103:8
<01:38>
**Dropping**
[1] 97:8 <01:32>
**Dry**
[1] 50:19 <10:49>
**Duces**
[3] 3:16 5:5 <09:42> 5:7
<09:42>
**Due**
[3] 84:23 <11:46> 96:4
<01:31> 113:6 <01:54>
**Duly**
[1] 4:2
**During**
[10] 25:13 <10:09> 26:2
<10:10> 26:18 <10:11> 29:1
<10:15> 29:3 <10:15> 30:5
<10:16> 60:2 <11:02> 60:22
<01:03> 82:18 <11:42> 88:
21 <01:21>
**Duty**
[3] 15:4 <09:56> 16:3
<09:57> 16:23 <09:57>
**Dying**
[1] 159:1 <03:08>

## E

**Earn**
[5] 69:9 <11:23> 74:12
<11:31> 82:9 <11:41> 124:2
<12:12> 163:19 <03:14>
**Earned**
[22] 34:13 <10:22> 40:20
<10:30> 40:23 <10:30> 41:7
<10:31> 41:10 <10:31> 41:
22 <10:32> 65:13 <11:09> 67:9
<11:20> 69:5 <11:23> 71:14
<11:26> 80:17 <11:40> 80:
25 <11:40> 82:5 <11:41> 86:
11 <01:18> 90:14 <01:23>
118:13 <02:01> 118:14
<02:02> 118:17 <02:02>
119:17 <02:03> 121:8
<02:05> 121:8 <02:05> 162:
21 <03:14>
**Earning**
[1] 88:24 <01:22>
**Earnings**
[9] 41:15 <10:31> 42:6
<10:32> 49:8 <10:47> 61:8
<11:04> 75:25 <11:32> 76:
10 <11:33> 76:15 <11:33>
84:12 <11:45> 84:21
<11:46>
**Easier**
[1] 164:15 <03:16>
**Easy**
[3] 58:11 115:17 <01:58>

132: 1 <02:22>

**Economic**
[3] 94: 5 <01:28>  157: 13
<03:07>  159: 22 <03:09>

**EDDIE**
[3] 1: 7 2: 11 168: 7

**Education**
[2] 70: 13 <11:25>  104: 22
<01:40>

**Effective**
[1] 11: 3 <09:52>

**EILEEN**
[2] 2: 12

**Either**
[7] 12: 25 <09:54>  14: 5
<09:55>  28: 21 <10:15>  86:
23 <01:19>  98: 14 <01:33>
109: 5 <01:48>  145: 10
<02:49>

**Electricity**
[1] 106: 6 <01:42>

**Elite**
[5] 128: 8 <02:17>  129: 3
<02:18>  129: 7 <02:18>  129:
11 <02:18>  130: 1 <02:19>

**Elizabeth**
[3] 2: 8 17: 4 <09:57>  86: 5
<01:18>

**Employed**
[1] 168: 18

**Employee**
[4] 21: 18 <10:04>  23: 1
<10:06>  24: 5 <10:08>  129:
18 <02:19>

**Employees**
[10] 9: 1 <09:48>  9: 18
<09:49>  9: 22 <09:50>  9: 24
<09:50>  17: 13 <09:58>  23: 2
<10:06>  26: 21 <10:11>  149:
17 <02:56>  150: 2 <02:56>
150: 3 <02:56>

**Employer**
[3] 12: 19 <09:54>  12: 25
<09:54>  13: 1 <09:54>

**Employers**
[7] 12: 21 <09:54>  16: 1
<09:56>  16: 25 <09:57>  17: 5
<09:57>  17: 12 <09:58>  22: 2
<10:05>  23: 1 <10:06>

**Encompass**
[1] 5: 22 <09:42>

**Encompassed**
[1] 141: 11 <02:41>

**End**
[1] 3: 8

**Ending**
[2] 54: 23 <10:54>  84: 22
<11:46>

**Ends**
[1] 151: 3 <02:58>

**Engaged**
[5] 125: 21 <02:15>  126: 9
<02:16>  127: 12 <02:17>
127: 22 <02:17>  127: 24
<02:17>

**Enrollment**
[6] 10: 23 <09:51>  10: 24
<09:51>  11: 8 <09:52>  129:
13 <02:19>  129: 18 <02:19>
130: 4 <02:19>

**Enter**
[1] 32: 21 <10:20>

**Entire**
[1] 120: 11 <02:04>

**Entities**
[2] 12: 15 <09:54>  55: 21
<10:56>

**Entitled**
[2] 14: 3 <09:55>  14: 14
<09:55>

**Entity**
[1] 19: 20 <10:02>  19: 25

<10:02>  <10:39>  53:14
<10:53>  83:17 <11:44>  152:
3 <03:00>

**Entries**
[1] 32:16 <10:20>

**Entry**
[2] 32:13 <10:20>  32:14
<10:20>

**Envelopes**
[1] 106:7 <01:42>

**Equipment**
[1] 106:7 <01:42>

**Eric**
[4] 20:18 <10:03>  45:16
<10:38>  52:18 <10:52>  127:
16 <02:17>

**ERRISURIZ**
[3] 1:8 2:11 168:8

**Error**
[1] 66:5 <11:19>

**Escobedo**
[1] 45:8 <10:38>

**Establish**
[1] 5:18 <09:42>

**Estimate**
[1] 22:12 <10:05>

**Eusebio**
[1] 82:21 <11:42>

**Evaluated**
[1] 144:19 <02:48>

**Evaluating**
[1] 77:22 <11:35>

**Eventually**
[1] 74:24 <11:31>  75:1
<11:31>

**Evidence**
[3] 31:9 <10:18>  39:13
<10:29>  113:21 <01:55>

**Evidencing**
[1] 34:22 <10:23>

**Exact**
[3] 15:7 <09:56>  149:6
<02:55>  162:7 <03:13>

**Exactly**
[5] 25:6 <10:09>  40:4
<10:29>  63:14 <11:15>  67:9
<11:20>  149:4 <02:55>

**Examination**
[6] 3:4 3:4 3:5 4:3 104:16 155:
1

**Example**
[7] 19:19 <10:02>  123:12
<02:11>  130:22 <02:20>
141:17 <02:42>  141:19
<02:42>  153:1 <03:01>  153:
4 <03:01>

**Except**
[9] 70:11 <11:25>  70:18
<11:25>  85:24 <01:18>  93:
13 <01:27>  100:20 <01:36>
113:23 <01:55>  116:2
<01:58>  146:12 <02:51>
167:2

**Exception**
[1] 32:2 <10:19>

**Exclusive**
[3] 12:8 <09:53>  12:8
<09:53>  18:6 <09:59>

**Exclusively**
[1] 7:20 <09:46>

**Excuse**
[2] 123:10 <02:11>  131:21
<02:21>  159:9 <03:08>

**Executed**
[1] 167:12

**Exhibit**
[43] 3:16 4:25 <09:41>  4:25
<09:41>  5:2 <09:41>  5:8
<09:42>  6:23 <09:45>  6:24
<09:45>  26:13 <10:11>  26:
15 27:15 <10:12>  27:24
<10:13>  28:3 <10:14>  28:11

<10:14>  31: 5 <10:17>  31:11
<10:17>  32:12 <10:19>  32:24
<10:21>  33: 4 <10:21>  33: 4
<10:21>  34: 5 <10:22>  55: 1
<10:55>  55: 7 <10:55>  55. 12
<10:55>  55: 14 <10:55>  55:
18 <10:55>  55:20 <10:55>
57:3 <10:57>  62: 19 <11:15>
62:21 <11:15>  78: 12
<11:36>  95:7 <01:30>  95:21
<01:30>  116:9 <01:59>  116:
9 <01:59>  116: 10 <01:59>
121: 7 <02:05>  121: 23
<02:08>  140: 12 <02:40>
140: 16 <02:40>  160: 5
<03:09>  160: 24 <03:11>
164: 16 <03:16>  165: 6

**Exhibits**
[5] 3:10 5: 22 <09:42>  26: 12
<10:11>  114: 18 <01:57>
160: 6 <03:09>

**Exist**
[1] 145: 8 <02:49>

**Existed**
[2] 112: 4 <01:53>  112: 5
<01:53>

**Existence**
[1] 152: 15 <03:00>

**Expect**
[7] 67: 5 <11:20>  69: 23
<11:24>  70: 4 <11:24>  70: 6
<11:24>  73: 19 <11:29>  73:
20 <11:29>  103: 11 <01:38>

**Expectancy**
[1] 133: 21 <02:24>

**Expected**
[6] 50: 14 <10:49>  50: 18
<10:49>  67: 22 <11:21>  105:
19 <01:41>  136: 25 <02:28>
137: 2 <02:28>

**Expense**
[1] 150: 17 <02:57>

**Experience**
[3] 44: 18 <10:36>  54: 25
<10:54>  55: 22 <10:56>  59:
17 <11:01>  61: 23 <11:05>
62: 3 <11:06>  65: 4 <11:18>
67: 7 <11:20>  67: 11 <11:20>
68: 4 <11:21>  68: 5 <11:21>
69: 7 <11:23>  69: 22 <11:24>
70: 3 <11:24>  70: 21 <11:25>
70: 25 <11:25>  71: 7 <11:26>
71: 8 <11:26>  72: 16 <11:28>
73: 15 <11:29>  73: 16
<11:29>  74: 19 <11:31>  75: 5
<11:31>  87: 2 <01:19>  92: 24
<01:26>  111: 9 <01:52>  115:
9 <01:57>  115: 12 <01:58>
116: 25 <02:00>  128: 1
<02:17>  134: 2 <02:24>  145:
7 <02:49>  146: 14 <02:51>
147: 1 <02:52>  155: 10
<03:04>  155: 11 <03:04>
155: 22 <03:05>

**Experienced**
[11] 62: 25 <11:15>  64: 11 66:
21 <11:19>  66: 23 <11:20>
66: 23 <11:20>  72: 2 <11:27>
104: 5 <01:40>  137: 15
<02:29>  137: 18 <02:29>  137:
19 <02:29>  137: 21
<02:29>

**Expert**
[10] 4: 10 <09:41>  5: 18
<09:42>  9: 9 <09:49>  15: 9
<09:56>  128: 20 <02:18>
129: 1 <02:18>  132: 7
<02:22>  155: 7 <03:04>  156:
3 <03:05>  156: 4 <03:05>

**Expertise**
[11] 25: 2 <10:09>  25: 2
<10:09>  54: 25 <10:54>  54:
25 <10:54>  128: 13 <02:18>
128: 15 <02:18>  130: 5
<02:19>  131: 4 <02:21>  155:
8 <03:04>  155: 9 <03:04>

1:  <03:05>

**Experts**
[1] 9: 14 <09:49>

**Expiration**
[1] 169: 6

**Explain**
[8] 16: 14 <09:57>  81: 7
<11:40>  81: 9 <11:40>  81: 15
<11:40>  117: 6 <02:00>  150:
1 <02:56>  158: 9 <03:08>
158: 16 <03:08>

**Explained**
[9] 61: 14 <11:05>  151: 21
<02:59>  152: 5 <03:00>  157:
12 <03:07>  158: 9 <03:08>
158: 10 <03:08>  158: 20
<03:08>  159: 22 <03:09>
159: 23 <03:09>

**Explaining**
[1] 83: 21 <11:44>

**Exposed**
[1] 15: 9 <09:56>

**Expressed**
[4] 61: 25 <11:05>  147: 4
<02:52>  149: 10 <02:55>
167: 12

**Extent**
[1] 9: 14 <09:49>

**Extrapolate**
[2] 144: 16 <02:48>  154: 18
<03:03>

**Extrapolated**
[1] 136: 9 <02:27>

### F

**F-O-R**
[1] 46: 7 <10:39>

**Facet**
[2] 18: 24 <10:00>  18: 25
<10:00>

**Fact**
[3] 63: 2 <11:15>  104: 23
<01:40>  151: 23 <02:59>

**Factor**
[1] 157: 18 <03:07>

**Factors**
[1] 49: 22 <10:48>

**Fair**
[1] 73: 10 <11:29>

**Fairly**
[1] 23: 11 <10:07>

**Fall**
[2] 141: 8 <02:41>  149: 13
<02:56>

**Familiar**
[1] 63: 25 <11:16>

**Far**
[12] 5: 9 <09:42>  6: 7
<09:43>  23: 5 <10:06>  40: 9
<10:30>  42: 5 <10:32>  44: 9
<10:36>  55: 15 <10:55>  55:
17 <10:55>  81: 18 <11:40>
130: 16 <02:20>  144: 3
<02:47>  153: 6 <03:01>

**Fast**
[2] 47: 15 <10:41>  47: 25
<10:42>

**Fault**
[1] 69: 6 <11:23>

**Faxed**
[1] 131: 13 <02:21>

**February**
[10] 38: 4 <10:27>  59: 22
<11:01>  60: 16 <11:03>  100:
14 <01:49>  114: 11 <01:56>
114: 14 <01:56>  138: 19
<02:38>  148: 18 <02:54>
148: 24 <02:55>  149: 19
<02:56>

**Federal**
[1] 1: 21

**Fees**

[2] 48: 7 <10:42>  105: 10
<01:41>

**Felt**
[2] 111: 12 <01:52>  149: 8
<02:55>

**Fernando**
[9] 1: 3 3: 19 8: 12 <09:47>  82:
19 <11:42>  109: 24 <01:49>
146: 2 <02:50>  158: 20
<03:08>  162: 11 <03:13>
168: 3

**Fernando's**
[1] 158: 22 <03:08>

**Few**
[2] 6: 1 <09:43>  6: 1 <09:43>

**Field**
[4] 30: 15 <10:17>  57: 15
<10:58>  92: 24 <01:26>  115:
10 <01:58>

**Fields**
[2] 155: 7 <03:04>  155: 10
<03:04>

**Figure**
[20] 36: 1 <10:24>  36: 2
<10:24>  54: 11 <10:54>  56: 3
<10:56>  56: 4 <10:56>  56: 5
<10:56>  56: 6 <10:56>  64: 18
<11:17>  65: 9 <11:18>  66: 6
<11:19>  66: 19 <11:19>  67:
19 <11:21>  68: 2 <11:21>  68:
22 <11:22>  71: 14 <11:26>
75: 10 <11:32>  102: 19
<01:38>  125: 14 <02:15>
153: 18 <03:02>  161: 1
<03:11>

**Figured**
[2] 146: 24 <02:52>  162: 15
<03:13>

**Figures**
[16] 36: 25 <10:25>  40: 25
<10:30>  40: 25 <10:30>  59:
12 <11:00>  62: 4 <11:06>  74:
11 <11:30>  92: 7 <01:26>  92:
21 <01:26>  94: 7 <01:28>  92:
101: 23 <01:37>  103: 17
<01:39>  103: 20 <01:39>
121: 22 <02:07>  160: 5
<03:09>  162: 7 <03:13>  162:
11 <03:13>

**Figuring**
[1] 142: 7 <02:43>

**File**
[3] 23: 14 <10:07>  24: 3
<10:08>  43: 17 <10:35>

**Filed**
[4] 24: 3 <10:08>  24: 10
<10:08>  25: 6 <10:09>  67: 13
<11:21>

**Files**
[1] 5: 11 <09:42>

**Filing**
[1] 24: 12 <10:08>

**Fill**
[1] 48: 12 <10:43>

**Filled**
[2] 24: 18 <10:08>  128: 13
<02:18>

**Financially**
[1] 168: 20

**Fine**
[5] 15: 19 <09:56>  78: 25
<11:38>  90: 22 <01:24>  102:
11 <01:37>  127: 2

**Finish**
[3] 97: 17 <01:32>  99: 8
<01:34>  99: 17 <01:34>

**Finished**
[1] 122: 15 <02:10>

**Fire**
[1] 67: 3 <11:20>

**Firms**
[1] 77: 4 <11:35>

**First**

[42] 7:19 <09:46> 14:9
<09:55> 22:7 <10:05> 32:13
<10:20> 32:14 <10:20> 35:4
<10:23> 35:5 <10:23> 36:7
<10:24> 36:8 <10:24> 36:12
<10:25> 42:11 <10:53> 44:8
<10:35> 56:3 <10:56> 56:10
<10:56> 56:11 <10:56> 61:
11 <11:04> 64:4 <11:17> 64:
5 <11:17> 64:4 <11:17> 69:1
<11:23> 80:14 <11:39> 81:4
<11:40> 81:9 <11:40> 81:18
<11:40> 81:22 <11:41> 82:1
<11:41> 93:22 <11:41> 96:5
<01:31> 96:8 <01:31> 108:1
<01:47> 111:7 <01:52> 120:
3 <02:04> 133: 18 <02:24>
133: 18 <02:24> 134: 14
<02:25> 134: 15 <02:25>
134: 19 <02:25> 135: 12
<02:26> 157: 5 <03:06> 161:
21 <03:13> 161:24 <03:13>
162: 5 <03:13>

**FISHER**
[1] 2:8

**Five**
[3] 26:19 <10:11> 86:17
<01:18> 161:21 <03:13>

**Five-month**
[1] 26:19 <10:11>

**Five-year**
[1] 93:3 <01:27>

**Flex**
[20] 56:3 <10:56> 56:13
<10:56> 61:11 <11:04> 61:
20 <11:05> 63:23 <11:16>
64:16 <11:17> 68:10
<11:22> 68:13 <11:22> 69:2
<11:23> 69:20 <11:24> 70:
<11:28> 72:11 <11:28>
98:24 <01:34> 99:7 <01:34>
100: 14 <01:35> 100: 15
<01:35> 143: 12 <02:46>
144: 20 <02:49> 145:6
<02:49> 161:23 <03:13>

**Flexible**
[1] 161: 24 <03:13>

**Flows**
[1] 22:8 <10:05>

**Focus**
[1] 19:2 <10:01>

**Folks**
[2] 57:8 <10:57> 57:8
<10:57>

**Follow**
[1] 64:1 <11:16>

**Following**
[1] 97:9 <01:32>

**Follows**
[1] 4:2

**Forces**
[1] 111:7 <01:52>

**Foregoing**
[3] 167:1 167:11 168:14

**Forever**
[2] 74:21 <11:31> 74:22
<11:31>

**Form**
[5] 24:15 <10:08> 40:21
<10:30> 41:6 <10:31> 55:20
<10:55> 122: 13 <02:08>

**Formal**
[2] 24:14 <10:08> 25:6
<10:09>

**Formed**
[4] 120: 18 <02:05> 147:16
<02:53> 156: 22 <03:06>
156: 24 <03:06>

**Formula**
[1] 159: 23 <03:09>

**Formulating**
[1] 77:11 <11:35>

**Forth**
[1] 137: 9 <02:28>

**Four**
[13] 9:4 <09:49> 9:23
<09:50> 10: 4 <09:50> 10:5
<09:50> 10: 7 <09:50> 30:18
<10:17> 37:24 <10:27> 38:
18 <10:28> 46:1 <10:50> 46:
8 <10:53> 56:1 <10:56> 97:7
<01:32> 151:1 <02:58>

**Fourth**
[1] 150: 19 <02:57> 150: 22
<02:57> 162: 2 <03:13>

**Frame**
[5] 11:18 <09:52> 60:22
<11:03> 111:3 <01:51> 114:
13 <01:56> 156:9 <03:05>

**Frequently**
[1] 45:4 <10:37>

**Fresnos**
[13] 10:15 <09:51> 11:14
<09:52> 12:10 <09:53> 17:
24 <09:58> 107: 10 <01:46>
107: 19 <01:46> 107: 23
<01:46> 149: 25 <02:56>
150: 4 <02:57> 150: 5
<02:57> 150: 6 <02:57> 150:
12 <02:57> 150: 16 <02:57>

**Friday**
[1] 151: 2 <02:58>

**Fulfill**
[1] 10: 11 <09:51>

**Full**
[8] 4:5 <09:40> 78: 19
<11:38> 84:2 <11:45> 84:24
<11:46> 119: 23 <02:03>
156: 13 <03:06> 156: 17
<03:06> 161: 12 <03:12>

**Full-time**
[6] 119:23 <02:03> 119:25
<02:03> 120: 3 <02:04> 156:
13 <03:06> 156: 15 <03:06>
156: 17 <03:06>

**Fully**
[1] 14:3 <09:55>

**Function**
[1] 142: 19 <02:44>

**Fund**
[1] 83:17 <11:44>

**Funds**
[4] 82:23 <11:43> 100: 7
<01:35> 100: 7 <01:35> 101:
9 <01:36>

**Future**
[2] 26:7 <10:10> 67: 10
<11:20>

---

**G**

**Gain**
[2] 18:16 <09:59> 18: 18
<09:59>

**Garbage**
[1] 106: 6 <01:42>

**Garcia**
[1] 110: 12 <01:50>

**Garza's**
[1] 86:5 <01:18>

**Geared**
[1] 136: 1 <02:26>

**General**
[4] 18:7 <09:59> 34: 20
<10:23> 100: 9 <01:35> 100:
10 <01:35>

**Generally**
[1] 50: 1 <10:48>

**Generate**
[6] 108: 24 <01:48> 109: 16
<01:49> 111: 21 <01:53>
114: 22 <01:57> 119: 21
<03:00> 122: 25 <03:01>

**Generated**
[10] 30:20 <10:17> 30: 21
<10:17> 34:21 <10:23> 43:6
<10:34> 111:24 <01:53>
112: 23 <01:54> 114: 19

**Generating**
[1] 110: 15 <01:50>

**Gentleman**
[1] 15:5 <09:56>

**Geographical**
[7] 125: 23 <02:15> 126: 10
<02:16> 126: 13 <02:16>
126: 18 <02:16> 127: 4 127: 7
127: 13 <02:17>

**Geographically**
[1] 128: 6 <02:17>

**Gillis**
[1] 82:20 <11:42>

**Given**
[7] 57:9 <10:57> 59:12
<11:00> 68:24 <11:22> 111:
24 <01:53> 113: 9 <01:55>
149: 16 <02:56> 167: 13

**Glass**
[2] 24:17 <10:08> 48:12
<10:43>

**Goals**
[1] 76:17 <11:33>

**Grabbed**
[2] 78:15 <11:38> 78:18
<11:38> 97:16 <01:32>

**Graces**
[1] 12:19 <09:54>

**Gracie**
[1] 158:6 <03:08>

**Grand**
[1] 114:6 <01:55>

**Grande**
[10] 20:25 <10:04> 65:3
<11:18> 67:6 <11:20> 72:23
<11:28> 110: 2 <01:50> 126:
15 <02:16> 128: 6 <02:17>
129: 23 <02:19> 129: 24
<02:19> 130: 8 <02:19>

**Granted**
[1] 12: 14 <09:54>

**Graph**
[1] 89:5 <01:22>

**Great**
[1] 96:7 <01:31>

**Grievance**
[4] 23:14 <10:07> 24:10
<10:08> 24: 12 <10:08> 24:
14 <10:08>

**Grieved**
[1] 24:6 <10:08>

**Gross**
[3] 84:8 <11:45> 84:8
<11:45> 84:9 <11:45>

**Group**
[4] 10: 12 <09:51> 10: 13
<09:51> 98: 12 <01:33> 150:
1 <02:56>

**Groups**
[3] 149: 17 <02:56> 149: 20
<02:56> 150: 3 <02:56>

**Grow**
[3] 10: 11 <09:51> 43:2
<10:33> 161: 10 <03:12>

**Grown**
[1] 9: 25 <09:50>

**Growth**
[53] 3: 13 28:6 <10:14> 28:8
<10:14> 29:23 <10:16> 34:
15 <10:22> 50: 14 <10:49>
50:18 <10:49> 51:2 <10:50>
51: 10 <10:50> 52: 15
<10:51> 52: 19 <10:52> 52:
20 <10:52> 53:1 <10:52> 57:
4 <10:57> 57:9 <10:57> 57:
12 <10:58> 61:23 <11:05>
62:2 <11:06> 69:21 <11:24>
70:2 <11:24> 70:20 <11:25>
72:3 <11:27> 77:25 <11:35>
78: 1 <11:35> 78:10 <11:36>

**<01:57>** 114: 23 <01:57>
141: 15 <02:42> 142: 24
<02:44>

**<01:29>** 95. 14
<01:29> 99: 23 <01:34> 99:
24 <01:35> 100. 1 <01:35>
101: 25 <01:37> 102: 15
<01:38> 102: 15 <01:38>
102: 24 <01:38> 103: 2
<01:38> 103: 20 <01:39>
103: 22 <01:39> 104: 3
<01:40> 114:10 <01:55>
114: 25 <01:57> 115: 4
<01:57> 117: 14 <02:00>
153: 2 <03:01> 153: 6
<03:01> 153: 7 <03:02> 153:
10 <03:02> 153: 13 <03:02>
153: 16 <03:02> 153: 17
<03:02> 153: 21 <03:02>
153: 25 <03:03> 154: 5
<03:03> 154: 17 <03:03>

**GUERRA**
[1] 2: 13

**Guess**
[2] 87:3 <01:19> 94:5
<01:28>

**Guesstimates**
[1] 67:8 <11:20>

**Guy**
[1] 139: 8 <02:38>

---

**H**

**H-2**
[2] 1:21 2:4

**Half**
[4] 102: 9 <01:37> 102: 10
<01:37> 120: 4 <02:04> 164:
17 <03:16>

**Hand**
[4] 30:21 <10:17> 33: 15
<10:21> 90:24 <01:24> 167:
13

**Handed**
[2] 27:24 <10:13> 90: 17
<01:24>

**Handful**
[1] 78: 15 <11:38>

**Handle**
[1] 129: 20 <02:19> 130: 4
<02:19>

**Hands**
[2] 78: 19 <11:38> 105: 5
<01:41>

**Handwriting**
[3] 91:3 <01:24> 92: 15
<01:25> 95:22 <01:30>

**Handwritten**
[6] 3: 12 3: 15 5:3 <09:41> 42:
16 <10:33> 142: 12 <02:43>
160: 7 <03:10>

**Handy**
[1] 164: 14 <03:16>

**Hang**
[2] 17:3 <09:57> 156: 16
<03:06>

**Happy**
[2] 81:8 <11:40> 164: 1
<03:15>

**Hard**
[3] 19: 1 <10:01> 43: 18
<10:35> 43: 19 <10:35>

**Hardly**
[1] 154: 10 <03:03>

**Harlingen**
[1] 20:8 <10:03>

**Head**
[2] 32:5 <10:19> 58:23
<11:00>

**Health**
[3] 47: 18 <10:41> 47: 20
<10:41> 133: 15 <02:23>

**Hear**
[1] 158: 11 <03:08>

**Heck**
[1] 159: 18 <03:09>

**Help**

**[5]** 56: 2 <10:56> 56:4
<10:56> 56: 5 <10:56> 56:6
<10:56> 58: 20 <10:59>

**Hereby**
[2] 167: 1 168: 13

**High**
[1] 74:1 <11:30>

**Higher**
[3] 51: 6 <10:50> 52:7
<10:51> 53: 11 <11:41>

**Highlighted**
[1] 35: 18 <10:24>

**Highlighter**
[1] 71:24 <11:27>

**Highlighting**
[1] 35: 8 <10:23>

**Highly**
[1] 64: 11

**Hill**
[1] 169: 6

**History**
[5] 29: 14 <10:16> 29: 15
<10:16> 64: 21 <11:17> 64:
23 <11:17> 117: 3 <02:00>
117:6 <02:00>

**Hold**
[5] 32: 2 <10:19> 38: 3
<10:27> 39: 11 <10:29> 95:
17 <01:30> 131: 4 <02:21>

**Holding**
[1] 155: 6 <03:04>

**Home**
[3] 108: 10 <01:47> 143: 7
<02:45> 160: 19 <03:10>

**Hondo**
[3] 17:25 <09:58> 109: 3
<01:48> 109: 4 <01:48>

**Horner**
[82] 5: 13 <09:42> 14: 16
<09:55> 14: 17 <09:55> 14:
18 <09:55> 25: 17 <10:10>
28: 16 <10:14> 28:16
<10:14> 31: 5 <10:17> 31:9
<10:18> 32:7 <10:20> 32:8
<10:20> 32:9 <10:20> 34:25
<10:23> 35:14 <10:23> 35:
17 <10:24> 35:22 <10:24>
39: 6 <10:28> 40: 16 <10:30>
41:6 <10:31> 42:4 <10:32>
42:7 <10:32> 43:5 <10:34>
43:11 <10:34> 43: 13
<10:34> 44:7 <10:35> 48:11
<10:43> 49:2 <10:46> 49:4
<10:47> 49: 10 <10:47> 57:
23 <10:58> 59: 13 <11:00>
61:8 <11:04> 61:25 <11:05>
64:2 <11:16> 64:4 <11:17>
75: 17 <11:32> 77:3 <11:34>
77: 11 <11:35> 79: 18
<11:39> 79: 21 <11:39> 86:
23 <01:19> 86: 23 <01:19>
91:9 <01:24> 91: 10 <01:25>
91: 20 <01:25> 92: 23
<01:26> 106: 13 <01:43>
111: 25 <01:53> 112: 1
<01:53> 114: 19 <01:57>
114: 21 <01:57> 115: 6
<01:57> 116: 22 <01:59>
116: 23 <01:59> 118: 11
<02:01> 122: 8 <03:00>
119: 3 <02:02> 123: 2
<02:11> 124: 5 <02:12> 134:
14 <02:25> 139: 19 <02:39>
140: 8 <02:40> 142: 13
<02:43> 142: 15 <02:44>
142: 17 <02:44> 143: 22
<02:46> 143: 23 <02:46>
143: 24 <02:46> 144: 1
<02:46> 144: 1 <02:47> 147:
12 <02:53> 148: 4 <02:53>
148: 20 <02:55> 151: 15
<02:59> 151: 24 <02:59>
151: 25 <02:59> 154: 2
<03:03> 157: 8 <03:06> 158:
18 <03:08> 158: 19 <03:08>

160:23 <03:11>   163:21
<03:14>

**Horner's**
[8] 5:19 <09:42>        28:24
<10:15>   39:7 <10:28>   77:1
<11:34>   77:5 <11:35>   77:8
<11:35>   77:9 <11:35>   160:6
<03:09>

**Hot**
[1] 67:2 <11:20>

**Hour**
[1] 142:4 <02:43>

**Hours**
[2] 12:2 <09:53>        142:7
<02:43>   151:1 <02:58>   151:
2 <02:58>

**House's**
[2] 76:23 <11:34>        77:7
<11:35>

**Houston**
[2] 19:15 <10:02>        20:22
<10:03>

**Huge**
[2] 19:20 <10:02>        19:20
<10:02>

**I**

**Ibbotson**
[1] 77:3 <11:34>

**Idea**
[12] 8:16 <09:47>        8:20
<09:48>   8:22 <09:48>   19:19
<10:02>   86:14 <01:18>   88:
12 <01:21>   88:14 <01:21>
88:23 <01:22>   93:2 <01:27>
106:10 <01:43>   107:5
<01:45>   160:2 <03:09>

**IDEN**
[1] 3:11

**Identified**
[1] 85:12 <01:17>

**Identify**
[2] 13:3 <09:54>   127:8

**Implying**
[1] 60:5 <11:02>

**Inaccurate**
[1] 135:12 <02:26>

**Inc**
[6] 7:11 <09:46>   120:14
<02:04>   143:20 <02:46>
147:18 <02:53>   147:24
<02:53>   148:2 <02:53>

**Incident**
[1] 88:22 <01:21>

**Include**
[2] 66:14 <11:19>   129:16
<02:19>

**Included**
[1] 62:2 <11:06>

**Including**
[2] 5:10 <09:42>        8:24
<09:48>

**Inclusive**
[5] 21:1 <10:04>   121:20
<02:06>   122:7 <02:08>   133:
1 <02:23>   150:23 <02:57>

**Income**
[43] 3:14 3:14 3:17 6:2
<09:43>   6:6 <09:43>   6:11
<09:43>   8:14 <09:47>   22:4
<10:05>   22:11 <10:05>   22:
14 <10:05>   22:15 <10:05>
25:11 <10:09>   25:20
<10:10>   25:24 <10:10>   26:
17 <10:11>   29:17 <10:16>
29:17 <10:16>   34:15
<10:22>   34:44 <10:25>   34:
22 <10:23>   36:18 <10:25>
38:9 <10:27>   38:10 <10:27>
39:13 <10:29>   40:23
<10:30>   41:7 <10:31>   42:19
<10:33>   72:4 <11:27>   112:
10 <01:54>   117:21 <02:00>

117: 24 <L               118: 1
<02:00>   118: 2 <02:01>   118:
7 <02:01>   118: 8 <02:01>
118: 13 <02:01>   118: 14
<02:02>   118: 17 <02:02>
120: 7 <02:04>   121: 24
<02:08>   122: 4 <02:08>   160:
12 <03:10>   160: 18 <03:10>

**Incorporate**
[1] 152: 6 <03:00>

**Incorporated**
[1] 76: 4 <11:33>

**Incorporates**
[1] 121: 10 <02:05>

**Incorrect**
[13] 33: 8 <10:20>   65:24
<11:18>   82: 7 <11:41>   102:
18 <01:38>   112: 15 <01:54>
134: 16 <02:25>   134: 20
<02:25>   134: 22 <02:25>
134: 23 <02:25>   135: 2
<02:26>   135: 3 <02:26>   136:
3 <02:27>   144: 2 <02:47>

**Increase**
[6] 72: 4 <11:27>   72: 5
<11:27>   81: 21 <11:41>   81:
22 <11:41>   81: 25 <11:41>
97:3 <01:32>

**Increased**
[1] 96: 25 <01:32>

**Independent**
[4] 1: 6 2: 6 60: 11 <11:02>
168: 6

**INDEX**
[1] 3: 1

**Indicate**
[4] 139: 18 <02:38>   139: 19
<02:39>   141: 25 <02:42>
156: 8 <03:05>

**Indicated**
[1] 22: 25 <10:06>

**Indicates**
[2] 40: 24 <10:30>   40: 25
<10:30>

**Indicative**
[1] 124: 2 <02:12>

**Individual**
[8] 20: 5 <10:02>   45: 20
<10:38>   47: 10 <10:40>   88:
13 <01:21>   110: 18 <01:51>
110: 20 <01:51>   111: 13
<01:52>   146: 15 <02:52>

**Individuals**
[18] 27: 8 <10:12>   46: 5
<10:38>   49: 16 <10:40>   49:22
<10:48>   50: 3 <10:48>   50:8
<10:49>   54: 17 <10:54>   55:
22 <10:56>   55: 24 <10:56>
57: 2 <10:57>   57: 11 <10:57>
57: 18 <10:58>   57: 21
<10:58>   58: 17 <10:59>   60: 6
<11:02>   65: 12 <11:18>   87: 5
<01:19>   162: 21 <03:14>

**Industry**
[23] 59: 3 <11:00>   59: 4
<11:00>   59: 5 <11:00>   73: 15
<11:29>   73: 16 <11:29>   77: 5
<11:35>   94: 2 <01:28>   96: 19
<01:31>   104: 18 <01:40>
104: 20 <01:40>   104: 23
<01:40>   105: 2 <01:40>   105:
17 <01:41>   105: 23 <01:41>
105: 25 <01:41>   125: 5
<02:14>   125: 7 <02:14>   125:
11 <02:14>   125: 12 <02:14>
128: 9 <02:17>   132: 15
<02:22>   138: 8 <02:30>   145:
20 <02:50>

**Information**
[16] 9: 14 <09:49>   14: 12
<09:55>   14: 16 <09:55>   14:
17 <09:55>   25: 16 <10:09>
48: 6 <10:42>   48: 8 <10:42>
51: 11 <10:50>   54: 18
<10:54>   54: 22 <10:54>   55: 6

<10:55>   55: 11 <10:55>   61: 7
<11:04>   105: 12 <01:41>
126: 1 <02:15>   142: 22
<02:44>

**Initial**
[1] 76: 1 <11:32>

**Ink**
[1] 95: 10 <01:30>

**Inquire**
[1] 9: 15 <09:49>

**Inquired**
[1] 44: 25 <10:37>

**Instance**
[23]   1: 15 26: 11 <10:11>   31:
23 <10:19>   32: 21 <10:20>
33: 15 <10:21>   33: 16
<10:22>   34: 12 <10:22>   34:
25 <10:23>   37: 2 <10:25>   43:
9 <10:31>   49: 4 <10:47>   57: 6
<10:57>   58: 17 <10:59>   65:
18 <11:18>   79: 6 <11:38>   80:
7 <11:39>   80: 8 <11:39>   85:
11 <11:77>   88: 20 <01:21>
89: 24 <01:22>   90: 14
<01:23>   123: 7 <02:11>   164:
9 <03:15>

**Instead**
[6] 118: 10 <02:01>   124: 20
<02:13>   124: 22 <02:13>
137: 23 <02:29>   138: 4
<02:30>   162: 5 <03:13>

**Instruct**
[7] 13: 13 <09:55>   13: 19 13:
24 <09:55>   14: 21 <09:55>
15: 20 <09:56>   15: 22
<09:56>   17: 19 <09:58>

**Instructed**
[1] 17: 2 <09:57>

**Instrument**
[1] 167: 11

**Insurance**
[20] 7: 20 <09:46>   40:21
<10:30>   45: 8 <10:38>   48: 5
<10:42>   67: 5 <11:20>   68: 12
<11:22>   100: 8 <01:35>   127:
18 <02:17>   127: 20 <02:17>
132: 23 <02:23>   132. 25
<02:23>   133: 4 <02:23>   133:
10 <02:23>   133: 12 <02:23>
133: 14 <02:23>   136: 13
<02:27>   138: 8 <02:30>   146:
18 <02:52>   155: 19 <03:05>
155: 19 <03:05>

**Intend**
[1] 5: 14 <09:42>

**Intention**
[1] 26: 4 <10:10>

**Interest**
[5] 8: 6 <09:47>   22: 16
<10:06>   26: 24 <10:11>   26:
25 <10:11>   27: 1 <10:11>

**Interested**
[1] 168: 21

**Internal**
[1] 11: 23 <09:52>

**Internet**
[1] 150: 24 <02:58>

**Interpret**
[1] 40: 16 <10:30>

**Interpreting**
[1] 110: 22 <01:51>

**Introduction**
[1] 26: 1 <10:10>

**Involved**
[6] 33: 14 <10:21>   104: 21
<01:40>   111: 6 <01:52>   132:
17 <02:23>   133: 13 <02:23>
157: 18 <03:07>

**IRS**
[1] 40: 22 <10:30>   118: 15
<02:02>

**Isabel**
[3] 17: 24 <09:58>   108: 7

<               108: 8 <01:47>

**Islands**
[1] 136: 20 <02:27>

**Issued**
[1] 85: 5 <11:46>

**Issues**
[1] 33: 15 <10:21>

**J**

**Janet**
[2] 108: 15 <01:47>   108: 17
<01:47>

**January**
[4] 38: 2 <10:27>   38:4
<10:27>   71: 11 <11:26>   81: 1
<11:40>   109: 14 <01:49>
115: 23 <01:58>   124: 18
<02:12>   138: 19 <02:38>

**Jefferson**
[1] 151:9 <02:58>

**Job**
[2] 7: 21 <09:46>   21: 15
<10:04>

**Joe**
[1] 20: 6 <10:02>

**Join**
[1] 67: 16 <11:21>

**Joined**
[1] 111: 7 <01:52>

**Journals**
[1] 68: 6 <11:21>

**JR**
[3]   1: 8 2: 11 168: 8

**Juan**
[1] 110: 11 <01:50>

**Judgment**
[2] 91: 5 <01:24>   91: 8
<01:24>

**July**
[1] 41: 19 <10:32>

**June**
[1] 28: 19 <10:15>

**Junk**
[1] 84: 2 <11:45>

**Jury**
[1] 73: 23 <11:30>

**Justify**
[2] 73: 12 <11:29>   73: 14
<11:29>   73: 14 <11:29>

**K**

**K-1s**
[1] 8: 20 <09:48>

**Keep**
[14] 29: 20 <10:16>   34:24
<10:23>   35: 19 <10:24>   42:
23 <10:33>   43: 1 <10:33>   43:
17 <10:35>   87: 13 <01:20>
87: 14 <01:20>   87: 16
<01:20>   123: 5 <02:11>   123:
9 <02:11>   142: 10 <02:43>
142: 15 <02:44>   158: 6
<03:08>

**Keeping**
[1] 51: 9 <10:50>

**Keeps**
[3] 88: 5 <01:20>   88:9
<01:20>   107: 4 <01:45>

**Kelly**
[13] 19: 8 <10:01>   19: 9
<10:01>   62: 14 <11:06>   64:
20 <11:17>   66: 2 <11:18>   66:
15 <11:19>   66: 18 <11:19>
66: 19 <11:19>   70: 24
<11:25>   110: 1 <01:50>   136:
2 <02:27>   139: 3 <02:38>
162: 11 <03:13>

**Kept**
[6] 29: 18 <10:16>   29: 19
<10:16>   42: 20 <10:33>   43:
18 <10:35>   67: 3 <11:20>
123: 6 <02:11>

**Kind**
[21] 38: 22 <10:28>   46: 7
<10:39>   53: 17 <10:53>   61:6
<11:04>   81: 6 <11:40>   86: 25
<01:19>   89: 21 <01:22>   93:
15 <01:27>   98: 5 <01:33>   98:
6 <01:33>   98: 7 <01:33>   99: 1
<01:34>   108: 8 <01:47>   118:
2 <01:01>   125: 22 <02:15>
126: 9 <02:16>   126: 10
<02:16>   127: 10 <02:17>
127: 22 <02:17>   131: 16
<02:21>   138: 25 <02:38>

**Kinds**
[2] 98: 11 <01:33>   99: 3
<01:33>

**Knowing**
[2] 144: 2 <02:47>   146: 22
<02:52>

**Knowledge**
[5] 9: 15 <09:49>   55: 23
<10:56>   58: 22 <10:59>   146:
14 <02:51>   146: 18 <02:52>

**Known**
[2] 136: 2 <02:26>   167: 10

**Knows**
[1] 131: 2 <02:20>

**L**

**L.L.P.**
[1] 2: 8

**Label**
[3] 102: 4 <01:37>   102: 6 102:
12 <01:37>

**Labeled**
[3] 31: 5 <10:17>   102: 8
<01:37>   116: 21 <01:59>

**Ladies**
[1] 109: 6 <01:48>

**Lady**
[1] 139: 3 <02:38>

**Language**
[4] 51: 19 <10:51>   63: 25
<11:16>   91: 22 <01:25>   159:
24 <03:09>

**Largest**
[1] 18: 8 <09:59>

**Last**
[24] 8: 5 <09:47>   8: 17
<09:47>   8: 23 <09:48>   11: 11
<09:52>   12: 13 <09:53>   15:
19:23 <10:02>   22: 4 <10:05>
23: 10 <10:07>   32: 18
<10:20>   41: 14 <10:33>   45:
21 <10:38>   45: 23 <10:39>
46: 24 <10:40>   47: 11
<10:40>   54: 10 <10:54>   111:
20 <01:53>   112: 3 <01:53>
113: 1 <01:54>   128: 17
<02:18>   134: 1 <02:24>   151:
7 <02:58>   160: 22 <03:10>

**Late**
[2] 10: 6 <09:50>   10: 7
<09:50>

**Laura**
[3] 45: 6 <10:37>   51: 1
<10:50>   57: 6 <10:57>

**LAW**
[1] 2: 3

**Lawsuit**
[10] 5: 13 <09:42>   25: 14
<10:09>   26: 3 <10:10>   26: 24
<10:11>   27: 18 <10:12>   54:
10 <10:54>   54: 12 <10:54>
88: 22 <01:21>   106: 24
<01:45>   110: 6 <01:50>

**Lay**
[1] 37: 5 <10:26>

**Learn**
[1] 58: 6 <10:59>

**Learned**
[1] 61: 4 <11:03>

**Learning**
[1] 57:14 <10:58>

**Lease**
[1] 150:18 <02:57>

**Least**
[2] 44:10 <10:36>   66:14 <11:19>

**Leave**
[4] 31:9 <10:18>   138:17 <02:37>   138:21 <02:38> 145:10 <02:49>

**Lecture**
[1] 15:1 <09:56>

**Led**
[2] 56:25 <10:57>   57:22 <10:58>

**Leeds**
[78] 2:12 3:4 7:2 <09:45>   7:5 <09:45>   7:9 <09:46>   9:13 <09:49>   13:4 <09:54>   13:10 <09:55>   13:13 <09:55>   13: 16 <09:55>   14:1 <09:55> 14:1 <09:55>   14:11 <09:55> 14:19 14:25 <09:56>   15:12 <09:56>   15:17 <09:56>   16:4 <09:57>   16:7 <09:57>   16:10 16:13 16:19 <09:57>   17:1 <09:57>   17:15 <09:58>   19:9 <10:01>   25:8 <10:09>   25:18 <10:10>   26:8 <10:10>   30:25 <10:17>   35:7 <10:23>   36:4 <10:23>   35:12 <10:23>   36:4 <10:24>   36:18 <10:23>   39:6 <10:28>   52:3 <10:51>   58:8 61:16 <11:05>   67:16 <11:21>   68:18 <11:22>   69: 12 <11:23>   71:5 <11:26>   74; 8 <11:30>   78:3 <11:36>   82: 25 <11:43>   83:3 <11:43>   87: 25 <01:20>   92:16 <01:26> 94:24 <01:29>   95:3 <01:30> 95:12 <01:30>   95:15 <01:30>   99:9 <01:34>   104: 17 113:8 <01:55>   117:8 <02:00>   117:18 120:25 <02:05>   121:2 <02:05>   121: 6 122:2 <02:08>   124:12 <02:13>   126:22 126:25 <02:16>   127:2 127:15 134:19 <02:25>   138:13 140:15 <02:40>   146:9 <02:51>   152: 22 <03:01>   154:25 <03:04> 156:3 <03:05>   156:14 <03:06>   157:9 <03:06>   158: 5 <03:07>   159:15 <03:09> 165:3 <03:16>

**Left**
[6] 23:24 <10:07>   24:1 <10:08>   24:3 <10:08>   139:9 <02:38>   164:9 <03:15>   164: 13 <03:15>

**Legal**
[1] 142:12 <02:43>

**Length**
[1] 87:7 <01:19>

**Lengthy**
[1] 37:7 <10:26>

**Less**
[10] 66:21 <11:19>   69:10 <11:23>   76:1 <11:32>   76:6 <11:33>   86:6 <01:18>   137: 14 <02:29>   137:17 <02:29> 137:19 <02:29>   146:24 <02:52>   153:24 <03:03>

**Letters**
[1] 26:1 <10:10>

**Level**
[1] 54:24 <10:54>

**Levels**
[1] 49:21 <10:48>

**License**
[2] 115:22 <01:58>   133:20 <02:24>

**Life**
[2] 45:1 <10:37>   50:24

<10:49>
[2] <10:51>   51: <10:51>   52: 6 <10:57>   72: 22 <11:28>   84: 11 <11:45> 84:20 <11:44>   93: 5 <01:27> 93:7 <01:27>   93: 10 <01:27> 93:16 <01:27>   94: 4 <01:28> 100: 6 <01:35>   100: 11 <01:35>   100: 22 <02:23> 101: 10 <01:36>   116: 3 <01:58>   132: 22 <02:23> 132: 25 <02:23>   133: 4 <02:23>   133: 10 <02:23> 133: 12 <02:23>   133: 14 <02:23>   133: 16 <02:24> 133: 21 <02:24>   155: 18 <03:05>

**Likely**
[1] 18:5 <09:59>

**Limited**
[3] 70:18 <11:25>   81: 13 <11:40>   93: 13 <01:27>

**Limiting**
[1] 9:10 <09:49>   25: 2 <10:09>   26: 9 <10:11>

**Linda**
[2] 109: 12 <01:48>   109: 13 <01:48>

**Line**
[4] 15:13 <09:56>   37: 22 <10:27>   122: 11 166: 2

**List**
[8] 3:18 26:23 <10:11>   125: 21 <02:15>   125: 24 <02:15> 126: 5 <02:16>   127: 11 <02:16>   128: 19 <02:18> 128: 23 <02:18>

**Listed**
[2] 86:4 <01:18>   125: 3 <02:14>

**Listen**
[2] 58:19 <10:59>   134: 5 <02:24>

**Live**
[3] 18:3 <09:59>   18: 7 <09:59>   157: 16 <03:07>

**Loan**
[2] 40:22 <10:30>   41: 7 <10:31>

**Loans**
[4] 39:9 <10:29>   39: 15 <10:29>   40: 3 <10:29>   40: 10 <10:30>

**Located**
[1] 127: 21 <02:17>

**Location**
[7] 60:8 <11:02>   126: 11 <02:16>   126: 13 <02:16> 126: 19 <02:16>   126: 25 <02:16>   127: 13 <02:17> 151: 11 <02:58>

**Locations**
[1] 60:2 <11:02>

**Log**
[5] 29:17 <10:16>   29: 19 <10:16>   42: 18 <10:33>   113: 25 <01:55>   114: 1 <01:55>

**Longest**
[2] 109: 21 <01:49>   109: 23 <01:49>   109: 25 <01:49> 110: 3 <01:50>   110: 9 <01:50>   111: 1 <01:52>

**Look**
[35] 6:9 <09:43>   6: 10 <09:43>   16: 24 <09:57>   6: 5 <10:11>   28: 15 <10:14>   29: 5 <10:16>   30: 8 <10:17>   30: 11 <10:17>   31: 22 <10:19> 32: 1 <10:19>   33: 5 <10:21> 34: 14 <10:22>   36: 1 <10:24> 46: 13 <10:39>   63: 9 <11:15> 63: 13 <11:15>   63: 20 <11:16>   71: 18 <11:27>   72: 4 <11:27>   74: 4 <11:30>   77: 10 <11:35>   77: 12 <11:33> 77: 17 <11:35>   79: 16 <11:39>

79: 17 <11:39>   80: 7 <11:39> 81: 14 <11:40>   86: 21 <01:19>   94: 8 <01:28>   94: 20 <01:29>   101: 23 <01:37> 116: 5 <01:59>   118: 10 <02:01>   140: 9 <02:40>   160: 23 <03:11>

**Looked**
[14] 6:18 <09:45>   29: 6 <10:16>   31: 10 <10:21>   33: 17 <10:22>   34: 1 <10:22>   34: 8 <10:22>   63: 16 <11:16>   64: 24 <11:17>   71: 13 <11:26> 77:3 <11:34>   79: 19 <11:39> 99: 5 <01:34>   121: 14 <02:06>   121: 14 <02:06>

**Looking**
[10] 4:18 <09:41>   4:21 30:23 <10:17>   41: 17 <10:32>   82: 4 <11:41>   85: 16 <01:17>   106: 10 <01:43>   106: 11 <01:43> 130: 13 <02:20>   141: 14 <02:41>

**Looks**
[4] 19:4 <10:01>   30:3 <10:16>   83:3 <11:43>   122: 17 <02:10>

**Los**
[13] 10:15 <09:51>   11: 14 <09:52>   12: 10 <09:53>   17: 24 <09:58>   107: 10 <01:46> 107: 19 <01:46>   107: 23 <01:46>   149: 25 <02:56> 150: 4 <02:57>   150: 5 <02:57>   150: 6 <02:57>   150: 22 <02:57>   150: 16 <02:57>

**Lose**
[3] 18:16 <09:59>   18: 18 <09:59>   53: 8 <10:52>

**Loss**
[7] 34: 16 <10:22>   49: 7 <10:47>   56: 4 <10:56>   56: 7 <10:56>   60: 20 <11:03>   72: 8 <11:28>   118: 25 <02:02>

**Losses**
[22] 3: 19 25: 11 <10:09>   25: 20 <10:10>   25: 24 <10:10> 26: 5 <10:10>   26: 17 <10:11> 27: 16 <10:12>   49: 11 <10:47>   49: 16 <10:48>   50: 1 <10:48>   55: 17 <10:55>   55: 55: 17 <10:55>   55: 19 <10:55> 57: 4 <10:57>   61: 13 <11:05> 62: 25 <11:15>   75: 11 <11:32>   76: 18 <11:33>   151: 16 <02:59>   163: 5 <03:14> 163: 6 <03:13>   163: 6 <03:14>

**Lost**
[7] 24: 25 <10:09>   36:3 <10:24>   60: 11 <11:02>   71: 4 <11:26>   88: 21 <01:21>   124: 3 <02:12>   145: 24 <02:50>

**LOU**
[3] 1: 18 168: 12 169: 5

**Lounge**
[1] 148: 23 <02:54>

**Lounges**
[1] 148: 17 <02:54>

**Love**
[1] 56: 20 <10:57>

**Low**
[1] 67: 4 <11:20>

**Lower**
[2] 55: 24 <10:04>

**Lucrative**
[2] 93: 25 <01:28>   94: 2 <01:28>

**Lunch**
[2] 85: 8 <11:46>   85: 9

**M**

**Ma'am**
[6] 68:21 <11:22>   86: 24

< >   112: 22 <01:54> 114: 23 <01:57>   134: 13 <02:24>   154: 3 <03:03>

**Mack**
[4] 83: 10 <11:44>   83: 11 <11:44>   89: 16 89: 17

**Maintain**
[1] 144: 21 <02:47>

**Major**
[1] 120: 17 <02:04>

**Majority**
[3] 98: 16 <01:33>   149: 12 <02:55>   155: 22 <03:05>

**Manage**
[1] 70: 14 <11:25>

**Manager**
[1] 9: 24 <09:50>

**Managers**
[1] 44: 20 <10:37>

**March**
[11] 1: 11 1: 16 7: 19 <09:46> 38: 4 <10:27>   59: 22 <11:01> 60: 16 <11:03>   83: 4 <11:43> 84: 13 <11:45>   84: 14 <11:45>   114: 14 <01:56> 168: 10

**Mark**
[13] 4: 24 <09:41>   5: 1 <09:41>   6: 22 <09:45>   6: 23 <09:45>   6: 25 <09:45>   26: 12 <10:11>   26: 13 <10:11>   62: 19 <11:15>   78: 20 <11:38> 116: 6 <01:59>   117: 17 <02:00>   117: 19 118: 1 <02:00>

**Marked**
[7] 5: 8 <09:42>   6: 24 <09:45>   26: 15 43: 5 <10:34>   62: 21 <11:15>   146: 2 <02:51>   165: 6

**Market**
[2] 53: 15 <10:53>   130: 25 <02:20>

**Marketing**
[12] 46: 17 <10:40>   47: 2 <10:40>   53: 11 <10:53>   53: 12 <10:53>   53: 14 <10:53> 53: 21 <10:53>   56: 3 <10:56> 98: 22 <01:34>   130: 11 <02:20>   130: 22 <02:20> 131: 3 <02:20>   131: 17 <02:21>

**Markets**
[5] 60: 6 <11:02>   60: 7 <11:02>   130: 22 <02:20>

**Marks**
[1] 35: 7 <10:23>

**Marr**
[4] 83: 10 <11:44>   83: 11 <11:44>   89: 16 89: 17

**Mathematical**
[1] 142: 19 <02:44>

**Matt**
[2] 47: 10 <10:40>   54: 9 <10:54>

**Matthew**
[1] 4: 7 <09:40>

**Maximum**
[5] 10: 4 <09:50>   96: 20 <01:31>   125: 10 <02:14> 125: 20 <02:15>   153: 22 <03:02>

**McAllen**
[8] 17: 25 <09:58>   18: 1 <09:55>   18: 3 <09:59>   18: 6 <09:55>   18: 7 <09:59>   18: 8 <09:59>   109: 7 <01:48>   169: 7

**McClure**
[1] 89: 11 <01:22>

**Mean**
[29] 4: 16 <09:41>   7: 7 18: 24 <10:00>   21: 11 <10:04>   23:

20 <10:07>   29: 10 <10:15> 29: 15 <10:16>   30: 8 <10:17> 30: 11 <10:17>   36: 10 <10:24>   36: 16 <10:25>   39: 9 <10:29>   40: 20 <10:30>   46: 7 <10:39>   51: 13 <10:50>   52: 4 <10:53>   59: 5 <11:00>   62: 1 <11:06>   62: 12 <11:24>   70: 4 <11:24>   78: 22 <11:38>   93: 11 <01:27>   100: 6 <01:35> 102: 2 <01:37>   108: 4 <01:47>   110: 9 <01:50>   118: 14 <02:02>   147: 18 <02:53> 164: 5 <03:15>

**Meaning**
[3] 8:5 <09:49>   88:3 <01:20>   108: 19 <01:48>

**Means**
[3] 69: 23 <11:24>   81: 18 <11:40>   145: 9 <02:49>

**Meant**
[4] 40: 16 <10:30>

**Meet**
[1] 10: 12 <09:51>

**Meeting**
[1] 23: 6 <10:06>

**Meetings**
[1] 111: 18 <01:52>

**Memory**
[2] 111: 2 <01:51>   113: 19 <01:55>

**Mention**
[1] 104: 9 <01:40>

**Mentioned**
[6] 49: 18 <10:48>   104: 18 <01:40>   112: 10 <01:54> 120: 6 <02:04>   125: 20 <02:15>   127: 19 <02:17>

**Met**
[1] 112: 1 <01:53>

**Middle**
[1] 120: 1 <02:04>

**Midyear**
[1] 8: 19 <09:48>

**Might**
[1] 159: 7 <03:08>

**Millennium**
[11] 46: 17 <10:40>   46: 18 47: 2 <10:40>   47: 6 <10:40>   47: 14 <10:41>   53: 10 <10:53> 53: 11 <10:53>   53: 12 <10:53>   56: 2 <10:56>   57: 12 <10:58>   130: 22 <02:20>

**Millin**
[1] 20: 1 <10:02>

**Million**
[2] 68: 15 <11:22>   136: 20 <02:27>

**Mind**
[3] 90: 23 <01:24>   160: 23 <03:11>   164: 5 <03:15>

**Mine**
[8] 8:9 <09:47>   42: 1 <10:32>   49: 20 <10:48>   89: 4 <01:22>   91: 3 <01:24>   92: 2 <01:25>   92: 4 <01:25>   159: 24 <03:09>

**Minimum**
[7] 50: 14 <10:49>   50: 18 <10:49>   70: 1 <11:24>   70: 9 <11:24>   71: 2 <11:26>   75: 3 <11:31>   153: 23 <03:03>

**Minneapolis**
[1] 47: 15 <10:41>

**Minus**
[1] 97: 9 <01:32>

**Minute**
[4] 67: 21 <11:21>   67: 23 117: 10 162: 7 <03:13>

**Miscellaneous**
[1] 151: 3 <02:58>

**Mischaracterizing**
[4] 57: 24 <10:58>   105: 21

<01:41>   154: 21 <03:03>
164: 3 <03:15>

**Misleading**
[1] 154: 19 <03:03>

**Monday**
[1] 151: 2 <02:58>

**Money**
[12] 8:16 <09:47>   21: 17
<10:04>   76: 6 <11:33>   79: 10
<11:38>   80: 4 <11:39>   94: 3
<12:13>   122: 23 <02:12>
124: 1 <02:12>   131: 17
<02:21>   145: 7 <02:49>   145:
10 <02:49>   145: 13 <02:49>

**Month**
[20]  26:19 <10:11>   35: 5
<10:23>   59: 4 <11:00>   80: 13
<11:39>   81: 1 <11:40>   81: 10
<11:40>   83: 3 <11:43>   83: 4
<11:43>   85: 1 <11:46>   85: 2
<11:46>   90: 6 <01:23>   90: 7
<01:23>   90: 15 <01:24>   108:
25 <01:49>   109: 16 <01:49>
123: 4 <02:11>   123: 22
<02:12>   124: 16 <02:13>
150: 22 <02:57>   150: 24
<02:58>

**Monthly**
[1]  29: 22 <10:16>

**Months**
[12]  8: 5 <09:47>   30. 16
<10:17>   35: 4 <10:23>   36: 8
<10:24>   132: 21 <02:23>
133: 11 <02:23>   133: 11
<02:23>   133: 21 <02:24>
133: 25 <02:24>   134: 11
<02:24>   141: 11 <02:41>
150: 24 <02:58>

**Morning**
[1]  56: 21 <10:57>

**Most**
[4]  86: 18 <01:19>   86: 19
<01:19>   93: 21 <01:27>   121:
12 <02:06>

**Mostly**
[1]  108: 12 <01:47>

**Motion**
[2]  91: 5 <01:24>   91: 7
<01:24>

**Move**
[6]  5: 25 <09:42>   14: 25
<09:56>   15: 12 <09:56>   15:
21 <09:56>   15: 23 <09:56>
132: 3 <02:22>

**Moved**
[1]  23: 21 <10:07>

**Multifarious**
[1]  154: 23 <03:03>

**Multiplied**
[1]  162: 1

## N

**Name**
[18]  4: 5 <09:40>   7:16
<09:46>   7: 17 <09:46>   12: 21
<09:54>   19: 8 <10:01>   44: 22
<10:37>   45: 21 <10:38>   45:
23 <10:39>   46: 12 <10:39>
46: 24 <10:40>   47: 11
<10:40>   47: 19 <10:41>   48: 1
<10:41>   48: 4 <10:42>   52: 25
<10:52>   54: 10 <10:54>   105:
13 <01:41>   167: 11

**Named**
[7]  20: 5 <10:02>   20: 21
<10:03>   45: 20 <10:38>   47:
10 <10:40>   47: 18 <10:41>
57: 22 <10:58>   65: 12
<11:18>

**Names**
[9]  16: 2 <09:57>   17: 8
<09:57>   17: 11 <09:58>   20:
20 <10:03>   21: 9 <10:04>   21:
10 <10:04>   21: 14 <10:04>

64:19 <11:   77:4 <11:35>
**National**
[9] 47:18 <10:41>   47:20
<10:41>   67:4 <11:20>   67:17
<11:21>   68:4 <11:21>   136:
13 <02:27>   137:1 <02:28>
137:3 <02:28>   137:9
<02:28>

**Nationally**
[2] 65:2 <11:18>   67:6
<11:20>

**Natural**
[3] 34:3 <10:22>   60:6
<11:02>   60:7 <11:02>

**Naturally**
[1] 33:14 <10:21>

**Nature**
[3] 16:24 <09:57>   149:3
<02:55>   149:4 <02:55>

**Neally**
[75] 2:8 3:4 3:5 4:4 4:20
<09:41>   4:24 <09:41>   5:7
<09:42>   6:22 <09:45>   6:25
<09:45>   7:3 <09:45>   7:8
<09:46>   9:11 <09:49>   13:9
<09:55>   13:15 14:20
<09:55>   15:22 <09:56>   17:
17 <09:58>   24:7 <10:08>   25:
9 <10:09>   26:13 <10:11>   26:
22 <10:11>   31:8 <10:18>   33:
23 <10:22>   35:8 <10:23>   35:
11 <10:23>   35:15 <10:23>
37:10 <10:24>   37:13 37:15
37:18 40:7 <10:30>   42:14 55:
2 <10:55>   56:18 <10:56>   58:
1 <10:58>   62:19 <11:15>   67:
14 <11:21>   67:24 <11:21>
68:16 <11:22>   77:15
<11:35>   78:1 <11:35>   78:22
<11:38>   79:14 <11:39>   83:1
<11:43>   83:8 <11:46>   91:15
<01:24>   92:18 <01:26>   95:
17 <01:30>   95:20 <01:30>
102:6 102:11 <01:37>   104:14
<01:40>   106:18 <01:44>
112:9 <01:53>   113:20
<01:55>   115:9 <01:57>   115:
13 <01:58>   116:16 <01:59>
117:17 <02:00>   122:5
<02:08>   125:3 <02:14>   125:
21 <02:15>   126:6 <02:16>
126:24 <02:16>   127:11
<02:16>   131:6 <02:21>   131:
9 <02:21>   131:12 <02:21>
136:23 <02:28>   142:14
<02:44>   146:10 <02:51>
155:2 <03:04>   156:4
<03:05>   158:7 <03:05>   165:
1 <03:16>

**Neally's**
[2] 114:18 <01:57>   135:5
<02:26>

**Nebraska**
[2] 46:21 <10:40>   47:2
<10:40>

**Necessarily**
[7] 82:13 <11:42>   82:14
<11:42>   85:21 <01:18>   104:
24 <01:40>   110:17 <01:50>
129:15 <02:19>   133:15
<02:23>

**Necessary**
[5] 16:12 <09:57>   16:22
<09:57>   117:11 <02:00>
152:18 <03:00>   152:25
<03:01>

**Need**
[21] 10:8 <09:50>   10:9
<09:51>   12:1 <09:53>   12:7
<09:53>   12:25 <09:54>   14:5
<09:55>   15:1 <09:56>   15:6
<09:56>   20:19 <10:03>   35:
13 <10:23>   55:9 <10:55>   56:
21 <10:57>   78:23 <11:38>
85:8 <11:46>   94:19 <01:29>
117:6 <02:00>   122:2

<02:08>   122: 24 <02:12>
124: 12 <02:13>   126: 21   131:
12 <02:21>

**Needed**
[1] 10: 11 <09:51>

**Needs**
[2] 88: 13 <01:21>   129: 20
<02:19>

**Negative**
[11] 97: 8 <01:32>   102: 16
<01:38>   102: 16 <01:38>
103: 6 <01:38>   103: 9
<01:38>   103: 13 <01:38>
104: 9 <01:40>   104: 10
<01:40>   153: 7 <03:02>   154:
5 <03:03>   154: 12 <03:03>

**Never**
[7]  23: 18 <10:07>   54: 23
<10:54>   74: 20 <11:31>   123:
19 <02:12>   147: 6 <02:53>
158: 8 <03:08>   164: 5
<03:15>

**Never-ending**
[1]  54: 23 <10:54>

**New**
[11]  3: 13  22: 4 <10:05>   32: 1
<10:19>   34: 12 <10:22>   34:
21 <10:23>   67: 20 <11:21>
68: 14 <11:22>   76: 19
<11:33>   101: 25 <01:37>
116: 3 <01:58>   123: 9
<02:11>

**Next**
[9]  40: 24 <10:30>   72: 7
<11:27>   72: 8 <11:28>   72: 10
<11:28>   96: 25 <01:32>   115:
21 <01:58>   142: 4 <02:43>
152: 10 <03:00>   152: 15
<03:00>

**Niche**
[6]  128: 8 <02:17>   128: 13
<02:18>   129: 3 <02:18>   129:
7 <02:18>   129: 11 <02:18>
130: 1 <02:19>

**NL**
[1]  100: 6 <01:35>

**Nobody**
[4]  128: 8 <02:17>   129: 22
<02:19>   130: 7 <02:19>   131:
1 <02:20>

**NOE**
[1]  1: 7  2: 11  168: 7

**Non-specific**
[1]  58: 4 <10:58>

**None**
[6]  9: 20 <09:49>   9: 20
<09:49>   17: 15 <09:57>   74: 7
<11:30>   93: 8 <01:27>   160:
10 <03:10>

**Nonproduction**
[1]  124: 13 <02:13>

**Nonresponsive**
[10]  25: 8 <10:09>   25: 9
<10:09>   25: 18 <10:10>   26: 8
<10:10>   58: 9 <10:59>   69: 12
<11:24>   71: 5 <11:26>   74: 8
<11:30>   99: 9 <01:34>   113: 8
<01:55>

**Norma**
[1]  109: 12 <01:48>

**North**
[2]  50: 24 <10:49>   169: 7

**Northern**
[13]  44: 25 <10:37>   45: 1
<10:37>   50: 24 <10:49>   51:
22 <10:51>   51: 25 <10:51>
52: 6 <10:51>   93: 5 <01:27>
93: 7 <01:27>   93: 10 <01:27>
93: 16 <01:27>   94: 4 <01:28>
100: 6 <01:35>   100: 22
<01:36>

**Nos**
[1]  35: 9 <09:42>

**Notary**

[1,   : 15
**Notations**
[1] 83: 7 <11:44>

**Note**
[3]  39: 22 <10:29>   39: 25
<10:29>   40: 24 <10:30>

**Notebook**
[7]  30: 21 <10:17>   32: 20
<10:20>   42: 20 <10:33>   42:
22 <10:33>   42: 23 <10:33>
123: 3 <02:11>   124: 7
<02:12>

**Notebooks**
[2]  31: 18 <10:18>   124: 8
<02:12>

**Noted**
[1]  167: 2

**Notes**
[13]  3: 15  4: 22 <09:41>   4: 23
<09:41>   5: 1 <09:41>   5: 3
<09:41>   5: 10 <09:42>   39: 3
<10:28>   39: 4 <10:28>   39: 4
<10:28>   39: 7 <10:28>   41: 8
<10:31>   42: 16 <10:33>   50: 7
<10:50>

**Nothing**
[2]  34: 12 <10:22>   165: 3
<03:16>

**Notice**
[3]  4: 14 <09:41>   4: 15
<09:41>   5: 6 <09:42>

**November**
[10]  32: 6 <10:19>   32: 7
<10:19>   44: 11 <10:37>   44: 10
<10:36>   55: 4 <10:55>   73: 3
<11:29>   75: 16 <11:32>   91:
18 <01:25>   97: 13 <01:32>
97: 14 <01:32>

**Number**
[26]  3: 11  27: 11 <10:12>   28: 2
<10:13>   37: 24 <10:27>   54: 4
<10:53>   58: 18 <10:59>   58:
25 <10:59>   66: 15 <11:19>
67: 12 <11:20>   93: 1 <01:26>
97: 8 <01:32>   105: 3 <01:41>
106: 15 <01:43>   106: 17
<01:43>   106: 22 <01:45>
106: 24 <01:45>   111: 8
<01:52>   120: 24 <02:05>
132: 10 <02:22>   132: 16
<02:22>   133: 6 <02:23>   134:
1 <02:24>   134: 12 <02:24>
139: 23 <02:39>   140: 18
<02:40>   141: 12 <02:41>

**Numbered**
[1]  1: 16

**Numbers**
[46]  9: 15 <09:49>   30: 16
<10:17>   41: 25 <10:32>   48:
18 <10:46>   48: 19  48: 20
<10:46>   48: 21 <10:46>   48:
23 <10:46>   66: 22 <11:19>
67: 4 <11:20>   92: 13 <01:26>
96: 2 <01:31>   99: 12 <01:34>
111: 24 <01:53>   113: 21
<01:55>   119: 7 <02:03>   121:
3 <02:06>   130: 3 <02:19>
135: 4 <02:26>   135: 6
<02:26>   135: 9 <02:26>   135:
24 <02:26>   137: 14 <02:29>
137: 20 <02:29>   137: 23
<02:29>   138: 4
<02:30>   138: 5 <02:30>   142:
<02:30>   138: 15 <02:30>   142:
11 <02:41>   144: 3 <02:47>
144: 19 <02:48>   146: 5
<02:51>   148: 7 <02:54>   148:
10 <02:54>   148: 12 <02:54>
148: 13 <02:54>   148: 16
<02:54>   152: 8 <03:00>   152:
5 <03:00>   154: 5 <03:03>
154: 8 <03:03>   154: 13
<03:03>   161: 3 <03:11>

**Numerous**
[3]  33: 11 <10:21>   44: 15

<01:36>   68: 5 <11:21>
**Nutshell**
[1]  117: 4 <02:00>

## O

**Object**
[13]  13: 4 <09:54>   15: 17
<09:56>   40: 7 <10:30>   55: 2
<10:55>   56: 18 <10:56>   67:
14 <11:21>   67: 24 <11:21>
68: 16 <11:22>   68: 18
<11:22>   77: 15 <11:35>   91:
15 <01:25>   122: 2 <02:08>
124: 12 <02:13>

**Objecting**
[1]  14: 13 <09:55>

**Objection**
[24]  23: 23 <10:07>   24: 7
<10:08>   25: 8 <10:09>   25: 9
<10:09>   25: 18 <10:10>   26: 8
<10:10>   57: 24 <10:58>   69:
12 <11:23>   71: 5 <11:26>   74:
8 <11:30>   99: 9 <01:34>   105:
15 <01:41>   113: 8 <01:55>
<02:00>   118: 23 <02:02>
126: 20 <02:16>   127: 1
<02:16>   127: 22 <02:17>
128: 22 <02:18>   144: 5
<02:47>   152: 20 <03:01>
154: 20 <03:03>   164: 3
<03:15>

**Obligations**
[1]  10: 12 <09:51>

**Obtained**
[1]  142: 22 <02:44>

**Obviously**
[1]  113: 4 <01:54>

**Occasion**
[2]  70: 11 <11:25>

**Occasional**
[2]  20: 16 <10:03>   23: 4
<10:06>

**Occasionally**
[1]  130: 18 <02:20>

**Occurred**
[1]  155: 23 <03:05>

**October**
[7]  11: 3 <09:52>   11: 3
<09:52>   59: 20 <11:01>   60:
16 <11:02>   60: 24 <11:03>
148: 18 <02:54>   148: 23
<02:55>

**Odds**
[1]  151: 3 <02:58>

**Offer**
[1]  12: 6 <09:53>

**Offered**
[2]  12: 5 <09:53>   94: 2
<01:28>

**Office**
[15]  9: 24 <09:50>   21: 2
<10:04>   32: 20 <10:20>   37:
16 <10:26>   79: 15 <11:39>
111: 5 <01:52>   111: 16
<01:52>   111: 19 <01:53>
112: 5 <01:53>   112: 7
<01:53>   149: 25 <02:56>
150: 1 <02:56>   150: 4
<02:57>   150: 6 <02:57>   167:
13

**Officer**
[1]  21: 19 <10:04>

**Offices**
[3]  1: 19  2: 3  150: 10 <02:57>

**Offset**
[1]  86: 9 <01:18>

**Offsets**
[1]  86: 4 <01:18>

**Often**
[1]  158: 3 <03:07>

**Old**
[13]  17: 15 <09:58>   85: 15

<01:17> 85:18 <01:18> 85:
20 <01:18> 85:21 <01:18>
85:23 <01:18> 86:5 <01:18>
86:7 <01:18> 86:16 <01:18>
86:17 <01:18> 86:17
<01:18> 86:20 <01:19> 121:
15 <02:06>

**OLIVEIRA**
[1] 2:8

**Omaha**
[3] 46:21 <10:40> 47:2
<10:40> 47:7 <10:40>

**Once**
[5] 61:2 <11:03> 76:12
<11:33> 142: 12 <02:43>
145: 4 <02:49> 145: 12
<02:49>

**One**
[87] 6:13 <09:44> 7:12
<09:46> 10:4 <09:50> 11:3
<09:52> 13:6 <09:54> 15:8
<09:56> 19:5 <10:01> 19:18
<10:02> 27:9 <10:12> 27:11
<10:12> 27:13 <10:12> 28:2
<10:13> 28:3 <10:14> 28:21
<10:15> 30:17 <10:17> 30:
22 <10:17> 31:5 <10:17> 32:
15 <10:20> 35:9 <10:23> 35:
11 <10:23> 38:18 <10:28>
42:4 <10:32> 43:13 <10:34>
45:17 <10:38> 56:10
<10:56> 56:11 <10:56> 58:
17 <10:59> 58:21 <10:59>
63:2 <11:15> 65:18 <11:18>
67:1 <11:20> 69:24 <11:24>
71:4 <11:26> 78:21 <11:38>
79:6 <11:38> 79:20 <11:39>
80:22 <11:40> 83:1
<11:44> 84:3 <11:45> 84:4
<11:45> 84:20 <11:46> 84:
21 <11:46> 85:12 <01:17>
90:14 <01:23> 90:20
<01:24> 90:20 <01:24> 90:
22 <01:24> 91:1 <01:24> 92:
8 <01:26> 93:13 <01:27> 94:
21 <01:29> 94:22 <01:29>
95: 6 <01:30> 96:1 <01:31>
96:15 <01:31> 96:16
<01:31> 96:25 <01:32> 98:
12 <01:33> 99:5 <01:34> 99:
18 <01:34> 102:7 102: 8
<01:37> 105:7 <01:41> 106:
18 <01:44> 106: 22 <01:45>
107:4 <01:45> 109: 5
<01:48> 111:10 <01:52>
111: 10 <01:52> 122:9
<02:08> 131:12 <02:22>
135: 18 <02:26> 136: 1
<02:26> 136: 18 <02:27>
136: 19 <02:27> 150: 18
<02:57> 150: 19 <02:57>
150: 22 <02:57> 151: 17
<02:59> 152: 3 <03:00> 153:
3 <03:01> 156: 16 <03:06>
159: 18 <03:09> 160: 22
<03:10> 161: 11 <03:12>
161: 12 <03:12> 161: 21
<03:13>

**One-fourth**
[2] 150: 19 <02:57> 150: 22
<02:57>

**One-page**
[1] 31:5 <10:17>

**One-week**
[1] 90:2 <01:23>

**Ones**
[5] 27:5 <10:11> 51:23
<10:51> 54:21 <10:54> 78:
18 <11:38> 85:24 <01:18>

**Ongoing**
[3] 32:17 <10:20> 33:13
<10:21> 54:23 <10:54>

**Opened**
[2] 111: 15 <01:52> 111:19
<01:53>

**Opinion**

[15] 5:15    42> 25:20
<10:10> 39: 19 <10:29> 39:
24 <10:29> 40:5 <10:29> 52:
20 <10:52> 53:7 <10:52> 56:
16 <10:56> 57:7 <10:57> 57:
13 <10:58> 58:24 <10:59>
59:16 <11:01> 72:2 <11:27>
88: 4 <01:20> 157: 22
<03:07>

**Opinions**
[9] 5:19 <09:42> 26:17
<10:11> 44: 18 <10:36> 53:3
<10:52> 55:16 <10:55> 57:3
<10:57> 57:9 <10:57> 77:11
<11:35> 77:13 <11:35>

**Opportunity**
[1] 9:8 <09:49> 14:9
<09:55> 28:15 <10:14>

**Oral**
[1] 1:10 1:14 168: 15

**Order**
[4] 10:22 <09:51> 13:2
<09:54> 37:6 <10:26> 44:13
<10:36>

**Organization**
[4] 76:13 <11:33> 76:14
<11:33> 76:19 <11:33> 120:
11 <02:04>

**Organizations**
[2] 155: 14 <03:04>

**Origin**
[1] 135: 5 <02:26>

**Original**
[2] 32:19 <10:20> 37: 11
<10:26> 37:16 <10:26>

**Osborn**
[2] 7:17 <09:46> 111: 4
<01:52>

**Otherwise**
[2] 132: 16 <02:22> 168:21

**Outcome**
[1] 168: 21

**Outfit**
[1] 46: 6 <10:39>

**Outside**
[1] 149: 21 <02:56>

**Overhead**
[9] 8:22 <09:48> 106: 2
<01:42> 106: 9 <01:42> 106:
12 <01:43> 150: 14 <02:57>
150: 16 <02:57> 150: 18
<02:57> 160: 10 <03:10>
160: 20 <03:10>

**Overwrite**
[6] 21:22 <10:04> 21:23
<10:04> 76:10 <11:33> 82:
15 <11:42> 162: 4 <03:13>
162: 5 <03:13>

**Overwrites**
[16] 21:21 <10:04> 38:22
<10:28> 56:5 <10:56> 63:15
<11:16> 63:17 <11:16> 63:
20 <11:16> 75:22 <11:32>
106: 25 <01:45> 112: 16
<01:54> 121:11 <02:05>
146: 13 <02:51> 147: 11
<02:53> 148: 1 <02:53> 148:
3 <02:53> 158: 23 <03:08>
158: 25 <03:08>

**Owe**
[1] 79:7 <11:38>

**Owed**
[1] 119: 20 <02:03>

**Own**
[15] 29:16 <10:16> 61: 13
<11:05> 61: 14 <11:05> 62: 1
<11:06> 72: 23 <11:28> 72:
24 <11:28> 81. 24 <11:41>
88: 13 <01:21> 97:4 <01:32>
113: 23 <01:55> 123: 14
<02:12> 141: 6 <02:53> 163:
1 <03:14> 163: 9 <03:14>
163: 10 <03:14>

**Owner**

[1] 7:22 <09:46>

**Owners**
[2] 7:12 <09:46>    75:17
<11:32>

**Ownership**
[1] 76:5 <11:33>

## P

**P.m.**
[1] 1:17

**Pad**
[1] 142:12 <02:43>

**Page**
[14] 3:2 3:6 3:10 31:5
<10:17> 79:4 <11:38> 84:1
<11:44> 116:10 <01:59>
116:18 <01:59> 123:13
<02:12> 161:17 <03:12>
161:19 <03:13> 161:21
<03:13> 166:1 166:2

**Pages**
[9] 5:1 <09:41> 27:4
<10:11> 27:25 <10:13> 39:3
<10:24> 84:3 <11:45> 94:
25 <01:29> 94:25 <01:29>
95:4 <01:30> 116:13
<01:59>

**Paid**
[11] 51:7 <10:50> 112:12
<01:54> 114:4 <01:55> 119:
5 <02:02> 119:11 <02:03>
119:14 <02:03> 125:7
<02:14> 141:14 <02:41>
157:19 <03:07> 158:23
<03:08> 161:13 <03:12>

**Paper**
[1] 92:6 <01:26>

**Paperwork**
[2] 25:6 <10:09> 29:16
<10:16>

**Paragraph**
[17] 61:22 <11:05> 64:4
<11:17> 64:5 <11:17> 72:10
<11:28> 134:15 <02:25>
134:19 <02:25> 135:6
<02:26> 137:12 <02:29>
139:18 <02:38> 140:18
<02:40> 143:8 <02:45> 143:
11 <02:45> 144:15 <02:48>
161:4 <03:11> 161:18
<03:13> 161:21 <03:13>
162:3 <03:13>

**Part**
[30] 27:12 <10:12> 27:13
<10:12> 36:21 <10:25> 36:
22 <10:25> 58:5 <10:58> 58:
6 <10:59> 76:12 <11:27> 84:
6 <11:45> 86:3 <01:18> 86:6
<01:18> 86:18 <01:19> 91:3
<01:24> 91:23 <01:25> 93:
21 <01:27> 104:7 <01:40>
108:13 <01:47>    116:8
<01:59> 116:14 <01:59>
121:12 <02:06>    121:14
<02:06> 125:2 <02:13> 126:
7 <02:16> 129:5 <02:18>
134:20 <02:25> 135:18
<02:26> 136:24 <02:28>
153:9 <03:02> 155:20
<03:05> 155:24 <03:05>
164:2 <03:15>

**Part-time**
[4] 9:20 <09:49> 104:6
<01:40> 155:20 <03:05>
155:24 <03:05>

**Participate**
[1] 11:8 <09:52>

**Participated**
[1] 11:6 <09:52>

**Particular**
[3] 13:20 <09:55>    124:1
<02:12> 142:1 <02:42>

**Parties**
[1] 168:18

**Partner**

[2,    <09:45>    7:15
<09:46>

**Partners**
[6] 7:13 <09:46>    9:4
<09:49> 9:23 <09:50> 17:10
<09:58> 45:12 <10:38> 104:
25 <01:40>

**Partnership**
[3] 1:4 8:7 <09:47>    168:4

**Parts**
[3] 102:12 <01:37> 116:18
<01:59> 124:9 <02:12>

**Pass**
[3] 104:14 <01:40>    154:25
<03:04> 157:24 <03:07>

**Passbook**
[2] 22:16 <10:06>

**Passes**
[1] 157:20 <03:07>

**Past**
[10] 22:6 <10:05>    22:10
<10:05> 61:24 <11:05> 63:
22 <11:16> 64:15 <11:17>
66:22 <11:19> 81:21
<11:41> 125:15 <02:15>
137:20 <02:29> 145:25
<02:50>

**Pay**
[10] 105:10 <01:41> 112:20
<01:54> 113:5 <01:54> 145:
12 <02:49> 150:19 <02:57>
150:22 <02:57> 158:2
<03:07> 158:4 <03:07> 159:
10 <03:08> 160:19 <03:10>

**Paying**
[3] 87:13 <01:20> 145:10
<02:49> 158:6 <03:08>

**Pays**
[1] 51:16 <10:51>

**Paz**
[30] 1:4 1:4 7:14 <09:46>    23:
10 <10:07> 49:6 <10:47> 49:
15 <10:48> 49:23 <10:48>
50:5 <10:48> 63:18 <11:16>
75:11 <11:32> 75:15
<11:32> 76:8 <11:33> 106:
20 <01:44> 106:25 <01:45>
107:5 <01:46> 109:2
<01:48> 109:18 <01:49>
109:22 <01:49> 110:4
<01:50> 151:15 <02:59>
151:18 <02:59> 152:2
<02:59> 152:14 <03:00>
156:21 <03:06> 156:24
<03:06> 163:6 <03:14> 163:
7 <03:14> 164:19 <03:16>
168:4 168:4

**Paz's**
[2] 63:12 <11:15> 151:16
<02:59>

**Pena**
[24] 1:3 3:19 7:14 <09:46>
49:6 <10:47> 49:15 <10:48>
50:5 <10:48> 62:23 <11:15>
62:24 <11:15> 63:2 <11:15>
63:19 <11:16> 64:7 <11:17>
64:11 66:3 <11:18> 66:4
<11:18> 66:6 <11:19> 75:11
<11:32> 82:20 <11:42> 132:
5 <02:22> 151:21 <02:59>
158:6 <03:08> 158:20
<03:08> 162:11 <03:13>
163:6 <03:14> 168:3

**Pena's**
[2] 63:9 <11:15>    146:2
<02:50>

**Penella**
[7] 46:11 <10:39>    48:17
<10:46> 48:17 <10:46> 53:
10 <10:53> 54:8 <10:53> 54:
14 <10:54> 58:22 <10:59>

**People**
[59] 12:7 <09:53>    19:19
<10:02> 20:6 <10:02> 21:11
<10:04> 26:6 <10:10> 26:9

<10:11> 26: 11 <10:11> 26:
18 <10:11> 26:23 <10:11>
27:21 <10:12> 41:23
<10:32> 44: 18 <10:36> 44:
19 <10:37> 45:3 <10:37> 47:
14 <10:41> 49:14 <10:47>
49:18 <10:48> 50:1 <10:48>
50:4 <10:48> 54:3 <10:53>
56:1 <10:56> 58:5 <10:58>
59:1 <11:00> 61:25 <11:05>
62:1 <11:06> 62:6 <11:06>
62:12 <11:06> 66:9 <11:19>
66:15 <11:19> 66:24
<11:20> 70:24 <11:25> 72:2
<11:27> 73:18 <11:29> 74:
24 <11:31> 74:25 <11:31>
77:23 <11:35> 82:18
<11:42> 85:15 <01:17> 86:
22 <01:19> 87:3 <01:19> 87:
13 <01:20> 87:15 <01:20>
104:22 <01:40> 104:25
<01:40> 105:1 <01:40>
110:21 <01:50> 111:13
<01:52> 115:10 <01:58>
125:20 <02:15> 125:25
<02:15> 126:6 <02:16> 128:
1 <02:17> 128:14 <02:18>
130:3 <02:19> 130:17
<02:20> 131:16 <02:21>
147:12 <02:52> 149:7
<02:55> 158:2 <03:07>

**Per**
[9] 67:1 <11:20>    70:7
<11:26> 70:8 <11:24> 123:3
<02:11> 123:4 <02:11> 123:
22 <02:12>    123:22 <02:12>
124:16 <02:13> 124:16
<02:13>

**Percent**
[75] 51:6 <10:50>    51:9
<10:50> 52:1 <10:51> 52:8
<10:51> 52:12 <10:51> 52:
12 <10:51> 52:21 <10:52>
57:14 <10:58> 61:22
<11:05> 62:2 <11:06> 69:2
<11:23> 69:10 <11:23> 69:
21 <11:24> 70:2 <11:24> 70:
7 <11:24> 70:8 <11:24> 70:
20 <11:25> 71:1 <11:25> 71:
19 <11:27> 72:3 <11:27> 72:
5 <11:27> 72:6 <11:27> 72:
11 <11:28> 72:14 <11:28>
72:21 <11:28> 73:11
<11:29> 73:12 <11:29> 73:
23 <11:30> 77:25 <11:35>
77:25 <11:35> 78:1 <11:35>
78:9 <11:36> 78:9 <11:36>
81:20 <11:41> 84:8 <11:45>
92:24 <11:26> 96:20
<01:31> 97:7 <01:32> 97:9
<01:32> 101:3 <01:36> 102:
14 <01:38> 102:15 <01:38>
103:23 <01:38> 102:25
<01:38> 103:3 <01:38> 103:
6 <01:38> 103:9 <01:38>
103:12 <01:38> 104:10
<01:40> 104:10 <01:40>
104:19 <01:40> 105:24
<01:41> 115:5 <01:57> 115:
25 <02:14> 125:4 <02:14>
125:8 <02:14>    139:20
<02:39> 139:24 <02:39>
140:2 <02:39> 140:18
<02:40> 141:13 <02:41> 142:
8 <02:42> 142:17 <02:44>
142:18 <02:44> 144:24
<02:49> 145:17 <02:50>
147:11 <02:53> 153:21
<03:02> 153:23 <03:03>
153:24 <03:03> 154:17
<03:03> 157:3 <03:06> 157:
8 <03:06> 161:10 <03:12>

**Percentage**
[3] 8:6 <09:47>    22:9
<10:05> 29:23 <10:16>

**Performance**
[2] 63:22 <11:16>    64:15

<11:17>
**Perhaps**
[1] 33:24 <10:22>
**Period**
[14] 26:2 <10:10> 26:19 <10:11> 59:10 <11:00> 69:5 <11:23> 81:11 <11:40> 82:19 <11:42> 82:25 <11:43> 84:12 <11:45> 84:22 <11:46> 85:5 <11:46> 90:2 <01:23> 148:16 <02:54> 148:22 <02:55> 148:22 <02:55>
**Permanent**
[3] 11:3 <09:52> 56:6 <10:56> 60:20 <11:03>
**Person**
[18] 19:4 <10:01> 19:5 <10:01> 66:3 <11:20> 67:1 <11:20> 67:5 <11:20> 68:13 <11:22> 68:15 <11:22> 69:24 <11:24> 81:24 <11:41> 85:21 <01:18> 85:24 <01:18> 87:1 <01:19> 88:5 <01:20> 88:9 <01:20> 103:24 <01:39> 104:5 <01:40> 137:21 <02:29> 167:11
**Person's**
[1] 103:22 <01:39>
**Personal**
[19] 44:17 <10:36> 44:17 <10:36> 56:3 <10:56> 56:6 <10:56> 61:11 <11:04> 61:20 <11:05> 62:1 <11:06> 69:20 <11:24> 110:20 <01:51> 110:24 <01:51> 113:23 <01:55> 114:11 <01:56> 116:1 <01:58> 143:12 <02:46> 143:16 <02:46> 144:7 <02:47> 144:10 <02:47> 161:7 <03:12> 161:23 <03:13>
**Personally**
[10] 36:20 <10:25> 38:24 <10:28> 49:23 <10:48> 62:2 <11:06> 63:18 <11:16> 70:14 <11:25> 70:17 <11:25> 75:22 <11:32> 120:9 <02:03> 167:10
**Persons**
[2] 9:19 <09:49> 125:3 <02:14>
**Pete**
[1] 89:11 <01:22>
**Petrarca**
[7] 20:12 <10:03> 20:13 <10:03> 65:18 <11:18> 66:21 <11:19> 137:13 <02:29> 138:7 <02:30> 162:7 <03:13>
**Phone**
[6] 46:13 <10:39> 48:17 <10:46> 48:18 <10:46> 48:19 48:23 <10:46> 58:18 <10:59>
**Phones**
[1] 150:24 <02:58>
**Phrased**
[1] 132:14 <02:22>
**Pick**
[3] 68:14 <11:22> 76:4 <11:33> 101:5 <01:36>
**Picked**
[1] 108:22 <01:48>
**Picking**
[1] 19:2 <10:01>
**Pie**
[2] 36:21 <10:25> 36:22 <10:25>
**Place**
[2] 99:12 <01:34> 135:5 <02:26>
**Plaintiffs**
[15] 2:2 5:16 <09:42> 25:4

<09:09> ,1 <10:10> 26:5 <10:10> 26:16 <10:11> 26:24 <10:11> 27:17 <10:12> 27:22 <10:12> 45:13 <10:38> 49:11 <10:47> 55:20 <10:55> 57:5 <10:57> 76:21 <11:33> 110:5 <01:50>
**Plan**
[12] 10:18 <09:51> 11:2 <09:51> 11:9 <09:52> 11:20 <09:52> 11:21 <09:52> 70:13 <11:25> 97:5 <01:32> 107:20 <01:46> 107:21 <01:46> 129:14 <02:19> 130:6 <02:19> 152:16 <03:00>
**Planning**
[1] 25:10 <10:09>
**Plans**
[3] 7:25 <09:46> 45:18 <10:38> 130:25 <02:20>
**Play**
[2] 32:5 <10:19> 110:13 <01:50>
**Plus**
[7] 98:14 <01:33> 98:15 <01:33> 98:15 <01:33> 99:24 <01:33> 115:19 <01:58> 139:23 <02:39> 142:17 <02:44>
**PM**
[1] 1:18
**Pocket**
[1] 20:23 <10:03>
**Point**
[13] 13:24 <09:55> 35:1 <10:23> 36:3 <10:24> 59:7 <11:00> 64:1 <11:16> 70:13 <11:25> 76:6 <11:33> 94:15 <01:28> 98:1 <01:33> 115:4 <01:57> 144:8 <02:47> 149:9 <02:55> 160:3 <03:09>
**Policies**
[7] 86:22 <01:19> 133:14 <02:23> 144:12 <02:47> 144:23 <02:49> 154:7 <03:03> 155:19 <03:05> 158:22 <03:08>
**Policy**
[12] 85:20 <01:18> 86:1 <01:18> 86:3 <01:18> 86:5 <01:18> 98:5 <01:33> 98:6 <01:18> 145:7 <02:49> 158:2 <03:07> 158:4 <03:07> 159:12 <03:09> 159:18 <03:09>
**Policyholders**
[1] 145:22 <02:50>
**Port**
[3] 17:24 <09:58> 108:7 <01:47> 108:8 <01:47>
**Posing**
[1] 13:6 <09:54>
**Positive**
[1] 97:7 <01:32>
**Possible**
[3] 27:21 <10:12> 125:17 <02:15> 142:6 <02:43>
**Possibly**
[1] 111:2 <01:51>
**Potty**
[1] 138:12
**Practice**
[2] 157:13 <03:07> 159:22 <03:09>
**Prado**
[8] 62:14 <11:06> 64:20 <11:17> 82:20 <11:42> 136:24 <02:27> 138:16 <02:30> 141:20 <02:42> 162:12 <03:13> 164:9 <03:15>
**Prefer**
[1] 48:21 <10:46>
**Preference**

[1] 60:8 <11:02>
**Premium**
[34] 46:3 <10:56> 56:13 <10:56> 58:24 <10:59> 59:9 <11:00> 61:11 <11:04> 61:20 <11:05> 63:24 <11:16> 64:17 <11:17> 68:10 <11:22> 68:13 <11:22> 69:3 <11:23> 69:20 <11:24> 70:14 <01:25> 72:11 <11:28> 72:15 <11:28> 77:5 <11:35> 98:24 <01:34> 98:25 <01:34> 99:7 <01:34> 100:14 <01:35> 100:15 <01:35> 143:12 <02:46> 144:21 <02:49> 144:23 <02:49> 145:3 <02:49> 145:12 <02:49> 145:16 <02:50> 145:21 <02:50> 161:15 <03:12> 161:18 <03:13> 161:24 <03:13>
**Premiums**
[3] 143:1 <02:45> 143:2 <02:45> 143:2 <02:45>
**Preparation**
[9] 29:7 <10:15> 33:5 <10:21> 34:1 <10:22> 34:9 <10:22> 49:2 <10:46> 55:14 <10:55> 56:12 <10:56> 78:7 <11:36> 78:11 <11:36>
**Prepare**
[7] 11:1 <09:51> 32:25 <10:21> 34:5 <10:22> 34:19 <10:23> 43:1 <10:33> 44:13 <10:36> 49:10 <10:47> 49:19 <10:48> 49:20 <10:48> 50:1 <10:48> 58:25 <10:59> 62:24
**Prepared**
[28] 29:8 <10:15> 32:4 <10:19> 32:8 <10:20> 32:11 <10:20> 32:15 <10:20> 44:6 <10:35> 44:7 <10:35> 49:5 <10:47> 55:4 <10:55> 56:10 <10:56> 58:16 <10:59> 61:13 <11:05> 62:23 <11:15> 75:17 <11:32> 79:18 <11:39> 90:24 <01:24> 90:25 <01:24> 91:2 <01:24> 91:17 <01:25> 116:20 <01:59> 116:23 <02:46> 146:6 <02:51> 151:24 <02:59> 151:25 <02:59>
**Preparing**
[6] 8:13 <09:47> 32:11 <10:20> 54:18 <10:54> 55:7 <10:55> 55:12 <10:55> 55:16 <10:55> 62:9 <11:06> 140:16 <02:40>
**Present**
[2] 28:25 <10:15> 29:1 <10:15>
**Presentations**
[2] 149:16 <02:56> 149:22 <02:56>
**Pretty**
[1] 103:12 <01:38>
**Prevented**
[1] 26:20 <10:11>
**Previous**
[1] 18:22 <10:00>
**Previously**
[6] 5:21 <09:42> 22:25 <10:06> 31:19 <10:18> 33:7 <10:21> 69:18 <11:24> 85:10 <01:17>
**Price**
[1] 2:9
**Principle**

[1, ] 5 <01:28>
**Printed**
[1] 43:18 <10:35>
**Procedure**
[1] 1:22 24:15 <10:08>
**Proceeding**
[1] 168:19
**Process**
[6] 8:13 <09:47> 33:13 <10:21> 34:3 <10:22> 37:7 <10:26> 49:20 <10:48> 106:23 <01:45>
**Produce**
[5] 31:1 <10:17> 70:14 <11:25> 146:16 <02:52> 146:24 <02:52> 147:8 <02:53>
**Produced**
[7] 1:14 31:19 <10:18> 69:2 <11:23> 77:19 <11:35> 124:20 <02:13> 139:20 <02:39> 155:3 <03:04>
**Producer**
[2] 141:25 <02:42> 146:15 <02:52>
**Producers**
[1] 59:17 <11:01>
**Producing**
[11] 38:25 <10:28> 49:24 <10:48> 62:2 <11:06> 62:13 <11:06> 63:18 <11:16> 70:17 <11:25> 111:1 <01:51> 120:9 <02:04> 154:9 <03:03> 154:10 <03:03> 155:13 <03:05>
**Product**
[5] 23:6 <10:06> 84:19 <11:46> 93:11 <01:27> 93:20 <01:27> 127:24 <02:17>
**Production**
[16] 48:14 <11:05> 61:24 <11:05> 66:22 <11:19> 72:23 <11:28> 110:20 <01:51> 110:21 <01:51> 110:24 <01:56> 111:14 <01:56> 136:10 <02:27> 137:20 <02:29> 143:16 <02:46> 144:7 <02:47> 144:10 <02:47> 154:7 <03:03> 154:12
**Products**
[8] 93:7 <01:27> 93:10 <01:27> 93:15 <01:27> 111:10 <01:52> 115:22 <01:58> 115:25 <01:58> 144:20 <02:49> 155:20 <03:05>
**Professional**
[5] 52:20 <10:52> 54:24 <10:54> 59:16 <11:01> 69:7 <11:23> 137:2 <03:07>
**Profit**
[6] 112:20 <01:54> 112:23 <01:54> 113:1 <01:55> 113:4 <01:54> 113:10 <01:55> 113:13 <01:55>
**Profitability**
[1] 73:21 <11:30>
**Projected**
[1] 101:25 <01:37>
**Projections**
[1] 3:13
**Proof**
[1] 164:8 <03:15>
**Proposal**
[8] 10:10 <09:51> 10:14 <09:51> 12:8 <09:53> 107:16 108:2 <01:47> 108:3 <01:47> 108:4 <01:47>
**Proposals**
[1] 11:10 <09:52> 12:12 <09:53> 14:5 <09:55>
**Proprietary**

[2] 12:24 <09:54> 16:2 <09:57>
**Protection**
[1] 12:24 <09:54>
**Prove**
[5] 22:21 <10:06> 124:2 <02:12> 133:21 <02:24> 133:23 <02:24> 164:7 <03:15>
**Proved**
[1] 167:11
**Provide**
[11] 6:19 <09:43> 48:6 <10:42> 48:8 <10:43> 51:8 <10:50> 91:9 <01:24> 91:10 <01:24> 91:11 <01:24> 123:15 <02:12> 124:8 <02:12> 130:3 <02:19> 162:19 <03:14>
**Provided**
[16] 5:12 <09:42> 6:2 <09:43> 6:17 <09:43> 14:15 <09:55> 14:18 <09:55> 25:17 <10:10> 31:24 <10:19> 43:18 <10:35> 44:11 <10:36> 72:25 <11:28> 78:5 <11:36> 76:6 <11:36> 122:3 <02:08> 128:16 <02:18> 143:22 <02:46> 158:8 <03:08>
**Provisions**
[1] 2:12
**Proximity**
[1] 38:14 <10:28>
**Prudent**
[1] 9:4 <01:01>
**Public**
[4] 12:15 <09:54> 24:11 <10:08> 70:13 <11:25> 167:15
**Publication**
[5] 68:2 <11:21> 132:15 <02:22> 133:24 <02:24> 134:7 <02:24> 136:17 <02:27>
**Publications**
[4] 33:12 <10:21> 33:18 <10:22> 33:19 <10:22> 34:4 <02:22>
**Published**
[2] 105:7 <01:41> 105:16 <01:41> 105:23 <01:41>
**Pull**
[1] 160:24 <03:11>
**Pure**
[1] 160:11 <03:10>
**Purpose**
[2] 9:7 <09:49> 80:6 <11:39>
**Purposes**
[2] 123:14 <02:12> 167:12
**Pursuant**
[1] 1:21
**Put**
[17] 5:4 <09:42> 31:8 <10:18> 37:6 <10:26> 50:11 <10:49> 55:1 <10:55> 65:1 <11:17> 95:3 <01:30> 95:5 <01:30> 95:9 <01:30> 95:10 <01:30> 123:3 <02:11> 131:20 <02:20> 142:12 <02:43> 145:3 <02:49> 147:12 <02:53> 149:21 <02:56> 150:3 <02:58>
**Putting**
[2] 145:7 <02:49> 153:25 <03:03>

**Q**

**Qualified**
[1] 5:18 <09:42>
**Quality**
[1] 111:12 <01:52>

**Quarter**
[4] 36  <10:24>  36 1
<10:25>  42 1  <10:33>  123
<02:11

**Quarterly**
[1] 29 2  <10:16>  30 1
<10:17

**Questions**
[23] 4 1  <09:41>  6
<09:43>  6  <09:43>  13 2
<09:53>  14  <09:55>  15
<09:56>  15  <09:56>  15
<09:56>  15 1  <09:56>  17
<09:57>  17  <09:57>  25 1
<10:09>  56  <10:56>  56 1
<10:56>  56 2  <10:57>  56
2  <10:57>  77 2  <11:33>
97 1  <11:33>  114 1
<01:57>  116 1  <01:59>
135  <02:26>  165
<03:16>  165  <03:16

**Quick**
[1] 78 2  <11:38

**Quit**
[4] 38 2  <10:28>  93 2
<01:27>  93 2  <01:28>  155
2  <03:05

**Quite**
[2] 90  <01:23>  132 2
<02:03

**Ran**
[1] 92  <01:25

**Range**
[2] 25  <10:09>  57 1
<10:58

**Rare**
[2] 51  <10:50>  70 1
<11:25

**Rate**
[71] 3 1  31 1  50 1  <10:49>
50 1  <10:49>  50 1
<10:49>  51  <10:50>  51 1
<10:50>  51  <10:50>  51 1
<10:50>  52  <10:50>  52
<10:51>  52 1  <10:51>  52
1  <10:52>  52 1  <10:52>
52 2  <10:52>  52  <10:57>
57  <10:57>  61 2  <11:05>
62  <11:06>  69 2  <11:24>
70  <11:24>  70 2  <11:25>
72 1  <11:28>  72 1
<11:28>  72 2  <11:28>  73
1  <11:29>  73 1  <11:29>
73 2  <11:30>  73 2
<11:30>  77 2  <11:33>  77
2  <11:35>  78  <11:35>  77
<11:36>  78 1  <11:36>  93
<01:27>  96 2  <01:31>
101 2  <01:37>  102 2
<01:38>  103  <01:38>  103
104  <01:39>  104 1
<01:40>  105 1  <01:41>
105 2  <01:41>  114 2
<01:57>  115  <01:57>  115
<01:57>  117 1  <02:00>
117 1  <02:00>  125
<02:14>  125 1  <02:15>
143  <02:45>  144 1
<02:48>  144 1  <02:48>
144 2  <02:49>  145 1
<02:50>  153  <03:01>  153
<03:01>  153 1  <03:02>
153 1  <03:02>  153 1
<03:02>  153  <03:02>  153
153 1  <03:02>  154
<03:02>  154  <03:03>  154
1  <03:03>  161 1  <03:12>
161 1  <03:12>  162
<03:13>  162  <03:13

**Rates**
[10] 53  <10:52>  57
<10:57>  57 1  <10:57>  74
<11:30>  91 2  <01:25>  94

**Quarter** (column 2)
22  <01:29>  ,:22  <01:29>
95:2  <01:29>  96:3  <01:31>
114: 20  <01:57>

**Re-create**
[1] 142: 3  <02:43>

**Reached**
[1] 5: 19  <09:42>

**Reaching**
[3] 5: 12  <09:42>  77: 24
<11:35>  78: 8  <11:36>

**Read**
[8] 28: 24  <10:15>  34: 2
<10:15>  34: 3  <10:22>  76: 23
<11:34>  77: 1  <11:34>  87: 19
<01:20>  132: 15  <02:22>
167: 1

**Reading**
[2] 70: 4  <11:24>  146: 11
<02:51>

**Real**
[7] 53: 7  <10:52>  72: 22
<11:28>  85: 24  <01:18>  137:
13  <02:29>  137: 23  <02:29>
137: 25  <02:29>  138: 4
<02:30>

**Realistic**
[1] 163: 25  <03:15>

**Really**
[7] 9: 22  <09:50>  78: 22
<11:38>  78: 23  <11:38>  103:
14  <01:39>  107: 6  <01:45>
120: 16  <02:04>  137: 13
<02:29>

**Reason**
[11] 13: 3  <09:54>  15: 11  15:
14  <09:56>  67: 4  <11:20>  67:
12  <11:20>  72: 8  <11:28>
100: 25  <01:33>  120: 8
<02:04>  120: 8  <02:04>  137:
16  <02:29>  166: 2

**Reasons**
[1] 16: 2  <09:57>

**Recalculate**
[2] 76: 9  <11:33>  76: 15
<11:33>

**Receipts**
[7] 39: 8  <10:28>  39: 11
<10:29>  39: 12  <10:29>  39:
16  <10:29>  39: 17  <10:29>
40: 3  <10:29>  40: 10  <10:30>

**Receivable**
[1] 38: 10  <10:27>

**Receivables**
[5] 118: 11  <02:01>  119: 3
<02:02>  119: 4  <02:02>  160:
13  <03:10>  160: 14  <03:10>

**Receive**
[8] 8: 20  <09:48>  21: 22
<10:04>  22: 5  <10:05>  29: 21
<10:16>  33: 11  <10:21>  123:
3  <02:11>  123: 4  <02:11>
158: 21  <03:08>

**Received**
[15] 3: 14  5: 10  <09:42>  8: 18
<09:47>  8: 19  <09:48>  10: 10
<09:51>  29: 17  <10:16>  36: 16
13  <10:25>  36: 17  <10:25>
82: 14  <11:42>  117: 24
<02:00>  118: 2  <02:01>  118:
24  <02:02>  136: 18  <02:27>

**Receiving**
[1] 146: 12  <02:51>

**Recently**
[3] 7: 15  <09:46>  8: 3
<09:46>  8: 5  <09:47>

**Recess**
[5] 24: 20  48: 15  <10:46>  62:
18  85: 9  138: 14

**Recopy**
[1] 123: 9  <02:11>

**Record**
[17] 1: 23  4: 6  <09:40>  9: 6
<09:49>  37: 8  <10:26>  37: 19

**Quarter** (column 3)
<10:26>  37: 21  <10:27>  42:
13  <10:33>  67: 21  <11:20>
78: 13  <11:36>  93: 1  <01:26>
101: 1  <01:36>  107: 7
<01:45>  121: 21  122: 3
<02:08>  140: 7  <02:39>  143:
10  <02:45>  159: 16

**Records**
[2] 113: 7  <01:55>  160: 8
<03:10>

**Recruiting**
[6] 106: 7  <01:42>  156: 1
<03:05>  156: 2  <03:05>  156:
3  <03:05>  156: 4  <03:05>
157: 2  <03:05>

**Redundant**
[1] 4: 12  <09:41>

**Refer**
[6] 61: 12  <11:04>  71: 23
<11:27>  107: 3  <01:45>  109:
1  <01:48>  109: 17  <01:49>
111: 22  <01:53>  113: 2
<01:54>  130: 24  <02:20>
150: 15  <02:57>

**Referrals**
[1] 109: 4  <01:48>

**Referred**
[1] 161: 16  <03:12>

**Referring**
[3] 63: 7  <11:15>  99: 4 125: 24
<02:15>

**Reflect**
[13] 8: 20  <09:48>  41: 15
<10:31>  41: 21  <10:32>  74:
15  <11:31>  104: 2  <01:39>
118: 4  <02:01>  119: 13
<02:03>  119: 16  <02:03>
124: 3  <02:13>  140: 2
<02:39>  140: 21  <02:40>
160: 10  <03:10>  163: 12
<03:14>

**Reflected**
[9] 22: 23  <10:06>  60: 4
<11:02>  60: 5  <11:02>  60: 19
<11:02>  84: 21  <11:46>  120:
23  <02:05>  141: 18  <02:42>
163: 16  <03:14>  164: 21
<03:16>

**Reflecting**
[2] 77: 4  <11:35>  162: 20
<03:14>

**Reflection**
[1] 103: 21  <01:39>

**Reflective**
[4] 41: 2  <10:30>  44: 1
<10:35>  73: 17  <11:29>  118:
12  <02:01>  118: 12  <02:01>
121: 23  <02:08>

**Reflects**
[4] 61: 2  <11:03>  80: 13
<11:39>  84: 11  <11:45>  140:
22  <02:40>

**Refuse**
[1] 17: 18  <09:58>

**Refusing**
[2] 48: 22  <10:46>  48: 23
<10:46>

**Regard**
[8] 39: 10  <10:29>  39: 16
<10:29>  39: 22  <10:29>  39: 16
<10:56>  57: 9  <10:57>  86: 25
<01:19>  115: 6  <01:57>  145:
14  <02:50>

**Regarding**
[10] 27: 14  <10:12>  27: 20
<10:12>  51: 11  <10:50>  56:
02  <10:56>  57: 5  <10:57>  61:
8  <11:04>  114: 19  <01:57>
148: 5  <02:54>  148: 9
<02:54>  152: 1  <02:59>

**Regardless**
[1] 144: 10  <02:47>

**Regular**
[1] 34: 24  <10:23>

**Re...ed** (column 4)
[5] 55: 13  <10:55>  55: 16
<10:55>  57: 6  <10:57>  121:
25  <02:08>  168: 18

**Relates**
[1] 81: 19  <11:41>

**Relating**
[1] 9: 9  <09:49>

**Relationship**
[5] 20: 5  <10:02>  53: 18
<10:53>  54: 3  <10:53>  111:
11  <01:52>  111: 17  <01:52>

**Relevant**
[4] 14: 7  <09:55>  14: 22
<09:56>  15: 3  <09:56>  148:
22  <02:55>

**Relied**
[4] 62: 9  <11:06>  77: 11
<11:35>  77: 18  <11:35>  77:
24  <11:35>

**Rely**
[3] 5: 14  <09:42>  13: 1
<09:54>  48: 10  <10:42>

**Remain**
[1] 7: 13  <09:46>

**Remains**
[1] 97: 10  <01:32>

**Remember**
[9] 45: 21  <10:38>  50: 10
<10:49>  50: 23  <10:49>  52:
24  <10:52>  53: 5  <10:52>
114: 3  <01:55>  128: 19
<02:18>  149: 6  <02:55>

**Remind**
[1] 131: 15  <02:21>

**Removal**
[1] 106: 6  <01:42>

**Render**
[1] 5: 19  <09:42>

**Rendered**
[1] 55: 17  <10:55>

**Rendering**
[2] 5: 15  <09:42>  86: 23
<01:19>

**Renewal**
[4] 72: 10  <11:28>  80: 16
<11:40>  144: 15  <02:48>
162: 4  <03:13>

**Renewals**
[8] 87: 14  <01:20>  88: 10
<01:20>  144: 9  <02:47>  157:
19  <03:07>  159: 20  <03:07>
159: 25  <03:09>  160: 2
<03:09>  161: 23  <03:13>

**Rent**
[1] 150: 22  <02:57>

**Reorganization**
[1] 76: 16  <11:33>

**Repeat**
[2] 52: 5  <10:51>  127: 10
<02:16>  134: 6  <02:24>

**Rephrase**
[4] 22: 4  <10:05>  32: 3
<10:19>  117: 12  <02:00>
126: 8  <02:16>

**Report**
[10] 5: 20  <09:42>  28: 16
<10:14>  50: 11  <10:49>  61: 5
<11:03>  62: 1  <11:05>  76: 24
<11:34>  77: 1  <11:34>  77: 7
<11:35>  77: 8  <11:35>  77: 9
<11:35>

**Reported**
[4] 106: 12  <01:43>  118: 25
<02:02>  121: 15  <02:06>
160: 14  <03:10>

**Reporter**
[2] 1: 18  168: 12

**Reporter's**
[2] 3: 7  168: 9

**Reports**
[9] 28: 16  <10:14>  28. 19

**Re** (column 5)
<10:15>  28: 21  <10:15>  29.
14  <10:16>  29: 15  <10:16>
41: 18  <10:32>  44: 16
<10:36>  83: 18  <11:44>  118:
15  <02:02>

**Represent**
[5] 18: 5  <09:59>  19: 20
<10:02>  26: 6  <10:10>  36: 11
<10:24>  38: 1  <10:27>

**Representations**
[1] 24: 22  <10:09>

**Representing**
[2] 26: 25  <10:11>  92: 10
<01:26>

**Represents**
[1] 101: 24  <01:37>

**Request**
[2] 10: 25  <09:51>  123: 20
<02:12>

**Requested**
[2] 30: 12  <10:17>  123: 19
<02:12>

**Require**
[1] 13: 1  <09:54>

**Requirements**
[1] 10: 11  <09:51>

**Research**
[8] 48: 5  <10:42>  60: 14
<11:02>  73: 17  <11:29>  73:
18  <11:29>  74: 4  <11:30>  75:
8  <11:32>  87: 6  <01:19>  157:
15  <03:07>

**Reserve**
[1] 165: 5  <03:16>

**Resolved**
[1] 106: 24  <01:45>

**Respect**
[2] 96: 5  <01:31>  113: 6
<01:54>

**Respectively**
[1] 153: 22  <03:02>

**Respond**
[2] 25: 15  <10:09>

**Responding**
[2] 15: 15  <09:56>  135: 4
<02:26>

**Response**
[5] 5: 21  <09:42>  56: 18
<10:56>  91: 7  <01:24>

**Responses**
[1] 44: 11  <10:36>

**Responsive**
[4] 4: 15  <09:41>

**Responsiveness**
[9] 24: 8  <10:08>  40: 7
<10:30>  55: 2  <10:55>  67: 14
<11:21>  67: 24  <11:21>  68:
16  <11:22>  68: 18  <11:22>
77: 15  <11:35>  91: 15
<01:25>

**Rest**
[2] 86: 11  <01:18>  106: 5
<01:42>

**Result**
[3] 55: 22  <10:56>  75: 25
<11:32>  88: 22  <01:21>

**Resume**
[5] 3: 20 131: 7  <02:21>  131:
10  <02:21>  153: 3  <03:04>
155: 4  <03:04>  164: 14
<03:16>

**Retail**
[1] 18: 23  <10:00>  20: 24
<10:03>  21: 3  <10:04>

**Retire**
[5] 74: 20  <11:31>  75: 2
<11:31>  75: 3  <11:31>  147: 5
<02:53>  147: 6  <02:53>

**Retired**
[1] 70: 12  <11:25>

**Retirement**
[4] 11: 23  <09:52>  45: 18

<10:38> 98: 15 <01:33> 130:
6 <02:19>
**Retiring**
[1] 41:20 <10:32>
**Return**
[6] 6:2 <09:43> 6: 11
<09:43> 6: 15 <09:44> 121:
20 <02:06> 122: 7 <02:08>
122: 8 <02:08>
**Returns**
[5] 3:17 6:6 <09:43> 8: 14
<09:47> 121: 14 <02:06>
121: 18 <02:06>
**Reveal**
[2] 16:16 <09:57> 16: 19
<09:57>
**Revenue**
[1] 11:23 <09:52>
**Review**
[5] 5:14 <09:42> 27: 20
<10:12> 93: 24 <01:28>
**Reviewed**
[4] 5:10 <09:42> 31: 10
<10:18> 33: 11 <10:21> 34:
19 <10:23>
**Revoked**
[2] 26:1 <10:10>
**RFP**
[1] 12: 16 <09:54>
**RFQ**
[1] 12: 16 <09:54>
**Rider**
[1] 52:2 <10:51>
**Rights**
[1] 12: 24 <09:54>
**Rio**
[13] 17:24 <09:58> 20: 25
<10:04> 65:3 <11:18> 67: 6
<11:20> 72: 23 <11:28> 109:
3 <01:48> 109: 4 <01:48>
110: 2 <01:50> 126: 15
<02:16> 128: 6 <02:19> 129:
22 <02:19> 129: 24 <02:19>
130: 7 <02:19>
**Road**
[1] 2:9
**ROERIG**
[1] 2:8
**Role**
[4] 101: 18 <01:37> 101: 21
<01:37> 103: 14 <01:39>
104: 7 <01:40>
**Romero**
[1] 169: 6
**Room**
[1] 92: 5 <01:25>
**Rough**
[1] 22: 11 <10:05>
**Rules**
[1] 1:21
**Run**
[1] 106: 8 <01:42>
**Running**
[10] 23:8 <10:07> 123: 5
<02:11> 123: 7 <02:11> 123:
10 <02:11> 123: 12 <02:11>
123: 25 <02:12> 127: 23
<02:17> 128: 4 <02:17> 136:
19 <02:27> 142: 10 <02:43>
**Runs**
[1] 111: 5 <01:52>

**S**

**Safe**
[1] 115: 14 <01:58>
**Salaried**
[1] 9:23 <09:50>
**Salaries**
[2] 8:24 <09:48> 106: 3
<01:42>
**Salary**
[5] 8:18 <09:47> 22: 12

<10:05> J1 <10:06> 112:
11 <01:54> 114: 1 <01:55>
**Salazar**
[1] 20: 6 <10:02>
**Sale**
[1] 23:4 <10:06>
**Sales**
[24] 3:13 23:3 <10:06> 25: 13
<10:09> 26: 20 <10:11> 41:
10 <10:33> 58: 25 <10:59>
59: 19 <11:01> 60: 1 <11:02>
60: 11 <11:02> 60: 15
<11:03> 60: 22 <11:03> 61: 2
<11:03> 81: 5 <11:40> 93: 7
<01:27> 93: 9 <01:27> 100:
16 <01:35> 101: 8 <01:36>
101: 9 <01:36> 101: 16
<01:36> 101: 23 <01:37>
120: 3 <02:04> 132: 17
<02:23> 133: 13 <02:23>
139: 1 <02:38>
**Salespeople**
[1] 68:9 <11:22>
**Sam**
[18] 60:21 <11:03> 62: 14
<11:06> 64: 20 <11:17> 65:
23 <11:18> 66: 1 <11:18> 68:
25 <11:22> 69: 1 <11:23> 70:
24 <11:25> 82: 21 <11:42>
82: 22 <11:42> 136: 14
<02:27> 139: 8 <02:38> 139:
19 <02:39> 140: 10 <02:40>
141: 21 <02:42> 159: 25
<03:09> 162: 10 <03:13>
163: 22 <03:15>
**Sample**
[2] 153: 20 <03:02> 153: 20
<03:02>
**San**
[12] 20:3 <10:02> 20: 21
<10:03> 21: 1 <10:04> 45: 22
<10:39> 111: 5 <01:52> 111:
15 <01:52> 111: 19 <01:53>
112: 4 <01:53> 112: 6
<01:53> 139: 3 <02:38> 150:
12 <02:57> 150: 14 <02:57>
**Sandals**
[1] 136: 20 <02:27>
**Sat**
[1] 58: 17 <10:59>
**Sauceda**
[19] 1:7 2:11 60:21 <11:03>
62: 14 <11:06> 64: 20
<11:17> 66: 1 <11:18> 69: 1
<11:23> 69: 2 <11:23> 82: 21
<11:42> 136: 15 <02:27>
139: 8 <02:38> 139: 19
<02:39> 140: 10 <02:40>
141: 22 159: 25 <03:09>
162: 10 <03:13> 163: 22 <03:15>
163: 24 <03:15> 168: 7
**Sauceda's**
[1] 65:23 <11:18>
**Savings**
[2] 22:16 <10:06>
**Saw**
[1] 94: 1 <01:28>
**Scattered**
[1] 130: 15 <02:20>
**Scenario**
[1] 89: 10 <01:22>
**Schedule**
[1] 3:13
**Scheme**
[1] 75: 18 <11:32>
**School**
[21] 1:7 2:7 10: 16 <09:51>
10: 17 <09:51> 11: 16
<09:52> 23: 14 <10:07> 24:
10 <10:08> 24: 12 <10:08>
59: 18 <11:01> 60: 9 <11:02>
60: 11 <11:02> 69: 5 <11:23>
70: 12 <11:25> 74: 13
<11:31> 88: 21 <01:21> 107:

24 <01:46> 140: 22 <02:40>
140: 24 <02:41> 140: 25
<02:41> 141: 6 <02:41> 168:
7
**Schools**
[1] 17:20 <09:58> 17: 22
<09:58> 109: 7 <01:48>
**Scientifically**
[1] 153: 5 <03:01>
**Se**
[1] 67: 1 <11:20>
**Seal**
[1] 167: 13
**Search**
[1] 157: 15 <03:07>
**Seasonal**
[2] 9:20 <09:49> 9: 22
<09:50>
**Second**
[14] 14:10 <09:55> 32:5
<10:19> 37: 20 <10:26> 90:
24 <01:24> 102: 19 <01:38>
109: 23 <01:49> 110: 9
<01:50> 111:1 <01:51> 117:
18 177: 12 <02:29> 161: 17
<03:12> 161: 18 <03:13>
161: 19 <03:13> 161: 19
<03:13>
**Secretarial**
[1] 9:25 <09:50>
**Secretaries**
[3] 9:25 <09:50> 10: 1
<09:50> 10: 5 <09:50>
**Secretary**
[5] 150: 18 <02:57> 151: 1
<02:58>
**Section**
[5] 60:20 <11:03> 121: 3
<02:05> 121: 7 <02:05> 121:
23 <02:08> 130: 4 <02:19>
**See**
[14] 29:25 <10:16> 32: 18
<10:20> 35: 11 <10:23> 38: 3
<10:27> 43: 25 <10:35> 96: 3
<01:30> 96: 1 <01:31> 96: 18
<01:31> 101: 2 <01:36> 101:
3 <01:36> 115: 16 <01:58>
121: 15 <02:06> 124: 14
<02:13> 146: 7 <02:51>
**Seeing**
[1] 146: 23 <02:52>
**Sell**
[7] 17:20 <09:58> 17: 22
<09:58> 18: 3 <09:59> 27: 8
<10:12> 53: 22 <10:53> 111:
9 <01:52> 115: 22 <01:58>
**Selling**
[30] 22:2 <10:05> 23:2
<10:06> 23:5 <10:06> 23: 6
<10:06> 41: 13 <10:31> 41:
16 <10:31> 70: 23 <11:25>
82: 19 <11:42> 93: 11
<01:27> 93: 15 <01:27> 93:
21 <01:27> 93: 22 <01:28>
100: 3 <01:35> 101: 18
<01:37> 101: 21 <01:37>
103: 22 <01:39> 103: 24
<01:39> 104: 3 <01:39> 104:
7 <01:40> 111: 14 <01:58>
119. 22 <02:03> 119: 25
<02:04> 127: 23 <02:17>
127: 24 <02:17> 132: 24
<02:23> 133: 7 <02:23> 139:
14 <02:38> 143: 5 <02:45>
155: 18 <03:05> 157: 5
<03:06>
**Semantics**
[2] 66:25 <11:20> 69: 6
<11:23>
**Seminar**
[1] 41:20 <10:32> 105: 1
<01:40> 150: 3 <02:56>
**Sense**
[2] 53:23 <10:53> 81: 16

**Sentence**
[3] 64:5 <11:17> 134: 14
<02:25> 135: 12 <02:26>
**Separate**
[2] 32:15 <10:20> 95: 7
<01:30>
**September**
[8] 10:25 <09:51> 28: 19
<10:15> 59: 20 <11:01> 60:
16 <11:03> 60: 23 <11:03>
107: 14 <01:46> 112: 4
<01:53> 114: 10 <01:56>
**Serve**
[1] 4:13 <09:41>
**Service**
[3] 10:12 <09:51> 51: 8
<10:50> 53: 7 <10:52>
**Services**
[2] 129: 13 <02:19> 129: 18
<02:19>
**Servicing**
[1] 10: 11 <09:51>
**Set**
[2] 67:3 <11:20> 137: 8
<02:28>
**Setting**
[1] 125: 23 <02:15>
**Seven**
[1] 161: 22 <03:13>
**Share**
[1] 42: 2 <10:32>
**Shared**
[5] 40:12 <10:30> 40: 15
<10:30> 40: 19 <10:30> 41: 6
<10:31> 72: 1 <11:27>
**Shaun**
[3] 7:17 <09:46> 8: 11
<09:47> 11: 6 <09:52> 111: 4
<01:51> 150: 15 <02:57>
**Sheer**
[1] 164: 2 <03:15>
**Sheet**
[2] 92: 5 <01:25> 102: 2
<01:37>
**Sheets**
[1] 72: 25 <11:28>
**Sheltered**
[1] 93: 19 <01:27>
**Shirley**
[1] 82: 20 <11:42>
**Short**
[1] 11: 2 <09:51>
**Shortly**
[3] 107: 11 <01:46> 107: 22
<01:46> 110: 12 <01:50>
**Shot**
[1] 67: 2 <11:20>
**Show**
[14] 6:17 <09:45> 26:11
<10:11> 28: 7 <10:14> 73: 22
<11:30> 76: 23 <11:34> 78:
14 <11:37> 85: 2 <11:46> 89:
1 <01:22> 94: 11 <01:28>
100: 5 <01:35> 106: 16
<01:43> 122: 8 <02:08> 122:
9 <02:08> 122: 12 <02:08>
**Showed**
[2] 29:20 <10:16> 85: 10
<01:17>
**Showing**
[1] 151: 16 <02:59>
**Shows**
[3] 29:23 <10:16> 79: 6
<11:38> 153: 20 <03:02>
**Side**
[3] 123: 14 <02:12> 123: 18
<02:12> 130: 5 <02:19>
**Sidebar**
[2] 13:4 <09:54> 15: 17
<09:56>
**Signage**

[1] 151: 3 <02:58>
**Signature**
[3] 3:6 6:11 <09:43> 6: 13
<09:44> 6: 15 <09:44> 6: 15
<09:44> 6: 16 <09:44> 6: 21
<09:45> 166: 1 167: 1
**Significantly**
[2] 75:21 <11:32> 101: 14
<01:36>
**Signify**
[1] 154: 8 <03:03>
**Similar**
[2] 127:4 128: 6 <02:17> 132:
17 <02:23> 151: 14 <02:59>
**Simple**
[5] 53:7 <10:52> 56: 20
<10:57> 64: 19 <11:17> 82:
10 <11:41> 142: 19 <02:44>
**Single**
[9] 58:14 <10:59> 89:20
<01:22> 98: 25 <01:34> 144:
23 <02:49> 145: 3 <02:49>
145: 12 <02:49> 145: 19
<02:50> 145: 21 <02:50>
161: 18 <03:13>
**Six**
[4] 8:5 <09:47> 8: 12
<09:47> 9: 5 <09:49> 9: 18
<09:49>
**Size**
[1] 128: 5 <02:17>
**Skill**
[1] 146: 22 <02:52>
**Skilled**
[1] 68: 15 <11:22>
**Sleeping**
[1] 72: 1 <11:27> 72: 3
<11:27>
**Slip**
[1] 43: 1 <10:33>
**Slow**
[1] 106: 23 <01:45>
**Smith**
[11] 19:9 <10:01> 62: 14
<11:06> 64: 20 <11:17> 66: 3
<11:18> 66: 15 <11:19> 66:
18 <11:19> 66: 19 <11:19>
110: 1 <01:50> 136: 14
<02:27> 139: 3 <02:38> 162:
11 <03:13>
**Sold**
[8] 12:18 <09:54> 82: 12
<11:42> 93: 12 <01:27> 93:
20 <01:27> 101: 10 <01:36>
117: 14 <02:00> 144: 24
<02:49> 144: 24 <02:49>
**Sole**
[1] 80:6 <11:39>
**Solely**
[1] 24:23 <10:09>
**Solicit**
[2] 26:10 <10:11> 108: 11
<01:47>
**Someone**
[1] 104: 2 <01:39>
**Sometime**
[7] 33:1 <10:21> 44: 8
<10:35> 55: 4 <10:55> 107:
14 <01:46> 111: 19 <01:53>
112: 3 <01:53> 141: 8
<02:41>
**Sometimes**
[3] 19:2 <10:01> 58: 7
<10:59> 58: 7 <10:59>
**Somewhere**
[7] 8:24 <09:48> 38: 14
<10:28> 57: 13 <10:58> 85: 2
<11:46> 105: 8 <01:41> 109:
14 <01:49> 133: 25 <02:24>
**Soon**
[1] 131: 14 <02:21>
**Sorry**
[22] 4:25 <09:41> 6: 10

<09:43>  26:22 <10:11>  33:3
<10:21>  37:23 <10:27>  43:
11 <10:34>  54:15 <10:54>
64:3 66:2 <11:18>  72:18
<11:28>  84:9 <11:45>  94:19
<01:29>  94:23 <01:29>  102:
19 <01:38>  120: 20 <02:05>
137: 7 <02:28>  138: 11
<02:30>  140: 11 <02:40>
141: 7 <02:41>  150: 6
<02:57>  155: 16 <03:04>
157: 10 <03:09>
**Sort**
[1]  144: 16 <02:48>
**Sources**
[2]  22: 15 <10:05>  121: 24
<02:08>
**Soured**
[1]  149: 9 <02:55>
**SOUTHERN**
[2]  1: 1 168: 1
**Southwestern**
[1]  84: 11 <11:45>
**Span**
[1]  93: 3 <01:27>
**Speaking**
[3]  54: 24 <10:54>  123: 10
<02:11>  153: 5 <03:01>
**Specialize**
[1]  128: 12 <02:17>
**Specialty**
[2]  7: 24 <09:46>  7: 25
<09:46>
**Specific**
[27]  12: 2 <09:53>  50: 10
<10:49>  50: 19 <10:49>  51: 2
<10:50>  55: 9 <10:55>  55: 10
<10:55>  55: 25 <10:56>  57: 1
<10:57>  57: 20 <10:58>  58: 2
<10:58>  58: 3 <10:58>  58: 4
<10:58>  58: 12 <10:59>  58:
14 <10:59>  58: 15 <10:59>
58: 21 <10:59>  59: 7 <11:00>
67: 1 <11:20>  68: 6 <11:21>
68: 11 <11:22>  68: 19
<11:22>  87: 4 <01:19>  87: 12
<01:20>  98: 25 <01:34>  122:
10 <02:08>  123: 6 <02:11>
156: 11 <03:05>
**Specifically**
[11]  33: 15 <10:21>  34:4
<10:22>  34: 10 <10:22>  54:
<10:58>  57: 12 <10:58>
58: 13 <10:59>  59: 2 <11:00>
59: 15 <11:00>  61: 9 <11:04>
125: 4 <02:14>  128: 13
<02:18>
**Specificity**
[1]  23: 23 <10:07>
**Specifics**
[1]  58: 12 <10:59>
**Spectrum**
[1]  130: 5 <02:19>
**Speculate**
[1]  67: 10 <11:20>
**Speculation**
[4]  40: 1 <10:29>  41: 17
<10:32>  164: 2 <03:15>  164:
6 <03:15>
**Spell**
[2]  46: 12 <10:39>  46: 24
<10:40>
**Spelling**
[1]  48: 16 <10:46>
**Spend**
[1]  142: 7 <02:43>
**Spent**
[1]  156: 2 <03:05>
**Split**
[4]  41: 20 <10:32>  41: 23
<10:32>  42: 2 <10:32>  82: 15
<11:42>
**Spoken**

[1]  17: 6 <
**Spouse**
[1]  158: 23 <03:08>
**Square**
[1]  2:4
**Staff**
[1]  9: 25 <09:50>
**Stagnant**
[1]  97: 10 <01:32>
**Stamps**
[1]  166: 6 <01:42>
**Standard**
[8]  104: 18 <01:40>  104: 20
<01:40>  105: 2 <01:41>  105:
17 <01:41>  105: 24 <01:41>
105: 25 <01:41>  125: 5
<02:14>  125: 11 <02:14>
**Standards**
[3]  96: 19 <01:31>  125: 7
<02:14>  125: 12 <02:14>
**Start**
[11]  6: 12 <09:43>  32:9
<10:20>  78: 14 <11:37>  87:
15 <01:20>  87: 24 <01:20>
97: 5 <01:32>  107: 10
<01:46>  107: 18 <01:46>
119: 25 <02:04>  140: 11
<02:40>  147: 10 <02:40>
**Started**
[18]  8: 18 <09:47>  10: 25
<09:51>  32: 11 <10:20>  46: 6
<10:39>  70: 23 <11:25>  71: 9
<11:26>  101: 20 <01:37>
115: 19 <01:58>  119: 22
<02:03>  120: 12 <02:04>
123: 9 <02:11>  141: 2
<02:41>  141: 6 <02:41>  156:
12 <03:05>  156: 14 <03:06>
156: 17 <03:06>  157: 4
<03:06>  157: 5 <03:06>
**Starting**
[1]  59: 7 <11:00>
**State**
[5]  1: 19 4: 5 <09:40>  167: 8
167: 15 168: 13
**Statement**
[23]  23: 11 <10:07>  31: 23
<10:19>  48: 25 <10:46>  78:
12 <11:36>  79: 2 <11:38>  79:
3 <11:38>  79: 4 <11:38>  79:
19 <11:39>  80: 3 <11:39>  80:
4 <11:39>  84: 14 <11:45>  85:
3 <11:46>  90: 1 <01:23>  96:
13 <01:31>  114: 15 <01:56>
116: 4 <01:59>  124: 19
<02:13>  131: 5 <02:21>  135:
19 <02:26>  136: 3 <02:27>
141: 17 <02:42>  154: 23
<03:03>  160: 16 <03:10>
**Statements**
[49]  31: 13 <10:18>  31: 16
<10:18>  31: 18 <10:18>  31:
23 <10:19>  37: 1 <10:25>  37:
6 <10:26>  39: 13 <10:29>  44:
16 <10:36>  62: 5 <11:06>  62:
9 <11:06>  63: 10 <11:15>  63:
13 <11:15>  64: 24 <11:17>
64: 25 <11:17>  65: 6 <11:18>
69: 17 <11:24>  72: 22
<11:28>  78: 16 <11:38>  79:
12 <11:39>  79: 16 <11:39>
79: 20 <11:39>  80: 8 <11:39>
85: 11 <01:17>  89: 2 <01:22>
89: 21 <01:22>  92: 25
<01:26>  97: 16 <01:32>  97:
22 <01:33>  124: 8 <02:13>
124: 21 <02:13>  124: 24
<02:13>  140: 3 <02:39>  140:
4 <02:39>  140: 5 <02:39>
140: 6 <02:39>  140: 9
<02:40>  140: 10 <02:40>
141: 21 <02:42>  141: 25
<02:42>  146: 3 <02:51>  163:
2 <03:14>  163: 8 <03:14>
163: 13 <03:14>  163: 17

<03:14>  164:18 <03:16>
164:22 <03:16>  164:24
<03:16>
**STATES**
[2]  1: 1 168: 1
**Status**
[1]  12:16 <09:54>
**Stay**
[2]  134:3 <02:24>  134:12
<02:24>
**Stayed**
[1]  163:22 <03:15>
**Stays**
[3]  132: 10 <02:22>  132:17
<02:23>  133:7 <02:23>
**Step**
[3]  99:19 <01:34>  101:20
<01:37>  114:11 <01:56>
**Stephen**
[15]  3:3 1:11 1:14 3:3 4:1 4:7
<09:40>  5:13 <09:42>  5:19
<09:42>  76:19 <11:33>  167:
1 167:4 167:10 168:3 168:9
168:15
**Stepping**
[1]  23:5 <10:06>
**Steve**
[18]  46:11 <10:39>  48:16
<10:46>  53:10 <10:53>  54:8
<10:53>  54:14 <10:54>  58:
22 <10:59>  146:13 <02:51>
164:23 <03:16>
**Still**
[23]  7:6 <09:45>  19:12
<10:01>  20:13 <10:03>  20:
14 <10:03>  22:5 <10:05>  22:
8 <10:05>  23:12 <10:07>  39:
22 <10:24>  41:13 <10:31>
43:20 <10:33>  68:8 <11:21>
79:14 <11:39>  94:24
<01:29>  97:25 <01:33>  106:
21 <01:45>  106:25 <01:45>
138:23 <02:38>  138:25
<02:38>  144:12 <02:47>
145:8 <02:49>  147:20
<02:53>  159:25 <03:09>
160:19 <03:10>
**Stipulations**
[1]  3:8
**Stop**
[4]  22:3 <10:05>  138:11
<02:30>  145:7 <02:49>  145:
10 <02:49>
**Stopped**
[1]  120:9 <02:04>
**Stracer**
[2]  44:23 <10:37>  50:17
<10:49>
**Street**
[1]  169:7
**Strike**
[1]  12:7 <09:53>
**Stronger**
[2]  111:17 <01:52>  111:18
<01:52>
**Structure**
[3]  22:7 <10:05>  120:17
<02:04>  148:5 <02:54>
**Study**
[1]  86:25 <01:19>
**Stuff**
[7]  16:15 <09:57>  30:24
<10:17>  89:1 <01:22>  108:
12 <01:47>  113:23 <01:55>
118:25 <02:02>  121:11
<02:05>
**Styled**
[1]  1:16
**Sub**
[1]  161:19 <03:13>
**Subagent**
[4]  26:6 <10:10>  63:24
<11:16>  64:17 <11:17>  93:

14   7>
**Subagents**
[4]  56:5 <10:56>  70:14
<11:25>  93:14 <01:27>  156:
5 <03:05>
**Subject**
[3]  25:14 <10:09>  26:2
<10:10>  88:22 <01:21>
**Subpoena**
[3]  3:16 4:14 <09:41>  4:16
<09:41>  5:4 <09:42>  30:12
<10:17>  44:2 <10:35>  44:3
<10:35>
**Subscribed**
[1]  167:11
**Subtracted**
[1]  49:24 <10:48>
**Suffered**
[2]  25:3 <10:09>  25:21
<10:10>
**Suit**
[2]  26:5 <10:10>  67:12
<11:20>
**Suite**
[5]  1:20 2:4 2:9 2:13 169:7
**Summary**
[3]  91:5 <01:24>  91:8
<01:24>
**Summation**
[2]  36:8 <10:24>  36:12
<10:25>  84:7 <11:45>
**Summer**
[9]  19:23 <10:02>  111:20
<01:53>  112:3 <01:53>  140:
23 <02:40>  141:9 <02:41>
156:24 <03:06>
**Supplement**
[1]  15:4 <09:56>
**Supplied**
[5]  5:21 <09:42>  31:19
<10:18>  33:7 <10:21>  42:5
<10:32>  69:18 <11:24>
**Supply**
[1]  61:7 <11:04>
**Support**
[7]  65:5 <11:18>  69:13
<11:23>  75:6 <11:31>  75:8
<11:32>  123:23 <02:12>
124:5 <02:12>  158:8
<03:08>
**Supported**
[1]  123:21 <02:12>
**Supporting**
[1]  42:10 <10:33>
**Suppose**
[2]  9:21 <09:50>  123:24
<02:12>
**Supposed**
[3]  10:25 <09:51>  30:25
<10:17>  61:17 <11:05>
**Surmises**
[1]  29:22 <10:16>
**Surround**
[1]  18:3 <09:59>
**Surrounding**
[1]  18:1 <09:59>
**Sworn**
[1]  4:2
**Sylvia**
[10]  20:10 <10:03>  20:13
<10:03>  65:18 <11:18>  66:
21 <11:19>  67:1 <11:20>
110:7 <01:50>  110:8
<01:50>  111:1 <01:51>  137:
12 <02:29>  162:7 <03:13>
**System**
[2]  129:19 <02:19>  151:20
<02:59>

**T**

**Take-home**
[1]  160:19 <03:10>

**Talks**
[2]  132: 16 <02:22>  136: 13
<02:27>
**Tape**
[1]  42: 16 <10:33>
**Tax**
[11]  3: 17 6:2 <09:43>  6:6
<09:43>  6: 11 <09:43>  8: 14
<09:47>  93: 19 <01:27>  121:
14 <02:06>  121: 18 <02:06>
121: 20 <02:06>  122: 7
<02:08>  122: 8 <02:08>
**Teacher**
[7]  23: 18 <10:07>  23: 19
<10:07>  23: 20 <10:07>  24: 2
<10:08>  68: 4 <11:21>  115:
11 <01:58>  155: 15 <03:04>
**Teachers**
[1]  41: 20 <10:32>  100: 7
<01:35>
**Teachers'**
[34]  7: 9 <09:46>  7: 10 7: 11
<09:46>  7: 21 <09:46>  7: 22
<09:46>  8: 17 <09:47>  8: 23
<09:48>  18: 10 <09:59>  19:
22 <10:02>  21: 18 <10:04>
22: 5 <10:05>  24: 24 <10:09>
26: 10 <10:11>  49: 6 <10:47>
49: 15 <10:48>  50: 5 <10:48>
75: 11 <11:32>  75: 15
<11:32>  75: 18 <11:32>  75:
23 <11:32>  76: 16 <11:33>
98: 21 <01:34>  108: 25
<01:48>  112: 12 <01:54>
112: 21 <01:54>  112: 24
<01:54>  114: 6 <01:55>  120:
14 <02:04>  143: 19 <02:46>
147: 15 <02:52>  147: 18
<02:53>  147: 23 <02:52>
150: 4 <02:57>  150: 6
<02:57>
**Teaching**
[6]  23: 12 <10:07>  23: 24
<10:08>  24: 1 <10:08>  24: 3
<10:08>  70: 12 <11:25>  87:
16 <01:20>
**Team**
[4]  20: 6 <10:02>  47: 15
<10:41>  47: 25 <10:42>  130:
4 <02:19>
**Tecum**
[2]  3: 16 5: 5 <09:42>  5: 7
<09:42>
**Temporarily**
[1]  26: 1 <10:10>
**Ten**
[57]  9: 5 <09:49>  19: 6
<10:01>  51: 4 <10:49>  51: 9
<10:50>  52: 1 <10:51>  52: 8
<10:51>  52: 11 <10:51>  52:
12 <10:51>  52: 21 <10:51>
57: 13 <10:58>  61: 22
<11:05>  62: 2 <11:06>  69: 2
<11:23>  69: 10 <11:23>  69:
21 <11:24>  70: 2 <11:24>  70:
6 <11:24>  70: 8 <11:24>  70:
20 <11:25>  71: 1 <11:25>  71:
19 <11:27>  72: 3 <11:27>  72:
11 <11:28>  72: 14 <11:28>
72: 20 <11:28>  73: 11
<11:29>  73: 12 <11:29>  73:
23 <11:30>  77: 13 <11:35>
77: 25 <11:35>  78: 1 <11:35>
78: 9 <11:36>  78: 9 <11:36>
92: 24 <01:26>  96: 19
<01:31>  101: 3 <01:36>  102:
14 <01:38>  102: 16 <01:38>
104: 19 <01:40>  105: 24
<01:41>  115: 5 <01:57>  115:
5 <01:57>  115: 15 <01:58>
115: 19 <01:58>  125: 4
<02:14>  125: 8 <02:14>  139:
20 <02:39>  134: 23 <02:39>
142: 18 <02:44>  144: 24
<02:49>  145: 17 <02:50>
153: 21 <03:02>  153: 23

<03:03>   153:24 <03:03>
154:17 <03:03>   157.3
<03:06>   161:10 <03:20>

**Term**
[2] 81:7 <11:40>   110:23
<01:51>

**Terms**
[3] 111:19 <01:53>   120:7
<02:04>   154:5 <03:03>

**Testified**
[3] 4:2 116:19 <01:59>   154:2
<03:03>

**Testify**
[5] 24:22 <10:09>   25:23
<10:10>   26:4 <10:10>   27:15
<10:12>   152:1 <02:59>

**Testifying**
[1] 25:10 <10:09>

**Testimony**
[9] 25:1 <10:09>   57:25
<10:58>   92:22 <01:26>   105:
22 <01:41>   114:16 <01:56>
141:24 <02:43>   154:21
<03:03>   156:25 <03:06>
164:4 <03:15>

**Texas**
[25] 1:1 1:19 1:21 2:5 2:9 2:14
7:6 <09:45>   7:7 46:1
<10:39>   46:3 <10:39>   46:4
<10:39>   46:8 <10:39>   52:25
<10:52>   126:12 <02:16>
126:25 <02:16>   127:21
<02:17>   130:15 <02:20>
130:19 <02:20>   130:20
<02:20>   167:8 167:15 168:1
168:13 169:5 169:7

**Theirs**
[2] 162:24 <03:14>   163:1
<03:14>

**Themselves**
[3] 65:8 <11:18>   133:22
<02:24>   133:24 <02:24>

**Therefore**
[1] 52:11 <10:51>

**Therein**
[1] 1:23 167:12

**Thinking**
[1] 159:9 <03:08>

**Third**
[2] 109:25 <01:49>   116:9
<01:59>

**Thomas**
[2] 47:4 <10:40>   54:9
<10:54>

**Thoroughly**
[1] 29:2 <10:15>

**Thoughts**
[1] 33:13 <10:21>

**Thousand**
[2] 141:18 <10:32>   142:25
<02:45>

**Three**
[36] 5:1 <09:41>   10:2
<09:50>   27:4 <10:11>   27:25
<10:13>   28:2 <10:13>   30:18
<10:17>   30:16 <10:23>   36:8
<10:24>   38:18 <10:28>   41:
20 <10:32>   61:25 <11:05>
62:12 <11:06>   64:19
<11:17>   64:22 <11:17>   65:1
<11:17>   65:11 <11:18>   70:
24 <11:25>   86:20 <01:19>
94:25 <01:29>   101:10
<01:36>   102:12 <01:37>
102:13 <01:38>   116:13
<01:59>   125:15 <02:15>
132:21 <02:23>   133:6
<02:23>   133:11 <02:23>
133:21 <02:24>   133:25
<02:24>   134:11 <02:24>
135:7 <02:26>   136:6
<02:27>   136:10 <02:27>
150:11 <02:57>   151:2
<02:58>   161:21 <03:13>

**Threw**
[3] 49:22 <10:48>   72: 18
<11:28>   142: 21 <02:44>

**Throughout**
[1] 130: 15 <02:20>

**Thursday**
[1] 151: 2 <02:58>

**Title**
[1] 117: 21 <02:00>

**Today**
[28] 4:9 <09:40>   22: 20
<10:06>   22:24 <10:06>   23:
21 <10:07>   25: 5 <10:09>   25:
7 <10:09>   25: 10 <10:09>   25:
15 <10:09>   28: 9 <10:14>   29:
7 <10:15>   32:2 <10:19>   33:
20 <10:22>   34: 1 <10:22>   34:
5 <10:22>   34: 9 <10:22>   34:
19 <10:23>   36:3 <10:23>
44: 3 <10:35>   57: 22 <10:58>
68:3 <11:21>   72: 25 <11:28>
77:24 <11:29>   90: 17
<01:24>   98:3 <01:33>   114:
17 <01:56>   116: 12 <01:59>
116: 14 <01:59>   142: 3
<02:43>

**Together**
[8] 7:1 <09:45>   35: 19
<10:23>   55: 1 <10:55>   56:9
<10:56>   90: 5 <01:23>   103:
20 <01:39>   103: 25 <01:39>
161:3 <03:13>

**Tons**
[1] 147: 1 <02:52>

**Took**
[11] 11: 7 <09:52>   14: 10
<09:55>   60: 10 <11:02>   61:
24 <11:05>   70: 23 <11:25>
114: 9 <01:56>   136: 6
<02:27>   136: 7 <02:27>   143:
7 <02:45>   148: 13 <02:54>
151: 7 <02:58>

**Top**
[4] 102: 9 <01:37>   129: 7
<02:18>   134: 18 <02:25>
136: 6 <02:27>

**Topics**
[3] 128: 23 <02:18>   128: 25
<02:18>   129: 6 <02:18>

**Total**
[10] 36: 14 <10:25>   36: 18
<10:25>   80: 17 <11:40>   90: 6
<01:23>   101: 8 <01:36>   123:
12 <02:12>   123: 25 <02:12>
124: 17 <02:12>   142: 10
<02:43>   142: 16 <02:44>

**Totaled**
[1] 89: 25 <01:23>

**Totally**
[3] 14: 22 <09:56>   15:3
<09:56>   95: 13 <01:30>

**Totals**
[5] 123: 3 <02:11>   123: 4
<02:11>   123: 5 <02:11>   123:
7 <02:11>   123: 10 <02:12>

**TPA**
[1] 50: 18 <10:49>

**Track**
[5] 29:20 <10:16>   67: 11
<11:20>   101: 1 <01:36>   107:
4 <01:45>   153: 19 <03:02>

**Trade**
[10] 33: 12 <10:21>   33: 18
<10:22>   33: 19 <10:22>   34: 4
<10:22>   36: 13 <10:25>   44:
18 <10:38>   44: 19 <10:37>
58: 6 <10:59>   64: 8 <11:21>
121: 25 <02:08>

**Trailer**
[5] 51: 6 <10:50>   52: 3
<10:51>   52: 4 <10:51>   52: 8
<10:51>   52: 13 <10:51>

**Trailers**
[3] 56: 6 <10:56>   121: 10

<02:05>   121: 24 <02.08>

**Training**
[5] 44: 17 <10:36>   54: 24
<10:54>   134: 2 <02:24>   155:
11 <03:04>   155: 12 <03:04>

**Transcript**
[1] 3:8

**Transcription**
[1] 168: 14

**Transferred**
[2] 106: 22 <01:45>   152: 6
<03:03>

**Transformation**
[1] 120: 11 <02:04>

**Transition**
[1] 156: 21 <03:06>

**Trial**
[4] 5: 17 <09:42>   15: 8
<09:56>   25: 24 <10: 10>   27:
15 <10:12>

**Tried**
[1] 108: 4 <01:47>

**Trips**
[1] 106: 7 <01:42>

**Troy**
[2] 44: 23 <10:37>   50: 17
<10:49>

**True**
[10] 48: 25 <10:46>   78: 12
<11:36>   79: 19 <11:39>   80:3
<11:39>   80: 4 <11:39>   147:
15 <02:53>   153: 1 <03:01>
153: 4 <03:01>   167: 2 168: 14

**Try**
[7] 4: 12 <09:41>   32:6
<10:19>   71: 14 <11:26>   71:
17 <11:26>   81: 17 <11:40>
84: 2 <11:45>   107: 23
<01:46>

**Trying**
[7] 54: 11 <10:54>   58: 19
<10:59>   96: 11 <01:31>   101:
20 <02:08>   107: 19 <01:46>
133: 3 <02:23>   149: 7
<02:55>

**TSA**
[2] 98: 9 <01:33>   105: 17
<01:41>

**TSA-1**
[1] 98: 12 <01:33>

**TSAs**
[2] 93: 17 <01:27>   98: 8
<01:33>

**Turn**
[1] 30: 5 <10:16>

**Turned**
[5] 29: 11 <10:15>   29: 18
<10:16>   30: 4 <10:16>   30: 7
<10:16>   143: 25 <02:47>

**Two**
[34] 19: 5 <10:01>   27:6
<10:12>   30: 17 <10:17>   35:
18 <10:24>   35: 23 <10:24>
38: 18 <10:28>   41: 23
<10:32>   69: 25 <11:24>   86:
17 <01:18>   88: 7 91: 1
<01:24>   93: 14 <01:27>   94:
25 <01:29>   98: 19 <01:33>
104: 2 106: 24 <01:45>
108: 19 <01:48>   108: 22
<01:48>   109: 5 <01:48>   109:
9 <01:48>   116: 18 <01:59>
120: 3 <02:04>   121: 5
<02:05>   136: 18 <02:27>
144: 16 <02:48>   145: 25
<02:50>   151: 13 <02:58>
153: 3 <03:01>   158: 9 <03:07>
158: 9 159: 8 159: 13
<03:09>   161: 25 <03:13>
164: 17 <03:16>

**Two-and-a-half**
[2] 120: 5 <02:04>   164: 17
<03:16>

T)
[7] 22: 17 <10:06>   27: 19
<10:12>   51: 8 <10:50>   57: 22
<10:58>   60: 14 <11:02>   92:
23 <01:26>   137: 10 <02:28>

**Typed**
[2] 43: 8 <10:34>   160: 7
<03:10>

**Types**
[2] 133: 19 <02:24>   155: 19
<03:04>

**Typewriter**
[1] 43: 9 <10:34>

**Typewritten**
[2] 49: 12 <10:47>   91: 2
<01:24>

---

**U**

**Unable**
[2] 15: 5 <09:56>   149: 8
<02:55>

**Under**
[3] 156: 5 <03:05>   161: 18
<03:13>   167: 13

**Understood**
[1] 24: 21 <10:09>

**Unique**
[2] 128: 11 <02:17>   129: 19
<02:18>

**United**
[3] 1: 1 100: 7 <01:35>   168: 1

**Universal**
[4] 84: 20 <11:46>   100: 11
<01:35>   101: 10 <01:36>
141: 18 <02:42>

**Unless**
[3] 13: 19 21: 19 <10:04>

**Up**
[41] 19: 2 <10:01>   22: 21
<10:06>   37: 3 <10:26>   38: 19
<10:28>   39: 11 <10:29>   49:
16 <10:48>   53: 11 <10:53>
61: 10 <11:04>   64: 18
<11:17>   64: 21 <11:17>   66:
6 <11:19>   68: 14 <11:22>   71:
1 <11:25>   73: 6 <11:29>   73:
13 <11:29>   73: 23 <11:30>
74: 18 <11:31>   75: 4 <11:31>
76: 4 <11:33>   86: 4 <01:18>
88: 18 <01:23>   89: 5 <01:22>
92: 7 <01:26>   94: 20 <01:26>
100: 5 <01:35>   101: 5
<01:36>   105: 3 <01:41>   108:
22 <01:48>   115: 25 <01:58>
121: 16 <02:06>   124: 9
<02:12>   124: 17 <02:13>
139: 3 <02:38>   140: 23
<02:40>   146: 20 <02:52>
147: 15 <02:53>   152: 4
<03:00>   159: 21 <03:09>
160: 22 <03:10>

**UTA**
[4] 44: 25 <10:37>   50: 17
<10:49>   100: 7 <01:35>   143:
6 <02:45>

**Utilities**
[1] 150: 19 <02:57>   150: 23
<02:57>

---

**V**

**Vague**
[4] 55: 8 <10:55>   118: 23
<02:02>   127: 25 <02:17>
144: 5 <02:47>

**Valentin**
[5] 1: 4 8: 11 <09:47>   82: 20
<11:42>   107: 9 <01:46>   109:
2 <01:48>   109: 18 <01:49>
<01:49> 110: 4
<01:50>   168: 4

**Valley**
[11] 18: 7 <09:59>   20: 25
<10:04>   65: 3 <11:18>   72: 23

<11:28>   110: 2 <01:50>   126:
15 <02:16>   126: 24 <02:16>
128: 7 129: 23 <02:19>   129: 25
<02:19>   130: 8 <02:19>

**Value**
[1] 141: 1 <02:42>

**Van**
[1] 109: 12 <01:48>

**Variables**
[3] 18: 20 <10:00>   88: 11
<01:21>   88: 16 <01:21>

**Variation**
[1] 9: 3 <09:48>

**Varied**
[1] 9: 2 <09:48>

**Varies**
[1] 150: 24 <02:58>

**Variety**
[1] 98: 11 <01:33>

**Various**
[6] 36: 15 <10:25>   47: 14
<10:41>   100: 2 <01:35>   117:
22 <02:00>   117: 24 <02:00>
155: 12 <03:04>

**Vast**
[1] 115: 9 <01:57>

**Vendors**
[5] 3: 18 25: 12 <10:09>   25: 25
<10:10>   26: 19 <10:11>   27:
16 <10:12>

**Ventured**
[1] 107: 23 <01:46>

**Verify**
[2] 37: 9 <10:26>   116: 24
<02:00>

**Version**
[1] 49: 12 <10:47>

**Vertical**
[2] 147: 14 <02:53>   147: 20
<02:53>

**Vice-presidents**
[2] 44: 20 <10:37>   111: 11
<01:52>

**Viewing**
[1] 29: 9 <10:15>

**Violate**
[1] 13: 8 <09:55>

**Visiting**
[1] 107: 18 <01:46>

**Viva**
[1] 100: 10 <01:35>

**Volume**
[4] 1: 12 69: 3 <11:23>   139: 20
<02:39>   168: 10

**Volumes**
[3] 49: 21 <10:48>   79: 12
<11:39>   79: 12 <11:39>

**Voluminous**
[1] 78: 15 <11:38>

**VS**
[2] 1: 5 168: 5

---

**W**

**W-2**
[1] 122: 16 <02:10>

**Waco**
[1] 47: 24 <10:42>

**Wait**
[5] 67: 21 <11:21>   67: 23 73: 2
<11:29>   73: 2 <11:29>   117:
10

**Waiting**
[1] 113: 6 <01:54>

**Wants**
[1] 147: 4 <02:52>

**Water**
[2] 24: 17 <10:08>   48: 12
<10:43>

**Ways**
[1] 41: 21 <10:32>

**Week**

**[3]** 90: 15 <01:24> 124: 16
<02:13> 136: 21 <02:27>

**Weekend**
**[1]** 155: 5 <03:04>

**Weekly**
**[1]** 57: 19 <10:58>

**West**
**[1]** 2: 9

**White**
**[2]** 108: 15 <01:47> 108: 17
<01:47>

**Whole**
**[8]** 16: 14 <09:57> 20: 6
<10:02> 87: 16 <01:20> 128:
19 <02:18> 140: 19 <02:40>
140: 25 <02:41> 141: 3
<02:41> 149: 9 <02:55>

**Wholesale**
**[2]** 18: 23 <10:00> 21: 5
<10:04>

**Wife**
**[1]** 158: 6 <03:08>

**WILLETTE**
**[1]** 2: 13

**Wise**
**[1]** 109: 21 <01:49>

**Witache**
**[1]** 36: 23 <10:25>

**Witness**
**[8]** 1: 15 36: 19 <10:25> 95: 14
<01:30> 104: 15 <01:40>
132: 4 <02:22> 138: 11
<02:30> 154: 25 <03:04>
167: 12

**Witness's**
**[4]** 57: 25 <10:58> 105: 22
<01:41> 154: 21 <03:03>
164: 4 <03:15>

**Wolfe**
**[4]** 20: 18 <10:03> 45: 16
<10:38> 52: 18 <10:52> 127:
16 <02:17>

**Word**
**[1]** 136: 1 <02:26>

**Words**
**[4]** 13: 1 <09:54> 125: 11
<02:14> 125: 12 <02:14>
147: 6 <02:53>

**Works**
**[3]** 52: 22 <10:52> 67: 20
<11:21> 68: 13 <11:22>

**World**
**[1]** 67: 3 <11:20>

**Worth**
**[1]** 43: 2 <10:33>

**Write**
**[18]** 12: 20 <09:54> 14: 4
<09:55> 17: 12 <09:58> 17:
13 <09:58> 20: 16 <10:03>
36: 15 <10:25> 57: 22
<10:58> 69: 23 <11:24> 70:
10 <11:25> 98: 18 <01:33>
98: 19 <01:33> 98: 20
<01:34> 99: 2 <01:34> 103:
14 <01:39> 109: 6 <01:48>
118: 19 <02:02> 149: 8
<02:55> 161: 8 <03:12>

**Writes**
**[1]** 21: 20

**Writing**
**[13]** 28: 4 <10:14> 39: 20
<10:29> 40: 4 <10:29> 59: 2
<11:00> 91: 25 <01:25> 97: 1
<01:32> 98: 17 <01:33> 100:
12 <01:35> 100: 13 <01:35>
137: 5 <02:28> 141: 19
<02:42> 141: 21 <02:42>

**Writings**
**[2]** 28: 8 <10:14>

**Written**
**[11]** 15: 25 <09:56> 19: 3
<10:01> 22: 6 <10:05> 36: 15
<10:25> 38: 22 <10:28> 38:

23 <10:28> ...25 <10:32>
94: 16 <01:29> 114: 1
<01:55> 114: 2 <01:55> 149:
12 <02:55>

**Wrote**
**[6]** 40: 16 <10:30> 73: 3
<11:29> 81: 21 <11:41> 82:
18 <11:42> 134: 24 <02:26>
134: 25 <02:26>

**Wyoming**
**[4]** 41: 10 <10:31> 41: 13
<10:31> 41: 16 <10:31> 130:
17 <02:20>

**Y**

**Year**
**[98]** 8: 17 <09:47> 8: 23
<09:48> 9: 2 <09:48> 11: 2
<09:51> 36: 9 <10:24> 36: 13
<10:25> 40: 20 <10:30> 40:
21 <10:30> 41: 16 <10:31>
56: 3 <10:56> 59: 4 <11:00>
59: 11 <11:00> 59: 13
<11:00> 59: 15 <11:00> 59:
15 <11:00> 59: 18 <11:01>
61: 11 <11:04> 61: 23
<11:05> 62: 3 <11:06> 64: 20
<11:17> 64: 23 <11:17> 65: 1
<11:17> 68: 11 <11:22> 68:
19 <11:22> 68: 24 <11:22>
69: 3 <11:23> 69: 4 <11:23>
69: 5 <11:23> 69: 8 <11:23>
69: 9 <11:23> 69: 21 <11:24>
69: 24 <11:24> 70: 3 <11:24>
70: 7 <11:24> 70: 8 <11:24>
70: 21 <11:25> 70: 25
<11:25> 71: 7 <11:26> 71: 14
<11:26> 71: 18 <11:27> 72: 7
<11:27> 72: 8 <11:28> 74: 13
<11:31> 80: 14 <11:39> 80:
17 <11:40> 81: 4 <11:40> 81:
10 <11:40> 81: 18 <11:40>
81: 22 <11:41> 82: 1 <11:41>
84: 12 <11:45> 84: 15
<11:46> 84: 24 <11:46> 86: 7
<01:18> 86: 16 <01:18> 88:
21 <01:21> 96: 23 <01:32>
96: 25 <01:32> 97: 9 <01:32>
97: 11 <01:32> 97: 12
<01:32> 99: 13 <01:34> 107:
24 <01:46> 113: 1 <01:54>
115: 18 <01:58> 115: 18
<01:58> 115: 20 <01:58>
115: 21 <01:58> 118: 21
<02:02> 119: 11 <02:03>
121: 8 <02:05> 123: 6
<02:11> 123: 11 <02:11>
123: 11 <02:11> 123: 22
<02:12> 124: 1 <02:12> 134:
3 <02:24> 136: 9 <02:27>
136: 10 <02:27> 136: 15
<02:27> 139: 20 <02:39>
139: 23 <02:39> 140: 17
<02:40> 140: 19 <02:40>
140: 21 <02:40> 140: 22
<02:40> 140: 24 <02:41>
140: 25 <02:41> 141: 1
<02:41> 141: 3 <02:41> 141:
6 <02:41> 142: 24 <02:44>
143: 7 <02:45> 148: 14
<02:54> 149: 11 <02:55>
156: 11 <03:05> 161: 25
<03:13> 162: 5 <03:13>

**Year's**
**[2]** 161: 11 <03:12> 161: 12
<03:12>

**Year-to-date**
**[1]** 80: 17 <11:40>

**Yearly**
**[1]** 80: 16 <11:40>

**Years**
**[38]** 69: 25 <11:24> 71: 8
<11:26> 74: 12 <11:31> 74:
15 <11:31> 74: 17 <11:31>
74: 18 <11:31> 81: 21
<11:41> 86: 17 <01:18> 86:
17 <01:18> 86: 20 <01:19>

87: 14 <01:20> 104: 17
<01:40> 108: 17 <01:47>
109: 15 <01:49> 115: 15
<01:58> 117: 22 <02:00>
117: 25 <02:00> 120: 3
<02:04> 120: 5 <02:04> 125:
16 <02:15> 132: 10 <02:22>
132: 17 <02:23> 133: 7
<02:23> 134: 1 <02:24> 134:
12 <02:24> 144: 17 <02:48>
145: 25 <02:50> 151: 13
<02:58> 152: 10 <03:00>
152: 15 <03:00> 154: 18
<03:03> 157: 10 <03:07>
157: 11 <03:07> 159: 20
<03:09> 159: 21 <03:09>
161: 25 <03:13> 163: 23
<03:15> 164: 17 <03:16>

**York**
**[1]** 116: 3 <01:58>

**You-all**
**[1]** 8: 7 <09:47>

**Yourself**
**[5]** 49: 5 <10:47> 71: 8
<11:26> 103: 17 <01:39>
113: 9 <01:55> 155: 6
<03:04>

**Z**

**Zamora**
**[1]** 108: 15 <01:47>

**Zero**
**[1]** 103: 12 <01:38>

**Zeros**
**[1]** 101: 4 <01:36>

**ZUNIGA**
**[3]** 1: 18 168: 12 169: 5

# EXHIBIT "2"

Deposition Notice of Stephen Andrus

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | § | |
| FERNANDO DE PENA, | § | |
| VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a Partnership | § | |
| | § | |
| | § | |
| vs. | § | B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | |
| and EDDIE ERRISURIZ, JR. | § | |

---

DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S
NOTICE OF INTENTION TO TAKE THE ORAL DEPOSITION OF
STEPHEN M. ANDRUS, PLAINTIFF EXPERT,
WITH SUBPOENA DUCES TECUM

---

TO:    Stephen M. Andrus, Plaintiff, by and through his attorneys of record:

J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

**PLEASE TAKE NOTICE** that commencing at 9:30 a.m. on March 10, 2004, and continuing thereafter from day to day until completed, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, its employees, agents and all those acting in concert or at their discretion, Defendant in the above-styled and numbered cause, will take the oral deposition of STEPHEN M. ANDRUS, Plaintiff Expert, at THE LAW OFFICES OF ARNOLD AGUILAR, Artemis Square, Suite H-2, 1200 Central Boulevard, Brownsville, Texas 78520 before, a duly authorized court reporter from Hill & Romero.

Pursuant to the Texas Rules of Civil Procedure, you are further advised that this deposition may be recorded on videotape, in addition to the usual stenographic recording.

PLEASE TAKE FURTHER NOTICE that, in connection with the taking of this deposition, STEPHEN M. ANDRUS is to produce at the commencement of the taking of this deposition the following documents: (See Exhibit A).

You are invited to attend and cross-examine the witness.

Respectfully submitted,

ROERIG, OLIVEIRA & FISHER, LLP
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

By: _____
    Elizabeth G. Neally
    State Bar No. 14840400
    Federal Bar No. 8044

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certifies that a true and correct copy of the foregoing *Defendant's Notice of Intention to Take the Oral Deposition of Plaintiff-Expert Stephen M. Andrus with Subpoena Duces Tecum* has been served upon counsel of record by Certified Mail, Return Receipt Requested, on this 3rd day of March, 2004, to wit:

Mr. J. Arnold Aguilar
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520
Via Facsimile: (956) 504-1408
and CMRRR: 7160 3901 9848 1267 9252

Ms. Eileen Leeds
Mr. Charles V. Willette, Jr.
WILLETTE & GUERRA
1534 East 6th Street, Suite 200
Brownsville, Texas 78521
Via Facsimile: (956) 541-1893

Elizabeth G. Neally

Defendant BISD's Notice of Deposition With Subpoena Duces Tecum to Stephen M. Andrus, Plaintiff Expert
83164 - Depo [J-andrus-Pl Expert]

Page 2

# EXHIBIT "A"

## SUBPOENA DUCES TECUM

Any and all documents you received, reviewed or created, including notes and computer generated files and calculations, in reaching the conclusions that you provided to Dr. Stephen M. Horner in this lawsuit.

Any and all documents that you intend to rely on or will review prior to rendering an opinion concerning your damages or the damages for other Plaintiffs in this case in the trial of this cause.

Any and all documents which establish that you are qualified to act as expert to render opinions reached in Dr. Stephen M. Horner's report in this case.

# EXHIBIT "3"

Exhibits "8" and "9" of Dr. Horner's Deposition



| 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|
| 1) 6,497.86 | 1) ▉▉▉ | 1) 13,729.88 | 1) |
| 2) 9,865.41 | 2) ▉▉▉ | 2) ▉▉▉ | 2) |
| 3) 12,831.21 | 3) ▉▉▉ | 3) ▉▉▉ | 3) |
| 4) 17,816.53 | 4) 17,096.82 | 4) 14,819.58 | 4) |
| 47,011.01 | ▉▉▉ | ▉▉▉ | |
| J) 1,986.20 | J) ▉▉▉ | J) 6,156.02 | J) 1,971.53 |
| F) 1,785.13 | F) ▉▉▉ | F) 1,892.35 | F) ▉▉▉ |
| M) 2,726.43 | M) ▉▉▉ | M) 5,681.43 | |
| A) 2,441.05 | A) ▉▉▉ | A) ▉▉▉ ← Wyoming | |
| M) 3,040.36 | M) ▉▉▉ | M) 5,189.91 | |
| J) 4,384.00 | J) 3,539.61 | J) 2,816.05 | |
| J) 3,885.88 | J) ▉▉▉ | J) ▉▉▉ ← oil service for retirees – larger pt over split 3 ways. | |
| A) 5,307.90 | A) 4,699.25 | A) ▉▉▉ | |
| S) 3,637.43 | S) ▉▉▉ | S) 2,499.55 | |
| O) 3,733.78 | O) ▉▉▉ | O) 4,248.59 | |
| N) 8,410.27 | N) 4,431.92 | N) 3,701.63 | |
| D) 5,672.48 | D) 4,992.61 | D) 6,861.36 | |
| | + 54% | + 22% | |

Receipts
- Some of broker or loans advances
- May not be on 1099 for that year. Would be in following yr as premium pmts made.
- Some carrier put it on 1099's



Horner

EXHIBIT NO. 8
9/18/03
Hill & Romero



| 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|
| 1) 6,497.86 | 1) ~~18,942.27~~ | 1) 13,729.31 | 1) |
| 2) 9,865.41 | 2) ~~15,34~~ | 2) | 2) |
| 3) 12,831.21 | 3) ~~22,075~~ | 3) ~~2,734~~ | 3) |
| 4) 17,816.53 | 4) 17,096.82 | 4) 14,819.58 | 4) |
| 47,011.01 | | | |
| J) 1,986.20 | J) | J) 6,156.10 | J) 1,971.53 |
| F) 1,785.13 | F) | F) 1,892.35 | F) |
| M) 2,726.43 | M) | M) 5,681.43 | |
| A) 2,441.05 | A) | A) ← V. promis | |
| M) 3,040.36 | M) | A) 5,189.31 | |
| J) 4,384. | J) 3,539.61 | J) 2,816.05 | |
| J) 3,885.88 | J) | J) | ← did seminar in return |
| A) 5,307.16 | A) 4,699.25 | A) | (coaches - later pt |
| S) 3,637.43 | S) | S) 2,499.55 | we split 3 ways |
| O) 3,733.78 | O) | O) 4,248.59 | |
| N) 8,410.27 | N) 4,431.12 | N) 3,709.63 | |
| D) 5,672.48 | D) 4,992.61 | D) 6,861.70 | |
| | +54% | +22% | |

Receipts
- Some in books or loans
  advances
- May not be on 1099 from
  that year. Would be
  in following year or
  prev in parts made.
- Some invoices paid, t
  in cash.

WORK COPY

Losses For Stephen M. Andrus:

The losses I experienced consist of many different forms including but not limited to the following:

| | | |
|---|---|---|
| 1) | Personal Flex Premium First Year Commission | $ 99,632. |
| 2) | Personal Single Premium Commission | $ 37,202. |
| 3) | Personal Renewals on Flex Premium | $102,153. |
| 4) | Personal Trailers on Assets Under Management | $110,115. |
| 5) | Overwrites on Sub-Agents First Year Flex Premium | $ 14,597. |
| 6) | Overwrites on Sub-Agents Single Premium | $ 6,300. |
| 7) | Overwrite Renewals on Sub-Agents Flex Premium | $ 9,753. |
| 8) | Permanent Loss of an Agent — Sam Sauceda | $417,258. |

Total Loss of Commissions:    $797,010.

*[handwritten left margin: 1) – 7) only 1st yr production & renewals – No New business]*

*[handwritten right margin: No assurance would have stayed Not sure what his doing]*

Flex Premium (1,3,5,7)

Based on past performance of all my agents I calculated that the average Flex Premium for each working Sub-Agent would be $281,200. I used this average for Fernando dePena who is a highly experienced agent. I receive a 2% overwrite on all of his First Year Premium which equates to $5,624.

Sylvia Petrarca was less experienced so I used past production numbers of a comparable experienced person. She would have produced $210,000. of First Year Flex Premium. My 2% overwrite equates to $4,200.

Sam Sauceda (No relation to defendant Noe Sauceda) would have produced 10% more Flex Premium volume than his prior year at $238,658. A 2% overwrite equates to $4,773.

For my personal Flex Premium I assumed a 10% growth rate for each year of experience in the business. This would have been $452,875. 22% First Year commission equates to $99,632.

For Renewal commissions for Flex Premium I assumed a 10% attrition rate for premium. My renewal rate is 3.25% for myself which equates to $102,153. coming in years 2-15 based on the production from the year in question. I receive a .5% overwrite for my Sub-Agents which equates to $9,753. from Fernando, $7,282. from Sylvia and $8,275. from Sam.

Horner
9
EXHIBIT NO. 9/18/03
Hill & Romero

## Trailers on Assets Under Management (4)

I receive .25% annual Trailer commission on all of my Assets Under Management. I assumed a 10% attrition rate on premium with each client's account earning 5% interest annually. This equates to a total of $110,115 of lost Trailers over a 15 year time frame from business lost during the time in question.

## Single Premium (2,6)

Based on a $210,000 premium average for Single Premium at 1% overwrite on my Sub-Agents, this equates to $2,100. for each of the three agents producing at BISD.

For my personal Single Premium production I assumed a 10% growth rate above the average of last year's production for each year of my experience. Assuming $338,207. this equates to $37,202.

## Permanent Loss of Agent (8)

Sam Sauceda relied on producing at BISD as his only source of income. He was forced to do something else and the net result was that I have lost him permanently. Assuming his production would have increased 10% per year for experience and 10% attrition this equates to a total loss of overwrites on First Year and Renewal commissions over the next 14 years to be $352,628. Loss of overwrites on Single Premium production equates to $64,630.