42

United States District Court
Southern District of Texas
FILED

MAY 1 7 2004

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROYAL SURPLUS LINES INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. B-03-109 |
| | § | JURY DEMANDED |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendant. | § § | |

### PLAINTIFF ROYAL SURPLUS LINES INSURANCE COMPANY'S
### MOTION FOR SUMMARY JUDGMENT

**Beirne, Maynard & Parsons, L.L.P.**
**Jay W. Brown**
State Bar No. 03138830
SDT No. 1314
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

**ATTORNEY-IN-CHARGE FOR
PLAINTIFF ROYAL SURPLUS
LINES INSURANCE COMPANY**

**OF COUNSEL:**

BEIRNE, MAYNARD & PARSONS, L.L.P.
**Stephen R. Wedemeyer**
State Bar No. 00794832
S.D.T. No. 19797
**John V. Trevino, Jr.**
State Bar No. 24003082
S.D.T. No. 23860
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

**TABLE OF CONTENTS**

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . viii

I.    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Royal Policies and the Long History of Problems at the Subject Schools . . . . . . . 1

    B.    BISD'S Insurance "Claim" with Royal  . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    Causation Reports from Various Engineers/Experts . . . . . . . . . . . . . . . . . . . 8

    D.    BISD's Proof of Loss in Support of Its Claim . . . . . . . . . . . . . . . . . . . . . . . 14

    E.    Royal's Requests for Materials Needed to Evaluate Claim . . . . . . . . . . . . . . . . 15

II.   STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    BISD's claim is not covered under the Royal Policies  . . . . . . . . . . . . . . . . . 17

    B.    Judicial Estoppel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C.    Known Loss/Loss in Progress Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    BISD's Failure to Comply with Conditions Precedent  . . . . . . . . . . . . . . . . . 18

IV.   ARGUMENT AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    BISD's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    C.    Summary of Causes of Loss or Damage as found by the Experts . . . . . . . . . . . 21

    D.    The Loss or Damage at  BISD is Specifically Excluded under the
        Royal Policies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    The Royal Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.    Excluded Causes of Loss or Damage (discussed in the order they
      appear in the Royal Policies) .................................. 26

      a.    *Exclusions for Wear and tear (Exclusion
            2.d.(1)), and Rust, corrosion, fungus, decay,
            deterioration, latent defects, et al. (Exclusion
            2.d.(2))* ......................................... 26

            i.    Fungus Exclusion ............................. 26

            ii.   Wear and tear, deterioration,
                  latent defects, et al. exclusions ..................... 31

      b.    *Exclusions for Faulty, inadequate or defective
            siting; design, construction, repair;
            maintenance, et al., (Exclusions 3. a. through
            3. c.)* ........................................... 33

            i.    Faulty, inadequate or defective:
                  Planning, surveying, **siting**
                  exclusion (Exclusion 3.c.(1)) ..................... 33

            ii.   Faulty, inadequate or defective:
                  **Design, specifications,
                  workmanship, repair,
                  construction,** renovation,
                  remodeling, **grading,**
                  compaction exclusion (Exclusion
                  3.c.(2)); **Materials used in
                  repair,** construction, renovation
                  or remodeling (Exclusion 3.c.
                  (3)); and **Maintenance**
                  (Exclusion 3.c.(4)).** ........................... 33

            iii.  Exception in Exclusion 3 does not apply ............ 38

3.    The Limitations Clause ...................................... 40

4.    The Additional Coverage Extension .......................... 42

E.    BISD is Estopped From Asserting that the Claimed Mold and Moisture Damage
      was Caused by Something Other than the Defective Design and Construction of
      the Schools, Including Defective HVAC Systems. ...................... 43

ii

F.    The Royal Policies Do Not Cover Known Losses. . . . . . . . . . . . . . . . . . . . . . . . 48

G.    BISD Did Not Provide Royal Prompt Notice of Its Alleged Damages . . . . . . . . 51

H.    BISD Failed to Comply with the "Legal Action Against Us" Clause . . . . . . . . . 55

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

APPENDIX OF ROYAL'S SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . 1

# TABLE OF CITATIONS

## CASES

*80 Broad Street Co. v. U.S. Fire Ins. Co.*, 88 Misc.2d 706, 389 N.Y.S.2d 214
    (Sup. Ct. 1975), aff'd, 54 A.D.2d 888, 390 N.Y.S.2d 768 (1st Dept. 1976) . . . . . . . 31, 32

*Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939 (5th Cir. 1965) . . . . . . . . . . . 15, 26, 31, 32, 34

*Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298 (5th Cir.1998), cert. denied,
    525 U.S. 1141 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Allen v. Western Alliance Ins. Co.* 349 S.W.2d 590 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*American Home Assur. Co. v. Unitramp, Ltd.*, 146 F.3d 311 (5th Cir. 1998) . . . . . . . . . . . . . . 53

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 106 S.Ct. 2505, 2510 (1986) . . . . . . . . . . . . . 19

*Assicurazioni Generali SpA v. Pipe Line Valve Specialties Co.*, 935 F. Supp. 879
    (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Bazile v. Aetna Cas. & Sur. Co.*, 784 S.W.2d 73 (Tex. App. -- Houston [14th Dist.]
    1989, writ dism'd); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Brandon v. Interfirst Corp.*, 858 F.2d 266 (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 46

*Broussard v. Lumberman's Mut. Cas. Co.*,582 S.W.2d 263
    (Tex. Civ. App.--Beaumont 1979, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Burch v. Commonwealth County Mut. Ins. Co.*, 450 S.W.2d 838 (Tex. 1970) . . . . . . . . . . . . . 48

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986 . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chiles v. Chubb Lloyds Ins. Co.*, 858 S.W.2d 633 (Tex. App.--Houston [1st Dist.]
    1993, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 54

*Commercial Standard Ins. Co. v. Lewallen*, 46 S.W.2d 355
    (Tex. Civ. App. -- Eastland 1932, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Coury*, No. Civ. A. H-02-2238, 2004 WL 343946 (S.D. Tex. Jan. 6, 2004) . . . . . . . . . . . . 28, 29

*Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252
(Tex. App. – Dallas 1993, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Daniell v. Fire Ins. Exch.*, 04-94-00824-CV, 1995 WL 612405, *2
(Tex. App. – San Antonio, Oct. 18, 1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Data General Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . 49

*Ergo Science, Inc. v. Martin*, 73 F.3d 595 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Fiess v. State Farm Lloyds*, No. Civ. A. H-02-1912, 2003 WL 21659408, *7, 9
(S.D. Tex. Jun. 4, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27, 28

*Franklin v. Fugro-McClelland (Southwest), Inc.*, 16 F. Supp.2d 732
(S.D. Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 48, 50

*Gemmy Industries Corp. v. Alliance Gen. Ins. Co.*, 190 F.Supp.2d 915
(N.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . 20

*Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391 (5th Cir. 2003) . . . . . . . . . . . . . . . . 16, 45, 46

*Harrison v. U.S.A.A. Ins. Co.*, 03-00-00362-CV, 2001 WL 391539, *2
(Tex. App. – Austin Apr. 19, 2001, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Holston v. Implement Dealers Mut. Fire Ins. Co.*, 206 F.2d 682 (5th Cir. 1953) . . . . . . . . . 16, 56

*Horizon III Real Estate v. Hartford Fire Ins. Co.*, 186 F.Supp.2d 1000,
1006-007 (D. Minn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 41

*Hostetler v. State Farm Fire & Cas. Co.*, 521 N.E.2d 1357 (Ind. Ct. App. 1988) . . . . . . . . . . 34

*Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*, 518 F.2D 671 (2d Cir. 1975) . . . . . . . . . . . 55

*In Re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999), cert. denied,
120 S.Ct. 936 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 43, 47

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991),
cert. denied, 502 U.S. 1059, 112 S.Ct. 936 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jett v. Truck Insurance Exch.*, 952 S.W.2d 108
(Tex. App. – Texarkana 1997, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 56

*Kale v. Obuchowski*, 985 F.2d 360 (7th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Klein v. Century Lloyds*, 275 S.W.2d 95 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Lambros v. Standard Fire Ins. Co.*, 530 S.W.2d 138
(Tex. Civ. App. – San Antonio 1975, writ ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 2002 WL 356756 . . . . . . . . . . . . . . . . 26

*Flores v. Allstate Texas Lloyd's Co*, 278 F. Supp. 2d 810 . . . . . . . . . . . . . . 16, 27, 29, 31, 52-54

*Love of God Holiness Temple Church v. Union Standard Ins. Co.*,
860 S.W.2d 179 (Tex. App. – Texarkana 1993, writ denied) . . . . . . . . . . . . . . . . . . . . . . 52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574
106 S.Ct. 1348, 1355-56 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir.), cert. denied,
525 U.S. 981, 119 S.Ct. 444 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Merrimack Mutual Fire Ins. Co. v. McCaffree*, 486 S.W.2d 616
(Tex. Civ. App.--Dallas 1972, ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . 15, 23, 26-28, 49

*Narob Dev. Corp. v. Insurance Co. of No. Am.*, 631 N.Y.S.2d 155
(N.Y. 1st Dept. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Montefiore Med. Center v. American Protection Ins. Co.*, 226 F. Supp.2d 470
(S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Ranger Ins. Co. v. Estate of Minje,*, 991 F.2d 240 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 20

*Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, __ F.Supp.2d __,
No. 4:03-CV-302-A, 2004 WL 547564, *7 (N.D. Tex. Mar. 17, 2004) . . . . . . . 16, 53, 54

*Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597
(9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Salinas v. Allstate Texas Lloyd's Co.*, 278 F.Supp.2d 820 (S.D. Tex. 2003) . . . . . . . . . . . . 16, 29

*Schloss v. Cincinnati Ins. Co.*, 54 F. Supp.2d 1090 (M.D. Ala. 1999) . . . . . . . . . . . . . . 16, 34, 39

*Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72 (Tex. App.--Dallas 2001, no pet.) . . . . . . . . . . . . . 48

*Sentry Ins. v. R.J. Weber*, 2 F.3d 554 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State Farm Fire & Cas. Co. v. Volding*, 426 S.W.2d 907
      (Tex. Civ. App. – Dallas 1968, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432
      (Tex. App. – Dallas 1988, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Summers v. Harris*, 573 F.2d 869 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 49

*Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495
      (Tex. App.--Houston [14th Dist.] 1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 48

*U.E. Texas One-Barrington, Ltd. v. General Star Indem. Co.*,
      243 F.Supp.2d 652 (W.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 42, 43

*United States v. McCaskey*, 9 F.3d 368 (5th Cir.1993), cert. denied,
      511 U.S. 1042, 114 S.Ct. 1565 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 817 A.2d 292 (N.H. 2003) . . . . . . . . . 16, 39, 40

**STATUTES**

Tex. Civ. Prac. & Rem. Code § 16.004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Tex. Ins. Code Ann., Art 21.58(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TREATISES**

LEE R. RUSS AND THOMAS F. SEGALLA, 11 COUCH ON INSURANCE §153:3 (3d 2000) . . . . . . . 26

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is an insurance coverage dispute. Plaintiff Royal Surplus Lines Insurance Company ("Royal") has filed this suit seeking a determination as to whether policies of insurance it issued to Defendant Brownsville Independent School District ("BISD") provide coverage for BISD's claim for loss at two schools.

The case has been pending for approximately 11 months. Royal and BISD designated their experts in January 2004 and March 2004, respectively. Although Royal first served discovery on BISD many months ago, BISD has yet to provide complete answers and documentation. Nevertheless, because numerous engineers, consultants, health department employees, and others, have investigated and inspected the schools, voluminous uncontroverted evidence has been generated, all of which shows that the loss at the schools was caused by defective design, construction, installation, repair and maintenance at the schools. In fact, everyone who has investigated and inspected the schools has agreed that defective design, construction, installation, repair and maintenance at the schools are the causes of the problems. BISD has even successfully sued the architects, contractors, subcontractors, among others, for the defective work.

Therefore, because there are no fact issues as to the causes of loss at the schools, and because the causes of loss are all excluded by the policies, Royal files this motion for summary judgment. Royal also asserts additional grounds for summary judgment showing that BISD breached the insurance policies.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ROYAL SURPLUS LINES** | § | |
| **INSURANCE COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. B-03-109** |
| | § | **JURY DEMANDED** |
| **BROWNSVILLE INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF ROYAL SURPLUS LINES INSURANCE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Royal Surplus Lines Insurance Company ("Royal") files its Motion for Summary Judgment, respectfully showing:

**I. STATEMENT OF FACTS**

*A.*   *Royal Policies and the Long History of Problems at the Subject Schools*

Defendant Brownsville Independent School District ("BISD") was the named insured under a series of commercial property policies issued to BISD by Royal that insured the subject properties, Aiken Elementary School ("Aiken") and Besteiro Middle School ("Besteiro"), continuously from September 1, 1996 through April 1, 2002.  The policies issued by Royal (the "Royal Policies") are as follows:

- ▸   Royal Policy No. KHT 307564, with effective dates of September 1, 1996 to September 1, 1997 (cancelled effective April 1, 1997) (**Exhibit 1**);

- ▸   Royal Policy No. KHT 308599, with effective dates of April 1, 1997 to April 1, 1998 (**Exhibit 2**);

480306.4                                                        1

▸    Royal Policy No. KHT 310355, with effective dates of April 1, 1998 to April 1, 2001 (**Exhibit 3**); and

▸    Royal Policy No. KHT 318271, with effective dates of April 1, 2001 to April 1, 2002 (**Exhibit 4**).

Besteiro and Aiken are conjoined schools. They connect via a common cafeteria and library. Besteiro was constructed around 1993-1994 and was completed before the 1994-1995 school year began in August 1994, while Aiken was constructed around 1995-1996 and was completed before the 1996-1997 school year began in August 1996. Both Aiken and Besteiro have suffered from problems associated with high humidity, water intrusion and indoor air quality, including mold/mildew, that began around the time each school opened. "Mildew growth" was discovered in the kitchen at Besteiro in the Fall of 1994. (*See* 12/13/94 RBM Engineering letter to architect, **Exhibit 5**). Around September 1995, mold/mildew was also discovered on books in the Besteiro library (9/15/95 RBM Engineering Memo, **Exhibit 6**), where the relative humidity was measured in the 80% range in September-October 1995. (*See* 10/31/95 RBM Engineering letter to architect, **Exhibit 7**). Chronic roof leaks began to plague Besteiro in 1995 due to construction defects and continued unresolved for years. (*See* 10/31/95 J. Mora letter to BISD, **Exhibit 8**; D. Wilson Construction Company correspondence dated 8/22/95, 10/16/95, and 10/19/95, **Exhibits 9, 10 and 11**). Roof leaks at Besteiro were again reported in early 1998 to the construction manager, D. Wilson Construction Company. (*See* 2/3/98 D. Wilson letter to BISD, **Exhibit 12**).

Shortly before Aiken Elementary opened for its first school year in August 1996, Aiken began to experience long term chronic problems with its HVAC system. The air conditioning was not cooling, and humidity readings as high as 74% were measured in the school in August 1996. (*See* 8/28/96 BISD letter to RBM Engineering, **Exhibit 13**). At such time, ceiling tiles already exhibited water stains from condensation forming on, and dripping from HVAC chiller lines. (*See* BISD 8/28/96 Punchlist Letter to

architect, **Exhibit 14).** In addition, several areas in Aiken already had wet and mildewed ceiling tiles, roof leaks were reported in hallways, water was penetrating the building's exterior base in several areas, and water was continuously ponding around the building exterior. (*See* 9/17/96 Aiken Punchlist, **Exhibit 15**). School maintenance personnel reported, at least as early as November 1996, that the interior walls would "sweat" on Mondays after the HVAC system was shut down for the weekend. (*See* 11/11/96 Mac's Insulation letter to Victoria Air, **Exhibit 16**). Mold/mildew attributed to condensation was also discovered on chiller lines in the Aiken hallways at such time. (*Id.*)

Documents provided by BISD to Royal indicate that mold problems in Aiken classrooms existed in the Summer of 1997, if not earlier. (*See* 9/11/98 Aiken teacher [N. Lopez] complaint letter, **Exhibit 17**; 10/20/98 BISD Memo, **Exhibit 18**). In 1998, an engineering firm hired by BISD (CRC Engineering) attributed the chronic humidity and mold problems at Aiken to a defective HVAC system. (*See* CRC Engineering 3/3/98 and 8/20/98 letters to BISD, **Exhibits 19 and 20**). The Texas Department of Health ("TDH") visited Aiken in October and November 1998 due to persistent complaints of mold/mildew and excessive humidity problems. (*See* 11/18/98 TDH Complaint Form, **Exhibit 21**; 11/16/01 TDH letter to BISD, **Exhibit 22**).[1] The TDH found visible mold growth on ceiling tiles, desks, books, and other areas, as well as humidity levels as high as 68.5%. (*See* 11/16/01 TDH letter to BISD, **Exhibit 22**). The TDH concluded that the humidity and mold problems at Aiken were most likely the result of a defectively designed HVAC system. (*Id.*). Several other engineering and consulting firms hired by BISD and others have also noted deficiencies with Aiken's HVAC system between 1999 and 2003, and have attributed indoor air quality problems, including mold/mildew, to such deficiencies.

---

[1]  At that time, every Saturday, BISD was cleaning the mold/mildew areas at Aiken caused by the pervasive humidity problems. (*See* **Exhibit 17**, 9/11/98 Aiken Teacher Complaint Letter; **Exhibit 52**, 10/22/98 BISD Memo to Aiken Principal.)

Neither the chronic mold and humidity problems at the schools, nor the continuing causes thereof, had been resolved by the time this lawsuit was filed in June 2003, and may not be fully resolved to date. Mold growth remained on the chill water pipe insulation at Aiken, and possibly in other locations, even after repairs were attempted at Aiken around Fall 1999. (*See* **Exhibit 23**, O. Tapia Sworn Statement, at pp.80-83). In August 2001, mold and excessive humidity at Aiken and Besteiro again became a serious concern to BISD when significant mold growth was detected in the Besteiro kitchen (again), in a Besteiro computer room, and in the library/media center (again). (*See* **Exhibit 24**, R. Vasquez Sworn Statement, at pp.24-28). The BISD Maintenance Administrator who observed the growth in August 2001 – when the school was being prepared for the upcoming school year – explained that the growth covered approximately 80% of the kitchen (walls, desks and chairs), approximately 95% of the library shared by the two schools (walls, books, desks, and computers), and approximately 80% of the computer room (desks, walls and equipment). (*Id*. at pp. 28-31). Assured Indoor Air Quality, LP, an expert hired by BISD, advised BISD on August 16, 2001 that the HVAC system's design was defective and "the air conditioning system is the prime suspect of being the cause of the aggressive mold growth." (*See* 8/16/01 AIAQ letter to BISD, **Exhibit 24A).**

Engineering firms hired by BISD have attributed the mold and humidity problems at Aiken and Besteiro to excessive moisture from multiple water sources, such as defectively designed, constructed, and maintained HVAC systems, defectively constructed, repaired, and maintained roofs and windows, and chronic condensation on the HVAC system's chill water pipe insulation. (*See* **Exhibits 25, 26, 27, and 28**). One firm hired by BISD also noted that improper drainage of exterior courtyards may have caused water intrusion since the construction of Besteiro in 1994. (*See* EFI Report, **Exhibit 26**, at pp.1-1, 2-3, 2-4). *None* concluded that any weather events had ever damaged the roof or walls allowing water to enter

4

and damage BISD's property. *Similarly, none identified any accidental discharges or leaks of water directly resulting from broken or cracked pipes containing water.*

Several engineering and consulting firms have issued reports to BISD since 2001 that comment on the cause of the humidity and mold problems at the schools. As noted, most of these firms were hired by or on behalf of BISD. Rimkus Consulting Group, Inc. ("Rimkus"), then working on BISD's account, issued a report dated July 26, 1999 (**Exhibit 29**). BISD hired Assured Indoor Air Quality, LP ("AIAQ"), who issued various reports in 2001 and 2002 (**Exhibits 27, 28 and 30**). BISD hired Ambiotec Environmental Consultants, Inc. ("Ambiotec"), who issued a report in May 2002 (**Exhibit 25**). BISD also hired Engineering & Fire Investigations ("EFI"), who issued a report dated January 20, 2003 (**Exhibit 26**). In addition, Rimkus, then hired by CIGNA, issued a report on December 20, 2002 (excerpts attached as **Exhibit 31**), and David A. Weeks of the Center for Toxicology and Environmental Health ("CTEH"), also hired by CIGNA, issued a report dated January 10, 2003 (excerpts attached as **Exhibit 32**).

In January 2002, BISD closed the two schools and brought suit in Cameron County against various architects, engineers and contractors (hereinafter, collectively the "construction contractors") involved in the design, construction and maintenance of the two schools, including their HVAC systems.[2] (*See* Cameron County 2002 Petition, **Exhibit 33**). BISD alleged that design and construction defects had caused the property damage that existed at the two schools. (*Id.* at p.3). Hundreds of students and staff members at the two schools also sued the construction contractors and BISD in Cameron County for

---

[2] The case was styled and numbered Cause No. 2002-01-000071-B, *BISD v. Stoler Construction Co., Carroll, Dusang & Rand, et al.,* in the 138th District Court of Cameron County, Texas.

alleged personal injuries they attributed to mold and indoor air quality problems at the schools.[3] (*See* Cameron County November 2001 Petition, **Exhibit 34**).

**B.    *BISD'S Insurance "Claim" with Royal***

Shortly before the schools were closed, on or around November 29, 2001, BISD for the first time made a "claim" under Royal Policy No. KHT 318271 (policy term 4/1/01 - 4/1/02) **(Exhibit 4)** for alleged damage and loss to Besteiro and Aiken. The 11/29/01 Notice of Loss letter **(Exhibit 35)** failed to provide Royal a date, suspected cause or a description of the claimed loss, but instead only stated that BISD had "suffered a loss covered by your policy of insurance...The insured has incurred damages at Besteiro Middle School and Aiken Elementary...as the result of occurrences covered under the policies." BISD provided Royal no further information about its claim at such time, such as the type or extent of damages, the cause of the claimed loss, or the timing of such loss.

Royal acknowledged receipt of the BISD claim and began its investigation of the claim. In order to assist with its lengthy investigation, Royal retained an independent adjusting firm, GAB Robins N.A., Inc. ("GAB"), in Harlingen, Texas. By December 5, 2001, GAB began requesting from BISD all materials that BISD claimed supported its sketchy allegations. (*See* GAB 12/5/01 correspondence to BISD's counsel, Constant and Vela, **Exhibit 36**). As part of its investigation, GAB requested many specific items from BISD over the course of many months, including all engineering, mold or other investigative studies related to the problems and claimed damage at the schools. (*See, e.g.*, GAB 8/22/02 correspondence with BISD, **Exhibit 3**; GAB 9/26/02 correspondence with BISD, **Exhibit 38**; GAB 10/25/02 correspondence with BISD, **Exhibit 39**; and GAB 2/21/03 letter to BISD, **Exhibit 40**).

---

[3] The case was styled and numbered Cause No. 2001-11-4959-C, *Angel Castillo and Maria Rosalva Castillo, et al. v. Carroll Dusang & Rand, Inc., et al.*, In the 197th District Court of Cameron County, Texas.

After numerous oral and written requests of BISD (*See* GAB 12/21/01 Report to Royal, **Exhibit 41**; and GAB 1/21/02 correspondence to BISD counsel, P. Moore, **Exhibit 42**), and many months, a GAB property adjuster was finally permitted to walk through and visually observe the schools on or around February 26, 2002. During the walk through, GAB observed, among other things, ongoing water leaks and standing water on the floors in two Aiken classrooms. (*See* GAB 3/22/02 Report to Royal, **Exhibit 43**, at p.2). During this preliminary walk through of the schools, GAB also noted what appeared to be mold on the Aiken chill water pipes, duct work and nearby sheetrock surfaces. (*Id.*).

On or around April 2, 2002, BISD for the first time provided Royal Notice of Loss (**Exhibit 44**) for damage and loss to Aiken and Besteiro under three *additional* Royal policies:  Policy No. KHT 307564 (effective 9/1/96 - 9/1/97, but cancelled effective 4/1/97) (**Exhibit 1**), Policy No. KHT 308599 (effective 4/1/97 - 4/1/98) (**Exhibit 2**), and Policy No. KHT 310355 (effective 4/1/98 - 4/1/01) (**Exhibit 3**).  Like the November 29, 2001 notice, the April 2, 2002 notice failed to provide a date, cause or description of BISD's claimed loss, but instead again stated only that BISD had "suffered a loss covered by the above listed policies of insurance...The insured has incurred damages at Besteiro Middle School and Aiken Elementary...as the result of occurrences covered under the policies." (*See* Notice, **Exhibit 44**).

On January 22, 2003[4], along with a letter (**Exhibit 45**), BISD finally provided Royal for the first time, *some* of the items Royal had requested through GAB beginning as early as December 2001.  BISD provided the following items in support of its claim for damage at Aiken and Besteiro, despite the fact that the dates on the documents indicated that some of the material had long been in BISD's possession:

---

[4]  Note that, although the letter from BISD's counsel is dated January 22, *2002*, this is simply the result of a "New Year's" typographical error.  The content of the letter makes it apparent that the letter should have been dated January 21, *2003*.

- ► Assured Indoor Air Quality ("AIAQ") Report dated November 9, 2001 and entitled "Indoor Air Quality Environmental Survey" (excerpts attached as **Exhibit 30**),

- ► Ambiotec Environmental Consultants ("Ambiotec") Report dated May 2002 and entitled "Preliminary Mold Investigation" (**Exhibit 25**),

- ► Engineering & Fire Investigations ("EFI") Report dated January 20, 2003 and entitled "Remediation Evaluation Assessment" (**Exhibit 26**), and

- ► Undated Besteiro/Aiken Project Breakdown Cost Report (for campus relocation expenses).

### C.    *Causation Reports from Various Engineers/Experts*

In January 2002, AIAQ had issued at least two reports to its client, BISD: a January 2, 2002 "Executive Summary" Report (**Exhibit 27**) and a January 25, 2002 "Status Report" (**Exhibit 28**). In its January 2, 2002 Report, AIAQ reported to BISD, among other things, that "the building air conditioning system does not sufficiently condition and/or treat the outside air enough to reduce the increased moisture load in the building...." (**Exhibit 27**, at p. 2). At such time, AIAQ recommended that BISD "repair roof leaks by *replacing* the roof" and *"replace* the deficient HVAC system with an appropriate HVAC system which will maintain an appropriate indoor dew point...." (*Id.*, at p. 5) (emphasis added). AIAQ also advised at such time that, "If present conditions are not immediately addressed with appropriate action, the problem will only get worse." (*Id.*, at p. 4). AIAQ reiterated its concerns and recommendations in its January 25, 2002 Report to BISD. (*See* **Exhibit 28**).

In May 2002, Ambiotec advised its client, BISD, among other things, that *Stachybotrys* mold found in Aiken air samples "presented a serious concern" and was "likely the result of airborne spores from the visible mold on the chiller pipe insulation jacket located above the corridor ceiling." (**Exhibit 25**, at p. 1). Ambiotec also advised that "one principal cause of the moisture intrusion in Aiken is from the chilled

water HVAC system, and in Besteiro from plumbing and roof leaks." (*Id.* at pp. 2, 11). Ambiotec, however, did not identify any cracked or broken pipes containing water at either school. (*See* **Exhibit 25**).

In EFI's January 20, 2003 report (**Exhibit 26**) to its client, BISD, EFI reported several potential sources of water infiltration and resulting mold manifestations, including problems with the roofs at both Aiken and Besteiro caused by inadequate maintenance, deterioration of roofing/sealant materials, improper/missing flashing, and improper design/construction of the roofs. (*Id.* at pp. 1-2, 2-17, 2-18, and 2-19). Notably, however, EFI did not identify that any weather events had ever damaged the roof, walls or other building structures allowing water to enter and damage BISD's property, nor after extensive study did EFI identify any accidental discharge or leaks of water resulting from broken or cracked pipes containing water.

In its January 2003 report to BISD (**Exhibit 26**), with regard to Besteiro, EFI reported out-of-calibration thermostats, poorly maintained HVAC system components, outside air ventilation rates and conditioned air quantities inconsistent with design quantities, and improperly sized roof-top units ("RTUs"). (*Id.* at pp. 1-2, 2-24, and 2-25). In addition to design defects with the Besteiro HVAC system/equipment, EFI found that "the discharge air temperature, dry bulb and wet bulb, of several RTUs [at Besteiro were] providing less than the cooling and dehumidification requirements of the original design. . . .Elevated levels of relative humidity in the classrooms and the lack of adequate routine cleaning of the interiors of the RTUs have also led to performance problems with the RTUs and the development of molds on the cooling units of some RTUs. The RTUs are not introducing designed amounts of outside air. Field measurements indicate that outside air ventilation rates are approximately 10 percent of the design outside air intake amount." (*Id.* at pp. 2-25 and 2-28). EFI recommended removing and redesigning certain aspects of the HVAC system, as well as certain HVAC equipment, and properly cleaning and maintaining other

equipment. (*Id.* at p. 1-2). Alternatively, EFI recommended to install all new RTUs at Besteiro, despite the 8 year old equipment having an estimated remaining useful life of 6-8 years. (*Id.* at p. 1-3).

EFI also reported finding corroded chill water piping needing replacement and oversized fan coil units at Aiken. (*Id.* at pp. 2-35, 2-38). According to EFI, the oversized units were overcooling areas, and not adequately controlling humidity.(*Id.*). EFI reported that chilled water leaks had occurred due to galvanic corrosion caused by *poor design or construction* – using steel piping in direct contact with brass and copper fittings. (*Id.* at p. 2-36). EFI found relative humidity levels well above the 50% design condition and heavy accumulations of dust, debris and possible mold on HVAC equipment resulting from improper maintenance. (*Id.* at p. 2-25). EFI reported mold staining on chilled water pipe insulation in first and second floor corridors. (*Id.* at p. 2-36). EFI also noted condensation and rust deterioration of the chilled water piping. (*Id.*). EFI also observed numerous instances of poor/inadequate maintenance and inadequate/deficient design and installation of the HVAC system and equipment at Aiken. (*Id.* at pp. 2-34 to 2-41).[5]

In Rimkus' July 26, 1999 Report to BISD's retained engineer, Mody Boatwright, (**Exhibit 29**), Rimkus' observations, conclusions and recommendations included the following:

- ▸ Elevated mold spore levels in the air at Aiken stem from sources of mold growth on surfaces inside the school and from inadequate air conditioning; (**Exhibit 29**, at p. 3, ¶ 4)

- ▸ Humidity levels in the school are not being maintained below the 60% maximum threshold, allowing mold to grow on walls, doors, and other surfaces inside Aiken; (*Id.*)

---

[5] Mr. Oscar Tapia, BISD's facilities administrator, provided a sworn statement on June 2, 2003, as permitted by the Royal Policies. Mr. Tapia testified that BISD hired EFI to determine the cause of the problems at the schools, that BISD is pleased with EFI, BISD believes EFI's report was accurate, and ***BISD agrees with all of EFI's findings***. (*See* **Exhibit 23**, O. Tapia Sworn Statement, p. 107). Mr. Tapia also testified that he thought the HVAC system was the "main culprit" of possible moisture sources at the schools, in part because Brownsville had had very little rain. (*Id.* at pp. 114-115).

- The school's climate control system needs to be modified to maintain humidity levels below 60%; (*Id.* at ¶ 5) and

- The school building should be appropriately remediated for mold and clearance testing should be implemented to verify air and surfaces are acceptable, and to ensure acceptable relative humidity levels. (**Exhibit 29,** at p. 3-4, ¶ 5)

In Rimkus' December 20, 2002 Report to Cigna's independent adjuster (excerpts attached as **Exhibit 31**), Rimkus' conclusions included the following:

- The development of general stains on Aiken and Besteiro building finishing materials that is believed to be mold is the result of improper functioning of HVAC systems, caused by design errors and improper maintenance of the HVAC system. (**Exhibit 31,** at p.2).

In CTEH's January 10, 2003 "Indoor Air Quality Report" to Cigna's independent adjuster (excerpts attached as **Exhibit 32**), CTEH's observations, conclusions and recommendations included the following:

- The relative humidity in some portions of Besteiro and Aiken exceeds the recommended relative humidity range of 60%; (**Exhibit 32,** at pp. 1, 3)

- There is a strong correlation between rooms with higher relative humidity and extensive fungal growth on contents and surfaces; (*Id.* at p. 1)

- Observed active chill water line leaks in several Aiken classrooms that was damaging contents; (**Exhibit 32,** at ¶ 3.1)

- Chill water lines (routed through ceilings of the Aiken main hallway) exhibited mold growth on insulation; (*Id.* at ¶ 3.1.2)

- HVAC system at Aiken is not adequately removing the moisture from the conditioned air; (*Id.* at ¶ 3.1.2)

- The roof-top air conditioning unit for Besteiro Room 112 was inspected due to high relative humidity in the classroom, and revealed a pigeon nesting on the coils inside the unit; (*Id.* at ¶ 4.1.2)

- The average relative humidity was measured at 84-91% in complaint areas at Besteiro and 54-61% in non-complaint areas at Besteiro; and (*Id.* at ¶ 4.3.1)

> ▸ The HVAC systems at Besteiro were very dirty; making it impossible to visually differentiate mold growth from dirt and debris in HVAC systems. (*Id.* at ¶ 4.1.2)

Rimkus, who had already investigated the mold in 1999 for BISD's retained engineer and in 2002 for CIGNA, was then retained by Plaintiff Royal in this litigation. Rimkus, after investigating even more thoroughly and reviewing mostly old, albeit newly available, documents from BISD, issued an expert report dated January 26, 2004 (**Exhibit 46**).  In its report, Rimkus' observations, conclusions and recommendations include the following:

> ▸ The HVAC systems for the school buildings are not functioning properly and, therefore, do not maintain the indoor humidity within industry standards, *i.e.* the humidity is too high and a damp indoor environment exists. (**Exhibit 46,** at p. RSL 1396)

> ▸ Documents provided by BISD indicate the HVAC systems have not functioned properly since the schools were constructed for the following reasons:

>> • Improper design,

>> • Improper installation, and

>> • Improper maintenance. (*Id.* at pp. RSL 1396-97, ¶ 2)

> ▸ The high humidity in the buildings has caused discomfort to occupants, and caused the development of general mold growth on building finishes and contents. (*Id.* at p. RSL 1397, ¶ 3)

> ▸ Localized water stains (and possible mold) on building finishes, caused by the formation of condensation, dripping condensation, or overflowing condensation from HVAC systems components, have occurred at 27 distinct locations. These problems were caused by high indoor humidity, which is condensing on cooled components of the operating HVAC systems, and inadequate maintenance to keep condensation drain pans/drains clean and functioning properly. (*Id.* at ¶ 4)

> ▸ The primary, if not the only, cause of the general mold growth on the building finishes and contents is the high indoor humidity, which has been an ongoing continuous condition since the school opened because of improper functioning of the HVAC systems. (*Id.* at ¶ 8)

> ▸ Proper functioning of the HVAC systems must be achieved to eliminate the high indoor humidity. (*Id.* at ¶ 9)

▸ Localized water leakage because of roof leaks (18 locations), and water supply and drainage pipe systems leaks (7 locations) have caused localized areas of water stains (and possible mold) on building finishes. The water leakage is at building construction joints, and pipe joints and/or fittings. The water leakage is the result of initial construction errors and/or normal wear and tear. (*Id.* at ¶ 5).

▸ There are no openings or gaps as the result of storm activity. The BISD records indicate this water leakage occurred soon after construction of the 6ᵗʰ grade addition, and occurred because of construction errors....[T]here are minor stains on acoustical ceiling tiles and gypsum board below the construction joint between the east wall of Aiken and the northern wing extending to the east...The sixteen (16) remaining locations of roof leaks are at penetrations through the roofs for the installation of roof drain hubs, rooftop HVAC units, electrical conduits, and mechanical piping....These problems are the result of poor installation of these various items or deteriorated sealant at the roof penetrations or pipe joints. No openings or gaps in the roofs because of storm activity were observed. (*Id.* p. RSL 1400).

Gobbell-Hays Partners ("GHP") was also retained by Royal and issued an expert report in this lawsuit dated January 21, 2004. (*See* GHP Report, **Exhibit 47**). In its report, GHP's observations, conclusions and recommendations included the following:

▸ Both schools have been impacted from point source incidents and systemic issues; both types existed from the time of occupancy. (**Exhibit 47,** at p. RSL 1362, ¶ 1)

▸ Besteiro has experienced repeated roof leaks and plumbing leaks, as well as problems with the air-handling system not functioning correctly. (*Id.* at ¶ 2)

▸ Aiken experienced humidity problems within the building immediately upon being occupied, which was tied to the air-handling system not functioning correctly. (**Exhibit 47,** at p. RSL 1363, ¶ 2)

▸ From approximately January 1999 through May 1999, the air conditioning system at Aiken was renovated; however, the documents provided by BISD indicate excessively high humidity levels and that mold growth continued within the school even after the renovation activities were completed. (*Id.* at ¶ 3)

In sum, all of the experts, including BISD's, are in agreement as to the causes of the claimed loss at the schools. This voluminous, overwhelming evidence is not controverted by anyone. Accordingly, there are no facts at issue as to causation of BISD's loss in this case.

480306.4                                    13

**D.**    ***BISD's Proof of Loss in Support of Its Claim***

On January 23, 2003, BISD submitted a $10 million Sworn Statement in Proof of Loss ("Proof of Loss") to Royal (**Exhibit 48**). The Proof of Loss indicated only that BISD was making a claim only under Policy No. KHT 318271 (effective 4/1/01 - 4/1/02) for a "loss by covered causes of loss," and that the property loss occurred "at an unknown date and time." (**Exhibit 48**). The Proof of Loss was signed by BISD's attorney, Baltazar Salazar, and indicated that BISD was making a claim for $10 million "actual cash value." *Id.* The proof advised Royal only that the cause and origin of the claimed loss were "mold manifestations." Although BISD had a duty under the policy to provide a fully complete Proof of Loss, it failed to do so. The Proof of Loss is a condition precedent under the policy, which provides in pertinent part that the insured will "send [Royal] a signed, sworn proof of loss containing the information we request to investigate the claim." Royal sent BISD the standard form which requested, *inter alia*, the date and time of the loss and the cause and origin of the loss. BISD failed to provide any information as to the date of the loss, despite the fact that BISD had first notified Royal of its claim more than one year earlier, in November 2001. Furthermore, BISD failed to identify the schools at issue and even identify the defects and problems that had been ongoing at the schools for many years. As presented, BISD's Proof of Loss failed to comply with the policy's condition precedent.

Because the January 23, 2003 Proof of Loss failed to provide Royal the required basic information about BISD's claimed loss, Royal advised BISD, on February 21, 2003, that it was rejecting the proof of loss, and requested that BISD resubmit a sworn proof of loss that included the basic information requested by the form (and required by the policy), including the date and time of the loss, and the cause and origin of the claimed "mold manifestations." (*See* 2/21/03 letter, **Exhibit 40**). Royal advised BISD at such time that "This information is necessary for Royal to fully understand and investigate the loss reported by BISD.

*I have enclosed another blank proof of loss form for your convenience.*" (*Id.*).   Despite Royal's

request, BISD has refused for over one (1) year, and continues to refuse, to provide another Proof of Loss

to Royal that complies with the policy requirements. This, despite the condition precedent that BISD:

"Send [Royal] a signed, sworn proof of loss . . . within 91 days after [Royal's] request." (*See* Royal

Policy, **Exhibit 4**, Building And Personal Property Coverage Form § E.3.a. (7)).

### E.      *Royal's Requests for Materials Needed to Evaluate Claim*

After receiving the initial materials from BISD, on February 21, 2003, Royal sent a letter to counsel

for BISD in which Royal requested to take an examination under oath ("EUO") of BISD representatives

on certain topics. (*See* **Exhibit 40**).  As permitted by the Royal Policies, Royal took EUOs of three BISD

representatives between May 30, 2003 and June 2, 2003, including Oscar Tapia, Raul Vasquez and Tony

Fuller. Royal also requested additional materials needed by Royal to evaluate BISD's claim. (*Id.*). Despite

the fact that numerous additional materials were requested from BISD by Royal on February 21, 2003,

BISD failed to provide all the requested materials before this lawsuit was filed in June 2003, and has since

continued its refusal to provide the requested materials.

## II. STATEMENT OF ISSUES

This Motion sets forth a number of bases for why BISD's claim is not covered by the Royal

Policies, and why summary judgment can be granted in favor of Royal. The following are the specific

issues to be ruled upon by the Court:

1.      BISD's claim is excluded from coverage under the Royal Policies pursuant to the exclusions for loss or damage caused by fungus, deterioration, wear and tear, latent defects; faulty, inadequate or defective: siting, grading, design, construction, workmanship, repair, and maintenance; and the exceptions to the exclusions are not applicable. *See Merrimack Mutual Fire Ins. Co. v. McCaffree*, 486 S.W.2d 616, 617 (Tex. Civ. App.- -Dallas 1972, ref'd n.r.e.); *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939 (5th Cir. 1965); *Fiess v. State Farm Lloyds*, No. Civ. A. H-02-1912, 2003 WL 21659408, *7,

9 (S.D. Tex. Jun. 4, 2003) (**Exhibit 53**); *Flores v. Allstate Texas Lloyd's Co*, 278 F. Supp. 2d 810, 814 and n.3 (S.D. Tex. 2003)*; Schloss v. Cincinnati Ins. Co.*, 54 F. Supp.2d 1090, 1095 (M.D. Ala. 1999), aff'd without op., 211 F.3d (11th Cir. 2000); *Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 817 A.2d 292 (N.H. 2003) (**Exhibit 54**).

2.      The Limitation clause of the Royal Policies applies to preclude coverage for any loss or damage to the interior of the schools caused by or resulting from rain. *See Horizon III Real Estate v. Hartford Fire Ins. Co.*, 186 F.Supp.2d 1000, 1006-007 (D. Minn. 2002).

3.      The Additional Coverage Extension is not applicable and does not provide coverage to BISD. *See U.E. Texas One-Barrington, Ltd. v. General Star Indem. Co.*, 243 F.Supp.2d 652, 666-67 (W.D. Tex. 2001).

4.      BISD is judicially estopped from asserting that its claim was caused by anything other than defective design and construction of the schools. *See In Re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 936 (2000); *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003).

5.      BISD's claim is barred under the known loss/loss in progress doctrine. *See Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App.--Houston [14[th] Dist.] 1995, no writ); *Franklin v. Fugro-McClelland (Southwest), Inc.*, 16 F. Supp.2d 732, 735 (S.D. Tex. 1997); *Summers v. Harris*, 573 F.2d 869, 871 (5th Cir. 1978).

6.      BISD's claim is precluded because BISD failed to provide Royal with "prompt notice" as required by the Royal Policies, and a first party property insurer need not show that it was prejudiced by late notice. *See Flores v. Allstate Texas Lloyd's Co*, 278 F. Supp.2d 810, 819 (S.D. Tex. 2003); *Salinas v. Allstate Texas Lloyd's Co.*, 278 F.Supp.2d 820, 825 (S.D. Tex. 2003)*; Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, __ F.Supp.2d __, No. 4:03-CV-302-A, 2004 WL 547564, *7 (N.D. Tex. Mar. 17, 2004) (**Exhibit 55**); *Chiles v. Chubb Lloyds Ins. Co.*, 858 S.W.2d 633, 635 (Tex. App.--Houston [1st Dist.] 1993, writ denied).

7.      BISD's counterclaim is barred because BISD failed to comply with the "Legal Action Against Us" clause of the Royal Policies. In other words, BISD's counterclaim is time-barred by the contractual limitations period. *See Jett v. Truck Insurance Exch.*, 952 S.W.2d 108, 109 (Tex. App. – Texarkana 1997, no writ); *Holston v. Implement Dealers Mut. Fire Ins. Co.*, 206 F.2d 682, 683 (5th Cir. 1953).

## III. SUMMARY OF ARGUMENT

### A.    *BISD's claim is not covered under the Royal Policies*

All of the causes of BISD's loss or damage in this case are causes of loss that are specifically excluded under the Royal Policies, such as defective design, construction, workmanship, repairs and maintenance. Moreover, the Royal Policies contain an explicit exclusion for mold. Furthermore, the exceptions to the exclusions contained in the Royal Policies do not apply in this case because none of the excluded causes of loss resulted in a covered loss.

In addition, the Royal Policies contain a Limitation clause that excludes coverage for any loss or damage to the interior of the schools caused by or resulting from rain. There is an exception to the limitation if the roof or walls of the building at issue are first damaged by a covered cause of loss through which rain enters. Here, there is no evidence of any damage to the roofs or walls by a covered cause of loss, such as hail or wind. Rather, all of the evidence here is that roof damage through which rain could enter was caused by defective construction, deterioration of sealant and improper maintenance, *i.e.*, all excluded causes of loss. Thus, the exception does not apply.

An Additional Coverage Extension provides coverage for access costs when there is "water damage," as defined in the Royal Policies. However, this extension does not apply when the water damage is caused by an uncovered cause of loss. To the extent BISD tries to argue for coverage under this provision, such an argument is without merit because there is no evidence of water damage from a covered cause of loss.

### B.    *Judicial Estoppel*

Prior to this suit being filed, BISD sued the architects, contractors, subcontractors, et al., who were involved in the design, construction, installation, repairs and maintenance of the HVAC system at the

480306.4                                          17

schools, the roofs, et al. In that litigation, BISD specifically sued for mold damage, and it explicitly alleged that mold damage was caused by the construction, design, selection, repair, inspection, and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment and the use of improper materials in the construction of the schools. BISD has been successful with such claims in that other litigation. Accordingly, BISD is judicially estopped from asserting against Royal in this suit that its claim was caused by anything other than defective design, construction, et al., of the schools.

## C.    *Known Loss/Loss in Progress Doctrine*

Under Texas law, insurance coverage is precluded where an insured is -- or should be -- aware of known loss or an ongoing progressive loss at the time a policy is purchased. Here, the evidence shows that BISD was fully aware of the problems at the schools and mold even before it purchased the first Royal policy. Accordingly, BISD's claim is barred under the known loss doctrine.

## D.    *BISD's Failure to Comply with Conditions Precedent*

BISD's claim is also precluded because BISD failed to provide Royal with "prompt notice" as required by the Royal Policies. BISD was fully aware of the problems at the schools and mold as far back as when the schools first opened in 1994 for Besteiro and 1996 for Aiken. Despite that knowledge, BISD did not provide notice to Royal under any policy until November 2001. Such a delay of many years in providing notice to an insurer is late notice as a matter of law and a breach of the policy. Furthermore, first party property insurers in Texas are not required to show prejudice as a result of late notice. Accordingly, BISD's breach of the notice provision of the Royal Policies bars coverage.

Finally, BISD's counterclaim against Royal is time-barred because BISD failed to comply with the "Legal Action Against Us" clause included in those Royal Policies effective April 1, 1997 - April 1,

2002. Under this clause, BISD was required to bring suit against Royal within two years and one day of

the manifestation of its property loss. As noted above, BISD was aware of its loss as far back as 1994

for Besteiro and 1996 for Aiken. BISD, however, did not file suit against Royal until June 2003 (that suit

has now been abated), nor did it assert the counterclaim in this suit until December 2003. Therefore, BISD

clearly did not bring suit within the required time period.

## IV.  ARGUMENT AND AUTHORITY

### A.  *Summary Judgment Standard*

Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See*

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1986). The party

seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and

identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986).

If the moving party carries his initial burden, the burden then falls upon the non-moving party to

demonstrate the existence of a genuine issue of material fact. This showing requires more than "some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 584-86, 106 S.Ct. 1348, 1355-56 (1986). Where the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Id.* The non-

movant may defeat the motion only by showing a genuine dispute of material fact. *International*

*Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct.

936 (1992).

Construction of an unambiguous contract is a question of law for the court and an appropriate subject for summary judgment. *Ranger Ins. Co. v. Estate of Minje,*, 991 F.2d 240, 243 (5th Cir. 1993). The insured has the initial burden to prove that coverage exists. *Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.,* 143 F.3d 192, 193 (5th Cir. 1998)*; Sentry Ins. v. R.J. Weber,* 2 F.3d 554, 556 (5th Cir. 1993). If the insurer relies on the policy's exclusions, it then bears the burden of proving that one or more of those exclusions apply. *Guaranty Nat'l Ins. Co.,* 143 F.3d at 193; TEX. INS. CODE ANN., Art 21.58(b). Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. *Guaranty Nat'l Ins. Co.,* 143 F.3d at 193.

## B.    *BISD's Claim*

Although BISD has not been forthcoming in its pleadings and discovery responses with respect to what it actually claims its loss or damage to be in this case, it appears BISD is making a claim for damage to the schools caused by or resulting from mold. In its Sworn Statement in Proof of Loss, BISD asserts that the "cause and origin" of its loss is "mold manifestations."[6] In other words, BISD's claim is that mold is the cause of the loss.

It also appears, however, that BISD is making a claim for mold loss/damage caused by or resulting from "water damage problems" at the schools. (*See* BISD's Original and First Supplemental Counterclaim). [In its counterclaim, BISD surprisingly never uses the word "mold." It simply refers to its loss as "loss" or "damage," and it states that "[d]ue to water damage problems in both schools, both schools were closed in January 2002."] In other words, BISD currently appears to be claiming that its loss was caused by "water damage problems."

---

[6]   See **Exhibit 48**, BISD's Proof of Loss dated January 23, 2003.

In either case, *i.e.*, whether the mold is the cause of the loss/damage at the schools, or whether the loss/damage at the schools is mold caused by water damage problems, there is no coverage for BISD's claim under the terms and conditions of the Royal Policies.

**C.**   ***Summary of Causes of Loss or Damage as found by the Experts***

As shown above, all of the engineers, consultants, adjusters, et al. (hereafter collectively "experts") have attributed the mold and humidity problems at Aiken and Besteiro to excessive moisture from multiple water/humidity sources. The principal and pervasive causes have been found to be defectively designed, constructed, installed and maintained HVAC systems. Other significant causes have been found to be leaks from roofs and windows, and condensation on the Aiken HVAC system's chill water pipe insulation, all of which were due to improper construction, repair and maintenance. It is significant that no roof leaks have been attributed to storm activity, such as hail or wind damage. In addition, some experts also found that improper drainage of exterior courtyards may have caused water intrusion into the buildings. Lastly, experts found plumbing leaks in water supply and drainage pipes at pipe joints and/or fittings that were due to construction defects and wear and tear. (BISD's own witnesses have testified that whenever they found such a leak, BISD promptly fixed it (*See* **Exhibit 24**, R. Vasquez Sworn Statement, at pp. 64-66), suggesting that faulty or inadequate maintenance may have also contributed to any re-occurring leaks.) It is significant that none of the plumbing leaks have been attributed to breaks or cracks in the pipe.

The following is a summary of all the causes of loss or damage as found by the experts who have investigated and evaluated the schools:

### HVAC Issues

* HVAC system defectively designed
* HVAC units improperly sized for the buildings
* Oversized fan coil units

* HVAC system defectively constructed/improper installation
* Condensation on HVAC chill water pipe insulation
* Corroded chill water piping due to galvanic corrosion caused by poor design and construction that used steel piping in direct contact with brass and copper
* Defective repair and maintenance of HVAC

**Roof/Window Issues**

* Improper design/construction of roofs/roof leaks due to construction defects, such as leaks at penetrations in roofs where rooftop HVAC units installed, mechanical piping installed, et al. and at construction joints
* Improper/missing flashing on roof
* Deterioration of roofing/sealant materials
* Inadequate repair and maintenance of roof
* Improper construction and repair of windows, window leaks due to construction and repair defects

**Siting Issues**

* Improper drainage of exterior courtyards causing ponding of water around exterior of buildings and causing water to penetrate base of buildings

**Plumbing Leaks**

* Plumbing leaks at pipe joints and/or fittings caused by construction defects and wear and tear

In sum, all of the experts attribute the high humidity, moisture, water intrusion and mold problems at Aiken and Besteiro to the initial design and construction defects and deficiencies, defective and deficient repairs, and improper and deficient maintenance. Therefore, no matter how BISD characterizes its claim, it is not covered under the Royal Policies.

**D.** ***The Loss or Damage at BISD is Specifically Excluded under the Royal Policies***

In order to trigger coverage under a commercial property policy, both the damaged property and *the cause of the loss or damage must be designated as covered under the policy.* Under a first party property policy, the insured has to demonstrate that the loss was caused by a fortuitous event or an external

cause. *See e.g., Merrimack Mutual Fire Ins. Co. v. McCaffree*, 486 S.W.2d 616, 617 (Tex. Civ. App.--Dallas 1972, ref'd. n.r.e.); (finding that a construction defect was an inherent vice resulting in damage that was not fortuitous or caused by a chance occurrence). In this case, therefore, Aiken and Besteiro have to be properties insured under the Royal Policies, and the cause/s of BISD's alleged loss must be covered causes under the Royal Policies. Here, Aiken and Besteiro are properties insured under the Royal Policies. However, all the causes of BISD's loss are **specifically excluded** from coverage because none of the causes of loss were fortuitous or from external causes, and moreover, all of the causes of loss are excluded by the plain language of the Royal Policies.

Although all four Royal Policies are not identical, they all contain the identical or nearly identical pertinent provisions discussed below.

Under the Royal Policies, BISD's insurance claim is barred under several exclusions, any one of which alone, or in combination, operates to preclude coverage in this case.

### 1.   The Royal Policies

The Royal Policies provide in pertinent part as follows:

### CAUSES OF LOSS - SPECIAL FORM[7]

#### A.   COVERED CAUSES OF LOSS

When Special is shown in the Declarations,[8] Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1.        Excluded in Section **B.**, Exclusions; or

2.        Limited in Section **C.**, Limitations; that follow.

---

[7] *See* The Causes of Loss - Special Form, Form CP 10 30 06 95 (ISO Commercial Risk Services, Inc. 1994) to the Royal Policies.

[8] "Special" is shown in the Declarations of all four Royal Policies. *See* Royal Policies, **Exhibits 1, 2, 3, and 4,** Form PC 86839.

B.  **EXCLUSIONS**

* * *

2.       We will not pay for loss or damage caused by or resulting from any of the following:

* * *

d.       **(1)**       Wear and tear;

**(2)**       Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

* * *

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

3.       We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.**  But if an excluded cause of loss that is listed in **3.a.** through **3.c** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

* * *

b.       Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c.       Faulty, inadequate or defective:

**(1)**       Planning, zoning, development, surveying, siting;

**(2)**       Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)**       Materials used in repair, construction, renovation or remodeling; or

**(4)**       Maintenance; of part or all of any property on or off the described premises.

* * *

## C.  LIMITATIONS[9]

* * *

c.    We will not pay for loss of or damage to the interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (1)    The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

* * *

## F.    DEFINITIONS

"Specified Causes of Loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

"Water damage" means **accidental discharge or leakage** of water or steam as the **direct** result of the **breaking apart or cracking** of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

---

[9] The Limitations provision appears, as modified by endorsement, in each of the Royal Policies. *See* Causes of Loss - Special Form, Form CP 10 30 06 95 of the Royal Policies, as amended by the Texas Changes Endorsement, Form CP 01 42 11 00, ¶ D.5. in Royal Policy No. KHT318271, **Exhibit 4**; as amended by the Texas Changes Endorsement, Form No. CP 01 42 12 92, ¶ D.5. in Royal Policy Nos. KHT308599 and KHT310355, **Exhibits 2 and 3**. Policy KHT307564, **Exhibit 1**, contains the Limitation Clause as well, but it is not amended by the Texas Changes Endorsement. The only substantive difference between the Limitations Clause in KHT307564, and as it appears after amendment in the other three policies, is that before the amendment the Limitation also applied to personal property. In other words, the amendment deleted the reference to personal property. The provision, as it appears in Policy No. KHT307564, is as follows: "We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section. . . . c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless: (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or . . ."

## 2.    Excluded Causes of Loss or Damage (discussed in the order they appear in the Royal Policies)

The Royal Policies clearly exclude the causes of loss or damage at Aiken and Besteiro consistently identified by the numerous experts who investigated the schools.

### a.    Exclusions for Wear and tear (Exclusion 2.d.(1)), and Rust, corrosion, fungus, decay, deterioration, latent defects, et al. (Exclusion 2.d.(2))

Insurers distinguish between what may be labeled "forces of nature," such as windstorms, rain, and flood, and what may be labeled "natural processes," such as rot, decay, rust, et al. Typically, property policies exclude losses caused by natural processes. LEE R. RUSS AND THOMAS F. SEGALLA, 11 COUCH ON INSURANCE §153:3 (3d 2000) (**Exhibit 62**).

The Royal Policies, like typical property policies, exclude coverage for losses attributable to "natural processes," *i.e.*, wear and tear, fungus, decay, deterioration, hidden or latent defects, et al. *See e.g., McCaffree,* 486 S.W.2d at 617; *State Farm Fire & Cas. Co. v. Volding*, 426 S.W.2d 907, 908 (Tex. Civ. App. – Dallas 1968, writ ref'd n.r.e.); *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965).

### i.    Fungus Exclusion

In its Sworn Statement in Proof of Loss, BISD states that the "cause and origin" of its loss is "mold manifestations." (*See* **Exhibit 47**, BISD's Proof of Loss.) BISD has never retreated from this position; rather, it has consistently claimed against Royal that mold <u>caused</u> its loss.

Mold is a fungus, so there is no dispute that the fungus exclusion encompasses mold. *See Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.,* 2002 WL 356756, * (N.D. Tex. March 5, 2002) (**Exhibit 56**). Therefore, because mold is a fungus, and BISD claims that its loss was caused by mold, the fungus exclusion precludes coverage for BISD's claim. Accordingly, BISD's claims for loss or

damage caused by mold must fail as a matter of law because mold is a specifically excluded cause of damage.

The Court should note that there are no cases from Texas interpreting the fungus/mold exclusion in the context of <u>commercial</u> property policies. There are, however, several cases, many of which are recent, from Texas federal district courts and state intermediate appellate courts involving the "mold or other fungi" exclusion in the Texas Standard Homeowner's Policy, *i.e.*, the "HOB" form. (There are no Texas Supreme Court or Fifth Circuit cases involving this exclusion in the HOB form). Although the HOB form is significantly different from the Royal Policies at issue here (such differences are discussed below), the cases interpreting the HOB form are instructive on some points.

The exclusion in the HOB form is as follows:

> We do not cover loss caused by:
>
> <div align="center">***</div>
>
> (2)  rust, rot, mold or other fungi.
>
> <div align="center">***</div>
>
> We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under this policy.

Although the reported HOB cases are not consistent in their holdings, the cases are consistent that the phrase "we do not cover loss caused by . . . mold or other fungi," on its face, excludes loss/damage caused by mold. *See Fiess v. State Farm Lloyds,* No. Civ. A. H-02-1912, 2003 WL 21659408, *7, 9 (S.D. Tex. Jun. 4, 2003) **(Exhibit 53)**; *Flores v. Allstate Texas Lloyd's Co*, 278 F. Supp. 2d 810, 814 and n.3 (S.D. Tex. 2003); *McCaffree*, 486 S.W.2d at 617. On this narrow issue, due to the similar initial exclusionary language in the HOB form and the Royal Policies, these cases are instructive.

Accordingly, the HOB cases uniformly hold that the mold/fungus exclusion, on its face, precludes coverage for a loss caused by mold. Where the homeowner's cases part company is on the interpretation of the "ensuing loss" provision which provides an exception to the exclusion. (No court in any recent case has held the provision to be ambiguous). Although the cases are in agreement that "ensuing" means to follow or come after as a consequence, as observed by the court in *Coury v. Allstate Texas Lloyd's*, the cases differ on what the "ensuing loss" must follow in order to be covered. *Coury*, No. Civ. A. H-02-2238, 2004 WL 343946 (S.D. Tex. Jan. 6, 2004) (Adopted by District Court on 3/31/04) **(Exhibits 57, 57A)**. The recent opinions arising in the mold context rely upon prior HOB cases (most of which do not involve mold claims) interpreting the "ensuing loss" clause.

One line of cases holds that the ensuing loss <u>must</u> follow from the excluded cause to fit within the exception. If it does, then there is coverage for the ensuing loss. In other words, losses which follow from the excluded cause, if caused by otherwise covered collapse, water damage, or breakage of glass, are covered. If they do not, then they are not covered. *See e.g., Fiess*, 2003 WL 21659408, *7 (S.D. Tex. Jun. 4, 2003) (holding that the ensuing loss must result from the excluded loss) **(Exhibit 53)**; *Harrison v. U.S.A.A. Ins. Co.*, 03-00-00362-CV, 2001 WL 391539, *2 (Tex. App. – Austin Apr. 19, 2001, no pet.) (same); *Daniell v. Fire Ins. Exch.*, 04-94-00824-CV, 1995 WL 612405, *2 (Tex. App. – San Antonio, Oct. 18, 1995, no writ) (same) **(Exhibit 58)**; *Lambros v. Standard Fire Ins. Co.*, 530 S.W.2d 138, 141 (Tex. Civ. App. – San Antonio 1975, writ ref'd) (same); *McCaffree* 486 S.W.2d at 617 (same).

For instance, in *Fiess* the court found that "[f]or coverage to be restored via the ensuing loss clause, an otherwise covered loss must result or ensue from the excluded loss." 2003 WL 21659408, * 7. The court, citing *Lambros v. Standard Fire Ins. Co.*, 530 S.W.2d 138, 141 (Tex. Civ. App. -- San Antonio 1975, writ ref'd), explained that "'[i]f we give to the language of the exception its ordinary

meaning, we must conclude that an ensuing loss caused by water damage is a loss caused by water damage where the water damage itself is the result of a preceding cause.' . . . . Accordingly, 'ensuing loss caused by . . . water damage' refers to water damage which is the result, rather than the cause, of one of the types of damage enumerated in [the] exclusion, in this case mold." *Id.* at * 7-8. The above cases find that mold does not cause water damage and therefore the exception does not apply.

The other line of cases hold that if collapse, water damage, or breakage of glass are otherwise covered by the policy, then the losses which ensue (follow) from those, even if they would normally be excluded, are also covered. *See Coury*, 2004 WL 343946 (Jan. 6, 2004) (**Exhibits 57, 57A**); *Flores*, 278 F.Supp.2d at 814; *Salinas v. Allstate Texas Lloyd's Co.*, 278 F.Supp.2d 820, 824 (S.D. Tex. 2003). These cases find that mold damage to a home is covered as a distinct loss if it ensues from an otherwise covered loss under the policy. *See e.g., Flores*, 278 F.Supp.2d at 814.

While the HOB cases are interesting with respect to the "ensuing loss" clause, they are not precedent for this Court because the "ensuing loss" provision of the HOB form differs very significantly from the "exception" clause in the Royal Policies. Thus, the cases involving homeowner's policies are not instructive on this issue.

In contrast with the "ensuing loss" clause in the HOB form, the exception clause in the Royal Policies does not lend itself to alternate interpretations.[10] Rather, the clause explicitly provides that: "if an excluded cause of loss that is listed in 2.d.(1) through (7) <u>results in</u> a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

---

[10] This type of exception clause is generically and sometimes imprecisely referred to as an "ensuing loss" clause.

Accordingly, under the Royal Policies, the "specified cause of loss" must definitely be caused by the excluded cause of loss. If that is met, then there is coverage for the loss or damage caused by the "specified cause of loss."

"Specified cause of loss" is defined in the Royal Policies as "Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."

Here, therefore, if the excluded loss, *i.e.*, fungus/mold, caused a "specified cause of loss," then the damage from the "specified cause of loss" will be covered. The only specified cause of loss that even arguably would be implicated under the facts of this case is water damage. "Water damage," however, has a very specific application and meaning in the Royal Policies. The Royal Policies define it as follows:

> "Water damage" means **accidental discharge or leakage** of water or steam as the **direct** result of the **breaking apart or cracking** of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

There is no evidence in this case that mold caused water damage as defined in the Royal Policies, *i.e.*, there is no evidence from any expert that mold caused the accidental discharge or leakage of water as the direct result of the breaking apart or cracking of any part of a system containing water. Accordingly, the exception does not apply. Therefore, the exclusion for fungus explicitly precludes coverage for BISD's claim that its loss was caused by mold.

Even if BISD's claim is for mold loss caused by so-called "water damage problems," the loss is still excluded because all the causes of loss found by the experts fall within policy exclusions.

ii. <u>Wear and tear, deterioration, latent defects, et al. exclusions</u>

The critical issue for coverage revolves around the causes, *i.e.*, sources of the "water damage problems" at Aiken and Besteiro. In other words, what was the cause of BISD's mold damage? If the cause of the mold loss/damage was not a covered cause of loss, then there can be no coverage under the Royal Policies. As will be shown below, all of the causes of loss found by the experts are causes excluded by the Royal Policies.

One cause of loss or damage at Aiken and Besteiro found by the experts was the <u>deterioration</u> of roofing/sealant materials. "Deterioration" is an explicitly excluded cause of loss under the Royal Policies. Accordingly, this cause of loss at the schools is specifically excluded under the Royal Policies, and any loss resulting therefrom is not covered.

The Court should also note that in *Salinas*, the court rejected the insureds' argument that their homeowners' policy should cover mold resulting from deterioration. In other words, if deterioration is the cause of loss, there is no coverage. 278 F.Supp.2d at 824.

Additionally, the exclusion for "latent defects" and "any quality in property that causes it to damage or destroy itself," also referred to as "inherent vice" in some policies, has been held to apply to exclude losses caused by improper construction. *See e.g., Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939 (5th Cir. 1965); *80 Broad Street Co. v. U.S. Fire Ins. Co.*, 88 Misc.2d 706, 707, 389 N.Y.S.2d 214 (Sup. Ct. 1975), aff'd, 54 A.D.2d 888, 390 N.Y.S.2d 768 (1st Dept. 1976) (**Exhibits 59, 59A**).

Although the construction defects in the context of the case at bar will be discussed in greater detail below with respect to the exclusion for faulty or defective construction, it is interesting to note that the "latent defects" exclusion also applies to preclude coverage for construction defects. For instance, in *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939 (5th Cir. 1965), homeowners discovered that the joists, sills

and sub-flooring of their home were almost completely rotted. The undisputed evidence showed that the damage to the Yates' home was caused by a design defect. *Id.* at 940-41. The crawl space beneath the home was inadequately supplied with vents. *Id.* at 940. Contact between air trapped in the crawl space and the subfloors and sills, which had been chilled by air conditioning, produced condensation of moisture and consequent rotting. *Id.* The Aetna property policy excluded loss caused by "inherent vice, wear and tear, deterioration; rust, rot, mould or other fungi; dampness of atmosphere . . . ." *Id.* at 940-41. The Fifth Circuit held that the plaintiffs' loss was caused by the defective construction, and consequently, fell within the exclusion. *Id.* Citing the "inherent vice," "deterioration," "rot," "fungi" and "dampness of atmosphere" exclusions, the Fifth Circuit reversed the trial court's judgment for the insured, holding that "we do not think that any acceptable reading permits compensation for the loss that plaintiffs incurred as a result of the *defective design of their home.*" *Id.* at 941 (emphasis added).

Similarly, in *80 Broad Street Co.*, the loss at issue involved buckling of marble facing on a building. 88 Misc.2d at 707. The policy contained exclusions for wear and tear, deterioration, rust or corrosion, mold, . . . inherent or latent defect, . . . ." *Id.* The insured's engineer attributed the buckling to (1) the failure to provide for masonry covering of the steel beams as required by the building code, (2) the bending of metal anchors before installation, and (3) the failure to properly place and connect steel beams which permitted moisture to penetrate. *Id.* The evidence showed that rain, frost, and seepage combined with the original improper construction to cause the buckling. *Id.* The court found that the loss was excluded under the exclusion for inherent or latent defects, among others, because the improper construction came within that exclusion. *Id.*

Here, all of the causes of loss found by the experts relating to defective construction -- defects with the HVAC system, the roofing, the plumbing pipe -- would be excluded under the latent defects exclusion.

Furthermore, the "exception" clause does not restore coverage. There is <u>no</u> evidence from any expert that a construction defect caused "water damage," as the Royal Policies define it. Stated differently, there is no evidence that construction defects with the HVAC system, the roof, or the plumbing pipes, caused "the accidental discharge or leakage of water . . . as the direct result of the breaking apart or cracking of any part of a system . . . containing water." In fact, there is <u>no</u> evidence in this case of <u>any</u> breaking apart or cracking of <u>any</u> pipes. Accordingly, the exclusions preclude coverage.

> **b.**    ***Exclusions for Faulty, inadequate or defective siting; design, construction, repair; maintenance, et al., (Exclusions 3. a. through 3. c.)***

>> i.   <u>Faulty, inadequate or defective: Planning, surveying, **siting** exclusion (Exclusion 3.c.(1))</u>

Some of the experts found that improper drainage of exterior courtyards at Aiken and Besteiro allowed for the ponding of water around the exterior of buildings, which allowed water to penetrate the base of those buildings. Accordingly, the exclusion for faulty planning, surveying, and siting of the schools applies.

>> ii.   <u>Faulty, inadequate or defective: **Design, specifications, workmanship, repair, construction**, renovation, remodeling, **grading**, compaction exclusion (Exclusion 3.c.(2)); **Materials used in repair**, construction, renovation or remodeling (Exclusion 3.c. (3)); and **Maintenance** (Exclusion 3.c.(4)).</u>

For the same reasons discussed above with respect to the exclusion for faulty siting, the exclusion for faulty or inadequate grading would also apply to preclude coverage for the loss resulting from the improper drainage of exterior courtyards.

Further, and most critically, the dominant causes of the mold at the schools, as found by all the experts, were defective design, construction, installation and maintenance of the HVAC systems, roof system, and to a lesser extent, plumbing line defects. All losses caused by such defects are specifically

excluded from coverage by virtue of the express exclusions listed above. For example, in *Narob Dev. Corp. v. Insurance Co. of No. Am.*, 631 N.Y.S.2d 155 (N.Y. 1st Dept. 1995) (**Exhibit 60**), coverage was denied for the collapse of a retaining wall that resulted from defective workmanship, where the property policy excluded losses "caused by or resulting from error, omission or deficiency in workmanship or materials." Likewise, in *Hostetler v. State Farm Fire & Cas. Co.*, 521 N.E.2d 1357 (Ind. Ct. App. 1988) (**Exhibit 61**), coverage was denied for a sagging roof which resulted from faulty design and construction, where the property policy excluded from coverage "loss from structural defects."

Another instructive case is *Schloss v. Cincinnati Ins. Co.*, 54 F. Supp.2d 1090, 1095 (M.D. Ala. 1999), aff'd without op., 211 F.3d (11th Cir. 2000). In *Schloss*, the insured's home was damaged by rot and deterioration as a result of water intrusion caused by defective design and/or construction. *Id.* at 1098-99. The court held that the policy, on its face, did not provide coverage because rot, deterioration, and faulty, inadequate, or defective construction were all excluded causes of loss. *Id.*

Lastly, in *Yates v. Aetna*, discussed above, the Fifth Circuit held that the homeowners' damage claim caused by a design defect was excluded because defective design fell within the exclusion for inherent vice in the policy at issue. 344 F.2d at 941. Based on the Fifth Circuit's holding, BISD's claim is also plainly excluded from coverage under the defective design and construction exclusions, which were not separate exclusions in the Aetna policy, but were considered part of the inherent vice exclusion.

In the case at bar, BISD's own retained engineering firms, among many others, have attributed the mold problems at the schools to defectively designed, constructed, operated and maintained HVAC systems and roofs. For example, Assured Indoor Air Quality, L.P. ("AIAQ") evaluated the alleged problems in the schools and sent BISD a status report on January 25, 2002 (**Exhibit 28**). In that status report, AIAQ wrote:

> The building air conditioning system does not sufficiently condition and/or treat the outside air enough to reduce the increased moisture load in the building. . . . [p. 2]
>
> . . .
>
> BISD should "repair roof leaks by replacing the roof" and "replace the deficient HVAC system with an appropriate HVAC system which will maintain an appropriate indoor dew point.... [p. 3]
>
> . . .
>
> If present conditions are not immediately addressed with appropriate action, the problem will only get worse. [p. 4]

See **Exhibit 28**, AIAQ January 25, 2002 Report, at pp. 2-4.

AIAQ was not the only engineering firm hired by BISD to evaluate the alleged problems at the school. Ambiotec Environmental Consultants, Inc.'s ("Ambiotec's") investigation found that the elevated levels of *Stachybotrys* mold spores found in Aiken "presented a serious concern" and was "likely the result of airborne spores from the visible mold on the chiller pipe insulation jacket located above the corridor ceiling." (*See* **Exhibit 25**, Ambiotec Report at p. 1). Ambiotec's report explained and cautioned:

> Moisture in the form of plumbing leaks, roof leaks, poor ventilation, HVAC condensation and humid ambient air entering the schools are all possible sources for creating an environment conducive to microbiological growth. Moisture trapped between walls and floors leads to increased presence of mold on wallboard and ceiling tiles. Condensation is a common source for mold growth on piping insulation. Preliminary indications from the pattern of visible mold suggest that one principal cause of the moisture intrusion in Aiken is [condensation] from the chilled water HVAC system, and in Besteiro from plumbing and roof leaks. [p. 2]
>
> . . .
>
> Elevated temperature and humidity levels (>60%) create conducive environments for mold growth. During the current investigation, temperature and RH were measured at several of the air sampling locations. [p. 6]

. . .

> RH measurements recorded in the [Besteiro] school ranged from 55.3% in Corridor C to 82.6% in Room 119. The median RH within the school was found to be 62.9%. Ambient air was found to have an RH level of 80.0%. [p. 9]

. . .

> RH measurements recorded in the [Aiken] school ranged from 50.1% in the counselor's office to 65.8% in the cafetorium. [p. 10]

. . .

> The sample that presented a serious concern at Aiken . . . The sample had an elevated concentration of *Stachybotrys* level of 60,000 counts/M$^3$, which was likely the result of airborne spores from the visible mold on the chiller system pipe insulation jacket located above the corridor ceiling. [p. 10]

*See* **Exhibit 25**, Ambiotec Report (emphasis added).

Finally, Engineering & Fire Investigations ("EFI") provided BISD its findings, observations, and conclusions on January 20, 2003. (*See* **Exhibit 26**, EFI report). In its report, EFI explained that defects in construction and in the HVAC systems, and poor maintenance, were the cause of the problems in the schools. The relevant language in the report states:

> The discharge air temperature, dry bulb and wet bulb, of several RTUs [at Besteiro were] providing less than the cooling and dehumidification requirements of the original design. [p. 2-25]

. . .

> Based on typical engineering benchmarks, the RTUs serving the [Besteiro] classrooms are oversized, and as a consequence, do not operate a sufficient number of hours daily to control relative humidity. Based on [EFI's] field measurements, the RTUs are not controlling temperature and relative humidity in the classrooms as designed. [p. 2-28]

. . .

> Elevated levels of relative humidity in the [Besteiro] classrooms and the lack of adequate routine cleaning of the interiors of the RTUs have also lead to performance problems with the RTUs and the development of molds on the cooling units of some RTUs. [p. 2-28]

. . .

The [Besteiro] RTUs are not introducing designed amounts of outside air. Field measurements indicate that outside air ventilation rates are approximately 10 percent of the design outside air intake amount. [p. 2-28]

. . .

The chilled water coils observed in the fan coil units [at Aiken] have moderate accumulations of dust, debris, and possible mold on the faces of the aluminum fins. Heavy accumulations of debris at a number of outside air pre-treating and interior fan coil units were restricting air movement and heat transfer at the cooling coils such that temperature and relative humidity control in the classrooms and other areas was ineffective. Accumulations of dust and debris were also observed on the blades of the blower fans in the fan coil units. [p. 2-35]

. . .

Based on typical engineering benchmarks, the interior fan coil units serving the main entrance, Administration Office, Counselor's Office and classrooms [at Aiken] are somewhat oversized, and as a consequence, are overcooling these areas and not adequately controlling relative humidity. Based on [EFI's] field measurements, some areas had temperature and relative humidity levels outside the ranges of original design. The room thermostats are apparently out of calibration, causing some areas to be overly cool and humid. [p. 2-38]

Elevated levels of relative humidity in [the Aiken main entrance, Administration Office, Counselor's Office] and classrooms and the lack of adequate routine cleaning of the interiors of the fan coil units including chilled water cooling coils have also lead to performance problems with the fan coil units and the development of molds on the cooling coils of some of the fan coil unit interiors. [p. 2-39]

*See* **Exhibit 26**, EFI Report to BISD.

As illustrated by the above, all of the causes of the mold loss/damage found by BISD's own experts and others are causes explicitly excluded under the Royal Policies. Thus, all loss resulting from faulty or defective design, workmanship, construction, repair, maintenance, et al. is not covered.

### iii. Exception in Exclusion 3 does not apply

Exclusion 3 contains the exception that "if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss." Like the exception clause for the exclusions of paragraph 2., this exception clause is not subject to alternate interpretations. Rather, it explicitly states that if the excluded cause of loss results in a Covered Cause of Loss, then there is coverage for loss caused by the Covered Cause of Loss. Therefore, if the excluded cause of loss does not result in a Covered Cause of Loss, the exception is not applicable. Unlike the exception clause in paragraph 2., however, this clause refers to Covered Causes of Loss, not "specified causes of loss."

In order for this exception to apply, the Covered Cause of Loss must follow *as a consequence of* the excluded cause of loss. The exclusions that are subject to this exception, such as defective siting, defective design, defective construction, faulty workmanship or repair, and/or inadequate maintenance, did not result in a Covered Cause of Loss in this case.

The exception's application is very limited. For instance, if defectively installed roof flashing allowed water to leak into a wall cavity, any subsequent deterioration and mold would be excluded by the Royal Policies because those are excluded causes of loss. If, however, the defectively installed roof flashing allowed water to leak into a wall cavity which entered an electrical box and caused an electrical short which resulted in a fire, then the damage caused by fire, which is a covered cause of loss, would be covered pursuant to the exception. The fire damage is covered because it results from a covered unforeseeable event occurring wholly separate from the defective property itself. The court in *Schloss* noted, with respect to an ensuing loss clause, that "the critical language of the exception emphasizes that

to be covered by the policy, an ensuing loss must be covered and not within another exclusion." 54 F.Supp.2d at 1098.

The Supreme Court of New Hampshire recently interpreted this very same exception clause in the context of a faulty workmanship case. *Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 817 A.2d 292 (N.H. 2003) (**Exhibit 54**). In that case the insured building owner filed a claim for damage to a brick wall on the building. *Id.* The experts on both sides attributed the damage to faulty workmanship. *Id.* Faulty workmanship was excluded under the policy pursuant to the "Faulty, inadequate or defective: (2) Design, specifications, workmanship, repair, construction, . . . ." exclusion. *Id.* at 175. The policy contained the same exception clause at issue in the case at bar. *See id.* at 174. The New Hampshire Supreme Court found that "[l]oss or damage caused by or resulting from faulty workmanship is excluded from coverage under the policy's negligent work exclusion unless the faulty workmanship results in a covered cause of loss, in which case the defendant will provide coverage for the loss or damage caused by that covered cause of loss. The question thus becomes whether a covered cause of loss ensued." *Id.* at 176-77.

The insurer argued that the exception to the exclusion did not apply because the damage was directly caused by the faulty workmanship and no other cause of loss ensued. *Id.* at 177. The insured countered that the exception abrogated the exclusion when the excluded cause of loss resulted in direct physical harm. *Id.* He argued that, although no coverage existed for the cost of correcting the faulty workmanship, the exception to the exclusion reinstated coverage for damage caused by the faulty workmanship. *Id.* The insured further argued that the provisions were ambiguous and must be construed in his favor. *Id.*

The New Hampshire Supreme Court held that the provisions were not ambiguous. *Id.* at 177-78. It further held as follows: "We interpret the ensuing loss provision to apply to the situation where there is

a 'peril,' *i.e.*, a hazard or occurrence which causes a loss or injury, <u>separate</u> and <u>independent</u> but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues.... Thus, the exception to the exclusion operates to restore coverage if the damage ensues from a covered cause of loss." *Id.* at 177 (emphasis in orig.) (citations omitted). In that case, the court held there was no subsequent ensuing cause of loss separate and independent from the initial excluded cause of loss, *i.e.*, the faulty workmanship. *Id.* Therefore, the exception to the exclusion did not apply. *Id.*

The same is true here. As shown above, the faulty workmanship and defective construction did not result in a covered cause of loss in this case. Accordingly, the exception does not apply.

### 3.    **The Limitations Clause**

As noted above, the "Causes of Loss - Special Form" of the Royal Policies also contains a "Limitations" clause.[11] This clause provides that:

> C.  **LIMITATIONS**
>
> The following limitations apply to all policy forms and endorsements, unless otherwise stated.
>
> [1.] We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.
>
> \* \* \*
>
> c.      **We will not pay for loss of or damage to the interior of any building or structure caused by or resulting from rain,** snow, sleet, ice, sand or dust, whether driven by wind or not, **unless:**
>
>> (1)      The building or structure **first** sustains damage by a Covered Cause of Loss to its roof or walls **through which** the rain, snow, sleet, ice, sand or dust enters; or . . .

---

[11] *See* footnote 9 *supra* for a discussion of this clause as it appears in the Royal Policies.

This limitation specifically excludes coverage for any damage to the interior of a building caused by rain. *See Horizon III Real Estate v. Hartford Fire Ins. Co.*, 186 F.Supp.2d 1000, 1006-007 (D. Minn. 2002). There is, however, an exception to the limitation for instances where the building first sustains damage by a Covered Cause of Loss (*e.g.*, hail or wind) to its roof or walls through which the rain enters. There is coverage only if this exception is met. *Id.* For example, if hail knocked holes in the roof through which rain entered, the exception would be met. Although miscellaneous roof leaks have been identified at the schools, there is no evidence that the schools first sustained damage by a Covered Cause of Loss. Rather, all the experts have attributed the roof leaks to inadequate or defective sealing of roof penetrations where HVAC, mechanical systems, et al. penetrate the roof and/or to the deterioration of sealant or improper maintenance of the roofs. (*See e.g.*, **Exhibit 26,** EFI Report at pp. 1-2 and 2-17, 2-18, and 2-19.)

Clearly, the schools did not first sustain damage to their roofs or walls by a *covered* cause of loss *through which* rain entered into the interior of the buildings. Rather, as BISD's experts explain, the rain entered the schools from the roof over a long period of time as a result of the roof's improper design, construction, installation, and maintenance. (*See*, EFI Report, **Exhibit 26,** at pp. 1-2, 2-15 to 2-24). Accordingly, though there likely exists *some* water/mold damage from leaking rain, there is no coverage for any such loss or damage to the interiors of the schools caused by this leaking rain. Thus, the exception to the rain limitation has not been met. There is no coverage for any interior damage at the schools from rain.

## 4.    The Additional Coverage Extension

To the extent BISD attempts to argue that the Additional Coverage Extension provides coverage

for its "water damage problems," Royal addresses that provision. The Additional Coverage Extension

clause in the Royal Policies provides in part, as follows[12]:

<div align="center">

**E.     ADDITIONAL COVERAGE EXTENSIONS**

\* \* \*

**2.    Water Damage, Other Liquids, Powder or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

</div>

The Additional Coverage Extension does not provide coverage to BISD in this case. The provision

provides coverage for access costs when there is an accidental discharge of water from a system containing

water, such as a plumbing system. *See e.g., U.E. Texas One-Barrington, Ltd. v. General Star Indem.*

*Co.*, 243 F.Supp.2d 652, 666-67 (W.D. Tex. 2001). However, whether this provision is even applicable

in any given case turns on whether there is a "covered loss or damage." *Id.* In other words, the water

damage must have been caused by a covered cause of loss. If the cause of the loss is an excluded cause,

the coverage extension does not kick in. *Id.* For instance, in *U.E. Texas One-Barrington, Ltd.*, the Court

held that the coverage extension did not apply. It explained that because the commercial property policy

at issue "clearly requires a covered loss before any access costs for repair are payable and because the

damages caused by the long-term plumbing leaks...are not covered through an application of the 14-day

---

[12] *See* The Causes of Loss - Special Form , Form CP 10 30 06 95 (ISO Commercial Risk Services, Inc. 1994) to the Royal Policies.

exclusion, there is no coverage for access costs to remediate plumbing deficiencies under 'Additional Coverage Extensions, part 2.'" 243 F.Supp.2d at 667.

Here, because there is no evidence of water damage as defined in the Royal Policies, *i.e.*, there is no evidence of any accidental discharge or leakage of water as the direct result of the breakage or cracking of pipe, there can be no coverage under the Additional Coverage Extension.

### E.    *BISD is Estopped From Asserting that the Claimed Mold and Moisture Damage was Caused by Something Other than the Defective Design and Construction of the Schools, Including Defective HVAC Systems.*

BISD is judicially estopped from submitting *any* evidence as to an alternative cause in an effort to *create* a fact issue in this action and is also judicially estopped from submitting evidence inconsistent with its prior position in its claims against the architects and contractors involved in the schools' design and construction.[13] Therefore, BISD cannot submit controverting causation evidence.

Judicial estoppel is a common law doctrine that applies when a party tries to contradict a statement made in a prior judicial proceeding. *See In Re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 936 (2000). Judicial estoppel includes instances where a party has assumed one position in pleadings pertaining to one lawsuit, then attempts to assume an inconsistent position in another lawsuit. *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988). The doctrine prevents "cold manipulation and not an unthinking or confused blunder" and is applied when a party uses intentional self-contradiction as a means of obtaining an unfair advantage in a legal proceeding. *In Re Coastal Plains,* 179

---

[13]    BISD has taken such positions in at least the following two lawsuits: (1) Cause No. 2003-08-4078-E, *American Standard & The Trane Company vs. Brownsville Independent School District*; In the 357th Judicial District Court of Cameron County Texas; and (2) Cause No. 2002-01-000071-B, *Brownsville Independent School District vs. Stotler Construction Company, et. al*; In the 138th District Court of Cameron County, Texas.

F.3d at 206. It is designed to prevent fraud and to protect the integrity of the judicial process by preventing a party from manipulating the judicial system for his own purposes. *See Brandon*, 858 F.2d at 268.

In BISD's suit against American Standard and the Trane Company (the *"Trane* lawsuit"), BISD alleges that the conduct of architects and contractors involved in the design and construction of the subject schools is the "legal cause of water damage and contamination of Besteiro by various molds, microbes, and fungi. . ." (*See* **Exhibit 49**, BISD's Original Third-Party Petition in Cause No. 2003-08-4078-E, *American Standard, et al. vs. BISD and Al Cardenas Masonry, Inc., et al.* at ¶ 4.1). Likewise, BISD alleges that the conduct of architects and contractors involved in the design and construction of the schools is the "legal cause of water damage and contamination of Aiken by various molds, microbes, and fungi. . ." (*Id.* at ¶ 4.2). BISD further explains that the contractors involved in the construction of the schools defectively "design[ed], "construct[ed]", and "acted after the construction" with regard to "design, plumbing, improper inspections, roofing systems, building envelope system, structural systems, HVAC (heating, ventilating, air conditioning) systems, electrical, mechanical, air conditioning, condensate drainage, and numerous other design deficiencies and construction deficiencies . . ." (*Id.* at ¶ 4.3). BISD argues in the *Trane* lawsuit that the conduct of the contractors involved in the design and construction of the schools was "a proximate cause of the actual damages suffered by BISD . . . not to exceed . . . $28,000,000.00 plus attorney's fees." (*Id.* at ¶ 9.7).

BISD states its position regarding the defective design and construction of the schools in detail. Specifically, its third-party petition in the *Trane* lawsuit, attached as **Exhibit 49**, states:

> BISD's property [Aiken and Besteiro] has been contaminated with pollution, various molds, mold spores, mildew, bacteria, fungus and other toxic materials, which was caused by the negligent construction, supervision, design, selection, repair, inspection, and installation of the schools' condensate drain systems, equipment, HVAC systems, roof

systems, building envelope systems, drain site systems, plumbing systems, equipment and the use of improper materials in the construction of the schools. [¶ 5.2 ]

. . .

[The contractors] failed to adequately and responsibly construct, supervise, inspect, design, and install the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and other defects in construction, repair, and design, which led to the subsequent damages . . . [¶ 5.3]

. . .

As a result of the negligent construction, supervision, inspection, design and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and the use of improper materials in the construction of the schools, excess moisture has developed throughout the schools resulting in the growth of harmful molds, mold spores, bacteria, fungi, and their resulting harmful products and pollutants of these molds, mold spores, bacteria, and fungi were released into [the Subject Schools]. [¶ 5.4]

. . .

After the construction of the schools, structural, environmental, HVAC, electrical, plumbing, roofing, venting, mechanical and other defects permeated throughout the schools which led to their contamination. As a result, both schools became uninhabitable and reasonably [*sic*] dangerous. [¶ 6.6]

. . .

*See* **Exhibit 49,** BISD's Third Party Petition. Thus, ***BISD's position places BISD squarely within the exclusions of the Royal Policies.***

Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003); *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996). The purpose of the doctrine is to prevent litigants "from 'playing fast and loose' with the courts." *Hall*, 327 F.3d at 396. Because BISD is attempting to manipulate the Court by asserting an inconsistent

position in this action, application of federal law is appropriate. *See Hall*, 327 F.3d at 395. In this Circuit, two bases for judicial estoppel must be satisfied before a party can be estopped. *See id.* First, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and second, that party must have convinced the court to accept that previous position." *Id.*

A party's inconsistent position may be used for summary judgment purposes under the doctrine of judicial estoppel. *Brandon*, 858 F.2d at 268. This is true because the purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing "fast and loose with the courts to suit the exigencies of self interest." *Brandon*, 858 F.2d at 268; *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 303 (5th Cir.1998), *cert. denied*, 525 U.S. 1141 (1999) (judicial estoppel applies to protect the integrity of the courts--preventing a litigant from contradicting its previous, inconsistent position). The integrity of the judicial process would be subverted if an insured was permitted to urge one causation theory in a liability case, then totally change its causation theory in a suit against its insurer solely because the previous causation theory would result in no coverage being afforded under the insurance policy.

In recognizing the application of judicial estoppel in this circuit, the Fifth Circuit has explained that "[t]he policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565 (1994); *Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("the doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed").

480306.4                          46

Notably, Royal is *not* required to demonstrate that it relied to its detriment on BISD's allegations in the Cameron County state court lawsuits. Because the doctrine of judicial estoppel is intended to protect the judicial system, rather than the litigants, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary. *See In Re Coastal Plains, Inc.,* 179 F.3d at 205.

Judicial estoppel should be applied by a court in a situation, such as this, where a party has asserted a position in another action to obtain a favorable outcome, regardless of whether by judgment or settlement. *See McNamara v. City of Chicago,* 138 F.3d 1219, 1225 (7th Cir.), *cert. denied,* 525 U.S. 981, 119 S.Ct. 444 (1998) ("doctrine of judicial estoppel requires . . . that the party sought to be estopped have obtained a favorable judgment *or* settlement on the basis of the factual or legal contention that he wants to repudiate in the current litigation"); *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604-605 (9th Cir. 1996) (holding that *a favorable settlement is equivalent to a favorable judgment for purposes of applying judicial estoppel*); *Kale v. Obuchowski*, 985 F.2d 360, 361-62 (7th Cir.1993) (applying judicial estoppel doctrine and explaining that frequently "a settlement represents capitulation").

This Court should not allow BISD to play "fast and loose with the Court" and manipulate the system with regard to its causation theories. BISD is estopped from asserting causation theories that are different from those it is urging in the still pending Cameron County state-court lawsuits. As a result of its causation position asserted in those cases, BISD has been paid to date at least $170,000 by one of the construction defendants, RBM Engineering, Inc., the mechanical electrical engineering firm that designed the HVAC system alleged by BISD to have been defectively designed, constructed and installed. (*See* **Exhibit 50**, BISD's 11/21/03 Response to Interrogatory No. 15 in *Trane* lawsuit, signed by Baltazar Salazar, BISD's counsel; **Exhibit 51**, June 28, 2003 Newspaper Article concerning BISD's settlement with RBM Engineering; **Exhibit 51A**, RBM 6/20/03 Settlement Check to BISD for $170,000, and related

6/23/03 correspondence to BISD's counsel, Mr. Salazar. BISD may have also been paid additional dollars to date that have not yet been disclosed to Royal, although Royal has repeatedly requested this information from BISD.

**F.    _The Royal Policies Do Not Cover Known Losses_.**

Insurance coverage is precluded where an insured is -- or should be -- aware of an ongoing progressive loss or known loss at the time a policy is purchased. *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App.--Houston [14th Dist.] 1995, no writ). This concept is known as the fortuity doctrine. Fortuity is an inherent requirement of all risk insurance policies, because the purpose of insurance is to protect insureds against unknown or fortuitous risks. *Id.* at 501; *accord Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72, 75 (Tex. App.--Dallas 2001, no pet.). The fortuity doctrine encompasses both the "known loss" and "loss in progress" principles. *Two Pesos, Inc.*, 901 S.W.2d at 502. ; *Franklin v. Fugro-McClelland (Southwest), Inc.*, 16 F. Supp.2d 732, 735 (S.D. Tex. 1997).

Under these concepts, "insurance coverage is precluded where an insured is, or should be, aware of an ongoing progressive loss or known loss at the time the policy is purchased." *Id.* at 502; *Franklin v. Fugro-McClelland (Southwest), Inc.*, 16 F. Supp.2d 732, 735 (S.D. Tex. 1997). The "loss in progress" principle is recognized as part of standard insurance law in Texas. *Two Pesos, Inc.,* 901 S.W.2d at 502; *Franklin*, 16 F. Supp.2d at 735. "An insured cannot insure against something that has already begun and which is known to have begun." *Two Pesos, Inc.*, 901 S.W.2d at 502; *Franklin*, 16 F. Supp.2d at 735, citing *Burch v. Commonwealth County Mut. Ins. Co.*, 450 S.W.2d 838, 840 (Tex. 1970) (finding that "if [an insured] applies for and obtains an antedated policy knowing that a loss has already occurred during the policy period, his failure to disclose the facts constitutes fraud that would enable the insurer to set aside the contract"); *see also Travis*, 68 S.W.3d at 75 (noting that the doctrine

has its roots in the prevention of fraud; because insurance policies are designed to insure against fortuities, fraud occurs when a policy is misused to insure a certainty).

For instance, in *Summers v. Harris*, a first party insurance case, the Fifth Circuit held that "when a loss is in progress at the time a policy is issued, the contract of insurance does not take place." 573 F.2d 869, 871 (5th Cir. 1978). In *Summers*, flooding of the insured's property began on April 17, 1973, and posed an immediate threat to his home three days later. And in fact, on April 20, the insured "paddled a boat across the area of water which then stood in his front yard." *Id*. He applied for flood insurance on April 25, and the flood waters reached the first floor of his house several days thereafter. The insured eventually sought coverage for the flood damage under the policy he procured on April 25. *Id*. In holding there was no coverage afforded under the policy, the Fifth Circuit determined that the damage had resulted from the flooding process that began on April 17, prior to the procurement of insurance, and as such it was a loss in progress at the time the policy was issued. *Id*. at 872.

Similarly, in *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th Cir. 1976), the Fifth Circuit held there was no coverage for an insured who obtained flood coverage while the flood waters were rising toward his house. The Fifth Circuit applied the loss in progress principle, holding that where a loss is already in progress at the time a policy is issued, the contract of insurance does not take effect. *Id*.

Furthermore, as noted above, several of the exclusions in insurance policies also incorporate fortuity concepts. For instance, exclusions for inherent defects and ordinary wear and tear are not considered fortuitous causes of loss. *See e.g., Montefiore Med. Center v. American Protection Ins. Co.*, 226 F. Supp.2d 470, 477 (S.D.N.Y. 2002). Likewise, insurance is not intended to provide coverage for maintenance or inevitable and predictable losses due to inherent problems. *See McCaffree*, 486 S.W.2d at 617.

Here, the indisputable, voluminous evidence shows that the loss and damage at the schools was actually known to BISD before it entered into its <u>first</u> policy with Royal, Policy No. KHT 307564, which incepted on September 1, 1996. The evidence shows that BISD was aware of problems associated with high humidity, water intrusion and indoor air quality, including mold/mildew at both schools from the time they opened. BISD was aware of such problems at Besteiro by the Fall of 1994 when mold and mildew were discovered in the kitchen. Furthermore, by September 1995, mold and mildew were discovered in the Besteiro library. Moreover, 1995 is when the chronic roof leaks at Besteiro due to the construction defects began.

BISD was aware of problems at Aiken by the time it opened in August 1996, as it already had documented problems with the HVAC system, and several areas had wet and mildewed ceiling tiles, as well as other problems. Accordingly, coverage should be precluded under all the Royal Policies because BISD was aware of a known loss at the time it purchased its first policy from Royal in 1996.

Further, Aiken and Besteiro clearly suffered known, ongoing progressive problems due to known and ongoing design and construction defects, faulty workmanship, wear and tear, deterioration, latent defects, fungi, and defective and faulty maintenance over a period of many years. Because of the documented indisputable evidence of problems at both schools, coverage under the subsequent three policies must also be precluded.

In sum, under the known loss/loss in progress doctrines, BISD's claim is not covered as a matter of law, and thus, the Royal Policies are inapplicable to the loss. *See Franklin*, 16 F. Supp.2d at 737 (holding that insured knew of its loss in progress at the time it entered into the insurance policy, and thus as a matter of law there could be no coverage under the policy).

480306.4                                    50

### G.   *BISD Did Not Provide Royal Prompt Notice of Its Alleged Damages.*

In addition to there being no coverage for BISD's claim based on exclusions in the Royal Policies, as well as the known loss doctrine, there is also no coverage because BISD breached the Policies. It failed to satisfy several policy conditions. For example, BISD failed to provide Royal prompt notice of its alleged loss or damage. As discussed above, the evidence shows that BISD was aware of problems associated with high humidity, water intrusion and indoor air quality, including mold/mildew at both schools from the time they opened, and of course, thereafter as the problems continued.

Although the problems at both schools were documented beginning in 1994 at Besteiro, and 1996 for Aiken, and then continued thereafter, BISD never provided notice of its claim to Royal until November 2001. At that time, BISD provided notice under the last Royal Policy, No. KHT318271 (effective 4/1/01 - 4/1/02). Then, in April 2002, BISD made a claim for the same damage under the three prior Royal Policies, effective September 1, 1996 to April 1, 2001. (*See* **Exhibit 44**).

The Policies are very clear as to the conditions and procedure to follow in making a claim. All four Royal Policies provide as follows:[14]

> **E.     Loss Conditions**
>
> The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.
>
> <div align="center">* * *</div>
>
> **3.      Duties in the Event of Loss or Damage**

---

[14] *See* Building and Personal Property Coverage Form, Form CP 00 10 06 95 (emphasis added), as amended by the Texas Changes Endorsement, Form CP 01 42 11 00, ¶ H. in Policy No. KHT 318271, **Exhibit 4**; as amended by the Texas Changes Endorsement, Form CP 01 42 12 92, ¶ H. in Royal Policy Nos. KHT308599 and KHT310355, **Exhibits 2 and 3**, Policy No. KHT307564 (effective 9/1/96-4/1/97), **Exhibit 1** does not contain the Texas Changes Endorsement. Therefore, Clause 8 of the provision is slightly different in the oldest policy, **Exhibit 1**, but not in a material way. Clause (7) is also different in Policy No. KHT307564 because the policy does not have the aforementioned Texas Changes Endorsement, which allows 91 days to provide proof of loss.

480306.4                                    51

a.      You must see that the following are done in the event of loss or damage to Covered Property:

* * *

(2)     Give us **prompt notice** of the loss or damage. Include a description of the property involved.

(3)     **As soon as possible, give us a description of how, when and where the loss or damage occurred.**

(4)     Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property....

(5)     At our request, give us **complete inventories of the damaged and undamaged property.** Include quantities, costs, values and amount of loss claimed.

(6)     As often as may be reasonably required, **permit us to inspect the property** proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7)     Send us a **signed, sworn proof of loss containing the information we request to investigate the claim.** You must do this within 91 days after our request. We will supply you with the necessary forms.

(8)     **Cooperate** with us in the investigation or settlement of the claim.

Texas courts interpret insurance policy notice requirements as conditions precedent to coverage. *Flores*, 278 F.Supp.2d at 815; *Love of God Holiness Temple Church v. Union Standard Ins. Co.*, 860 S.W.2d 179,180 (Tex. App. – Texarkana 1993, writ denied). An insured's failure to comply with the notice requirement constitutes a breach of contract and relieves the insurer of its obligations. *Flores*, 278 F.Supp.2d at 815. Whether notice is "prompt" is generally a question of fact, evaluated under a standard

of reasonableness. *Id.* If the facts are undisputed, however, Texas courts may deem late notice unreasonable as a matter of law. *Id.* This is especially true "where delay is totally unexplained and without excuse." *Id.*

Under Texas law, a party cannot be said to sustain actual property damage until such damage becomes manifest. *Id.*; *Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252, 257 (Tex. App. – Dallas 1993, writ denied); *American Home Assur. Co. v. Unitramp, Ltd.,* 146 F.3d 311, 314 (5th Cir. 1998) (holding that an injury becomes manifest when it is apparent or capable of being perceived).

"Prompt notice" means notice within a reasonable time from the occurrence of the event causing the loss or damage or the time the damage is apparent. *See e.g., Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432, 435 (Tex. App. – Dallas 1988, no writ); *Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, Civ. No. 4:03-CV-302-A, 2004 WL 547564, *6 (N.D. Tex. Mar. 17, 2004) **(Exhibit 55)**.

Thus, BISD was required under the Royal Policies to provide "prompt notice" of its claim for mold damage when such damage became manifest or apparent. Here, BISD failed to notify Royal for seven years as to Besteiro, and five years as to Aiken. In *Flores*, the court held that the insured's failure to provide notification to the insurer for six months after his claim for mold damage became apparent was not "prompt" as a matter of law. 278 F.Supp.2d at 819. In *Salinas,* the court held that the insureds' failure to notify the insurer for over a year after the mold claim became apparent was not "prompt" as a matter of law. 278 F.Supp.2d at 825. Many other cases have found that even shorter delays in providing notice to an insurer were unreasonable as a matter of law. *See, e.g., Klein v. Century Lloyds*, 275 S.W.2d 95, 97 (1955) (32 day delay in providing notice was unreasonable and did not constitute notice given as soon

as practicable as required by the policy); *Allen v. Western Alliance Ins. Co.* 349 S.W.2d 590, 594 (1961) (holding as a matter of law that failure to give notice for 107 days, under the circumstances of that case, did not constitute the giving of notice "as soon as practicable" after the accident); *see also Broussard v. Lumberman's Mut. Cas. Co.*, 582 S.W.2d 261, 263 (Tex. Civ. App.--Beaumont 1979, no writ) (finding that delay of 22 months in giving notice of the claim to the insurance companies did not constitute giving notice "as soon as practicable" as required by the insurance policies); *Assicurazioni Generali SpA v. Pipe Line Valve Specialties Co.*, 935 F. Supp. 879, 888 (S.D. Tex. 1996) (holding that a delay in reporting an accident for 17 months was not "as soon as practicable" as a matter of law).

Accordingly, BISD's notice to Royal was late as a matter of law. To the extent BISD attempts to argue that multiple causes of mold damage resulted in multiple times when injury became manifest, and that its notice in 2001 was therefore timely, such argument has no merit. The incontrovertible evidence shows that not only was mold manifest at the schools from the time they opened (Besteiro in 1994 and Aiken in 1996), but BISD was fully aware of the ongoing problems and mold manifestations from that time forward. Accordingly, BISD had a duty under the Royal Policies to provide prompt notice; it failed to do so.

In Texas, a first party property insurer is not required to prove it was prejudiced by late notice. *See Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, __ F.Supp.2d __, No. 4:03-CV-302-A, 2004 WL 547564, *7 (N.D. Tex. Mar. 17, 2004) (specifically holding commercial property insurer not required to show prejudice from late notice) (**Exhibit 55**); *Chiles v. Chubb Lloyds Ins. Co.*, 858 S.W.2d 633, 635 (Tex. App.--Houston [1st Dist.] 1993, writ denied); *Gemmy Industries Corp. v. Alliance Gen. Ins. Co.*, 190 F.Supp.2d 915, 921-22 (N.D. Tex. 1998); *see also Flores*, 278 F.Supp.2d at 816-17. The purpose of the notice and cooperation clauses is to enable the insurer to obtain all knowledge and facts

480306.4                                                54

concerning the claim while the information is fresh in order to protect itself from fraudulent claims by its insured. *See Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*, 518 F.2D 671, 674 (2d Cir. 1975).

In sum, under Texas law and the undisputed facts, BISD's lengthy delay in notifying Royal of the loss was unreasonable and was not "prompt notice" as a matter of law. Royal need show no prejudice from the late notice. BISD's breach of the notice provision was a breach of a condition precedent to coverage and therefore precludes coverage under the Royal Policies.

## H.   *BISD Failed to Comply with the "Legal Action Against Us" Clause*

BISD also failed to comply with the Legal Action Against Us clause of the three most recent Royal Policies (effective April 1, 1997 - April 1, 2002). That clause states as follows[15]:

> **F.    Legal Action Against Us**
>
> **1.**    The **Legal Action Against Us** Commercial Property Condition is replaced by the following ...
>
> **LEGAL ACTION AGAINST US**
>
> No one may bring a legal action against us under this Coverage Part unless:
>
> **a.**    There has been full compliance with all of the terms of this Coverage Part; and
>
> **b.**    The action is brought within **2 years and one day after the date** on which the direct physical loss or damage occurred.

BISD has not met provision "a." because it has not fully complied with all terms of the Royal Policies. As shown above, it failed to provide "prompt notice." It also failed to comply with other conditions precedent to coverage, such as providing a signed sworn proof loss containing information Royal

---

[15] *See* Commercial Property Conditions, Form CP 00 90 07 88, Clause D., of the most recent three Royal Policies, as amended by the Texas Changes Endorsement, Form CP 01 42 11 00, ¶ F. in Royal Policy No. KHT318271 (4/1/01-4/1/02), **Exhibit 4**; as amended by the Texas Changes Endorsement, Form No. CP 01 42 12 92, ¶ F. in Royal Policy Nos. KHT308599 (4/1/97-4/1/98) and KHT310355 (4/1/98-4/1/01), **Exhibits 2 and 3**.

needed to investigate the claim. Moreover, BISD has failed to cooperate with Royal by never providing any description of how, when and where the loss or damage occurred, although repeatedly requested to do so by Royal before and during this litigation.

Furthermore, BISD failed to comply with provision "b." because it failed to bring suit against Royal within "2 years and one day after the date on which the direct physical loss or damage occurred." As a general rule, the applicable period of limitations for a claim made pursuant to contract is four years from the date the cause of action accrues. Tex. Civ. Prac. & Rem. Code § 16.004. However, parties to a transaction may agree to the time in which a person must file suit, subject only to Section 16.070(a) of the Code. *See Jett v. Truck Insurance Exch.*, 952 S.W.2d 108, 109 (Tex. App. – Texarkana 1997, no writ); *see also Holston v. Implement Dealers Mut. Fire Ins. Co.*, 206 F.2d 682, 683 (5th Cir. 1953).

Section 16.070(a) provides that " . . . a person may not enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to a period shorter than two years. A stipulation, contract, or agreement that establishes a limitation period that is shorter than two years is void in this state." Accordingly, parties can fix the limitation on actions on a contract at any period under four years, so long as it is not less than two years. *See e.g., Holston*, 206 F.2d at 683.

Contractual provisions in insurance policies which limit the time in which to file suit to "two years and one day" have consistently been held valid and binding under Texas law. *See Jett*, 952 S.W.2d at 109; *Bazile v. Aetna Cas. & Sur. Co.,* 784 S.W.2d 73, 74 (Tex. App. -- Houston [14th Dist.] 1989, writ dism'd); *Commercial Standard Ins. Co. v. Lewallen,* 46 S.W.2d 355 (Tex. Civ. App. -- Eastland 1932, no writ); *Holston*, 206 F.2d at 683. Therefore, the contractual provision in the three Royal Policies

effective April 1, 1997 - April 1, 2002 that limit the time in which to file suit to "two years and one day after the date on which the direct physical loss or damage occurred" is valid and enforceable.

In this case, BISD was aware of the manifestation of mold at the schools by the time each school opened. Therefore, for Besteiro by 1994, and for Aiken, by 1996, and then at various times consistently thereafter in 1997, 1998, 1999, and 2000. Yet BISD did not file its state court suit against Royal (which has now been abated) until June 30, 2003, nor did it file its counterclaim in this suit until December 12, 2003. Accordingly, if BISD had a cause of action against Royal, which is denied, BISD was required to comply with the two years and one day limitation, which it did not. Consequently, BISD's suit against Royal filed in 2003 is outside the limitation period, and is therefore time-barred by the plain language of the referenced Royal Policies. Therefore, BISD's alleged causes of action against Royal must be dismissed as a matter of law because BISD's suit against Royal is time-barred.

## IV. CONCLUSION

In sum, for the reasons provided herein, Royal is entitled to summary judgment and a declaration that BISD's claim for insurance is outside of coverage. Plaintiff Royal Surplus Lines Insurance Company prays that the Court grant its Motion for Summary Judgment, declare that BISD is not entitled to coverage under any of the Royal Policies for any claimed damage or loss at Besteiro and Aiken, dismiss BISD's counterclaim against Royal, and grant Royal any and all other relief to which it is entitled.

Respectfully submitted,

**Jay W. Brown**
State Bar No. 03138830
SDT No. 1314
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

**ATTORNEY-IN-CHARGE FOR PLAINTIFF
ROYAL SURPLUS LINES INSURANCE
COMPANY**

**OF COUNSEL:**

BEIRNE, MAYNARD & PARSONS, L.L.P.
Stephen R. Wedemeyer
State Bar No. 00794832
S.D.T. No. 19797
John V. Trevino, Jr.
State Bar No. 24003082
S.D.T. No. 23860
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Royal's Motion for Summary Judgment was served on all counsel of record on May 14, 2004.

Craig S. Smith                              *Via Certified Mail/Return Receipt Requested*
LAW OFFICE OF CRAIG S. SMITH
14493 S.P.I.D., Suite A, P.M.B. 240
Corpus Christi, Texas 78418

Baltazar Salazar                           *Via Certified Mail Return Receipt Requested*
1612 Winbern
Houston, Texas 77004

Ramon Garcia                               *Via Certified Mail Return Receipt Requested*
LAW OFFICE RAMON GARCIA, P.C.
222 W. University
Edinburg, Texas 78539

*Attorneys for Defendant BISD*

_____
Stephen R. Wedemeyer

480306.4                                   59

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROYAL SURPLUS LINES<br>INSURANCE COMPANY, | §<br>§<br>§ | |
| **Plaintiff,** | §<br>§ | |
| vs. | §<br>§ | **CIVIL ACTION NO. B-03-109**<br>**JURY DEMANDED** |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, | §<br>§<br>§ | |
| **Defendant.** | §<br>§ | |

## APPENDIX OF PLAINTIFF ROYAL'S SUMMARY JUDGMENT EVIDENCE

In support of its Motion for Summary Judgment filed contemporaneously herewith, Plaintiff Royal Surplus Lines Insurance Company ("Royal") relies upon the following summary judgment evidence, which is hereby incorporated by reference into Royal's Motion for Summary Judgment:

| EXHIBIT | DOCUMENT |
|---|---|
| 1. | Royal Policy No. KHT 307564, with effective dates of September 1, 1996 to September 1, 1997 (cancelled effective April 1, 1997) |
| 2. | Royal Policy No. KHT 308599, with effective dates of April 1, 1997 to April 1, 1998 |
| 3. | Royal Policy No. KHT 310355, with effective dates of April 1, 1998 to April 1, 2001 |
| 4. | Royal Policy No. KHT 318271, with effective dates of April 1, 2001 to April 1, 2002 |
| 5. | 12/13/94 RBM Engineering letter to architect |
| 6. | 9/15/95 RBM Engineering Memo |
| 7. | 10/31/95 RBM Engineering letter to architect |
| 8. | 10/31/95 J.Mora letter to BISD |

480306.4

| EXHIBIT | DOCUMENT |
|---------|----------|
| 9. | D. Wilson Construction Company correspondence dated 8/22/95 |
| 10. | D. Wilson Construction Company correspondence dated 10/16/95 |
| 11. | D. Wilson Construction Company correspondence dated 10/19/95 |
| 12. | 2/3/98 D. Wilson Construction Company letter to BISD |
| 13. | 8/28/96 BISD letter to R. Beasely [RBM Engineering] |
| 14. | J. Condit [BISD] 8/28/96 Punchlist Letter to architect |
| 15. | 9/17/96 Aiken Punchlist |
| 16. | 11/11/96 Mac's Insulation letter to Victoria Air |
| 17. | 9/11/98 Aiken teacher complaint letter |
| 18. | 10/20/98 BISD Memo |
| 19. | 3/3/98 CRC Engineering letter to BISD |
| 20. | 8/20/98 CRC Engineering letter to BISD |
| 21. | 11/18/98 Texas Department of Health Complaint Form |
| 22. | 11/16/01 Texas Department of Health letter to BISD |
| 23. | Oscar Tapia (BISD) Sworn Statement (excerpts) |
| 24. | Raul Vasquez (BISD) Sworn Statement (excerpts) |
| 24A. | 8/16/01 AIAQ letter to BISD |
| 25. | Ambiotec Environmental Consultants, Inc. May 2002 Report to BISD |
| 26. | Engineering & Fire Investigations January 20, 2003 Report to BISD |
| 27. | AIAQ's "Executive Summary" Report to BISD dated January 2, 2002 |
| 28. | AIAQ's "Status Report" to BISD dated January 25, 2002 |
| 29. | Rimkus Consulting Group's July 26, 1999 Report to BISD's retained engineer |
| 30. | Excerpts of Assured Indoor Air Quality Report dated November 9, 2001 |
| 31. | Rimkus Consulting Group, Inc.'s December 20, 2002 Report (excerpts) |
| 32. | Center for Toxicology and Environmental Health Report dated January 10, 2003 |

| EXHIBIT | DOCUMENT |
|---------|----------|
| 33. | Certified Copy of Cameron County 2002 Petition (design and construction defects) |
| 34. | Certified Copy of Cameron County November 2001 Petition (personal injury lawsuit) |
| 35. | BISD's November 29, 2001 Notice of Loss letter to Royal |
| 36. | GAB 12/5/01 correspondence to Constant and Vela, BISD's counsel |
| 37. | GAB correspondence with BISD dated 8/22/02 |
| 38. | GAB correspondence with BISD dated 9/26/02 |
| 39. | GAB correspondence with BISD dated 10/25/02 |
| 40. | GAB 2/21/03 letter to BISD |
| 41. | GAB 12/21/01 Report to Royal |
| 42. | GAB 1/21/02 correspondence to P. Moore, BISD's counsel |
| 43. | GAB 3/22/02 Report to Royal |
| 44. | BISD's April 2, 2002 Notice of Loss to Royal |
| 45. | BISD January 22, 2003 Letter to GAB enclosing reports |
| 46. | Rimkus Consulting Group, Inc.'s January 26, 2004 Report |
| 47. | Gobbell-Hays Partners' January 21, 2004 Report |
| 48. | BISD's January 23, 2003 Sworn Statement in Proof of Loss to Royal |
| 49. | Certified Copy of BISD's Original Third-Party Petition in 2003 *Trane* lawsuit in Cameron County |
| 50. | BISD's 11/21/03 Responses [including No. 15] to Interrogatories in *Trane* lawsuit in Cameron County |
| 51. | June 28, 2003 Newspaper Article concerning RBM's Settlement with BISD |
| 51A. | RBM 6/20/03 Settlement Check to BISD for $170,000, and related 6/23/03 correspondence to BISD's counsel, Mr. Salazar |
| 52. | 10/22/98 BISD Memo to Aiken Principal |
| 53. | *Fiess v. State Farm Lloyds*, 2003 WL 21659408 (S.D. Tex. June 4, 2003) |
| 54. | *Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 817 A.2d 292 |

| EXHIBIT | DOCUMENT |
|---------|----------|
| 55. | *Ridglea Estate Condominium Assoc. v. Lexington Ins. Co.*, 2004 WL 547564 (N.D. Tex. March 17, 2004) |
| 56. | *Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 2002 WL 356756 (N.D. Tex. March 5, 2002) |
| 57. | *Coury v. Allstate Texas Lloyd's, Coury*, No. Civ. A. H-02-2238, 2004 WL 343946 (S.D. Tex. Jan. 6, 2004) |
| 57A. | District Court 3/31/04 Order Approving the Memorandum Opinion of Magistrate attached as Exhibit 57 |
| 58. | *Daniell v. Fire Ins. Exchange*, 04-94-00824-CV, 1995 WL 612405, *2 (Tex. App. – San Antonio, Oct. 18, 1995, no writ) |
| 59. | *80 Broad Street Co. v. U.S. Fire Ins. Co.*, 88 Misc.2d 706, 389 N.Y.S.2d 214 (Sup. Ct. 1975), aff'd, 54 A.D.2d 888, 390 N.Y.S.2d 768 (1st Dept. 1976) |
| 59A. | *80 Broad Street Co. v. U.S. Fire Ins. Co.*, 54 A.D.2d 888, 390 N.Y.S.2d 768 (1st Dept. 1976) (affirming opinion attached as Exhibit 59) |
| 60. | *Narob Dev. Corp. v. Insurance Co. of No. Am.*, 219 A.D.2d 454, 631 N.Y.S.2d 155  (N.Y. 1st Dept. 1995) |
| 61. | *Hostetler v. State Farm Fire & Cas. Co.*, 521 N.E.2d 1357 (Ind. Ct. App. 1988) |
| 62. | LEE R. RUSS AND THOMAS F. SEGALLA, 11 COUCH ON INSURANCE §153:3 (3d 2000) |
| 63. | Affidavit of Mark Schwartz of RSUI (proving up Exhibits 1, 2, 3, 4 as Royal business records) |
| 64. | Affidavit of Philip Watters of Rimkus Consulting Group, Inc. (proving up Exhibits 29, 31 and 46 as business records) |
| 65. | Affidavit of Kenny McCameron of Mac's Insulation (proving up Exhibit 16 as business record) |
| 66. | Affidavit of Dennis Nickolaff of GAB Robins N.A., Inc. (proving up Exhibits 36-43 as business records) |
| 67. | Affidavit of Stephen Kenoyer of Gobbell Hays Partners (proving up Exhibit 47 as business record) |

| EXHIBIT | DOCUMENT |
|---------|----------|
| 68. | Affidavit of Jay W. Brown (proving up Exhibits 8, 13, 14, 15, 17, 18, 21, 22, 23, 24, 33, 34, 35, 44, 45, 48, 49, and 52 as true and correct copies of (i) documents produced by BISD in connection with this lawsuit and/or the underlying insurance claim, and (ii) Sworn Statements [EUOs] of BISD employees. |
| 69. | Affidavit of Robert Beasely of RBM Engineering (proving up Exhibits 5, 6, 7 as business records) |
| 70. | Affidavit of Mike Hubbard of CTEH (proving up Exhibit 32 as business record) |
| 71. | Affidavit of Trey Chandler of Assured Indoor Air Quality (proving up Exhibits 24A, 27 and 28 as business records) |

Respectfully submitted,

**Jay W. Brown**
State Bar No. 03138830
SDT No. 1314
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

**ATTORNEY-IN-CHARGE FOR PLAINTIFF
ROYAL SURPLUS LINES INSURANCE
COMPANY**

OF COUNSEL:

BEIRNE, MAYNARD & PARSONS, L.L.P.
Stephen R. Wedemeyer
State Bar No. 00794832
S.D.T. No. 19797
John V. Trevino, Jr.
State Bar No. 24003082
S.D.T. No. 23860
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone: (713) 623-0887
Facsimile: (713) 960-1527

480306.4                                                     5

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appendix to Royal's Motion for Summary Judgment was served on all counsel of record on May 14, 2004.

Craig S. Smith                                   *Via Certified Mail/Return Receipt Requested*
LAW OFFICE OF CRAIG S. SMITH
14493 S.P.I.D., Suite A, P.M.B. 240
Corpus Christi, Texas 78418

Baltazar Salazar                                 *Via Certified Mail Return Receipt Requested*
1612 Winbern
Houston, Texas 77004

Ramon Garcia                                     *Via Certified Mail Return Receipt Requested*
LAW OFFICE RAMON GARCIA, P.C.
222 W. University
Edinburg, Texas 78539

*Attorneys for Defendant BISD*


Stephen R. Wedemeyer




**Homeowners Insurance** | **Auto Insurance** | **Personal Finance**

Homepage
Homeowners Update
Insurance Basics
Coverage Options
Saving Money
Preventing Loss
Glossary
Homeowners News
Links
Quiz

## Judge dismisses plaintiffs in lawsuit of moldy schools

**The Beaumont Enterprise (AP)**
**June 28, 2003**

Citing lack of evidence, a judge dismissed more than 100 parents, teachers and students as plaintiffs in a lawsuit against companies blamed for mold problems at two Brownsville schools.

The order by District Judge Migdalia Lopez was signed Friday.

Lopez also is expected this week to dismiss the Brownsville Independent School District as a defendant in the lawsuit, The Brownsville Herald reports in its Saturday editions.

The lawsuit was filed in November 2001. It contends that contractors and developers who built Aiken Elementary School and Besteiro Middle School were responsible for the mold found at the two schools in 1999.

The suit seeks unspecified monetary damages for illnesses the plaintiffs claim were caused by mold exposure.

The schools were closed in January 2002 for cleanup and aren't expected to reopen until after Christmas.

Meanwhile, students are attending classes at other campuses and in portable buildings.

The architects, engineers, air conditioning contractor and general contractor blame BISD for the recurring mold problems at the schools.

One defendant, RBM Engineering of El Paso, has reached a $340,000 settlement with the plaintiffs and the district. The two parties will evenly split the money, Zavaletta said.

"This first settlement has caused other defendants to explore settlement talks with us as well," Zavaletta told the newspaper.

# ALLENSWORTH & PORTER, L.L.P.

### ATTORNEYS AT LAW

**620 Congress Avenue, Suite 100**
**Austin, Texas 78701-3229**

Telephone: (512) 708-1250
Facsimile: (512) 708-0519

**MATTHEW B. CANO**
   Board Certified – Personal Injury Trial Law
   Texas Board of Legal Specialization

E-Mail Address:
mbc@aaplaw.com

June 23, 2003

Baltazar Salazar
Baltazar Salazar, P.C.
1612 Winbern
Houston, Texas 77004

*Via Federal Express*

|       |              |                                          |
|-------|--------------|------------------------------------------|
| Re:   | Your client: | Brownsville Independent School District  |
|       | Our client:  | RBM Engineering, Inc.                    |
|       | Claim:       | Aiken Elementary and Besteiro Middle School |

Dear Baltazar:

Enclosed herewith is the settlement check issued by DPIC Companies for the negotiated settlement of the Brownsville Independent School District's claims against RBM Engineering, Inc.. As you and I have discussed, we will work on acceptable release language for the final settlement documents.

I have forwarded the enclosed check to you in trust that it will not be disbursed until we have finalized the release and the BISD Board of Trustees has approved the terms of the settlement and had an authorized representative execute the release.

If you have any questions about the enclosed, or the terms upon which it was forwarded to you, please give me a call.

With best regards.

Sincerely,

Matthew B. Cano



No. 101501

DPIC Companies

06/20/03
DATE

Void 120 Days after date shown above

PAY: $170,000.00 Dollars and 00 cents

PARTICULARS OF FILE. If incorrect, please return without alteration.

INSURED
RBM ENGINEERING INC

NATURE OF PAYMENT IN FULL SATISFACTION OF

Upon
Acceptance    RBM, TAZAK, SALAZAR, IN TRUST ACCOUNT C/O
Pay To The
Order Of

DATE OF LOSS/NOTICE    POLICY NO.
11/29/99    PL 503372

AMOUNT (Void after 120 Days)
$170,000.00

FILE NO.    TERR.
14-EB1374    420

P.I NO.    L.C.N. NO.
14-14

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE
Two Signatures Required if Over $5,000.

1 0 1 5 0 1

101501

| L.CN NUM | FILE NUM | POLICY NUM | AGENT CODE | INSURED | AMOUNT |
|----------|----------|------------|------------|---------|--------|
| 14-14 | 14-EB1374 | PL 503372 | 91- | RBM ENGINEERING INC | 170,000.00 |
| | | | | | =========== |
| | | | | | 170,000.00 |
| | | | | TOTAL | |



# Brownsville Independent School District

1900 Price Road   Brownsville, Texas 78521-2417   (210) 548-8000   Fax: (210) 548-8010

G. Wallace Jackson
Superintendent

To: Mr. Sam Garcia, Aiken Principal

From: George Dominguez
       Custodial Supervisor

Date:  October 22, 1998

Re:   Cleaning Aiken Mildew Walls

      I have been instructed to send an appropriate number of custodians (5-6) to report to your school every Saturday, until such time that the humidity problems are corrected, to clean the mildew areas. The custodians will report at 8:00 am and leave at 5:00 p.m. with a half-hour lunch.  In addition, I will provide the disinfectant neutralizer chemical cleaner and dispenser units.

      If you have any question, please contact my office at 548-8081.

Xc:  Mr. Oscar Tapia, Facilities/Maintenance Administrator
      Mr. Hector Gonzalez, Area Administrator

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"*

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408 (S.D.Tex.))
<KeyCite Yellow Flag>

Page   4

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas.

**Richard FIESS and Stephanie Fiess,
Plaintiffs,
v.
STATE Farm Lloyds, Defendant.**

No. Civ.A. H-02-1912.

Filed May 20, 2002.
June 4, 2003.

Jason Matthew Medley, O'Donnell Ferebee et al, Houston, TX, for Richard Fiess, plaintiff.

Jason Matthew Medley, (See above), for Stephanie Fiess, plaintiff.

Christopher W Martin, Martin Disiere et al, Houston, TX, for State Farm Lloyds, defendant.

MEMORANDUM AND ORDER

CRONE, Magistrate J.

I. Introduction

*1 Pending before the court is Defendant State Farm Lloyds's ("State Farm") Motion for Summary Judgment (# 25). State Farm seeks summary judgment on Plaintiffs Richard Fiess ("Mr.Fiess") and Stephanie Fiess's ("Mrs.Fiess") (collectively, "the Fiesses") claims for violations of the Texas Deceptive Trade Practices Act ("DTPA") and the Texas Insurance Code, breach of express and implied warranties, breach of contract, fraud/ intentional misrepresentation, and unconscionability. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

II. Background

The Fiesses bring suit against State Farm for mold damage to their home located at 2437 Henderson Lane, Deer Park, Harris County, Texas. They are successors in interest to a homeowner's insurance policy ("the Policy") issued by State Farm. In the summer of 2001, their home sustained flooding and other damage as the result of Tropical Storm Allison. The Fiesses made a claim under their flood insurance policy with State Farm Fire and Casualty Company ("Fire & Casualty") for damages caused by the flood. Fire and Casualty paid them $48,626.00 under the flood policy for repairs to their home and for replacement of personal property damaged by the flood. The Fiesses are not making a claim under the flood policy.

According to Mr. Feiss's deposition testimony, he and his wife began removing sheetrock one week after the flood and discovered black mold growing throughout the residence. Mold was growing in the dining room on a wall adjoining the kitchen in an area "behind the refrigerator and against the door frame" and in the middle bedroom wall and hall bathroom wall about two feet above the baseboard "running up to the outside wall on down the outside wall." Additionally, there was mold in the back bedroom about two feet up from the baseboards around three of the four walls and in the front bedroom about two feet up from the baseboards on the front and side walls. Black mold was also found on the outside wall of the master bedroom and around the baseboards in the master bathroom. After removing the cabinets in the master bathroom and laundry room, mold was observed at the bottom of the cabinets and behind the walls "along the baseboard, about two feet up." The Fiesses took samples of the mold and sent them for testing to NOVA Labs in Conroe, Texas. Paul Pearce, Ph.D. ("Dr.Pearce"), tested the mold and determined that it contained stachybotrys, [FN1] an allegedly hazardous type of mold. He advised the Fiesses to leave their home because of the high levels of stachybotrys. Dr. Pearce subsequently inspected the home and found other types of mold, including alternaria, [FN2] chaetomium, [FN3] cladosporium, [FN4]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



aspergillus penicillium, [FN5] and all of the naturally occurring environmental molds. He identified six areas of water intrusion into the home: "flood waters, roof leaks, plumbing leaks, heating, air conditioning and ventilation (HVAC) leaks, exterior door leaks, and window leaks." Dr. Pearce opined at deposition that 25% of the mold at the time of inspection was "non-Allison related" as the "patterns of moisture of water intrusion, the presence of mold that resulted from non-Allison related, in my opinion, non-Allison-related water intrusion." He later changed his answer, however, claiming that he misunderstood the question. In his revised response, Dr. Pearce claimed that 70% of the mold at the time of inspection was non-Allison related. Nevertheless, Dr. Pearce conceded that "[t]he floodwaters left behind mold on virtually every wall and on every stud and every baseboard and every baseplate in the first 2 to 3 feet of this house."

FN1. "Stachybotrys atra" is "[a] mold that produces toxic compounds (mycotoxins). Prolonged exposure can be associated with symptoms such as fatigue, hearing loss, and memory loss." 5 J.E. SCHMIDT, M.D., Attorneys' Dictionary of Medicine and Word Finder S-273 (2002).

FN2. "Alternaria" refers to "a genus of dematiacious Fungi Imperfecti of the order Moniliales, having dark-colored conidia ... it causes several diseases of plants and has been reported in diseases of the lungs and in skin infection in man, and is also a common allergen in human bronchial asthma." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 51 (28th ed.1994).

FN3. "Chaetomium" is "[a] genus of soil fungi. Some species may cause allergy." 2 J.E. SCHMIDT, M.D., supra, at C-183.

FN4. "Cladosporium" is "[a] genus of fungi having dematiaceous or dark-colored conidiophores with oval or round spores, commonly isolated in soil or plant residues." STEDMAN'S MEDICAL DICTIONARY 348 (26th ed.1995).

FN5. "Aspergillus" refers to "[a] genus of fungi (class Ascomycetes) that contains many species, a number of them with black, brown, or green spores. A few species are pathogenic for man, other animals, and avians." STEDMAN'S, supra, at 156. "Penicillum" refers to "[a] genus of fungi (class Ascomycetes, order Aspergillales), species of which yield various antibiotic substances and biologicals," STEDMAN'S, supra, at 1321.

*2 After discovering the mold, the Fiesses made a claim under their homeowner's insurance policy for mold contamination. During the investigation of the claim, State Farm sent the Fiesses a reservation of rights letter informing them that the damage claimed might not be covered under the terms of the Policy. Ultimately, while maintaining that the claims were not covered under the Policy, State Farm paid the Fiesses $34,425.00 for "non-covered mold remediation in those areas of the flood damaged house where there was evidence of small pre-flood water leaks." The Fiesses, however, assert that State Farm failed to compensate them fully for damage caused by mold attributable to pre-existing water leaks, which they contend falls within the scope of coverage of the Policy.

On April 1, 2002, the Fiesses filed their original petition in the 127th Judicial District Court of Harris County, Texas, asserting claims for violations of the DTPA, breach of contract, and fraud/intentional misrepresentation. On May 20, 2002, State Farm removed the case to federal court on the basis of diversity of citizenship, asserting that the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The Fiesses filed an amended complaint on November 20, 2002, alleging additional claims against State Farm for violations of the Texas Insurance Code and breach of warranty. In the instant motion, State Farm seeks summary judgment on all the Fiesses' claims.

III. Analysis

A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *2 (S.D.Tex.))

Page  6

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999); Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 321 (5th Cir.1998); Wenner v. Texas Lottery Comm'n, 123 F.3d 321, 324 (5th Cir.1997), cert. denied, 523 U.S. 1073 (1998). A material fact is one that might affect the outcome of the suit under governing law. See Burgos v. Southwestern Bell Tel. Co., 20 F.3d 633, 635 (5th Cir.1994). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The moving party, however, need not negate the elements of the nonmovant's case. See Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir.1996) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)).

*3 Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. See Celotex Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 257; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 505 (5th Cir.1999), cert. denied, 528 U.S. 1160 (2000); Colson, 174 F.3d at 506; Marshall, 134 F.3d at 321-22; Wallace, 80 F.3d at 1047; Little, 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole." ' Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587). All the evidence must be construed "in the light most favorable

to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir.1996) (citing Lindsey v. Prive Corp., 987 F.2d 324, 327 n. 14 (5th Cir.1993)); see Reeves, 530 U.S. at 150; Colson, 174 F.3d at 506; Marshall, 134 F.3d at 321; Messer v. Meno, 130 F.3d 130, 134 (5th Cir.1997), cert. denied, 525 U.S. 1067 (1999); Hart v. O'Brien, 127 F.3d 424, 435 (5th Cir.1997), cert. denied, 525 U.S. 1103 (1999). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255; Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49 n. 5 (1990); see Christopher Vill. Ltd. P'ship v. Retsinas, 190 F.3d 310, 314 (5th Cir.1999); Samuel v. Holmes, 138 F.3d 173, 176 (5th Cir.1998); Marshall, 134 F.3d at 321.

Nevertheless, " 'only reasonable inferences can be drawn from the evidence in favor of the nonmoving party." ' Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 469 n. 14 (1992) (emphasis in original) (quoting H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1012 (2d Cir.1989)). "If the nonmoving party's theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." Id. at 468-69. The nonmovants' burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." Little, 37 F.3d at 1075; see Hart, 127 F.3d at 435; Wallace, 80 F.3d at 1047; Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir.1996) (citing Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir.), cert. denied, 513 U.S. 871 (1994)); State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 118 (5th Cir.1990) (citing Anderson, 477 U.S. at 247-48). Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. See Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Celotex Corp., 477 U.S. at 322; Wenner, 123 F.3d at

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23.

B. Breach of Insurance Contract

*4 Under Texas law, the interpretation of insurance policies is governed by the same rules that apply to the interpretation of other contracts. See Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 537 (5th Cir.2002); Mid-Continent Cas. Co. v. Swift Energy Co., 206 F.3d 487, 491 (5th Cir.2000); American States Ins. Co. v. Bailey, 133 F.3d 363, 369 (5th Cir.1998); Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co., 99 F.3d 695, 701 (5th Cir.1996); Constitution State Ins. Co. v. Iso-Tex Inc., 61 F.3d 405, 407 (5th Cir.1995); Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 740-41 (Tex.1998); Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 823 (Tex.1997); Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex.1997). The insurance contract is considered as a whole, with each part to be given effect. See Balandran, 972 S.W.2d at 741; Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex.1994); Royal Indem. Co. v. Marshall, 388 S.W.2d 176, 180 (Tex.1965); Tumlinson v. St. Paul Ins. Co., 786 S.W.2d 406, 408 (Tex.App.-Houston [1st Dist.] 1990, writ denied). Specific provisions in the policy control over general statements of coverage. See Forbau, 876 S.W.2d at 133; see also 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 545-54 (1960). Similarly, "[e]ndorsements control over conflicting general policy language." Westchester Fire Ins. v. Heddington Ins. Ltd., 883 F.Supp. 158, 165 (S.D.Tex.1995), aff'd, 84 F.3d 432 (5th Cir.1996) (citing Mutual Life Ins. Co. v. Daddy$ Money, Inc., 646 S.W.2d 255, 259 (Tex.App.-Dallas 1982, writ ref'd n.r.e.)). The terms used in an insurance contract are given their ordinary and generally accepted meaning, unless the policy shows the words were meant in a technical or different sense. See Canutillo Indep. Sch. Dist., 99 F.3d at 700; Security Mut. Cas. Co. v.

Johnson, 584 S.W.2d 703, 704 (Tex.1979); Tri County Serv. Co. v. Nationwide Mut. Ins. Co., 873 S.W.2d 719, 721 (Tex.App.-San Antonio 1993, writ denied).

If an insurance policy is ambiguous and is susceptible to more than one reasonable interpretation, under the "contra-insurer rule," it will be construed in favor of the insured. See Bailey, 133 F.3d at 369; Canutillo Indep. Sch. Dist., 99 F.3d at 701; State Farm Fire & Cas. Co. v. Vaughan, 968 S.W.2d 931, 933 (Tex.1998); McKee, 943 S.W.2d at 458. This rule of construction does not apply, however, when the insurance contract is expressed in plain and unambiguous language and is susceptible to only one reasonable interpretation. See Bailey, 133 F.3d at 369; Canutillo Indep. Sch. Dist., 99 F.3d at 701; Iso-Tex Inc. at 407; National Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex.1991). "When there is no ambiguity, it is the court's duty to give the words used their plain meaning." Puckett v. United States Fire Ins. Co., 678 S.W.2d 936, 938 (Tex.1984). If an insurance policy "is worded so that it can be given only one reasonable construction, it will be enforced as written." Iso-Tex Inc., 61 F.3d at 407 (citing State Farm Fire & Cas. Co. v. Reed, 873 S.W.2d 698, 699 (Tex.1993)); National Union Fire Ins. Co. v. CNA Ins. Cos., 28 F.3d 29, 32 (5th Cir.1994), cert. denied, 513 U.S. 1190 (1995). "When the terms of an insurance policy are plain, definite, and unambiguous, a court may not vary those terms." Id.; see Reed, 873 S.W.2d at 699. Thus, after considering the rules of contract interpretation, summary judgment is often appropriate in cases where unambiguous language is at issue. See Tri County Serv. Co., 873 S.W.2d at 721 (citing Phillips v. Union Bankers Ins. Co., 812 S.W.2d 616, 617 (Tex.App.-Dallas 1991, no writ)).

*5 The determination of whether an insurance policy is ambiguous is a question of law for the court to decide. See Canutillo Indep Sch. Dist., 99 F.3d at 700; Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 861 (Tex.2000) (citing R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



517, 518 (Tex.1980)). An ambiguity in a contract may be "patent" or "latent." National Union Fire Ins. Co. v. CBI Indus. Inc., 907 S.W.2d 517, 520 (Tex.1995). A patent ambiguity is apparent upon examining the contract. See Universal Home Builders, Inc. v. Farmer, 375 S.W.2d 737, 742 (Tex.Civ.App.-Tyler 1964, no writ). A latent ambiguity arises when a contract is applied to the subject matter it concerns and different interpretations become apparent. See Murphy v. Dilworth, 151 S.W.2d 1004, 1005 (Tex.1941); see also Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n, 611 S.W.2d 706, 708 (Tex.Civ.App.-San Antonio 1980, no writ). Not every difference in interpretation of an insurance policy, however, amounts to an ambiguity. See Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 465 (Tex.1998); Vaughan, 968 S.W.2d at 933; Reed, 873 S.W.2d at 699. In addition, a contractual clause that is ambiguous as applied to certain facts may be unambiguous as applied to others. See Vaughan, 968 S.W.2d at 934.

The insured initially has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. See Harken Exploration Co. v. Sphere Drake Ins. PLC, 261 F.3d 466, 471 (5th Cir.2001); Western Alliance Ins. Co. v. Northern Ins. Co., 176 F.3d 825, 831 (5th Cir.1999); Guaranty Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir.1998); Data Specialties, Inc. v. Transcontinental Ins. Co., 125 F.3d 909, 911 (5th Cir.1997). The insurer, however, bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage. See Harken Exploration Co., 261 F.3d at 471; Vic Mfg. Co., 143 F.3d at 193; Bailey, 133 F.3d at 364; Canutillo Indep. Sch. Dist., 99 F.3d at 701; Sentry Ins. v. R.J. Webber Co., Inc., 2 F.3d 554, 556 (5th Cir.1993); see also Tex. Ins.Code Ann. art. 21.58(b). The Texas Insurance Code provides:

> In any suit to recover under a contract of insurance, the insurer has the burden of proof as to any avoidance or affirmative defense that must be affirmatively pleaded under the Texas Rules of Civil Procedure.

> Any language of exclusion in the policy and any exception to coverage claimed by the insurer constitutes an avoidance or an affirmative defense.

Tex. Ins.Code Ann. art. 21.58(b). Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. See Vic Mfg. Co., 143 F.3d at 193; Telepak v. United Servs. Auto. Ass'n, 887 S.W.2d 506, 507-08 (Tex.App.-San Antonio 1994, writ denied); Britt v. Cambridge Mut. Ins. Co., 717 S.W.2d 476, 482 (Tex.App.-San Antonio 1986, writ ref'd n.r.e.).

1. Provisions of the Policy

*6 State Farm maintains that the Fiesses' claim for mold damage is expressly excluded from coverage under the Policy. The Fiesses, however, assert that the mold damage is covered as an "ensuing loss" under the Policy and, therefore, the mold exclusion is not operative. Under section 1 of the Policy, entitled Exclusions, sub-section f provides:

f. We [State Farm] do not cover loss caused by:

(1) wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself.

(2) rust, rot, mold or other fungi.

(3) dampness of atmosphere, extremes of temperature.

(4) contamination.

(5) rats, mice, termites, moths or other insects.

We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under the policy.

* * *

i. We do not cover loss caused by or resulting from flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water or spray from any of these whether or not driven by wind.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *6 (S.D.Tex.))

Page   9

The provisions of section 1 of the Policy explicitly remove from coverage any loss caused by mold. See Harrison v. U.S.A.A. Ins. Co ., No. 03-00-00362-CV, 2001 WL 391539, at *2 (Tex.App.-Austin Apr. 19, 2001, no pet.) (not designated for publication). "Thus, unless an exception to this exclusion applies, the policy does not cover [the Fiesses'] loss." Id. State Farm argues that the "cause of the mold growth is irrelevant" because the "plain, unambiguous language of the Policy excludes from coverage the Fiess' [sic] alleged loss due to mold." Furthermore, State Farm contends that "any argument by the Fiess' [sic] that coverage exists because their mold was possibly caused by covered water intrusion must be rejected as inconsistent with Texas law." (emphasis in original). In support of their argument, State Farm cites Bentley v. National Standard Ins. Co., in which the court upheld the insurer's denial of coverage for damage resulting from the settling of a home's foundation caused by a severe drought, where the cause of the settlement was immaterial to the application of the settlement exclusion. See 507 S.W.2d 652, 654 (Tex.Civ.App.-Waco 1974, writ ref'd n.r.e.). In Bentley, the homeowner's insurance policy excluded from coverage damage to the foundation, walls, floors, ceiling, roof structures, walks, drives, curbs, fences, retaining walls, or swimming pools caused by settling. See id. at 653. The court held that the language of the contract was "clear and unambiguous ... and must be taken in its ordinary meaning." Id. at 654. Hence, to bring the damage to the foundation caused by settling outside the settlement exclusion in the contract would "render this exclusion meaningless." Id. The language of the contract did not limit the exclusion to certain causes. See id. Likewise, as State Farm contends, "the mold exclusion in this case contains no language limiting it to 'certain causes," ' thus excluding from coverage any damage caused by mold.

*7 State Farm also cites Auten v. Employers Nat'l Ins. Co. for the contention that the cause of the excluded loss is immaterial. See 722 S.W.2d 468, 468-71 (Tex.App.-Dallas 1987, writ denied). In that case, the insureds sought coverage for the misapplication of pesticide that rendered their home uninhabitable. See id. at 468-69. The insurance company denied their claim under the contamination exclusion in their homeowner's insurance policy. See id. at 469-70. Looking to the plain language of the policy, the court found that "the parties intended to exclude all losses occasioned by contamination without regard to the cause of the contamination." Id. at 470. Otherwise, "[t]o adopt the Autens' reading of the policy would limit this provision to exclude recovery for contamination only when the contamination itself was not the result of an excluded cause." Id. at 470-71. Additionally, the court reasoned, "to do so would violate the rule that insurance contracts should not be construed to render one of its terms meaningless when it is possible to construe those terms in a manner that would give meaning to all terms of the contract." Id. at 471 (citing Blaylock v. American Guarantee Bank Liab. Ins. Co., 632 S.W.2d 719, 722 (Tex.1982)). The Auten court also refused "to limit the contamination exclusion to contamination which results from otherwise excluded causes." Id. The court held that where "the loss results solely from contamination, then the clause excluding these losses is applicable regardless of the cause of the contamination." Id. Similarly, in the case at bar, the mold exclusion is not limited to losses caused only by excluded causes. Thus, the cause of the Fiesses' mold damage does not affect the exclusion's applicability.

In light of the foregoing cases, State Farm argues that "any attempt to characterize the mold as resulting from a covered cause of loss is clearly immaterial." The clear and unambiguous wording of the mold exclusion does not limit its application to excluded causes only. As a result, according to State Farm, the mold exclusion applies, and the Fiesses' loss is not covered under the Policy. The court concurs that, considering the Policy at issue in this case, the plain and unambiguous language of the exclusion expressly excludes from coverage any loss resulting from mold. There are no limitations to this exclusion, and to interpret this clause in any other manner would render the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *7 (S.D.Tex.))

Page 10

exclusion meaningless. Consequently, the mold damage sustained by the Fiesses is excluded from coverage under the Policy's mold exclusion.

## 2. Ensuing Loss

The Fiesses, however, contend that the mold exclusion does not apply because the mold damage to their home falls within an exception to the exclusion as an "ensuing loss caused by ... water damage" under the Policy. "To 'ensue' means 'to follow as a consequence or in chronological succession; to result, as an ensuing conclusion or effect." ' Lambros v. Standard Fire Ins. Co., 530 S.W.2d 138, 141 (Tex.Civ.App.-San Antonio 1975, writ ref'd) (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 852 (2d ed., unabridged, 1959)); see Zeidan v. State Farm Fire & Cas. Co., 960 S.W.2d 663, 666 (Tex.App.-El Paso 1997, no writ). Thus, an ensuing loss "is a loss which follows as a consequence of some preceding event or circumstance." Lambros, 530 S.W.2d at 141 (quoting McKool v. Reliance Ins. Co., 386 S.W.2d 344 (Tex.Civ.App.-Dallas 1965, writ dism'd); see Zeidan, 960 S.W.2d at 666. For coverage to be restored via the ensuing loss clause, an otherwise covered loss must result or ensue from the excluded loss. In Lambros, the court explained, "[i]f we give to the language of the exception its ordinary meaning, we must conclude that an ensuing loss caused by water damage is a loss caused by water damage where the water damage itself is the result of a preceding cause." Lambros, 530 S.W.2d at 141.

*8 Accordingly, "ensuing loss caused by ... water damage" refers to water damage which is the result, rather than the cause, of one of the types of damage enumerated in exclusion f, in this case, mold. See Zeidan, 960 S.W.2d at 666; Daniell v. Fire Ins. Exch., No. 04-94-00824-CV, 1995 WL 612405, at * 2 (Tex.App.-San Antonio Oct. 18, 1995, no writ) (not designated for publication); Lambros, 530 S.W.2d at 141; Merrimack Mut. Fire Ins. Co. v. McCaffree, 486 S.W.2d 616, 620 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.). "To qualify for the exception, ensuing water

damage must follow from one of the types of damage enumerated in exclusion (f)." Harrison, 2001 WL 391539, at * 2. Here, it is undisputed that the water damage was not caused by the mold; instead, the mold was caused by the water damage. Therefore, the mold damage is excluded under the ensuing loss provision of the Policy. See Daniell, 1995 WL 612405, at *2; Aetna Cas. & Sur. Co. v. Yates, 344 F.2d 939, 941 (5th Cir.1965); Harrison, 2001 WL 391539, at *2; Lambros, 530 S.W.2d at 142; Merrimack, 486 S.W.2d at 620. "Since the evidence in this case, even when viewed in the light most favorable to [the Fiesses] conclusively establishes that water damage was the cause, rather than the consequence, of [mold]," the exclusion is applicable. Zeidan, 960 S.W.2d at 666; see Harrison, 2001 WL 391539, at *2.

In the case at bar, the Fiesses argue that the mold was caused by water damage arising from leaks in the residence. "Under these circumstances, [the Fiesses'] interpretation of the ensuing loss provision conclusively establishes that the loss claimed is not a covered loss." Daniell, 1995 WL 612405, at *2 (citing Yates, 344 F.2d at 941; McKool, 386 S.W.2d at 345-46). The Fiesses' argument that the ensuing loss provision extends coverage for their loss "reverses the causation required by that exception." Harrison, 2001 WL 391539, at *2. The result of their interpretation of the ensuing loss provision "would be that a clause intended to narrow the exclusions for 'rust, rot, mould or other fungi' and 'dampness of atmosphere' would very nearly destroy them." Yates, 344 F.2d at 941. "A court may not properly give the clause such an unnatural effect unless the words compel." Id. In Yates, the Fifth Circuit observed:

> We do not think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified as water damage; it would not be easy to find a case of rot or dampness of atmosphere not equally subject to that label and the exclusions would become practically meaningless.

Id. The same applies in this case with respect

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *8 (S.D.Tex.))

Page 11

to mold.

Assuming that the leaks identified by Dr. Pearce constitute water damage, the leaking preceded, rather than followed, the Fiesses' excluded mold loss. The leaking water which allegedly ran from the identified areas could very well have created an atmosphere or environment which could have, and possibly did, contribute to the growth of mold which, in turn, caused the damage to the Fiesses' residence. See Merrimack, 486 S.W.2d at 620 (holding that leaking water causing fungus to grow and deteriorate the shower stall was not covered as an ensuing loss under the policy). The mold, however, did not cause the intrusion of water into the home and the ensuing loss. "[W]hile an ensuing loss provision will cover water damage caused by an excluded event, it will not cover the excluded event even if it is caused by water damage." Daniell, 1995 WL 612405, at *2. "The ensuing loss provision therefore does not extend coverage to [the Fiesses'] loss." Harrison, 2001 WL 391539, at *2.

*9 In this instance, the presence of mold arose from water intrusion and is not a loss that would "otherwise be covered under the policy ." Instead, mold is specifically excluded from coverage under exclusion f of the Policy. The opinion relied upon by the Fiesses, Home Ins. Co. v. McClain, No. 05-97-01479-CV, 2000 WL 144115, at *3 (Tex.App.-Dallas Feb. 10, 2000, no pet.) (not designated for publication), departs from this long line of authority in Texas and is contrary to the interpretation given the ensuing loss clause in other jurisdictions. See, e.g., Cooper v. American Family Mut. Ins. Co., 184 F.Supp.2d 960, 964 (D.Ariz.2002) (citing Acme Galvanizing Co., Inc. v. Fireman's Fund Ins. Co., 221 Cal.App.3d 170, 179-80, 270 Cal.Rptr. 405, 411 (Cal.Ct.App.1990)). As the California Court of Appeals explained in Acme Galvanizing Co., Inc .:

> We interpret the ensuing loss provision to apply to the situation where there is a "peril," i.e., a hazard or occurrence which causes a loss or injury, separate and independent but resulting from the original excluded peril, and this new peril is not an

excluded one, from which loss ensues.

221 Cal.App.3d 170, 179-80 (emphasis added). Other courts which have interpreted the clause similarly hold that the ensuing loss provision does not reinsert coverage for excluded losses, but reaffirms coverage for secondary losses ultimately caused by excluded perils. See Cooper, 184 F.Supp.2d at 964 (citing Ames Privilege Ass'n v. Utica Mut. Ins. Co., 742 F.Supp. 704, 708 (D.Mass.1990) (perils which are excluded by the policy cannot be, at the same time, perils which are not excluded, and for which the defendant would be liable for any ensuing loss); Schloss v. Cincinnati Ins. Co., 54 F.Supp.2d 1090, 1094-95 (M.D.Ala.1999) (same), aff'd without opinion, 211 F.3d 131 (11th Cir.2000); Brodkin v. State Farm Fire & Cas. Co., 217 Cal.App.3d 210, 218, 265 Cal.Rptr. 710, 714 (Cal.Ct.App.1989) ("It is not the intent of [the ensuing loss provision] to enlarge the items which are covered under the policy"); McDonald v. State Farm Fire & Cas. Co., 119 Wash.2d 724, 734, 837 P.2d 1000, 1005 (Wash.1992) (ensuing loss clause provides that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered; however, the uncovered event itself, however, is never covered)).

As a result, the mold damage to the Fiesses' residence is not covered under the express terms of the Policy nor under the ensuing loss exception to the mold exclusion. Furthermore, the fact that State Farm reimbursed the Fiesses for some mold remediation costs does not create coverage in the face of the express exclusion for loss caused by mold. "It is well-established under Texas law that insurance coverage may not be created by estoppel where none exists under the plain terms of the policy." Sharp v. State Farm Fire & Cas. Ins. Co., 115 F.3d 1258, 1263 n. 3 (5th Cir.1997) (citing Texas Farmers Ins. Co. v. McGuire, 744 S.W.2d 601, 602-03 (Tex.1988)). Summary judgment, therefore, is warranted with respect to the Fiesses' claim for breach of the insurance contract.

C. Doctrine of Concurrent Causes

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



**\*10** State Farm alleges that, alternatively, the Fiesses cannot recover for mold damage because they cannot segregate what they contend are covered losses under the homeowner's insurance policy from non-covered causes of the mold. State Farm points out that it is the insured's burden to prove that any loss sustained is covered under the Policy and that this burden includes proving an exception to an applicable coverage exclusion. See Vic Mfg. Co., 143 F.3d at 193; Employers Cas. Co. v. Block, 744 S.W.2d 940, 945 (Tex.1988), overruled on other grounds by State Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696 (Tex.1996); Telepak, 887 S.W.2d at 507; Love of God Holiness Temple Church v. Union Standard Ins. Co., 860 S.W.2d 179, 181 (Tex.App.-Texarkana 1993, no writ).

"Texas recognizes the doctrine of concurrent causes." Wallis v. United Servs. Auto Ass'n, 2 S.W.3d 300, 302 (Tex.App.-San Antonio 1999, pet. denied). This doctrine provides that when covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril. See id. (citing Travelers Indem. Co. v. McKillip, 469 S.W.2d 160, 163 (Tex.1971); Paulson v. Fire Ins. Exch., 393 S.W.2d 316, 319 (Tex.1965); Warrilow v. Norrell, 791 S.W.2d 515, 527 (Tex.App.-Corpus Christi 1989, writ denied)); see also State Farm Fire & Cas. Co. v. Rodriguez, 88 S.W.3d 313, 320-21 (Tex.App.-San Antonio 2002, no pet.) (citing Wallis, 2 S .W.3d at 302). "The doctrine of concurrent causation is not an affirmative defense or an avoidance issue; rather it is a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove that their damage is covered by the policy." Allison v. Fire Ins. Exch., 98 S.W.3d 227, 258 (Tex. App-Austin 2002, no pet.) (citing Wallis, 2 S.W.3d at 302-03). "Thus, an insured may only recover for the amount of damage caused solely by the covered peril." Id. " 'Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden." ' Rodriguez, 88 S.W.3d at 321 (quoting Wallis, 2 S.W.3d at 303). "The insured must therefore present some evidence upon which the jury can allocate the damage attributable to the covered peril." Allison, 98 S.W.3d at 258-59 (citing Wallis, 2 S.W.3d at 303); see also Rodriguez, 88 S.W.3d at 321. "Although a plaintiff is not required to establish the amount of his damages with mathematical precision, there must be some reasonable basis upon which the jury's finding rests." Id.

In this case, the Fiesses cannot satisfy the doctrine of concurrent causation. Damage to the residence caused by floodwaters is expressly excluded by the Policy. Although the Fiesses' expert, Dr. Pearce, belatedly attributed 70% of the mold damage to water events other than the flood, the Fiesses have adduced no evidence that would provide a reasonable basis for distinguishing mold caused by the flood from mold caused by non-flood events. Dr. Pearce conceded at deposition that there was mold on every wall, stud, baseboard, and base plate throughout the residence caused by the flood. Thus, there is insufficient evidence from which a distinction can reasonably be drawn between any mold damage caused by the flood, which is not covered under the Policy, and any other mold damage arguably covered under the Fiesses' interpretation of the Policy. "This is fatal to their claim." Wallis, 2 S.W.3d at 304. Because the Fiesses are unable to meet their burden of segregating the amount of damage caused solely by the purportedly covered peril from that caused by excluded perils, their mold loss claim must fail under the doctrine of concurrent causation.

### D. Duty of Good Faith and Fair Dealing

**\*11** The Fiesses allege that State Farm's denial of their claim amounted to a breach of the duty of good faith and fair dealing. State Farm maintains, however, that the Fiesses are not entitled to recover on their bad faith claim because a bona fide dispute existed regarding State Farm's liability for mold damage under the Fiesses' insurance policy.

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



faith with an insured in the processing of claims." Higginbotham v. State Farm Mut. Auto. Ins. Co., 103 F.3d 456, 459 (5th Cir.1997) (citing Arnold v. Nat'l County Mut. Fire Ins. Co. 725 S.W.2d 165, 167 (Tex.1987)); see also Erwin v. Texas Health Choice, L.C., 187 F.Supp.2d 661, 666 (N.D.Tex.2002); Stewart Title Guar. Co. v. Aiello, 941 S.W.2d 68, 70-71 (Tex.1997); Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 340 (Tex.1995); Viles v. Security Nat'l Ins. Co., 788 S.W.2d 566, 567 (Tex.1990); Vandeventer v. All Am. Life & Cas. Co., 101 S.W .3d 703, 722 (Tex.App.-Fort Worth 2003, no pet. h.). "A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has no reasonable basis for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial." Higginbotham, 103 F.3d at 459 (citing Arnold, 725 S.W.2d at 167); Universe Life Ins Co. v. Giles, 950 S.W.2d 48, 50-51 (Tex.1997) (quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex.1994)); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 283 (Tex.1994). The key inquiry in a bad faith claim is the reasonableness of the insurer's conduct. See Giles, 950 S.W.2d at 49; Moriel, 879 S.W.2d at 17-18; Lyons v. Millers Cas. Co., 866 S.W.2d 597, 601 (Tex.1993).

An insurer's liability under an insurance contract is separate and distinct from its liability for breach of the duty of good faith and fair dealing. See Lyons, 866 S.W.2d at 600; Viles, 788 S .W.2d at 567. "A bona fide controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim." Higginbotham, 103 F.3d at 459; see Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 195-96 (Tex.1998). "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." Higginbotham, 103 F.3d at 459 (citing Lyons, 866 S.W.2d at 600); see Castaneda, 988 S.W.2d at 196.

To succeed on a claim of breach of the duty of good faith and fair dealing, the insured

must prove (1) that the insurer either denied or delayed payment of the claim and (2) that the insurer "knew or should have known that it was reasonably clear that the claim was covered." Giles, 950 S.W.2d at 55; see Castaneda, 988 S.W.2d at 195-96; United States Fire Ins. Co. v. Williams, 955 S.W.2d 267, 268 (Tex.1997); State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex.1997); Pena v. State Farm Lloyds, 980 S.W.2d 949, 955 (Tex.App.-Corpus Christi 1998, no pet. h.). "[A]n insurer breaches its duty of good faith and fair dealing by denying a claim when the insurer's liability has become reasonably clear." State Farm Fire & Cas. Co. v. Simmons, 963 S.W.2d 42, 44 (Tex.1998); see Williams, 955 S.W.2d at 268; Nicolau, 951 S.W.2d at 448. An insurer does not breach its duty, however, merely by erroneously denying a claim. See Tucker v. State Farm Fire & Cas. Co., 981 F.Supp. 461, 465 (S.D.Tex.1997); Williams, 955 S.W .2d at 268; Moriel, 879 S.W.2d at 17. The courts of Texas have repeatedly held that bad faith does not arise simply because the insurer's construction of the policy was subsequently found to be legally incorrect. See Williams, 955 S.W.2d at 268 (citing Giles, 950 S.W.2d at 48); Moriel, 879 S.W.2d at 17. Similarly, evidence that shows only a bona fide coverage dispute does not rise to the level of bad faith. See Robinson v. State Farm Fire & Cas. Co., 13 F.3d 160, 162 (5th Cir.1994); Simmons, 963 S.W.2d at 44; Williams, 955 S.W.2d at 268; Nicolau, 951 S.W.2d at 448; Moriel, 879 S.W.2d at 17; National Union Fire Ins. Co. v. Dominguez, 873 S.W.2d 373, 376-77 (Tex.1994).

*12 Nevertheless, an insurer cannot escape liability by failing to investigate a claim in order to assert that liability was never reasonably clear. See Giles, 950 S.W.2d at 56 n. 5. Rather, the Supreme Court reaffirmed in Giles that "an insurance company may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim." Id. (citing Arnold, 725 S.W.2d at 167). Thus, an insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial. See Simmons, 963 S.W.2d at 44; Nicolau, 951 S.W.2d at 448; Lyons, 866

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *12 (S.D.Tex.))

Page  14

S.W.2d at 601. Moreover, an insurer's reliance upon an expert report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. See Nicolau, 951 S.W.2d at 448.

An insurance company's obligation to investigate, however, is not unlimited. See Simmons, 963 S.W.2d at 44. "The scope of the appropriate investigation will vary with the claim's nature and value and the complexity of the factual issues involved." Id. at 44-45. If, after a reasonable investigation, the insurer has evidence showing that the insured's claim may be invalid, a bad faith action is not viable. See Tucker, 981 F.Supp. at 465 (citing Aranda v. Insurance Co. of N. Am., 748 S.W.2d 210, 213 (Tex.1988); St. Paul Lloyd's Ins. v. Fong Chun Huang, 808 S.W.2d 524, 526 (Tex.App.-Houston [14th Dist.] 1991, writ denied). "[I]nsurance carriers maintain the right to deny questionable claims without being subject to liability for an erroneous denial of the claim." Higginbotham, 103 F.3d at 459 (citing Fong Chun Huang, 808 S.W.2d at 526); see Robinson, 13 F.3d at 162; Aranda, 748 S.W.2d at 213.

1. Investigation

Here, in view of the nature of the incident and the value and complexity of the claim, State Farm's investigation was adequate and reasonable. See Simmons, 963 S.W.2d at 44-45. After the Fiesses discovered the mold on the sheetrock, State Farm sent an adjuster to inspect and evaluate the claim. Mr. Fiess testified:

  A. The insurance had instructed us to - that we could do that and then wait for an adjustor.
  Q. Okay. And when did you see the adjustor?
  A. For a date, I'm not sure. It was within a couple of days.

Additionally, State Farm sent two experts, Steve Pituch and Richard Fahrian, of Brown Engineering to conduct tests on the Fiesses' residence. According to Mr. Fiess, these experts told him the mold damage pre-dated the flood. Consequently, State Farm, though

maintaining mold damage was excluded under the Policy, paid for mold remediation where there was evidence of pre-flood leaks "in an effort to help the insureds ravaged by a terrible flood."

2. Bona Fide Dispute-Coverage under the Policy

The Fiesses contend that State Farm acted in bad faith by paying "only a fraction of the insured's legitimate claim," while improperly denying coverage for the remaining damage caused by the mold contamination. The Fiesses argue there is no bona fide dispute because the mold damage resulted from pre-flood leaks, thereby clearly establishing State Farm's liability under the ensuing loss provision of the Policy. They assert that State Farm should have interpreted the ensuing loss provision in their favor and then paid the claim.

*13 State Farm contends that a bona fide dispute existed between itself and the Fiesses as to whether the alleged mold contamination of the Fiesses' residence is covered under the Policy. Although their liability under the Policy for mold damage was not reasonably clear, State Farm paid the Fiesses for mold remediation in the areas where pre-flood leaks were identified. State Farm then promptly denied the remainder of their claim for mold remediation, citing the mold exclusion in the Policy. Under the express terms of the Policy, damage caused by mold is excluded from coverage. In any event, at the time State Farm denied the claim, it was questionable as to whether mold damage was covered under the ensuing loss provision of the Policy.

Thus, based on the facts that were before the insurer after a reasonable investigation, State Farm's liability was not reasonably clear when it denied the claim. In this situation, the Fiesses have failed to adduce competent summary judgment evidence from which it could be inferred that State Farm acted in bad faith when denying their claim. At most, there was a bona fide coverage dispute between the parties. Therefore, summary judgment is warranted with respect to the Fiesses' claim

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



for breach of the duty of good faith and fair dealing.

E. Statutory Claims

The Fiesses further allege that State Farm's denial of their claim amounted to a violation of the Texas Insurance Code and the DTPA. In Texas, an individual who has been damaged by "unfair methods of competition or unfair or deceptive acts or practices in the business of insurance" may bring a statutory cause of action under the Texas Insurance Code against the "person or persons engaging in such acts or practices." Tex. Ins.Code Ann. art. 21.21, § 16; see Transitional Hosp. Corp. v. Blue Cross & Blue Shield of Tex., Inc., 164 F.3d 952, 955 (5th Cir.1999); Storebrand Ins. Co. U.K., Ltd. v. Employers Ins. of Wausau, 139 F.3d 1052, 1055 (5th Cir.1998); Higginbotham, 103 F.3d at 460; Douglas v. State Farm Lloyds, 37 F.Supp.2d 532, 543-44 (S.D.Tex.1999); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 382-83 (Tex.2000). A violation of the duty of good faith and fair dealing also constitutes an unfair insurance practice in violation of Article 21.21 of the Insurance Code. See Tucker, 981 F.Supp. at 465; Bates v. Jackson Nat'l Life Ins. Co., 927 F.Supp. 1015, 1024 (S.D.Tex.1996); Dixon v. State Farm Fire & Cas. Co., 799 F.Supp. 691, 694 (S.D.Tex.1992); Vail v. Texas Farm Bureau Mut. Ins. Co., 754 S.W.2d 129, 136 (Tex.1988). In addition, "the use or employment by any person of an act or practice in violation of Article 21.21, Insurance Code" is a violation of the DTPA. Tex. Bus. & Com.Code Ann. § 17.50(a); see Thrash v. State Farm Fire & Cas. Co., 992 F.2d 1354 (5th Cir.1993); Tucker, 981 F.Supp. at 465; Dixon, 799 F.Supp. at 694; Vail, 754 S.W.2d at 136.

"The Texas Insurance Code and the Deceptive Trade Practices Act are in large measure statutory fleshings-out of the already existing common law requirements." Robinson, 13 F.3d at 162. Hence, the breach of an insurance contract does not automatically give rise to liability under the Insurance Code or the DTPA. See Walker v. Federal Kemper Life Assurance Co., 828 S.W.2d 442, 454 (Tex.App.-San Antonio 1992, writ denied)

(citing South Tex. Nat'l Bank v. U.S. Fire Ins. Co., 640 F.Supp. 278, 280 (S.D.Tex.1985)). Rather, the "reasonableness" requirements of common law good faith apply equally in the statutory context. See Giles, 950 S.W.2d at 55. "According to Texas law, extra-contractual tort claims pursuant to the Texas Insurance Code and the DTPA require the same predicate for recovery as bad faith causes of action." Lawson v. Potomac Ins. Co., No. Civ. 3:98-CV-0692H, 1998 WL 641809, at *4 (N.D.Tex. Sept. 14, 1998) (citing Higginbotham, 103 F.3d at 460). Thus, in order to establish a statutory violation under the Insurance Code or the DTPA, the elements necessary to demonstrate an insurer's breach of the common law duty of good faith and fair dealing must be proven. See Higginbotham, 103 F.3d at 460; Lawson, 1998 WL 641809, at *4; Lockett v. Prudential Ins. Co., 870 F.Supp. 735, 741 (W.D.Tex.1994) (citing Vail, 754 S.W.2d at 135; Koral Indus., Inc. v. Security-Connecticut Life Ins. Co., 788 S.W.2d 136, 147 (Tex.App.-Dallas), writ denied per curiam, 802 S.W.2d 650 (Tex.1990)). A statutory violation is dependent upon a " 'determination pursuant to law that the insurer breached the duty of good faith and fair dealing." ' Id. (quoting Koral Indus., Inc., 788 S.W.2d at 148); see Higginbotham, 103 F.3d at 460; Lawson, 1998 WL 641809, at *4; see also Charter Roofing Co. v. Tri-State Ins. Co., 841 S.W.2d 903, 906 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

*14 Thus, when an insured joins claims under the Texas Insurance Code and the DTPA with a bad faith claim, all asserting a wrongful denial of policy benefits, if there is no merit to the bad faith claim, there can be no liability on either of the statutory claims. See Higginbotham, 103 F.3d at 460; Lawson, 1998 WL 641809, at *4; Beaumont Rice Mill, Inc. v. Mid-American Indem. Ins. Co., 948 F.2d 950, 952 (5th Cir.1991); Tucker, 981 F.Supp. at 465; State Farm Fire & Cas. Co. v. Woods, 925 F.Supp. 1174, 1180 (E.D.Tex.1996), aff'd, 129 F.3d 607 (5th Cir.1997); Saunders v. Commonwealth Lloyd's Ins. Co., 928 S.W.2d 322, 324 (Tex.App.-San Antonio 1996, no writ); Emmert v. Progressive County Mut. Ins. Co., 882 S.W.2d 32, 36

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *14 (S.D.Tex.))

Page 16

(Tex.App.-Tyler 1994, writ denied). Concerning the interrelationship between bad faith and statutory claims, the court in Tucker commented, "Plaintiff's extra-contractual claims live or die depending on whether plaintiff's bad-faith claim has any viability." 981 F.Supp. at 465. The Tucker court ultimately concluded:

> Given the facts alleged in this case, which were before [the insurer] when it denied Plaintiff's claim, the Court concludes that liability in this case has not yet become reasonably clear. It is apparent that [the insurer] had a reasonable factual basis for denying Plaintiff's claim. Whether that basis is erroneous is a factual issue for the trier of fact; however, the bad-faith issue is not. Thus, without commenting upon the strength of Plaintiff's remaining contractual action, the Court finds that no reasonable jury could conclude that [the insurer] was unreasonable in denying Plaintiff's claim, that [the insurer] did not have a reasonable basis for denying Plaintiff's claim, or that [the insurer] committed actions sufficient to constitute bad faith. Therefore, under Giles, Plaintiff's extra-contractual claims must fail.

981 F.Supp. at 466 (emphasis in original) (citations and footnotes omitted). Consequently, because the common law bad faith claims asserted by the Fiesses in the instant case are without merit, summary judgment is also proper as to their statutory claims under the Texas Insurance Code and the DTPA. See id.

**F. Breach of Express and Implied Warranties**

In their First Amended Complaint, the Fiesses allege that State Farm breached its express and implied warranties by intentionally and knowingly failing to compensate them fully for their mold damage and by violating certain provisions of the DTPA.

**1. Express Warranties**

" 'An express warranty is created when a seller makes an affirmation of fact or a

promise to the purchaser, which relates to the sale and warrants a conformity to the affirmation as promised." ' McDade v. Texas Commerce Bank, 822 S.W.2d 713, 718 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (quoting McCrea v. Cubilla Condominium Corp., 685 S.W.2d 755, 757 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.)); see Brandon v. American Sterilizer Co., 880 S.W.2d 488, 493 (Tex.App.-Austin 1994, no writ). "As a general rule in a sale of goods there is an express warranty that the goods conform to an affirmation of fact, promise or a description of the goods made by the seller to the buyer if the affirmation or description is part of the basis of the bargain." Calloway v. Manion, 572 F.2d 1033, 1036-37 (5th Cir.1978). Texas courts treat the question of whether a promise constitutes an express warranty as a question of law. See Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co., 832 F.2d 1358, 1372 (5th Cir.), clarified, 832 F.2d 1378 (5th Cir.1987) (citing S.I. Property Owners' Ass'n, Inc. v. Pabst Corp., 714 S.W.2d 358, 361 (Tex.App.-Corpus Christi, 1986, writ ref'd n.r.e.)). " 'An express warranty is entirely a matter of contract, wherein the seller may define or limit his obligation respecting the subject of the sale, and provide as to the manner of fulfilling the warranty or the measure of damages for its breach." ' S.I. Property Owners' Ass'n, 714 S.W.2d at 361 (quoting Donelson v. Fairmont Food Co., 252 S.W.2d 796, 799 (Tex.Civ.App.-Waco 1952 writ ref'd n.r.e.)). "Above all, however, an express warranty must be explicit." Id.

*15 The most accessible definition of "express warranty" appears in Chapter 2 of the Texas Uniform Commercial Code ("the Code"). See Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1373 (citing Tex. Bus. & Com.Code Ann. § 2.313 (Vernon 1968)). Section 2.313 of the Code, entitled "Express Warranties by Affirmation, Promise, Description, Sample," provides:

(a) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *15 (S.D.Tex.))

the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Chapter 2 of the Code governs only the sale of goods. See Tex. Bus. & Com.Code Ann. § 2.102; Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1373; S.I. Property Owners' Ass'n, 714 S.W.2d at 361. An insurance policy, however, is a contract for services, not goods. See Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1373. Contracts for services are not governed by the Code. See Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 764 (5th Cir.), cert. denied, 493 U.S. 820 (1989); Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1373. Nevertheless, as the Fifth Circuit has noted, the Code's provisions on express warranties are instructive, even if they are not controlling, in other contexts. See Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1374.

The remedy provisions of the Code distinguish between situations in which the seller has completely failed to deliver the goods promised and those in which the seller has delivered the goods, but they are nonconforming. See id. at 1374-75. As the Fifth Circuit has observed:

[T]he remedy provisions of the Code distinguish between when the buyer has nothing at all and when the buyer has something, but it is not what was promised. In other words, the Code's remedies

distinguish based on delivery and acceptance of the goods. This distinction is important because, under the system the Code sets up, a buyer's ability to sue for breach of warranty arises only under section 2.714, where acceptance of nonconforming goods is a prerequisite.... Consequently, under the Code a breach of warranty does not occur when the seller completely fails to deliver. When that happens, the buyer's remedy is found under sections 2.712 and 2 .713 for the seller's breach of contract.

*16 Id. Following this reasoning, the Fifth Circuit has held that a buyer has a cause of action for breach of express warranty in a services contract "when the focus of the express promise is on the way in which the service is to be performed, but not when the focus is only on the fact that service is promised." Id. at 1375. In contrast, "the mere promise to perform does not constitute an express warranty." Id. at n. 14. Therefore, nonperformance by the seller does not result in the breach of an express warranty. See id. Moreover, if all that the seller promises is performance, the result is not changed just because the seller attempts to perform. See id. As the Fifth Circuit has explained:

Unless the seller made additional promises concerning the manner of performance-as opposed to the fact of performance-it does not matter what action the seller takes. Not performing at all, or performing incorrectly-neither leads to liability ... for breach of express warranty because the seller has made no express warranties which can be breached.

Id. at 1375 n. 14.

In this case, the Fiesses have not established the existence of an express warranty in the Policy issued to them by State Farm. As in Brandon, the Fiesses "[have] failed to bring forward the terms of any alleged express warranty. They do not identify the express warranty nor do they refer to any part of the record where the terms of such a warranty may be located." 880 S.W.2d at 493. A review of the Policy reveals no language that could be construed as an express warranty. See S.I. Property Owners' Ass'n, 714 S.W.2d at 361. Further, there is nothing to suggest that State

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *16 (S.D.Tex.))

Page 18

Farm made a promise for performance to the Fiesses independent of the terms of the homeowner's insurance policy or that a promise of such performance became a basis of the bargain. The Fiesses have proffered no evidence supporting a finding of an express promise concerning the manner in which the Policy was to be performed, the only recognized basis for an express warranty in a service contract. See Brooks, Tarlton, Gilbert, Douglas & Kressler, 832 F.2d at 1375. State Farm's mere promise to perform does not constitute an express warranty. See id. at n. 14. Thus, neither State Farm's alleged lack of performance nor its purported improper performance with respect to its handling of the Fiesses' claim leads to liability for breach of express warranty, as there is no evidence that State Farm made an express warranty that could be breached. See id. Here, as in Brooks, Tarlton, Gilbert, Douglas & Kressler, "the promise of performance is simply a term of the contract which, when breached, gives rise to an action for contract damages." Id. at 1376.

2. Implied Warranties

While express warranties are imposed by agreement of the parties to a contract, implied warranties are created by operation of law and are grounded more in tort than in contract. See La Sara Grain v. First Nat'l Bank of Mercedes, 673 S.W.2d 558, 565 (Tex.1984). Implied warranties are derived primarily from statute, although some have their origin at common law. See id. Implied warranty claims arise by operation of law for any sale of goods in Texas. See Melody Home Mfg. Co. v. Barnes, 741 S.W.2d 349, 353 (Tex.1987) (citing La Sara Grain, 673 S.W.2d at 565; Humber v. Morton, 426 S.W.2d 554 (Tex.1968)). Chapter 2 of the Code establishes three implied warranties in sales transactions: (1) the warranty of title; (2) the warranty of merchantability; and (3) the warranty of fitness for a particular purpose. See Parkway Co. v. Woodruff, 901 S.W.2d 434, 438 n. 2 (Tex.1995) (citing Tex. Bus. & Com.Code Ann. §§ 2.312, 2.314, 2.315). Liability under the latter two provisions depends on a finding that the goods are defective, meaning that they are unfit for the ordinary purpose for which they

are used because of a lack of something necessary for adequacy. See Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 444 (Tex.1989).

*17 None of these implied warranties, however, applies to a strictly service transaction. See Parkway Co., 901 S.W.2d at 438 n. 2. Unlike the implied warranties imposed on sales transactions under the Code, an implied service warranty is a common law creation. See id. at 438 (citing Melody Home Mfg. Co., 741 S.W.2d at 353). As the Fifth Circuit explained in Suwannee River Spa Lines, Inc., "[a]rguably because contracts for services are not subject to the implied warranties provided by the U.C.C., it is necessary to impose a duty of proper performance in tort in order to provide the buyer of services with analogous protection from economic loss." 866 F.2d at 764. "The judicial recognition of implied warranties in service transactions in Texas has had a short and somewhat uneven history." Parkway Co., 901 S.W.2d at 438. Until 1987, the Texas Supreme Court had never recognized a cause of action for breach of an implied warranty relating to services. See id. In Melody Home Mfg. Co., the court first acknowledged a limited implied warranty relating to services, recognizing "an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner." 741 S.W.2d at 354. In Parkway Co., the court noted that in implied warranties relating to services, two principles apply. See 901 S.W.2d at 439. First, an implied warranty will not be judicially imposed unless there is a demonstrated need for it. See id. Second, the Melody Home implied warranty extends only to services provided to remedy defects existing at the time of the relevant consumer transaction. See id.

As to their breach of implied warranty claim, the Fiesses have failed to establish the existence of an implied warranty. They have not demonstrated a need for an implied warranty independent of the contract of insurance. See Parkway Co., 901 S.W.2d at 439. Furthermore, the Fiesses have pointed to no defect in the Policy at the time they

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



entered into the transaction to which an implied warranty could attach. See id. "The terms of the policy themselves define its benefits and obligations, and no implied warranty can extend those terms." Jay Freeman v. Glens Falls Ins. Co., 486 F.Supp. 140, 143 (N.D.Tex.1980). Although State Farm owed the Fiesses an implied duty of good faith and fair dealing, it has already been determined that State Farm fulfilled that duty. With regard to any implied duty of proper performance, such a duty has never been recognized in Texas in connection with an insurance contract. Indeed, Texas courts have held that the only cause of action available to a first-party claimant for an alleged deficiency in claims handling is breach of the duty of good faith and fair dealing, whether that claim is predicated on the common law or the Insurance Code. See Robinson, 13 F.3d at 163; United States Auto Ass'n v. Pennington, 810 S.W.2d 777, 783-84 (Tex.App.-San Antonio 1991, writ denied).

**\*18** Thus, the Fiesses' extra-contractual claims for breach of express and implied warranties must be rejected, as they are without factual or legal basis.

G. Fraud/Intentional Misrepresentation

The Fiesses further assert that State Farm committed fraud and intentional misrepresentation in connection with their mold claim under the Policy. They allege that State Farm's "misrepresentations regarding the terms of its contract for insurance were material and were made recklessly and/or with knowledge of their falsity, and were made in anticipation of Plaintiffs' reliance upon the same, and upon which, Plaintiffs did actually rely to their detriment." Specifically, they assert that State Farm sold them a Policy ostensibly covering mold damage if it was an ensuing loss that was false and was known to be false. According to the Fiesses, the denial of their claim on the basis that mold damage is not an ensuing loss constitutes fraud and misrepresentation. They allege that, as a result of such fraud, they have been damaged equal to the "amount of money necessary to remediate their home." In addition, the

Fiesses maintain that State Farm's misrepresentations were made intentionally and/or maliciously, thereby entitling them to punitive damages.

State Farm contends in its motion for summary judgment that there is no evidence that it "made a material representation to [the Fiesses] that was false, and upon making the representation, State Farm knew it was false, or should have known it was false." Furthermore, State Farm asserts that the Fiesses have failed to prove that any representation was made with the intent that they act on it, that the Fiesses acted on such representation, and that they sustained damage as a result of such representation.

In their complaint, the Fiesses make conclusory allegations that State Farm committed fraud. In order to state a claim for fraud in federal court, the plaintiff must state with particularity the circumstances constituting the fraud. See Fed. R. CIV. P. 9(b); Herrman Holdings Ltd. v. Lucent Techs., Inc., 302 F.3d 552, 564 (5th Cir.2002); American Realty Trust, Inc. v. Bagley, No. Civ. A. 3:02CV0641-G, 2003 WL 158878, at *1 (N.D.Tex. Jan. 16, 2003). Instead of the "short and plain statement of the claim" required by Rule 8(a) of the Federal Rules of Civil Procedure, Rule 9(b) imposes a heightened standard of pleading for averments of fraud. See ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 349 (5th Cir.2002); Melder v. Morris, 27 F.3d 1097, 1100 (5th Cir.1994); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir.1994); Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir.1992). Rule 9(b) states:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
Fed. R. Civ. P. 9(b); see Tchuruk, 291 F.3d at 349; Hart v. Bayer Corp., 199 F.3d 239, 248 n. 6 (5th Cir.2000); United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir.1999); Guidry v. United States Tobacco Co., 188 F.3d 619, 632 (5th Cir.1999); Sanchez v. Liggett & Myers, Inc .,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



187 F.3d 486, 491 (5th Cir.1999). This higher standard of pleading "stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation." Guidry v. Bank of LaPlace, 954 F.2d 278, 288 (5th Cir.1992) (citing Segal v. Gordon, 467 F.2d 602, 607 (2d Cir.1972)).

**\*19** To satisfy Rule 9(b), a plaintiff must at a minimum allege the " " 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." " ' Epic Healthcare Mgmt. Group, 193 F.3d at 308 (quoting Williams v. WMX Techs., 112 F.3d 175, 177 (5th Cir.1997) (quoting Tuchman, 14 F.3d at 1068)); accord Tchuruk, 291 F.3d at 349; Hart, 199 F.3d at 248 n. 6; Melder, 27 F.3d at 1100; Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir.1993). " '[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." ' Tchuruk, 291 F.3d at 349 (quoting Williams, 112 F.3d at 177-78); accord Abrams v. Baker Hughes Inc., 292 F.3d 424, 431 (5th Cir.2002). " '[D]irectly put, the who, what, when, and where must be laid out before access to the discovery process is granted." ' Tchuruk, 291 F.3d at 349 (quoting Williams, 112 F.3d at 178) (emphasis in original); accord Hart, 199 F.3d at 248 n. 6. "Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." Williams, 112 F.3d at 178 (citing Tuchman, 14 F .3d at 1067). "Facts and circumstances constituting charged fraud must be specifically demonstrated and cannot be presumed from vague allegations." Howard v. Sun Oil Co., 404 F.2d 596, 601 (5th Cir.1968); see Nathenson v. Zonagen Inc., 267 F.3d 400, 419-20 (5th Cir.2001); In re Commonwealth Oil/ Tesoro Petroleum Corp. Sec. Litig., 467 F.Supp. 227, 250 (W.D.Tex.1979). If a complaint fails to meet the pleading requirements of Rule 9(b), it must be dismissed. See Tchuruk, 291 F.3d at 350; Abrams, 292 F.3d at 430.

Under Fifth Circuit precedent, a dismissal for failure to plead fraud with particularity is treated as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1017 (5th Cir.1996); Shushany, 992 F.2d at 520; Robertson v. Strassner, 32 F.Supp.2d 443, 446 (S.D.Tex.1998). To avoid dismissal, the complaint must contain facts showing that the plaintiff is entitled to relief on his substantive causes of action. See McClain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246 (1980); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Frank v. Delta Airlines, Inc., 314 F.3d 195, 197 (5th Cir.2002). A dismissal should only be granted if "it appears beyond doubt that the plaintiff could prove no set of facts in support of its claims that would entitle it to relief." Bagley, 2003 WL 158878, at \*2 (citing Conley, 355 U.S. at 45-46; Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 524 (5th Cir.1994)); see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir.1982). To avoid dismissal, however, the plaintiff must plead specific facts, not mere conclusory allegations. Kane Enters. v. MacGregor (USA) Inc., 322 F.3d 371, 374 (5th Cir.2003) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir.2000)).

**\*20** Although State Farm does not allege that the Fiesses failed to comply with the heightened pleading requirements for a fraud claim, "a district court may dismiss a complaint on its own motion for failure to state a claim." Shawnee Int'l, N.V. v. Hondo Drilling Co., 742 F.2d 234, 236 (5th Cir.1984); see also Timmons v. Special Ins. Servs., 984 F.Supp. 997, 1004 (5th Cir.1997), aff'd, 167 F.3d 537 (5th Cir.1998); Lewis v. Law-Yone, 813 F.Supp. 1247, 1249 (N.D.Tex.1993). "Under Rule 12(b)(6), dismissal is proper only if there is either (1) 'the lack of a cognizable legal theory' or (2) 'the absence of sufficient facts alleged under a cognizable legal theory." ' Timmons, 984 F.Supp. at 1004 (quoting Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir.1988)) In making such assessment, the court cannot consider material

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



outside the plaintiff's complaint. See id . (citing Powe v. Chicago, 664 F.2d 639, 642 (7th Cir.1981)).

Looking strictly at the fraud/intentional misrepresentation allegation in the complaint, the Fiesses have not alleged sufficient facts to meet the requirements of a fraud claim under Rule 9(b). Thus, the Fiesses' claim against State Farm for fraud is subject to dismissal for failure to state a claim upon which relief can be granted. Moreover, aside from failing to plead fraud properly, the Fiesses have not adduced evidence from which it could be inferred that State Farm committed fraud. The Fiesses have not shown that State Farm engaged in any fraudulent conduct or made any actionable misrepresentations in connection with the homeowner's insurance policy at issue. Under Texas law, in order to establish fraud, the plaintiff must show:

  1. a material representation was made;

  2. it was false;

  3. it was made with the knowledge of its falsity or recklessly without knowledge of its truth and as a positive assertion;

  4. it was made with the intention that it be acted upon;

  5. the plaintiff acted in reliance on the representation; and

  6. the plaintiff thereby suffered injury.

See Norman v. Apache Corp., 19 F.3d 1017, 1022 (5th Cir.1994); Boggan v. Data Sys. Network Corp., 969 F.2d 149, 151-52 (5th Cir.1992); Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex.1994); T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 222 (Tex.1992); Trenholm v. Ratcliff, 646 S.W.2d 927, 930 (Tex.1983); Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex.1977). "As a general rule, failure to perform the terms of a contract yields contract liability, not tort liability." Schindler v. Austwell Farmers Coop., 829 S.W.2d 283, 286 (Tex.App.-Corpus Christi), aff'd as modified on other grounds, 841 S.W.2d 853 (Tex.1992) (citing International Printing Pressmen & Assistant's Union v. Smith, 198 S.W.2d 729, 735-36 (Tex.1946)). "[A] contract to perform in the future is actionable fraud when it is made with the intention, design and purpose of deceiving, and with no intention of

performing." Id. (citing Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex.1986)). Nevertheless, "a party's failure to perform the contract, standing alone, is no evidence of that party's intent not to perform at the time the contract was made." Id. (citing Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 596 (Tex.1992); Spoljaric, 708 S.W.2d at 435)).

*21 In the case at bar, with respect to the factual basis for their fraud and misrepresentation claim, Mrs. Fiess testified at deposition:

  Q. Okay. That's what I'm talking about right now are just things that you were told that now - and I guess the layman way of saying it would be that now you believe are lies. And there may not be anything specifically that you remember, and there might be. But I'm just trying to figure out if there are things that you were told that you are now looking back saying, "I was lied to about that."

  A. Not about my policy or anything. Perhaps if you are just talking about smart aleckness maybe or something like that -

  Q. Well, we can get -

  A. - that I believe was - but as far as telling me something about the policy that I feel like I've been lied to about, no.

With regard to State Farm's handling of their claim, the following exchange occurred at Mrs. Fiess's deposition:

  Q. Okay. And let me talk about the other thing you were just talking about, about just the handling of the claim. And let me just talk about some general issues that seem to - in dealing with Marilyn Thompson, do you have any issues regarding how she handled the claim?

  A. No, sir.

          * * *

  Q. Okay. But other than - other than that, you didn't have any problem with the way she handled the claim other than the fact that she denied certain parts of the mold claim?

  A. No, to the way she handled the claim.

While Mrs. Fiess complained of State Farm's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



failure to return her repeated telephone calls in a timely manner and of its "mocking attitude" when discussing the claim, State Farm correctly points out the Fiesses' dissatisfaction with the company's denial of and lack of communication concerning their claim provides an insufficient factual basis to establish each of the elements of a viable claim of fraud.

Furthermore, there is no evidence in the record that State Farm intended not to perform its contractual obligations at the time the Policy was issued. On the contrary, Mrs. Fiess's deposition testimony establishes the absence of any misrepresentations made by State Farm when the Policy was issued. Likewise, Mr. Fiess's deposition testimony is equally silent regarding any misrepresentations made at the time the Policy was issued. A party's failure to perform in accordance with the terms of an agreement may constitute a breach of contract, but it is insufficient to establish fraud or misrepresentation. Thus, the Fiesses' fraud/ intentional misrepresentation claim grounded on State Farm's failure to pay for additional mold remediation lacks any support in the record. Thus, in addition to failing to plead fraud properly, the Fiesses have not produced competent evidence to raise a genuine issue of material fact with regard to their claim for fraud and intentional misrepresentation, rendering summary judgment appropriate.

H. Unconscionability

Finally, the Fiesses allege that State Farm's actions with regard to the sale of the policy and the failure to compensate them fully for their entire mold loss were unconscionable.

*22 In Texas, "[a] consumer may bring a DTPA cause of action when any unconscionable action or course of action constitutes a producing cause of economic damages." U.S. Tire-Tech, Inc. v. Boeran, B.V., ___ S.W.3d ___, No. 01-00-00812-CV, 2003 WL 21197128, at *7 (Tex.App.-Houston [1st Dist.] May 22, 2003, no pet. h.) (not released for publication) (citing Tex. Bus. & Com.Code Ann. § 17.50(a)(3)). Unlike a breach

of warranty claim, an "unconscionable action or course of action" is specifically defined in the DTPA to mean "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com.Code Ann. § 17.45(5). " 'To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and "that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." " ' Royal Maccabees Life Ins. Co. v. James, ___ S.W.3d ___, No. 05-01-01372-CV, 2003 WL 1848601, at *9 (Tex.App.-Dallas Apr. 10, 2003, no pet. h.) (quoting Bradford v. Vento, 48 S.W.3d 749, 760 (Tex.2001) (quoting Insurance Co. of N. Am. v. Morris, 981 S.W.2d 667, 677 (Tex.1998); Chastain v. Koonce, 700 S.W.2d 579, 583 (Tex.1985))). "While a specific misrepresentation may not be required to establish unconscionability, see, e.g., Tri-Legends Corp. v. Ticor Title Ins. Co., 889 S.W.2d 432, 439 (Tex.App.-Houston [14th Dist.] 1994, writ denied), unconscionability may not necessarily be established even where an insurer breaches the policy and there is evidence of bad faith." Royal Maccabees Life Ins. Co., 2003 WL 1848601, at *9 (citing Nicolau, 951 S.W.2d at 451 (there was legally insufficient evidence to establish unconscionability even though the policy was breached and there was some evidence of bad faith)). Furthermore, "[t]he conduct constituting unconscionability must take place at the time of the consumer transaction made the basis of the DTPA claim." Id. (citing Parkway Co., 901 S.W.2d at 441 (unconscionability requires that seller take advantage of special skills and training at time of sale)).

Here, it is undisputed that the mold exclusion is clearly set forth in the Policy, and the Fiesses conceded at deposition that they were not "lied to" about anything in the Policy. There is also no evidence that State Farm acted unconscionably due to an act that resulted in a gross disparity between the value the Fiesses received and the consideration they paid. See Nicolau, 951 S.W.2d at 451.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21659408, *22 (S.D.Tex.))

Page  23

Although State Farm refused to pay the Fiesses' entire claim for mold remediation, it paid in excess of $34,000.00, despite the mold exclusion, for the costs it deemed most closely related to pre-existing, non-flood related leaks. Hence, there is no basis for concluding that "State Farm took advantage of the [Fiesses] to the degree that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated." Id. In this situation, where there is no evidence of misrepresentation or bad faith, a finding of unconscionability clearly is not warranted.

IV. Conclusion

*23 Accordingly, State Farm's motion for summary judgment is GRANTED. There exist no outstanding issues of material fact with regard to the Fiesses' breach of contract claim or their extra-contractual causes of action for breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code and the DTPA, breach of express and implied warranties, fraud/intentional misrepresentation, and unconscionability. Consequently, State Farm is entitled to judgment as a matter of law on all the Fiesses' claims.

IT IS SO ORDERED.

2003 WL 21659408 (S.D.Tex.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



817 A.2d 292
**(Cite as: 149 N.H. 174, 817 A.2d 292)**
< KeyCite History >

Supreme Court of New Hampshire.

**Bill O. WEEKS**
v.
**CO-OPERATIVE INSURANCE COMPANIES.**

No. 2002-105.

Argued Jan. 8, 2003.
Opinion Issued Feb. 19, 2003.
Rehearing Denied March 13, 2003.

Insured brought action against property insurer to recover for separation of brick veneer wall from asphalt shingle wall as a result of faulty workmanship. The Superior Court, Coos County, Smith, J., entered summary judgment in favor of insured. Insurer appealed. The Supreme Court, Broderick, J., held that negligent work exclusion barred coverage, even though the exclusion contained an exception providing coverage if an excluded cause of loss resulted in a covered cause of loss.

Reversed.

West Headnotes

**[1] Judgment ☞ 185(2)**
228k185(2)
In acting upon a motion for summary judgment, the trial court is required to construe the pleadings, discovery, and affidavits in the light most favorable to the non-moving party to determine whether the proponent has established the absence of a dispute over any material fact and the right to judgment as a matter of law.

**[2] Judgment ☞ 181(2)**
228k181(2)
An issue of fact is "material" for summary judgment purposes if it affects the outcome of the litigation. RSA 491:8-a.

**[3] Appeal and Error ☞ 934(1)**
30k934(1)
To determine whether the trial court erred in granting the plaintiff's summary judgment

motion, the Supreme Court considers the affidavits and other evidence, as well as all proper inferences therefrom, in the light most favorable to the defendant; if it finds no genuine issue of material fact and plaintiff's entitlement to judgment as a matter of law, it will affirm the trial court's decision.

**[4] Insurance ☞ 1863**
217k1863
The interpretation of the language of an insurance policy is ultimately a question of law.

**[5] Insurance ☞ 1810**
217k1810

**[5] Insurance ☞ 1818**
217k1818

**[5] Insurance ☞ 1822**
217k1822
Courts take the plain and ordinary meaning of an insurance policy's words in context and construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole.

**[6] Insurance ☞ 1832(1)**
217k1832(1)
If the language of the policy reasonably may be interpreted more than one way and one interpretation favors coverage, then an ambiguity exists in the policy that will be construed in favor of the insured and against the insurer.

**[7] Insurance ☞ 1808**
217k1808
Courts will not perform amazing feats of linguistic gymnastics to find an insurance policy term ambiguous.

**[8] Insurance ☞ 2156**
217k2156

**[8] Insurance ☞ 2165(2)**
217k2165(2)
Coverage for separation of brick veneer wall from asphalt shingle wall was barred by

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



817 A.2d 292                                     **Page 26**
(Cite as: 149 N.H. 174, 817 A.2d 292)

negligent work exclusion of business owners' insurance policy, even though the exclusion contained an exception providing coverage if an excluded cause of loss resulted in a covered cause of loss; the term "covered cause of loss" could not be interpreted to include damage from faulty workmanship, no subsequent ensuing cause of loss existed separate and independent from the initial excluded cause of loss, i.e., the faulty workmanship, and, thus, exception did not apply.

**[9] Insurance ⟜ 2165(2)**
217k2165(2)
Property insurance coverage for an ensuing loss applies where there is a peril, i.e., a hazard or occurrence which causes a loss or injury, separate and independent, but resulting from the original excluded peril, and this new peril is not an excluded one from which loss ensues.

**[10] Insurance ⟜ 2165(2)**
217k2165(2)
An ensuing loss exception to an exclusion of property insurance coverage operates to restore coverage if damage ensues from a covered cause of loss.

**[11] Insurance ⟜ 2165(2)**
217k2165(2)
Reasonably interpreted, the ensuing loss clause in a property insurance policy says that, if a specified uncovered event takes place, any ensuing loss which is otherwise covered by the policy will remain covered; the uncovered event itself, however, is never covered.

**[12] Insurance ⟜ 2165(2)**
217k2165(2)
Property insurance coverage will be reinstated under the ensuing loss exception to an exclusion when an excluded risk sets in motion a chain of causation which leads to a covered cause of loss; in that case, the policy insures against damage directly caused by the ensuing covered cause of loss.

**294 *174 Hall, Hess, Stewart, Murphy & Brown, P.A., of Manchester (John B. Kenison, Jr. on the brief and orally), for the plaintiff.

Devine, Millimet & Branch, P.A., of Manchester (Andrew D. Dunn and James R. Fox on the brief, and Mr. Fox orally), for the defendant.

BRODERICK, J.

The defendant, Co-Operative Insurance Companies, appeals the decision of the Superior Court (Smith, J.) granting summary judgment in favor of the plaintiff, Bill O. Weeks. We reverse.

The following facts are undisputed. The plaintiff owns property in Whitefield, on which a four-story brick and timber frame structure is located. In the 1940s or 1950s, a brick veneer wall was built over the existing asphalt shingle wall on one side of the building. In March 2000, the brick veneer wall was damaged when it separated from the asphalt shingle wall. The property was insured by a business owner's insurance policy issued by the defendant. The plaintiff filed a claim, which the defendant denied after its expert determined that the cause of the wall separation was negligent workmanship. Subsequently, the plaintiff retained his own expert, who also attributed the damage to faulty workmanship.

The insurance policy at issue insures against "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." The policy defines covered cause of loss as "Risks Of Direct Physical Loss unless the loss is: a. Excluded in Section B., Exclusions; or b. Limited in Paragraph A.4., Limitations." Section B of the policy provides, in pertinent part:
> We will not pay for loss or damage caused by or resulting from any of the following .... But if an excluded cause of loss that is listed [below] results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
> ....
> *175 c. Negligent Work
> Faulty, inadequate or defective:
> ...
> (2)Design, specifications, workmanship,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



repair, construction, renovation, remodeling, grading, compaction;
... of part or all of any property on or off the described premises.
(Emphasis added.)       Section B further provides:
We will not pay for loss or damage caused by or resulting from any of the following:
....
k. Other Types Of Loss
...
(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
...
(4) Settling, cracking, shrinking or expansion;
....
**295 But if an excluded cause of loss that is listed [above] results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

In September 2000, the plaintiff brought a declaratory judgment action in superior court challenging the defendant's denial of coverage and, thereafter, moved for summary judgment. The defendant countered with its own motion for summary judgment. The defendant argued that the loss is excluded from coverage under two of the policy's provisions: the "negligent work" exclusion and the "other types of loss" exclusion. The plaintiff argued that the loss is covered under the exception to the negligent work exclusion. He contended that although negligent workmanship is not covered, the physical damage to his property resulting from negligent workmanship is covered. Alternatively, he argued that the policy language is ambiguous and, therefore, must be construed in his favor.

The trial court found an ambiguity in the policy's language and granted summary judgment in the plaintiff's favor, ruling that the defendant was not required to cover the faulty workmanship itself, but was required to cover the damages caused by the faulty

workmanship.     The court further *176 determined that the "other types of loss" clause did not apply because the parties' experts agreed that the dominant and efficient cause of the loss was the negligent workmanship.     Following a hearing on damages, the court ruled that the scope of coverage included the "bowing" of the brick veneer, the replacement of the affected windows, and the damage to the roof.

On appeal, the defendant argues that the trial court erred because: (1) the "negligent work" exclusion bars coverage; (2) the "other types of loss" exclusion bars coverage; and (3) the policy does not provide coverage because the damage was merely a manifestation of the negligent work.

[1][2] In acting upon a motion for summary judgment, the trial court is required to construe the pleadings, discovery and affidavits in the light most favorable to the non-moving party to determine whether the proponent has established the absence of a dispute over any material fact and the right to judgment as a matter of law. Panciocco v. Lawyers Title Ins. Corp., 147 N.H. 610, 613, 794 A.2d 810 (2002). The party objecting to a motion for summary judgment "may not rest upon mere allegations or denials of his pleadings, but his response, by affidavits or by reference to depositions, answers to interrogatories, or admissions, must set forth specific facts showing that there is a genuine issue [of material fact] for trial." RSA 491:8-a, IV (1997). An issue of fact is material if it affects the outcome of the litigation. Panciocco, 147 N.H. at 613, 794 A.2d 810.

[3] To determine whether the trial court erred in granting the plaintiff's motion, we consider the affidavits and other evidence, as well as all proper inferences therefrom, in the light most favorable to the defendant. See id. If we find no genuine issue of material fact and that the plaintiff was entitled to judgment as a matter of law, we will affirm the trial court's decision. Id.

[4][5][6][7] The interpretation of the language of an insurance policy is ultimately

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



817 A.2d 292
(Cite as: 149 N.H. 174, *176, 817 A.2d 292, **295)

Page  28

a question of law for this court to decide.  High Country Assocs. v. N.H. Ins. Co., 139 N.H. 39, 41, 648 A.2d 474 (1994).  We take the plain and ordinary meaning of the policy's words in context, and we construe the terms of the policy as would a reasonable person in the position of the insured **296 based on more than a casual reading of the policy as a whole.  Id.  If the language of the policy reasonably may be interpreted more than one way and one interpretation favors coverage, then an ambiguity exists in the policy that will be construed in favor of the insured and against the insurer.  Id.  We will not, however, perform amazing feats of linguistic gymnastics to find a term ambiguous.  Hudson v. Farm Family Mut. Ins. Co., 142 N.H. 144, 147, 697 A.2d 501 (1997).

[8]  Both parties agree that faulty workmanship was the dominant and efficient cause of the damage to the plaintiff's building.  Loss or damage *177 caused by or resulting from faulty workmanship is excluded from coverage under the policy's negligent work exclusion unless the faulty workmanship results in a covered cause of loss, in which case the defendant will provide coverage for the loss or damage caused by that covered cause of loss.  The question thus becomes whether a covered cause of loss ensued.

The defendant argues that the exception to the exclusion does not apply here because the damage was directly caused by faulty workmanship and no other cause of loss ensued.  The plaintiff counters that the exception abrogates the exclusion when the excluded cause of loss results in direct physical harm.  He argues that, although no coverage exists for the cost of correcting the faulty workmanship, the exception to the exclusion reinstates coverage for damage caused by the faulty workmanship.  Thus, he contends that in this case the exception to the exclusion for faulty workmanship is triggered by the direct physical loss to his building.

The plaintiff further argues that even if the policy could be read as not providing coverage for the resulting physical damage, the provisions in question are ambiguous and

therefore must be construed in his favor.  He contends that the term "covered cause of loss" is ambiguous in relation to faulty workmanship because the parties reasonably disagree over its meaning.

He asserts that the term can reasonably be interpreted to mean, in this case, "damages caused as a result of [faulty] workmanship."

[9][10][11][12]  "We interpret the ensuing loss provision to apply to the situation where there is a 'peril,' i.e., a hazard or occurrence which causes a loss or injury, separate and independent but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues."  Acme Galvanizing v. Fireman's Fund Ins., 221 Cal.App.3d 170, 270 Cal.Rptr. 405, 411 (1990).  Thus, the exception to the exclusion operates to restore coverage if the damage ensues from a covered cause of loss.    "Reasonably interpreted, the ensuing loss clause says that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered.  The uncovered event itself, however, is never covered."  McDonald v. State Farm Fire and Cas. Co., 119 Wash.2d 724, 837 P.2d 1000, 1005 (1992).    Accordingly, coverage will be reinstated under the exception to the exclusion when an excluded risk sets into motion a chain of causation which leads to a covered cause of loss.  In that case, the policy insures against damage directly caused by the ensuing covered cause of loss.

Here, there was no subsequent ensuing cause of loss separate and independent from the initial excluded cause of loss, i.e., the faulty workmanship.  Therefore, we conclude that the exception to the exclusion for faulty workmanship does not apply.    We further conclude that the plaintiff's interpretation of the policy's language is not reasonable given its *178 context.  Essentially **297 he argues that any damage caused by faulty workmanship is covered under the policy.  Interpreting the policy in this way contravenes the explicit language of the policy and renders the negligent work exclusion meaningless, a result which we conclude is not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



817 A.2d 292
(Cite as: 149 N.H. 174, *178, 817 A.2d 292, **297)

reasonable.    Therefore, we find that the provisions at issue are not ambiguous.

We hold that the policy's negligent work exclusion bars coverage in this case. Accordingly, we need not address the defendant's remaining arguments.

Reversed.

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.

817 A.2d 292, 149 N.H. 174

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2004 WL 547564
--- F.Supp.2d ----
--- F.Supp.2d ---
(Cite as: 2004 WL 547564 (N.D.Tex.))

Page 31

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Fort Worth Division.

**RIDGLEA ESTATE CONDOMINIUM ASSOCIATION, Plaintiff,**
v.
**LEXINGTON INSURANCE COMPANY, Defendant.**

No. 4:03-CV-302-A.

March 17, 2004.

**Background:** Insured brought diversity action against insurer alleging breach of property insurance policy.

**Holdings:** On insurer's motion for summary judgment, the District Court, McBryde, J., held that: (1) notice provisions in policy did not pertain to "claim for damages"; (2) insured should have, and could have, discovered damage to its property prior to passage of six years; (3) insurer did not waive defense of non-compliance with notice requirements; and (4) insurer failed to show that it was entitled to recover attorney fees from insured for having to defend against insured's claims under Texas unfair competition and unfair practices statute.

Motion granted.

**[1] Insurance ☞ 3142**
217k3142
Notice provisions in property insurance policy, which required insured to give insurer notice of loss or damage to insured property, together with details of event, so that insurer might promptly investigate to determine whether alleged loss or damage was covered by terms of insurance policy and extent of damage to the property, were not affected by Texas notice requirement statute, since provisions did not pertain to "claim for damages." V.T.C.A., Civil Practice & Remedies Code § 16.071(a).

**[2] Insurance ☞ 3156**
217k3156
The absence of a valid notice provision in an insurance policy invokes a reasonable notice standard of not less than 90 days under Texas law.

**[3] Insurance ☞ 3153**
217k3153

**[3] Insurance ☞ 3160(2)**
217k3160(2)
Although insured was not required under Texas law to give notice before it had reasonable opportunity to ascertain that its buildings suffered hail damage, insured should have, and could have, discovered damage to its property caused by hailstones three inches and greater in size, and made claim against property insurance policy prior to passage of six years, since size of hailstones, without more, would have indicated need for immediate inspection of roofs for damage.

**[4] Insurance ☞ 3191(9)**
217k3191(9)

**[4] Insurance ☞ 3192**
217k3192
Insurer could assert non-compliance with notice requirements as defense under Texas law to insured's claim under property insurance policy, although insurer did not give non-compliance as reason for rejecting claim when it was first presented to insurer; parties entered into non-waiver agreement, which said, in effect, that insured agreed that action taken by insurer in connection with investigating insured's report of loss would not waive or invalidate any of the terms or conditions of insurance policy.

**[5] Insurance ☞ 3120**
217k3120
In Texas, a non-waiver agreement shields an insurance company from a claim by the insured that the insurance company has waived its right to defend a claim on the basis of non-compliance with policy requirements.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2004 WL 547564
(Cite as: 2004 WL 547564 (N.D.Tex.))

Page 32

**[6] Insurance ⊛⟳ 3168**
217k3168
Under Texas law, insurer was not required to show that it was prejudiced by insured's late notice under property insurance policy.

**[7] Insurance ⊛⟳ 3585**
217k3585
Insurer failed to show that it was entitled to recover attorney fees from insured, for having to defend against insured's claims under Texas unfair competition and unfair practices provisions of Insurance Code, where insurer did not devote any significant time to defense of those claims as distinguished from insured's claims for recovery under property insurance policy. V.A.T.S. Insurance Code, art. 21.21.

Russell Joseph Bowman, Scott Bowman & Stella, Dallas, TX, for plaintiff.

M. Jarrett Coleman, Cozen O'Connor, Dallas, TX, for defendant.

MEMORANDUM OPINION and ORDER

MCBRYDE, District Judge.

*1 Before the court for decision are the motion of plaintiff, Ridglea Estate Condominium Association, ("Ridglea") for partial summary judgment and the motion of defendant, Lexington Insurance Company, ("Lexington") for summary judgment. For the reasons set forth below, the court has concluded that Ridglea's motion should be denied and that Lexington's should be granted except as to its request for recovery of attorneys' fees.

I.
Nature of the Litigation

This is an action by Ridglea against Lexington for recovery of insurance policy benefits based on damages allegedly suffered by Ridglea's buildings as a result of a severe hailstorm that occurred on May 5, 1995. Lexington provided physical damage insurance coverage from February 1, 1995, to February 1, 1996, for Ridglea's buildings. In addition to seeking recovery of contractual

benefits under the policy, Ridglea seeks recovery of ancillary benefits based on alleged violations by Lexington of Texas statutes and common law related to obligations of an insurance company to its insured in the event of a loss.

Among Lexington's defenses is that Ridglea failed to give it timely notice of the alleged hail damage loss, having first given the insurance company any notice of the loss in late 2001, more than six years after the hail damage occurred. Ridglea alleges several reasons why its failure to give notice at an earlier date does not adversely affect its claims. Other issues raised by the pleadings of the parties will be discussed later as necessary.

The court has subject matter jurisdiction because of diversity of citizenship and amount in controversy. Texas substantive law controls the outcome.

II.
The Pending Motions

A. Ridglea's Motion.

Ridglea's motion for summary judgment seeks rulings and declarations that Lexington cannot successfully rely as a defense on the failure of Ridglea to give earlier notice of the alleged hail damage loss because, Ridglea asserts, (a) the notice requirement in the insurance policy is void because of § 16.071 of the Texas Civil Practice and Remedies Code, (b) the policy notice requirement is ambiguous, and must be construed in a manner favorable to Ridglea, such that it would not preclude Ridglea's claim, and (c) Lexington waived compliance with the notice requirement by denying Ridglea's claim without asserting noncompliance with the notice requirement as a reason for the denial.

B. Lexington's Motion.

Lexington seeks a summary adjudication dismissing Ridglea's claims in their entirety. One of the grounds of Lexington's motion is that, if there was hail damage resulting from

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



the May 5, 1995, hailstorm, it would not be covered under Lexington's policy if it did not manifest itself before the policy expired on February 1, 1996. The main ground of Lexington's motion is that Ridglea cannot recover because of having failed to comply with the notice requirements of the insurance policy. Ridglea has responded by asserting that the summary judgment evidence establishes that the damage did manifest itself before February 1, 1996, and by relying, in avoidance of the insurance policy's notice requirement, on the theories urged by Ridglea in support of its motion for partial summary judgment. Ridglea adds that Lexington cannot successfully assert a late notice defense, because it cannot show that it was prejudiced by Ridglea's failure to give notice at an earlier date.

### III.
### Applicable Summary Judgment Principles

*2 A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. Anderson, 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine

issue for trial. Anderson, 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim [s]." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir.1994). An issue is material only if its resolution could affect the outcome of the action. Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir.1984).

The standard for granting a summary judgment is the same as the standard for a directed verdict. Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597, 106 S.Ct. 1348. See also Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

### IV.
### Analysis

A. Notice Defense Issues.

The insurance policy contains the following notification requirements:
You must see that the following are done in the event of loss or damage to Covered Property:

\* \* \*

b. Give us prompt notice of the loss or damage. Include a description of the property involved.
c. As soon as possible, give us a description of how, when and where the loss or damage occurred. [FN1]
Ridglea's App. at 36. Another provision says that no one may bring a legal action against Lexington unless there has been full compliance with all of the terms of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



applicable coverage part (which includes the notice provisions mentioned above). Id. at 13.

1. Effect, If Any, of § 16.071(a) on Notice Requirements.

**\*3 [1]** The primary controversy over the notice requirements arises from the provisions of § 16.071(a) of the Texas Civil Practice and Remedies Code, which reads:

A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void.

Before this statutory provision was incorporated into the Texas Civil Practice and Remedies Code it was in a separate section of the Texas statutes, which read, in relevant part, as follows:

No stipulation in a contract requiring notice to be given of a claim for damages as a condition precedent to the right to sue thereon shall ever be valid unless such stipulation is reasonable. Any such stipulation fixing the time within which such notice shall be given at a less period than ninety (90) days shall be void ....

Tex. Rev. Civ. Stat. of 1925, art. 5546(a). Article 5546(a) was, in turn, preceded by article 5714 of the Texas Revised Civil Statutes of 1911, which, in turn, was preceded by article 3379 of the Texas Revised Statutes of 1895, as amended 1907. Certain of the court decisions that guide the court's rulings are based on an earlier version of the statute. Although there are slight differences in the wording of the versions of the statute, they are substantially identical. When used in this opinion, the words "the statute" have reference to whichever version of the statute under discussion applies to the case under discussion.

The court has not found a Texas Supreme Court decision directly on point on the question as to the effect, if any, of § 16.071(a) on the insurance policy notice requirements. Therefore, the court must make an "Erie [FN2] guess" as to the ruling the Texas

Supreme Court would make if directly confronted with the issue. See Rogers v. Corrosion Prods., Inc., 42 F.3d 292, 295 (5th Cir.1995); Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 396-97 (5th Cir.1986). While decisions of intermediate appellate courts of Texas "should be given some weight, [ ] they are not controlling where the highest state court has not spoken on the subject." Rogers, 42 F.3d at 295. Rather, the court is obligated to make its best effort to predict how the Texas Supreme Court would decide the issue. Batts v. Tow-Motor Forklift Co., 66 F.3d 743, 750 (5th Cir.1995). "Erie and its progeny require no more of a federal court than conscientiously to satisfy its duty to predict how the state court will decide a question." Id. However, if a panel of the Fifth Circuit has settled on the state law to be applied in a diversity case, that precedent should be followed "absent a subsequent state court decision or statutory amendment that rendered [the Fifth Circuit's] prior decision clearly wrong." Id. at 747.

Fortunately, the Texas Supreme Court has now rendered decisions that, when considered in context with principles announced in earlier Supreme Court decisions, make quite clear that the Supreme Court would hold that Lexington's notice provisions are not within the scope of § 16.071(a). The court is satisfied that, if directly confronted with the issue, the Texas Supreme Court would hold that the notice provisions in question do not pertain to a "claim for damages," but merely are requirements that the insured give the insurance company notice of a potentially covered event so that the insurance company might be able to promptly conduct an investigation of the event.

**\*4** One of the recent decisions is American Airlines Employees Federal Credit Union v. Martin, 29 S.W.3d 86 (Tex.2000). The notice provision at issue there, which was in a bank deposit agreement, required that notice of objection to any item shown on a statement of the account must be made before the sixtieth day following the date the statement was mailed in order to avoid waiver of the objection. A contention of the bank customer/

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2004 WL 547564
(Cite as: 2004 WL 547564, *4 (N.D.Tex.))

Page  35

plaintiff was that the notice requirement was unenforceable because it violated the statute. The court rejected that contention, holding that the statute "by its terms does not apply here, when the notice to be given is not notice of a claim for damages, but rather notice of unauthorized transactions." Martin, 29 S.W.3d at 97. The court took into account the purpose of the notice requirement in its evaluation of whether the statute applied. Id. at 97-98.

In support of its ruling in Martin, the Supreme Court cited its 1982 decision in St. Paul Mercury Insurance Co. v. Tri-State Cattle Feeders, Inc., 638 S.W.2d 868 (Tex.1982), id. at 97 n. 62, a case in which the Court disapproved the holding of an intermediate Texas appellate court invalidating, under authority of the statute, a notice of loss provision in a theft insurance policy. By way of explanation, the Court said that the "notice provision in the present theft policy is not a 'notice of claim for damages' under" the statute. St. Paul Mercury Ins. Co., 638 S.W.2d at 869. In 2002 the Texas Supreme Court in Community Bank & Trust v. Fleck, 107 S.W.3d 541, 542 (Tex.2002), reaffirmed its Martin ruling.

The Texas Supreme Court rulings mentioned above are consistent with, and compelled by, the earlier ruling of that court in Commercial Standard Insurance Co. v. Harper, 129 Tex. 249, 103 S.W.2d 143 (1937), where the Court, by adoption of an opinion of the Texas Commission of Appeals, held that a provision in an automobile theft policy requiring that the insured give immediate notice to the insurance company of loss or damage did not violate the statute. In support of its ruling, the Court quoted with approval from Cooley's Briefs on Insurance (2d Ed.) vol. 8 (Supplement) p. 874, as follows:

Notice that an automobile had been stolen is not 'notice of a claim for damages' as that term is used in a statute providing that any stipulation fixing the time within which notice of a claim for damages shall be given at a less period than 90 days shall be void. It is only notice of the happening of an event upon which liability may or may not result, dependent upon its being given in manner

and within the time stipulated for its delivery in the contract entered into between the parties for such delivery. It is apparent that the very purpose for contracting for the notice by [the insurer] was to give it an opportunity to take steps to recover the automobile in case it was stolen. To disregard the distinction between a notice that a car has been stolen and notice of a claim for damages is to seriously infringe upon the common-law right of contract and to virtually destroy contracts entered into insuring automobiles.
*5 103 S.W.2d at 145.

Instructive is language used by the Texas Commission of Appeals in Burns v. American National Insurance Co., 280 S.W. 762 (Tex. Comm'n App.1926, judgm't adopted). The question there was whether the statute applied to notice requirements in an accident insurance policy. The Commission described the determinative issue to be "the true construction of the phrase 'claim for damages,' " as used in the statute. Burns, 280 S.W. at 764. Explanations given by the Commission provide rationale for the Texas Supreme Court decisions that mere notice of an event does not come within the statute:

Before one has any "claim for damages" whereby he can give to another notice thereof, there must be in existence provable facts of a cause of action in his favor against the other; .... Damages are a sum awarded to one because another has wrongfully invaded his rights contrary to agreement or contrary to law; and where one claims damages under the terms of a written contract in the execution of which there is no allegation that it was executed through fraud, accident, or mistake, he must stand upon the contract as written, and allege and prove that without fault or negligence on his part the other party to the contract has breached it, showing that on account of such breach the complaining party has been damaged in a sum which can be ascertained.

* * *

... In other words, before there can be a "claim for damages" within the meaning of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



the statute, there must be made a prima facie case by the pleading and proof that the contract upon which the suit is based had been breached by the party against whom the claim is made.
Id. at 764-65.

Under the Texas Supreme Court decisions now on the books, there is no doubt that notice provisions of the kind contained in Lexington's policy are outside the scope of § 16.071(a). There is no reasonable basis for a contention that the notice provisions require Ridglea "to give notice of a claim for damages." Rather, the only reasonable reading of the notice requirements is that Ridglea must give the insurance company notice of an event--loss or damage to the insured property--together with details of the event so that the insurance company might promptly investigate to determine whether the alleged loss or damage is covered by the terms of the insurance policy and the extent of the damage to the property.

Potentially applicable is the 1963 decision of the Fifth Circuit in Round Rock Independent School District v. First National Insurance Co. of America, 324 F.2d 280 (5th Cir.1963). While expressing misgivings, the Fifth Circuit panel concluded that notice of loss requirements, similar to Lexington's, in a fire and explosion policy were covered by the statute. The panel explained:

> If we were writing on a clean slate we might decide the question differently, but constrained as we are by the Erie doctrine, we are bound to hold that the best evidence of the Texas law as presently stated in the decisions of the courts of that State is that the requirement of "immediate notice of any loss" is void under Article 5546, Vernon's Annotated Texas Civil Statutes.

*6 Round Rock Indep. Sch. Dist., 324 F.2d at 284. The "decisions of the courts of [Texas]" to which the panel referred included only one opinion of the Texas Supreme Court. The others were a collection of opinions of courts of civil appeals and the Commission of Appeals in which conflicting results had been reached. Id. at 283-84 nn. 2-6. Had the Fifth Circuit panel enjoyed the benefit of the 1982, 2000,

and 2002 Texas Supreme Court decisions mentioned above, supra at ---- - ----, it, upon reading them in the context of the principles previously announced by the Texas Supreme Court, clearly would have decided that the statute did not apply to the notice requirements there at issue.

For the reasons stated, the court concludes that the notice provisions in the policy issued by Lexington to Ridglea are not affected by § 16.071(a).

2. Ridglea Failed to Comply With the Policy's Notice Requirements.

[2][3] The court concludes that there is nothing ambiguous about the notice requirement that would allow it to be construed in a manner that would not preclude Ridglea's claim. Furthermore, Texas law compels the conclusion that the "prompt notice" and "as soon as possible" language in the notice requirements means within a reasonable time from the occurrence of the event causing the loss or damage, i.e., in this instance the severe hailstorm. [FN3] See, e.g., Stonewall Ins. Co. v. Modern Exploration, Inc., 757 S.W.2d 432, 435 (Tex.App.--Dallas 1988, no writ).

Of course, Texas law does not contemplate that Ridglea would be required to give notice before it had a reasonable opportunity to ascertain that its buildings suffered hail damage. The summary judgment record in this case establishes as a matter of law that if Ridglea suffered the degree of hail damage it claims to have suffered as a result of the May 5, 1995, severe hailstorm, it could and should have discovered the damage shortly after the storm occurred, certainly within a few months of the occurrence of the storm. Ridglea's own expert establishes the obvious nature of the damage. He said that an inspection of the roofs reveals that the hail hits on the roofs were up to three inches and greater in size. Ridglea's 2d App. at 131. The expert said that his examination of the roofs of the buildings in early 2002 showed extensive hail damage to the buildings that was caused by the May 5, 1995, storm, which involved hailstones up to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



four inches or greater. Id. at 132. The record contains evidence that there was severe automobile damage from hail in the area of Ridglea's buildings on May 5, 1995. These items of summary judgment evidence are only samplings of the evidence in the summary judgment record that would lead to the conclusion that, if the damage to which Ridglea now refers was sustained on May 5, 1995, a reasonable insured would have discovered, and reported, the existence of the roof damage shortly after the hailstorm occurred. The size of the hailstones, without more, would indicate a need for an immediate inspection of the roofs for damage. Even the extent of the damage Ridglea asserts, as measured by the claimed $450,000.00 cost of repair, Lexington's App. at 159, belies Ridglea's claim that it had no occasion to discover the damage for more than six years. Common sense dictates that if damage of that magnitude was sustained, Ridglea would, or should, have been aware of the damage at the time. The fact that Ridglea's management may have been negligent with respect to discovery of the damage, or may have engaged in subsequent activities to blame the damage on later-occurring storms (perhaps as a cover-up for earlier negligence), does not work to Ridglea's benefit on the notice issue. [FN4]

*7 No rational finder of fact could conclude from the summary judgment evidence that Ridglea reported the hail loss and damage to its buildings within a reasonable time after it was suffered (if one were to assume that the damage of which Ridglea now complains was caused by the severe May 5, 1995, hailstorm). The only rational finding that could be made is that more than a reasonable time passed before Ridglea notified Lexington in late 2001.

3. There Was No Waiver of the Notice Requirements.

[4] Ridglea maintains that Lexington cannot assert noncompliance with the notice requirements as a defense because Lexington did not give noncompliance as a reason for rejecting the claim when it was first presented to Lexington in late 2001. There is no evidence in the summary judgment record

that would support a finding that Lexington waived its right to assert as a defense the failure of Ridglea to comply with the policy notice requirements.

[5] Moreover, upon being notified in late 2001 of Ridglea's claim that it suffered hail damage on May 5, 1995, Lexington took from Ridglea what commonly is referred to in the insurance industry as a non-waiver agreement, which, in effect, said that the insured agreed that action taken by the insurance company in connection with investigating Ridglea's report of loss would not waive or invalidate any of the terms or conditions of the insurance policy. Lexington's App. at 152. Such an agreement shields an insurance company from a claim by the insured that the insurance company has waived its right to defend a claim on the basis of non-compliance with policy requirements. See Round Rock Indep. Sch. Dist., 324 F.2d at 285-286. The facts that must exist for there to be a finding of waiver against an insurance company simply are not raised by the summary judgment record. See id. at 284-85.

4. Compliance With the Notice Requirements Was a Condition Precedent to Recovery by Ridglea.

[6] As previously noted, the policy provides that Ridglea may not bring a legal action against Lexington unless there has been full compliance with all applicable policy terms. Supra at ----. Ridglea has conceded, indeed advocated, throughout that compliance with the notice requirements were conditions precedent. See Lexington's App. at 160; Ridglea's Br. in Resp. to Mot. for Summ. J. at 7; Ridglea's Br. in Supp. of Mot. for Partial Summ. J. at 3. Thus, Ridglea must know that its present contention that Lexington is required to show prejudice from the failure to give the required notices before benefitting from that failure is patently without merit. Needless to say, Texas rules and regulations pertaining to entirely different types of insurance requiring that proof of prejudice be shown have no relevance to this case. See, e.g., Flores v. Allstate Tex. Lloyds Co., 278 F.Supp.2d 810, 816 (S.D.Tex.2003).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



B.    Lexington's    Non-Manifestation
Argument.

The court is inclined to agree with the
contention made by Lexington in its summary
judgment papers that the law of Texas is that
Lexington would not be liable for hail damage
resulting from a hailstorm that occurred
during the effective period of its policy unless
the damage resulting from the storm
manifested itself during the policy period.
Apparently, Lexington was inspired to assert
non-manifestation as an alternative theory by
Ridglea's contention that it did not learn of
the hail damage until years after the
hailstorm occurred. The court considers this
alternative theory to be meritless under the
summary judgment record. For reasons
previously stated, supra at ---- - ----, the
summary judgment evidence indicates that
Ridglea could and should have discovered the
damage shortly after the hailstorm occurred,
certainly before the Lexington policy expired
on February 1, 1996. Lexington apparently
has recognized the lack of merit of its non-
manifestation theory because the theory has
been abandoned in the answer Lexington filed
after realignment.

C.  Ridglea's Statutory and Common Law
Claims.

*8  For the reasons previously stated, the
court concludes that Ridglea has no right to
recover benefits under the insurance policy
issued by Lexington.  Ridglea has not raised
an issue that would support recovery of any
damages or penalties from Lexington under
any of the statutory or common law theories of
recovery asserted by Ridglea. As a matter of
law, Lexington has conducted itself
appropriately and in good faith in response to
Ridglea's belated report of loss.

D.  Lexington's Request for Recovery of
Attorneys' Fees.

[7] The court has considered Lexington's
request for an award of attorneys' fees for
having to defend Ridglea's claims under
article 21.21 of the Texas Insurance Code.
Nothing has been provided that would allow

the court to conclude that any significant time
has been devoted by Lexington to defense of
Ridglea's article 21.21 claims as distinguished
from Ridglea's claims for recovery under the
policy. The court is satisfied that Lexington
has not shown a basis for recovery of
attorneys' fees. Therefore, the court is denying
Lexington's motion as to that request.

Upon being informed during a conference
call between the court and counsel for the
parties that the court had determined to grant
Lexington's motion for summary judgment as
to all but Lexington's claim for attorneys' fees,
counsel for Lexington advised the court that
Lexington will not pursue that claim if the
court renders judgment for Lexington on
Ridglea's claims against Lexington.

V.
Order

For the reasons given above,

The court ORDERS that Ridglea's motion
for partial summary judgment be, and is
hereby, denied.

The court further ORDERS that Lexington's
motion for summary judgment be, and is
hereby, granted except as to Lexington's
request for recovery of attorneys' fees.

The court further ORDERS that Lexington's
request for attorneys' fees be, and is hereby,
dismissed without prejudice.

The court further ORDERS that all claims
asserted by Ridglea against Lexington be, and
are hereby, dismissed.

FINAL JUDGMENT

Consistent with the memorandum opinion
and order signed in the above-captioned action
on the date of the signing of this final
judgment,

The court ORDERS, ADJUDGES, and
DECREES that all claims asserted by
plaintiff, Ridglea Estate Condominium
Association, in the above-captioned action

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2004 WL 547564                                                    **Page  39**
(Cite as: 2004 WL 547564, *8 (N.D.Tex.))

against defendant, Lexington Insurance
Company, be, and are hereby, dismissed.

The court further ORDERS, ADJUDGES,
and DECREES that the claim of defendant for
recovery of attorneys' fees be, and is hereby,
dismissed without prejudice.

The court further ORDERS, ADJUDGES,
and DECREES that defendant have and
recover from plaintiff cost of court incurred by
defendant.

FN1. The word "you" as used in the policy has
reference to Ridglea; the word "us" has reference to
Lexington. Ridglea's App. at 43.

FN2. Erie R.R. v. Tompkins, 304 U.S. 64, 58
S.Ct. 817, 82 L.Ed. 1188 (1938).

FN3. The court notes that even if the court had
found that the notice requirements in the insurance
policy were subject to § 16.071(a), the outcome
would be the same because "[t]he absence of a valid
notice provision invokes a reasonable notice
standard of not less than 90 days." St. Paul
Mercury Ins. Co. v. Tri-State Cattle Feeders, Inc.,
628 S.W.2d 844, 846 (Tex.App.--Amarillo), writ
ref'd n.r.e., 638 S.W.2d 868 (Tex.1982) (per
curiam opinion disapproving of the ruling of the
Court of Appeals that the statute voided the notice
requirement in the insurance policy at issue there).

FN4. Before Ridglea reported hail damage to
Lexington in late 2001, it made a claim based on
the same damage against another insurance
company under a policy that was in effect from
February 1, 2001, to February 1, 2002. Lexington's
App. at 156-57. Also puzzling is the evidence that
the roof on at least one of the buildings was
replaced in 1996, Ridglea's 2d App. at 260, at
which time hail damage resulting from the May 5,
1995, hailstorm would have been observable. And,
there is summary judgment evidence that the roofs
of several of the buildings were inspected in early
1999, apparently related to complaints that roof
repairs done at an earlier date were not satisfactory.
Id. at 190-258.

2004 WL 547564, --- F.Supp.2d ---, 2004 WL
547564 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2002 WL 356756 (N.D.Tex.))
< KeyCite History >

Page 41

Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas Division.

**LEXINGTON INSURANCE COMPANY, Plaintiff-counterdefendant,**
v.
**UNITY/WATERFORD-FAIR OAKS, LTD., d/b/a Oak Meadow Apartments, Defendant-counterplaintiff.**

No. CIV.A. 399CV1623D.

March 5, 2002.

MEMORANDUM OPINION AND ORDER

FITZWATER, District J.

*1 The court must decide whether coverage for mold damage to an apartment complex is excluded by the "Pollution, Contamination Debris Removal Exclusion Endorsement" ("Pollution and Contamination Exclusion") of the insurance policy in question and whether coverage for other damage is excluded by a so-called anti-concurrent cause clause ("Anti-Concurrent Cause Clause"). Concluding that the insurer has established that coverage is excluded, the court grants summary judgment in its favor.

I

The background facts and procedural history of this case are set out in a prior memorandum opinion and order and need not be repeated at length. See Lexington Ins. Co. v. Unity/ Waterford-Fair Oaks, Ltd., 2001 WL 694582, at * 1 (N.D. Tex. June 14, 2001) (Fitzwater, J.) ("Lexington I "). In sum, plaintiff-counterdefendant Lexington Insurance Company ("Lexington") seeks a declaratory judgment that it is not liable to its insured, defendant-counterplaintiff U.E. Texas One-Barrington, Ltd. ("Texas One"), for damages that Texas One incurred from mold damage to first and second floor apartment units and

other damage to second floor units caused by a severe rainstorm and flooding at the Oak Meadow Apartments ("Oak Meadow"). Texas One counterclaims for over $3 million in damages to the apartments. By agreed order, the parties stipulated that Texas One is not entitled to collect any policy benefits for the cost to repair and/or replace the roofs at Oak Meadow and may not collect any judgment against Lexington for costs associated with reported damage to the roofs. See id. at *1 n. 1 (citing Apr. 7, 2000 Order). In Lexington I the court held that Lexington and Texas One had agreed during mediation to a binding appraisal of, and Lexington's liability for, the actual cash value of the damage to specified first floor units caused by the flooding. Id. at * 2-*3. It concluded that the parties had agreed to binding appraisal of--but not to Lexington's liability for--the costs to abate and repair mold damage that had developed in the first floor units (and which costs were not included in the value of the damage to these units), the actual cash value of damage to second floor units caused by roof leaks, and the cost to abate and repair mold damage that had developed in second floor units due to roof leaks. Id.

The dispute now before the court is whether Lexington is liable for mold damage to first and second floor units of Oak Meadow and whether it is liable for damage to the second floor units caused by roof leaks. These questions turn on the interpretation and application of the policy's Pollution and Contamination Exclusion and Anti-Concurrent Cause Clause.

II
A

The court turns first to Lexington's motion for summary judgment concerning coverage for the cost to abate and repair mold damage that developed in the first and second floor units.

Lexington asserts that Texas One seeks coverage for a loss that falls within the policy's Pollution and Contamination Exclusion, [FN1] which provides, in relevant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2002 WL 356756, *1 (N.D.Tex.))

Page  42

part:

> FN1. Lexington also contends that even if mold damage is not excluded, Texas One is barred from recovering for the loss due to its failure to mitigate damages. The court need not reach this argument.

**\*2** This policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy.

\* \* \*

CONTAMINANTS or POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

P.App. 318. It contends the mold damage that developed in the first and second floor units following the October 1998 rainstorm and flooding falls within this proviso because it specifically excludes "damage caused by, resulting from, contributed to or made worse by the actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS," and "fungi" is specifically included in the list of "CONTAMINANTS or POLLUTANTS ." Lexington argues that the mold spores that caused the damage in question are unambiguously included in this definition

because they are "fungi" that "can cause or threaten damage to human health[,]" and "cause[ ] or threaten[ ] damage, deterioration, loss of value, marketability or loss of use to property insured[.]"

B

Under Texas law, the insurer has the burden of proving a claimed exclusion. See Tex. Ins.Code § 21.58(b) (Vernon Pamp. Supp.2002). In construing exclusionary language, the court must adopt the construction of an exclusionary clause that favors the insured as long as that construction is not unreasonable. See Blaylock v. Am. Guar. Bank Liab. Ins. Co., 632 S.W.2d 719, 721 (Tex.1982); Glover v. Nat'l Ins. Underwriters, 545 S.W.2d 755, 761 (Tex.1977). The Texas Supreme Court has held pollution exclusions similar to the one at issue to be clear, unambiguous, and enforceable. See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 522 (Tex.1995) ("This pollution exclusion is just what it purports to be--absolute[.]") (quoting Alcolac v. Cal. Union Ins. Co., 716 F.Supp. 1546, 1549 (D.Md.1989)).

Texas One neither challenges the validity of the Pollution and Contaminant Exclusion nor asserts that it is ambiguous. [FN2] Rather, it contends the exclusion is inapplicable to the present facts because the mold in the apartments "was not released, discharged or dispersed nor did it escape." D. Br. at 13. As the sole support for this argument, Texas One cites the testimony of Lexington's mold expert that mold and mold spores exist at de minimis levels in all apartment environments. See P.App. 663. On the basis of this testimony, Texas One posits that the mold that caused the extensive damage to the apartments "was simply already present and thrived because of the moisture." D. Br. at 14. This fact, Texas One contends, leads to the legal conclusion that the mold that was the cause of the loss was neither released, discharged, or dispersed, nor did it escape within the meaning of the policy language. The court disagrees.

> FN2. Texas One does argue that policies are to be strongly construed against the insurer in order to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



avoid forfeiture, if possible. See D. Br. at 13.

**\*3** Lexington has adduced evidence regarding the process by which mold proliferates when an unusual amount of water is introduced into an apartment environment. This proof establishes that, under normal conditions, fungal mold spores exist at safe levels on the exterior and the interior of virtually all homes and businesses. See P.App. 613. Only when the living conditions for these mold spores are enhanced, as in an apartment building that has recently experienced a substantial influx of water, do mold spores proliferate to a degree that they can become unhealthy and damage the property. See id. at 682, 628. The process of mold proliferation involves existing mold bodies giving off reproductive spores that are dispersed via the air into the surrounding environment. Lexington's mold expert, Ron Thaman, described as follows the process of mold reproduction by the airborne transmission of spores:

> In other words, some of [the spores] are actually shot out of the organism itself, and that's just the way they help [re]produce, and some of them just float away; they're very powdery[.] and they're very buoyant in the air and they float away to an area. And if it's a wet area, they take ground and start growing.

P.App. 672.

Lexington's experts documented transmission of elevated levels of mold spores into the air inside the apartments. See id. 606-07. In addition, several of the mold species identified as being present in the apartments produce, as a byproduct of their growth, a wide variety of volatile chemicals, also known as mycotoxins. See id. 612, 673-74. Lexington adduced expert testimony that indicates that these mycotoxins are dangerous to human health, a fact Texas One has formally admitted. See id. 613, 20, 27. The overall concentration of mold in many of the apartments is well beyond the level that is considered safe. See id. 617, 633, 619-20, 637. Taking into account the uncontroverted physical evidence relating to the nature and scope of the mold contamination, the court

concludes that the mold that was the cause of the damage at issue was dispersed within the covered properties and, consequently, that the damage caused thereby falls within the scope of the Pollution and Contamination Exclusion contained in the policy. See West Am. Ins. Co. v. Desenberg, 925 F.Supp. 758, 761 (M.D.Fla.1996) (holding that dispersal of airborne "sick-building syndrome" contaminants from attic space of building into indoor air supply was "release" of pollutants within meaning of absolute pollution exclusion), aff'd, 138 F.3d 1428 (11th Cir.1998).

The court's holding regarding the application of the exclusion at issue comports with prior court applications of pollution exclusions to analogous factual settings. Faced with a set of pollution exclusion clauses that provided no explicit definition of "pollution," the Texas Supreme Court in National Union Fire Insurance adopted a broad reading of the term in refusing to recognize an exception for "accidental" releases. See Nat'l Union Fire Ins., 907 S.W.2d at 519. Texas law is clear, moreover, that "[w]hen terms are defined in an insurance contract, those definitions control." Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 823 (Tex.1997). Here, the policy expressly includes "fungi" within the list of contaminants or pollutants that trigger application of the exclusion. Cf. Am. States Ins. Co. v. Nethery, 79 F.3d 473, 476 (5th Cir.1996) (holding that, regardless whether paint fumes would typically fall within definition of "pollutant," inclusion of term "fumes" in pollution exclusion clause mandated exclusion of claim based on inhalation of paint fumes). The Pollution and Contamination Exclusion contains broad language, extending to loss that is not only "caused" but that is "contributed to or made worse by" any of the defined contaminants or pollutants. Cf. Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc., 112 F.3d 184, 188 (5th Cir.1997) (holding pollution exclusion applicable to even comparatively small discharge of pollutant where clause by its terms applied to "pollution and/or contamination[ ] whenever occurring.").

III

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2002 WL 356756, *4 (N.D.Tex.))

*4 The court now considers whether Lexington is entitled to summary judgment concerning its liability for the actual cash value of the interior damage to the second floor units caused by roof leaks. Lexington contends the roof leaks were caused in part by inadequate maintenance of the roof and that it is therefore shielded from liability for damages resulting from the roof leaks pursuant to the Anti-Concurrent Cause Clause, which provides, in relevant part:

This Agreement does not insure against loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

* * *

(D) Faulty, inadequate or defective planning, zoning, development, surveying, siting; design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; materials used in repair, construction, renovation, remodeling or maintenance of part or all of any property on or off the described premises.

* * *

(G) Wear and tear, gradual deterioration, inherent vice, latent defect, moths, vermin or insects.

P.App. 342-43.

As with the Pollution and Contamination Exclusion, Lexington has the burden of proving that the exclusionary language contained in the Anti-Concurrent Cause Clause exempts Lexington from liability for interior damage to the second floor units caused by roof leaks. To do so under section (D) of the Anti-Concurrent Cause Clause, Lexington must establish the absence of a genuine issue of material fact concerning whether inadequate maintenance was a contributing cause to the roof leaks. In other words, Lexington must conclusively establish that inadequate maintenance was a contributing cause. If Lexington succeeds in making this showing, it is exempt from liability for all damages caused directly or

indirectly by the excluded cause, i.e., inadequate maintenance, regardless of any other cause or event contributing concurrently or in any sequence to the loss. That this is the legal effect of the adoption of an Anti-Concurrent Cause Clause within a policy is well established in those jurisdictions that have considered the question. See, e.g., State Farm Fire & Cas. Co. v. Bongen, 925 P.2d 1042, 1045-46 (Alaska 1996); Pakmark Corp. v. Liberty Mut. Ins. Co., 943 S.W.2d 256, 258-61 (Mo.App.1997); Kane v. Royal Ins. Co., 768 P.2d 678, 684-85 (Colo.1989) (en banc). Given the weight of this authority, and the clear import of the clause's language, the court concludes, in applying Texas state law under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), that the Anti-Concurrent Cause Clause at issue would have a similar effect, assuming sufficient facts are present to trigger its applicability. Texas One does not contest this legal conclusion regarding the operation of the Anti-Concurrent Cause Clause.

Texas One retained the services of James T. Slider ("Slider") of Unified Building Sciences and Engineering, Inc. to provide an expert opinion on the cause of the roof leaks. In his report, Slider informed Texas One's counsel that he "did not identify damage to the roofs resulting from the storm event [,]" P.App. 473, and described the damage to the flat roofs at Oak Meadow as follows:

*5 In general, the roofs evidenced a lack of maintenance. There were numerous issues of blisters and ineffective patching of the existing roof membrane. Our representative identified improper repairs, flashing, debris scattered on the roof and ponding in numerous areas.

Id. When questioned about whether the inadequate maintenance described in his report contributed to the roof leaks, Slider testified as follows:

Q. Sir, in your opinion did the lack of proper maintenance of the roofs contribute to the roof leaks during the storm of October 1998?
A. Yes.

Id. at 402. Slider's deposition testimony details the specific observations he made in reaching the conclusion that the roofs at Oak Meadow had been inadequately maintained.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2002 WL 356756, *5 (N.D.Tex.))

Page 45

See id. at 404-05 (describing "rotted wood" and "an old, old leak"); 405-06 (describing depressions in the wood of the roof concluded to have been present for at least five years). Consistent with Slider's opinion, the expert report of Lexington's engineer, Bruce Morris ("Morris"), concludes that one of the causes of the roof leakage was "lack of proper and adequate maintenance of the roof[.]" See id. at 535. [FN3] Slider's supplemental affidavit also identifies "a maintenance issue[,]" D.App. 28, as a cause of the roof leaks at Oak Meadow. [FN4]

> FN3. In its response brief, Texas One moves to strike Morris' testimony on the ground that he is not qualified to opine regarding wear and tear as a contributing cause to the roof leaks. See D. Br. at 16-18. This motion to strike is not specifically directed at Morris' opinions concerning inadequate maintenance as a potential contributing cause of the roof leaks. The basis of the evidentiary objection is Texas One's contention that Morris' "background is in explosives." D. Br. at 16. Because Lexington has cited in its reply brief substantial evidence that Morris possesses a professional background sufficient to render probative opinions regarding the effects of maintenance and wear and tear on the roof damage in question reliable, see P. Rep. Br. at 18-19, the court overrules Texas One's objection to Morris' testimony. Morris' professional qualifications include a civil engineering degree from Rice University, approximately ten years of professional employment analyzing the structural integrity of structures, and more than seven years practice as a consultant analyzing structural damage to various types of residential and commercial buildings, including the analysis of damage to roofs. See P.App. 499-501. Even assuming arguendo that the court should exclude Morris' testimony, all the record evidence—including the testimony of Texas One's expert witness Slider—supports the conclusion that inadequate maintenance was a contributing factor to the roof leaks in question.

> FN4. Lexington moves to strike Slider's supplemental affidavit on the ground inter alia that his testimony conflicts with Texas One's responses to Lexington's Requests for Admission Nos. 51 and 57. The matter contained in the affidavit that is arguably the subject of this conflict relates to the question whether wear and tear was a contributing

factor to the roof leaks, and thus whether the second floor interior damage is excluded under section (G) of the Anti-Concurrent Cause Clause. Because the court grants summary judgment in favor of Lexington as to the second floor interior damage without considering the applicability of section (G), see infra, Lexington's November 1, 2001 motion to strike summary judgment evidence is denied as moot. Moreover, the part of Slider's supplemental affidavit that affirms that maintenance issues contributed to the second floor loss was not subject to any conflict with a prior admission by Texas One.

Given the state of the evidence regarding inadequate maintenance as a contributing cause to the roof leaks that resulted in the interior damage to the second floor units, Texas One relies on a legal argument concerning construction of section (D) of the Anti-Concurrent Cause Clause. Texas One contends this section should not be read to contain an exclusion of loss resulting from the inadequate maintenance of the apartment building itself. It maintains that this reading of section (D) is compelled by the definition contained in Article X, section (B) of the policy. Article X, section (B) states:

(B) The word "premises" or "location" shall mean the building(s) or that portion of the building(s), including the area within five hundred feet (500') thereof, at the location(s) covered which are owned, leased, or rented and occupied by the Insured for the business purpose conducted[.]

P. Br. at 346. In view of this definition of "premises," Texas One contends that because section (D) requires that the maintenance complained of must relate to maintenance of "property on or off the described premises[,]" the section (D) maintenance exclusion on which Lexington relies relates to maintenance of property on or about the buildings, not to the buildings themselves. See D. Br. at 15. The court disagrees.

As an initial matter, the Article X, section (B) definition of "premises" states that the word "premises" "shall mean the building(s)[.]" Even applying the principle that exclusions are to be strictly construed so as to afford coverage and avoid forfeiture, the plain

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2002 WL 356756, *5 (N.D.Tex.))

language of the section (D) exclusion and the associated definition of "premises" cannot reasonably be read as not excluding damage caused by inadequate maintenance of the roofs at Oak Meadow.  [FN5] In so construing the provisions, this court is in accord with the holdings of state courts that have considered virtually identical language.  See, e.g., Sunshine Motors, Inc. v. N.H. Ins. Co., 530 N.W.2d 120, 121 (Mich.App.1995) (applying exclusion for faulty or inadequate maintenance of property on or off insured premises to flood damage caused by block drain at insured's building); Suttmann v. Wolverine Mut. Ins. Co., 1999 WL 33326878, at *3 (Mich.App. Dec. 21, 1999) (holding that exclusion for damage caused by faulty, inadequate, or defective design and construction of property on or off premises precluded coverage for damage to roof and structure of home caused by inadequate initial construction), aff'd, 618 N.W.2d 596 (Mich.2000).  Therefore, because the uncontradicted evidence establishes that inadequate maintenance was a cause of the leaks that resulted in the interior damage to the second floor units, the court grants summary judgment in favor of Lexington concerning liability for such damage.

FN5. Moreover, even if the section (D) exclusion did not apply to the Oak Meadow apartment buildings, the roofing materials still would fall within the scope of "any property on or off" the "premises", i.e., the buildings themselves.

* * *

*6 Accordingly, the court grants summary judgment in favor of Lexington with respect to all claims asserted in Lexington's third amended complaint and all counterclaims that Texas One asserts against Lexington. A declaratory judgment in favor of Lexington is filed contemporaneously with this memorandum opinion and order.

SO ORDERED.

2002 WL 356756 (N.D.Tex.)

**END OF DOCUMENT**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                    Page    48

Citation                               Database          Mode
2004 WL 343946          FOUND DOCUMENT   ANDREWS-DOC       Page
  2004 WL 343946 (S.D.Tex.)

            TO ORDER COPIES OF DOCUMENTS RELATED TO THIS OR OTHER MATTERS
                    CALL WEST DOCUMENT RETRIEVAL
              1-877-DOC-RETR (1-877-362-7387) (Additional charges apply)
Related Andrews Newsletter Articles

            United States District Court, S.D. Texas, Houston Division.
                    Tanya COURY, Plaintiff,
                              v.
              ALLSTATE TEXAS LLOYD'S, Defendant.
                    Civil No. H-02-2238
                    January 6, 2004.

                  Memorandum and Recommendation

Nancy K. Johnson, United States Magistrate Judge.

 Pending before the court [FN1] is Defendant's Motion for Summary Judgment
(Docket Entry No. 32). The court has considered the motion, all relevant
filings, and the applicable law. For the reasons set forth below, the court
RECOMMENDS that Defendant's motion be DENIED.

    FN1. This case was referred to the undersigned magistrate judge pursuant
to 28 U.S.C. s 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under
the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket
Entry No. 17.

                         I. Case Background

 Plaintiff initiated this suit in state court for breach of contractual and
extra-contractual duties arising out of Defendant's denial of a claim filed
under Plaintiff's Texas Homeowners Policy. Defendant properly removed the suit
to federal court based on diversity jurisdiction.
 Plaintiff purchased a homeowners policy from Defendant, effective August 26,
2000, to August 26, 2001. [FN2] Within six weeks of purchasing the insured
dwelling, Plaintiff filed a claim with Defendant for water damage and mold.
According to Plaintiff, Defendant denied Plaintiff's claim on December 29,
2000, asserting that the damage was preexisting. [FN3] According to Defendant,
it denied the claim because mold was an excluded loss under the policy and
because the water damage and mold preexisted the effective dates of Plaintiff's
homeowners policy. [FN4]

    FN2. See Defendant's Motion for Summary Judgment, Docket Entry No. 32, Ex.
A, Texas Homeowners Policy, Declarations Page.

    FN3. See Plaintiff's Response to Defendant's Motion for Partial Summary
Judgment, Docket Entry No. 29, p. 2. The court found no actual documentation
                    Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(C) 2004 West Group                                    Page    49

2004 WL 343946

reflecting the date and reason for denial of Plaintiff's claim.

FN4. Defendant's Motion for Summary Judgment, Docket Entry No. 32, p. 1.

Plaintiff filed this lawsuit, alleging that the water damage and mold resulted from an "accidental discharge, leakage, or overflow of water or steam from within a plumbing, heating or air conditioning system[] or household appliance []" after Plaintiff purchased the home. [FN5] She alleged that Defendant's failure to pay benefits under the homeowners policy breached the parties' contract, breached Defendant's duty of good faith and fair dealing, and violated the Texas Insurance Code and the Texas Deceptive Trade Practices Act.

FN5. Notice of Removal, Docket Entry No. 1, Att. 2, Plaintiff's Original Petition, p. 2.

Defendant filed a partial summary judgment motion contesting the viability of Plaintiff's extra-contractual causes of action. Before the court ruled on that motion, Defendant filed the current motion challenging all of Plaintiff's causes of action. Because the deadline for filing dispositive motions had passed, Defendant also moved the court for leave to file the belated summary judgment motion. Shortly thereafter, the court issued a Memorandum and Recommendation on Defendant's first motion, recommending that it be granted as to all extra-contractual claims except the Texas Insurance Code Article 21.55 claim. [FN6] On July 15, 2003, the court granted Defendant leave to file its second summary judgment motion. The court now considers the merits of that motion.

FN6. Memorandum and Recommendation, Docket Entry No. 33; see also Order Adopting, Docket Entry No. 38.

                        II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.).
A material fact is a fact which is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. Id. at 250. When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001).

                            III. Analysis
Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(C) 2004 West Group                                                    Page    50

2004 WL 343946

   Texas law applies to the interpretation of this insurance contract. See
Tex. Ins. Code Ann. art. 21.42. Under Texas law, insurance policies are
subject to the general rules of contract interpretation. Balandran v. Safeco
Ins. Co. of Am., 972 S.W.2d 738, 740-41 (Tex. 1998). The terms are to be "given
their plain, ordinary and generally accepted meaning unless the instrument
itself shows that the terms have been used in a technical or different sense."
Fed. Ins. Co. v. Srivastava, 2 F.3d 98, 101 (5th Cir. 1993) (applying Texas
law and quoting Ramsay v. Md. Am. Gen. Ins. Co., 533 S.W.2d 344, 346 (Tex.
1976)). The wording of a contract is unambiguous if it can be given a definite
or certain legal meaning. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v.
CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995).
   Absent any ambiguity, the meaning imparted by the language used in the
insurance contract can be decided as a matter of law. Utica Nat'l Ins. Co.
of Tex, v. Fid. & Gas. Co. of N.Y., 812 S.W.2d 656, 661 (Tex. App.-Dallas 1991,
writ denied). To the extent possible, all provisions within the contract are
read together and each is given effect so that no part of the agreement is left
without meaning. Balandran, 972 S.W.2d at 741. If the court finds an
ambiguity in the contract provisions, particularly in exclusionary clauses, the
court should construe the policy strictly against the insurer. Toops v. Gulf
Coast Marine, Inc., 72 F.3d 483, 486 (5th Cir. 1996) (applying Texas law);
Balandran, 972 S.W.2d at 741. In fact, if the insured's construction of an
exclusionary provision is reasonable, it must be adopted, even if the insurer's
construction is more reasonable. Toops, 72 F.3d at 486; Balandran, 972
S.W.2d at 741.
   The initial burden is placed on the insured to demonstrate that the claim is
covered under the policy. Federated Mut. Ins. Co. v. Grapevine Excavation,
Inc., 197 F.3d 720, 723 (5th Cir. 1999) (applying Texas law and discussing the
burdens in the context of an insurer's duty to defend); Telepak v. United
Servs. Auto. Ass'n, 887 S.W.2d 505, 507 (Tex. App.-San Antonio 1994, writ
denied). If so demonstrated, the burden shifts to the insurer to prove the
application of an exclusionary provision. Grapevine Excavation, Inc., 197
F.3d at 723; Telepak, 887 S.W.2d at 507. The final burden rests on the
insured to show that the claim falls within an exception to the exclusion.
Grapevine Excavation, Inc., 197 F.3d at 723.
   Defendant's motion raises only one issue. Defendant contends that coverage for
mold is excluded under the policy, regardless of cause. Plaintiff responds that
her claim fits within the exception to that exclusion because the mold
developed as a result of a plumbing leak. Assuming Plaintiff's version of the
facts, the court agrees with Plaintiff.
   Plaintiff's homeowners policy covers all losses to the property except those
specifically excluded. [FN7] Included in the exclusions are the following:

     FN7. Defendant's Motion for Summary Judgment, Docket Entry No. 32, Ex. A,
   Texas Homeowners Policy, p. 6.

   We do not cover loss caused by:
   (1) wear and tear, deterioration or loss caused by any quality in property
that causes it to damage or destroy itself.
   (2) rust, rot, mold or other fungi.
   (3) dampness of atmosphere, extremes of temperature.
                        Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(C) 2004 West Group                                                    Page    51

2004 WL 343946

    (4) contamination.
    (5) rats, mice, termites, moths or other insects.
    We do cover ensuing loss caused by collapse of building or any part of the
building, water damage or breakage of glass which is part of the building if
the loss would otherwise be covered under this policy. [FN8]

    FN8. Id. at p. 7.

    The last sentence of this exclusion, which explains an exception to the
exclusion, provides the fodder for the disagreement between the parties. The
disagreement on the effect of this clause runs deeper than just between the
parties. Neither Texas intermediate appellate courts nor federal district
courts agree among themselves on the proper interpretation of the clause. [FN9]

    FN9. Ironically, cases on both sides of the issue rely on Aetna Casualty
and Surety Company v. Yates, 344 F.2d 939 (5th Cir. 1965), as support for their
contrary positions. See Floras v. Allstate Tex. Lloyd's Co., 278 F. Supp.2d
810, 814 n.3 (S.D. Tex. 2003); Fiess v. State Farm Lloyds, 2003 WL 21659408,
at *7 (S.D. Tex. June 4, 2003). As explained below, this court finds Yates
to support its reading of the clause.

    One strand of cases understands the clause to mean that losses which ensue
from the excluded event, if caused by otherwise covered collapse of the
building or any part of the building, water damage, or breakage of glass, are
covered, but the excluded event is never covered. See, e.g., Fiess v. State
Farm Lloyds, 2003 WL 21659408 (S.D. Tex. June 4, 2003); Harrison v. U.S.A.A.
Ins. Co., 2001 WL 391539 (Tex. App.-Austin Apr. 19, 2001, no pet.) (not
designated for publication); Daniell v. Fire Ins. Exch., 1995 WL 612405
(Tex. App.-San Antonio Oct. 18, 1995, no writ)(not designated for
publication); Lambros v. Standard Fire Ins. Co., 530 S.W.2d 138 (Tex. Civ.
App.-San Antonio 1975, writ ref'd); Park v. Hanover Ins. Co., 443 S.W.2d
940 (Tex. Civ. App.-Amarillo 1969, no writ); McKool v. Reliance Ins. Co.,
386 S.W.2d 344 (Tex. Civ. App.-Dallas 1965, writ dism'd).
    The other strand of cases interprets the clause to cover ensuing losses from
otherwise covered collapse of the building or any part of the building, water
damage, or breakage of glass, even if those losses include the listed excluded
events. See Salinas v. Allstate Tex. Lloyd's Co., 278 F. Supp.2d 820 (S.D.
Tex. 2003); Flores v. Allstate Tex. Lloyd's Co., 278 F. Supp.2d 810 (S.D.
Tex. 2003); Home Ins. Co. v. McClain, 2000 WL 144115 (Tex. App.-Dallas Feb.
10, 2000, no pet.)(not designated for publication); Allstate Ins. Co. v.
Smith, 450 S.W.2d 957 (Tex. Civ. App.-Waco 1970, no writ); Employers Cas.
Co. v. Holm, 393 S.W.2d 363 (Tex. Civ. App.-Houston 1965, no writ). The
analysis behind each of these strands deserves more attention.
    The courts agree that "ensuing" means following or coming after as a
consequence, but differ on what the "ensuing loss" must follow in order to be
covered. Compare Lambros, 530 S.W.2d at 141 with McClain. 2000 WL 144115,
at *3; see also Holm, 393 S.W.2d at 366. Lambros, a case upon which
several other courts rely, holds that the loss must follow from the excluded
event to fit within the exception. Lambros, 530 S.W.2d at 141. In that case,
the plaintiffs claimed that movement of underground water caused structural
                    Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(C) 2004 West Group                                    Page    52

2004 WL 343946

damage to their dwelling. Id. at 139. After the trial court entered a
judgment for the defendant notwithstanding the jury verdict, the plaintiffs
appealed. Id. at 138.
  On appeal, the plaintiffs argued that their claim met the "ensuing loss"
exception to the exclusion for losses caused by settling, cracking, bulging,
shrinkage, or expansion of foundations, walls, floors, ceilings, or roof
structures because the structural damage was caused by water damage. Id. at
139. After consideration of "ensuing loss" language very similar to that in
this case, the court stated, "If we give to the language of the exception its
ordinary meaning, we must conclude that an ensuing loss caused by water damage
is a loss caused by water damage where the water damage itself is the result of
a preceding cause." Id. at 141. The court found no coverage under the policy
for the plaintiffs' loss. Id. at 143.
  Defendant relies on a recent federal district case that follows the Lambros
logic. In Fiess, the court found that the plaintiffs' mold damage was
excluded under the policy's mold exclusion. Fiess, 2003 WL 21659408, at *7.
The plaintiffs argued that their loss, which resulted from flooding, fit within
the "ensuing loss" exception because the mold was caused by water damage.
[FN10] Id. The court disagreed, citing Lambros and stating, "Here, it is
undisputed that the water damage was not caused by the mold; instead, the mold
was caused by the water damage. Therefore, the mold damage is excluded under
the ensuing loss provision of the Policy." Id. at *8.

    FN10. Even under this court's interpretation, flood waters would not meet
the exception's requirement that the ensuing loss be caused by "water
damage ... if the loss would otherwise be covered under the policy." It appears
that neither the policy here nor the one in Fiess otherwise covered flood
damage.

  Although these cases present a remotely plausible reading of the exception,
they require some manipulation of the language. The more reasonable and natural
reading is that "collapse of the building or any part of the building, water
damage, or breakage of glass" are the losses to which the latter part of the
clause refers. If those losses are otherwise covered by the policy, then the
ensuing losses (i.e., the losses which follow), even if they would normally be
excluded, are also covered. Only under this reading does the clause truly
provide an exception to the exclusions.
  The exception refers to an "ensuing loss" and a "loss" otherwise covered by
the policy. Literally, the "ensuing loss" follows the "loss." Reading "ensuing
loss" to refer to something that follows an excluded loss (as Lambros and
Fiess do) necessarily means that the excluded loss itself is the "loss" to
which the phrase "if the loss would otherwise be covered under this policy"
refers. According to that reading, the exception would never reinstate coverage
because the exclusions are not otherwise covered by the policy.
  This court's interpretation stands in line with several Texas intermediate
courts. See McClain, 2000 WL 144115, at *4; Smith, 450 S.W.2d at 959;
Holm, 393 S.W.2d at 366. In Holm, for example, the loss resulted from an
inherent defect in the construction of a shower stall. Holm, 393 S.W.2d at
365. Under the policy, coverage was excluded for inherent defects. Id. at
366. Due to the defect, water ran laterally from the shower under the flooring
                 Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



2004 WL 343946

of the house causing rot and deterioration. Id. at 365. The policy also excluded coverage for rot and deterioration, but included an exception for ensuing losses caused by water damage, provided the loss would otherwise be covered under the policy. Id. at 366. The court held:

It is a matter of common knowledge that the more or less continual application of water to and against the wooden flooring of a house would cause warping and cracks and water damage thereto which finally would result in rot and deterioration. The loss which ensued or followed the water damage grew out of and was caused by water damage. Hence the exception or exclusion to the exclusion (i) should apply. The water damage in this cause would be covered by the policy since it is not within exclusion (d) which excludes certain other kinds of water damage. It thus comes within the proviso in the exception to the exclusion in that the water damage loss would otherwise be covered under the policy. Id.

A federal district court recently agreed with this interpretation. In two cases dealing with coverage for mold growth that resulted from water damage, a district court held that a homeowners policy with identical pertinent language "covers mold damage to the dwelling ... that ensues from an otherwise covered water damage event under the Policy." Flores, 278 F. Supp.2d at 815; see also Salinas, 278 F. Supp.2d at 824 (adopting the interpretation of the policy discussed in Flores and holding that the policy "covers mold claims to the extent that the claimed mold damage ensues from an otherwise covered water damage event"). In Flores, the district court explicitly rejected the reasoning of Fiess. See Flores, 278 F. Supp.2d at 814 n.3.

As noted by the Flores court, Fifth Circuit and Texas Supreme Court case law tend to support its interpretation. See id. In a case dealing with insurance coverage for rotting subfloors caused by naturally occurring condensation in the poorly vented crawl space under the house, the Fifth Circuit found that "the rot may have ensued from water, but not from water damage," and, thus, was not covered. Yates, 344 F.2d at 941. However, the court stated, "A likely case for application of the [ensuing loss] clause would be if water used in extinguishing a fire or coming from a burst pipe flooded the house and in turn caused rust or rot; loss from rust or rot so caused would be a loss ensuing on water damage." Id. Here, as in that example, the loss (allegedly) resulted from a covered plumbing leak.

A 1998 Texas Supreme Court case provides further support. See Balandran, 972 S.W.2d at 738. The decision in that case answered affirmatively the Fifth Circuit's certified question whether the 1991 Texas Standard Homeowners Policy-Form B covered damage to the insured's dwelling from foundation movement caused by an underground plumbing leak. Id. at 739. The plaintiffs there presented three arguments in favor of coverage, one of which furthered the claim that an "ensuing loss" exception (identical to the one in this case) created an exception to the exclusion for loss caused by "settling, cracking, bulging, shrinkage, or expansion of foundations." Id. at 740. Unfortunately, the court did not reach this argument. [FN11] However, the Texas Supreme Court's position on the interpretation of insurance policies supports this court's interpretation of the "ensuing loss" exception in favor of the insured. Dealing with an exclusion repeal provision, the Texas Supreme Court found that the insureds' interpretation was not unreasonable and adopted it as the proper construction of the policy. Id. at 742. The court mandated rulings in favor

(C) 2004 West Group                                              Page    54

2004 WL 343946

of the insureds in cases where the contract provisions are ambiguous and the
insureds' interpretations are reasonable. See id. at 741.

    FN11. The dissent did address this argument, arguing that the ensuing loss
provision would not provide coverage based on the reasoning in Lambros. See
Balandran, 972 S.W.2d at 746 (Owen, J., dissenting). The court does not find
this to be persuasive authority on the issue or to be convincing evidence of
how the Texas Supreme Court, as a whole, might rule.

  This court is bound by decisions of the Texas Supreme Court on matters of
Texas state law and by Fifth Circuit cases interpreting Texas law. In a
situation such as this where no binding case law exists on the matter before
it, the court must decide the issue in accordance with how it determines the
Texas Supreme Court would decide the issue. Based on the reasoning expressed
here and in Holm and Flores and on the principles discussed in
Balandran and Yates, this court finds that the Texas Supreme Court would
interpret the policy to provide coverage for mold damage when that loss ensues
from otherwise covered water damage. This is the proper interpretation,
regardless of whether it is reached as the only reasonable interpretation or as
the insured's "not unreasonable" construction of an ambiguous clause.
  Defendant's motion hinges solely on an interpretation of the policy that
absolutely excludes coverage of mold damage regardless of cause. Because the
court disagrees with that interpretation, Defendant's motion should be denied.
The court makes no determination whether a plumbing leak caused Plaintiff's
mold damage or whether the policy affords coverage in this particular case.
Those issues are subject to the jury's factual conclusions and are not
presently before the court.

                              IV. Conclusion

  Based on the foregoing, the court RECOMMENDS that Defendant's Motion for
Partial Summary Judgment be DENIED.
  The Clerk shall send copies of this Memorandum and Recommendation to the
respective parties who have ten days from the receipt thereof to file written
objections thereto pursuant to Federal Rule of Civil Procedure 72 and
General Order 2002-13. Failure to file written objections within the time
period mentioned shall bar an aggrieved party from attacking the factual
findings and legal conclusions on appeal.
  The original of any written objections shall be filed with the United States
District Clerk, P.O. Box 61010, Houston, Texas, 77208. Copies of such
objections shall be mailed to opposing parties and to the chambers of the
undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.
  SIGNED in Houston, Texas, this 6th day of January, 2004.
                                                            , NANCY
K. JOHNSON, UNITED STATES MAGISTRATE JUDGE

Related Andrews Newsletter Articles(Back to Top)
14 NO. 26 Andrews Ins. Coverage Litig. Rep. 8
2 NO. 12 Andrews Mold Litig. Rep. 4
END OF DOCUMENT
                    Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(C) 2004 West Group                                                 Page    47

---

                              **Citation Entry:**      **5**
    Your Information:
        2004 wl 343946
        Extracted from page: 1

    WestCheck Information:
        Verification information is not available for this citation.

---

**FIND Request:**     2004 wl 343946



(C) 2004 West Group                                         Page      5

─────────────────────────────────────────────────────────────
                        **Citation Entry:**     5
    Your Information:
       2004 wl 343946
       Extracted from page: 1

    WestCheck Information:
       Verification information is not available for this citation.
─────────────────────────────────────────────────────────────

**KeyCite Request:**    2004 wl 343946

We cannot process this request because KeyCite information is not available
for this citation.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
ENTERED

MAR 3 1 2004

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| TANYA COURY, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-2238 |
| | § | |
| ALLSTATE TEXAS LLOYD'S, | § | |
| | § | |
| **Defendant.** | § | |

### ORDER

Pending before the Court is Magistrate Judge Nancy K. Johnson's Memorandum and Recommendation entered on January 6, 2004 (Dkt. # 42). Defendant Allstate Texas Lloyd's ("Allstate") filed objections to the M&R on January 20, 2004 (Dkt. # 43).[1] After considering the M&R, the objections, the entire record and the applicable law, the Court ADOPTS the M&R.

Accordingly, Defendant's Motion for Summary Judgment (Dkt. # 32) is DENIED.

Signed this *31st* day of *March*, 2004.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

---

[1] Allstate also requests clarification from the Court that the M&R addresses Allstate's Motion for Summary Judgment entered as Docket Entry No. 32. On Page 1 of the M&R, the Court refers to Allstate's motion as "Defendant's Motion for Summary Judgment (Docket Entry No. 32)." On Page 14 of the M&R, the Court refers to Allstate's motion as "Defendant's Motion for Partial Summary Judgment," which was entered as Docket Entry No. 25. The reference on page 14 of the M&R is a clerical error. The M&R clearly addresses Allstate's Motion for Summary Judgment entered as Docket Entry No. 32.

47

Not Reported in S.W.2d
(Cite as: 1995 WL 612405 (Tex.App.-San Antonio))
<KeyCite Citations>

Page   3

Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE 47.7, UNPUBLISHED OPINIONS HAVE NO PRECEDENTIAL VALUE BUT MAY BE CITED WITH THE NOTATION "(not designated for publication)."

Court of Appeals of Texas, San Antonio.

James and Kelly S. DANIELL, Appellant,
v.
FIRE INSURANCE EXCHANGE,
Appellee.

04-94-00824-CV.

Oct. 18, 1995.

Before L OPEZ, GREEN and DUNCAN, Justices.

SARAH B. DUNCAN, Justice.

*1 James and Kelly Daniell appeal the summary judgment against them in their suit against their homeowner's insurer, Fire Insurance Exchange. Because we hold that the Daniells' loss is not covered by the ensuing loss provision in their homeowner's insurance policy, we affirm.

FACTS

The material facts are undisputed. In 1988, Sitterle Homes installed wood siding on the Daniells' home. Sitterle failed, however, to install felt backing between the aluminum foam sheathing and the wood siding. As a result, the heat caused the siding to buckle, which broke the paint seal and allowed water to get between the siding and the aluminum foam sheathing. Ultimately, the siding rotted. After replacing the rotted siding, the Daniells filed a claim for the repair costs of $11,392.50 with Fire Insurance Exchange. Fire Insurance Exchange denied coverage, and the Daniells sued.

Fire Insurance Exchange filed a motion for summary judgment arguing that the Daniells' loss was excluded from coverage by exclusion (f), which provides:

(f) We do not cover loss caused by:
(1) wear and tear, deterioration or any quality in property that causes it to damage or destroy itself.
(2) rust, rot, mold or other fungi.
We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under this policy.
In their response and cross-motion, the Daniells argued that coverage was established by the last paragraph of the exclusion.

The trial court granted Fire Insurance Exchange's motion and denied the Daniells'. In two points of error, the Daniells assert that the trial court's rulings were erroneous because their loss is covered by the policy.

STANDARD OF REVIEW

We review a summary judgment de novo. Accordingly, a summary judgment will be upheld only when the movant establishes that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Tex.R.Civ.P. 166a(c); Nixon v. Mr. Property Mgt. Co., 690 S.W.2d 546, 548-49 (Tex.1985). In deciding whether the summary judgment proof presents a disputed issue of material fact, we view as true the evidence favorable to the nonmovant and indulge every reasonable inference and resolve all doubts in its favor. Nixon, 690 S.W.2d at 548-49.

The Daniells argue that, "since this summary judgment is based upon a finding of no coverage against an insured, even stricter standards of review are applicable." Specifically, the Daniells argue that we must adopt their construction of the policy if it is not unreasonable, citing National Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex.1991), and Blaylock v. American Guarantee Bank, 632 S.W.2d 719, 721 (Tex.1982). We disagree. The cases and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in S.W.2d                                                    **Page   4**
(Cite as: 1995 WL 612405, *1 (Tex.App.-San Antonio))

rules relied upon by the Daniells do not effect a stricter standard of review; rather, they recognize and apply the well-established rule of substantive law that, if a provision in an insurance contract is ambiguous, all doubts are resolved in favor of the insured. National Union Fire Ins. Co., 811 S.W.2d at 555. While we recognize and adhere to this well-established rule of construction in appropriate cases, we do not believe this rule is applicable here because the insurance provision at issue unambiguously excludes the Daniells' loss from coverage. See Lambros v. Standard Fire Ins. Co., 530 S.W.2d 138 (Tex.Civ.App.-San Antonio 1975, writ ref'd).

### COVERAGE UNDER THE ENSUING LOSS PROVISION

*2 In Lambros, the "plaintiffs alleged that their dwelling 'suffered serious structural damage and structural slab collapse caused by movement of water below the ground surface exerting pressure on the foundation, floors, sidewalks, walls....' " Lambros, 530 S.W.2d at 139. However, the policy excluded from coverage any "[l]oss ... caused by settling, cracking, bulging, shrinkage, or expansion of foundations, walls, floors, ceilings, roof structures...." Id. The plaintiffs argued that this exclusion did not negate coverage because the policy further provided that the exclusion did not apply to "ensuing loss caused by ... water damage." This court rejected the Lambros' argument, holding that " '[e]nsuing loss caused by water damage' refers to water damage which is the result, rather than the cause, of 'settling, cracking, bulging, shrinkage, or expansion of foundations, walls, floors, ceilings....' " Lambros, 530 S.W.2d at 141. The plain meaning of this court's holding is that, while an ensuing loss provision will cover water damage caused by an excluded event, it will not cover the excluded event even if it is caused by water damage.

In this case, the Daniells have not alleged water damage that was the result of rot; rather, they have alleged rot caused by water damage. Under these circumstances, Lambros 's interpretation of the ensuing loss

provision conclusively establishes that the loss claimed is not a covered loss. See also, e.g., McKool v. Reliance Ins. Co., 386 S.W.2d 344, 345-46 (Tex.Civ.App.-Dallas 1965, writ dism'd); accord Aetna Cas. & Sur. Co. v. Yates, 344 F.2d 939, 941 (5th Cir.1965).

We hold that the trial judge correctly granted Fire Insurance Exchange's motion for summary judgment and denied that of the Daniells. Accordingly, the Daniells' points of error are overruled, and the judgment is affirmed.

1995 WL 612405 (Tex.App.-San Antonio)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



389 N.Y.S.2d 214
**(Cite as: 88 Misc.2d 706, 389 N.Y.S.2d 214)**
<KeyCite Yellow Flag>

Supreme Court, New York County, New York,
Trial Term, Part 19.

**80 BROAD STREET CO., Plaintiff,**
v.
**UNITED STATES FIRE INSURANCE
CO., Defendant.**

Dec. 17, 1975.

Sublessee brought action against insurer to recover under 'Standard Multi-Peril Building Form Endorsement' of its all-risk fire insurance policy for loss sustained as result of buckling of marble facing on its building constructed over 40 years earlier. The Supreme Court, Trial Term, New York County, Seymour Schwartz, J., held that damages sustained by sublessee came within policy exclusions for wear and tear, deterioration, rust or corrosion, mould, wet or dry rot, and inherent or latent defects.

Complaint dismissed.

West Headnotes

**[1] Insurance ⚖══ 2141**
217k2141
(Formerly 217k417.5(1))
Purpose of "all-risk" insurance policy is to protect against fortuitous event; such policy does not obligate insurer to pay for loss or damage resulting wholly from nature and inherent qualities of property insured.

**[2] Insurance ⚖══ 2140**
217k2140
(Formerly 217k417.5(1))

**[2] Insurance ⚖══ 2146**
217k2146
(Formerly 217k417.5(1))
Damages sustained by sublessee, seeking to recover under "Standard Multi-Peril Building Form Endorsement" of its "all-risk" fire insurance policy for loss sustained as result of buckling of marble facing on building due to combination of rain, frost, moisture seepage, rust and corrosion, and original improper construction of building over 40 years earlier,

came within policy exclusions for wear and tear, deterioration, rust or corrosion, mould, wet or dry rot and inherent or latent defects.

**\*706  \*\*214** Hendler & Siegel, Samuel Hendler and Stanley P. Siegel, New York City, for plaintiff.

**\*\*215** Tell, Cheser & Breitbart, New York City, for defendant.

SEYMOUR SCHWARTZ, Justice:

Both parties move for summary judgment in this action where plaintiff, sublessee of 78–86 Broad Street, New York City, seeks to recover under its 'Standard Multi-Peril Building Form Endorsement' of its fire insurance policy (all-risk) for loss sustained as a result of the buckling of the marble facing on its building constructed in 1931. On August 1, 1972, the City of New York placed a violation on the building and directed repair. The policy provides:
'This policy insures against all risks of direct physical loss to coverage A-Buildings(S), subject to the provisions and stipulations herein and in the policy of which this form is made a part.'

Defendant claims the policy does not cover this damage in these circumstances, citing the following exclusion:

'This policy does not insure under this form against: \* \* \*

D. Loss caused by
1. Wear and tear, deterioration, rust or corrosion, mould, wet or dry rot; inherent or latent defect; smog; \* \* \* settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings; \* \* \* unless loss by a peril not otherwise excluded ensues and then the company shall be liable only for such ensuing loss.'

**\*707** Plaintiff's engineer attributed the buckling to failure to provide for masonry covering of the steel beams called for by the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



New York City Building Code, the bending of galvanized metal anchors in the field before installation causing the galvanizing to break and steel straps to rust and failure to connect steel beams to steel plates placing them instead into the masonry backup opening joints and permitting moisture to penetrate.

The parties are in essential agreement that rain, frost, seepage, rust and corrosion combined with the original improper construction to ultimately cause the buckling.

[1] While sometimes referred to as an 'all risk policy' this is actually a misnomer since, as here, there are specific exclusions. The purpose of such a policy is to protect against a fortuitous event. This has been defined as 'an event happening by chance or accident.' Kermani v. Ins. Co. of North America, 142 Misc. 542, 543, 255 N.Y.S. 687, 689. Or '(An event) occurring by chance without evidence causal need or relation or without deliberate intention.' Avis v. Hartford Fire Insurance Co., 283 N.C. 142, 148, 195 S.E.2d 545, 548. Such a policy does not obligate the insurer to pay for loss or damage resulting wholly from the nature and inherent qualities of the property insured. Avis v. Hartford, supra.

Here the moisture which was a cause of the damage acted over a period of forty years and it was approximately thirty-nine years after construction that the policy sued on was issued. In Greene v. Cheetham, 293 F.2d 933, 936--937 (2d Cir. 1961) the Court stated: '* * * But the 'all-risk' event so covered would not include an undisclosed event that existed prior to coverage, or an event caused by the consummation during the period of coverage of an indwelling fault in the goods that had existed prior to coverage. Otherwise the underwriters are in the position of either having to pay for undisclosed loss or damage actually caused prior to the time of coverage or uncontemplated loss or damage caused from deteriorating agents present within the goods * * *.'

[2] The policy specifically excludes 'wear and tear, deterioration, rust or corrosion, mould,

wet or dry rot; inherent or latent defects * * *.' Moisture seepage comes within this exclusion and improper construction forty years before comes within the '* * * inherent or latent defect' portion.

Plaintiff insists, however, that an exception from the exclusion clause governs '* * * unless loss by a peril not otherwise excluded ensues and then the company shall be liable for only *708 such ensuing loss.' It claims that water seepage and accumulation **216 of moisture behind the marble slabs, freezing of water and negligent construction were causative features not otherwise excluded. This argument is not persuasive. The alleged non-excluded clauses grow out of and are directly related to the excluded ones. They do not take on the character of a subsequent fortuitous event.

Perhaps the closest case in point is Aetna Casualty and Surety Co. v. Yates, 344 F.2d 939 (5 Cir.). There plaintiffs discovered that the joists, sills and subflooring of their home were almost completely rotted away. The cause was that the crawl space under the house was inadequately supplied with vents. Contact between air trapped in the crawl space and the subfloors and sills, which had been chilled by air conditioning, produced condensation of moisture and consequent rotting. The policy was an all risk policy which excluded 'i. Loss by inherent vice, wear and tear, deterioration; rust, rot, mould * * *' An exception to the exclusion was '* * * loss caused by collapse of building, water damage, * * * provided such losses would otherwise be covered under this policy.'

Judge Friendly in granting judgment for the insurer held: 'Plaintiffs put more weight on the last quoted clause then it will bear. The result of their construction would be that a clause intended to narrow the exclusions for 'rust, rot, mould or other fungi' and 'dampness of atmosphere' would very nearly destroy them. A court may not properly give the clause such an unnatural effect unless the words compel. They are far from doing that. A likely case for application of the clause would be if water used in extinguishing a



fire or coming from a burst pipe flooded the house and in turn caused rust or rot; loss from rust or rot so caused would be a loss ensuing on water damage. That is not this case, where the rot may have ensued from the presence of water but not from water damage.

'In short, plaintiffs cannot bring themselves within either of these readings, both of which require that rot and water damage be in some sense separable events. We do not think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified as water damage; it would not be easy to find a case of rot or dampness of atmosphere not equally subject to that label and the exclusions *709 would become practically meaningless. In our case the rot may have ensued from water but not from water damage, and the damage ensuing from the rot was not the damage from the direct intrusion of water conveyed by the phrase 'water damage."

In a recent New York case, Budd Looms Inc. v. American Casualty Company of Reading, Pa., 37 N.Y.2d 738, 374 N.Y.S.2d 620, 337 N.E.2d 132, suit was brought under an all risk policy where damage ensued because rainwater entered an opening in a basement wall made by workmen installing a sprinkler system. Excluded from coverage was '* * * influx of water derived from natural sources through basement walls * * * unless caused by or resulting from a peril not otherwise excluded.' The Court held that rain was a natural source and denied coverage.

In the present case the damages sustained by plaintiff come within the exclusion provisions of the policy.

Judgment for defendant dismissing plaintiff's complaint.

389 N.Y.S.2d 214, 88 Misc.2d 706

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



54 A.D.2d 888 (Table)                                                    Page   5
390 N.Y.S.2d 768
(Cite as: 54 A.D.2d 888)

**80 Broad Company, Appellant,**
**v.**
**United States Fire Insurance Company,**
**Respondent**

Supreme Court, Appellate Division, First
Department, New York

November 30, 1976

Judgment, Supreme Court, New York
County, entered on January 8, 1976,
unanimously affirmed on the opinion of S.
Schwartz, J., at Trial Term. Respondent shall
recover of appellant $60 costs and
disbursements of this appeal.

Concur -- Markewich, J. P., Murphy, Birns,
Capozzoli and Nunez, JJ. [88 Misc 2d 706.]

Copr. (c) 2004, Randy A. Daniels, Secretary of
State, State of New York.

N.Y.A.D.,1976.

80 BROAD CO. V UNITED STATES FIRE
INS. CO.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



631 N.Y.S.2d 155
(Cite as: 219 A.D.2d 454, 631 N.Y.S.2d 155)
< KeyCite History >

Page    60

Supreme Court, Appellate Division, First
Department, New York.

NAROB DEVELOPMENT CORP., et al.,
Plaintiffs-Respondents,
v.
INSURANCE COMPANY OF NORTH
AMERICA, Defendant-Appellant.

Sept. 7, 1995.

Insured brought action against property insurer to recover payment for collapse of retaining wall due to insureds' defective workmanship.    The Supreme Court, New York County, Gammerman, J., entered judgment on jury verdict in favor of insureds. Insurer appealed.    The Supreme Court, Appellate Division, held that exclusion barred recovery since there was no collateral or subsequent damage or loss as result of collapse of wall.

Reversed.

West Headnotes

Insurance ⟐ 2156
217k2156
(Formerly 217k417.5(1))
Property insurance policy's exclusion for loss caused by or resulting from deficiency in workmanship or materials barred coverage for collapse of retaining wall due to defective workmanship, even though exclusion stated exception allowing coverage for loss caused by or to covered property as result in deficiency in workmanship or materials;  there was no collateral or subsequent damage or loss, and exception to exclusion does not apply to loss directly related to excluded risk.

**155  I.   Weinstock,   for   plaintiffs-respondents.

S.W. Kallmann, for defendant-appellant.

Before MURPHY, P.J., and WALLACH, ROSS, NARDELLI and WILLIAMS, JJ.

MEMORANDUM DECISION.

*454 Judgment, Supreme Court, New York County (Ira Gammerman, J.), entered May 26, 1994, after jury trial, in favor of plaintiffs in the sum of $187,695.00, with interest from April 4, 1992, unanimously reversed, on the law, and the complaint dismissed, without costs.

The policy exclusion at issue barred recovery by plaintiffs, and the trial court erred in denying defendant a directed verdict.    After finding that the evidence presented at trial established that the retaining wall collapsed due to plaintiffs' defective workmanship and that the first sentence of "Exclusion 9" of the insurance policy barred recovery by plaintiffs, the trial court misinterpreted the second sentence, which provides an exception to the exclusion and reads as follows:
"Workmanship or Materials"
We won't cover any loss caused by or resulting from error, omission or deficiency in workmanship or materials as respects the cost of making good such error, omission or deficiency.    However, we will cover resulting physical loss caused by or to the Covered Property. (Emphasis added.)

Where a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss **156 directly related to the original excluded risk (see, Aetna Cas. & Sur. Co. v. Yates, 344 F.2d 939 (5th Cir.);   80 Broad St. Co. v. United States Fire Ins. Co., 88 Misc.2d 706, 707, 389 N.Y.S.2d 214, affd. 54 A.D.2d 888, 390 N.Y.S.2d 768;   Acme Galvanizing Co. v. Fireman's Fund Ins. Co., 221 Cal.App.3d 170, 270 Cal.Rptr. 405).    Here, inasmuch as there was no collateral or subsequent damage or loss as a result of the collapse of the free-standing retaining wall, the exception should not have been at issue.

631 N.Y.S.2d 155, 219 A.D.2d 454

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

521 N.E.2d 1357
**(Cite as: 521 N.E.2d 1357)**
<KeyCite Citations>

Court of Appeals of Indiana,
Fourth District.

Daniel P. HOSTETLER, and Brenda K.
Hostetler, Appellants (Plaintiffs Below),
v.
**STATE FARM FIRE AND CASUALTY
COMPANY, Appellee (Defendant Below).**

No. 27A04-8710-CV-332.

April 28, 1988.

Insured brought action against insurer to recover for damages to home's sagging roof under policy which covered home against damage from snow and ice but excluded from coverage loss due to structural defects. The Circuit Court, Grant County, Dennis D. Carroll, Special Judge, granted insurer's motion for summary judgment, and insured appealed. The Court of Appeals, Conover, J., held that insured was not entitled to recover for damages under policy since insurer showed that sagging roof was result of faulty design and construction, and insured failed to show damages were covered under policy.

Affirmed.

West Headnotes

**[1] Judgment ⬤= 185(6)**
228k185(6)

**[1] Judgment ⬤= 185.2(1)**
228k185.2(1)
On motion for summary judgment, nonmovant may rest upon his pleadings until moving party establishes no general factual issue exists; however, if moving party successfully demonstrates no genuine issue exists, nonmoving party must show presence of such fact to stave off summary judgment and in so doing nonmoving party may not merely rest upon his pleadings but his response must set forth specific facts indicating issue of material fact exists; if nonmovant fails to meet his burden, summary judgment may be granted. Trial Procedure Rule 56(E).

Page  62

**[2] Appeal and Error ⬤= 934(1)**
30k934(1)
When reviewing grant of summary judgment, reviewing court stands in shoes of trial court, and all evidence is construed in favor of nonmovant and all doubts as to existence of material issue are resolved against movant.

**[3] Judgment ⬤= 178**
228k178

**[3] Judgment ⬤= 181(2)**
228k181(2)
Summary judgment is not substitute for trial to resolve factual issues, and even though court may believe nonmovant will be unsuccessful at trial, summary judgment should not be granted when material facts are disputed or conflicting inferences arise.

**[4] Insurance ⬤= 2156**
217k2156
(Formerly 217k417.5(1))
Insured was not entitled to recover for damage to home's sagging roof under policy covering home against damage from snow and ice but excluding loss due to structural defects; insurer submitted affidavits and report from engineer that sagging roof was result of faulty design and construction and not due to snow and ice damage, and insured failed to show that damage was covered under policy.

*1358 David M. Payne, Ryan, Welchons & Payne, Marion, for appellants.

Jerome T. Holderead, Browne Spitzer Herriman Browne Stephenson & Holderead, Marion, for appellee.

CONOVER, Judge.

Plaintiffs-Appellants Daniel and Brenda Hostetler (Hostetlers) appeal from the trial court's grant of summary judgment in favor of Defendant-Appellee State Farm Fire and Casualty Company (State Farm) in a case to recover for damages under an insurance policy.

We affirm.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



521 N.E.2d 1357
(Cite as: 521 N.E.2d 1357, *1358)

Page 63

The sole issue presented on appeal is whether the trial court erred in granting State Farm's motion for summary judgment.

The Hostetlers purchased their home in December, 1976. Thereafter, State Farm issued an insurance policy covering it against damage from snow and ice, but excluding loss from structural defects.

In March, 1984, after a period of heavy snow, the Hostetlers noticed their roof sagging and filed a claim for $3,597.16 with State Farm for roof and ceiling damage. State Farm denied the claim, believing the damage was not caused by ice and snow. The Hostetlers then initiated the current action to recover for damages under the insurance policy. State Farm filed a motion for summary judgment which was granted by the trial court. The Hostetlers contend summary judgment was inappropriate because a genuine issue of material fact exists regarding the cause of their sagging roof.

Summary judgment is appropriate only in limited situations. Ind. Rules of Procedure, Trial Rule 56 provides in part
   (C) Motion and Proceedings Thereon.
*1359 ... The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions and affidavits filed pursuant to Trial Rule 5(D), together with any testimony show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.....
(E) Form of Affidavits--Further Testimony-- Defense Required....
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.... (Emphasis supplied).

Thus, the moving party carries the burden of

establishing:
   (a) there is no issue as to any material fact, and
   (b) he is entitled to judgment as a matter of law.

Hinkle v. Niehaus Lumber Co. (1987), Ind.App., 510 N.E.2d 198, 200, reh. denied. The moving party must fulfill these two requirements before any burden shifts to the non-movant. Id.

[1] In Hinkle, we discussed this proposition stating
   The method of ascertaining whether a material factual issue exists is as follows: Facts alleged in the complaint are taken as true except to the extent that they are negated by other pleadings, depositions, answers to interrogatories, affidavits, or other evidence presented by the moving party. (citing cases) All of which amounts to requiring the party moving for summary judgment to shoulder the burden of establishing the lack of material factual issue.... Once the movant makes such a showing, the opposing party may not rest on his pleadings, but must then demonstrate the existence of a genuine issue for trial. (citing cases)

Hinkle, supra, at 200, quoting Kahf v. Charleston South Apartments (1984), Ind.App., 461 N.E.2d 723, 729, trans. denied. Therefore, the nonmovant may rest upon his pleadings until the moving party establishes no genuine factual issue exists. Hinkle, supra, at 200-201. If, however, the moving party successfully demonstrates no genuine issue exists, the non-moving party must show the presence of such a fact to stave off summary judgment. Fort Wayne Community Schools v. Fort Wayne Education Association, Inc. (1986), Ind.App., 490 N.E.2d 337, 339; Conard v. Waugh (1985), Ind.App., 474 N.E.2d 130, 134. In doing so, the non-moving party may not merely rest upon his pleadings, but his response must set forth specific facts indicating an issue of material fact exists. Raymundo v. Hammond Clinic Assoc. (1983), Ind., 449 N.E.2d 276, 281; Popp v. Hardy (1987), Ind.App., 508 N.E.2d 1282, 1284; Fort

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



521 N.E.2d 1357
(Cite as: 521 N.E.2d 1357, *1359)

Page 64

Wayne Community Schools, supra, at 340; Ind. Rules of Procedure, T.R. 56(E). If the nonmovant fails to meet this burden, summary judgment may be granted. Raymundo, supra, at 280; Williams v. Lafayette Production Credit Association (1987), Ind.App., 508 N.E.2d 579, 582, reh. denied; Conard, supra, at 134; Ind. Rules of Procedure, T.R. 56(E).

[2] When reviewing the grant of a summary judgment motion, we stand in the shoes of the trial court. Hinkle, supra, at 201. All evidence must be construed in favor of the nonmovant and all doubts as to the existence of a material issue must be resolved against the movant. Raymundo, supra, at 280; Hinkle, supra, at 201; Penwell v. Western & Southern Life Ins. Co. (1985), Ind.App., 474 N.E.2d 1042, 1044; Kahf, supra, at 729. Even if facts are not in dispute, summary judgment is inappropriate if conflicting inferences arise. Hinkle, supra, at 201; Board of Aviation Commissioners of St. Joseph County v. Hestor (1985), Ind.App., 473 N.E.2d 151, 153.

[3] Summary judgment is not a substitute for a trial to resolve factual disputes. Though the trial court may believe the *1360 nonmovant will be unsuccessful at trial, summary judgment should not be granted where material facts are disputed or conflicting inferences arise. Hinkle, supra, at 201.

In the present case, State Farm submitted two affidavits and an accompanying report in support of its motion for summary judgment-- the report and one affidavit were from an engineer who inspected the Hostetler's house and the other affidavit was from the house's builder. The affidavits and report stated the sagging roof was the result of faulty design and construction, and specifically rejected snow and ice damage as a possible cause.

In response to State Farm's motion, the Hostetlers, in oral argument and depositions, merely reasserted the identical claim set forth in their complaint, namely, the snow and ice caused the damage to their roof. In their depositions, the Hostetlers admitted to having no expertise or training in home construction, but instead based their claim solely on "common sense."

[4] The trial court was correct in granting State Farm's motion for summary judgment. State Farm, as the moving party, successfully demonstrated the absence of a genuine issue of material fact. It then became incumbent upon the Hostetlers to set forth specific facts showing the presence of such an issue. The Hostetlers did nothing more than reassert their own opinions and conclusions which is not sufficient to oppose a motion for summary judgment. McMahan v. Snap On Tool Corp. (1985), Ind.App., 478 N.E.2d 116, 122; Indiana University Hospital v. Carter (1983), Ind.App., 456 N.E.2d 1051, 1057, reh. denied. Thus, the Hostetlers failed to meet their burden of demonstrating the existence of a genuine issue for trial.

Affirmed.

MILLER, P.J., concurs.

GARRARD, P.J., concurs in result.

521 N.E.2d 1357

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



BEIRNE MAYNARD & PARSONS

# COUCH ON INSURANCE 3D

by

Lee R. Russ
Inactive Member of Iowa Bar

in consultation with

Thomas F. Segalla
Member of New York Bar



**WEST GROUP**

Bancroft-Whitney • Clark Boardman Callaghan
Lawyers Cooperative Publishing • WESTLAW® • West Publishing

IT #1-675-662-8                                                              12/00

Copyright © 2000
West Group
All Rights Reserved.

 is a trademark used herein under license.

The trademarks used throughout this publication are used herein under license.

Library of Congress Catalog Card Number 98-70999

Thus, a property insurance provision describing the perils insured against which states "Windstorm and Hail, excluding loss caused by frost or cold weather or ice other than hail, snowstorm or sleet, all whether driven by wind or not," windstorm and hail are the only perils insured against, and the natural phenomena named following those two perils, and clearly set off from them, are part of an excluded group not insured against.[13]

## § 153:3   "Forces of Nature" Versus "Natural Forces" or "Natural Processes"

In keeping with the basic nature of insurance as a mechanism for transferring the "risk" of a loss from the insured to the insurer,[14] and recognition that the risk so transferred must generally be "contingent,"[15] insurers almost universally distinguish between what may be labelled "forces of nature," such as windstorms, rain, and floods, and what may be labelled "natural forces" or "natural processes," such as rot, decay, rust, and the like. Coverage against the former is usually available for the right premium, although the risk of a given force of nature may be so great in some locations that insurers are unwilling to undertake the risk. Coverage against the latter, however, is usually not available.

In comparing these two very different perils, it is useful to view them in terms of the degree to which their occurrence may be considered "contingent" or "fortuitous." While floods, windstorms, and other weather-related phenomena are, for all intents and purposes, "sure" to occur, this is true only as a generality; there is as yet no way of predicting with any certainty how often they will occur, how long they will last when they do occur, the places they will be or go once they do occur, or the severity of any given occurrence. In fact, a given piece of property may never be subjected to a given force of nature even though the property is located in a geographic area that is at high risk for the force of nature.

---

[13] Clark v. Cooperative Fire Ins. Ass'n of Vermont, 141 Vt. 321, 448 A.2d 155 (1982) (provision will not be read to extend coverage to perils not named in the first instance).

[Section 153:3]

[14] See Couch on Insurance 3d, §§ 1:9, 101:2.

[15] See Couch on Insurance 3d, § 1:6.

§ **153:3**                                               COUCH ON INSURANCE 3D

---

◆ **Observation:** Persons contemplating the wisdom of insuring against forces of nature can perform their own risk-benefit analysis of the likelihood of a loss, its likely magnitude if it does occur, and the premiums for purchasing insurance. Or, as many are wont to do in modern times, the person may simply rely on potential governmental disaster relief.

---

Natural processes of decay, on the other hand, are certain to occur in all items of property unless they are destroyed by some other peril before the effect becomes manifest. This is not to say that all aspects of these processes are known. It remains uncertain exactly when the process will manifest itself in some detrimental form, and how long the process will take to render the property unfit for its ordinary purposes. It is even possible that fortuitous events, such as exposure of the property to certain agents, will affect when the detriment occurs and how fast the process progresses. But the detrimental effect will occur, and will occur to the insured property unless another cause of loss intervenes.

Apart from the much greater certainty of occurrence, coverage for natural processes like decay also present much greater opportunities for fraud, and significant proof problems. For example, there is frequently little in the way of physical evidence to indicate whether a piece of personal property has been damaged because of natural decay and the like, or because of misuse, deliberate destruction, or other perils wholly within the control of the insured. "Forces of nature" like wind and rain, on the other hand, are overt, visible, and sufficiently widespread that they rarely escape the attention of third parties in the area.

---

◆ **Observation:** The existence of rot, decay, and rust may effect the evaluation of the property at the time of the loss and may be taken into consideration when the insurer is adjusting the claim.

---

Yet another difference is that natural forces like rot and decay are, in many respects, "built in" to the price one pays for the property. This is the essential theory underlying the very concept of "depreciation," and is most obvious when the natural forces at work are

ordinary "wear and tear." When property becomes less valuable or useful merely because past use has decreased its efficiency, safety, or some other aspect of usefulness, this is either because the owners have gotten precisely what they paid for or, if the useful life is less than was advertised at the time of sale, they have a complaint and potential legal claim against the manufacturer, distributor, or seller.

## II.   TORNADO, HURRICANE, AND WINDSTORM

### A.   IN GENERAL

### § 153:4   Nature and Scope of Coverage

Insurance may be purchased against the effect of violent storms or high winds, and may be given any of several labels, including cyclone, hurricane, storm, tornado, and windstorm or weather insurance. [16]

---

◆ **Observation:**  In some locations subject to frequent storms of this nature, the state establishes a fund to insure property owned by the state and its political subdivisions against these risks. [17] Government financing is often also made available to private property owners, but the availability and amount of these funds is always uncertain; residents of such areas should at least attempt to determine whether additional insurance can be purchased.

---

Similar coverage may exist under all risks or comprehensive insurance which fails to specifically exclude such perils. [18]

It has long been recognized that insurance may validly be effected against damage from wind, tornados, cyclone, hurricane, and so

---

[Section 153:4]

[16] See Couch on Insurance 3d, § 1:38.

[17] Minot Special School Dist. No. 1 v. Olsness, 53 **N.D.** 683, 208 N.W. 968, 45 A.L.R. 1337 (1926) (tornado fund valid).

[18] See, for example, Indiana Ins. Co. v. Carnegie Constr., Inc., 104 **Ohio** App. 3d 219, 661 N.E.2d 776, 107 Ed. Law Rep. 278 (2d Dist. Champaign County 1995), finding that extended coverage as used in builder's risk insurance policy, which states that it protects against damage to contractor's work incurred by theft, fire, lightning, extended coverage, vandalism, and malicious mischief, included risk of loss by windstorm.

© West Group Pub. 12/98 (COI)                    **Page 153-13**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ROYAL SURPLUS LINES INSURANCE COMPANY | § § § | |
| vs. | § § | CIVIL ACTION NO. B-03-109 |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT. | § § | |

**AFFIDAVIT**

| | |
|---|---|
| STATE OF GEORGIA | § § |
| COUNTY OF FULTON | § |

BEFORE ME, the undersigned authority, on this day, personally appeared MARK SCHWARTZ, who, being duly sworn upon his oath according to law, did depose and state the following:

"My name is Mark Schwartz. I reside in the State of Georgia. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Resurgens Specialty Underwriting, Inc. ("RSUI"). Attached hereto are records of RSUI, marked as Exhibit Nos. 1, 2, 3, and 4. These records are kept by RSUI in the regular course of business, and it was the regular course of business of RSUI (or its predecessor) for an employee or representative of RSUI (or its predecessor) with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_Mark Schwartz_
Mark Schwartz

SWORN TO AND SUBSCRIBED this _11th_ day of May, 2004.

_Pamela Smith_
Notary Public, State of Georgia

Pamela Smith
Notary Public, Gwinnett County, Georgia
My Commission Expires October 3, 2004

#513045v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| ROYAL SURPLUS LINES INSURANCE COMPANY, | ' ' ' |
| vs. | '    CIVIL ACTION NO. B-03-109 ' |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT. | ' ' |

## AFFIDAVIT

STATE OF TEXAS     '

COUNTY OF HARRIS     '

BEFORE ME, the undersigned authority, on this day, personally appeared Philip R. Watters, who, being duly sworn upon his oath according to law, did depose and state the following:

My name is Philip R. Watters. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Rimkus Consulting Group, Inc. Attached hereto are records from Rimkus Consulting Group, Inc., marked as Exhibit Nos. 29, 31 and 46. These records are kept by Rimkus Consulting Group, Inc. in the regular course of business, and it was the regular course of business of Rimkus Consulting Group, Inc. for an employee or representative of Rimkus Consulting Group, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the records or to transmit information thereof to be included in such records. These records were made at the time of the act, event, condition, opinion, or diagnosis, near that time or reasonably soon thereafter. The records attached hereto are true and correct copies of the originals.

FURTHER AFFIANT SAYETH NOT.

_____
Witness

SWORN TO AND SUBSCRIBED this _10_ day of May, 2004.

KAREN C. NAGY
MY COMMISSION EXPIRES
August 29, 2007

_____
Notary Public in and For the State of Texas

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROYAL SURPLUS LINES | § | |
| INSURANCE COMPANY | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-109 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT. | § | |

### AFFIDAVIT

STATE OF TEXAS          §
                        §
COUNTY OF *CAMERON*     §

BEFORE ME, the undersigned authority, on this day, personally appeared *Kenny McCAmeron*, who, being duly sworn upon his/her oath according to law, did depose and state the following:

"My name is *Kenny McCAmeron*. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Mac's Insulation Co., Inc. ("MIC"). Attached hereto are records from MIC, marked as Exhibit No. 16. These records are kept by MIC in the regular course of business, and it was the regular course of business of MIC for an employee or representative of MIC with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_____
Witness

SWORN TO AND SUBSCRIBED this 11th day of MAY 2004.

_____
Notary Public in and for the State of Texas

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ROYAL SURPLUS LINES** | ' | |
| **INSURANCE COMPANY** | ' | |
| | ' | |
| **vs.** | ' | **CIVIL ACTION NO. B-03-109** |
| | ' | |
| **BROWNSVILLE INDEPENDENT** | ' | |
| **SCHOOL DISTRICT.** | ' | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | ' |
| | ' |
| COUNTY OF *Cameron* | ' |

BEFORE ME, the undersigned authority, on this day, personally appeared *Dennis Nickoloff*, who, being duly sworn upon his/her oath according to law, did depose and state the following:

"My name is *Dennis Nickoloff*. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of GAB Robins North America, Inc. ("GAB"). Attached hereto are records from GAB, marked as Exhibit Nos. 36, 37, 38, 39, 40, 41, 42, and 43. These records are kept by GAB in the regular course of business, and it was the regular course of business of GAB for an employee or representative of GAB with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the records or to transmit information thereof to be included in such records. These records were made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_____
Witness

SWORN TO AND SUBSCRIBED this *10th* day of May, 2004.

_____
Notary Public in and for the State of Texas

SIMON ROCHA JR.
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
12-19-2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| **ROYAL SURPLUS LINES** | ' |
| **INSURANCE COMPANY** | ' |
| | ' |
| **vs.** | '   **CIVIL ACTION NO. B-03-109** |
| | ' |
| **BROWNSVILLE INDEPENDENT** | ' |
| **SCHOOL DISTRICT.** | ' |

## AFFIDAVIT

| | |
|---|---|
| **STATE OF TEXAS** | ' |
| | ' |
| **COUNTY OF BEXAR** | ' |

BEFORE ME, the undersigned authority, on this day, personally appeared Stephen Kenoyer, who, being duly sworn upon his/her oath according to law, did depose and state the following:

"My name is Stephen Kenoyer. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Gobbell Hays Partners, Inc. Attached hereto are records from Gobbell Hays Partners, Inc. marked as Exhibit No. 47. These records are kept by Gobbell Hays Partners, Inc. in the regular course of business, and it was the regular course of business of Gobbell Hays Partners, Inc. for an employee or representative of Gobbell Hays Partners, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_____
Stephen Kenoyer

SWORN TO AND SUBSCRIBED this ⟨12⟩ day of May, 2004.

SARA NEWBERRY
Notary Public
State of Texas
My Commission Expires
November 25, 2006

_____
Notary Public in and for the State of Texas

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ROYAL SURPLUS LINES** | § | |
| **INSURANCE COMPANY** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. B-03-109** |
| | § | |
| **BROWNSVILLE INDEPENDENT** | § | |
| **SCHOOL DISTRICT.** | § | |

**AFFIDAVIT**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day, personally appeared **JAY W. BROWN**, who, being duly sworn upon his oath according to law, did depose and state the following:

"My name is Jay W. Brown. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am an attorney licensed to practice in the State of Texas. I am the attorney of record for Royal Surplus Lines Insurance Company in the above styled and numbered cause. Attached hereto are copies of (i) documents produced by Brownsville independent School District ("BISD") in connection with this lawsuit and/or the underlying insurance claim and (ii) Sworn Statements of BISD employees, marked as Exhibit Nos. 8, 13, 14, 15, 17, 18, 21, 22, 23, 24, 35, 38, 44. The documents attached hereto are true and correct copies of the originals."

FURTHER AFFIANT SAYETH NOT.

_____
Jay W. Brown

SWORN TO AND SUBSCRIBED this _12_ day of _May_ 2004.

_____
Notary Public in and for the State of Texas



**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ROYAL SURPLUS LINES** | ' | |
| **INSURANCE COMPANY** | ' | |
| | ' | |
| **vs.** | ' | **CIVIL ACTION NO. B-03-109** |
| | ' | |
| **BROWNSVILLE INDEPENDENT** | ' | |
| **SCHOOL DISTRICT.** | ' | |

**AFFIDAVIT**

STATE OF TEXAS     '

COUNTY OF _EL PASO_     '

       BEFORE ME, the undersigned authority, on this day, personally appeared _ROBERT H. BEASLEY_, who, being duly sworn upon his/her oath according to law, did depose and state the following:

       "My name is _Robert H. Beasley_. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

       I am employed by and a custodian of records of RBM Engineering, Inc. Attached hereto are records from RBM Engineering, Inc., marked as Exhibit Nos. 5, 6, 7. These records are kept by RBM Engineering, Inc. in the regular course of business, and it was the regular course of business of RBM Engineering, Inc. for an employee or representative of RBM Engineering, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

                                Witness

SWORN TO AND SUBSCRIBED this _10th_ day of _MAY_ 2004.

REBECCA QUINTANA
NOTARY PUBLIC
In and State of Texas
My commission expires
09-18-2006

Notary Public in and for the State of Texas

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| ROYAL SURPLUS LINES | ' |
| INSURANCE COMPANY | ' |
| | ' |
| **vs.** | ' |
| | ' |
| BROWNSVILLE INDEPENDENT | ' |
| SCHOOL DISTRICT. | ' |

**CIVIL ACTION NO. B-03-109**

## AFFIDAVIT

STATE OF ARKANSAS          '

COUNTY OF PULASKI          '

BEFORE ME, the undersigned authority, on this day, personally appeared **TREY CHANDLER**, who, being duly sworn upon his/her oath according to law, did depose and state the following:

"My name is Trey Chandler. I reside in the State of Arkansas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Center for Toxicology & Environmental Health, L.L.C. ("CTEH"). Attached hereto are records from CTEH, marked as Exhibit No. 32. These records are kept by CTEH in the regular course of business, and it was the regular course of business of CTEH for an employee or representative of CTEH with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_____
Trey Chandler

SWORN AND SUBSCRIBED this 13th day of May 2004.

_____
Notary Public in and for the State of Arkansas

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROYAL SURPLUS LINES | § | |
| INSURANCE COMPANY | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-109 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT. | § | |

### AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF _Dallas_ | § |

BEFORE ME, the undersigned authority, on this day, personally appeared _Mike Hubbard_, who, being duly sworn upon his/her oath according to law, did depose and state the following:

"My name is _Mike Hubbard_. I reside in the State of Texas. I am over the age of twenty-one (21) years and am competent to make this affidavit. I have never been convicted of a felony or any other crime involving moral turpitude. I have personal knowledge of the facts set forth in this affidavit, and those facts are true and correct.

I am employed by and a custodian of records of Assured Indoor Air Quality ("AIAQ"). Attached hereto are records from AIAQ, marked as Exhibit Nos. 24A, 27, 28. These records are kept by AIAQ in the regular course of business, and it was the regular course of business of AIAQ for an employee or representative of AIAQ with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. This record was made at the time of the act, event, condition, opinion, or diagnosis, near that time, or reasonably soon thereafter. The records attached hereto are true and correct copies of the original."

FURTHER AFFIANT SAYETH NOT.

_Mike Hubbard_
Witness

SWORN TO AND SUBSCRIBED this _11_ day of _May_ 2004.

KYLIE HAYES
Notary Public
State of Texas
Comm. Expires 6-21-2004

_Kyli Hayes_
Notary Public in and for the State of Texas

## COMMON POLICY DECLARATIONS

**Royal Insurance**

### THIS POLICY IS ISSUED BY THE COMPANY NAMED BELOW

COMPANY NAME: Royal Surplus Lines Insurance Company

BRANCH ADDRESS: 945 East Paces Ferry Road, Suite 1890, Atlanta, GA 30326

**POLICY NO.** KHT307564    **RENEWAL OF** New

**NAMED INSURED AND MAILING ADDRESS:**
Brownsville Independent School District
1900 Price Road
Brownsville, TX 78521

**PRODUCER:**    ☐ DIRECT BILL
Royal Specialty Underwriting, Inc.
945 East Paces Ferry Road
Suite 1890
Atlanta, GA 30326

**POLICY PEROD: From** 09/01/96 **to** 09/01/97 12:01 A.M. Standard Time at your Mailing Address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM. AND SUBJECT TO ALL THE TERMS OF THIS POLICY. WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| COVERAGE PARTS | | PREMIUM | COMM. |
|---|---|---|---|
| ☒ Commercial Property | PC86839 (0187) | $ 366,091. | 15% |
| ☐ Commercial General Liability | | $ | |
| ☐ Commercial Crime | | $ | |
| ☒ Commercial Inland Marine | MC86841 (0187) | $ Included | |
| ☐ Boiler and Machinery | | $ | |
| ☐ Commercial Auto | | $ | |
| ☐ Commercial Farm | | $ | |
| ☐ | | $ | |

| | |
|---|---|
| ☐ Premium is payable in installments: See endorsement. | **TOTAL POLICY ▶ PREMIUM** $ 366,091. |

**FORMS APPLICABLE TO ALL COVERAGE PARTS:** (Show numbers)

End. #1, End. #2, End. #3, IL0017 (1185)

**BUSINESS DESCRIPTION:**

School District

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS. COVERAGE PART DECLARATIONS. COVERAGE FORM(S) AND ENDORSEMENTS. IF ANY. ISSUED TO FORM A PART THEREOF. COMPLETE THE CONTRACT OF INSURANCE.

Countersigned: 10/21/96    By: _James A. Dixon_
Date    Authorized Representative

WHITE COPY - Original
PINK COPY - Memorandum of Insurance
GOLD COPY - Company Copy
BLUE COPY - Producer's Copy
CANARY COPY - Copy

LI86831 (1188)

Includes copyrighted material of Insurance Services Office. Inc with its permission
Copyright. Insurance Services, Inc., 1984.

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal**
**Insurance**

In consideration of a return premium of $156,473., it is hereby agreed
this policy is cancelled and rewritten effective 4/1/97.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____**KHT307564**_____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences.
Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy
became effective.

Effective Date: ____**4/01/97**____    Endorsement No. ___**006**___    **Page:1 of 1**

Countersigned By:

_James A. Dirk_
Authorized Representative

____**4/07/97**____
Date



This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of the premium charged, it is agreed that the
Protective Safeguards form - IL0415(1091) is amended as follows:

Premises Number and Building Number are to read " Protective devices
where installed and operational"

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT307564** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____ 9/01/96 _____     Endorsement No. _ 005 _     Page:1 of 1

Countersigned By:

Authorized Representative          1/02/97
                                      Date



This Endorsement Changes The Policy. Please Read It Carefully.

**Royal**
**Insurance**

In consideration of an additional premium of $7,352., it is agreed the following location and values are added to this policy:

Bruce Aiken Elementary School (Addition)
6290 Southmost Road
Brownville, TX

Building & Contents - $6,393,353.

Our limit of liability is amended to read $304,462,759 as respects Blanket Real & Personal Property.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT307564** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT** _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____ **9/01/96** _____    Endorsement No. **004**    **Page:1 of 1**

Countersigned By:

_____
Authorized Representative

**12/13/96**
Date

 

*This Endorsement Changes The Policy. Please Read It Carefully.*

**Royal
Insurance**

## DEDUCTIBLE ENDORSEMENT

It is hereby agreed that the following deductibles shall apply:

1.    $    50,000    per occurrence, except;

2.    $2,144,000    per building and its contents combined as respects the peril of Windstorm or Hail

3.    $    5,000    per occurrence as respects Contractors Equipment, Radio Equipment, Musical Instruments and EDP; except for the peril of Windstorm or Hail, as referenced in item #2 above.

ENDORSEMENT NUMBER: _____3_____



*This Endorsement Changes The Policy. Please Read It Carefully.*

**Royal Insurance**

## MINIMUM EARNED PREMIUM CLAUSE — PERCENTAGE

In the event of cancellation of this policy by the Insured, a minimum premium of __25__ % of the original policy premium shall become earned; any conditions of the policy to the contrary notwithstanding.

Failure of the Insured to make timely payment of premium shall be considered a request by the Insured for the Company to cancel. In the event of such cancellation by the Company for non-payment of premium, the minimum premium shall be due and payable; provided, however, such non-payment cancellation shall be rescinded if the Insured remits the full premium due within 10 days of receiving it.

In the event of any other cancellation by the Company, the earned premium shall be computed pro rata, not subject to the minimum premium.

ENDORSEMENT NUMBER: _____ 2 _____

 

*This Endorsement Changes The Policy. Please Read it Carefully.*

**Royal Insurance**

## SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal. The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

ENDORSEMENT NUMBER: _____1_____



GU 267
(11-85)

IL 00 17 11 85

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premiun refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.



Copyright, Insurance Services Office, Inc., 1982, 1983

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

 **Royal Insurance**

1. **POLICY NO.** KRT307564      **EFFECTIVE DATE** 09/01/96

2. **NAMED INSURED** Brownsville Independent School District     **RENEWAL OF** New

3. **DESCRIPTION OF PREMISES**     ☐ "X" If supplemental declarations attached

| Prem. No. | Bldg. No. | Location, Construction and Occupancy |
|---|---|---|
| * | * | |

\* Various as per schedule on file with the Company

**COVERAGES PROVIDED** — Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No | Bldg. | Coverage | Limit of Insurance | Covered Cause of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|---|
| * | * | Blanket Real & Personal Property | $250,000,406 | Special | 100% | Included |
| * | * | Blanket Business Income | $ 100,000 | Special | 100% | Included |
| * | * | Blanket Extra Expense | $ 50,000 | Special | 100% | Included |

\* Various as per schedule on file with the Company

*IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

**OPTIONAL COVERAGES** — Applicable only when entries are made in the schedule below.

| Prem No | Bldg. No. | Agreed Value | | | Replacement Cost (X) | | |
|---|---|---|---|---|---|---|---|
| | | Expiration Date | Coverage | Amount | Building | Personal Property | Including "Stock" |
| * | * | | | | X | X | |

\* Various as per schedule on file with the Company

| Prem. No | Bldg. No | Inflation Guard (Percentage) | | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|---|
| | | Building | Personal Property | | | |

Not Applicable

*APPLIES TO BUSINESS INCOME ONLY

4. **MORTGAGE HOLDERS**

| Prem. No. | Bldg. No. | Mortgage Holder Name and Mailing Address |
|---|---|---|
| Nil | | |

5. **DEDUCTIBLE** ~~XXXXXXXXXXXEXCEPTIONS:XXXX~~ See Endorsement #3    **TOTAL PREMIUM FOR THIS ► COVERAGE PART**   $ Included

6. **FORMS / ENDORSEMENTS APPLICABLE**

| To All Coverages | | To Specific Premises / Coverages | | | |
|---|---|---|---|---|---|
| CP0010 (0695) | IL0415 (1091) | Prem. No. | Bldg. No | Coverages | Form Number |
| CP0030 (0695) | PC0005 (0289) | | | | |
| CP0090 (0788) | | Included | | | |
| CP0485 (0695) | | | | | |
| CP0425 (1090) | | | | | |
| CP1030 (0695) | | | | | |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

WHITE COPY – Original
PINK COPY – Memorandum Of Insurance
GOLD COPY – Company Copy
BLUE COPY – Producers Copy
CANARY COPY – Copy

PC 86839 (0187)

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1984.

# COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTARY DECLARATIONS

**Royal Insurance**

1. POLICY NO. **KHT307564**

2. NAMED INSURED **Brownsville Independent School District**    EFFECTIVE DATE **09/01/96**

3. DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | | Location, Construction and Occupancy |
|-----------|-----------|---|---|
| ** | ** | | ** |

**** Refer to PC86839 (0187)**

---

**COVERAGES PROVIDED** — Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. | Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|-----------|-----------|----------|--------------------|------------------------|--------------|-------|
| * | * | Blanket Musical Instruments | $ 2,024,032 | Special | 100% | Included |

***** Various as per schedule on file with the Company**

*** IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT**

**OPTIONAL COVERAGES** — Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Agreed Value Expiration Date | Coverage | Amount | Replacement Cost (X) Building | Personal Property | Including "Stock" |
|-----------|-----------|------------------------------|----------|--------|-------------------------------|-------------------|-------------------|
| * | * | | | | X | X | |

***** Various as per schedule on file with the Company**

| Prem. No. | Bldg. No. | Inflation Guard (Percentage) Building | Personal Property | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|-----------|-----------|---------------------------------------|-------------------|-----------------------------------------|-----------------------------------|---------------------------------------|
| | | | | | | |

**Not Applicable**

*** APPLIES TO BUSINESS INCOME ONLY**

4. MORTGAGE HOLDERS

| Prem. No. | Bldg. No. | Mortgage Holder Name and Mailing Address |
|-----------|-----------|------------------------------------------|
| | | |

**Nil**

5. FORMS / ENDORSEMENTS APPLICABLE TO SPECIFIC PREMISES / COVERAGES

| Prem No | Bldg No | Coverages | Form Number | Prem No | Bldg No | Coverages | Form Number |
|---------|---------|-----------|-------------|---------|---------|-----------|-------------|
| | | | | | | | |

**** Refer to PC86839 (0187)**

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission
Copyright, ISO Commercial Risk Services, Inc., 1984

WHITE COPY – Original GOLD COPY – Company Copy
BLUE COPY – Producer's Copy CANARY COPY – Copy
PINK COPY – Memorandum Of Insurance



CP 00 10 06 95

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

*Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H—DEFINITIONS.*

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

   **(a)** Machinery and

   **(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

   **(a)** Fire extinguishing equipment;

   **(b)** Outdoor furniture;

   **(c)** Floor coverings; and

   **(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

   **(a)** Additions under construction, alterations and repairs to the building or structure;

   **(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property—Separation of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

   **(a)** Made a part of the building or structure you occupy but do not own; and

   **(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### 2. Property Not Covered

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;



**1**

CF 160
(6-95)

premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(3) Insurance under this Extension for each newly acquired or constructed proper-

ty will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire or begin to construct the property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records — Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2,500 at each described premises, unless a higher limit is shown in the Declarations.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock," that is temporarily at a location you do not own, lease, or operate. This Extension does not apply to Covered Property:

(1) In or on a vehicle;

(2) In the care, custody or control of your salespersons; or

(3) At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than

3

an umpire. If they do not agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3)**.

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $100,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

Step (1): $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $ 40,000 x .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $200,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

the minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

When:

The value of the property is:

| | |
|---|---|
| Bldg. at Location No. 1 | $ 75,000 |
| Bldg. at Location No. 2 | $100,000 |
| Personal Property at Location No. 2 | $ 75,000 |
| | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| The Deductible is | $1,000 |

The amount of loss is:

| | |
|---|---|
| Bldg. at Location No. 2 | $30,000 |
| Personal Property at Location No. 2 | $20,000 |
| | $50,000 |

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $50,000 x .80 = $40,000

Step (4): $40,000 − $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

### 2. Mortgageholders

**a.** The term "mortgageholder" includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

7

**(4)** Works of antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(5)** "Stock", unless the including "Stock" option is shown in the Declarations.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

## H. DEFINITIONS

**1.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**2.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

9

CP 00 30 06 95

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION G—DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**(i)** Business Income including "Rental Value."

**(ii)** Business Income other than "Rental Value."

**(iii)** "Rental Value."

If option **(i)** above is selected, the term Business Income will include "Rental Value." If option **(iii)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

**1.** All routes within the building to gain access to the described premises; and

**2.** Your personal property in the open (or in a vehicle) within 100 feet.

**1. Business Income**

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

**2. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**3. Additional Coverages**

**a. Extra Expense.**

Extra Expense means necessary expenses

you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

**(1)** We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

**(a)** At the described premises; or

**(b)** At replacement premises or at temporary locations, including:

**(i)** Relocation expenses; and

**(ii)** Costs to equip and operate the replacement or temporary locations.

**(2)** We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations."

**(3)** We will pay any Extra Expense to:

**(a)** Repair or replace any property; or

**(b)** Research, replace or restore the lost information on damaged valuable papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form

**b. Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

**(1)** 3 consecutive weeks after the time of that action; or



1

Copyright, ISO Commercial Risk Services, Inc., 1994

CF 169
(6-95)

to this Extension.

## B. EXCLUSIONS AND LIMITATIONS

See applicable Causes of Loss Form as shown in the Declarations.

## C. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

## D. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

**a.** You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Prop-

erty, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 3. Limitation—Electronic Media And Records

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

**a.** 60 consecutive days from the date of direct physical loss or damage; or

**b.** The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electron-

**(2)** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2. Divide the Limit of Insurance for the described premises by the figure determined in step **1**; and

3. Multiply the total amount of loss by the figure determined in step **2**.

We will pay the amount determined in step **3**. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**a.** Prepaid freight—outgoing;

**b.** Returns and allowances;

**c.** Discounts;

**d.** Bad debts;

**e.** Collection expenses;

**f.** Cost of raw stock and factory supplies consumed (including transportation charges);

**g.** Cost of merchandise sold (including transportation charges);

**h.** Cost of other supplies consumed (including transportation charges);

**i.** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**j.** Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);

**k.** All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 10 is attached); and

**l.** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion—not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would

| | |
|---|---:|
| have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $150,000 |
| The amount of loss is | $ 80,000 |

Step 1: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000 ÷ $200,000 = .75

Step 3: $ 80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would

| | |
|---|---:|
| have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $200,000 |
| The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to the Extra Expense Additional Coverage.

**F. OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

    **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    **b.** The most we will pay for loss of Business Income is the lesser of:

    **(1)** The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

    **(2)** The Limit of Insurance shown in the Declarations.

2. **Monthly Limit Of Indemnity**

    **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    **b.** The most we will pay for loss of Business Income in each period of 30 consecutive days

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

    **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

    **(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

    **(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

    **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means the:

    **a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

    **b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

    **c.** Fair rental value of any portion of the described premises which is occupied by you.

7

 

CF 189
(7-88)

CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.
2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.
2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:
   a. Someone insured by this insurance;
   b. A business firm:
      (1) Owned or controlled by you; or
      (2) That owns or controls you; or
   c. Your tenant.

This will not restrict your insurance.



Copyright, ISO Commercial Risk Services, Inc., 1983, 1987



## 5. Covered Extensions

### a. Debris Removal

1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:

   a) The date of direct physical "loss"; or

   b) The end of the policy term.

2) The most we will pay under this extension is 25% of:

   a) The amount we pay for the direct "loss"; plus

   b) The deductible in this policy applicable to that "loss".

   But the amount we pay for direct "loss" and debris removal expenses combined will not be more than the Limit of Insurance applying to the property at the premises listed in the Declarations where the "loss" occurs.

3) This Coverage Extension does not apply to costs to:

   a) Extract "pollutants" from land or water; or

   b) Remove, restore or replace polluted land or water.

   "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

### b. Tuning of Towers

We will pay your expense to tune or retune towers that are damaged caused by or resulting from a Covered Cause of Loss.

## 6. Covered Options

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown in the Declarations.

### a. Extra Expense

When a Limit of Insurance for Extra Expense is shown in the Declarations, we will pay the actual and necessary extra expense you incur in order to continue your normal operations which are interrupted due to direct physical "loss" to your broadcasting equipment, towers, studios and offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered Cause of Loss. Extra Expense means necessary expenses you incur during the period of restoration that you would not have incurred if there had been no direct physical "loss" to the property. We will also cover Extra Expense you incur:

1) If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

2) If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.



MC0033 0587



**b.** Mudslide or mudflow;

**c.** Water that backs up from any sewer or drain; or

**d.** Water that seeps, leaks or flows from below the surface of the ground; or

**e.** Any release of water impounded by a dam; but we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

This exclusion does not apply to property in transit.

**9.** The enforcement of any ordinance or law:

    **a.** Regulating the construction, use or repair of any property; or

    **b.** Requiring the tearing down of any property, including the cost of removing its debris.

**10.** GOVERNMENTAL ACTION

Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**11.** NUCLEAR HAZARD

    **1.** Any weapon employing atomic fission or fusion; or

    **2.** Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**12.** WAR AND MILITARY ACTION

    **1.** War, including undeclared or civil war;

    **2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, soveriegn or other authority using military personnel or other agents; or

    **3.** intact, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

    **1.** **Coverage Territory**

We cover property wherever located within the United States.




**2. Valuation**

General Condition I. Valuation of the policy is replaced by the following:

**a.** The value of property will be determined by the valuation method shown in the Declarations.

**1. Actual Cash Value**

**a)** The actual cash value of the property at the time of "loss";

**b)** The cost of restoring the property to its condition immediately before the "loss"; or

**c)** The cost of replacing the property with material of the same kind and quality.

**2. Replacement Cost**

The actual cash replacement cost of the property at the time of "loss". But we will not pay more than the cost of repairing or replacing the property with material of the same kind and quality.

**3. Additional Acquired Property**

If during the policy period you acquire additional property of a type already covered by this form, we will cover such property for up to 60 days. The most we will pay in a "loss" is the lesser of:

**a.** 25% of the total Limit of Insurance shown in the Declarations for that type of property; or

**b.** $100,000

You will report such property within 60 days from the date acquired and will pay any additional premium due. If you do not report such property, coverage will cease automatically 60 days after the date the property is acquired.

**4. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any loss that the limit of insurance on a scheduled item bears to eighty percent (80%) of its actual cash value at the time of loss.

When the Unscheduled Equipment is covered by this form the penalty is that we will pay only the proportion of any loss that the Limit of Insurance bears to 80% of the actual cash value of all such property at the time of loss.

**F. DEFINITIONS**

"Loss" means accidental loss or damage.

   MC0033 0587

1. Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

2. Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

**I. RECOVERIES**

Any recovery or salvage on a "loss" will accrue entirely to our benefit until the sum paid by us has been made up.

**J. REINSTATEMENT OF LIMIT AFTER LOSS**

The Limit of Insurance will not be reduced by the payment of any claim, except for total "loss" of a scheduled item, in which event we will refund the unearned premium on that item.

**K. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after "loss" to impair them.

**GENERAL CONDITIONS**

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

**B. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and
2. The action is brought within 2 years after you first have knowledge of the "loss."

**C. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

**D. POLICY PERIOD**

We cover "loss" commencing during the policy period shown in the Declarations.

**E. VALUATION**

The value of property will be the least of the following amounts:

1. The actual cash value of that property;
2. The cost of reasonably restoring that property to its condition immediately before "loss"; or
3. The cost of replacing that property with substantially identical property.

In the event of "loss," the value of property will be determined as of the time of "loss."








However:

**(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

**(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The COINSURANCE Additional Condition does not apply to Increased Cost of Construction Coverage.

**b.** If the covered Building property is damaged or destroyed by a Covered Cause of Loss and Coverage C applies to that property in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same condition stated in **3.a.**:

**(1)** The cost of excavations, grading, backfilling and filling;

**(2)** Foundation of the building;

**(3)** Pilings, and

**(4)** Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this provision, **3.b.**

**D. Loss Payment**

**1.** When Coverage A applies, loss to the building, including loss in value of the undamaged portion of the building due to enforcement of an ordinance or law, will be determined as follows:

**a.** If the Replacement Cost Coverage Option applies and the property **is** repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

**(1)** The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the **same** premises and to the same height, floor area, style and comparable quality of the original property insured; or

**(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

**b.** If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

**(1)** The actual cash value of the building at the time of loss; or

**(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

**2.** Unless paragraph **D.4.** applies, loss payment under Coverage B—Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

**a.** The amount you actually spend to demolish and clear the site of the described premises; or

**b.** The applicable Limit of Insurance shown for Coverage B in the Schedule above.

**3.** Unless paragraph **D.4.** applies, loss payment under Coverage C—Increased Cost of Construction Coverage will be determined as follows:

**a.** We will not pay under Coverage C:

**(1)** Until the property is actually repaired or replaced, at the same or another premises; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**b.** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage C is the lesser of:

**(1)** The increased cost of construction at the same premises; or

**(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

**c.** If the ordinance or law requires relocation to another premises, the most we will pay under Coverage C is the lesser of:

**(1)** The increased cost of construction at the new premises; or

**(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

**4.** If a **Blanket** Limit of Insurance is shown for Coverages B and C in the Schedule above, paragraph **D.2.** and **D.3.** of this endorsement do not apply with respect to the Building property that is subject to the Blanket Limit, and the following loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Blanket Limit of Insurance shown for Coverages B and C in the Schedule above. Subject to this Blanket Limit of Insurance, the following loss payment provisions apply:

**a.** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

rounds covering the entire building, when the premises are not in actual operation.

**"P-4"** **Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

2. The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS—BASIC FORM
CAUSES OF LOSS—BROAD FORM
CAUSES OF LOSS—SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
FARM PROPERTY COVERAGE FORM

MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**a.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**b.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

 

3.  Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you. or operated under your control.

4.  Breakage of glass forming part of the refrigeration machine.

B.  We will not pay for loss or damage caused directly or indirectly by any of the following causes of loss. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

1.  Earth movement, including but not limited to earthquake, landslide, mudflow, or earth shrinking, rising or shifting;

2.  Flood. surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not:

3.  Water that backs up from a sewer or drain;

4.  Water under the ground surface pressing on, or flowing or seeping through:

    (a)  Foundations, walls, floors or paved surfaces;

    (b)  Basements, whether paved or not; or,

    (c)  Doors, windows or other openings.

5.  Riot, riot attending a strike, civil commotion, vandalism or malicious mischief wherever occurring.

C.  We will not pay anything under this endorsement when a loss to covered property is also covered under any other form or provision of this policy.

III.    **Definitions**

"Mechanical breakdown" means a sudden and accidental breakdown of the refrigeration machine or part of the machine. At the time the breakdown occurs, it must manifest itself by physical damage to the machine that necessitates repair or replacement.

None of the following is a "mechanical breakdown":

a.  Depletion, deterioration, corrosion or erosion:

b.  Wear and tear:

c.  Leakage at any valve, fitting, shaft seal, gland packing joint or connection;

d.  Breakdown of any vacuum tube, gas tube or brush;

e.  Breakdown of any electronic computer or electronic data processing equipment;

f.  Breakdown of any structure or foundation supporting the machine or any of its parts;

g.  The functioning of any safety or protective device.

"Perishable stock" means personal property:

a.  maintained under control conditions for its preservation; and

b.  susceptible to loss or damage if the controlled conditions change.

IV. **Additional Conditions**

1.  Salvage

    You must take all necessary precautions to preserve the salvage and reduce the loss:

2.  Refrigeration Maintenance Agreement

    If a refrigeration maintenance agreement is shown as applicable in the Schedule, the following condition applies:

    You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us, the insurance provided by this endorsement will be automatically suspended at the involved locations.

3.  Selling Price

    If a Selling Price Clause is applicable to this Coverage Part, the word "stock" in such clause is revised to read "stock" or "perishable stock."





 




**b.** The property is Covered Property under this Coverage Form.

**4.** Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**5.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**E. ADDITIONAL COVERAGE EXTENSIONS**

**1. Property In Transit.** This Extension applies only to your personal property to which this form applies.

   **a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   **b.** Loss or damage must be caused by or result from one of the following causes of loss:

     **(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

     **(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

     **(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   **c.** The most we will pay for loss or damage under this Extension is $1000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder Or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

**F. DEFINITIONS**

"Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**1.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   **a.** The cost of filling sinkholes; or

   **b.** Sinking or collapse of land into man-made underground cavities.

**2.** Falling objects does not include loss or damage to:

   **a.** Personal property in the open; or

   **b.** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**3.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

 

**(a)** Paragraph **B.1.a.**, Ordinance or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War and Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

## C. LIMITATIONS

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income coverage or Extra Expense coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

**g.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**2.** We will not pay more than $500 in any one occurrence for loss of or damage to glass that is part of a building or structure, regardless of the number of panes, plates or similar units of glass. Subject to this $500 aggregate, we will not pay more than $100 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

However, this limitation does not apply to.

**a.** Loss or damage by the "specified causes of loss," except vandalism; or

**b.** Business Income coverage or Extra Expense coverage.

**3.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

4

against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g. (1)** through **g. (4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** S⸱ ⸱e, vapor or gas from agricultural sr ⸱ ⸱ging or industrial operations.

**d. (1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay

for the loss or damage caused by that elevator collision;

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryn⸱ of atmosphere;

**(b)** Changes in or extre⸱ of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for **the** loss or damage caused by that **"specified cause** of loss" or building glass **breakage.**

**e.** Explosion of steam **boilers**, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted

2











We will pay for a "loss" on a replacement cost basis until the designated replacement property is actually purchased. When you buy the replacement property we will pay you the difference between the replacement cost and the increased value, if any.

In the event of "loss", the value of property will be determined as of the date of "loss."

**b. "Electronic Media"**

The value will be the actual cost of reproducing the data and the cost of the media.

When the data is not reproduced, we will not pay more than the cost of blank discs, films, tapes, or similar electronic data processing media, of the same kind and quality.

When the data and media is individually listed or described on the Declarations, its value will be the applicable Limit of Insurance shown on the Declarations for that item.

**3. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for all Covered Property at all locations bears to 80% of the total value of all property at all locations as of the time of "loss."

**F. DEFINITIONS**

1. "Loss" means accidental loss or damage.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Electronic Media" means all forms of data including computer instructions and programs which are converted to a form usable in your "operations." This also includes the materials on which the data is recorded.

4. "Extra Expense" means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical "loss" to the property.

5. "Operations" means your business activities occurring at the described premises.

6. "Period of restoration" means the period of time that:

   a. Begins with the date of direct physical "loss" caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

   "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   a. Regulates the construction, use or repair, or requires the tearing down of any property; or

   b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

   The expiration date of this policy will not cut short the "period of restoration."

7. "Computer virus" means any self-replicating program which contaminates or destroys programs, data or operating systems.

80037A



   b. **Nuclear Hazard**

     (1) Any weapon employing atomic fission or fusion; or

     (2) Nuclear reaction or radiation or radioactive contamination from any other cause.

    But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

   c. **War and Military Action**

     (1) War, including undeclared or civil war;

     (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

     (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   d. **Earthquake**

     (1) Earth movement such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But we will pay for "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

     (2) Volcanic eruption, explosion or effusion. But we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

   e. **Flood**

     (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

     (2) Mudslide or mudflow;

     (3) Water that backs up from any sewer or drain;

     (4) Water that seeps, leaks or flows from below the surface of the ground; or

     (5) Any release of water impounded by a dam.

    But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

    This Exclusion does not apply to property in transit.

3. **Special Exclusions**

The following provisions apply only to the "Extra Expense" or Loss of Income Coverage Options and are in addition to the Exclusions shown above. We will not pay for "loss" caused by or resulting from:

   a. "Loss" to property loaned, leased or rented to others while away from the premises listed on the Declarations.

   b. Loss of income, but this Exclusion only applies to the "Extra Expense" Coverage Option.

   c. Error or omission in machine programming or incorrect instructions to a machine.

   d. Suspension, lapse or cancellation of any lease, license, contract or order.

   e. Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume "operations."

You must make every reasonable effort to resume your "operations" as quickly as possible.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

89037A

 

**e. Debris Removal**

   (1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:
   
   (a) The date of direct physical "loss;" or
   
   (b) The end of the policy period.
   
   (2) The most we will pay under this Coverage Extension is:
   
   (a) 25% of the amount we pay for the direct "loss;" plus
   
   (b) The Deductible in this policy applicable to that "loss."
   
   (3) This Coverage Extension does not apply to costs to:
   
   (a) Extract "pollutants" from land, air, water or Covered Property; or
   
   (b) Remove, restore or replace polluted land, air, water or Covered Property.

**f.** We cover expenses you incur resulting from a "computer virus", even if no direct damage or "loss" has occurred. We will pay your expense to:

   (1) Extract a "computer virus" from your equipment; plus
   
   (2) Restore your equipment, data and media.
   
   The most we will pay under this Coverage Extension is $5,000 in any one occurrence.

**7. Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

**a. "Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "Extra Expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover "Extra Expense" you incur:

   (1) If the premises where the property is located is damaged and you are prevented from using the Covered Property.
   
   (2) If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a reduction or suspension of your "operations."
   
   (3) If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b. Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

   (1) If the premises where the property is located is damaged and you are prevented from using the Covered Property.

 **Royal Insurance**    

# INFORMATION SYSTEMS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss..

### 1. Covered Property

We cover:

**a.** Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

**b.** "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

### 2. Where Coverage Applies

We cover:

**a.** At the locations listed on the Declarations.
**b.** Temporarily at other locations.
**c.** In transit.

### 3. Property Not Covered

We do not cover:

**a.** Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents. But we do cover such property when it is converted to data form and then only in that form.

**b.** Data or media which cannot be replaced with others of the same kind and quality. But we do cover such property when it is specifically described and a separate Limit of Insurance is shown on the Declarations.

**c.** Property loaned, leased or rented to others while away from your premises listed on the Declarations.

**d.** Contraband, or property in the course of illegal transportation or trade.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

### 5. Additional Coverages

**a. Fire Suppression System Discharge Protection**

We will pay expense you incur to recharge an automatic fire suppression system due to accidental discharge. The most we will pay in any one occurrence is $25,000. We will not pay for accidental discharge caused by system testing.

No Deductible applies to this Additional Coverage.

**b. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

---

MC 0010 0193                                                                                    Page 1 of 7

59037A

 

   **b.** Structural or mechanical breakdown.

   **c.** Electrical breakdown or failure.

**C. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

**D. DEDUCTIBLE**

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

**E. ADDITIONAL CONDITIONS**

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

   **1. Coverage Territory**

   We cover property wherever located within the United States and Canada.

   **2. Coinsurance**

   All Covered Property must be insured for at least 80% of its actual cash value as of the date of "loss" or you will incur a penalty.

   The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its actual cash value as of the date of "loss".

   If this policy insures two or more items, this condition shall apply to each item separately.

   When Unscheduled Equipment is covered by this Coverage Form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the actual cash value of all such property as of the date of "loss".

   **3. Partial Loss Waiver of Depreciation**

   The following is added to Commercial Inland Marine General Condition E. Valuation:

   No deduction for depreciation shall be taken on the adjustment of any partial "loss" that does not exceed 20% of the actual cash value of the scheduled item involved. If two or more items are involved in the same occurrence, this condition shall apply to each item separately.

**F. DEFINITIONS**

   **1.** "Loss" means accidental loss or damage.

   **2.** "Underground" means under the surface of the ground including but not limited to shafts, tunnels and mines.

   **3.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

 

period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

**g. Debris Removal**

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

(2) The most we will pay under this Additional Coverage is $25,000.

(3) This Additional Coverage does not apply to costs to:

    (a) Extract "pollutants" from land, air, water or Covered Property;

    (b) Remove, restore or replace polluted land, air, water or Covered Property; or

    (c) Remove expendable supplies.

**5. Coverage Extensions**

The Limit of Insurance for the following Coverage Extension is included within the Limits of Insurance applicable to the property listed on the Declarations.

**a. Newly Acquired Equipment**

If during the policy period you acquire additional equipment of a type already covered by this form, we will cover such equipment for up to 60 days after you acquire it or until the policy ends, whichever is sooner. We will cover such additional equipment for up to:

(1) 25% of the total Limit of Insurance shown on the Declarations; or

(2) $250,000, whichever is the lesser amount.

You agree to report the value of such equipment to us within the 60 day period and to pay an additional premium from the date you acquire it.

**6. Coverage Options**

**a. Unscheduled Equipment Leased or Rented From Others**

When a Limit of Insurance is shown on the Declarations we will cover unscheduled equipment in your care, custody or control and for which you are responsible which you have leased or rented from others. The Limit of Insurance shown for such equipment is the most we will pay for "loss" in any one occurrence.

Within 30 days after the end of each policy year you must report to us your total expenditures for such equipment during the past 12 months. We will compute the actual earned premium by applying the rate shown on the Declarations to the total expenditures. If it is more than the Deposit Premium you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference. But you must pay at least the minimum annual premium shown on the Declarations.

The Coinsurance Condition of the Coverage Form does not apply to this Coverage Option.

**b. Rental Expense Reimbursement**

When a Limit of Insurance is shown on the Declarations we will reimburse your rental expenses should a covered "loss" to equipment you own make it necessary to rent replacement equipment to continue your normal operations of the work in progress. We will reimburse these rental expenses

---

MC 0007 0294                                                       **Page 3 of 5**

 **Royal Insurance**  

# SCHEDULE CONTRACTORS EQUIPMENT
# COVERAGE FORM

Various Provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover:

**a.** Your contractors equipment, including spare parts and accessories, and similar property of others that is in your care, custody or control and for which you are responsible, for up to the Limit of Insurance specified on each item in the schedule of property shown on the Declarations.

**b.** Unscheduled equipment used in your business when a Limit of Insurance is shown on the Declarations.

### 2. Property Not Covered

We do not cover:

**a.** Automobiles, motor trucks, tractors, trailers or motorcycles designed and principally used to transport property or persons over public roads; aircraft or watercraft.

**b.** Property while "underground", underwater, airborne, or waterborne, except while in transit in the custody of a carrier for hire.

**c.** Property while leased, loaned or rented to others.

**d.** Contraband or property in the course of illegal transportation or trade.

### 3. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

### 4. Additional Coverages

**a. Expediting Expense**

We will pay the reasonable extra costs for:

(1) Temporary repairs of damaged Coverage Property; or
(2) Expediting permanent repairs or permanent replacement, whichever is less;

Of Covered Property damaged by a Covered Cause of Loss, including:

(1) Overtime wages; and
(2) The extra cost of express or other rapid means of transportation.

The most we will pay under this Additional Coverage is $10,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

Expediting expenses do not include the costs incurred for:

(1) Temporary rental of property; or
(2) Temporary replacement of damaged property.

---

MC 0007 0294                                                                                           Page 1 of 5

 

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the policy conditions:



### 1. COVERAGE TERRITORY

We cover property wherever located within or between the United States and Canada; but we do not cover property in transit to or from Alaska or Hawaii.

### 2. VALUATION

General Condition I. Valuation of the policy is replaced by the following:

The Covered Property will be valued in the event of "loss" at the amount shown on the invoice, if any; otherwise, the value of the property will be the least of the following amounts:

a.  The actual cash value of the property at destination;

b.  The cost of restoring the property to its condition immediately before the "loss;"

c.  The cost of replacing the property with substantially identical property.

The value of the property will include your prepaid freight charges; and any other shipping costs or charges that are due since the start of transit

### 3. REPORTS AND PREMIUM

a.  Reports. Within 30 days after the end of each reporting period shown in the Declarations, you will report to us the actual value of all shipments made during that period of time.

b.  Rates and Premium.

   (1)  Premium Computation. We will compute the premium:

      (a)  Using the rates shown in the Declarations, and
      (b)  As of each Premium Adjustment Period shown in the Declarations.

   (2)  Premium Adjustment.

      (a)  When the Annual Premium Adjustment Period is shown in the Declarations, we will compare the total computed premium to the Deposit Premium. If it is more than the Deposit Premium, you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference.

      (b)  When any other Premium Adjustment Period is shown in the Declarations, we will apply the computed premium to the Deposit Premium until it is used up. You will pay us all premiums that exceed the Deposit Premium.

   (3)  Minimum Premium.

      You must pay at least the minimum annual premium shown in the Declarations.

   (4)  If this coverage is cancelled:

      You will report the total value of all shipments up to and including the date of cancellation.

### 4. RECORDS

You will keep accurate records of all shipments covered by this Coverage Form and retain them for 3 years after the policy ends.

### 5. EXCESS INSURANCE

You agree not to obtain Excess Insurance over and above the Limits of Insurance as provided in this policy, except as may be specifically agreed to by us.

### 6. RELEASED BILLS OF LADING

You may accept bills of lading or shipping receipts issued by carriers that limit their liability to less than the actual value of the property.

 



**Royal Insurance** **TRANSPORTATION COMPREHENSIVE COVERAGE FORM**

Various provisions in this policy restrict coverage. Please read the entire policy carefully.
Throughout this policy and form, "you" and "your" refer to the Named Insured shown in the Declarations. "We", "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. COVERED PROPERTY

We cover:

Property described in the Declarations while in transit at your risk:

a. In the care of:

   (1) Railroads.

   (2) Public truckmen, land transfer or land transportation companies.

   (3) Air carriers on air express companies.

b. In or on vehicles owned or operated by you.

We cover from the time the property leaves the initial point of shipment and continuously thereafter in transit, including while on ferries or car transfers until delivered at destination.

### 2. PROPERTY NOT COVERED

We do not cover:

a. Accounts, bills, deeds, notes, securities, evidences of debt, letters of credit, tickets, stamps, valuable papers, works of art, money, currency, bullion, precious stones, watches, furs or jewelry.

b. Property shipped by mail.

c. Samples in the care, custody or control of any sales person.

d. Export shipments after loaded on board the export conveyance or after Ocean Marine insurance applies to the shipment whichever occurs first.

e. Import shipments while Ocean Marine insurance applies to the shipment.

f. Property you accept while acting as a common or contract carrier; or as a bailee for hire.

g. Property while located in or on your premises, or in any garage or building where your vehicles are usually garaged.

h. Contraband or property in the course of illegal transportation or trade.

### 3. COVERED CAUSES OF LOSS

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

### 4. COVERAGE EXTENSIONS

a. F.O.B. Shipments

We cover your contingent interest in property sold under Free on Board or Freight Allowed terms.

But we will pay for "loss" only if you cannot collect:

   (1) from the purchaser, or
   (2) from other insurance that would cover the "loss" if this insurance had not been issued.

b. Return Shipments

We cover the return of property you have shipped if the original shipment was covered by this Coverage Form. We also cover the property while held temporarily by the receiver or carrier while awaiting its return to you.

c. Debris Removal

   1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.
   2) The most we will pay under this Coverage Extension is $5,000. This amount is in addition to any other amount payable under this Coverage Form.

## 2. RECOVERIES

The following is added to Commercial Inland Marine Loss Condition **I.** Recoveries:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your "loss" will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

## 3.

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. Coverage Territory**

We cover property:

**(1)** Within your "premises"; and

**(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

**(a)** The United States of America;

**(b)** Puerto Rico; and

**(c)** Canada.

**b. Protection Of Records**

Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

## F. DEFINITIONS

**1.** "Loss" means accidental loss or damage.

**2.** "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities," converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

**3.** "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

**4.** "Money" means:

**a.** Currency, coins and bank notes whether or not in current use; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

**5.** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets, revenue and other stamps whether or not in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

but does not include "money."

3



CM 00 67 06 95

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F—DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. COVERED PROPERTY**, as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

**2. PROPERTY NOT COVERED**

Covered Property does not include:

**a.** Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

**b.** Property held as samples or for delivery after sale;

**c.** Property in storage away from the "premises" shown in the Declarations; or

**d.** Contraband, or property in the course of illegal transportation or trade.

**3. COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the Exclusions.

**4. ADDITIONAL COVERAGE—COLLAPSE**

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

**a.** Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

**5. COVERAGE EXTENSIONS**

**a. Removal**

If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of "loss," we will pay for "loss" while it is:

**(1)** At a safe place away from your "premises"; or

**(2)** Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

**b. Away From Your Premises**

We will pay up to $5,000 for "loss" to Covered Property while it is away from your "premises."

But if a higher Limit of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

## B. EXCLUSIONS

**1.** We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for "loss" caused by or resulting from acts of destruction ordered by gov-



**1**

Copyright, Insurance Services Office, Inc , 1994

CI 256
(6-95)

**a.** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of "loss," the following method will be used:

    **(1)** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the "loss" occurs; and

    **(2)** Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the "loss" occurred or for any demonstrated variance from the average for that month.

**b.** The following will be deducted from the total amount of accounts receivable, however, that amount is established:

    **(1)** The amount of the accounts for which there is no "loss";

    **(2)** The amount of the accounts that you are able to re-establish or collect;

    **(3)** An amount to allow for probable bad debts that you are normally unable to collect; and

    **(4)** All unearned interest and service charges.

**2. RECOVERIES**

The following is added to Commercial Inland Marine Loss Condition I. Recoveries:

You will pay us the amount of all recoveries you receive for a "loss" paid by us. But any recoveries in excess of the amount we have paid belong to you.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. COVERAGE TERRITORY**

We cover records of accounts receivable:

    **(1)** Within your "premises"; and

    **(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

        **(a)** The United States of America;

        **(b)** Puerto Rico; and

        **(c)** Canada.

**b. COINSURANCE**

All accounts receivable, except those in transit, must be insured for at least 80% of their total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for Coverage Applicable at All Locations bears to 80% of the total value of all accounts receivable at all locations as of the time of "loss." This penalty will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to re-establish your records of accounts receivable.

**c. PROTECTION OF RECORDS**

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

**E. DEFINITIONS**

**1.** "Loss" means accidental loss or damage.

**2.** "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

3



CM 00 66 06 95

# ACCOUNTS RECEIVABLE COVERAGE FORM

*Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.*

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E—DEFINITIONS.

## A. COVERAGE

1. We will pay:

   a. All amounts due from your customers that you are unable to collect;

   b. Interest charges on any loan required to off-set amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the "loss"; and

   d. Other reasonable expenses that you incur to re-establish your records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

2. **PROPERTY NOT COVERED**

   Coverage does not apply to:

   a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

   b. Contraband, or property in the course of illegal transportation or trade.

3. **COVERED CAUSES OF LOSS**

   Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to your records of accounts receivable except those causes of "loss" listed in the Exclusions.

4. **ADDITIONAL COVERAGE—COLLAPSE**

   We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

   a. Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

5. **COVERAGE EXTENSION**

   **Removal**

   If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of "loss," we will pay for "loss" while they are:

   a. At a safe place away from your "premises"; or

   b. Being taken to and returned from that place.

   This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

## B. EXCLUSIONS

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

   a. **GOVERNMENTAL ACTION**

      Seizure or destruction of property by order of governmental authority.

      But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   b. **NUCLEAR HAZARD**

      (1) Any weapon employing atomic fission or fusion; or



**1**

Copyright, Insurance Services Office, Inc., 1994

CI 255
(6-95)

# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**Royal Insurance**

**1. POLICY NO.** KHT307564      **EFFECTIVE DATE** 09/01/96

**2. NAMED INSURED** Brownsville Independent School District      **RENEWAL OF** New

**3. LOCATION**      **ADDRESS OF LOCATION**

    *                   *

    * Various as per schedule on file with the Company

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Accounts Receivable | $ 100,000 Blanket | $ See End. #3 | $ Included |

**MORTGAGE HOLDER / LOSS PAYEE**

Nil

**FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE**
CM0066 (0695)

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Valuable Papers & Records | $ 100,000 Blanket | $ See End. #3 | $ Included |

**MORTGAGE HOLDER / LOSS PAYEE**

Nil

**FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE**
CM0067 (0695)

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Transit | $ 100,000 Sublimit | $ See End. #3 | $ Included |

**MORTGAGE HOLDER / LOSS PAYEE**
Nil

**FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE**
MC0005 (1087)

**4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES:**     **TOTAL PREMIUM FOR THIS** ▶   **COVERAGE PART**

    CM0001 (0695), CM0112 (1090)      $   Included

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services, Inc., 1984.

MC 86841 (0187)

**COMMERCIAL INLAND M▁INE COVERAGE PART DECLAR▁ ▁ONS**

**♦ Royal Insurance**

| 1. **POLICY NO.** KHT307564 | | **EFFECTIVE DATE** 09/01/96 |
|---|---|---|

2. **NAMED INSURED** Brownsville Independent School District    **RENEWAL OF** New

| 3. **LOCATION** | **ADDRESS OF LOCATION** |
|---|---|
| * | * |

* Various as per schedule on file with the Company

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Contractors Equipment Actual Cash Value | $ 161,720 Blanket | $ See End. #3 | $ Included |
| **MORTGAGE HOLDER / LOSS PAYEE** | | | |
| Nil | | | |
| **FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE** | | | |
| MC0007 (0294) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| EDP Replacement Cost | $ 17,035,008 Blanket | $ See End. #3 | $ Included |
| **MORTGAGE HOLDER / LOSS PAYEE** | | | |
| Nil | | | |
| **FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE** | | | |
| MC0010 (0193) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Radio Equipment Replacement Cost | $ 699,981 Blanket | $ See End. #3 | $ Included |
| **MORTGAGE HOLDER / LOSS PAYEE** | | | |
| Nil | | | |
| **FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE** | | | |
| MC0033 (0587) | | | |

| 4. **FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES:** | **TOTAL PREMIUM FOR THIS ▶ COVERAGE PART** | |
|---|---|---|
| CM0001 (0695), CM0112 (1090) | | $ Included |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services, Inc., 1984.

MC 86841 (0187)

**THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND DELIVERED AS A SURPLUS LINES COVERAGE PURSUANT TO THE TEXAS INSURANCE STATUTES. THE STATE BOARD OF INSURANCE DOES NOT AUDIT THE FINANCES OR REVIEW THE SOLVENCY OF THE SURPLUS LINES INSURER PROVIDING THIS COVERAGE, AND THIS INSURER IS NOT A MEMBER OF THE PROPERTY AND CASU-ALTY INSURANCE GUARANTY ASSOCIATION CREATED UNDER ARTICLE 21.28-C, INSURANCE CODE. ARTICLE 1.14-2, INSURANCE CODE, REQUIRES PAYMENT OF 4.85 PERCENT TAX ON GROSS PREMIUM.**

88949 (0391)

SURPLUS LINES AGENT:   School District – Exempt

ADDRESS:

LICENSE #:

POLICY #:   KHT307564

# COMMON POLICY DECLARATIONS

 **Royal Insurance**

THIS POLICY IS ISSUED BY THE COMPANY NAMED BELOW

COMPANY NAME: Royal Surplus Lines Insurance Company

BRANCH ADDRESS: 945 East Paces Ferry Road, Suite 1800, Atlanta, GA 30326

POLICY NO. KHT308599

Rewrite 01

**RENEWAL OF** ~~XXXXXXXXX~~ KHT307564

**NAMED INSURED AND MAILING ADDRESS:**
Brownsville Independent School District
1900 Price Road
Brownsville, TX 78521

**PRODUCER:**              ☐ DIRECT BILL

Royal Specialty Underwriting, Inc.
945 East Paces Ferry Road, Suite 1890
Atlanta, Georgia 30326

POLICY PERIOD: From 04/01/97 to 04/01/98 12:01 A.M. Standard Time at your Mailing Address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | COVERAGE PARTS | PREMIUM | |
|---|---|---|---|
| ☒ Commercial Property | PC86839 (0187) | $ 219,195 | 15% |
| ☐ Commercial General Liability | | $ | |
| ☐ Commercial Crime | | $ | |
| ☒ Commercial Inland Marine | MC86841 (0187) | $ Included | |
| ☐ Boiler and Machinery | | $ | |
| ☐ Commercial Auto | | $ | |
| ☐ Commercial Farm | | $ | |
| ☐ | | $ | |

| ☐ Premium is payable in installments: See endorsement. | TOTAL POLICY ▶ PREMIUM | $219,195 | |
|---|---|---|---|

FORMS APPLICABLE TO ALL COVERAGE PARTS: (Show numbers)

IL0017 (1185), Endt. 1, 2, 3

BUSINESS DESCRIPTION:

School District

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Countersigned: 4/17/97 TX        By: _James A. Dixon_
                    Date                          Authorized Representative

WHITE COPY – Original
PINK COPY – Memorandum of Insurance
GOLD COPY – Company Copy
BLUE COPY – Producer's Copy
CANARY COPY – Copy

LJ86831 (1188)

Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services, Inc., 1984

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal Insurance**

In consideration of an additional premium of $2,708., it is hereby agreed the following location is added to the policy:

Eddie Lucio Middle School
300 North Vermillion Road
Brownsville, TX 78521
Building - $5,665,385
Contents - $ 815,319
Electronic Equipment - $293,388
Mobile Equipment - $3,335
Total Values - $6,777,427

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ KHT308599

Issued to BROWNSVILLE INDEPENDENT SCHOOL

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: ___8/28/97___    Endorsement No. __006__    Page:1 of 1

Countersigned By:

_James A. Dixon_
Authorized Representative

___10/14/97___
Date

 

**Royal Insurance**

## *This Endorsement Changes The Policy.  Please Read It Carefully.*

---

### FLOOD ENDORSEMENT

1.  It is agreed that this policy covers loss or damage to the insured property as a result of **Flood**.

2.  For the purpose of this insurance, **Flood** shall be defined as follows:

    A.  Surface water, waves or tidal water, and the rising (including the overflow or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams or similar bodies of water, whether driven by wind or not;

    B.  Mudslide or mudflow;

    C.  Water that backs up from any sewer or drain;

    D.  Any release of water impounded by a dam;

3.  Limits of Liability:

    The liability of the Company for loss or damage caused by **Flood** shall not exceed the sum of **$10,000,000\*** for loss or damage at any one insured location; however, the limit of liability shown above shall not exceed the sum of **$10,000,000\*** due to any one **Flood** occurrence for all locations combined, nor for all **Flood** losses occurring in any one year period or policy period, whichever is less, commencing **08/19/97.**

4.  Deductible:

    The sum of **$250,000 per building/$1,000,000 annual aggregate** shall be deducted from any adjusted claim due to **Flood**.

5.  Each loss by **Flood** shall constitute a single claim hereunder; provided, that if more than one **Flood** shall occur within any period of seventy-two (72) hours during the term of this endorsement, such **Flooding** shall be considered to constitute a single **Flood**, but the Company shall not be liable for any loss or damage:

    A.  Occurring before this policy becomes effective; or

    B.  Occurring after termination of this policy, except loss or damage arising out of an occurrence in progress when this policy is terminated.

6.  If the coverage of the policy to which this endorsement is attached includes both Property Damage and Business Interruption, the foregoing limits shall be the maximum amounts collectible under this policy for loss or damage resulting from the peril described in Paragraph 2 above, regardless of whether the loss involves Property Damage alone, or both Property Damage and Business Interruption.

    **\* Flood coverage applies to Properties located in Flood zone A and AH only, subject to values of $127,000,000.**

**ALL OTHER TERMS, CONDITIONS AND WARRANTIES REMAINING UNCHANGED.**

**ENDORSEMENT NUMBER 5**

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of an additional premium of $93,878., it is hereby agreed Endorsement #5 is attached and made part of the policy.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT308599** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL**

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: ____ **8/19/97** ____     Endorsement No. ___ **004**    **Page:1 of 1**

Countersigned By:

_James A. Dixon_
_____     ____ **10/14/97** ____
Authorized Representative                Date



# IMPORTANT NOTICE

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call USAA General Agency's toll-free telephone number for information or to make a complaint at

### 1-800-531-8333

You may also write to USAA General Agency at:

USAA Bldg. B-2-E
San Antonio, TX 78288

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

### 1-800-252-3439

You may write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de USAA General Agency para informacion o para someter una queja al

### 1-800-531-8333

Usted tambien puede escribir a USAA General Agency:

USAA Bldg. B-2-E
San Antonio, TX 78288

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

### 1-800-252-3439

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

**THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND DELIVERED AS A SURPLUS LINES COVERAGE PURSUANT TO THE TEXAS INSURANCE STATUTES. THE STATE BOARD OF INSURANCE DOES NOT AUDIT THE FINANCES OR REVIEW THE SOLVENCY OF THE SURPLUS LINES INSURER PROVIDING THIS COVERAGE, AND THIS INSURER IS NOT A MEMBER OF THE PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION CREATED UNDER ARTICLE 21.28-C, INSURANCE CODE. ARTICLE 1.14-2, INSURANCE CODE, REQUIRES PAYMENT OF 4.85 PERCENT TAX ON GROSS PREMIUM.**

88949 (0391)

SURPLUS LINES AGENT:     Penco

ADDRESS:                 26 Century Blvd

                         P.O. Box 305107, Nashville, TN

LICENSE #:               S900057

POLICY #:                KHT308599



GU 267
(11-85)

IL 00 17 11 85
# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premiun refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.



Copyright, Insurance Services Office, Inc., 1982, 1983


**Royal Insurance**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

---

## <u>SERVICE OF SUIT</u>

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.  The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

**Endorsement Number: <u>1</u>**



**Royal Insurance**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

---

## *MINIMUM EARNED PREMIUM CLAUSE - PERCENTAGE*

In the event of cancellation of this policy by the Insured, a minimum premium of **25%** of the original policy premium shall become earned; any conditions of the policy to the contrary notwithstanding.

Failure of the Insured to make timely payment of premium shall be considered a request by the Insured for the Company to cancel.  In the event of such cancellation by the Company for non-payment of premium, the minimum premium shall be due and payable; provided, however, such non-payment cancellation shall be rescinded if the Insured remits the full premium due within 10 days of receiving it.

In the event of any other cancellation by the Company, the earned premium shall be computed pro rata, not subject to the minimum premium.

**Endorsement Number:  2**

---

 

*This Endorsement Changes The Policy. Please Read It Carefully.*

**Royal Insurance**

# <u>Deductible Endorsement</u>

It is hereby agreed that the following deductibles shall apply:

1. $   50,000        per occurrence, except;

2. $2,144,000        per building and its contents combined as respects the peril of Windstorm or Hail

3. $    5,000         per occurrence as respects Contractors Equipment, Radio Equipment, Musical Instruments and EDP; except for the peril of Windstorm or Hail, as referenced in item #2 above.

ENDORSEMENT NUMBER: _____3_____

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

 **Royal Insurance**

1. **POLICY NO.** KHT308599      **EFFECTIVE DATE** 04/01/97
   Rewrite of
   ~~RENEWAL OF~~ KHT307564

2. **NAMED INSURED** Brownsville Independent School District

3. **DESCRIPTION OF PREMISES**    ☐ "X" If supplemental declarations attached

| Prem. No. | Bldg. No. | Location, Construction and Occupancy |
|---|---|---|
| * | * | * |

    * **Various as per Schedule on file with the Company**

**COVERAGES PROVIDED** — Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No | Bldg. No | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|---|
| * | * | Blanket Real & Personal Property | $304,462,849 | Special | 100% | Incl. |
| * | * | Blanket Business Income | $ 100,000 | Special | 100% | Incl. |

   * **Various as per Schedule on file with the Company**    *IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

**OPTIONAL COVERAGES** — Applicable only when entries are made in the schedule below.

| Prem. No | Bldg No | Agreed Value Expiration Date | Coverage | Amount | Replacement Cost (X) Building | Personal Property | Including "Stock" |
|---|---|---|---|---|---|---|---|
| * | * | | | | X | X | |

   * **Various as per Schedule on file with the Company**

| Prem No | Bldg. No. | Inflation Guard (Percentage) Building | Personal Property | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|---|

**Not Applicable**

     *APPLIES TO BUSINESS INCOME ONLY

4. **MORTGAGE HOLDERS**

| Prem. No | Bldg. No. | Mortgage Holder Name and Mailing Address |
|---|---|---|

**NIL**

5. **DEDUCTIBLE**

~~XXXXXXXXXXXXXXXXXX~~: See Endorsement #3    **TOTAL PREMIUM FOR THIS ▶ COVERAGE PART**    $ Included

6. **FORMS / ENDORSEMENTS APPLICABLE**

| To All Coverages | | To Specific Premises / Coverages | | | |
|---|---|---|---|---|---|
| CP0010 (0695) | CP0405 (0695) | Prem. No. | Bldg No. | Coverages | Form Number |
| CP0030 (0695) | CP0425 (1090) | | | | |
| CP0090 (0788) | CP1030 (0695) | | | **Included** | |
| CP0142 (1292) | IL0415 (1091) | | | | |
| CP0202 (0296) | | | | | |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

WHITE COPY – *Original*
PINK COPY – *Memorandum Of Insurance*
GOLD COPY – *Company Copy*
BLUE COPY – *Producer's Copy*
CANARY COPY – *Copy*

PC 86839 (0187)

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission
Copyright, ISO Commercial Risk Services, Inc., 1984

# COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL DECLARATIONS

**Royal Insurance**

1. POLICY NO. KHT308599

2. NAMED INSURED  Brownsville Independent School District     EFFECTIVE DATE 04/01/97

3. **DESCRIPTION OF PREMISES**

| Prem. No. ** | Bldg. No. ** | Location, Construction and Occupancy ** |
|---|---|---|
| | ** Refer to PC86839 (0187) | |

**COVERAGES PROVIDED** — Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. * | Bldg. No. * | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|---|
| * | * | Blanket Extra Expense | $   50,000 | Special | 100% | Incl. |
| * | * | Blanket Musical | $2,024,032 | Special | 100% | Incl. |

    * **Various as per Schedule on file with the Company**

\* IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

**OPTIONAL COVERAGES** — Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Agreed Value / Expiration Date | Coverage | Amount | Building | Personal Property | Including "Stock" |
|---|---|---|---|---|---|---|---|
| * | * | | | | X | X | |

    * **Various as per Schedule on file with the Company**

Replacement Cost (X)

| Prem. No. | Bldg. No. | Inflation Guard (Percentage) Building / Personal Property | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|
| | | | | | |

**Not Applicable**

\* APPLIES TO BUSINESS INCOME ONLY

4. **MORTGAGE HOLDERS**

| Prem. No. | Bldg. No. | Mortgage Holder Name and Mailing Address |
|---|---|---|
| | NIL | |

5. **FORMS / ENDORSEMENTS APPLICABLE TO SPECIFIC PREMISES / COVERAGES**

| Prem. No | Bldg No | Coverages | Form Number | Prem No | Bldg No | Coverages | Form Number |
|---|---|---|---|---|---|---|---|
| ** | Refer to PC86839 (0187) | | | | | | |

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission. Copyright, ISO Commercial Risk Services, Inc., 1984

WHITE COPY – Original  GOLD COPY – Company Copy
BLUE COPY – Producer's Copy  CANARY COPY – Copy
PINK COPY – Memorandum Of Insurance

PC 86840 (0187)




CP 00 10 06 95

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H—DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property—Separation of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### 2. Property Not Covered

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;



1

Copyright, ISO Commercial Risk Services, Inc., 1994

premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(3) Insurance under this Extension for each newly acquired or constructed proper-

ty will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire or begin to construct the property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records — Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2,500 at each described premises, unless a higher limit is shown in the Declarations.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock," that is temporarily at a location you do not own, lease, or operate. This Extension does not apply to Covered Property:

(1) In or on a vehicle;

(2) In the care, custody or control of your salespersons; or

(3) At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than

3

an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

   **a.** You must see that the following are done in the event of loss or damage to Covered Property:

     **(1)** Notify the police if a law may have been broken.

     **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

     **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

     **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

     **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

     **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

       Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

     **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

     **(8)** Cooperate with us in the investigation or settlement of the claim.

   **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

   **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

     **(1)** Pay the value of lost or damaged property;

     **(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

     **(3)** Take all or any part of the property at an agreed or appraised value; or

     **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

   **b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

   **c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

   **d.** We will not pay you more than your financial interest in the Covered Property.

   **e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

   **f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

   **g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

     **(1)** We have reached agreement with you on the amount of loss; or

     **(2)** An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt

**F. ADDITIONAL CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in step (2); and

(4) Subtract the deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $100,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

Step (1): $250,000 × 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $ 40,000 × .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

When:

| | |
|---|---|
| The value of the property is: | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $200,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

When:

The value of the property is:

| | |
|---|---|
| Bldg. at Location No. 1 | $ 75,000 |
| Bldg. at Location No. 2 | $100,000 |
| Personal Property at Location No. 2 | $ 75,000 |
| | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| The Deductible is | $1,000 |

The amount of loss is:

| | |
|---|---|
| Bldg. at Location No. 2 | $30,000 |
| Personal Property at Location No. 2 | $20,000 |
| | $50,000 |

Step (1): $250,000 × 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $50,000 × .80 = $40,000

Step (4): $40,000 − $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

2. **Mortgageholders**

a. The term "mortgageholder" includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

7

**(4)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(5)** "Stock", unless the including "Stock" option is shown in the Declarations.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property:

**(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

## H. DEFINITIONS

**1.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**2.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

9

CP 00 30 06 95

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION G—DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**(i)** Business Income including "Rental Value."

**(ii)** Business Income other than "Rental Value."

**(iii)** "Rental Value."

If option **(i)** above is selected, the term Business Income will include "Rental Value." If option **(iii)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

1. All routes within the building to gain access to the described premises; and

2. Your personal property in the open (or in a vehicle) within 100 feet.

1. **Business Income**

    Business Income means the:

    **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    **b.** Continuing normal operating expenses incurred, including payroll.

2. **Covered Causes Of Loss**

    See applicable Causes of Loss Form as shown in the Declarations.

3. **Additional Coverages**

    **a.** **Extra Expense.**

    Extra Expense means necessary expenses

you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

**(1)** We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

   **(a)** At the described premises; or

   **(b)** At replacement premises or at temporary locations, including:

   **(i)** Relocation expenses; and

   **(ii)** Costs to equip and operate the replacement or temporary locations.

**(2)** We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations."

**(3)** We will pay any Extra Expense to:

   **(a)** Repair or replace any property; or

   **(b)** Research, replace or restore the lost information on damaged valuable papers and records;

   to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**b.** **Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

**(1)** 3 consecutive weeks after the time of that action; or



1



to this Extension.

## B. EXCLUSIONS AND LIMITATIONS

See applicable Causes of Loss Form as shown in the Declarations.

## C. LIMITS OF INSURANCE

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

## D. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Prop-

erty, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Limitation—Electronic Media And Records**

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electron-

3

**(2)** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2. Divide the Limit of Insurance for the described premises by the figure determined in step **1**; and

3. Multiply the total amount of loss by the figure determined in step **2**.

We will pay the amount determined in step **3**. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**a.** Prepaid freight—outgoing;

**b.** Returns and allowances;

**c.** Discounts;

**d.** Bad debts;

**e.** Collection expenses;

**f.** Cost of raw stock and factory supplies consumed (including transportation charges);

**g.** Cost of merchandise sold (including transportation charges);

**h.** Cost of other supplies consumed (including transportation charges);

**i.** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**j.** Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);

**k.** All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 10 is attached); and

**l.** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion—not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would

| | |
|---|---:|
| have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $150,000 |
| The amount of loss is | $ 80,000 |

Step 1: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000 ÷ $200,000 = .75

Step 3: $ 80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would

| | |
|---|---:|
| have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $200,000 |
| The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to the Extra Expense Additional Coverage.

**F.  OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

    **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    **b.** The most we will pay for loss of Business Income is the lesser of:

    **(1)** The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

    **(2)** The Limit of Insurance shown in the Declarations.

2. **Monthly Limit Of Indemnity**

    **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    **b.** The most we will pay for loss of Business Income in each period of 30 consecutive days

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

    **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

    **(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means the:

    **a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

    **b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

    **c.** Fair rental value of any portion of the described premises which is occupied by you.

CF 189
(7-88)

CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America (including its territories and possessions);

   b. Puerto Rico; and

   c. Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.


AUTHENTIC

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

CF 475a
(12-92)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CP 01 42 12 92

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy CP 00 99, the term Coverage Part is replaced by the term Policy.

**B.** The provisions of items **B.1.** through **B.5.** below apply to the following coverage forms:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
CONDOMINIUM ASSOCIATION COVERAGE FORM;
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
BUILDERS RISK COVERAGE FORM;
TOBACCO SALES WAREHOUSES COVERAGE FORM; AND
STANDARD PROPERTY POLICY

**1.** Under Additional Coverages, the Debris Removal coverage is deleted and replaced by the following:

**Debris Removal**

We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

**2.** Under Additional Coverages, the Fire Department Service Charge coverage is deleted.

**3.** Under Additional Coverages, the Pollutant Clean Up and Removal coverage is deleted.

**4.** Under LIMITS OF INSURANCE, the third and fourth paragraphs (second and third paragraphs in the Tobacco Sales Warehouses Coverage Form) are deleted and replaced by the following:

The limits applicable to the Coverage Extensions are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**a.** Preservation of Property; or

**b.** Debris Removal; but if the sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance, we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**5.** Under DEFINITIONS, the definition of "pollutants" is deleted.

**C.** The ADDITIONAL COVERAGE—COLLAPSE in the CAUSES OF LOSS—BROAD FORM is deleted and replaced by the following:

**Additional Coverage—Collapse**

We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building.

We will not pay for loss or damage described below unless the loss or damage is a direct result of the collapse of a building:

**1.** Loss or damage to the following types of property, if otherwise covered in this Coverage Part: outdoor radio or television antennas, including their lead-in wiring, masts or towers; awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks, roadways and other paved surfaces; and

**2.** Loss or damage by settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings.

This Additional Coverage will not increase the Limits of Insurance provided in this Coverage Part.

Section **E.** of this endorsement restricts collapse coverage on property covered under the Builders Risk Coverage Form.

**D.** The provisions of items **D.1.** through **D.5.** below apply to the CAUSES OF LOSS—SPECIAL FORM.

**1.** Exclusion **B.2.d.(4)** is deleted and replaced by the following exclusion:

**(4)** Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, ceilings, curbs, fences, retaining walls or swimming pools.

**2.** Exclusion **B.2.f.**, which pertains to continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more, is deleted. However, all other exclusions pertaining to loss or damage by water continue to apply.



1

Copyright, ISO Commercial Risk Services, Inc., 1992

If there is an appraisal:

   **a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

   **b.** We will still retain our right to deny the claim.

**H.** The provision requiring signed, sworn proof of loss in the DUTIES IN THE EVENT OF LOSS OR DAMAGE Loss Condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**I.** Under the LOSS PAYMENT CONDITION, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

   **1. Claims Handling**

      **a.** Within 15 days after we receive written notice of claim, we will:

        **(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

        **(2)** Begin any investigation of the claim; and

        **(3)** Request a signed sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

      **b.** We will notify you in writing as to whether:

        **(1)** The claim or part of the claim will be paid;

        **(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

        **(3)** More information is necessary; or

        **(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **b.(1)** through **b.(4)** above, within:

        **(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

        **(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**2.** We will pay for covered loss or damage within 5 business days after:

      **a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

      **b.** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

The following paragraphs are added:

**3. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **I.1.** and **I.2.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

      **(1)** Is declared a disaster under the Texas Disaster Act of 1975; or

      **(2)** Is determined to be a catastrophe by the State Board of Insurance.

**4.** The term "business day", as used in the LOSS PAYMENT CONDITION, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**J.** The following is added to the VALUATION Loss Condition:

Article 6.13. Policy a Liquidated Demand. A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. The provisions of this Article shall not apply to personal property.

**K.** Paragraphs **d.** and **f.** of the MORTGAGE HOLDERS ADDITIONAL CONDITION are replaced by the following:

      **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

        **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

        **(2)** Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

        **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this Coverage Part will then apply directly to the mortgage holder.

**3**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

CP 02 02 02 96

# TEXAS CHANGES—CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

A. Paragraphs 2., 3. and 4. of the CANCELLATION Common Policy Condition are replaced by the following:

2. **a.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we may cancel this policy by mailing or delivering written notice of cancellation, at least 30 days before the effective date of cancellation, to:

   **(1)** The first Named Insured; and

   **(2)** Each unit-owner to whom we issued a certificate or memorandum of insurance.

   If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

   **b.** If the policy covers a risk other than the risk described in paragraph 2.a., then we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **(1)** 14 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

   If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

   **c.** In compliance with Texas law, we will not cancel this policy solely because the policyholder is an elected official.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will also mail or

deliver notice of cancellation to each unit-owner to whom we issued a certificate or memorandum of insurance, to each last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. The notice of cancellation will also state that pro rata unearned paid premium, if not tendered, will be refunded on demand.

B. The following condition is added and applies unless paragraph D. applies:

**NONRENEWAL**

1. If we elect not to renew this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

2. In compliance with Texas law, we will not refuse to renew this policy solely because the policyholder is an elected official.

3. If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then:

   **a.** We will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to the first Named Insured and to each unit-owner to whom we issued a certificate or memorandum of insurance.

   **b.** We will mail or deliver such notice to each last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

C. **CANCELLATION—ONE- AND TWO-FAMILY DWELLINGS AND GOVERNMENTAL PROPERTY**

1. Paragraph 5. of the CANCELLATION Common Policy Condition is replaced by the following:

   If this policy is cancelled, we will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

   The refund will be pro rata if:

   **a.** We cancel this policy; or

(over)



Copyright, ISO Commercial Risk Services, Inc., 1995

CF 476b
(2-96)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CP 04 05 06 95

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement effective | Policy No. |
|---|---|
| 04/01/97          12:01 A.M. standard time | KHT308599 |
| Named Insured | Countersigned by |
| Brownsville Independent School District | *James A. Dixon* |
| | (Authorized Representative) |

## SCHEDULE*

| Bldg. No./Prem. No. | Cov. A | Cov. B Limit of Insur. | Cov. C Limit of Insur. | Cov. B and C Blanket Limit of Insur. |
|---|---|---|---|---|
| All/All | [X] | $25,000 | $50,000 | $ _____ ** |
| ___/___ | [ ] | $ Sublimit | $ Sublimit | $ _____ ** |
| ___/___ | [ ] | $ _____ | $ _____ | $ _____ ** |

** Do **not** enter a Blanket Limit of Insurance if individual Limits of Insurance are selected for Coverages B and C, or if one of these Coverages is not applicable.

**A.** Each Coverage—Coverage A, Coverage B and Coverage C—applies only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the Building property identified for that Coverage(s) in the Schedule.

**B.** We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

**C. Coverage**

**1. Coverage A—Coverage for Loss to the Undamaged Portion of the Building**

If a Covered Cause of Loss occurs to covered Building property, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

**a.** Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

**b.** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

**c.** Is in force at the time of loss.

Coverage A is included within the Limit of Insurance shown in the Declarations as applicable to the covered Building property. Coverage A does not increase the Limit of Insurance.

**2. Coverage B—Demolition Cost Coverage**

If a Covered Cause of Loss occurs to covered Building property, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by enforcement of building, zoning or land use ordinance or law.

The COINSURANCE Additional Condition does not apply to Demolition Cost Coverage.

**3. Coverage C—Increased Cost of Construction Coverage**

**a.** If a Covered Cause of Loss occurs to the covered Building property, we will pay for the increased cost to:

**(1)** Repair or reconstruct damaged portions of that Building property; and/or

**(2)** Reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required;

when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.

* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.



1

Copyright, ISO Commercial Risk Services, Inc., 1994

CF 495
(6-95)

However:

**(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

**(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The COINSURANCE Additional Condition does not apply to Increased Cost of Construction Coverage.

**b.** When covered building property is damaged or destroyed by a Covered Cause of Loss and Coverage C applies to that property in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same condition stated in **3.a.**:

**(1)** The cost of excavations, grading, backfilling and filling;

**(2)** Foundation of the building;

**(3)** Pilings; and

**(4)** Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this provision, **3.b.**

**D. Loss Payment**

**1.** When Coverage A applies, loss to the building, including loss in value of the undamaged portion of the building due to enforcement of an ordinance or law, will be determined as follows:

**a.** If the Replacement Cost Coverage Option applies and the property **is** repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

**(1)** The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

**b.** If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

**(1)** The actual cash value of the building at the time of loss; or

**(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

**2.** Unless paragraph **D.4.** applies, loss payment under Coverage B—Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

**a.** The amount you actually spend to demolish and clear the site of the described premises; or

**b.** The applicable Limit of Insurance shown for Coverage B in the Schedule above.

**3.** Unless paragraph **D.4.** applies, loss payment under Coverage C—Increased Cost of Construction Coverage will be determined as follows:

**a.** We will not pay under Coverage C:

**(1)** Until the property is actually repaired or replaced, at the same or another premises; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**b.** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage C is the lesser of:

**(1)** The increased cost of construction at the same premises; or

**(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

**c.** If the ordinance or law requires relocation to another premises, the most we will pay under Coverage C is the lesser of:

**(1)** The increased cost of construction at the new premises; or

**(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

**4.** If a **Blanket** Limit of Insurance is shown for Coverages B and C in the Schedule above, paragraph **D.2.** and **D.3.** of this endorsement do not apply with respect to the Building property that is subject to the Blanket Limit, and the following loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Blanket Limit of Insurance shown for Coverages B and C in the Schedule above. Subject to this Blanket Limit of Insurance, the following loss payment provisions apply:

**a.** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

2

**b.** With respect to Increased Cost of Construction:

   **(1)** We will not pay for the increased cost of construction:

      **(a)** Until the property is actually repaired or replaced, at the same or another premises; and

      **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

   **(2)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

   **(3)** If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

**E.** The terms of this endorsement apply separately to each building to which this endorsement applies.

**F.** Under this endorsement we will not pay for loss due to any ordinance or law that:

   **1.** You were required to comply with before the loss, even if the building was undamaged; and

   **2.** You failed to comply with.

3

POLICY NUMBER:                                            COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEWLY ACQUIRED OR CONSTRUCTED PROPERTY-INCREASED LIMIT

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> STANDARD PROPERTY POLICY
> LEGAL LIABILITY COVERAGE FORM

**A.** When this endorsement is attached to the LEGAL LIABILITY COVERAGE FORM CP 00 40, the term Newly Acquired or Constructed Property in this endorsement is replaced by the term Newly Acquired Property. In addition, the reference to subparagraph (1) in paragraph B. below is replaced by a reference to subparagraph (1)(b).

**B.** The $250,000 Limit of Insurance in subparagraph (1) of the NEWLY ACQUIRED OR CONSTRUCTED PROPERTY Coverage Extension is replaced by the following:

The Newly Acquired or Constructed Property Limit shown in the Schedule or in the Declarations.

### SCHEDULE

**Newly Acquired or Constructed Property Limit:**

$2,500,000 Sublimit  (90 Days Reporting)

CP 10 30 06 95

# CAUSES OF LOSS—SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F.**—Definitions.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section **B.**, Exclusions; or

2. Limited in Section **C.**, Limitations;

that follow.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   The enforcement of any ordinance or law:

   **(1)** Regulating the construction, use or repair of any property; or

   **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance or Law, applies whether the loss results from:

   **(1)** An ordinance or law that is enforced even if the property has not been damaged; or

   **(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   **(1)** Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   **(2)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   **(a)** Airborne volcanic blast or airborne shock waves;

   **(b)** Ash, dust or particulate matter; or

   **(c)** Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   **d. Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

   **e. Utility Services**

   The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

   But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

   **f. War and Military Action**

   **(1)** War, including undeclared or civil war;

   **(2)** Warlike action by a military force, including action in hindering or defending



**1**

Copyright, ISO Commercial Risk Services, Inc., 1994

CF 497
(6-95)

the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that, "specified cause of loss."

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

**(2)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock."

This exclusion does not apply to Extra Expense.

**(3)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(4)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

**(5)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

**(6)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following Exclusions do not apply to insurance under this Coverage Form:

**3**

b. Animals, and then only if they are killed or their destruction is made necessary.

c. Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

   (1) Glass that is part of a building or structure;

   (2) Containers of property held for sale; or

   (3) Photographic or scientific instrument lenses.

d. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

   However, this limitation does not apply:

   (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

   (2) To Business Income coverage or to Extra Expense coverage.

4. The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

   a. $2,500 for furs, fur garments and garments trimmed with fur.

   b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   c. $2,500 for patterns, dies, molds and forms.

   d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

   These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

   This limitation, **C.4.**, does not apply to Business Income coverage or to Extra Expense coverage.

5. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

   However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

**D. ADDITIONAL COVERAGE—COLLAPSE**

The term Covered Cause of Loss includes the Additional Coverage—Collapse as described and limited in **D.1.** through **D.5.** below.

1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

   a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

2. If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

   a. The personal property which collapses is inside a building insured under this Coverage Form; and

   b. The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

3. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   b. Awnings, gutters and downspouts;

   c. Yard fixtures;

   d. Outdoor swimming pools;

   e. Fences;

   f. Piers, wharves and docks;

   g. Beach or diving platforms or appurtenances;

   h. Retaining walls; and

   i. Walks, roadways and other paved surfaces;

   if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.**, we will pay for loss or damage to that property only if:

   a. Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

5



CM 00 01 06 95
# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. ABANDONMENT

There can be no abandonment of any property to us.

### B. APPRAISAL

If we and you disagree on the value of the property or the amount of "loss," either may make written demand for an appraisal of the "loss." In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss." If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the "loss." Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the "loss" occurred.

4. Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss. Also if feasible, set the damaged property aside and in the best possible order for examination.

5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.

6. Permit us to inspect the property and records proving "loss."

7. If requested, permit us to question you under oath, at such times as may be reasonably re-

quired, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Promptly send us any legal papers or notices received concerning the "loss."

10. Cooperate with us in the investigation or settlement of the claim.

### D. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same "loss," we will not pay more than the actual amount of the "loss."

### E. LOSS PAYMENT

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;

2. The entry of final judgment; or

3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

### F. OTHER INSURANCE

If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

### G. PAIR, SETS OR PARTS

1. **Pair or Set.** In case of "loss" to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the "loss"; or

   b. Pay the difference between the value of the pair or set before and after the "loss."

2. **Parts.** In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

### H. PRIVILEGE TO ADJUST WITH OWNER

In the event of "loss" involving property of others in your care, custody or control, we have the right to:

(over)



Copyright, Insurance Services Office, Inc., 1994

CI 166
(6-95)



CM 00 66 06 95

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E—DEFINITIONS.

## A. COVERAGE

1. We will pay:

   a. All amounts due from your customers that you are unable to collect;

   b. Interest charges on any loan required to off-set amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the "loss"; and

   d. Other reasonable expenses that you incur to re-establish your records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

2. **PROPERTY NOT COVERED**

   Coverage does not apply to:

   a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

   b. Contraband, or property in the course of illegal transportation or trade.

3. **COVERED CAUSES OF LOSS**

   Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to your records of accounts receivable except those causes of "loss" listed in the Exclusions.

4. **ADDITIONAL COVERAGE—COLLAPSE**

   We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

   a. Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

5. **COVERAGE EXTENSION**

   **Removal**

   If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of "loss," we will pay for "loss" while they are:

   a. At a safe place away from your "premises"; or

   b. Being taken to and returned from that place.

   This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

## B. EXCLUSIONS

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

   a. **GOVERNMENTAL ACTION**

      Seizure or destruction of property by order of governmental authority.

      But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   b. **NUCLEAR HAZARD**

      (1) Any weapon employing atomic fission or fusion; or



Copyright, Insurance Services Office, Inc., 1994

CI 255
(6-95)

**a.** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of "loss," the following method will be used:

**(1)** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the "loss" occurs; and

**(2)** Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the "loss" occurred or for any demonstrated variance from the average for that month.

**b.** The following will be deducted from the total amount of accounts receivable, however, that amount is established:

**(1)** The amount of the accounts for which there is no "loss";

**(2)** The amount of the accounts that you are able to re-establish or collect;

**(3)** An amount to allow for probable bad debts that you are normally unable to collect; and

**(4)** All unearned interest and service charges.

## 2. RECOVERIES

The following is added to Commercial Inland Marine Loss Condition I. Recoveries:

You will pay us the amount of all recoveries you receive for a "loss" paid by us. But any recoveries in excess of the amount we have paid belong to you.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. COVERAGE TERRITORY**

We cover records of accounts receivable:

**(1)** Within your "premises"; and

**(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

**(a)** The United States of America;

**(b)** Puerto Rico; and

**(c)** Canada.

**b. COINSURANCE**

All accounts receivable, except those in transit, must be insured for at least 80% of their total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for Coverage Applicable at All Locations bears to 80% of the total value of all accounts receivable at all locations as of the time of "loss." This penalty will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to re-establish your records of accounts receivable.

**c. PROTECTION OF RECORDS**

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

## E. DEFINITIONS

**1.** "Loss" means accidental loss or damage.

**2.** "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

 

CM 00 67 06 95

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F—DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. COVERED PROPERTY**, as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

**2. PROPERTY NOT COVERED**

Covered Property does not include:

**a.** Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

**b.** Property held as samples or for delivery after sale;

**c.** Property in storage away from the "premises" shown in the Declarations; or

**d.** Contraband, or property in the course of illegal transportation or trade.

**3. COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the Exclusions.

**4. ADDITIONAL COVERAGE—COLLAPSE**

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

**a.** Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

**5. COVERAGE EXTENSIONS**

**a. Removal**

If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of "loss," we will pay for "loss" while it is:

**(1)** At a safe place away from your "premises"; or

**(2)** Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

**b. Away From Your Premises**

We will pay up to $5,000 for "loss" to Covered Property while it is away from your "premises."

But if a higher Limit of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

## B. EXCLUSIONS

**1.** We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for "loss" caused by or resulting from acts of destruction ordered by gov-



1

Copyright, Insurance Services Office, Inc., 1994

CI 256
(6-95)



## 2. RECOVERIES

The following is added to Commercial Inland Marine Loss Condition I. Recoveries:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your "loss" will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

## 3.

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

### a. Coverage Territory

We cover property:

(1) Within your "premises"; and

(2) Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

(a) The United States of America;

(b) Puerto Rico; and

(c) Canada.

### b. Protection Of Records

Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

## F. DEFINITIONS

1. "Loss" means accidental loss or damage.

2. "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

   But "valuable papers and records" does not mean "money" or "securities," converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

3. "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

4. "Money" means:

   a. Currency, coins and bank notes whether or not in current use; and

   b. Travelers checks, register checks and money orders held for sale to the public.

5. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets, revenue and other stamps whether or not in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

   but does not include "money."



GU 470
(10-91)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 04 15 10 91

## PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement effective | | Policy No. |
|---|---|---|
| 04/01/97 | 12:01 A.M. standard time | KHT3308599 |
| Named Insured | | Countersigned *James A. Dixon* |
| Brownsville Independent School District | | |
| | | (Authorized Representative) |

### SCHEDULE*

Prem.
No.

Bldg.
No.

**Protective Safeguards Symbols Applicable**

"Where installed and operational"

"P-9" *

Describe any "P-9":  *  Central Station  -  Burglar Alarm
                              -  Security Censors
                              -  Fire Alarms

1.  The following is added to the:

Commercial Property Conditions
General Conditions in the Farm Property Coverage Form
General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage Form

PROTECTIVE SAFEGUARDS

a.  As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

b.  The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1"  Automatic Sprinkler System,** including related supervisory services.

Automatic Sprinkler System means:

(1) Any automatic fire protective or extinguishing system, including connected:

(a) Sprinklers and discharge nozzles;

(b) Ducts, pipes, valves and fittings;

(c) Tanks, their component parts and supports; and

(d) Pumps and private fire protection mains.

(2) When supplied from an automatic fire protective system:

(a) Non-automatic fire protective systems; and

(b) Hydrants, standpipes and outlets.

**"P-2"  Automatic Fire Alarm,** protecting the entire building, that is:

(1) Connected to a central station; or

(2) Reporting to a public or private fire alarm station.

**"P-3"  Security Service,** with a recording system or watch clock, making hourly

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

(over)



Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990

# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**Royal Insurance**

| | |
|---|---|
| 1. **POLICY NO.** KHT308599 | **EFFECTIVE DATE** 04/01/97 |
| | Rewrite of |
| 2. **NAMED INSURED** Brownsville Independent School District | KHT307564 |

| 3. LOCATION | ADDRESS OF LOCATION |
|---|---|
| * | * |

   **\*  Various as per Schedule on file with the Company**

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Accounts Receivable | $ 100,000 Blanket | $ See Endt. #3 | $ Included |
| MORTGAGE HOLDER / LOSS PAYEE<br>NIL | | | |
| FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE | | | |
| CM0066 (0695) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Valuable Papers & Records | $ 100,000 Sublimit | $See Endt. #3 | $ Included |
| MORTGAGE HOLDER / LOSS PAYEE<br>NIL | | | |
| FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE | | | |
| CM0067 (0695) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Transit | $ 100,000 Sublimit | $See Endt. #3 | $ Included |
| MORTGAGE HOLDER / LOSS PAYEE<br>NIL | | | |
| FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE | | | |
| MC0005 (1087) | | | |

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES: | TOTAL PREMIUM FOR THIS ▶ COVERAGE PART | $ |
|---|---|---|
| CM0001 (0695), CM0112 (1090) | | Included |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

WHITE COPY – Original
PINK COPY – Memorandum Of Insurance
GOLD COPY – Company Copy
BLUE COPY – Producer's Copy
CANARY COPY – Copy

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services, Inc., 1984.

MC 86841 (0187)



# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**Royal Insurance**

| | |
|---|---|
| 1. POLICY NO. **KRT308599** | EFFECTIVE DATE ___04/01/97___ |
| | **Rewrite of** |
| 2. NAMED INSURED  **Brownsville Independent School District** | ~~RWRWRRXXRKRT307564~~ |

| 3. LOCATION | ADDRESS OF LOCATION |
|---|---|
| * | * |

**\* Various as per Schedule on file with the Company**

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| **Contractors Equipment**<br>**Actual Cash Value**<br>MORTGAGE HOLDER / LOSS PAYEE<br><br>**NIL**<br><br>FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE<br><br>**MC0007 (0294), MC0028 (0587)** | $ 161,720 Blanket | $See Endt. #3 | $Included |
| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
| **EDP**<br>**Replacement Cost**<br>MORTGAGE HOLDER / LOSS PAYEE<br>**NIL**<br><br>FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE<br><br>**MC0010 (0193)** | $ 17,035,008 Blanket | $ See Endt. #3 | $ Included |
| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
| **Radio Equipment**<br>**Replacement Cost**<br>MORTGAGE HOLDER / LOSS PAYEE<br>**NIL**<br><br>FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE<br><br>**MC0033 (0587)** | $ 699,981 Blanket | $See Endt. #3 | $ Included |

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES:<br><br>**CM0001 (0695), CM0112 (1090)** | TOTAL PREMIUM<br>FOR THIS  ▶<br>COVERAGE PART | $<br>**Included** |
|---|---|---|

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

**Page 2 of 3**

WHITE COPY – Original<br>PINK COPY – Memorandum Of Insurance<br>GOLD COPY – Company Copy<br>BLUE COPY – Producer's Copy<br>CANARY COPY – Copy

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services, Inc , 1984.

MC 86841 (0187)

**COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS**

**Royal Insurance**

1. POLICY NO. KHT308599

EFFECTIVE DATE 04/01/97
Rewrite of
2. NAMED INSURED Brownsville Independent School District    ~~XXXXXXXXXX~~ KHT307564
RENEWAL OF

3. LOCATION              ADDRESS OF LOCATION
   *                        *

        *  Various as per Schedule on file with the Company

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Spoilage | $ 5,000 Sublimit | $ See Endt. #3 | $ Included |

MORTGAGE HOLDER / LOSS PAYEE

NIL

FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE

CP0440 (0695)

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| | $ | $ | $ |

MORTGAGE HOLDER / LOSS PAYEE

FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| | $ | $ | $ |

MORTGAGE HOLDER / LOSS PAYEE

FORMS / ENDORSEMENTS APPLICABLE – TO THIS COVERAGE

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES: | TOTAL PREMIUM FOR THIS ▶ COVERAGE PART | |
|---|---|---|
| CM0001 (0695), CM0112 (1090) | $ | Included |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Page 3 of 3

WHITE COPY – Original
PINK COPY – Memorandum Of Insurance
GOLD COPY – Company Copy
BLUE COPY – Producer's Copy
CANARY COPY – Copy

MC 86841 (0187)    Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services, Inc., 1984

 **Royal Insurance** 

# TRANSPORTATION COMPREHENSIVE
# COVERAGE FORM

*Various provisions in this policy restrict coverage. Please read the entire policy carefully.*

Throughout this policy and form, "you" and "your" refer to the Named Insured shown in the Declarations. "We," "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. COVERED PROPERTY

We cover:

Property described in the Declarations while in transit at your risk:

**a.** In the care of:

**(1)** Railroads.

**(2)** Public truckmen, land transfer or land transportation companies.

**(3)** Air carriers on air express companies.

**b.** In or on vehicles owned or operated by you.

We cover from the time the property leaves the initial point of shipment and continuously thereafter in transit, including while on ferries or car transfers until delivered at destination.

### 2. PROPERTY NOT COVERED

We do not cover:

**a.** Accounts, bills, deeds, notes, securities, evidences of debt, letters of credit, tickets, stamps, valuable papers, works of art, money, currency, bullion, precious stones, watches, furs or jewelry.

**b.** Property shipped by mail.

**c.** Samples in the care, custody or control of any sales person.

**d.** Export shipments after loaded on board the export conveyance or after Ocean Marine insurance applies to the shipment whichever occurs first.

**e.** Import shipments while Ocean Marine insurance applies to the shipment.

**f.** Property you accept while acting as a common or contract carrier; or as a bailee for hire.

**g.** Property while located in or on your premises, or in any garage or building where your vehicles are usually garaged.

**h.** Contraband or property in the course of illegal transportation or trade.

### 3. COVERED CAUSES OF LOSS

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

### 4. COVERAGE EXTENSIONS

**a.** F.O.B. Shipments

We cover your contingent interest in property sold under Free on Board or Freight Allowed terms.

But we will pay for "loss" only if you cannot collect:

**(1)** from the purchaser, or

---

MC 0005 0187                    Page 1 of 4



Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**8. Nuclear Hazard**

**a.** Any weapon employing atomic fission or fusion; or

**b.** Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**9. War and Military Action**

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations. Two or more vehicles while connected or while being operated with a single power vehicle will be considered one vehicle in applying the applicable Limit of Insurance.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the policy conditions:

**1. COVERAGE TERRITORY**

We cover property wherever located within or between the United States and Canada; but we do not cover property in transit to or from Alaska or Hawaii.

**2. VALUATION**

General Condition I. Valuation of the policy is replaced by the following:

The Covered Property will be valued in the event of "loss" at the amount shown on the invoice, if any; otherwise, the value of the property will be the least of the following amounts:

**a.** The actual cash value of the property at destination;

**b.** The cost of restoring the property to its condition immediately before the "loss;"

**c.** The cost of replacing the property with substantially identical property.

The value of property will include your prepaid freight charges; and any other shipping costs or charges that are due since the start of transit.

**3. REPORTS AND PREMIUM**

**a.** Reports. Within 30 days after the end of each reporting period shown in the Declarations, you will report to us the actual value of a all shipments made during that period of time.

**b.** Rates and Premium.

**(1)** Premium Computation. We will compute the premium:

**(a)** Using the rates shown in the Declarations, and

---

MC 0005 0187                         **Page 3 of 4**

 

# SCHEDULE CONTRACTORS EQUIPMENT
# COVERAGE FORM

Various Provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover:

a. Your contractors equipment, including spare parts and accessories, and similar property of others that is in your care, custody or control and for which you are responsible, for up to the Limit of Insurance specified on each item in the schedule of property shown on the Declarations.

b. Unscheduled equipment used in your business when a Limit of Insurance is shown on the Declarations.

### 2. Property Not Covered

We do not cover:

a. Automobiles, motor trucks, tractors, trailers or motorcycles designed and principally used to transport property or persons over public roads; aircraft or watercraft.

b. Property while "underground", underwater, airborne, or waterborne, except while in transit in the custody of a carrier for hire.

c. Property while leased, loaned or rented to others.

d. Contraband or property in the course of illegal transportation or trade.

### 3. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

### 4. Additional Coverages

a. **Expediting Expense**

We will pay the reasonable extra costs for:

(1) Temporary repairs of damaged Coverage Property; or
(2) Expediting permanent repairs or permanent replacement, whichever is less;

Of Covered Property damaged by a Covered Cause of Loss, including:

(1) Overtime wages; and
(2) The extra cost of express or other rapid means of transportation.

The most we will pay under this Additional Coverage is $10,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

Expediting expenses do not include the costs incurred for:

(1) Temporary rental of property; or
(2) Temporary replacement of damaged property.

---

period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

g. **Debris Removal**

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

(2) The most we will pay under this Additional Coverage is $25,000.

(3) This Additional Coverage does not apply to costs to:

(a) Extract "pollutants" from land, air, water or Covered Property;

(b) Remove, restore or replace polluted land, air, water or Covered Property; or

(c) Remove expendable supplies.

5. **Coverage Extensions**

The Limit of Insurance for the following Coverage Extension is included within the Limits of Insurance applicable to the property listed on the Declarations.

a. **Newly Acquired Equipment**

If during the policy period you acquire additional equipment of a type already covered by this form, we will cover such equipment for up to 60 days after you acquire it or until the policy ends, whichever is sooner. We will cover such additional equipment for up to:

(1) 25% of the total Limit of Insurance shown on the Declarations; or

(2) $250,000, whichever is the lesser amount.

You agree to report the value of such equipment to us within the 60 day period and to pay an additional premium from the date you acquire it.

6. **Coverage Options**

a. **Unscheduled Equipment Leased or Rented From Others**

When a Limit of Insurance is shown on the Declarations we will cover unscheduled equipment in your care, custody or control and for which you are responsible which you have leased or rented from others. The Limit of Insurance shown for such equipment is the most we will pay for "loss" in any one occurrence.

Within 30 days after the end of each policy year you must report to us your total expenditures for such equipment during the past 12 months. We will compute the actual earned premium by applying the rate shown on the Declarations to the total expenditures. If it is more than the Deposit Premium you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference. But you must pay at least the minimum annual premium shown on the Declarations.

The Coinsurance Condition of the Coverage Form does not apply to this Coverage Option.

b. **Rental Expense Reimbursement**

When a Limit of Insurance is shown on the Declarations we will reimburse your rental expenses should a covered "loss" to equipment you own make it necessary to rent replacement equipment to continue your normal operations of the work in progress. We will reimburse these rental expenses

    **b.** Structural or mechanical breakdown.

    **c.** Electrical breakdown or failure.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

**1. Coverage Territory**

We cover property wherever located within the United States and Canada.

**2. Coinsurance**

All Covered Property must be insured for at least 80% of its actual cash value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its actual cash value as of the date of "loss".

If this policy insures two or more items, this condition shall apply to each item separately.

When Unscheduled Equipment is covered by this Coverage Form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the actual cash value of all such property as of the date of "loss".

**3. Partial Loss Waiver of Depreciation**

The following is added to Commercial Inland Marine General Condition E. Valuation:

No deduction for depreciation shall be taken on the adjustment of any partial "loss" that does not exceed 20% of the actual cash value of the scheduled item involved. If two or more items are involved in the same occurrence, this condition shall apply to each item separately.

## F. DEFINITIONS

**1. "Loss"** means accidental loss or damage.

**2. "Underground"** means under the surface of the ground including but not limited to shafts, tunnels and mines.

**3. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

---

 **Royal Insurance**

# INFORMATION SYSTEMS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss..

### 1. Covered Property

We cover:

**a.** Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

**b.** "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

### 2. Where Coverage Applies

We cover:

**a.** At the locations listed on the Declarations.
**b.** Temporarily at other locations.
**c.** In transit.

### 3. Property Not Covered

We do not cover:

**a.** Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents. But we do cover such property when it is converted to data form and then only in that form.

**b.** Data or media which cannot be replaced with others of the same kind and quality. But we do cover such property when it is specifically described and a separate Limit of Insurance is shown on the Declarations.

**c.** Property loaned, leased or rented to others while away from your premises listed on the Declarations.

**d.** Contraband, or property in the course of illegal transportation or trade.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

### 5. Additional Coverages

**a. Fire Suppression System Discharge Protection**

We will pay expense you incur to recharge an automatic fire suppression system due to accidental discharge. The most we will pay in any one occurrence is $25,000. We will not pay for accidental discharge caused by system testing.

No Deductible applies to this Additional Coverage.

**b. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

---

MC 0010 0193

Page 1 of 7

89037A

**e. Debris Removal**

    **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:

        **(a)** The date of direct physical "loss;" or

        **(b)** The end of the policy period.

    **(2)** The most we will pay under this Coverage Extension is:

        **(a)** 25% of the amount we pay for the direct "loss;" plus

        **(b)** The Deductible in this policy applicable to that "loss."

    **(3)** This Coverage Extension does not apply to costs to:

        **(a)** Extract "pollutants" from land, air, water or Covered Property; or

        **(b)** Remove, restore or replace polluted land, air, water or Covered Property.

**f.** We cover expenses you incur resulting from a "computer virus", even if no direct damage or "loss" has occurred. We will pay your expense to:

    **(1)** Extract a "computer virus" from your equipment; plus

    **(2)** Restore your equipment, data and media.

    The most we will pay under this Coverage Extension is $5,000 in any one occurrence.

**7. Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

**a. "Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "Extra Expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover "Extra Expense" you incur:

    **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.

    **(2)** If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a reduction or suspension of your "operations."

    **(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b. Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

    **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.

89037A

   b. **Nuclear Hazard**

     **(1)** Any weapon employing atomic fission or fusion; or

     **(2)** Nuclear reaction or radiation or radioactive contamination from any other cause.

     But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

   c. **War and Military Action**

     **(1)** War, including undeclared or civil war;

     **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

     **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   d. **Earthquake**

     **(1)** Earth movement such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But we will pay for "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

     **(2)** Volcanic eruption, explosion or effusion. But we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

   e. **Flood**

     **(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

     **(2)** Mudslide or mudflow;

     **(3)** Water that backs up from any sewer or drain;

     **(4)** Water that seeps, leaks or flows from below the surface of the ground; or

     **(5)** Any release of water impounded by a dam.

     But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

     This Exclusion does not apply to property in transit.

**3. Special Exclusions**

The following provisions apply only to the "Extra Expense" or Loss of Income Coverage Options and are in addition to the Exclusions shown above. We will not pay for "loss" caused by or resulting from:

   **a.** "Loss" to property loaned, leased or rented to others while away from the premises listed on the Declarations.

   **b.** Loss of income, but this Exclusion only applies to the "Extra Expense" Coverage Option.

   **c.** Error or omission in machine programming or incorrect instructions to a machine.

   **d.** Suspension, lapse or cancellation of any lease, license, contract or order.

   **e.** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume "operations."

   You must make every reasonable effort to resume your "operations" as quickly as possible.

**C. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

**D. DEDUCTIBLE**

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

We will pay for a "loss" on a replacement cost basis until the designated replacement property is actually purchased. When you buy the replacement property we will pay you the difference between the replacement cost and the increased value, if any.

In the event of "loss", the value of property will be determined as of the date of "loss."

**b. "Electronic Media"**

The value will be the actual cost of reproducing the data and the cost of the media.

When the data is not reproduced, we will not pay more than the cost of blank discs, films, tapes, or similar electronic data processing media, of the same kind and quality.

When the data and media is individually listed or described on the Declarations, its value will be the applicable Limit of Insurance shown on the Declarations for that item.

**3. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for all Covered Property at all locations bears to 80% of the total value of all property at all locations as of the time of "loss."

**F. DEFINITIONS**

**1. "Loss"** means accidental loss or damage.

**2. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3. "Electronic Media"** means all forms of data including computer instructions and programs which are converted to a form usable in your "operations." This also includes the materials on which the data is recorded.

**4. "Extra Expense"** means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical "loss" to the property.

**5. "Operations"** means your business activities occurring at the described premises.

**6. "Period of restoration"** means the period of time that:

   **a.** Begins with the date of direct physical "loss" caused by or resulting from any Covered Cause of Loss at the described premises; and

   **b.** Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   **a.** Regulates the construction, use or repair, or requires the tearing down of any property; or

   **b.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**7. "Computer virus"** means any self-replicating program which contaminates or destroys programs, data or operating systems.

  

**Royal Insurance**

# FLOOD COVERAGE EXCLUSION

*This endorsement modifies insurance under the following:*

The following is added to paragraph B. EXCLUSIONS:

We will not pay for a "loss" caused by or resulting from:

**a.** Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not:

**b.** Mudslide or mudflow;

**c.** Water that backs up from any sewer or drain; or

**d.** Water that seeps, leaks or flows from below the surface of the ground;

**e.** Any release of water impounded by a dam;

but we will pay for direct "loss" caused by resulting fire or explosion if these causes of "loss" would be covered under this Coverage Form.

This exclusion does not apply to property in transit.

MC0028 0587

 **Royal Insurance**

# RADIO AND TELEVISION COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover your property consisting of:

**a.** Transmission towers, including antennas, foundations, supports and other equipment permanently attached or connected to such towers;

**b.** Transmission, receiving, recording and studio equipment including transmission and receiving lines and poles;

**c.** Portable transmitting, receiving, recording and studio equipment; and

**d.** Similar property of others in your care.

### 2. Property Not Covered

We do not cover:

**a.** Aircraft, watercraft or automobiles;

**b.** Growing crops, plants or land;

**c.** Jewelry or precious stones; or

**d.** Money, securities, letters of credit or accounts receivable.

**e.** Tubes, glass, porcelain and fragile articles. But we do cover such property when the "loss" is caused by or results from:

1) Collapse of the tower;

2) Fire, explosion, lightning, windstorm, aircraft, riot, strike, vandalism, theft or attempted theft; or

3) Collision, upset and/or overturn of equipment used to transport such property.

**f.** Buildings and their improvements and betterments.

### 3. Where Coverage Applies

We cover:

**a.** At the locations listed in the Declarations;

**b.** In transit.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the exclusions.

### 5. Covered Extensions

**a. Debris Removal**

1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:

MC0033 1190

   **c)** Suspension, lapse or cancellation of any lease, license, contract or order.

   **d)** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.

   **e)** Repair or Replacement of Property

   But we will pay extra repair or replacement costs you incur in order to reduce Extra Expense "loss", but only up to the amount by which that "loss" is actually reduced.

   You must make every reasonable effort to resume your normal operations as quickly as possible.

**b. Loss of Income**

When a Limit of Insurance for Loss of Income is shown in the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your normal operations. The suspension must be caused by direct physical "loss" to your broadcasting equipment, towers, studios or offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered *Cause of Loss.*

   **1)** We will also cover Loss of Income you sustain:

      **a)** If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

      **b)** If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to four consecutive weeks from the date of that action.

   **2)** What we will pay for Loss of Income

   If "loss" to Covered Property results in total or partial suspension of your normal operations, we will pay up to the Limit of Insurance for Loss of Income shown in the Declarations:

      **a)** The actual loss of income you sustain beginning with the date of "loss" and not limited by the expiration date of the policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the period of restoration; and

      **b)** All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

      But we will not pay more than the actual amount by which the Loss of Income is reduced.

   You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or by using other property to continue your operations.

   **3)** Loss of Income That Is Not Covered

   We will not cover your Loss of Income resulting from any of the following:

      **a)** "Loss" to property loaned, leased or rented to others while away from your premises listed in the Declarations.

      **b)** Enforcement of any law that:

         **1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

         **2)** Regulates the prevention, control, repair, clean-up or restoration of damage caused by pollutants.

      **c)** Suspension, lapse or cancellation of any lease, license, contract or order.

      **d)** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.

**B. EXCLUSIONS**

We will not pay for a "loss" caused by or resulting from:

**1.** Delay, loss of use, loss of market or any other consequential "loss".

 

2. Unexplained disappearance or shortage found upon taking inventory.

3. Gradual deterioration, wear and tear, hidden or latent defect, rust, corrosion, inherent vice, mechanical or electrical breakdown or failure.

4. Expansion or contraction due to changes in temperature. But this exclusion does not apply if the "loss" results in a partial or total collapse of a tower.

5. Electrical or magnetic injury; but we will pay for direct "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

6. EARTHQUAKE

   a. Earth movement such as an earthquake, landslide, or earth sinking, rising or shifting; but we will pay for direct "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

   b. Volcanic eruption, explosion or effusion; but we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

   This exclusion does not apply to property in transit.

7. WATER

   a. Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

   b. Mudslide or mudflow;

   c. Water that backs up from any sewer drain; or

   d. Water that seeps, leaks or flows from below the surface of the ground; or

   e. Any release of water impounded by a dam;
   But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

   This exclusion does not apply to property in transit.

8. The enforcement of any ordinance or law:

   a. Regulating the construction, use or repair of any property; or

   b. Requiring the tearing down of any property, including the cost of removing its debris.

9. GOVERNMENTAL ACTION

   Seizure or destruction of property by order of governmental authority.

   But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

10. NUCLEAR HAZARD

    1. Any weapon employing atomic fission or fusion; or

    2. Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

11. WAR AND MILITARY ACTION

    1. War, including undeclared or civil war;

    2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or other authority using military personnel or other agents; or

    3. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

We will not pay to extract "pollutants", as defined elsewhere in this Coverage Form, from land or water.

C. **LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

MC0003 1190

CI 234a
(10-90)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CM 01 12 10 90

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

**A.** Commercial Inland Marine Loss Condition **B.** APPRAISAL is replaced by the following:

**B. APPRAISAL**

If we and you disagree on the value of the property or the amount of "loss", either may make written demand, within 60 days after our receipt of a signed, sworn statement of "loss", for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**B.** Paragraph **8.** of Commercial Inland Marine Loss Condition **C.** DUTIES IN THE EVENT OF LOSS is replaced by the following:

**8.** Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**C.** Paragraph **2.** of Commercial Inland Marine General Condition **B.** LEGAL ACTION AGAINST US is replaced by the following:

**2.** The action is brought within 2 years and 1 day after you first have knowledge of "loss".

**D.** Paragraphs **A.5.a** and **A.5.b.** of the Coverage Extensions and paragraph **F.2.** of the Definitions in the EQUIPMENT DEALERS COVERAGE FORM are deleted.



Copyright, Insurance Services Office, Inc., 1990

# COMMON POLICY DECLARATIONS



ROYAL &
SUNALLIANCE

THIS POLICY IS ISSUED BY THE COMPANY NAMED BELOW

COMPANY NAME:    **Royal Surplus Lines Insurance Company**

BRANCH ADDRESS:    **945 East Paces Ferry Road, Suite 1800, Atlanta, GA 30326**

POLICY NO.    KHT310355                         RENEWAL OF    KHT308599

NAMED INSURED AND MAILING ADDRESS:            PRODUCER:
Brownsville Independent School District
1900 Price Road                                **Royal Specialty Underwriting, Inc.**
Brownsville, TX 78521                          **945 East Paces Ferry Road, Suite 1800**
                                               **Atlanta, GA 30326**

POLICY PERIOD: From 04/01/98 to 04/01/99 12:01 A.M. Standard Time at your Mailing Address above.
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE
WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS
PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| COVERAGE PARTS | | PREMIUM | |
|---|---|---|---|
| ☒ Commercial Property | PC86839 (0187) | $302,935 | 17.5% |
| ☐ Commercial General Liability | | $ | |
| ☐ Commercial Crime | | $ | |
| ☒ Commercial Inland Marine | MC86841 (0187) | $Included | DO NOT WRITE IN TINTED AREA |
| ☐ Boiler and Machinery | | $ | |
| ☐ Commercial Auto | | $ | |
| ☐ Commercial Farm | | $ | |
| ☐ | | $ | |

| ☐ Premium is payable in installments: See endorsement. | TOTAL POLICY ➡ Annual PREMIUM $  302,935 | |
|---|---|---|

FORMS APPLICABLE TO ALL COVERAGE PARTS: (Show numbers) IL0017 (1185), Endt. 1, 2, 3, & 4

BUSINESS DESCRIPTION:  School District

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE FORM(S)
AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Countersigned:    05/18/98 TM            By:    _James A. Dixon_
                  _____                    _____
                      Date                       Authorized Representative

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services, Inc., 1984.

LI86831 (1188)



**ROYAL &
SUNALLIANCE**

---

## *This Endorsement Changes The Policy.  Please Read It Carefully*

In consideration of an additional premium of $65., it is hereby agreed the following location has been added to this policy.

    Castaneda Elementary School
    3064 E. 30th Street
    Brownsville, TX
    One story, metal roof, block construction
    4777 sq. ft. occupied as Mini-Gym.
    Total Value:  $140,000

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  09/22/2000
forms part of Policy Number  KHT310355
issued to   Brownsville  Independent  School      Endorsement No.: 18
District                                       Date Processed   : 09/26/2000
Authorized Representative

*James A. Dixon*



ROYAL & SUNALLIANCE

---

*This Endorsement Changes The Policy.  Please Read It Carefully*

---

In consideration of an additional premium of $161., it is hereby agreed the following location is added to this policy.

>   Hudson Elementary School
>   2980 FM 802
>   Brownsville, TX  78521
>   5 Double Portables
>   Total Value:  $209,965

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  05/19/2000
forms part of Policy Number  KHT310355
issued to   Brownsville Independent  School          Endorsement No.: 17
District                                                              Date Processed   : 06/30/2000
Authorized Representative

*James A Dixon*

 

**ROYAL & SUNALLIANCE**

## *This Endorsement Changes The Policy.  Please Read It Carefully*

In consideration of an additional premium of $15,797., it is hereby agreed the annual installment due for the term 04/01/00 to 04/01/01 is amended to $341,535 in lieu of $325,738.

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  04/01/2000
forms part of Policy Number  KHT310355
issued to   Brownsville  Independent  School                Endorsement No.: 16
District                                                    Date Processed   : 06/08/2000
Authorized Representative

 

**ROYAL &**
**SUNALLIANCE**

*This Endorsement Changes The Policy.  Please Read It Carefully*

---

In consideration of the premium charged, it is hereby agreed that an annual installment in the amount of $325,738., is now due for the term 04/01/00 to 04/01/01.

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  04/01/2000
forms part of Policy Number  KHT310355
issued to   Brownsville Independent School        Endorsement No.: 15
District                                        Date Processed   : 05/23/2000
Authorized Representative

*James A. Dixon*



**ROYAL & SUNALLIANCE**

---

*This Endorsement Changes The Policy.  Please Read It Carefully*

---

In consideration of the premium charged, it is hereby agreed the following location has been deleted:

      Lopez High School
      3205 South Dakota Avenue
      Brownsville, TX  78521
      Total Value:  $42,000

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  06/17/1999
forms part of Policy Number  KHT310355
issued to  Brownsville Independent School      Endorsement No.: 14
Authorized Representative                Date Processed  : 03/06/2000

 

**ROYAL &**
**SUNALLIANCE**

_This Endorsement Changes The Policy.  Please Read It Carefully_

In consideration of premiums shown below, it is hereby agreed the following changes are  made part of this policy:

Eff.  7/12/99 – Deleting Canales Elementary School
Building No. 101-001
$257,886 Building and Contents

**Return Premium:  $163.**

Eff. 8/6/99 – Adding    Benavides Elementary School
3101 McAllen Road
Brownsville, TX  78521

Office, Classroom, Cafeteria
$4,100,000 Building
$   675,000 Contents
$   125,000 EDP

Mini-gym
$140,000 Building

**Additional Premium:  $2,891.**

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  08/06/1999
forms part of Policy Number  KHT310355
issued to  Brownsville Independent School        Endorsement No.: 13
Authorized Representative        Date Processed   : 09/21/1999



ROYAL &
SUNALLIANCE



*This Endorsement Changes The Policy.  Please Read It Carefully*

In consideration of an additional premium of $2,035., it is hereby agreed the following locations are added to the policy:

1. Porter High School Restroom
   3500 International Blvd.
   Brownsville, TX 78521
   Value - $42,000

2. Lopez High School
   3205 South Dakota Avenue
   Brownsville, TX 78521
   Value - $42,000

3. Garza Elementary School
   200 Esperanza Road
   Brownsville, TX 78521
   Value - $339,125

4. El Jardin Elementary School
   6911 Boca Chica Blvd.
   Brownsville, TX 78521
   Value - $1,210,000

5. Skinner Elementary School
   411 West St. Charles Street
   Brownsville, TX 78521
   Value - $840,000

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  06/17/1999
forms part of Policy Number  KHT310355
issued to  Brownsville Independent School          Endorsement No.: 12
Authorized Representative                          Date Processed   : 07/27/1999

*James A. Dixon*



ROYAL &
SUNALLIANCE

_This Endorsement Changes The Policy.  Please Read It Carefully_

6. Victoria Elementary School
   2801 East 13th Street
   Brownsville, TX 78521
   Value - $339,125

7. Sams Stadium
   1 Blvd. Of Champions
   Brownsville, TX 78520
   Value - $125,000

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  06/17/1999
forms part of Policy Number  KHT310355
issued to  Brownsville Independent School        Endorsement No.: 12
Authorized Representative                         Date Processed  : 07/27/1999

_James A. Dixon_

 

## This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

```
In consideration of the premium charged, it is hereby agreed that
an annual installment in the amount of $309,380 is now due for the
term 04/01/99 - 04/01/00.
```

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT310355** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL** _____

_____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences.
Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy
became effective.

Effective Date: _____ **4/01/99** _____   Endorsement No. ___ **011**   **Page:1 of 1**

Countersigned By:

_James A. Dixon_
<div style="text-align:center">Authorized Representative</div>

**5/17/99**
<div style="text-align:center">Date</div>

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of the premium charged, it is hereby ageed that Form
PC0077 (1297) (Year 2000 Systems Failure Coverage - Commercial
Property) is attached and made part of the policy.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT310355** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL** _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences.
Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy
became effective.

Effective Date: _____ **4/01/99** _____     Endorsement No. __ **010** __ **Page:1 of 1** _____

Countersigned By:

_____      _____ **4/21/99** _____
Authorized Representative                                        Date



**ROYAL & SUNALLIANCE**

*This Endorsement Changes the Policy. Please Read it Carefully.*

## YEAR 2000 SYSTEMS FAILURE COVERAGE –
## COMMERCIAL PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART

**A.** We will not pay for loss, damage or expense caused directly or indirectly by the following. Such loss, damage or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage or expense, except as provided in paragraph D. in this endorsement.

    **1.** The inability or failure of electronic data processing equipment, microprocessors, computer programs, computer hardware, computer software, microchips embedded in non-computer equipment, media, data, microcontrollers, or any other computerized or electronic equipment or components to recognize, interpret, process or differentiate between dates; or

    **2.** Any other data processing problems associated with the inability or failure at any time to accurately process data;

    involving dates on or after January 1, 2000.

**B.** If any loss or damage described in paragraph A. in this endorsement results in:

    **1.** A "Specified Cause of Loss" under the Causes of Loss – Special Form; or

    **2.** A Covered Cause of Loss under the Causes of Loss – Basic Form or Broad Form;

    we will pay only for the loss or damage caused by such "Specified Cause of Loss" or Covered Cause of Loss.

**C.** We will not pay for:

    **1.** Any costs or expenses you or others on your behalf incur to assess, inspect, test, repair, modify or monitor the items in paragraph **A.1** or **A.2** in this endorsement for the ability to recognize, interpret, process or differentiate between data; or

    **2.** Any costs or expenses you or others on your behalf incur for new or replacement items described in paragraph **A.1** or **A.2** in this endorsement that permit you to recognize, interpret, process or differentiate between data;

    involving dates on or after January 1, 2000.

**D.** We will pay for loss or damage to Covered Property of the type described below, business income and/or extra expense loss associated with the Covered Property, which occurs during the policy period, and for which a Limit of Insurance is shown below, caused by or resulting from:

---



1.  The inability or failure of electronic data processing equipment, microprocessors, computer programs, computer hardware, computer software, microchips embedded in non-computer equipment, media, data, microcontrollers or any other computerized or electronic equipment or components to recognize, interpret, process or differentiate between dates; or

2.  Any other data processing problems associated with the inability or failure to accurately process data;

involving dates on or after January 1, 2000.

The most we will pay in any one occurrence is the applicable Limit of Insurance shown below:

|  | **Limit of Insurance** |
|---|---|
| Building and/or Business Personal Property | $  10,000 |
| Business Income and/or Extra Expense | $  10,000 |

We will not pay for loss or damage caused by or resulting from the inability or failure of any property described in paragraph **D.** in this endorsement that begins before the inception date of this endorsement.

The Aggregate Limit of Insurance shown below is the most we will pay for the sum of all occurrences regardless of the time we make payment. If the first occurrence does not exhaust the Aggregate Limit of Insurance, then the balance of that limit is available for subsequent occurrences.

|  | **Aggregate Limit of Insurance** |
|---|---|
|  | $  10,000 |

The applicable Limit of Insurance as shown above is not an additional Limit of Insurance and will not increase the other Causes of Loss Limit(s) of Insurance as shown in the Declaration.

The coverage granted in this endorsement ends upon the exhaustion of the Aggregate Limit of Insurance.

Coverage provided for Business Income and/or Extra Expense is subject to an indemnity period. The indemnity period will not exceed twelve (12) months from the date of loss or damage.

E.  The Deductible(s), if any, in the Coverage Part to which this endorsement is attached is replaced by the following:

We will not pay for loss occurring during the first five (5) consecutive days immediately following the occurrence covered in Paragraph **D.** in this endorsement. We will then pay the amount of loss occurring after the first five (5) consecutive days, up to the applicable Limit of Insurance in this endorsement.

This Deductible applies only to loss or damage caused by or resulting from your loss of Business Income and/or Extra Expense.

F.  If this endorsement is attached to the **BUILDING AND BUSINESS PERSONAL PROPERTY COVERAGE FORM, A. COVERAGE, 5. Coverage Extensions a. Newly Acquired or Constructed Property** and **F. ADDITIONAL CONDITIONS, 1. Coinsurance** do not apply. Payment under this endorsement is not affected by **G. OPTIONAL COVERAGES, 1. Agreed Value** or **2. Inflation Guard.**

G.  If this endorsement is attached to the **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM,** the following apply:

Includes copyright material of Insurance Services Office, Inc.
with its permission. Copyright, Insurance Services Office, Inc., 1997



1. Business Income provided under this endorsement covers the actual loss of Business Income you sustain caused by or resulting from the inability or failure of Covered Property as described in paragraph **D.** in this endorsement during the period of indemnity, subject to the Limit of Insurance provided in paragraph **D.** in this endorsement.

2. This endorsement covers the necessary and actual Extra Expense you incur as a result of the loss you sustain caused by or resulting from the inability or failure of Covered Property described in paragraph **D.** in this endorsement during the period of indemnity, subject to the Limit of Insurance provided in paragraph **D.** in this endorsement. Extra Expense, as used in this endorsement, means necessary expenses you incur that you would not have incurred had there been no loss as described in paragraph **D.** in this endorsement. Extra Expense includes expenses for repair, modification or replacement of Covered Property described in paragraph **D.** in this endorsement, but only to the extent that such expenses reduce the amount of the Business Income loss that otherwise would have been payable under the provisions of this endorsement.

3. Coverage provided under this endorsement does not include **A. COVERAGE, 3. Additional Coverages, b. Civil Authority, c. Alterations and New Buildings, d. Extended Business Income** or **4. Coverage Extension, Newly Acquired Locations.** The **ADDITIONAL CONDITION, Coinsurance** does not apply. Payment under this endorsement is not affected by **F. OPTIONAL COVERAGES, 1. Maximum Period Of Indemnity, 2. Monthly Limit Of Indemnity** or **3. Business Income Agreed Value.**

**H.** If this endorsement is attached to **BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM,** the following apply:

1. Business Income provided under this endorsement covers the actual loss of Business Income you sustain caused by or resulting from the inability or failure of Covered Property as described in paragraph **D.** in this endorsement during the period of indemnity, subject to the Limit of Insurance provided in paragraph **D.** in this endorsement.

2. This endorsement covers **Expenses to Reduce Loss.** In the event of a covered loss of Business Income as described in paragraph **D.** in this endorsement, we will pay actual and necessary expenses you incur to avoid further loss of Business Income, including expenses for repair, modification or replacement of Covered Property described in paragraph **D.** in this endorsement. The total of our payment for Business Income loss and Expenses to Reduce Loss will not be more than the Business Income loss that would have been payable under this endorsement had the Expenses to Reduce Loss had not been incurred.

3. Coverage provided under this endorsement does not include **A. COVERAGE, 3. Additional Coverages, b. Civil Authority, c. Alterations and New Buildings, d. Extended Business Income** or **4. Coverage Extension, Newly Acquired Locations.** The **ADDITIONAL CONDITION, Coinsurance** does not apply. Payment under this endorsement is not affected by **F. OPTIONAL COVERAGES, 1. Maximum Period Of Indemnity, 2. Monthly Limit Of Indemnity** or **3. Business Income Agreed Value.**

**I.** If this endorsement is attached to **EXTRA EXPENSE COVERAGE FORM,** the following apply:

1. Extra Expense as provided for in this endorsement covers the actual and necessary Extra Expense you incur as a result of the loss you sustain caused by or resulting from the inability or failure of Covered Property described in paragraph **D.** in this endorsement during the period of indemnity, subject to the Limit of Insurance provided in paragraph **D.** in this endorsement. Extra Expense, as used in this endorsement, means necessary expenses you incur that you would not have incurred had there been no loss as provided for under paragraph **D.** in this endorsement. Extra Expense does not include expenses for repair, modification or replacement of Covered Property described in paragraph **D.** in this endorsement.

2. Coverage provided for under this endorsement does not include **A. COVERAGE, 3. Additional Coverages, a. Alterations and New Buildings, b. Civil Authority,** or **4. Coverage Extension, Newly Acquired Locations.** Payment under this endorsement is not affected by **D. LOSS CONDITIONS, 3. Limits On Loss Payment.**



This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of a return premium of $231., it is hereby agreed
that the following changes are made to Endorsement #8:

1. The values in Item No. 1 are amended to $5,759,986 broken out as
   follows:  Building - $5,160,116
             Contents - $  441,145
             EDP      - $  158,725

2. The effective date of Item No. 3 is amended to 08/20/98 in lieu
   of 09/10/98.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT310355** _____

Issued to **BROWNSVILLE INDEPENDENT SCHOOL** _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences.
Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy
became effective.

Effective Date: _____ **8/05/98** _____    Endorsement No. ___ **009** ___ **Page:1 of  1**

Countersigned By:

_James A. Dijon_

_____    _____ **11/10/98** ____
Authorized Representative                     Date

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of an additional premium of $3,994., it is hereby agreed the following additions are made to the policy:

1.  Effective 08/05/98 - Hubert R. Hudson Elementary School
                         2980 FM 802
                         Brownsville, TX 78521
                         Construction - Steel Frame
                         Values - $6,160,116  ~ $5,469,116~
                         Additional Premium - $3,551

2.  Effective 09/09/98 - "Astro turf" is added to Sam Stadium.
                         Value - $900,000
                         Additonal Premium - $443

3.  Effective 09/10/98 - Alternative Center #2 (Boot Camp)
          8/20/98        2044 North Coria St.
                         Brownsville, TX 78512
                         Construction - Wood Frame
                         No Additional Premium

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ KHT310355 _____

Issued to  BROWNSVILLE INDEPENDENT SCHOOL _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____8/05/98_____     Endorsement No. ___008___  **Page:1 of 1**

Countersigned By:  _James A. Dixon_____

                   _____          ___9/22/98___
                   Authorized Representative                Date

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of the premium charged, it is hereby agreed that this policy will have a three year term with Annual Installments.
It is further agreed that the policy rate will stay the same, subject to an incurred loss ration of 40% or less.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No.  _____ KHT310355 _____

Issued to  BROWNSVILLE INDEPENDENT SCHOOL _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____ 4/01/98 _____    Endorsement No. __007___  **Page:1 of 1**

Countersigned By:  *James A. Dixon*

_____         _____ 8/18/98 _____
Authorized Representative                                           Date



This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of the premium charged, it is hereby agreed the following changes are made to the policy:

1.  Expiration Date, as shown on the Common Policy Declarations, is amended to read 04/01/01 in lieu of 04/01/99.

2.  Form CP0425 (1091) and Form CP0440 (0788) on the Commercial Property Coverage Part Declarations Section 6. are amended to read as follows:  CP0425 (1090) and CP0440 (0695)

3.  Sublimit is deleted from Coverage B and Coverage C on Form CP0405 (0695) (Ordinance or Law Coverage).

4.  "P-9" on Form IL0415 (1091) (Protective Safeguards) is amended to read:  Central Station - Burglar Alarm, Security Sensors, and Automatic Sprinkler System - per scheudle.

5.  EDP and Radio & Equipment as shown on the Commercial Inland Marine Coverage Part Declarations are amended to show Replacement Cost.

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ **KHT310355** _____

Issued to  **BROWNSVILLE INDEPENDENT SCHOOL** _____

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____ **4/01/98** _____        Endorsement No. ___ **006** ____ **Page:1 of 1**

Countersigned By:

_James A. Dixon_ (signature)

_____        _____ **8/06/98** _____
Authorized Representative                                   Date

 

This Endorsement Changes The Policy. Please Read It Carefully.

**Royal
Insurance**

In consideration of an additional premium of $659., it is hereby agreed the following location is added to the policy:

                    Central Middle School
                    708 Palm Blvd.
                    Brownsville, TX 78520
                    Construction - Block & Brick
                    Values - $880,000

All other terms, conditions and warranties remaining unchanged.

Attached to and forming part of the Policy No. _____ KHT310355 _____

Issued to  BROWNSVILLE INDEPENDENT SCHOOL

If this endorsement is listed in the policy declarations, it it in effect from the time coverage under this policy commences. Otherwise, the effective date of this endorsement is as shown below at the same time or hour of the day as the policy became effective.

Effective Date: _____ 5/25/98 _____     Endorsement No. __ 005 __  **Page:1 of 1**

Countersigned By:

_James A. Dixon_

_____          ____ 8/06/98 ____
          Authorized Representative                          Date



# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.



*This Endorsement Changes The Policy.  Please Read It Carefully.*

## SERVICE OF SUIT

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.  The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

**Endorsement Number: 1**



*This Endorsement Changes The Policy.  Please Read It Carefully.*

### MINIMUM EARNED PREMIUM CLAUSE - PERCENTAGE

In the event of cancellation of this policy by the Insured, a minimum premium of <u>25</u>% of the original policy premium shall become earned; any conditions of the policy to the contrary notwithstanding.

Failure of the Insured to make timely payment of premium shall be considered a request by the Insured for the Company to cancel. In the event of such cancellation by the Company for non-payment of premium, the minimum premium shall be due and payable; provided, however, such non-payment cancellation shall be rescinded if the Insured remits the full premium due within 10 days of receiving it.

In the event of any other cancellation by the Company, the earned premium shall be computed pro rata, not subject to the minimum premium.

ENDORSEMENT NUMBER: <u>2</u>



*This Endorsement Changes The Policy. Please Read It Carefully.*

### FLOOD ENDORSEMENT

1. It is agreed that this policy covers loss or damage to the insured property as a result of flood.

2. For the purpose of this insurance, Flood shall be defined as follows:

   A. Surface water, waves or tidal water, and the rising (including the overflow or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams or similar bodies of water, whether driven by wind or not;

   B. Mudslide or mudflow;

   C. Water that backs up from any sewer or drain;

   D. Any release of water impounded by a dam.

3. Limits of Liability:

   The liability of the Company for loss or damage caused by flood shall not exceed the sum of $10,000,000* for loss or damage at any one insured location; however, the limit of liability shown above shall not exceed the sum of $10,000,000* due to any one flood occurrence for all locations combined nor for all flood losses occurring in any one year period or policy period, whichever is less, commencing 04/01/98.

4. Deductible:

   The sum of $____**____ shall be deducted from any adjusted claim due to flood.

5. Each loss by flood shall constitute a single claim hereunder; provided, that if more than one flood shall occur within any period of seventy-two (72) hours during the term of this endorsement, such flooding shall be considered to constitute a single flood, but the Company shall not be liable for any loss or damage:

   A. occurring before this policy becomes effective; or

   B. occurring after termination of this policy, except loss or damage arising from an occurrence in progress when this policy is terminated.

6. If the coverage of the policy to which this endorsement is attached includes both Property Damage and Business Interruption, the foregoing limits shall be the maximum amounts collectible under this policy for loss or damage resulting from the peril described in Paragraph 2 above, regardless of whether the loss involves Property Damage alone or both Property Damage and Business Interruption.

All other terms, conditions and warranties remaining unchanged.

\* Coverage applies to Flood Zone 'A' and 'AH' locations only, as defined by the National Flood Insurance Program, subject to values of $127,000,000.
\*\* $250,000 per building/$1,000,000 annual aggregate.

ENDORSEMENT NUMBER: 3



*This Endorsement Changes The Policy.  Please Read It Carefully.*

# Deductible Endorsement

**It is hereby agreed that the following deductibles shall apply:**

1.  $   50,000   Per Occurrence, except;

2.  $2,144,000   per building and its contents combined as respects the peril of Windstorm or Hail

3.  $    5,000   per occurrence all perils except Windstorm or Hail as respects Contractors Equipment, Radio Equipment, Musical Instrumetns, and EDP Per Schedule

4.  See Endt. #3 Flood

**Endorsement 4**



## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

**ROYAL & SUNALLIANCE**

---

**1. POLICY NO.** <u>KHT310355</u>                                    **EFFECTIVE DATE** <u>04/01/98</u>

**2. NAMED INSURED** <u>Brownsville Independent School District</u>        **RENEWAL OF** <u>KHT308599</u>

**3. DESCRIPTION OF PREMISES**                                    ☒ "X" If supplemental declarations attached

Prem. No. Bldg. No.                                    Location, Construction and Occupancy

*        *                                                    *

\* As per schedule on file with the company.

---

**COVERAGES PROVIDED** - Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. | Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|---|
| * | * | Blanket Building & Personal Property | $314,106,401 | Special | 100% | Included |
| * | * | Blanket Buisness Income | $  100,000 | Special | 100% | Included |

\* As per schedule on file with the company.

*IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

---

**OPTIONAL COVERAGES** - Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Agreed Value Expiration Date | Coverage | Amount | Replacement Cost (X) Building | Personal Property | Including "Stock" |
|---|---|---|---|---|---|---|---|
| * | * | | | | X | X | |

| Prem. No. | Bldg. No. | Inflation Guard (Percentage) Building | Personal Property | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|---|
| N/A | | | | | | |

* APPLIES TO BUSINESS INCOME ONLY

---

**4. MORTGAGE HOLDERS**

Prem. No.   Bldg. No.           Mortgage Holder Name and Mailing Address

NIL

---

**5. DEDUCTIBLE**              See Endorsement #4              **TOTAL PREMIUM FOR THIS ➡ $ Included COVERAGE PART**

---

**6. FORMS / ENDORSMENTS APPLICABLE**

| To All Coverages | | To Specific Premises / Coverages | | | |
|---|---|---|---|---|---|
| | | Prem. No. | Bldg. No. | Coverages | Form Number |
| CP0010 (0695) | CP0405 (0695) | | | | |
| CP0030 (0695) | CP0425 (~~1091~~)(1096) | | | Included | |
| CP0090 (0788) | CP0440 (~~0788~~)(0695) | | | | |
| CP0142 (1292) | CP1030 (0695) | | | | |
| CP0202 (0296) | IL0415 (1091) | | | | |

---

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1984.

PC 86839 (0187)

# COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL DECLARATIONS

ROYAL &
SUNALLIANCE

**1. POLICY NO.**  KHT310355

**2. NAMED INSURED** Brownsville ISD          **EFFECTIVE DATE** 04/01/98

**3. DESCRIPTION OF PREMISES**

Prem No.  Bldg. No.
**        **

Location, Construction and Occupancy
**

** Refer to PC86839 (0187)

**COVERAGES  PROVIDED** - Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. | Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|-----------|-----------|----------|--------------------|-----------------------|--------------|-------|
| * | * | Blanket Extra Expense | $ 50,000 | Special | 100% | Included |
| * | * | Blanket Musical Instruments/ Band Uniforms | $2,900,000 | Special | 100% | Included |

* As per schedule on file with
the company.

*IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

**OPTIONAL COVERAGES** - Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Agreed Value | | | | Replacement Cost (X) | | |
|-----------|-----------|--------------|--|--|--|----------------------|--|--|
| | | Expiration Date | Coverage | | Amount | Building | Personal Property | Including "Stock" |
| * | * | | | | | X | X | |

| Prem. No. Bldg. No. | Inflation Guard (Percentage) | | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---------------------|-------------------------------|--|------------------------------------------|------------------------------------|---------------------------------------|
| | Building | Personal Property | | | |
| N/A | | | | | |

* APPLIES TO BUSINESS INCOME ONLY

**4. MORTGAGE  HOLDERS**

Prem. No. Bldg. No.    Mortgage Holder Name and Mailing Address
NIL

**5. FORMS / ENDORSEMENTS APPLICABLE TO SPECIFIC PREMISES / COVERAGES**

| Prem. No. Bldg. No. | Coverages | Form Number | Prem. No. | Bldg. No. | Coverages | Form Number |
|---------------------|-----------|-------------|-----------|-----------|-----------|-------------|
| | Refer to PC86839 | | | | | |

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright. ISO Commercial Risk Services, Inc., 1984.

after the beginning of the "period of resto-ration" is:

**(1)** The Limit of Insurance, multiplied by

**(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example:**

When:  The Limit of Insurance
is                                              $120,000

The fraction shown in the Declarations for this Optional Coverage is                                  ¼

The most we will pay for loss in each period of 30 consecutive days is: $120,000 x ¼ = $30,000

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days  1-30 | $40,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $90,000 |

We will pay:

| | |
|---|---|
| Days  1-30 | $30,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

**a.** To activate this Optional Coverage:

**(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

**(a)** During the 12 months prior to the date of the Work Sheet; and

**(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

**(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

**(a)** The Coinsurance percentage shown in the Declarations; multiplied by

**(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

**b.** The Additional Condition, Coinsurance, is suspended until:

**(1)** 12 months after the effective date of this Optional Coverage; or

**(2)** The expiration date of this policy;

whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example:**

When:  The Limit of Insurance
is                                        $100,000
The Agreed Value is               $200,000
The amount of loss is            $ 80,000

Step (a): $100,000 ÷ $200,000 = .50

Step (b): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under paragraph **A.3.d.**, Extended Business Income, the number "30" in subparagraph **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**G. DEFINITIONS**

**1.** "Finished Stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

**3.** "Period of Restoration" means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense coverage;

ic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1—September 1. Loss during the period September 2—October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1—September 29 (60 consecutive days). Loss during the period September 30—October 15 is not covered.

**4. Loss Determination**

  **a.** The amount of Business Income loss will be determined based on:

  **(1)** The Net Income of the business before the direct physical loss or damage occurred;

  **(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses.

  **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

  **(4)** Other relevant sources of information, including:

    **(a)** Your financial records and accounting procedures;

    **(b)** Bills, invoices and other vouchers; and

    **(c)** Deeds, liens or contracts.

  **b.** The amount of Extra Expense will be determined based on:

  **(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during

the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

    **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

  **(2)** All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

  **c. Resumption Of Operations**

  We will reduce the amount of your:

  **(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

  **(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

  **d.** If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**5. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

  **a.** We have reached agreement with you on the amount of loss; or

  **b.** An appraisal award has been made.

**E. ADDITIONAL CONDITION**

**Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

  **a.** The Coinsurance percentage shown for Business Income in the Declarations, times

  **b.** The sum of:

  **(1)** The Net Income (Net Profit or Loss before income taxes), and

4

**(2)** When your Business Income coverage ends;

whichever is later.

**c. Alterations and New Buildings.** We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations," the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**d. Extended Business Income.**

**(1)** Business Income other than "Rental Value"

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations," with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had not occurred; or

**(ii)** 30 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused

by or resulting from any Covered Cause of Loss.

**(2)** "Rental Value"

If the necessary suspension of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 30 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**4. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay for loss under this Extension is $100,000 at each location.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply

2

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

    **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

    **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

    **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

    **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

    **a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it

in the Declarations.

    **b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

    **c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

        **(1)** On or after the effective date of this Optional Coverage; and

        **(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

    **a.** The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

    **b.** The amount of increase will be:

        **(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

        **(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

        **(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

If:

| | |
|---|---|
| The applicable Limit of Insurance is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |

The amount of increase is
$100,000 x .08 x 146 ÷ 365 =
                                $3,200

**3. Replacement Cost**

    **a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

    **b.** This Optional Coverage does not apply to:

        **(1)** Personal property of others;

        **(2)** Contents of a residence;

        **(3)** Manuscripts;

notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

    **a. Description of Terms**

        **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

            **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

            **(b)** When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its square footage:

                **(i)** Is not rented; or

                **(ii)** Is not used to conduct customary operations.

        **(2)** Buildings under construction or renovation are not considered vacant.

    **b. Vacancy Provisions**

    If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

        **(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

            **(a)** Vandalism;

            **(b)** Sprinkler leakage, unless you have protected the system against freezing;

            **(c)** Building glass breakage;

            **(d)** Water damage;

            **(e)** Theft; or

            **(f)** Attempted theft.

        **(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

    **a.** At actual cash value as of the time of loss

or damage, except as provided in **b.**, **c.**, **d.**, **e.** and **f.** below.

    **b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:

        **(1)** Awnings or floor coverings;

        **(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

        **(3)** Outdoor equipment or furniture.

    **c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

    **d.** Glass at the cost of replacement with safety glazing material if required by law.

    **e.** Tenant's Improvements and Betterments at:

        **(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

        **(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

            **(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

            **(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

        If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

        **(3)** Nothing if others pay for repairs or replacement.

    **f.** Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

        **(1)** Blank materials for reproducing the records; and

        **(2)** Labor to transcribe or copy the records when there is a duplicate.

6

signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Preservation of Property; or

**2.** Debris Removal; but if:

    **a.** The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

    **b.** The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

    we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**D. DEDUCTIBLE**

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.

**Example No. 1:**

(This example assumes there is no coinsurance penalty.)

Deductible: $250

Limit of Insurance—Bldg. 1:    $60,000
Limit of Insurance—Bldg. 2:    $80,000

Loss to Bldg. 1:    $60,100
Loss to Bldg. 2:    $90,000

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
<u>−   250</u>
$59,850 Loss Payable—Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:  $59,850 + 80,000 = $139,850

**Example No. 2:**

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

Loss to Bldg. 1:    $70,000 (exceeds Limit of Insurance plus Deductible)
Loss to Bldg. 2:    $90,000 (exceeds Limit of Insurance plus Deductible)

Loss Payable—Bldg. 1:    $60,000 (Limit of Insurance)

Loss Payable—Bldg. 2:    $80,000 (Limit of Insurance)

Total amount of loss payable:    $140,000

**E. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select

4

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

   **(1)** The lowest basement floor; or

   **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

**o.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

   **(1)** Are licensed for use on public roads; or

   **(2)** Are operated principally away from the described premises.

   This paragraph does not apply to:

   **(1)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   **(2)** Vehicles or self-propelled machines, other than autos, you hold for sale; or

   **(3)** Rowboats or canoes out of water at the described premises;

**p.** The following property while outside of buildings:

   **(1)** Grain, hay, straw or other crops;

   **(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

  **a. Debris Removal**

   **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

   **(2)** The most we will pay under this Additional Coverage is 25% of:

    **(a)** The amount we pay for the direct physical loss of or damage to Covered Property; plus

    **(b)** The deductible in this policy applicable to that loss or damage.

    But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

   **(3)** This Additional Coverage does not apply to costs to:

    **(a)** Extract "pollutants" from land or water; or

    **(b)** Remove, restore or replace polluted land or water.

  **b. Preservation of Property**

   If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

   **(1)** While it is being moved or while temporarily stored at another location; and

   **(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

  **c. Fire Department Service Charge**

   When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

   **(1)** Assumed by contract or agreement prior to loss; or

   **(2)** Required by local ordinance.

   No Deductible applies to this Additional Coverage.

  **d. Pollutant Clean Up and Removal**

   We will pay your expense to extract "pollutants" from land or water at the described

2



COMMERCIAL PROPERTY
CP 00 10 06 95

# BUILDING AND PERSONAL
# PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H – DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

  **(a)** Machinery and

  **(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

  **(a)** Fire extinguishing equipment;

  **(b)** Outdoor furniture;

  **(c)** Floor coverings; and

  **(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

  **(a)** Additions under construction, alterations and repairs to the building or structure;

  **(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

  **(a)** Made a part of the building or structure you occupy but do not own; and

  **(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

**o.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises.

This paragraph does not apply to:

(1) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

(2) Vehicles or self-propelled machines, other than autos, you hold for sale; or

(3) Rowboats or canoes out of water at the described premises.

**p.** The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) The most we will pay under this Additional Coverage is 25% of:

(a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

Copyright, ISO Commercial Risk Services, Inc., 1994
CP 00 10 06 95    □



**(b)** The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

**(3)** This Additional Coverage does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Building to apply to:

**(a)** Your new buildings while being built on the described premises, and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2)** You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.




(3) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

(a) This policy expires.

(b) 30 days expire after you acquire or begin to construct the property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records – Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2,500 at each described premises, unless a higher limit is shown in the Declarations.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock", that is temporarily at a location you do not own, lease or operate. This Extension does not apply to Covered Property:

(1) In or on a vehicle;

(2) In the care, custody or control of your salespersons; or

(3) At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Preservation of Property; or




2. Debris Removal; but if:

a. The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

b. The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

## D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.

**Example No. 1:**

(This example assumes there is no coinsurance penalty.)

Deductible: $250

| | |
|---|---|
| Limit of Insurance – Bldg. 1: | $60,000 |
| Limit of Insurance – Bldg. 2: | $80,000 |
| Loss to Bldg. 1: | $60,100 |
| Loss to Bldg. 2: | $90,000 |

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
– 250
$59,850  Loss Payable – Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:  $59,850 + 80,000 = $139,850

**Example No. 2:**

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

| | |
|---|---|
| Loss to Bldg. 1: | $70,000 (exceeds Limit of Insurance plus Deductible) |
| Loss to Bldg. 2: | $90,000 (exceeds Limit of Insurance plus Deductible) |
| Loss Payable – Bldg. 1: | $60,000 (Limit of Insurance) |
| Loss Payable – Bldg. 2: | $80,000 (Limit of Insurance) |

Total amount of loss payable: $140,000

## E. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.



**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

 

**6. Vacancy**

**a. Description of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its square footage:

(i) Is not rented; or

(ii) Is not used to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety glazing material if required by law.

e. Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.




If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**f.** Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

**(1)** Blank materials for reproducing the records; and

**(2)** Labor to transcribe or copy the records when there is a duplicate.

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3)**.

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $100,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

Step (1): $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷**Error! AutoText entry not defined.** $200,000 = .50

Step (3): $ 40,000 x .50 = $20,000

Step (4): $ 20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2** (Adequate Insurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $200,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

 

**Example No. 3:**
When:

| | |
|---|---|
| The value of property is: | |
| Bldg. at Location No. 1 | $75,000 |
| Bldg. at Location No. 2 | $100,000 |
| Personal Property at | |
| Location No. 2 | $75,000 |
| | $250,000 |
| The Coinsurance | |
| percentage for it is | 90% |
| The Limit of Insurance for | |
| Buildings and Personal | $180,000 |
| Property at Location | |
| Nos. 1 and 2 is | |
| The Deductible is | $1,000 |
| The amount of loss is: | |
| Bldg. at Location No. 2 | $30,000 |
| Personal Property at | $20,000 |
| Location No. 2. | $50,000 |

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷**Error! AutoText entry not defined.** $225,000 = .80

Step (3): $ 50,000 x .80 = $40,000.

Step (4): $ 40,000 − $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

  **a.** The term mortgageholder includes trustee.

  **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

  **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

  **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

    **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

    **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

  All of the terms of this Coverage Part will then apply directly to the mortgageholder.

  **e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

    **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

  At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

  **f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

    **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.




**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

  **a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

  **b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

  **c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

    **(1)** On or after the effective date of this Optional Coverage; and

    **(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

  **a.** The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

  **b.** The amount of increase will be:

    **(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

    **(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

    **(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

| If: | |
|---|---|
| The applicable Limit of Insurance is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |
| The amount of increase is $100,000 x .08 x 146 ÷**Error! AutoText entry not defined.** 365 = | $3,200 |

**3. Replacement Cost**

  **a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

  **b.** This Optional Coverage does not apply to:

    **(1)** Personal property of others;

    **(2)** Contents of a residence;

    **(3)** Manuscripts;

    **(4)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

    **(5)** "Stock", unless the Including "Stock" option is shown in the Declarations.

  **c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

  **d.** We will not pay on a replacement cost basis for any loss or damage:

    **(1)** Until the lost or damaged property is actually repaired or replaced; and

    **(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

  **(1)** The Limit of Insurance applicable to the lost or damaged property;

  **(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

    **(a)** Of comparable material and quality; and

    **(b)** Used for the same purpose; or

  **(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

## H. DEFINITIONS

**1.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**2.** **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.



**COMMERCIAL PROPERTY**
**CP 00 30 06 95**

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION **G** – DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations.

**(i)** Business Income including "Rental Value".

**(ii)** Business Income other than "Rental Value".

**(iii)** "Rental Value".

If option **(i)** above is selected, the term Business Income will include "Rental Value". If option (iii) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

**1.** All routes within the building to gain access to the described premises; and

**2.** Your personal property in the open (or in a vehicle) within 100 feet.

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

### 2. Covered Causes of Loss

See applicable Causes of Loss Form as shown in the Declarations.

### 3. Additional Coverages

**a. Extra Expense.**

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

**(1)** We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

**(a)** At the described premises; or

**(b)** At replacement premises or at temporary locations, including:

**(i)** Relocation expenses; and

**(ii)** Costs to equip and operate the replacement or temporary locations.

**(2)** We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations".

**(3)** We will pay any Extra Expense to:

**(a)** Repair or replace any property; or

**(b)** Research, replace or restore the lost information on damaged valuable papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.



**b. Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

**(1)** 3 consecutive weeks after the time of that action; or

**(2)** When your Business Income coverage ends;

whichever is later.

**c. Alterations and New Buildings.** We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**d. Extended Business Income.**

**(1)** Business Income Other Than "Rental Value"

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 30 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2)** "Rental Value"

If the necessary suspension of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

 

**(b)** Ends on the earlier of:

    **(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

    **(ii)** 30 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**4. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay for loss under this Extension is $100,000 at each location.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

    **(1)** This policy expires;

    **(2)** 30 days expire after you acquire or begin to construct the property; or

    **(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Alterations and New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

**D. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

    **(1)** Notify the police if a law may have been broken.

    **(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

    **(3)** As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

 Copyright ISO Commercial Risk Services, Inc., 1994



(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Limitation – Electronic Media And Records**

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1 – September 1. Loss during the period September 2 – October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1 – September 29 (60 consecutive days). Loss during the period September 30 – October 15 is not covered.

**4. Loss Determination**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

    **(a)** Your financial records and accounting procedures;

    **(b)** Bills, invoices and other vouchers; and

    **(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

    **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**5. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**E. ADDITIONAL CONDITION**

**Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

    **a.** The Coinsurance percentage shown for Business Income in the Declarations; times

    **b.** The sum of:

        **(1)** The Net Income (Net Profit or Loss before income taxes), and

        **(2)** Operating expenses, including payroll expenses,

        that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

**1.** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

**2.** Divide the Limit of Insurance for the described premises by the figure determined in Step **1.**; and

**3.** Multiply the total amount of loss by the figure determined in Step **2.**

We will pay the amount determined in Step **3.** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.




In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

1. Prepaid freight – outgoing;
2. Returns and allowances;
3. Discounts;
4. Bad debts;
5. Collection expenses;
6. Cost of raw stock and factory supplies consumed (including transportation charges);
7. Cost of merchandise sold (including transportation charges);
8. Cost of other supplies consumed (including transportation charges);
9. Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;
10. Power, heat and refrigeration expenses that do not continue under contract (if form **CP 15 11** is attached);
11. All ordinary payroll expenses or the amount of payroll expense excluded (if form **CP 15 10** is attached); and
12. Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises | |
|---|---|---|
| | would have been | $400,000 |
| | The Coinsurance percentage is | 50% |
| | The Limit of Insurance is | $150,000 |
| | The amount of loss is | $ 80,000 |

Step 1: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000 ÷**Error! AutoText entry not defined.** $200,000 = .75

Step 3: $ 80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises | |
|---|---|---|
| | would have been | $400,000 |
| | The Coinsurance percentage is | 50% |
| | The Limit of Insurance is | $200,000 |
| | The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to the Extra Expense Additional Coverage.

**F. OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income is the lesser of:

      (1) The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

      (2) The Limit of Insurance shown in the Declarations.

Copyright, ISO Commercial Risk Services, Inc., 1994
CP 00 30 06 95   □





**2. Monthly Limit Of Indemnity**

  **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

  **b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

    **(1)** The Limit of Insurance, multiplied by

    **(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example:**

When: The Limit of Insurance
is                          $120,000
The fraction shown in the Declarations for this Optional Coverage is                1/4

The most we will pay for loss in each period of 30 consecutive days is:

$ 120,000 x 1/4 = $30,000

If, in this example, the actual amount of loss is:

Days  1-30 $40,000
Days 31-60  20,000
Days 61-90  <u>30,000</u>
              $90,000

We will pay:

Days  1-30 $30,000
Days 31-60  20,000
Days 61-90  <u>30,000</u>
              $80,000

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

  **a.** To activate this Optional Coverage:

    **(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

      **(a)** During the 12 months prior to the date of the Work Sheet; and

      **(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

    **(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

      **(a)** The Coinsurance percentage shown in the Declarations; multiplied by

      **(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

  **b.** The Additional Condition, Coinsurance, is suspended until:

    **(1)** 12 months after the effective date of this Optional Coverage; or

    **(2)** The expiration date of this policy;

    whichever occurs first.

  **c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

    **(1)** Within 12 months of the effective date of this Optional Coverage; or

    **(2)** When you request a change in your Business Income Limit of Insurance.

  **d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

    **(1)** The Business Income Limit of Insurance; divided by

    **(2)** The Agreed Value.

**Example:**

When: The Limit of Insurance
is                          $100,000
The Agreed Value is         $200,000
The amount of loss is       $ 80,000

Step (a): $100,000 ÷**Error! AutoText entry not defined.** $200,000 = .50

Step (b): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

 

**4. Extended Period Of Indemnity**

Under paragraph **A.3.d.,** Extended Business Income, the number "30" in subparagraph **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

## G. DEFINITIONS

**1. "Finished Stock"** means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2. "Operations"** means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

**3. "Period of Restoration"** means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**4. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5. "Rental Value"** means the:

**a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

**b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

**c.** Fair rental value of any portion of the described premises which is occupied by you.

     Copyright, ISO Commercial Risk Services, Inc., 1994     CP 00 30 06 95     ☐

 

**COMMERCIAL PROPERTY**

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

**2.** The coverage territory is:

**a.** The United States of America (including its territories and possessions);

**b.** Puerto Rico; and

**c.** Canada.



**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
CP 00 90 07 88    □



**COMMERCIAL PROPERTY**
**CP 01 42 12 92**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part is replaced by the term Policy.

**B.** The provisions of items **B.1.** through **B.5.** below apply to the following coverage forms:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
CONDOMINIUM ASSOCIATION COVERAGE FORM;
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
BUILDERS RISK COVERAGE FORM;
TOBACCO SALES WAREHOUSES COVERAGE FORM; AND
STANDARD PROPERTY POLICY

1. Under Additional Coverages, the Debris Removal coverage is deleted and replaced by the following:

   **Debris Removal**

   We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

2. Under Additional Coverages, the Fire Department Service Charge coverage is deleted.

3. Under Additional Coverages, the Pollutant Clean Up and Removal coverage is deleted.

4. Under LIMITS OF INSURANCE, the third and fourth paragraphs (second and third paragraphs in the Tobacco Sales Warehouses Coverage Form) are deleted and replaced by the following:

   The limits applicable to the Coverage Extensions are in addition to the Limits of Insurance.

   Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

   **a.** Preservation of Property; or

   **b.** Debris Removal; but if the sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance, we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

5. Under DEFINITIONS, the definition of "pollutants" is deleted.

**C.** The ADDITIONAL COVERAGE – COLLAPSE in the CAUSES OF LOSS – BROAD FORM is deleted and replaced by the following:

**Additional Coverage – Collapse**

We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building.

We will not pay for loss or damage described below unless the loss or damage is a direct result of the collapse of a building:

1. Loss or damage to the following types of property, if otherwise covered in this Coverage Part: outdoor radio or television antennas, including their lead-in wiring, masts or towers; awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks, roadways and other paved surfaces; and

2. Loss or damage by settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings.

This Additional Coverage will not increase the Limits of Insurance provided in this Coverage Part.

Section **E.** of this endorsement restricts collapse coverage on property covered under the Builders Risk Coverage Form.

**D.** The provisions of items **D.1.** through **D.5.** below apply to the CAUSES OF LOSS – SPECIAL FORM.

  **1.** Exclusion **B.2.d.(4)** is deleted and replaced by the following exclusion:

    **(4)** Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, ceilings, curbs, fences, retaining walls or swimming pools.

  **2.** Exclusion **B.2.f.**, which pertains to continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more, is deleted. However, all other exclusions pertaining to loss or damage by water continue to apply.

  **3.** Exclusion **B.2.k.**, Collapse, is deleted. However, Section **E.** of this endorsement restricts collapse coverage on property covered under the Builders Risk Coverage Form.

  **4.** Exclusion **B.2.l.**, which pertains to pollutants, is deleted.

  **5.** Limitation **C.1.c.** is replaced by the following:

    **c.** We will not pay for loss of or damage to the interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      **(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      **(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

  **6.** Section **D.**, ADDITIONAL COVERAGE – COLLAPSE, is deleted.

**E.** In the BUILDERS RISK COVERAGE FORM, condition **F.3.**, Restriction of Additional Coverage – Collapse, is replaced by the following:

  **3. Restriction of Collapse Coverage**

  If the Causes of Loss – Broad Form or Causes of Loss – Special Form applies to the Builders Risk Coverage Form, coverage for collapse is restricted as follows:

  We will not pay for loss or damage caused by or resulting from collapse of a building under construction, or any part of a building under construction, caused by use of defective materials or methods in construction, remodeling or renovation.

**F. LEGAL ACTION AGAINST US**

  **1.** The LEGAL ACTION AGAINST US Commercial Property Condition is replaced by the following, except as provided in **F.2.** below:

  **LEGAL ACTION AGAINST US**

  No one may bring a legal action against us under this Coverage Part unless:

    **a.** There has been full compliance with all of the terms of this Coverage Part; and

    **b.** The action is brought within 2 years and one day after the date on which the direct physical loss or damage occurred.

  **2.** Paragraph **F.1.** above does not apply to the Legal Action Against Us loss condition in the LEGAL LIABILITY COVERAGE FORM **CP 00 40.**

**G. APPRAISAL**

  **1.** Except as provided in **G.2.** below, the APPRAISAL Loss Condition in the:

  BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
  CONDOMINIUM ASSOCIATION COVERAGE FORM;
  CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
  BUILDERS RISK COVERAGE FORM;
  EXTRA EXPENSE COVERAGE FORM;
  LEASEHOLD INTEREST COVERAGE FORM;
  TOBACCO SALES WAREHOUSES COVERAGE FORM; and
  STANDARD PROPERTY POLICY

  is replaced by the following:

  **APPRAISAL**

  If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

    **a.** Pay its chosen appraiser; and

    **b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

a. You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

b. We will still retain our right to deny the claim.

2. The APPRAISAL Condition in the:

BUSINESS INCOME COVERAGE FORM (AND EXTRA EXPENSE); and
BUSINESS INCOME COVERAGE FORM (WITHOUT EXTRA EXPENSE)

is replaced by the following:

**APPRAISAL**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense and the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

a. You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

b. We will still retain our right to deny the claim.

H. The provision requiring signed, sworn proof of loss in the DUTIES IN THE EVENT OF LOSS OR DAMAGE Loss Condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

I. Under the LOSS PAYMENT CONDITION, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

1. **Claims Handling**

a. Within 15 days after we receive written notice of claim, we will:

(1) Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

(2) Begin any investigation of the claim; and

(3) Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

b. We will notify you in writing as to whether:

(1) The claim or part of the claim will be paid;

(2) The claim or part of the claim has been denied, and inform you of the reasons for denial;

(3) More information is necessary; or

(4) We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in b.(1) through b.(4) above, within:

(1) 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

(2) 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

2. We will pay for covered loss or damage within 5 business days after:

   a. We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   b. An appraisal award has been made.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

   The following paragraphs are added:

3. **Catastrophe Claims**

   If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in I.1. and I.2. above are extended for an additional 15 days.

   Catastrophe or Major Natural Disaster means a weather related event which:

   (1) Is declared a disaster under the Texas Disaster Act of 1975; or

   (2) Is determined to be a catastrophe by the State Board of Insurance.

4. The term "business day", as used in the LOSS PAYMENT CONDITION, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

J. The following is added to the VALUATION Loss Condition:

   **Article 6.13. Policy a Liquidated Demand.** A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. The provisions of this Article shall not apply to personal property.

K. Paragraphs **d.** and **f.** of the MORTGAGE HOLDERS ADDITIONAL CONDITION are replaced by the following:

   d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

   (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

   (2) Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

   (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

   All of the terms of this Coverage Part will then apply directly to the mortgage holder.

   f. If we cancel this policy, we will give written notice to the mortgage holder at least:

   (1) 14 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   (2) 30 days before the effective date of cancellation if we cancel for any other reason.

L. The following is added to Paragraph D.1. in the Duties in the Event of Accident, Claim or Suit loss condition in the LEGAL LIABILITY COVERAGE FORM:

   We will notify the first Named Insured in writing of:

   1. An initial offer to compromise or settle a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 10th day after the date on which the offer is made.

   2. Any settlement of a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 30th day after the date of the settlement.

M. In the CAUSES OF LOSS – BROAD FORM, the Water Damage Cause of Loss is replaced by the following:

   Water Damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam, other than an Automatic Sprinkler System. If the building or structure containing the system or appliance is Covered Property, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or steam escapes.

   We will not pay:

   a. The cost to repair any defect that caused the loss or damage; or

   b. For loss or damage caused by or resulting from freezing, unless:

   (1) You do your best to maintain heat in the building or structure; or

   (2) You drain the equipment and shut off the water supply if the heat is not maintained.



COMMERCIAL PROPERTY
CP 02 02 02 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraphs **2.**, **3.** and **4.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. a.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we may cancel this policy by mailing or delivering written notice of cancellation, at least 30 days before the effective date of cancellation, to:

**(1)** The first Named Insured; and

**(2)** Each unit-owner to whom we issued a certificate or memorandum of insurance.

If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

**b.** If the policy covers a risk other than the risk described in Paragraph **2.a.**, then we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 14 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

**c.** In compliance with Texas law, we will not cancel this policy solely because the policyholder is an elected official.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will also mail or deliver notice of cancellation to each unit-owner to whom we issued a certificate or memorandum of insurance, to each last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** The notice of cancellation will also state that pro rata unearned paid premium, if not tendered, will be refunded on demand.

**B.** The following condition is added and applies unless Paragraph **D.** applies:

**NONRENEWAL**

**1.** If we elect not to renew this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

**2.** In compliance with Texas law, we will not refuse to renew this policy solely because the policyholder is an elected official.

**3.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then:

**a.** We will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to the first Named Insured and to each unit-owner to whom we issued a certificate or memorandum of insurance.

**b.** We will mail or deliver such notice to each last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

Copyright, ISO Commercial Risk Services, Inc., 1995



## C. Cancellation – One- And Two-Family Dwellings And Governmental Property

1. Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

   If this policy is cancelled, we will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

   The refund will be pro rata if:

   a. We cancel this policy; or

   b. The first Named Insured cancels this policy because:

      (1) We refused to provide additional coverage which the first Named Insured requested under the policy; or

      (2) We reduced or restricted coverage under the policy without the consent of the first Named Insured.

   The refund may be less than pro rata if the first Named Insured cancels this policy for a reason other than those listed in **b.(1)** and **b.(2)** above.

2. The following provisions are added to the **Cancellation** Common Policy Condition:

   a. If this policy has been in effect for 90 days or less and is not a renewal of a policy we issued, we may cancel coverage on one – and two-family dwellings and on governmental units for any reason.

   b. If this policy has been in effect for more than 90 days or is a renewal of a policy we issued, we may cancel coverage on one – and two-family dwellings and on governmental units only for the following reasons:

      (1) If the first Named Insured does not pay the premium or any portion of the premium when due;

      (2) If the Texas Department of Insurance determines that continuation of this policy would result in violation of the Texas Insurance Code or any other law governing the business of insurance in Texas;

      (3) If the Named Insured submits a fraudulent claim; or

      (4) If there is an increase in the hazard covered by this policy that is within the control of the Named Insured and would produce an increase in the premium rate of this policy.

   c. If such coverage is cancelled, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

   d. In compliance with Texas law, we will not cancel such coverage solely because the policyholder is an elected official.

## D. The following condition is added:

### NONRENEWAL – ONE- AND TWO-FAMILY DWELLINGS AND GOVERNMENTAL PROPERTY

1. If we elect not to renew coverage on one – and two-family dwellings or on governmental units, we will mail or deliver written notice of nonrenewal to the first Named Insured and any mortgageholder shown in the Declarations, at least 30 days before the expiration date. Proof of mailing will be sufficient proof of notice.

   We will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

   If we fail to give the first Named Insured proper notice of our refusal to renew, the first Named Insured may require us to renew the policy.

2. We may elect not to renew such coverage for any reason, subject to the exceptions and limitations in Paragraphs **3.** and **4.** below.

3. We will not refuse to renew coverage:

   a. Solely because the policyholder is an elected official; or

   b. Because of claims for losses resulting from natural causes.

4. **Claims That Do Not Result From Natural Causes**

   a. If we have previously notified you as provided in **b.** below, we may refuse to renew coverage if the Named Insured has filed under this policy, in any three-year period, three or more claims that do not result from natural causes.

   b. If the Named Insured has filed two such claims in a period of less than three years, we may notify the first Named Insured in writing that, if the Named Insured files a third such claim during the three year period, we may refuse to renew coverage.

   c. A claim does not include a claim that is filed but is not paid or payable under the policy.



POLICY NUMBER:

**COMMERCIAL PROPERTY**
CP 04 05 06 95

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE*

| Bldg. No./ Prem. No. | Cov. A | Cov. B Limit of Insur. | Cov. C Limit of Insur. | Cov. B and C Blanket Limit of Insur. | |
|---|---|---|---|---|---|
| All /All · | [X] | $ 25,000 | $ 50,000 | $ _____ | ** |
| \_\_\_\_/ | [ ] | $ ~~Sublimit~~ | $ ~~Sublimit~~ | $ _____ | ** |
| \_\_\_\_/ | [ ] | $ _____ | $ _____ | $ _____ | ** |

\* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

\*\* Do **not** enter a Blanket Limit of Insurance if individual Limits of Insurance are selected for Coverages B and C, or if one of these Coverages is not applicable.

---

**A.** Each Coverage – Coverage A, Coverage B and Coverage C – applies only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the Building property identified for that Coverage(s) in the Schedule.

**B.** We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**C.** **Coverage**

   **1.** Coverage A – Coverage for Loss to the Undamaged Portion of the Building

   If a Covered Cause of Loss occurs to covered Building property, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

   **a.** Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

   **b.** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

   **c.** Is in force at the time of loss.

   Coverage A is included within the Limit of Insurance shown in the Declarations as applicable to the covered Building property. Coverage A does not increase the Limit of Insurance.

   **2.** **Coverage B – Demolition Cost Coverage**

   If a Covered Cause of Loss occurs to covered Building property, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by enforcement of building, zoning or land use ordinance or law.

   The COINSURANCE Additional Condition does not apply to Demolition Cost Coverage.

---



**3. Coverage C – Increased Cost of Construction Coverage**

a. If a Covered Cause of Loss occurs to the covered Building property, we will pay for the increased cost to:

(1) Repair or reconstruct damaged portions of that Building property; and/or

(2) Reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required;

when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.

However:

(1) This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

(2) We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The COINSURANCE Additional Condition does not apply to Increased Cost of Construction Coverage.

b. When covered Building property is damaged or destroyed by a Covered Cause of Loss and Coverage C applies to that property in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in **3.a.**:

(1) The cost of excavations, grading, backfilling and filling;

(2) Foundation of the building;

(3) Pilings; and

(4) Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this provision, **3.b.**

**D. Loss Payment**

1. When Coverage A applies, loss to the building, including loss in value of the undamaged portion of the building due to enforcement of an ordinance or law, will be determined as follows:

a. If the Replacement Cost Coverage Option applies and the property is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

(1) The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

(2) The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

b. If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

(1) The actual cash value of the building at the time of loss; or

(2) The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

2. Unless paragraph **D.4.** applies, loss payment under Coverage B – Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

a. The amount you actually spend to demolish and clear the site of the described premises; or

b. The applicable Limit of Insurance shown for Coverage B in the Schedule above.



3. Unless paragraph **D.4.** applies, loss payment under Coverage C – Increased Cost of Construction Coverage will be determined as follows:

   **a.** We will not pay under Coverage C:

      **(1)** Until the property is actually repaired or replaced, at the same or another premises; and

      **(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

   **b.** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage C is the lesser of:

      **(1)** The increased cost of construction at the same premises; or

      **(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

   **c.** If the ordinance or law requires relocation to another premises, the most we will pay under Coverage C is the lesser of:

      **(1)** The increased cost of construction at the new premises; or

      **(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

4. If a **Blanket** Limit of Insurance is shown for Coverages B and C in the Schedule above, paragraphs **D.2.** and **D.3.** of this endorsement do not apply with respect to the Building property that is subject to the Blanket Limit, and the following loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Blanket Limit of Insurance shown for Coverages B and C in the Schedule above. Subject to this Blanket Limit of Insurance, the following loss payment provisions apply:

   **a.** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

   **b.** With respect to the Increased Cost of Construction:

      **(1)** We will not pay for the increased cost of construction:

         **(a)** Until the property is actually repaired or replaced, at the same or another premises; and

         **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

      **(2)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

      **(3)** If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

**E.** The terms of this endorsement apply separately to each building to which this endorsement applies.

**F.** Under this endorsement we will not pay for loss due to any ordinance or law that:

   **1.** You were required to comply with before the loss, even if the building was undamaged; and

   **2.** You failed to comply with.

POLICY NUMBER:KHT310355                                    **COMMERCIAL PROPERTY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEWLY ACQUIRED OR CONSTRUCTED PROPERTY–INCREASED LIMIT

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> STANDARD PROPERTY POLICY
> LEGAL LIABILITY COVERAGE FORM

**A.** When this endorsement is attached to the LEGAL LIABILITY COVERAGE FORM CP 00 40, the term Newly Acquired or Constructed Property in this endorsement is replaced by the term Newly Acquired Property. In addition, the reference to subparagraph (1) in paragraph B. below is replaced by a reference to subparagraph (1)(b).

**B.** The $250,000 Limit of Insurance in subparagraph (1) of the NEWLY ACQUIRED OR CONSTRUCTED PROPERTY Coverage Extension is replaced by the following:

The Newly Acquired or Constructed Property Limit shown in the Schedule or in the Declarations.

**SCHEDULE**

**Newly Acquired or Constructed Property Limit: $2,500,000 Sublimit (90 days reporting)**

POLICY NUMBER:KHT310355

**COMMERCIAL PROPERTY**
**CP 04 40 06 95**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPOILAGE COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM

**SCHEDULE\***

| Prem. No. * | Bldg. No. * | Description of Property | Limit of Insurance $5,000 Sublimit | Deductible See Endt. #4 | Refrigeration Maintenance Agreement | Causes of Loss: Breakdown or Contamination | Power Outage | Selling Price |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

The Coverage Form to which this endorsement applies is extended to insure against direct physical loss or damage by the Covered Causes of Loss, but only with respect to coverage provided by this endorsement.

**A.** Paragraph **A.1. COVERED PROPERTY** is replaced by the following:

**1. Covered Property**

Covered Property means "perishable stock" at the described premises owned by you or by others that is in your care, custody or control.

**B.** The following is added to Paragraph **A.2. PROPERTY NOT COVERED:**

**q. Property located:**

**(1)** On buildings;

**(2)** In the open; or

**(3)** In vehicles.

\*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.



**C.** Paragraph **A.3. COVERED CAUSES OF LOSS** is replaced by the following:

**3. Covered Causes of Loss**

Covered Causes of Loss means the following only if indicated by an "X" in the Schedule:

**a.** Breakdown or Contamination, meaning:

**(1)** Change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises; and

**(2)** Contamination by the refrigerant.

**b.** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**D. SELLING PRICE**

If Selling price is indicated by an "X" in the Schedule, the following is added to the VALUATION Loss Condition:

We will determine the value of finished "perishable stock" in the event of loss or damage at:

**1.** The selling price, as if no loss or damage had occurred;

**2.** Less discounts and expenses you otherwise would have had.

**E.** Paragraph **A.5. COVERAGE EXTENSIONS** does not apply.

**F.** Paragraph **B. EXCLUSIONS** is replaced by the following:

**B. EXCLUSIONS**

**1.** Only the following EXCLUSIONS contained in paragraph **B.1.** of the Causes of Loss Form applicable to this Coverage Part apply to Spoilage Coverage:

**a.** EARTH MOVEMENT;

**b.** GOVERNMENTAL ACTION;

**c.** NUCLEAR HAZARD;

**d.** WAR AND MILITARY ACTION; and

**e.** WATER.

**2.** The following EXCLUSIONS are added:

We will not pay for loss or damage caused by or resulting from:

**a.** The disconnection of any refrigerating, cooling or humidity control system from the source of power.

**b.** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

**c.** The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

**(1)** Lack of fuel; or

**(2)** Governmental order.

**d.** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

**e.** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

**G.** Paragraph **D. DEDUCTIBLE** is replaced by the following:

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Schedule of this endorsement. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance. No other deductible in this policy applies to the coverage provided by this endorsement.

**H.** Paragraph **F. ADDITIONAL CONDITIONS** is replaced by the following:

**ADDITIONAL CONDITION**

The following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

**REFRIGERATION MAINTENANCE AGREEMENTS**

If Breakdown or Contamination is designated as a Covered Cause of Loss and a refrigeration maintenance agreement is shown as applicable by an "X" in the Schedule, the following condition applies:

You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us, the insurance provided by this endorsement will be automatically suspended at the involved location.

**I.** Paragraph **G. OPTIONAL COVERAGES** does not apply.

**J.** The following is added to the DEFINITIONS:

**"Perishable Stock"** means personal property:

**a.** Maintained under controlled conditions for its preservation; and

**b.** Susceptible to loss or damage if the controlled conditions change.



COMMERCIAL PROPERTY
CP 10 30 06 95

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section F. – Definitions.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section **B.,** Exclusions; or

2. Limited in Section **C.,** Limitations;

that follow.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance or Law, applies whether the loss results from:

   (1) An ordinance or law that is enforced even if the property has not been damaged; or

   (2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(2) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.



**e. Utility Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in **2.d. (1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from gases of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

 Copyright, ISO Commercial Risk Services, Inc., 1994 CP 10 30 06 95    □



f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others; or

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

k. Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

3. We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

4. **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

a. **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

(2) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.



(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

  (a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

  (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(6) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.** Ordinance or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

  (a) Your cancelling the lease;

  (b) The suspension, lapse or cancellation of any license; or

  (c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following Exclusions do not apply to insurance under this Coverage Form:

  (a) Paragraph **B.1.a.**, Ordinance or Law;

  (b) Paragraph **B.1.c.**, Governmental Action;

  (c) Paragraph **B.1.d.**, Nuclear Hazard;

  (d) Paragraph **B.1.e.**, Utility Services; and

  (e) Paragraph **B.1.f.**, War and Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

  (a) **Contractual Liability**

    We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

    (i) Your assumption of liability was executed prior to the accident; and

    (ii) The building is Covered Property under this Coverage Form.

  (b) **Nuclear Hazard**

    We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. LIMITATIONS**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

  **a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

  **b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.



c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

(1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

(2) Business Income coverage or Extra Expense coverage.

e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

f. Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

g. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay more than $500 in any one occurrence for loss of or damage to glass that is part of a building or structure, regardless of the number of panes, plates or similar units of glass. Subject to this $500 aggregate, we will not pay more than $100 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

However, this limitation does not apply to:

a. Loss or damage by the "specified causes of loss", except vandalism; or

b. Business Income coverage or Extra Expense coverage.

3. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

a. Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

b. Animals, and then only if they are killed or their destruction is made necessary.

c. Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

(1) Glass that is part of a building or structure;

(2) Containers of property held for sale; or

(3) Photographic or scientific instrument lenses.

d. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

(1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

(2) To Business Income coverage or to Extra Expense coverage.

4. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

a. $2,500 for furs, fur garments and garments trimmed with fur.

b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2,500 for patterns, dies, molds and forms.



**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.4.**, does not apply to Business Income coverage or to Extra Expense coverage.

**5.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

## D. ADDITIONAL COVERAGE – COLLAPSE

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5.** below.

**1.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

**a.** The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

**2.** If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

**a.** The personal property which collapses is inside a building; and

**b.** The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

**3.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.**, we will pay for loss or damage to that property only if:

**a.** Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

**b.** The property is Covered Property under this Coverage Form.

**4.** Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**5.** This Additional Coverage – Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

## E. ADDITIONAL COVERAGE EXTENSIONS

**1. Property In Transit.** This Extension applies only to your personal property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   Copyright, ISO Commercial Risk Services, Inc., 1994   CP 10 30 06 95   □

b. Loss or damage must be caused by or result from one of the following causes of loss:

(1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

(2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

(3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

c. The most we will pay for loss or damage under this Extension is $1000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

## F. DEFINITIONS

"Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

1. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   a. The cost of filling sinkholes; or

   b. Sinking or collapse of land into man-made underground cavities.

2. Falling objects does not include loss or damage to:

   a. Personal property in the open; or

   b. The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

3. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.



POLICY NUMBER:KHT310355

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

**SCHEDULE***

| Prem. No. " Where installed and operational" | Bldg. No. | Protective Safeguards Symbols Applicable "P-9" |
|---|---|---|
| | | |

Describe any "P-9": ~~Genteral Station - Burglar Alarm, Seccurity Censors, and Fire Alarms.~~
See Endt #6

1. The following is added to the:

    Commercial Property Conditions
    General Conditions in the Farm Property Coverage Form
    General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
    General Conditions in the Livestock Coverage Form

    **PROTECTIVE SAFEGUARDS**

    a. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

    b. The protective safeguards to which this endorsement applies are identified by the following symbols:

    **"P-1"** **Automatic Sprinkler System,** including related supervisory services.

    Automatic Sprinkler System means:

    (1) Any automatic fire protective or extinguishing system, including connected:

    (a) Sprinklers and discharge nozzles;

    (b) Ducts, pipes, valves and fittings;

    (c) Tanks, their component parts and supports; and

    (d) Pumps and private fire protection mains.

    (2) When supplied from an automatic fire protective system:

    (a) Non-automatic fire protective systems; and

    (b) Hydrants, standpipes and outlets.

    **"P-2"** **Automatic Fire Alarm,** protecting the entire building, that is:

    (1) Connected to a central station; or

    (2) Reporting to a public or private fire alarm station.

    **"P-3"** **Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

    **"P-4"** **Service Contract** with a privately owned fire department providing fire protection service to the described premises.

    **"P-9"** The protective system described in the Schedule.

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.




2. The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND
    OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
FARM PROPERTY COVERAGE FORM
MOBILE AGRICULTURAL MACHINERY AND
    EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

a. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

b. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990

IL 04 15 10 91

# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**ROYAL &**
**SUNALLIANCE**

1. **POLICY NO.** KHT310355     **EFFECTIVE DATE** <u>04/01/98</u>

2. **NAMED INSURED** <u>Brownsville Independent School District</u>     **RENEWAL OF** <u>KHT308599</u>

3. **LOCATION**     **ADDRESS OF LOCATION**

\* As per schedule on file with the company.

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Accounts Receivable | $100,000 Blanket | $ See Endt. #4 | $Included |

**MORTGAGE HOLDER / LOSS PAYEE**
NIL

**FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**
CM0066 (0695)

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Valuable Papers & Records | $ 100,000 Blanket | $ See Endt. #4 | $ Included |

**MORTGAGE HOLDER / LOSS PAYEE**
NIL

**FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**
CM0067 (0695)

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Transit | $ 100,000 Sublimit | $ See Endt. #4 | $ Included |

**MORTGAGE HOLDER / LOSS PAYEE**
NIL

**FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**
MC0005 (0187)

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES: | TOTAL PREMIUM FOR THIS COVERAGE PART | $Continued |
|---|---|---|

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

(Page 1 of 2)

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services, Inc., 1984.

MC 86841(0187)





**ROYAL & SUNALLIANCE**

**1. POLICY NO.**  KHT310355

**EFFECTIVE DATE** <u>04/01/98</u>

**2. NAMED INSURED** <u>Brownsville Independent School District</u>

**RENEWAL OF** <u>KHT308599</u>

**3. LOCATION**                                    **ADDRESS OF LOCATION**

* \*                                                  \*                          —

\* As per Schedule on file with the company.

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Contractors Equipment<br>Actual Cash Value | $283,677 Blanket | $ See Endt. #4 | $Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0007 (0294) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| EDP<br>*Replacement Cost* | $ 26,488,886 Blanket | $ See Endt. #4 | $ Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0010 (0193) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Radio & Equipment<br>*Replacement Cost* | $ 699,991 Blanket | $ See Endt. #4 | $ Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0033 (1190) | | | |

| **4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES:**<br>CM0001 (0695), CM0112 (1090) | **TOTAL PREMIUM FOR THIS COVERAGE PART** | **$Included** |
|---|---|---|

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.<br>Copyright, Insurance Services, Inc., 1984.

MC 86841(0187)



CM 00 66 06 95

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E—DEFINITIONS.

## A. COVERAGE

1. We will pay:

   a. All amounts due from your customers that you are unable to collect;

   b. Interest charges on any loan required to off-set amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the "loss"; and

   d. Other reasonable expenses that you incur to re-establish your records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

2. **PROPERTY NOT COVERED**

   Coverage does not apply to:

   a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

   b. Contraband, or property in the course of illegal transportation or trade.

3. **COVERED CAUSES OF LOSS**

   Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to your records of accounts receivable except those causes of "loss" listed in the Exclusions.

4. **ADDITIONAL COVERAGE—COLLAPSE**

   We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

   a. Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

5. **COVERAGE EXTENSION**

   **Removal**

   If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of "loss," we will pay for "loss" while they are:

   a. At a safe place away from your "premises"; or

   b. Being taken to and returned from that place.

   This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

## B. EXCLUSIONS

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

   a. **GOVERNMENTAL ACTION**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   b. **NUCLEAR HAZARD**

   (1) Any weapon employing atomic fission or fusion; or

1



Copyright. Insurance Services Office, Inc., 1994

CI 255
(6-95)



CM 00 67 06 95

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F—DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. COVERED PROPERTY,** as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

**2. PROPERTY NOT COVERED**

Covered Property does not include:

**a.** Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

**b.** Property held as samples or for delivery after sale;

**c.** Property in storage away from the "premises" shown in the Declarations; or

**d.** Contraband, or property in the course of illegal transportation or trade.

**3. COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the Exclusions.

**4. ADDITIONAL COVERAGE—COLLAPSE**

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

**a.** Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

**5. COVERAGE EXTENSIONS**

**a. Removal**

If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of "loss," we will pay for "loss" while it is:

**(1)** At a safe place away from your "premises"; or

**(2)** Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

**b. Away From Your Premises**

We will pay up to $5,000 for "loss" to Covered Property while it is away from your "premises."

But if a higher Limit of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

## B. EXCLUSIONS

**1.** We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for "loss" caused by or resulting from acts of destruction ordered by gov-

1



Copyright, Insurance Services Office, Inc., 1994

CI 256
(6-95)

**2. RECOVERIES**

The following is added to Commercial Inland Marine Loss Condition I. Recoveries:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your "loss" will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. Coverage Territory**

We cover property:

**(1)** Within your "premises"; and

**(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

**(a)** The United States of America;

**(b)** Puerto Rico; and

**(c)** Canada.

**b. Protection Of Records**

Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

**F. DEFINITIONS**

**1.** "Loss" means accidental loss or damage.

**2.** "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities," converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

**3.** "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

**4.** "Money" means:

**a.** Currency, coins and bank notes whether or not in current use; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

**5.** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets, revenue and other stamps whether or not in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

but does not include "money."

3




ROYAL &
SUNALLIANCE

# TRANSPORTATION COMPREHENSIVE
# COVERAGE FORM

Various provisions in this policy restrict coverage. Please read the entire policy carefully.

Throughout this policy and form, "you" and "your" refer to the Named Insured shown in the Declarations. "We," "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

**A. COVERAGE**

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. COVERED PROPERTY**

We cover:

Property described in the Declarations while in transit at your risk:

a. In the care of:

(1) Railroads.

(2) Public truckmen, land transfer or land transportation companies.

(3) Air carriers or air express companies.

b. In or on vehicles owned or operated by you.

We cover from the time the property leaves the initial point of shipment and continuously thereafter in transit, including while on ferries or car transfers until delivered at destination.

**2. PROPERTY NOT COVERED**

We do not cover:

a. Accounts, bills, deeds, notes, securities, evidences of debt, letters of credit, tickets, stamps, valuable papers, works of art, money, currency, bullion, precious stones, watches, furs or jewelry.

b. Property shipped by mail.

c. Samples in the care, custody or control of any sales person.

d. Export shipments after loaded on board the export conveyance or after Ocean Marine insurance applies to the shipment whichever occurs first.

e. Import shipments while Ocean Marine insurance applies to the shipment.

f. Property you accept while acting as a common or contract carrier; or as a bailee for hire.

g. Property while located in or on your premises, or in any garage or building where your vehicles are usually garaged.

h. Contraband or property in the course of illegal transportation or trade.

**3. COVERED CAUSES OF LOSS**

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

**4. COVERAGE EXTENSIONS**

a. F.O.B. Shipments

We cover your contingent interest in property sold under Free on Board or Freight Allowed terms.

But we will pay for "loss" only if you cannot collect:

(1) from the purchaser, or

89037A

    (2)  from other insurance that would cover the "loss" if this insurance had not been issued.

**b.**  Return Shipments

We cover the return of property you have shipped if the original shipment was covered by this Coverage Form. We also cover the property while held temporarily by the receiver or carrier while awaiting its return to you.

**c.**  Debris Removal

    (1)  We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

    (2)  The most we will pay under this Coverage Extension is $5,000. This amount is in addition to any other amount payable under this Coverage Form.

    (3)  This Coverage Extension does not apply to costs to:

        **a)**  Extract "pollutants" from land or water; or

        **b)**  Remove, restore or replace polluted land or water.

        "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**d.**  We will pay for the cost to replace the identifying label or wrapper containing the covered property if this is the only part lost or damaged.

## B.  EXCLUSIONS

We will not pay for a "loss" caused by or resulting from:

**1.**  Delay, loss of use, loss of market or any other consequential loss.

**2.**  Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration, depreciation; insects, vermin, rodents.

**3.**  Spoilage, contamination, leakage, breakage, marring, scratching, corrosion, rust, dampness or dryness, cold or heat. But we will pay for direct physical "loss" resulting from:

    **a.**  Fire, lightning or explosion.

    **b.**  Windstorm, cyclone or tornado.

    **c.**  Flood, surface water, waves, tidal waves, or overflow of any body of water.

    **d.**  Collision, overturn or derailment of the transporting conveyance.

    **e.**  Collapse of bridges or culverts.

    **f.**  Hazards of seas, lakes, rivers or inland waters while on ferries only.

**4.**  Inadequate packing, improper preparation for shipment; or insecure stowage of property in or on any vehicle you own or operate.

**5.**  Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives or anyone entrusted with the property whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

But this exclusion does not apply to a carrier for hire.

**6.**  Release, discharge or dispersal of "pollutants" as defined elsewhere in this Coverage Form.

This exclusion applies regardless of whether or not any other cause or event contributes concurrently or in any sequence to the "loss."

**7.**  Governmental Action



Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

  **8.** Nuclear Hazard

    **a.** Any weapon employing atomic fission or fusion; or

    **b.** Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

  **9.** War and Military Action

    **a.** War, including undeclared or civil war;

    **b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**C.  LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations. Two or more vehicles while connected or while being operated with a single power vehicle will be considered one vehicle in applying the applicable Limit of Insurance.

**D.  DEDUCTIBLE**

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

**E.  ADDITIONAL CONDITIONS**

This Coverage Form is subject to the following conditions in addition to the policy conditions:

  **1.  COVERAGE TERRITORY**

    We cover property wherever located within or between the United States and Canada; but we do not cover property in transit to or from Alaska or Hawaii.

  **2.  VALUATION**

    General Condition I. Valuation of the policy is replaced by the following:

    The Covered Property will be valued in the event of "loss" at the amount shown on the invoice, if any; otherwise, the value of the property will be the least of the following amounts:

    **a.** The actual cash value of the property at destination;

    **b.** The cost of restoring the property to its condition immediately before the "loss;"

    **c.** The cost of replacing the property with substantially identical property.

    The value of property will include your prepaid freight charges; and any other shipping costs or charges that are due since the start of transit.

  **3.  REPORTS AND PREMIUM**

    **a.** Reports. Within 30 days after the end of each reporting period shown in the Declarations, you will report to us the actual value of all shipments made during that period of time.

    **b.** Rates and Premium.

      **(1)** Premium Computation. We will compute the premium:

        **(a)** Using the rates shown in the Declarations, and

38037A



    **(b)** As of each Premium Adjustment Period shown in the Declarations.

  **(2)** Premium Adjustment

    **(a)** When the Annual Premium Adjustment Period is shown in the Declarations, we will compare the total computed premium to the Deposit Premium. If it is more than the Deposit Premium, you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference.

    **(b)** When any other Premium Adjustment Period is shown in the Declarations, we will apply the computed premium to the Deposit Premium until it is used up. You will pay us all premiums that exceed the Deposit Premium.

  **(3)** Minimum Premium

    You must pay at least the minimum annual premium shown in the Declarations.

  **(4)** If this coverage is cancelled:

    You will report the total value of all shipments up to and including the date of cancellation.

**4.** **RECORDS**

You will keep accurate records of all shipments covered by this Coverage Form and retain them for 3 years after the policy ends.

**5.** **EXCESS INSURANCE**

You agree not to obtain Excess Insurance over and above the Limits of Insurance as provided in this policy, except as may be specifically agreed to by us.

**6.** **RELEASED BILLS OF LADING**

You may accept bills of lading or shipping receipts issued by carriers that limit their liability to less than the actual value of the property.

 **Royal Insurance**

# SCHEDULE CONTRACTORS EQUIPMENT
# COVERAGE FORM

*Various Provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.*

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover:

a. Your contractors equipment, including spare parts and accessories, and similar property of others that is in your care, custody or control and for which you are responsible, for up to the Limit of Insurance specified on each item in the schedule of property shown on the Declarations.

b. Unscheduled equipment used in your business when a Limit of Insurance is shown on the Declarations.

### 2. Property Not Covered

We do not cover:

a. Automobiles, motor trucks, tractors, trailers or motorcycles designed and principally used to transport property or persons over public roads; aircraft or watercraft.

b. Property while "underground", underwater, airborne, or waterborne, except while in transit in the custody of a carrier for hire.

c. Property while leased, loaned or rented to others.

d. Contraband or property in the course of illegal transportation or trade.

### 3. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

### 4. Additional Coverages

a. **Expediting Expense**

We will pay the reasonable extra costs for:

(1) Temporary repairs of damaged Coverage Property; or
(2) Expediting permanent repairs or permanent replacement, whichever is less;

Of Covered Property damaged by a Covered Cause of Loss, including:

(1) Overtime wages; and
(2) The extra cost of express or other rapid means of transportation.

The most we will pay under this Additional Coverage is $10,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

Expediting expenses do not include the costs incurred for:

(1) Temporary rental of property; or
(2) Temporary replacement of damaged property.

---

MC 0007 0294                                                                                          Page 1 of 5

89037A

b. **Employee Tools and Clothing**

We will pay for "loss" to tools and clothing of your employees caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises.

The most we will pay under this Additional Coverage is:

(1) $500 for any one employee.

(2) $5,000 in any one occurrence of the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $100. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

c. **Expendable Supplies**

We will pay for "loss" to fuel, oil, grease and similar expendable supplies usual to your operations caused by or resulting from a Covered Cause of Loss.

But this Coverage Extension does not apply to water or to expendable supplies in underground tanks.

The most we will pay under this Additional Coverage is $5,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $250. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance Condition of this Coverage Form does not apply to this Coverage Option.

d. **Mobile Radios, Antennas and Cellular Telephones**

We will pay for "loss" to mobile radios, antennas and cellular telephones caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises while in your vehicle.

The most we will pay under this Additional Coverage is $5,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $100. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

e. **Mobile Office Trailers and Their Contents**

We will pay for "loss" to mobile office trailers and their contents usual to your operations caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises.

The most we will pay under this Additional Coverage is $25,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $250. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

f. **Pollution Clean Up and Removal**

We will pay your expenses to extract "pollutants" from land, air, water or Covered Property at the insured premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy

period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

**g. Debris Removal**

    **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

    **(2)** The most we will pay under this Additional Coverage is $25,000.

    **(3)** This Additional Coverage does not apply to costs to:

        **(a)** Extract "pollutants" from land, air, water or Covered Property;

        **(b)** Remove, restore or replace polluted land, air, water or Covered Property; or

        **(c)** Remove expendable supplies.

**5. Coverage Extensions**

The Limit of Insurance for the following Coverage Extension is included within the Limits of Insurance applicable to the property listed on the Declarations.

**a. Newly Acquired Equipment**

If during the policy period you acquire additional equipment of a type already covered by this form, we will cover such equipment for up to 60 days after you acquire it or until the policy ends, whichever is sooner. We will cover such additional equipment for up to:

    **(1)** 25% of the total Limit of Insurance shown on the Declarations; or

    **(2)** $250,000, whichever is the lesser amount.

You agree to report the value of such equipment to us within the 60 day period and to pay an additional premium from the date you acquire it.

**6. Coverage Options**

**a. Unscheduled Equipment Leased or Rented From Others**

When a Limit of Insurance is shown on the Declarations we will cover unscheduled equipment in your care, custody or control and for which you are responsible which you have leased or rented from others. The Limit of Insurance shown for such equipment is the most we will pay for "loss" in any one occurrence.

Within 30 days after the end of each policy year you must report to us your total expenditures for such equipment during the past 12 months. We will compute the actual earned premium by applying the rate shown on the Declarations to the total expenditures. If it is more than the Deposit Premium you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference. But you must pay at least the minimum annual premium shown on the Declarations.

The Coinsurance Condition of the Coverage Form does not apply to this Coverage Option.

**b. Rental Expense Reimbursement**

When a Limit of Insurance is shown on the Declarations we will reimburse your rental expenses should a covered "loss" to equipment you own make it necessary to rent replacement equipment to continue your normal operations of the work in progress. We will reimburse these rental expenses

provided you do not have equivalent idle equipment you can use and you restore or replace the lost or damaged equipment as soon as possible.

Our reimbursement is limited to rental expenses incurred during the period of time beginning seventy-two (72) hours after the "loss" has occurred and continuing until the equipment has been restored, replaced or is no longer needed, whichever occurs first. The period of reimbursement will not be limited by the policy expiration date.

The Deductible condition of this Coverage Form does not apply to this Coverage Option.

## B. EXCLUSIONS

1. We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   **a. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   **b. Nuclear Hazard**

   (1) Any weapon employing atomic fission or fusion; or
   (2) Nuclear reaction or radiation or radioactive contamination from any other cause.

   But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

   **c. War and Military Action**

   (1) War, including undeclared or civil war;
   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
   (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   **d. Pollution**

   The discharge, dispersal, seepage, migration, release or escape of "pollutants".

2. We will not pay for a "loss" caused by or resulting from:

   **a.** Delay, loss of use, loss of market or any other consequential loss.

   **b.** Unexplained disappearance.

   **c.** Shortage found upon taking inventory.

   **d.** Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

   (1) Acting alone or in collusion with others; or
   (2) Whether or not occurring during the hours of employment.

   But this Exclusion does not apply to property in the custody of a carrier for hire which is not a company you manage or own.

3. We will not pay for a "loss" caused by or resulting from any of the following. But if a "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss" except if the "loss" results from a lack of reasonable maintenance.

   **a.** Gradual deterioration, wear and tear, hidden or latent defect, rust, corrosion or any quality in the property which causes it to damage or destroy itself.

    **b.** Structural or mechanical breakdown.

    **c.** Electrical breakdown or failure.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

**1. Coverage Territory**

We cover property wherever located within the United States and Canada.

**2. Coinsurance**

All Covered Property must be insured for at least 80% of its actual cash value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its actual cash value as of the date of "loss".

If this policy insures two or more items, this condition shall apply to each item separately.

When Unscheduled Equipment is covered by this Coverage Form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the actual cash value of all such property as of the date of "loss".

**3. Partial Loss Waiver of Depreciation**

The following is added to Commercial Inland Marine General Condition E. Valuation:

No deduction for depreciation shall be taken on the adjustment of any partial "loss" that does not exceed 20% of the actual cash value of the scheduled item involved. If two or more items are involved in the same occurrence, this condition shall apply to each item separately.

## F. DEFINITIONS

**1.** "Loss" means accidental loss or damage.

**2.** "Underground" means under the surface of the ground including but not limited to shafts, tunnels and mines.

**3.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

 **Royal Insurance**

# INFORMATION SYSTEMS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss..

### 1. Covered Property

We cover:

**a.** Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

**b.** "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

### 2. Where Coverage Applies

We cover:

**a.** At the locations listed on the Declarations.
**b.** Temporarily at other locations.
**c.** In transit.

### 3. Property Not Covered

We do not cover:

**a.** Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents. But we do cover such property when it is converted to data form and then only in that form.
**b.** Data or media which cannot be replaced with others of the same kind and quality. But we do cover such property when it is specifically described and a separate Limit of Insurance is shown on the Declarations.
**c.** Property loaned, leased or rented to others while away from your premises listed on the Declarations.
**d.** Contraband, or property in the course of illegal transportation or trade.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

### 5. Additional Coverages

**a. Fire Suppression System Discharge Protection**

We will pay expense you incur to recharge an automatic fire suppression system due to accidental discharge. The most we will pay in any one occurrence is $25,000. We will not pay for accidental discharge caused by system testing.

No Deductible applies to this Additional Coverage.

**b. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

---

MC 0010 0193                                                                 Page 1 of 7

(1) Assumed by contract or agreement prior to "loss;" or

(2) Required by local ordinance.

No Deductible applies to this Additional Coverage.

#### c. Pollutant Clean Up and Removal

We will pay your expenses to extract "pollutants" from land, air, water or Covered Property at the insured premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay at each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

### 6. Coverage Extensions

The Limit of Insurance for each of the following Coverage Extensions is included within the Limits of Insurance applicable to the property listed on the Declarations.

#### a. Newly Acquired Equipment

If during the policy period you acquire additional property similar to the property covered under this Coverage Form, we will cover such property for up to 60 days after you acquire it or until the policy ends, whichever is sooner.

We will cover such additional property for up to:

(1) 20% of the total amount of Insurance listed on the Declarations; or

(2) $500,000;

Whichever is the lesser amount.

You agree to report the value of such property to us within the 60 day period and to pay an additional premium from the date you acquire it.

#### b. Newly Acquired Locations

Property we cover at a location listed on the Declarations will also be covered if at a new location you acquire during the policy period.

We will cover this property for up to $1,000,000 at any one new location.

You must report the moving of property to a new location within 60 days or your coverage will no longer apply. Your premium will be adjusted if the rate at the new location is different from the rate at the existing location.

#### c. Duplicate "Electronic Media"

We will cover duplicate and backup "electronic media" for up to $50,000 at any one backup location. But this coverage applies only:

(1) To a separate storage location at least 100 feet from a location listed on the Declarations; and

(2) If there is no other insurance covering this property.

#### d. Removal

If you give us written notice within 10 days after the removal of Covered Property because of imminent danger of "loss," we will cover while the property is:

(1) At a safe place away from your premises listed in the Declarations, or

(2) Being taken to and returned from that place.

**e. Debris Removal**

   **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:

   **(a)** The date of direct physical "loss;" or

   **(b)** The end of the policy period.

   **(2)** The most we will pay under this Coverage Extension is:

   **(a)** 25% of the amount we pay for the direct "loss;" plus

   **(b)** The Deductible in this policy applicable to that "loss."

   **(3)** This Coverage Extension does not apply to costs to:

   **(a)** Extract "pollutants" from land, air, water or Covered Property; or

   **(b)** Remove, restore or replace polluted land, air, water or Covered Property.

**f.** We cover expenses you incur resulting from a "computer virus", even if no direct damage or "loss" has occurred. We will pay your expense to:

   **(1)** Extract a "computer virus" from your equipment; plus

   **(2)** Restore your equipment, data and media.

   The most we will pay under this Coverage Extension is $5,000 in any one occurrence.

**7. Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

**a. "Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "Extra Expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover "Extra Expense" you incur:

   **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.

   **(2)** If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a reduction or suspension of your "operations."

   **(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b. Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

   **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.



(2) If the air conditioning or electrical system necessary for the operation of the Covered Property is damaged and this causes a reduction or suspension of your "operations."

(3) If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for Loss of Income:**

If "loss" to Covered Property results in total or partial suspension of your "operations" we will pay up to the Limit of Insurance shown on the Declarations.

(1) The actual Loss of Income you sustain beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the "period of restoration."

(2) All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

But we will not pay more than the actual amount by which the Loss of Income is reduced.

You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or property of others to continue your "operations.

## B. EXCLUSIONS

1. We will not pay for a "loss" caused by or resulting from:

   a. Delay, loss of use, loss of market or any other consequential loss.

   b. Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration or depreciation.

   c. Animals.

   d. Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

      (1) Acting alone or in collusion with others; or

      (2) Whether or not occurring during the hours of employment.

      This Exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

      But this Exclusion does not apply to property in the custody of a carrier for hire.

   e. Any Covered Cause of Loss for which you are not responsible under the terms of any lease, rental agreement, warranty or guarantee.

   f. Corrosion, rust, dampness or dryness, cold or heat, extremes or changes in temperature.

      But we will pay for such "loss" resulting from direct physical "loss" to the air conditioning system that services the Covered Property if the damage to such property is caused by a Covered Cause of Loss.

   g. Enforcement of any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

      (2) Regulates the prevention, control, repair, clean-up or restoration of damage caused by "pollutants."

   h. Voluntary parting with property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

   i. Unauthorized instructions to transfer property to any person or to any place.

   j. The discharge, dispersal, seepage, migration, release or escape of "pollutants."

2. We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

   a. **Governmental Action**

      Seizure or destruction of property by order of governmental authority.

      But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

(1) Any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation or radioactive contamination from any other cause.

But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**c. War and Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**d. Earthquake**

(1) Earth movement such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But we will pay for "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

(2) Volcanic eruption, explosion or effusion. But we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

**e. Flood**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up from any sewer or drain;

(4) Water that seeps, leaks or flows from below the surface of the ground; or

(5) Any release of water impounded by a dam.

But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

This Exclusion does not apply to property in transit.

**3. Special Exclusions**

The following provisions apply only to the "Extra Expense" or Loss of Income Coverage Options and are in addition to the Exclusions shown above. We will not pay for "loss" caused by or resulting from:

**a.** "Loss" to property loaned, leased or rented to others while away from the premises listed on the Declarations.

**b.** Loss of income, but this Exclusion only applies to the "Extra Expense" Coverage Option.

**c.** Error or omission in machine programming or incorrect instructions to a machine.

**d.** Suspension, lapse or cancellation of any lease, license, contract or order.

**e.** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume "operations."

You must make every reasonable effort to resume your "operations" as quickly as possible.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

---

MC 0010 0193                                                                                            Page 5 of 7

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

### 1. Coverage Territory

We cover property wherever located within the United States and Canada.

### 2. Valuation

General Condition E.- Valuation of the Commercial Inland Marine Conditions is replaced by the following:

#### a. Electronic Equipment

The value of Covered Property will be determined by the valuation method shown on the Declarations.

##### (1) Actual Cash Value

We will pay the least of the following amounts:

(a) The actual cash value of the damaged property as of the time of "loss;"

(b) The cost of restoring the property to its condition immediately before the "loss;"

(c) The cost of replacing the property with substantially identical property.

(d) The Limit of Insurance applicable to the lost or damaged property.

##### (2) Replacement Cost

We will not pay on a replacement cost basis for any "loss:"

(a) Until the lost or damaged property is actually repaired or replaced; and

(b) Unless the repairs or replacements are made within 180 days after the "loss;"

We will not pay more for "loss" on a replacement cost basis than the least of:

(a) The Limit of Insurance applicable to the lost or damaged property;

(b) The cost to replace the lost or damaged property with other property:

    (i) Of substantially identical material and quality; and

    (ii) Used for the same purpose; or

(c) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

If you do not repair or replace the lost or damaged property within 180 days, or choose not to repair or replace the lost or damaged property, we will pay the least of the following amounts:

(a) The actual cash value of the damaged property as of the date of "loss."

(b) The cost of restoring the property to its condition immediately before the "loss."

(c) The cost of replacing the property with substantially identical property.

(d) The Limit of Insurance applicable to the lost or damaged property.

In the event of "loss", the value of property will be determined as of the date of "loss."

##### (3) Functional Replacement Cost

We will pay the cost of replacing destroyed property with property of greater processing ability. However, the new property must be able to perform the same function as the destroyed property.

For Functional Replacement Cost coverage to apply, the following requirements must be met:

(a) Before a "loss" occurs, you must give us a list of property which includes:

    (i) The description and current replacement cost of the property you now own that you plan to replace.

    (ii) The description and current cost of the replacement property.

(b) There must be a total "loss" of the current property. If a partial "loss" occurs to property covered for Functional Replacement cost, we will pay as if the property were insured for replacement cost as explained above.

We will not pay more than:

(a) The amount you actually spend to replace the current property; or

(b) The amount shown as the current cost of the replacement property on the last list you gave us.

We will pay for a "loss" on a replacement cost basis until the designated replacement property is actually purchased. When you buy the replacement property we will pay you the difference between the replacement cost and the increased value, if any.

In the event of "loss", the value of property will be determined as of the date of "loss."

**b. "Electronic Media"**

The value will be the actual cost of reproducing the data and the cost of the media.

When the data is not reproduced, we will not pay more than the cost of blank discs, films, tapes, or similar electronic data processing media, of the same kind and quality.

When the data and media is individually listed or described on the Declarations, its value will be the applicable Limit of Insurance shown on the Declarations for that item.

**3. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for all Covered Property at all locations bears to 80% of the total value of all property at all locations as of the time of "loss."

**F. DEFINITIONS**

**1. "Loss"** means accidental loss or damage.

**2. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3. "Electronic Media"** means all forms of data including computer instructions and programs which are converted to a form usable in your "operations." This also includes the materials on which the data is recorded.

**4. "Extra Expense"** means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical "loss" to the property.

**5. "Operations"** means your business activities occurring at the described premises.

**6. "Period of restoration"** means the period of time that:

**a.** Begins with the date of direct physical "loss" caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**a.** Regulates the construction, use or repair, or requires the tearing down of any property; or

**b.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**7. "Computer virus"** means any self-replicating program which contaminates or destroys programs, data or operating systems.

  **Royal Insurance** 

# RADIO AND TELEVISION COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover your property consisting of:

**a.** Transmission towers, including antennas, foundations, supports and other equipment permanently attached or connected to such towers;

**b.** Transmission, receiving, recording and studio equipment including transmission and receiving lines and poles;

**c.** Portable transmitting, receiving, recording and studio equipment; and

**d.** Similar property of others in your care.

### 2. Property Not Covered

We do not cover:

**a.** Aircraft, watercraft or automobiles;

**b.** Growing crops, plants or land;

**c.** Jewelry or precious stones; or

**d.** Money, securities, letters of credit or accounts receivable.

**e.** Tubes, glass, porcelain and fragile articles. But we do cover such property when the "loss" is caused by or results from:

    **1)** Collapse of the tower;

    **2)** Fire, explosion, lightning, windstorm, aircraft, riot, strike, vandalism, theft or attempted theft; or

    **3)** Collision, upset and/or overturn of equipment used to transport such property.

**f.** Buildings and their improvements and betterments.

### 3. Where Coverage Applies

We cover:

**a.** At the locations listed in the Declarations;

**b.** In transit.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the exclusions.

### 5. Covered Extensions

#### a. Debris Removal

    **1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:



MC0033 1190



    **a)** The date of direct physical "loss"; or

    **b)** The end of the policy period.

**2)** The most we will pay under this Coverage Extension is 25% of:



    **a)** The amount we pay for the direct "loss"; plus

    **b)** The Deductible in this policy applicable to that "loss".

But the amount we pay for direct "loss" and Debris Removal expenses combined will not be more than the Limit of Insurance applying to the property at the premises listed in the Declarations where the "loss" occurs.

**3)** This Coverage Extension does not apply to costs to:

    **a)** Extract "pollutants" from land or water; or

    **b)** Remove, restore or replace polluted land or water.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**b. Tuning of Towers**

We will pay your expense to tune or retune towers that are damaged caused by or resulting from a Covered Cause of Loss.

**6. Covered Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown in the Declarations.

**a. Extra Expense**

When a Limit of Insurance for Extra Expense is shown in the Declarations, we will pay the actual and necessary Extra Expense you incur in order to continue your normal operations which are interrupted due to direct physical "loss" to your broadcasting equipment, towers, studios and offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered Cause of Loss. Extra Expense means necessary expenses you incur during the period of restoration that you would not have incurred if there had been no direct physical "loss" to the property. We will also cover Extra Expense you incur:



**1)** If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

**2)** If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to four consecutive weeks from the date of that action.

**3)** What we will pay for Extra Expense Losses

If "loss" to Covered Property results in Extra Expense, we will pay up to the Limit of Insurance shown in the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the period of restoration once operations are resumed.

**4)** Extra Expense That is Not Covered

We will not cover Extra Expense you incur as a result of any of the following:

    **a)** Loss of income.

    **b)** Enforcement of any law that:

        **1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

        **2)** Regulates the prevention, control, repair, clean-up or restoration of damages caused by pollutants.



MC0030 1190

    **c)** Suspension, lapse or cancellation of any lease, license, contract or order.

    **d)** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.

    **e)** Repair or Replacement of Property

       But we will pay extra repair or replacement costs you incur in order to reduce Extra Expense "loss", but only up to the amount by which that "loss" is actually reduced.

       You must make every reasonable effort to resume your normal operations as quickly as possible.

**b. Loss of Income**

When a Limit of Insurance for Loss of Income is shown in the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your normal operations. The suspension must be caused by direct physical "loss" to your broadcasting equipment, towers, studios or offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered Cause of Loss.

**1)** We will also cover Loss of Income you sustain:

    **a)** If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

    **b)** If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to four consecutive weeks from the date of that action.

**2)** What we will pay for Loss of Income

If "loss" to Covered Property results in total or partial suspension of your normal operations, we will pay up to the Limit of Insurance for Loss of Income shown in the Declarations:

    **a)** The actual loss of income you sustain beginning with the date of "loss" and not limited by the expiration date of the policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the period of restoration; and

    **b)** All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

       But we will not pay more than the actual amount by which the Loss of Income is reduced.

You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or by using other property to continue your operations.

**3)** Loss of Income That Is Not Covered

We will not cover your Loss of Income resulting from any of the following:

    **a)** "Loss" to property loaned, leased or rented to others while away from your premises listed in the Declarations.

    **b)** Enforcement of any law that:

       **1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

       **2)** Regulates the prevention, control, repair, clean-up or restoration of damage caused by pollutants.

    **c)** Suspension, lapse or cancellation of any lease, license, contract or order.

    **d)** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.




**B. EXCLUSIONS**

We will not pay for a "loss" caused by or resulting from:

**1.** Delay, loss of use, loss of market or any other consequential "loss".

2. Unexplained disappearance or shortage found upon taking inventory.

3. Gradual deterioration, wear and tear, hidden or latent defect, rust, corrosion, inherent vice, mechanical or electrical breakdown or failure.

4. Expansion or contraction due to changes in temperature. But this exclusion does not apply if the "loss" results in a partial or total collapse of a tower.

5. Electrical or magnetic injury; but we will pay for direct "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

6. EARTHQUAKE

   a. Earth movement such as an earthquake, landslide, or earth sinking, rising or shifting; but we will pay for direct "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

   b. Volcanic eruption, explosion or effusion; but we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

   This exclusion does not apply to property in transit.

7. WATER

   a. Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

   b. Mudslide or mudflow;

   c. Water that backs up from any sewer drain; or

   d. Water that seeps, leaks or flows from below the surface of the ground; or

   e. Any release of water impounded by a dam;
   But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

   This exclusion does not apply to property in transit.

8. The enforcement of any ordinance or law:

   a. Regulating the construction, use or repair of any property; or

   b. Requiring the tearing down of any property, including the cost of removing its debris.

9. GOVERNMENTAL ACTION

   Seizure or destruction of property by order of governmental authority.

   But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

10. NUCLEAR HAZARD

    1. Any weapon employing atomic fission or fusion; or

    2. Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

11. WAR AND MILITARY ACTION

    1. War, including undeclared or civil war;

    2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or other authority using military personnel or other agents; or

    3. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

We will not pay to extract "pollutants", as defined elsewhere in this Coverage Form, from land or water.

C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

MC0033 1190

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limit of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the policy conditions.

### 1. Coverage Territory

We cover property wherever located within the United States.

### 2. Valuation

General Condition I. Valuation of the policy is replaced by the following:

a. The value of property will be determined by the Valuation method shown in the Declarations.

1. **Actual Cash Value;** the most we will pay on an actual cash value basis is the least of the following:

a) The Actual Cash Value of the property at the time of "loss";

b) The cost of restoring the property to its condition immediately before the "loss"; or

c) The cost of replacing the property with material of the same kind and quality.

2. **Replacement Cost;** the most we will pay on a replacement cost basis is the least of the following:

a) the amount necessary to repair the property; or

b) the amount necessary to replace the property with new material of the same kind and quality; or

c) the applicable Limit of Insurance.

### 3. Additional Acquired Property

If during the policy period you acquire additional property of a type already covered by this form, we will cover such property for up to 60 days. The most we will pay in a "loss" is the lesser of:

a. 25% of the total Limit of Insurance shown in the Declarations for that type of property; or

b. $100,000

You will report such property within 60 days from the date acquired and will pay any additional premium due. If you do not report such property, coverage will cease automatically 60 days after the date the property is acquired, or until the policy ends, whichever occurs first.

### 4. Coinsurance

All Covered Property must be insured for at least 80% of its total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any loss that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its total value at the time of "loss".

When the Unscheduled Equipment is covered by this form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the total value of all such property at the time of "loss".

 

CM 00 01 06 95

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. ABANDONMENT

There can be no abandonment of any property to us.

### B. APPRAISAL

If we and you disagree on the value of the property or the amount of "loss," either may make written demand for an appraisal of the "loss." In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss." If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the "loss." Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the "loss" occurred.

4. Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss. Also if feasible, set the damaged property aside and in the best possible order for examination.

5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.

6. Permit us to inspect the property and records proving "loss."

7. If requested, permit us to question you under oath, at such times as may be reasonably re-

quired, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Promptly send us any legal papers or notices received concerning the "loss."

10. Cooperate with us in the investigation or settlement of the claim.

### D. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same "loss," we will not pay more than the actual amount of the "loss."

### E. LOSS PAYMENT

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;

2. The entry of final judgment; or

3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

### F. OTHER INSURANCE

If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

### G. PAIR, SETS OR PARTS

1. Pair or Set. In case of "loss" to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the "loss"; or

   b. Pay the difference between the value of the pair or set before and after the "loss."

2. Parts. In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

### H. PRIVILEGE TO ADJUST WITH OWNER

In the event of "loss" involving property of others in your care, custody or control, we have the right to:



Copyright, Insurance Services Office, Inc., 1994

CI 166
(6-95)



1. Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

2. Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

**I. RECOVERIES**

Any recovery or salvage on a "loss" will accrue entirely to our benefit until the sum paid by us has been made up.

**J. REINSTATEMENT OF LIMIT AFTER LOSS**

The Limit of Insurance will not be reduced by the payment of any claim, except for total "loss" of a scheduled item, in which event we will refund the unearned premium on that item.

**K. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after "loss" to impair them.

**GENERAL CONDITIONS**

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and

2. The action is brought within 2 years after you first have knowledge of the "loss."

**C. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

**D. POLICY PERIOD**

We cover "loss" commencing during the policy period shown in the Declarations.

**E. VALUATION**

The value of property will be the least of the following amounts:

1. The actual cash value of that property;

2. The cost of reasonably restoring that property to its condition immediately before "loss"; or

3. The cost of replacing that property with substantially identical property.

In the event of "loss," the value of property will be determined as of the time of "loss."



CI 234a
(10-90)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CM 01 12 10 90

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

**A.** Commercial Inland Marine Loss Condition **B.** APPRAISAL is replaced by the following:

**B. APPRAISAL**

If we and you disagree on the value of the property or the amount of "loss", either may make written demand, within 60 days after our receipt of a signed, sworn statement of "loss", for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**B.** Paragraph **B.** of Commercial Inland Marine Loss Condition **C.** DUTIES IN THE EVENT OF LOSS is replaced by the following:

**8.** Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**C.** Paragraph **2.** of Commercial Inland Marine General Condition **B.** LEGAL ACTION AGAINST US is replaced by the following:

**2.** The action is brought within 2 years and 1 day after you first have knowledge of "loss".

**D.** Paragraphs **A.5.a** and **A.5.b.** of the Coverage Extensions and paragraph **F.2.** of the Definitions in the EQUIPMENT DEALERS COVERAGE FORM are deleted.



Copyright, Insurance Services Office, Inc., 1990

## COMMON POLICY DECLARATIONS



ROYAL &
SUNALLIANCE

THIS POLICY IS ISSUED BY THE COMPANY NAMED BELOW

COMPANY NAME: **Royal Surplus Lines Insurance Company**

BRANCH ADDRESS: **945 East Paces Ferry Road, Suite 1800, Atlanta, GA 30326**

POLICY NO.   KHT318271                          RENEWAL OF  KHT310355

NAMED INSURED AND MAILING ADDRESS:             PRODUCER:
Brownsville Independent School District
1900 Price Road                                **Royal Specialty Underwriting, Inc.**
Brownsville, TX  78521                         **945 East Paces Ferry Road, Suite 1800**
                                               **Atlanta, GA 30326**

POLICY PERIOD: From 04/01/01  to 04/01/02   12:01 A.M. Standard Time at your Mailing Address above.
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE
WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS
PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| COVERAGE PARTS | | PREMIUM | |
|---|---|---|---|
| ☒ Commercial Property | PC86839 (0187) | $408,525 | |
| ☐ Commercial General Liability | | $ | |
| ☐ Commercial Crime | | $ | DO |
| ☒ Commercial Inland Marine | MC86841 (0187) | $Included | NOT |
| ☐ Boiler and Machinery | | $ | WRITE |
| ☐ Commercial Auto | | $ | IN |
| ☐ Commercial Farm | | $ | TINTED |
| ☐ | | $ | AREA |
| ☐ Premium is payable in installments: See endorsement. | | **TOTAL POLICY PREMIUM $  408,525** | |

FORMS APPLICABLE TO ALL COVERAGE PARTS: (Show numbers)
IL0017 (1198), IL0171 (0992), IL0288 (1192), Endorsement #1,2,PC0027 (0996), IN8282 (1298)

BUSINESS DESCRIPTION:
School District

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE
FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM  A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Countersigned: _____        By: _James A. Dixon_____
                    Date      06/11/01 lps                Authorized Representative

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services, Inc., 1984.

LI86831 (1188)



ROYAL &
SUNALLIANCE

---

*This Endorsement Changes The Policy.  Please Read It Carefully*

---

In consideration of the premium charged, it is hereby agreed that the effective date for Endorsement #7 is amended to read 12/3/01 in lieu of 12/31/01.

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  12/03/2001
forms part of Policy Number  KHT318271
issued to  Brownsville Independent School          Endorsement No.: 8
Authorized Representative                          Date Processed   : 02/14/2002

*James A. Dixon*



**ROYAL &**
**SUNALLIANCE**

_____

*This Endorsement Changes The Policy.  Please Read It Carefully*

_____

In consideration of an **additional premium of $585.**, it is hereby agreed the following
locations are added to this policy:

     Martin Elementary School
     1701 Standford Avenue
     Brownsville, TX
     - Total Values:            $579,800
     *Additional Premium Due:*    *$114.*

     Villa Nueva Elementary  School
     Rt. 8 Box 630
     Brownsville, TX
     - Total Values:            $713,600
     *Additional Premium Due:*    *$141.*

     Sharp Elementary School
     1439 Palm Blvd.
     Brownsville, TX
     - Total Values:            $44,600
     *Additional Premium Due:*    *$9.*

     Russell  Elementary  School
     800 Lakeside Blvd.
     Brownsville, TX
     - Total Values:            $847,400
     *Additional Premium Due:*    *$305.*

     El Jardin Elementary School
     6911 Boca Chica Blvd.
     Brownsville, TX
     - Total Values:            $44,600
     *Additional Premium Due:*    *$16.*

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  12/31/2001
forms part of Policy Number  KHT318271
issued to  Brownsville Independent School     Endorsement No.: 7
Authorized Representative              Date Processed  : 02/05/2002

*James A. Dixon*



**ROYAL & SUNALLIANCE**

---

*This Endorsement Changes The Policy. Please Read It Carefully*

---

In consideration of an **additional premium of $1,843.**, it is hereby agreed the following locations are added to this policy:

Margaret M. Aquatic Center
(occupied as swimming and training competition)
2901 FM 802
Brownsville, TX 78520
- Total Values:              $6,531,000
*Additional Premium Due:*     *$1,416.*

Porter High School
(occupied as classroom)
3500 International Blvd.
Brownsville, TX 78521
- Total Values:              $1,970,000
*Additional Premium Due:*     *$427.*

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  11/21/2001
forms part of Policy Number  KHT318271
issued to  Brownsville Independent School          Endorsement No.: 6
Authorized Representative                          Date Processed   : 02/05/2002

*James A. Dixon*



**ROYAL &**
**SUNALLIANCE**

## *This Endorsement Changes The Policy. Please Read It Carefully*

In consideration of the additional premium of $5,178., it is hereby agreed the following locations have been added to this policy:

1) Gallegos Elementary School
   2700 Avenida Rancho Viejo, Brownsville, TX  78521
   Total Value:  $4,874,000
   Additional Premium Due:  $3,347

2) Champion Elementary
   4750 Bowie Road, Brownsville, TX  78521
   Total Value:  $4,874,000
   Additional Premium Due:  $1,831

## **REVISED**

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  08/17/2001
forms part of Policy Number  KHT318271
issued to  Brownsville Independent School          Endorsement No.: 5
Authorized Representative                          Date Processed   : 10/27/2001

*James A. Dixon*



**ROYAL &**
**SUNALLIANCE**

---

*This Endorsement Changes The Policy.  Please Read It Carefully*

---

In consideration of the additional premium of $5,178., it is hereby agreed the following locations have been added to this policy:

1) Gallegos Elementary School
   2700 Avenida Rancho Viejo, Brownsville, TX 78521
   Total Value: $4,874,000
   Additional Premium Due: $1,831

2) Champion Elementary
   4750 Bowie Road, Brownsville, TX 78521
   Total Value: $4,874,000
   Additional Premium Due: $3,347

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  08/17/2001
forms part of Policy Number  KHT318271
issued to  Brownsville Independent School          Endorsement No.: 5
Authorized Representative                          Date Processed   : 10/27/2001

James A. Dixon

 

# CLAIM NOTICE

Please notify Royal Specialty Underwriting, Inc. at the address below of all claims.

**Royal Specialty Underwriting, Inc.**
**945 East Paces Ferry Road**
**Suite 1890**
**Atlanta, GA 30326**

**Attention: Claims Department**

RIW-IN-113



THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED
TO TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND
DELIVERED AS A SURPLUS LINES COVERAGE PURSUANT TO THE
TEXAS INSURANCE STATUTES. THE STATE BOARD OF INSURANCE
DOES NOT AUDIT THE FINANCES OR REVIEW THE SOLVENCY OF
THE SURPLUS LINES INSURER PROVIDING THIS COVERAGE, AND
THIS INSURER IS NOT A MEMBER OF THE PROPERTY AND
CASUALTY INSURANCE GUARANTY ASSOCIATION    CREATED
UNDER ARTICLE 21.28-C, INSURANCE CODE. ARTICLE 1.14-2,
INSURANCE CODE, REQUIRES PAYMENT OF 4.85 PERCENT TAX ON
GROSS PREMIUM.

88949 (0391)

SURPLUS LINES AGENT: _____

ADDRESS: _____

_____

_____

LICENSE #: _____

 

# IMPORTANT NOTICE

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |

To obtain information or make a complaint:

Para obtener informacion o para someter una queja:

You may call Royal & SunAlliance collect for information or to make a complaint at:

Usted puede llamar a Royal & SunAlliance con cargo a nosotros sin ningun cuesto de larga distancia para usted, para pedir informacion o a dar quejas al telefono

### COLLECT
### 1-404-231-2366

### 1-404-231-2366

You may also write to Royal & SunAlliance at:

Usted tambien puede escribir a Royal & SunAlliance:

945 E. Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

945 E. Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

### 1-800-252-3439

### 1-800-252-3439

You may write the Texas Department of Insurance

Puede escribir al Departamento de Seguros de Texas

P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS SOBRE PRIMAS O RECLAMOS**: Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998       ☐



IL 01 71 09 92

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – LOSS PAYMENT

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY
   AND EQUIPMENT COVERAGE FORM
COMMERCIAL INLAND MARINE COVERAGE PART

**A. LOSS PAYMENT**

1. With respect to the BOILER AND MACHINERY COVERAGE PART and COMMERCIAL CRIME PART, the following conditions are added.

2. With respect to the COMMERCIAL INLAND MARINE COVERAGE PART, the following conditions replace Item **E. LOSS PAYMENT** in the Commercial Inland Marine Loss Conditions.

3. With respect to the FARM COVERAGE PART, the following conditions replace paragraphs **c.** and **f.** of the Loss Payment Condition:

   **a. Claims Handling**

   (1) Within 15 days after we receive written notice of claim, we will:

      (a) Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

      (b) Begin any investigation of the claim; and

      (c) Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   (2) We will notify you in writing as to whether:

      (a) The claim or part of the claim will be paid;

      (b) The claim or part of the claim has been denied, and inform you of the reasons for denial;

      (c) More information is necessary; or

      (d) We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in (2)(a) through (2)(d) above, within:

      (i) 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

      (ii) 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

   If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

Copyright, Insurance Services Office, Inc., 1992





**b.** We will pay for covered loss or damage within 5 business days after:

  **(1)** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

  **(2)** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within 5 business days after the date you have complied with such terms.

**c. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **a.** and **b.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which is:

  **(1)** Declared a disaster under the Texas Disaster Act of 1975; or

  **(2)** Determined to be a catastrophe by the State Board of Insurance.

**d.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**B.** With respect to the Commercial Inland Marine Coverage Part the following is added:

We will not be liable for any part of a "loss" that has been paid or made good by others.

 

IL 02 88 11 92

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – CANCELLATION
# AND NONRENEWAL

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    COMMERCIAL CRIME COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART

**A.** The following is added to paragraph **2.** of the **CANCELLATION** Common Policy Condition:

   We may cancel this policy for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following condition is added:

   **NONRENEWAL**

   We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.



ROYAL &
SUNALLIANCE

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## SERVICE OF SUIT

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal. The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

Endorsement Number: 1

 

ROYAL & SUNALLIANCE

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## MINIMUM EARNED PREMIUM CLAUSE - PERCENTAGE

In the event of cancellation of this policy by the Insured, a minimum premium of 25% of the original policy premium shall become earned; any conditions of the policy to the contrary notwithstanding.

Failure of the Insured to make timely payment of premium shall be considered a request by the Insured for the Company to cancel. In the event of such cancellation by the Company for non-payment of premium, the minimum premium shall be due and payable; provided, however, such non-payment cancellation shall be rescinded if the Insured remits the full premium due within 10 days of receiving it.

In the event of any other cancellation by the Company, the earned premium shall be computed pro rata, not subject to the minimum premium.

ENDORSEMENT NUMBER:  2

 

**ROYAL &**
**SUNALLIANCE**

# TEXAS INFORMATION SYSTEMS PROPERTY COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. - DEFINITIONS.

## A. COVERAGE

We will pay for direct physical "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover:

**a.** Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

**b.** "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

### 2. Where Coverage Applies

We cover:

**a.** At the locations listed on the Declarations.
**b.** Temporarily at other locations.
**c.** In transit.

### 3. Property Not Covered

We do not cover:

**a.** Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents. But we do cover such property when it is converted to data form and then only in that form.

**b.** Data or media which cannot be replaced with others of the same kind and quality. But we do cover such property when it is specifically described and a separate Limit of Insurance is shown on the Declarations.

**c.** Property leased or rented to others while away from your premises listed on the Declarations.

**d.** Contraband, or property in the course of illegal transportation or trade.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

### 5. Additional Coverages

**Fire Suppression System Discharge Protection**

We will pay expense you incur to recharge an automatic fire suppression system due to accidental discharge. The most we will pay in any one occurrence is $25,000. We will not pay for accidental discharge caused by system testing.

No Deductible applies to this Additional Coverage.

### 6. Coverage Extensions

The Limit of Insurance for each of the following Coverage Extensions is included within the Limits of Insurance applicable to the property listed on the Declarations.

Includes copyrighted material of Insurance Services Office, Inc. or ISO Commercial Risk Services, Inc. with its permission. Copyright, ISO Commercial Risk Services, Inc., 1991, 1992

a. **Newly Acquired Equipment**

If during the policy period you acquire additional property similar to the property covered under this Coverage Form, we will cover such property for up to 60 days after you acquire it or until the policy ends, whichever is sooner.

We will cover such additional property for up to:

**(1)** 20% of the total amount of Insurance listed on the Declarations; or

**(2)** $500,000;

Whichever is the lesser amount.

You agree to report the value of such property to us within the 60 day period and to pay an additional premium from the date you acquire it.

b. **Newly Acquired Locations**

Property we cover at a location listed on the Declarations will also be covered if at a new location you acquire during the policy period.

We will cover this property for up to $1,000,000 at any one new location.

You must report the moving of property to a new location within 60 days or your coverage will no longer apply. Your premium will be adjusted if the rate at the new location is different from the rate at the existing location.

c. **Duplicate "Electronic Media"**

We will cover duplicate and backup "electronic media" for up to $50,000 at any one backup location. But this coverage applies only:

**(1)** To a separate storage location at least 100 feet from a location listed on the Declarations; and

**(2)** If there is no other insurance covering this property.

d. **Preservation of Property**

If it is necessary to move covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another locations; and

**(2)** Only if the loss or damage occurs within 10 days after the property is first moved.

e. **Debris Removal**

We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

If the sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance, we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal.

f. We cover expenses you incur resulting from a "computer virus", even if no direct damage or "loss" has occurred. We will pay your expense to:

**(1)** Extract a "computer virus" from your equipment; plus

**(2)** Restore your equipment, data and media.

The most we will pay under this Coverage Extension is $5,000 in any one occurrence.

7. **Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

a. **"Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "Extra Expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

---



We will also cover "Extra Expense" you incur:

**(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.

**(2)** If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a reduction or suspension of your "operations."

**(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b.  Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

**(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.

**(2)** If the air conditioning or electrical system necessary for the operation of the Covered Property is damaged and this causes a reduction or suspension of your "operations."

**(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for Loss of Income:**

If "loss" to Covered Property results in total or partial suspension of your  "operations" we will pay up to the Limit of Insurance shown on the Declarations.

**(1)** The actual Loss of Income you sustain beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the "period of restoration."

**(2)** All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

But we will not pay more than the actual amount by which the Loss of Income is reduced.

You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or property of others to continue your "operations."

**B.  EXCLUSIONS**

**1.**  We will not pay for a "loss" caused by or resulting from:

**a.**  Delay, loss of use, loss of market or any other consequential loss.

**b.**  Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration or depreciation.

**c.**  Insects, vermin, rodents, inherent vice.

**d.**  Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)**  Acting alone or in collusion with others; or

**(2)**  Whether or not occurring during the hours of employment.



This Exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

But this Exclusion does not apply to property in the custody of a carrier for hire.

**e.** Any Covered Cause of Loss for which you are not responsible under the terms of any lease, rental agreement or purchase agreement.

**f.** Corrosion, rust, dampness or dryness, cold or heat, extremes or changes in temperature.

But we will pay for such "loss" resulting from direct physical "loss" to the air conditioning system that services the Covered Property if the damage to such property is caused by a Covered Cause of Loss.

**g.** Voluntary parting with property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h.** Unauthorized instructions to transfer property to any person or to any place.

**2.** We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

**(1)** Any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation or radioactive contamination from any other cause.

But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**c. War and Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**d. Earth Movement**

**(1)** Earth movement such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But we will pay for "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

**(2)** Volcanic eruption, explosion or effusion. But we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

**e. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up from any sewer or drain;

**(4)** Water that seeps, leaks or flows from below the surface of the ground; or

**(5)** Any release of water impounded by a dam.

But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

This Exclusion does not apply to property in transit.

Includes copyrighted material of Insurance Services Office, Inc.
or ISO Commercial Risk Services, Inc. with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1991, 1992

 

**3. Special Exclusions**

The following provisions apply only to the "Extra Expense" or Loss of Income Coverage Options and are in addition to the Exclusions shown above. We will not pay for "loss" caused by or resulting from:

**a.** "Loss" to property loaned, leased or rented to others while away from the premises listed on the Declarations.

**b.** Loss of income, but this Exclusion only applies to the "Extra Expense" Coverage Option.

**c.** Error or omission in machine programming or incorrect instructions to a machine.

**d.** Suspension, lapse or cancellation of any lease, license, contract or order.

**e.** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume "operations."

**f.** Enforcement of any ordinance or law that regulates the construction, use or repair, or requires the tearing down of any property.

You must make every reasonable effort to resume your "operations" as quickly as possible.

**C. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

**D. DEDUCTIBLE**

We will not pay for "loss" or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition.

**E. ADDITIONAL CONDITIONS**

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we or you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

a. You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property condition ; and

b. We will still retain our right to deny the claim.

**3. Duties In The Event Of Loss or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.



    **(4)** Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

    **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

    **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

    **(8)** Cooperate with us in the investigation or settlement of the claim.

  **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

  **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

    **(1)** Pay the value of lost or damaged property;

    **(2)** Pay the cost of repairing or replacing the lost or damaged property;

    **(3)** Take all or any part of the property at an agreed or appraised value; or

    **(4)** Repair, rebuild or replace the property with other property of like kind and quality.

  **b. 1. Claims Handling**

Within 15 days after we receive written notice of claim, we will:

    **(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment:

    **(2)** Begin any investigation of the claim; and

    **(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

We will notify you in writing as to whether:

    **(1)** The claim or part of the claim will be paid;

    **(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

    **(3)** More information is necessary; or

    **(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reason for such need.

We will provide notification, as described in (1) through (4) above, within:

    **(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

    **(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

  **b. 2.** We will pay for covered loss or damage within 5 business days after:

    **a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

    **b.** An appraisal award has been made.

Includes copyrighted material of Insurance Services Office, Inc. or ISO Commercial Risk Services, Inc. with its permission. Copyright, ISO Commercial Risk Services, Inc., 1991, 1992

 

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

**b. 3. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in b. 1 and b. 2 above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

**(1)** Is declared a disaster under the Texas Disaster Act of 1975; or

**(2)** Is determined to be a catastrophe by the Texas Department of Insurance.

**5. Valuation**

**a. Electronic Equipment**

The value of Covered Property will be determined by the valuation method shown on the Declarations.

**(1) Actual Cash Value**

We will pay the least of the following amounts:

**(a)** The actual cash value of the damaged property as of the time of "loss;"
**(b)** The cost of restoring the property to its condition immediately before the "loss;"
**(c)** The cost of replacing the property with substantially identical property.
**(d)** The Limit of Insurance applicable to the lost or damaged property.

**(2) Replacement Cost**

We will not pay on a replacement cost basis for any "loss:"

**(a)** Until the lost or damaged property is actually repaired or replaced; and

**(b)** Unless the repairs or replacements are made within 180 days after the "loss;"

We will not pay more for "loss" on a replacement cost basis than the least of:

**(a)** The Limit of Insurance applicable to the lost or damaged property;

**(b)** The cost to replace the lost or damaged property with other property:

  **(i)** Of substantially identical material and quality; and

  **(ii)** Used for the same purpose; or

**(c)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

If you do not repair or replace the lost or damaged property within 180 days, or choose not to repair or replace the lost or damaged property, we will pay the least of the following amounts:

**(a)** The actual cash value of the damaged property as of the date of "loss."
**(b)** The cost of restoring the property to its condition immediately before the "loss."
**(c)** The cost of replacing the property with substantially identical property.
**(d)** The Limit of Insurance applicable to the lost or damaged property.

In the event of "loss", the value of property will be determined as of the date of "loss."

**(3) Functional Replacement Cost**

We will pay the cost of replacing destroyed property with property of greater processing ability. However, the new property must be able to perform the same function as the destroyed property.

For Functional Replacement Cost coverage to apply, the following requirements must be met:

**(a)** Before a "loss" occurs, you must give us a list of property which includes:

  **(i)** The description and current replacement cost of the property you now own that you plan to replace.

  **(ii)** The description and current cost of the replacement property.

Includes copyrighted material of Insurance Services Office, Inc. or ISO Commercial Risk Services, Inc. with its permission. Copyright, ISO Commercial Risk Services, Inc., 1991, 1992



**(b)** There must be a total "loss" of the current property. If a partial "loss" occurs to property covered for Functional Replacement cost, we will pay as if the property were insured for replacement cost as explained above.

We will not pay more than:

**(a)** The amount you actually spend to replace the current property; or

**(b)** The amount shown as the current cost of the replacement property on the last list you gave us.

We will pay for a "loss" on a replacement cost basis until the designated replacement property is actually purchased. When you buy the replacement property we will pay you the difference between the replacement cost and the increased value, if any.

In the event of "loss", the value of property will be determined as of the date of "loss."

**b.   "Electronic Media"**

The value will be the actual cost of reproducing the data and the cost of the media.

When the data is not reproduced, we will not pay more than the cost of blank discs, films, tapes, or similar electronic data processing media, of the same kind and quality.

When the data and media is individually listed or described on the Declarations, its value will be the applicable Limit of Insurance shown on the Declarations for that item.

**6.   Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for all Covered Property at all locations bears to 80% of the total value of all property at all locations as of the time of "loss."

**F.   DEFINITIONS**

**1.   "Business Day"** means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**2.   "Loss"** means accidental loss or damage.

**3.   "Electronic Media"** means all forms of data including computer instructions and programs which are converted to a form usable in your "operations." This also includes the materials on which the data is recorded.

**4.   "Extra Expense"** means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical "loss" to the property.

**5.   "Operations"** means your business activities occurring at the described premises.

**6.   "Period of restoration"** means the period of time that:

**a.**   Begins with the date of direct physical "loss" or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.**   Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that regulates the construction, use or repair, or requires the tearing down of any property.

The expiration date of this policy will not cut short the "period of restoration."

**7.   "Computer virus"** means any self-replicating program which contaminates or destroys programs, data or operating systems.

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS



ROYAL & SUNALLIANCE

| | |
|---|---|
| **1. POLICY NO.** <u>KHT318271</u> | **EFFECTIVE DATE** <u>04/01/01</u> |
| **2. NAMED INSURED** <u>Brownsville Independent School District</u> | **RENEWAL OF** <u>KHT310355</u> |

**3. DESCRIPTION OF PREMISES** ☐ "X" If supplemental declarations attached

Prem. No.   Bldg. No.                                    Location, Construction and Occupancy

\*       \*                      *As Per Schedule On File With The Company*

**COVERAGES PROVIDED** – Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No | Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|---|
| \* | \* | Blanket Building & Personal Property | $371,452,376 | Special | 100% | Included |
| \* | \* | Blanket Business Income | $100,000 | Special | 100% | Included |

*As Per Schedule on File with Company          *IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT*

**OPTIONAL COVERAGES** – Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Agreed Value Expiration Date | Coverage | Amount | | Replacement Cost (X) | |
|---|---|---|---|---|---|---|---|
| | | | | | Building | Personal Property | Including *Stock |
| \* | \* | | | | X | X | |

| Prem. No. | Bldg. No. | Inflation Guard (Percentage) | | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|---|
| N/A | | Building | Personal Property | | | |

**\* APPLIES TO BUSINESS INCOME ONLY**

**4. MORTGAGE HOLDERS**

Prem. No.   Bldg. No.           Mortgage Holder Name and Mailing Address

NIL

| **5. DEDUCTIBLE** | | |
|---|---|---|
| See Endorsement #3 | **TOTAL PREMIUM FOR THIS COVERAGE PART** ➡ | **$** Included |

**6. FORMS / ENDORSEMENTS APPLICABLE**

| To All Coverages | | To Specific Premises / Coverages | | | |
|---|---|---|---|---|---|
| | | Prem. No. | Bldg. No. | Coverages | Form Number |
| Endorsement #3&4 | CP0202 (0269) | | | | |
| CP0010 (0695) | CP0405 (0695) | | | | |
| CP0030 (0695) | CP0425 (1090) | | | Included | |
| CP0090 (0788) | CP0440 (0695) | | | | |
| CP0142 (1100) | CP1030 (0695) | | | | |
| IL0415 (0498) | | | | | |

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright. ISO Commercial Risk Services. Inc., 1984.

PC 86839 (0187)

## COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL DECLARATIONS

**ROYAL &
SUNALLIANCE**

**1. POLICY NO.**    KHT318271

**2. NAMED INSURED** Brownsville ISD                    **EFFECTIVE DATE** 04/01/01

### 3. DESCRIPTION OF PREMISES

| Prem No. Bldg. No. | Location, Construction and Occupancy |
| ** ** | ** |

**\*\* Refer to PC86839 (0187)**

**COVERAGES PROVIDED** - Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates |
|---|---|---|---|---|---|
| * * | Blanket Extra Expense | $50,000 | Special | 100% | Included |
| * * | Blanket Musical Instrument/ Band Uniforms | $2,900,000 | Special | 100% | Included |

*Refer to PC86839 (0187)                    *IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

**OPTIONAL COVERAGES** - Applicable only when entries are made in the schedule below.

| Prem. No. Bldg. No. | Agreed Value | | | Replacement Cost (X) | | |
|---|---|---|---|---|---|---|
| | Expiration Date | Coverage | Amount | Building | Personal Property | Including "Stock" |
| * * | | | | X | X | |

| Prem. No. Bldg. No. | Inflation Guard (Percentage) | | * Monthly Limit of Indemnity (Fraction) | * Maximum Period of Indemnity (X) | * Extended Period of Indemnity (Days) |
|---|---|---|---|---|---|
| | Building | Personal Property | | | |
| N/A | | | | | |

**\* APPLIES TO BUSINESS INCOME ONLY**

### 4. MORTGAGE HOLDERS

| Prem. No. Bldg. No. | Mortgage Holder Name and Mailing Address |
|---|---|
| NIL | |

### 5. FORMS / ENDORSEMENTS APPLICABLE TO SPECIFIC PREMISES / COVERAGES

| Prem. No. Bldg. No. | Coverages | Form Number | Prem. No. | Bldg. No. | Coverages | Form Number |
|---|---|---|---|---|---|---|
| | Refer to PC86839(0187) | | | | | |

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright. ISO Commercial Risk Services. Inc., 1984.

PC 86840 (0187)



 ROYAL & SUNALLIANCE  **This Endorsement Changes The Policy.  Please Read It Carefully.**

### DEDUCTIBLES

All claims for loss, damage or expense arising out of any one occurrence shall be adjusted as one claim, and from the amount of such adjusted claim, there shall be deducted the sum of:

| | |
|---|---|
| $50,000 | Per occurrence, except |
| $2,192,000 | Per Building and its Contents combined as respects Windstorm or Hail |
| $5,000 | Per Occurrence All Perils except Windstorm or Hail as respects Contractors Equipment, Radio Equipment, Musical Instruments, and EDP Per Schedule. |

See Endorsement #4 -Flood

**Endorsement Number 3**

 

ROYAL &
SUNALLIANCE

## *This Endorsement Changes The Policy.  Please Read It Carefully.*

### FLOOD ENDORSEMENT

1.  It is agreed that this policy covers loss or damage to the insured property as a result of flood.

2.  For the purpose of this insurance, Flood shall be defined as follows:

    A.  Surface water, waves or tidal water, and the rising (including the overflow or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams or similar bodies of water, whether driven by wind or not;

    B.  Mudslide or mudflow;

    C.  Water that backs up from any sewer or drain;

    D.  Any release of water impounded by a dam.

3.  Limits of Liability:

    The liability of the Company for loss or damage caused by flood shall not exceed the sum of $ 10,000,000 for loss or damage at any one insured location; however, the limit of liability shown above shall not exceed the sum of $10,000,000 due to any one flood occurrence for all locations combined nor for all flood losses occurring in any one year period or policy period, whichever is less, commencing 04/01/01.

4.  Deductible:

    The sum of $** shall be deducted from any adjusted claim due to flood.

5.  Each loss by flood shall constitute a single claim hereunder; provided, that if more than one flood shall occur within any period of seventy-two (72) hours during the term of this endorsement, such flooding shall be considered to constitute a single flood, but the Company shall not be liable for any loss or damage:

    A.  occurring before this policy becomes effective; or

    B.  occurring after termination of this policy, except loss or damage arising from an occurrence in progress when this policy is terminated.

6.  If the coverage of the policy to which this endorsement is attached includes both Property Damage and Business Interruption, the foregoing limits shall be the maximum amounts collectible under this policy for loss or damage resulting from the peril described in Paragraph 2 above, regardless of whether the loss involves Property Damage alone or both Property Damage and Business Interruption.

All other terms, conditions and warranties remaining unchanged.

*Coverage applies to Flood Zone A and AH locations only, as defined by the National Flood Insurance Program, subject to values of $149,017,022.
**$250,000 per building - $1,000,000 annual aggregate

ENDORSEMENT NUMBER: 4



**COMMERCIAL PROPERTY**
**CP 00 10 06 95**

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION **H** – DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

    (a) Machinery and

    (b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

    (a) Fire extinguishing equipment;

    (b) Outdoor furniture;

    (c) Floor coverings; and

    (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

    (a) Additions under construction, alterations and repairs to the building or structure;

    (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

    (a) Made a part of the building or structure you occupy but do not own; and

    (b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.




**c. Personal Property of Others** that is:

    **(1)** In your care, custody or control; and

    **(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

    **(1)** The lowest basement floor; or

    **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

**o.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

    **(1)** Are licensed for use on public roads; or

    **(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

    **(1)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

    **(2)** Vehicles or self-propelled machines, other than autos, you hold for sale; or

    **(3)** Rowboats or canoes out of water at the described premises;

**p.** The following property while outside of buildings:

    **(1)** Grain, hay, straw or other crops;

    **(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

    **a. Debris Removal**

        **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

        **(2)** The most we will pay under this Additional Coverage is 25% of:

            **(a)** The amount we pay for the direct physical loss of or damage to Covered Property; plus






**(b)** The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

**(3)** This Additional Coverage does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Building to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2)** You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.



**(3)** Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

**(a)** This policy expires.

**(b)** 30 days expire after you acquire or begin to construct the property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records – Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2,500 at each described premises, unless a higher limit is shown in the Declarations.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock", that is temporarily at a location you do not own, lease or operate. This Extension does not apply to Covered Property:

**(1)** In or on a vehicle;

**(2)** In the care, custody or control of your salespersons; or

**(3)** At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Preservation of Property; or



2. Debris Removal; but if:

   a. The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

   b. The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

   we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

## D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.

**Example No. 1:**

(This example assumes there is no coinsurance penalty.)

       Deductible: $250

       Limit of Insurance – Bldg. 1:    $60,000
       Limit of Insurance – Bldg. 2:    $80,000

       Loss to Bldg. 1:                 $60,100
       Loss to Bldg. 2:                 $90,000

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

       $60,100
       –   250
       $59,850  Loss Payable – Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:  $59,850 + 80,000 = $139, 850

**Example No. 2:**

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

       Loss to Bldg. 1:       $70,000 (exceeds Limit
                                      of Insurance
                                      plus Deductible)

       Loss to Bldg. 2:       $90,000 (exceeds Limit
                                      of Insurance
                                      plus Deductible)

       Loss Payable – Bldg. 1: $60,000 (Limit of
                                      Insurance)

       Loss Payable – Bldg. 2: $80,000 (Limit of
                                      Insurance)

       Total amount of loss payable: $140,000

## E. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

   a. You must see that the following are done in the event of loss or damage to Covered Property:

      (1) Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

## 6. Vacancy

### a. Description of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

  (a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

  (b) When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its square footage:

    (i) Is not rented; or

    (ii) Is not used to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

### b. Vacancy Provisions

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

  (a) Vandalism;

  (b) Sprinkler leakage, unless you have protected the system against freezing;

  (c) Building glass breakage;

  (d) Water damage;

  (e) Theft; or

  (f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## 7. Valuation

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:

  (1) Awnings or floor coverings;

  (2) Appliances for refrigerating, ventilating, cooking, dishwashing; or

  (3) Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety glazing material if required by law.

**e.** Tenant's Improvements and Betterments at:

  (1) Actual cash value of the lost or damaged property if you make repairs promptly.

  (2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

    (a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

    (b) Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

 

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

f. Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

(1) Blank materials for reproducing the records; and

(2) Labor to transcribe or copy the records when there is a duplicate.

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in step (2); and

(4) Subtract the deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $100,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

Step (1): $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $ 40,000 x .50 = $20,000

Step (4): $ 20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2** (Adequate Insurance):
When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 80% |
| The Limit of Insurance for it is | $200,000 |
| The Deductible is | $250 |
| The amount of loss is | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

 

**Example No. 3:**
When:

The value of property is:

| | |
|---|---|
| Bldg. at Location No. 1 | $75,000 |
| Bldg. at Location No. 2 | $100,000 |
| Personal Property at Location No. 2 | $75,000 |
| | $250,000 |

| | |
|---|---|
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| The Deductible is | $1,000 |

The amount of loss is:

| | |
|---|---|
| Bldg. at Location No. 2 | $30,000 |
| Personal Property at Location No. 2. | $20,000 |
| | $50,000 |

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $ 50,000 x .80 = $40,000.

Step (4): $ 40,000 – $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

 

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

a. The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

| If: | |
|---|---|
| The applicable Limit of Insurance is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |
| The amount of increase is $100,000 x .08 x 146 ÷ 365 = | $3,200 |

### 3. Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Manuscripts;

(4) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(5) "Stock", unless the Including "Stock" option is shown in the Declarations.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

      Copyright, ISO Commercial Risk Services, Inc., 1994      CP 00 10 06 95      □

 

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

    **(a)** Of comparable material and quality; and

    **(b)** Used for the same purpose; or

**(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

## H. DEFINITIONS

**1.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**2.** **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

 

COMMERCIAL PROPERTY
CP 00 30 06 95

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION **G** – DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

(i) Business Income including "Rental Value".

(ii) Business Income other than "Rental Value".

(iii) "Rental Value".

If option (i) above is selected, the term Business Income will include "Rental Value". If option (iii) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

    **1.** All routes within the building to gain access to the described premises; and

    **2.** Your personal property in the open (or in a vehicle) within 100 feet.

### 1. Business Income

Business Income means the:

    **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    **b.** Continuing normal operating expenses incurred, including payroll.

### 2. Covered Causes of Loss

See applicable Causes of Loss Form as shown in the Declarations.

### 3. Additional Coverages

    **a. Extra Expense.**

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

    **(1)** We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

        **(a)** At the described premises; or

        **(b)** At replacement premises or at temporary locations, including:

            **(i)** Relocation expenses; and

            **(ii)** Costs to equip and operate the replacement or temporary locations.

    **(2)** We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations".

    **(3)** We will pay any Extra Expense to:

        **(a)** Repair or replace any property; or

        **(b)** Research, replace or restore the lost information on damaged valuable papers and records;

        to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.



 

**b. Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

**(1)** 3 consecutive weeks after the time of that action; or

**(2)** When your Business Income coverage ends;

whichever is later.

**c. Alterations and New Buildings.** We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**d. Extended Business Income.**

**(1)** Business Income Other Than "Rental Value"

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2)** "Rental Value"

If the necessary suspension of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and



**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 30 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**4. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay for loss under this Extension is $100,000 at each location.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Alterations and New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

**D. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

 

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Limitation – Electronic Media And Records**

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1 – September 1. Loss during the period September 2 – October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1 – September 29 (60 consecutive days). Loss during the period September 30 – October 15 is not covered.

**4. Loss Determination**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

    Copyright, ISO Commercial Risk Services, Inc., 1994    CP 00 30 06 95    □

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**5. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**E. ADDITIONAL CONDITION**

**Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

**a.** The Coinsurance percentage shown for Business Income in the Declarations; times

**b.** The sum of:

**(1)** The Net Income (Net Profit or Loss before income taxes), and

**(2)** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

**1.** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

**2.** Divide the Limit of Insurance for the described premises by the figure determined in Step **1.**; and

**3.** Multiply the total amount of loss by the figure determined in Step **2.**

We will pay the amount determined in Step **3.** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

 

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

1. Prepaid freight – outgoing;

2. Returns and allowances;

3. Discounts;

4. Bad debts;

5. Collection expenses;

6. Cost of raw stock and factory supplies consumed (including transportation charges);

7. Cost of merchandise sold (including transportation charges);

8. Cost of other supplies consumed (including transportation charges);

9. Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

10. Power, heat and refrigeration expenses that do not continue under contract (if form **CP 15 11** is attached);

11. All ordinary payroll expenses or the amount of payroll expense excluded (if form **CP 15 10** is attached); and

12. Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When:  The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises

| | |
|---|---|
| would have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $150,000 |
| The amount of loss is | $ 80,000 |

Step 1: $400,000 x 50% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000 ÷     $200,000 = .75

Step 3: $ 80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

When:  The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises

| | |
|---|---|
| would have been | $400,000 |
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $200,000 |
| The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to the Extra Expense Additional Coverage.

**F. OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income is the lesser of:

      (1) The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

      (2) The Limit of Insurance shown in the Declarations.

 

**2. Monthly Limit Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

(1) The Limit of Insurance, multiplied by

(2) The fraction shown in the Declarations for this Optional Coverage.

**Example:**

When:  The Limit of Insurance
is                                               $120,000
The fraction shown in
the Declarations for
this Optional Cover-
age is                                              1/4

The most we will pay for loss in
each period of 30 consecutive
days is:

$ 120,000 x 1/4 = $30,000

If, in this example, the actual amount
of loss is:

Days   1-30 $40,000
Days 31-60  20,000
Days 61-90  30,000
           $90,000

We will pay:

Days   1-30 $30,000
Days 31-60  20,000
Days 61-90  30,000
           $80,000

The remaining $10,000 is not
covered.

**3. Business Income Agreed Value**

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

**Example:**

When:  The Limit of Insurance
is                                              $100,000
The Agreed Value is                             $200,000
The amount of loss is                           $ 80,000

Step (a): $100,000 ÷       $200,000 = .50

Step (b): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.




**4. Extended Period Of Indemnity**

Under paragraph **A.3.d.**, Extended Business Income, the number "30" in subparagraph **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

## G. DEFINITIONS

**1. "Finished Stock"** means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2. "Operations"** means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

**3. "Period of Restoration"** means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**4. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5. "Rental Value"** means the:

**a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

**b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

**c.** Fair rental value of any portion of the described premises which is occupied by you.



# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

**1.** We cover loss or damage commencing:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

**2.** The coverage territory is:

    **a.** The United States of America (including its territories and possessions);

    **b.** Puerto Rico; and

    **c.** Canada.

  

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
**CP 00 90 07 88**     □




**COMMERCIAL PROPERTY**
**CP 01 42 11 00**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part is replaced by the term Policy.

**B.** The provisions of Items **B.1.** through **B.5.** below apply to the following coverage forms:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
CONDOMINIUM ASSOCIATION COVERAGE FORM;
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
BUILDERS RISK COVERAGE FORM;
TOBACCO SALES WAREHOUSES COVERAGE FORM; AND
STANDARD PROPERTY POLICY

1. Under Additional Coverages, the Debris Removal coverage is deleted and replaced by the following:

   **Debris Removal**

   We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

2. Under Additional Coverages, the Fire Department Service Charge coverage is deleted.

3. Under Additional Coverages, the Pollutant Clean Up And Removal coverage is deleted.

4. Under Limits of Insurance, the third and fourth paragraphs (second and third paragraphs in the Tobacco Sales Warehouses Coverage Form) are deleted and replaced by the following:

   The limits applicable to the Coverage Extensions are in addition to the Limits of Insurance.

   Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

   **a.** Preservation of Property; or

**b.** Debris Removal; but if the sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance, we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

5. Under Definitions, the definition of "pollutants" is deleted.

**C.** The **Additional Coverage – Collapse in the Causes Of Loss – Broad Form** is deleted and replaced by the following:

**Additional Coverage – Collapse**

We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building.

We will not pay for loss or damage described below unless the loss or damage is a direct result of the collapse of a building:

1. Loss or damage to the following types of property, if otherwise covered in this Coverage Part: outdoor radio or television antennas, including their lead-in wiring, masts or towers; awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks, roadways and other paved surfaces; and

2. Loss or damage by settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings.

This Additional Coverage will not increase the Limits of Insurance provided in this Coverage Part.

Section **E.** of this endorsement restricts collapse coverage on property covered under the Builders Risk Coverage Form.

 

D. The provisions of Items **D.1.** through **D.5.** below apply to the Causes Of Loss – Special Form.

1. Exclusion **B.2.d.(4)** is deleted and replaced by the following exclusion:

    (4) Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, ceilings, curbs, fences, retaining walls or swimming pools.

2. Exclusion **B.2.f.,** which pertains to continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more, is deleted. However, all other exclusions pertaining to loss or damage by water continue to apply.

3. Exclusion **B.2.k.,** Collapse, is deleted. However, Section **E.** of this endorsement restricts collapse coverage on property covered under the Builders Risk Coverage Form.

4. Exclusion **B.2.l.,** which pertains to pollutants, is deleted.

5. Limitation **C.1.c.** is replaced by the following:

    c. We will not pay for loss of or damage to the interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

        (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

6. Section **D.**, Additional Coverage – Collapse, is deleted.

E. In the **Builders Risk Coverage Form,** Condition **F.3.,** Restriction Of Additional Coverage – Collapse, is replaced by the following:

3. **Restriction Of Collapse Coverage**

    If the Causes Of Loss – Broad Form or Causes Of Loss – Special Form applies to the Builders Risk Coverage Form, coverage for collapse is restricted as follows:

    We will not pay for loss or damage caused by or resulting from collapse of a building under construction, or any part of a building under construction, caused by use of defective materials or methods in construction, remodeling or renovation.

F. **Legal Action Against Us**

1. The **Legal Action Against Us** Commercial Property Condition is replaced by the following, except as provided in **F.2.** below:

    **LEGAL ACTION AGAINST US**

    No one may bring a legal action against us under this Coverage Part unless:

    a. There has been full compliance with all of the terms of this Coverage Part; and

    b. The action is brought within 2 years and one day after the date on which the direct physical loss or damage occurred.

2. Paragraph **F.1.** above does not apply to the Legal Action Against Us loss condition in the Legal Liability Coverage Form **CP 00 40.**

G. **Appraisal**

1. Except as provided in **G.2.** below, the Appraisal Loss Condition in the:

    BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
    CONDOMINIUM ASSOCIATION COVERAGE FORM;
    CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
    BUILDERS RISK COVERAGE FORM;
    EXTRA EXPENSE COVERAGE FORM;
    LEASEHOLD INTEREST COVERAGE FORM;
    TOBACCO SALES WAREHOUSES COVERAGE FORM; and
    STANDARD PROPERTY POLICY

    is replaced by the following:

    **APPRAISAL**

    If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

    a. Pay its chosen appraiser; and

    b. Bear the other expenses of the appraisal and umpire equally.

 

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim.

**2.** The **Appraisal** Condition in the:

BUSINESS INCOME COVERAGE FORM (AND EXTRA EXPENSE); and
BUSINESS INCOME COVERAGE FORM (WITHOUT EXTRA EXPENSE)

is replaced by the following:

**APPRAISAL**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense and the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim.

**H.** The provision requiring signed, sworn proof of loss in the Duties In The Event Of Loss Or Damage Loss Condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**I.** Under the Loss Payment Condition, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

**1. Claims Handling**

**a.** Within 15 days after we receive written notice of claim, we will:

**(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

**(2)** Begin any investigation of the claim; and

**(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**b.** We will notify you in writing as to whether:

**(1)** The claim or part of the claim will be paid;

**(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**(3)** More information is necessary; or

**(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **b.(1)** through **b.(4)** above, within:

**(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

**(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

 

2. We will pay for covered loss or damage within 5 business days after:

   a. We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   b. An appraisal award has been made.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

   The following paragraphs are added:

3. **Catastrophe Claims**

   If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in I.1. and I.2. above are extended for an additional 15 days.

   Catastrophe or Major Natural Disaster means a weather related event which:

   (1) Is declared a disaster under the Texas Disaster Act of 1975; or

   (2) Is determined to be a catastrophe by the State Board of Insurance.

4. The term "business day", as used in the Loss Payment Condition, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

J. The following is added to the Valuation Loss Condition:

   **Article 6.13. Policy a Liquidated Demand.** A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. The provisions of this Article shall not apply to personal property.

K. Paragraphs **d.** and **f.** of the **Mortgageholders** Additional Condition are replaced by the following:

   d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

      (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

      (2) Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

   (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

   All of the terms of this Coverage Part will then apply directly to the mortgageholder.

   f. If this policy is cancelled, we will give the mortgageholder named in the Declarations written notice of cancellation.

   If we cancel this policy, we will give written notice to the mortgageholder at least:

      (1) 14 days before the effective date of cancellation if we cancel for your non-payment of premium; or

      (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   If you cancel the policy, we will give the mortgageholder notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

L. The following is added to Paragraph **D.1.** in the Duties in the Event of Accident, Claim or Suit Loss Condition in the Legal Liability Coverage Form:

   We will notify the first Named Insured in writing of:

   1. An initial offer to compromise or settle a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 10th day after the date on which the offer is made.

   2. Any settlement of a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 30th day after the date of the settlement.

M. In the **Causes Of Loss – Broad Form**, the Water Damage Cause Of Loss is replaced by the following:

   Water Damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam, other than an Automatic Sprinkler System. If the building or structure containing the system or appliance is Covered Property, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or steam escapes.

 Copyright, Insurance Services Office, Inc., 2000 CP 01 42 11 00     ☐



We will not pay:

**a.** The cost to repair any defect that caused the loss or damage; or

**b.** For loss or damage caused by or resulting from freezing, unless:

    **(1)** You do your best to maintain heat in the building or structure; or

    **(2)** You drain the equipment and shut off the water supply if the heat is not maintained.

 

**COMMERCIAL PROPERTY**
**CP 02 02 02 96**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TEXAS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraphs **2.**, **3.** and **4.** of the **Cancellation** Common Policy Condition are replaced by the following:

  **2. a.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we may cancel this policy by mailing or delivering written notice of cancellation, at least 30 days before the effective date of cancellation, to:

    **(1)** The first Named Insured; and

    **(2)** Each unit-owner to whom we issued a certificate or memorandum of insurance.

    If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

  **b.** If the policy covers a risk other than the risk described in Paragraph **2.a.**, then we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    **(1)** 14 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

    If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

  **c.** In compliance with Texas law, we will not cancel this policy solely because the policyholder is an elected official.

  **3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will also mail or deliver notice of cancellation to each unit-owner to whom we issued a certificate or memorandum of insurance, to each last mailing address known to us.

  **4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

  **5.** The notice of cancellation will also state that pro rata unearned paid premium, if not tendered, will be refunded on demand.

**B.** The following condition is added and applies unless Paragraph **D.** applies:

**NONRENEWAL**

  **1.** If we elect not to renew this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

  **2.** In compliance with Texas law, we will not refuse to renew this policy solely because the policyholder is an elected official.

  **3.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then:

    **a.** We will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to the first Named Insured and to each unit-owner to whom we issued a certificate or memorandum of insurance.

    **b.** We will mail or deliver such notice to each last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

 

## C. Cancellation – One- And Two-Family Dwellings And Governmental Property

1. Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

   If this policy is cancelled, we will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

   The refund will be pro rata if:

   a. We cancel this policy; or

   b. The first Named Insured cancels this policy because:

      (1) We refused to provide additional coverage which the first Named Insured requested under the policy; or

      (2) We reduced or restricted coverage under the policy without the consent of the first Named Insured.

   The refund may be less than pro rata if the first Named Insured cancels this policy for a reason other than those listed in **b.(1)** and **b.(2)** above.

2. The following provisions are added to the **Cancellation** Common Policy Condition:

   a. If this policy has been in effect for 90 days or less and is not a renewal of a policy we issued, we may cancel coverage on one – and two-family dwellings and on governmental units for any reason.

   b. If this policy has been in effect for more than 90 days or is a renewal of a policy we issued, we may cancel coverage on one – and two-family dwellings and on governmental units only for the following reasons:

      (1) If the first Named Insured does not pay the premium or any portion of the premium when due;

      (2) If the Texas Department of Insurance determines that continuation of this policy would result in violation of the Texas Insurance Code or any other law governing the business of insurance in Texas;

      (3) If the Named Insured submits a fraudulent claim; or

      (4) If there is an increase in the hazard covered by this policy that is within the control of the Named Insured and would produce an increase in the premium rate of this policy.

   c. If such coverage is cancelled, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

   d. In compliance with Texas law, we will not cancel such coverage solely because the policyholder is an elected official.

## D. The following condition is added:

### NONRENEWAL – ONE- AND TWO-FAMILY DWELLINGS AND GOVERNMENTAL PROPERTY

1. If we elect not to renew coverage on one – and two-family dwellings or on governmental units, we will mail or deliver written notice of nonrenewal to the first Named Insured and any mortgageholder shown in the Declarations, at least 30 days before the expiration date. Proof of mailing will be sufficient proof of notice.

   We will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

   If we fail to give the first Named Insured proper notice of our refusal to renew, the first Named Insured may require us to renew the policy.

2. We may elect not to renew such coverage for any reason, subject to the exceptions and limitations in Paragraphs **3.** and **4.** below.

3. We will not refuse to renew coverage:

   a. Solely because the policyholder is an elected official; or

   b. Because of claims for losses resulting from natural causes.

4. **Claims That Do Not Result From Natural Causes**

   a. If we have previously notified you as provided in **b.** below, we may refuse to renew coverage if the Named Insured has filed under this policy, in any three-year period, three or more claims that do not result from natural causes.

   b. If the Named Insured has filed two such claims in a period of less than three years, we may notify the first Named Insured in writing that, if the Named Insured files a third such claim during the three year period, we may refuse to renew coverage.

   c. A claim does not include a claim that is filed but is not paid or payable under the policy.



POLICY NUMBER:KHT318271

**COMMERCIAL PROPERTY**
**CP 04 05 06 95**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE\***

| Bldg. No./ Prem. No. | Cov. A | Cov. B Limit of Insur. | Cov. C Limit of Insur. | Cov. B and C Blanket Limit of Insur. | |
|---|---|---|---|---|---|
| All    /All | [X] | $ 25,000 | $ 50,000 | $ | ** |
| ____/____ | [ ] | $ _____ | $ _____ | $ _____ | ** |
| ____/____ | [ ] | $ _____ | $ _____ | $ _____ | ** |

\* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

\*\* Do **not** enter a Blanket Limit of Insurance if individual Limits of Insurance are selected for Coverages B and C, or if one of these Coverages is not applicable.

---

**A.** Each Coverage – Coverage A, Coverage B and Coverage C – applies only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the Building property identified for that Coverage(s) in the Schedule.

**B.** We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**C. Coverage**

1. Coverage A – Coverage for Loss to the Undamaged Portion of the Building

   If a Covered Cause of Loss occurs to covered Building property, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

   **a.** Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

   **b.** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

   **c.** Is in force at the time of loss.

   Coverage A is included within the Limit of Insurance shown in the Declarations as applicable to the covered Building property. Coverage A does not increase the Limit of Insurance.

2. **Coverage B – Demolition Cost Coverage**

   If a Covered Cause of Loss occurs to covered Building property, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by enforcement of building, zoning or land use ordinance or law.

   The COINSURANCE Additional Condition does not apply to Demolition Cost Coverage.

---

 

**3. Coverage C – Increased Cost of Construction Coverage**

**a.** If a Covered Cause of Loss occurs to the covered Building property, we will pay for the increased cost to:

  **(1)** Repair or reconstruct damaged portions of that Building property; and/or

  **(2)** Reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required;

when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.

However:

  **(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

  **(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The COINSURANCE Additional Condition does not apply to Increased Cost of Construction Coverage.

**b.** When covered Building property is damaged or destroyed by a Covered Cause of Loss and Coverage C applies to that property in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in **3.a.:**

  **(1)** The cost of excavations, grading, back-filling and filling;

  **(2)** Foundation of the building;

  **(3)** Pilings; and

  **(4)** Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this provision, **3.b.**

**D. Loss Payment**

**1.** When Coverage A applies, loss to the building, including loss in value of the undamaged portion of the building due to enforcement of an ordinance or law, will be determined as follows:

  **a.** If the Replacement Cost Coverage Option applies and the property is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

    **(1)** The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

    **(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

  **b.** If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

    **(1)** The actual cash value of the building at the time of loss; or

    **(2)** The Limit of Insurance shown in the Declarations as applicable to the covered Building property.

**2.** Unless paragraph **D.4.** applies, loss payment under Coverage B – Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

  **a.** The amount you actually spend to demolish and clear the site of the described premises; or

  **b.** The applicable Limit of Insurance shown for Coverage B in the Schedule above.

Copyright, ISO Commercial Risk Services, Inc., 1994



3. Unless paragraph **D.4.** applies, loss payment under Coverage C – Increased Cost of Construction Coverage will be determined as follows:

   **a.** We will not pay under Coverage C:

      **(1)** Until the property is actually repaired or replaced, at the same or another premises; and

      **(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

   **b.** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage C is the lesser of:

      **(1)** The increased cost of construction at the same premises; or

      **(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

   **c.** If the ordinance or law requires relocation to another premises, the most we will pay under Coverage C is the lesser of:

      **(1)** The increased cost of construction at the new premises; or

      **(2)** The applicable Limit of Insurance shown for Coverage C in the Schedule above.

4. If a **Blanket** Limit of Insurance is shown for Coverages B and C in the Schedule above, paragraphs **D.2.** and **D.3.** of this endorsement do not apply with respect to the Building property that is subject to the Blanket Limit, and the following loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Blanket Limit of Insurance shown for Coverages B and C in the Schedule above. Subject to this Blanket Limit of Insurance, the following loss payment provisions apply:

   **a.** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

   **b.** With respect to the Increased Cost of Construction:

      **(1)** We will not pay for the increased cost of construction:

         **(a)** Until the property is actually repaired or replaced, at the same or another premises; and

         **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

      **(2)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

      **(3)** If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

**E.** The terms of this endorsement apply separately to each building to which this endorsement applies.

**F.** Under this endorsement we will not pay for loss due to any ordinance or law that:

   **1.** You were required to comply with before the loss, even if the building was undamaged; and

   **2.** You failed to comply with.

POLICY NUMBER:KHT318271                                          **COMMERCIAL PROPERTY**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEWLY ACQUIRED OR CONSTRUCTED PROPERTY – INCREASED LIMIT

This endorsement modifies insurance provided under the following:

      BUILDING AND PERSONAL PROPERTY COVERAGE FORM
      CONDOMINIUM ASSOCIATION COVERAGE FORM
      STANDARD PROPERTY POLICY
      LEGAL LIABILITY COVERAGE FORM

**A.** When this endorsement is attached to the LEGAL LIABILITY COVERAGE FORM CP 00 40, the term Newly Acquired or Constructed Property in this endorsement is replaced by the term Newly Acquired Property. In addition, the reference to subparagraph (1) in paragraph B. below is replaced by a reference to subparagraph (1)(b).

**B.** The $250,000 Limit of Insurance in subparagraph (1) of the NEWLY ACQUIRED OR CONSTRUCTED PROPERTY Coverage Extension is replaced by the following:

    The Newly Acquired or Constructed Property Limit shown in the Schedule or in the Declarations.

### SCHEDULE
**Newly Acquired or Constructed Property Limit: $2,500,000 Sublimit (90 days reporting)**




POLICY NUMBER:KHT318271

**COMMERCIAL PROPERTY**
CP 04 40 06 95

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SPOILAGE COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM

### SCHEDULE*

| Prem. No. All | Bldg. No. All | Description of Property | Limit of Insurance $5,000 Sublimit | Deductible See Endt. #3 | Refrigeration Maintenance Agreement | Causes of Loss: Breakdown or Contamination | Power Outage X | Selling Price |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

The Coverage Form to which this endorsement applies is extended to insure against direct physical loss or damage by the Covered Causes of Loss, but only with respect to coverage provided by this endorsement.

A. Paragraph **A.1. COVERED PROPERTY** is replaced by the following:

1. **Covered Property**

Covered Property means "perishable stock" at the described premises owned by you or by others that is in your care, custody or control.

B. The following is added to Paragraph **A.2. PROPERTY NOT COVERED:**

q. **Property located:**

(1) On buildings;

(2) In the open; or

(3) In vehicles.

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

 

**C.** Paragraph **A.3. COVERED CAUSES OF LOSS** is replaced by the following:

**3. Covered Causes of Loss**

Covered Causes of Loss means the following only if indicated by an "X" in the Schedule:

**a.** Breakdown or Contamination, meaning:

**(1)** Change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises; and

**(2)** Contamination by the refrigerant.

**b.** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**D. SELLING PRICE**

If Selling price is indicated by an "X" in the Schedule, the following is added to the VALUATION Loss Condition:

We will determine the value of finished "perishable stock" in the event of loss or damage at:

**1.** The selling price, as if no loss or damage had occurred;

**2.** Less discounts and expenses you otherwise would have had.

**E.** Paragraph **A.5. COVERAGE EXTENSIONS** does not apply.

**F.** Paragraph **B. EXCLUSIONS** is replaced by the following:

**B. EXCLUSIONS**

**1.** Only the following EXCLUSIONS contained in paragraph **B.1.** of the Causes of Loss Form applicable to this Coverage Part apply to Spoilage Coverage:

**a.** EARTH MOVEMENT;

**b.** GOVERNMENTAL ACTION;

**c.** NUCLEAR HAZARD;

**d.** WAR AND MILITARY ACTION; and

**e.** WATER.

**2.** The following EXCLUSIONS are added:

We will not pay for loss or damage caused by or resulting from:

**a.** The disconnection of any refrigerating, cooling or humidity control system from the source of power.

**b.** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

**c.** The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

**(1)** Lack of fuel; or

**(2)** Governmental order.

**d.** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

**e.** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

**G.** Paragraph **D. DEDUCTIBLE** is replaced by the following:

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Schedule of this endorsement. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance. No other deductible in this policy applies to the coverage provided by this endorsement.

**H.** Paragraph **F. ADDITIONAL CONDITIONS** is replaced by the following:

**ADDITIONAL CONDITION**

The following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

**REFRIGERATION MAINTENANCE AGREEMENTS**

If Breakdown or Contamination is designated as a Covered Cause of Loss and a refrigeration maintenance agreement is shown as applicable by an "X" in the Schedule, the following condition applies:

You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us, the insurance provided by this endorsement will be automatically suspended at the involved location.

**I.** Paragraph **G. OPTIONAL COVERAGES** does not apply.

**J.** The following is added to the DEFINITIONS:

**"Perishable Stock"** means personal property:

**a.** Maintained under controlled conditions for its preservation; and

**b.** Susceptible to loss or damage if the controlled conditions change.

 

COMMERCIAL PROPERTY
CP 10 30 06 95

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning.  Refer to Section **F.** – Definitions.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or

**2.** Limited in Section **C.**, Limitations;

that follow.

## B. EXCLUSIONS

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance or Law, applies whether the loss results from:

**(1)** An ordinance or law that is enforced even if the property has not been damaged; or

**(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(2)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

 Copyright, ISO Commercial Risk Services, Inc., 1994     □

 

**e. Utility Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

2. We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in **2.d. (1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.



f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

　(1) You do your best to maintain heat in the building or structure; or

　(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

　(1) Acting alone or in collusion with others; or

　(2) Whether or not occurring during the hours of employment.

　This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

k. Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

3. We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

　(1) Planning, zoning, development, surveying, siting;

　(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

　(3) Materials used in repair, construction, renovation or remodeling; or

　(4) Maintenance;

　of part or all of any property on or off the described premises.

4. **Special Exclusions**

　The following provisions apply only to the specified Coverage Forms.

a. **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

　We will not pay for:

　(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

　　But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

　(2) Any loss caused by or resulting from:

　　(a) Damage or destruction of "finished stock"; or

　　(b) The time required to reproduce "finished stock".

　　This exclusion does not apply to Extra Expense.




(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

    (a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

    (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(6) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.** Ordinance or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

    (a) Your cancelling the lease;

    (b) The suspension, lapse or cancellation of any license; or

    (c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following Exclusions do not apply to insurance under this Coverage Form:

    (a) Paragraph **B.1.a.**, Ordinance or Law;

    (b) Paragraph **B.1.c.**, Governmental Action;

    (c) Paragraph **B.1.d.**, Nuclear Hazard;

    (d) Paragraph **B.1.e.**, Utility Services; and

    (e) Paragraph **B.1.f.**, War and Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

    **(a) Contractual Liability**

    We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

    (i) Your assumption of liability was executed prior to the accident; and

    (ii) The building is Covered Property under this Coverage Form.

    **(b) Nuclear Hazard**

    We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. LIMITATIONS**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

    **a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

    **b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

Copyright, ISO Commercial Risk Services, Inc., 1994

**CP 10 30 06 95**    □

 

c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

   (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

   (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

   However, this limitation does not apply to:

   (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

   (2) Business Income coverage or Extra Expense coverage.

e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

f. Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

g. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay more than $500 in any one occurrence for loss of or damage to glass that is part of a building or structure, regardless of the number of panes, plates or similar units of glass. Subject to this $500 aggregate, we will not pay more than $100 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

   However, this limitation does not apply to:

   a. Loss or damage by the "specified causes of loss", except vandalism; or

   b. Business Income coverage or Extra Expense coverage.

3. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

   b. Animals, and then only if they are killed or their destruction is made necessary.

   c. Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass that is part of a building or structure;

      (2) Containers of property held for sale; or

      (3) Photographic or scientific instrument lenses.

   d. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income coverage or to Extra Expense coverage.

4. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

   a. $2,500 for furs, fur garments and garments trimmed with fur.

   b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   c. $2,500 for patterns, dies, molds and forms.

 

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.4.,** does not apply to Business Income coverage or to Extra Expense coverage.

**5.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

   **a.** Results in discharge of any substance from an automatic fire protection system; or

   **b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

## D. ADDITIONAL COVERAGE – COLLAPSE

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5.** below.

**1.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

   **a.** The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

   **b.** Hidden decay;

   **c.** Hidden insect or vermin damage;

   **d.** Weight of people or personal property;

   **e.** Weight of rain that collects on a roof;

   **f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

**2.** If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

   **a.** The personal property which collapses is inside a building; and

   **b.** The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

**3.** With respect to the following property:

   **a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   **b.** Awnings, gutters and downspouts;

   **c.** Yard fixtures;

   **d.** Outdoor swimming pools;

   **e.** Fences;

   **f.** Piers, wharves and docks;

   **g.** Beach or diving platforms or appurtenances;

   **h.** Retaining walls; and

   **i.** Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.**, we will pay for loss or damage to that property only if:

   **a.** Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

   **b.** The property is Covered Property under this Coverage Form.

**4.** Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**5.** This Additional Coverage – Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

## E. ADDITIONAL COVERAGE EXTENSIONS

**1. Property In Transit.** This Extension applies only to your personal property to which this form applies.

   **a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.



**b.** Loss or damage must be caused by or result from one of the following causes of loss:

  **(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

  **(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

  **(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage under this Extension is $1000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

**F. DEFINITIONS**

"Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**1.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

  **a.** The cost of filling sinkholes; or

  **b.** Sinking or collapse of land into man-made underground cavities.

**2.** Falling objects does not include loss or damage to:

  **a.** Personal property in the open; or

  **b.** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**3.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.





POLICY NUMBER:KHT318271

INTERLINE
IL 04 15 04 98

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

### SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| "Where installed and operational" | | "P-9" |

**Describe any "P-9":"P-9": Central Station-Burglar Alarm, Security Sensors and Automatic Sprinkler System per schedule.**

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the
    Farm Property – Other Farm
    Provisions Form – Additional Coverages,
    Conditions, Definitions
General Conditions in the Mobile Agricultural
    Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage
    Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

    **"P-1" Automatic Sprinkler System,** including related supervisory services.

    Automatic Sprinkler System means:

    **a.** Any automatic fire protective or extinguishing system, including connected:

      **(1)** Sprinklers and discharge nozzles;

      **(2)** Ducts, pipes, valves and fittings;

      **(3)** Tanks, their component parts and supports; and

      **(4)** Pumps and private fire protection mains.

    **b.** When supplied from an automatic fire protective system:

      **(1)** Non-automatic fire protective systems; and

      **(2)** Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

    **a.** Connected to a central station; or

    **b.** Reporting to a public or private fire alarm station.

**"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

 

**B.** The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM – FARM PROPERTY
MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

    Copyright, Insurance Services Office, Inc., 1997    IL 04 15 04 98    □

# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**ROYAL &**
**SUNALLIANCE**

**1. POLICY NO.** KHT318271

**EFFECTIVE DATE** 04/01/01

**2. NAMED INSURED** Brownsville Independent School District

**RENEWAL OF** KHT310355

| 3. LOCATION | ADDRESS OF LOCATION |
|---|---|
| * | *As Per Schedule on File with Company |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Accounts Receivable | $100,000 Blanket | $See Endt. #3 | Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>CM0066 (0695) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Valuable Papers & Records | $100,000 Blanket | $See Endt. #3 | $Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>CM0067 (0695) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Transit | $100,000 Sublimit | $See Endt. #3 | $Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0005 (0187) | | | |

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES: | TOTAL PREMIUM FOR THIS COVERAGE PART | $Continued |
|---|---|---|

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

MC 86841(0187) Copyright, Insurance Services, Inc., 1984.

# COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS

**ROYAL &**
**SUNALLIANCE**

**1. POLICY NO.** KHT318271

**EFFECTIVE DATE** 04/01/01

**2. NAMED INSURED** Brownsville Independent School District

**RENEWAL OF** KHT310355

---

| 3. LOCATION | ADDRESS OF LOCATION |
|---|---|
| | *As Per Schedule on File with Company |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Contractors Equipment<br>Actual Cash Value | **$283,677 Blanket** | $See Endt. #3 | Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0007 (0294) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| EDP<br>Replacement Cost | $26,647,611 Blanket | $See Endt. #3 | $Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0010 (0193) | | | |

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Radio & Equipment<br>Replacement Cost | $699,991 Blanket | $See Endt. #3 | $Included |
| **MORTGAGE HOLDER / LOSS PAYEE**<br>NIL | | | |
| **FORMS / ENDORSEMENTS APPLICABLE - TO THIS COVERAGE**<br>MC0033 (1190) | | | |

| 4. FORMS / ENDORSEMENTS APPLICABLE FOR ALL COVERAGES:<br>CM0001 (0695), CM0112 (1090), CM0066 (0695), CM0067 (0900),<br>MC0005 (0187), MC0007 (0294), MC0010 (0193), MC0033 (1190) | TOTAL PREMIUM<br>FOR THIS ➡<br>COVERAGE PART | $Included |
|---|---|---|

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

MC 86841(0187)    Includes copyrighted material of Insurance Services Office, Inc., with its permission<br>Copyright, Insurance Services, Inc., 1984.




COMMERCIAL INLAND MARINE
CM 00 01 06 95

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. ABANDONMENT

There can be no abandonment of any property to us.

### B. APPRAISAL

If we and you disagree on the value of the property or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the "loss". Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the "loss" occurred.

4. Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss. Also if feasible, set the damaged property aside and in the best possible order for examination.

5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.

6. Permit us to inspect the property and records proving "loss".

7. If requested, permit us to question you under oath, at such times as may be reasonably required, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Promptly send us any legal papers or notices received concerning the "loss".

10. Cooperate with us in the investigation or settlement of the claim.

### D. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same "loss", we will not pay more than the actual amount of the "loss".

### E. LOSS PAYMENT

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;

2. The entry of final judgment; or

3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

### F. OTHER INSURANCE

If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

 Copyright, Insurance Services Office, Inc., 1994 ☐

 

## G. PAIR, SETS OR PARTS

**1. Pair or Set.** In case of "loss" to any part of a pair or set we may:

  **a.** Repair or replace any part to restore the pair or set to its value before the "loss"; or

  **b.** Pay the difference between the value of the pair or set before and after the "loss".

**2. Parts.** In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

## H. PRIVILEGE TO ADJUST WITH OWNER

In the event of "loss" involving property of others in your care, custody or control, we have the right to:

**1.** Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

**2.** Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

## I. RECOVERIES

Any recovery or salvage on a "loss" will accrue entirely to our benefit until the sum paid by us has been made up.

## J. REINSTATEMENT OF LIMIT AFTER LOSS

The Limit of Insurance will not be reduced by the payment of any claim, except for total "loss" of a scheduled item, in which event we will refund the unearned premium on that item.

## K. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after "loss" to impair them.

## GENERAL CONDITIONS

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

## B. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all the terms of this Coverage Part; and

**2.** The action is brought within 2 years after you first have knowledge of the "loss".

## C. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

## D. POLICY PERIOD

We cover "loss" commencing during the policy period shown in the Declarations.

## E. VALUATION

The value of property will be the least of the following amounts:

**1.** The actual cash value of that property;

**2.** The cost of reasonably restoring that property to its condition immediately before "loss"; or

**3.** The cost of replacing that property with substantially identical property.

In the event of "loss", the value of property will be determined as of the time of "loss".



COMMERCIAL INLAND MARINE
CM 00 66 06 95

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E – DEFINITIONS.

## A. COVERAGE

1. We will pay:

   a. All amounts due from your customers that you are unable to collect;

   b. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the "loss"; and

   d. Other reasonable expenses that you incur to re-establish your records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

2. **PROPERTY NOT COVERED**

   Coverage does not apply to:

   a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

   b. Contraband, or property in the course of illegal transportation or trade.

3. **COVERED CAUSES OF LOSS**

   Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to your records of accounts receivable except those causes of "loss" listed in the Exclusions.

4. **ADDITIONAL COVERAGE – COLLAPSE**

   We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

   a. Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Form;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

5. **COVERAGE EXTENSION**

   Removal

   If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of "loss", we will pay for "loss" while they are:

   a. At a safe place away from your "premises"; or

   b. Being taken to and returned from that place.

   This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

## B. EXCLUSIONS

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   a. **GOVERNMENTAL ACTION**

      Seizure or destruction of property by order of governmental authority.

 Copyright, Insurance Services Office, Inc., 1994

 

But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. NUCLEAR HAZARD**

(1) Any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**c. WAR AND MILITARY ACTION**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for a "loss" caused by or resulting from any of the following:

a. Delay, loss of use, loss of market or any other consequential loss.

b. Dishonest or criminal act committed by:

(1) You, any of your partners, employees, directors, trustees, or authorized representatives;

(2) Anyone else with an interest in the property, or their employees or authorized representatives; or

(3) Anyone else to whom the property is entrusted for any purpose.

This exclusion applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

This exclusion does not apply to Covered Property that is entrusted to others who are carriers for hire or to acts of destruction by your employees. But theft by employees is not covered.

c. Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

d. Bookkeeping, accounting or billing errors or omissions.

e. Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

(1) Programming errors or faulty machine instructions;

(2) Faulty installation or maintenance of data processing equipment or component parts;

(3) An occurrence that took place more than 100 feet from your "premises"; or

(4) Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises".

But we will pay for direct "loss" caused by lightning.

f. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

g. Unauthorized instructions to transfer property to any person or to any place.

3. We will not pay for "loss" that requires any audit of records or any inventory computation to prove its factual existence.

4. We will not pay for a "loss" caused by or resulting from any of the following. But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss".

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the "loss".

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;



(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property wherever located.

d. Collapse except as provided in the Additional Coverage – Collapse section of this Coverage Form.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

## D. ADDITIONAL CONDITIONS

### 1. DETERMINATION OF RECEIVABLES

General Condition E. Valuation in the Commercial Inland Marine Conditions is replaced by the following:

a. If you cannot accurately establish the amount of accounts receivable outstanding as of the time of "loss", the following method will be used:

(1) Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the "loss" occurs; and

(2) Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the "loss" occurred or for any demonstrated variance from the average for that month.

b. The following will be deducted from the total amount of accounts receivable, however that amount is established:

(1) The amount of the accounts for which there is no "loss";

(2) The amount of the accounts that you are able to re-establish or collect;

(3) An amount to allow for probable bad debts that you are normally unable to collect; and

(4) All unearned interest and service charges.

## 2. RECOVERIES

The following is added to Commercial Inland Marine Loss Condition I. Recoveries:

You will pay us the amount of all recoveries you receive for a "loss" paid by us. But any recoveries in excess of the amount we have paid belong to you.

3. The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

### a. COVERAGE TERRITORY

We cover records of accounts receivable:

(1) Within your "premises"; and

(2) Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

(a) The United States of America;

(b) Puerto Rico; and

(c) Canada.

### b. COINSURANCE

All accounts receivable, except those in transit, must be insured for at least 80% of their total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for Coverage Applicable at All Locations bears to 80% of the total value of all accounts receivable at all locations as of the time of "loss". This penalty will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to re-establish your records of accounts receivable.

### c. PROTECTION OF RECORDS

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

## E. DEFINITIONS

1. "Loss" means accidental loss or damage.

2. "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

 

**COMMERCIAL INLAND MARINE**
**CM 00 67 09 00**

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F** – Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

1. **Covered Property**, as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

2. **Property Not Covered**

   Covered Property does not include:

   a. Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

   b. Property held as samples or for delivery after sale;

   c. Property in storage away from the "premises" shown in the Declarations; or

   d. Contraband, or property in the course of illegal transportation or trade.

3. **Covered Causes Of Loss**

   Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE to Covered Property except those causes of loss listed in the Exclusions.

4. **Additional Coverage – Collapse**

   We will pay for direct loss or damage caused by or resulting from risks of direct physical loss or damage involving collapse of all or part of a building or structure caused by one or more of the following:

   a. Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   This Additional Coverage does not increase the Limits of Insurance provided in this Coverage Form.

5. **Coverage Extensions**

   a. **Removal**

      If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of loss or damage, we will pay for loss or damage while it is:

      (1) At a safe place away from your "premises"; or

      (2) Being taken to and returned from that place.

      This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

 

**b. Away From Your Premises**

We will pay up to $5,000 for loss or damage to Covered Property while it is away from your "premises".

But if a higher Limit of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   **b. Nuclear Hazard**

   (1) Any weapon employing atomic fission or fusion; or

   (2) Nuclear reaction or radiation, or radioactive contamination from any other cause. But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

   **c. War And Military Action**

   (1) War, including undeclared or civil war;

   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

   **a.** Delay, loss of use, loss of market or any other consequential loss.

   **b.** Dishonest or criminal act committed by:

   (1) You, any of your partners, employees, directors, trustees, or authorized representatives;

   (2) A manager or a member if you are a limited liability company;

   (3) Anyone else with an interest in the property, or their employees or authorized representatives; or

   (4) Anyone else to whom the property is entrusted for any purpose.

   This exclusion applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

   This exclusion does not apply to Covered Property that is entrusted to others who are carriers for hire or to acts of destruction by your employees. But theft by employees is not covered.

   **c.** Errors or omissions in processing or copying.

   But we will pay for direct loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

   **d.** Electrical or magnetic injury, disturbance or erasure of electronic recordings.

   But we will pay for direct loss or damage caused by lightning.

   **e.** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

   **f.** Unauthorized instructions to transfer property to any person or to any place.

   **g.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

Copyright, Insurance Services Office, Inc., 1999

CM 00 67 09 00    □




3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

   a. **Weather Conditions.** But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

   b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   c. Faulty, inadequate or defective:

      (1) Planning, zoning, development, surveying, siting;

      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) Materials used in repair, construction, renovation or remodeling; or

      (4) Maintenance;

      of part or all of any property wherever located.

   d. Collapse except as provided in the Additional Coverage – Collapse Section of this Coverage Form.

   e. Wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration; insects, vermin or rodents.

## C. Limits Of Insurance

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

## D. Deductible

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

## E. Additional Conditions

### 1. Valuation – Specifically Declared Items

The following is added to General Condition **F. Valuation** in the Commercial Inland Marine Conditions:

The value of each item of property that is specifically declared and described in the Declarations is the applicable Limit of Insurance shown in the Declarations for that item.

### 2. Recoveries

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your loss or damage will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

### 3. The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

   a. **Coverage Territory**

      We cover property:

      (1) Within your "premises"; and

      (2) Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

         (a) The United States of America (including its territories and possessions);

         (b) Puerto Rico; and

         (c) Canada.

   b. **Protection Of Records**

      Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

## F. Definitions

1. "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

   But "valuable papers and records" does not mean "money" or "securities", converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

2. "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

3. "Money" means:

   a. Currency, coins and bank notes whether or not in current use; and

   b. Travelers checks, register checks and money orders held for sale to the public.

 Copyright, Insurance Services Office, Inc., 1999




4. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

    a. Tokens, tickets, revenue and other stamps whether or not in current use; and

    b. Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

but does not include "money".

     Copyright, Insurance Services Office, Inc., 1999     CM 00 67 09 00     ☐

 

COMMERCIAL INLAND MARINE
CM 01 12 09 00

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

**A.** Loss Condition **B. Appraisal** in the Commercial Inland Marine Conditions is replaced by the following:

**B. Appraisal**

1. If we and you disagree on the value of the property or the amount of loss, either may make written demand, within 60 days after our receipt of a signed, sworn proof of loss, for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

2. If there is an appraisal:

   **a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Inland Marine Condition; and

   **b.** We will still retain our right to deny the claim.

**B.** Paragraph **8.** of Loss Condition **C. Duties In The Event Of Loss** in the Commercial Inland Marine Conditions is replaced by the following:

**8.** Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**C.** Under Loss Condition **E. Loss Payment** in the Commercial Inland Marine Conditions, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

**1. Claims Handling**

**a.** Within 15 days after we receive written notice of claim, we will:

   **(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

   **(2)** Begin any investigation of the claim; and

   **(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**b.** We will notify you in writing as to whether:

   **(1)** The claim or part of the claim will be paid;

   **(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

   **(3)** More information is necessary; or

   **(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in Paragraphs **b.(1)** through **b.(4)**, within:

   **(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

Copyright, Insurance Services Office, Inc., 2000  □



**(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

2. We will pay for covered loss or damage within 5 business days after:

   **a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   **b.** An appraisal award has been made.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

The following paragraphs are added:

3. **Catastrophe Claims**

   If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in Paragraphs **C.1.** and **C.2.** are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

   **a.** Is declared a disaster under the Texas Disaster Act of 1975; or

   **b.** Is determined to be a catastrophe by the Texas Department of Insurance.

4. The term "business day", as used in the Loss Payment Condition, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

D. Paragraph **2.** of General Condition **C. Legal Action Against Us** in the Commercial Inland Marine Conditions is replaced by the following:

   2. The action is brought within 2 years and 1 day after you first have knowledge of the direct loss or damage.

E. Paragraphs **A.5.a.** and **A.5.b.** of the Coverage Extensions and Section **F. Definitions** in the Equipment Dealers Coverage Form are deleted.

     Copyright, Insurance Services Office, Inc., 2000     **CM 01 12 09 00**     □



ROYAL &
SUNALLIANCE

# TRANSPORTATION COMPREHENSIVE
# COVERAGE FORM

Various provisions in this policy restrict coverage. Please read the entire policy carefully.

Throughout this policy and form, "you" and "your" refer to the Named Insured shown in the Declarations. "We," "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

**A. COVERAGE**

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. COVERED PROPERTY**

We cover:

Property described in the Declarations while in transit at your risk:

  **a.** In the care of:

    **(1)** Railroads.

    **(2)** Public truckmen, land transfer or land transportation companies.

    **(3)** Air carriers or air express companies.

  **b.** In or on vehicles owned or operated by you.

We cover from the time the property leaves the initial point of shipment and continuously thereafter in transit, including while on ferries or car transfers until delivered at destination.

**2. PROPERTY NOT COVERED**

We do not cover:

  **a.** Accounts, bills, deeds, notes, securities, evidences of debt, letters of credit, tickets, stamps, valuable papers, works of art, money, currency, bullion, precious stones, watches, furs or jewelry.

  **b.** Property shipped by mail.

  **c.** Samples in the care, custody or control of any sales person.

  **d.** Export shipments after loaded on board the export conveyance or after Ocean Marine insurance applies to the shipment whichever occurs first.

  **e.** Import shipments while Ocean Marine insurance applies to the shipment.

  **f.** Property you accept while acting as a common or contract carrier; or as a bailee for hire.

  **g.** Property while located in or on your premises, or in any garage or building where your vehicles are usually garaged.

  **h.** Contraband or property in the course of illegal transportation or trade.

**3. COVERED CAUSES OF LOSS**

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

**4. COVERAGE EXTENSIONS**

  **a.** F.O.B. Shipments

    We cover your contingent interest in property sold under Free on Board or Freight Allowed terms.

    But we will pay for "loss" only if you cannot collect:

    **(1)** from the purchaser, or

89037A



     **(2)** from other insurance that would cover the "loss" if this insurance had not been issued.

  **b.** Return Shipments

We cover the return of property you have shipped if the original shipment was covered by this Coverage Form. We also cover the property while held temporarily by the receiver or carrier while awaiting its return to you.

  **c.** Debris Removal

     **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

     **(2)** The most we will pay under this Coverage Extension is $5,000. This amount is in addition to any other amount payable under this Coverage Form.

     **(3)** This Coverage Extension does not apply to costs to:

       **a)** Extract "pollutants" from land or water; or

       **b)** Remove, restore or replace polluted land or water.

     "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

  **d.** We will pay for the cost to replace the identifying label or wrapper containing the covered property if this is the only part lost or damaged.

**B. EXCLUSIONS**

We will not pay for a "loss" caused by or resulting from:

**1.** Delay, loss of use, loss of market or any other consequential loss.

**2.** Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration, depreciation; insects, vermin, rodents.

**3.** Spoilage, contamination, leakage, breakage, marring, scratching, corrosion, rust, dampness or dryness, cold or heat. But we will pay for direct physical "loss" resulting from:

  **a.** Fire, lightning or explosion.

  **b.** Windstorm, cyclone or tornado.

  **c.** Flood, surface water, waves, tidal waves, or overflow of any body of water.

  **d.** Collision, overturn or derailment of the transporting conveyance.

  **e.** Collapse of bridges or culverts.

  **f.** Hazards of seas, lakes, rivers or inland waters while on ferries only.

**4.** Inadequate packing, improper preparation for shipment; or insecure stowage of property in or on any vehicle you own or operate.

**5.** Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives or anyone entrusted with the property whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

But this exclusion does not apply to a carrier for hire.

**6.** Release, discharge or dispersal of "pollutants" as defined elsewhere in this Coverage Form.

This exclusion applies regardless of whether or not any other cause or event contributes concurrently or in any sequence to the "loss."

**7.** Governmental Action



Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**8. Nuclear Hazard**

**a.** Any weapon employing atomic fission or fusion; or

**b.** Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**9. War and Military Action**

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**C. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations. Two or more vehicles while connected or while being operated with a single power vehicle will be considered one vehicle in applying the applicable Limit of Insurance.

**D. DEDUCTIBLE**

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

**E. ADDITIONAL CONDITIONS**

This Coverage Form is subject to the following conditions in addition to the policy conditions:

**1. COVERAGE TERRITORY**

We cover property wherever located within or between the United States and Canada; but we do not cover property in transit to or from Alaska or Hawaii.

**2. VALUATION**

General Condition I. Valuation of the policy is replaced by the following:

The Covered Property will be valued in the event of "loss" at the amount shown on the invoice, if any; otherwise, the value of the property will be the least of the following amounts:

**a.** The actual cash value of the property at destination;

**b.** The cost of restoring the property to its condition immediately before the "loss;"

**c.** The cost of replacing the property with substantially identical property.

The value of property will include your prepaid freight charges; and any other shipping costs or charges that are due since the start of transit.

**3. REPORTS AND PREMIUM**

**a.** Reports. Within 30 days after the end of each reporting period shown in the Declarations, you will report to us the actual value of all shipments made during that period of time.

**b.** Rates and Premium.

**(1)** Premium Computation. We will compute the premium:

**(a)** Using the rates shown in the Declarations, and

---

MC 0005 0187                                                                Page 3 of 4

38037A



     **(b)** As of each Premium Adjustment Period shown in the Declarations.

  **(2)** Premium Adjustment

     **(a)** When the Annual Premium Adjustment Period is shown in the Declarations, we will compare the total computed premium to the Deposit Premium. If it is more than the Deposit Premium, you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference.

     **(b)** When any other Premium Adjustment Period is shown in the Declarations, we will apply the computed premium to the Deposit Premium until it is used up. You will pay us all premiums that exceed the Deposit Premium.

  **(3)** Minimum Premium

    You must pay at least the minimum annual premium shown in the Declarations.

  **(4)** If this coverage is cancelled:

    You will report the total value of all shipments up to and including the date of cancellation.

**4.** **RECORDS**

You will keep accurate records of all shipments covered by this Coverage Form and retain them for 3 years after the policy ends.

**5.** **EXCESS INSURANCE**

You agree not to obtain Excess Insurance over and above the Limits of Insurance as provided in this policy, except as may be specifically agreed to by us.

**6.** **RELEASED BILLS OF LADING**

You may accept bills of lading or shipping receipts issued by carriers that limit their liability to less than the actual value of the property.



**ROYAL & SUNALLIANCE**

# SCHEDULE CONTRACTORS EQUIPMENT
# COVERAGE FORM

Various Provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. DEFINITIONS.

**A.   COVERAGE**

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1.   Covered Property**

We cover:

**a.**   Your contractors equipment, including spare parts and accessories, and similar property of others that is in your care, custody or control and for which you are responsible, for up to the Limit of Insurance specified on each item in the schedule of property shown on the Declarations.

**b.**   Unscheduled equipment used in your business when a Limit of Insurance is shown on the Declarations.

**2.   Property Not Covered**

We do not cover

**a.**   Automobiles, motor trucks, tractors, trailers or motorcycles designed and principally used to transport property or persons over public roads; aircraft or watercraft.

**b.**   Property while "underground", underwater, airborne, or waterborne, except while in transit in the custody of a carrier for hire.

**c.**   Property while leased, loaned or rented to others.

**d.**   Contraband or property in the course of illegal transportation or trade.

**3.   Covered Causes of Loss**

We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the Exclusions.

**4.   Additional Coverages**

**a.   Expediting Expense**

We will pay the reasonable extra costs for:

**(1)**   Temporary repairs of damaged Coverage Property; or
**(2)**   Expediting permanent repairs or permanent replacement, whichever is less;

Of Covered Property damaged by a Covered Cause of Loss, including:

**(1)**   Overtime wages; and
**(2)**   The extra cost of express or other rapid means of transportation.

The most we will pay under this Additional Coverage is $10,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

Expediting expenses do not include the costs incurred for:

**(1)**   Temporary rental of property; or
**(2)**   Temporary replacement of damaged property.

MC 0007 0294

89037A

**b.  Employee Tools and Clothing**

We will pay for "loss" to tools and clothing of your employees caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises.

The most we will pay under this Additional Coverage is:

**(1)**  $500 for any one employee.
**(2)**  $5,000 in any one occurrence or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $100. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

**c.  Expendable Supplies**

We will pay for "loss" to fuel, oil, grease and similar expendable supplies usual to your operations caused by or resulting from a Covered Cause of Loss.

But this Coverage Extension does not apply to water or to expendable supplies in underground tanks.

The most we will pay under this Additional Coverage is $5,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $250. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance Condition of this Coverage Form does not apply to this Coverage Option.

**d.  Mobile Radios, Antennas and Cellular Telephones**

We will pay for "loss" to mobile radios, antennas and cellular telephones caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises while in your vehicle.

The most we will pay under this Additional Coverage is $5,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $100. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

**e.  Mobile Office Trailers and Their Contents**

We will pay for "loss" to mobile office trailers and their contents usual to your operations caused by or resulting from a Covered Cause of Loss. Coverage only applies while at your job sites or premises and while in transit to or from such job sites or premises.

The most we will pay under this Additional Coverage is $25,000 or the Limit of Insurance shown on the Declarations, whichever is higher.

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible amount of $250. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

The Coinsurance condition of this Coverage Form does not apply to this Coverage Option.

**f.  Pollution Clean Up and Removal**

We will pay your expenses to extract "pollutants" from land, air, water or Covered Property at the insured premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid

MC 0007 0294

only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

**g. Debris Removal**

    **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

    **(2)** The most we will pay under this Additional Coverage is $25,000.

    **(3)** This Additional Coverage does not apply to costs to:

        **(a)** Extract "pollutants" from land, air, water or Covered Property;
        **(b)** Remove, restore or replace polluted land, air, water or Covered Property; or
        **(c)** Remove expendable supplies.

**5. Coverage Extensions**

The Limit of Insurance for the following Coverage Extension is included within the Limits of Insurance applicable to the property listed on the Declarations.

**a. Newly Acquired Equipment**

If during the policy period you acquire additional equipment of a type already covered by this form, we will cover such equipment for up to 60 days after you acquire it or until the policy ends, whichever is sooner. We will cover such additional equipment for up to:

    **(1)** 25% of the total Limit of Insurance shown on the Declarations; or
    **(2)** $250,000, whichever is the least amount.

    You agree to report the value of such equipment to us within the 60 day period and to pay an additional premium from the date you acquire it.

**6. Coverage Options**

**a. Unscheduled Equipment Leased or Rented From Others**

When a Limit of Insurance is shown on the Declarations we will cover unscheduled equipment in your care, custody or control and for which you are responsible which you have leased or rented from others. The Limit of Insurance shown for such equipment is the most we will pay for "loss" in any one occurrence.

Within 30 days after the end of each policy year you must report to us your total expenditures for such equipment during the past 12 months. We will compute the actual earned premium by applying the rate shown on the Declarations to the total expenditures. If it is more than the Deposit Premium you will pay us the difference. If it is less than the Deposit Premium, we will pay you the difference. But you must pay at least the minimum annual premium shown on the Declarations.

The Coinsurance Condition of the Coverage Form does not apply to this Coverage Option.

**b. Rental Expense Reimbursement**

When a Limit of insurance is shown on the Declarations we will reimburse your rental expenses should a covered "loss" to equipment you own make it necessary to rent replacement equipment to continue your normal operations of the work in progress. We will reimburse these rental expenses provided you do not have



equivalent idle equipment you can use and you restore or replace the lost or damaged equipment as soon as possible.

Our reimbursement is limited to rental expenses incurred during the period of time beginning seventy-two (72) hours after the "loss" has occurred and continuing until the equipment has been restored, replaced or is no longer needed, whichever occurs first. The period of reimbursement will not be limited by the policy expiration date.

The Deductible condition of this Coverage Form does not apply to this Coverage Option.

## B.  EXCLUSIONS

1.  We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   **a.  Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   **b.  Nuclear Hazard**

   (1)  Any weapon employing atomic fission or fusion; or
   (2)  Nuclear reaction or radiation or radioactive contamination from any other cause.

   But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

   **c.  War and Military Action**

   (1)  War, including undeclared or civil war;
   (2)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or other authority using military personnel or other agents; or
   (3)  Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   **d.  Pollution**

   The discharge, dispersal, seepage, migration, release or escape of "pollutants".

2.  We will not pay for a "loss" caused by or resulting from:

   **a.**  Delay, loss of use, loss of market or any other consequential loss.

   **b.**  Unexplained disappearance.

   **c.**  Shortage found upon taking inventory.

   **d.**  Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

   (1)  Acting alone or in collusion with others; or
   (2)  Whether or not occurring during the hours of employment.

   But this Exclusion does not apply to property in the custody of a carrier for hire which is not a company you manage or own.

3.  We will not pay for a "loss" caused by or resulting from any of the following. But if a "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss" except if the "loss" results from a lack of reasonable maintenance.

   **a.**  Gradual deterioration, wear and tear, hidden or latent defect, rust, corrosion or any quality in the property which causes it to damage or destroy itself.

      **b.** Structural or mechanical breakdown.

      **c.** Electrical breakdown or failure.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

## D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

**1. Coverage Territory**

We cover property wherever located within the United States and Canada.

**2. Coinsurance**

All Covered Property must be insured for at least 80% of its actual cash value as of the date of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its actual cash value as of the date of "loss".

If this policy insures two or more items, this condition shall apply to each item separately.

When Unscheduled Equipment is covered by this Coverage Form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the actual cash value of all such property as of the date of "loss".

**3. Partial Loss Waiver of Depreciation**

The following is added to Commercial Inland Marine General Condition E. Valuation:

No deduction for depreciation shall be taken on the adjustment of any partial "loss" that does not exceed 20% of the actual cash value of the scheduled item involved. If two or more items are involved in the same occurrence, this condition shall apply to each item separately.

## F. DEFINITIONS

**1.** **"Loss"** means accidental loss or damage.

**2.** **"Underground"** means under the surface of the ground including but not limited to shafts, tunnels and mines.

**3.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

89037A



ROYAL &
SUNALLIANCE

# INFORMATION SYSTEMS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

We cover:

a. Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

b. "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

### 2. Where Coverage Applies

We cover:

a. At the locations listed on the Declarations.

b. Temporarily at other locations.

c. In transit.

### 3. Property Not Covered

We do not cover:

a. Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents. But we do cover such property when it is converted to data form and then only in that form.

b. Data or media which cannot be replaced with others of the same kind and quality. But we do cover such property when it is specifically described and a separate Limit of Insurance is shown on the Declarations.

c. Property loaned, leased or rented to others while away from your premises listed on the Declarations.

d. Contraband, or property in the course of illegal transportation or trade.

### 4. Covered Causes of Loss

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

### 5. Additonal Coverages

a. **Fire Suppression System Discharge Protection**

We will pay expense you incur to recharge an automatic fire suppression system due to accidental discharge. The most we will pay in any one occurrence is $25,000. We will not pay for accidental discharge caused by system testing.

No Deductible applies to this Additional Coverage.

b. **Fire Department Service Charge**



When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to "loss;" or
**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**c.  Pollutant Clean Up and Removal**

We will pay your expenses to extract "pollutants" from land, air, water or Covered Property at the insured premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land, air, water or Covered Property.

The most we will pay at each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate twelve (12) month period of this policy.

We will not pay under this Additional Coverage your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

**6.  Coverage Extensions**

The Limit of Insurance for each of the following Coverage Extensions is included within the Limits of Insurance applicable to the property listed on the Declarations.

**a.  Newly Acquired Equipment**

If during the policy period you acquire additional property similar to the property covered under this Coverage Form, we will cover such property for up to 60 days after you acquire it or until the policy ends, whichever is sooner.
We will cover such additional property for up to:

**(1)** 20% of the total amount of Insurance listed on the Declarations; or
**(2)** $500,000;

Whichever is the lesser amount.

You agree to report the value of such property to us within the 60 day period and to pay an additional premium from the date you acquire it.

**b.  Newly Acquired Locations**

Property we cover at a location listed on the Declarations will also be covered if at a new location you acquire during the policy period.

We will cover this property for up to $1,000,000 at any one new location.

You must report the moving of property to a new location within 60 days or your coverage will no longer apply. Your premium will be adjusted if the rate at the new location is different from the rate at the existing location.

**c.  Duplicate "Electronic Media"**

We will cover duplicate and backup "electronic media" for up to $50,000 at any one backup location. But this coverage applies only:

**(1)** To a separate storage location at least 100 feet from a location listed on the Declarations; and
**(2)** If there is no other insurance covering this property.

**d.  Removal**

If you give us written notice within 10 days after the removal of Covered Property because of imminent danger of "loss," we will cover while the property is:

**(1)** At a safe place away from your premises listed in the Declarations, or

---

MC 0010 0193                                                                                      Page 2 of 7



    **(2)** Being taken to and returned from that place.

**e.** **Debris Removal**

    **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:

        **(a)** The date of direct physical "loss;" or

        **(b)** The end of the policy period.

    **(2)** The most we will pay under this Coverage Extension is:

        **(a)** 25% of the amount we pay for the direct "loss;" plus

        **(b)** The Deductible in this policy applicable to that "loss."

    **(3)** This Coverage Extension does not apply to costs to:

        **(a)** Extract "pollutants" from land, air, water or Covered Property; or

        **(b)** Remove, restore or replace polluted land, air, water or Covered Property.

**f.** We cover expenses you incur resulting from a "computer virus", even if no direct damage or "loss" has occurred. We will pay your expense to:

    **(1)** Extract a "computer virus" from your equipment; plus
    **(2)** Restore your equipment, data and media.

The most we will pay under this Coverage Extension is $5,000 in any one occurrence.

**7.** **Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

**a.** **"Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "extra expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover "Extra Expense" you incur:

    **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered Property.
    **(2)** If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a reduction or suspension of your "operations."
    **(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b.** **Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

    **(1)** If the premises where the property is located is damaged and you are prevented from using the Covered

Property.

**(2)** If the air conditioning or electrical system necessary for the operation of the Covered Property is damaged and this causes a reduction or suspension of your "operations."

**(3)** If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for Loss of Income:**

If "loss" to Covered Property results in total or partial suspension of your "operations" we will pay up to the Limit of Insurance shown on the Declarations.

**(1)** The actual Loss of Income you sustain beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the "period of restoration."

**(2)** All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

But we will not pay more than the actual amount by which the Loss of Income is reduced.

You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or property of others to continue your "operations."

**B. EXCLUSIONS**

**1.** We will not pay for a "loss" caused by or resulting from:

**a.** Delay, loss of use, loss of market or any other consequential loss.

**b.** Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration or depreciation.

**c.** Animals.

**d.** Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This Exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered. But this Exclusion does not apply to property in the custody of a carrier for hire.

**e.** Any Covered Cause of Loss for which you are not responsible under the terms of any lease, rental agreement, warranty or guarantee.

**f.** Corrosion, rust, dampness or dryness, cold or heat, extremes or changes in temperature.

But we will pay for such "loss" resulting from direct physical "loss" to the air conditioning system that services the Covered Property if the damage to such property is caused by a Covered Cause of Loss.

**g.** Enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Regulates the prevention, control, repair, clean-up or restoration of damage caused by "pollutants."

**h.** Voluntary parting with property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**i.** Unauthorized instructions to transfer property to any person or to any place.

**j.** The discharge, dispersal, seepage, migration, release or escape of "pollutants."

**2.** We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

**(1)** Any weapon employing atomic fission or fusion; or



    **(2)** Nuclear reaction or radiation or radioactive contamination from any other cause.

But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

**c. War and Military Action**

    **(1)** War, including undeclared or civil war;

    **(2 )** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**d. Earthquake**

    **(1)** Earth movement such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But we will pay for "loss" caused by resulting fire or explosion, if these causes of "loss" would be covered under this Coverage Form.

    **(2)** Volcanic eruption, explosion or effusion. But we will pay for direct "loss" caused by resulting fire, if the fire would be covered under this Coverage Form.

**e. Flood**

    **(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

    **(2)** Mudslide or mudflow;

    **(3)** Water that backs up from any sewer or drain;

    **(4)** Water that seeps, leaks or flows from below the surface of the ground; or

    **(5)** Any release of water impounded by a dam.

But we will pay for direct "loss" caused by resulting fire, explosion or theft, if these causes of "loss" would be covered under this Coverage Form.

This Exclusion does not apply to property in transit.

**3. Special Exclusions**

The following provisions apply only to the "extra expense" or Loss of Income Coverage Options and are in addition to the Exclusions shown above. We will not pay for "loss" caused by or resulting from:

**a.** "Loss" to property loaned, leased or rented to others while away from the premises listed on the Declarations.

**b.** Loss of income, but this Exclusion only applies to the "Extra Expense" Coverage Option.

**c.** Error or omission in machine programming or incorrect instructions to a machine.

**d.** Suspension, lapse or cancellation of any lease, license, contract or order.

**e.** Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume "operations."

You must make every reasonable effort to resume your "operations" as quickly as possible.

**C. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

**D. DEDUCTIBLE**

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown on the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

**E. ADDITIONAL CONDITIONS**

This Coverage Form is subject to the following conditions in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

**1. Coverage Territory**

We cover property wherever located within the United States and Canada.

**2. Valuation**

General Condition E.- Valuation of the Commercial Inland Marine Conditions is replaced by the following:



a. **Electronic Equipment**

The value of Covered Property will be determined by the valuation method shown on the Declarations.

**(1) Actual Cash Value**
We will pay the least of the following amounts:
(a) The actual cash value of the damaged property as of the time of "loss;"
(b) The cost of restoring the property to its condition immediately before the "loss;"
(c) The cost of replacing the property with substantially identical property.
(d) The Limit of Insurance applicable to the lost or damaged property.

**(2) Replacement Cost**
We will not pay on a replacement cost basis for any "loss:"
(a) Until the lost or damaged property is actually repaired or replaced; and
(b) Unless the repairs or replacements are made within 180 days after the "loss;"
We will not pay more for "loss" on a replacement cost basis than the least of:
(a) The Limit of Insurance applicable to the lost or damaged property;
(b) The cost to replace the lost or damaged property with other property:
    (i) Of substantially identical material and quality; and
    (ii) Used for the same purpose; or
(c) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

If you do not repair or replace the lost or damaged property within 180 days, or choose not to repair or replace the lost or damaged property, we will pay the least of the following amounts:

(a) The actual cash value of the damaged property as of the date of "loss."
(b) The cost of restoring the property to its condition immediately before the "loss."
(c) The cost of replacing the property with substantially identical property.
(d) The Limit of Insurance applicable to the lost or damaged property.
In the event of "loss", the value of property will be determined as of the date of "loss."

**(3) Functional Replacement Cost**

We will pay the cost of replacing destroyed property with property of greater processing ability. However, the new property must be able to perform the same function as the destroyed property.

For Functional Replacement Cost coverage to apply, the following requirements must be met:

(a) Before a "loss" occurs, you must give us a list of property which includes:
    (i) The description and current replacement cost of the property you now own that you plan to replace.
    (ii) The description and current cost of the replacement property.
(b) There must be a total "loss" of the current property. If a partial "loss" occurs to property covered for Functional Replacement cost, we will pay as if the property were insured for replacement cost as explained above.
We will not pay more than:
(a) The amount you actually spend to replace the current property; or
(b) The amount shown as the current cost of the replacement property on the last list you gave us.

We will pay for a "loss" on a replacement cost basis until the designated replacement property is actually purchased. When you buy the replacement property we will pay you the difference between the replacement cost and the increased value, if any.

In the event of "loss," the value of property will be determined as of the date of "loss."

b. **"Electronic Media"**

The value will be the actual cost of reproducing the data and the cost of the media.

When the data is not reproduced, we will not pay more than the cost of blank discs, films, tapes, or similar electronic data processing media, of the same kind and quality.

When the data and media is individually listed or described on the Declarations, its value will be the applicable Limit of Insurance shown on the Declarations for that item.

**3. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the date of "loss" or you will incur a penalty.



The penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance shown in the Declarations for all Covered Property at all locations bears to 80% of the total value of all property at all locations as of the time of "loss."

**F. DEFINITIONS**

1. **"Loss"** means accidental loss or damage.

2. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. **"Electronic Media"** means all forms of data including computer instructions and programs which are converted to a form usable in your "operations." This also includes the materials on which the data is recorded.

4. **"Extra Expense"** means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical "loss" to the property.

5. **"Operations"** means your business activities occurring at the described premises.

6. **"Period of restoration"** means the period of time that:

   a. Begins with the date of direct physical "loss" caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

   "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   a. Regulates the construction, use or repair, or requires the tearing down of any property; or

   b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

   The expiration date of this policy will not cut short the "period of restoration."

7. **"Computer virus"** means any self-replicating program which contaminates or destroys programs, data or operating systems.

 

# RADIO AND TELEVISION COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. The word "loss" means accidental loss or damage.

### A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

1. **Covered Property**

   We cover your property consisting of:

   a. Transmission towers, including antennas, foundations, supports and other equipment permanently attached or connected to such towers;

   b. Transmission, receiving, recording and studio equipment including transmission and receiving lines and poles;

   c. Portable transmitting, receiving, recording and studio equipment; and

   d. Similar property of others in your care.

2. **Property Not Covered**

   We do not cover:

   a. Aircraft, watercraft or automobiles;

   b. Growing crops, plants or land;

   c. Jewelry or precious stones; or

   d. Money, securities, letters of credit or accounts receivable.

   e. Tubes, glass, porcelain and fragile articles. But we do cover such property when the "loss" is caused by or results from:

      1) Collapse of the tower;

      2) Fire, explosion, lightning, windstorm, aircraft, riot, strike, vandalism, theft or attempted theft; or

      3) Collision, upset and/or overturn of equipment used to transport such property.

   f. Buildings and their improvements and betterments.

3. **Where Coverage Applies**

   We cover:

   a. At the locations listed in the Declarations;

   b. In transit.

4. **Covered Causes of Loss**

   We cover risks of direct physical "loss" to Covered Property except those causes of "loss" listed in the exclusions.

5. **Covered Extensions**

   a. **Debris Removal**

      1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the earlier of:



    a) The date of direct physical "loss"; or

    b) The end of the policy period.

**2)** The most we will pay under this Coverage Extension is 25% of:

    a) The amount we pay for the direct "loss"; plus

    b) The Deductible in this policy applicable to that "loss".

But the amount we pay for direct "loss" and Debris Removal expenses combined will not be more than the Limit of Insurance applying to the property at the premises listed in the Declarations where the "loss" occurs.

**3)** This Coverage Extension does not apply to costs to:

    a) Extract "pollutants" from land or water; or

    b) Remove, restore or replace polluted land or water.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**b. Tuning of Towers**

We will pay your expense to tune or retune towers that are damaged caused by or resulting from a Covered Cause of Loss.

**6. Covered Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown in the Declarations.

**a. Extra Expense**

When a Limit of Insurance for Extra Expense is shown in the Declarations, we will pay the actual and necessary Extra Expense you incur in order to continue your normal operations which are interrupted due to direct physical "loss" to your broadcasting equipment, towers, studios and offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered Cause of Loss. Extra Expense means necessary expenses you incur during the period of restoration that you would not have incurred if there had been no direct physical "loss" to the property. We will also cover Extra Expense you incur:

**1)** If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

**2)** If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to four consecutive weeks from the date of that action.

**3)** What we will pay for Extra Expense Losses

If "loss" to Covered Property results in Extra Expense, we will pay up to the Limit of Insurance shown in the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the period of restoration once operations are resumed.

**4)** Extra Expense That is Not Covered

We will not cover Extra Expense you incur as a result of any of the following:

    a) Loss of income.

    b) Enforcement of any law that:

        **1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

        **2)** Regulates the prevention, control, repair, clean-up or restoration of damages caused by pollutants.

    c) Suspension, lapse or cancellation of any lease, license, contract or order



   d) Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.

   e) Repair or Replacement of Property

   But we will pay extra repair or replacement costs you incur in order to reduce Extra Expense "loss", but only up to the amount by which that "loss" is actually reduced.

   You must make every reasonable effort to resume your normal operations as quickly as possible.

b. **Loss of Income**

When a Limit of Insurance for Loss of Income is shown in the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your normal operations. The suspension must be caused by direct physical "loss" to your broadcasting equipment, towers, studios or offices. The "loss" must occur at a location listed in the Declarations and be caused by or result from a Covered Cause of Loss.

   1) We will also cover Loss of Income you sustain

      a) If the premises where the property is located is damaged and you are prevented from using your broadcasting equipment; or

      b) If you are denied access to your premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to four consecutive weeks from the date of that action.

   2) What we will pay for Loss of Income

   If "loss" to Covered Property results in total or partial suspension of your normal operations, we will pay up to the Limit of Insurance for Loss of Income shown in the Declarations:

      a) The actual loss of income you sustain beginning with the date of "loss" and not limited by the expiration date of the policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the period of restoration; and

      b) All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

      But we will not pay more than the actual amount by which the Loss of Income is reduced.

   You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or by using other property to continue your operations.

   3) Loss of Income That Is Not Covered

   We will not cover your Loss of Income resulting from any of the following:

      a) "Loss" to property loaned, leased or rented to others while away from your premises listed in the Declarations.

      b) Enforcement of any law that:

         1) Regulates the construction, use or repair, or requires the tearing down of any property; or

         2) Regulates the prevention, control, repair, clean-up or restoration of damage caused by pollutants.

      c) Suspension, lapse or cancellation of any lease, license, contract or order.

      d) Interference at your premises by strikers or other persons which delays your efforts to repair or replace damaged property or resume your normal operations.

**B. EXCLUSIONS**

We will not pay for a "loss" caused by or resulting from:

1. Delay, loss of use, loss of market or any other consequential "loss".

2. Unexplained disappearance or shortage found upon taking inventory.



### C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

### D. DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" before applying the applicable Limit of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

### E. ADDITIONAL CONDITIONS

This Coverage Form is subject to the following conditions in addition to the policy conditions.

**1. Coverage Territory**

We cover property wherever located within the United States.

**2. Valuation**

General Condition 1. Valuation of the policy is replaced by the following:

a. The value of property will be determined by the Valuation method shown in the Declarations.

    **1. Actual Cash Value;** the most we will pay on an actual cash value basis is the least of the following:

        **a)** The Actual Cash Value of the property at the time of "loss";

        **b)** The cost of restoring the property to its condition immediately before the "loss"; or

        **c)** The cost of replacing the property with material of the same kind and quality.

    **2. Replacement Cost;** the most we will pay on a replacement cost basis is the least of the following:

        **a)** the amount necessary to repair the property; or

        **b)** the amount necessary to replace the property with new material of the same kind and quality; or

        **c)** the applicable Limit of Insurance.

**3. Additional Acquired Property**

If during the policy period you acquire additional property of a type already covered by this form, we will cover such property for up to 60 days. The most we will pay in a "loss" is the lesser of:

a. 25% of the total Limit of Insurance shown in the Declarations for that type of property; or

b. $100,000

You will report such property within 60 days from the date acquired and will pay any additional premium due. If you do not report such property, coverage will cease automatically 60 days after the date the property is acquired, or until the policy ends, whichever occurs first.

**4. Coinsurance**

All Covered Property must be insured for at least 80% of its total value as of the time of "loss" or you will incur a penalty.

The penalty is that we will pay only the proportion of any loss that the Limit of Insurance on a scheduled item bears to eighty percent (80%) of its total value at the time of "loss".

When the Unscheduled Equipment is covered by this form the penalty is that we will pay only the proportion of any "loss" that the Limit of Insurance bears to 80% of the total value of all such property at the time of "loss".

12/14/94  17:02    ☎ 9153421594    CDR    P.04

# RBM ENGINEERING, INC.

*Mechanical & Electrical Engineers*

1950 Doniphan, Ste. O    El Paso, Texas 79922

December 13, 1994

Mr. Jorge Mora, AIA
Carroll, DuSang & Rand
122 Castellano
El Paso, TX 79912

Re:   BESTEIRO MIDDLE SCHOOL - BROWNSVILLE, TX
       KITCHEN ODOR PROBLEM

Dear Mr. Mora:

The District had contacted us regarding an "odor" in the kitchen area at the above referenced project and mentioned that they felt it may be sewer gas. On Thursday, December 8, 1994 you and I visited Brownsville and the school to investigate further.

The odor detected was not sewer gas. Sewer gas is unique and very noticeable and I did not smell any in the areas of complaint. Several observations were made that there was some slight mildew growth on diffusers and walls adjacent to the diffusers. A return air grille is located immediately over the vegetable prep table and sink which is helping pick-up and distribute odors throughout the office area. Upon our return, review of the Test & Balance Report indicates that the outside air damper on this unit is closed.

I submit the following recommendations regarding this matter:

1.   Open outside air (fresh air intake) dampers on rooftop unit to allow the specified outside air flow into the unit and space.

2.   Relocate return air panel to corridor in front of walk-in freezer/refrigerator. This is easily accomplished by switching the return air panel and a lay-in tile.

3.   Scrub down walls, floor and diffusers with anti-fungal disinfectant and deodorizer.

4.   The unit must be checked to insure that condensate is draining quickly and effectively.

(915) 584-9934    Bryan R. Morris, P.E.
                    Robert H. Beasley, P.E.

**EXHIBIT**

21

12/14/94  17:03    ☎ 9155421594                    CDR      P.05

*Besteiro Middle School - Brownsville, TX*
*Kitchen Odor Problem*
*December 13, 1994*
*page 2 of 2*

5.    Clean unit interior with anti-fungal disinfectant and deodorizer, particularly the condensate drain pan.

I feel that with the introduction of outside (fresh) air and the other measures listed above, that the problem will be eliminated.  Please call if you have any questions or comments.

Sincerely

*Robert H. Beasley, P.E.*
*94061-12.134*

/sk

**BESTEIRO MIDDLE SCHOOL - BROWNSVILLE**
**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**LIBRARY**

TELEPHONE CONVERSATION

Date: 09/15/95    3:10 P.M.

Conversation with Mr. Oscar Tapia - BISD and Mr. Robert Beasley, RBM Engineering.

Conversation Notes:  These notes represent our understanding of the items discussed during our telephone conversation.

· **BESTEIRO MIDDLE SCHOOL; LIBRARY AREA:**

▸    Mildew on books - Mold

▸    Units are running.  Were shut down for a period of time during the summer due to an electrical failure.

▸    Instructed Mr. Tapia to check the following:

     1.    Make certain that condensate drains are clear and no water is accumulated in drain pans.
     2.    Check outside air setting.

▸    Biocide wipe down may eliminate current growth.

▸    Mr. Tapia was going to investigate and let me know results.

▸    Contacted Mr. DuSang - CD &R; he will follow-up when he is in Brownsville the week of 09-18-95.

92065-09.155
Ak


Distribution:

Mr Oscar Tapia - BISD
Mr. Jorge Mora & Mr George DuSang - Mijares Group



## RBM ENGINEERING, INC.

*3950 Doniphan, Ste. O*                                                          *El Paso, Texas 79922*

October 31, 1995

Mr. Jorge Mora, Architect
Carroll, Dusang & Rand Architects, Inc.
122 Castellano
El Paso, Texas 79912

RE:    Besteiro Middle School
       Brownsville Independent School District
       Investigation of various HVAC complaints

Dear Mr. Mora:

I visited the site on Thursday, October 26, 1995 to investigate three areas of concern for this project. The middle school has been occupied and functioning for approximately one year. The three areas of concern are:

1.    Elevated space humidity in the Library
2.    Water droplets on Gym floor from center (north) AC unit, and
3.    Continued water dripping from edge of units onto roof.

I was on the site throughout the day with Mr George Tamez (BISD), the District's acting Maintenance Supervisor and a Service Technician. Mr Sabas Lopez and Mr. Bill Wilson with Wilson Construction were also present during part of the day.

The District personnel provided me with Psychrometric readings in the Library when I arrived. The readings indicated humidity levels in the 80% percent range over the period of October 24, 25, and 26th. This condition has been noted since school started in September of 1995. This condition did not exist throughout the school year of 1994-1995. District personnel were working on the existing thermostat when I arrived. Apparently they were considering replacing this thermostat. After viewing the space temperature and thermostat setpoints it appeared that the unit was not loading fully. This was confirmed by the Trane Service Technician (Mr. Joe Ines Montes) later in the day.. At normal setpoints, the unit was loading to two (2) stages with four (4) stages available. The other two (2) stages would not cycle on until the thermostat setpoint was dropped well below room temperature, ±10 degrees.

*(915) 584-9934*                                                   *Bryan R. Morris, P.E.*
*(915) 584-8723 (Fax)*                                             *Robert H. Beasley, P.E.*

Mr. Jorge Mora
Besteiro Middle School
Page 2

These additional stages should help dehumidify when reducing room temperature. It was decided that options shall be investigated to remedy this situation:

1.    BISD shall replace the existing thermostat with a more sensitive, possibly programmable unit to effectively stage the unit and cycle the fan.

2.    RBM shall investigate the use of a hi-limit humidistat to operate the unit when humidity levels increase.

3.    RBM shall investigate the possibility of placing this unit on the DDC control system for the new elementary school.

We did note the water droplets on the gymnasium floor dripping from the area of the center (north) unit. This moisture is not coming from the unit itself. There were visible droplets on the metal deck (underside) adjacent to the unit. When we checked the rooftop unit we found that the condensate drain was connected to the uphill side and the pan had water collected on the opposite side. The drain plug was opened to release this water. The contractor shall connect the condensate drain to the proper side.

Unfortunately, this did not explain the moisture located on the underside of the deck. Ambient moisture condensation was suggested but dismissed because it is isolated to the area around this unit. If ambient moisture was the cause then it would be more widespread through the Gym. The only plausible idea suggested was that the supply duct from this unit had a leaking joint. If this was the case, the cold air hitting the deck could cause moisture condensation. The contractor shall check this ductwork for leakage.

The final area investigated involved the dripping of water from the edges of the roof top units and is widespread throughout the school. It appears that the problem is isolated to the larger units and not the small classroom units. Typically two (2) problems were evident when the units were opened up. Moisture dripping from compressor sections resulted from condensation dripping off of the exposed refrigeration piping. Armaflex insulation around the lines will alleviate this condensation. The other area occurs around the condensate drain pan. As discussed previously, several units have the drain line connected to the "uphill" side not allowing effective drainage of the pan. The contractor shall check all units for proper slope of the pan and correct the drain connection points. Some units needed simple maintenance of cleaning the drain pans to maintain effective drainage. This work shall be done by District personnel.

A severe case of dripping was noted at one location, the boys locker room unit. When this unit was opened we found an iced coil and refrigerant lines to the compressor section.

Mr. Jorge Mora
Besteiro Middle School
Page 3


Discussions with the District personnel shows that this coach had been complaining of low airflow and temperature/humidity discomfort. Of course, with the coil iced over there is no way to provide the airflow to the space.

It was also noted that the thermostat was set down to the lowest point of 50 degrees. This is the reason the unit iced over. I instructed District personnel that set screws are available to limit the set point range of the thermostats. This needs to be done on all units to prevent staff from setting the controls to their lowest point and leaving them indefinitely.

A final item discussed, was the possibility of providing a DDC control system for this school similar to the system being installed for the new elementary school. I explained that there was a bid alternate to provide this when the new school was bid. Cost was the concern after the bids, so I suggested perhaps requesting a proposal from the contractor to provide a simpler system. The basic functions outlined by Mr. Tamez were temperature monitoring and setpoint control, unit status and on-off control. I will write up a proposal request for this system and forward under separate cover.

Please do not hesitate to contact me at your convenience with any questions.

Sincerely,

Robert H. Beasley, P.E.
94061B-10.315

# CR Carroll, DuSang and Rand

### AIA ARCHITECTS

October 31, 1995

Brownsville Independent School District
1900 Price Road
Brownsville, Texas 78520

**Attention:**　**Mr. Oscar Tapia**

**Reference:**　**Besteiro Middle School**

On October 25, 1995, a walk through of the roof was conducted at Besteiro Middle School with Mr. Bill Wilson and Mr. Sabas Lopez of Wilson Construction.

The following is a list of our observations:

1. Precast concrete coping at roof parapets has mortared joints; project drawing details call for sealant at each joint.

2. Mortared joints, noted above, have cracked allowing moisture to penetrate to below the coping.

3. Northeast corner of cafetorium, above roof of Concourse B119: Sabas Lopez has removed the brick above the metal counterflashing to reveal that the wall flashing behind the 2" rigid insulation does not extend the full width of the brick as indicated on detail 10/A48. It appears moisture penetrating through the cracks in the mortar joints of the coping above is thereby penetrating through the brick into the building.

4. East wall of Gymnasium, above the roof of Concourse B119: At several weep holes above the counter flashing, as noted on detail 10/A48, it is evident that the wall flashing again does not extend the full depth of the brick thus allowing moisture to seep into the building in similar fashion to item 3 above.

Mr. Bill Wilson indicated that his crew will seal all joints in the precast concrete coping throughout the building with sealant as specified. In addition those areas in items 3 and 4 above, will have brick removed and the wall flashing corrected.
By copy of this letter, Wilson Construction is also requested to replace ceiling tiles damaged by the above conditions.

If you have any questions please let us know.

Sincerely,

Jorge L. Mora, AIA
Carroll DuSang and Rand

cc:　Mr. Bill Wilson-Wilson Construction

RECEIVED
- 9 1995

# WILSON CONSTRUCTION
## D.WILSON CONSTRUCTION

P.O BOX 3455 . 1209 EAST PECAN . (210) 686-9573 .FAX 6863270
MCALLEN , TEXAS 78502-3455

8-22-95

BILL MCBRIDE
SECHRIST HALL
P.O BOX 2347
HARLINGIN ,TEXAS  78551

RE: SOUTHMOST MIDDLE SCHOOL (BESTERIO MIDDLE SCHOOL)  .

DEAR MR. MCBRIDE :

TODAY ONCE AGAIN I GOT ANOTHER CALL FROM MR . OSCAR TAPIA
( B.I.S.D. ADMINISTRATOR ) ABOUT THE STATUES OF THE LEAKS AT THE
ABOVE SCHOOL. SINCE THE CALL WAS MADE TO ME ON 8-16-95 I HAVE
REQUESTED FROM YOUR COMPANY THAT I WOULD MEET WITH YOUR FIELD
PERSONELL AT YOUR CONVENIENCE BUT TO DATE I STILL HAVE <u>NOT</u>  BEEN
ADVICED FROM YOUR COMPANY WHEN YOU INTEND TO SCHEDULE SOMEONE
TO LOOK OVER THIS MATTER . ALSO , THE  OVERALL ROOF LAYOUT PLAN
YOU REQUESTED HAS BEEN FAXED TO YOUR OFFICE .

AGAIN, I AM READY TO ASSIST YOUR COMPANY IN ANY WAY I CAN TO
RESOLVE THIS SITUATION A.S.A.P.

SINCERELY ,

C.C. BILL WILSON
     BILL MCBRIDE

**EXHIBIT**



LEGEND: COR    P.02

Leak Areas

DESTEIRO MIDDLE SCHOOL.
BROWNSVILLE INDEPENDENT SCHOOL DISTRICT.

# WILSON CONSTRUCTION
## D.WILSON CONSTRUCTION
### P.O.BOX 3455 . 1209 EAST PECAN . (210) 6869573 .FAX 6863270

10-16-95

**BILL MCBRIDE**
**SECHRIST HALL**
**P.O.BOX 2347**
**HARLINGIN ,TEXAS 78551**

RE:SOUTHMOST MIDDLE SCHOOL ( BESTERIO MIDDLE SCHOOL )

DEAR MR. MCBRIDE:

REFERENCE TO OUR TELE CONVERSATION ON 10-13-95 IN WHICH I REMINDED YOU OF THE ROOF LEAKS YOUR FORMAN LARRY ODEM SAID WERE TO BE CHECKED . AS YOU CAN SEE ON THE ENCLOSED LETTER , ITS BEEN 2 MONTHS TO THE DAY SINCE THE FIRST CONTACT WAS MADE TO YOUR OFFICE . YOU SAID THAT YOU WOULD HAVE SOMEONE ON THE ROOF ON MONDAY10-16-95 . TODAY I CALLED AND YOU SAID YOU WOULD HAVE SOMEONE ON THE ROOF TOMORROW 10-17-95 .

I HOPE AND EXPECT TO SEE YOUR ROOF CREW  TOMORROW  MORNING IN A COORDINATED EFFORT TO GET THIS SITUATION BEHIND US .

SINCERELY ,

C.C BILL WILSON
    BILL MCBRIDE

# WILSON CONSTRUCTION

## D. WILSON CONSTRUCTION COMPANY, INC.

P.O. BOX 3455 • 1209 EAST PECAN • (210) 686-9573 • FAX (210) 686-3270
McALLEN, TEXAS 78502-3455

October 19, 1995

Mr. Oscar Tapia
Brownsville Independent
  School District
1900 Price Road
Brownsville, Texas  78521

Re:  Roof Leaks
     Besterio Middle School
     Brownsville, Texas

Dear Mr. Tapia:

This is a follow-up of the meeting held yesterday at the above referenced project.

        Attendance:   Sabas Lopez (Wilson Construction Co.)
                      Oscar Tapia (Brownsville I.S.D.)
                      Bill McBride (Sechrist-Hall Company)
                      Reynaldo Castillo (Head Custodian)

The following observations were made:

1.   <u>LEAK LOCATED AT THE NORTHSIDE STAIRWAY:</u>

     All of the pre-fab concrete coping and waterproofing membrane was removed by the new construction in progress.  This area will continue to leak until the coping and waterproofing is re-installed by the new construction contractor.

2.   <u>LEAK LOCATED AT THE LIBRARY RESTROOM:</u>

     The new elementary construction contractor is using the library roof as a work area to install the masonry block walls.  The block debris is still visible on the roof thus causing a puncture on the roof area.  This will continue to leak until the new contractor finishes the block and brick walls and then repairs the punctured roof.

COMMERCIAL        INDUSTRIAL        INSTITUTIONAL

OCTOBER 19, 1995
PAGE TWO

Mr. Tapia stated that there was too much moisture inside
the library and was concerned that it might cause damage
to the books. I asked Mr. Tapia if the A/C unit filters
had been changed because the unit appeared to be over
freezing. Upon checking the thermostat I discovered that
the thermostat was broken. The temperature was about
sixty-six degrees and was causing the unit to run
continuously.

3.   LEAKS LOCATED AT THE DINING ROOM:

There are about 6 to 8 ceiling tiles which have water
stains. Mr. Tapia was aware that this was not caused
from any rainfalls but rather the roof A/C units over
freezing and the condensation finding its way into the
ceiling tiles. The over freezing of these units were
caused by the maintenance personnel failure to change
out the filters on a regular basis. Mr. Castillo
confirmed that during and after it had rained no water
had appeared on the ceiling or floor of the dining area.

4.   KITCHEN ROOF:

Although there does not appear to be any leaks on the
southside of the kitchen area there is block, block
debris, mortar, scaffolds, etc. from the new construction
in progress. It is just a matter of time before this
roof is punctured by these materials.

In conclusion, Wilson Construction and Sechrist-Hall Company will
continue to water test other areas that are leaking and will keep
you informed of all findings and solutions on a daily basis.

Sincerely,


SABAS LOPEZ
D. WILSON CONSTRUCTION CO., INC.

SL:ie

cc:  Bill Wilson - Wilson Construction Company
     George DuSang - Carroll, DuSang & Rand, Inc.
     Felix Mejia - Brownsville I.S.D.

# Wilson Construction Company Inc

P.O. Box 3455 -  1209 East Pecan.
(210)686-9573 Fax (210)686-3270
McAllen Texas 78502- 3455
FIELD OFFICE
80 FORT BROWN CONSTRUCTION SITE SOUTH
(210) 544-2382 FAX (210) 544-4781
BROWNSVILLE, TEXAS 78520

FEB 3,1998

Re BESTERIO MIDDLE SCHOOL ( LEAKS )

DEAR MR TAPIA

THIS LETTER IS IN REFERENCE TO OUR MEETING THIS MORNING  THERE ARE
( 3 ) LOCATIONS THAT WILSON CONSTRUCTION WILL BE LOOKING AT  TO
DETERMINE POSIBLE ROOF LEAKS  THE OTHER AREAS ARE NOT RELATEDTO
ROOF LEAKS  SOME OF THE CAUSES MAY BE LACK OF A\C FILTER CHANGES .
,CALKING,INSIDE ROOF TOP A\C UNITS COPPING, AND NEW ADDITIONS NOT
RELATED TO WILSON CONSTRUCTION

IF WE CAN BE OF FURTHER ASSISTENCE PLEASE CALL ME AT (956)544-2382

THANKS

SABAS LOPEZ, CONSTRUCTION SUPERINTENDENT

CC  BILWILSON ,WILSON CONSTRUCTION

Discovery Ex. No. 16
Cause No.
2001-11-4959-C
Castillo  et al v. Carroll,
DuSang & Rand, Inc.,

Castillo
20576-037452



# Brownsville Independent School District

1900 Price Road   Brownsville, Texas 78521-2417   (210) 548-8000   Fax: (210) 548-8010

G. Wallace Jackson
Superintendent

August 28, 1996

RECEIVED

SEP 03 1996

RBM ENGINEERING, INC.

Robert H. Beasley, P.E.
RBM Engineering Inc.
3950 Doniphan, Suite N & O
El Paso, TX 79922

RE:   Besteiro New Wing

Dear Mr. Beasley:

We are now in our second week of school in session. Throughout both weeks our
Maintenance Dept. has received repeated complaints that the air conditioning is not
cooling and that the humidity levels are too high. The TRANE Co. has a setpoint of 74
degrees for the entire New Besteiro Wing. The following is a survey of the temperatures
and relative humidity levels on Tuesday, August 27, 1996. Please review this data and
recommend appropriate action to correct this situation.

| 1. Survey #1, Tuesday, 8/27/96: | Location | Temp.(°F) | Relative Humidity(%) |
|---|---|---|---|
| start time 7:40 am | Outside | 77 | 79 |
| | 1st Fl. Hall | 75 | 61 |
| | Rm 124 | 73 | 63 |
| | Rm 125 | 73 | 63 |
| | Rm 126 | - | - |
| | Rm 127 | 74 | 72 |
| | Rm 128 | - | - |
| | Rm 129 | - | - |
| | Rm 130 | - | - |
| | 2nd Fl Hall | 74 | 70 |
| | Rm 228 | 72 | 68 |
| | Rm 229 | 74 | 71 |
| | Rm 230 | - | - |
| | Rm 231 | 73 | 69 |
| | Rm 232 | 74 | 71 |
| | Rm 233 | 73 | 69 |
| | Rm 234 | 73 | 71 |
| | Rm 235 | 74 | 71 |
| stop time 8:15 am | Rm 236 | 74 | 74 |



Castillo
20576-008543

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"*

 **Brownsville Independent School District**

1900 Price Road   Brownsville, Texas 78521-2417   (210) 548-8000   Fax: (210) 548-8010

G. Wallace Jackson
Superintendent

August 28, 1996

Jorge Mora
Carroll, Dusang and Rand
122 Castellano Drive
El Paso, Texas 79912

**Re:  Punch List Items at Bruce Aiken Elementary**

Dear Jorge;

I am writing you this letter to express our concern over the
continuous problems we are having at the new Bruce Aiken
Elementary School.

Among the more pressing problems I noticed during a site
inspection yesterday are the following:

    1. Drainage around the entire building, in particular
       at the entrance to the new elementary, the planting
       beds have about 3" of standing water, the concern is
       that this may cause the trees to die.  Also standing
       water adjacent to the covered walk in the concrete
       area there is a large section with about 1 1/2" of
       standing water that is not draining towards the
       grate as designed.

    2. There is a lake on the south side of the new
       elementary that is not going anywhere.  When will
       the final grading be done to relieve this problem.

    3. There are still various clg. panels with water
       stains, presumably from the chiller lines.  In
       particular at the corridor between the new school
       and the existing library the was evidence of a
       severe water liek on the floor.

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"*

4. In room B217 there was a waterfall at the a/c unit, I
   think Victoria was looking at the problem, but we
   could not find any one from Stotler to confirm this.

5. I have received several calls from school personnel
   regarding the intrusion system at the new school
   going off by itself.  Also the fire alarm system at
   the new choir room at Besteiro Middle School keeps
   going off constantly, in fact it was sounding while
   I was there.  I have reported this to Robert Aguirre
   at least twice and he tells me that it's being taken
   care off, but the problem persists.

Your intervention regarding these matters would be greatly
appreciated.  Should you have any questions don't hesitate
to contact me at 210-548-8081.


Sincerely,

Jaime C. Condit
B.I.S.D. Construction Manager



xc:  O. Tapia, B.I.S.D. Facilities/Maintenance Administrator
     Roberto Ruiz, Architect

10/09/96  11:31    ☎ 9155421594                          TMGA      P.02

September 17, 1996
Punchlist Review
New Elementary School - Southmost Road
Additions to Besteiro Middle School

The following is a list of items found to be incomplete and/or needing correction during a walkthrough on September 17, 1996.

**GENERAL ITEMS:** (including but not limited to)

1. Complete submitted: O & M Manuals: missing electrical special systems, fire alarm, intrusion alarm, PA system
2. Stotler will have locksmith recut those keys that are not operable; coordinate with head custodian at Elementary School
3. Submit record drawings to A/E
4. Provide all required training sessions to school district personnel
   a. Energy Management System Trane will provide training 9/18/1996
   b. Metro will coordinate fire alarm training session
5. Transmit all computer hardware for Energy Management System to Owner- missing laptop computer and printer
6. Transmit all extra Materials to Owner, deliver to office of Oscar Tapia
7. Provide General Contractor's letter of warranty, provide Metro Electric and special systems letters of warranty, provide Polvado Glass letter of warranty.
8. Check top and bottom of all doors and seal if un-sealed.
9. Remove all stains and spots on ceramic tile and Terrazzo floors. Clean all quarry base tile
10. Distance at B235 and B236, from wall to center line of handicap accessible water closets must be 18" - required by code. Several such water closets were noted as not complying and must be corrected
11. Our office sent a letter on 3/31/1995 to your office requesting that dimension from floor to top of lavatory rim be set at 34" with 28" knee clearance on Elevations 11/A-16A and 12/A-16A. Please verify that this instruction was followed. Correct any non-conforming locations.
12. Verify operation and instruct Owner on intrusion alarm work at Besteiro Middle School.
13. Several areas of the building have wet & mildewed ceiling tiles. Check for plumbing leaks, leaks at fan coil units, etc. repair and replace stained ceiling tiles.

**EXTERIOR:**

1. Clean all joints in concrete walks and curbs and seal expansion joints as specified.
2. Fine grade lawn areas; provide fill in low areas: remove construction debris.
3. Hydro mulch and/or seed and finish landscape and irrigation - install all covers on valve boxes
4. Complete all courtyard work at court between Cafetorium and classroom building, missing coping at brick wall.
5. Paint gate at courtyard to match buff color brick.
6. Install building name letters on tower
7. Repair broken and cracked concrete at sidewalks and drive

10/09/96  11:32    ☎ 9155421594    TMBA    P.03

*Room numbers of classrooms in the punch list are those numbers on the number plaque by corridor door.   All other room numbers are plan numbers.*

**Classroom  Bookroom**
Relocate intrusion alarm sensor closer to exterior wall

**Corridor B101**
Exhibits roof leaks - repair leaks and replace stained ceiling tiles.

**B106**
secure waste receptacble
provide strip at carpet

**Resource Room B - 104**
edgebending of shelves is not painted

**Lobby B - 101**
finish elevator car interior - missing ceiling panel
adjust level of car to stop flush with floor line

**Classroom B - 109**
paint touch required

**Classroom D - 210 - ART ROOM**
repaint inside island sink base cabinets

**Women B - 235**
water closet is 22 1/2" from wall, must be 18"

**Area E corridor E 119**
repair electric water coolers missing parts, not cooling water, low water pressure

**Men B - 236**
water closet is 22 1/2" from wall, must be 18"

**Classroom B - 207**
paint  cabinet jamb at door - left north end

**Cafetoruim C - 101**
complete paint and patch floor
Provide VCT floor patch and vinyl base at base cabinet

**Boy's C - 109**
Sand and repaint toilet partition framing
complete paint and patch floor

**Electrical C - 105-A**
clean

**Open Courtyard**
install coping on brick wall between Middle School and Elementary School Courtyard area - paint gate

**Rehearsal Hall G - 115**
*remove back of slot cabinet and store as directed by Principal*
paint exposed wood strips

Music Library G - 116
clean vinyl base

Robe Storage - G118
clean walls of concrete splatter

**Building F**

1.  Paint sealant at Hollow Metal Door Frame on stair side - first floor existing stair.
    Touch up epoxy coating below display window in 1st floor corridor and east west concrete
    No evidence of hydromulch or seeding, too much debris on lawn areas
    Missing concrete collars of clean outs in lawn areas on west side

BH
MW
BM
JRS

Phone 423-5943                                              P.O. BOX 532191

# MAC'S INSULATION CO. INC.
## COMMERCIAL & INDUSTRIAL CONTRACTORS
### HARLINGEN, TEXAS 78553

November 11, 1996

Victoria Air
P.O. Box 3882
Victoria, TX 78903



Re: Southmost Road Elementary School
    Brownsville, Texas

Mark:

We had our crew out on the above project on Saturday November 9, 1996 to
fix the condensation problems in the hallway. We checked all along the lines
that show mildew, indicating condensation. There was only about 15 feet on
3 lines that had moisture inside of the vapor barrier. Somehow moisture is
appearing on outside of the insulation along these lines in this area. This
really does not make sense. If there were insuffient thickness of insulation
you should be having this problem from the mechanical room all the way
throughout the building, not just on this approximate of 180 feet.

The whole problem here could stem from the fact that the hallways on this
project are not conditioned. Maybe the addition of a few free-air return
grills in this area would relieve some of the stagnant air in this attic space.
If we could lower the temperature of the attic a little the problem would
probably go away.

There is a plumbing leak in this general area, that can raise the humidity.
The higher the humidity the less effective our insulation will be.

It is our understanding, from the maintenance people, that even the walls
sweat on Monday's after the system has been shut down for the weekend.
This condensation of the walls may extend to the piping, but the insulation
is dry on the interior.

Please let me know if we can be of any further service.

Thank You,

Kenny McCameron

September 11, 1998

To whom it may concern,

For the past 2 summers, I have noticed a growing problem with mold in my room. Mold has grown on my tables and under the tables, on my doors and closets as well. Due to the high humidity in this classroom, I have had to discard of some art materials that had alot of mold, such as the fingerpaint, and markers that went bad.

At this present time I have mold build up in my closet doors and on my paintings in my room. The mold that I found on my tables was wiped off from the surface due to the need of the tables for the students. There is still a fair amount of mold under the tables.

This kind of problem has caused me alot of health problems in the past and present. I suffer from allergies and am constantly ill. I would really appreciate it if this problem is taken care of soon. Thank you for your attention in this matter.

Sincerely,

Miss N. Lopez

RSL 001123

To:      *Mr. Hector Gonzales, Area Administrator*

From:    *Sam Garcia, Principal*

Date:    *October 20, 1998*

Re:      *Mold and Humidity Concerns from Staff Members*

*This is to notify you that some staff members at Aiken Elementary have written some concerns regarding the mold and humidity problems at our school. Some staff members have been seen by their family doctor and have been advised to seek immediate relief in order for their condition to improve.*

*This week we received two phone calls from the Health Department. The first call was from Mr. Frank Gamez, City of Brownsville Health Department and the other from Mr. William Ashton, State Health Department. They informed us of having received phone calls from concerned parents and staff members.*

*Mr. Ashton from the State Health Department (956) 423-0130 Ext. 611 informed us about doing an air quality study. He stated that any materials which are porous in nature would need to be disposed of completely and any surface which is non-porous could be wiped down to remove the mold and fungus growth.*

*Please advise me as to the idea of an air quality study so that we can respond to staff and parent concerns that our school has an unsafe working environment. By conducting the air quality study, I feel the district would approach the situation from a proactive rather than a reactive manner.*

*P.S. Please let me know the status of the request to have substitute custodians clean the building on Saturdays.*

*Thank you for your attention. Your efforts are always appreciated at Aiken.*

*xc: Mr. Oscar Tapia,*
*    Adm. for Maintenance*
*    and Facilities*

**EXHIBIT**

32

# CRC ENGINEERING, INC.

119 W. McIntyre
Edinburg, Texas 78539
(956) 381-8700
(956) 381-8710 (fax)

March 3, 1998

Brownsville ISD
1900 Price Rd.
Brownsville, Texas 78521

Attn: Mr. Oscar Tapia

Facilities/ Maintenance Administrator

RE: Aikens Elementary School

HVAC Study

Dear Sir:

Our firm has completed the study of the HVAC System at the above referenced school facility. We offer the following observations and recommendations:

A. Chilled Water System (Areas "A","B","D","E")

1. The fan coil units supplying the outside air to the building are sized to deliver 26,032 cfm as measured by the Test and Balance Contractor. The system design specified 25,740 cfm to be introduced into the building. Load calculations indicate the system was designed for 22.5 persons per classroom or combinations of rooms served by one fan coil. At 20 cfm per person, this allows 1287 people in the building. The current occupancy load is estimated to be 756 people. Therefore at the present time the outside air fan coil units are over capacity for the current occupancy load. Assuming the original design conditions of 22.5 persons per fan coil, we recommend the outside air fan coil unit outputs remain unchanged, and the controls be set to cool the outside air to the lowest temperature possible. We also recommend a motorized damper be installed on the outside air inlet at each room fan coil. This damper shall be interlocked with the room fan coil unit and close when the fan coil fan is not operating. The installation of the dampers at each room fan coil will prevent outside air from entering the room space when the room fan coil is not operating.

2. The outside air supplied to the building is not being relieved ; therefore, it will be necessary to create a means for the air in each room to be exhausted. This will require grilles, ductwork and fire dampers be installed at each room to allow the air to flow to the corridor. At present the total

EXHIBIT

37

volume of air that can be exhausted from the building by the exhaust fans is 13,040 cfm; however, the air gap under the doors from each room to the corridors and from the corridors to the exhaust fans in the toilets is to small to allow the air to flow freely between the two areas. Additionally, the exhaust fans are also controlled by the lights switches in the toilets and do not operate when the lights have been turned off. A more positive means of reliving the air from the building is to install additional exhaust fans at the top of the stairs or other selected areas and have them interlocked with the HVAC control system. This fan should be sized to exhaust the total cfm of outside air that is introduced into the building.

3.  We recommend re-heat control to maintain the set temperature for the space. The dew point or saturation temperature of air at room conditions of 72 deg F db and 50% RH is 52.6 deg F wb. The air must be cooled to this temperature to remove the moisture. Without re-heat the room conditions of 72 deg F cannot be maintained. Shutting the room fan coil fan "off" is not an acceptable means of control. This operating procedure will cause moisture to remain in the room and will not allow it to be exhausted.

B. Rooftop Systems (Area "C")

1.  Insure the outside air dampers are set to allow 7000 cfm per unit into the space. The tonnage required to cool the outside air is approximately 13 tons per unit. This represents 20% of the load placed on the unit. Without the outside air load, the unit is to large and will not remove the moisture from the air. A relief air damper was specified for each of these units; therefore the problem of relieving air in this area is not a factor as in the other areas.

C. Rooftop System (Area "F")

1.  Load calculations for this area indicate a 4.36 ton rooftop unit is required for each classroom with 450 cfm of outside air required for 22.3 persons. Sensible load called for 32,372 BTUH. A sensible load of 30,000 BTUH and total load of 5 tons were specified. The systems for this area have been sized according to the same conditions our firm assumed. A relief air damper was also specified for these units as in area "C".

C. Cost Estimate

1.  Chilled Water System

    a.  Motorized dampers and installation –57x $200 = $11,400

    b.  Fire dampers – 57 x $35 = $1,995

    c.  Grilles 10x8 – 57 x $30 = 1,710

● Page 3                                                                      March 3, 1998

   d.  Ductwork, 10x8- 57x10'x$20/ft = $11,400

   e.  Exhaust fans,  13,000cfm – 2 x $2,675 = $5350

   f.  Total Estimated cost - $31,855  (Materials only)

In summary, the HVAC system for areas "A","B","D" and "E" have been designed to accommodate over 1200 persons. This is based on 25,740 cfm of outside air at 20cfm per person introduced into the building. If you find the original design stated the system was to be designed for an occupancy load of 800 persons then we will add to this report regarding  changes to be made to the outside air fan coil units. The lack of means for relief air in the building can be considered a design deficiency. I consider the introduction of outside air into the room with no restraints when the room fan coil unit is shut down as a design deficiency.

The Test and Air Balance Contractor checked all systems and verified the units met or exceeded the design conditions. I did not find evidence in their reports to indicate adjustments were made to the equipment. Either the equipment was constructed exactly as specified or adjustments were made and not recorded. They did not include the amount of outside air supplied to each room nor the pressure inside each room. This data would have simplified the investigation procedure of this report.

Respectfully,

Charles R. Clark, P.E.

# CRC ENGINEERING, INC.

**119 W. McINTYRE**
**EDINBURG, TEXAS**
**(956) 381-8700**
**(956) 381-8758(FAX)**

August 20, 1998

Oscar Tapia
Brownsville Independent School District
1900 Price Road
Brownsville, Texas 78521

RE:   ALKENS ELEM. HVAC SYSTEM

Mr. Tapia,

Per our meeting of August 12, 1998 regarding the above referenced project, we offer the following suggestions to eliminate the mold & mildew problem of the facility.

1.   Reduce outside air into the building to 16,500 cfm by adjusting each outside air fan coil unit.

2.   Install manual balancing dampers at the inlet to each fan coil unit above each space and set to allow 460 cfm into the space.

3.   Cool outside air temperature to 55°F.

4.   At each room fan coil unit, run fan continuously. Control room temperature by opening & closing chill water valve, do not allow chill water valve to modulate. Chill water valve to be controlled by room thermostat.

5.   Install a humidistat in each room and allow this device to control the strip heater to provide reheat if needed and control humidity in room.

6.   Install a transfer grille in each room and directly outside of each room in corridor and connect with a 10x10 sheet metal duct. Install a smoke/fire damper in the

corridor firewall. Obtain 120 V power to operate damper from nearest source. Connect damper to fire alarm panel.

7.   Install a 13,000 cfm sidewall exhaust fan on the second level of the central stairwell. Fan shall be equipped with fire damper and smoke detector and shall be shut-down by the fire alarm panel. The fan shall be controlled by the EMS system for normal operation.

The building code allows air to be transferred from the classrooms to the corridor if the local building code official waives the code. With the installation of the smoke/fire dampers, the building official should not dis-allow this installation. The same holds true for the exhaust fan installation.

Fan coil units are extremely notorious for creating high humidity levels in the building. The coils are commonly over sized by the manufacturer and will not remove all the moisture. The control sequence we have suggested would allow cold dry air to enter the coil of the room unit and by turning the chill water valve "on" and "off" to maintain room temperature, the humidity will be kept as low as possible. We expect the reheat cycle to energize only during periods of very high humidity conditions outdoors. It is very important to run the fan continuously in the room fan coil unit.

Respectfully,

*Charles R. Clark*

Charles R. Clark

Received    May-28-2003 15:44    From-    To-BEIRNE MAYNARD    Page 011

**Texas Department of Health**
**Bureau of Environmental Health**
**Complaint/Technical Assistance Request Form**

Co. _____

No. _____

| Camp & Sanitation | ☐ Youth Camp ☐ Pool ☐ Migrant Housing ☐ Field San. ☐ Lodging ☐ School ☐ Child Care ☐ Vector ☐ Other |

| | ☐ Asbestos ☐ Hazard Communications ☐ Indoor Air ☐ Industrial Hygiene ☐ Lead ☐ Other |

| | ☐ Bedding ☐ Glue & Paint ☐ Playground Safety ☐ Other |

| Type of Request/Complaint | Telephone | X | Written | Facsimile | E-Mail | Visit | Referral |

| Source of Request | City of Brownsville Health Department |

| Address | 964 East Madison | | | Telephone | (956)542-3437 |
| City | Brownsville | | State | Texas | Zip | 78520 |

| Request/Complaint Site Owner/Establishment | Bruce Tansill Aiken Elementary School |
| Address | 6290 Southmost Road | | | Telephone | (956)986-5200 |
| City | Brownsville | Zip | 78520 | Co. | Cameron | Region | 11 | Lic./Reg# | |

**Description of Complaint/Request**

Extreme levels of humidity within building causing severe mold and mildew growth within the building.

| Received/Assigned/Complaint | William A. Ashton, R.S. | Date | Oct. 19, 1998 |
| Referred to | William A. Ashton, R.S. | Date | Oct. 19, 1998 |
| Completed by | William A. Ashton, R.S. | Date | Oct. 22, 1998 |

**Disposition and Action Taken**

Conducted site assessment with Jose Ramirez, City of Brownsville Health Department on 10/22/98.
Collected material samples for mold identification. Collected on-site measurements for temperature and relative humidity. Will follow-up with survey on 11/4/98

| Follow-up Inspection | ☒ Yes ☐ No | When | 11/4/98 | Notice Given? | ☒ Yes ☐ No | day |
| Signed | William Ashton, R.S. | Title | Reg. I. H. | Date | 11/18/98 |
| Reviewed by | | Title | | Date | |

May 28 2003 15:49    P.11

RSL 001116



**T D H**

# Texas Department of Health

Eduardo J. Sanchez, M.D., M.P.H.
Commissioner of Health

https://www.tdh.state.tx.us

Brian R. Smith, M.D., M.P.H.
Regional Medical Director

Public Health Region 11
601 W. Sesame Drive
Harlingen, Texas 78550
(956) 423-0130

November 16, 2001

Dr. Noe Sauceda, Superintendent of Schools
Brownsville Independent School District
1900 Price Road
Brownsville, Texas 78521

Case Number: 01110511WAA01

Dear Dr. Sauceda:

At the request of Mr. Josh Ramirez, City of Brownsville Health Department, and with the concurrence of Mr. Frank Ortiz, School Principal, a limited indoor air quality survey of Bruce Tansill Aiken Elementary School, 6290 Southmost Road, was conducted on November 5, 2001, by this writer. The purpose of the survey was to determine if the current indoor air conditions are contributing to an indoor air quality problem associated with mold and mold spore growth.

Three indoor air surveys of this facility have previously been conducted. These surveys were conducted on October 22, 1998, November 4, 1998 and August 19, 1999. At the time of the first indoor air survey the school was approximately three years old and problems with visible moisture, high humidity, and visible mold growth were noted.

During the inspection conducted on November 5, 2001, a visual inspection of the adjoining restroom located between rooms A-106 and A-108 showed visible mold growth on the ceramic tile. Cracking and peeling paint was also noted within the restrooms and various sections of the building. The cracking and peeling paint may be an indication of higher than normal humidity levels within the building. Classrooms B-217 and B-218 had a light build-up of material growing on the surface of the closet doors. These doors had been previously painted and the material which was painted over appears to be returning. A similar situation was also noted within room B-202, with the exception that the growth was on an interior wall above the bulletin board, and in room B-209 visible mold growth was noted growing underneath the counter top on the teacher's work station. The rooms selected had previously been inspected or were randomly chosen. According to the staff interviewed, all surfaces of the school including but not limited to walls, desk tops, cabinets, etc. are cleaned weekly. Staff further indicated that in some areas the building products are cleaned, but mold growth will reappear. With the exception of the library which was under containment and being cleaned by an environmental remediation company, the mold levels observed within the school were minimal. However, if the areas where mold growth was observed are not properly addressed, and the environmental conditions worsen the observed growth can become more wide spread. The painting over of surfaces which have had previous mold growth will not prevent the mold from reappearing.

<u>On-Site Measurements Results</u>
During the survey on-site measurements were collected in the areas of concern for temperature, relative humidity, and carbon dioxide ($CO_2$). The locations and results are summarized on Table I. The temperature readings ranged from 71.2°F to 76.4°F and the relative humidity readings ranged from 41.7 to 68.5%. These measurements are an indication that the air is generally being controlled within the comfort range recommended by the American Society of Heating, Refrigerating, and Air Conditioning Engineers (ASHRAE) in its Standard 55-1992, *"Thermal Environmental Conditions for Human Occupancy."* With the exception of the cafeteria which had a relative humidity level reading of 68.5%.

*An Equal Employment Opportunity Employer*

Dr. Noe Sauceda
November 16, 2001
Page Two

The carbon dioxide ($CO_2$) levels collected ranged from a low of 815 to a high of 1385 parts per million (ppm). This is indicative that an inadequate amount of fresh outside air is being introduced into the building. The higher carbon dioxide levels were collected on the second floor. Carbon dioxide is a normal constituent of exhaled breath and is used as an indicator gas in order to determine the introduction of fresh outside air into the building. However, if indoor $CO_2$ concentrations are more than 1000 ppm (3 to 4 times the outside level), there may be a problem of inadequate ventilation and complaints such as headaches, fatigue, eye and throat irritation are frequently reported. The American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) recommends that fresh air be introduced into a classroom at the rate of 15 cubic feet per minute (cfm) per person and at a rate of 20 cfms per person in an office.

**Summary and Recommendations:**
High humidity levels within the school, especially if the air handling units are turned off during periods when the building is vacant, are most likely contributing to mold growth, and musty odors identified within the building. Microbial contamination within a building represents an unsanitary condition that poses a significant health risk to occupants, particularly those who may already suffer from allergies, asthma, immune deficiency disorders, or related health conditions. Molds can cause various symptoms, including headaches, sneezing, coughing and respiratory illnesses ranging from allergic sensitization to hypersensitivity pneumonitis. Both live and dead mold spores can produce adverse health effects. Reducing the humidity levels within the building, and increasing the fresh air ventilation rates, will better insure a healthier and more comfortable work environment for your staff and students.

We recommended that the enclosed "*Guidelines for the Correction and Prevention of Indoor Air Quality Problems*" be used to evaluate and correct your problems. Specific areas that need to be addressed include:

1. All moldy surfaces need to be removed or completely cleaned of all mold. Porous surfaces, such as ceiling tiles and paper materials, that cannot be cleaned adequately must be removed. Hard surfaces, such as desks, walls, etc., can be cleaned with a disinfectant such as a dilute bleach solution (1 part liquid bleach mixed with 9 to 20 parts water).

2. Have a qualified air-conditioning contractor check the coil temperature and the size of your cooling unit in relation to the size of your building. If the unit is properly sized so it runs long enough and at a low enough temperature, the air in the ducts will be relatively dry and will not encourage mold growth in the ducts.

3. A contractor needs to review the system and insure that the proper amount of make-up and return air is being introduced, and is properly sized. The humidity should be less than 55% even on humid days.

We appreciate your efforts to provide a safe, healthy and comfortable environment for your employees and students. Please contact us if we can be of any further assistance.

Sincerely,

William A. Ashton, R.S.
Environmental Specialist IV

enclosures

cc:     Public Health Region 11
        TDH-Austin
        Mr. Josh Ramirez, City Of Brownsville Health Department
        Mr. Frank Ortiz, School Principal
    ✓ Ms. Rachel Ayala, Area Administrator

Table 1
On-site Measurements
Aiken Elementary School
Brownsville, Texas

November 5, 2001

| Location | Temperature[1] | Relative Humidity[1] | Carbon dioxide[2] |
|----------|------------|------------------|---------------|
| Adm Ofc. | 72.5° F | 52.2% | 956 ppm |
| Room A106 | 76.4° F | 51.5% | 997 ppm |
| Room B106 | 75.0° F | 43.4% | 815 ppm |
| Room B105 | 75.9° F | 46.5% | 898 ppm |
| Room B217 | 73.8° F | 41.7% | 1101 ppm |
| Room B218 | 74.1° F | 43.0% | 1385 ppm |
| Room B202 | 73.4° F | 43.4% | 1204 ppm |
| Room B209 | 74.9° F | 45.1% | 1095 ppm |
| Cafeteria | 71.2° F | 68.5% | 1350 ppm |

Notes:

1. The temperatures, relative humidity and carbon dioxide ($CO_2$) levels were measured On-Site utilizing the Quest Technologies aq Series Indoor Air Quality Monitor. The instrument's ranges are 0 to 100 for relative humidity, 32° F to 140° F for temperature, 0-5000 ppm. This instrument is capable of resolving relative humidity to 0.1%, temperature to 0.1° F, and carbon dioxide +/- 50 ppm.

BROWNSVILLE INDEPENDENT         §
SCHOOL DISTRICT                 §
                               §
                               §
VS.                            §        CLAIM NO.:   1250037684
                               §
                               §
                               §
ROYAL SURPLUS INSURANCE        §


EXAMINATION UNDER OATH OF

OSCAR TAPIA

JUNE 2, 2003


# COPY


# *Compex Legal Services*

*Houston    San Antonio    Dallas    Austin*

*(800) 899-3282*

80

1   specifically remember one room even having mold growth until

2   summer 2001.

3       Q    We talked to Mr. Vasquez on Friday that some mold,

4   mildew, some type of substance seemed to be growing along

5   the chiller line insulation.  Are you familiar with any of

6   that?

7       A    Yes, that was actually there when we did the

8   retrofits.

9       Q    The retrofit by Coastal in 1999?

10      A    Yes.  The lines were sweating a lot.  They had

11  moisture on them.  There were some stains, yellowish,

12  brownish, dark brown stains on them.

13           And once the system improved, our maintenance

14  department did some work on there as well.  We replaced the

15  ceiling tiles with material that does not encourage mold

16  growth.

17           And we replaced all those and noticed all the

18  lines were like that, but they had already dried up.  They

19  looked more like water stains.

20           And we talked about replacing all the insulation.

21  But to do that, you have to shut off the entire chiller

22  system and empty all the water out to replace all that.

23           And we decided at that time, well, it's dry,

24  it's not -- the moisture has gone away, there shouldn't be

25  any mold growing, it's just water stains.  We will address

81

1  this in the future when we are able to close the school

2  down.

3           But since the problem went away throughout that

4  whole year, two and a half, two years, we never got back to

5  replace it.

6      Q    So the insulation that was there in the summer

7  fall of '99, it's still the insulation there today?

8      A    Yes.

9      Q    What is your understanding of the reason why, I

10 think the term you used was sweating of the chiller lines,

11 what's your understanding of why that was happening?

12     A    If I remember correctly, the sweating was due to

13 the pipes running the cold water.  That's about as much as I

14 know about that.  I don't know why they were becoming so

15 saturated because insulation would prevent the condensation.

16     Q    Do you know if the condensation was occurring in

17 areas of the chill water pipe where there were tears or

18 holes or problems with the insulation?

19     A    Yes.  Yes.  That was happening in certain areas.

20 And when Coastal Engineering did their work, they went and

21 patched up those problem areas that had lack of insulation

22 on them.

23     Q    I guess what I'm trying to figure out is, are the

24 problems with sweating isolated to those portions of the

25 chill water piping where there were problems with the

82

1  insulation, or was there also sweating where the insulation

2  appeared to be fine?

3      A    There was sweating throughout several pipes, the

4  majority of the pipes, even where there was no tears; yes,

5  that did happen.

6      Q    All right.  Let me show you Exhibit 41 and ask you

7  if you've seen this before.

8      A    Okay.

9      Q    This Exhibit 41 is a letter to the school district

10 from the Texas Department of Health?

11     A    Right.

12     Q    Dated October 25th, 1989?

13     A    Correct.

14     Q    Based on this letter, can you determine whether or

15 not Coastal Engineering had completed its work by this time,

16 August 25, 1999?

17     A    Yes, they had.

18     Q    And I think, as you mentioned, the T.D.H. had gone

19 through the building and did not see any visible mold growth

20 in the classrooms but did note the size of mold growth on

21 the chilled water lines; is that correct?

22     A    On Page 1?

23     Q    Yes, sir, the second paragraph at the very bottom.

24     A    Right.  Correct.

25     Q    I think you mentioned that the chill water line

83

1   insulation has never been replaced; is that correct?

2       A    That's correct.

3       Q    On the second page he lists some -- Mr. Ashton

4   lists some recommendations?

5       A    Right.

6       Q    And number four says that the school district may

7   want to consider stand-alone dehumidification units?

8       A    Uh-huh.

9       Q    Do you know what Mr. Ashton's concern was there in

10  August of 1989?

11      A    I believe these are actual rooftop units that

12  strictly introduce and recycle air in the building and strip

13  the moisture out to bring the moisture down in either

14  certain parts of the school or the entire school if we

15  invest in that, install that in the dehumidification units.

16  That's what they call pretreatment air units that stand

17  alone in the roof independent of the actual air condition

18  systems themselves.

19      Q    Do you know why Mr. Ashton was making this

20  recommendation even after Coastal had completed its work at

21  Aiken?

22      A    It's just an extra thing to do to ensure the

23  humidity levels are kept low.  If for some reason the air

24  conditioning system is start to have problems again, this is

25  kind of like a backup that this would catch extra humidity

107

1  and basically tell us what is wrong with the building, what

2  we need to fix it and how bad is the mold damage and --

3      Q    Was Ambio -- excuse me, was EFI hired then to find

4  out what was causing the problem and what would be necessary

5  to solve the problem?

6      A    That's correct.

7      Q    And then, in addition, I guess what it would take

8  to repair whatever damage was at the facility?

9      A    Right.

10     Q    Have you -- you said you had seen it before.  Have

11 you read through EFI's report that we've marked as Exhibit

12 15?

13     A    I have read through it.  It's been sometime back,

14 but I do remember going through the report.

15     Q    Are you aware of any disagreement within the

16 district as to the findings of EFI?

17     A    No, we were very pleased with the report.  We felt

18 it was very thorough and accurate.

19     Q    Let me ask you a question about one of the

20 conclusions that EFI had.  On Page 2-3 of Exhibit 15.

21     A    I think the conclusions are into dash 4.

22     Q    Well, I guess the -- I guess the Section 2.05, the

23 side assessment and then it goes on to the conclusions and

24 recommendations.  I wanted to ask you about their findings

25 and conclusions relating to the main courtyard to Besteiro.

123

1  BROWNSVILLE INDEPENDENT          )

   SCHOOL DISTRICT                  )

2                                   )

   VS.                              )    CLAIM NO.:  1250037684

3                                   )

   ROYAL SURPLUS INSURANCE          )

4

5                          REPORTER'S CERTIFICATION

                        ORAL DEPOSITION OF OSCAR TAPIA

6                              JUNE 2, 2003

7

8           I, DORA M. CANIZALES, Certified Shorthand Reporter

9  in and for the State of Texas, hereby certify to the

10 following:

11          That the witness, OSCAR TAPIA, was duly

12 sworn by the officer and that the transcript of the oral

13 deposition is a true record of the testimony given by the

14 witness;

15          That the deposition transcript was submitted on

16 __June 10____, 2003, to the witness or to the attorney for

17 the witness for examination, signature and return to me by

18 __July 2____, 2003.

19          That the amount of time used by each party at the

20 Examination Under Oath is as follows:

21          MR. STEPHEN R. WEDEMEYER - 3 Hours and 21 Minutes.

22          MR. ERIC JARVIS - 0 Hours and 0 Minutes.

23          That _____ is the court officer's

24 charges to the Defendant for preparing the original

25 deposition transcript and any copies of exhibits;

124

1    That pursuant to information given to the

2    deposition officer at the time said testimony was taken,

3    the following includes counsel for all parties of record:

4    MR. ERIC JARVIS, Attorney for Plaintiffs,

5    MR. STEPHEN WEDEMEYER, Attorney for Defendant,

6    I further certify that I am neither counsel for,

7    related to, nor employed by any of the parties or attorneys

8    in the action in which this proceeding was taken, and

9    further that I am not financially or otherwise interested in

10   the outcome of the action.

11   Further certification requirements pursuant to

12   Rule 203 TRCP will be certified to after they have occurred.

13   Certified to by me this _10th_ day of _June_____,

14   2003.

15

16   _____

     DORA M. CANIZALES CSR 5360

17   Expiration Date:  12-31-03

     COMPEX LEGAL SERVICES

18   3300 Nacogdoches Road, Suite 220

     San Antonio, Texas  78217

19   (800) 969-6424

20

21

22

23

24

25

125

FURTHER CERTIFICATION UNDER RULE 203 TRCP

1

2     The original deposition (was)/~~was not~~ returned

3  to the deposition officer on __June 16, 2003__;

4

5     If returned, the original deposition was delivered

to Stephen R. Wedemeyer, Custodian Attorney;

6

7     That $ _648.90_ is the deposition officer's charges

8  to the Defendant for preparing the original deposition

transcript and any copies of exhibits;

9     That the deposition was delivered in accordance

with Rule 203.3, and that a copy of this certificate was

10  served on all parties shown herein on and filed with the

Clerk.

11     Certified to by me this ____24____ day of

____June____, 2003.

12

13

14

15     _Dora M. Canizales /s/_

DORA M. CANIZALES CSR 5360

Expiration Date:  12-31-03

16  COMPEX LEGAL SERVICES

3300 Nacogdoches Road, Suite 220

17  San Antonio, Texas  78217

(800) 969-6424

18

19

20

21

22

23

24

25

121

CHANGES IN FORM OR SUBSTANCE -- ERRATA SHEET

Reasons for changes: (1) Clarify the record (2) Conform to the facts (3) Correct Transcription Errors

| Page | Line | Change from/Change to | Reason |
|------|------|----------------------|--------|
| 11 | 4 | Noul → barrel | 3 |
| 11 | 11 | interit → Saatiman | 3 |
| 11 | 12 | TCI → TSI | 3 |
| 13 | 15 | Swerding → refructing | 3 |
| 16 | 21 | was Portier → was Cross word Patin | 1 |
| 21 | 22 | Delete the was heat → top | 1 |
| 24 | 17 | boatage should be "voltage" | 3 |
| 51 | 7 | change starting → installing | 3 |
| 51 | 15 | change required → original | 1 |
| 73 | 5 | Mr. Bosqut should read → Mr. Boatright | 1 |
| 113 | 13 | "Satterfield and Pontikes" | 3 |
| 113 | 11 | Satterfield and Pontikes | 3 |
| 114 | 1 | Pontikes" in place of Funes | 3 |

_Oscar Tapia signature_ 6/12

OSCAR TAPIA

**COMPEX LEGAL SERVICES**
1-800-899-3282 * 713-861-3900

122

SIGNATURE OF WITNESS

1

2      I, OSCAR TAPIA, have read the foregoing

3  sworn deposition transcript and hereby affix my signature

4  stating that same is true and correct, except as noted

5  hereinabove.

6

7

8                                    OSCAR TAPIA

9

10

11  THE STATE OF TEXAS   )

12  COUNTY OF Cameron    )

13      BEFORE ME, ___Norma Lee Ortiz_____, a Notary

14  Public, on this day personally appeared OSCAR TAPIA, known

15  to me (or proved to me under oath) through

16  _Texas Drivers' License_____, to be the person whose name is

17  subscribed to the foregoing instrument and acknowledged to

18  me that they executed the same for the purposes and

19  consideration therein expressed.

20      Given under my hand and seal of office on this the

21  __12th__ day of ___June_____, 2003.

22

23        NORMA LEE ORTIZ
          Notary Public, State of Texas
          My Commission Expires
          03-20-2007

24                                    NOTARY PUBLIC, STATE OF TEXAS

25

| | |
|---|---|
| BROWNSVILLE INDEPENDENT | § |
| SCHOOL DISTRICT | § |
| | § |
| | § |
| VS. | §    CLAIM NO.:  1250037684 |
| | § |
| | § |
| ROYAL SURPLUS INSURANCE | § |

## EXAMINATION UNDER OATH OF

### RAUL N. VASQUEZ

### MAY 30, 2003

# COPY

# *Compex Legal Services*

*Houston      San Antonio      Dallas      Austin*

*(800) 899-3282*

24

1   school?

2       A    You do.  I would -- like I said, on the layout you

3   would be able to see it better.

4       Q    Okay.  Where do the pipes run by the way?

5       A    In the ceilings and in the hallways in between the

6   floors.

7       Q    Is it above ceiling tiles, below ceilings tiles?

8       A    It's above the ceiling tiles.

9       Q    So they are not exposed?

10      A    They are not exposed.

11      Q    Do you know if the space, is that conditioned or

12  unconditioned space that they're in?

13      A    I think that's something you would have to ask

14  Mr. Tapia because that was his project at the time.

15      Q    Okay.  Would he be the person to ask about the

16  type of -- how they are insulated, the chill water pipes?

17      A    Yes, sir, because when we took over the project,

18  we were not dealing with that anymore, we were dealing with

19  another issue.

20      Q    Okay.  I guess why don't you tell me then what

21  your first involvement was with -- your first knowledge of

22  that they were having some problems with humidity or

23  mold-type issues at the two schools?

24      A    The first time that the department had any

25  knowledge of a substance was in August of 2001.

25

1    Q    What do you mean by a substance?

2    A    Well, like -- like you were asking me a while ago,

3  I am not an expert so I can tell you that there was

4  something there.  We had an abatement company that came in

5  and the abatement company made the test and determined that

6  there was mold in the kitchen at Besteiro and in the library

7  and Room 122.

8    Q    All right.  And I'm -- as I say, you know, I'm

9  not -- you don't have to be an expert in an area.  Just tell

10  me what you know, like you said.  The substance -- some

11  substance you all thought were growing mold, mildew,

12  something like that --

13    A    Okay.

14    Q    -- that that was -- and that's what caused the

15  concern, there was something growing?

16    A    There was something growing in the kitchen and it

17  was determined by the abatement company that there was mold

18  and then we found, and I can tell you that we found it

19  growing in the library on the books, on the desks, on the AV

20  equipment, on the walls.

21    Q    Okay.  Tell me -- let's see, you had just began as

22  a maintenance administrator about a month before the issue

23  started rising with the substance growing?

24    A    Yes.

25    Q    Welcome to your new position.  I guess tell me

26

1   what, you know, who discovered something, how was it

2   reported?

3       A    If I recall correctly, it was the administration

4   ready to open up the school for the school year and they

5   contacted our office to go check on some suspicious growth.

6       Q    Who were the principals at the time at Besteiro

7   and Aiken?

8       A    Mr. Guadalupe Leal was the --

9       Q    What was his last name again?

10      A    Leal, L-E-A-L.

11      Q    Okay.

12      A    He was at the time the interim principal.

13      Q    And what about at Aiken at the time?

14      A    Sam Garcia.  I'm trying to remember here.  I might

15  be wrong because I think that was the summer that Sam was

16  leaving.  I don't know if he was still there or not because

17  a Frank Ortiz came on board.

18           And I'm being very honest with you, I don't recall

19  if -- if Garcia -- if Garcia was gone yet because he was

20  leaving for another job.  He might have been there for one

21  year.

22      Q    Your recollection is that the administration of

23  the schools were about to open for the 2001 school year.

24  And what -- I guess what did they find?

25      A    They called us because they had some growth that

27

1    was discovered in the kitchen.

2         Q    That was the first area that it was noticed in?

3         A    The library and Room 122.

4         Q    All of them at the same time?

5         A    Well, they were preparing the school to open up

6    and they were going around the campus checking on things and

7    they discovered those areas.  The school was closed for the

8    summer.

9         Q    Do you know how it was reported to the maintenance

10   department?

11        A    We received the phone call.

12        Q    And I guess kind of -- where did it go from there?

13        A    We went to investigate, we reported it to the

14   central office and the central office sent an abatement

15   company out there.

16        Q    Do you recall who that was?

17        A    Assured Air Quality.

18        Q    Okay.  That's the folks who run the training

19   seminar at Texas Tech?

20        A    Yes.

21        Q    Assured Indoor Air Quality?

22        A    Yes.

23        Q    I don't know if they run it or they --

24        A    Well, they have connections with them.

25        Q    Yeah, that's what I meant.  Can you tell me the --

28

1   well, let me ask you this.  Did you go out there or send

2   somebody out there when you first learned of this problem

3   for the schools?

4       A    I went out there and I took some of my foremen

5   with me.

6       Q    And can you describe to me what you saw in the --

7   I guess in each of the three different rooms?

8       A    In the kitchen we had it growing on some walls,

9   desks, chairs, in the kitchen area completely.  In the

10  library it basically was all over everything.

11      Q    In the kitchen it was more isolated?  It wasn't

12  all over every wall?

13      A    Well, yeah, it was on the walls, it was on a room

14  that housed supplies.  Remember, you also have a lot of

15  stainless stuff in the kitchen so you are not going to have

16  it growing on stainless.

17      Q    What was it -- what was it on, more the wood and

18  that type of thing?

19      A    The wood, the walls, the --

20      Q    Sheetrock walls?

21      A    Sheetrock, chairs.

22      Q    And could you give a -- the nonstainless steel

23  surfaces, could you give an estimate of what percentage was

24  covered with the substance?

25      A    I couldn't be honest.

64

1    These have been events that have lasted, I mean, a few

2    hours, a few days, the actual leaks?

3         A    We had the rainstorm -- we had the rainstorm, we

4    had the leaks, we called maintenance.  Maintenance went out

5    there to investigate, if I'm not mistaken, by the next day

6    or the day after the contractor was there.

7         Q    So it would probably be fixed within a week?

8         A    Less than a week.

9         Q    Okay.  When the rains would stop, would the leaks

10   subside?

11        A    Well, when we had the leaks, you know, and we had

12   the rain.  Of course, it subsided.  And then we didn't have

13   rain for quite a while.

14             Later, you know, especially being South Texas.

15   And then again maybe six months to a year later we had

16   another big rainstorm.  And we are not talking about little

17   rainstorm, we are talking about a real heavy rainstorm.

18   Then we had some other leaks and especially over here and

19   they came and fixed them and that took care of it.

20        Q    What about -- okay.  We talked about the roof

21   leaks.  Did you have any problems with windows leaking?

22        A    No, not that I can recall.

23        Q    Any other types of -- of leaks that you remember

24   other than the roofs -- the three places that we talked

25   about with the roofs while you were principal there?

65

1    A    Not that I can recall.

2    Q    You don't remember any pipes breaking or water

3  pouring out or events like that?

4    A    We had overflow in a bathroom.

5    Q    Like a toilet or something?

6    A    A toilet, broken faucet, those kind of things, but

7  those were taken care of right away because we shut off the

8  water and maintenance came and repaired whatever needed to

9  be repaired.  But if you are asking me did we have anything

10  that lasted overnight --

11    Q    Right.

12    A    -- the answer is no.

13    Q    Nothing that you couldn't -- the maintenance

14  department couldn't fix?

15    A    That we couldn't repair right away or ever our

16  custodians ourselves shut off the water to make sure and

17  clean up the area right away.

18    Q    What do you mean by broken faucet, like a dripping

19  thing or --

20    A    No, I mean a broken faucet where --

21    Q    The top fell off?

22    A    -- either that or a kid went and played with it

23  and snapped -- you are talking about middle school kids.

24    Q    Kids would never do that?

25    A    Oh, well, you're talking about middle school kids

66

1  so we had one or two incidents like that but it wasn't

2  anything major.   It was contained within the bathroom area.

3       Q    Right.  Let me hand you what I've marked as No. 4.

4  And again, this is from the documents the district has

5  provided us that are apparently from Aiken -- excuse me,

6  from Assured Air Quality.  Have you seen this before?

7       A    I've never seen this Exhibit 4 before, no.

8       Q    The -- were you involved at all with the

9  discussions with Assured as to what needed to be done to

10  clean up the library and the computer room?

11      A    Yes.

12      Q    I guess tell me what your involvement was.

13      A    All my involvement was we were meeting in

14  Mr. Pineda's office.  He was in charge of something else at

15  the time.  He was in charge of maintenance, too.  And we had

16  Assured Air Quality --

17      Q    That's the superintendent now?

18      A    Yes, sir.  He was an assistant superintendent in

19  charge of maintenance and facilities.  And we heard what

20  Assured Air Quality wanted to do.  We listened to their

21  proposal.

22      Q    Mr. Holder?

23      A    Mr. Holder.  And he brought in some other

24  colleagues, three or four other gentlemen.

25      Q    And is Exhibit 4, is this basically what you

136

1                    EXAMINATION UNDER OATH

2    BROWNSVILLE INDEPENDENT          )

3    SCHOOL DISTRICT                  )

                                      )

4    VS.                              )   CLAIM NO.:  1250037684

                                      )

5    ROYAL SURPLUS INSURANCE          )

     _____

6

7                    REPORTER'S CERTIFICATION

            ORAL DEPOSITION OF RAUL N. VASQUEZ

8                       MAY 30, 2003

9    _____

10

11          I, DORA M. CANIZALES, Certified Shorthand Reporter

12   in and for the State of Texas, hereby certify to the

13   following:

14          That the witness, RAUL N. VASQUEZ, was duly

15   sworn by the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by the

17   witness;

18          That the deposition transcript was submitted on

19   __*June 10*___, 2003, to the witness or to the attorney for

20   the witness for examination, signature and return to me by

21   __*July 2*___, 2003.

22          That the amount of time used by each party at the

23   deposition is as follows:

24          MR. STEPHEN R. WEDEMEYER - 3 Hours and 39 Minutes.

25          MR. ERIC JARVIS - 0 Hours and 0 Minutes.

137

1          That _____ is the deposition officer's

2    charges to the Defendant for preparing the original

3    deposition transcript and any copies of exhibits;

4          That pursuant to information given to the

5    deposition officer at the time said testimony was taken,

6    the following includes counsel for all parties of record:

7          MR. ERIC JARVIS, Attorney for Plaintiffs,

8          MR. STEPHEN WEDEMEYER, Attorney for Defendant,

9          I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties or attorneys

11   in the action in which this proceeding was taken, and

12   further that I am not financially or otherwise interested in

13   the outcome of the action.

14         Further certification requirements pursuant to

15   Rule 203 TRCP will be certified to after they have occurred.

16         Certified to by me this _10th_ day of _June_,

17   2003.

18

19         _Dora M. Canizales_

     DORA M. CANIZALES CSR 5360

20   Expiration Date: 12-31-03

     COMPEX LEGAL SERVICES

21   3300 Nacogdoches Road, Suite 220

     San Antonio, Texas 78217

22   (800) 969-6424

23

24

25

138

1    FURTHER CERTIFICATION UNDER RULE 203 TRCP
2         The original deposition (was) ~~was not~~ returned to the
deposition officer on ____*June 25, 2003*_____;
3
4         If returned, the original deposition was delivered
to Stephen R. Wedemeyer, Custodian Attorney;
5
6         That $ *810.80* is the deposition officer's charges
to the Defendant for preparing the original deposition
7    transcript and any copies of exhibits;
8         That the deposition was delivered in accordance
with Rule 203.3, and that a copy of this certificate was
9    served on all parties shown herein on and filed with the
Clerk.
10        Certified to by me this ____*30*_____ day of
____*June*___, 2003.
11
12
13
                    *Dora M. Canizales*
14        DORA M. CANIZALES CSR 5360
          Expiration Date: 12-31-03
15        COMPEX LEGAL SERVICES
          3300 Nacogdoches Road, Suite 220
16        San Antonio, Texas 78217
          (800) 969-6424
17
18
19
20
21
22
23
24
25

135

1    SIGNATURE OF WITNESS

2         I, RAUL N. VASQUEZ, have read the foregoing

3    deposition transcript and hereby affix my signature stating

4    that same is true and correct, except as noted hereinabove.

5

6

7                              RAUL N. VASQUEZ

8

9

10   THE STATE OF TEXAS    )

11   COUNTY OF HIDALGO      )

12         BEFORE ME, _____Norma Lee Ortiz_____, a Notary

13   Public, on this day personally appeared RAUL N. VASQUEZ,

14   known to me (or proved to me under oath) through

15   _____Raul Vasquez_____, to be the person whose name is

16   subscribed to the foregoing instrument and acknowledged to

17   me that they executed the same for the purposes and

18   consideration therein expressed.

19         Given under my hand and seal of office on this the

20   __24th__ day of ____June_____, 2003.

21        NORMA LEE ORTIZ
         Notary Public, State of Texas
22        My Commission Expires
         03-20-2007

23                              NOTARY PUBLIC, STATE OF TEXAS

24

25



# AMBIOTEC GROUP

**Civil & Environmental Engineers**



**Environmental Scientists**



**Surveyors**



**Construction Managers**

---

**Brownsville**



**Harlingen**



**McAllen**

# BROWNSVILLE ISD



# Mold Investigation

## BESTEIRO MIDDLE SCHOOL AIKEN ELEMENTARY

### Brownsville, Texas
### May 2002

RSL 000048

**ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT**

# Ambiotec Environmental Consultants, Inc.

P.O. Box 2565
1101 East Harrison Avenue
Harlingen, Texas 78551
(956)423-7807  Fax:(956)423-7905

## PRELIMINARY MOLD INVESTIGATION
### Besteiro Middle School/Aiken Elementary School
Southmost Road
Brownsville, Texas
AEC Project No. 3163

## DRAFT REPORT

**Prepared For:**

**Brownsville Independent School District Counsel
Brownsville, Texas**

*May, 2002*

RSL 000049

**ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT**

# TABLE OF CONTENTS

| Section | Page |
|---|---|

EXECUTIVE SUMMARY ..........................................................................................1

1.0    INTRODUCTION ..................................................................................3

2.0    SITE DESCRIPTION ............................................................................3

3.0    METHODS...............................................................................................3

4.0    BACKGROUND INFORMATION AND EVALUATION CRITERIA ............4
    4.1    Symptoms .........................................................................................5
    4.2    Possible Causes.................................................................................5
    4.3    Current Status of Regulatory Levels .................................................6
    4.4    Comfort Indicators............................................................................6
    4.5    Microbiological Contaminants..........................................................6
        4.5.1    *Stachybotrys* ...................................................................7
        4.5.2    *Aspergillus* .....................................................................7
    4.6    Evaluation of Laboratory Analytical Results ....................................7

5.0    RESULTS.................................................................................................8
    5.1    Besteiro Middle School ....................................................................8
        5.1.1    Air Samples ......................................................................8
        5.1.2    Surface Samples ...............................................................9
        5.1.3    Temperature and Relative Humidity..................................9
    5.2    Aiken Elementary School .................................................................9
        5.2.1    Air Samples ......................................................................9
        5.2.2    Surface Samples .............................................................10
        5.2.3    Temperature and Relative Humidity................................10

6.0    CONCLUSIONS....................................................................................10

7.0    RECOMMENDATIONS .......................................................................12

LIST OF FIGURES

    FIGURE 1          FIRST FLOOR SAMPLE LOCATIONS
    FIGURE 2          SECOND FLOOR SAMPLE LOCATIONS

LIST OF TABLES

    TABLE 1          DISTRIBUTION OF SAMPLES
    TABLE 2          DISTRIBUTION OF INDOOR SAMPLES

**ATTORNEY PRIVILEGED AND**
**CONFIDENTIAL WORK PRODUCT**

TABLE 3              DISTRIBUTION OF OUTDOOR SAMPLES
TABLE 4-1            DISTRIBUTION OF INDOOR OCCURRENCES OF INDICATOR
                    CRITERIA FOR AIKEN
TABLE 4-2            DISTRIBUTION OF INDOOR OCCURRENCES OF INDICATOR
                    CRITERIA FOR AIKEN (%)
TABLE 5-1            DISTRIBUTION OF INDOOR OCCURRENCES OF INDICATOR
                    CRITERIA FOR BESTEIRO
TABLE 5-2            DISTRIBUTION OF INDOOR OCCURRENCES OF INDICATOR
                    CRITERIA FOR BESTEIRO (%)
TABLE 6              RELATIVE COMPARISON OF INDOOR AND OUTDOOR AIR
                    QUALITY
TABLE 7              SUMMARY OF LABORATORY RESULTS - BESTEIRO SCHOOL
TABLE 8              SUMMARY OF LABORATORY RESULTS - AIKEN SCHOOL

**APPENDICES**

APPENDIX A           MOLD LABORATORY REPORTS - BESTEIRO SCHOOL
APPENDIX B           MOLD LABORATORY REPORTS - AIKEN SCHOOL

RSL  000050

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

## EXECUTIVE SUMMARY

In February 2002, Ambiotec Environmental Consultants, Inc. (AEC) was contracted by the Brownsville Independent School District's (BISD) counsel to provide technical assistance in the evaluation of potential mold contamination in the Besteiro Middle School/Aiken Elementary School building located on Southmost Road in Brownsville, Cameron County, Texas. AEC performed walk-through inspections of the building in February 2002 to identify visible evidence of mold growth colonies and to develop a sampling and analysis plan to assess indoor air quality parameters.

AEC performed an initial sampling event on February 27, 2002 during which fifteen (15) air samples were collected within the building. Additional sampling events were performed on March 28, 2002, April 3, 2002, and May 21, 2002 during which an additional total of 88 air samples and 90 surface samples were collected. This resulted in the collection and analysis of 55 air and 52 surface sample at Aiken, and 48 air and 38 surface samples at Besteiro, for a total of 193 samples. The sampling locations were selected based on previous investigations; and information collected during the walk-through inspection, including areas of visible mold. Six of the air samples were collected to measure the outside air mold concentrations.

Mold concentrations from the air samples ranged from none detected (ND) to a high 60,035 counts/$M^3$. The predominant molds included *Alternaria, Aspergillus, Chaetomium, Penicillium, Stachybotrys* and *Cladosporium*.

**In general, the results of the air samples do not indicate widespread elevated airborne mold concentrations at either school.** Of the 97 indoor air samples collected, only one sample was characterized as posing a serious concern; and three samples were characterized as posing a potential concern. The level of concern was based on criteria developed for this investigation based on the absolute value of the measured total and specific target mold concentrations, and the relative value of the concentration compared to the observed outdoor air concentrations. The remaining 93 samples had mold air concentrations less than 500 counts/ $M^3$, and none of these reported *Stachybotrys* above detection limits.

The sample that presented a serious concern occurred at Aiken. This sample had a measured concentration of 60,035 counts/$M^3$ and was taken at the southern end of the first floor corridor. The sample had an elevated concentration of *Stachybotrys* level of 60,000 counts/$M^3$, which was likely the result of airborne spores from the visible mold on the chiller system pipe insulation jacket located above the corridor ceiling.

Surface (tape) samples were collected at locations that indicated visible signs of mold growth on building or other surfaces. **The results of the surface samples indicate the presence of visible microbial growth in over eighty areas that would require remediation under current industry guidelines. Visible mold was found in the sheetrock (walls and ceilings) material in various locations throughout both schools, and in the thermal system insulation jacket in the chilled water system at Aiken. In general, Aiken Elementary exhibited more extensive surface contamination than Besteiro.**

Fifty-one (51) and thirty-eight (38) tape samples were collected in Aiken and Besteiro, respectively. The highest *Stachybotrys* tape concentration of 4,395,000 counts/$M^2$ was found in samples collected from Rooms

---

RSL 000051

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

B104 and B108 in Aiken, and is considered to be a serious concern. The highest *Aspergillus/Penecillium* concentration was found to be 24,000,000 counts/$M^2$ in a sample collected from the conference room of Aiken.

Thirty (30) of the surface samples at Aiken, or approximately 60%, reported concentrations above 1000 counts/$M^2$, while only nineteen (19), or 50%, of the Besteiro samples were found above 1000 counts/$M^2$. The overall average concentration of the surface samples was over twenty times higher at Aiken than Besteiro.

Although some elevated levels of *Stachybotrys* and *Aspergillus* were detected in samples collected from the site, the investigation of a relationship between the presence of mold and the health symptoms reported and/or alleged by BISD staff and/or students is outside the scope of this investigation.

Moisture in the form of plumbing leaks, roof leaks, poor ventilation, HVAC condensation and humid ambient air entering the schools are all possible sources for creating an environment conducive to microbiological growth. Moisture trapped between walls and floors leads to increased presence of mold on wallboard and ceiling tiles. Condensation is a common source for mold growth on piping insulation. Preliminary indications from the pattern of visible mold suggest that one principal cause of the moisture intrusion in Aiken is from the chilled water HVAC system, and in Besteiro from plumbing and roof leaks.

Temperature and relative humidity measurements collected in both schools during the investigation indicated no anomalous patterns to suggest enhancement of fungal growth by these parameters although the humidity level within the building was slightly high (median of approximately 63%).

**Both Aiken and Besteiro exhibit mold contamination that would need to be remediated under current industry guidelines. In order to insure a sustainable and cost effective remediation effort, the following future actions are recommended:**

- **Implementation of follow-up investigation activities to determine the quantities of the affected surface areas requiring remediation, and to prepare specifications for remediation including engineering estimates of the cost of remediation;**
- **Investigation, determination and remedial design for the control/elimination of the sources/causes of mold contamination;**
- **Remediation of affected areas, including physical removal of the water-damaged and contaminated materials in porous materials such as wallboard and ceiling tile;**
- **Implementation of the source/cause remedial design; and**
- **Development and implementation of a preventive, early detection and rapid response maintenance program to control the frequency and magnitude of future mold outbreaks.**

RSL 000052

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

## 1.0    INTRODUCTION

In February 2002, Ambiotec Environmental Consultants, Inc. (AEC) was contracted by the Brownsville Independent School District's (BISD) counsel to provide technical assistance in the evaluation of potential mold contamination in the Besteiro Middle School/Aiken Elementary School building. Employees at the school had reported "allergy-like" symptoms, including headaches, nasal congestion and coughing. A report of a previous investigation performed by another environmental consultant indicated the presence of mold in several areas of the building. On the basis of the concerns raised by the report, BISD administrators recommended that students, faculty and staff be relocated to another facility pending resolution of the mold concerns.

This report describes the results of the mold investigation performed by Ambiotec Environmental Consultants, Inc. at the Besteiro Middle School/Aiken Elementary School building. The scope of work for this project involved collecting air and microscopic screen (surface) samples to determine the concentration and type of mold in the building.

The remainder of the report is organized as follows. A brief description of the project site is presented in Section 2. The methods employed in the investigation are detailed in Section 3. Section 4 provides a background on mold standards, and describes the criteria used in this investigation to aid in the interpretation of the sampling results. The results of the sampling investigation are presented in Section 5. Finally the conclusions of the investigation and recommendations for future activities are presented in Sections 6 and 7, respectively.

## 2.0    SITE DESCRIPTION

The property is located on Southmost Road in southern Brownsville, Cameron County, Texas. The property consists of the Besteiro Middle School and the Aiken Elementary School, which are interconnected. Construction of the school was completed in 1997. Both schools consist of two floors and have a combined total area of approximately 250,000 square feet. The schools include classrooms, administrative offices, cafeterias, kitchens, a gymnasium, locker rooms, and restrooms. Surrounding properties are primarily residential and commercial properties.

## 3.0    METHODS

The investigation was initiated by performing a site visit by Ambiotec personnel upon receiving authorization to proceed from the BISD's counsel. A walk-through of the facility was performed to inspect the interior of the building while identifying potential sampling locations. School personnel were interviewed to inquire about previous water damage incidents and health symptoms reported among employees at the site. An inspection was performed on both floors of both schools to determine areas of obvious and potential fungal contamination, identify past roof leaks, and identify other potential sources and pathways for moisture vapor intrusion into the building.

Upon completion of the initial walk-through, a sampling plan was developed and implemented at the site. Two

RSL 000053

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

types of samples were collected during three subsequent sampling events: air samples and surface samples.

Air samples were collected using spore trap media (Air-O-Cell or Cyclex D cassettes). Each sample was collected over a period of 10 minutes using a high-volume air pump (15 or 20 liters per minute) attached to the spore trap cassette. The spore trap cassettes are designed for rapid collection and analysis of a wide range of airborne particles, including fungal spores. Samples are analyzed by light microscopy at 600X magnification, with the entire slide (100% of the sample) being analyzed. The results are reported as "total", meaning they include both viable (living) and non-viable (dead) fungal spores. The technique, however, does not allow for the differentiation between *Aspergillus* and *Penicillium* spores. Small (1-3 $\mu$) spherical fungal spores that cannot be identified and may include *Aspergillus*, *Penicillium*, and *Trichoderma* and others are grouped together as *Amerospores*. Additionally, it does not allow for cultivation or speciation of spores. Slides containing greater than 500 fungal spores are difficult to count accurately due to overcrowding and are therefore estimates. Similarly, excessive non-microbial particulates can mask the presence of fungal spores, thereby reducing counting accuracies.

Surface samples are samples collected from surfaces such as walls, ceilings, furniture and fixtures. Clear adhesive tape was used to collect microbiological growths from hard surfaces by lightly pressing strips of tape against areas of mold growth. The samples were placed in clear polyethylene bags, refrigerated, and sent to the environmental microbiological laboratory to confirm the presence and identity of fungi in or on the surface of each sample. Surface samples are analyzed directly and spores are counted. All samples are analyzed via light microscopy in the same manner as performed for air samples collected in the spore trap cassettes.

AEC performed an initial sampling event on February 27, 2002 during which fifteen (15) air samples were collected within the building. Additional sampling events were performed on March 28, 2002, April 3, 2002, and May 21, 2002 during which an additional total of 88 air samples and 90 surface samples were collected. This resulted in the collection and analysis of 55 air and 52 surface sample at Aiken, and 48 air and 38 surface samples at Besteiro, for a total of 193 samples. The sampling locations were selected based on previous investigations, as well as information collected during the walk-through inspection. Surface samples were collected wherever visible mold contamination was found. Six of the air samples were collected to measure the outside air mold concentrations.

A breakdown of the distribution of the total, indoor and outdoor samples are presented for both the air and surface samples for both schools in Tables 1, 2 and 3, respectively. The location of the samples is presented in Figures 1 and 2, respectively, for the first and second floors of the buildings.

Real-time temperature and relative humidity (RH) measurements were also collected in various locations of the facility to evaluate occupant comfort parameters. A hand-held digital sensor was used to take the temperature and humidity measurements.

## 4.0    BACKGROUND INFORMATION AND EVALUATION CRITERIA

The relatively recent nature of the focus on mold related contamination and the lack of nationwide regulatory standards, make it difficult to evaluate the significance and implication of measured mold concentration levels.

RSL 000054

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

This section presents a summary background on mold and the evaluation criteria that were developed and used in this investigation to aid in the interpretation of the results. The background section includes a discussion of health symptoms and possible causes, comfort indicators, and microbial contaminants. The evaluation section presents numerical values that were used to establish rules for classifying results as being of potential or serious concern.

## 4.1    Symptoms

A number of published studies have reported a high occurrence of symptoms among individuals working in high-occupancy buildings. The symptoms and health complaints reported by these individuals have been diverse and usually not suggestive of any particular medical diagnosis or readily associated with a causative agent. A typical spectrum of symptoms has included headaches, unusual fatigue, varying degrees of itching or burning eyes, irritations of the skin, nasal congestion, dry or irritated throats, and other respiratory irritations. Typically, the workplace environment has been implicated because workers report that their symptoms lessen or resolve when they leave the building.

## 4.2    Factors Affecting Indoor Air Quality

Scientists investigating indoor environmental problems believe that there are multiple factors contributing to building-related occupant complaints. Among these factors are imprecisely defined characteristics of heating, ventilating, and air-conditioning (HVAC) systems, cumulative effects of exposure to low concentrations of multiple chemical pollution, odors, elevated concentrations of particulate matter, microbiological contamination, and physical factors such as thermal comfort, lighting, and noise. Reports are not conclusive as to whether increases of outdoor air above currently recommended amounts (15 cubic feet per minute per person [cfm/personal]) are beneficial. However, rates lower than these amounts appear to increase the rates of complaints and symptoms in some studies. Design, maintenance, and operation of HVAC systems are critical to their proper functioning and provision of healthy and thermally comfortable indoor environmental pollutants can arise from either outdoor sources or indoor sources.

There are also reports describing results that show that occupant perceptions of the indoor environment are more closely related to the occurrence of symptoms than the measurement of any indoor contaminant or condition. Some studies have shown relationships between psychological, social, and organizational factors in the workplace and the occurrence of symptom and comfort complaints.

Less often, an illness may be found to be specifically related to something in the building environment. Some examples of potentially building-related illnesses are allergic rhinitis, allergic asthma, hypersensitivity pneumonitis, Legionnaires disease, Pontiac fever, carbon monoxide poisoning, and reaction to boiler corrosion inhibitors. The first three conditions can be caused by various microorganisms or other organic material. Legionnaires disease and Pontiac fever are caused by Legionella bacteria. Sources of carbon monoxide include vehicle exhaust and inadequately ventilated kerosene heaters or other fuel-burning appliances. Exposure to boiler additives can occur if

RSL 000055

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

boiler steam is used for humidification or is released by accident.

Problems mold investigators have found in the non-industrial indoor environmental have included poor air quality due to ventilation system deficiencies, overcrowding, volatile organic chemicals from office furnishing, machines, structural components of the building and contents, tobacco smoke, microbiological contamination, and outside air pollutants; comfort problems due to improper temperature and RH conditions, poor lighting, and unacceptable noise levels; adverse ergonomic conditions; and job-related psycho-social stressors.

## 4.3    Current Status of Regulatory Levels

Standards specifically for the non-industrial indoor environment do not exist. NIOSH, OSHA, and the American Conference of Governmental Industrial Hygienists (ACGIH) have published regulatory standards of recommended limits for occupational exposures. With few exceptions, pollutant concentrations observed in the office work environment fall well below these published occupational standards or recommended exposure limits. The American Society of Heating, Refrigerating, and Air-conditioning Engineers (ASHARE) has published recommended building ventilation design criteria and thermal comfort guidelines. The ACGIH has also developed a manual of guidelines for approaching investigations building-related complaints that might be caused by airborne living organisms or their effluents.

In terms of remediation criteria, the current industry standard is to remediate all areas of visible mold.

## 4.4    Comfort Indicators

Measurement of indoor environmental contaminants has rarely proved to be helpful, in the general case, in determining the cause of symptoms and complaints except where there are strong or unusual sources, or a proven relationship between a contaminant and a building-related illness. However, measuring ventilation and comfort indicators such as $CO_2$, temperature, and relative humidity (RH) is useful in the early stages of an investigation in providing information relative to the proper functioning and control of HVAC systems. Elevated temperature and humidity levels (>60%) create conducive environments for mold growth. During the current investigation, temperature and RH were measured at several of the air sampling locations.

## 4.5    Microbiological Contaminants

There are few, if any, convincingly documented cases of the direct effect of mycotoxins on the health of occupants of fungal-contaminated buildings. Two-fungi, *Stachybotrys chartarum* and *Aspergillus versicolor* have been implicated as possible source of mycotoxin exposure in water-damaged buildings.

RSL 000056

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

4.5.1    *Stachybotrys*

Possible symptoms or human disease caused by *Stachybotrys* can include respiratory irritation (from inhalation exposure to spores and mycelial parts) allergy, mycosis (infection by the organism) and toxicity or mycotoxicosis (poisoning) from exposure to its metabolic products. Data on the allergic and toxic forms of the disease are limited, but several studies and case reports suggest *Stachybotrys* and its mycotoxins as causes of certain human illnesses. Not all strains of *Stachybotrys* can produce mycotoxins.

The toxic manifestations of *Stachybotrys* (Stachybotryotoxicosis) are caused by the absorption of the toxins produced by the fungus. There are several potential routes of exposure to the tricothecene toxins produced by this fungus, including absorption from skin contact, inhalation, or ingestion. There are reports of local skin irritation due to handling of material contaminated by this fungus, but whether or not systemic effects occur due to skin absorption is unknown. Inhalation is the most likely entryway of the spores into the body in occupational exposures. Work sites that provide a potential risk for this disease include farms, cottonseed oil plant, grain elevators and facilities used for reprocessing moldy grain, malts grain processors, textile mills using plant fibers, and bindertwine factories. Because occupations at these sites involve close contact with mold-contaminated materials, the affected employees probably received greater exposure to mold spores than would be expected in most non-industrial environments.

4.5.2    *Aspergillus*

*Aspergillus* is a mold that is common throughout the world. There are over 600 species in the genus *Aspergillus*. Most *Aspergillus* species are found in soil, although many species can be found on a wide variety of substrates include forage and food products, cotton, and other organic debris. Aspergillus fumigatus, the most common species accounts for most disease attributable to *Aspergillus*, both allergic and infectious. Groups at risk of exposure to this fungus include farmers; bird hobbyists; worker in sawmills, greenhouses, cane mills or breweries; and people who work around mushrooms, tobacco or grain. Workers who are exposed to dust from compost piles, decomposing haystack, or mold grains may develop hypersensitivity responses.

**4.6    Criteria for Evaluating Laboratory Analytical Results**

Given the general lack of regulatory and industry standards for assessing the limits at which chronic and acute mold exposure is acceptable, the following criteria were developed to aid in the interpretation of the results. These levels do not necessarily suggest that exposure at these levels is relevant to health-related symptoms. Rather, the levels were used as a basis for providing a relative measure for evaluating the sample results. The laboratory analytical results were evaluated against both background concentrations (outdoor air) measured in ambient air samples, and the following suggested criteria.

RSL  000057

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

### Potential Concern Criteria

Mold concentrations in air samples were considered to be a **potential** concern at levels between 1,000 and 5,000 total spore counts/$M^3$ (counts per cubic meter of air), or between 5 and 100 counts/$M^3$ for *Stachybotrys*. For surface samples, a potential concern was noted for samples having total detectable spore concentrations of less than 1,000 counts/$M^2$, but above the detection limit.

### Serious Concern Criteria

Mold concentrations in air samples were considered to be a **serious** concern at levels above 5,000 counts/$M^3$, or above 100 counts/$M^3$ for *Stachybotrys*. For surface samples, a serious concern was noted for samples having total detectable spore concentrations of more than 1,000 counts/$M^2$.

## 5.0    RESULTS

All samples collected at the site were submitted to an environmental laboratory for analytical testing for mold species. Visible mold was found in the sheetrock (wallboard and ceilings) in various locations throughout both schools, and in the thermal system insulation jacket in the chilled water system at Aiken. These areas are shown in Figures 1 and 2 wherever tape sample locations are indicated. In particular, blue surface sample locations represent areas of potential concern, while red surface sample locations represent areas of serious concern. The same color scheme was also used to denote the significance of air samples. A discussion of the sampling results by school is presented below.

The sample results are summarized in Tables 4 through 8. Tables 4-1 and 4-2 present the distribution of occurrences and the percentage occurrence of the indicator criteria (i.e., potential and serious concern) for the indoor samples at Aiken. The same information for Besteiro is presented in Tables 5-1 and 5-2. Table 6 presents a comparison of indoor and outdoor air concentrations for both schools. A summary of the sampling results is presented in Tables 7 and 8 for Aiken and Besteiro, respectively. The laboratory reports are presented in the Appendix.

### 5.1    Besteiro Middle School

#### 5.1.1    Air Samples

Only two out of 45 of the air samples were found to be of concern, although none of serious concern. The results of analytical testing indicate that *Stachybotrys* was detected above detection limits in only one air sample. The resulting *Stachybotrys* concentration was measured at 45 counts/$M^3$ and was collected from Room 235. The total mold count, however, was comparable to that found in the outside air. The only other sample categorized as being of potential concern was collected in the Besteiro side of the entertainment center. No *Stachybotrys* was observed above detection limits in this sample, but the total count (1950 counts/$M^3$) exceeded 1000 counts/$M^3$. The rest of the air samples were found in

RSL 000058

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

concentrations that were less than 500 counts/M$^3$ and generally comparable to the concentrations found in the outside air during the sampling period.

5.1.2    Surface Samples

A total of 38 locations were observed to exhibit visible mold contamination and were sampled. Over 90% of these samples were found to be of concern. Half of the surface samples collected at Besteiro were classified as being of serious concern. However, *Stachybotrys* was detected in only one surface sample, which was collected in Room 113 above the ceiling tile, although at the very high concentration of 219,745 counts/M$^2$ (total count of 366,242 counts/M$^3$). Only three samples were found with total counts below the detection limit.

5.1.3    Temperature and Relative Humidity

Measurements of temperature and relative humidity (RH) were collected at several areas of the Besteiro Middle School and are listed in Table 1. All measurements were performed during the collection of air samples on March 28, 2002.

Temperatures recorded in the school ranged from 63.7 °F in Room 204 to 72.1 °F in the main office. The median temperature within the school was found to be 69.5 °F. A temperature of 73.5 °F was recorded for two ambient air samples.

RH measurements recorded in the school ranged from 55.3% in Corridor C to 82.6% in Room 119. The median RH within the school was found to be 62.9%. Ambient air was found to have an RH level of 80.0%.

5.2    **Aiken Elementary School**

5.2.1    Air Samples

Only two out of 56 of the air samples were found to be of concern, although one was considered to be of serious concern, with *Stachybotrys* detected in both samples. In one case (elevator room), the total count was comparable to outside air concentrations, and the *Stachybotrys* concentration (7 counts/M$^3$) was found only slightly above the detection limit (5 counts/M$^3$). However, in the second case, which was collected along the first floor corridor, both the total (60,035 counts/M$^3$) and Stachybotrys (60,000 counts/M$^3$) concentrations represent a serious concern. The rest of the air samples were found in concentrations that were less than 500 counts/M$^3$ and generally comparable to the concentrations found in the outside air during the sampling period.

RSL 000059

**ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT**

5.2.2    Surface Samples

A total of 51 locations were observed to exhibit visible mold contamination and were sampled. Over 90% of these samples were found to be of concern. Almost 60% of these were classified as being of serious concern. *Stachybotrys* was detected in a total of nine surface samples. These included samples collected at Rom 212, Rm A102, Kitchen, Room 107, Room B104, Room B108, Room C105, Cafetorium and the first floor corridor. The highest *Stachybotrys* concentrations were found in C105 and B104/B018, which exceeded 1 million and 4 million counts/$M^3$, respectively. The highest total count was observed in the conference room and exceeded 25 million counts/$M^3$. Only three samples were found with total counts below the detection limit.

5.2.3    Temperature and Relative Humidity

Measurements of temperature and relative humidity (RH) were collected at several areas of the Aiken Elementary School and are listed in Table 2. All measurements were performed during the collection of air samples on March 28, 2002.

Temperatures recorded in the school ranged from 69.9 °F in Corridor A to 74.4°F in the cafetorium. The median temperature within the school was found to be 72.1°F. A temperature of 83.0 °F was recorded for two ambient air samples.

RH measurements recorded in the school ranged from 50.1% in the counselor's office to 65.8% in the cafetorium. The median RH within the school was found to be 56.5%. Ambient air was found to have an RH level of 63.0%.

## 6.0    CONCLUSIONS

In general, the results of the air samples do not indicate widespread elevated airborne mold concentrations at either school. Of the 97 indoor air samples collected, only one sample was characterized as posing a serious concern; and three samples were characterized as posing a potential concern. The level of concern was based on criteria developed for this investigation based on the absolute value of the measured total and specific target mold concentrations, and the relative value of the concentration compared to the observed outdoor air concentrations. The remaining 93 samples had mold air concentrations less than 500 counts/ $M^3$, and none of these reported *Stachybotrys* above detection limits.

The sample that presented a serious concern occurred at Aiken. This sample had a measured concentration of 60,035 counts/$M^3$ and was taken at the southern end of the first floor corridor. The sample had an elevated concentration of *Stachybotrys* level of 60,000 counts/$M^3$, which was likely the result of airborne spores from the visible mold on the chiller system pipe insulation jacket located above the corridor ceiling. Of the three samples that were judged to be of potential concern, two occurred at Besteiro and one at Aiken. The Aiken sample reported a total count comparable, if not lower, than the outside air; but had *Stachybotrys* spores measured above detection, although only slightly above detection (7 counts/ $M^3$ versus 5 counts/ $M^3$). No

---

RSL 000060

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

outside air samples had *Stachybotrys* spores measured above detection levels (5 counts/ $M^3$). Of the two air samples of concern at Besteiro, one had a total count comparable, if not lower, than the outside air, but had *Stachybotrys* spores measured above detection (45 counts/ $M^3$). The other sample had a total count (1950 counts/ $M^3$) that was higher than the average outdoor air counts, but did not indicate detectable levels of *Stachybotrys*.

Surface (tape) samples were collected at locations that indicated visible signs of mold growth on building or other surfaces. The results of the surface samples indicate the presence of visible microbial growth in over eighty areas that would require remediation under current industry guidelines. Visible mold was found in the sheetrock (walls and ceilings) material in various locations throughout both schools, and in the thermal system insulation jacket in the chilled water system at Aiken. In general, Aiken Elementary exhibited more extensive surface contamination than Besteiro.

Fifty-one (51) and thirty-eight (38) tape samples were collected in Aiken and Besteiro, respectively. The highest *Stachybotrys* tape concentration of 4,395,000 counts/$M^2$ was found in samples collected from Rooms B104 and B108 in Aiken, and is considered to be a serious concern. The highest *Aspergillus/Penecillium* concentration was found to be 24,000,000 counts/$M^2$ in a sample collected from the conference room of Aiken.

Thirty (30) of the surface samples at Aiken, or approximately 60%, reported concentrations above 1000 counts/ $M^2$, while only nineteen (19), or 50%, of the Besteiro samples were found above 1000 counts/ $M^2$. The overall average concentration of the surface samples was over twenty times higher at Aiken than Besteiro.

Although elevated levels of *Stachybotrys* and *Aspergillus* were detected in samples collected from the site, the investigation of a relationship between the presence of mold and the health symptoms reported and/or alleged by BISD staff and/or students is outside the scope of this investigation.

Moisture in the form of plumbing leaks, roof leaks, poor ventilation, HVAC condensation and humid ambient air entering the schools are all possible sources for creating an environment conducive to microbiological growth. Moisture trapped between walls and floors leads to increased presence of mold on wallboard and ceiling tiles. Condensation is a common source for mold growth on piping insulation. Preliminary indications from the pattern of visible mold suggest that one principal cause of the moisture intrusion in Aiken is from the chilled water HVAC system, and in Besteiro from plumbing and roof leaks.

Temperature and relative humidity measurements collected in both schools during the investigation indicated no anomalous patterns to suggest enhancement of fungal growth by these parameters although the humidity level within the building was slightly high (median of approximately 63%).

It should be noted that care should be taken in the generalization or extrapolation of the data and/or conclusions of this study for a number of reasons. First, the sampling period was limited to a narrow seasonal window that has limited variation in ambient conditions. And second, unless the mold is remediated and the moisture sources controlled in the near term, the air and surface mold concentrations will change as a result of potential migration and propagation of the mold colonies beyond the observed areas.

---

RSL 000061

ATTORNEY PRIVILEGED AND
CONFIDENTIAL WORK PRODUCT

## 7.0   RECOMMENDATIONS

Both Aiken and Besteiro exhibit mold contamination that would need to be remediated under current industry guidelines. In order to insure a sustainable and cost effective remediation effort, the following actions are recommended:

- Implementation of follow-up investigation activities to determine the quantities of the affected surface areas requiring remediation, and to prepare specifications for remediation including engineering estimates of the cost of remediation;
- Investigation, determination and remedial design for the control/elimination of the sources/causes of mold contamination;
- Remediation of affected areas, including physical removal of the water-damaged and contaminated materials in porous materials such as wallboard and ceiling tile;
- Implementation of the source/cause remedial design; and
- Development and implementation of a preventive, early detection and rapid response maintenance program to control the frequency and magnitude of future mold outbreaks.

Appropriate containment practices should be followed to reduce the potential for allowing mold spores to become airborne during the remedial activity. HEPA-type vacuum and air filtering systems have proven sufficient for containing airborne spores during removal activities.

For non-porous surfaces such as counter tops, floor tile and wood trim, remediation may be performed by cleaning and wiping down the affected surfaces. The cleaning activity should be done using a suitable detergent/surfactant and disinfection with an appropriate chemical agent (e.g.,10% chlorine bleach in water solution). As with the porous surface remediation, all non-porous surfaces should be vacuumed to reduce the potential for airborne spores.

Remediation of other surfaces should include HEPA-type vacuuming and wipe down to remove any dormant surface spores which have not become airborne. These surfaces include fixtures (e.g., lighting, hardware), furniture, computers, built-in bookshelves and books.

RSL 000062

**DRAFT:  FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**REMEDIATION EVALUATION ASSESSMENT**
**Besteiro Middle School and Aiken Elementary School**
**Southmost Road**
**Brownsville, Texas**

EFI Project No. 98410-05840

Prepared For:

Law Office of Miguel A. Saldana
302 Kings Highway, Suite 109
Brownsville, Texas  78521

Prepared By:

Engineering and Fire Investigations

January 20, 2003



**EFI®**

Engineering and Fire
Investigations

9700 Richmond
Suite 201
Houston, TX 77042
Tel: 866-464-2127
Fax: 713-975-7336
www.efiinfo.com

Project No. 98410-05840
January 20, 2003

Mr. Miguel Saldana
**Law Office of Miguel A. Saldana**
302 Kings Highway, Suite 109
Brownsville, TX 78521

**REMEDIATION / EVALUATION ASSESSMENT**
**Besteiro Middle School and Aiken Elementary School**
**Southmost Road**
**Brownsville, Texas**

Dear Mr. Saldana,

Engineering and Fire Investigations (EFI) is pleased to provide the results of the Remediation/Evaluation Assessment of the Besteiro Middle School and Aiken Elementary School in Brownsville, Texas. This assessment was authorized on November 15, 2002 and performed in general accordance with the scope of services outlined in the Proposal for Remediation/Evaluation Survey submitted in November 2002.

We appreciate the opportunity to provide Remediation Evaluation Assessment services to the Law Office of Miguel A. Saldana. If you have any questions concerning this report, or if we can assist you in any other matter, please call at 713-975-7031.

Sincerely,

**ENGINEERING AND FIRE INVESTIGATIONS**

Rick A. Anderson, P.E., CIAPQ
Director, Facilities Engineering

Lee A. Burckle, P.E.
Branch Manager

Copies submitted: 2

(e:\projects2002\BISD\05840)

# TABLE OF CONTENTS
## DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product



**EFI**
Engineering and Fire
Investigations

|  |  | Page |
|---|---|---|
| 1.0 | Executive Summary | 1-1 |
|  | TABLES |  |
|  | Opinion of Remediation Cost.................................................... | *Table 1:* |
| 2.0 | Assessment | 2-1 |
|  | 2.01 Site Visit ............................................................... | 2-1 |
|  | 2.02 Building Review ....................................................... | 2-1 |
|  | 2.03 Property Information................................................. | 2-2 |
|  | 2.04 Building History ...................................................... | 2-2 |
|  | 2.05 Site Assessment ...................................................... | 2-3 |
|  | 2.06 Mold Assessment ..................................................... | 2-5 |
|  | 2.07 Roof Assessment...................................................... | 2-15 |
|  | 2.08 Mechanical Assessment ............................................. | 2-24 |
| 3.0 | General Information | 3-1 |
|  | 3.01 Purpose and Scope of Services .................................... | 3-1 |
|  | 3.02 Report Tense........................................................... | 3-1 |
|  | 3.04 Opinion of Cost...................................................... | 3-1 |
|  | 3.05 Interviews.............................................................. | 3-2 |
|  | 3.05 Documents ............................................................ | 3-3 |
| APPENDICES |  |  |
| APPENDIX A: | Wing Designation Drawing |  |
| APPENDIX B: | Fungal and Biological Laboratory Results |  |
| APPENDIX C: | Temperature, Relative Humidity, Carbon Monoxide and Dioxide Results |  |
| APPENDIX D: | HVAC Observations and Field Notes |  |
| APPENDIX E: | Opinion of Cost Tabulation |  |

**2.0 ASSESSMENT**

**EFI•**

Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

## GENERAL

A remediation evaluation/assessment was performed by EFI at the Besteiro Middle School and Aiken Elementary School located on Southmost Road, in Brownsville, Texas on November 19-22, 2002 and December 4-5, 2002. The assessment was authorized by the Law Office of Miguel A. Saldana. The scope of work includes a mold/water damage assessment, roof assessment, mechanical assessment, site assessment, and an opinion of remediation cost.

Besteiro Middle School is a 2-story middle school containing approximately 159,000 square feet, originally built circa 1994. Aiken Elementary School is a 2-story elementary school adjacent and connected to Besteiro Middle School containing approximately 85,000 square feet, originally built circa 1996. The original construction documents for both schools depicts classrooms, administrative areas, counseling and nurses rooms, gymnasium and locker rooms, band and instrument storage rooms, cafetorium, and shared kitchen and library facility, and support areas.

For purposes of this report the schools are referred to as "the facility" and/or separately by their names. To better understand the data collected, In order to present the data in a systematic manner, the facility was divided into eight sections. For the purpose of this report the sections will be referred to as "Wings A, B, C, D, E, F G, and H." Refer to Appendix A, Wing Designation Drawing.

## SITE ASSESSMENT

Our review of the main entrance courtyard drainage at Besteiro Middle School indicates that it is inadequately sloped toward the front sidewalk, where area drains are located, and that the existing courtyard is sloped in one plane only. The slope of the underground PVC piping connecting to the area drains at the front sidewalk is inadequate to remove water from the main entrance courtyard. Our review of the back courtyard drainage at Besteiro Middle School and Aiken Elementary School indicates that the courtyards are inadequately sloped toward the drainage sump pits located in the existing courtyards. Also, the paved concrete is too high compared to the elevation of the concrete floor slabs of the surrounding building areas. The condition and slope of the underground PVC pipe connecting the area drainage pits to the lift station located in the back courtyard of Aiken Elementary appears to be adequate to remove water from the back courtyard.

We recommend installing four drainage sump pits equally spaced in the main entrance courtyard of Besteiro Middle School draining into 8-inch underground PVC pipes. We recommend re-paving and sloping the main entrance courtyard in two planes into the four drainage sump pits and draining to a new 5-foot deep lift station discharging to the parking area.

We recommend installing two area drainage sump pits equally spaced in each of the back courtyards draining into the existing 12-inch underground PVC pipes that are currently routed to the lift station. The back courtyards are recommended for re-paving and sloped in two planes toward the four drainage sump pits.

## MOLD ASSESSMENT

EFI obtained viable airborne (bioaerosol) samples, and Air-O-Cell airborne samples, a bulk material sample and tape lift samples from various areas within the schools. In addition to the samples collected inside, Air-O-Cell airborne and viable airborne biological samples were also obtained from outside of the schools, to provide a "baseline" for comparison to the results of the interior samples collected.

The results of the biological sampling and field observations conducted at Besteiro Middle School and Aiken Elementary School indicate that fungal contaminants are present in several of the areas tested and

**2.0 ASSESSMENT**
**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**EFI®**
Engineering and Fire
Investigations

that visible mold/water damage is present on select building components, furnishings, supplies and equipment.

Based on the results of our sampling and observations, it is recommended that all porous water/mold damaged building components (gypsum board ceilings, ceiling tiles, pipe insulation, gypsum board walls, etc.) should be removed to 18" beyond any visible water/mold damage and be disposed of. Following the removal of the porous water/mold damaged building components, equipment and supplies, all remaining non-porous interior finishes, furnishings, equipment, and supplies should be cleaned and sanitized with an Environmental Protection Agency (EPA) registered biocide (such as Biocide International's Oxine) approved for such use.

ROOF ASSESSMENT

The schools are composed of a total of 23 separate roof areas that are typically divided by rise walls and parapet walls. The existing roofs currently include a built-up roof membrane at Besteiro Middle School, and a built-up roof system with a granule-surfaced modified bitumen cap sheet at Aiken Elementary and Wing A of Besteiro Middle School.

The roof membrane systems serving both schools were observed to be in generally good condition; however, several potential sources of water infiltration were observed, including the following: blocked roof drain strainers, cracked mortar joints between precast concrete copings at parapet walls, cracks and discontinuities at parapet/parapet and parapet/rise wall intersections, deteriorated sealant at wall expansion joints and metal counter flashing assemblies, discontinuities at base flashing materials, and pipe supports and abandoned equipment bearing on aggregate surfacing. It is recommended that these conditions be repaired to minimize the future potential for water infiltration and manifestation of mold inside the buildings.

MECHANICAL ASSESSMENT

Besteiro Middle School is provided with single zone, packaged, roof mounted, heating and cooling units (RTUs) that serve all areas of the school. A large number of the RTUs have thermostats that are not calibrated and are attempting to control room temperatures in a range of 3 to 5 degrees below or above the setpoint. In many cases, measured room temperatures were in the range of 68 to 72 degrees F and relative humidity in the range of 55 to 62 percent. We found that the air handling components of the RTUs including cooling coils, drain pans, and insulated conditioned air sections contain moderate to heavy deposits of dust, debris, and accumulations of possible mold that is affecting the performance of the RTUs. Outside air ventilation rates were observed and measured to be less than the design quantities. Conditioned air quantities delivered by the RTUs were measured and found to be significantly below and above the design air quantities in a number of cases. As compared to industry design benchmarks, many of the RTUs serving the classrooms and administrative areas are somewhat oversized for the anticipated cooling demands. Consequently, the units that are oversized do not operate a sufficient number of hours to adequately control room temperature and relative humidity.

It is recommended that certain RTUs be removed and the supply air duct systems in the classrooms and administrative areas be re-configured to match the anticipated cooling demands. It is also recommended that dedicated outside air pre-heating, pre-cooling and dehumidifying RTUs be installed to provide ventilation air to these areas. It is recommended that the wall thermostats of all RTUs be replaced with electronic wall sensors calibrated and maintained at 74 degrees F and that all RTUs be interfaced with the Trane energy management system that is installed at Aiken Elementary School. All remaining RTUs should be cleaned to remove dust, debris and accumulations of possible mold and treated with a biocide.



## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

Following cleaning and sanitizing, it recommended the remaining RTUs per repaired and re-commissioned for re-use. An alternative to cleaning, sanitizing, repairing and re-commissioning the remaining RTUs, is to install new RTUs. The current age of the existing RTUs is approximately 8 years and the estimated remaining useful life of these RTUs is approximately 6 to 8 years. In this alternative, the outdoor condenser coils, casing exterior, indoor evaporator coils, and condensate drain pans would be coated with an air-dry phenolic coating to extend the life of the new RTUs. The anticipated additional cost of this alternative compared to the cost of cleaning, sanitizing, repairing and re-commissioning the remaining RTUs included in Table 1 above is approximately $288,702. It is recommended that the RTUs serving the boy's and girl's locker rooms be replaced with RTUs capable of providing 100 percent outside air for room heating, cooling and ventilating. It is recommended that a complete air balance at each of RTU be conducted to provide outside air and conditioned air to design conditions and the building at a net positive indoor air pressure.

Aiken Elementary School is provided with single zone, packaged, ceiling mounted, fan coil units utilizing chilled water for cooling and duct mounted electric heaters for heating. We found a large number of the fan coil units which have wall temperature sensors that are not calibrated, or are broken, and are attempting to control room temperatures in a range of 3 to 5 degrees below or above the setpoint of the wall mounted temperature sensor. In many areas of Aiken Elementary School, measured room temperatures were in the range of 68 to 72 degrees F, and relative humidity in the range of 55 to 62 percent. Fan coil units including cooling coils, drain pans, and insulated conditioned air sections were found to contain moderate to heavy deposits of dust, debris, and accumulations of possible mold that was affecting the performance of the fan coil units. Ceiling mounted fan coil units provide pre-heated or pre-cooled outside air for ventilation of the classrooms and administrative areas. The ceiling mounted fan coil units providing pre-conditioned outside air supply ductwork connecting to other fan coil units serving the classrooms and administrative areas. It was generally observed, and measured, that the quantities of ventilation air were found to be less than the design air quantities. Also, conditioned air quantities delivered by the fan coil units were measured and found to be significantly below or above the design air quantities in a number of cases. A review of the chilled water piping reveals that the piping has corroded behind the insulation in a number of areas leading to possible mold growth due to sweating. Further, due to leaks, chilled water flowing in the piping system is heavily corroded and contains air. Compared to industry design benchmarks, many of the fan coil units serving the classrooms and administrative areas are oversized for the anticipated cooling demands and consequently do not adequately control room temperature or relative humidity.

It is recommended that the chilled water flow rates and conditioned air quantities of the fan coil units serving the classrooms and administrative areas be rebalanced to match the anticipated cooling demands. It is also recommended that dedicated outside air pre-heating, pre-cooling and dehumidifying air handling units be installed to provide outside air ventilation to these areas. It is recommended that the fan coil units and RTU's be cleaned to remove dust, debris, and accumulation of possible mold and biocide treated. Replacing the existing steel chilled water piping with copper and flushing the chilled water piping system, including fan coil units to remove corroded materials and debris is recommended. Repairing and re-calibrating the differential pressure control valves to stabilize chilled flows in the piping system is recommended. Repairing and replacing the chilled water control valves at all fan coil units is recommended. With respect to controls, it is recommended that the wall mounted temperature sensors be replaced or recalibrated and that the de-humidification cycle at each fan coil unit be changed to provide reheat. We recommend that wall sensors be maintained at 74 degrees F by the existing Trane energy management system.

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product



**EFI**
Engineering and Fire
Investigations

**Table 1**
**Opinion of Remediation Cost**
**Besteiro Middle School and Aiken Elementary School**

| Description | Item | Opinion of Cost |
|---|---|---|
| Hard Cost | Site Remediation | $295,273 |
| | Mold Remediation | $1,124,119 |
| | Roof Remediation | $242,309 |
| | Mechanical Remediation | $2,184,620 |
| | **TOTAL HARD COST EXPENDITURES** | **$3,846,322** |
| Soft Cost | A/E Design Fee | $346,169 |
| | A/E Construction Management Fee | $115,389 |
| | Mold Management Fee | $96,158 |
| | Change Order Contingency | $384,632 |
| | Miscellaneous Survey Fee | $38,463 |
| | **TOTAL SOFT COST EXPENDITURES** | **$980,811** |
| | **TOTAL HARD & SOFT COST EXPENDITURES** | **$4,827,133** |

## 2.0 ASSESSMENT
**DRAFT: FOR REVIEW ONLY**
*Privileged – Attorney / Client Work Product*



EFI•
Engineering and Fire
Investigations

### 2.01 Site Visit

Mr. Jeffrey A. Miller, P.E. and Mr. Don Corneau performed the site visit portion of the mechanical assessment on November 19-22 and December 4-5, 2002. Mr. Jon Baak and Mr. Chris Murray of EFI performed the site visit portion of the mold assessment on November 19-22, 2002. Mr. Brian Bonczynski of Aestimo, Inc. performed the site visit portion of the roof assessment on November 19-20, 2002. Mr. Jeffrey A. Miller, P.E. and Mr. Don Corneau performed the site visit portion of the civil site assessment on December 4-5, 2002. The weather at the time of the observations was warm and clear.

### 2.02 Building Review

For purposes of the field evaluation and reporting the schools were subdivided into various Wings. The Wings are noted as A, B, C, D, E, F, G, and H as described below. A drawing depicting the various Wings in included in the Appendix. Where appropriate the report sections are divided into sections discussing findings and conclusions based on the Wings described below.

- Wing A is generally described as northern most corridor, Floors 1 and 2, of the Besteiro Middle School and includes Rooms 124-130 and 228-236 and associated restrooms and janitorial and storage closets. Also known as the 6th Grade Wing.

- Wing B is generally described as main building area of Besteiro Middle School and includes the building entrance and corridors, administrative offices, nurse's office, teacher's lounge, and Rooms 101-112, 117-123, 201-226, and associated restrooms and janitorial and storage closets located on Floors 1 and Floors 2.

- Wing C is generally described as the section of the building between Wing B (described above) and the Gymnasium (Wing D) and includes the locker area, teacher's lounge, and Rooms 113 and 115 and associated restrooms and janitorial and storage closets. There is no Floor 2 component associated with Wing C.

- Wing D is generally described as the Gymnasium, Boy's and Girl's locker rooms, the Band and Rehearsal Rooms and associated corridor and storage areas. There is no Floor 2 component associated with Wing D.

- Wing E is generally described as the Besteiro Middle School Cafetorium, the kitchen area and associated restrooms and storage closets. There is no Floor 2 component associated with Wing E.

- Wing F is generally described as the Media Center located between Besteiro Middle School and Aiken Elementary School. There is no Floor 2 component associated with Wing F.

- Wing G is generally described as Floors 1 and 2 of Aiken Elementary School and includes the main entrance area, the Nurse's Office, the Administration Offices, the Counselor's Office the Teacher's Lounge, Rooms B100-B112, A101-A108, C101-C108 on Floor 1, Rooms B201-B218 of Floor 2 and associated restrooms, janitorial and storage closets.

- Wing H is generally described as the Aiken Elementary School Cafetorium, Music area and associated restrooms and storage closets. There is no Floor 2 component associated with Wing H.

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product



EFI®
Engineering and Fire
Investigations

### 2.03 Property Information

*Site Information*
*Land Area:*                         37.46 Acres

*Building Classification Information*
*Building Code:*                     Current............................1994 Standard Building Code

*Occupancy:*                         Educational

*Total Building Area:*               Area defined as approximate SF of Gross Area

| Besteiro Middle School | 159,000 |
|---|---|
| Aiken Elementary School | 85,000 |

### 2.04 Building History

*Approximate Construction Date(s):*

| Besteiro Middle School | 1993 |
|---|---|
| Aiken Elementary School & Besteiro Wing | 1995 |

*Major Improvements Date(s):*      N/A

*Current Owner:*                    Brownsville Independent School District

*Architects/Designers*
        *Buildings-*                Carroll Dusang & Rand, Inc. (Besteiro and Aiken)

*Engineers*

        *Civil-*                    Cardenas Salcedo & Assoc., Inc. (Besteiro)
                                    Unknown (Aiken)

        *Structural -*              Zamora Engineering (Besteiro and Aiken)

        *MEP -*                     RBM Engineering, Inc. (Aiken)
                                    Coupland Moran Engineers, Inc. (Besteiro)


Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

## 2.05 SITE ASSESSMENT

### 2.05.1 Scope of Services

We understand that the main entrance courtyard to Besteiro Middle School does not drain adequately causing rainwater to pond at various areas adjacent to the outside walls of the classrooms.   The site assessment included a review of the main entrance courtyard at Besteiro Middle School and the adjoining back courtyards at Besteiro Middle School and Aiken Elementary School, the original construction documents, related documentation, a walk-through of the sites, observations of the site drainage and related building construction, evaluation of the results, and development of conclusions and recommendations.

### 2.05.2 Findings and Observations

a.  We obtained field measurements of the main entrance courtyard and found it to be approximately 99-feet wide between classroom wings by 102-feet deep from the front sidewalk to the entrance doors or 10,000 square feet of surface area.  The main entrance courtyard contains paved 4-inch thick concrete sidewalks, grassed areas and plantings, two area drainage inlets along the front sidewalk, and a canopy covering the central sidewalk between front sidewalk and entrance doors.   From our field measurements, the paved concrete contained within the main entrance courtyard totals approximately 5,700 square feet of surface area.  We observed that the main entrance courtyard is sloped uniformly in one plane from the main lobby to the front sidewalk at a rate of approximately 3-inches over 102-feet or about 0.25 per cent.  Two 6-inch and four 4-inch roof downspouts and six roof scuppers from the surrounding roof areas drain into the main entrance courtyard.  We observed two sloped drainage inlets along the front sidewalk of the main entrance courtyard that route rainwater to four 8-inch underground PVC drainage pipes below grade.  From our review of the site and available documents, the routing of the underground PVC drainage piping apparently connects to the parking areas in the front of the school.

b.  Reportedly, BISD maintenance personnel have experienced site water drainage problems with the back courtyards of Besteiro Middle School and Aiken Elementary School.  The back courtyard at Besteiro Middle School was included in original construction circa 1994.  The back courtyard at Aiken Elementary School was included and adjoined the back courtyard of Besteiro Middle School during its original construction circa 1996.  The back courtyards of both schools are bordered on three sides by classrooms, library, and the respective cafetorium of each school.  We understand that the back courtyards do not drain adequately, during periods of heavy rain, causing rainwater to pond at various areas adjacent to the outside walls of the classrooms, library and cafetorium of each school.

c.  We obtained field measurements of the back courtyard at Besteiro Middle School and found it to be approximately 56 feet wide between classroom wings by 86 feet deep from a six foot concrete block wall to the south outside wall of the building or approximately 4,700 square feet of surface area.  The back courtyard contains paved 4-inch thick concrete areas, grassed areas, concrete block planter boxes, and one central 2-foot 8-inch by 2-foot 8-inch drainage sump pit.  The paved concrete is pitched slightly towards the drainage sump pit in four planes in an approximate 8-foot perimeter area surrounding the sump pit.  A 12-inch underground PVC drainpipe in the base of the drainage sump pit routes rainwater to a 5-foot deep lift station located in the north side of the Aiken Elementary School back courtyard.  Two roof scuppers drain into the back courtyard.  From our review of the site and available documents, the lift station discharges to an 8-inch PVC underground drainpipe that is routed to a storm sewer main pipe at the west side of the property.

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

EFI•
Engineering and Fire
Investigations

d. We obtained field measurements of the back courtyard at Aiken Elementary School and found it to be approximately 56 feet wide between classroom wings by 108 feet deep from a six foot concrete block wall to the north of the courtyard to a covered sidewalk connecting the building to the cafetorium or approximately 5,600 square feet of surface area. The back courtyard contains paved 4-inch thick concrete areas, grassed areas, concrete block planter boxes, and one central 1-foot 4-inch by 2-foot 8-inch drainage sump pit. The paved concrete is pitched slightly towards the drainage sump pit in four planes in an approximate 8-foot perimeter area surrounding the sump pit. An 8-inch underground PVC pipe in the base of the drainage sump pit routes rainwater to the lift station located in the back courtyard of Aiken Elementary School. Two 6-inch downspouts and three roof scuppers drain into the back courtyard from surrounding roof areas.

### 2.05.3 Conclusions /Recommendations

Our observations identified deficient items associated with the site drainage at the identified areas of Besteiro Middle School and Aiken Elementary School. Based upon our experience with similar situations, we make the following conclusions and recommendations.

a. The main entrance courtyard of Besteiro Middle School contains 4-inch thick concrete paved sidewalks, grassed areas and plantings, two area drainage inlets, four 8-inch underground PVC drain pipes, and a canopy covering the central sidewalk between front sidewalk and the main lobby. The paved concrete area contained within the main entrance courtyard totals approximately 5,700 square feet. Our review of the courtyard drainage indicates that is inadequately sloped towards the front sidewalk where area drains are located and that the existing courtyard is sloped in one plane only. Our review indicates that the slope of the underground PVC pipe connecting to the area drains at the front sidewalk is inadequate to remove water from the main entrance courtyard.

   i. A recommended solution to improve drainage within the main entrance courtyard is to install four 16-inch by 16-inch area drainage sump pits equally spaced in the courtyard that drain into 8-inch underground PVC pipes. To facilitate site water drainage including the outflow of the roof drains, the concrete in the courtyard is recommended for re-paving and sloped in two planes at a 0.5 percent grade into the four 16-inch by 16-inch area drainage sump pits. The drainage sump pits are recommended to be drained by 8-inch underground PVC pipes at a minimum slope of 0.5 percent connecting to a new 5-foot deep lift station that discharges to the parking area.

b. The back courtyards of Besteiro Middle School and Aiken Elementary School contain 4-inch thick paved concrete areas, grassed areas, concrete block planters, and two area drainage sump pits. The paved concrete area of both schools totals approximately 10,300 square feet of surface area. Our review of the courtyard drainage indicates that it is inadequately sloped towards the drainage sump pits located in the existing courtyards. The concrete paving is also too high compared to the elevation of the concrete floor slabs of the surrounding building areas. The condition and slope of the underground PVC pipe connecting the area drains to the lift station located in the back courtyard of Aiken Elementary appears to be adequate to remove water from the back courtyards.

   i. A recommended solution to improve drainage in the back courtyards is to install two 16-inch by 16-inch area drainage sump pits equally spaced in each of the back courtyards that drain into the existing 12-inch underground PVC pipes that are currently routed to the lift station. To facilitate drainage of the back courtyards, including the outflow of the roof drains, the back courtyards are recommended for re-paving and sloped in two planes at a 0.5 percent grade into the four 16-inch by 16-inch area drainage sump pits recommended. It is recommended that the



Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

drainage sump pits be drained by the existing 12-inch underground PVC pipes at a minimum slope of 0.5 percent connecting to the lift station.

## 2.06  MOLD ASSESSMENT

### 2.06.1 Scope of Services

The mold remediation evaluation assessment included a review of pertinent available building plans, as well as, documentation of previous water/mold related work performed at the schools; the collection of biological air and surface samples; the collection of temperature, relative humidity, carbon dioxide, and carbon monoxide measurements; the review of the general condition of the interior building finishes; and determining a recommended remediation scope of work as it relates to water/mold damage based on information obtained.

### 2.06.2 Previous Reports, Data and Information Reviewed

Based on a review of the provided documents it appears that BISD retained Assured Indoor Air Quality (Assured) of Dallas, Texas, to conduct an Indoor Environmental Survey Study of Aiken Elementary School.  Assured prepared and distributed survey forms to the staff of Aiken Elementary School.  It appears that their survey conclusions suggest "a building with a high probability to negatively impact the well-being of occupants."  No air sampling or material testing was performed as part of Assured's evaluation.  Additionally, no other information prepared by Assured was included as part of our document review.

The second report reviewed indicats that Ambiotec Environmental Consultants, Inc. of Harlingen, Texas was retained by BISD's counsel to evaluate the potential mold contamination in the Besteiro Middle School and Aiken Elementary School.  The results of their testing and observations suggests that air sampling did not indicate widespread airborne mold concentrations, however, surface samples indicated the presence of visible microbial growth on gypsum board walls and ceilings in both schools, and pipe insulating materials in Aiken.

### 2.06.3 Sampling Methods Employed

Indoor fungal aerosol concentrations significantly higher than then the laboratory guidelines or the outdoor fungal aerosol concentrations, indicates that indoor mold growth may be occurring.  If air sampling confirms the presence of one or more fungal genera present indoors and not similarly present in outdoor air samples, it suggests that there may be a reservoir of fungal growth indoors, especially if the fungal concentrations are high. This condition is also termed amplification.  The presence of fungal genera in indoor air samples that indicate elevated moisture conditions, such as, but not limited to *Aureobasidium, Chaetomium, Fusarium, Trichoderma, Stachybotrys, Ulocladium*, as well as, some species of *Aspergillus* and *Penicillium* suggests that amplification of fungal growth may be occurring.

#### a.  Bioaerosol (Viable) Airborne Sampling

Sampling for viable airborne molds was performed using a variation of the American Conference of Governmental Industrial Hygienist (ACGIH) sampling protocol and analytical procedure for bioaerosols.  This protocol outlines procedures for collecting and quantifying airborne molds and bacteria in Colony Forming Units per cubic meter of air ($Cfu/M^3$).  All fungal growth (viable data) is enumerated as colony forming units (Cfu) per cubic meter of sampled air ($Cfu/M^3$).  The term Cfu is

**2.0 ASSESSMENT**

**EFI®**
Engineering and Fire
Investigations

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

used because it is unknown what the amount of fungal material was present that resulted in a single colony. For viable samples the recommended guidelines suggest levels below 500 Cfu/M$^3$ Total Mold or levels for individual mold organisms (such as *Aspergillus, Penicillium, Aureobasidium, Chaetomium, Fusarium, Trichoderma, Stachybotrys, and Ulocladium*) be less than 50 Cfu/M$^3$) or comparison of indoor air sampling to outdoor air sampling results. Analysis of the results of fungal sampling is difficult because there are no published health standards that define how much biological material is unhealthy. As a result, interpretation of fungal air sampling is generally limited to the comparison of indoor air sampling to outdoor air sampling results. The laboratory results are shown in Appendix A.

**b. Air-O-Cell Sampling**

The total fungal air samples were collected on Air-O-Cell cassettes. The Air-O-Cell cassette is a unique sampling device designed for rapid collection and analysis of a wide range of airborne particles, including fungal spores. Air samples were collected at a rate of 15 L/minute as recommended by Zefon. Indoor and outdoor samples were collected for 3 minutes. Samples are analyzed via light microscopy at 600X magnification. The results are reported as total, meaning they include both viable and Air-O-Cell fungal spores. Unfortunately, this technique does not allow for the differentiation between *Aspergillus* and *Penicillium* spores because they are morphologically identical. Additionally, the technique dose not allow for cultivation, or the identification of spores to the species level, except in a few cases. This method is used for genus determination and relative sample concentration. The laboratory results sheets are included in Appendix A.

**c. Surface Sampling – Tape Lift**

The primary purpose of a tape sample is to identify mold by microscopic screening. Clear, sticky tape is gently pressed over the suspect area and placed on a microscopic slide for direct examination. The surface sample results are shown in Appendix A.

**d. Bulk Biological Sampling**

Samples are analyzed via light microscopy at 600X magnification. The results are reported as total, meaning they include both viable and non-viable fungal spores. This method is used for genus determination and relative sample concentration. The laboratory results sheets are included in Appendix A.

All collected samples (air and surface) were submitted to EFI's Technical Support services Laboratories, in Kingwood, Texas for analysis.

**e. Temperature, Relative Humidity, Carbon dioxide and Carbon monoxide**

Temperature, Relative Humidity, Carbon dioxide ($CO_2$) and Carbon monoxide (CO) levels were measured within facility and outside of the building (background levels) using a direct reading instrument (TSI Q-Track IAQ Monitor). Generally, the temperature and relative humidity levels are used to determine the effectiveness of the HVAC system at conditioning the space and removing moisture from the air, the $CO_2$ levels are used as a surrogate indicator of the amount of outside air supplied to a space and the CO levels are a measure of a contaminant usually associated with combustion sources. It should be noted that there was no occupancy of the buildings during our sampling.



Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

i. The average $CO_2$ levels within the Besteiro Middle School range from 377 ppm to 788 ppm and in Aiken Elementary School range from 381 ppm to 480 ppm during our survey. The outside ambient levels range from 370 ppm to 445 ppm. The current ASHRAE guidelines indicate that the difference between the indoor and outdoor $CO_2$ levels for schools should not exceed approximately 707 ppm, which equates to the ASHRAE recommended ventilation rate of 15 cubic feet per minute (cfm) of outside air per person. ASHRAE is the organization that provides the recommended ventilation rates (including outside air) as it relates to indoor air quality that is considered industry standard. A summary of the carbon dioxide measurements is presented in Appendix B.

ii. Carbon monoxide (CO) levels in the areas sampled within the both Besteiro Middle School and Aiken Elementary School were below the ASHRAE referenced maximum exposure limit and ranged from 0 ppm (parts per million in air) to 2.8 ppm in Besteiro and 0 ppm to 1.0 ppm in Aiken. The ASHRAE referenced maximum exposure limit for carbon monoxide is 9 ppm. A summary of the carbon monoxide measurements is presented in Appendix B.

iii. The temperature measured in the conditioned areas of Besteiro ranged from 68 to 75 degrees Fahrenheit in and ranged from 68 to 77 degrees Fahrenheit in Aiken. The ASHRAE recommended range is 68 to 76 degrees Fahrenheit for winter temperatures and 73 to 80 degrees Fahrenheit for summer temperatures. The humidity measured in the conditioned areas of Besteiro ranged from 38 to 69 percent relative humidity, and ranged from 33 to 61 percent relative humidity in Aiken. Once again it should be noted that there was no occupancy in the building during our survey. The elevated humidity levels will be addressed in the HVAC portion of the report. The ASHRAE recommended range is 30 to 60 percent for relative humidity. A summary of the temperature and humidity measurements is presented in Appendix B.

iv. Ambient temperature at the time of our sampling ranged from 64 to 75 degrees Fahrenheit. The ambient relative humidity ranged from 29 to 57 percent.

**2.06.4 Results and Observations**

The general results of our observations and sampling at the facilities are as follows:

- It appears that moisture/water damage staining on building components (walls, ceilings, etc.) may be caused by roof leaks and HVAC piping leaks.

- The schools were not occupied at the time of our site visit. However, the HVAC systems are reportedly continuously operating.

- Previous mold remedial activities appear to have taken place in the Media Center connecting the two facilities and a classroom in Besteiro. However, it appears that the "build back" is not complete.

- Musty odors where observed in several areas within the schools.

- It appears that no materials, equipment or supplies were removed from the school when the schools were vacated.

- The areas of apparent roof leaks will require repair prior to the start of the mold remediation work and are discussed in detail in other sections of the report.

- Leaking/condensating HVAC equipment/piping will require repair prior to the start of the mold remediation work and is discussed in detail in other sections of the report.



Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

- Several mold spores were identified on viable samples collected at various locations on the interior of the school that were not identified on the ambient sample these spores include: *Chrysosporium, Curvularia, Sporothrix, Scopulariopsis,* and *Phoma.* All mold spores identified on the Air-O-Cell samples collected on the inside of the school were also identified on one of the seven ambient samples obtained.

EFI observed the general condition of the interior finishes, as they relate to visible water/mold damage. Presented below is a summary of our observations. Quantities of damaged materials are estimates only to be used for preparing the remediation cost estimates as part of this report. Refer to Appendix C for itemized listing of water/mold damaged materials.

The results of our biological sampling and observations by wing are as follows:

### Wing A

Air-O-Cell biological air samples were collected from Rooms 124, 130, 231 and 236. The samples were generally within the recommended guidelines and ranged from 213 to 426 Spores/M$^3$. The samples identified *Ascospores, Scopulariopsis, Basidiospores, Penicillium/Aspergillus-like, Cladosporium, Myxomycetes/Rust/Smut, and hyphae.*

Viable biological air samples were randomly collected from areas within the building. Room 228 was selected in Wing A. The sample indicated that the mold level in the area sampled was 94 Cfu/M$^3$ which is considered to be within the recommended guidelines. The viable sample identified *Cladosporium and Fusarium.*

Visually observed areas and approximate quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing A – Besteiro | | |
|---|---|---|
| Location | Type of Damage | Approximate Quantity and Materials Damaged |
| 127 | Water | 20sf-Gyp walls |
| Restrooms 2 | Water | 5sf-Gyp Ceiling / 5sf-Gyp Wall |
| Floor 2 Corridor | Water | 10sf Fire Rated Ceiling / 60sf Gyp. Ceiling |
| Room 235-Storage Closet | Water | 4sf-Ceiling tile |

### Wing B

Air-O-Cell biological air samples were collected from Rooms 101, 106, 111, 112, 123, 117, 204, 210, 215, 219, 226, the Floor 2 North Corridor, and the Principal's Office. The samples were generally within the recommended guidelines and ranged from "No Fungal Spores Detected" to 22,767 Spores/M$^3$.

Air-O-Cell biological air samples collected that would be considered elevated when compared to the recommended guidelines were collected from Rooms 112, 117, 123, 219, and the Principal's Office. The samples identified *Ascospores, Drechslerea/Bipolaris, Scopulariopsis, Basidiospores, Penicillium/Aspergillus-like, Cladosporium, Myxomycetes/Rust/Smut,* and *hyphae.*

## 2.0 ASSESSMENT



**EFI**
Engineering and Fire
Investigations

### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

Air-O-Cell biological air samples collected that would be considered within the normal range when compared to the recommended guidelines were collected from Rooms 101, 106, 111, 204, 210, 215, 226 and the Floor 2 North Corridor.

Viable biological air samples were collected from randomly selected areas within the building. Rooms 102, 220, the main entrance lobby, and the Administrative Office were selected Wing B. The samples results indicated that mold levels in the area sampled ranged from 35 to 213 Cfu/M³. All other fungal levels appeared to be within recommended guidelines. The viable samples identified *Cladosporium, Chrysosporium, Curvularia, Penicillium, Sporothrix, and non-sporulating Fungi*.

Surface samples (tape lift) obtained from a bar stool in Room 112, a wooden storage room door in Room 123, CMU block wall outside of Room 120, and the principal's chair and desk.

The relative spore concentration on the sample obtained from the bar stool in Room 112 would be considered "few" for *Chaetomium and Nigrospora* spores, "many" for *Scopulariopsis* spores, and "loaded" for *Penicilliun* spores.

The relative spore concentration on the sample obtained from the wooden storage room door in Room 123 would be considered "few" for *Aureobasidium* spores and "many" for *Aureobasidium* spores.

The relative spore concentration on the sample obtained from the CMU block wall outside of Room 120 would be considered "few" for *Chaetomium* spores and "loaded" for *Penicillium* and *Scopulariopsis* spores.

The relative spore concentration on the sample obtained from the Principal's desk and chair in the Principal's office would be considered "many" for *Cladosporium* spores and "loaded" for *Aspergillus, Penicillium* and *Scopulariopsis* spores.

Visually observed areas and estimated quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing B – Besteiro | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| 102 | Water | 75sf Fire rated ceiling |
| 112 | Water/Mold | 50sf Fire rated ceiling / 225sf Ceiling plenum/ 15 Cloth chairs |
| 119 | Mold | 12 Desks |
| 120 | Water | 10sf Ceiling tile |
| 123 | Mold | 27 Desks |
| Corridor B | Water/Mold | 30sf – CMU block |
| Corridor C | Water/Mold | 330sf - CMU block |
| Counseling Office | Water/Mold | 10sf - Ceiling tile |
| Nurse Office | Water | 10sf Ceiling tile |
| Office | Water/Mold | 19ea - Chairs / 2 – Desks / 2 - Office Carts / 3 Doors |
| 201 | Water | 20sf Fire rated ceiling |
| 202 | Water | 20sf Fire rated ceiling / 30sf Ceiling tile /Roof leak |

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product


**EFI**
Engineering and Fire
Investigations

| Wing B – Besteiro | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| 208 | Water | 120sf Fire rated ceiling / 120 sf ceiling tile / 10-1'x4' Wood shelves |
| 209 | Water/Mold | 60sf Fire rated ceiling / 25sf ceiling tile |
| 210 | Water | 5lf Roof drain pipe |
| 213 | Water | 10sf - Fire rated ceiling/ 8sf -Ceiling tile |
| 215 | Water | 20sf - Fire rated ceiling |
| 217 | Water | 4 sf - Ceiling Tile |
| 220 | Water/Mold | 10sf - Fire rated ceiling / 10sf - Ceiling tile |
| 222 | Water/Mold | 20sf - Fire rated ceiling / 10sf - Ceiling tile |
| SW Custodian Room | Water | 4sf - Ceiling tile / 5lf - pipe insulation |
| SW Teacher's Lounge | Water/Mold | 20sf - Ceiling tile/ 20sf - HVAC Duct/ Refrigerator |

## Wing C

An Air-O-Cell biological air sample was collected from the central locker room area. The sample was generally within the recommended guidelines and indicated a result of 213 spores/$M^3$. The sample identified *Ascospores, Basidiospores,* and *Penicillium/Aspergillus-like* spores.

One bulk ceiling tile sample was obtained from Room 113. The analytical results indicated the sample was "loaded" with *Cladosporium* spores. The bulk sample taken was from areas of visible water/mold damage observed on the ceiling tile.

Visually observed areas and approximate quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing C – Besteiro | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| 113 | Water/Mold | 50sf Fire rated ceiling / 225sf Ceiling plenum |
| 115 | Mold | One Couch |
| Lockers Area/ Central Corridor | Water/Mold | 150sf-Gyp ceiling |

## Wing D

Air-O-Cell biological air samples were collected from the Band and Rehearsal Rooms. The samples would be considered elevated when compared to the recommended guidelines and


EFI•
Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

ranged from 3,146 to 37,750 Spores/M$^3$.  The Air-O-Cell samples identified Ascospores, *Scopulariopsis, Drechslera/Bipolaris, Penicillium/Aspergillus-like, Cladosporium, Myxomycetes/Rust/Smut,* and *hyphae.*

Surface samples (tape lift) obtained from a piano in Rehearsal Room.  The relative spore concentration on the sample obtained from the piano would be considered "few" for *Cladosporium* spores, "many" for *Scopulariopsis* spores and "loaded" for *Penicillium* spores.

Visually observed areas and estimated quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing D – Besteiro | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| Gym/Locker Rooms | Water/Mold | 20sf - Gyp ceiling / 20sf - Fire rated ceiling |
| Band Corridor | Water/Mold | 20sf - Fire rated Ceiling / 8lf – Pipe |
| Band Wing | Water | 200sf - Fire rated ceiling |
| Rehearsal Hall | Water/Mold | 10sf - Fire rate ceiling / 2 - Ceiling tiles / 1 – Piano |

### Wing E

A viable biological air sample was collected from the Cafeteria area.  The sample indicated a mold level in the area sampled of 189 Cfu/M$^3$.  The *Penicillium* level of 59 Cfu/M$^3$.  Typically this would be considered slightly elevated for the screening method utilized.  However, the ambient sample result indicated a level of 524 Cfu/m$^3$ for total mold and 128 Cfu/M$^3$ for *Penicillium*, which would suggest there was no amplification of *Penicillium* spores in the area tested.  All other fungal levels appeared to be within recommended guidelines.  The viable sample identified *Aspergillus, Aspergillus niger, Cladosporium, Penicillium, and non-sporulating Fungi.*

Visually observed areas and estimated quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing E – Besteiro | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| Cafeteria | Water/Mold | 200sf - Ceiling tile |
| Kitchen Area | Water | 100sf - Ceiling tile |

### Wing F

Remediation had reportedly been performed within this area, consequently, no viable or Air-O-Cell airborne mold samples were obtained.

**EFI***
Engineering and Fire
Investigations

**2.0 ASSESSMENT**
**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**Wing G**

Air-O-Cell biological air samples were collected from Rooms B100, A101, A102, B104, B111, C101, C107, B201, B206, B211, B217 and the Administration Office. The samples ranged from 106 to 4,852 Spores/M$^3$.

Air-O-Cell biological air samples collected that would be considered within the normal range when compared to the recommended guidelines were collected from Rooms B100, B104, B111, C101, B201, B206, B211, B217 and the Administration Office.

The samples collected that would be considered elevated when compared to the recommended guidelines were collected from Rooms A101, A102, and C107. The samples identified *Ascospores, Nigrospora, Scopulariopsis, Basidiospores, Penicillium/Aspergillus-like, Cladosporium,* and *hyphae.*

Viable biological air samples were collected from randomly selected areas within the building. Rooms A108, C108, B206, B211 and the main entrance lobby were selected Wing G. The samples results indicated that the mold levels in the area sampled ranged from 24 to 295 Cfu/M$^3$. The analytical result of the sample indicated a *Penicillium* levels of 82 Cfu/M$^3$ in the sample obtained from Room C108. Typically this would be considered slightly elevated for the screening method utilized However, the ambient sample result indicated a 524 CFM/m$^3$ for total mold and 128 Cfu/M$^3$ for *Penicillium,* which would suggest there was not amplification of *Penicillium* spores in the area tested. All other fungal levels appeared to be with in laboratory guidelines. The viable samples identified *Aspergillus, Cladosporium, Chrysosporium, Penicillium, Scopulariopsis, and non-sporulating Fungi.*

Surface samples (tape lift) obtained from inside the wall cavity in Room B211, from the fire rated ceiling in Room B214, from a window sill in Room C101 and from the condenser water pipe insulation in Corridor B (Floor 1).

The relative spore concentration on the sample obtained from the inside the wall cavity in Room B112 would be considered "loaded" for *Nigrospora* spores.

The relative spore concentration on the sample obtained from the gypsum board fire rated ceiling in Room B214 would be considered "loaded" for *Dreschlera* spores.

The relative spore concentration on the sample obtained from the windowsill in Room C101 would be considered "loaded" for *Aspergillus* and *Cladosporium* spores.

The relative spore concentration on the sample obtained from the pipe insulation in Corridor B would be considered "loaded" for *Stachybotrys* spores. Whenever *Stachybotyrs* spores are identified on a sample, remediation is typically recommended.

Visually observed areas and estimated quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing G - Aiken Elementary School | | |
|---|---|---|
| Location | Type of Damage | Approximate Quantity and Materials Damaged |
| A101 | Water/Mold | 25sf - Gyp. Walls / 2 –Student desks / 2 - Door frames |
| A102 | Water/Mold | 10sf - Gyp. Ceiling / 100sf - Gyp Walls / 5sf Fire rated ceiling / 1 – Chair |
| Admin. | Water/Mold | 150sf - Fire rated ceiling / 150sf - Ceiling tile / 1 – Chair |

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI***
Engineering and Fire
Investigations

| Wing G - Aiken Elementary School | | |
|---|---|---|
| **Location** | **Type of Damage** | **Approximate Quantity and Materials Damaged** |
| Office | | |
| B102 | Water/Mold | 120sf - Gyp. Wall / 1,100sf - Carpet |
| B105 | Water/Mold | 100sf - Ceiling tile |
| B111 | Water/Mold | 10sf - Fire rate ceiling / 10sf - Ceiling tile / 1 - Light lense |
| B112 | Water | 10sf - Fire rated ceiling / 4-Desks / 4cf - Books, paper, etc. |
| B201 | Water/Mold | 80sf - Ceiling tile / 20lf HVAC pipe |
| B202 | Water/Mold | 240sf - Fire rated ceiling |
| B204 | Water | 30sf - Gyp. Wall / 100sf – Fire rated ceiling |
| B207 | Water | 5lf - Roof drain pipe |
| B210 | Water/Mold | 100sf - Fire rated ceiling / 100sf - Ceiling tile |
| B211 | Water/Mold | 40sf - Ceiling tile / 2 - Computers / 1- Desk |
| B212 | Water/Mold | 100sf - Fire rated ceiling |
| B213 | Water/Mold | 40sf - Gyp. Walls / 50sf stained floors |
| B214 | Mold/Water | 100sf - Fire rated ceiling |
| B215 | | |
| B216 | Mold/Water | 100sf - Fire rated ceiling |
| B217 | Water | 20sf - Ceiling tile / 50sf - Stained floor tile |
| B218 | Water/Mold | 100sf - Fire rated ceiling |
| C101 | Water/Mold | 20sf - Gyp Walls / 100sf - Fire rated ceiling / 2 - metal doors & door frames and 2 - metal window frames |
| C102 | Water/Mold | 20sf - Gyp Walls / 2 - metal doors & door frames and 2 – metal window frames |
| C103 | Water/Mold | 100sf - Fire rated ceiling |
| C104 | Water/Mold | 10sf - Fire rated ceiling |
| C105 | Water/Mold | 20sf - Gyp Walls / 100sf - Fire rated ceiling / 2 - metal doors & door frames and 2 - metal window frames |
| C106 | Water/Mold | 20sf - Gyp Walls / 2 - metal doors & door frames and 2 – metal window frames |
| C107 | Water/Mold | 100sf - Fire rated ceiling |
| Corridor A | Water/Mold | 320lf - 12" pipe / 160lf - 8" pipe |
| Corridor B & C (South) | Water/Mold | 250lf - 8"pipe / 250lf - 12" pipe |
| Corridor B (North) | Water/Mold | 180lf - 8" pipe / 180lf - 12"pipe |
| Counselor's Office | Water/Mold | 100sf - Fire rated ceiling |
| Floor 2 - Lobby | Water/Mold | 300sf - CMU wall / 265sf Ceiling tile |
| North Stairs | Water/Mold | 100sf - Gyp. Ceiling |



**EFI**
Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| Wing G - Aiken Elementary School | | |
|---|---|---|
| Location | Type of Damage | Approximate Quantity and Materials Damaged |
| Nurse's Office | Water | 10sf - Stained ceiling tile |

## Wing H

An Air-O-Cell biological air sample was collected from the Cafeteria area. The sample indicated an airborne mold level of 1,546 Spores/M$^3$, which is within recommended guidelines. The sample identified *Scopulariopsis* and *Penicillium/Aspergillus* spores.

A surface sample (tape lift) was obtained from a folding lunch table in the Cafetorium. The relative spore concentration on the sample would be considered "loaded" for *Aspergillus* and *Penicillium* spores.

Visually observed areas and estimated quantities of water/mold damaged interior finishes, furnishings and/or equipment include:

| Wing G - Aiken Elementary School | | |
|---|---|---|
| Location | Type of Damage | Approximate Quantity and Materials Damaged |
| Cafeteria | Water/Mold | 200sf - Ceiling tile / 500sf Floor tile / 30ea. - Cafeteria tables |

## 2.06.10 Conclusions/Recommendations

The results of the field observations, the viable bioaerosol, Air-O-Cell, bulk material, and surface tape lift sampling conducted at Besteiro Middle School and Aiken Elementary on November 19, 20, 21 and 22, 2002 indicate fungal contaminants are present in areas tested.

The viable bioaerosol samples indicated that levels in the areas sampled were generally within laboratory recommended guidelines for total mold and range from 35 to 213 Cfu/M$^3$ at Besteiro, and 24 to 295 Cfu/M$^3$ at Aiken. The primary airborne contaminants identified include *Aspergillus, Chrysoporium, Cladosporium, Curvularia, Penicillium, Sporothrix, Phoma, Fusarium, and non-sporulating fungi.*

The Air-O-Cell samples considered to be elevated when compared to the recommended guidelines were collected in Room 112 (10,292 spores/ m$^3$), the Band Room (3,146 spores/M$^3$), the Rehearsal Hall (37,750 spores/M$^3$), Room 123 (22,767 spores/M$^3$), Room 117 (4,266 spores/M$^3$), and the Principal's Office (19,355 spores/M$^3$) in Besteiro and A101 (4,852 spores/M$^3$), Room C107 (3,199 spores/M$^3$) in Aiken. The primary airborne contaminants identified include *Alternaria, Aspergillus/Penicillium, Chaetomium, Cladosporium, Curvularia, Drechslera/Bipolaris Group, Epicoccum purpurascens, Myxomycetes/Rust/Smut, Nigrospora, Scopulariopsis, Tetraploa, Torula, Ascospores, Basidiospores, and Hyphal Fragments.*

Additionally, samples collected in Room A102, was below the recommended level of 2000 spores/M$^3$, however, each sample was found to have a individual mold organism (*Aspergillus/Penicillium*) level



**EFI**
Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

greater than 650 spores/M³, therefore would also be considered elevated when compared to the laboratory recommended guidelines.

Tape lift samples obtained from various surfaces within each of the facilities indicated the following molds were identified on the samples collected *Chaetomium, Nigrospora, Penicillium, Scopulariopsis, Aureobasidium, Cladosporium, Aspergillus, Stachybotrys, Dreschlera,* and *Phoma.*

One bulk ceiling tile sample was obtained from Room 113 of Besteiro Middle School. The analytical results indicated the sample was "loaded" with *Cladosporium* spores. The bulk sample taken was from areas of visible water/mold damage observed on the ceiling tile.

Based on the results of our sampling and observations, all porous water/mold damaged building components (gypsum board ceilings, ceiling tiles, pipe insulation, gypsum board walls, etc.) should be removed to 18" beyond any visible water/mold damage and be disposed of. Following the removal of the porous water/mold damaged building components, equipment and supplies, all remaining non-porous interior finishes, furnishings, equipment, and supplies should be cleaned and sanitized with an Environmental Protection Agency (EPA) registered biocide (such as Biocide International's Oxine) approved for such use. The current HVAC system remediation related to mold will be covered in the Mechanical Assessment section of this report.

## 2.07 ROOF ASSESSMENT

### 2.07.1 Scope of Services

The purpose of this Roof Condition Assessment is to observe and document readily visible roofing materials and systems, and to identify defects and deficiencies which might significantly affect the integrity of the system to prohibit water infiltration. Recommendations are provided for observed deficiencies.

Our services for this project have included the following:
- Review of existing project drawings.
- Interviews with personnel familiar with the facility.
- Fieldwork to review and document general condition of the roof, roof-mounted appurtenances, existing leaks and existing deficiencies.
- Evaluation of the existing roof system and alternatives for corrective action.

### 2.07.2 Interviews

Mr. Vasquez of Brownsville Independent School District provided the following information:

- There are no current active leaks at either Aiken Elementary or Besteiro Middle School.

- Shortly after Aiken Elementary was completed, persistent roof leaks occurred in the corridor at the intersection of the Wing A addition and the north wall of the original Besteiro Middle School. 

- New cementitious drop ceiling tiles were recently installed at Aiken Elementary School.

- Damaged ceiling tiles and evidence of previous water on the vinyl floor within the Aiken Elementary Cafetorium are the result of rooftop mechanical unit and are not a result of a roof leak. Reportedly, the water damage within this room was not associated with a rain event.



Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

### 2.07.3 Results and Observations

The subject facility is comprised of two campuses: Besteiro Middle School and Aiken Elementary School. The facility includes a total of 23 separate roof areas that are typically divided by rise walls or parapet walls. The existing roofs on the facility currently include a built-up roof membrane at Besteiro Middle School and some type of built-up roof system with a granule-surfaced modified bitumen cap sheet at Aiken Elementary School and Wing A serving Besteiro Middle School.

Each roof area of the facility under consideration was observed and the existing systems and components were assessed. The following sections provide brief descriptions of the roof systems assessed, a list of observed conditions, including deficiencies, our general assessment of the roof areas, and recommendations for corrective action, if any. The following summarizes general information related to the existing roof membrane systems at the subject school:

*Structural Framing:*
CMU walls supporting open web steel joists

*Roof Deck:*
Metal deck.

*Roof Slope:*
Based on visual observations, greater than 1/4 in/ft.

*Insulation:*
Per drawings, specified as 1 ½ inch rigid

*Membrane Type:*
Besteiro MS:
Multi-ply built-up roof with aggregate surfacing.
Aiken Elementary:
Assumed to be 1 or 2 plies of base felts with a granule surfaced modified bitumen cap sheet.

*Manufacturer:*
Information not provided.

*Age:*
Besteiro MS: 7 years (original)
Aiken Elementary: 6 years (original)

*Bitumen/Adhesive:*
Asphalt

*Attachment:*
Besteiro MS:
Roof Membrane: Hot asphalt to rigid insulation.
Rigid Insulation: Mechanical fasteners to metal deck
Aiken Elementary:
Roof Membrane: Hot asphalt or torch applied to rigid insulation
Rigid Insulation: Mechanical fasteners to metal deck

*Surfacing:*
Besteiro MS: Aggregate surfacing embedded in hot asphalt
Aiken Elementary: Granule-surfaced modified bitumen

## 2.0 ASSESSMENT

**EFI***
Engineering and Fire
Investigations

<u>DRAFT: FOR REVIEW ONLY</u>
<u>Privileged – Attorney / Client Work Product</u>

In general, the following conditions were observed:

### *Besteiro Middle School:*

a.  A multi-ply asphalt built-up roof system with aggregate surfacing was observed at the roof areas serving Besteiro Middle School.  However, a granule-surfaced modified bitumen cap sheet is provided at Wing A, which was an addition when Aiken Elementary was constructed.

b.  Roof penetrations are typically limited to plumbing vent stacks, HVAC mechanical curbs, exhaust fans, and roof expansion joints.

c.  Besteiro Middle School is divided into six wings (Wing A – Wing F) and a total of 13 separate roof areas, each of which is defined by the perimeter edge of the roof, parapets, or rise walls.

d.  Drainage for each roof area is accomplished by sheet flow to internal roof drains.  The following summarizes our observations regarding roof drainage:
   i.   Roof drains are typically provided at the perimeters of the individual roof areas.
   ii.  Through-wall overflow scuppers are generally provided near each roof drain.
   iii. Based on visual observations, each of the roof areas generally appeared to be sloped a minimum of ¼ inch per foot to internal roof drains.
   iv.  Evidence of ponding water was observed in an isolated area near the southwest corner of Wing C.  It appears that within this isolated area, water ponds between the parapet wall and the curb-mounted HVAC unit.
   v.   Roof drains generally appeared to be in good condition.  However, debris has blocked or partially blocked the strainers above the Gymnasium, Cafetorium, Kitchen, Media Center and Wing A.  Evidence of ponding water was generally observed adjacent to blocked roof drains.
   vi.  No through-wall scupper is provided adjacent to the drain at the northeast corner of the cafeteria, which allows a significant amount of water to pond within this area.
   vii. One damaged strainer was observed on the west side of Wing C.  This strainer should be replaced to prevent debris from obstructing the drainpipe.

e.  The perimeter roof areas are typically bound by parapet walls or rise walls.  The following summarizes our observations regarding the parapet/rise walls.
   i.   Parapet wall construction includes 4-foot long precast concrete coping above brick masonry and CMU walls.
   ii.  The precast concrete coping was generally observed to be in good condition; however, damaged or missing copings were observed at the northwest corner of the gymnasium and the southwest corner of the kitchen.
   iii. Cracked mortar joints were observed at the concrete coping joints throughout the facility.  "Band-aid" sealant joints were observed at many of the mortar joints.  The sealant was typically observed to be in poor condition.
   iv.  Expansion joints are regularly spaced in the masonry parapet and rise walls.  At many locations, non-uniform sealant depth was observed.  In addition, the sealant material was observed to generally be in poor condition, with missing sealant material observed in several locations including near the northeast corner of the cafetorium, southeast corner of the gymnasium, and southwest corner of Wing B.
   v.   Wall expansion joints are not continuous through the precast concrete copings.  As a result, the coping restrains movement at the top of the wall; however, no obvious evidence

2.0 ASSESSMENT

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

EFI°
Engineering and Fire
Investigations

of damage resulting from restrained movement was observed at the coping or parapet walls.

vi. Mortar or sealant joints are typically provided at the parapet/parapet and parapet/rise wall intersections. Mortar cracks and open sealant joints were observed at several locations including the following: southeast corner of gymnasium, northwest corner of Room 209, northeast corner of Room 213, and Wing C.

f. Surface-mounted galvanized steel counter flashings are typically provided at the base of the parapet/rise walls. The following summarizes our observations regarding the counter flashings:

i. Sealant is provided between the top of the counter flashing and the masonry wall. Discontinuities were observed in the sealant material throughout the facility. In addition, the sealant was cupped, such that water ponds at the top of the counter flashing.

ii. Remedial application of sealant at the top of the counter flashing and counter flashing lap joints was observed along the east side of Wing C. It appears that the remedial sealant was applied to address specific leak locations.

iii. An open seam in the metal counter flashing was observed at the northwest corner of the mechanical room behind the cafetorium.

iv. Remedial application of sealant was observed at the lap joints of the metal counter flashing throughout the facility. Observed locations included the east wall of Wing C, near the southwest corner of Room 209, northeast corner of Room 213, and above the north-south corridor in Wing B. The sealant at many locations was noted to be in poor condition and discontinuous.

g. Modified bitumen base flashing membranes are provided at the perimeter of the roof areas and at the roof-mounted HVAC curb systems. The base flashing serving the facility was generally observed to be in good condition; however, splits and/or discontinuities were observed at lap edges or corners in isolated areas at the perimeter of Wings A and B. In addition, discontinuities and/or open seams were observed at a number of HVAC curb locations.

h. In general, the roof membrane was generally observed to be in fair to good condition and the following observations were made with regard to the roof membrane:

i. The aggregate surfacing was generally observed to be evenly distributed with adequate coverage; however, isolated bare areas with exposed flood coat and membrane were observed at Wings B, D, and E.

ii. A roof blister was observed near the roof drain at the northeast quadrant of Wing B.

iii. Loss of surface granules was observed at the modified bitumen cap sheet provided at Wing A. The amount of granule loss appeared to be more than would typically be expected for a roof of its age.

j. Roof expansion joints are provided at Wings B and C. Application of remedial sealant was observed at most of the locations where the roof expansion joint terminates at the parapet wall. In addition, sealant has been remedially applied on the pre-formed expansion joint membrane and the counter flashing material at regular intervals on the joints serving Wing B.

k. Rooftop pipes serving the HVAC equipment are typically supported by preformed pipe supports. At Wings B, D, E and F, the pipe supports were typically observed to bear directly on the aggregate surfacing, which increases the possibility of membrane puncture. Missing or damaged pipe supports or piping not bearing on pipe supports were also observed at Wings B, D and F.

l. Abandoned equipment and debris, such as pipe, mechanical equipment, and construction debris, was observed on the roof areas throughout the facility.

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI**
Engineering and Fire
Investigations

m. The antenna mounted above the kitchen is improperly flashed into the roof membrane. No flashing is provided at the base and the supports appear to be attached directly to the roof membrane. Membrane damage at the supports is a potential source for water infiltration.

n. A damaged exhaust fan was observed at Wing B above the Nurse's Office that should be repaired to limit the possibility of water infiltration at this roof penetration.

o. Two skylights are provided at Wing C. Remedial application of sealant material was observed at the perimeter each skylight unit.

p. No active roof leaks were reported; however, stained gypsum board or ceiling tiles were observed at the following locations:
   i. Room 208 Storage Room - intersection of Wing A addition and original Besteiro Middle School construction.
   ii. Room 217
   iii. Room 219
   iv. Room 220 – at roof drain
   v. Room 222 – at HVAC unit
   vi. Room 233 – at HVAC unit
   vii. Wing A Girls Restroom – intersection of Wing A addition and original Besteiro Middle School construction.
   viii. Skylight at 1st floor locker area
   ix. Concourse area outside Boy's Locker Room (west side of gymnasium)
   x. Corridor outside Music Room.
   xi. Cafetorium – north wall, east wall, and below HVAC equipment in middle of room.
   xii. Kitchen – north wall

q. Observations of the ceiling plenum space were performed in association with work performed for other sections of this report. Reference those sections for identification of other areas of potential water infiltration.

*Aiken Elementary School:*

a. A granule-surfaced modified bitumen cap sheet is provided at Aiken Elementary School.

b. Aiken Elementary School is divided into two wings (Wing G and Wing H) and a total of 10 separate roof areas each of which is defined by the perimeter edge of the roof, parapets, or rise walls.

c. Drainage for each roof area is accomplished by sheet flow to internal roof drains. The following summarizes our observations regarding roof drainage:
   i. Roof drains are typically provided at the perimeters of the individual roof areas.
   ii. Through-wall overflow scuppers are generally provided near each roof drain.
   iii. Based on visual observations, each of the roof areas generally appeared to be sloped a minimum of ¼ inch per foot to internal roof drains.
   iv. Roof drains generally appeared to be in good condition. However, debris, including vegetation growth, was observed at most of the roof drain strainers partially blocking the roof drains. Evidence of ponding water was observed adjacent to most of the roof drains.

d. The perimeter roof areas are typically bound by parapet walls or rise walls. The following summarizes our observations regarding the parapet/rise walls:
   i. Parapet wall construction includes 4-foot long precast concrete coping above brick masonry and CMU walls.

**EFI°**
Engineering and Fire
Investigations

    ii.    The precast concrete coping was generally observed to be in good condition; however, damaged or missing copings were observed at the northwest corner of the cafetorium.

    iii.    Cracked mortar joints were observed at the concrete coping joints throughout the facility. "Band-aid" sealant joints were observed at many of the mortar joints. The sealant was typically observed to be in poor condition.

    iv.    Expansion joints are regularly spaced in the masonry parapet and rise walls. The expansion joint sealant was observed to generally be in good condition; however, mortar instead of sealant was observed in two joints serving Wing H.

    v.    Wall expansion joints are not continuous through the precast concrete copings. As a result, the coping restrains movement at the top of the wall; however, no obvious evidence of damage resulting from retrained movement was observed at the coping or parapet walls.

    vi.    Mortar or sealant joints are typically provided at the parapet/parapet and parapet/rise wall intersections. Mortar cracks and open sealant joints were observed at several locations.

e.    Surface-mounted galvanized steel counter flashings are typically provided at the base of the parapet/rise walls. The following summarizes our observations regarding the counter flashings:

    i.    Sealant is provided between the top of the counter flashing and the masonry wall. Discontinuities were observed in the sealant material throughout the facility. In addition, the sealant was cupped, such that water ponds at the top of the counter flashing.

    ii.    Remedial application of sealant was observed at several lap joints of the metal counter flashing throughout the facility. It is assumed that the sealant was applied in an effort to address leak locations. The sealant at many locations was noted to be in poor condition and discontinuous.

    iii.    A loose lap joint was observed at Wing G, which should be addressed to prevent water infiltration behind the base flashing.

f.    Modified bitumen base flashing membranes are provided at the perimeter of the roof areas and at the roof-mounted HVAC curb systems. The base flashings serving the Aiken Elementary School were generally observed to be in fair condition. Horizontal cracks were observed in the base flashing membrane at the roof perimeters, which is typically indicative of relative movement between the roof deck and the parapet wall. The cracks provide a potential source for water infiltration. In addition, discontinuities were observed at several of the HVAC mechanical curbs.

g.    In general, the roof membrane was generally observed to be in fair to good condition. The following observations were made with regard to the roof membrane:

    i.    Loss of surface granules was observed at the modified bitumen cap sheet provided at Wing A. The amount of granule loss appeared to be more than would typically be expected for a roof of its age.

    ii.    A loose lap edge was observed in the field of the roof serving Wing G.

h.    The ceiling tiles serving Aiken Elementary School were recently replaced with a cementitious tile. Interior observations were made within limited areas of Aiken Elementary School and no water-damaged ceiling tiles were observed.

    i.    Observations of the ceiling plenum space were performed in association with work performed for other sections of this report. In general, it was reported that where evidence of water infiltration was observed within the ceiling plenum, it generally correlated with the roof perimeters. Reference those sections for identification of specific areas of potential water infiltration



## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

### 2.07.5 Conclusions/Recommendations

Based on our observations, discussions with personnel familiar with the facility's roof history, and experience with similar projects, the following summarizes our conclusions and recommendations concerning the roof systems at Besteiro Middle School and Aiken Elementary to minimize the potential for water infiltration.

### *Besteiro Middle School:*

a.  The built-up roof membrane with aggregate surfacing was generally observed to be in fair to good condition, considering it's age. It is recommended that the aggregate surfacing be redistributed as necessary to cover exposed areas. In addition, the roof blister at Wing B should be cut out and repaired in accordance with recognized industry practices.

b.  Provided roof drainage systems were generally observed to be adequate and in good condition; however, several repair items are recommended with regard to the drainage systems:

   i.   As a part of routine maintenance, the roof drains should be regularly inspected and debris cleared from the strainers to ensure proper function. The blocked roof drain strainers cause areas of ponding water that can contribute to roof membrane degradation and water infiltration.

   ii.  It is recommended that a new roof drain be remedially installed within the area of ponding water at the southwest quadrant of Wing C.

   iii. It is recommended that a new through-wall scupper be installed adjacent to the roof drain at the northeast corner of the cafetorium. Ponding water caused by an obstructed roof drain will adversely affect the roof membrane, base flashings and counter flashing materials and is possibly contributing to water infiltration problems within this area.

   iv.  Damaged and missing roof strainers should be replaced to ensure that roof drains do not become blocked.

c.  The parapet walls were generally observed to be in fair condition; however, several deficient items were observed that may be contributing to water infiltration:

   i.   Cracked mortar joints between adjacent precast concrete copings provide an avenue for water to infiltrate the wall system. The parapet wall assembly was specified to include a flashing assembly between the bottom of the coping and the top of the wall assembly that would redirect water away from the wall assembly. Because of the apparent historical problems with water infiltration at the roof perimeters, it is recommended that the precast concrete coping be removed at several locations that have historically experienced problems with water infiltration to determine the condition of the flashing between the bottom of the coping and the top of the wall assembly. Depending on the excavation findings, the following alternatives may be recommended:

   ➢ Option 1. If the flashing material is in poor condition or is improperly installed, then it is recommended that the concrete coping at all parapet walls be removed, new flashing material be installed and the coping be reinstalled. When the coping is reinstalled, it is also recommended that the coping joints be aligned with wall expansion joints.

   ➢ Option 2. If the flashing is determined to be in good condition, then it is recommended that the mortar at the coping joints be removed and replaced with a sealant material that can accommodate anticipated thermal movement.

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI**
Engineering and Fire
Investigations

> ➢ For the purposes of this preliminary evaluation, we recommend budgeting for Option 1, and if the flashing is observed to be in good condition, proceeding with Option 2.

    ii. Currently the parapet walls are not exhibiting damage resulting from the coping restraining the top of the parapet wall at expansion joint locations. If the coping is not removed, it is recommended that Brownsville ISD monitor the parapet walls and copings for future damage resulting from differential movement at the joint.

    iii. Cracks and discontinuities are present at most of the parapet/parapet and parapet/rise wall intersections. The cracks appear to be the result of relative differential movement between the wall assemblies. It is recommended that the mortar or sealant material at these assemblies be removed and a soft joint utilizing backer rod and high performance sealant be installed that can accommodate the anticipated movement at these locations.

    iv. Damaged and missing precast concrete copings should be replaced.

    v. Expansion joint sealant material at the parapet walls was observed to be in poor condition with numerous locations that could allow water to infiltrate the building envelope. It is recommended that the sealant material be replaced. Although our observations were limited to the parapet walls, it is anticipated that the sealant material at the exterior wall sealant joints are in similar condition and should also be replaced.

d. The sealant material at the top of the metal counter flashings should be cut out and replaced. The new sealant should be installed such that water does not pond within the joint and is redirected away from the wall. In addition, it is recommended that sealant be remedially applied within counter flashing lap joints.

e. Tears, splits and discontinuities were observed in the base flashing materials at isolated roof perimeter locations and HVAC mechanical curb locations. The deteriorated base flashing assemblies should be repaired or replaced to prevent water infiltration.

f. Discontinuities and avenues for water infiltration are currently present at the roof expansion joint/parapet wall intersections. Remedially applied mastic and sealant indicates that these have historically been a source for water infiltration. It is recommended that new flashing details be designed and installed at these locations. In addition, the preformed roof expansion joints serving Wing B should be replaced.

g. Pipe supports should be repositioned such that they are not bearing directly on the aggregate surfacing. Damaged and missing pipe supports should also be replaced. In addition, all pipes should be inspected to ensure that they are properly bearing on the pipe supports.

h. The damaged exhaust fan at Wing B should be repaired to limit the possibility of water infiltration at this roof penetration.

i. The antenna on the kitchen should be removed and reinstalled with the supports properly flashed into the roof system.

j. Abandoned equipment, such as pipe, mechanical equipment and construction debris, can puncture the roof membrane and it is recommended that all debris be removed from the roof areas.

*Aiken Elementary School:*

a. The built-up roof system with granule-surfaced modified bitumen cap sheet was generally observed to be in fair to good condition. The amount of granule loss appeared to be more than

---

**2.0 ASSESSMENT**

**EFI•**
Engineering and Fire
Investigations

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

would typically be expected for a roof of this age; however, no recommendations are proposed with regard to this issue. The roof areas should be inspected and all loose lap edges should be repaired.

b. Roof drainage systems were generally observed to be adequate and in good condition. As a part of routine maintenance, the roof drains should be regularly inspected and debris cleared from the strainers to ensure proper drainage. Blocked roof drain strainers cause areas of ponding water that can degrade the roof membrane. In addition, ponding water increases the opportunity of water infiltration.

c. The parapet walls were generally observed to be in fair condition; however, several deficient items were observed that may be contributing to water infiltration:

    i. Cracked mortar joints between adjacent precast concrete copings provide an avenue for water to infiltrate the wall system. The parapet wall assembly was specified to include a flashing assembly between the bottom of the coping and the top of the wall assembly that would redirect water away from the wall assembly. Because of the apparent historical problems with water infiltration at the roof perimeters, it is recommended that the precast concrete coping be removed at several locations that have historically experienced problems with water infiltration to determine the condition of the flashing between the bottom of the coping and the top of the wall assembly. Depending on the excavation findings, the following alternatives may be recommended:

        ➢ Option 1. If the flashing material is in poor condition or is improperly installed, then it is recommended that the concrete coping be removed at all parapet walls, new flashing material be installed and the coping be reinstalled. When the coping is reinstalled, it is also recommended that the coping joints be aligned with wall expansion joints.

        ➢ Option 2. If the flashing is determined to be in good condition, then it is recommended that the mortar at the coping joints be removed and replaced with a sealant material that can accommodate the anticipated thermal movement.

        ➢ For the purposes of this preliminary evaluation, we recommend budgeting for Option 1, and if the flashing is observed to be in good condition, proceeding with Option 2.

    ii. Currently the parapet walls are not exhibiting damage resulting from the coping being restrained by the top of the parapet wall at expansion joint locations. If the coping is not removed, it is recommended that Brownsville ISD monitor the parapet walls and copings for future damage resulting from differential movement at the joint.

    iii. Cracks and discontinuities are provided at most of the parapet/parapet and parapet/rise wall intersections. The cracks appear to be the result of relative differential movement between the wall assemblies. It is recommended that the mortar or sealant material at these assemblies be removed and a soft joint consisting of backer rod and high performance sealant be installed that can accommodate the anticipated movement at these locations.

    iv. Damaged and missing precast concrete copings should be replaced.

    v. At those parapet wall expansion joints that are filled with mortar, the mortar should be removed and backer rod and sealant material installed at the expansion joint.

d. The base flashing membrane at the perimeter roof locations was observed to be in fair to poor condition. If water is not currently infiltrating the building envelope at the horizontal cracks in the base flashing membrane, it should be expected that future relative movement between the roof deck and parapet wall will provide an avenue for water infiltration. It is recommended that the

**EFI**
Engineering and Fire
Investigations

**2.0 ASSESSMENT**
**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

base flashings be repaired or replaced at the roof perimeters serving this facility and designed such that the base flashings are isolated and are not affected by relative movement between the wall and roof deck. New counter flashing is expected to be installed as part of the base flashing repairs.

e. Tears, splits and discontinuities were observed in the base flashing materials at isolated HVAC mechanical curb locations. The deteriorated base flashing assemblies should be repaired to prevent water infiltration.

## 2.08 MECHANICAL ASSESSMENT

### 2.08.1 Scope of Services

The HVAC evaluation included a review of the HVAC systems and related building construction, review of operational and maintenance procedures, a walk-through of interior and exterior areas, observations of the HVAC systems and related building construction, evaluation of the results, and development of conclusions and recommendations.

### 2.08.2 Findings and Observations - Besteiro Middle School

The results of our observations of the mechanical HVAC systems and rated building construction features are listed below:

a. The Roof Top Units (RTUs) in Besteiro Middle School, installed during original construction in 1993-94, are controlled by wall mounted mercury-bulb and electronic thermostats that have temperature adjustment levers, Heat-Off-Cool mode switches and Auto-On fan switches. The RTUs in the original portion of Besteiro are not controlled by an energy management system. The RTUs in the A-wing of Besteiro, which was constructed concurrently with Aiken in 1995-96, are controlled by electronic wall thermostats that have temperature adjustment wheels, Heat-Off-Cool mode switches and Auto-On fan switches. The RTUs in the A-wing are controlled by a Trane energy management system that is also controlling the HVAC equipment at Aiken Elementary School. According to school district personnel, the Trane energy management system maintains the temperature setpoint of all RTUs in the A-wing at 72 degrees Fahrenheit (F).

b. Field measurements of room temperatures and relative humidity levels in typical classrooms and other areas were obtained and compared with the design conditions specified in the original construction documents. Our field measurements were also compared with the existing room thermostat setpoints and temperature readings. We found that many room thermostats were generally out of calibration and attempting to control room temperatures 3 to 5-degrees F below or above measured room temperatures. In many cases, room temperatures were measured to be in the range of 68 to 72 degrees F as compared a room design of 75 degree F. Also, relative humidity levels were elevated and were measured in the range of 55 to 62 percent as compared to design conditions of 50 percent.

c. The direct-expansion cooling coils in the RTUs were observed to contain moderate to heavy accumulations of dust, debris, bird feathers, and possible mold on the faces of the aluminum fins. Heavy accumulations of debris at a number of RTUs is restricting air movement and heat transfer at the cooling coils such that temperature and relative humidity control in the classrooms and other areas is ineffective. A layer of frost was observed covering the coils at some RTUs. We also observed accumulations of dust and debris on the blades of the blower fans in the RTUs.

d. Manually adjustable outside intake hoods and dampers were observed installed at the RTUs in lieu of automatic air economizer hoods specified on the original construction documents. From our previous experience with HVAC systems in humid climates, such as Brownsville, we would not expect that air



EFI•
Engineering and Fire
Investigations

economizer hoods would be included on the RTU's due to the limited number of days they would be used during a typical year.

e.  The return air/outside air mixing sections were generally observed to have heavy accumulations of dust and debris. Filters were heavily loaded and in some cases, collapsed, allowing unfiltered air to pass through the cooling coils, blower fans, and supply air ductwork. Filters installed were generally 2-inch pleated media type.

f.  The supply air ductwork is generally galvanized sheet metal with internal 1-inch thick neoprene coated fiberglass insulation except for the A-wing, which has externally wrapped fiberglass insulation. The supply air ductwork generally has a 20 to 60-foot primary duct that has round, flexible, insulated branches that supply ceiling or soffit mounted aluminum diffusers. The ductwork, insulation and air grilles were generally observed to be in good condition and of the sizes and types specified in the original construction documents. Accumulations of dust, debris and possible mold were not observed in the interior surfaces of the ductwork. The supply air and return air grilles have minor accumulations of duct and debris at several classrooms.

g.  Classrooms, Bookroom, Teacher's Workrooms, and Lounges are provided with packaged, roof mounted Trane heating/cooling units (RTUs), 4-ton or 5-ton nominal cooling capacity. The RTUs are typically mounted on insulated, structural steel roof curb foundations that provide sheet metal connections to galvanized metal ductwork. The RTUs have integral direct-expansion cooling coils, electric heating coils, direct-drive blower fans, filter sections, return air/outside air mixing sections, and compressor/condenser sections.

    i   Manually adjustable outside intake hoods and dampers are installed at the RTUs in lieu of automatic air economizer hoods as stated previously. The manual outside air intake dampers were observed to be either closed or open approximately 1/3 during our site visit. Field measurements of outside air intake rates at several RTUs in the classroom wings of the building were obtained. It was determined that the outside air intake was deficient as compared to the design at most units and varied from no outside air intake to approximately 38 CFM as compared to 225 CFM and 450 CFM depending on either 4-ton or 5-ton capacity RTU specified.

    ii.   Field measurements were obtained of conditioned airflow delivered by several RTUs in typical classroom wings of the building and determined from the units measured that the RTUs generally delivering the design volume, or greater than the design volume, of conditioned air. In several cases, approximately double the amount of conditioned air was being delivered compared to the design indicated in the construction documents. It is apparent that either changes in the characteristics of the operation of RTUs have been made since original construction or that a proper air balance has not been performed. Since this Trane RTU model has two-speed, direct drive blower motors, changes may have been made to the speed settings of the blower motors. Field measurements of conditioned airflow were conducted using an inclined tube manometer in straight sections of the supply air ductwork.

h.  From our field measurements, the discharge air temperature, dry bulb and wet bulb, of several RTUs are providing less than the cooling and dehumidification requirements of the original design.

i.  The Principal's Office, Counseling Office, and Nurse's Office are each provided with Trane RTUs, 6-ton nominal cooling capacity. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above.

## 2.0 ASSESSMENT

**EFI•**

Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

    i.    Manually adjustable outside intake hoods and dampers were observed installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were open approximately 1/3 and based on field measurements at other RTUs, the RTUs serving these areas are providing less than the specified amount of outside air ventilation. The original design specified 300 CFM and 375 CFM respectively for the principal's office and nurse's office.

j.    The Entrance Lobby and Common Area containing lockers are provided with Trane RTUs, 5-ton and 10-ton nominal cooling capacities respectively. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above.

    i.    We observed manually adjustable outside intake hoods and dampers installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were open during our site visit. We performed field measurements of outside air intake rate at the RTU serving the Common Area and found that the actual outside air intake was above original design at approximately 1717 CFM as compared to 1500 CFM specified in the design documents.

    ii.    Field measurements obtained of actual airflow at the RTU serving the Common Area and found that the unit was generally delivering greater amounts of conditioned air than design at approximately 5777 CFM compared to 4500 CFM specified in the original construction documents. It is apparent that either changes in the characteristics of the operation of RTUs have been made since original construction or that a proper air balance has not been performed. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

k.    The vocal music and band rooms are provided with Trane RTUs, 5-ton and 8-ton nominal cooling capacities. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above.

    i.    Manually adjustable outside intake hoods and dampers were observed installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were nearly closed during our site visit. We did not field measure the amounts of outside air and conditioned delivered by the RTUs. The rooms were cool and humid.

l.    The boys and girls locker rooms are each provided with Trane RTUs, 8-ton nominal cooling capacities. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above except that they are specified to provide 100 percent outside air to these areas in the construction documents.

    i.    Field measurements were obtained of outside air intake and total conditioned air volumes at the RTU serving the boy's locker room. It was found that the outside air intake and total conditioned air volume was above original design at approximately 3931 CFM as compared to 2500 CFM specified in the construction documents. Further, a review of published catalog materials provided by Trane indicates that this model of RTU is not rated for 100 percent outside air duty. These units appear to have been mis-applied. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

m.    The gymnasium is provided with four Trane RTUs, each with 30-ton nominal cooling capacity. The RTUs typically are mounted on an insulated, structural steel roof curb foundation that provides sheet

**2.0 ASSESSMENT**
**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

EFI®
Engineering and Fire
Investigations

metal connections to galvanized metal ductwork. The RTUs have integral direct-expansion cooling coils, natural gas furnaces, belt-drive blower fans, filter sections, return air/outside air mixing sections, and compressor/condenser sections. The original construction documents indicate that the RTUs are to be provided with air economizers and modulating exhaust fans, however, this equipment is not installed.

   i.  Field measurements obtained of outside air intake rates at RTU-13 found that the outside air intake is substantially below the original design at approximately 1150 CFM as compared to 2775 specified in the construction documents.

   ii. Field measurements obtained of conditioned airflow at RTU-13 found that the unit is generally delivering a lower amount of conditioned air than design at approximately 1500 CFM compared to 9000 specified in the construction documents. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

n.  The kitchen is provided with two Trane RTUs, 25 and 30-ton nominal cooling capacities. The RTUs are mounted on an insulated, structural steel roof curb foundation that provides sheet metal connections to galvanized metal ductwork. The RTUs have integral direct-expansion cooling coils, natural gas furnaces, belt-drive blower fans, filter sections, return air/outside air mixing sections, and compressor/condenser sections. The original construction documents indicate that the RTUs are to be provided with air economizers and modulating exhaust fans, however, this equipment is not installed.

   i.  Field measurements of outside air intake rates at RTU-15 found that the actual outside air intake is substantially below the original design at approximately 2558 CFM as compared to 4550 specified in the construction documents.

   ii. Field measurements of conditioned airflow at RTU-15 found that the unit is generally delivering lower amounts of conditioned air than design at approximately 6000 CFM compared to 8265 specified in the original construction documents. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

o.  The cafetorium is provided with two Trane RTUs, each at 30-ton nominal cooling capacity. The RTUs rest on an insulated, structural steel roof curb foundation that provides sheet metal connections to galvanized metal ductwork. The RTUs have integral direct-expansion cooling coils, natural gas furnaces, belt-drive blower fans, filter sections, return air/outside air mixing sections, and compressor/condenser sections. The original construction documents indicate that the RTUs are to be provided with air economizers and modulating exhaust fans, however, this equipment is not installed.

   i.  Field measurements of outside air intake rates at RTU-8 found that the outside air intake is substantially below the original design at approximately 1125 CFM as compared to 4550 specified in the construction documents.

   ii. Field measurements of conditioned airflow at RTU-8 found that the unit was generally delivering lower amounts of conditioned air than design at approximately 2340 CFM compared to 8000 specified in the original construction documents. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

p.  The library is provided with one packaged, roof mounted Trane RTU, 40-ton nominal cooling capacity. The RTU rests on an insulated, structural steel roof curb foundation that provides sheet metal connections to galvanized metal ductwork. The RTU has integral direct-expansion cooling coil,

**2.0 ASSESSMENT**

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

EFI*
Engineering and Fire
Investigations

natural gas furnace, belt-drive blower fan, filter section, return air/outside air mixing section, and compressor/condenser section. The original construction documents indicate that the RTU is to be provided with an air economizer and modulating exhaust fans, however, this equipment is not installed.

    i.  Field measurements of outside air and conditioned air in the library were not obtained because the area was under renovation. The return air/mixing sections, direct-expansion cooling coils, and fan sections were observed to have been cleaned and re-insulated by the renovation contractor prior to our site visit. The filters had not been re-installed in the unit.

    ii.  The supply air ductwork is generally galvanized sheet metal with external fiberglass insulation and was in the process of being re-installed during our sire visit. The ductwork, insulation and air grilles were observed to be in good condition and of the sizes and types specified in the original construction documents.

**2.08.3 Conclusions and Recommendations - Besteiro Middle School**

Our observations identified deficient items associated with the design, installation and operation of the HVAC equipment and systems. Using our experience with similar situations, we have made the following conclusions and recommendations.

a.  Based on typical engineering benchmarks, the RTUs serving the classrooms are oversized, and as a consequence, do not operate a sufficient number of hours daily to control relative humidity. Based on our field measurements, the RTUs are not controlling temperature and relative humidity in the classrooms as designed. The room thermostats are also apparently out of calibration, causing some classrooms to be overly cool and humid. We observed that most classrooms are provided with a nominal 5-ton RTU designed to deliver 1500 CFM of conditioned air to the classroom or approximately 1.6 CFM square foot versus a typical benchmark of 1.0 CFM per square foot. Also, the RTUs are selected at 105 degrees F ambient temperature that rarely occurs in this geographic area, also causing RTUs to be oversized. Our review of Trane cataloged performance of the models installed indicates that the design airflow is below the beyond the operating range of the equipment. Elevated levels of relative humidity in the classrooms and the lack of adequate routine cleaning of the interiors of the RTUs have also lead to performance problems with the RTUs and the development of molds on the cooling coils of some RTUs. The RTUs are not introducing designed amounts of outside air. Field measurements indicate that outside air ventilation rates are approximately 10 percent of the design outside air intake amount.

    i.  A recommended solution is to remove some RTUs and reconfigure the supply air ducts to supply those classrooms from remaining RTUs serving adjacent classrooms in the fashion indicated in the table below. The process of RTU removal would include installing sheet metal enclosures over existing roof penetrations, removing some supply and return ducts, removing associated electrical cabling and circuit breakers and removing some controls. Reconfiguring and re-balancing supply air ducts would include redistributing the supply air equally from the remaining RTUs to supply two classrooms. Any existing RTU to remain should have the ductwork, cooling coil, drain pan, heating coil, and fan sections cleaned and sanitized by a commercial duct cleaning contractor. The existing RTUs to remain would also require repairs and re-commissioning to prepare the RTUs for use after ductwork modifications are completed. All existing ductwork to be reused should also be cleaned and sanitized and all existing flex duct should be replaced. An alternative to cleaning, sanitizing, repairing and re-commissioning the remaining RTUs, is to install new RTUs. Given the current age of the existing RTUs is

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

EFI•
Engineering and Fire
Investigations

approximately 8 years, we estimate the remaining useful life of the existing RTUs to be approximately 6 to 8 years. We also understand from BISD that RTU's of similar construction at other schools located in the same general area as Besteiro Middle School have required replacement in 1 to 12 years. In this alternative, the new RTUs would be of similar sizing and design to the RTUs designated above to remain. Also in this alternative, the outdoor condenser coils, casing exterior, indoor evaporator coils, and condensate drain pans would be coated with an air-dry phenolic coating to extend the life of the new RTUs. The anticipated additional cost of this alternative compared to the cost of cleaning, sanitizing, repairing and re-commissioning the remaining RTUs included in Table 1 above is approximately $288,702.

| Classroom No. for RTU Removal | Reconfigure Remaining RTU and Supply Duct And Re-Air Balance |
|---|---|
| 101 | 104 |
| 105 | 108 |
| 102 | 103 |
| 106 | 107 |
| 109 | 110 |
| 113 | 112 |
| 114, Bookroom | 111 |
| 116 | 115 |
| 117 east unit | 117 west unit |
| 118A | 118B |
| 119 | 121 |
| 120 east unit | 120 west unit |
| 122 | 123 |
| Teacher's Lounge | Teacher's Workroom |
| 125 | 127 |
| 129 | 130 |
| 126 north unit | 126 south unit |
| 128 north unit | 128 south unit |
| 201 | 204 |
| 205 | 208 |
| 202 | 203 |
| 206 | 207 |
| 209 | Provide new 2-ton RTU |

## 2.0 ASSESSMENT

### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

**EFI**
Engineering and Fire
Investigations

| Classroom No. for RTU Removal | Reconfigure Remaining RTU and Supply Duct And Re-Air Balance |
|---|---|
| 210 | 211 |
| Teacher's Lounge | 212 |
| 213 | 214 |
| 215 | 216 |
| 217 | 218 |
| 220 | 223 |
| 221 | 222 |
| 224 | 227 |
| 225 | 226 |
| 230 | 232 |
| 224 | 236 |
| 229 | 231 |
| 233 | 235 |

ii.  Following removal of the RTUs as noted, we recommend installation of dedicated outside air pre-treating RTUs to supply pre-heated or pre-cooled and dehumidified air to classrooms on each wing as indicated in the table below. The pre-treating RTUs would introduce pretreated outside air in the range of 70 degrees F to each classroom for blending with conditioned air from the remaining RTUs.

| Classroom Nos. Served | Outside Air Pre-treating RTU Capacity |
|---|---|
| 101 through 114, Bookroom, 115, 116 | 6225 CFM |
| 117, 118A, 118B, 119 through 123, Teachers Workroom, Teachers Lounge | 4500 CFM |
| 124 through 130 | 3375 CFM |
| 201 through 214 | 5100 CFM |
| 215 through 227 | 4725 CFM |
| 228 through 236 | 3375 CFM |

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI•**
Engineering and Fire
Investigations

b. Based on typical engineering benchmarks, the RTUs serving the Boy's and Girls' locker rooms are somewhat oversized and improperly applied. Following a review of Trane cataloged performance of the models installed in these areas, the RTUs are not rated to provide 100 percent outside air duty as designed. As a consequence, the existing RTUs do not control temperature and relative humidity in the occupied areas. The units are not operating as designed and are not adequately removing moisture from the outside air that is being introduced into the school.

    i. A recommended solution is to remove the existing RTUs and install RTUs designed to supply heated or cooled and dehumidified outside air as designed to the boy's and girl's locker rooms. The RTUs would introduce 100 outside air conditioned in the range of 90 degrees F for heating and 55 degrees F for cooling to each locker room. All existing ductwork to remain should be cleaned and sanitized and all existing flex duct should be replaced.

| Locker Room | 100 percent Outside Air RTU |
|---|---|
| Boy's | 2500 CFM |
| Girl's | 2500 CFM |

c. Based on typical engineering benchmarks, the RTUs serving the Lobby, Common Area, Principal's office, Counselors Office, and Nurses Office are somewhat oversized. We observed that these areas are provided with RTUs designed to deliver conditioned air at approximately 1.6 CFM square foot versus a typical benchmark of 1.0 CFM per square foot. The compressor/condensing sections not operating a significant number of hours due to oversizing. As a consequence of oversizing, the RTUs are not adequately controlling temperature and relative humidity in the occupied areas. The low room temperatures and high relative humidity levels are also due to the thermostats being out of calibration and the cooling coils being heavily covered with dust and debris. Also, the RTUs are not introducing adequate amounts of outside air as designed.

    i. A recommended solution to replace the existing RTUs with nominal 4 and 10-ton RTUs as indicated in the table below. To control room temperature and relative humidity, the thermostats need to be properly calibrated. To provide the design amounts of outside air ventilation and conditioned air, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas. All existing ductwork to remain should be cleaned and sanitized. All existing flex duct to remain should be replaced

2.0 ASSESSMENT
DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product



EFI
Engineering and Fire
Investigations

| Room | New RTU design tons | Approximate RTU conditioned supply air / outside air quantities |
|------|---------------------|------------------------------------------------------------------|
| Lobby | 4-tons | 1600 CFM / 375 CFM O/A |
| Common Area | 12.5-tons | 5000 CFM / 1250 CFM O/A |
| Principal's Office | 4-tons | 1600 CFM / 375 CFM O/A |
| Counselors and Nurses Offices | 4-tons | 1600 CFM / 300 CFM O/A |

d.  Based on typical engineering benchmarks, the RTUs serving the Vocal Music and Band rooms are adequately sized. The RTUs are not introducing adequate amounts of outside air as designed. The RTUs are not adequately controlling temperature and relative humidity in these areas. The improper room temperatures and high relative humidity levels are generally due to the thermostats being out of calibration and the cooling coils being heavily covered with dust and debris. To control room temperature and relative humidity, the thermostats need to be properly calibrated. It is recommended that the return air/outside air mixing sections, cooling coils, drain pans, heating coils, and blower sections be cleaned by a commercial duct cleaning contractor. To provide the design amounts of outside air ventilation and conditioned air per the table below, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas.

| Room | New RTU design tons | RTU design conditioned air and outside air |
|------|---------------------|---------------------------------------------|
| Vocal Music Room | 4 Tons | 1600 CFM / 375 CFM |
| Band Room | 5 Tons | 2000 CFM / 375 CFM |

e.  The Gymnasium is provided with four Trane RTUs, each with 30-ton nominal cooling capacity. Based on typical engineering benchmarks, the RTUs are somewhat oversized. The RTUs are not introducing adequate amounts of outside air as designed. The compressor/condensing sections not operating a significant number of hours due to oversizing. As a consequence of oversizing, the RTUs are not adequately controlling temperature and relative humidity in the occupied areas. The improper room temperatures and high relative humidity levels are also due to the thermostats being out of calibration and the cooling coils being heavily covered with dust and debris. It is recommended that the return air/outside air mixing sections, cooling coils, drain pans, heating coils, and blower sections be cleaned by a commercial duct cleaning contractor. To control room temperature and relative humidity, the thermostats need to be re-calibrated and the RTUs staged at thermostats as indicated in the table below. To provide the design amounts of outside air ventilation and conditioned air, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas.

2.0 ASSESSMENT
DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product



EFI•
Engineering and Fire
Investigations

| Room | Existing RTU Number | RTU design conditioned air / outside air | Thermostat Setpoint |
|---|---|---|---|
| Gymnasium | AC-10 | 9000 CFM / 2775 CFM O/A | 74 degrees F |
| Gymnasium | AC-11 | 9000 CFM / 2775 CFM O/A | 76 degrees F |
| Gymnasium | AC-12 | 9000 CFM / 2775 CFM O/A | 74 degrees F |
| Gymnasium | AC-13 | 9000 CFM / 2775 CFM O/A | 78 Degrees F |

f.  The cafetorium is provided with two Trane RTUs, each with 30-ton nominal cooling capacity. The kitchen is provided with two Trane RTUs, each with 25-ton nominal cooling capacity. Based on typical engineering benchmarks, the RTUs are adequately sized. The RTUs are not introducing adequate amounts of outside air as designed. The RTUs are not adequately controlling temperature and relative humidity in these areas. The improper room temperatures and high relative humidity levels are generally due to the thermostats being out of calibration and the cooling coils being heavily covered with dust and debris. To control room temperature and relative humidity, the thermostats need to be properly calibrated and the RTUs staged at thermostats as indicated in the table below. It is recommended that the return air/outside air mixing sections, cooling coils, drain pans, heating coils, and blower sections be cleaned by a commercial duct cleaning contractor. To provide the design amounts of outside air ventilation and conditioned air, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas.

| Room | Existing RTU Number | RTU design conditioned air / outside air | Thermostat Setpoint |
|---|---|---|---|
| Cafetorium | AC-8 | 8000 CFM / 1500 CFM O/A | 74 degrees F |
| Cafetorium | AC-9 | 8000 CFM / 1500 CFM O/A | 76 degrees F |
| Kitchen | AC-14 | 8265 CFM / 4550 CFM O/A | 74 degrees F |
| Kitchen | AC-15 | 8265 CFM / 4550 CFM O/A | 76 degrees F |

g.  The library is provided with one Trane RTU, 40-ton nominal cooling capacity. Based on typical engineering benchmarks, the RTU is adequately sized. The RTUs also has multiple stages of cooling capacity, allowing it to cycle compressors to meet varying cooling demands through the year. Because the unit was not operational due to the Library being renovated and the RTU being partially repaired, we did not observe it's operating characteristics. To control room temperature and relative humidity, the thermostats need to be properly calibrated to maintain 74 degrees F. To provide the design amounts of outside air ventilation and conditioned air per the table below, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas. Prior to balancing, of the installation of the mechanical system, to original conditions, should be completed. ·

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI**
Engineering and Fire
Investigations

| Room | RTU design tons | RTU design conditioned air / outside air |
|------|-----------------|------------------------------------------|
| Library | Repair existing 40-ton RTU | 12,000 CFM / 2025 CFM O/A |

h.  The room thermostats observed varied in temperature settings from 65 degrees to 78 degrees F and that the fan settings were generally at the Auto setting with a small number at the Run Continuous setting. A number of RTUs were not operable. We generally observed that classrooms and other areas were cool and humid, ranging from 50 to 70 percent relative humidity. To effectively control temperature and relative humidity at all areas of the building, temperature settings should be maintained at 74 to 75 degrees F and the FAN setting placed in the AUTO position.

i   The RTUs are controlled by wall mounted mercury-bulb thermostats and electronic temperature sensors that have temperature adjustment levers, Heat-Off-Cool mode switches and Auto-On fan switches. The RTUs installed during original construction having mercury-bulb thermostats are not controlled by an energy management system. The wall mounted thermostats and electronic temperature sensors were observed to be out of calibration in many areas and temperature setpoints were not uniform in the building. A recommended solution is to replace the mercury-bulb thermostats in all areas, except Wing A which already has electronic temperature sensors, with electronic temperature sensors having local temperature adjustment and interface all RTUs to the Trane energy management system installed at Aiken Elementary School. This option would incorporate the schedule of operating hours and monitor temperature control setpoints of all HVAC equipment for both schools at one energy management system and one master station. We recommend that the electronic wall sensors be set to maintain all RTUs in the building at 74 degrees F.

j   As a further temperature control option, it is recommended that the wall mounted mercury-bulb thermostats and temperature sensors at all RTUs be replaced with wall electronic sensors having no local setpoint adjustment. In this option, the temperature control setpoints of all RTUs would be maintained at the Trane energy management system that is currently installed at Aiken Elementary School. A master station would be located at Aiken Elementary School and at the Brownsville ISD maintenance department offices. This option would incorporate the schedule of operating hours and the temperature control setpoints of all HVAC equipment for both schools in one energy management system.

### 2.08.4  Findings and Observations - Aiken Elementary School

a.  Fan coil units in Aiken Elementary School, installed during original construction in 1995-96, are controlled by wall mounted electronic temperature sensors that have temperature adjustment wheels, Heat-Off-Cool mode switches and Auto-Low-High-Off fan switches. The fan coil units are controlled by a Trane energy management system. According to Brownsville ISD personnel, the energy management system maintains the temperature set point of all fan coil units in the school at 72 degrees Fahrenheit (F).

b.  Field measurements of room temperatures and relative humidity levels were conducted in typical classrooms and other areas and compared these readings with the design conditions specified in the original construction documents. Our field measurements were compared with the existing room thermostat set points and temperature readings. Many room thermostats were generally found to be

**2.0 ASSESSMENT**
**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

EFI•
Engineering and Fire
Investigations

    i.    Manually adjustable outside intake hoods and dampers were observed installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were open approximately 1/3 and based on field measurements at other RTUs, the RTUs serving these areas are providing less than the specified amount of outside air ventilation. The original design specified 300 CFM and 375 CFM respectively for the principal's office and nurse's office.

j.    The Entrance Lobby and Common Area containing lockers are provided with Trane RTUs, 5-ton and 10-ton nominal cooling capacities respectively. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above.

    i.    We observed manually adjustable outside intake hoods and dampers installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were open during our site visit. We performed field measurements of outside air intake rate at the RTU serving the Common Area and found that the actual outside air intake was above original design at approximately 1717 CFM as compared to 1500 CFM specified in the design documents.

    ii.    Field measurements obtained of actual airflow at the RTU serving the Common Area and found that the unit was generally delivering greater amounts of conditioned air than design at approximately 5777 CFM compared to 4500 CFM specified in the original construction documents. It is apparent that either changes in the characteristics of the operation of RTUs have been made since original construction or that a proper air balance has not been performed. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

k.    The vocal music and band rooms are provided with Trane RTUs, 5-ton and 8-ton nominal cooling capacities. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above.

    i.    Manually adjustable outside intake hoods and dampers were observed installed at the RTUs in lieu of automatic air economizer hoods as stated previously. We observed that the manual outside air intake dampers were nearly closed during our site visit. We did not field measure the amounts of outside air and conditioned delivered by the RTUs. The rooms were cool and humid.

l.    The boys and girls locker rooms are each provided with Trane RTUs, 8-ton nominal cooling capacities. The RTUs are similar in design, accessories, and installation to the RTUs serving the classrooms as described above except that they are specified to provide 100 percent outside air to these areas in the construction documents.

    i.    Field measurements were obtained of outside air intake and total conditioned air volumes at the RTU serving the boy's locker room. It was found that the outside air intake and total conditioned air volume was above original design at approximately 3931 CFM as compared to 2500 CFM specified in the construction documents. Further, a review of published catalog materials provided by Trane indicates that this model of RTU is not rated for 100 percent outside air duty. These units appear to have been mis-applied. Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork similar to the procedures used with the classroom units above.

m.    The gymnasium is provided with four Trane RTUs, each with 30-ton nominal cooling capacity. The RTUs typically are mounted on an insulated, structural steel roof curb foundation that provides sheet



SECOND FLOOR SAMPLE LOCATIONS
Fig. 2



## 2.0 ASSESSMENT

**EFI°**
Engineering and Fire
Investigations

### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

out of calibration and attempting to control room temperatures 3 to 5-degrees F below or above measured room temperatures. In many cases, room temperatures were measured to be in the range of 68 to 77 degrees F as compared a room design of 75 degree F. Also, relative humidity levels were elevated and were measured in the range of 55 to 62 percent as compared to design conditions of 50 percent.

c.  The chilled water coils observed in the fan coil units have moderate accumulations of dust, debris, and possible mold on the faces of the aluminum fins. Heavy accumulations of debris at a number of outside air pre-treating and interior fan coil units was restricting air movement and heat transfer at the cooling coils such that temperature and relative humidity control in the classrooms and other areas was ineffective. Accumulations of dust and debris were also observed on the blades of the blower fans in the fan coil units.

d.  The outside air intake louvers, aluminum intake ducts, and interiors of the outside air pre-treating fan coil units were observed to generally have heavy accumulations of dust and debris. The return air/outside air mixing sections of the interior fan coil units generally had moderate accumulations of dust and debris. Filters are heavily loaded and in some cases, collapsed, allowing unfiltered air to pass through the cooling coils, blower fans, and supply air ductwork of both the outside air pre-treating and interior fan coil units. Filters installed are generally 2-inch pleated media type.

e.  The supply air ductwork is generally galvanized sheet metal with external 1-inch thick fiberglass insulation. The supply air ductwork generally has a 20 to 60-foot primary duct that has round, flexible, insulated branches that supply ceiling mounted aluminum diffusers. The ductwork, insulation and air grilles observed were in good condition and of the sizes and types specified in the original construction documents. Accumulations of dust, debris and possible mold in the interior surfaces of the ductwork were not observed. The supply air and return air grilles had minor accumulations of duct and debris at several classrooms.

f.  The school is provided with chilled water for cooling by a 340-ton Trane air-cooled rotary screw water chiller operating on refrigerant HCFC-22. The chiller has a microprocessor based chilled water temperature controller set to maintain 41 degree F chilled water supply to the building. The chilled water temperature difference across the chiller water was approximately 10 degrees F as specified in the construction documents. The unit-mounted controller also has diagnostics. The Trane energy management system is interfaced to the controller for remote temperature set point adjustment and to receive alarms. EFI was provided a report of nuisance and chronic water chiller shutdowns by the Brownsville Independent School District maintenance department that have occurred during 2002 that average approximately eight shutdowns per month. We understand from the maintenance department that the shutdowns required manual reset and are suspected to be related to the momentary opening of the chilled water flow switch located in the chilled water piping near the chiller. The chilled water flow switch appeared to be installed properly in the chilled water piping in the chiller yard.

g.  The school is provided with a primary and secondary chilled water piping system. The secondary chilled water piping is routed from the main pump room to outside air pre-treating fan coils and individual classroom fan coil units located above ceilings on the first and second floors. Main chilled water piping headers are generally 6-inch and 4-inch diameter schedule 40 steel located above ceilings of the corridors on first and second floors. Chilled water piping branches supplying fan coil units are 2½-inch diameter and below and are type L copper. Each fan coil unit is equipped with a piping package that includes isolation and balancing valves, electronic control valves, pressure-temperature ports, and on the second floor, manual air vents. We observed that the piping generally was properly sized for the chilled water flows specified. The chilled water pipe insulation observed was generally 1-inch thick fiberglass with vapor barrier and protective wrapping on all chilled water piping except at

## 2.0 ASSESSMENT
<u>**DRAFT: FOR REVIEW ONLY**</u>
<u>**Privileged – Attorney / Client Work Product**</u>

**EFI°**
Engineering and Fire
Investigations

the piping package located at each fan coil unit. Possible mold staining was observed at several locations of chilled water pipe insulation on the first and second floor corridors. On examination, it appears that an apparent break in the vapor barrier of the insulation has occurred at these locations allowing ambient air in the ceiling to contact the surface of the chilled water piping leading to condensation behind the fiberglass insulation. Condensation and rust deterioration of the chilled water piping was observed at these locations. At several fan coil units we observed steel piping that has been installed between brass and copper fittings that have developed leaks or had failed previously. Brownsville Independent School District maintenance personnel reported that a number of piping leaks have occurred in the past at tee fittings of steel and copper piping. As the result of previous and current water piping leaks in these areas, the chilled water system contains some air as evidenced by water samples taken in the pump room and at the sight glass near the chemical feeder in the pump room. Moderate amounts of rust and debris in the chilled water sample were observed in the sample obtained. Several broken pipe taps were observed along the chilled water piping in the pump room and the chiller yard. In several classrooms, evidence of current and previous leaks by staining was observed on the floor and on ceiling tiles. We did not observe any documentation on the type and frequency of chemical treatment of the chilled water. The manual air vents observed were apparently not functioning properly.

← Broken pipe taps

h.  The pump room contains a chilled water pump skid, which has two primary pumps, two secondary pumps, variable speed drives for the secondary pumps, flow meter, pressure gauges, a decouper pipe, and staging controls. The pump skid was manufactured by Namco. The primary pumps circulate chilled water through the chiller at a constant flow rate. Two primary pumps are provided on the skid with one pump designated as stand-by. The secondary pumps circulate chilled water to the fan coil units on both floors of the building. Two secondary pumps are provided on the skid with one pump designated as stand-by. The secondary pumps are controlled by variable speed drives that respond to chilled water pressure sensors installed in the chilled water piping. In the original design, differential pressure control valves installed in the chilled water piping on each floor maintain a minimum pressure in the piping to overcome pressure losses in the piping caused by fan coil units and control valves. We were advised that Brownsville Independent School District maintenance personnel had experienced problems with the pressure settings of the differential pressure control valves. Erratic operation of the variable speed drives at the pump skid was observed during our site visit. One primary chilled water pump had leaking or broken seals.

i.  Trane model BWHA outside air pre-treating fan coils units located in wings A, B and D on the first floor and wing B on the second floor contain filter sections, 6-row chilled water coils, belt drive blower fans, and insulated drain pans. Duct mounted electric heaters are located downstream of the fan coil units. The outside air pre-treating fan coil units are rated at approximately 2250 CFM air delivery. Outside intake louvers at the building exterior and automatic intake dampers at the interior classroom fan coil units are supplying individual classrooms. Field measurements obtained of outside air intake rates at several interior classroom fan coil units determined that the outside air intake was deficient compared to the design at most units and varied from no outside air intake to approximately 614 CFM as compared to 450 CFM specified. It is apparent that either changes in the characteristics of the operation of the interior class fan coil units have been made since original construction or that a proper air balance has not been performed. Field measurements of airflow were conducted using an anemometer in straight sections of ductwork. Moderate deposits of debris and possible mold were observed on the aluminum fins of the cooling coils. Heavy accumulations of dust and debris were observed on the filter sections. Heavy rust and corrosion on the cooling coil and in the condensate drain pan of the unit was also observed.



**EFI•**
Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
#### Privileged – Attorney / Client Work Product

j.  The main entrance, Administration Office, and Counselor's Office are each provided with Trane model BWHA fan coil units, nominal 1500 CFM conditioned air delivery. The fan coil units contain filter sections, 4-row chilled water coils, belt drive blower fans, and insulated drain pans. Duct mounted electric heaters are located downstream of the fan coil units. The outside air intake dampers were open and based on field measurements are providing less than the specified amount of outside air ventilation. Dust and possible mold was observed on the face of the cooling coil. Filters had moderate to heavy accumulations of dust and debris. A condensate drain pan contains heavy rust and standing water. The fan drive wheels have limited deposits of rust. Some spots of possible mold was observed on the supply air grilles. Measured room temperatures appeared to vary 3 to 5-degrees F from the set point of the thermostats, were inoperable in some cases, and appeared to be out of calibration. The occupied areas are provided with wall mounted humidistats that, according to Brownsville Independent School District maintenance personnel, stop flow of chilled water through the fan coil units and activate the electric duct heaters if the indoor relative humidity exceeds 50 percent. This sequence appears to be an improper application of reheat. The supply air quantity of several fan coil units was measured and found that the air delivery was significantly below or above design in some cases indicating that either changes in the characteristics of the operation of the interior class fan coil units have been made since original construction or that a proper air balance has not been performed.

k.  Classrooms A101 through A108, B100 through B112, and C101 through C108 are each provided with Trane model BWHA fan coil units, nominal 1500 CFM conditioned air delivery. The fan coil units are similar in design, accessories, and installation to the fan coil units serving the administrative areas as described above. The outside air intake dampers were open and based on field measurements are providing less than the specified amount of outside air ventilation. Gray dust and possible mold was observed on the face of the cooling coils. Filters have moderate to heavy accumulations of dust and debris and the condensate drain pan contained heavy rust and standing water. Further, the exterior of the fan coils exhibited signs of condensation/sweating. The fan drive wheels have limited deposits of rust. We observed some spots of mildew on the supply air grilles. Measured room temperatures appeared to vary 3 to 5-degrees F from the set point of the thermostats, were inoperable in some cases, and appeared to be out of calibration. The occupied areas are provided with wall mounted humidistats that, according to Brownsville Independent School District maintenance personnel, stop flow of chilled water through the fan coil units and activate the electric duct heaters if the indoor relative humidity exceeds 50 percent. This sequence appears to be an improper application of reheat. The supply air quantity of some fan coil units was measured and found that the air delivery was significantly below or above the design in some cases indicating that either changes in the characteristics of the operation of the interior class fan coil units have been made since original construction or that a proper air balance has not been performed.

l.  The lobby on second floor is provided with Trane model BWHA fan coil unit, nominal 800 CFM conditioned air delivery. The fan coil unit is similar in design, accessories, and installation to the fan coil units serving the administrative areas as described above. The outside air intake dampers were open and were providing outside air ventilation. Gray dust on the face of the cooling coil was observed. Filters had moderate to heavy accumulations of dust and debris and the condensate drain pan contained heavy rust. The fan drive wheel has limited deposits of rust. Some spots of possible mold growth on the supply air grilles were observed. Measured room temperatures appeared to vary 3 to 5-degrees F from the set point of the thermostat and appeared to be out of calibration. The supply air quantity of some fan coil units was measured and found that the air delivery was significantly below or above the design indicating that either changes in the characteristics of the operation of the interior class fan coil unit have been made since original construction or that a proper air balance has not been performed.

## 2.0 ASSESSMENT
### DRAFT:  FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

**EFI°**
Engineering and Fire
Investigations

m.  Classrooms B201 through B218 are each provided with Trane model BWHA fan coil units, nominal 800 and 1350 CFM conditioned air delivery.  The fan coil units are similar in design, accessories, and installation to the fan coil units serving the administrative areas as described above. The outside air intake dampers were open and based on field measurements are providing none to 442 CFM of outside air ventilation compared to 450 CFM in the original construction documents. Gray dust and possible mold was observed on the face of the cooling coils. Filters have moderate to heavy accumulations of dust and debris and the condensate drain pans contained heavy rust.  Further, the exterior of some fan coil units exhibited signs of condensation/sweating.  The fan drive wheels had limited deposits of rust. Some spots of possible mold on the supply air grilles were observed.  Measured room temperatures appeared to vary 3 to 5-degrees F from the set point of the thermostats, were inoperable in some cases, and appeared to be out of calibration.  The occupied areas are provided with wall mounted humidistats that, according to Brownsville Independent School District maintenance personnel, stop flow of chilled water through the fan coil units and activate the electric duct heaters if the indoor relative humidity exceeds 50 percent.  This sequence appears to be an improper application of reheat. The supply air quantity at some fan coil units was measured and found that air delivery was significantly below or above the design air delivery indicating that either changes in the characteristics of the operation of the fan coil units have been made since original construction or that a proper air balance has not been performed.  Chilled water valves observed are not operating properly and allowing chilled water to enter the cooling coils.  Fans were observed operating out of balance and showing various degrees of vibration at some units.  Dissimilar metals were observed being used in pipe connections within the chilled water system.  Classrooms were observed that appeared to have had previous chilled water leaks evident by the heavy rust stains on the floors and ceiling tiles just below the HVAC units.

n.  The Cafeteria is provided with two Trane RTUs, each at 30-ton nominal cooling capacity. The RTUs rest on an insulated, structural steel roof curb foundation that provides sheet metal connections to galvanized steel ductwork.  The RTUs have integral direct-expansion cooling coils, natural gas furnaces, belt-drive blower fans, filter sections, return air/outside air mixing sections, and compressor/condenser sections. The original construction documents indicate that the RTUs are to be provided with air economizers and modulating exhaust fans, however, this equipment is not installed. Field measurements of conditioned airflow were obtained at the cafeteria west RTU and found that the unit was generally delivering lower amounts of conditioned air than design at approximately 6300 CFM compared to 8000 CFM specified in the original construction documents. Field measurements of conditioned airflow at the cafeteria east RTU and indicated that the unit was generally delivering lower amounts of conditioned air than design at approximately 7200 CFM compared to 8000 CFM specified in the original construction documents.  Field measurements were conducted using an inclined tube manometer in straight sections of the supply air ductwork.

## 2.08.5  Conclusions and Recommendations - Aiken Elementary School

Our observations identified deficient items associated with the design, installation and operation of the HVAC equipment and systems.  Using our experience with similar situations, we have made the following conclusions and recommendations.

a.  Based on typical engineering benchmarks, the interior fan coil units serving the main entrance, Administration Office, Counselor's Office and classrooms are somewhat oversized, and as a consequence, are overcooling these areas and not adequately controlling relative humidity. Based on our field measurements, some areas had temperature and relative humidity levels outside the ranges of original design.  The room thermostats are apparently out of calibration, causing some areas to be overly cool and humid.  We observed that most classrooms are provided with a nominal 1500 CFM fan

**EFI®**
Engineering and Fire
Investigations

## 2.0 ASSESSMENT
### DRAFT: FOR REVIEW ONLY
### Privileged – Attorney / Client Work Product

coil unit delivering conditioned air to the classrooms or approximately 1.8 CFM square foot versus a typical benchmark of 1.0 CFM per square foot. Elevated levels of relative humidity in these areas and classrooms and the lack of adequate routine cleaning of the interiors of the fan coil units including chilled water cooling coils have also lead to performance problems with the fan coil units and the development of molds on the cooling coils of some of the fan coil unit interiors. From field measurements, some fan coil units are not introducing adequate amounts of outside air as designed. Field measurements indicated that outside air ventilation rates vary from no outside air to amounts greater than design. Any existing RTU to remain should have the ductwork, cooling coil, drain pan, heating coil, and fan sections cleaned and sanitized by a commercial duct cleaning contractor. All existing ductwork to be reused should also be cleaned and sanitized. All existing flex duct should be replaced.

b.  A recommended solution is to conduct a cooling and heating load study of the interior areas and classrooms and re-balance the supply air quantity and chilled water flow at the existing fan coil units to match the cooling demand of the interior areas and classrooms. The chilled water cooling coils in the fan coil units are recommended for cleaning of debris and possible mold and the heat transfer tubes back-flushed of debris. Removal and replacement of non-functioning chilled water valves at the chilled water cooling coils is recommended. The room thermostats are recommended for replacement or recalibration to design conditions. Further, we recommend that the control sequence of de-humidification using electric heating coils be re-worked such that the chilled water coils operate at full capacity during the de-humidification cycle and the electric heating coils provide re-heat to maintain relative humidity at approximately 50 percent as designed. Cleaning of supply and return air grilles is recommended. Quarterly replacement of filters with pleated media filters is also recommended.

c.  Following rebalancing of the supply air and chilled water flow at the classroom fan coil units as noted, we recommend installation of dedicated outside air pre-treating air handling units mounted in the ceiling area above corridors to supply pre-heated or pre-cooled and dehumidified air to interior areas and classrooms in each wing as indicated in the table below. The pre-treating air handling units would introduce pretreated outside air in the range of 70 degrees F to each area and classroom for blending with conditioned air from the existing fan coil units.

d.  As a further temperature control option, it is recommended that the wall mounted temperature sensors at all fan coil units and RTUs be replaced with wall electronic sensors having no local setpoint adjustment. In this option, the temperature control setpoints of all fan coil units and RTUs would be maintained at one master station that communicates with the Trane Tracer 100 energy management system that is currently installed at Aiken Elementary School. This option would incorporate the schedule of operating hours and the temperature control setpoints of all HVAC equipment for both schools at one energy management system and one master station.



Engineering and Fire
Investigations

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| Classroom Nos. | Outside Air Pre-Treating Air Handling Unit Capacity |
|---|---|
| A100 through A108, B100, B102, B104, Workroom, Nurses Station | 6300 CFM |
| Administration, B112, C101 through C108 | 4950 CFM |
| B101, B103, B105, B106, Counselors Office | 3150 CFM |
| B107 through B111 | 2250 CFM |
| B201 through B209 | 4950 CFM |
| B210 through B218 | 4500 CFM |

e.  The secondary chilled water piping is routed from the pump room to outside air pre-treating fan coils and individual fan coil units located above ceilings on the first and second floors. We observed that the vapor barrier of the fiberglass insulation covering the main chilled water piping headers has failed in several areas allowing sweating to occur behind the insulation and causing the formation of molds. Also, the steel piping in these locations has rust deterioration from sweating. At a number of fan coil unit piping packages, chilled water leaks have apparently occurred due galvanic corrosion caused by the use of steel piping in direct contact with brass and copper fittings. A recommended solution is to remove and replace the 6-inch and 4-inch steel chilled water piping headers and the steel piping in the fittings with type L copper. It is recommended that a closed cell pipe insulation be utilized with a properly applied vapor barrier to prevent pipe sweating. As stated above, non-functioning chilled water control valves at the fan coil units are recommended for replacement. Following replacement, the chilled water piping system is recommended for complete flushing, treatment with a corrosion inhibitor, and purging of air. A water treatment and maintenance program is recommended to include periodic chilled water sampling and purging of air from the piping.

f.  Approximately eight shutdowns per month were experienced in 2002. We were informed that the water chiller has experienced nuisance and chronic shutdowns water. We recommend that the chiller's evaporator be completely flushed during the replacement and flushing of the chilled water piping be performed. The chilled water flow switch should be replaced during the flushing process of the chilled water piping. Damaged chilled water pipe insulation in the chilled yard and outside of the building is recommended for repair and replacement.

g.  In the original design, differential pressure control valves were installed in the chilled water piping on each floor to maintain a minimum pressure in the piping to overcome pressure losses in the piping caused by fan coil units and control valves. We were advised that Brownsville Independent School District maintenance personnel had experienced problems with the pressure settings of the differential pressure control valves. We believe that erratic operation of the variable speed drives at the pump skid is related to calibration problems with the differential pressure control valves and air in the secondary

2.0 ASSESSMENT
DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product


Engineering and Fire
Investigations

chilled water piping. We recommend that the differential pressure control valves be completely flushed and recalibrated during the flushing process of the chilled water piping. As part of the calibration, we recommend adjusting the differential pressure control valves to maintain a minimum of 10 per cent excess secondary chilled water flow in the decoupler pipe at the pump skid. We observed that one primary chilled water pump seal was leaking or broken and is recommended for replacement.

h.  The Cafetorium is provided with two Trane RTUs, each with 30-ton nominal cooling capacity. Based on typical engineering benchmarks, the RTUs are adequately sized. The RTUs are not introducing adequate amounts of outside air as designed. The RTUs are not adequately controlling temperature and relative humidity in these areas. The improper room temperatures and high relative humidity levels are generally due to the thermostats being out of calibration and the cooling coils being heavily covered with dust and debris. To control room temperature and relative humidity, the thermostats need to be properly calibrated and the RTUs staged at thermostats as indicated in the table below. It is recommended that the return air/outside air mixing sections, cooling coils, drain pans, heating coils, and blower sections be cleaned by a commercial duct cleaning contractor. To provide the design amounts of outside air ventilation and conditioned air, the outside air intake dampers need to be opened and the supply air grilles air balanced to the design conditions. A net positive indoor air pressure needs to be provided in the occupied areas.

| Room | RTU Number | RTU design conditioned air / outside air | Thermostat Set point |
|---|---|---|---|
| Cafetorium West | AC-2 | 88000 CFM / 3000 CFM O/A | 74 degrees F |
| Cafetorium East | AC-2 | 8000 CFM / 3000 CFM O/A | 76 degrees F |

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

## 3.01 Purpose and Scope of Services

**General.** The primary purpose of this Remediation Evaluation Assessment is to observe and document readily visible conditions relating to the mold damaged building components. The secondary purpose of this Remediation Evaluation Assessment is to evaluate the roof, Heating, Ventilation, and Air Conditioning System as contributors to the mold damaged building components. Finally, an assessment of the site drainage at the entrance to Besteiro Middle School was performed to determine drainage characteristics. This work has been performed using that degree of skill and care normally exercised by reputable consultants performing similar work.

**Observation.** This assessment included a site visit along with limited interviews of the school personnel. A review of available construction documents (drawings) provided by the client; and visual observations were performed to determine the general construction of the facility and the, type of design systems their possible contribution to the mold damage.

The observations are performed without removing or damaging components of the existing building systems. Consequently, comprehensive studies to identify, document, and evaluate every existing defect or deficiency was not conducted. In some cases, additional studies may be warranted to fully evaluate concerns noted. In addition, system checks or testing of the equipment's operating condition is beyond the scope of this assessment.

**Report.** This report is intended to provide a general overview of the mold damaged building components and contributing systems (roofing and HVAC) and their general conditions. The recommendations and opinions of cost provided herein are for observed deficiencies based on the understanding that the facility will continue to operate in its present occupancy classification. Certain assumptions have been made regarding conditions and operating performance. If any additional information is encountered concerning the facility, it should be forwarded to EFI for possible re-evaluation of the assumptions, conclusions and recommendations presented herein.

The opinions and recommendations presented are based on our observations, evaluation of the information provided, and limited interviews with school personnel familiar with the property. No calculations have been performed to determine the adequacy of the facility's original design. It is possible that defects and/or deficiencies exist that are not readily accessible or visible. In addition, other problems may develop with time that are not evident at the time of the assessment.

The opinions and recommendations in this report should not be construed in any way to constitute a warranty or guarantee regarding the current or future performance of any system identified.

Reliance on this report in any way by parties other than the Law Office of Miguel A. Saldana is subject to the contractual terms and conditions in effect between Law Office of Miguel A. Saldana and EFI for this project. The observations, findings, and conclusions within this report are based on our professional judgment and information obtained during the course of this assessment.

## 3.02 Report Tense

This report has been prepared in the present tense as it is intended to only describe conditions at the time of the site observations.

## 3.03 Opinion of Cost

The opinion of cost presented is for the materials and building systems affected by the assessment findings. These opinions are based on approximate quantities and values. They do not constitute a

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

warranty that all items, which may require repair or replacement, are included.  In addition, the following assumptions were utilized in the development of the Opinion of Cost.

- The General Conditions mark-up is defined as the cost to the General Contractor for performing the work.  This cost includes job supervision, job trailer, temporary utilities, small tools etc.

- The mark-up for General Contractor OH and Profit is defined as General home office overhead, insurances, bonds etc.

- The mark-up for Contingency is solely an estimating contingency due to the schematic/program level of design documentation. This is not a change order contingency. As the work becomes better defined, this percentage will decrease.

- Price escalation is included in the estimate to the mid point of FY 2004 to allow for design and bidding.

- The line items for the estimate are reported in "unit costs" which include labor and material in the cost.  The line items are developed and priced at the subcontractor level with General Contractor mark-ups added at the bottom line.

- The estimate has been developed in CSI divisions with major scopes of work separated for better definition.

- The estimate is priced using a combination of historical data and RS Means pricing Guides.

- This estimate pricing assumes the project/scope of work to be bid as one package with full access to the entire school for what ever construction period is required.

- No costs have been added to address code violations or upgrades to the existing systems.

- The estimate does not include any asbestos abatement cost.

- The estimate does not include any lead based paint abatement cost.

- The estimate does not include any cost/fees for relocation of staff/students.

This opinion should not be interpreted as a bid or offer to perform the work.  All costs are stated in present value.

In evaluating the costs presented, it is important to understand that actual costs depend on such factors as design documentation, contractor expertise, existing contractor commitments, seasonal workload, insurance and bonding.  These factors may cause wide variations in the actual cost provided by the bidders. In view of these factprs and the qualifications provided, the costs presented in this report should be considered "order of magnitude" and used for budgeting purposes only. Preparation of detailed design documentation and obtaining competitive contractor bids is necessary to determine actual costs.

## 3.04  Interviews

The following individuals provided documents, information, or assistance in performance of these services and preparation of this report.

| | |
|---|---|
| *Facilities Director:* | Oscar Tapia |
| *Facilities Coordinator:* | Robert Garcia |
| | Leo Garza |

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

| | |
|---|---|
| *General Counsel:* | Mike Saldana |
| *Maintenance Administrator:* | Raul Vasquez |
| *Maintenance:* | Kenny Robertson |
| | Gabriel DelGado |
| | Gabriel Alberta |
| | J. P. Villareal |
| | Conrad Ingle |
| *Energy Management:* | Steve Vera |

## 3.05 Documents

The following documents, were utilized in performance of these services and preparation of this report.

### Site Assessment

#### Drawings

| | |
|---|---|
| Drawings: | Brownsville ISD |
| | New Facilities For Besteiro Middle School |
| Prepared by: | Carrol, DuSang & Rand, Inc. |
| Dated: | January 1993 |
| Sheets: | C-1 through C-6, A-1 through A-61, L-1 through L-2 |

| | |
|---|---|
| Drawings: | Brownsville ISD |
| | New Facilities For Besteiro Middle School |
| Prepared by: | Carrol, DuSang & Rand, Inc. |
| Dated: | February 25, 1993 |
| Sheets: | U1-A and U1-B, Addendum No. 5 |

| | |
|---|---|
| Drawings: | Brownsville ISD |
| | New Aiken Elementary School and Additions to Besteiro Middle School |
| Prepared by: | Carrol, DuSang & Rand, Inc. |
| Dated: | November 1994 |
| Sheets: | sheets A-1 through A-47, L-1 through L-2 |

### Mold Assessment

#### Previous Reports/documents Reviewed

| | |
|---|---|
| Document: | Indoor Air Quality Environmental Survey of Bruce Aiken Elementary School, |
| From: | Assured Indoor Air Quality |
| Dated: | November 9, 2001 |
| Subject: | Aiken Elementary School |

| | |
|---|---|
| Document: | Preliminary Mold Investigation Besteiro Middle School/Aiken Elementary School |
| From: | Ambiotec Environmental Inc Consultants. |

DRAFT: FOR REVIEW ONLY
**Privileged – Attorney / Client Work Product**

Dated:          May, 2002
Subject:        Besteiro Middle School/Aiken Elementary School

## Roof Assessment
*Drawings*

Drawings:       Brownsville ISD
                Middle School -Southmost Road (Besteiro MS)
Prepared by:    Carrol, DuSang & Rand, Inc.
Dated:          January 23, 1993
Sheets:         A48, A51, and A61

Drawings:       Brownsville ISD
                New Elementary School (Aiken ES) – Southmost Road and Additions to Raul A.
                Besteiro Jr. Middle School.
Prepared by:    Carrol, DuSang & Rand, Inc.
Dated:          November 22, 1994
Sheets:         A35 and A47

*Previous Reports/Documents Reviewed*
From:           Mr. Sabas Lopez, Wilson Construction
Dated:          August 22, 1995
Subject:        Besteiro Middle School
Document:       Memorandum
Summary:        Wilson Construction (General Contractor) reported that Brownsville ISD has
                reported leaks at Besteiro Middle School during Elementary School construction
                and requested that Sechrist Hall (assumed to be the roof subcontractor) meet at
                site and review conditions.

Document        Memorandum
From:           Mr. Sabas Lopez, Wilson Construction
To:             Mr. Bill McBride, Sechrist Hall
Dated:          October 16, 1995
Subject:        Besteiro Middle School
Summary:        Follow-up to August 22, 1995 memorandum.  Confirmation of October 17, 1995
                meeting at site to review roof conditions at Besteiro Middle School

Document:       Letter
From:           Mr. Sabas Lopez, Wilson Construction
Dated:          October 19, 1995
Subject:        Roof Leaks at Besteiro Middle School
Summary:        Site Visit Report regarding reported leak locations at Besteiro Middle School
                during the Elementary School construction.  Leaks at north stairway and library
                caused by new construction/addition of Elementary School and will be addressed
                at end of construction.  Leaks at Dining Room caused by refrigeration lines
                serving HVAC units and are not related to rain events.

Document:       Letter

DRAFT: FOR REVIEW ONLY
**Privileged – Attorney / Client Work Product**

| | |
|---|---|
| From: | Mr. Jorge L. Mora, Carroll DuSang and Rand |
| Dated: | October 31, 1995 |
| Subject: | Site Visit Report regarding a walk through of the Besteiro Middle School roof |
| Summary | Concrete coping joints at roof parapet are mortared in lieu of sealant. Through-wall flashing installed at base of rise wall at northeast corner of cafetorium and east wall of gymnasium was not installed properly. Contractor was to reinstall wall flashing and seal all joints in the precast concrete coping. |

| | |
|---|---|
| Document: | Memorandum |
| From: | Mr. Raul Vasquez, Besteiro Middle School, and Assistant Principal |
| Dated: | May 1, 1996 |
| Subject: | Roof Leaks |
| Summary: | Identifying leaks at (1) cafeteria entrance, (2) band hall, (3) 1st floor teacher's lounge, and (4) new addition to band hall |

## Mechanical Assessment
### Drawings

| | |
|---|---|
| Drawings: | New Facilities For Besteiro Middle School |
| Prepared by: | Carrol, DuSang & Rand, Inc. |
| Dated: | January 1993 |
| Sheets: | M-1 through M-12 |

| | |
|---|---|
| Drawings: | New Aiken Elementary School and Additions to Besteiro Middle School |
| Prepared by: | Carrol, DuSang & Rand, Inc. |
| Dated: | November 1994 |
| Sheets: | M-1 through M-11 |

### Previous Reports/Documents Reviewed

| | |
|---|---|
| Document: | Letter of Air Conditioning Options |
| From: | Carroll Dusang and Rand Architects |
| Dated: | November 24, 1992 |
| Subject: | Southmost School |

| | |
|---|---|
| Document: | Letter and Report of Air Conditioning Options |
| From: | Coupland-Moran Engineers |
| Dated: | November 9, 1992 |
| Subject: | Aiken Elementary School |

| | |
|---|---|
| Document: | Letter and Report of Air Conditioning Options |
| From: | Coupland-Moran Engineers |
| Dated: | December 2, 1992 |
| Subject: | Southmost School |

| | |
|---|---|
| Document: | FAX-Letter of Air Conditioning Options |
| From: | Carroll Dusang and Rand Architects |
| Dated: | August 25, 1994 |
| Subject: | Aiken Elementary School |

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

| | |
|---|---|
| Document: | Final Submittal and Air Balance Report |
| From: | RBM Engineering |
| Dated: | June 9, 1999 |
| Subject: | Aiken Elementary |

| | |
|---|---|
| Document: | Indoor Air Quality Survey Environmental Survey |
| From: | Assured Indoor Air Quality |
| Dated: | November 9, 2001 |
| Subject: | Aiken Elementary School |

| | |
|---|---|
| Document: | Preliminary Mold Investigation |
| From: | Ambiotec Environmental Consultants |
| Dated: | May, 2002 |
| Subject: | Besteiro Middle School and Aiken Elementary Schools |

| | |
|---|---|
| Document: | Air Balance Report |
| From: | Alamo Controls |
| Dated: | May 27, 1999 |
| Subject: | Aiken Elementary School |

DRAFT:  FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

APPENDIX



WING G

AIKEN

WING A

WIN

WING H

O O R



WING A

WING G

DRAFT:  FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

**Appendix B -**
**Fungal and Biological Results**

Pg 1 of 6

# Chain of Custody Form - COMMERCIAL

Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: LAW OFFICES OF Soldin  Project / Job No: 98410·65340  Project Name: BISD

Date Sampled: 11/19— 11/22  Sampled by: CHRIS MURRAY

**TURNAROUND TIME: Immediate (3 HR)   Same-day   Next day   3-5 days   (3-14 days (Standard))**

Date Submitted for Laboratory analysis: _____  Contact Name and Number RICK ANDERSON

| Sample No: | Sample Description | ¹5 / 5 Volume / Min | Test Code | Notes | |
|---|---|---|---|---|---|
| AO-1 | RM 101 | 75 L | 5 | CALIBRATED | (B) |
| AO-2 | RM 106 | 75 L | 5 | | (B) |
| AO-3 | RM 111 | 75 L | 5 | | (B) |
| T-01 | R112 · BAR STOOL | N/A | 4 | | (B) |
| B-01 | RM113 · CEILING TILE | N/A | 2 | | (B) |
| AO-4 | RM 112 | 75 L | 5 | | (B) |
| AO-5 | RM 124 | 75 L | 5 | | (B) |
| AO-6 | AMBIENT | 75 L | 5 | 6:30 PM — 11-19-02 | |
| AO-7 | RM 130 | 75 L | 5 | CALIBRATED  11.20-02 | (B) |
| AO-8 | LOCKERS AREAS | 75 L | 5 | | (B) |
| AO-9 | BAND ROOM | 75 L | 5 | | (B) |
| T-02 | REHERSAL HALL | N/A | 4 | PIANO - WOOD | (B) |

**Test Codes**    (B) = BESTERIO
**(Aerotech/ Bulks)**    (A) = AIKEN
1. Fungi – culture (Count and Genus ID).          3. Swab – (Culture Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).          4. Tape lift Direct Exam. (Genus ID and relative count)

**(Air-o-cell / Allergenco)**
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date | Samples Received by | Date / Time |
|---|---|---|---|
| Cl~ ~ | 11/25/02  9:00 PM | Aubrey Mills | Mar/02  1:16 PM |
| Results Released By | Time / Date | Results Received by | Date / Time |
| Pakes | 12/4/02  3:24 PM | | |

Pg 2 of 6

# Chain of Custody Form - COMMERCIAL

Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: _____    Project / Job No: 98410 - 05340    Project Name: BISD

Date Sampled: 11-19 > 11/22    Sampled by: CHRIS MURPHY

**TURNAROUND TIME: Immediate (3 HR)   Same-day   Next day   3-5 days   (3-14 days (Standard))**

Date Submitted for Laboratory analysis: _____    Contact Name and Number _____ _____

| Sample No: | Sample Description | Volume / Min 15/5 | Test Code | Notes |
|---|---|---|---|---|
| Ao-10 | REHERSAL HALL | 75L | 5 | (B) |
| Ao-11 | RM 123 | 75L | 5 | (B) |
| T-03 | RM 123 | N/A | 4 | STORAGE RM DOOR (B) |
| Ao-12 | RM 117 | 75L | 5 | (B) |
| T-04 | ols RM 120 | N/A | 4 | HALLWAY (SE Corridor) (B) |
| Ao-13 | Principals office | 75L | 5 | (B) |
| T-05 | PRINCIPAL'S DESK | N/A | 4 | (B) |
| T-06 | Principal's CHAIR | N/A | 4 | (B) |
| Ao-14 | AMBIENT | 75L | 5 | 11-20-02 · 2:51 · 73°F/57%/ ca 0·6 / co2 370 |
| Ao-15 | AIKEN CAFETERIA | 75L | 5 | (A) |
| T-07 | AIKEN CAFETERIA | N/A | 4 | CAFETERIA TABLE - UNDER (A) |
| Ao-16 | RM B100 | 75L | 5 | (A) |

**Test Codes**    (A)= AIKEN
(B) = BESTERIO

**(Aerotech/ Bulks)**
1. Fungi – culture (Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).
3. Swab – (Culture Count and Genus ID).
4. Tape lift Direct Exam. (Genus ID and relative count)

**(Air-o-cell / Allergenco)**
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date 11/25/02  9:00 a | Samples Received by | Date / Time 11/25/02  1:16 pm |
|---|---|---|---|
| Results Released By | Time / Date 12/4/02  3:21pm | Results Received by | Date / Time |

Pg 3 of 6

# Chain of Custody Form - COMMERCIAL
Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: _____    Project / Job No: 93410 - 05340    Project Name: BISD

Date Sampled: 11/19 → 11/22    Sampled by: CHEN MURRAY

TURNAROUND TIME: Immediate (3 HR)    Same-day    Next day    3-5 days    3-14 days (Standard)

Date Submitted for Laboratory analysis: _____    Contact Name and Number ___ _____

| Sample No: | Sample Description | Volume / Min | Test Code | Notes |
|---|---|---|---|---|
| AO-17 | RM A101 | 75 L | 5 | (A) |
| AO-18 | RM A102 | 75 L | 5 | (A) |
| AO-19 | AMBIENT | 75 L | 5 | RH:48/ Temp: 66°F  11-20-02 - 6:23pm  CO-0.4  CO2-409 |
| AO-20 | RM B104 | 75 L | 5 | CALIBRATED 11-21-02 (A) |
| AO-21 | ADMIN OFFICE | 75 L | 5 | (A) |
| AO-22 | RM B111 | 75 L | 5 | (A) |
| AO-23 | RM C101 | 75 L | 5 | CEILING PLENUM (A) |
| T-08 | RM C101 | N/A | 4 | RESTROOM - WINDOW SILL (A) |
| AO-24 | RM C107 | 75 L | 5 | (A) |
| T-09 | CORRIDOR B - PIPE | N/A | 4 | CHILL H₂O PIPE (A) |
| AO-25 | AMBIENT | 75 | 5 | 11-21-02 1:38 PM  RH:29% Temp: 74°  CO-0.0  CO2 = 372 |
| T-10 | RM B214 | N/A | 4 | FIRE RATED CEILING |

**Test Codes**    (A) = AIKEN
(B) = BESTERIO

**(Aerotech/ Bulks)**
1. Fungi – culture (Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).

3. Swab – (Culture Count and Genus ID).
4. Tape lift Direct Exam. (Genus ID and relative count)

**(Air-o-cell / Allergenco)**
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date | Samples Received by | Date / Time |
|---|---|---|---|
| CL | 11/25/02 / 9:00 AM | Aileen Mills | 11/27/02 1:16 pm |
| **Results Released By** | **Time / Date** | **Results Received by** | **Date / Time** |
| Plato | 12/4/02 3:21pm | | |

DRAFT:  FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

**Appendix A -
Wing Designation Drawing**

Pg 4 of 6

## Chain of Custody Form - COMMERCIAL
### Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: _____   Project / Job No: 98410 - 05340   Project Name: BISD

Date Sampled: 11/19 → 11/22   Sampled by: Chris Murphy

**TURNAROUND TIME: Immediate (3 HR)   Same-day   Next day   3-5 days   3-14 days (Standard)**

Date Submitted for Laboratory analysis: _____   Contact Name and Number _____

| Sample No. | Sample Description | Volume / Min | Test Code | Notes | |
|---|---|---|---|---|---|
| A0-26 | B211 | 75 L | 5 | (A) | |
| A0-27 | B217 | 75 L | 5 | (A) | |
| A0-28 | RM B206 | 75 L | 5 | (A) | |
| A0-29 | RM B201 | 75 L | 5 | (A) | |
| A0-30 | RM 226 | 75 L | 5 | (B) | |
| A0-31 | RM 219 | 75 L | 5 | (B) | |
| A0-32 | RM 215 | 75 L | 5 | (B) | |
| A0-33 | AMBIENT | 75 L | 5 | 11-21-02 / 7:02 PM / 68°F / RH=43% / CO=0.4 | CO2=445 |
| A0-34 | AMBIENT | 75 L | 5 | 11-22-02 / 8:13 AM / 64°F / RH= 47% / CO=1.4 / CO2= 412 | |
| A0-35 | RM 210 | 75 L | 5 | CALIBRATED (B) | |
| A0-36 | RM 204 | 75 L | 5 | (B) | |
| A0-37 | East central corridor | 75 L | 5 | LEVEL 2 (B) | |

**Test Codes**   (A) = AIKEN
                 (B) = BESTEGO

**(Aerotech/ Bulks)**
1. Fungi – culture (Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).
3. Swab – (Culture Count and Genus ID).
4. Tape lift Direct Exam. (Genus ID and relative count)

**(Air-o-cell / Allergenco)**
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date | Samples Received by | Date / Time |
|---|---|---|---|
| Chris | 11/25/62  9:00 am | Aileen Mills | 11/25/02  1:16 pm |
| Results Released By | Time / Date | Results Received by | Date / Time |
| Patel | 12/4/02  3:22 pm | | |

pg 5 of 6

# Chain of Custody Form - COMMERCIAL
Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: _____   Project / Job No: 98410- 05340   Project Name: BISD

Date Sampled: 11/19 → 11/22   Sampled by: CHRIS MURPHY

TURNAROUND TIME: Immediate (3 HR)   Same-day   Next day   3-5 days   3-14 days (Standard)

Date Submitted for Laboratory analysis: _____   Contact Name and Number _____ _____

| Sample No: | Sample Description | Volume / Min | Test Code | Notes | |
|---|---|---|---|---|---|
| A0-38 | RM 231 | 75 L | 5 | | (B) |
| A0-39 | RM 236 | 75 L | 5 | | (B) |
| A0-40 | AMBIENT | 75 L | 5 | 11-22-02 11:01 AM | TEMP 75° CO-0.1 RH 35% CO2-422 (B) |
| A6-1 | AMBIENT | 141 L | 1 | ↓ ME - CALIBRATED | |
| A6-2 | BESTEIRO LOBBY | 84.9 L | 1 | ENTRANCE ME | (B) |
| A6-3 | RM 102 | 84.9 L | 1 | 75/49% ME | (B) |
| A6-4 | BESTEIRO CAFETERIA | 84.9 L | 1 | 73°/46% ME | (B) |
| A6-5 | RM 228 | 84.9 L | 1 | 75°/41% ME | (B) |
| A6-6 | RM 220 | 84.9 L | 1 | 74° 46% ME | (B) |
| A6-7 | RM A108 | 84.9 L | 1 | 72° 49% ME | (A) |
| A6-8 | AIKEN LOBBY | 84.9 L | 1 | 71° 44% ME | (A) |
| A6-9 | RM C108 | 84.9 L | 1 | 69° 43% ME | (A) |

### Test Codes
(A) : AIKEN
(B) : BESTEIRO

(Aerotech/ Bulks)
1. Fungi – culture (Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).
3. Swab – (Culture Count and Genus ID).
4. Tape lift Direct Exam. (Genus ID and relative count)

(Air-o-cell / Allergenco)
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date | Samples Received by | Date / Time |
|---|---|---|---|
| (signature) | 11/25/02 / 9:00 A7 | Allan Miller | 11/26/02 1:16 pm |
| Results Released By | Time / Date | Results Received by | Date / Time |
| Pates | 12/4/02 3.22pm | | |

Pg 6 of 6

# Chain of Custody Form - COMMERCIAL

Technical Support Services
2218 Northpark Drive, Kingwood, TX 77339

Client Name: _____  Project / Job No: 9B410 -05340  Project Name: BZSD

Date Sampled: 11/19-7 11/22  Sampled by: CHRIS MURPHY

**TURNAROUND TIME: Immediate (3 HR)  Same-day  Next day  3-5 days  3-14 days (Standard)**

Date Submitted for Laboratory analysis: _____  Contact Name and Number __ _____

| Sample No: | Sample Description | Volume / Min | Test Code | Notes |
|---|---|---|---|---|
| A6-10 | RM B206 | 84.9 L | 1 | 71° / 43% (A) |
| A6-11 | RM B216 | 84.9 L | 1 | 70° / 45% (A) |
| T-11 | RM B211 | N/A | 4 | INSIDE WALL CAVITY SOUTH WALL (A) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Test Codes**  (A) = AIKEN
(B) = BESIGIKU

**(Aerotech/ Bulks)**
1. Fungi – culture (Count and Genus ID).
2. Bulk sample – (Culture and Genus ID).

3. Swab – (Culture Count and Genus ID).
4. Tape lift Direct Exam. (Genus ID and relative count)

**(Air-o-cell / Allergenco)**
5. Fungi (Count and Genus ID)

| Samples Released By | Time / Date | Samples Received by | Date / Time |
|---|---|---|---|
| Cl | 11/25/02  9:00 AM | Alison Miller | 11/25/02  1:16 pm |
| Results Released By | Time / Date | Results Received by | Date / Time |
| Yates | 12/4/02  3.23 pm | | |

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing**
**(EMPAT) Program. Laboratory ID # 163092**

**Client: EFI**              **Project Name: BISD**              **Project No: 98410-05840**

**Date Sampled: 11/19 ~ 11/22**     **Name of Sampler: CHRIS MURRAY**

**Test Method: Aerotech 6 / Malt Extract Agar**

**Date Received for Laboratory analysis: 11/25/02**          **Date Completed: 12/04/02**

**Lab Job Number: 1197**          **Lab Test Method: Culturable/ Genus ID and Colony Count**

| Sample ID: | A61 | A62 | A63 | A64 |
|---|---|---|---|---|
| Location: | Ambient | BESTEIRO LOBBY | RM 102 | BESTEIRO CAFETERIA |
| Total Volume Air: | 141.5L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) |
| Alternaria | | | | |
| Arthrinium | | | | |
| Aspergillus sp. | 28 | | | 24 |
| *Aspergillus niger* | | | | 12 |
| Aureobasidium | | | | |
| Botrytis | | | | |
| Chrysosporium | | 12 | 35 | |
| Chaetomium | | | | |
| Cladosporium | 276 | 141 | 71 | 82 |
| Coprinus | | | | |
| Curvularia | | 12 | | |
| Drechslera/Bipolaris Group | | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | 28 | | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium sp. | 128 | 24 | | 59 |
| Phoma sp. | | | | |
| Scopulariopsis | | | | |
| Sporothrix sp. | | 12 | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | |
| Non Sporulating Fungi | 64 | 12 | 59 | 12 |
| Unidentified | | | | |
| **Total CFU/ m³** | **524** | **213** | **165** | **189** |

Analyst: _Bates_    Lab Supervisor: _Bates_    Date/Time _12/4/02 3.19pm_

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program.  Laboratory ID # 163092**

**Client:  EFI**            **Project Name:  BISD**            **Project No:  98410-05840**

**Date Sampled:  11/19 ~ 11/22**      **Name of Sampler:  CHRIS MURRAY**

**Test Method: Aerotech 6 / Malt Extract Agar**

**Date Received for Laboratory analysis: 11/25/02**        **Date Completed: 12/04/02**

**Lab Job Number: 1197**          **Lab Test Method:  Culturable/ Genus ID and Colony Count**

| Sample ID: | A65 | A66 | A67 | A68 |
|---|---|---|---|---|
| Location: | RM 228 | RM 220 | RM A108 | AIKEN LOBBY |
| Total Volume Air: | 84.9L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) |
| Alternaria | | | 47 | |
| Arthrinium | | | | |
| Aspergillus sp. | | | | |
| *Aspergillus niger* | | | | |
| Aureobasidium | | | | |
| Botrytis | | | | |
| Chrysosporium | | | | |
| Chaetomium | | | | |
| Cladosporium | 35 | | 24 | 12 |
| Coprinus | | | | |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | 24 | | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium sp. | | | 12 | 12 |
| Phoma sp. | | | 188 | |
| Scopulariopsis | | | | |
| Sprothrix sp. | | | 12 | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | |
| Non Sporulating Fungi | 35 | 35 | | |
| Unidentified | | | | |
| **Total CFU/ m³** | 94 | 35 | 283 | 24 |

Analyst: _Blatos_      Lab Supervisor: _Blatos_      Date/Time _12/4/02  3:19pm_

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program.  Laboratory ID # 163092**

**Client:** EFI                **Project Name:** BISD                **Project No:** 98410-05840

**Date Sampled:** 11/19 ~ 11/22        **Name of Sampler:** CHRIS MURRAY

**Test Method:** Aerotech 6 / Malt Extract Agar

**Date Received for Laboratory analysis:** 11/25/02              **Date Completed:** 12/04/02

**Lab Job Number:** 1197          **Lab Test Method:** Culturable/ Genus ID and Colony Count

| Sample ID: | A69 | A610 | A611 | A64 |
|---|---|---|---|---|
| Location: | RM C108 | RM B206 | RM B211 | |
| Total Volume Air: | 84.9L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) | 84.9L (CFU/m³) |
| Alternaria | | | | |
| Arthrinium | | | | |
| Aspergillus sp. | | | 12 | |
| *Aspergillus niger* | | | | |
| Aureobasidium | | | | |
| Botrytis | | | | |
| Chrysosporium | | 12 | 12 | |
| Chaetomium | | | | |
| Cladosporium | 24 | 59 | 200 | |
| Coprinus | | | | |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium sp. | 82 | 12 | | |
| Phoma sp. | | | | |
| Scopulariopsis | | 24 | | |
| Sporothrix | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | |
| Non Sporulating Fungi | 24 | | 71 | |
| Unidentified | | | | |
| **Total CFU/ m³** | 130 | 107 | 295 | |

**Analyst:** _Slater_      **Lab Supervisor:** _Slater_      **Date/Time** _12/4/02  3.19pm_

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

Client: EFI                    Project Name: BISD                    Project No: 98410-05840

Date Sampled: 11/19 ~ 11/22        Name of Sampler: CHRIS MURRAY

Test Method: Air-o-cell

Date Received for Laboratory analysis: 11/25/02              Date Completed: 11/27/02

Lab Job Number: 1197              Lab Test Method: Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-1 | A0-2 | A0-3 | A0-4 |
|---|---|---|---|---|
| Location: | RM 101 | RM 106 | RM 111 | RM 112 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | 53 | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 160 | 267 | 373 | 160 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | | 107 |
| Epicoccum purpurascens | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 160 | 213 | 267 | 3466 |
| Scopulariopsis | 160 | 107 | | 6132 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | 53 | | | 107 |
| Basidiospores | | | 107 | 267 |
| Hyphal Fragments | 213 | | 53 | 53 |
| Unidentified | | | | |
| Total spores/m³ | 799 | 587 | 800 | 10292 |
| Debris Rating | 1 | 1 | 1 | 1 |

Analyst: _Slate for R Yap_  Lab Supervisor: _Slate_        Date/Time 12/2/02 1.24pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**

**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

Client: EFI                  Project Name: BISD                  Project No: 98410-05840

Date Sampled: 11/19 ~ 11/22          Name of Sampler: CHRIS MURRAY

Test Method: Air-o-cell

Date Received for Laboratory analysis: 11/25/02          Date Completed: 11/27/02

Lab Job Number: 1197          Lab Test Method: Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-5 | A0-6 | A0-7 | A0-8 |
|---|---|---|---|---|
| Location: | RM 124 | AMBIENT | RM 130 | LOCKERS AREAS |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | 213 | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | | 533 | 53 | |
| Curvularia | | 53 | | |
| Drechslera/Bipolaris Group | | 107 | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | 107 | | |
| Nigrospora | | 53 | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | | 373 | 160 | 53 |
| Scopulariopsis | 107 | | | |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | 53 | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | 320 | | 53 |
| Basidiospores | 160 | 960 | | 107 |
| Hyphal Fragments | | 267 | | |
| Unidentified | | 1 | | |
| **Total spores/m³** | 267 | 3042 | 213 | 213 |
| **Debris Rating** | 1 | 1 | 1 | 1 |

Analyst: _Patel for R Kapil_  Lab Supervisor: _Patel_          Date/Time 12/2/02  1·25pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program.  Laboratory ID # 163092**

Client:  EFI                 Project Name:  BISD                 Project No:  98410-05840

Date Sampled:  11/19 ~ 11/22          Name of Sampler:  CHRIS MURRAY

Test Method: Air-o-cell

Date Received for Laboratory analysis: 11/25/02          Date Completed: 11/27/02

Lab Job Number:  1197          Lab Test Method:  Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-9 | A0-10 | A0-11 | A0-12 |
|---|---|---|---|---|
| Location: | BAND ROOM | REHERSAL HALL | RM 123 | RM 117 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | 53 | | | |
| Alternaria | | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 213 | | 1013 | |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | 107 | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | 53 | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicilium/Aspergillus | 2400 | 11,517 | 9224 | 3999 |
| Scopulariopsis | 53 | 26,180 | 12,477 | 267 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | |
| Hyphal Fragments | 267 | 53 | 53 | |
| Unidentified | | | | |
| Total spores/m³ | 3146 | 37,750 | 22,767 | 4266 |
| Debris Rating | 1 | 1 | 1 | 1 |

Analyst:  *BRoach*      Lab Supervisor:  *Pales*      Date/Time  12/2/02  1·27pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

Client: EFI                Project Name: BISD                Project No: 98410-05840

Date Sampled: 11/19 ~ 11/22        Name of Sampler: CHRIS MURRAY

Test Method: Air-o-cell

Date Received for Laboratory analysis: 11/25/02        Date Completed: 11/27/02

Lab Job Number: 1197        Lab Test Method: Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-13 | A0-14 | A0-15 | A0-16 |
|---|---|---|---|---|
| Location: | PRINCIPAL'S OFFICE | AMBIENT | AIKEN CAFETERIA | RM B100 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 320 | 1606 | | |
| Curvularia | | 160 | | |
| Drechslera/Bipolaris Group | | 373 | | |
| *Epicoccum purpurascens* | | 53 | | |
| Fusarium | | 160 | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | 53 | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 4852 | 427 | 213 | 267 |
| Scopulariopsis | 14,183 | 213 | 1333 | 960 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | 213 | | |
| Basidiospores | | 267 | | |
| Hyphal Fragments | | 373 | | |
| Unidentified | | | | |
| **Total spores/m³** | 19,355 | 3898 | 1546 | 1227 |
| **Debris Rating** | 1 | 1 | 1 | 1 |

Analyst: *BRoach*    Lab Supervisor: *Slater*    Date/Time 12|2|02 1:28pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing**
**(EMPAT) Program.  Laboratory ID # 163092**

Client: EFI                    Project Name:  BISD                    Project No:  98410-05840

Date Sampled: 11/19 ~ 11/22        Name of Sampler:  CHRIS MURRAY

Test Method: Air-o-cell

Date Received for Laboratory analysis: 11/25/02                    Date Completed: 11/26/02

Lab Job Number: 1197        Lab Test Method:  Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-17 | A0-18 | A0-19 | A0-20 |
|---|---|---|---|---|
| Location: | RM A101 | RM A102 | AMBIENT | RM B104 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | | 160 | 853 | 267 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | 53 | |
| Epicoccum purpurascens | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | | 160 | 53 |
| Nigrospora | 53 | | 160 | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 3679 | 1066 | 213 | 267 |
| Scopulariopsis | 906 | 587 | | |
| Stachybotrys | | | | |
| Tetraploa | | | 53 | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | 107 | | 160 | 53 |
| Basidiospores | 107 | | 213 | 107 |
| Hyphal Fragments | | 107 | | |
| Unidentified | | | | |
| **Total spores/m³** | 4852 | 1813 | 1972 | 747 |
| **Debris Rating** | 2 | 1 | 3 | 4 |

Analyst: _(signature)_  Lab Supervisor: _(signature)_    Date/Time 12/2/02 1:28pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program.  Laboratory ID # 163092**

| Client: EFI | Project Name: BISD | | Project No: 98410-05840 |
|---|---|---|---|

Date Sampled: 11/19 ~ 11/22      Name of Sampler: CHRIS MURRAY

Test Method: Air-o-cell

| Date Received for Laboratory analysis: 11/25/02 | | Date Completed: 11/26/02 | |
|---|---|---|---|

Lab Job Number: 1197          Lab Test Method:  Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-21 | A0-22 | A0-23 | A0-24 |
|---|---|---|---|---|
| Location: | ADMIN OFFICE | RM B111 | RM C101 | RM C107 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | 53 | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 107 | 53 | 427 | 693 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | 53 | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | | | |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 160 | 427 | 267 | 2346 |
| Scopulariopsis | | | | |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | 160 |
| Hyphal Fragments | | | | |
| Unidentified | | | | |
| **Total spores/m³** | 372 | 480 | 694 | 3199 |
| **Debris Rating** | 1 | 1 | 2 | 2 |

Analyst: _Silugs Nili_    Lab Supervisor: _Pates_    Date/Time _11/27th/02 1:28pm_

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**

**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

**Client: EFI**                    **Project Name: BISD**                    **Project No: 98410-05840**

**Date Sampled: 11/19 ~ 11/22**        **Name of Sampler: CHRIS MURRAY**

**Test Method: Air-o-cell**

**Date Received for Laboratory analysis: 11/25/02**            **Date Completed: 11/26/02**

**Lab Job Number: 1197**            **Lab Test Method: Non Culturable Genus ID and Count light microscopy**

| Sample ID: | A0-25 | A0-26 | A0-27 | A0-28 |
|---|---|---|---|---|
| Location: | AMBIENT | B211 | B217 | RM B206 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 693 | | 107 | |
| Curvularia | | 53 | | |
| Drechslera/Bipolaris Group | 107 | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | 160 | 53 | | |
| Nigrospora | 53 | | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 53 | 107 | | 53 |
| Scopulariopsis | | 53 | | 160 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | 53 | | | |
| Basidiospores | 107 | 53 | | |
| Hyphal Fragments | 160 | | 53 | 53 |
| Unidentified | 1 | | | |
| **Total spores/m³** | 1387 | 319 | 160 | 266 |
| **Debris Rating** | 1 | 1 | 1 | 1 |

Analyst: _Al Caram_ ——— Lab Supervisor: _Pates_ ——— Date/Time 12|2|02 1·23 pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

| Client: EFI | Project Name: BISD | Project No: 98410-05840 |
|---|---|---|

Date Sampled: 11/19 ~ 11/22     Name of Sampler: CHRIS MURRAY

Test Method: Air-o-cell

| Date Received for Laboratory analysis: 11/25/02 | Date Completed: 11/26/02 |
|---|---|

Lab Job Number: 1197     Lab Test Method: Non Culturable Genus ID and Count light microscopy

| Sample ID: | A0-29 | A0-30 | A0-31 | A0-32 |
|---|---|---|---|---|
| Location: | RM B201 | RM 226 | RM 219 | RM 215 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | | 53 | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 53 | 53 | 213 | 53 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | 53 | |
| Epicoccum purpurascens | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | 53 | 53 | |
| Nigrospora | | | 53 | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | | 53 | 213 | 107 |
| Scopulariopsis | | | 53 | 160 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | 53 | | 53 | |
| Basidiospores | | | 53 | 53 |
| Hyphal Fragments | | | 267 | 53 |
| Unidentified | | | 2 | |
| Total spores/m³ | 106 | 159 | 1066 | 426 |
| Debris Rating | 1 | 1 | 4 | 1 |

Analyst: _[signature]_     Lab Supervisor: _[signature]_     Date/Time 2/12/02 1:28pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing**
**(EMPAT) Program.  Laboratory ID # 163092**

| Client:  EFI | Project Name:  BISD | Project No:  98410-05840 |
|---|---|---|

**Date Sampled:** 11/19 ~ 11/22     **Name of Sampler:** CHRIS MURRAY

**Test Method: Air-o-cell**

| Date Received for Laboratory analysis: 11/25/02 | Date Completed: 11/26/02 |
|---|---|

**Lab Job Number: 1197**     **Lab Test Method:  Non Culturable Genus ID and Count light microscopy**

| Sample ID: | A0-33 | A0-34 | A0-35 | A0-36 |
|---|---|---|---|---|
| Location: | AMBIENT | AMBIENT | RM 210 | RM 204 |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | X | |
| Alternaria | | 53 | | |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | 53 | | | |
| Cladosporium | 533 | 746 | | 53 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | 53 | | | |
| *Epicoccum purpurascens* | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | 53 | | | |
| Nigrospora | 53 | | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | 267 | 53 | | |
| Scopulariopsis | | | | 53 |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | 213 | 53 | | |
| Basidiospores | 53 | 53 | | 53 |
| Hyphal Fragments | 53 | | | |
| Unidentified | | | | |
| **Total spores/m³** | 1331 | 958 | N/A | 159 |
| **Debris Rating** | 2 | 2 | 1 | 1 |

Analyst: _____    Lab Supervisor: _____    Date/Time 12|2|02  1:28 pm

**Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing**
**(EMPAT) Program. Laboratory ID # 163092**

| Client: EFI | Project Name: BISD | Project No: 98410-05840 |
|---|---|---|

**Date Sampled: 11/19 ~ 11/22    Name of Sampler: CHRIS MURRAY**

**Test Method: Air-o-cell**

| Date Received for Laboratory analysis: 11/25/02 | | Date Completed: 11/26/02 | |
|---|---|---|---|

**Lab Job Number: 1197    Lab Test Method: Non Culturable Genus ID and Count light microscopy**

| Sample ID: | A0-37 | A0-38 | A0-39 | A0-40 |
|---|---|---|---|---|
| Location: | EAST CENTRAL CORRIDOR | RM 231 | RM 236 | AMBIENT |
| Total Volume Air: | 75 L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) | 75L (spores/m³) |
| No Fungal Spores Detected | | | | |
| Alternaria | | | | 53 |
| Aureobasidium | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | 53 | 267 | 160 | 1066 |
| Curvularia | | | | |
| Drechslera/Bipolaris Group | | | | 106 |
| Epicoccum purpurascens | | | | |
| Fusarium | | | | |
| Myxomycetes/Rust/Smut | | | 53 | 53 |
| Nigrospora | | | | |
| Paecilomyces | | | | |
| Penicillium/Aspergillus | | | 53 | |
| Scopulariopsis | | 53 | | |
| Stachybotrys | | | | |
| Tetraploa | | | | |
| Torula | | | | |
| Ulocladium/Stemphylium | | | | |
| Ascospores | | 53 | | 267 |
| Basidiospores | | | | |
| Hyphal Fragments | | 53 | | 53 |
| Unidentified | | | | |
| **Total spores/m³** | 53 | 426 | 266 | 1598 |
| **Debris Rating** | 1 | 1 | 1 | 2 |

Analyst: _____ Lab Supervisor: _____ Date/Time 12|2|02 1·28pm

**EFI- Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical**
**Testing (EMPAT) Program. Laboratory ID # 163092**

Client: EFI                    Project Name: BISD                    Project No: 98410-05840

Date Sampled: 11/19 ~ 11/22          Name of Sampler: CHRIS MURRAY

Test Method: Bulk / Direct Exam / Tape Lift

Date Received for Laboratory analysis: 11/25/02          Date Completed: 11/25/02

Lab Job Number: 1197          Lab Test Method: Cultrable/ Genus ID

| Sample No: | Volume (Liters) | Sample Description | Genus Identification | Relative Conc |
|---|---|---|---|---|
| B-01 | | RM113 – CEILING TILE | Cladosporium | Loaded |

Analyst: _____   Lab Supervisor: _____   Date/Time: 12/2/02 11·35am

**EFI- Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical Testing (EMPAT) Program. Laboratory ID # 163092**

Client: EFI                Project Name: BISD                Project No: 98410-05840

Date Sampled: 11/19 ~ 11/22        Name of Sampler: CHRIS MURRAY

Test Method: Tape lift

Date Received for Laboratory analysis: 11/25/02             Date Completed: 11/25/02

Lab Job Number: 1197          Lab Test Method: Non viable Genus ID

| Sample No: | Volume (Liters) | Sample Description | Genus Identification | Relative Conc. |
|---|---|---|---|---|
| T-01 | | R112 – BAR STOOL | Chaetomium<br>Nigrospora<br>Penicillium sp.<br>Scopulariopsis | Few<br>Few<br>Loaded<br>Many |
| T-02 | | REHERSAL HALL | Cladosporium<br>Penicillium<br>Scopulariopsis | Few<br>Loaded<br>Many |
| T-03 | | RM 123 | Aureobasidium<br>Cladosporium | Few<br>Many |
| T-04 | | O/S RM 120 | Chaetomium<br>Penicillium sp.<br>Scopulariopsis | Few<br>Loaded<br>Loaded |
| T-05 | | PRINCIPAL'S DESK | Penicillium sp.<br>Scopulariopsis | Loaded<br>Loaded |
| T-O6 | | PRINCIPAL'S CHAIR | Aspergillus sp.<br>Cladosporium<br>Scopulariopsis | Loaded<br>Many<br>Loaded |
| T-07 | | AIKEN CAFETERIA | Aspergillus sp.<br>Penicillium sp. | Loaded<br>Loaded |

Analyst: _Bates_  Lab Supervisor: _Bates_        Date/Time  12/2/02  11-35am

**EFI- Technical Support Services**
**Dept of Microbiology**
**2218 Northpark Dr, Kingwood, TX, 77339**
**Tel: 281 312 3136**
**EFI-TSS Microbiology Laboratory is a participant in the AIHA Environmental Microbiology Analytical**
**Testing (EMPAT) Program.  Laboratory ID # 163092**

Client: EFI                    Project Name:  BISD                    Project No:  98410-05840

Date Sampled:  11/19 ~ 11/22          Name of Sampler:  CHRIS MURRAY

Test Method: Tape lift

Date Received for Laboratory analysis:  11/25/02              Date Completed: 11/25/02

Lab Job Number: 1197          Lab Test Method:  Non viable Genus ID

| Sample No: | Volume (Liters) | Sample Description | Genus Identification | Relative Conc. |
|---|---|---|---|---|
| T-08 | | RM C101 | Aspergillus sp. Cladosporium | Loaded Loaded |
| T-09 | | CORRIDOR B – PIPE | Stachybotrys | Loaded |
| T-10 | | RM B214 | Dreschlera sp. | Loaded |
| T-11 | | RM B211 | Nigrospora Phoma sp. | Loaded |

Analyst: _Bakos_  Lab Supervisor: _Bakos_        Date/Time _12/2/02 11-16am_

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**Appendix C –**
**Temperature, Relative Humidity, Carbon Monoxide and Dioxide Results**

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

### APPENDIX C
### BESTEIRO MIDDLE SCHOOL
### BROWNSVILLE, TEXAS

**Air Sample Results**

| LOCATION | Temperature (Degrees F) | Relative Humidity (%) | Carbon Monoxide (ppm) | Carbon Dioxide (ppm) |
|---|---|---|---|---|
| **Date Sampled: 11/19/02-11/22/02** | | | | |
| 213 | 72°F | 43% | 0 ppm | 426 ppm |
| 217 | 72°F | 40% | 0 ppm | 470 ppm |
| S & SE Corridor and Restrooms | 71°F | 41% | 0 ppm | 450 ppm |
| SW Teacher's Lounge | 70°F | 42% | 0 ppm | 415 ppm |
| 214 | 72°F | 41% | 0 ppm | 390 ppm |
| SW Custodian Room | 73°F | 40% | 0 ppm | 434 ppm |
| 215 | 73°F | 39% | 0 ppm | 426 ppm |
| 216 | 72°F | 40% | 0 ppm | 387 ppm |
| 218 | 73°F | 40% | 0.2 ppm | 402 ppm |
| 219 | 73°F | 40% | 0 ppm | 395 ppm |
| 221 | 72°F | 44% | 0 ppm | 380 ppm |
| 220 | 72°F | 42% | 0 ppm | 392 ppm |
| 222 | 71°F | 43% | 0.2 ppm | 416 ppm |
| 223 | 72°F | 38% | 0 ppm | 484 ppm |
| 225 | 71°F | 45% | 0 ppm | 385 ppm |
| 224 | 71°F | 36% | 0 ppm | 411 ppm |
| 226 | 71°F | 45% | 0 ppm | 394 ppm |
| 227 | 74°F | 45% | 0.1 ppm | 400 ppm |
| Cafeteria | 72°F | 55% | 0.3 ppm | 371 ppm |
| Corridor B | 73°F | 54% | 0.7 ppm | 402 ppm |
| 115 | 73°F | 54% | 0 ppm | 385 ppm |
| 116 | 73°F | 54% | 0 ppm | 392 ppm |
| Security Office | 74°F | 55% | 0 ppm | 479 ppm |
| Office | 73°F | 64% | 0.1 ppm | 397 ppm |
| Counseling Office | 71°F | 58% | 0.1 ppm | 460 ppm |
| Corridor C | 72°F | 59% | 0 ppm | 434 ppm |
| 117 | 72°F | 58% | 0.1 ppm | 422 ppm |
| 118A | 72°F | 60% | 0 ppm | 427 ppm |
| 118B | 71°F | 61% | 0 ppm | 438 ppm |
| Rehersal Hall | 71°F | 69% | 0.4 ppm | 377 ppm |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO2):** | 1000 ppm |
| **ACGIH Threshold Limit Value:** | 5000 ppm |
| **OSHA Permissible Exposure Limit:** | 5000 ppm |
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | 9 ppm |
| **ACGIH Threshold Limit Value:** | 25 ppm |
| **OSHA Permissible Exposure Limit:** | 35 ppm |
| **Recommended temperature range for comfort (ASHRAE): Winter** | 73 to 80°F Summer; 68 to 76°F |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

**DRAFT:  FOR REVIEW ONLY**
**Privileged -- Attorney / Client Work Product**

| APPENDIX C BESTEIRO MIDDLE SCHOOL BROWNSVILLE, TEXAS | | | | |
|---|---|---|---|---|
| **Air Sample Results** | | | | |
| **LOCATION** | **Temperature (Degrees F)** | **Relative Humidity (%)** | **Carbon Monoxide (ppm)** | **Carbon Dioxide (ppm)** |
| **Date Sampled:  11/19/02-11/22/02** | | | | |
| Band Corridor | 71°F | 56% | 0.3 ppm | 421 ppm |
| Band Wing | 74°F | 53% | 0.7 ppm | 422 ppm |
| Gym/Locker Rooms | 74°F | 62% | 0.6 ppm | 408 ppm |
| Corridor A | 72°F | 56% | 1.1 ppm | 437 ppm |
| Lockers Area/ Central Corridor | 72°F | 59% | 1.0 ppm | 423 ppm |
| Storage room # 1 & 2 | 73°F | 54% | 1.2 ppm | 479 ppm |
| Restrooms 2 & 3 | 72°F | 55% | 1.0 ppm | 520 ppm |
| Restroom 1 | 73°F | 57% | 1.1 ppm | 490 ppm |
| North wing | 72°F | 56% | 1.0 ppm | 419 ppm |
| 130 | 71°F | 62% | 1.7 ppm | 483 ppm |
| 129 | 72°F | 54% | 0.0 ppm | 423 ppm |
| 127 | 73°F | 53% | 0.2 ppm | 394 ppm |
| 126 & 128 | 75°F | 54% | 0.3 ppm | 479 ppm |
| 125 | 72°F | 56% | 0.1 ppm | 411 ppm |
| 124 | 71°F | 61% | 0.1 ppm | 398 ppm |
| 115 | 69°F | 52% | 0.3 ppm | 388 ppm |
| 114 | 69°F | 59% | 0.1 ppm | 429 ppm |
| 113 | 68°F | 61% | 0.1 ppm | 411 ppm |
| 112 | 67°F | 60% | 0.1 ppm | 408 ppm |
| 111 | 71°F | 55% | 0.2 ppm | 472 ppm |
| 110 | 73°F | 56% | 0.3 ppm | 391 ppm |
| 109 | 73°F | 54% | 0.5 ppm | 386 ppm |
| 108 | 74°F | 52% | 0.7 ppm | 388 ppm |
| 107 | 75°F | 52% | 1.0 ppm | 396 ppm |
| 106 | 74°F | 53% | 2.5 ppm | 389 ppm |
| 105 | 72°F | 56% | 1.7 ppm | 389 ppm |
| 104 | 69°F | 69% | 1.0 ppm | 392 ppm |
| 103 | 75°F | 51% | 1.9 ppm | 401 ppm |
| 102 | 73°F | 48% | 1.4 ppm | 404 ppm |
| 101 | 73°F | 53% | 1.2 ppm | 393 ppm |
| 120 | 70°F | 60% | 0.0 ppm | 409 ppm |

| | |
|---|---|
| ASHRAE Referenced Maximum Exposure Limits (CO2): | 1000 ppm |
| **ACGIH Threshold Limit Value:** | **5000 ppm** |
| **OSHA Permissible Exposure Limit:** | **5000 ppm** |
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | **9 ppm** |
| **ACGIH Threshold Limit Value:** | **25 ppm** |
| **OSHA Permissible Exposure Limit:** | **35 ppm** |
| **Recommended temperature range for comfort (ASHRAE): Winter** | **73 to 80°F Summer; 68 to 76°F** |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| APPENDIX C<br>BESTEIRO MIDDLE SCHOOL<br>BROWNSVILLE, TEXAS<br><br>Air Sample Results | | | | |
|---|---|---|---|---|
| **LOCATION** | **Temperature**<br>**(Degrees F)** | **Relative**<br>**Humidity**<br>**(%)** | **Carbon**<br>**Monoxide**<br>**(ppm)** | **Carbon**<br>**Dioxide (ppm)** |
| **Date Sampled: 11/19/02-11/22/02** | | | | |
| 121 | 71°F | 60% | 0.1 ppm | 421 ppm |
| 119 | 70°F | 62% | 0.0 ppm | 430 ppm |
| 122 | 71°F | 58% | 0.0 ppm | 462 ppm |
| Nurse Office | 71°F | 58% | 0.0 ppm | 440 ppm |
| 123 | 72°F | 66% | 0.0 ppm | 451 ppm |
| Teacher's Lounge | 72°F | 56% | 0.1 ppm | 411 ppm |
| Fl.2 Corridor | 72°F | 41% | 1.2 ppm | 432 ppm |
| 236 | 72°F | 43% | 1.3 ppm | 419 ppm |
| 235 | 71°F | 43% | 1.2 ppm | 429 ppm |
| 233 | 71°F | 43% | 1.4 ppm | 405 ppm |
| 234 | 72°F | 42% | 1.4 ppm | 411 ppm |
| 232 | 72°F | 43% | 1.3 ppm | 435 ppm |
| 231 | 71°F | 42% | 1.4 ppm | 404 ppm |
| 230 | 72°F | 42% | 1.3 ppm | 441 ppm |
| 229 | 72°F | 43% | 1.8 ppm | 438 ppm |
| 228 | 72°F | 43% | 2.1 ppm | 429 ppm |
| E.Central Corridor | 72°F | 42% | 2.2 ppm | 397 ppm |
| 201 | 71°F | 43% | 2.4 ppm | 405 ppm |
| 202 | 73°F | 43% | 2.4 ppm | 400 ppm |
| 203 | 73°F | 44% | 2.5 ppm | 426 ppm |
| 204 | 71°F | 43% | 2.4 ppm | 413 ppm |
| 205 | 71°F | 43% | 2.4 ppm | 399 ppm |
| 206 | 73°F | 43% | 2.7 ppm | 445 ppm |
| 207 | 72°F | 45% | 2.8 ppm | 414 ppm |
| 208 | 71°F | 46% | 2.6 ppm | 442 ppm |
| 209 | 72°F | 46% | 2.2 ppm | 788 ppm |
| 210 | 69°F | 44% | 1.5 ppm | 442 ppm |
| 211 | 69°F | 49% | 2.0 ppm | 401 ppm |
| 212 | 69°F | 50% | 2.0 ppm | 415 ppm |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO2):** | **1000 ppm** |
| **ACGIH Threshold Limit Value:** | **5000 ppm** |
| **OSHA Permissible Exposure Limit:** | **5000 ppm** |
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | **9 ppm** |
| **ACGIH Threshold Limit Value:** | **25 ppm** |
| **OSHA Permissible Exposure Limit:** | **35 ppm** |
| **Recommended temperature range for comfort (ASHRAE): Winter** | **73 to 80°F Summer; 68 to 76°F** |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX C**
**AIKEN ELEMENTARY SCHOOL**
**BROWNSVILLE, TEXAS**

**Air Sample Results**

| LOCATION | Temperature (Degrees F) | Relative Humidity (%) | Carbon Monoxide (ppm) | Carbon Dioxide (ppm) |
|---|---|---|---|---|
| **Date Sampled: 11/19/02-11/22/02** | | | | |
| B214 | 68°F | 39% | 0 ppm | 398 ppm |
| B216 | 69°F | 40% | 0 ppm | 407 ppm |
| North & South Stairwells | | | | |
| North Corridor & Restrooms - Fl 2 | 73°F | 39% | 0 ppm | 438 ppm |
| B201 | 73°F | 36% | 0 ppm | 435 ppm |
| B202 | 73°F | 33% | 0.1 ppm | 408 ppm |
| B203 | 73°F | 39% | 0 ppm | 381 ppm |
| B205 | 73°F | 39% | 0 ppm | 383 ppm |
| B207 | 73°F | 38% | 0 ppm | 413 ppm |
| B204 | 73°F | 33% | 0 ppm | 426 ppm |
| B206 | 72°F | 34% | 0 ppm | 402 ppm |
| B209 | 72°F | 37% | 0 ppm | 398 ppm |
| B208 | 70°F | 36% | 0 ppm | 390 ppm |
| Fl. 2 Lobby & Asst. Principal's Office | 71°F | 38% | 0 ppm | 402 ppm |
| South Corridor & Restrooms Fl. 2 | 69°F | 41% | 0 ppm | 426 ppm |
| B218 | 69°F | 37% | 0.1 ppm | 406 ppm |
| B217 | 72°F | 34% | 0 ppm | 383 ppm |
| B212 | 72°F | 36% | 0.1 ppm | 394 ppm |
| B215 | 72°F | 39% | 0.2 ppm | 382 ppm |
| B213 | 71°F | 43% | 0.2 ppm | 391 ppm |
| B210 | 71°F | 41% | 0 ppm | 442 ppm |
| B211 | 73°F | 41% | 0 ppm | 436 ppm |
| Corridor B (North) Fl. 1 | 70°F | 44% | 0 ppm | 388 ppm |
| Corridor B & C (South) Fl. 1 | 69°F | 39% | 0 ppm | 480 ppm |
| C108 | 70°F | 39% | 0 ppm | 452 ppm |
| C107 | 70°F | 40% | 0 ppm | 455 ppm |
| C105 | 71°F | 38% | 0 ppm | 463 ppm |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO2):** | **1000 ppm** |
| **ACGIH Threshold Limit Value:** | **5000 ppm** |
| **OSHA Permissible Exposure Limit:** | **5000 ppm** |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | **9 ppm** |
| **ACGIH Threshold Limit Value:** | **25 ppm** |
| **OSHA Permissible Exposure Limit:** | **35 ppm** |

| | |
|---|---|
| **Recommended temperature range for comfort (ASHRAE): Winter** | **73 to 80°F Summer; 68 to 76°F** |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| APPENDIX C | | | | |
|---|---|---|---|---|
| **AIKEN ELEMENTARY SCHOOL** | | | | |
| **BROWNSVILLE, TEXAS** | | | | |
| **Air Sample Results** | | | | |
| **LOCATION** | **Temperature (Degrees F)** | **Relative Humidity (%)** | **Carbon Monoxide (ppm)** | **Carbon Dioxide (ppm)** |
| **Date Sampled: 11/19/02-11/22/02** | | | | |
| C106 | 66°F | 42% | 0 ppm | 420 ppm |
| C104 | 69°F | 40% | 0.1 ppm | 400 ppm |
| C103 | 69°F | 40% | 0 ppm | 441 ppm |
| C102 | 69°F | 40% | 0 ppm | 412 ppm |
| C101 | 71°F | 40% | 0 ppm | |
| B112 | 70°F | 37% | 0 ppm | 394 ppm |
| B111 | 70°F | 42% | 0 ppm | 386 ppm |
| B110 | 69°F | 44% | 0 ppm | 439 ppm |
| B109 | 69°F | 45% | 0 ppm | 394 ppm |
| B108 | 70°F | 43% | 0 ppm | 407 ppm |
| Admin. Office | 70°F | 44% | 0.3 ppm | 435 ppm |
| B107 | 72°F | 41% | 0.5 ppm | 448 ppm |
| Counselor's Office | 73°F | 41% | 0.7 ppm | 381 ppm |
| Nurse's Office | 73°F | 50% | 0.5 ppm | 489 ppm |
| Entry Lobby/Custodian Closet/Electrical Room | 70°F | 47% | 0.5 ppm | 439 ppm |
| B106 | 70°F | 45% | 0.7 ppm | 418 ppm |
| Teacher's Lounge, Workroom & Restrooms | 73°F | 47% | 0.2 ppm | 403 ppm |
| B105 | 72°F | 42% | 0.9 ppm | 395 ppm |
| B104 | 73°F | 47% | 1.0 ppm | 393 ppm |
| Corridor A | 75°F | 50% | 0.2 ppm | 427 ppm |
| A108 | 75°F | 50% | 0.4 ppm | 422 ppm |
| A107 | 75°F | 51% | 0.2 ppm | 417 ppm |
| A106 | 77°F | 50% | 0.5 ppm | 392 ppm |
| A105 | 77°F | 51% | 0.3 ppm | 414 ppm |
| A104 | 76°F | 51% | 0.4 ppm | 430 ppm |
| A103 | 77°F | 52% | 0.3 ppm | 420 ppm |
| A102 | | | | |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO2):** | 1000 ppm |
| **ACGIH Threshold Limit Value:** | 5000 ppm |
| **OSHA Permissible Exposure Limit:** | 5000 ppm |
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | 9 ppm |
| **ACGIH Threshold Limit Value:** | 25 ppm |
| **OSHA Permissible Exposure Limit:** | 35 ppm |
| **Recommended temperature range for comfort (ASHRAE): Winter** | 73 to 80°F Summer; 68 to 76°F |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| APPENDIX C<br>AIKEN ELEMENTARY SCHOOL<br>BROWNSVILLE, TEXAS<br><br>Air Sample Results | | | | |
|---|---|---|---|---|
| **LOCATION** | **Temperature<br>(Degrees F)** | **Relative<br>Humidity<br>(%)** | **Carbon<br>Monoxide<br>(ppm)** | **Carbon<br>Dioxide (ppm)** |
| **Date Sampled: 11/19/02-11/22/02** | | | | |
| A101 | 75°F | 56% | 0.2 ppm | 415 ppm |
| B103 | 73°F | 55% | 0.2 ppm | 407 ppm |
| B102 | 73°F | 57% | 0.4 ppm | 397 ppm |
| B101 | 71°F | 55% | 0.1 ppm | 418 ppm |
| B100 | 73°F | 53% | 0.6 ppm | 431 ppm |
| Library | 74°F | 55% | 0.3 ppm | 439 ppm |
| Cafeteria | 72°F | 61% | 0.4 ppm | 434 ppm |
| Kitchen | 71°F | 56% | 0.1 ppm | 391 ppm |

| | |
|---|---|
| **ASHRAE Referenced Maximum Exposure Limits (CO2):** | **1000 ppm** |
| **ACGIH Threshold Limit Value:** | **5000 ppm** |
| **OSHA Permissible Exposure Limit:** | **5000 ppm** |
| **ASHRAE Referenced Maximum Exposure Limits (CO):** | **9 ppm** |
| **ACGIH Threshold Limit Value:** | **25 ppm** |
| **OSHA Permissible Exposure Limit:** | **35 ppm** |
| **Recommended temperature range for comfort (ASHRAE): Winter** | **73 to 80°F Summer; 68 to 76°F** |
| **Recommended humidity range for comfort (ASHRAE): 30 to 60%** | |

DRAFT:  FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

**Appendix D –**
**HVAC Observations and Field Notes**

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | Comments |
|---|---|---|
| B-First Floor | Principal's Office | Single zone rooftop direct expansion cooling, electric heating. 24/12 internally insulated sheet metal duct to flexible run-outs. Aluminum ceiling grilles, 9/9 supply and two 22/22 return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-3 Design CFM: 1800 Design O/A CFM: 375 Design Cooling BTU/H, Total/Sensible: 68.4/47.6 Heating: 11.5 KW Field Notes: Filters very heavy with dust and debris. Cooling coil heavily loaded with debris and possible mold. Heavy rust in drain pan. Compressor running and condenser fan failed. Trane TCD075C400BA. Temp/RH 73 degF/64%. Thermostat setpoint 72 degF, reading 75 degF, Fan On Continuous. |
| B-First Floor | Entrance Lobby | Single zone rooftop direct expansion cooling, electric heating. 24/12 internally insulated sheet metal duct to flexible run-outs. Aluminum ceiling grilles, 9/9 supply and two 22/22 return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-6 Design CFM: 1500. Air grilles: 1650 Design O/A CFM: 375 Design Cooling BTU/H, Total/Sensible: 54.8/38.2 Heating: 11.5 KW Field Notes: O/A measured at 38 CFM. Filters and return very heavy with dust and debris. Cooling coil covered with ice. Heavy rust in drain pan. Compressor running and indoor blower fan running. Trane TCC060F400BA. Temp/RH 74 degF/55%. Thermostat setpoint 70 degF, reading 77 degF, Fan Auto. |
| B-First Floor | Classrooms 101 through 108 | Single zone rooftop direct expansion cooling, electric heating. 24/12 internally insulated sheet metal duct to sidewall grilles. Aluminum sidewall grilles, two 18/12 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-6 Design CFM: 1500. Design O/A CFM: 375 Design Cooling BTU/H, Total/Sensible: 54.8/38.2 Heating: 11.5 KW Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. Trane TCC060F400BA. Temp/RH range 74 |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

<table>
<tr><td colspan="3">

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**
</td></tr>
</table>

| Wing | Classrooms or Area | Comments |
|---|---|---|
| | | degF/53%. Thermostat setpoints 74 degF, reading 70 to 76 degF, Fan Auto. Rooms feel cool and humid. |
| B-First Floor | Classroom 105 | Field Diagnostic Measurements:<br>Unit scheduled on drawings: AC-6<br>Design CFM: 1500<br>Measured CFM: 1,602<br>Design O/A CFM: 375<br>Measured O/A CFM: 38, dampers closed.<br>Design Cooling Supply Air: 53/52<br>Measured Cooling Supply Air: 62.4/54.5 |
| B-First Floor | Classrooms 109 through 110 | Single zone rooftop direct expansion cooling, electric heating. 18/12 internally insulated sheet metal duct to sidewall grilles. Aluminum sidewall grilles, two 18/12 supply and one 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through common area restrooms.<br>Unit scheduled on drawings: AC-18<br>Design CFM: 900<br>Design O/A CFM: 225<br>Design Cooling BTU/H, Total/Sensible: 29.9/26.1<br>Heating: 6 KW<br>Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Rust in drain pan. Trane TCC048F400BA. Temp/RH range 73 degF/55%. Thermostat setpoints 71 degF, reading 70 to 71 degF, Fan Auto. Rooms were cool, humid, musty. |
| B, C-First Floor | Classrooms 111, 114, Bookroom, 115, 116 | Single zone rooftop direct expansion cooling, electric heating. 24/12 internally insulated sheet metal duct to sidewall grilles. Aluminum sidewall grilles, two 18/12 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms.<br>Unit scheduled on drawings: AC-6<br>Design CFM: 1500.<br>Design O/A CFM: 375<br>Design Cooling BTUH, Total/Sensible: 54.8/38.2<br>Heating: 11.5 KW<br>Field Notes: Filters and return section heavy with dust and debris. Cooling coil deposits of debris and possible mold. Rust in drain pan. Trane TCC060F400BA. Temp/RH range 73 degF/54%. Thermostat setpoint 75 degF, reading 70 to 71 degF, Fan Auto. Thermostat calibration problems. O/A dampers closed at Bookroom and room 114, 115 units. Rooms feel warm and elevated humidity. |
| B-First Floor | Classroom 112 | Single zone rooftop direct expansion cooling, electric heating. 26/14 internally insulated sheet metal duct to sidewall grilles. Aluminum ceiling grilles, six 12/12 and one 6/6 supply and three |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| | | |
|---|---|---|
| **APPENDIX D** **BESTEIRO MIDDLE SCHOOL** **BROWNSVILLE, TEXAS** **HVAC OBSERVATIONS AND FIELD NOTES** | | |
| **Wing** | **Classrooms or Area** | **Comments** |
| | | 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-2 Design CFM: 2300 Design O/A CFM: 450 Design Cooling BTU/H, Total/Sensible: 92.5/65.5 Heating: 13.9 KW Field Notes: Filters and return section heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. Trane TCD102B400BA. Temp/RH range 67 degF/67%. Thermostat setpoint 66 degF, reading 68 degF, Fan Auto. O/A dampers closed. Room feels cool and humid. |
| B-First Floor | Classroom 113 | Single zone rooftop direct expansion cooling, electric heating. 36/14 internally insulated sheet metal duct to sidewall grilles. Aluminum ceiling grilles, six 12/12 and one 6/6 supply and three 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-1 Design CFM: 3000 Design O/A CFM: 450 Design Cooling BTU/H, Total/Sensible: 107.9/73.5 Heating: 16.5 KW Field Notes: Return section heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. Trane TCD120B400BA. Temp/RH range 68 degF/61%. Thermostat setpoint 66 degF, reading 68 degF, Fan Continuous. O/A dampers closed. Birds nesting inside return section. Ceiling stained below unit. Room feels warm and humid. |
| C-First Floor | Common Area at Lockers | Single zone rooftop direct expansion cooling, electric heating. 48/14 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 9/9 supply and 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through common area restrooms. Unit scheduled on drawings: AC-7 Design CFM: 4500 Measured CFM: 5777 CFM Design O/A CFM: 1500 Measured O/A CFM: 1717 Design Cooling BTU/H, Total/Sensible: 158.8/108.5 Heating: 32 KW Field Notes: Return section heavy with dust and debris. Cooling coil deposits of debris. Rust in drain pan. Trane model not visible. Temp/RH range 72 degF/59%. Thermostat setpoints 72 degF, |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| | | |
|---|---|---|
| **APPENDIX D** <br> **BESTEIRO MIDDLE SCHOOL** <br> **BROWNSVILLE, TEXAS** <br><br> **HVAC OBSERVATIONS AND FIELD NOTES** | | |
| **Wing** | **Classrooms or Area** | **Comments** |
| | | reading 72 degF, Fan Auto. O/A dampers closed. |
| B-First Floor | Classrooms 117 through 122 | Single zone rooftop direct expansion cooling, electric heating. 18/12 internally insulated sheet metal duct to sidewall grilles. Aluminum sidewall grilles, 18/12 supply and 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through Teachers restrooms. <br> Unit scheduled on drawings: AC-6 <br> Design CFM: 1500 except Room 118A is 1350 CFM. <br> Design O/A CFM: 375 <br> Design Cooling BTU/H, Total/Sensible: 54.8/38.2 <br> Heating: 6 KW <br> Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Rust in drain pan. Trane TCC060F400BA. Temp/RH range 72 to 73 degF/58%. Thermostat setpoints 76 to 77 degF except room 118B set at 70 degF, reading 75 to 76 degF except room 118B reading 70 degF, Fan Auto. Thermostat calibration problems. O/A dampers open minimum. Room 118B has intermittent kitchen exhaust hood without make-up. Room 122 was extensive water staining on floor. baseboards removed for renovation, gypsum wall board stains, and roof leak suspended. |
| B-First Floor | Classroom 118B | Field Diagnostic Measurements: <br> Unit scheduled on drawings: AC-6 <br> Design CFM: 1500 <br> Measured CFM: 1962 <br> Design O/A CFM: 375 <br> Measured O/A CFM: 170, dampers 1/3 open. <br> Design Cooling Supply Air: 53/52 <br> Measured Cooling Supply Air: 58.9/51.7 <br> Design Cooling BTU/H, Total/Sensible: 54.8/38.2 |
| C-First Floor | Counseling and Nurses Station | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 9/9 and 6/6 supply and 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through restrooms across corridor. <br> Unit scheduled on drawings: AC-4 <br> Design CFM: 1500 <br> Design O/A CFM: 300 <br> Design Cooling BTU/H, Total/Sensible: 54.8/38.2 <br> Heating: 6 KW <br> Field Notes: Return section heavy with dust and debris. Cooling coil heavy deposits of debris and possible mold. Rust in drain pan. Trane TCC075C400BA. Temp/RH 71 degF/58%. Thermostat setpoint 80 degF, reading 78 degF, Fan Auto. Thermostat |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

<table>
<tbody>
<tr><td colspan="3" style="text-align:center">

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

</td></tr>
<tr><td>**Wing**</td><td>**Classrooms or Area**</td><td>**Comments**</td></tr>
<tr><td></td><td></td><td>calibration problems. O/A dampers open minimum.</td></tr>
<tr><td>A-First Floor</td><td>Classrooms 124 through 130 added during construction of Aiken Elementary</td><td>Single zone rooftop direct expansion cooling, electric heating. 18/16 externally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles 12/12 supply and 22/22 ceiling return. Electronic thermostats connected to EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through restrooms across corridor.<br>Unit scheduled on drawings: AC-1<br>Design CFM: 1500<br>Design O/A CFM: 450<br>Design Cooling BTU/H, Total/Sensible: 54.8/38.2<br>Heating: 6 KW<br>Field Notes: Return section heavy with dust and debris. Cooling coil heavy deposits of debris and possible mold. Rust in drain pan. Trane TCD060F400BA. Temp/RH 72 to 75 degF/54 to 55%. Thermostat setpoint 72 degF by EMS, reading 72 to 74 degF, Fan Auto, units disabled by EMS. O/A dampers open minimum.</td></tr>
<tr><td>D-First Floor</td><td>Boys Locker Room</td><td>Single zone rooftop direct expansion cooling, natural gas heating, 100% O/A. 28/14 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 9/9 and 12/12 supply. No ceiling return. Room is exhausted 100% by roof mounted exhaust fan. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed. Exhaust through restroom areas.<br>Unit scheduled on drawings: AC-17<br>Design CFM: 2500<br>Measured CFM: 3931<br>Design O/A CFM: 2500<br>Measured O/A CFM: 3931<br>Design Exhaust CFM: 2700<br>Design Cooling BTU/H, Total/Sensible: 95.5/74.1<br>Heating: 180,000 BTUH<br>Field Notes: O/A section heavy with dust and debris. Cooling coil deposits of debris. Rust in drain pan. Trane YCD102B4HOCA. Temp/RH range 74 degF/62%. Thermostat setpoints 65 degF, reading 65 degF, Fan Continuous. Thermostat calibration problems. O/A dampers full open. Mis-application of Trane model; unit not rated for 100% O/A duty.</td></tr>
<tr><td>D-First Floor</td><td>Girls Locker Room</td><td>Single zone rooftop direct expansion cooling, natural gas heating, 100% O/A. 28/14 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 9/9 and 12/12 supply. No ceiling return. Room is exhausted 100% by roof mounted fan. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed. Exhaust through restroom areas.<br>Unit scheduled on drawings: AC-16<br>Design CFM: 2500<br>Design O/A CFM: 2500</td></tr>
</tbody>
</table>

DRAFT: FOR REVIEW ONLY
Privileged – Attorney / Client Work Product

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | Comments |
|---|---|---|
| | | Measured O/A CFM: Not measured, O/A damper closed. Design Cooling BTU/H, Total/Sensible: 95.5/74.1 Heating: 180,000 BTUH Field Notes: O/A section heavy with dust, bird feathers, and debris. Filters collapsed. Cooling coil deposits of debris. Rust in drain pan. Trane YCD102B4HOCA. Temp/RH range 74 degF/62%. Thermostat setpoints 78 degF, reading 78 degF, Fan Continuous. Humidity feels elevated. O/A dampers closed. Mis-application of Trane model; unit not rated for 100% O/A duty. |
| D-First Floor | Gymnasium | Four single zone rooftop direct expansion cooling, natural gas heating. 32-inch round internally insulated sheet metal duct to concentric ceiling grilles. Aluminum ceiling grilles, 16-inch concentric with internal balancing dampers. Open return boots at ceiling. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed. Economizer specified with modulating exhaust, no modulating exhaust installed. Exhaust through locker room. Unit scheduled on drawings: AC-10, 11, 12, 13 Design CFM: 9000 Measured CFM: 1500 at AC-13 Design O/A CFM: Two @ 2775, Two @ 3000 Measured O/A CFM: 1150 at Ac-13, O/A damper open minimum. Design Cooling BTU/H, Total/Sensible: 329.5/224.7 Design Cooling Supply Air: 53/52 Measured Supply Air Temperature at AC-13: 58.4/58.4 Heating: 294,000 BTUH Field Notes: O/A section heavy with dust, bird feathers, and debris. Filters collapsed. Cooling coil heavy deposits of debris, bird feathers, possible mold deposits. Rust in drain pan. Trane SFHCC304L. Temp/RH range 74 degF/62%. Thermostat setpoints 65 to 78 degF, reading 70 to 76 degF, Fan Auto. Humidity feels elevated. O/A dampers open minimum. |
| D-First Floor | Band Room | Single zone rooftop direct expansion cooling, electric heating. 28/14 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles 12/12 supply and 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through restrooms across corridor. Unit scheduled on drawings: AC-2 Design CFM: 2500 Design O/A CFM: 450 Design Cooling BTU/H, Total/Sensible: 92.5/62.5 Heating: 13.9 KW Field Notes: Filters collapsed. Return section heavy with dust and debris. Cooling coil heavy deposits of debris and possible mold. Rust in drain pan. Trane TCD102B400BA. Temp/RH 74 |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| | | |
|---|---|---|
| **APPENDIX D**<br>**BESTEIRO MIDDLE SCHOOL**<br>**BROWNSVILLE, TEXAS**<br><br>**HVAC OBSERVATIONS AND FIELD NOTES** | | |
| **Wing** | **Classrooms or Area** | **Comments** |
| | | degF/53%. Thermostat setpoint 78 degF, reading 75 degF, Fan Auto. Thermostat calibration problems. Room feels cool and humid. |
| D-First Floor | Vocal Music Room | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles 12/12 supply and 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through restrooms across corridor.<br>Unit scheduled on drawings: AC-6<br>Design CFM: 1500<br>Design O/A CFM: 375<br>Design Cooling, Total/Sensible: 54.8/38.2<br>Heating: 6 KW<br>Field Notes: Return section heavy with dust and debris. Cooling coil heavy deposits of debris and possible mold. Rust in drain pan. O/A dampers closed. Trane TCC060F400BA. Temp/RH 74 degF/53%. Thermostat setpoint 75 degF, reading 73 degF, Fan Auto. Thermostat calibration problems. Room feels cool and humid. |
| E-First Floor | Kitchen | Two single zone rooftop direct expansion cooling, natural gas heating. 30/24 and 24/24 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 6/6 and 12/12 supply and 22/22 return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed. Economizer specified with modulating exhaust, no modulating exhaust installed. Exhaust through vent hoods.<br>Unit scheduled on drawings: AC- 14, 15<br>Design CFM: 8265<br>Measured CFM: 6,000 at AC-15<br>Design O/A CFM: 4550<br>Measured O/A CFM: 2558, O/A damper open minimum.<br>Design Cooling BTU/H, Total/Sensible: 330/224<br>Design Cooling Supply Air: 53/52<br>Measured Cooling Supply Air: 58/58<br>Heating: 500,000 BTUH<br>Field Notes: O/A section very heavy with dust, bird feathers, and debris. Filters collapsed. Cooling coil heavy deposits of debris, bird feathers, possible mold deposits. Rust in drain pan. Very heavy covering of debris and bird feathers on condenser coils. Trane SFHCC254L. Temp/RH range 72 degF/55%. Thermostat setpoints 70 degF, reading 70 degF, Fan Auto. Humidity feels elevated. O/A dampers open minimum. |
| E-First Floor | Cafetorium | Two single zone rooftop direct expansion cooling, natural gas heating. 40/14 and 24/14 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 14-inch concentric and |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | Comments |
|------|--------------------|----------|
| | | 12/12 supply. Return air boots. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed. Economizer specified with modulating exhaust, no modulating exhaust installed. Exhaust through kitchen. <br> Unit scheduled on drawings: AC- 8, 9 <br> Design CFM: 8000 <br> Measured CFM: 2334 at AC-8 <br> Design O/A CFM: 4550 <br> Measured O/A CFM: 1125, O/A damper open minimum. <br> Design Cooling BTU/H, Total/Sensible: 327/231 <br> Design Cooling Supply Air: 53/52 <br> Measured Cooling Supply Air: 62/58 <br> Heating: 294,000 BTUH <br> Field Notes: O/A section very heavy with dust, bird feathers, and debris. Cooling coil heavy deposits of debris, bird feathers, possible mold deposits. Rust in drain pan. Trane SFHCC304L. Temp/RH range 72 degF/55%. Thermostat setpoints 67 degF, reading 67 degF, Fan Auto. Humidity feels elevated. |
| B-Second Floor | Classrooms 201 through 208 | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 15/15 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. <br> Unit scheduled on drawings: AC-6 <br> Design CFM: 1500 <br> Design O/A CFM: 375 <br> Design Cooling BTU/H, Total/Sensible: 54.8/38.2 <br> Heating: 11.5 KW <br> Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. Trane TCC060F400BA. Temp/RH range 74 degF/53%. Thermostat setpoints 74 to 76 degF, reading 69 to 73 degF, Fan Auto. Thermostat calibration problems. Rooms feel cool and humid. Musty odors. |
| B-Second Floor | Classroom 202 | Field Diagnostic Measurements: <br> Unit scheduled on drawings: AC-6 <br> Design CFM: 1500 <br> Measured CFM: 2550 <br> Design O/A CFM: 375 <br> Measured O/A CFM: 38, dampers closed. <br> Measured Room Temperature: 66.2/36.9% RH <br> Design Cooling Supply Air: 53/52 <br> Measured Cooling Supply Air: 58/58 <br> Design Cooling BTU/H, Total/Sensible: 54.8/38.2 |
| B-Second | Classroom 209 | Single zone rooftop direct expansion cooling, electric heating. |

DRAFT: FOR REVIEW ONLY
**Privileged – Attorney / Client Work Product**

**APPENDIX D
BESTEIRO MIDDLE SCHOOL
BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | Comments |
|---|---|---|
| Floor | | 18/12 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 12/12 supply and two 22/22 ceiling return. Mercury bulb thermostat, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-18 Design CFM: 900 Design O/A CFM: 225 Design Cooling BTU/H, Total/Sensible: 29.9/26.1 Heating: 6 KW Field Notes: Return section heavy with dust and debris. Cooling coil deposits of debris. Rust in drain pan. Trane TCC048C400BA. Temp/RH range 72 degF/46%. Thermostat setpoint 75 degF, reading 73 degF, Fan Auto. Room is cool and humid. |
| B-Second Floor | Classrooms 210 through 214 | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 15/15 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms. Unit scheduled on drawings: AC-6 Design CFM: 1500 Design O/A CFM: 375 Design Cooling BTU/H, Total/Sensible: 54.8/38.2 Heating: 11.5 KW Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. Trane TCC060F400BA. Temp/RH range 69 degF/49%. Thermostat setpoints 70 to 76 degF, reading 69 to 73 degF, Fan Auto. Thermostat calibration problems. Rooms feel cool and humid except room 214. Rooms 210 and 211 are laboratories with local exhaust at 3700 CFM for each room. |
| B-Second Floor | Classroom 211 | Field Diagnostic Measurements: Unit scheduled on drawings: AC-6 Design CFM: 1500 Measured CFM: 2262 Design O/A CFM: 375 Measured O/A CFM: 37, dampers closed. Measured Room Temperature: 69/49% RH Design Cooling Supply Air: 53/52 Measured Cooling Supply Air: 59/56.5 Design Cooling, Total/Sensible: 54.8/38.2 |
| B-Second Floor | Teachers Lounge | Single zone rooftop direct expansion cooling, electric heating. 18/12 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 12/12 supply and two 22/22 ceiling return. Mercury bulb thermostat, no EMS. Manual O/A hoods and |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

APPENDIX D
BESTEIRO MIDDLE SCHOOL
BROWNSVILLE, TEXAS

HVAC OBSERVATIONS AND FIELD NOTES

| Wing | Classrooms or Area | Comments |
|---|---|---|
| | | dampers installed, economizer specified. Exhaust through corridor and common area restrooms.<br>Unit scheduled on drawings: AC-18<br>Design CFM: 900<br>Design O/A CFM: 225<br>Measured O/A CFM: 103<br>Design Cooling BTU/H, Total/Sensible: 29.9/26.1<br>Heating: 6 KW<br>Field Notes: Return section heavy with dust and debris. Cooling coil deposits of debris and possible mold. Rust in drain pan. Trane TCC048C400BA. Temp/RH range 72 degF/56%. Thermostat setpoint 68 degF, reading 70 degF, Fan Auto. Room is cool and humid. |
| B-Second Floor | Classrooms 215 through 218 | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 15/15 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through corridor and common area restrooms.<br>Unit scheduled on drawings: AC-6<br>Design CFM: 1500<br>Design O/A CFM: 375<br>Design Cooling BTU/H, Total/Sensible: 54.8/38.2<br>Heating: 11.5 KW<br>Field Notes: Filters and return section very heavy with dust and debris. Cooling coil deposits of debris and possible mold. Heavy rust in drain pan. O/A dampers 1/3 open. Trane TCC060F400BA. Temp/RH range 73 degF/40%. Thermostat setpoints 74 to 75 degF, reading 69 to 72 degF, Fan Auto. Thermostat calibration problems. Rooms feel cool and humid. Rooms 217 and 218 are laboratories with local exhaust at 3700 CFM for each room. Classroom 217 unit has loose and open panels. |
| B-Second Floor | Classroom 216 | Field Diagnostic Measurements:<br>Unit scheduled on drawings: AC-6<br>Design CFM: 1500<br>Measured CFM: 2400<br>Design O/A CFM: 375<br>Measured O/A CFM: 37, dampers 1/3 open.<br>Measured Room Temperature: 66.2/38.3%<br>Design Cooling Supply Air: 53/52<br>Measured Cooling Supply Air: 60.5/58.3<br>Design Cooling, Total/Sensible: 54.8/38.2 |
| B-Second Floor | Classrooms 220 through 227 | Single zone rooftop direct expansion cooling, electric heating. 18/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, two 15/15 supply and two 22/22 ceiling return. Mercury bulb thermostats, no EMS. Manual O/A hoods and |

**DRAFT:  FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

<table>
<tr><td colspan="3" align="center">

**APPENDIX D**
**BESTEIRO MIDDLE SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

</td></tr>
<tr><td>

**Wing**

</td><td>

**Classrooms or Area**

</td><td>

**Comments**

</td></tr>
<tr><td></td><td></td><td>

dampers installed, economizer specified.  Exhaust through corridor and common area restrooms.
Unit scheduled on drawings: AC-6
Design CFM: 1500
Design O/A CFM: 375
Design Cooling BTU/H, Total/Sensible: 54.8/38.2
Heating: 11.5 KW
Field Notes: Return section very heavy with dust and debris.  Cooling coil deposits of debris and possible mold.  Rust in drain pan.  O/A dampers 1/3 open.  Trane TCC060F400BA.  Temp/RH range measured 72 degF/40%.  Thermostat setpoints 72 to 78 degF, reading 68 to 72 degF, Fan Auto.  Thermostat calibration problems.  Rooms feel cool and humid.

</td></tr>
<tr><td>

B-Second Floor

</td><td>Classroom 219</td><td>

Field Diagnostic Measurements:
Unit scheduled on drawings: AC-6
Design CFM: 1500
Measured CFM: 2656
Design O/A CFM: 375
Measured O/A CFM: 38, dampers 1/3 open.
Measured Room Temperature: 73/40%
Design Cooling Supply Air: 53/52
Measured Cooling Supply Air: 60.5/58.5
Design Cooling BTU/H, Total/Sensible: 54.8/38.2

</td></tr>
<tr><td>

B-Second Floor

</td><td>Classroom 220</td><td>

Field Diagnostic Measurements:
Unit scheduled on drawings: AC-6
Design CFM: 1500
Measured CFM: 2119
Design O/A CFM: 375
Measured O/A CFM: 38, dampers 1/3 open.
Measured Room Temperature: 73/42%
Design Cooling Supply Air: 53/52
Measured Cooling Supply Air: 61/57.5
Design Cooling BTU/H, Total/Sensible: 54.8/38.2

</td></tr>
<tr><td>

B-Second Floor

</td><td>Classroom 225</td><td>

Field Diagnostic Measurements:
Unit scheduled on drawings: AC-6
Design CFM: 1500
Measured CFM: 1791
Design O/A CFM: 375
Measured O/A CFM: 38, dampers 1/3 open.
Measured Room Temperature: 71/45%
Design Cooling Supply Air: 53/52
Measured Cooling Supply Air: 53.6/57.5
Design Cooling BTU/H, Total/Sensible: 54.8/38.2

</td></tr>
<tr><td>

B-Second Floor

</td><td>Classroom 227</td><td>

Field Diagnostic Measurements:
Unit scheduled on drawings: AC-6
Design CFM: 1500

</td></tr>
</table>

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

| | | |
|---|---|---|
| **APPENDIX D**<br>**BESTEIRO MIDDLE SCHOOL**<br>**BROWNSVILLE, TEXAS**<br><br>**HVAC OBSERVATIONS AND FIELD NOTES** | | |
| **Wing** | **Classrooms or Area** | **Comments** |
| | | Measured CFM: 3000<br>Design O/A CFM: 375<br>Measured O/A CFM: 38, dampers 1/3 open.<br>Measured Room Temperature: 74/45%<br>Design Cooling Supply Air: 53/52<br>Measured Cooling Supply Air: 61/59.5<br>Design Cooling BTU/H, Total/Sensible: 54.8/38.2 |
| A-First Floor | Classrooms 228 through 236 added during construction of Aiken Elementary | Single zone rooftop direct expansion cooling, electric heating. 18/16 externally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles 12/12 supply and 22/22 ceiling return. Electronic thermostats connected to EMS. Manual O/A hoods and dampers installed, economizer specified. Exhaust through restrooms across corridor.<br>Unit scheduled on drawings: AC-1<br>Design CFM: 1500<br>Design O/A CFM: 450<br>Design Cooling BTU/H, Total/Sensible: 54.8/38.2<br>Heating: 6 KW<br>Field Notes: Return section heavy with dust and debris. Cooling coil heavy deposits of debris and possible mold. Rust in drain pan. Trane TCD060F400BA. Temp/RH 72 degF/43%. Thermostat setpoint 72 degF by EMS, reading 69 to 80 degF, Fan Auto, units disabled by EMS. Calibration problems. O/A dampers open minimum. Rooms feel cool, humid, musty. |
| F-First Floor | Library | One single zone rooftop direct expansion cooling, natural gas heating. 54/16 and 36/16 internally insulated sheet metal duct to ceiling grilles. Aluminum ceiling grilles, 9/9 supply and 22/22 return. Electronic thermostat, no EMS. Manual O/A hood and dampers installed. Economizer specified with modulating exhaust, no modulating exhaust installed. Exhaust through restrooms.<br>Unit scheduled on drawings: AC- 5<br>Design CFM: 12005<br>Measured CFM: Not operational<br>Design O/A CFM: 2025<br>Measured O/A CFM: Not operational<br>Design Cooling BTU/H, Total/Sensible: 435.3/303.8<br>Heating: 588,000 BTUH<br>Field Notes: Unit has been cleaned and re-insulated by contractor. Trane SFHCC404L. Very dirty condenser coils. |
| B-Wing | Outside Door | Building Pressure +0.02-inches |
| C-Wing | Outside Door facing North | Building Pressure -0.01-inches |
| D-Wing | Outside Door facing west near Band Room | Building Pressure –0.02-inches |
| B-Wing | Teachers Lounge on second floor outside window | Building Pressure -0.01-inches |
| B-Wing | Outside Door at Front Entrance | Building Pressure Neutral |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**AIKEN ELEMENTARY SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | HVAC Observations and Findings |
|------|--------------------|--------------------------------|
| G-First Floor | Main Entrance | Coils were dusty, minor spots. Filters were moderately dirty. Measured Supply Air: 60.2 Deg F db/53.3 wb Measured Room Temperature: 73 Deg. Measured Room Relative Humidity: 50%. Design Supply CFM: 1350. Measured Supply CFM: 2901. Design Outside Air CFM: 450. |
| | Administration Office | Coils contained debris, gray dust. Moderate rust in drain pan. Mildew spots on supply grilles. Measured Supply Air: 56.2 DegF db/50.2 wb Measured Room Temperature: 70.0 DegF. Measured Room Relative Humidity: 50.2%. Design Supply CFM: 1100. Measured Supply CFM: 1114. Design Outside Air: 450. Measured Outside Air CFM: 206 |
| | Counselors Office-Back Area | Coils contained heavy deposits of gray and white dust. Fan wheel contained rust. Rust deposits in drain pan. Roof drain leaking in back office with possible mold. Measured Supply Temperature: 61.2 Deg F db/54.4 wb Measured Room Temperature: 73 Deg. Measured Room Relative Humidity: 41%. Design Supply CFM: 800. Measured Supply CFM: 1364. Design Outside CFM: 450. Measured Outside CFM: 94 |
| | Rooms A101-A115 | Coils contained light deposits of white and gray dust. Fan wheels contained spots of rust. Filters contained moderate deposits. |
| | Room A103 | Coil contained black spots and possible mold. Heavy rust in coil channel. A/C unit shows signs of sweating and condensation forming on the exterior of unit. Measured Supply Temperature: 60.2 Deg F db/55.7 wb Measured Room Temperature: 77.0 DegF. Measured Room Relative Humidity: 52%. Design Supply CFM: 1350. Measured Supply CFM: 1958. Design Outside CFM: 450. |
| | Room A105 | Measured Supply Temperature: 70.1 DegF db/56.4 wb Measured Room Temperature: 68.2 DegF. Measured Room Relative Humidity: 42.1%. Design Supply CFM: 1350. Measured Supply CFM: 1257. Design Outside CFM: 450. Measured Outside CFM: 614. |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**AIKEN ELEMENTARY SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | HVAC Observations and Findings |
|------|--------------------|--------------------------------|
| | Room A106 | Measured Supply Temperature: 62.6 DegF db/57.2 wb<br>Measured Room Temperature: 70.0 DegF.<br>Measured Room Relative Humidity: 50.0%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1471.<br>Design Outside CFM: 450. |
| | Room B100-B106 | Coil contains heavy deposits of gray dust and debris. Drain pans contain heavy deposits of rust. |
| | Room B102 | Measured Supply Temperature: 59.8 DegF db/55.5 wb<br>Measured Room Temperature: 73.0 Deg.<br>Measured Relative Humidity: 57%.<br>Design Supply CFM: 2700.<br>Measured Supply CFM 2035.<br>Design Outside CFM: 450. |
| | Room B105 | Measured Supply Temperature: 65.0 DegF db/56.3 wb.<br>Measured Room Temperature: 72.0 DegF.<br>Measured Room Relative Humidity: 42%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1246.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 55 |
| | Room B107-B112 | Coil contains heavy deposits of gray dust. Drain pan contains moderate deposits of rust. Filters contain moderate debris and dust. |
| | Room B108 | Measured Supply Temperature: 64.0 Deg F db/54.0 wb.<br>Measured Room Temperature: 70.0 Deg.<br>Measured Room Relative Humidity: 43%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 778.<br>Design Outside CFM: 450. |
| | Room B110 | Coil contained black spots and possible mold. Evidence of previous chilled water leak in room indicated by staining on floor.<br>Measured Supply Temperature: 67.7 DegF db/56.8 wb.<br>Measured Room Temperature: 69.0 DegF.<br>Measured Room Relative Humidity: 44%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1664.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 132. |
| | Room C101-108 | Coil contains heavy debris, gray dust, black spots and possible mold. Drain pan contains heavy deposits of rust and debris. Filter contains moderate amount debris. |
| | Room C108 | Measured Supply Temperature: 63.6 DegF db/54 wb<br>Measured Room Temperature: 69.6 DegF.<br>Measured Room Relative Humidity: 38.8%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 872. |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**AIKEN ELEMENTARY SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | HVAC Observations and Findings |
|---|---|---|
| | | Design Outside CFM: 450.<br>Measured Outside CFM: 225. |
| **G-Second Floor** | Second Floor Lobby | Coil contained heavy deposits of gray dust. Drain pan contained heavy deposits of rust. Exterior bottom of unit shows heavy corrosion. Filter is extremely dirty.<br>Measured Supply Temperature: 71.9 DegF db/58.8 wb<br>Measured Room Temperature: 71.0 DegF.<br>Measured Room Relative Humidity: 38%.<br>Design Supply CFM: 800.<br>Measured Supply CFM: 1231.<br>Design Outside CFM: 450. |
| | Room B201-B209 | Coils contain deposits of light gray dust. Drain pan contains heavy deposits of rust. Fan operating in low speed. |
| | Room B203 | Measured Supply Temperature: 74.6 DegF db/60.7 wb.<br>Measured Room Temperature: 73.0 DegF.<br>Measured Room Relative Humidity: 39%.<br>Design Supply CFM: 800.<br>Measured Supply CFM: 1168.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 87. |
| | Room B206 | Base of unit corroded and rusty.<br>Measured Supply Temperature: 72.0 DegF db/56.5 wb<br>Measured Room Temperature: 72.0 DegF.<br>Measured Room Relative Humidity: 34%.<br>Design Supply CFM: 800.<br>Measured Supply CFM: 731.<br>Design Outside CFM: 450<br>Measured Outside CFM: 398. |
| | Room B207 | Fan out of balance and vibrating. Valve not operating allowing chilled water to enter the coil.<br>Measured Supply Temperature: 73.1 DegF db/59.9 wb<br>Measured Room Temperature: 73.0 DegF.<br>Measured Room Relative Humidity: 38%.<br>Design Supply CFM: 1360.<br>Measured Supply CFM: 1632.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 87. |
| | Room B210-218 | Coil contains light gray dust. Heavy rust deposits in drain pan. Filter contains moderate deposits of gray dust and deposits. |
| | Room B210 | Measured Supply Temperature: 70.3 DegF db/57.6 wb<br>Measured Room Temperature: 71.0 DegF.<br>Measured Room Relative Humidity: 41%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1534.<br>Design Outside CFM: 450. |
| | Room B214 | Measured Supply Temperature: 66.3 DegF db/55.8 wb<br>Measured Room Temperature: 68.0 DegF. |

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

<table>
<tr><td colspan="3">APPENDIX D<br>AIKEN ELEMENTARY SCHOOL<br>BROWNSVILLE, TEXAS<br><br>HVAC OBSERVATIONS AND FIELD NOTES</td></tr>
<tr><td><strong>Wing</strong></td><td><strong>Classrooms or Area</strong></td><td><strong>HVAC Observations and Findings</strong></td></tr>
<tr><td></td><td></td><td>Measured Room Relative Humidity: 39%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1178.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 362.</td></tr>
<tr><td></td><td>Room B217</td><td>Chilled water leak in room, floor heavily stained. Dissimilar metals used in joining air vents to pipe fittings; brass air vent connected to Schedule 40 steel pipe nipple and brass pipe fitting.<br>Measured Supply Temp: 75.6 DegF db/60.5 wb.<br>Measured Room Temperature: 72.0 DegF.<br>Measured Room Relative Humidity: 34%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1305.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 442.</td></tr>
<tr><td></td><td>Room B218</td><td>Measured Supply Temperature: 65.8 DegF db/55.5 wb.<br>Measured Room Temperature: 69.0 DegF.<br>Relative Humidity: 37%.<br>Design Supply CFM: 1350.<br>Measured Supply CFM: 1312.<br>Design Outside CFM: 450.<br>Measured Outside CFM: 256</td></tr>
<tr><td>Wing H</td><td>Cafeteria-West</td><td>Trane: Model: SFHFC304LE00B27B1001AGY<br>Trane: Serial: J95E7271<br>Observations: Heavy deposits of debris and possible mold on coil. Dirty filters. Dirty return air section. Initial measurement of air delivery yielded a reading of 1028 CFM. Second reading after adjusting fan drive belt yielded a reading of 10180 CFM</td></tr>
<tr><td></td><td>Cafeteria-East</td><td>Trane: Model: SFHFC304LE00B27B1001AGY<br>Trane: Serial: J95E71272<br>Observations: Heavy deposits of debris and possible mold on coil. Dirty filters. Dirty return air plenum. Chiller would not start initially due to a burned out fan drive belt. Belt was replaced and measurement for air delivery yielded a reading of 7195 CFM</td></tr>
</table>

**DRAFT: FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**APPENDIX D**
**AIKEN ELEMENTARY SCHOOL**
**BROWNSVILLE, TEXAS**

**HVAC OBSERVATIONS AND FIELD NOTES**

| Wing | Classrooms or Area | HVAC Observations and Findings |
|---|---|---|
| Bldg. Rear | Central Plant Chiller | Trane: Model: RTAA3404XJ04J01B1D0BADFG<br>Trane: Serial: U95G29250<br>Observations: Unit is located outside of the building at the southeast corner. Unit supplied by primary pumps at pump skid in pump room at rear of the building adjacent to the chiller. Position of the flow switch appears to be installed within acceptable standards. Observation of chilled water temperature leaving the unit was approximately 41 degF and return 51 degF. Chilled water appeared to contain deposits of rust and debris and contained air visible through a site glass. |
| | Pump Room | Type: Namco<br>Serial: N-1545. 4 pumps.<br>Design Pressure: 16-psig-primary/30-psig secondary.<br>Capacity: 383 GPM primary/766 GPM secondary.<br>Date of Manufacture: 9/29/95.<br>Observations: Air vents do not appear to be operating properly. Cavitation of the pumps is possible with air present in the system. Secondary pumps operating erratically due to calibration problems with differential pressure switches. |

**DRAFT:  FOR REVIEW ONLY**
**Privileged – Attorney / Client Work Product**

**Appendix E -**
**Opinion of Cost Tabulation**

**BROWNSVILLE I.S.D.**
**December 2002**

TOTAL PROGRAM COST

| Description | | Besteiro MS | | Aiken ES |
|---|---|---|---|---|
| **Hard Costs** | | | | |
| Construction | | $ 2,734,972 | $ | 1,111,350 |
| | | | | |
| **Soft Costs** | | | | |
| A/E Design Fee | 9.00% | $ 246,148 | $ | 100,021 |
| A/E Construction Management Fee | 3.00% | $ 82,049 | $ | 33,340 |
| Mold Management Fee | 2.50% | $ 68,374 | $ | 27,784 |
| Change Order Contingency (Board Award Amount) | 10.00% | $ 273,497 | $ | 111,135 |
| Miscellaneous Survey Fees | 1.00% | $ 27,350 | $ | 11,113 |
| | | $ 3,432,390 | $ | 1,394,744 |
| **Grand Total** | | $ 4,827,134 | | |

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

## SUMMARY

| Description<br>Area (sf) | Aiken Sitework<br>85,000 | Aiken HVAC<br>85,000 | Aiken HZMAT<br>85,000 | Aiken Roof<br>85,000 | Total |
|---|---|---|---|---|---|
| 02 Sitework/Demolition | $ 58,500 | $ - | $ - | $ - | $ 58,500 |
| 03 Concrete | $ 32,300 | $ - | $ - | $ - | $ 32,300 |
| 04 Masonry | $ - | $ - | $ - | $ - | $ - |
| 05 Metals | $ - | $ - | $ - | $ - | $ - |
| 06 Wood and Plastic | $ - | $ - | $ - | $ - | $ - |
| 07 Thermal/Moisture | $ - | $ 2,000 | $ - | $ 50,213 | $ 52,213 |
| 08 Doors/Windows | $ - | $ - | $ - | $ - | $ - |
| 09 Finishes | $ - | $ - | $ - | $ - | $ - |
| 10 Specialties | $ - | $ - | $ - | $ - | $ - |
| 13 Special Construction | $ - | $ - | $ 321,419 | $ - | $ 321,419 |
| 14 Conveying | $ - | $ - | $ - | $ - | $ - |
| 15 Mechanical (Plumbing) | $ - | $ 5,900 | $ - | $ - | $ 5,900 |
| 15 Mechanical (HVAC) | $ - | $ 352,901 | $ - | $ - | $ 352,901 |
| 16 Electrical | $ - | $ 34,350 | $ - | $ - | $ 34,350 |
| | | | | | $ - |
| **Subtotal Construction** | **$ 90,800** | **$ 395,151** | **$ 321,419** | **$ 50,213** | **$ 857,583** |
| General Conditions - 10% | $ 9,080 | $ 39,515 | $ 32,142 | $ 5,021 | $ 85,758 |
| **Subtotal** | **$ 99,880** | **$ 434,666** | **$ 353,561** | **$ 55,234** | **$ 943,341** |
| General Contractor OH & Profit 5% | $ 4,994 | $ 21,733 | $ 17,678 | $ 2,762 | $ 47,167 |
| **Subtotal** | **$ 104,874** | **$ 456,399** | **$ 371,239** | **$ 57,995** | **$ 990,508** |
| Contingency 10% | $ 10,487 | $ 45,640 | $ 37,124 | $ 5,800 | $ 99,051 |
| **Subtotal** | **$ 115,361** | **$ 502,039** | **$ 408,363** | **$ 63,795** | **$ 1,089,559** |
| Escalation 2% | $ 2,307 | $ 10,041 | $ 8,167 | $ 1,276 | $ 21,791 |
| **Total Project Cost** | **$ 117,669** | **$ 512,080** | **$ 416,530** | **$ 65,071** | **$ 1,111,350** |

| | |
|---|---|
| **Grand Total Aiken** | **$ 1,111,350** |
| **$/SF** | **13.07** |

**ROOFING OPTIONS:**
Option 1 - Rout out Motar, Install Backer Rod and Sealant  (deduct)        $        (17,412)

**HVAC OPTION:**
Option 1 -  to Convert Existing Controls to Bi-Metal Sensors
Besteiro MS  (add)                                                          $          7,418
Aiken ES  (add)                                                            $         19,544

Note: all options are total price, mark-ups are already included in pricing.

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

**ASSUMPTIONS/QUALIFICATIONS:**

1. The General Conditions mark-up is defined as the cost to the General Contractor for performing the work. This cost include job supervision, job trailer, temporary utilities, small tools etc.

2. The mark-up for General Contractor OH and Profit is defined as General home office overhead, insurances, bonds etc.

3. The mark-up for Contingency is solely and estimating contingency due to the schematic/program level of design documentation. This is not a change order contingency. As the work becomes better defined, this percentage will decrease.

4. Prince escalation is included in the estimate to the mid point of FY 2004 to allow for design and bidding.

5. Estimate Basis:
   This estimate was created using the EFI assessment report for Besteiro Middle School and Aiken Elementary School.

   The line items for the estimate are reported in "unit costs" which include labor and material in the cost. The line items are developed and priced at the subcontractor level with General Contractor mark-ups added at the bottom line.

   The estimate has been developed in CSI divisions with major scopes of work separated for better definition.

   The estimate is priced using a combination of historical data and RS Means pricing Guides.

6. This estimate pricing assumes the project/scope of work to be bid as one package with full access to the entire school for what ever construction period is required.

7. The estimate does not include any asbestos abatement cost

8. The estimate does not include any lead base paint abatement cost

9. No cost have been added to address code violations or upgrades to the existing building

10. The estimate does not include any cost/fees for relocation of staff/students.

Sitework Aiken

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

|  | | | | | Total | | 85,000 | |
|---|---|---|---|---|---|---|---|---|

| Description | Quantity | Unit | Unit Cost | | Extension | | Total | SF |
|---|---|---|---|---|---|---|---|---|
| **Sitework - Division 02** | | | | | | | | |
| | | | | | | | | |
| **BACK COURTYARD AREA** | | | | | | | | |
| **Sitework - Storm Drainage Courtyard** | | | | | | | | |
| New 16"x16" Inlets w/Sump Boxes | 2 | ea | $ | 350.00 | $ | 700 | | |
| Storm Drainage - PVC 8" | 100 | lf | $ | 8.00 | $ | 800 | | |
| Trench/Backfill for new Storm Piping | 100 | lf | $ | 4.00 | $ | 400 | | |
| Earthwork - Re-Grade/Prep for Concrete | 5,600 | sf | $ | 1.00 | $ | 5,600 | | |
| Patch/Repair Landscape | 1 | ls | $ | 1,000.00 | $ | 1,000 | | |
| ADA - Allowance for ADA Requirements | 1 | ls | $ | 50,000.00 | $ | 50,000 | | |
| | | | | | | | | |
| | | | **Subtotal  Sitework - Division 02** | | | $ | 58,500  $ | 0.69 |
| | | | | | | | | |
| | | | | | | | | |
| **Concrete - Division 03** | | | | | | | | |
| **Back Courtyard Area** | | | | | | | | |
| Remove Existing Concrete at Back Courtyard | 5,600 | sf | $ | 2.00 | $ | 11,200 | | |
| New Concrete - Repave Exisiting Back Courtyard | 5,600 | sf | $ | 3.50 | $ | 19,600 | | |
| Miscellaneous Concrete | 1 | ls | $ | 1,500.00 | $ | 1,500 | | |
| | | | | | | | | |
| | | | **Subtotal Concrete - Division 03** | | | $ | 32,300  $ | 0.38 |
| | | | | | | | | |
| | | | **Subtotal Construction** | | | $ | 90,800 | |

Aiken HVAC

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

|  |  |  | Total SF | 85,000 |  |  |
|---|---|---|---|---|---|---|

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Sitework - Division 02** |  |  |  |  |  |  |
|  |  |  |  | ——— |  |  |
| Subtotal Sitework - Division 02 |  |  |  |  | $    - | $    - |
|  |  |  |  |  |  |  |
| **Concrete - Division 03** |  |  |  |  |  |  |
|  |  |  |  | ——— |  |  |
| Subtotal Concrete - Division 03 |  |  |  |  | $    - | $    - |
|  |  |  |  |  |  |  |
| **Masonry - Division 04** |  |  |  |  |  |  |
|  | 0 | sf | $    - | $    - |  |  |
| Subtotal Masonry - Division 04 |  |  |  |  | $    - | $    - |
|  |  |  |  |  |  |  |
| **Metals - Division 05** |  |  |  |  |  |  |
|  | 0 | sf | $    - | $    - |  |  |
| Subtotal Metals - Division 05 |  |  |  |  | $    - | $    - |
|  |  |  |  |  |  |  |
| **Wood and Plastics - Division 06** |  |  |  |  |  |  |
| **Wood and Plastics** |  |  |  |  |  |  |
|  |  |  |  | ——— |  |  |
| Subtotal Wood and Plastics - Division 06 |  |  |  |  | $    - | $    - |
|  |  |  |  |  |  |  |
| **Thermal and Moisture Protection - Division 07** |  |  |  |  |  |  |
| Miscellaneous Caulk and Seal | 1 | ls | $  2,000.00 | $    2,000 |  |  |
| Subtotal Thermal and Moisture Protection - Division 07 |  |  |  |  | $  2,000 | $  0.02 |
|  |  |  |  |  |  |  |
| **Doors and Windows - Division 08** |  |  |  |  |  |  |
|  |  |  |  | ——— |  |  |
| Doors and Windows - Division 08 |  |  |  |  | $    - | $    - |

Aiken HVAC

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

|  | | | Total SF | 85,000 | | |
|---|---|---|---|---|---|---|
| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |

**Interior Construction and Finishes  - Division 09**

|  |  |  | $  · | | | |
|---|---|---|---|---|---|---|
| Sub Total Interior Construction and Finishes  - Division 09 | | | | $  - | $  - | |

**Specialties - Division 10**

|  |  |  | $  · | | | |
|---|---|---|---|---|---|---|
| Sub Total Specialties - Division 10 | | | | $  - | $  - | |

**Division  13 - Special Construction**

|  |  |  | $  · | | | |
|---|---|---|---|---|---|---|
| Subtotal Special Construction - Division 13 | | | | $  - | $  - | |

**Conveying Systems - Division 14**

| Sub Total Conveying Systems - Division 14 | $  - | | $  - | $  - | | |
|---|---|---|---|---|---|---|

**HVAC/Plumbing - Division 15**

**Plumbing**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| New Condensate Drains - Pretreatment Units | 6 | ea | $  150.00 | $  900 | | |
| Miscellaneous Plumbing Repairs | 1 | ls | $  5,000.00 | $  5,000 | | |
| Subtotal Plumbing - Division 15 | | | | | $  5,900 | $  0.07 |

**HVAC**
**Work at Existing Fan Coil Units**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| Rebalance Air and Water Side of FCU's | 58 | ea | $  500.00 | $  29,000 | | |
| Clean Coils in FCU's | 58 | ea | $  200.00 | $  11,600 | | |
| Remove/Replace CHW Valves (assume 100%) | 58 | ea | $  300.00 | $  17,400 | | |
| Check/Recalib. Room Thermostats (Assume 50%) | 29 | ea | $  65.00 | $  1,885 | | |
| Replace Bad Thermostates ( Assume 50%) | 29 | ea | $  250.00 | $  7,250 | | |
| Rework Control Sequence for Duct Heaters | 58 | ea | $  50.00 | $  2,900 | | |
| Clean Supply/Return Ductwork at FCU | 58 | ea | $  225.00 | $  13,050 | | |
| Clean Diffusers (assume 6 per FCU) | 348 | ea | $  12.00 | $  4,176 | | |

**New Outside Air Pre-Treatment Units**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| Air Handler - OA Pre-Treater 6300 CFM | 1 | ea | $  18,900.00 | $  18,900 | | |
| Air Handler - OA Pre-Treater 4950 CFM | 1 | ea | $  14,850.00 | $  14,850 | | |
| Air Handler - OA Pre-Treater 3150 CFM | 1 | ea | $  9,450.00 | $  9,450 | | |
| Air Handler - OA Pre-Treater 2250 CFM | 1 | ea | $  6,750.00 | $  6,750 | | |
| Air Handler - OA Pre-Treater 4950 CFM | 1 | ea | $  14,850.00 | $  14,850 | | |

Aiken HVAC

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

| | | | Total SF | | 85,000 | | |
|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit | Unit Cost | | Extension | Total | SF |
| Air Handler - OA Pre-Treater 4500 CFM | 1 | ea | $ 13,500.00 | $ | 13,500 | | |
| Hoist/Set Equipment | 6 | ea | $ 80.00 | $ | 480 | | |
| Roof Curbs/Supports | 6 | ea | $ 400.00 | $ | 2,400 | | |
| Pretreatment Duct for Classrooms 6300 CFM | 1 | ls | $ 10,080.00 | $ | 10,080 | | |
| Pretreatment Duct for Classrooms 4950 CFM | 1 | ls | $ 7,920.00 | $ | 7,920 | | |
| Pretreatment Duct for Classrooms 3150 CFM | 1 | ls | $ 5,040.00 | $ | 5,040 | | |
| Pretreatment Duct for Classrooms 2250 CFM | 1 | ls | $ 3,600.00 | $ | 3,600 | | |
| Pretreatment Duct for Classrooms 4950 CFM | 1 | ls | $ 7,920.00 | $ | 7,920 | | |
| Pretreatment Duct for Classrooms 4500 CFM | 1 | ls | $ 7,200.00 | $ | 7,200 | | |
| **Piping Corrections** | | | | | | | |
| Remove/Replace CHW Piping Main 6" Copper | 700 | lf | $ 88.00 | $ | 61,600 | | |
| Remove/Replace CHW Piping Main 4" Copper | 400 | lf | $ 54.00 | $ | 21,600 | | |
| Remove/Replace Misc. Piping Insulation - 6" | 700 | lf | $ 14.00 | $ | 9,800 | | |
| Remove/Replace Misc. Piping Insulation - 4" | 400 | lf | $ 9.50 | $ | 3,800 | | |
| Rework Piping Connection at FCUs (Assume 25%) | 15 | ea | $ 200.00 | $ | 2,900 | | |
| **Water Treatment** | | | | | | | |
| Drain/Flush/Treat CHW Piping System | 1 | ls | $ 5,000.00 | $ | 5,000 | | |
| **Chilled Water System Work** | | | | | | | |
| Flush Evaporator | 1 | ea | $ 2,500.00 | $ | 2,500 | | |
| Replace Flow Switch | 1 | ea | $ 1,200.00 | $ | 1,200 | | |
| Replace Damage CHW Piping Insulation | 200 | lf | $ 16.00 | $ | 3,200 | | |
| Recalibrate Differential Pressure Valves | 1 | ls | $ 1,000.00 | $ | 1,000 | | |
| Replace Seal at Primary CHW Pump | 1 | ea | $ 500.00 | $ | 500 | | |
| **Cafetorium RTU's** | | | | | | | |
| Clean RA/OA Mixing Sections | 2 | ea | $ 750.00 | $ | 1,500 | | |
| Clean Drain Pans | 2 | ea | $ 200.00 | $ | 400 | | |
| Clean Coil Sections | 2 | ea | $ 350.00 | $ | 700 | | |
| Air Balance Cafetorium System | 2 | ea | $ 750.00 | $ | 1,500 | | |
| **Patch/Repair Adjacent Finishes in Path of Construction** | | | | | | | |
| Flooring - Assume no Floor Patching Required | | | | | | | |
| Ceiling - No Work - Assume new ceilings in HZMAT cleanup | | | | | | | |
| Wall Repair - Due to penetrations | 85,000 | sf | $ 0.30 | $ | 25,500 | | |
| (Wall repair at penetrations HVAC/Elec core/patch) | | | | | | | |
| **Subtotal HVAC - Division 15** | | | | | | $ 352,901 | $ 4.15 |

**Electrical - Division 16**

**Panelboards and Equipment**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Miscellaneous Recircuiting at Panelboards | 1 | ls | $ 3,500.00 | $ | 3,500 | | |
| **Conduit and Wire** | | | | | | | |
| Electrical Connection - New OA Units | 6 | ea | $ 450.00 | $ | 2,700 | | |
| Conduit - New OA Units | 1,500 | lf | $ 4.60 | $ | 6,900 | | |

Aiken HVAC

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

Total SF    85,000

| Description | Quantity | Unit | | Unit Cost | | Extension | | Total | | SF |
|---|---|---|---|---|---|---|---|---|---|---|
| **Systems** | | | | | | | | | | |
| Fire Alarm - Test/Adjust | 85,000 | sf | $ | 0.15 | $ | 12,750 | | | | |
| Public Address - Test/Adjust | 85,000 | sf | $ | 0.10 | $ | 8,500 | | | | |
| | | | **Subtotal Electrical - Division 16** | | | | $ | 34,350 | $ | 0.40 |
| | | | **Subtotal Construction** | | | | $ | 395,151 | | |

7

Aiken HVAC

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

|  |  |  | Total SF | 85,000 |  |  |
| --- | --- | --- | --- | --- | --- | --- |

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
| --- | --- | --- | --- | --- | --- | --- |

**HVAC CONTROLS OPTION:  (Add to Base Price)**
**Option 1 - To Replace Existing Thermostats on Existing EMS System With Bi-Metal**
**No Local Control Type Sensor.**

| Description | Quantity | Unit | Unit Cost | Extension |
| --- | --- | --- | --- | --- |
| Remove Existing Thermostat | 58.00 | ea | 20.00 | 1,160.00 |
| New Bi-Metal Sensor | 58.00 | ea | 175.00 | 10,150.00 |
| System Check/Recalibrate for New Sensors | 1.00 | ls | 1,200.00 | 1,200.00 |
| Miscellaneous Control Wiring Changes | 18.00 | ea | 50.00 | 900.00 |
| Miscellaneous Patch/Repair Adjacent Finishs at Thermostat Replacement | 58.00 | ea | 30.00 | 1,740.00 |

| | | |
| --- | --- | --- |
| Subtotal HVAC Option 1 | $ | 15,150 |
| Total With Markups | $ | 19,544 |

Note: all options are total price, mark-ups are already included in pricing.

8

Aiken HZMAT

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

| | | Total SF | | 85,000 | | |
|---|---|---|---|---|---|---|

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Sitework - Division 02** | | | | | | |
| | | | $ - | | | |
| | | Subtotal  Sitework - Division 02 | | $ - | $ - | |
| **Concrete - Division 03** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Concrete - Division 03 | | $ - | $ - | |
| **Masonry - Division 04** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Masonry - Division 04 | | $ - | $ - | |
| **Metals - Division 05** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Metals - Division 05 | | $ - | $ - | |
| **Wood and Plastics - Division 06** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Wood and Plastics - Division 06 | | $ - | $ - | |
| **Thermal and Moisture Protection - Division 07** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Thermal and Moisture Protection - Division 07 | | $ - | $ - | |
| **Doors and Windows - Division 08** | | | | | | |
| | | | $ - | | | |
| | | Doors and Windows - Division 08 | | $ - | $ - | |
| **Interior Construction and Finishes  - Division 09** | | | | | | |
| | | | $ - | | | |

Aiken HZMAT

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

|  |  |  | Total SF | 85,000 |  |  |
|---|---|---|---|---|---|---|
| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| **Sub Total Interior Construction and Finishes - Division 09** |  |  |  | $   - | $   - |  |

**Specialties - Division 10**

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  | $   - |  |  |  |
| **Sub Total Specialties - Division 10** |  |  |  | $   - | $   - |  |

**Division 13 - Special Construction - Cleaning/Wiping Down**

| Description | Quantity | Unit | Unit Cost | Extension |
|---|---|---|---|---|
| Mobilize/Demobilize/Supervision | 85,000 | sf | $ 0.10 | $ 8,500 |
| Cleaning Walls | 202,488 | sfsa | $ 0.30 | $ 60,746 |
| Remove/Clean/Reinstall Ceiling | 85,000 | sf | $ 0.90 | $ 76,500 |
| Replace Damaged Ceiling Tiles (assume 25%) | 21,250 | sf | $ 2.50 | $ 53,125 |
| Cutout/Replace Gyp Ceiling | 2,220 | sf | $ 4.00 | $ 8,880 |
| Cutout/Replace Gyp Walls | 630 | sf | $ 3.00 | $ 1,890 |
| Clean Fire Rated Gyp Above Ceiling | 92,331 | sf | $ 0.12 | $ 11,080 |
| Clean Teachers Desk | 71 | ea | $ 30.00 | $ 2,130 |
| Clean Student Desk and Chair | 671 | ea | $ 16.00 | $ 10,736 |
| Clean Tables | 254 | ea | $ 15.00 | $ 3,810 |
| Clean Plastic Chairs | 1,377 | ea | $ 10.00 | $ 13,770 |
| Clean Cloth Chairs | 131 | ea | $ 10.00 | $ 1,310 |
| Clean Computers | 219 | ea | $ 75.00 | $ 16,425 |
| Clean Media Equipment | 88 | ea | $ 75.00 | $ 6,600 |
| Clean 4 Drawer File Cabinet | 76 | ea | $ 30.00 | $ 2,280 |
| Podium | 10 | ea | $ 35.00 | $ 350 |
| Clean Books | 2,548 | cf | $ 5.00 | $ 12,740 |
| Dispose of Paper Supplies, Miscellaneous | 918 | cf | $ 3.00 | $ 2,754 |
| Clean Misc. Supplies/Hard Surfaces Etc. | 918 | cf | $ 3.00 | $ 2,754 |
| Clean Book Shelves (5x4x2) | 157 | ea | $ 45.00 | $ 7,065 |
| Counter Space | 3,620 | sf | $ 0.20 | $ 724 |
| Fixture Replace - Allowance (20% of Total) | 100 | ea | $ 130.00 | $ 13,000 |
| Miscellaneous Cleaning | 85,000 | sf | $ 0.05 | $ 4,250 |

|  |  |  |  |  |
|---|---|---|---|---|
| **Subtotal Special Construction - Division 13** |  |  | $ 321,419 | $ 3.78 |

**Conveying Systems - Division 14**

|  |  |  |  |  |
|---|---|---|---|---|
| **Sub Total Conveying Systems - Division 14** |  |  | $   - | $   - |

**Plumbing - Division 15**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | $   - |  |  |
| **Subtotal Plumbing - Division 15** |  |  | $   - | $   - |

Aiken HZMAT

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

Total SF          85,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|

HVAC - Division 15

$          -

Subtotal HVAC - Division 15                              $          -     $    -

Electrical - Division 16

$          -

Subtotal Electrical - Division 16                        $          -     $    -

Subtotal Construction                                    $    321,419

Aiken Roofing

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

Total SF                85,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Sitework - Division 02** | | | | | | |
| | | | $          - | | | |
| Subtotal  Sitework - Division 02 | | | | $         - | $    - | |
| | | | | | | |
| **Concrete - Division 03** | | | | | | |
| | | | $          - | | | |
| Subtotal Concrete - Division 03 | | | | $         - | $    - | |
| | | | | | | |
| **Masonry - Division 04** | | | | | | |
| | | | $          - | | | |
| Subtotal Masonry - Division 04 | | | | $         - | $    - | |
| | | | | | | |
| **Metals - Division 05** | | | | | | |
| | | | $          - | | | |
| Subtotal Metals - Division 05 | | | | $         - | $    - | |
| | | | | | | |
| **Wood and Plastics - Division 06** | | | | | | |
| | | | $          - | | | |
| Subtotal Wood and Plastics - Division 06 | | | | $         - | $    - | |
| | | | | | | |
| **Thermal and Moisture Protection - Division 07** | | | | | | |
| Inspect Roof Areas/Repair Loose Lap Edges (1 work crew 1 day) | 1 | ls | $    1,800.00 | $    1,800 | | |
| Clean Roof Drain Strainers | 1 | ls | $      500.00 | $      500 | | |
| **Remove All Coping, Install Flashing, Reinstall Coping** | | | | | | |
| Remove Damaged Precast Coping | 2,250 | lf | $        1.50 | $    3,375 | | |
| Install New Flashing | 2,250 | lf | $        3.30 | $    7,425 | | |
| Reinstall Existing Coping | 2,250 | lf | $        2.20 | $    4,950 | | |
| Add For Replacing Damaged Pieces (assume 5% of total) | 112.50 | lf | $       45.00 | $    5,063 | | |
| **Repair Deteriorated Base Flashing At Penetrations and Curbs** | | | | | | |
| Remove Flashing | 2,600 | lf | $        2.00 | $    5,200 | | |
| New Flashing | 2,600 | lf | $        3.50 | $    9,100 | | |
| Re-Roof/Seal at New Flashing | 2,600 | lf | $        3.00 | $    7,800 | | |

Aiken Roofing

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | Total SF | 85,000 | | |
| Miscellaneous Roofing | 1 | ls | $ 5,000.00 | $ 5,000 | | |
| Subtotal Thermal and Moisture Protection - Division 07 | | | | | $ 50,213 | $ 0.59 |

**Doors and Windows - Division 08**

| | | | | $ - | | |
| Doors and Windows - Division 08 | | | | | $ - | $ - |

**Interior Construction and Finishes - Division 09**

| | | | | $ - | | |
| Sub Total Interior Construction and Finishes - Division 09 | | | | | $ - | $ - |

**Specialties - Division 10**

| | | | | $ - | | |
| Sub Total Specialties - Division 10 | | | | | $ - | $ - |

**Division 13 - Special Construction**

| | | | | $ - | | |
| Subtotal Special Construction - Division 13 | | | | | $ - | $ - |

**Conveying Systems - Division 14**

| | | | | $ - | | |
| Sub Total Conveying Systems - Division 14 | | | | | $ - | $ - |

**Plumbing - Division 15**

| | | | | $ - | | |
| Subtotal Plumbing - Division 15 | | | | | $ - | $ - |

**HVAC - Division 15**

Aiken Roofing

**BROWNSVILLE I.S.D.**
**Aiken Elementary School**
**December 2002**

Total SF        85,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | $ - | | | |
| | | Subtotal HVAC - Division 15 | | $ - | $ - | |
| **Electrical - Division 16** | | | | | | |
| | | | $ - | | | |
| | | Subtotal Electrical - Division 16 | | $ - | $ - | |
| | | Subtotal Construction | | $ 50,213 | | |

**ROOFING:  COPING REPAIR OPTIONS**

**Option 1 - Rout out Motar, Install Backer Rod and Sealant**

| Description | Quantity | Unit | Unit Cost | Extension |
|---|---|---|---|---|
| Rout/Clean Joints | 950 | lf | $ 3.00 | $ 2,850 |
| Install Backer Rod | 950 | lf | $ 1.40 | $ 1,330 |
| Install Sealant Material | 950 | lf | $ 3.30 | $ 3,135 |
| **Remove All Coping, Install Flashing, Reinstall Coping (this scope is included in base estimate)** | | | | |
| Remove Damaged Precast Coping | (2,250) | lf | $ 1.50 | $ (3,375) |
| Install New Flashing | (2,250) | lf | $ 3.30 | $ (7,425) |
| Reinstall Existing Coping | (2,250) | lf | $ 2.20 | $ (4,950) |
| Add For Replacing Damaged Pieces (assume 5% of total) | (112.50) | lf | $ 45.00 | $ (5,063) |

| | |
|---|---|
| Subtotal Option 1 | $ (13,498) |
| **Total With Markups** | **$ (17,412)** |

Summary

BROWNSVILLE I.S.D.
Besteiro Middle School
December 2002

### SUMMARY

| Description Area (sf) | Besteiro Sitework 159,000 | Besteiro HVAC 159,000 | Besteiro HZMAT 159,000 | Besteiro Roof 159,000 | Total |
|---|---|---|---|---|---|
| 02 Sitework/Demolition | $ 74,375 | $ - | $ - | $ - | $ 74,375 |
| 03 Concrete | $ 62,675 | $ - | $ - | $ - | $ 62,675 |
| 04 Masonry | $ - | $ - | $ - | $ - | $ - |
| 05 Metals | $ - | $ - | $ - | $ - | $ - |
| 06 Wood and Plastic | $ - | $ - | $ - | $ - | $ - |
| 07 Thermal/Moisture | $ - | $ 5,000 | $ - | $ 136,768 | $ 141,768 |
| 08 Doors/Windows | $ - | $ - | $ - | $ - | $ - |
| 09 Finishes | $ - | $ 258,485 | $ - | $ - | $ 258,485 |
| 10 Specialties | $ - | $ - | $ - | $ - | $ - |
| 13 Special Construction | $ - | $ - | $ 546,017 | $ - | $ 546,017 |
| 14 Conveying | $ - | $ - | $ - | $ - | $ - |
| 15 Mechanical (Plumbing) | $ - | $ 8,905 | $ - | $ - | $ 8,905 |
| 15 Mechanical (HVAC) | $ - | $ 934,240 | $ - | $ - | $ 934,240 |
| 16 Electrical | $ - | $ 84,000 | $ - | $ - | $ 84,000 |
|  |  |  |  |  | $ - |
| **Subtotal Construction** | $ 137,050 | $ 1,290,630 | $ 546,017 | $ 136,768 | $ 2,110,465 |
| General Conditions - 10% | $ 13,705 | $ 129,063 | $ 54,602 | $ 13,677 | $ 211,046 |
| **Subtotal** | $ 150,755 | $ 1,419,693 | $ 600,619 | $ 150,444 | $ 2,321,511 |
| General Contractor OH & Profit 5% | $ 7,538 | $ 70,985 | $ 30,031 | $ 7,522 | $ 116,076 |
| **Subtotal** | $ 158,293 | $ 1,490,678 | $ 630,650 | $ 157,966 | $ 2,437,587 |
| Contingency 10% | $ 15,829 | $ 149,068 | $ 63,065 | $ 15,797 | $ 243,759 |
| **Subtotal** | $ 174,122 | $ 1,639,745 | $ 693,715 | $ 173,763 | $ 2,681,345 |
| Escalation 2% | $ 3,482 | $ 32,795 | $ 13,874 | $ 3,475 | $ 53,627 |
| **Total Project Cost** | $ 177,604 | $ 1,672,540 | $ 707,589 | $ 177,238 | $ 2,734,972 |
| Cost/SF | $ 1.12 | $ 10.52 | $ 4.45 | $ 1.11 | $ 17.20 |

| Grand Total Besteiro | $ 2,734,972 |
|---|---|
| $/SF | 17.20 |

**ROOFING OPTION:**

| Option 1 - Rout out Mortar, Install Backer Rod and Sealant (deduct) | $ (28,854) |
|---|---|

**HVAC OPTION:**
Option to convert controls to Bi-Metal Sensors

| Besteiro MS (add to base price) | $ 7,418 |
|---|---|
| Aiken ES (add to base price) | $ 19,544 |

**HVAC OPTION:**

| Option - Remove and replace existing rooftop and replace with new units in lieu of cleaning existing. (add to base price) | $ 288,702 |
|---|---|

Note: all options are total price, mark-ups are already included in pricing.

Summary

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

**ASSUMPTIONS/QUALIFICATIONS:**

1. The General Conditions mark-up is defined as the cost to the General Contractor for performing the work. This cost include job supervision, job trailer, temporary utilities, small tools etc.

2. The mark-up for General Contractor OH and Profit is defined as General home office overhead, insurances, bonds etc.

3. The mark-up for Contingency is solely and estimating contingency due to the schematic/program level of design documentation. This is not a change order contingency. As the work becomes better defined, this percentage will decrease.

4. Price escalation is included in the estimate to the mid point of FY 2004 to allow for design and bidding.

5. Estimate Basis:
   This estimate was created using the EFI assessment report for Besteiro Middle School and Aiken Elementary School.

   The line items for the estimate are reported in "unit costs" which include labor and material in the cost. The line items are developed and priced at the subcontractor level with General Contractor mark-ups added at the bottom line.

   The estimate has been developed in CSI divisions with major scopes of work separated for better definition.

   The estimate is priced using a combination of historical data and RS Means pricing Guides.

6. This estimate pricing assumes the project/scope of work to be bid as one package with full access to the entire school for what ever construction period is required.

7. The estimate does not include any asbestos abatement cost

8. The estimate does not include any lead base paint abatement cost

9. No cost have been added to address code violations or upgrades to the existing building

10. The estimate does not include any cost/fees for relocation of staff/students.

11. The estimate includes detail line items in division 9 for finishing out the library and adjacent computer room including flooring, ceiling, painting, mechanical, electrical, and library book shelves/stacks.

Sitework Besteiro

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

| Description | Quantity | Unit | Unit Cost | Extension | Total |
|---|---|---|---|---|---|
| | | Total SF | | 159,000 | |
| **Sitework - Division 02** | | | | | |
| | | | | | |
| **FRONT ENTRY AREA** | | | | | |
| **Sitework - Storm Drainage Front Entry** | | | | | |
| New 16"x16" Inlets w/Sump Boxes | 4 | ea | $ 350.00 | $ 1,400 | |
| Storm Drainage - PVC 8" | 200 | lf | $ 8.00 | $ 1,600 | |
| Trench/Backfill for new Storm Piping | 200 | lf | $ 4.00 | $ 800 | |
| Storm Drainage - New Lift Station | 1 | ls | $ 3,500.00 | $ 3,500 | |
| Storm Drainage - New Lift Station Discharge to Parking | 1 | ls | $ 1,000.00 | $ 1,000 | |
| Earthwork - Re-Grade/Prep for Concrete | 5,700 | sf | $ 1.00 | $ 5,700 | |
| Patch/Repair Landscape | 1 | ls | $ 1,000.00 | $ 1,000 | |
| | | | | | |
| **Electrical - Front Entry** | | | | | |
| Electrical - Conduit to Lift Station | 150 | lf | $ 5.50 | $ 825 | |
| Electrical - Motor Connection at Lift Station | 1 | ea | $ 300.00 | $ 300 | |
| Electrical - Trench/Backfill for Conduit | 150 | lf | $ 3.00 | $ 450 | |
| Electrical - Terminations at Existing Panelboard | 1 | ls | $ 200.00 | $ 200 | |
| | | | | | |
| | | | | | |
| **BACK COURTYARD AREA** | | | | | |
| **Sitework - Storm Drainage Courtyard** | | | | | |
| New 16"x16" Inlets w/Sump Boxes | 2 | ea | $ 350.00 | $ 700 | |
| Storm Drainage - PVC 8" | 100 | lf | $ 8.00 | $ 800 | |
| Trench/Backfill for new Storm Piping | 100 | lf | $ 4.00 | $ 400 | |
| Earthwork - Re-Grade/Prep for Concrete | 4,700 | sf | $ 1.00 | $ 4,700 | |
| Patch/Repair Landscape | 1 | ls | $ 1,000.00 | $ 1,000 | |
| | | | | | |
| ADA - Allowance for ADA Requirements | 1 | ls | $ 50,000.00 | $ 50,000 | |
| | | | | | |
| | | **Subtotal Sitework - Division 02** | | $ | 74,375 |
| | | | | | |
| | | | | | |
| **Concrete - Division 03** | | | | | |
| **Main Entrance Area** | | | | | |
| Remove Existing Concrete at Main Entry | 5,700 | sf | $ 2.00 | $ 11,400 | |
| New Concrete - Repave Exisiting Area Main Entry | 5,700 | sf | $ 3.50 | $ 19,950 | |
| Miscellaneous Concrete | 1 | ls | $ 1,500.00 | $ 1,500 | |
| | | | | | |
| **Back Courtyard Area** | | | | | |
| Remove Existing Concrete at Back Courtyard | 5,150 | sf | $ 2.00 | $ 10,300 | |
| New Concrete - Repave Exisiting Back Courtyard | 5,150 | sf | $ 3.50 | $ 18,025 | |
| Miscellaneous Concrete | 1 | ls | $ 1,500.00 | $ 1,500 | |
| | | | | | |
| | | **Subtotal Concrete - Division 03** | | $ | 62,675 |
| | | | | | |
| | | | | | |
| | | **Subtotal Construction** | | $ | 137,050 |

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF     159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Sitework - Division 02** | | | | | | |
| Subtotal Sitework - Division 02 | | | | | $ - | $ - |
| **Concrete - Division 03** | | | | | | |
| Subtotal Concrete - Division 03 | | | | | $ - | $ - |
| **Masonry - Division 04** | | | | | | |
| | 0 | sf | $ - | $ - | | |
| Subtotal Masonry - Division 04 | | | | | $ - | $ - |
| **Metals - Division 05** | | | | | | |
| | 0 | sf | $ - | $ - | | |
| Subtotal Metals - Division 05 | | | | | $ - | $ - |
| **Wood and Plastics - Division 06** | | | | | | |
| **Wood and Plastics** | | | | | | |
| Subtotal Wood and Plastics - Division 06 | | | | | $ - | $ - |
| **Thermal and Moisture Protection - Division 07** | | | | | | |
| Miscellaneous Caulk and Seal | 1 | ls | $ 5,000.00 | $ 5,000 | | |
| Subtotal Thermal and Moisture Protection - Division 07 | | | | | $ 5,000 | $ 0.03 |
| **Doors and Windows - Division 08** | | | | | | |
| Doors and Windows - Division 08 | | | | | $ - | $ - |
| **Interior Construction and Finishes - Division 09** | | | | | | |
| **Build-out Library Interiors 10,500sf** | | | | | | |
| New Flooring - Carpet | 1,167 | sy | $ 24.00 | $ 28,000 | | |

5

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

|  |  |  | Total SF | 159,000 |  |  |  |
|---|---|---|---|---|---|---|---|

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| New Ceilings - Acoustical Lay-In | 10,500 | sf | $ 2.20 | $ 23,100 | | |
| New Wall Finishes - Paint (surface area) | 10,500 | sf | $ 1.00 | $ 10,500 | | |
| New Supply Grilles and Flex | 34 | ea | $ 90.00 | $ 3,060 | | |
| New Return Grilles | 12 | ea | $ 60.00 | $ 720 | | |
| Miscellaneous HVAC/Startup/Balance | 10,500 | sf | $ 0.40 | $ 4,200 | | |
| New Light Fixtures 2x4 Fluorescent | 140 | ea | $ 145.00 | $ 20,300 | | |
| New Fire Alarm Devices (connect to existing/test) | 1 | ls | $ 3,000.00 | $ 3,000 | | |
| New Library Casework - Shelves/Stacks | 1 | ls | $ 150,000.00 | $ 150,000 | | |
| **Build-out Computer Room Interiors 1,500sf** | | | | | | |
| New Flooring - Carpet | 167 | sy | $ 24.00 | $ 4,000 | | |
| New Ceilings - Acoustical Lay-In | 1,500 | sf | $ 2.20 | $ 3,300 | | |
| New Wall Finishes - Paint (surface area) | 1,500 | sf | $ 1.00 | $ 1,500 | | |
| New Supply Grilles and Flex | 6 | ea | $ 90.00 | $ 540 | | |
| New Return Grilles | 2 | ea | $ 60.00 | $ 120 | | |
| Miscellaneous HVAC/Startup/Balance | 1,500 | sf | $ 0.40 | $ 600 | | |
| New Light Fixtures 2x4 Fluorescent | 21 | ea | $ 145.00 | $ 3,045 | | |
| New Fire Alarm Devices (connect to existing/test) | 1 | ls | $ 1,000.00 | $ 1,000 | | |
| Miscellaneous Electrical/Data Connection Work | 1 | ls | $ 1,500.00 | $ 1,500 | | |
| **Sub Total Interior Construction and Finishes  - Division 09** | | | | | $ 258,485 | $ 1.63 |
| **Specialties - Division 10** | | | | | | |
| | | | $ - | | | |
| **Sub Total Specialties - Division 10** | | | | | $ - | $ - |
| **Division  13 - Special Construction** | | | | | | |
| | | | $ - | | | |
| **Subtotal Special Construction - Division 13** | | | | | $ - | $ - |
| **Conveying Systems - Division 14** | | | | | | |
| **Sub Total Conveying Systems - Division 14** | | | $ - | | $ - | $ - |
| **HVAC/Plumbing - Division 15** | | | | | | |
| **Plumbing** | | | | | | |
| Disconnect/Remove Condensate Drains | 71 | ea | $ 10.00 | $ 710 | | |
| New Condensate Drains - Drain to Roof | 71 | ea | $ 45.00 | $ 3,195 | | |
| Miscellaneous Plumbing Repairs | 1 | ls | $ 5,000.00 | $ 5,000 | | |
| **Subtotal Plumbing - Division 15** | | | | | $ 8,905 | $ 0.06 |

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | Total SF | 159,000 | | |
| **HVAC** | | | | | | |
| **Classroom Area Remove Replace RTU/Ducts/Grilles** | | | | | | |
| Disconnect Existing RTU's | 36 | ea | $ 75.00 | $ 2,700 | | |
| Hoist/Remove RTU's | 36 | ea | $ 125.00 | $ 4,500 | | |
| Remove Existing Ductwork/Grilles | 36 | ea | $ 350.00 | $ 12,600 | | |
| Remove Existing Ductwork/Grilles - Existing RTUs | 35 | ea | $ 200.00 | $ 7,000 | | |
| New Diffusers /w Flex | 432 | ea | $ 80.00 | $ 34,560 | | |
| New RTU - 2 ton | 1 | ea | $ 2,800.00 | $ 2,800 | | |
| Reconfigure Ductwork at Existing RTUs | 35 | ea | $ 4,800.00 | $ 168,000 | | |
| Rebalance Ductwork | 71 | clsr | $ 500.00 | $ 35,500 | | |
| Haul/Dispose | 1 | ls | $ 2,100.00 | $ 2,100 | | |
| | | | | | | |
| **New Outside Air Pre-Treatment Units w/Corrosion Coating** | | | | | | |
| Air Handler - OA Pre-Treater 6225 CFM w/ Corr. Coat | 1 | ea | $ 24,277.50 | $ 24,278 | | |
| Air Handler - OA Pre-Treater 4500 CFM w/ Corr. Coat | 1 | ea | $ 17,550.00 | $ 17,550 | | |
| Air Handler - OA Pre-Treater 3375 CFM w/ Corr. Coat | 1 | ea | $ 13,162.50 | $ 13,163 | | |
| Air Handler - OA Pre-Treater 5100 CFM w/Corr. Coat | 1 | ea | $ 19,890.00 | $ 19,890 | | |
| Air Handler - OA Pre-Treater 4725 CFM w/ Corr. Coat | 1 | ea | $ 18,427.50 | $ 18,428 | | |
| Air Handler - OA Pre-Treater 3375 CFM w/ Corr. Coat | 1 | ea | $ 13,162.50 | $ 13,163 | | |
| Hoist/Set Equipment | 6 | ea | $ 80.00 | $ 480 | | |
| Roof Curbs/Supports | 6 | ea | $ 400.00 | $ 2,400 | | |
| | | | | | | |
| Pretreatment Duct for Classrooms 01-116 | 17 | ea | $ 1,100.00 | $ 18,700 | | |
| Pretreatment Duct for Classrooms 117/Workrooms | 28 | ea | $ 1,100.00 | $ 30,800 | | |
| Pretreatment Duct for Classrooms 124-130 | 7 | ea | $ 1,100.00 | $ 7,700 | | |
| Pretreatment Duct for Classrooms 201-214 | 14 | ea | $ 1,100.00 | $ 15,400 | | |
| Pretreatment Duct for Classrooms 215-227 | 32 | ea | $ 1,100.00 | $ 35,200 | | |
| Pretreatment Duct for Classrooms 228-236 | 8 | ea | $ 1,100.00 | $ 8,800 | | |
| | | | | | | |
| **Boys and Girl Locker Area** | | | | | | |
| Remove Existing Units | 2 | ea | $ 450.00 | $ 900 | | |
| New RTU at Locker Rooms 2500 CFM | 2 | ea | $ 7,000.00 | $ 14,000 | | |
| Replace Flex Duct to Diffusers | 15 | ea | $ 45.00 | $ 675 | | |
| Clean Exisiting Ductwork | 1 | ls | $ 650.00 | $ 650 | | |
| Clean Existing Diffusers | 15 | ea | $ 18.00 | $ 270 | | |
| Rebalance Duct Systems | 2 | ea | $ 450.00 | $ 900 | | |
| Hoist/Set Equipment | 2 | ea | $ 80.00 | $ 160 | | |
| Roof Curbs/Supports | 2 | ea | $ 400.00 | $ 800 | | |
| Haul/Dispose | 1 | ls | $ 200.00 | $ 200 | | |
| | | | | | | |
| **Lobby/Commons/Principal/Counslers** | | | | | | |
| Remove Existing Units | 4 | ea | $ 450.00 | $ 1,800 | | |
| New RTU 4 ton | 3 | ea | $ 5,500.00 | $ 16,500 | | |
| New RTU  12.5 ton | 1 | ea | $ 18,000.00 | $ 18,000 | | |
| Replace Flex Duct to Diffusers | 20 | ea | $ 45.00 | $ 900 | | |
| Clean Existing Ductwork | 1 | ls | $ 850.00 | $ 850 | | |
| Clean Existing Diffusers | 20 | ea | $ 18.00 | $ 360 | | |
| Hoist/Set Equipment | 2 | ea | $ 80.00 | $ 160 | | |
| Roof Curbs/Supports | 2 | ea | $ 400.00 | $ 800 | | |
| Rebalance Duct Systems | 4 | ea | $ 450.00 | $ 1,800 | | |
| Haul/Dispose | 1 | ls | $ 400.00 | $ 400 | | |
| | | | | | | |
| **Vocal Music/Band Room** | | | | | | |
| Remove Existing Units | 2 | ea | $ 450.00 | $ 900 | | |

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF    159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| New RTU 4 ton | 1 | ea | $ 5,500.00 | $ 5,500 | | |
| New RTU 5 ton | 1 | ea | $ 6,000.00 | $ 6,000 | | |
| Replace Flex Duct to Diffusers | 15 | ea | $ 45.00 | $ 675 | | |
| Clean Exisiting Ductwork | 1 | ls | $ 650.00 | $ 650 | | |
| Clean Existing Diffusers | 15 | ea | $ 18.00 | $ 270 | | |
| Hoist/Set Equipment | 2 | ea | $ 80.00 | $ 160 | | |
| Roof Curbs/Supports | 2 | ea | $ 400.00 | $ 800 | | |
| Rebalance Duct Systems | 2 | ea | $ 450.00 | $ 900 | | |
| Haul/Dispose | 1 | ls | $ 200.00 | $ 200 | | |
| **Classroom Areas** | | | | | | |
| Clean Existing Classroom RTU's | 36 | ea | $ 120.00 | $ 4,260 | | |
| Clean Remaining Verticle Ductwork Risers | 1,296 | lf | $ 2.50 | $ 3,240 | | |
| **Gymnasium** | | | | | | |
| Clean Coils, Pans, Mixing Sections | 4 | ea | $ 1,200.00 | $ 4,800 | | |
| New Thermostats/Control Staging/Conduit/Wire | 4 | ea | $ 1,800.00 | $ 7,200 | | |
| Rebalance Duct Systems | 4 | ea | $ 650.00 | $ 2,600 | | |
| **Cafetorium/Kitchen** | | | | | | |
| Clean Coils, Pans, Mixing Sections | 4 | ea | $ 1,200.00 | $ 4,800 | | |
| New Thermostats/Control Staging/Conduit/Wire | 4 | ea | $ 1,800.00 | $ 7,200 | | |
| Rebalance Duct Systems | 4 | ea | $ 650.00 | $ 2,600 | | |
| **Library** | | | | | | |
| Repair Existing 40-ton RTU | 1 | allow | $ 7,500.00 | $ 7,500 | | |
| **Temperature Controls** | | | | | | |
| New DDC Temperature Controls - Complete System | 159,000 | sf | $ 1.50 | $ 238,500 | | |
| **Patch/Repair Adjacent Finishes in Path of Construction** | | | | | | |
| Flooring - Assume no Floor Patching Required | | | | | | |
| Patch/Cap Penetrations at Removed RTU's | 36 | ea | $ 225.00 | $ 8,100 | | |
| Wall Repair - Due to penetrations | 159,000 | sf | $ 0.45 | $ 71,550 | | |
| | | Subtotal HVAC - Division 15 | | | $ 934,240 | $ 5.88 |
| **Electrical - Division 16** | | | | | | |
| **Electrical Demolition** | | | | | | |
| Disconnect Existing RTU's Electrical | 36 | ea | $ 75.00 | $ 2,700 | | |
| Remove Conduit/Cable to RTUs | 5,400 | lf | $ 1.50 | $ 8,100 | | |
| Remove Breakers | 42 | ea | $ 25.00 | $ 1,050 | | |
| **Panelboards and Equipment** | | | | | | |
| Miscellaneous Recircuiting at Panelboards | 1 | ls | $ 10,000.00 | $ 10,000 | | |
| **Conduit and Wire** | | | | | | |
| Electrical Connection - New OA Units | 6 | ea | $ 450.00 | $ 2,700 | | |
| Electrical Connection - Locker Room Units | 2 | ea | $ 450.00 | $ 900 | | |
| Electrical Connection - Lobby/Commons | 4 | ea | $ 450.00 | $ 1,800 | | |

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | Total SF | 159,000 | | |
| Electrical Connection - Music/Band | 2 | ea | $ 450.00 | $ 900 | | |
| Conduit - New OA Units | 1,500 | lf | $ 4.60 | $ 6,900 | | |
| Conduit - New Locker Units | 500 | lf | $ 4.60 | $ 2,300 | | |
| Conduit - New Lobby/Commons | 1,000 | lf | $ 4.60 | $ 4,600 | | |
| Conduit - New Music/Band | 500 | lf | $ 4.60 | $ 2,300 | | |
| **Systems** | | | | | | |
| Fire Alarm - Test/Adjust | 159,000 | sf | $ 0.15 | $ 23,850 | | |
| Public Address - Test/Adjust | 159,000 | sf | $ 0.10 | $ 15,900 | | |
| | | | **Subtotal Electrical - Division 16** | | $ 84,000 | $ 0.53 |
| | | | **Subtotal Construction** | | $ 1,290,630 | |

| HVAC CONTROLS OPTION: (Add to Base Price) |
|---|

Option 1 - To Replace Existing Thermostats on Existing EMS System With Bi-Metal
No Local Control Type Sensor. (This occurs at Besteiro Wing A only. New Sensors for balance of
building are included in scope above.)

| | | | | |
|---|---|---|---|---|
| Remove Existing Thermostat | 18.00 | ea | 20.00 | 360.00 |
| New Bi-Metal Sensor | 18.00 | ea | 175.00 | 3,150.00 |
| System Check/Recalibrate for New Sensors | 1.00 | ls | 800.00 | 800.00 |
| Miscellaneous Control Wiring Changes | 18.00 | ea | 50.00 | 900.00 |
| Miscellaneous Patch/Repair Adjacent Finishs at | 18.00 | ea | 30.00 | 540.00 |
| Thermostat Replacement | | | | |

| Subtotal HVAC Option 1 | $ 5,750 |
|---|---|
| Total With Markups | $ 7,418 |

TOTAL HVAC OPTION 1 FOR CONTROLS AT BOTH SCHOOLS

| TOTAL HVAC OPTION 1 | |
|---|---|
| BESTEIRO | $ 7,418 |
| AKIEN | $ 19,544 |
| TOTAL | $ 26,961 |

| HVAC OPTION TO REPLACE 36 EXISTING ROOFTOP UNITS - (Add to Base Price) |
|---|

Option - Remove and replace existing rooftop and replace with new units in lieu of cleaning existing.
(New Package Units to incorporate coating material to inhibit corrosion.)

Besteiro HVAC

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF          159,000

| Description | Quantity | Unit | | Unit Cost | | Extension | Total | SF |
|---|---|---|---|---|---|---|---|---|
| Disconnect Existing RTU's | 36 | ea | $ | 75.00 | $ | 2,700 | | |
| Hoist/Remove Existing RTU's | 36 | ea | $ | 125.00 | $ | 4,500 | | |
| New Rooftop Package Units - w/Corrosion Coating | 36 | ea | | 5,300.00 | | 190,800.00 | | |
| New Electrical Connection - Disconnect | 36 | ea | | 450.00 | | 16,200.00 | | |
| Miscellaneous Control Wiring Changes | 36 | ea | | 100.00 | | 3,600.00 | | |
| Patch/Roofing at New Units | 36 | ea | | 450.00 | | 16,200.00 | | |
| Clean Existing Classroom RTU's | (36) | ea | $ | 120.00 | $ | (4,260) | | |
| Clean Remaining Verticle Ductwork Risers | (1,296) | lf | $ | 2.50 | $ | (3,240) | | |

| | | |
|---|---|---|
| Subtotal HVAC Option 1 | $ | 223,800 |
| Total With Markups | $ | 288,702 |

Note: all options are total price, mark-ups are already included in pricing.

Besteiro Hzmat

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

|  |  |  | Total SF |  | 159,000 |  |  |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Description | Quantity | Unit | Unit Cost | Extension | Total | | SF |
| **Sitework - Division 02** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal  Sitework - Division 02 | | $ | - | $ - |
| **Concrete - Division 03** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal Concrete - Division 03 | | $ | - | $ - |
| **Masonry - Division 04** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal Masonry - Division 04 | | $ | - | $ - |
| **Metals - Division 05** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal Metals - Division 05 | | $ | - | $ - |
| **Wood and Plastics - Division 06** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal Wood and Plastics - Division 06 | | $ | - | $ - |
| **Thermal and Moisture Protection - Division 07** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Subtotal Thermal and Moisture Protection - Division 07 | | $ | - | $ - |
| **Doors and Windows - Division 08** | | | | | | | |
|  | | | | $ - | | | |
|  | | | Doors and Windows - Division 08 | | $ | - | $ - |
| **Interior Construction and Finishes  - Division 09** | | | | | | | |

Besteiro Hzmat

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF          159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | $        - | | | |
| **Sub Total Interior Construction and Finishes  - Division 09** | | | | | $       - | $  - |
| | | | | | | |
| **Specialties - Division 10** | | | | | | |
| | | | $        - | | | |
| **Sub Total Specialties - Division 10** | | | | | $       - | $  - |
| | | | | | | |
| **Division  13 - Special Construction - Cleaning/Wiping Down** | | | | | | |
| Mobilize/Demobilize/Supervision | 159,000 | sf | $      0.08 | $      12,720 | | |
| Cleaning Walls | 230,552 | sfsa | $      0.15 | $      .34,583 | | |
| Remove/Replace Ceilings - Acoustical | 119,545 | sf | $      2.80 | $     334,726 | | |
| Cut/Remove/Replace FR Gyp Ceiling | 1,470 | sf | $      4.00 | $      5,880 | | |
| Cut/Remove/Replace FR Gyp Walls | 50 | sf | $      3.00 | $      150 | | |
| Clean Fire Rated Gyp Above Ceiling | 119,545 | sf | $      0.12 | $      14,345 | | |
| Clean Teachers Desk | 129 | ea | $      30.00 | $      3,870 | | |
| Clean Student Desk and Chair | 1,449 | ea | $      16.00 | $      23,184 | | |
| Clean Tables | 279 | ea | $      15.00 | $      4,185 | | |
| Clean Plastic Chairs | 1,144 | ea | $      10.00 | $      11,440 | | |
| Clean Cloth Chairs | 107 | ea | $      10.00 | $      1,070 | | |
| Clean Computers - Wipe/Vac | 224 | ea | $      35.00 | $      7,840 | | |
| Clean Media Equipment - Wipe/Vac | 95 | ea | $      35.00 | $      3,325 | | |
| Clean 4 Drawer File Cabinet | 116 | ea | $      25.00 | $      2,900 | | |
| Clean 2 Drawer File Cabinet | 15 | ea | $      15.00 | $      225 | | |
| Clean Books | 3,160 | cf | $      4.50 | $      14,220 | | |
| Dispose of Paper Supplies, Miscellaneous | 1,250 | cf | $      3.00 | $      3,750 | | |
| Clean Misc. Supplies/Hard Surfaces Etc. | 1,088 | cf | $      3.00 | $      3,264 | | |
| Clean Book Shelves (5x4x1) | 105 | ea | $      45.00 | $      4,725 | | |
| Clean Media Carts | 97 | ea | $      20.00 | $      1,940 | | |
| Fixture Replace - Allowance (20% of Total) | 398 | ea | $      130.00 | $      51,675 | | |
| Miscellaneous Cleaning | 60,000 | sf | $      0.10 | $      6,000 | | |
| **Subtotal Special Construction - Division 13** | | | | | $   546,017 | $  3.43 |
| | | | | | | |
| **Conveying Systems - Division 14** | | | | | | |
| **Sub Total Conveying Systems - Division 14** | | | | | $       - | $  - |
| | | | | | | |
| **Plumbing - Division 15** | | | | | | |

Besteiro Hzmat

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | Total SF | 159,000 | | |
| | | | $ - | | | |
| Subtotal Plumbing - Division 15 | | | | $ - | $ - | |
| **HVAC - Division 15** | | | | | | |
| | | | $ - | | | |
| Subtotal HVAC - Division 15 | | | | $ - | $ - | |
| **Electrical - Division 16** | | | | | | |
| | | | $ - | | | |
| Subtotal Electrical - Division 16 | | | | $ - | $ - | |
| Subtotal Construction | | | | $ 546,017 | | |

Besteiro Roofing

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF          159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Sitework - Division 02** | | | | | | |
| | | | $          - | | | |
| Subtotal  Sitework - Division 02 | | | | | $          - | $          - |
| | | | | | | |
| **Concrete - Division 03** | | | | | | |
| | | | $          - | | | |
| Subtotal Concrete - Division 03 | | | | | $          - | $          - |
| | | | | | | |
| **Masonry - Division 04** | | | | | | |
| | | | $          - | | | |
| Subtotal Masonry - Division 04 | | | | | $          - | $          - |
| | | | | | | |
| **Metals - Division 05** | | | | | | |
| | | | $          - | | | |
| Subtotal Metals - Division 05 | | | | | $          - | $          - |
| | | | | | | |
| **Wood and Plastics - Division 06** | | | | | | |
| | | | $          - | | | |
| Subtotal Wood and Plastics - Division 06 | | | | | $          - | $          - |
| | | | | | | |
| **Thermal and Moisture Protection - Division 07** | | | | | | |
| Redistribute Aggregate Surfacing at 6 Areas | 600 | sf | $          3.00 | $          1,800 | | |
| Repair Roof Blister | 100 | sf | $          6.50 | $          650 | | |
| Clean Roof Strainers (assume 30 total strainers) | 30 | ea | $          45.00 | $          1,350 | | |
| **Install New Roof Drain** | | | | | | |
| Core/Cut Roof for Drain | 1 | ea | $          150.00 | $          150 | | |
| Roof Drain | 1 | ea | $          145.00 | $          145 | | |
| Drain Leader Piping | 100 | lf | $          18.00 | $          1,800 | | |
| Connect To Existing Roof Drain System | 1 | ea | $          350.00 | $          350 | | |
| Re-Roof/Seal at Roof Drain Penetration | 1 | ea | $          350.00 | $          350 | | |
| **Install New Thru-Wall Scupper** | | | | | | |
| Core/Cut Parapet for Scupper | 1 | ea | $          150.00 | $          150 | | |
| New Scupper Drain | 1 | ea | $          75.00 | $          75 | | |
| Flash/Seal at New Scupper | 1 | ea | $          200.00 | $          200 | | |
| Replace Damaged/Missing Roof Strainers | 2 | ea | $          175.00 | $          350 | | |

Besteiro Roofing

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF          159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| **Precast Coping Flashing Assembly** | | | | | | |
| Remove Damaged Precast Coping | 4 | ea | $ 75.00 | $ 300 | | |
| Install New Precast Coping | 4 | ea | $ 205.00 | $ 820 | | |
| Flash/Caulk/Seal | 4 | ea | $ 65.00 | $ 260 | | |
| | | | | | | |
| **Repair Cracks at Parapet** | | | | | | |
| Clean/Prep Cracks at Parapet Locations | 50 | ea | $ 30.00 | $ 1,500 | | |
| Caulk/Seal Cracks at Parapet Locations | 50 | ea | $ 45.00 | $ 2,250 | | |
| | | | | | | |
| **Remove All Coping, Install Flashing, Reinstall Coping** | | | | | | |
| Remove Damaged Precast Coping | 3,750 | lf | $ 1.50 | $ 5,625 | | |
| Install New Flashing | 3,750 | lf | $ 3.30 | $ 12,375 | | |
| Reinstall Existing Coping | 3,750 | lf | $ 2.20 | $ 8,250 | | |
| Add For Replacing Damaged Pieces (assume 5% of total) | 187.50 | lf | $ 45.00 | $ 8,438 | | |
| | | | | | | |
| **Replace Exterior Wall & Parapet Wall Expansion Joint Sealant Material** | | | | | | |
| Rout/Clean Joints | 2,600.00 | lf | $ 2.50 | $ 6,500.00 | | |
| Install Backer Rod | 2,600.00 | lf | $ 1.00 | $ 2,600.00 | | |
| Install Sealant Material | 2,600.00 | lf | $ 2.80 | $ 7,280.00 | | |
| | | | | | | |
| **Cutout and Replace Sealant at Top of Counter Flashing** | | | | | | |
| Clean Joints at Counter Flashing | 4,750.00 | lf | $ 0.60 | $ 2,850.00 | | |
| Install Sealant Material | 4,750.00 | lf | $ 1.20 | $ 5,700.00 | | |
| | | | | | | |
| **Repair Deteriorated Base Flashing At Penetrations and Curbs** | | | | | | |
| Remove Flashing | 750 | lf | $ 2.00 | $ 1,500 | | |
| New Flashing | 750 | lf | $ 3.50 | $ 2,625 | | |
| Re-Roof/Seal at New Flashing | 750 | lf | $ 3.00 | $ 2,250 | | |
| | | | | | | |
| **Re-Flash Roof Expansion Joint/Parapet Wall Terminations** | | | | | | |
| Re-Flash Roof Expansion Joint/Parapet Wall | 8 | ea | $ 250.00 | $ 2,000 | | |
| | | | | | | |
| **Replace Roof Expansion Joint at Wing B (2 @ 35lf ea)** | | | | | | |
| Cut/Remove Existing Expansion Joint | 70 | lf | $ 3.00 | $ 210 | | |
| New Expansion Joint | 70 | lf | $ 17.00 | $ 1,190 | | |
| Re-Roof/Seal New Expansion Joint | 70 | lf | $ 5.00 | $ 350 | | |
| | | | | | | |
| **Address Pipe Supports Bearing Directly on Aggregate (assume 110 ea)** | | | | | | |
| Raise Pipe Support | 110 | ea | $ 25.00 | $ 2,750 | | |
| Install Base Material Under Pipe Support | 110 | ea | $ 175.00 | $ 19,250 | | |
| | | | | | | |
| Repair Damaged Exhaust Fan | 1 | ls | $ 500.00 | $ 500 | | |
| | | | | | | |
| Properly Flash Antenna Into Roof System | 3 | legs | $ 75.00 | $ 225 | | |
| | | | | | | |
| Remove Abandoned Equipment and Debris | 159,000 | sf | $ 0.20 | $ 31,800 | | |
| | | | | | | |
| **Subtotal Thermal and Moisture Protection - Division 07** | | | | | $ 136,768 | $ 0.86 |

**Doors and Windows - Division 08**

Besteiro Roofing

**BROWNSVILLE I.S.D.**
**Besteiro Middle School**
**December 2002**

Total SF 159,000

| Description | Quantity | Unit | Unit Cost | Extension | Total | SF |
|---|---|---|---|---|---|---|
| | | | | $ - | | |
| Doors and Windows - Division 08 | | | | | $ - | $ - |
| **Interior Construction and Finishes - Division 09** | | | | | | |
| | | | | $ - | | |
| Sub Total Interior Construction and Finishes - Division 09 | | | | | $ - | $ - |
| **Specialties - Division 10** | | | | | | |
| | | | | $ - | | |
| Sub Total Specialties - Division 10 | | | | | $ - | $ - |
| **Division 13 - Special Construction** | | | | | | |
| | | | | $ - | | |
| Subtotal Special Construction - Division 13 | | | | | $ - | $ - |
| **Conveying Systems - Division 14** | | | | | | |
| | | | | $ - | | |
| Sub Total Conveying Systems - Division 14 | | | | | $ - | $ - |
| **Plumbing - Division 15** | | | | | | |
| | | | | $ - | | |
| Subtotal Plumbing - Division 15 | | | | | $ - | $ - |
| **HVAC - Division 15** | | | | | | |
| | | | | $ - | | |
| Subtotal HVAC - Division 15 | | | | | $ - | $ - |
| **Electrical - Division 16** | | | | | | |

## Executive Summary

The opinions expressed herein by Assured Indoor Air Quality, LP are based on analysis of occupants' responses to their environment, visual inspections of the building, indoor and outdoor samples collected at the site, and information provided to Assured concerning the basis for requesting indoor air quality services. No other aspects of indoor air quality were examined. Assured reserves the rights to revise, supplement, and otherwise amend this report as further information and evidence may be made known.

The Brownsville Independent School District has been dealing with moisture intrusion problems from building envelope leaks and comfort problems associated with the Heating Ventilation and Air Conditioning (HVAC) systems (excessive humidity) at Aiken Elementary School and Besteiro Middle School.

In November 2001, the Texas Department of Health issued a letter to BISD indicating that there were areas of concern that showed visible mold growth which needed to be addressed. Health related concerns were also being voiced by the staff and students due to the quality of the indoor environment, visible mold growth, and comfort issues.

Recognizing the above and a potential for further extensive contamination associated with excessive moisture in the schools, the BISD requested Assured Indoor Air Quality, LP (Assured) perform an investigation of the facilities to determine the extent of the contamination and recommendations for approaching the problem in the facilities. During the investigation, Assured noted extensive microbial growth on certain contents and surfaces in the structures. After having sampled and evaluating the facilities, Assured is providing the following summary information.

Since the building has conditions that provide opportunities for wetting of materials, microbial contamination can occur in any location and on virtually any nutrient substrate that is wetted. Acoustical ceiling tile, drywall construction, carpet, the air conditioning units, and internal insulation in the air conditioning duct system represents a large potential area that can harbor contamination.

Fungi need food, water, favorable temperature and spores to start colonies and grow. The food is anything organic and includes, but is not limited to, materials that we use to build, finish, and furnish buildings. The water activity required varies for different types of fungi, however the moisture problems at the school were more than sufficient to provide the needed water activity for fungal growth. The temperature that these molds need for growth is within the range of temperature that we try to maintain in habitable buildings. Having fungal spores in the air is normal, both indoors and outdoors, however fungi growing in a building is not acceptable. Therefore, it is clear that the most effective and

Aiken Elementary & Besteiro Middle School
1/2/2002

Assured IAQ
Page 1 of 5



RSL 000159

practical means of control for fungal growth is to manage moisture. Not only is the Heating Ventilation and Air Conditioning (HVAC) system a primary means for maintaining control of moisture in a dry building it is also the primary transport mechanism for airborne pollutants. Therefore, once the conditions are suitable for fungal growth and this growth is established in a building, the HVAC system can then transport pollutants to potential (moist) growth sites.

It is apparent the buildings have been subject to excessive moisture from multiple sources.
- Water intrusions due to the building envelope – roof leaks, leaks around windows
- Breaches in the chill water pipe insulation at Aiken
- The building air conditioning system does not sufficiently condition and/or treat the outside air enough to reduce the increased moisture load in the building. Furthermore, the outside air for ventilation being introduced into the building during hot and humid periods can add to the moisture load already in the building.

In general, condensation can and does occur indoors when the temperature of a surface falls below the dew point of the indoor air. Therefore, the operation schedules and temperature setting of the air conditioning system are important with regard to preventing condensation taking place inside the facility, particularly when the outside air is humid and outside air for ventilation is not conditioned before being introduced into the air conditioning system.

Microbial growth on drywall, ceiling tiles, furniture, and contents was observed. Stained ceiling tiles, a rusted ceiling grid system, and rusted light fixtures all point to an excessively wet environment.

Cleaning and chemical sanitizing of processed cellulose material(s) that have had growth is not appropriate. Rapid re-growth on cleaned and sanitized processed cellulose materials when wetted or in a high humid environment is a predictable outcome.

Sufficient drying of the buildings and all remaining materials will be required to protect the structures and contents from further risk. An appropriate technology, such as desiccant drying equipment, may be required to sufficiently dry the buildings and contents, if the HVAC equipment cannot manage the inside dew point appropriately.

Fungi and/or bacteria found at Aiken Elementary School are listed below and some are known to be allergenic and/or associated with intrinsic asthma and/or mycotoxin producers.

- Viable air samples revealed elevated levels of various species of yeast, *Bipolaris, Cladosporium, Aspergillus, Aspergillus versicolor, Aspergillus terreus, Aspergillus*

RSL 000160

niger, *Engyodontium, Alternaria, Penicillium, Fusarium, Nigrospora, Rhodotorula,* and *Verticillium.*

- Spore trap samples revealed species of *Nigrospora, Bipolaris, Alternaria, Curvularia, Ascospores,* and *Exserohilum.*
- Surface tape slide samples collected from building materials and/or contents revealed growth sites of various species including: *Cladosporium\*, Aspergillus\*, Bipolaris\*, Alternaria\*, Penicillium\*, Acremonium, Stachybotrys\*, Chaetomium\*,* and *Penicillium/Aspergillus\** like growth sites.
- Surface tape slide samples collected from building materials and/or contents included various species of *Nigrospora, Cladosporium, Alternaria, Bipolaris, Curvularia, Ascospores, Scopulariopsis, Exserohilum, Acremonium, Aspergillus, Tetraploa, Stachybotrys, Chaetomium,* and *Penicillium/Aspergillus* type spores.
- Surface swab samples collected from building materials and/or contents included various species of *Penicillium, Cladosporium, Curvularia, Alternaria, Nigrospora, Bipolaris, Aspergillus, Paecilomyces, Fusarium, Stachybotrys, Rhizopus,* and other yeasts.
- Samples collected from carpet (carpet cassettes) included various species of *Alternaria, Cladosporium, Aspergillus, Acremonium, Penicillium, Fusarium, Rhizopus, Rhodotorula* and other yeasts
- Samples collected from the air conditioning systems included various species of *Cladosporium\*, Bipolaris, Curvularia, Trichoderma\*, Penicillium, Alternaria, Nigrospora, Penicillium/Aspergillus* like spores, *Rhizopus,* and other yeasts.

Fungi and/or bacteria found at Besteiro Middle School are listed below and some are known to be allergenic and/or associated with intrinsic asthma and/or mycotoxin producers.

- Viable air samples revealed elevated levels of various species of *Verticillium, Fusarium, Alternaria, Bipolaris, Acremonium, Penicillium, Cladosporium, Aspergillus, Aspergillus niger, Aspergillus terreus, Aspergillus versicolor, Nigrospora, Bacillus, Ascomycete, Paecilomyces, Chaetomium, Rhodotorula* and other yeasts.
- Spore trap samples revealed species of *Cladosporium, Nigrospora, Curvularia,* and *Penicillium/Aspergillus* type spores.
- Surface tape slide samples collected from the building materials and/or contents revealed growth sites of various species including: *Aspergillus\*, Cladosporium\*, Bipolaris\*,* and *Stachybotrys\*.*
- Surface tape slide samples collected from building materials and/or contents included various species of *Cladosporium, Alternaria, Bipolaris, Nigrospora, Ascospores, Aspergillus, Stachybotrys,* and *Penicillium/Aspergillus* type spores.

- Surface swab samples collected from building materials and/or contents included various species of *Cladosporium, Aspergillus niger, Penicillium, Bipolaris, Stachybotrys*, and yeast.
- Samples collected from carpet (carpet cassettes) included various species of *Cladosporium, Fusarium, Bipolaris* and yeast.
- Samples collected from the air conditioning systems included various species of *Cladosporium\*, Penicillium\*, Nigrospora\*, Alternaria, Aspergillus, Verticillium, Fusarium, Tritirachium\*, Trichoderma\*, Engyodontium, Curvularia, Exophiala, Rhizopus\** and other yeasts.

Certain sensitized individuals may suffer neurological type symptoms and/or allergic type reactions to elevated levels of the organisms found in this building. Typically, these symptoms are not permanent and usually are reduced in severity when the sufferer leaves the contaminated environment for a period of time.

Five potentially dangerous organisms, *Aspergillus versicolor* sp., *Stachybotrys* sp., *Chaetomium* sp., *Fusarium* sp., *and Trichoderma* sp., were isolated in multiple samples. The *Trichoderma* sp. was found in some Roof top units at Besteiro, and on the fan blade of a Fan Coil Unit (FCU) at Aiken, and the *Stachybotrys* sp. was found in the return air plenum at both schools, which allows the organisms to be circulated throughout the HVAC system. The *Chaetomium* sp. was found in the air at Besteiro, and on a surface sample at Aiken.

Samples were collected from sites selected as representative locations for the various conditions found in the building. Therefore, we are confident all areas of contamination were not found and more contamination will be revealed during the remedial process.

In light of the above findings, it is our opinion that you should consider immediately relocating students and staff until the problems at the schools are appropriately resolved. It is our suggestion that you involve the Texas Department of Health and the City of Brownsville Department of Public Health as a resource to validate your decision.

Repairs, modifications, and/or replacement of certain systems, to the building, the HVAC system, and removal of any contaminated materials should allow the building to function in an acceptable manner. If present conditions are not immediately addressed with appropriate action, the problem will only get worse.

RSL 000162

It is the recommendation of Assured Indoor Air Quality, LP that the building be remediated, with meticulous orchestration and supervision to assure that the sequence of activities and the detail of criteria are addressed properly, based on the following scope of work:

1. Fix moisture causes
   - Repair roof leaks by replacing the roof.
   - Repair windows necessary to stop water intrusion.
   - Replace the deficient HVAC system with an appropriate HVAC system which will maintain an appropriate indoor dew point and includes, but is not limited to:
     - New Central Plant
     - New Electronic Control system
     - New duct work
     - New conditioned outside air systems

2. Remove contamination and clean building.
   - Clean and sanitize floors.
   - Clean, sanitize, and re-paint the walls.
   - Clean, sanitize, and/or discard building contents.
   - Clean, sanitize, and/or replace casework as required.
   - Discard and replace the ceiling system.
   - Remove the drywall fire proofing in the HVAC return air plenum and replace with a sprinkler system.

3. Program Management
   - Project management and administration.
   - Testing/Monitoring
     - Containment Management/Monitoring
     - Quality Control/Assurance
     - Clearance testing.

\* Numerous samples indicated moderate to very heavy growth site.

RSL 000163

## Status Report

The opinions expressed herein by Assured Indoor Air Quality, LP are based on analysis of occupants' responses to their environment, visual inspections of the building, indoor and outdoor samples collected at the site, and information provided to Assured concerning the basis for requesting indoor air quality services. No other aspects of indoor air quality were examined. This is a preliminary status report and Assured reserves the rights to revise, supplement, and otherwise amend this report as further information and evidence may be made known.

The Brownsville Independent School District has been dealing with moisture intrusion problems from building envelope leaks and comfort problems associated with the Heating Ventilation and Air Conditioning (HVAC) systems (excessive humidity) at Aiken Elementary School and Besteiro Middle School.

In November 2001, the Texas Department of Health issued a letter to BISD indicating that there were areas of concern that showed visible mold growth which needed to be addressed. Health related concerns were also being voiced by the staff and students due to the quality of the indoor environment, visible mold growth, and comfort issues.

Recognizing the above and a potential for further extensive contamination associated with excessive moisture in the schools, the BISD requested Assured Indoor Air Quality, LP (Assured) perform an investigation of the facilities to determine the extent of the contamination and recommendations for approaching the problem in the facilities. During the investigation, Assured noted extensive microbial growth on certain contents and surfaces in the structures.

Since the building has conditions that provide opportunities for wetting of materials, microbial contamination can occur in any location and on virtually any nutrient substrate that is wetted. Acoustical ceiling tile, drywall construction, carpet, the air conditioning units, and internal insulation in the air conditioning duct system represents a large potential area that can harbor contamination.

Fungi need food, water, favorable temperature and spores to start colonies and grow. The food is anything organic and includes, but is not limited to, materials that we use to build, finish, and furnish buildings. The water activity required varies for different types of fungi, however the moisture problems at the school were more than sufficient to provide the needed water activity for fungal growth. The temperature that these molds need for growth is within the range of temperature that we try to maintain in habitable buildings. Having fungal spores in the air is normal, both indoors and outdoors, however fungi growing in a building is not acceptable. Therefore, it is clear that the most effective and

EXHIBIT

12

RSL 000164

practical means of control for fungal growth is to manage moisture. Not only is the Heating Ventilation and Air Conditioning (HVAC) system a primary means for maintaining control of moisture in a dry building it is also the primary transport mechanism for airborne pollutants. Therefore, once the conditions are suitable for fungal growth and this growth is established in a building, the HVAC system can then transport pollutants to potential (moist) growth sites.

It is apparent the buildings have been subject to excessive moisture from multiple sources.

- Water intrusions due to the building envelope – roof leaks, leaks around windows
- Breaches in the chill water pipe insulation at Aiken
- The building air conditioning system does not sufficiently condition and/or treat the outside air enough to reduce the increased moisture load in the building. Furthermore, the outside air for ventilation being introduced into the building during hot and humid periods can add to the moisture load already in the building.

In general, condensation can and does occur indoors when the temperature of a surface falls below the dew point of the indoor air. Therefore, the operation schedules and temperature setting of the air conditioning system are important with regard to preventing condensation taking place inside the facility, particularly when the outside air is humid and outside air for ventilation is not conditioned before being introduced into the air conditioning system.

Microbial growth on drywall, ceiling tiles, furniture, and contents was observed. Stained ceiling tiles, a rusted ceiling grid system, and rusted light fixtures all point to a history of an excessively wet environment.

Cleaning and chemical sanitizing of processed cellulose material(s) that have had growth is not appropriate. Rapid re-growth on cleaned and sanitized processed cellulose materials when wetted or in a high humid environment is a predictable outcome.

Sufficient drying of the buildings and all remaining materials will be required to protect the structures and contents from further risk. An appropriate technology, such as desiccant drying equipment, may be required to sufficiently dry the buildings and contents, if the HVAC equipment cannot manage the inside dew point appropriately.

Viable and total air samples and surface tape and swab samples were collected at both schools and sent to the Indoor Air Quality Research Laboratory at Texas Tech University Health Sciences Center (TTUHSC) for processing and identification.

Samples were collected from sites selected as representative locations for the various conditions found in the building. Multiple fungal growth sites were identified in both

RSL 000165

school buildings. It was determined from the survey previously collected, inspections, and sampling that both schools were contaminated. Furthermore, we are confident that all areas of contamination were not found and more extensive contamination will be revealed during the remedial process.

Certain of the types of fungi and/or bacteria found are known to be allergenic and/or associated with intrinsic asthma and/or mycotoxin producers. Certain sensitized individuals may suffer neurological type symptoms and/or allergic type reactions to the organisms found in these buildings. Typically, symptoms are not permanent and usually are reduced in severity when the sufferer leaves the contaminated environment for a period of time.

Among the many types of fungi found and identified, five potentially dangerous organisms, *Aspergillus versicolor, Stachybotrys sp., Chaetomium sp., Fusarium sp., and Trichoderma sp.*, were isolated in multiple samples. *Trichoderma sp.* were found in roof top units at Besteiro, and on the fan blade of a Fan Coil Unit (FCU) at Aiken, and *Stachybotrys sp.* were found in the return air plenum at both schools, which allows the organisms to be circulated throughout the HVAC system. *Chaetomium sp.* were isolated from the air at Besteiro, and on a surface sample at Aiken.

In light of the above findings, it is our opinion that the District took the appropriate action by re-locating students and staff until the problems with the building can be appropriately resolved.

Repairs, modifications, and/or replacement of certain systems, to the building, the HVAC system, and removal of any contaminated materials should allow the building to function in an acceptable manner. If present conditions are not immediately addressed with appropriate action, the problem will only get worse.

It is the recommendation of Assured Indoor Air Quality, LP that the building be remediated, with meticulous orchestration and supervision to assure that the sequence of activities and the detail of criteria are addressed properly, based on the following scope of work:

1. Fix moisture causes
   - Repair roof leaks by replacing the roof.
   - Repair windows necessary to stop water intrusion.
   - Replace the deficient HVAC system with an appropriate HVAC system which will maintain an appropriate indoor dew point and includes, but is not limited to:
     - New Central Plant
     - New Electronic Control system

Aiken Elementary & Besteiro Middle School
1/25/2002

Assured IAQ
Page 3 of 4

RSL 000166

- New duct work
- New conditioned outside air systems

2. Remove contamination and clean building.
   - Clean and sanitize floors.
   - Clean, sanitize, and re-paint the walls.
   - Clean, sanitize, and/or discard building contents.
   - Clean, sanitize, and/or replace casework as required.
   - Discard and replace the ceiling system.
   - Remove the drywall fire proofing in the HVAC return air plenum and replace with a fire sprinkler system.

3. Program Management
   - Project management and administration.
   - Testing/Monitoring
     - Containment Management/Monitoring
     - Quality Control/Assurance
     - Clearance testing.



RSL 000001



Rimkus Consulting Group, Inc.
Eight Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 621-3550 Telephone
(713) 623-4357 Facsimile

# Report of Findings

## Sampling for Mold
### at Aiken Elementary School
### 6290 Southmost Road
### Brownsville, TX
### File No: 17670

**Prepared For:**

Boatwright Engineering, Inc.
629 Santa Monica
Corpus Christi, TX 78411

**Attention:**

Mody K. Boatwright, P.E.

*Daniel W. Bridge*

Daniel W. Bridge, Ph.D., C.I.H.
*Senior Consultant*

Philip R. Watters, P.E., M.B.A.
*Senior Vice President*

PHILIP R. WATTERS
36677
STATE OF TEXAS
REGISTERED PROFESSIONAL ENGINEER

July 26, 1999

RSL 000002

# TABLE OF CONTENTS

I. Introduction .......................................... 1

II. Conclusions .......................................... 2

III. Discussion .......................................... 5

IV. Basis Of Report ..................................... 12

V. Appendices ......................................... 13

    A. Photographs

    B. Chain-of-Custody

    C. Laboratory Reports

*July 26, 1999*

RSL 000003

**Section I**

# INTRODUCTION

On July 1, 1999, Rimkus Consulting Group, Inc. (Rimkus) was retained to sample the Aiken Elementary School on 6290 Southmost Road, Brownsville, Texas, for evidence of mold (fungi). Dr. Daniel W. Bridge, C.I.H. of Rimkus conducted sampling of the school on July 8, 1999.

Our report is based on the information available to us at this time, as described in **Section IV, BASIS OF REPORT.** Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions, and to revise our opinions and conclusions if necessary and warranted by the discovery of additional information.

RSL 000004

## Section II
## CONCLUSIONS

Following the conclusions listed below, Table 1 is provided as a sample results summary table.

1. Laboratory analysis of surface samples confirmed the presence of excessive mold growth on classroom walls, classroom bathroom doors, hallway walls, classroom game toys, a carpet, and a section of ceiling tile. These samples were taken from surfaces inside the school building. The predominant mold spore genera identified in the surface samples were *Cladosporium/Paecilomyces* and *Aspergillus/Penicillium.* These mold genera were also the predominant mold spores identified in the outside air sample collected with an Air-O-Cell cassette. Analysis of surface samples revealed no evidence of *Stachybotrys* mold.

2. Air samples collected with Air-O-Cell cassettes indicated elevated mold spore levels in Room C-108, Room B-217, and Room A-108. The predominant mold spore genera collected by the Air-O-Cell cassettes were *Cladosporium/Paecilomyces* and *Aspergillus/Penicillium.* Again, these species were also the predominant mold spore genera found in the outside Air-O-Cell sample.

3. Air samples collected with malt extract agar (MEA) plates revealed the following:

   • *Cladosporium*, a mold commonly associated with outdoor environments, was the predominant mold spore found in both the outside and inside samples. However, none of the indoor samples had *Fusarium*, a mold also associated with outdoor environments. Fusarium was the second most predominant mold found in the outdoor

RSL 000005

sample. Instead, the second most predominant molds found in the indoor samples included *Acremonium, Bipolaris*, and *Penicillium*, indicating that mold spores inside the school building are potentially being generated from mold sources indoors.

4. The elevated levels of mold spore found in the air samples stem from sources of mold growth on surfaces inside the building, as well as from inadequate air conditioning. The American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE) Standard 62-1989 recommends that relative humidities indoors be maintained between 30 to 60 percent. Relative humidities above 60 percent will promote the growth of mold. Data collected on July 8, 1999, indicate that the relative humidity is not being maintained below 60 percent in the school building. This has allowed mold to grow on walls, doors, and other surfaces inside the building. The climate control system needs to be modified in order to maintain relative humidities below 60 percent.

5. At present, *no regulatory standard for mold spore levels in indoor air* exists in the United States. There is a wide variability among individuals concerning susceptibility to adverse health effects from mold spore. Young children can be particularly susceptible to mold spores. The following measures are recommended prior to opening the building for the new school season.

- The climate-control system should be modified to maintain the relative humidity below 60 percent.

- The building should be inspected for any water leaks or moisture sources, and these should be eliminated.

- The building should be appropriately remediated for mold removal.

---

RSL 000006

To insure that the above measures have been effective, the building air and relative humidity should be monitored for acceptable values. The building surface should be visually inspected for mold growth, and the building air should be sampled to determine mold spore type and levels.

**Table 1**
**Selected Results From July 8, 1999, Sampling of**
**Aiken Elementary School, Brownsville, Texas**

| Area Sampled | Surface Sampling | Air Sampling |
|---|---|---|
| Room C-108 | *Cladosporium/Paecilomyces* and *Aspergillus/Penicillium* on wall and bathroom door | Elevated mold spore levels in Air-O-Cell (*Cladosporium/Paecilomyces* and *Aspergillus/Penicillium*) |
| C-Hallway | *Cladosporium/Paecilomyces* and *Aspergillus/Penicillium* on wall | No elevated mold spore levels apparent |
| Room B-217 | *Aspergillus/Penicillium* on ceiling tile | Elevated mold spore levels in Air-O-Cell (*Cladosporium/Paecilomyces* and *Aspergillus/Penicillium*) and MEA plate—(*Cladosporium* and *Penicillium* higher than outside) |
| B-Hallway | No sample taken | No elevated mold spore levels apparent |
| Room A-108 | *Aspergillus/Penicillium* on toy block, carpet, and game board | Elevated mold spore in Air-O-Cell (*Cladosporium/Paecilomyces* and *Aspergillus/Penicillium*) |
| A-Hallway | No sample taken | No elevated mold spore levels apparent |

RSL 000007

## Section III
## DISCUSSION

**Description of Project Task**

The Aiken Elementary School is a two-story brick building. Dr. Daniel Bridge of Rimkus sampled the building for evidence of abnormal mold growth on July 8, 1999. Photographs taken during the sampling process are located in **Appendix A.** A single-stage N6 Andersen air sampler was used to collect airborne viable mold and Air-O-Cell cassettes were used to collect airborne viable and nonviable bioaerosols.

Additional surface samples were taken with transparent tape that was attached to glass slides. Three bulk samples were also collected.

All samples were placed in plastic bags and stored in an insulated cooler containing "blue" ice. The samples were shipped overnight via Federal Express to Aerotech Laboratories, Inc., for analysis. The chain-of-custody is provided in **Appendix B.**

**Interpretation of Investigative Results**

At present, no government regulatory standard has been established for fungi (mold) in the United States. As indicated in the 1999 publication, *Bioaerosols—Assessment and Control*, the American Conference of Governmental Industrial Hygienists, Inc. (ACGIH) does not support any numeric criteria for interpreting data on biological agents from source or air samples.

RSL 000008

Our interpretation of the Aiken Elementary School sampling data emphasizes a comparison of outdoor conditions versus indoor conditions, with the recognition that every indoor environment has unique characteristics that must be considered in comparison to other environments. In reviewing the sampling results, we compared such factors as total outdoor spore levels versus total indoor spore levels, and the spore distribution/percentage ranking of outside air versus inside air. Surface samples were taken in each sample area, and subsequently screened for *Stachybotrys*.

All laboratory results are provided in **Appendix B**. Note that our discussion below only lists predominant mold genera. For all mold spores identified, the reader is referred to the laboratory report pages in **Appendix C.**

*Visible Growth of Mold*
Visible growth of mold should not normally exist inside of buildings. If no water leaks in the building are detected, the existence of visible mold growing on inside surfaces typically indicates that the inside air is not being properly conditioned. Visible growth of mold is frequently associated with elevated levels of airborne mold spores.

Temperature measurements and corresponding relative humidities for locations in the Aiken Elementary School building are provided below for July 8, 1999:

---

RSL 000009

| Location | Time | Dry Bulb Temperature (°F) | Wet Bulb Temperature (°F) | Relative Humidity (%) |
|---|---|---|---|---|
| C-108 | 11:40 a.m. | 72 | 64 | 65 |
| C-Hall | 11:48 a.m. | 73 | 65 | 65 |
| B-217 | 12:40 p.m. | 71.5 | 66 | 75 |
| D-Hall | 1:00 p.m. | 74 | 65 | 62 |
| A-108 | 1:38 p.m. | 72 | 65 | 70 |
| A-Hall (A-103) | 1:55 p.m. | 74 | 65 | 62 |
| Outside | 2:15 p.m. | 93 | 78 | 50 |

The American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE) Standard 62-1989 recommends that relative humidities indoors be maintained between 30 to 60 percent. Relative humidities above 60 percent will promote the growth of mold. The above data collected on July 8, 1999, indicate that the air cooling system should be adjusted to keep the relative humidity below 60 percent, which will discourage the growth of mold in the building.

Visible mold was observed on various surfaces inside the school building, such as classroom doors (Appendix A, Photograph 1), hallway walls (Appendix A, Photograph 2), closet shelves (Appendix A, Photograph 3), and ceiling tiles (Appendix A, Photographs 4 and 5).

Visible mold was also observed on articles such as a wooden toy block (Appendix A, Photograph 6), a game board (Appendix A, Photograph 7), and a carpet (Appendix A, Photograph 8).

RSL 000010

*Tape Samples and Bulk Samples*

Six tape samples were taken from various surfaces within the building and three bulk samples were taken from three separate articles. All laboratory results are provided in **Appendix C.**

*Cladosporium/Paecilomyces* and *Aspergillus/Penicillium* mold spores were found on the following samples:

| Sample Identification | Percent of Visible Field at 400 x Magnification | |
| --- | --- | --- |
| | *Cladosporium/ Paecilomyces* | *Aspergillus/ Penicillium* |
| 1.  Tape-Room C-108 Wall | 25%-75% | 0% |
| 2.  Tape-Room C-108 Bathroom Door | 0% | <5% |
| 3.  Tape-Room C-103 Bathroom Door | >75% | 0% |
| 4.  Tape-Hall Near Room C-103 | 25%-75% | <5% |
| 5.  Tape-Hall near Principal's Office(C-Wing) | 25%-75% | <5% |
| 6.  Bulk-Wooden Toy Block Room A-108 | 0% | 25%-75% |
| 7.  Bulk-Carpet-Room A-108 | 0% | 5%-25% |
| 8.  Tape-Cardboard Game-Room A-108 | 0% | 25%-75% |
| 10. Bulk-Ceiling Tile-Room B-217 | <5% | >75% |

The nine samples above reveal a wide range of values for both groups of mold genera. Sample 6 also contained <5 percent of *Exserohilum* and <5 percent of yeast.

*Air Sampling:  Air-O-Cell Cassettes*

Seven Air-O-Cell cassettes and a trip blank were submitted for analysis. With the exception of the trip blank, an air flow rate of 15 liters per minute (l/m) for a duration of four minutes was used for each Air-O-Cell sample. The results are listed in **Appendix C.** The samples and total spore counts per cubic meter (Cts/m$^3$) of air are given below:

RSL 000011

| Sample Identification | Spore (Cts/m³) | | |
|---|---|---|---|
| | Cladooporium/ Paecilomyces | Aspergillus/ Penicillium | Total |
| 24.  Outside | 4,300 | 4,633 | 9,933 |
| 12.  Room C-108 | 876 | 1,450 | 2,350 |
| 15.  Hallway (Near C-105) | 467 | 583 | 1,100 |
| 16.  Room B-217 | 2,317 | 3,550 | 5,883 |
| 18.  Hallway (Near B-215) | 1,583 | 533 | 2,150 |
| 20.  Room A-108 | 267 | 1,883 | 2,150 |
| 22.  Hallway (Near A-103) | 117 | 283 | 400 |
| 26.  Blank | 0 | 0 | 0 |

The following source states that total spore concentrations greater than 2,200 Cts/m³ or concentrations greater than 1,500 Cts/m³ of *Aspergillus/Penicillium* may indicate the presence of indoor air contamination:

> *Airborne Mold Spore Concentrations in Commercial and Residential Buildings.* 1995. Daniel M. Baxter, Environmental Testing Associates.

Based on these above guidelines, air sampling data in the preceding table indicate that samples 12 (Room C-108), 20 (Room A-108), and 16 (Room B-217) have elevated concentrations of mold spore that may be associated with indoor contamination. Tape samples 1 and 2 from Room C-108 both reveal surface mold growth. A wooden block, game board, and carpet in Room A-108 all had mold growth. The ceiling tile sample from Room B-217 also had abnormally high levels of mold growth.

*Air Sampling:  Agar Plates*
Seven malt extract agar (MEA) plates and a trip blank were submitted for analysis. Except for the trip blank, an air flow rate of 28.3 l/m was used for

RSL 000012

the MEA plates. The MEA plate sample results are given below, as colony forming units per cubic meter of air (CFU/m$^3$):

| Sample Identification | Viable Spore (CFU/m$^3$) | | |
|---|---|---|---|
| | Predominant Mold Spore | | Total |
| 25. Outside | Cladosporium | 1,272 | 1,343 |
| | Fusarium | 71 | |
| 13. Room C-108 | Cladosporium | 274 | 318 |
| | Acremonium | 35 | |
| 14. Hallway (Near C-105) | Cladosporium | 336 | 380 |
| | Acremonium | 27 | |
| 17. Room B-217 | Cladosporium | 1,449 | 1,572 |
| | Penicillium | 97 | |
| 19. Hallway (Near B-215) | Cladosporium | 813 | 857 |
| | Penicillium | 27 | |
| 21. Room A-108 | Cladosporium | 133 | 203 |
| | Bipolaris | 44 | |
| 23. Hallway (Near A-103) | Cladosporium | 53 | 115 |
| | Bipolaris | 27 | |
| 9. Blank | | 0 | 0 |

There are several reasons why the malt agar plate results indicate elevated mold spore levels within the Aiken Elementary School:

1. The outside MEA sample contained only two genera (*Cladosporium* and *Fusarium*). For both the outside and inside MEA samples, the predominant mold spore was *Cladosporium*. However, none of the indoor air samples had *Fusarium* as the second most predominant mold spore, as was found in the outside sample. Instead the second most predominant molds found in the indoor samples included either *Acremonium*, *Bipolaris*, and *Penicillium*. These data indicate that mold spores inside the school building are potentially being generated from mold sources within the building.

RSL 000013

2. The total mold spore count for Room B-217 (Sample No. 17) is higher than the outside total, indicating a potential problem. As mentioned earlier, visible mold was observed in a ceiling tile in Room B-217, which was found to contain a high concentration of *Penicillium*. This is probably why *Penicillium* was the second most predominant mold spore found in the MEA samples for Room B-217 and the adjacent hallway.

RSL 000014

. **Section IV**
## BASIS OF REPORT

---

1. Rimkus inspected and sampled Aiken Elementary School on July 8, 1999.

2. Rimkus reviewed laboratory results from Aerotech Laboratories, Inc.

---

RSL 000015

# Section V
# APPENDICES

RSL 000016

## Section VI
## APPENDIX A

---

# Photographs

Photographs taken during our inspection which are not included in this report are retained in our files and are available to you upon request.

---

July 26, 1999

RSL 000018

**Photograph 1**
*Arrow points to visible mold on door to Classroom C-103.*



RSL 000019

**Photograph 2**
*Crutch points to visible mold on C-Hall walls.*



**Photograph 3**
*Arrow points to mold on closet shelf in Room C-108.*



RSL 000021

**Photograph 4**
*Arrow points to mold growing in ceiling tile.*



RSL 000022

**Photograph 5**
*Surface of ceiling tile facing upward.  Bulk sample taken from middle of the dark mold growth.*



**Photograph 6**
*Arrow points to visible mold on wooden toy block in Room A-108.*



RSL  000023

**Photograph 7**
*Mold is slightly visible on game board from Room A-108 (but barely noticeable in photograph).*



**Photograph 8**
*Visible mold is seen on carpet mat in Room A-108. Dark square hole is where bulk sample was taken.*



RSL  000024



**ASSURED**
INDOOR AIR QUALITY

# Indoor Air Quality
# Environmental Survey
# of

# Bruce Aiken Elementary School
# 6290 Southmost Road
# Brownsville, Texas 78521

PREPARED FOR:

THE BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
1900 PRICE ROAD
BROWNSVILLE, TEXAS 78521

Report Prepared by:

*Nancy L. Hardy*

Nancy L. Hardy, B.S.
Senior Laboratory Technician
Assured Indoor Air Quality

Reviewed by:

*Doug Hubbard*

Doug Hubbard, M.S.
Statistician
Database Administrator
Assured Indoor Air Quality

The opinions expressed herein by Assured Indoor Air Quality©, L.P. (Assured) are based on analysis of occupants' responses to their environment, and descriptions provided to Assured concerning the basis for requesting indoor air quality services. No other aspects of indoor air quality were examined. Assured reserves the rights to revise, supplement, and otherwise amend this report as further information and evidence may be made known.

Assured Indoor Air Quality, L.P.
6616 Forest Park Road
Dallas, Texas 75235

Report No.
002003400VS78521
November 9, 2001

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 1
SUMMARY .................................................................................................................. 2
ASSURED IAQ SCHOOL RATINGS: AIKEN ELEMENTARY SCHOOL .......................... 3
REPORTED SYMPTOMS: AIKEN ELEMENTARY SCHOOL ........................................... 4
RESPONDENTS' SYMPTOM RESULTS ......................................................................... 5
DATABASE TO SCHOOL COMPARISON ....................................................................... 6
RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY ...................................... 7
RESPONDENTS' REPORTED ODORS TOPOGRAPHY .................................................... 8
FOREWORD ............................................................................................................... 9
BACKGROUND ......................................................................................................... 10
INFORMATION COLLECTION SCOPE ......................................................................... 11
APPENDICES ............................................................................................................ 12

# SUMMARY

## Introduction

In November 2001, the Brownsville Independent School District commissioned Assured Indoor Air Quality, L.P. (Assured) to conduct an Indoor Environmental Survey Study of Aiken Elementary School. Assured prepared and provided 80 surveys to the district in November 2001 for distribution to the school.

The Brownsville Independent School District administrative staff distributed the surveys to the school, where staff completed the surveys during November 2001. Assured received completed surveys in November 2001. After receiving the completed survey forms, Assured analyzed the data and rated the school in November 2001.

## Results

Aiken Elementary School is located at 6290 Southmost Road in Brownsville, Texas. Of the 80 surveys prepared for Aiken Elementary School, the staff completed and returned 57 for a 71% response rate.

The cumulative score for Aiken Elementary School is a 5.0. Reported conditions indicate a building with a high probability to negatively impact the wellbeing of occupants. Determine cause. Develop a plan to lessen possible effects upon the occupants. Consider relocation of certain sensitive individuals. Consider viability of building.

More than forty-three percent (43.86%) of responses indicate building-related symptoms.

Two small clusters (3-4 rooms) of rooms where responses indicate building-related symptoms were identified.

Several responses reported water events where wetted materials were not replaced promptly.

Several areas of odors were reported by respondents.

## Recommendations

1. Initiate a detailed study, to include:

    a. Determine the extent of contamination.
    b. Determine areas of water intrusion.

# ASSURED IAQ SCHOOL RATINGS: AIKEN ELEMENTARY SCHOOL

| Least Occupant Impact | | Transitional | Investigate Further | |
|---|---|---|---|---|
| 1 | 2 | ⇐3.5⇒ | 4 | 5 |

**Composite Score**                                                                5.0

**Composite Components**

*Occupant Response*                                                                5.0

>43% of occupants reported building related symptoms.

*Cluster Effects*                                        4.0

Two small clusters (3-4 rooms) were respondents indicate building related symptoms.

*Occupant Reported Water Events*              3.4

Several water events reported where wetted materials were not promptly replaced.

*Occupant Reported Odors*              3.6

Several areas of odors reported by respondents.

See appendix for summary of scoring procedures.

## REPORTED SYMPTOMS: AIKEN ELEMENTARY SCHOOL



**SYMPTOMS LEGEND**

- Indicates No Symptoms
- Indicates Potential Building-Related Symptoms
- Indicates Symptoms That Do Not Improve When Respondents Leave
- Indicates Building-Related Symptoms
- No Room Response Returned Or Not Part Of The Sampling Group

## RESPONDENTS' SYMPTOM RESULTS

**Occupant Survey:**

Analysis of the Occupant Survey responses indicated that 43.86% of the respondents were experiencing building-related symptoms, and that 3.51% were experiencing potential building-related symptoms. This response rate equated to a 5.0 rating.

**Total Symptom Profile**



3.5%    0.0%

43.9%

52.6%

⊞ Indicates Building-Related Symptoms
⊞ Indicates Symptoms That Do Not Improve When Respondents Leave
☐ Indicates Potential Building-Related Symptoms
⊞ Indicates No Symptoms

**Building-Related Symptoms** are frequently occurring, multiple symptoms that affect the occupant while he or she is in the building and disappear or lessen in severity when the occupant leaves the building for an extended period of time.

**Potential Building-Related Symptoms** are single building related symptoms, occurring with less frequency.

**Symptoms That Do Not Improve When Respondents Leave** are symptoms reported by the occupant that cannot be isolated to the building because they do not diminish or lessen in severity when the occupant leaves the building for an extended period of time.

**No Symptoms Reported** means that the occupant reported having no symptoms commonly associated with Sick Building Syndrome.

### DATABASE TO SCHOOL COMPARISON





These two graphs show the comparison of the symptom response from Aiken Elementary School to the averages of the Assured Database. Error bars represent one standard deviation.

# RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY



## WATER EVENTS LEGEND

◔ Rating of 1-2: No, or few, reports of water intrusion with wetted materials not promptly replaced.

◯ Rating of 3: Several reports of water intrusion with wetted materials not promptly replaced.

◉ Rating of 4-5: Numerous reports of water intrusions, not all wetted materials were replaced.

## RESPONDENTS' REPORTED ODORS TOPOGRAPHY



### ODORS LEGEND
○ Chemical Odors
◉ Musty Odors
◉ Pungent Odors

# FOREWORD

Indoor Air Quality (IAQ) is a supporting factor in providing a productive and healthful environment. At the core of the issue is the effect of indoor air contaminants - microbiological, chemical, and particulate - on the wellbeing of occupants. Since human response to these contaminants in varying combinations remains incompletely understood, IAQ presents a complex issue with many influencing determinants including:

- Building design.
- HVAC system design, installation, operation & maintenance.
- Management policy.
- Occupant activities.
- Housekeeping practices.
- Renovation and expansion projects.

Effective IAQ management requires an ongoing program that will involve the development of a standardized set of protocols for each building. These protocols should address known influencing factors and include periodic monitoring of protocol compliance and occupant response.

One of the first steps in such a program is to determine whether the building's ecology is negatively affecting its occupants. The intent of the Indoor Environmental Survey is to provide meaningful data about, and an understanding of, the IAQ of each facility with respect to the current indoor ecology and the building's possible effects on occupants. The survey establishes a platform that can be used as a reference for future IAQ audits.

It is important to understand that the Environmental Survey Study provides a limited and representative indication of building conditions only. The more comprehensive is the study, the greater the likelihood that potential areas of concern will be uncovered.

Keep in mind that this survey does not establish a cause and effect opinion of any existing IAQ problems within the building. A cause and effect opinion can develop only through further investigation.

This report is proprietary to Assured Indoor Air Quality, L.P., (Assured) and the Brownsville Independent School District and intended solely for the specific use of these parties. The descriptive results of this document should be reviewed in its entirety. Assured Indoor Air Quality, L.P.©, is not responsible for third party review of this document. Reproduction of this document by persons other than those working for Assured or Brownsville Independent School District is prohibited without written permission of both parties.

# BACKGROUND

In November 2001, the Brownsville Independent School District engaged Assured Indoor Air Quality, L.P.© to conduct an Indoor Environmental Survey in Aiken Elementary School. Based on numerous experiences with facilities jointly investigated by Assured and the Indoor Air Quality Research Laboratory at Texas Tech University Health Sciences Center (TTUHSC), Assured has developed a series of questions to determine the effect of the indoor air on a building's occupants: the Indoor Environmental Survey. Analysis of survey results enables Assured to rate a facility numerically on a scale ranging from 1 to 5. This process represents an economical method of establishing relative IAQ rankings within an entire inventory of facilities.

## Objectives

1. Determine the relative quality of the facility based on the gathered data.
2. Identify other actions that may be required and categorize the school as:

- **Least Occupant Impact** - Displays minimum conditions, occupant complaints, and/or symptoms associated with IAQ problem facilities.
- **Transitional**- Displays conditions, system configurations, and/or early signs of symptoms common to sites classified as Priority.
- **Investigate Further**- Requires the highest priority due to occupant symptoms and occupant responses.

## Chronology of Events

Brownsville Independent School District administrative staff distributed surveys to the school during November 2001.

School staff completed surveys and returned responses to Assured in November 2001.

Assured analyzed returned responses in November 2001.

Assured prepared this report in November 2001.

The increasing awareness of IAQ issues by district staff, in concert with an active IAQ Program, should help ensure that the district's facilities function in a manner that does not adversely affect occupants. Commendations are due to the District for its pro-active position regarding the indoor environment.

## Continued Research

These rankings may change as the IAQ Program is implemented and refined, and more data becomes available.

# INFORMATION COLLECTION SCOPE

### Protocol

Upon commission by the Brownsville Independent School District, Assured prepared 80 Indoor Environmental Quality Survey forms. District administrative personnel distributed these forms to the school staff. School staff completed and returned the surveys for analysis. This analysis includes comparison to the AIAQ Database as well as a location analysis from a building plat.

Assured employed its proprietary survey, based on a questionnaire developed and validated by the National Institute of Safety and Occupational Health (NIOSH), to assess building occupants' health profiles. Assured's consulting epidemiologists, statisticians, and IAQ specialists adapted the survey specifically for use in school by comparing individual responses to the company's large historical database of occupant profiles and scientific, on-site building investigations. Questions in the survey gather information on the site, the condition of the workplace, and the respondent's health and wellbeing as well as the respondent's job characteristics. Relying upon the answers given by each respondent as accurate, representative descriptions of his or her environment, Assured uses a series of statistical protocols and analyses of these three subject areas to create a profile of the indoor environment of the building in which the occupant works. In addition to describing the present quality of the work environment, and isolating problem areas, the procedure can project in statistical terms what the status of the building may become in the future.

### Acceptable conditions

- Fewer than 15% of the respondents indicate building-related symptoms.
- No clusters of rooms identified where occupants indicate building-related symptoms.
- No, or few, water events reported where wetted materials were not replaced promptly.
- Occupants indicate no, or few, areas with odors.

# APPENDICES

## ASSURED IAQ SCHOOL RATING SYSTEM

### School Occupant Response Results

Aiken Elementary School, Brownsville Independent School District:
- 80 Surveys Distributed
- 57 Responses Returned
- 71% Response Rate

### AIAQ Scoring Procedures

**Composite Score** This score is based on the Predictive Model that has been developed using a large number of observations. Specifically, a percentage of each of the predictor variables of the survey is calculated. These percentages, according to our predictive model, are additive and therefore yield the composite score. When a certain amount of error is entered into the calculation, the composite score many times is larger than any one of the individual variable components.)

1.0-1.9    The facility has no indication of either symptoms or conditions that would suggest an adverse health impact on occupants.

2.0-2.9    The facility is a typical well-maintained building. Occupant profile is within "normal" range.

3.0-3.9    Building conditions could cause a worsening indoor environment. Operational strategies, housekeeping and maintenance procedures, or change in use can influence (positively or negatively) the building's direction. Monitor facilities scoring over 3.5.

4.0-4.9    Reported conditions correspond to warning signs regarding buildings that can affect the wellbeing of occupants. Determine cause.

5.0    Reported conditions indicate a building with a high probability to negatively impact the wellbeing of occupants. Determine cause.

**Occupant Response** (Based on an analysis of the respondents' building-related symptoms obtained from the survey):

Rating of 1 -    Low rate of respondents indicate building-related symptoms

Rating of 2 -    Low to Moderate rate of responses indicating building-related symptoms.

Rating of 3 -    Moderate rate of responses indicating building-related symptoms.

Rating of 4 -    High rate of responses indicating building-related symptoms.

Rating of 5 -    Unacceptable rate of responses indicating building-related symptoms.

**Clusters** (Based on the respondents' building related symptoms as projected onto a site plat.)

Rating of 1 -   No clusters of rooms or areas where respondents indicate building related symptoms.

Rating of 2 -   No clusters of rooms or areas where respondents indicate building related symptoms, but several rooms close together.

Rating of 3 -   One small cluster of rooms or areas where respondents indicate building related symptoms (3-4 rooms).

Rating of 4 -   Two small clusters of rooms or areas where respondents indicate building related symptoms or one medium cluster (4-5 rooms).

Rating of 5 -   Three or more small clusters of rooms or areas where respondents indicate building related symptoms or one large cluster (6 or more).

**Water Events** (Based on respondent information concerning water intrusion and timely replacement of wetted or water damaged materials.)

Rating of 1 -   No water events or no water events reported by respondents suggesting water intrusion and wetted materials not replaced promptly.

Rating of 2 -   Few water events reported by the respondents suggesting water intrusions and wetted materials not replaced promptly.

Rating of 3 -   Several water events reported by the respondents indicating water intrusion and wetted materials not replaced promptly.

Rating of 4 -   Numerous water events reported with wetted materials not replaced promptly.

Rating of 5 -   Numerous water events reported by the respondents with wetted materials not replaced.

**Odors** (Based on the frequency of different odors {musty, pungent, and chemical} reported by the respondents.)

Rating of 1 -   No or few odors reported by respondents.

Rating of 2 -   Occasional odors reported by respondents.

Rating of 3 -   Several areas of persistent odors reported by respondents.

Rating of 4 -   Numerous areas of odors reported by respondents.

Rating of 5 -   Numerous areas or clusters of odors reported by respondents occurring on a daily basis.



# ASSURED
INDOOR AIR QUALITY

## INDOOR AIR QUALITY
## ENVIRONMENTAL SURVEY
## OF

## BRUCE AIKEN ELEMENTARY SCHOOL
## 6290 SOUTHMOST ROAD
## BROWNSVILLE, TEXAS 78521

PREPARED FOR:

THE BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
1900 PRICE ROAD
BROWNSVILLE, TEXAS 78521

Report Prepared by:

Nancy L. Hardy, B.S.
Senior Laboratory Technician
Assured Indoor Air Quality

Reviewed by:

Doug Hubbard, M.S.
Statistician
Database Administrator
Assured Indoor Air Quality

The opinions expressed herein by Assured Indoor Air Quality©, L.P. (Assured) are based on analysis of occupants' responses to their environment, and descriptions provided to Assured concerning the basis for requesting indoor air quality services. No other aspects of indoor air quality were examined. Assured reserves the rights to revise, supplement, and otherwise amend this report as further information and evidence may be made known.

Assured Indoor Air Quality, L.P.
6616 Forest Park Road
Dallas, Texas 75235

Report No.
002003400VS78521
November 9, 2001

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... 1

SUMMARY .................................................................................................................................. 2

ASSURED IAQ SCHOOL RATINGS: AIKEN ELEMENTARY SCHOOL .......................................... 3

REPORTED SYMPTOMS: AIKEN ELEMENTARY SCHOOL ............................................................ 4

RESPONDENTS' SYMPTOM RESULTS......................................................................................... 5

DATABASE TO SCHOOL COMPARISON ...................................................................................... 6

RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY...................................................... 7

RESPONDENTS' REPORTED ODORS TOPOGRAPHY .................................................................. 8

FOREWORD ............................................................................................................................... 9

BACKGROUND.......................................................................................................................... 10

INFORMATION COLLECTION SCOPE .......................................................................................... 11

APPENDICES............................................................................................................................. 12

## SUMMARY

### Introduction

In November 2001, the Brownsville Independent School District commissioned Assured Indoor Air Quality, L.P. (Assured) to conduct an Indoor Environmental Survey Study of Aiken Elementary School. Assured prepared and provided 80 surveys to the district in November 2001 for distribution to the school.

The Brownsville Independent School District administrative staff distributed the surveys to the school, where staff completed the surveys during November 2001. Assured received completed surveys in November 2001. After receiving the completed survey forms, Assured analyzed the data and rated the school in November 2001.

### Results

Aiken Elementary School is located at 6290 Southmost Road in Brownsville, Texas. Of the 80 surveys prepared for Aiken Elementary School, the staff completed and returned 57 for a 71% response rate.

The cumulative score for Aiken Elementary School is a 5.0. Reported conditions indicate a building with a high probability to negatively impact the wellbeing of occupants. Determine cause. Develop a plan to lessen possible effects upon the occupants. Consider relocation of certain sensitive individuals. Consider viability of building.

More than forty-three percent (43.86%) of responses indicate building-related symptoms.

Two small clusters (3-4 rooms) of rooms where responses indicate building-related symptoms were identified.

Several responses reported water events where wetted materials were not replaced promptly.

Several areas of odors were reported by respondents.

### Recommendations

1. Initiate a detailed study, to include:

   a. Determine the extent of contamination.
   b. Determine areas of water intrusion.

# ASSURED IAQ SCHOOL RATINGS: AIKEN ELEMENTARY SCHOOL

| Least Occupant Impact | | Transitional | Investigate Further | |
|---|---|---|---|---|
| 1 | 2 | ⇐3.5⇒ | 4 | 5 |

**Composite Score**

5.0

**Composite Components**

*Occupant Response*

5.0

>43% of occupants reported building-related symptoms.

*Cluster Effects*

4.0

Two small clusters (3-4 rooms) were respondents indicate building related symptoms.

*Occupant Reported Water Events*

3.4

Several water events reported where wetted materials were not promptly replaced.

*Occupant Reported Odors*

3.6

Several areas of odors reported by respondents.

See appendix for summary of scoring procedures.

# REPORTED SYMPTOMS: AIKEN ELEMENTARY SCHOOL



## SYMPTOMS LEGEND

- ⊚ Indicates No Symptoms
- ○ Indicates Potential Building-Related Symptoms
- ◔ Indicates Symptoms That Do Not Improve When Respondents Leave
- ◉ Indicates Building-Related Symptoms
- ○ No Room Response Returned Or Not Part Of The Sampling Group

## RESPONDENTS' SYMPTOM RESULTS

### Occupant Survey:

Analysis of the Occupant Survey responses indicated that 43.86% of the respondents were experiencing building-related symptoms, and that 3.51% were experiencing potential building-related symptoms. This response rate equated to a 5.0 rating.

**Total Symptom Profile**



3.5%  ⌐0.0%

43.9%

52.6%

☒ Indicates Building-Related Symptoms
☒ Indicates Symptoms That Do Not Improve When Respondents Leave
☐ Indicates Potential Building-Related Symptoms
☒ Indicates No Symptoms

**Building-Related Symptoms** are frequently occurring, multiple symptoms that affect the occupant while he or she is in the building and disappear or lessen in severity when the occupant leaves the building for an extended period of time.

**Potential Building-Related Symptoms** are single building related symptoms, occurring with less frequency.

**Symptoms That Do Not Improve When Respondents Leave** are symptoms reported by the occupant that cannot be isolated to the building because they do not diminish or lessen in severity when the occupant leaves the building for an extended period of time.

**No Symptoms Reported** means that the occupant reported having no symptoms commonly associated with Sick Building Syndrome.

## DATABASE TO SCHOOL COMPARISON





These two graphs show the comparison of the symptom response from Aiken Elementary School to the averages of the Assured Database. Error bars represent one standard deviation.

# RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY



## WATER EVENTS LEGEND

Rating of 1-2: No, or few, reports of water intrusion with wetted materials not promptly replaced.

Rating of 3: Several reports of water intrusion with wetted materials not promptly replaced.

Rating of 4-5: Numerous reports of water intrusions, not all wetted materials were replaced.

Aiken Elementary School
November 2001

Brownsville ISD
Procedure Copyrighted

Page 7
Assured Indoor Air Quality, L.P.

# RESPONDENTS' REPORTED ODORS TOPOGRAPHY



**ODORS LEGEND**

○ Chemical Odors
◉ Musty Odors
◉ Pungent Odors

# FOREWORD

Indoor Air Quality (IAQ) is a supporting factor in providing a productive and healthful environment. At the core of the issue is the effect of indoor air contaminants - microbiological, chemical, and particulate - on the wellbeing of occupants. Since human response to these contaminants in varying combinations remains incompletely understood, IAQ presents a complex issue with many influencing determinants including:

- Building design.
- HVAC system design, installation, operation & maintenance.
- Management policy.
- Occupant activities.
- Housekeeping practices.
- Renovation and expansion projects.

Effective IAQ management requires an ongoing program that will involve the development of a standardized set of protocols for each building. These protocols should address known influencing factors and include periodic monitoring of protocol compliance and occupant response.

One of the first steps in such a program is to determine whether the building's ecology is negatively affecting its occupants. The intent of the Indoor Environmental Survey is to provide meaningful data about, and an understanding of, the IAQ of each facility with respect to the current indoor ecology and the building's possible effects on occupants. The survey establishes a platform that can be used as a reference for future IAQ audits.

It is important to understand that the Environmental Survey Study provides a limited and representative indication of building conditions only. The more comprehensive is the study, the greater the likelihood that potential areas of concern will be uncovered.

Keep in mind that this survey does not establish a cause and effect opinion of any existing IAQ problems within the building. A cause and effect opinion can develop only through further investigation.

This report is proprietary to Assured Indoor Air Quality, L.P., (Assured) and the Brownsville Independent School District and intended solely for the specific use of these parties. The descriptive results of this document should be reviewed in its entirety. Assured Indoor Air Quality, L.P.©, is not responsible for third party review of this document. Reproduction of this document by persons other than those working for Assured or Brownsville Independent School District is prohibited without written permission of both parties.

## BACKGROUND

In November 2001, the Brownsville Independent School District engaged Assured Indoor Air Quality, L.P.© to conduct an Indoor Environmental Survey in Aiken Elementary School. Based on numerous experiences with facilities jointly investigated by Assured and the Indoor Air Quality Research Laboratory at Texas Tech University Health Sciences Center (TTUHSC), Assured has developed a series of questions to determine the effect of the indoor air on a building's occupants: the Indoor Environmental Survey. Analysis of survey results enables Assured to rate a facility numerically on a scale ranging from 1 to 5. This process represents an economical method of establishing relative IAQ rankings within an entire inventory of facilities.

### Objectives

1. Determine the relative quality of the facility based on the gathered data.
2. Identify other actions that may be required and categorize the school as:

- **Least Occupant Impact** - Displays minimum conditions, occupant complaints, and/or symptoms associated with IAQ problem facilities.
- **Transitional**- Displays conditions, system configurations, and/or early signs of symptoms common to sites classified as Priority.
- **Investigate Further**- Requires the highest priority due to occupant symptoms and occupant responses.

### Chronology of Events

Brownsville Independent School District administrative staff distributed surveys to the school during November 2001.

School staff completed surveys and returned responses to Assured in November 2001.

Assured analyzed returned responses in November 2001.

Assured prepared this report in November 2001.

The increasing awareness of IAQ issues by district staff, in concert with an active IAQ Program, should help ensure that the district's facilities function in a manner that does not adversely affect occupants. Commendations are due to the District for its pro-active position regarding the indoor environment.

### Continued Research

These rankings may change as the IAQ Program is implemented and refined, and more data becomes available.

## INFORMATION COLLECTION SCOPE

### Protocol

Upon commission by the Brownsville Independent School District, Assured prepared 80 Indoor Environmental Quality Survey forms. District administrative personnel distributed these forms to the school staff. School staff completed and returned the surveys for analysis. This analysis includes comparison to the AIAQ Database as well as a location analysis from a building plat.

Assured employed its proprietary survey, based on a questionnaire developed and validated by the National Institute of Safety and Occupational Health (NIOSH), to assess building occupants' health profiles. Assured's consulting epidemiologists, statisticians, and IAQ specialists adapted the survey specifically for use in school by comparing individual responses to the company's large historical database of occupant profiles and scientific, on-site building investigations. Questions in the survey gather information on the site, the condition of the workplace, and the respondent's health and wellbeing as well as the respondent's job characteristics. Relying upon the answers given by each respondent as accurate, representative descriptions of his or her environment, Assured uses a series of statistical protocols and analyses of these three subject areas to create a profile of the indoor environment of the building in which the occupant works. In addition to describing the present quality of the work environment, and isolating problem areas, the procedure can project in statistical terms what the status of the building may become in the future.

### Acceptable conditions

- Fewer than 15% of the respondents indicate building-related symptoms.
- No clusters of rooms identified where occupants indicate building-related symptoms.
- No, or few, water events reported where wetted materials were not replaced promptly.
- Occupants indicate no, or few, areas with odors.

Aiken Elementary School
November 2001

Brownsville ISD
Procedure Copyrighted

Page 11
Assured Indoor Air Quality, L.P.

# APPENDICES

Aiken Elementary School
November 2001

Brownsville ISD
Procedure Copyrighted

Page 12
Assured Indoor Air Quality, L.P.

## ASSURED IAQ SCHOOL RATING SYSTEM

### School Occupant Response Results

Aiken Elementary School, Brownsville Independent School District:
- 80 Surveys Distributed
- 57 Responses Returned
- 71% Response Rate

### AIAQ Scoring Procedures

**Composite Score** This score is based on the Predictive Model that has been developed using a large number of observations. Specifically, a percentage of each of the predictor variables of the survey is calculated. These percentages, according to our predictive model, are additive and therefore yield the composite score. When a certain amount of error is entered into the calculation, the composite score many times is larger than any one of the individual variable components.)

1.0-1.9    The facility has no indication of either symptoms or conditions that would suggest an adverse health impact on occupants.

2.0-2.9    The facility is a typical well-maintained building. Occupant profile is within "normal" range.

3.0-3.9    Building conditions could cause a worsening indoor environment. Operational strategies, housekeeping and maintenance procedures, or change in use can influence (positively or negatively) the building's direction. Monitor facilities scoring over 3.5.

4.0-4.9    Reported conditions correspond to warning signs regarding buildings that can affect the wellbeing of occupants. Determine cause.

5.0    Reported conditions indicate a building with a high probability to negatively impact the wellbeing of occupants. Determine cause.

**Occupant Response** (Based on an analysis of the respondents' building-related symptoms obtained from the survey):

Rating of 1 -  Low rate of respondents indicate building-related symptoms

Rating of 2 -  Low to Moderate rate of responses indicating building-related symptoms.

Rating of 3 -  Moderate rate of responses indicating building-related symptoms.

Rating of 4 -  High rate of responses indicating building-related symptoms.

Rating of 5 -  Unacceptable rate of responses indicating building-related symptoms.

**Clusters (Based on the respondents' building related symptoms as projected onto a site plat.)**

Rating of 1 -   No clusters of rooms or areas where respondents indicate building related symptoms.

Rating of 2 -   No clusters of rooms or areas where respondents indicate building related symptoms, but several rooms close together.

Rating of 3 -   One small cluster of rooms or areas where respondents indicate building related symptoms (3-4 rooms).

Rating of 4 -   Two small clusters of rooms or areas where respondents indicate building related symptoms or one medium cluster (4-5 rooms).

Rating of 5 -   Three or more small clusters of rooms or areas where respondents indicate building related symptoms or one large cluster (6 or more).

**Water Events (Based on respondent information concerning water intrusion and timely replacement of wetted or water damaged materials.)**

Rating of 1 -   No water events or no water events reported by respondents suggesting water intrusion and wetted materials not replaced promptly.

Rating of 2 -   Few water events reported by the respondents suggesting water intrusions and wetted materials not replaced promptly.

Rating of 3 -   Several water events reported by the respondents indicating water intrusion and wetted materials not replaced promptly.

Rating of 4 -   Numerous water events reported with wetted materials not replaced promptly.

Rating of 5 -   Numerous water events reported by the respondents with wetted materials not replaced.

**Odors (Based on the frequency of different odors {musty, pungent, and chemical} reported by the respondents.)**

Rating of 1 -   No or few odors reported by respondents.

Rating of 2 -   Occasional odors reported by respondents.

Rating of 3 -   Several areas of persistent odors reported by respondents.

Rating of 4 -   Numerous areas of odors reported by respondents.

Rating of 5 -   Numerous areas or clusters of odors reported by respondents occurring on a daily basis.



**ASSURED**
INDOOR AIR QUALITY

# INDOOR AIR QUALITY
# ENVIRONMENTAL SURVEY
# OF

# RAUL BESTEIRO, JR. MIDDLE SCHOOL
# 6280 SOUTHMOST ROAD
# BROWNSVILLE, TEXAS 78521

PREPARED FOR:

THE BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
1900 PRICE ROAD
BROWNSVILLE, TEXAS 78521

Report Prepared by:                                  Reviewed by:

Nancy L. Hardy, B.S.                                 Doug Hubbard, M.S.
Senior Laboratory Technician                         Statistician
Assured Indoor Air Quality                           Database Administrator
                                                     Assured Indoor Air Quality

The opinions expressed herein by Assured Indoor Air Quality©, L.P. (Assured) are based on analysis of occupants' responses to their environment, and descriptions provided to Assured concerning the basis for requesting indoor air quality services. No other aspects of indoor air quality were examined. Assured reserves the rights to revise, supplement, and otherwise amend this report as further information and evidence may be made known.

Assured Indoor Air Quality, L.P.                                    Report No.
6616 Forest Park Road                                        002003500VS78521
Dallas, Texas 75235                                           November 9, 2001

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ 1
SUMMARY .......................................................................................................... 2
ASSURED IAQ SCHOOL RATINGS: BESTEIRO MIDDLE SCHOOL ...................... 3
REPORTED SYMPTOMS: BESTEIRO MIDDLE SCHOOL ..................................... 4
REPORTED SYMPTOMS: BESTEIRO MIDDLE SCHOOL ..................................... 5
RESPONDENTS' SYMPTOM RESULTS................................................................. 6
DATABASE TO SCHOOL COMPARISON .............................................................. 7
RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY.............................. 8
RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY.............................. 9
RESPONDENTS' REPORTED ODORS TOPOGRAPHY ........................................ 10
RESPONDENTS' REPORTED ODORS TOPOGRAPHY ........................................ 11
FOREWORD...................................................................................................... 12
BACKGROUND.................................................................................................. 13
INFORMATION COLLECTION SCOPE ................................................................ 14
APPENDICES.................................................................................................... 15

# SUMMARY

### Introduction

In November 2001, the Brownsville Independent School District commissioned Assured Indoor Air Quality, L.P. (Assured) to conduct an Indoor Environmental Survey Study of Besteiro Middle School. Assured prepared and provided 120 surveys to the district in November 2001 for distribution to the school.

The Brownsville Independent School District administrative staff distributed the surveys to the school, where staff completed the surveys during November 2001. Assured received completed surveys in November 2001. After receiving the completed survey forms, Assured analyzed the data and rated the school in November 2001.

### Results

Besteiro Middle School is located at 6280 Southmost Road in Brownsville, Texas. Of the 120 surveys prepared for Besteiro Middle School, the staff completed and returned 91 for a 76% response rate.

The cumulative score for Besteiro Middle School is a 4.0. Reported conditions correspond to warning signs regarding buildings that can affect the wellbeing of occupants. Determine cause.

More than ten percent (10.98%) of responses indicate building-related symptoms.

No clusters of rooms or areas where responses indicate building-related symptoms were identified, but several rooms were close together where respondents indicate building-related symptoms.

Few responses reported water events where wetted materials were not replaced promptly.

Occasional odors were reported by respondents.

### Recommendations

1. Initiate a detailed study, to include:

    a. Determine the extent of contamination.
    b. Determine areas of water intrusion.

## ASSURED IAQ SCHOOL RATINGS: BESTEIRO MIDDLE SCHOOL

| Least Occupant Impact | | Transitional | Investigate Further | |
|---|---|---|---|---|
| 1 | 2 | ⇐3.5⇒ | 4 | 5 |

**Composite Score**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 4.0

**Composite Components**

*Occupant Response*

▓▓▓▓▓▓▓▓▓▓ 2.6

>10% of occupants reported building related symptoms.

*Cluster Effects*

▓▓▓▓▓▓▓ 2.0

No clusters of rooms or areas where respondents indicate building related symptoms, but seven rooms closet together.

*Occupant Reported Water Events*

▓▓▓▓▓▓▓▓▓▓ 2.6

Few water events reported where wetted materials were not promptly replaced.

*Occupant Reported Odors*

▓▓▓▓▓▓▓▓▓▓ 2.6

Occasional odors reported by respondents.

See appendix for summary of scoring procedures.

# REPORTED SYMPTOMS: BESTEIRO MIDDLE SCHOOL



**BESTEIRO MIDDLE SCHOOL
FIRST FLOOR**

### SYMPTOMS LEGEND

- Indicates No Symptoms
- Indicates Potential Building-Related Symptoms
- Indicates Symptoms That Do Not Improve When Respondents Leave
- Indicates Building-Related Symptoms
- No Room Response Returned Or Not Part Of The Sampling Group

# REPORTED SYMPTOMS: BESTEIRO MIDDLE SCHOOL



**BESTEIRO MIDDLE SCHOOL**
**SECOND FLOOR**

### SYMPTOMS LEGEND

- Indicates No Symptoms
- Indicates Potential Building-Related Symptoms
- Indicates Symptoms That Do Not Improve When Respondents Leave
- Indicates Building-Related Symptoms
- No Room Response Returned Or Not Part Of The Sampling Group

## RESPONDENTS' SYMPTOM RESULTS

**Occupant Survey:**

Analysis of the Occupant Survey responses indicated that 10.98% of the respondents were experiencing building-related symptoms, and that 7.69% were experiencing potential building-related symptoms. This response rate equated to a 4.0 rating.

**Total Symptom Profile**





| | |
|---|---|
| ☒ | Indicates Building-Related Symptoms |
| ☒ | Indicates Symptoms That Do Not Improve When Respondents Leave |
| ☐ | Indicates Potential Building-Related Symptoms |
| ☒ | Indicates No Symptoms |

**Building-Related Symptoms** are frequently occurring, multiple symptoms that affect the occupant while he or she is in the building and disappear or lessen in severity when the occupant leaves the building for an extended period of time.

**Potential Building-Related Symptoms** are single building related symptoms, occurring with less frequency.

**Symptoms That Do Not Improve When Respondents Leave** are symptoms reported by the occupant that cannot be isolated to the building because they do not diminish or lessen in severity when the occupant leaves the building for an extended period of time.

**No Symptoms Reported** means that the occupant reported having no symptoms commonly associated with Sick Building Syndrome.

# DATABASE TO SCHOOL COMPARISON



These two graphs show the comparison of the symptom response from Besteiro Middle School to the averages of the Assured Database. Error bars represent one standard deviation.

## RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY



**BESTEIRO MIDDLE SCHOOL
FIRST FLOOR**

### WATER EVENTS LEGEND

- Rating of 1-2: No, or few, reports of water intrusion with wetted materials not promptly replaced.
- Rating of 3: Several reports of water intrusion with wetted materials not promptly replaced.
- Rating of 4-5: Numerous reports of water intrusions, not all wetted materials were replaced.

# RESPONDENTS' REPORTED WATER EVENTS TOPOGRAPHY



**BESTEIRO MIDDLE SCHOOL
SECOND FLOOR**

## WATER EVENTS LEGEND

◉ Rating of 1-2: No, or few, reports of water intrusion with wetted materials not promptly replaced.

○ Rating of 3: Several reports of water intrusion with wetted materials not promptly replaced.

◉ Rating of 4-5: Numerous reports of water intrusions, not all wetted materials were replaced.

## RESPONDENTS' REPORTED ODORS TOPOGRAPHY



**BESTEIRO MIDDLE SCHOOL
FIRST FLOOR**

### ODORS LEGEND
○ Chemical Odors
◉ Musty Odors
◉ Pungent Odors

# RESPONDENTS' REPORTED ODORS TOPOGRAPHY



**BESTEIRO MIDDLE SCHOOL**
**SECOND FLOOR**

**ODORS LEGEND**
○ Chemical Odors
◉ Musty Odors
◉ Pungent Odors

# FOREWORD

Indoor Air Quality (IAQ) is a supporting factor in providing a productive and healthful environment. At the core of the issue is the effect of indoor air contaminants - microbiological, chemical, and particulate - on the wellbeing of occupants. Since human response to these contaminants in varying combinations remains incompletely understood, IAQ presents a complex issue with many influencing determinants including:

- Building design.
- HVAC system design, installation, operation & maintenance.
- Management policy.
- Occupant activities.
- Housekeeping practices.
- Renovation and expansion projects.

Effective IAQ management requires an ongoing program that will involve the development of a standardized set of protocols for each building. These protocols should address known influencing factors and include periodic monitoring of protocol compliance and occupant response.

One of the first steps in such a program is to determine whether the building's ecology is negatively affecting its occupants. The intent of the Indoor Environmental Survey is to provide meaningful data about, and an understanding of, the IAQ of each facility with respect to the current indoor ecology and the building's possible effects on occupants. The survey establishes a platform that can be used as a reference for future IAQ audits.

It is important to understand that the Environmental Survey Study provides a limited and representative indication of building conditions only. The more comprehensive is the study, the greater the likelihood that potential areas of concern will be uncovered.

Keep in mind that this survey does not establish a cause and effect opinion of any existing IAQ problems within the building. A cause and effect opinion can develop only through further investigation.

This report is proprietary to Assured Indoor Air Quality, L.P., (Assured) and the Brownsville Independent School District and intended solely for the specific use of these parties. The descriptive results of this document should be reviewed in its entirety. Assured Indoor Air Quality, L.P.©, is not responsible for third party review of this document. Reproduction of this document by persons other than those working for Assured or Brownsville Independent School District is prohibited without written permission of both parties.

# BACKGROUND

In November 2001, the Brownsville Independent School District engaged Assured Indoor Air Quality, L.P.© to conduct an Indoor Environmental Survey in Besteiro Middle School. Based on numerous experiences with facilities jointly investigated by Assured and the Indoor Air Quality Research Laboratory at Texas Tech University Health Sciences Center (TTUHSC), Assured has developed a series of questions to determine the effect of the indoor air on a building's occupants: the Indoor Environmental Survey. Analysis of survey results enables Assured to rate a facility numerically on a scale ranging from 1 to 5. This process represents an economical method of establishing relative IAQ rankings within an entire inventory of facilities.

### Objectives

1. Determine the relative quality of the facility based on the gathered data.
2. Identify other actions that may be required and categorize the school as:

   - **Least Occupant Impact** - Displays minimum conditions, occupant complaints, and/or symptoms associated with IAQ problem facilities.
   - **Transitional**- Displays conditions, system configurations, and/or early signs of symptoms common to sites classified as Priority.
   - **Investigate Further**- Requires the highest priority due to occupant symptoms and occupant responses.

### Chronology of Events

Brownsville Independent School District administrative staff distributed surveys to the school during November 2001.

School staff completed surveys and returned responses to Assured in November 2001.

Assured analyzed returned responses in November 2001.

Assured prepared this report in November 2001.

The increasing awareness of IAQ issues by district staff, in concert with an active IAQ Program, should help ensure that the district's facilities function in a manner that does not adversely affect occupants. Commendations are due to the District for its pro-active position regarding the indoor environment.

### Continued Research

These rankings may change as the IAQ Program is implemented and refined, and more data becomes available.

## INFORMATION COLLECTION SCOPE

### Protocol

Upon commission by the Brownsville Independent School District, Assured prepared 120 Indoor Environmental Quality Survey forms. District administrative personnel distributed these forms to the school staff. School staff completed and returned the surveys for analysis. This analysis includes comparison to the AIAQ Database as well as a location analysis from a building plat.

Assured employed its proprietary survey, based on a questionnaire developed and validated by the National Institute of Safety and Occupational Health (NIOSH), to assess building occupants' health profiles. Assured's consulting epidemiologists, statisticians, and IAQ specialists adapted the survey specifically for use in school by comparing individual responses to the company's large historical database of occupant profiles and scientific, on-site building investigations. Questions in the survey gather information on the site, the condition of the workplace, and the respondent's health and wellbeing as well as the respondent's job characteristics. Relying upon the answers given by each respondent as accurate, representative descriptions of his or her environment, Assured uses a series of statistical protocols and analyses of these three subject areas to create a profile of the indoor environment of the building in which the occupant works. In addition to describing the present quality of the work environment, and isolating problem areas, the procedure can project in statistical terms what the status of the building may become in the future.

### Acceptable conditions

- Fewer than 15% of the respondents indicate building-related symptoms.
- No clusters of rooms identified where occupants indicate building-related symptoms.
- No, or few, water events reported where wetted materials were not replaced promptly.
- Occupants indicate no, or few, areas with odors.

# APPENDICES

# ASSURED IAQ SCHOOL RATING SYSTEM

**School Occupant Response Results**

Besteiro Middle School, Brownsville Independent School District:
- 120 Surveys Distributed
- 91 Responses Returned
- 76% Response Rate

**AIAQ Scoring Procedures**

**Composite Score** This score is based on the Predictive Model that has been developed using a large number of observations. Specifically, a percentage of each of the predictor variables of the survey is calculated. These percentages, according to our predictive model, are additive and therefore yield the composite score. When a certain amount of error is entered into the calculation, the composite score many times is larger than any one of the individual variable components.)

| | |
|---|---|
| 1.0-1.9 | The facility has no indication of either symptoms or conditions that would suggest an adverse health impact on occupants. |
| 2.0-2.9 | The facility is a typical well-maintained building. Occupant profile is within "normal" range. |
| 3.0-3.9 | Building conditions could cause a worsening indoor environment. Operational strategies, housekeeping and maintenance procedures, or change in use can influence (positively or negatively) the building's direction. Monitor facilities scoring over 3.5. |
| 4.0-4.9 | Reported conditions correspond to warning signs regarding buildings that can affect the wellbeing of occupants. Determine cause. |
| 5.0 | Reported conditions indicate a building with a high probability to negatively impact the wellbeing of occupants. |

**Occupant Response** (Based on an analysis of the respondents' building-related symptoms obtained from the survey):

Rating of 1 -   Low rate of respondents indicate building-related symptoms

Rating of 2 -   Low to Moderate rate of responses indicating building-related symptoms.

Rating of 3 -   Moderate rate of responses indicating building-related symptoms.

Rating of 4 -   High rate of responses indicating building-related symptoms.

Rating of 5 -   Unacceptable rate of responses indicating building-related symptoms.

**Clusters** (Based on the respondents' building related symptoms as projected onto a site plat.)

Rating of 1 -  No clusters of rooms or areas where respondents indicate building related symptoms.

Rating of 2 -  No clusters of rooms or areas where respondents indicate building related symptoms, but several rooms close together.

Rating of 3 -  One small cluster of rooms or areas where respondents indicate building related symptoms (3-4 rooms).

Rating of 4 -  Two small clusters of rooms or areas where respondents indicate building related symptoms or one medium cluster (4-5 rooms).

Rating of 5 -  Three or more small clusters of rooms or areas where respondents indicate building related symptoms or one large cluster (6 or more).

**Water Events** (Based on respondent information concerning water intrusion and timely replacement of wetted or water damaged materials.)

Rating of 1 -  No water events or no water events reported by respondents suggesting water intrusion and wetted materials not replaced promptly.

Rating of 2 -  Few water events reported by the respondents suggesting water intrusions and wetted materials not replaced promptly.

Rating of 3 -  Several water events reported by the respondents indicating water intrusion and wetted materials not replaced promptly.

Rating of 4 -  Numerous water events reported with wetted materials not replaced promptly.

Rating of 5 -  Numerous water events reported by the respondents with wetted materials not replaced.

**Odors** (Based on the frequency of different odors {musty, pungent, and chemical} reported by the respondents.)

Rating of 1 -  No or few odors reported by respondents.

Rating of 2 -  Occasional odors reported by respondents.

Rating of 3 -  Several areas of persistent odors reported by respondents.

Rating of 4 -  Numerous areas of odors reported by respondents.

Rating of 5 -  Numerous areas or clusters of odors reported by respondents occurring on a daily basis.



Rimkus Consulting Group, Inc.
1431 Greenway Drive, Suite 900
Irving, Texas 75038
(972) 518-0900 Telephone
(972) 518-0011 Facsimile
(877) 271-1168 Toll Free

# Report of Findings

## BUILDING WATER INTRUSION EVALUATION
## RCG, Inc. File No.: 220024

### Prepared For:

**ACE AMERICA LLOYDS INSURANCE COMPANY**
Claim No.: 456P729886-3
Insured: Brownsville Independent School District
C/O GAB ROBINS NORTH AMERICA, INC.
8700 Commerce Park, Suite 235
Houston, Texas 77036
GAB File No.: 35054-00246

### Attention:

**MR. ROGER SAWYER, EXECUTIVE GENERAL ADJUSTER**

Jerry E. Mercer, P.E.
*Vice President, District Manager*

Jeffrey H. Peters, P.E.
*Division Manager*

ACE 000003

December 20, 2002

RSL 001179

# TABLE OF CONTENTS

I.   Introduction ................................................................................ 1

II.  Conclusions ................................................................................ 2

III. Discussion ................................................................................. 4

IV.  Recommendations For Additional Work ................................... 7

V.   Basis of Report ......................................................................... 8

VI.  Attachments .............................................................................. 9

       A.  Schematic Floor Plans

       B.  Observation Logs

       C.  BISD Work Order Reports

       D.  Résumés (Jerry E. Mercer, Jeffrey H. Peters)

       E.  Photographs

ACE 000004

# Section I
# INTRODUCTION

Representatives of the Brownsville Independent School District have reported the presence of water damage and mold within the interior of Bruce Aiken Elementary School and Raul A. Besteiro, Jr. Middle School, located respectively at 6280 and 6290 Southmost Road in Brownsville, Texas.

Rimkus Consulting Group, Inc., was retained on June 7, 2002, by Mr. Roger Sawyer of GAB Robins North America, Inc., to determine when and what caused the reported water damage to develop. Our work to complete this assignment was conducted by Jerry E. Mercer, P.E., and Jeffrey H. Peters, P.E.

This report was prepared for the exclusive use of ACE America Lloyds Insurance Company, c/o GAB Robins North America, Inc., and is not intended for any other purpose. Our report is based on the information available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions, and to revise our opinions and conclusions if necessary and warranted by the discovery of additional information.

ACE 000005

RSL 001181

**Section II**

**CONCLUSIONS**

1. Stains associated with the presence of moisture in the schools fall into two broad categories:

   a. General development of stains (believed to be mold) on building finish materials and on the contents.

   b. Localized development of stains (often accompanied with what is believed to be mold) at "site" specific areas of water intrusion.

2. The development of the general stains is the result of improper functioning of the Heating Ventilation and Air-Conditioning (HVAC) systems. The improper functioning of the HVAC systems is a result of one or more of the following:

   a. HVAC systems design error(s).

   b. Improper operation of the HVAC systems.

   c. Improper maintenance of the HVAC systems.

3. The development of localized stains is the result of one or more of the following site specific causes of water intrusion:

   a. Roof leak(s), either at a membrane edge or penetration, roof drain hub, on the roof drain pipe (18 locations).

   b. Plumbing leaks, both domestic water supply system and drainage system leaks (eight locations).

   c. Dripping and/or leakage of condensate, and/or water from components of the HVAC systems (27 locations)

RSL 001182    ACE 000006

d. Human saliva (two locations).

We are unable to determine an obvious source of moisture at 11 locations.

4. We are, based on physical inspection of the stains, unable to determine the exact date the general stain development or the site specific staining began. Dripping and/or leakage of condensate, and/or water from HVAC components appear to be a historic, reoccurring, and ongoing source of water intrusion. We are unable to determine how quickly roof leaks and plumbing leaks were discovered and eliminated, or if some persist. In general, the development of the site specific water damage and staining is not recent, i.e. we believe in the area of at least one year old. Again, however, we are unable to date exactly when the water intrusion occurred based solely on our physical inspection of the stains. Representatives provided some information with respect to dates water intrusion occurred at some locations.

ACE 000007

## Section III

## DISCUSSION

Raul A. Besteiro, Jr. Middle School (Besteiro) was completed in approximately 1994, as was the Library located at the south end of Besteiro. The library is common to Bruce Aiken Elementary School (Aiken), which was completed in approximately 1996. The sixth grade addition at the north end of Besteiro was completed in 1996 (Attachment A, and Photograph 1). The front of the school faces east.

Mr. Raul N. Vasquez, Maintenance Administrator of the Brownsville Independent School District (BISD), reported that while he was Principal at Besteiro that some roof leaks had occurred. Specifically, he reported leaks at the sixth grade addition in the area where it interfaced with the existing stairway at the north end of the original Besteiro building. He also reported roof leaks at the entrance to the cafeteria and band room of Besteiro. Furthermore, Mr. Vasquez reported that groundwater intrusion occurred at the below-grade amphitheater located in the library.

Mr. Vasquez reported that he does not have specific knowledge, but is aware of reports of mold in Aiken in about 1997. He believes remediation of this mold occurred in the same year. Mr. Vasquez reported the first mold he was personally aware of was on the books in the library. Mold was also present in Room 122 of Besteiro at this same time. He reported he first became aware of this mold in July and August 2001. Mr. Vasquez reported the air-conditioning for the library was shut down in November 2001. Shortly thereafter, remediation of mold in the library and Room 122 began and this work is ongoing.

Both schools (and the library) were closed and vacated on December 26, 2001. Occupancy of the schools has not occurred since that time. Since the schools were vacated, Mr. Vasquez reports that the HVAC systems have been operated and maintained, as well as restroom toilets routinely flushed and water run at the sinks. Per

ACE 000008

RSL 001184

Mr. Vasquez, routine maintenance of the HVAC units included replacement of air filters. He reported the third set of filters are, since December 26, 2001, presently installed. Mr. Vasquez reported that high relative humidity readings have been recorded by Mr. J.P. Villarreal, Energy Manager of BISD, in the library and cafeteria of Aiken, and in general throughout Aiken. Mr. Villarreal stated he believes the highest mold levels are in Rooms 113 and 114 of Besteiro, which are in the area of the aforementioned roof leaks at the south end of the sixth grade addition. Mr. Vasquez reported he believes Aiken has the greater mold problem.

The building(s) are combination one and two-story structures. The exterior wall finishes are primarily brick veneer. The structural system for the buildings is load bearing concrete block, supporting steel bar joists for the upper floors and roofs. Two types of roofing systems are used: standard built-up roof system surfaced with gravel; and single-ply granule surfaced modified bitumen roll roofing (Photographs 2 through 11).

The interior air of Besteiro is conditioned by conventional packaged rooftop air-handling units (Photographs 12 through 16). The library, common kitchen, and Aiken Cafeteria are also conditioned by packaged rooftop air-handling units. The remainder of the Aiken interior air is conditioned by a chill water system. This system is controlled off-site.

During our initial inspection of the interior of the schools on June 13, 2002, it was noted that the indoor air quality was inferior. While the temperature of the air in some rooms of Besteiro was reasonably cool, i.e. in the neighborhood of 73 to 75 degrees, at the same time high relative humidity within most, if not all, of the rooms was obvious. The quality of the air in Aiken was better than Besteiro; the temperature seemed a little cooler, but the relative humidity seemed higher than expected for properly conditioned air. We concluded from this initial observation that the HVAC systems were probably not functioning properly.

Further inspection of the interior of the buildings and their HVAC systems on July 11, 2002, confirmed the overall general poor indoor air quality in the buildings is directly related to improper functioning of the HVAC systems. Improper functioning of the HVAC

RSL 001185        ACE 000009

systems is the result of either improper design, improper operation or improper maintenance of the systems, or a combination of any of these three.

Subsequent to the July 11, 2002, site inspection, Mr. David A. Weeks, P.E., of the Center For Toxicology and Environmental Health, L.L.C., provided information related to the presence of localized water damage and staining due to site specific water intrusion. Attachment B contains Observation Logs noting the type(s) of localized water damage observed by both the Center for Toxicology and Environmental Health, L.L.C., and Rimkus Consulting Group, Inc. The logs also reference photographs of the damage, which are attached to this report. Causes, when determinable, for the localized water damage and stains (i.e. water intrusion) are included in the logs and photograph captions. The causes for the site specific water intrusion fall into five general categories. The categories are defined and referenced in the logs.

When the water intrusion began has not been determined from inspection of the water damage and/or stains. Generally, most damage appears to be at least one year old. Review of a limited number of BISD Work Order Reports (Attachments C) indicates interviews of BISD personnel may provide dates when some of the damage initiated. Some information from these reports is included in the Observation Logs.

ACE 000010

RSL 001186

## Section IV

## RECOMMENDATIONS FOR ADDITIONAL WORK

1. Interview the following BISD employees to assist in the determination of the date(s) of occurrence of some or all of the localized water damage and mold:

   a. Mr. J.P. Villarreal, Energy Manager

   b. Mr. Kenny Robertson, Maintenance Foreman

   c. Mr. Raul N. Vasquez, Maintenance Administrator

   d. Mr. Oscar Tapia, Facility Administrator

2. Review the HVAC systems design calculations, drawings, and specifications.

3. Interview the BISD employees (listed above) to evaluate the operation and maintenance of the HVAC systems and obtain historic records of the operation and maintenance of the systems.

ACE 000011

RSL 001187

## Section V
## BASIS OF REPORT

1. Discussions with Mr. Raul N. Vasquez, Mr. J. P. Villarreal, and Mr. Kenny Robertson of the BISD regarding the history of the construction of the schools and the development of water damage and mold in the schools.

2. Inspection of the schools on June 13, 2002, July 11 and 17, 2002, and November 18 and 19, 2002.

3. Review of portions of the design/construction drawings for the schools.

4. Review of Work Order Reports received from BISD.

ACE 000012

RSL 001188

# Section VI

# ATTACHMENTS

ACE 000013

RSL  001189

# Section VI

## ATTACHMENT A

**Schematic Floor Plans**

ACE 000014

December 20, 2002

RSL  001190



SIXTH GRADE ADDITION
COMPLETED 1996

...ETED 1996

STAINS ON CEILING TILE
AND GYPSUM CEILING TILE
BELOW CONDUIT PENETRATION

STAIND ON CEILING TILE
AND FLOOR BELOW
HVAC AIR HANDLER

STAINS ON CEILING TILE

℄ SINKS ABOVE WATER
DAMAGE IN ROOM 116

STAINS ON CEILING TILE
AND GYPSUM CEILING
BELOW ROOF DRAIN HUB

STAINS ON CEILING TILE

WING "C" ROOF

WATER STAINS
ON CEILING TILE

WATER STAINS
FROM ROOF LEAKS

℄ PVC PIPE SLEEVE
ABOVE WATER DAMAGE
IN ROOM 112 BELOW

WATER STAIN ON TOP & BOTTOM
CEILING TILE BELOW ROOF
DRAIN, RUST ON PIPE HANGER

STAIN ON DRAIN PIPE JACKET

WATER DAMAGE IN
ROOM 113 BELOW

STAINS ON CEILING
TILE BELOW
ELECTRICAL
CONDUIT & CAULK

LAB TABLE PLUMBING
ABOVE DAMAGE IN
COUNSELORS OFFICE BELOW

DUST/DIRT ACCUMULATION
AT CEILING OF STAIRWELL

WATER STAINS ON
GYPSUM CEILING
& BEAM IN COUNSELOR'S
OFFICE BELOW

AIR-HANDLING UNIT (TYP.)

| 236 | 234 | 232 | 230 | 228 | | B211 | B213 | B215 | | B217 |

| 235 | 233 | 231 | 329 | | B210 | B212 | B214 | B216 | B218 |

RAUL...EMENTARY SCHOOL

RSL 001191

ACE 000015

Z N

BROWNSVILLE ISD
SOUTHMOST ROAD   BROWNSVILLE, TX

Los Vegas, NV
Phoenix, AZ
Denver, CO
Orlando, FL

Houston, TX
Dallas–Fort Worth, TX
San Antonio, TX
Austin, TX



SIXTH GRADE ADDITION
COMPLETED 1996

D 1996

CIRCULAR WATER
STAINS ON GYPSUM
BOARD CEILING

WATER STAIN
AROUND PVC
PIPE SLEEVE -
SEE DRAWING
NUMBER FP2

WATER STAINS ON
GYPSUM CEILING

WATER STAIN BELOW
BLUE DRAIN PIPE
(PHOTOGRAPHS 27 & 28)

LINE OF WATER
STAINS ON GYPSUM
BOARD CEILING
BELOW ROOF-TOP
HVAC UNIT

STAIN ON CEILING
TILE BELOW PIPE
(PHOTOGRAPHS 29 & 30)

STAIN ON
CEILING TILE
IN MEN'S
ATHLETIC
OFFICE

STAIN ON
GYPSUM
CEILING

STAINS ON CEILING
TILE BELOW HVAC
AIR-HANDLER

130  129  127  125  124

128  126

C108  C107
C106  C105
C104  C103
C102  C101

B112

B107  B108  B109  B110  B111  STORAGE

OFFICES

RAUL MENTARY SCHOOL

RSL 001192

ACE 000016

BROWNSVILLE ISD
BROWNSVILLE, TX
SOUTHMOST ROAD

SCHEMATIC FLOOR PLAN

FP1

RIMKUS CONSULTING GROUP, INC.

# Section VI

# ATTACHMENT B

**Observation Logs**

ACE 000017     RSL 001193

December 20, 2002

# OBSERVATION LOG

## RAUL A. BESTEIRO, JR. MIDDLE SCHOOL

| LOCATION | DESCRIPTION | CAUSE | PHOTOGRAPH NUMBER(S) | CATEGORY (see below) | DATE OF OCCURRENCE |
|---|---|---|---|---|---|
| ROOM 102 | ABOUT 6 INDEPENDENT (SEPARATED FROM ONE ANOTHER) CIRCULAR STAINS ON GYPSUM CEILING (OF HVAC RETURN AIR INTERSTITIAL SPACE) | NO PLUMBING IN INTERSTITIAL SPACE. NO PLUMBING ABOVE INTERSTITIAL SPACE. NO OBVIOUS SOURCE OF MOISTURE | 17 THROUGH 22 | A | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 110 | STAIN ON CEILING TILE (OF DROP CEILING) | WATER LEAKS FROM DRAIN SYSTEM OF TWO LAVATORIES IN WOMEN'S RESTROOM ABOVE | 23 THROUGH 26 | B | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 111 | STAIN ON CEILING TILES (2 LOCATIONS) | WATER LEAK FROM DRAIN PIPE JOINT (BOTH LOCATIONS) | 27 THROUGH 30 | B | ORIGINAL: ? ONGOING: YES |
| ROOM 112 | STAIN ON CEILING TILE AND ON GYPSUM CEILING AROUND PVC PIPE PENETRATION | WATER SUPPLY LINE LEAK AT LAB TABLE IN ROOM 210 ABOVE | 31 THROUGH 39 | B | ORIGINAL: ? * REPORT: SUPPLY LINE - 9/12 & 1/3/01 |
| ROOM 113 | STAINS ON CEILING TILES AND ON GYPSUM CEILING. RUST ON CEILING TILE GRID | CONDENSATE DRIP FROM HVAC DUCTS | 40 THROUGH 46 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 117 | STAINS ON CEILING TILE AND GYPSUM CEILING BELOW CUSTODIAN ROOM UTILITY SINK. | LEAK AT CUSTODIAN ROOM UTILITY SINK DRAIN SYSTEM | 47 AND 48 | B | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 120 | STAINS ON CEILING TILE (BOTTOM SURFACE ONLY) | SURFACE "GROWTH" PROBABLY ASSOCIATED WITH AIR FLOW FROM ADJACENT HVAC AIR SUPPLY DIFFUSER | 49 | C | ORIGINAL: ? ONGOING: PROBABLY |
| ROOM 122 | RUST ON FLANGES OF WALL METAL SOLE PLATE. STAINED CMU BLOCK | POSSIBLY MOISTURE FROM PERIODIC FLOOR MOPPING, AND/OR FROM TIME OF CONSTRUCTION. THERE IS NO PLUMBING IN THE AREA. NO OBVIOUS SOURCE OF MOISTURE | 50 THROUGH 52 | A | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 204 | STAINS ON CEILING TILES (BOTTOM SURFACE ONLY) | HUMAN SALIVA FROM "SPIT-WADS" | 53 THROUGH 59 | D | ORIGINAL: ? ONGOING: NO |
| ROOM 205 | CIRCULAR STAIN ON BOTTOM, CIRCULAR AND LINEAR STAIN ON TOP OF CEILING TILE, DIRECTLY BELOW HVAC DUCT AND DUCT ACCESS DOOR | CONDENSATE DRIP FROM HVAC DUCTS | 80 THROUGH 85 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 207 | STAINS ON CEILING TILES | CONDENSATE DRIP FROM HVAC DUCTS | 86 AND 87 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 208 | STAIN ON CEILING TILES AND ON GYPSUM CEILING (2 LOCATIONS) | ROOF DRAIN HUB LEAK AT WEST LOCATION. ROOF LEAK AT EDGE OF ROOF AT EAST LOCATION | 88 THROUGH 76 | E | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 209 | STAIN ON CEILING TILE AND GYPSUM CEILING | ROOF LEAK AT EDGE OF ROOF | 77 THROUGH 81 | E | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 210 | STAIN ON BOTTOM OF JACKET OF ROOF DRAIN PIPE | LEAKING ROOF DRAIN HUB AND/OR PIPE | 82 THROUGH 87 | E | ORIGINAL: ? ONGOING: PRESENTLY WET, PROBABLY ONGOING |
| ROOM 213 | STAINS ON CEILING TILES AND GYPSUM CEILING AROUND ELECTRICAL CONDUIT PENETRATION | LEAK AT CONDUIT PENETRATION THROUGH METAL ROOF DECK/MEMBRANE | 85 THROUGH 93 | E | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 214 | STAIN ON CEILING TILE | WATER DRIP FROM ELECTRICAL JUNCTION BOX. LEAK AT CONDUIT PENETRATION THROUGH METAL ROOF DECK/MEMBRANE | 94 THROUGH 101 | E | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |

Page 1

ACE 000018

| LOCATION | DESCRIPTION | CAUSE | PHOTOGRAPH NUMBER(S) | CATEGORY (see below) | DATE OF OCCURRENCE |
|---|---|---|---|---|---|
| ROOM 215 | STAINS ON CEILING TILES | CONDENSATE DRIP FROM HVAC DUCTS | 102 AND 103 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 216 | STAIN ON CEILING TILE AND GYPSUM BOARD | CONDENSATE DRIP FROM HVAC DUCTS | 104 THROUGH 107 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 219 | STAINS ON CEILING TILES (2 LOCATIONS). ONE ON BOTH SIDES OF TILE BELOW HVAC DUCTS. OTHER STAIN ON BOTTOM OF TILE ONLY | CONDENSATE DRIP FROM HVAC DUCTS AT ONE LOCATION. NO PLUMBING ABOVE OTHER STAIN, NO OBVIOUS SOURCE OF MOISTURE AT THIS LOCATION | 108 THROUGH 112 | A,C | ORIGINAL: ? ONGOING: PRESENTLY DRY AT STAIN CAUSED BY CONDENSATE DRIP, BUT PROBABLY ONGOING ONGOING: ? (PRESENTLY DRY AT OTHER LOCATION) |
| ROOM 220 | STAIN ON CEILING TILE BELOW ROOF DRAIN HUB/PIPE AND STAIN ON PIPE JACKET DIRECTLY BELOW | ROOF LEAK AT ROOF DRAIN HUB | 113 THROUGH 122 | E | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ROOM 222 | STAINS ON CEILING TILES (2 LOCATIONS). STAINS ON GYPSUM CEILING IN AREA ADJACENT TO HVAC DUCTS | WATER DRIP FROM ELECTRICAL JUNCTION BOX AT ONE LOCATION CAUSED BY ROOF LEAK AT CONDUIT PENETRATION THROUGH ROOF. CONDENSATE DRIP FROM HVAC DUCT AT OTHER | 123 THROUGH 133 | E,C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING AT BOTH LOCATIONS |
| ROOM 224 | STAINS ON CEILING TILES AND GYPSUM CEILING (2 LOCATIONS) | CONDENSATE DRIP AT HVAC DUCTS | 134 THROUGH 138 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM 227 | STAINS ON CEILING TILES (2 LOCATIONS) | ROOF LEAK AT COPPER LINE PENETRATION THROUGH ROOF METAL DECK/MEMBRANE. CONDENSATE DRIP FROM HVAC DUCTS | 139 THROUGH 143 | E,C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING AT BOTH LOCATIONS |
| ROOM 235 | STAIN ON CEILING TILE, RUST ON PIPE HANGER DIRECTLY BELOW ROOF DRAIN HUB | ROOF DRAIN HUB LEAK | 144 THROUGH 146 | E | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| CAFETERIA | STAINS ON CEILING TILES | CONDENSATE DRIP FROM HVAC DUCTS, AND/OR ROOF LEAKS, AND/OR ROOF DRAIN LEAK(S) | 147 THROUGH 157 | C,E | ORIGINAL: ? *REPORT: ROOF - 8/28 & 11/20/01 ONGOING: LIKELY |
| COUNSELOR'S OFFICE | STAINS ON CEILING TILES | WATER LEAK FROM DRAIN SYSTEM FOR LAB TABLE IN ROOM 217 ABOVE | 158 THROUGH 160 | B | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| HALL (adjacent to Room 204) | STAIN ON CEILING TILE | NO PLUMBING IN INTERSTITIAL SPACE. NO STAIN ON GYPSUM CEILING. NO OBVIOUS SOURCE OF MOISTURE | 161 THROUGH 164 | A | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| HALL (2nd floor main north-south) | STAIN ON CEILING TILE | HUMAN SALIVA FROM "SPIT-WADS" | 165 | D | ORIGINAL: ? ONGOING: NO |
| KITCHEN | STAIN ON TERRAZZO FLOOR, STAINS AND DAMAGE ON ROOF BEAM AND GYPSUM CEILING | CONDENSATE DRIP AT HVAC DUCTS, AND/OR ROOF LEAK(S), AND/OR ROOF DRAIN LEAK(S) | 166 THROUGH 173 | C,E | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING AT BOTH LOCATIONS |
| LIBRARY | REPORTEDLY PAST WATER ACCUMULATION IN AMPHITHEATER. (NO PRESENT DAMAGE) | APPARENTLY PAST GROUND WATER INTRUSION. NO OBVIOUS SOURCE OF MOISTURE | 174 THROUGH 181 | A | ORIGINAL: SHORTLY AFTER LIBRARY OPENED (PER MR RAUL VASQUEZ) ONGOING: ? (PRESENTLY DRY) |

2

Page 2

ACE 000019

| LOCATION | DESCRIPTION | CAUSE | PHOTOGRAPH NUMBER(S) | CATEGORY (see below) | DATE OF OCCURRENCE |
|---|---|---|---|---|---|
| MENS ATHLETIC OFFICE | STAIN ON BOTTOM ONLY OF CEILING TILE | NO PLUMBING. NO OBVIOUS SOURCE OF MOISTURE. ELECTRICAL CONDUITS AND JUNCTION BOX | 182 THROUGH 184 | A | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| NURSE'S STATION | STAINS ON CEILING TILES | CONDENSATE DRIP AT HVAC DUCTS AND PLUMBING LEAK AT PIPE TO LAB TABLE IN ROOM 217 ABOVE | 185 AND 186 | C,B | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING AT HVAC CONDENSATE DRIP, AND ? AT LAB TABLE PLUMBING |
| STAIRWELL (north of Room 112) | STAINS ON GYPSUM CEILING, LOOSE GYPSUM JOINT TAPE AT CEILING/WALL JOINT | ROOF LEAK | 187 THROUGH 193 | E | ORIGINAL: ? ONGOING: NO |
| SUPPLY ROOM | STAINS ON CEILING TILES AND GYPSUM CEILING | ROOF LEAK(S) AT EDGE OF ROOF | 194 AND 195 | E | ORIGINAL: ? ONGOING: NO |

* INFORMATION OBTAINED FROM BISD WORK ORDER REPORT

CATEGORY DEFINITIONS:

A   NO OBVIOUS SOURCE OF MOISTURE
B   PLUMBING LEAK
C   DRIP OR LEAK AT HVAC COMPONENT
D   INTENTIONAL BY HUMAN(S)
E   ROOF SYSTEM LEAK

Page 3

ACE 000020

# OBSERVATION LOG

## BRUCE AIKEN ELEMENTARY SCHOOL

| LOCATION | DESCRIPTION | CAUSE | PHOTOGRAPH NUMBER(S) | CATEGORY (see below) | DATE OF OCCURRENCE |
|---|---|---|---|---|---|
| ROOM A102 | STAINS ON CEILING TILES AND ON GYPSUM CEILING | ROOF LEAK | 196 AND 197 | E | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B101 | STAINS ON GYPSUM CEILING | PLUMBING SYSTEM OVERFLOW AND/OR WATER LEAK(S) FROM RESTROOM ABOVE (REPORTED BY BISD EMPLOYEE) | 198 AND 199 | B | ORIGINAL: ?<br>* REPORT: A/C - 8/23/01<br>ONGOING: NO |
| ROOM B105 (Restroom) | WATER STAINS ON CEILING TILES BELOW HVAC AIR | CONDENSATE DRIP AND/OR CONDENSATE DRIP PAN OVERFLOW AT AIR HANDLER | 200 THROUGH 203 | C | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B108 | STAIN ON BOTTOM ONLY OF GYPSUM CEILING | NO PLUMBING. SOURCE OF MOISTURE UNKNOWN | 204 THROUGH 207 | A | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B110 | STAIN ON TERRAZZO FLOOR | CONDENSATE DRIP PAN OVERFLOW AT AIR HANDLER | 208 AND 209 | C | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B111 | WATER IN LIGHT FIXTURE AND STAINS ON CEILING TILES BELOW HVAC AIR HANDLER AND STAINS ON GYPSUM CEILING AT WEST EXTERIOR CMU BLOCK WALL BELOW DRAIN PIPE | CONDENSATE DRIP AT ONE LOCATION. PIPE JOINT LEAK AT SECOND LOCATION | 210 THROUGH 213 | C,B | ORIGINAL: ?<br>* REPORT: WATER LEAK - 8/28/01<br>ROOF LEAK - 0/10/01<br>WATER LEAK - 12/3/01<br>WATER LEAK - 12/6/01<br>ONGOING: YES, AT BOTH LOCATIONS |
| ROOM B201 | WATER ON TERRAZZO FLOOR | CONDENSATE DRIP FROM UNINSULATED WATER VALVE TO AIR HANDLER | 214 THROUGH 216 | C | ORIGINAL: ?<br>* REPORT: A/C - 8/24/01<br>ONGOING: YES |
| ROOM B202 | STAINS (SPOTS) ON BOTTOM OF GYPSUM CEILING AT WEST EXTERIOR CMU BLOCK WALL. DARK AREA ON TOP OF GYPSUM CEILING | NO PLUMBING IN AREA. NO OBVIOUS SOURCE OF MOISTURE | 217 THROUGH 220 | A | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B204 | STAINS (SPOTS) ON BOTTOM OF GYPSUM CEILING AT WEST EXTERIOR CMU BLOCK WALL. DARK AREA ON TOP OF GYPSUM CEILING | NO PLUMBING IN AREA. NO OBVIOUS SOURCE OF MOISTURE | 221 AND 222 | A | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B206 | STAINS (SPOTS) ON BOTTOM OF GYPSUM CEILING AT WEST EXTERIOR CMU BLOCK WALL. DARK AREA ON TOP OF GYPSUM CEILING | NO PLUMBING IN AREA. NO OBVIOUS SOURCE OF MOISTURE | 223 THROUGH 228 | A | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |
| ROOM B211 | STAINS ON TERRAZZO FLOOR AND CEILING TILE | CONDENSATE DRIP, AND/OR CONDENSATE DRIP PAN OVERFLOW AT AIR HANDLER | 229 THROUGH 231 | C | ORIGINAL: ?<br>ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| ROOM B217 | STAINS ON TERRAZZO FLOOR AND CEILING TILE | CONDENSATE DRIP, AND/OR CONDENSATE DRIP PAN OVERFLOW AT AIR HANDLER | 232 THROUGH 239 | C | ORIGINAL: ?<br>* REPORT: A/C - 8/1/201<br>ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| CAFETERIA | STAINS ON CEILING TILES (2 LOCATIONS) | POSSIBLE ROOF LEAK AND/OR CONDENSATE DRIP AT HVAC DUCT PENETRATION THROUGH GYPSUM CEILING, AND/OR CONDENSATE DRIP FROM HVAC DUCTS | 240 THROUGH 243 | C,E | ORIGINAL: ?<br>ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| CONFERENCE ROOM | STAINS ON GYPSUM CEILING | BELOW CHANGE IN ROOF ELEVATIONS INDICATES ROOF LEAK(S) | 244 AND 245 | E | ORIGINAL: ?<br>ONGOING: ? (PRESENTLY DRY) |

ACE 000021

RSL  001197

| LOCATION | DESCRIPTION | CAUSE | PHOTOGRAPH NUMBER(S) | CATEGORY (see below) | DATE OF OCCURRENCE |
|---|---|---|---|---|---|
| COUNSELOR'S OFFICE | STAINS ON GYPSUM CEILING | PROBABLE ROOF LEAK | 246 AND 247 | E | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |
| ELEVATOR EQUIPMENT ROOM | SPOTS ON GYPSUM CEILING (PROBABLE BOTTOM SURFACE ONLY) | PROBABLE HIGH HUMIDITY IN ROOM | 248 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| HALL (2nd floor) | STAINS ON JACKET OF ROOF DRAIN PIPE | ROOF DRAIN HUB LEAK | 249 | E | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| HALL (2nd floor, outside B208 & B208) | STAIN AT CHANGE IN PRESSURE PIPE INSULATION JACKET DIAMETER | NO PLUMBING ABOVE. CONDENSATE FORMING ON SURFACE OF PIPE, TRAPPED INSIDE OF PIPE JACKET | 250 | C | ORIGINAL: ? ONGOING: YES |
| HALL (2nd floor, outside teachers lounge) | STAIN AT JOINT IN PRESSURE PIPE INSULATION JACKET | NO PLUMBING ABOVE. CONDENSATE FORMING ON SURFACE OF PIPE, TRAPPED INSIDE OF PIPE JACKET | 251 | C | ORIGINAL: ? ONGOING: YES |
| HALL (2nd floor, outside girls south restroom) | STAIN AT JOINT IN PRESSURE PIPE INSULATION JACKET | NO PLUMBING ABOVE. CONDENSATE FORMING ON SURFACE OF PIPE, TRAPPED INSIDE OF PIPE JACKET | 252 | C | ORIGINAL: ? ONGOING: YES |
| HALL (1st floor main north-south) | STAINS ON HVAC CHILL WATER SUPPLY PIPE AND RUST ON CEILING GRID | CONDENSATE FORMING ON SURFACE OF PIPE, TRAPPED INSIDE OF PIPE JACKET | 253 THROUGH 264 | C | ORIGINAL: ? ONGOING: YES |
| MAIN ENTRY | WATER STAINS ON CEILING TILE BELOW HVAC AIR HANDLER | CONDENSATE DRIP, AND/OR CONDENSATE DRIP PAN OVERFLOW AT AIR HANDLER | 265 AND 266 | C | ORIGINAL: ? ONGOING: PRESENTLY DRY, BUT PROBABLY ONGOING |
| STAIRWELL (main) | STAINS AND DIRT ON CEILING TILES AND CMU BLOCK WALLS | CONDENSATE CAUSING DUST/DIRT ACCUMULATION ASSOCIATED WITH HVAC AIR | 267 | C | ORIGINAL: ? ONGOING: YES |
| TEACHER'S LOUNGE | STAINS (SPOTS) ON BOTTOM OF GYPSUM CEILING AT WEST EXTERIOR CMU BLOCK WALL. DARK AREA ON TOP OF CEILING | NO PLUMBING IN AREA. NO OBVIOUS SOURCE OF MOISTURE | 268 | A | ORIGINAL: ? ONGOING: ? (PRESENTLY DRY) |

* INFORMATION OBTAINED FROM BISD WORK ORDER REPORT

CATEGORY DEFINITIONS

A  NO OBVIOUS SOURCE OF MOISTURE
B  PLUMBING LEAK
C  DRIP OR LEAK AT HVAC COMPONENT
D  INTENTIONAL BY HUMAN(S)
E  ROOF SYSTEM LEAK

RSL  001198

ACE 000022

# ✻ BESTEIRO MIDDLE SCHOOL ←— campus

**Dates Received: From 8/1/2001 To 12/31/200**

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Assigned To | Purpose | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 67836 A/C unit not fucntioning in Room #113 and Teacher's lounge 2nd FLOOR. (Please Respond.) | 8/3/2001 | 8/3/2001 | C | 1 | A | | | 0 | $0.00 | $125.67 | $1.60 | $127.27 |
| 048 | Besteiro | 67803 A/C in room 113 needs to be repair for district inervice being held at Besteiro on 8/14/01 | 8/3/2001 | 8/3/2001 | C | 1 | A | | | 6 | $54.06 | $11.87 | $1.12 | $67.05 |
| 048 | Besteiro | 68228 A/C unit not functioning in Room 113 and Teacher's Lounge 2nd Floor, Please Respond | 8/9/2001 | | I | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 68381 Emergency: A/C units are not functioning in Room #'s 104,212,215,216,222,226,231…please respond 2:54P | 8/13/2001 | 8/13/2001 | C | 1 | A 0018 | | | 16 | $132.16 | $1,489.81 | $2.56 | $1,624.53 |
| 048 | Besteiro | 68755 A/C NOT WORKING IN ROOMS 204 AND 104 | 8/16/2001 | | I | 1 | A | | | 0 | $0.00 | $368.72 | $0.00 | $368.72 |
| 048 | Besteiro | 69023 The A/C units in the following rooms still not functioning: rooms 207,212,216,236,104,130,204….please respond | 8/20/2001 | | I | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69152 The A/C unit is not working in room 118B(B.I. unit)…Please respond | 8/21/2001 | | I | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69211 Filter Inspection | 8/21/2001 | 9/18/2001 | C | 1 | A 0019 | | FL | 24 | $195.12 | $234.29 | $20.48 | $449.89 |
| 048 | Besteiro | 69420 BESTEIRO NEED TO REPLACE KITCHEN A/C THERMOSTAT | 8/22/2001 | 8/27/2001 | C | 2 | A | | | 22 | $229.06 | $485.20 | $15.36 | $729.62 |
| 048 | Besteiro | 69546 Emergency A/C units in Rooms #104,#108,#222, we had requested for rooms 104 and 222 previously…please respond | 8/23/2001 | | I | EM | A 0018 | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

RSL 001199          ACE 000023

# BESTEIRO MIDDLE SCHOOL

**Dates Received: From 8/1/2001  To 12/31/200**

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Assigned To | Purpose | Budge Codes | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 69505 Emergency: A/C not functioning in Room 118B and Room 213. please respond. | 8/23/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69651 A/C not working in office between Rooms 126 and 128... please respond | 8/24/2001 | | 1 | 1 | A 0018 | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69687 EMERGENCY A/C in room 220 NOT FUNCTIONING...PLEASE RESPOND | 8/24/2001 | | 1 | 1 | A 0018 | | | 0 | $0.00 | $509.01 | $0.00 | $509.01 |
| 048 | Besteiro | 70210 Emergency: A/c in our Cafeteria not functioning...also requested previously A/c in Room 213 not working..please respond | 8/28/2001 | 8/28/2001 | C | EM | A 0018 | | | 4 | $34.08 | $0.00 | $4.80 | $38.88 |
| 048 | Besteiro | 70290 Emergency: the a/c unit in the cafeteria's kitchen is not working at all...please respond | 8/29/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 70909 The A/C in rooms 213, 126 and 128 are not working. 9-4-01 | 9/4/2001 | 9/7/2001 | C | 1 | A | | | 10 | $105.08 | $196.70 | $10.24 | $312.02 |
| 048 | Besteiro | 71022 A/c units in Rooms 218,104 and the office between 126 and 128 not functioning...please respond 10:55A | 9/5/2001 | | 1 | EM | A 0018 | | | 0 | $0.00 | $708.84 | $0.00 | $708.84 |
| 048 | Besteiro | 71987 A/C NOT WORKING IN ROOM 213...PLEASE RESPOND | 9/14/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 72002 Emergency: Room 204 smells like smoke...please respond | 9/14/2001 | 9/14/2001 | C | 1 | A 0018 | | | 4 | $41.20 | $83.88 | $1.60 | $126.68 |
| 048 | Besteiro | 72192 EMERGENCY: the A/C in the cafeteria is not working at all...please respond 851A | 9/18/2001 | | 1 | 1 | A 0018 | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 72324 Filter Inspection | 9/21/2001 | 10/11/2001 | C | | A 0019 | FL | | 24 | $195.12 | $256.29 | $15.36 | $466.77 |

Thursday, September 12, 2002    Work Order Report 2    Page 2 of 7

ACE 000024

RSL  001200

# BESTEIRO MIDDLE SCHOOL

**Dates Received: From 8/1/2001 To 12/31/200**

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/Description | Received | Completed | Status | Priority | Trade Assigned To | Purpose | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 73008 A/C NOT WORKING IN RM 104 & BANDHALL. | 10/3/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73398 EMERGENCY: A/C IN GYM DRIPPING TOO MUCH WATER...PLEASE RESPOND | 10/8/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73489 A/C IN RM 128 NORTH NOT COOLING. | 10/9/2001 | | 1 | BM | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73405 EMERGENCY: A/C IN CAFETERIA KITCHEN NEEDS A/C ON, IT SHUTS DOWN EVERYTIME WE HAVE A FIRE DRILL. | 10/9/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73661 A/C NOT WORKING - RM 129 | 10/10/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 74110 The A/C register needs to be reinforced in the Band Hall. | 10/16/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 74460 Filter Inspection | 10/19/2001 | 11/13/2001 | C | 1 | A | FL | 0019 | 22 | $191.62 | $252.97 | $15.36 | $459.95 |
| 048 | Besteiro | 74873 A/C IN RM 128 AND THE CAFETERIA | 10/25/2001 | 10/25/2001 | C | 1 | A | | | 6 | $54.93 | $43.90 | $2.56 | $101.39 |
| 048 | Besteiro | 75338 A/C IN THE CHOIR ROOM IS NOT WORKING | 11/1/2001 | 11/1/2001 | C | 1 | A | | 0018 | 2 | $18.03 | $3.53 | $2.24 | $23.80 |
| 048 | Besteiro | 76422 A/C IN ROOM 204 NOT WORKING. | 11/14/2001 | 11/19/2001 | C | 1 | A | | | 4 | $35.18 | $0.00 | $1.92 | $37.10 |
| 048 | Besteiro | 76708 A/C IN ROOM 216 IS MAKING A LOUD NOISE. PLEASE HAVE SOMEONE CHECK THE A/C. | 11/16/2001 | 11/19/2001 | C | 1 | A | | | 4 | $35.18 | $67.19 | $1.92 | $104.29 |
| 048 | Besteiro | 77176 Filter Inspection | 11/27/2001 | 12/17/2001 | C | 1 | A | FL | 0019 | 24 | $209.04 | $253.21 | $15.36 | $477.61 |

RSL 001201          ACE 000025

# BESTEIRO MIDDLE SCHOOL

User-defined Title 1
User-defined Title 2

Dates Received: From 8/1/2001 To 12/31/200

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Assigned To | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 77419 THERMOSTAT IN ROOM 118B IN NOT WORKING NEEDS TO BE FIXED ASAP. | 11/29/2001 | 12/4/2001 | C | 1 | A | | 2 | $20.30 | $19.67 | $0.00 | $39.97 |
| 048 | Besteiro | 77818 A/C IN MR. GARZA'S OFFICE IS NOT WORKING. | 12/4/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 78636 THE CAFETERIA AIR CONDITION IS NOT WORKING | 12/13/2001 | 12/14/2001 | C | 1 | A | | 1 | $9.86 | $0.00 | $2.24 | $12.10 |
| 048 | Besteiro | 78635 THE AIR CONDITION DOES NOT WORK IN ROOM 107 | 12/13/2001 | 12/14/2001 | C | 1 | A | | 1 | $9.86 | $80.87 | $1.92 | $92.65 |
| 048 | Besteiro | 79017 A/C IN THE GYM AND IN ROOM 107 ARE NOT WORKING | 12/19/2001 | 12/27/2001 | C | 1 | A | | 2 | $17.35 | $0.00 | $1.92 | $19.27 |
| 048 | Besteiro | 79053 A/C IN ROOM 108 IS NOT WORKING | 12/19/2001 | 12/27/2001 | C | 1 | A | | 6 | $52.05 | $136.31 | $1.92 | $190.28 |
| 048 | Besteiro | 79159 A/C IN ROOM 108 IS NOT WORKING. PLEASE RESPOND. | 12/21/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69021 EMERGENCY: CAMODES OF BOYS AND GIRLS RESTROOMS IN FRONT OF ROOM 124 OVERFLOWING//EMERGENCY | 8/20/2001 | | I | EM | PL | 0055 | 0 | $0.00 | $29.80 | $0.00 | $29.80 |
| 048 | Besteiro | 69507 Emergency: water pressure very low in the Boy's restroom by room 118 for the sinks and the camodes. please respond | 8/23/2001 | 8/30/2001 | C | 1 | PL | | 4.5 | $47.34 | $48.44 | $8.96 | $104.74 |
| 048 | Besteiro | 69508 Faucets and spouts in need of repair..several missing knobs,knobs do not turn...leaks at bases by the eye wash stations | 8/23/2001 | | I | EM | PL | 0055 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 69646 5 sprinkler heads need to be installed, front lawn..please respond | 8/24/2001 | | I | 1 | PL | | 0 | $0.00 | $104.15 | $0.00 | $104.15 |

ACE 000026

RSL 001202

# BESTEIRO MIDDLE SCHOOL

Dates Received: From 8/1/2001  To 12/31/200

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Assigned To | Purpose | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 69894 — Urinal in boys' restroom leaking, 2nd floor across from room 216, and commode leaking water is girls' restroom, 6th grade wing across from room 228...please respond | 8/27/2001 | 9/4/2001 | C | 1 | PL | | | 4 | $33.84 | $22.58 | $5.12 | $61.54 |
| 048 | Besteiro | 70151 — Emergency: Water leaking in one of our Science Classrooms ,we tried to shut off the valve but it's broken, please respond... | 8/28/2001 | 8/28/2001 | C | EM | PL | | | 2 | $16.92 | $0.00 | $1.60 | $18.52 |
| 048 | Besteiro | 70045 — Emergency: Commode in Boy's restroom in gym is clogged up...and water fountain is leaking ..please respond. | 8/28/2001 | 8/28/2001 | C | EM | PL | 0055 | | 2 | $16.92 | $0.00 | $5.12 | $22.04 |
| 048 | Besteiro | 70634 — Water fountain not functioning at all, next to Room #216...please respond | 8/31/2001 | | 1 | 1 | PL | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 71882 — High Priority: EMBERGENCY: ATTN: Plumbers--water leak in Room 112(computer room) pipe leaking ... from Room 210 to Room 112..please respond | 9/13/2001 | 9/14/2001 | C | 1 | PL | | | 4 | $33.84 | $0.00 | $4.80 | $38.64 |
| 048 | Besteiro | 71988 — Teacher's restroom next to room 117: the flushing mechanism is not working properly, sprays water all over the toilet bowl and floor...please respond | 9/14/2001 | | 1 | 1 | PL | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 72907 — BOY'S AND GIRL'S RESTROOMS DOWNSTAIRS ARE OVERFLOWING. | 10/2/2001 | | 1 | EM | PL | 0055 | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73009 — WATER FOUNTAIN NEXT TO RM 235 (2ND FLOOR) | 10/3/2001 | | 1 | 3 | PL | | | 0 | $0.00 | $354.85 | $0.00 | $354.85 |
| 048 | Besteiro | 71652 — REPAIR FAUCET BY RM 217 | 10/10/2001 | | 1 | 3 | PL | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 74099 — Please fix broken faucet line on the football field. | 10/16/2001 | | 1 | EM | PL | 0055 | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

Thursday, September 12, 2002                     Work Order Report 2                     Page 5 of 7

ACE 000027

RSL 001203

# BESTEIRO MIDDLE SCHOOL

**User-defined Title 1**
**User-defined Title 2**

Dates Received: From 8/1/2001 To 12/31/200

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Purpose Assigned To | Budge Codes | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 74111 Water Fountain not working at all next to room #216 ( second floor) | 10/16/2001 | | I | 1 | PL | | 0 | $0.00 | $1.83 | $0.00 | $1.83 |
| 048 | Besteiro | 75108 ALSO TWO WATER LEAKS FRONT LAWN , BY THE FLAG POLE THE OTHER BY THE MARQUEE | 10/10/2001 | 11/15/2001 | C | 2 | PL | | 8 | $88.40 | $3.13 | $1.92 | $93.45 |
| 048 | Besteiro | 75289 EMERGENCY: Major water leak in room 117, it is believed that a pipe is bust!!! | 10/31/2001 | 11/1/2001 | C | EM | PL | 0055 | 2.5 | $25.38 | $24.00 | $1.92 | $51.30 |
| 048 | Besteiro | 75850 CONNECTOIN FOR HOSE BIBB 1 1/4 VALVE TO 3/4 IN. WITH 1 1/4 B- VALVE IN FRONT OF SCHOOL | 11/7/2001 | | I | 2 | PL | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 76731 GIRLS RESTROOM ON 2ND FLOOR NEEDS MAINTANCE NOT WORKING | 11/16/2001 | 11/26/2001 | C | 2 | PL | | 4 | $32.00 | $1.44 | $4.48 | $37.92 |
| 048 | Besteiro | 76918 WATER FOUNTAIN NOT FUNCTIONING AT ALL NEXT TO RM # 216, 2nd FLOOR. | 11/20/2001 | 11/26/2001 | C | 1 | PL | | 4 | $39.30 | $0.00 | $2.24 | $41.54 |
| 048 | Besteiro | 76916 WATER FOUNTAIN NOT FUNCTIONING AT ALL OUTSIDE GYM BY CONCOURSE AREA. | 11/20/2001 | 11/26/2001 | C | 1 | PL | | 0 | $0.00 | $0.00 | $2.24 | $2.24 |
| 048 | Besteiro | 76917 COMMADE LEAKING WATER IN TEACHER'S RESTROOM, NEXT TO RM #216 | 11/20/2001 | 11/27/2001 | C | 1 | PL | | 5 | $46.95 | $32.67 | $10.24 | $89.86 |
| 048 | Besteiro | 78321 SINK IN ROOM120 IS CLOGGED. NEEDS PLUMING | 12/10/2001 | | I | 1 | PL | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 79074 THE SINK(LAVATORY) FROM THE RESTROOM IS NOT WORKING. | 12/20/2001 | | I | 1 | PL | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

Thursday, September 12, 2002 — Work Order Report 2 — Page 6 of 7

RSL 001204          ACE 000028

# BESTEIRO MIDDLE SCHOOL

User-defined Title 1
User-defined Title 2

**Dates Received: From 8/1/2001 To 12/31/200**

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade | Purpose | Assigned To | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 048 | Besteiro | 70046 Emergency: Water leaking in Room 208 and our supply room...please respond | 8/28/2001 | 8/28/2001 | C | EM | R | | 0300 | | 9 | $85.80 | $0.00 | $1.60 | $87.40 |
| 048 | Besteiro | 70152 Emergency: Roof leak in our cafeteria..please respond | 8/28/2001 | 8/29/2001 | C | EM | R | | | | 3 | $26.86 | $0.00 | $0.96 | $27.82 |
| 048 | Besteiro | 70159 EMERGENCY:WATER LEAK THROUGH ROOF IN ROOM 210, CHOIR ROOM...PLEASE RESPOND | 8/28/2001 | 8/29/2001 | C | EM | R | | | | 3 | $26.86 | $0.00 | $0.96 | $27.82 |
| 048 | Besteiro | 71823 High Priority: leak in room 112 (our computer room) and also in room 210 from 210 it's leaking to room 110...please respond | 9/12/2001 | | 1 | EM | R | | 0300 | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 73098 WATER LEAKING FROM CEILING IN HALLWAY OUTSIDE CHOIR DEPT. (1ST FLOOR) | 10/3/2001 | | 1 | 3 | X | | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 76920 WATER LEAKING FROM CEILING INSIDE THE CAFETERIA. | 11/20/2001 | | 1 | 1 | R | | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 048 | Besteiro | 76919 WATER LEAKING FROM CEILING IN HALLWAY BY THE LOCKERS AREA. | 11/20/2001 | 11/30/2001 | C | 1 | R | | | | 6 | $56.62 | $0.00 | $1.92 | $58.54 |
| | | | | | | | | | **Grand Totals:** | | 245.00 | $2,216.31 | $5,950.82 | $174.56 | $8,341.68 |

RSL 001205

ACE 000029

Post-It Fax Note    7671
To Jerry ____ cer    From R. Vasquez
Co./Dept.    Co.
Phone #    Phone #
Fax # (972) 518-0011    Fax # 554-7900

# ✱ AIKEN ELEMENTARY — Campus

**Dates Received: From 8/1/2001  To 12/31/200**

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Assigned To | Purpose | Budge | Hours | Labor | Material | Travel | Total | User-defined Title 1 | User-defined Title 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | Aiken | 68223 Repair refrigerator in teacher louge at first floor | 8/9/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 | | |
| 133 | Aiken | 68336 Filler Inspection | 8/11/2001 | 9/6/2001 | C | | A FL | | | 8 | $57.76 | $90.53 | $5.12 | $153.41 | | |
| 133 | Aiken | 68435 THE FOLLOWING A/C UNITS ARE NOT COOLING AT AIKENS: LOBBY IST FLOOR, NURSES OFFICE, A102,B206,B204,B202 AND OUTSIDE AIR UNITS IN RMS. 218,202. STILL HAVING PROBLEMS WITH ONLY TWO COMPRESSORS OPERATING THE CHILLER AT THE CAMPUS. | 8/14/2001 | 8/16/2001 | C | EM | A 0133 | | | 2 | $21.20 | $0.00 | $5.12 | $26.32 | | |
| 133 | Aiken | 69069 BRUCE AIKENS NEED TO REPLACE EXPANSION VALVE ON CHILLER | 8/21/2001 | 8/16/2001 | C | 2 | A | | | 1 | $10.03 | $1,075.20 | $2.24 | $1,087.47 | | |
| 133 | Aiken | 69351 BRUCE AIKENS NEED TO CHECK OUTSIDE AIR UNITS | 8/22/2001 | | 1 | 2 | A | | | 0 | $0.00 | $9.67 | $0.00 | $9.67 | | |
| 133 | Aiken | 69523 Please repair A/C water leack in B101 | 8/23/2001 | 8/23/2001 | C | 1 | A | | | 3 | $24.78 | $0.00 | $2.56 | $27.34 | | |
| 133 | Aiken | 69629 Please repair A/C Water leack in B201 | 8/24/2001 | 8/26/2001 | C | 1 | A | | | 2 | $16.52 | $0.00 | $2.56 | $19.08 | | |
| 133 | Aiken | 69864 Please repair Heaters in A 102 | 8/27/2001 | | 1 | 1 | A 0018 | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 | | |
| 133 | Aiken | 71016 Please repair Room A-108 (To Hot) | 9/5/2001 | 9/5/2001 | C | 1 | A | | | 3 | $27.03 | $0.00 | $2.24 | $29.27 | | |
| 133 | Aiken | 71065 Please repair A/C in nurse room (to Hot) | 9/5/2001 | 9/5/2001 | C | 1 | A | | | 4 | $36.04 | $0.00 | $1.60 | $37.64 | | |
| 133 | Aiken | 71419 Please repair A/C water leak in Room B-105 | 9/10/2001 | | 1 | 1 | A | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 | | |

**Costs**

Page 1 of 4

RSL 001206    ACE 000030

# AIKEN ELEMENTARY

**Dates Received: From 8/1/2001  To 12/31/200**

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Purpose Assigned To | Codes Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | Aiken | 71734 Please Repair A/C Water Leak in B-217 | 9/12/2001 | | I | 1 | A 0018 | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 72345 Filler Inspection | 9/21/2001 | 10/9/2001 | C | | A 0133 | FL | 12 | $86.64 | $116.78 | $8.64 | $212.06 |
| 133 | Aiken | 73727 Please repair A/C in A-108 (To Hot) | 10/11/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 73854 Filler Inspection | 10/12/2001 | 1/14/2002 | C | | A 0133 | FL | 8 | $66.32 | $134.52 | $4.48 | $205.32 |
| 133 | Aiken | 74539 Please repair A/C in room B207 is to noise | 10/22/2001 | | I | 1 | A 0133 | | 0 | $0.00 | $151.73 | $0.00 | $151.73 |
| 133 | Aiken | 74496 Please re-star, Water chiller ( The complete school is hot) | 10/22/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 74919 Please re-star, Water chiller ( The complete school is hot) | 10/26/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 74987 Please re-star, Water chiller ( The complete school is hot) | 10/29/2001 | 10/29/2001 | C | 1 | A | | 1 | $10.03 | $0.00 | $2.56 | $12.59 |
| 133 | Aiken | 76064 Please revise A/C Water drain in front of the school | 11/8/2001 | | I | 2 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 76089 Please Repair A/C Water Leak in B-105 | 11/9/2001 | 11/10/2001 | C | 1 | A | | 7 | $64.75 | $0.00 | $0.00 | $64.75 |
| 133 | Aiken | 76248 Please revise A/C Cafeteria | 11/12/2001 | 11/13/2001 | C | 1 | A | | 4 | $37.64 | $0.00 | $2.56 | $40.20 |
| 133 | Aiken | 76250 Please Repair A/C Water leak in B-105 | 11/12/2001 | | I | 1 | A | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 76249 Please Revice A/C in Nurse room | 11/12/2001 | 11/13/2001 | C | 1 | A | | 2 | $18.82 | $0.00 | $2.56 | $21.38 |
| 133 | Aiken | 77006 check Cafeteria A/C too much humidity | 11/26/2001 | 11/26/2001 | C | 2 | A 0055 | | 1 | $9.86 | $8.56 | $1.92 | $20.34 |

RSL 001207            ACE 000031

# AIKEN ELEMENTARY

Dates Received: From 8/1/2001  To 12/31/200

User-defined Title 1
User-defined Title 2

| Reference ID | Path Name | WO ID/ Description | Received | Completed | Status | Priority | Trade Purpose Assigned To | Budge | Hours | Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | Aiken | 77271 Please Repair A/C in A106 To Cool and B218 A/C to 1lot | 11/28/2001 | 12/3/2001 | C | 1 | A | | 2 | $19.72 | $0.00 | $2.56 | $22.28 |
| 133 | Aiken | 77417 REPAIR HEATER IN ROOM B212 | 11/29/2001 | 11/29/2001 | C | 2 | A | | 2 | $18.03 | $0.00 | $1.60 | $19.63 |
| 133 | Aiken | 78194 A/C LEAK ON ROOM C102 | 12/7/2001 | 12/7/2001 | C | 1 | A 0018 | | 4 | $34.70 | $0.00 | $1.92 | $36.62 |
| 133 | Aiken | 79205 NEBD TO REPLACE CHILL WATER TRANSDUCER AT BRUCE AIKENS. | 12/27/2001 | | 1 | 2 | A | | 0 | $0.00 | $870.00 | $0.00 | $870.00 |
| 133 | Aiken | 67758 Please repair sprinkler sistem in front patio | 8/3/2001 | 8/16/2001 | C | 2 | PL | | 26 | $220.11 | $0.00 | $15.36 | $235.47 |
| 133 | Aiken | 69005 Please repair Zink in Room C-102 | 8/20/2001 | 8/27/2001 | C | 1 | PL | | 3 | $23.96 | $0.00 | $1.92 | $25.88 |
| 133 | Aiken | 70167 please repair water leak in room B111 at aiken | 8/28/2001 | 8/30/2001 | C | 1 | PL | | 2 | $15.97 | $0.00 | $1.92 | $17.89 |
| 133 | Aiken | 71128 Please repair water fountain in Black top | 9/6/2001 | 9/17/2001 | C | 2 | PL | | 5 | $46.80 | $19.70 | $2.24 | $68.74 |
| 133 | Aiken | 74154 AIKEN ELEMENTARY NEEDS TRENCHING UP FOR CHILLER CONTROL. | 10/17/2001 | | 1 | 2 | PL | | 0 | $0.00 | $66.53 | $0.00 | $66.53 |
| 133 | Aiken | 75155 Plase repair Water leak in A-102 sink | 10/30/2001 | 12/6/2001 | C | 1 | PL | | 3.5 | $38.68 | $190.97 | $1.60 | $231.24 |
| 133 | Aiken | 76185 Please Repair Sink in First floor Restrooms | 11/10/2001 | 11/14/2001 | C | 1 | PL | | 3 | $27.30 | $0.40 | $5.44 | $33.14 |
| 133 | Aiken | 71423 Please Repai Roof water leak in Room B-111 | 9/10/2001 | | 1 | 1 | R | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | Aiken | 77632 B111 check water leak on wall | 12/3/2001 | | 1 | 2 | R | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

RSL 001208          ACE 000032

# AIKEN ELEMENTARY

User-defined Title 1
User-defined Title 2

Dates Received: From 8/1/2001  To 12/31/200

| Reference ID | Path Name | WO ID/ Description | Dates Received | Completed | Status | Priority | Codes Trade | Purpose | Budge Assigned To | Hours | Costs Labor | Material | Travel | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | Aiken | 78068 WATER LEAK ON ROOM B111 | 12/6/2001 | | 1 | 1 | R | | | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | | | | Grand Totals: | 108.50 | $932.68 | $2,734.59 | $78.72 | $3,745.99 |

ACE 000033

RSL 001209

## Section VI

## ATTACHMENT C

### BISD Work Order Reports

ACE 000034

# Section VI

# ATTACHMENT D

**Résumés (Jerry E. Mercer, Jeffrey H. Peters)**

ACE 000035

December 20, 2002

RSL 001211

## JERRY E. MERCER, P.E.



# Rimkus
Consulting Group, Inc.



### JERRY E. MERCER, P.E.
### VICE PRESIDENT, DISTRICT MANAGER

A 1976 civil engineering graduate of Texas A&M University, Mr. Mercer is a licensed Professional Engineer with experience in civil and structural engineering design, project administration, construction, failure analysis, and accident reconstruction. His experience includes: building and equipment foundation and superstructure design; retaining wall and sheet pile design; site grading and drainage design; water distribution, storm sewer and sanitary sewer systems design; paving design; soil mechanics; inspection of construction of land improvement utilities; design and contract document preparation for residential/commercial land improvement projects; and building finishes design including roofs, sidings, and wall and floor coverings.

He also is experienced in coordination of the preparation of architectural, civil/structural, mechanical and electrical engineering contract documents; and building construction project administration. Mr. Mercer has provided failure analysis and accident reconstruction services since 1983. His experience includes analysis of: architectural/engineering design and construction; construction accidents; ladder accidents; chair accidents; slip-and-fall accidents; temporary and permanent traffic control devices; vehicle accidents; roof collapses; storm, fire and water damage to structures; architectural/engineering contract relationships and responsibilities; contract disputes; and site flooding.

### EDUCATION AND PROFESSIONAL ASSOCIATIONS

B.S. - Civil Engineering - Texas A&M University
Roofing Symposium - National Roofing Contractors Assoc., Gaithersburg, Maryland
Soil Stabilization - The Lime Assoc., Houston, Texas
Concrete Additives - Gifford Hill Company, Houston, Texas
Reinforced Earth - The Reinforced Earth Company, Houston, Texas
Construction Safety - Occupational Safety & Health Administration, Dallas, Texas
Construction Law Seminar - Defense Research Institute, Orlando, Florida
Construction Litigation in Texas – Lorman Education Services, Dallas, Texas
Registered Professional Engineer: Texas and Oklahoma
Member of:     American Institute of Steel Construction, American Society of Civil Engineers,
               American Concrete Institute, Texas/National Society of Professional Engineers
Certifications:  Instructor – Texas Department of Insurance Continuing Education Courses: "Vehicle
                Accident Reconstruction," "Foundations," "Low-Slope Roofs," and "Steep-Slope
                Roofs"
Inspector – State of Texas: Insurable Property for Wind Storms and Hail

### EMPLOYMENT HISTORY

| | |
|---|---|
| 1987 - Present | Rimkus Consulting Group, Inc. |
| 1986 - 1987 | Crane, McDowell & Company |
| 1983 - 1986 | Craddock & McDowell Ltd., Inc. |

ACE 000036

RSL 001212

JERRY E. MERCER, P.E.

| 1979 - 1983 | The Austin Company |
| 1978 - 1979 | Mercer-Brown Engineers, Inc. |
| 1976 - 1978 | The Austin Company |

## DETAILED PROFESSIONAL EXPERIENCE:

**RIMKUS CONSULTING GROUP, INC.**                                    **1987 - PRESENT**

District Manager

Analysis of failures, disputes, and accidents in the civil/structural engineering disciplines and the construction industry, including: building and equipment foundation and superstructure design and performance failures; communication tower failures; construction accidents; crane failures/accidents; slip, trip, and fall accidents; automobile and heavy truck vehicle accidents; traffic control device layout; ladder and scaffold accidents; site design grading and drainage; flooding; building and roadway design/construction; contract disputes; building finish material failures; low-slope and steep-slope roofs design, leak, and failure evaluations; and building water leakage damage evaluations.

**CRANE, MCDOWELL & COMPANY**                                    **1986 - 1987**

Civil/Structural Consulting Engineer

Analysis of failures and accidents in architectural and civil/structural engineering disciplines related to residential/commercial/industrial building and equipment foundations and superstructures; and residential/commercial/industrial land improvement facilities including water supply, sanitary and storm sewer systems, and paving; and analysis of design E&O insurance claims. Failure analysis of insurance claims related to property losses and product liability losses.

**CRADDOCK & MCDOWELL, LTD., INC.**                                    **1983 - 1986**

Civil/Structural Consulting Engineer

Analysis of failures and accidents in architectural and civil/structural engineering disciplines related to residential/commercial/industrial land improvement, building and equipment foundations and superstructures; and analyses of design E&O insurance claims. Failure analysis of insurance claims related to property losses and product liability losses.

**THE AUSTIN COMPANY**                                    **1979 - 1983**

Project Engineer/Supervisor

Responsible for supervising development of architectural, civil/structural, mechanical and

ACE 000037

RSL 001213

### JERRY E. MERCER, P.E.

electrical engineering systems and contract documents for building projects. Coordination of building construction projects with clients, purchasing, construction and accounting departments. Projects included large machine shops, warehouses, manufacturing plants and low-rise office buildings.

**MERCER-BROWN ENGINEERS, INC.**                                          **1978 - 1979**

Design Engineer

Served as construction inspector and project designer and draftsman. Primary areas of responsibility included inspection of construction of land improvement facilities, and design and contract document preparation for residential/commercial land improvement projects, including: the design of site grading and drainage; water distribution systems; storm and sanitary sewer systems; paving design; and preparation of contract engineering plans, specifications and bid documents. Projects included office buildings, single-family residential subdivisions, multi-family residential housing, strip shopping centers and hotels/motels.

**THE AUSTIN COMPANY**                                          **1976 - 1978**

Project Civil/Structural Designer/Draftsman

Served as designer and draftsman for building design and construction projects. Primary areas of responsibility included civil and structural engineering design and contract document preparation for project site improvements and building and equipment foundations and superstructures, including: pile and concrete pier supported foundations; and concrete and steel framing systems. Projects included large machine shops, warehouses, manufacturing plants and low-rise office buildings.

**PUBLISHED ARTICLES**

"Guardrail Standards Inadequate" Claims Magazine, June 1989.
"The Expert's Role in Construction-Related Personal Injury Cases" DRI Construction Law Seminar, February 2000.

ACE 000038

Page 3

RSL 001214



**Rimkus**
Consulting Group, Inc.



### JEFFREY H. PETERS, B.A.E., P.E.
### DIVISION MANAGER

Mr. Peters has more than twenty years of diversified engineering and management experience. He is a graduate of the Pennsylvania State University with a Bachelor of Architectural Engineering degree with an emphasis in Environmental Systems. Currently he is a registered Professional Engineer in the state of Texas.

Mr. Peters has extensive knowledge and expertise in Indoor Air Quality (IAQ) evaluations in residential and commercial buildings. Most recently his focus has been the cause and origin analysis of mold growth moisture sources and the necessary remediation methods for mold removal (having evaluated over 600 projects). His specific expertise is in identifying mechanical (Heating, Ventilating and Air Conditioning - HVAC), plumbing and building envelope defects as a moisture sources for mold growth. On numerous occasions he has presented both on the specific relationship of HVAC systems and mold propagation; and on remediation techniques to eliminate mold contamination. He also investigates carbon monoxide exposures and is a Certified Carbon Monoxide Analyst.

He has vast experience and expertise in facilities operations, maintenance and management of large commercial healthcare facilities. He has served as a design project engineer and project manager overseeing multiple large and complex construction projects with a particular emphasis on mechanical, electrical and plumbing systems for healthcare facilities. He has owned and operated his own landscape contracting company serving commercial and residential customers and worked several years as a carpenter constructing new multi-family residences and renovating older houses.

### EDUCATIONAL AND PROFESSIONAL ASSOCIATIONS

Bachelor of Architectural Engineering – Environmental Systems - Pennsylvania State University
Registered Professional Engineer by Examination  – Texas (80660)
OSHA General Industry Safety and Health Certificate (10-hour course)
OSHA Compliance and Inspections Certificate (16-hour course)
Licensed Ham Radio Operator, Technician Class KD5EXD
Certified Carbon Monoxide Analyst (by the Building Performance Institute, Inc.)

Member of:   American Society of Heating, Refrigeration & Air-conditioning Engineers
             Texas Association of Healthcare Facility Engineers (Former Board Member and
                 Education Chairmen)
             National Society of Professional Engineers
             National Fire Protection Association
             American Society of Healthcare Engineers

HOUSTON   DALLAS/FT. WORTH   MC ALLEN   SAN ANTONIO   CORPUS CHRISTI   AUSTIN   NEW ORLEANS
ATLANTA   CHICAGO   TAMPA   FT. LAUDERDALE   ORLANDO   LAS VEGAS   DENVER   PHOENIX   ZURICH

ACE 000039

RSL 001215

**JEFFREY H. PETERS, B.A.E., P.E.**

**EMPLOYMENT HISTORY**

| | |
|---|---|
| 2001 – Present | Rimkus Consulting Group, Inc. |
| 1994 – 2000 | The Methodist Hospital |
| 1990 – 1994 | Smith Seckman Reid, Inc. |
| 1986 – 1990 | Cambridge Landscape Co. |
| 1981 – 1986 | I. A. Naman + Assoc. |

**DETAILED PROFESSIONAL EXPERIENCE**

**RIMKUS CONSULTING GROUP, INC.**                              **2001 - Present**

Division Manager

Manage the Environmental Division that investigates environmental contaminants in buildings with mold being the primary agent. Investigate deficiencies in design, construction, maintenance and operations of building envelopes, mechanical (HVAC) and plumbing systems and how they contribute as a source for indoor environmental contaminants. Prepare damage assessments, determine moisture source cause and origin, and develop remediation plans to eliminate these contaminant sources.

**THE METHODIST HOSPITAL**                              **1994 – 2000**

Interim Vice President of Support Services and
Director of Facility Management Services

Directed facilities operations for a +900 bed, +2 million square foot, acute care, teaching hospital. Directed Plant Operations, Design and Construction, Security, Service Communications and Building Services with a $16 million operating, $20 million construction annual budgets and 170 staff. Additional duties included chairing several committees in Y2K Preparedness; Emergency Preparedness; and Utility and Life Safety. Also a member of the Hospital's Safety Committee, Houston's Weapons of Mass Destruction Coordination Committee, and Texas Medical Center's Deregulation Task Force and Long Range Utilities Master Planning Committee. Lead engineering investigator for Risk Management department for all types of facility losses at all of the Methodist Health Care System corporation buildings.

On an interim basis (six months) the Executive responsible for the Support Services areas, that in addition to Facility Management Services, included the departments of Bio-medical, Anesthesia Services, Warehouse, Patient Transportation, Mailroom, Linen Services, Central Supply and Dietary. The combined operating budget for these departments was $48 million with 840 staff.

**SMITH SECKMAN REID, INC.**                              **1990-1994**

Project Manager, Mechanical Project Engineer

ACE 000040

RSL 001216

**JEFFREY H. PETERS, B.A.E., P.E.**

Managed the design team for numerous mechanical (HVAC), plumbing and electrical system designs for various sized new and renovated healthcare and research facility projects. Lead mechanical project engineer for these same projects preparing the plans and specifications with projects sizes as large as $20 million.

**CAMBRIDGE LANDSCAPE COMPANY**                                    **1986-1990**

Owner

Managed the operations for a midsize landscape contracting company specializing in new landscape and irrigation system installations for residential and commercial properties. Performed the design work and directed and trained the maintenance and installation staff.

**I. A. NAMAN +ASOCIATES**                                    **1981-1986**

Project Engineer

Designed the mechanical (HVAC), electrical and plumbing systems for large high-rise office buildings, healthcare and research facilities. Developed marketing plans for healthcare and telecommunications consulting.

## PRESENTATIONS

"Residential Air Conditioning Systems as a Source for Mold Propagation" A one-hour Professional Development course for several insurance adjuster-training seminars, Austin, Texas, June 2001- November 2001.

"Mold Investigation and Remediation Techniques" An eight-hour Professional Development course for insurance adjuster training, Harrisburg, Pennsylvania, October 2001.

"False Fire alarms" on camera interview, Channel 11 News, Houston, Texas September 1999

"Hurricane Preparedness" Twenty minute presentation and panel discussion to the Texas Medical Center, Houston, Texas, June 1999.

"Incident Commander System Training", Four-hour Incident Commander management training for emergency response to disasters, The Methodist Hospital, Houston, Texas, multiple sessions 1998-2000.

"Hurricane Polly", A multiple hour presentation to The Methodist Hospital management and staff for hurricane preparedness training, multiple sessions 1996-2000.

ACE 000041

RSL 001217

# Section VI

## ATTACHMENT E

**Photographs**

ACE 000042

December 20, 2002

RSL  001218





**CENTER FOR TOXICOLOGY & ENVIRONMENTAL HEALTH, L.L.C. — DALLAS**

# INDOOR AIR QUALITY REPORT
## Volume 1

### Brownsville Independent School District
**Aiken Elementary School**
**Besteiro Middle School**

**GAB File No.: 35054-00246**
**Claim No. 456P729886-3**

**Prepared for**

**Roger Sawyer**
**GAB Robins North America, Inc.**
**8700 Commerce Park, Suite 235**
**Houston, Texas 77036**

**Prepared by**

**Center for Toxicology & Environmental Health, L.L.C.**
**346 Oaks Trail, Suite 105**
**Garland, TX 75043**
**(972) 203-2011**

RSL 000168

**January 10, 2003**

ACE 000001

# CENTER FOR TOXICOLOGY & ENVIRONMENTAL HEALTH, L.L.C.—DALLAS



*Writer's Address:*
Oak Trails
TX 75043
s@consultant.com
*Website: www.cteh.uams.edu*

January 10, 2003

Roger Sawyer
Executive General Adjuster
GAB Robins North America, Inc.
8700 Commerce Park, Ste. 235
Houston, TX 77036-7423

RE: Brownsville ISD Project; GAB File No. 35054-00246

Dear Mr. Sawyer:

CTEH is pleased to present one copy of the Indoor Air Quality Report, Brownsville Independent School District, Aiken Elementary School, Besteiro Middle School, dated January 10, 2003.

If you have any questions, please call me at 972-203-2011, or send e-mail to daweeks@attglobal.net.

Sincerely,
**Center for Toxicology and Environmental Health**

David A. Weeks, P.E., DEE, QEP
Senior Environmental Engineer

Enclosures

RSL 000171

# INDOOR AIR QUALITY REPORT

**Brownsville Independent School District
Aiken Elementary School and Besteiro Middle School**

**Claim No. 456P729886-3**

**Prepared for**

**GAB Robins North America, Inc.
8700 Commerce Park, Suite 235
Houston, Texas 77036**

**Prepared by**

**Center for Toxicology and Environmental Health - Dallas
346 Oaks Trail, Suite 105
Garland, Texas 75043
(972) 203-2011**

**January 10, 2003**

RSL 000172

# TABLE OF CONTENTS

1.0    Summary ..................................................................... 1

2.0    Introduction .............................................................. 2

3.0    Aiken Elementary School ............................................. 2
    3.1    Observations ....................................................... 2
       3.1.1    Moisture Source Identification ......................... 3
       3.1.2    Heating, Ventilation, and Air Conditioning (HVAC) System ........ 3
    3.2    Sampling and Analytical Methods ........................... 3
       3.2.1    Air Sampling ............................................ 3
       3.2.2    Source Sampling ........................................ 4
       3.2.3    Wall Cavity Air Sampling................................ 5
       3.2.4    Heating Ventilation & Air Conditioning (HVAC) System Sampling . 5
    3.3    Results and Discussion........................................ 5
       3.3.1    Ambient Air Sampling Results......................... 6
       3.3.2    Biological Air Sampling Results ...................... 6
       3.3.3    Visible Mold and Source Sample Results............... 7
       3.3.4    Wall Cavity Air Sample Results ....................... 7
       3.3.5    HVAC Sample Results ................................... 8
    3.4    Cause of Mold Growth ....................................... 9
    3.5    Conclusions ...................................................... 9

4.0    Besteiro Middle School ................................................ 9
    4.1    Observations ....................................................... 9
       4.1.1    Moisture Source Identification......................... 10
       4.1.2    Heating Ventilation and Air Conditioning (HVAC) System ......... 10
    4.2    Sampling and Analytical Methods ........................... 10
       4.2.1    Air Sampling ............................................ 11
       4.2.2    Source Sampling ........................................ 12
       4.2.3    Wall Cavity Sampling.................................. 12
       4.2.4    Heating Ventilation & Air Conditioning (HVAC) System Sampling 12
    4.3    Results and Discussion........................................ 12
       4.3.1    Ambient Air Sampling Results......................... 13
       4.3.2    Biological Air Sampling Results ...................... 14
       4.3.3    Visible Mold and Source Sample Results............... 14
       4.3.4    Wall Cavity Air Sample Results ....................... 14
       4.3.5    HVAC Sample Results ................................... 15
    4.4    Cause of Mold Growth ....................................... 16
    4.5    Conclusions ...................................................... 16

5.0    Quality Assurance/Quality Control................................ 17

6.0    Remediation Recommendations................................... 17

7.0    References ............................................................... 19

RSL  000173

## LIST OF TABLES, FIGURES, and ATTACHMENTS

### ATTACHMENTS

<u>VOLUME 1</u>

1 - Tables and Figures

TABLE  1:    Survey Form Summary - Aiken Elementary School
TABLE  2:    Survey Form Summary - Besteiro Middle School
TABLE  3:    Air Sample Data Summary - Aiken Elementary School
TABLE  4:    Air Sample Data Summary - Besteiro Middle School
TABLE  5:    Source Sample Data Summary
TABLE  6:    Wall Cavity Sample Data Summary
TABLE  7:    HVAC Table - Mold Type Comparison
TABLE  8:    Ambient Air Data Summary - Aiken Elementary School
TABLE  9:    Ambient Air Data Summary - Besteiro Middle School
TABLE 10:    Comprehensive Ambient Air Data Summary - Aiken E.S. & Besteiro M.S.
FIGURE 1:    Aiken Elementary School Relative Humidity Graph
FIGURE 2:    Besteiro Middle School Relative Humidity Graph
FIGURE 3:    Aiken Elementary School & Besteiro Middle School First Floor Diagram
FIGURE 4:    Aiken Elementary School & Besteiro Middle School Second Floor Diagram

2 - Remediation Cost Estimate/Guidelines
     Remediation Cost Estimate Worksheet
     EPA Mold Remediation Cleanup Guidelines
     Mold Remediation Cleanup Method Descriptions
     New York City Guidelines on Assessment and Remediation
     U.S. EPA's Mold Remediation Guidelines

3 - CD ROM: Photographic Log PowerPoint Presentation
     Photographic Log Key

<u>VOLUME 2</u>

4 - Supporting Data
     Biological Data
     Ambient Air Data — AES
     Ambient Air Data — BMS

5 - Initial Visit Forms
     Inspection Forms — AES
     Inspection Forms — BMS
     Photo Log Forms

6 - Comparative Data from Follow-Up Visit
     Ambient Air Data — LHS
     Ambient Air Data — PMS
     Biological Data — LHS
     Biological Data — PMS

7 - Follow-Up Visit Forms
     Comprehensive Ambient Air Data Forms — AES
     Comprehensive Ambient Air Data Forms — BMS
     Ambient Air Data Forms — LHS
     Ambient Air Data Forms — PMS
     Follow-Up Photo Log Forms

RSL  000174

# 1.0 Summary

The Center for Toxicology and Environmental Health (CTEH) conducted a fungal assessment of Aiken Elementary School (AES) and Besteiro Middle School (BMS) which are part of the Brownsville Independent School District (BISD) from July 8 through 15, 2002. A second site visit was conducted on November 18-19, 2002, to collect additional relative humidity (Rh) data and to collect samples in two non-complaint schools [Lopez High School (LHS) and Perkins Middle School (PMS)]. The purpose of the assessment was to inspect for the presence of indoor microbiological contamination and, if detected, to determine the extent of the contamination. Moisture source identification and causes of mold growth were not within the scope of this investigation.

Approximately 2,163 ft$^2$ and 1,381 ft$^2$ of visible mold were identified in AES and BMS, respectively. CTEH estimates that $160,719.34 is required to remediate the mold in AES and BMS in accordance with the U.S. Environmental Protection Agency's guidelines entitled "Mold Remediation in Schools and Commercial Buildings" dated March 2001.

The air inside AES and BMS was not contaminated with abnormally high levels of fungal spores. Limited air sampling was conducted during the initial and follow-up assessments. The results of the air sampling did not show the presence of elevated indoor airborne fungal contamination in AES and BMS. The culturable air samples identified very low concentrations of fungal species. The airborne distributions of the indoor culturable and non-culturable fungal types generally matched the outdoor distributions and were less than the concentrations of fungal spores found in the two non-complaint schools (LHS and PMS).

The spore concentrations inside the wall cavities in the complaint and non-complaint rooms of both AES and BMS did not suggest the presence of hidden mold growth inside the walls.

The relative humidity (Rh) in the complaint and non-complaint areas of AES was within the recommended range (60%). (Refer to Figures 1 and 2 and Tables 8 and 9). The Rh inside the BMS complaint room was significantly above the recommended range. However, the Rh in the BMS non-complaint room was within the recommended range.

The results of the comprehensive ambient air measurement collection showed a strong correlation between rooms with higher Rh and extensive fungal growth on contents (e.g. books) and surfaces (Refer to Tables 1, 2, and 7). Indeed, the rooms with the greatest areas of visible mold on contents typically exhibited Rh values that exceeded 60%. High humidity was more of an issue in BMS than AES, although some rooms in AES did exhibit high Rh levels.

1

RSL 000175

CTEH collected comparative HVAC samples from the complaint schools (AES and BMS) and the non-complaint schools (LHS and PMS). CTEH collected HVAC source samples from at least three systems in each school. The results of the comparative HVAC sampling showed the presence of similar fungal species growing in the HVACs of the complaint and non-complaint schools in the both the return and supply sides of the systems. Thus, the data shows that the visible fungi found in AES and BMS did not contribute to the contamination of the HVAC systems at levels that exceed the normal range for BISD schools. Rather, the fungal species that were identified in the AES and BMS HVAC systems are normal constituents of HVAC systems in BISD schools given the South Texas environment and the maintenance procedures implemented by the District.

## 2.0 Introduction

The Center for Toxicology and Environmental Health (CTEH) conducted a fungal assessment of Aiken Elementary School (AES) and Besteiro Middle School (BMS) which are part of the Brownsville Independent School District (BISD) from July 8 through 15, 2002. A second site visit was conducted on November 18-19, 2002, to collect additional relative humidity (Rh) data and to collect samples in two non-complaint schools (LHS and PMS). The purpose of the assessment was to inspect for the presence of indoor microbiological contamination and, if detected, to determine the extent of the contamination. Moisture source identification and causes of mold growth were not within the scope of this investigation.

## 3.0 Aiken Elementary School

### 3.1 Observations

Dirt, debris, and trash was observed throughout the vacant school. Dead plants, rotting food, and dead aquarium fish were observed in several areas of the school. The ceiling tiles were constructed of a ceramic material. A significant number of the ceramic ceiling tiles had been moved to allow inspection of the upper ceiling by previous inspectors. CTEH also observed a plumbing leak in the cafeteria ceiling which appeared to have gone unnoticed, flooded the cafeteria, and caused deterioration of the ceiling tiles. CTEH also noticed chill water line leaks in several classrooms which had caused minimal to extensive damage to contents in the rooms.

Visible stains that were classified as potential fungi were observed in 49 areas within the school. The visible staining is summarized in Table 1. Overall, approximately 2,163 ft$^2$ of visible staining was observed within AES.

2

RSL 000176

### 3.1.1 Moisture Source Identification

Refer to the Rimkus Consulting Group report for moisture source identification.

### 3.1.2 Heating, Ventilation, and Air Conditioning (HVAC) System

AES utilizes a chilled-water system to maintain the indoor environment in the school.

The primary HVAC chill water plumbing lines are routed through the main hallway ceilings. The HVAC systems exhibited mold growth on the insulation that wraps the main chiller lines. Mold growth and dust was observed on the backside of many of the supply registers which is indicative of normal operation. The air handling and duct systems were not clean and showed a significant amount of dust and mold build-up on the duct surfaces. Several of the systems exhibited knocking noises.

CTEH observed current leaking cold water lines in several classrooms and in the cafeteria.

Several of the systems were not adequately removing the moisture from the conditioned air. Relative humidity was measured in rooms with significant mold growth on contents (e.g. books and working surfaces) at concentrations in excess of 60%. A review of Tables 7 and 11 shows that rooms with significant mold growth on contents exceeded the maximum Rh of 60%, which is recommended as appropriate for indoor air by U.S. EPA and the American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE).

### 3.2    Sampling and Analytical Methods

Four types of sampling activities were conducted: air sampling, source sampling, wall cavity air sampling, and HVAC related sampling.

CTEH collected both culturable and non-culturable air samples for two main reasons: 1) non-culturable air samples are necessary to characterize environments where fungi are present that are no longer viable (i.e. alive), do not culture well, or do not compete well on Malt Extract Agar (MEA) and 2) culturable air samples can be used to differentiate species of fungi so that air samples can be properly compared to source samples and outdoor air samples. The primary investigation guidance document referenced by indoor air quality professionals (Bioaerosols: Assessment and Control) recommends that comparisons between fungal sample results be made at the species level. Non-viable sampling methods are not usually able to identify fungi at the species level.

### 3.2.1 Air Sampling

CTEH selected three areas for air sampling. A non-complaint area (Rm B207), a complaint area (downstairs main hallway outside the administration offices), and

3

outdoors were selected for air sampling locations. A complaint area is defined as an area that exhibits significant visible mold growth on building materials where mold growth should not be expected. A non-complaint area is defined as an area that exhibits no visible mold growth on building materials. (A non-complaint area may display some minor water staining on the ceiling or on the air supply register.) The areas were selected at the beginning of the investigation process.

Three air sampling rounds were conducted at the three selected locations. The samples were collected simultaneously in the morning (approximately 0900), afternoon (approximately 1300), and evening (approximately 1630). Only a minimal number of air samples were collected due to the extensive air testing that had already been performed by other individuals, and more importantly, due to the fact that the indoor environment of the schools were not representative of indoor conditions before the schools were closed and regular cleaning and maintenance was discontinued.

CTEH collected Zefon Air-O-Cell$^{TM}$ spore trap air samples in all three sampling locations. As recommended by Zefon and Environmental Microbiology Laboratories, Inc. (EMLI), CTEH collected each sample for 5 minutes at a flow rate of 15 liters per minute resulting in a total air volume of 75 liters. EMLI analyzed the samples by direct microscopy to determine the genus of the molds along with the concentration of spores per cubic meter of air (spores/m$^3$). Refer to Attachment 1, Table 3 for the air sample summary.

CTEH collected culturable air samples using an Anderson-type N6 Viable Microbial Particle Sampler with MEA in the three sampling locations. CTEH collected each sample for 5 minutes at a flow rate of one acfm (28.3 liters/min) resulting a total air volume of 141.5 liters. EMLI analyzed the samples by separating the *Penicillium* and *Cladosporium* colonies from the *Aspergillus* colonies and replating them on specialized media for further development which would allow for speciation by direct microscopy and the ability to accurately determine the concentration of colony forming units (CFUs) per cubic meter of air (CFU/m$^3$). Refer to Attachment 1, Table 3 for the air sample summary.

Additionally, CTEH utilized two types of TSI ambient air data logging instruments (Q-CALC model number 8760 and Q-TRAK model number 8551) to collect real-time temperature, carbon dioxide (CO$_2$), and relative humidity (Rh) measurements in the three air sampling locations. The ambient air measurements from the primary stations were data logged continuously for 7 days and download into an Excel spreadsheet. The ambient air data from other areas and rooms within the school were collected over a time period of several minutes and represent grab samples.

## 3.2.2 Source Sampling

According to procedures specified by EMLI, CTEH collected non-culturable, tape lift and bulk samples from areas where fungal structures and/or spores were most likely present. EMLI analyzed the samples by direct microscopy to determine the genus of the mold(s) including semi-quantitative amount(s) present.

4

RSL 000178

According to procedures specified by EMLI, CTEH collected culturable swab and bulk samples from areas where fungal structures and/or spores were most likely present. Initially, EMLI cultured the collected samples on MEA agar. After approximately a week EMLI separated the *Penicillium* and *Cladosporium* colonies from the *Aspergillus* colonies and re-plated the colonies on specialized media for further development and ultimately speciation by direct microscopy.

### 3.2.3 Wall Cavity Air Sampling

CTEH collected WallChek™ spore trap air samples from the wall cavities of interior walls, which were located in complaint and non-complaint rooms, with Zefon Air-O-Cell™ Cassettes. As recommended by the WallChek™ manufacturer, two-minute samples were collected at a flow rate of 15 liters per minute for a total air volume of 30 liters. EMLI analyzed the samples by direct microscopy to determine the genus of the molds along with a concentration of spores per cubic meter of air (spores/m$^3$). Refer to Attachment 1, Table 6 for the wall cavity data summary.

### 3.2.4 Heating Ventilation & Air Conditioning (HVAC) System Sampling

The HVAC sampling was conducted to determine the extent to which fungi may have contaminated the air handling units and ducting. Swab and bulk samples were collected from the return air duct and from the filter to represent the return side of each system. Swab samples were collected from the air supply register to represent the supply side of the system. Samples were also collected from any visible mold or water stains in the room. The objective of the sampling was to determine if the same species of fungi could be found throughout a HVAC system and to determine if the HVAC systems in AES had greater amounts of fungi or different species of fungi from the non-complaint schools.

### 3.3    Results and Discussion

The purpose of this investigation was to identify the presence and extent of the indoor microbiological contamination. Identification of any moisture sources and the causes of mold growth are not part of this study. The Rimkus Consulting Group Report addresses the moisture sources and the causes of the mold growth. This study was not designed to assess the health significance, if any, of microbiological materials present in AES. The results of a study with limited sampling, such as this study, are uncertain and preclude the ability to determine the cause of any reported health effects. Determining any link between health effects and the presence of microbiological material requires further study including the collection of a statistically relevant number of samples, appropriate medical tests, and a detailed review and analysis of the data by a toxicologist and physician.

Currently there are no generally accepted occupational or public health standards for interpreting indoor surface and airborne microbiological sample results (ACGIH, 1999). Guidelines published by New York City Department of Health recommend comparing the indoor and outdoor air sampling results (NYC DOH, 2000). In

5

general, the types of fungi and their airborne levels found indoors should be similar (in non-problem buildings) to the outdoor air. Differences in the airborne levels or types of fungi may indicate the presence of moisture sources and resultant fungal growth.

When the survey results indicate an indoor source of microbiological material CTEH recommends investigating further or remediating and then controlling the indoor environment to minimize the return of the microbiological organisms.

The results of CTEH's investigation are summarized in Attachment 1. The photographic log compact disk and supporting documents can be found in Attachment 3. Laboratory results and detailed ambient air measurements can be found in Attachments 4.

### 3.3.1 Ambient Air Sampling Results

CTEH collected ambient air measurements over a seven day period from three stations in AES. The average Rh ranged from 57.15 to 59.83% in the complaint area (downstairs main hallway) and from 58.52 to 60.14% in the non-complaint area (Rm A207). The average Rh outdoors ranged from 60.10 to 85.09% over a seven day period. In addition, short-term ambient air measurements were collected in all of the AES rooms that were accessible to CTEH. The rooms with visible mold on the contents displayed Rh levels that ranged from 47.0 to 71%. The Rh data is summarized in Tables 8 and 10 and Figure 1 of Attachment 1.

CTEH collected carbon dioxide ($CO_2$) measurements over a seven day period. The average $CO_2$ measurement ranged from 334 to 382 ppm in the complaint area and from 343 to 385 ppm in the non-complaint area. The average $CO_2$ measurement outdoors ranged from 314 to 381 ppm.

To help control indoor mold growth, both U.S. EPA and ASHRAE generally recommend an indoor relative humidity (Rh) range of 30 – 60% (ASHRAE 55-1992: Thermal Environmental Conditions for Human Occupancy). Rh levels greater than 60% may provide enough moisture for some molds to grow independently of other moisture sources such as plumbing leaks. ASHRAE considers indoor $CO_2$ concentrations greater than approximately 1000 ppm a sign of insufficient fresh outdoor supply air that often indicates unacceptable indoor air quality (ASHRAE 62-1999: Ventilation for Acceptable Indoor Air Quality). The Occupational Safety and Health Administration's (OSHA) Permissible Exposure Limit (PEL) for $CO_2$ is 5,000 ppm (OSHA Standard 1910.1000, Table Z-1).

### 3.3.2 Biological Air Sampling Results

In summary, none of the data collected by CTEH suggests that the air inside AES contains fungi at concentrations that exceed the outdoor air or a similar non-complaint school in the BISD. The sample results are summarized in Table 3 of Attachment 1.

6

CTEH collected Zefon Air-O-Cell™ spore trap samples in the complaint area (downstairs main hallway), non-complaint area (Rm B207), and outdoors. The total spore concentration (106 - 227 spores/m³) and individual spore concentrations of the complaint area and non-complaint area (66 - 160 spores/m³) were less than the total (7,167 – 76,556 spores/m³) and individual spore concentrations outdoors. The air samples did not identify a spore type at an elevated concentration as compared to the outdoors. In addition, CTEH compared the samples to the non-complaint school with a similar type of HVAC system and similar age – LHS. The data shows that the total spore concentrations in AES were less than the total spore concentration in LHS (173 - 867 spores/m3).

In addition to non-culturable air samples, CTEH collected culturable air samples in the complaint area, non-complaint area, and outdoors. The total colony forming unit (CFU) concentrations of the complaint (42-126 cfu/m³) and non-complaint areas (56-63 cfu/m³) were less than the total CFU concentrations outdoors (868 – 1,711 cfu/m³). Additionally, none of the individual spore type concentrations indoors were significantly greater than the same spore types outdoors. Finally, the total colony forming units in AES were also less than the total colony forming units in Lopez (147 – 538 cfu/m³):

### 3.3.3 Visible Mold and Source Sample Results

CTEH observed approximately 2,163 ft² of visible fungi in 49 areas within AES. The source sampling results are summarized in Table 5 of Attachment 1. The areas with the greatest concentrations of visible fungi are graphically depicted in Figures 3 and 4.

CTEH collected 17 tape lift, 2 bulk non-culturable, 19 culturable swab, and 14 culturable bulk samples from areas within AES that were visibly stained with fungi or fungi-like substances. Visible fungi were confirmed to be present in building materials and on contents in 22 areas within the school. Fungi were not found to be present in every room. Refer to Table 5 for a listing of the identified fungal genera.

### 3.3.4 Wall Cavity Air Sample Results

With the exception of the C106/C108 and the A102/A104 walls, the total and individual spore concentrations in the wall cavities of each of the rooms were less than the total and individual spore concentrations outdoors. The individual concentration of *Penicillium/Aspergillus* spores in the A102/A104 wall (1,870 spores/m³) and in the C106/C108 wall (933 spores/m³) were greater than the outdoors (667 – 800 spores/m³). Although the individual spore concentration of *Penicillium/Aspergillus* was slightly higher in these wall cavities than outdoors, such concentrations are not indicative of a wall containing hidden visible mold. It has been CTEH's experience that air cavity spore concentrations are typically tens to hundreds of times greater than outdoors when visible mold is hidden inside a wall cavity.

7

CTEH collected WallChek™ wall cavity air samples from the following locations:

- Before-work outdoor air sample
  - Total spore concentration: 7,300 spores/m³
- Room A101, wall common with A103
  - Total spore concentration: 600 spores/m³
- Room A102, wall common with A104
  - Total spore concentration: 1,870 spores/m³
- Room C106, wall common with C108
  - Total spore concentration: 966 spores/m³
- Counselor's office lobby wall, common with the speech office
  - Total spore concentration: 200 spores/m³
- Room B206, wall common with B204
  - Total spore concentration: 133 spores/m³
- Room B212, wall common with B214
  - Total spore concentration: <34 spores/m³
- After-work outdoor air sample
  - Total spore concentration: 9,099 spores/m³

The wall cavity air sampling data are summarized in Table 6 of Attachment 1.

### 3.3.5 HVAC Sample Results

CTEH collected HVAC-related samples from 6 rooms within AES. Five of the 6 rooms contained some type of staining on walls, ceilings, or room contents. Significant staining or mold growth on contents was observed in 3 rooms. The same species of fungi were found in both the return and supply sides of the HVAC system in all 6 rooms. The most common fungal species found paired in both the return and supply side were *Cladosporium sphaerospermum* (4 of 6 rooms), *Cladosporium cladosporioides* (5 of 6 rooms). However, only 1 of the 6 rooms (A101) displayed results where the fungi found in the room matched the fungi in the HVAC system (*Cladosporium sphaerospermum*).

CTEH also collected HVAC-related samples from 3 rooms in a school of similar age and HVAC system—LHS (as reported by Mr. Vasquez with BISD). The same species of fungi were found in both the return and supply sides of the HVAC system in all 3 rooms. The most common fungal species found paired in both the return and supply side was *Cladosporium sphaerospermum* ( 3 of 3 rooms). *Cladosporium cladosporioides* was also found to be present in both the return and supply side of the HVAC systems in addition to *Alternaria, Aureobasidium, Aspergillus glaucus,* and *Bipolaris/Drechslera*.

*Cladosporium cladosporioides* and *Cladosporium sphaerospermum* were the two most common fungal species detected in the 8 outdoor air samples that

8

were collected during the initial and follow-up investigations. *Cladosporium cladosporioides* was detected in 7 of the 8 outdoor viable air samples. *Cladosporium sphaerospermum* was detected in 6 of the 8 viable outdoor air samples.

### 3.4   Cause of Mold Growth

See the Rimkus Consulting Group Report.

### 3.5   Conclusions

Based on a review of all of the data available to CTEH in connection with this investigation, CTEH concludes the following:

1. Approximately 2,163 ft$^2$ of visible mold is located in the school, primarily on the ceiling and chill-water pipe insulation.

2. The airborne concentrations of fungi inside the school are similar to the outdoors and less than the fungal concentrations measured in a non-complaint school reportedly of similar age and HVAC-type.

3. The fungal growth inside the school has not contaminated the HVAC system. Fungi were found to be present in both the return and supply sides of the HVAC system regardless of the presence of fungal contamination within a specific room. The types and levels of fungi observed inside the complaint school HVAC system were no different than the types and levels observed in the non-complaint school. The most common fungi found in the HVAC systems were the most common fungi detected in the outdoor air samples. Thus, the fungi detected in the AES HVAC systems appears to be normal given the type of HVAC system and maintenance practices implemented by BISD.

4. The sampling results do not suggest the presence of hidden fungal contamination located behind classroom walls.

## 4.0  Besteiro Middle School

### 4.1   Observations

Dirt and debris was observed throughout the vacant school. Dead plants and rotting food were observed in several areas of the school. The ceiling tiles were constructed of the typical acoustic cellulose material. A significant number of the tiles had been moved to allow inspection of the upper ceiling by previous inspectors.

9

RSL 000183

### 4.1.1 Moisture Source Identification

See the Rimkus Consulting Group Report.

### 4.1.2 Heating Ventilation and Air Conditioning (HVAC) System

CTEH observed that, in general, each room was serviced by a separate HVAC system. CTEH observed that several of the systems were not turned on at the time of inspection.

CTEH observed several of the roof mounted compressor units. CTEH observed that several units displayed access panels that were loose, even to the point where birds could enter the return air space of the system. The HVAC unit for Room 112 is an extreme example, but not the only system that displayed questionable maintenance issues.

CTEH requested to inspect the compressor unit for Room 112 because the Rh was so high inside the room. CTEH accessed the room at approximately 1500 hours on July 9, 2002, with Mr. Kenny Roberts of BISD. The access panel to the HVAC system for Room 112 was open and laying on the roof when CTEH arrived at the site. CTEH observed a pigeon actually nesting on the cooling coils and a large amount of bird excrement inside the system—indicating that this was not the first time the access panel had become dislodged. Mr. Roberts removed the bird and replaced the access panel.

Minor mold growth and dust was observed on the backside of many of the supply registers. The HVAC systems were very dirty and showed a large amount of dust build-up in the return and supply duct insulation. CTEH did not observe any visible mold growth in the HVAC systems that could clearly be differentiated from dirt and debris. Refer to the Rimkus Consulting Group report for more detailed information concerning the HVAC systems.

### 4.2     Sampling and Analytical Methods

Four types of sampling activities were conducted: air sampling, source sampling, wall cavity air sampling, and HVAC related sampling.

CTEH collected both culturable and non-culturable air samples for two main reasons: 1) non-culturable air samples are necessary to characterize environments where fungi are present that are no longer viable (i.e. alive), do not culture well, or do not compete well on Malt Extract Agar (MEA) and 2) culturable air samples can be used to differentiate species of fungi so that air samples can be properly compared to source samples and outdoor air samples. The primary investigation guidance document referenced by indoor air quality professionals (Bioaerosols: Assessment and Control) recommends that comparisons between fungal sample results be made at the species level. Non-viable sampling methods are not usually able to identify fungi at the species level.

10

RSL 000184

### 4.2.1 Air Sampling

CTEH selected three areas for air sampling. A non-complaint area (Rm 222), a complaint area (Rm 112), and outdoors were selected for air sampling locations. CTEH selected three areas for air sampling. A complaint area is defined as an area that exhibits significant visible mold growth on building materials where mold growth should not be expected. A non-complaint area is defined as an area that exhibits no visible mold growth on building materials. (A non-complaint area may display some minor water staining on the ceiling or on the air supply register.) The areas were selected at the beginning of the investigation process.

Three air sampling rounds were conducted at the three selected locations. The samples were collected simultaneously in the morning (approximately 0900), afternoon (approximately 1300), and evening (approximately 1630). Only a minimal number of air samples were collected due to the extensive air testing that had already been performed by other individuals, and more importantly, due to the fact that the indoor environment of the schools were not representative of indoor conditions before the schools were closed and regular cleaning and maintenance was discontinued.

CTEH collected Zefon Air-O-Cell$^{TM}$ spore trap air samples in all three sampling locations. As recommended by Zefon and Environmental Microbiology Laboratories, Inc. (EMLI), CTEH collected each sample for 5 minutes at a flow rate of 15 liters per minute resulting in a total air volume of 75 liters. EMLI analyzed the samples by direct microscopy to determine the genus of the molds along with the concentration of spores per cubic meter of air (spores/m$^3$). Refer to Attachment 1, Table 3 for the air sample summary.

CTEH collected culturable air samples using an Anderson-type N6 Viable Microbial Particle Sampler with MEA in the three sampling locations. CTEH collected each sample for 5 minutes at a flow rate of one acfm (28.3 liters/min) resulting a total air volume of 141.5 liters. EMLI analyzed the samples by separating the *Penicillium* and *Cladosporium* colonies from the *Aspergillus* colonies and replating them on specialized media for further development which would allow for speciation by direct microscopy and the ability to accurately determine the concentration of colony forming units (CFUs) per cubic meter of air (CFU/m$^3$). Refer to Attachment 1, Table 3 for the air sample summary.

Additionally, CTEH utilized two types of TSI ambient air data logging instruments (Q-CALC model number 8760 and Q-TRAK model number 8551) to collect real-time temperature, carbon dioxide (CO2), and relative humidity (Rh) measurements in the three air sampling locations. The ambient air measurements from the primary stations were data logged continuously for 7 days and download into an Excel spreadsheet. The ambient air data from other areas and rooms within the school were collected over a time period of several minutes and represent grab samples.

11

### 4.2.2 Source Sampling

According to procedures specified by EMLI, CTEH collected non-culturable, tape lift and bulk samples from areas where fungal structures and/or spores were most likely present. EMLI analyzed the samples by direct microscopy to determine the genus of the mold(s) including semi-quantitative amount(s) present.

According to procedures specified by EMLI, CTEH collected culturable swab and bulk samples from areas where fungal structures and/or spores were most likely present. Initially, EMLI cultured the collected samples on MEA agar. After approximately a week EMLI separated the *Penicillium* and *Cladosporium* colonies from the *Aspergillus* colonies and re-plated the colonies on specialized media for further development and ultimately speciation by direct microscopy.

### 4.2.3 Wall Cavity Sampling

CTEH collected WallChek™ spore trap air samples from the wall cavities of interior walls, which were located in complaint and non-complaint rooms, with Zefon Air-O-Cell™ Cassettes. As recommended by the WallChek™ manufacturer, two-minute samples were collected at a flow rate of 15 liters per minute for a total air volume of 30 liters. EMLI analyzed the samples by direct microscopy to determine the genus of the molds along with a concentration of spores per cubic meter of air (spores/m$^3$). Refer to Attachment 1, Table 6 for the wall cavity data summary.

### 4.2.4 Heating Ventilation & Air Conditioning (HVAC) System Sampling

The HVAC sampling was conducted to determine the extent to which fungi may have contaminated the air handling units and ducting. Swab and bulk samples were collected from the return air duct and from the filter to represent the return side of each system. Swab samples were collected from the air supply register to represent the supply side of the system. Samples were also collected from any visible mold or water stains in the room. The objective of the sampling was to determine if the same species of fungi could be found throughout a HVAC system and to determine if the HVAC systems in AES had greater amounts of fungi or different species of fungi from the non-complaint schools.

### 4.3    Results and Discussion

The purpose of this investigation was to identify the presence and extent of the indoor microbiological contamination. Identification of any moisture sources and the causes of mold growth are not part of this study. The Rimkus Consulting Group Report addresses the moisture sources and the causes of the mold growth. This study was not designed to assess the health significance, if any, of microbiological materials present in Besteiro Middle School. The results of a study with limited sampling, such as this study, are uncertain and preclude the ability to determine the cause of any reported health effects. Determining any link between health effects and the presence of microbiological material requires further study

RSL 000186

including the collection of a statistically relevant number of samples, appropriate medical tests, and a detailed review and analysis of the data by a toxicologist and physician.

Currently there are no generally accepted occupational or public health standards for interpreting indoor surface and airborne microbiological sample results (ACGIH, 1999). Guidelines published by New York City Department of Health recommend comparing the indoor and outdoor air sampling results (NYC DOH, 2000). In general, the types of fungi and their airborne levels found indoors should be similar (in non-problem buildings) to the outdoor air. Differences in the airborne levels or types of fungi may indicate the presence of moisture sources and resultant fungal growth.

When the survey results indicate an indoor source of microbiological material CTEH recommends investigating further or remediating and then controlling the indoor environment to minimize the return of the microbiological organisms.

The results of CTEH's investigation are summarized in Attachment 1. Laboratory results and detailed ambient air measurements can be found in Attachments 4. The photographic log compact disk and supporting documents can be found in Attachment 3.

### 4.3.1 Ambient Air Sampling Results

CTEH collected ambient air measurements over a seven day period from three stations in BMS. The average Rh ranged from 83.48 to 91.44% in the complaint area (Rm 112) and from 54.39 to 60.74% in the non-complaint area (Rm 222). The average Rh outdoors ranged from 66.46 to 88.7% over a seven day period. In addition, short-term ambient air measurements were collected in all of the BMS rooms that were accessible to CTEH. The rooms with visible mold on the contents exhibited Rh levels that ranged from 50.9 to 65.8%. The Rh data is summarized in Tables 9 and 10 and Figure 2 of Attachment 1.

CTEH collected $CO_2$ measurements over a seven day period. The average $CO_2$ measurement ranged from 386 to 424 ppm in the complaint area and from 372 to 395 ppm in the non-complaint area. The average $CO_2$ measurement outdoors ranged from 421 to 477 ppm.

To help control indoor mold growth, the Environmental Protection Agency (EPA) and the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) generally recommend an indoor relative humidity (Rh) range of 30 - 60% (ASHRAE 55-1992: Thermal Environmental Conditions for Human Occupancy). Rh levels greater than 60% may provide enough moisture for some molds to grow independently of other moisture sources such as plumbing leaks. ASHRAE considers indoor carbon dioxide ($CO_2$) concentrations greater than approximately 1000 ppm a sign of insufficient fresh outdoor supply air that often indicates unacceptable indoor air quality (ASHRAE 62-1999: Ventilation for Acceptable

13

Indoor Air Quality).  The Occupational Safety and Health Administration's (OSHA) Permissible Exposure Limit (PEL) for $CO_2$ is 5,000 ppm (OSHA Standard 1910.1000, Table Z-1).

### 4.3.2 Biological Air Sampling Results

In summary, none of the data collected by CTEH suggests that the air inside Besteiro Middle School contains fungi at concentrations that exceed the outdoor air or any similar non-complaint school in the BISD.  The sample results are summarized in Table 4 of Attachment 1.

CTEH collected Zefon Air-O-Cell™ spore trap samples in the complaint area (Room 112), non-complaint area (Room 222), and outdoors.  The total spore concentrations of the complaint area (213 - 920 spores/$m^3$) and non-complaint area (106 - 266 spores/$m^3$) were less than the total spore concentrations outdoors (4,776 - 13,427 spores/$m^3$).  With the exception of the *Penicillium/Aspergillus* concentration in one air sample collected from the complaint area, the individual spore concentrations in the indoor air samples were less than the same spore types in the outdoor air samples.  In addition, CTEH compared the samples to the non-complaint school with a similar type of HVAC system and similar age - Perkins Middle School (PMS).  The data shows that the total spore concentrations in BMS were less than the total spore concentration in PMS (574 - 1,416 spores/$m^3$)

In addition to non-culturable air samples, CTEH collected culturable air samples in the complaint area, non-complaint area, and outdoors.  The total CFU concentrations of the complaint (14 - 154 cfu/$m^3$) and non-complaint areas (92 - 254 cfu/$m^3$) were less than the total CFU concentrations outdoors (1,264 - 1,456 cfu/$m^3$).  Additionally, none of the individual spore type concentrations indoors were significantly greater than the same spore types outdoors.  In addition, the total CFUs in BMS were also less than the total CFUs in PMS (239 - 528 spores/$m^3$).

### 4.3.3 Visible Mold and Source Sample Results

CTEH observed approximately 1,381 $ft^2$ of visible fungi in 16 areas within BMS.  The source sampling results are summarized in Table 5 of Attachment 1.  The areas with the greatest concentrations of visible fungi are graphically depicted in Figures 3 and 4.

CTEH collected 24 tape lift, 21 swab, and 15 bulk samples from areas within BMS that were visibly stained with fungi or fungi-like substances.  Visible fungi were confirmed to be present in building materials and on contents in 18 areas within the school.  Fungi were not found to be present in every room.  Refer to Table 5 for a listing of the identified fungal genera.

### 4.3.4 Wall Cavity Air Sample Results

With the exception of the Room 113 closet wall and the Room 216/217 wall, the total and individual spore concentrations in the wall cavities of each of the rooms

14

were less than the total and individual spore concentrations outdoors. The individual concentration of *Penicillium/Aspergillus* type spores in the Room 113 closet wall (533 spores/m$^3$) and in the Room 216/217 wall (667 spores/m$^3$) were greater than the same spore type detected outdoors (267 – 400 spores/m$^3$). Although the individual spore concentration of *Penicillium/Aspergillus* was slightly higher in these wall cavities than outdoors, such concentrations are not indicative of a wall containing hidden visible mold. It has been CTEH's experience that air cavity spore concentrations are typically tens to hundreds of times greater than outdoors when visible mold is located within a wall cavity.

CTEH collected WallChek™ air samples from the following locations:

- Room 113, closet wall
  - o Total spore concentration: 533 spores/m$^3$
- Room 102, wall common with 103
  - o Total spore concentration: 133 spores/m$^3$
- Room 119, wall common with 121
  - o Total spore concentration: <34 spores/m$^3$
- Room 123, wall common with teacher's workroom
  - o Total spore concentration: <34 spores/m$^3$
- Room 125, wall common with 127
  - o Total spore concentration: 266 spores/m$^3$
- Room 216, wall common with 217
  - o Total spore concentration: 667 spores/m$^3$
- Room 222, wall common with 221
  - o Total spore concentration: <34 spores/m$^3$
- Before-work outdoor sample
  - o Total spore concentration: 2,367 spores/m$^3$
- After-work outdoor sample
  - o Total spore concentration: 3,797 spores/m$^3$

The wall cavity air sampling data is summarized in Table 6 of Attachment 1.

### 4.3.5 HVAC Sample Results

CTEH collected HVAC-related samples from 6 rooms within BMS. Five of the 6 rooms contained some type of staining on walls, ceilings, or room contents. Significant staining or mold growth on contents was observed in 3 rooms. Small ceiling stains were observed in two other rooms (216 and 222). The same species of fungi were found in both the return and supply sides of the HVAC system in 4 of the 6 rooms. The most common fungal species found paired in both the return and supply side was *Cladosporium sphaerospermum* (3 of 6 rooms). *Cladosporium cladosporioides* was also found in 1 room and non-sporulating fungi were found in another. Fungi found on contents in a room matched the fungi in the HVAC system in 2 of the 5 rooms where a stain

15

observed.    The fungi that matched both the source, return, and supply components include *Cladosporium cladosporioides* and *Cladosporium sphaerospermum*.

CTEH also collected HVAC-related samples from 3 rooms in a school of similar age and HVAC system—PMS (as reported by Mr. Vasquez with BISD).    The same species of fungi were found in both the return and supply sides of the HVAC system in all 3 rooms.  The most common  fungal species found paired in both the return and supply side were *Cladosporium sphaerospermum* (3 of 3 rooms) and *Alternaria* (1 of 3 rooms).

*Cladosporium cladosporioides* and *Cladosporium sphaerospermum* were the two most common fungal species detected in the 8 outdoor air samples that were collected during the initial and follow-up investigations.  *Cladosporium cladosporioides* was detected in 7 of the 8 outdoor viable air samples. *Cladosporium sphaerospermum* was detected in 6 of the 8 viable outdoor air samples.

### 4.4    Cause of Mold Growth

See the Rimkus Consulting Group Report.

### 4.5    Conclusions

Based on a review of all of the data available to CTEH in connection with this investigation, CTEH concludes the following:

5. Approximately 1,381 ft$^2$ of visible mold is located in the school, primarily on the ceiling and room contents.

6. The airborne concentrations of fungi inside the school are similar to the outdoors and less than the fungal concentrations measured in a non-complaint school reportedly of similar age and HVAC-type.

7. The fungal growth inside the school has not contaminated the HVAC system.  Fungi were found to be present in both the return and supply sides of the HVAC system regardless of the presence of fungal contamination within a specific room.   The types and levels of fungi observed inside the complaint school HVAC system were no different than the types and levels observed in the non-complaint school.   The most common fungi found in the HVAC systems were the most common fungi detected in the outdoor air samples.  Thus, the fungi detected in the BMS HVAC systems appears to be normal given the type of HVAC system and maintenance practices implemented by BISD.

16

RSL 000190

8. The sampling results do not suggest the presence of hidden fungal contamination located behind classroom walls.

## 5.0   Quality Assurance/Quality Control

CTEH's Certified Industrial Hygienist (CIH) S. Brett Tarkington randomly selected rooms from both Aiken Elementary School and Besteiro Middle School to inspect for visible mold growth.   The CIH's inspection forms were compared to the other inspector's forms for accuracy.   No discrepancies were found between the CIH's inspection forms and the other industrial hygienist's inspection forms.

Additionally, CTEH subjected all data to a detailed review process which required the report, tables, and figures to be thoroughly reviewed by a licensed professional engineer and a peer review group of industrial hygienists.

In addition to CTEH's own QA/QC program, CTEH used an American Industrial Hygiene Association (AIHA) Environmental Microbiology Proficiency Analytical Testing (EMPAT) certified laboratory for biological sample analysis.   Environmental Microbiology Laboratory (EMLab) participates in the EMPAT program which is intended to insure that labs have common standards for the identification of organisms.   In addition to participation in the EMPAT program, EMLab selects samples randomly each day for duplicate analysis after they have been analyzed. Therefore, analysts never know when they are analyzing a duplicate sample.   In addition to the blind duplicate analysis, EMLab runs blank samples weekly through the laboratory process to measure and control cross-contamination.   The spore load, relative pressure and temperature of the laboratory are also continuously monitored to insure that possible sources of contamination are rapidly identified and removed.

## 6.0   Remediation Recommendations

CTEH prepared a detailed cost estimate to complete the mold remediation.   The total estimated cost to complete the remediation is $160,719.34.   The cost estimate was based on asbestos remediation data provided by RSMeans in its 2001 "Environmental Remediation Cost Data."

The detailed remediation procedures recommended for this facility are provided in Volume 1, Attachment 3.   At a minimum, the remediation should be completed in accordance with the New York City and U.S. Environmental Protection Agency (EPA) Remediation Guidelines.

CTEH used professional judgment to determine some of the factors needed to produce the cost estimate.   The following are the assumptions used to produce the cost estimate.

RSL 000191

1) Many items are constructed of a material that can not be remediated such as particle board. In instances were fungal growth is present on surfaces that can not be cleaned a cost was provided to discard the item, but not for replacement.

2) All costs are corrected for Brownsville, Texas. According to RSMeans "Environmental Remediation Cost Data" the cost correction factor for Brownsville, Texas is 0.77.

3) According to the school plans the average classroom size is 34ft x 29ft for a total square footage of 986 $ft^2$. This area was used to calculate the classroom surface area necessary in estimating the cost for cleaning, containment, etc.

4) The chilled water pipes for the HVAC system are routed through the hallways. The pipes are wrapped with insulation. Small patches of visible mold growth were observed on the insulation down the full length of the pipe. CTEH estimated based on the school plans that all hallways were 123 feet long except for the A108 to B103 hallway which is 135 feet long. It was also estimated that there is 2.5 feet of insulation around the pipes. Square footage estimates for the pipe insulation remediation are based on the length of the hallway times 2.5 feet, the distance around the pipe.

5) CTEH followed the U.S. EPA Mold Remediation in Schools and Commercial Buildings when producing the remediation cost estimate. Therefore, areas that exhibit less than 10 square feet of visible mold growth are not contained during remediation and minimal personal protective equipment (PPE) is utilized. Areas that contain 10 to 100 square feet of visible mold growth have limited containment and limited or full PPE. The cost estimate assumed limited PPE in all of these circumstances. Areas that contain greater than 100 square feet of visible mold growth utilize full containment and full PPE.

6) CTEH determined that two people should be able to complete a small job in one day, 4 people per day should be able to complete a medium size job in 2 days, and eight people per day should be able to complete a large size job in 5 days.

7) This remediation cost estimate does not address any fungi that may be associated with the HVAC system. The sampling data shows that non-affected schools have similar or greater levels of fungi in their HVAC systems as AES and BMS. Therefore, it cannot be shown that fungi resulting from a water leak from any building system caused the subsequent growth of fungi in the HVAC systems at levels that are a-typical for any school in the Brownsville area. Hence, the need to address HVAC related fungi is not driven by a specific fact that is inherent to AES and BMS. Rather, CTEH recommends that BISD consider the development of a district-wide HVAC remediation program to address fungi that is normal and expected with any system.

8) CTEH determined that a visual only clearance of the remediated areas will require five hours per school including the generation of a report of the findings.

RSL 000192

## 7.0  References

ASHRAE. Thermal environmental conditions for human occupancy.  Atlanta, GA: American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc.; 1992; ANSI/ASHRAE 55-1992.

ASHRAE. Ventilation for acceptable indoor air quality.  Atlanta, GA: American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc.; 1999; ANSI/ASHRAE 62-1999.

EPA.  A Brief Guide to Mold, Moisture and Your Home.  Washington, DC: Environmental Protection Agency; 2002; http://www.epa.gov/iaq/molds/moldguide.html.

EPA.  Mold Remediation in Schools and Commercial Buildings.  Washington, DC:  Environmental Protection Agency; 2001; http://www.epa.gov/iaq/molds.

Macher, J. Bioaerosols: assessment and control. Cincinnati, OH: American Conference of Governmental Industrial Hygienists; 1999.

NYC DOH. Guidelines on assessment and remediation of fungi in indoor environments.  New York, New York: Bureau of Environmental and Occupational Disease Epidemiology, New York City Department of Health; 2000; http://www.ci.nyc.ny.us/html/doh/html/epi/moldrpt1.html.

RSMeans Company, Inc.:  Environmental Remediation Cost Data, 7th Annual Edition. Talisman Partners Ltd., Englewood, CO, 2001.

RSL  000193

David A. Weeks, P.E., DEE, QEP
Senior Environmental Engineer

**Date:** 1-10-03





20

RSL 000194

**CERTIFIED COPY**

No. 2002-01-000071-B

| | | |
|---|---|---|
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | OF CAMERON COUNTY, TEXAS |
| | § | |
| STOTLER CONSTRUCTION | § | |
| COMPANY; COASTAL | § | |
| ENGINEERING, INC.; CARROLL | § | |
| DUSANG AND RAND, INC.; D. | § | |
| WILSON CONSTRUCTION | § | |
| COMPANY, INC.; RBM | § | |
| ENGINEERING, INC.; ALAMO | § | |
| CONTROLS, INC.; and CRC | § | |
| ENGINEERING, INC. | § | |
| Defendants | § | |

FILED _____ O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK

JAN 0 7 2002

DIST_____

By _____ JUDICIAL DISTRICT

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

1.      This matter should proceed under Discovery Control Plan 3 pursuant to TEX.R.CIV.P. 190.4 and Plaintiffs asks this Court to enter a Level 3 Discovery Control Plan.

2.      The Defendant Stotler Construction Company is a Texas corporation with its principal place of business in Pharr, Texas and can be served with process by mailing citation to its registered agent Mr. Loyal C. Stotler at 521 Nebraska, San Juan, Texas 78589 by certified mail, return receipt requested.

3.      The Defendant Coastal Engineering, Inc. is a Texas corporation with its principal place of business in San Benito, Texas and can be served with process by mailing citation to its registered agent Mr. J. Nel Murphy at 191 N. Travis, San Benito, Texas 78586 by certified mail, return receipt requested.

4.      The Defendant Victoria Air Conditioning, Ltd. is a Texas Limited Partnership with its principal place of business in Victoria, Texas and may be served with process by mailing citation to its registered agent Benjamin Heilker, Jr. at 513 Profit Drive, Victoria, Texas 77901 by certified mail, return receipt requested.

 **CERTIFIED COPY** ●

5.      The Defendant Carroll Dusang and Rand, Inc. is a Texas corporation with its principal place of business in El Paso, Texas and can be served with process by mailing citation to its registered agent Mr. George C. Dusang, Jr. at 122 Castellano, El Paso, Texas 79912 by certified mail, return receipt requested.

6.      The Defendant D. Wilson Construction Company, Inc. is a Texas corporation with its principal place of business in McAllen, Texas and can be served with process by mailing citation to its registered agent Mr. William D. Wilson at 1209 E. Pecan, Box 3455, McAllen, Texas 78502 by certified mail, return receipt requested.

7.      The Defendant RBM Engineering, Inc. is a Texas corporation with its principal place of business in El Paso, Texas and can be served with process by mailing citation to its registered agent Mr. Bryan R. Morris at 3950 Doniphan, Suite O, El Paso, Texas 79922 by certified mail, return receipt requested.

8.      The Defendant Alamo Controls, Inc. is a Texas corporation with its principal place of business in Universal City, Texas and can be served with process by mailing citation to its registered agent Mr. Harry J. Burns at 750 Rittiman Rd., San Antonio, Texas 78209 by certified mail, return receipt requested.

9.      The Defendant CRC Engineering, Inc. is a Texas corporation with its principal place of business in Edinburg, Texas and can be served with process by mailing citation to its registered agent Mr. Charles R. Clark at 2001 Industrial, McAllen, Texas 78504 by certified mail return receipt requested.

10.      Venue is mandatory in Cameron County, Texas pursuant to CPRC §15.011 because this action is for recovery of damages to real property. Venue is also proper in Cameron County under the general venue rule CPRC §15.002 because all or a substantial part of the events or omissions giving rise to the claims against the Defendants occurred in Cameron County. Also, defendants have contracted with Plaintiff in writing to perform obligations in Cameron County and this suit is instituted on or by reason of said obligation making venue in Cameron County proper pursuant to CPRC §15.035.

2

 **CERTIFIED COPY**

11.    Defendants agreed to provide certain services to the Brownsville Independent School District involving the design and construction of the Bruce Aiken Elementary School and/or the Besteiro Middle School both of which are located in Cameron County, Texas.. Defendants failed to use ordinary care in the construction and/or design of the schools as required by law and by their agreement with the school district and as a direct result of Defendants' conduct, the schools have suffered physical damage and the Brownsville Independent School District has suffered substantial financial loss and such damages are within the jurisdictional limits of this Court. Plaintiff brings this action for the recovery of damages to real property. Said real property is located in Cameron County, Texas.

Plaintiff prays that the Defendants be cited to appear herein and that upon trial, Plaintiff have judgement against Defendants, jointly and severally, for all damages, for costs of court, for pre-judgement interest, and for all the other relief to which they may show themselves justly entitled.

PLAINTIFFS DEMAND A JURY TRIAL.

Respectfully submitted,

CONSTANT & VELA
1570 Frost Bank Plaza
Corpus Christi, Texas 78470
Telephone: (361) 698-8000
Telecopier: (361) 887-8010

ANTHONY F. CONSTANT
ATTORNEY IN CHARGE
State Bar No. 04711000
FILEMON B. VELA, JR.
State Bar No. 20536025
1570 Frost Bank Plaza
Corpus Christi, Texas 78470
Telephone: (361) 698-8000
Telecopier: (3610 887-8010

*362501*
*362502*



A TRUE COPY I CERTIFY
AURORA DE LA GARZA, CLERK
DISTRICT COURT CAMERON COUNTY, TEXAS
MAY 05 2004
BY_____ DEPUTY

3

CERTIFIED COPY

CAUSE NO: 2001-11-4959-C

| | | |
|---|---|---|
| ANGEL CASTILLO & MARIA ROSALVA CASTILLO, *Individually and as Next Friends of* CHRISTIAN CASTILLO & ISAAC CASTILLO, Minor Children, TOMASA B. CARAVEO, *Individually and as Next Friend of* CHRISTIAN CARAVEO, Minor Child, MARIA G. SOSA, *Individually and as Next Friend of* MIGUEL A. SOSA, ROBERTO A. SOSA & CHRISTOPHER SOSA, Minor Children, CARLOS O. VALDEZ, PEDRO A. VALDERAS, ALMA L. ISLAS, MIRIAM TORRES, *Individually and as Next Friend of* JESUS J. TORRES, Minor Child, JESUS GARZA, Jr., LUIS D. RAMIREZ *Individually and as Next Friend of* LUIS D. RAMIREZ, Jr., Minor Child, JOSIE GARCIA, ANA L. GONZALEZ, *Individually and as Next Friend of* XENIA A. CRUZ, Minor Child, VANESSA CISNEROS, FERNANDO PINEDA, Jr., EFRAIN DE LEON, *Individually and as Next Friend of* EFRAIN DE LEON, Jr. & ERICK DE LEON, Minor Children, MARIA DEL CARMEN CHAVEZ, *Individually and as Next Friend of* PAOLA M. CHAVEZ & JESSICA CHAVEZ, Minor Children, ORLANDO TREVINO & IMELDA TREVINO, *As Next Friends of* ANA M. TREVINO, Minor Child, RACHEL RAMIREZ, *As Next Friend of* JOSE A. JARAMILLO, Minor Child, MARTHA MARTINEZ, *As Next Friend of* LYDIA C. MARTINEZ, Minor Child, MARCOS BARRIENTOS, *As Next Friend of* YESENIA BARRIENTOS, Minor Child, DAVID SOLIS, *As Next Friend of* ANGELA M. SOLIS, Minor Child, MARIA DE LA LUZ RUBIO, *As Next Friend of* AGUSTIN JUAREZ & IRVING R. GALVAN, Minor Children, ARMANDO TENORIO, *As Next Friend of* ARMANDO TENORIO & KASSANDRA TENORIO, Minor Children, ALMA GARZA, *As* | § | IN THE DISTRICT COURT OF |

CERTIFIED COPY

*Next Friend of* BRANDON ARI GARZA,
JESUS GARZA & BRAULIO E. GARZA,
Minor Children, SAN JUANA
SALINAS, *As Next Friend of* BADOMERO
SALINAS, Minor Child, ALMA
CISNEROS *Individually and as Next Friend of*
DANIEL CISNEROS & JACKELIN
CISNEROS, Minor Children,
MARIA I. MUNIZ, *As Next Friend of*
JOSE A. MUNIZ & CLAUDIA N. MUNIZ,
Minor Children, MARIA A. GAYTAN,
*Individually and as Next Friend of* SERGIO SANCHEZ,
Minor Child, BLANCA E. LEAL, *As Next Friend of*
ILSE D. LEAL & RICKY M. LEAL, Minor
Children, FIDELA MONTIEL, *As Next
Friend of* KEILLY MONTIEL & ANA K.
MONTIEL, Minor Children, JUANA M.
LOPEZ, *Individually and as Next Friend of*
DAVID LOPEZ & ADRIAN LOPEZ, Jr., Minor
Children, CARMELA TORRES, *As Next Friend of*
ESTHEBAN TORRES, Jr., ALICIA MONTOYA,
*As Next Friend of* VALERIE MONTOYA, Minor
Child, ALICIA ROCHA, *As Next Friend of* MARY
C. ROCHA & CLAUDIA L. ROCHA, Minor Children,
EULALIA ALVARADO, *As Next Friend of* CESAR A.
ALVARADO & ALEXIS J. ALVARADO, Minor
Children, EMMA HERNANDEZ, *As Next Friend
of* MARIO HERNANDEZ, Minor Child, LIDIA
M. GONZALEZ, *As Next Friend of* CARLA D.
GONZALEZ & GUADALUPE GONZALEZ,
Minor Children, ELIA GRACIA, *Individually
and as Next Friend of* EDUARDO GRACIA &
GERARDO GRACIA, Minor Children, SILVIA
ESPINOZA, *As Next Friend of* RAFAEL ESPINOZA,
VICTOR H. ESPINOZA & MIGUEL A. ESPINOZA,
Minor Children, MARTHA MALDONADO,
*As Next Friend of* MARGARITA MALDONADO,
Minor Child, SAVINA GARCIA, *As Next Friend of*
GUADALUPE GARCIA, Minor Child, NEREYDA
HURTADO, *As Next Friend of* SAMUEL SALAS III,
& RUBY SALAS, Minor Children, LETICIA
CORDOVA, *As Next Friend of* ROMAN CORDOVA III
& GLORIA A. CORDOVA, Minor Children, DORA E.
CORONA, *As Next Friend of* CECILIA G. CORONA,
JESSICA CORONA & ROSARIO A. CORONA,
Minor Children, MARIA I. HERNANDEZ, *As*

CERTIFIED COPY

*Next Friend of* RICARDO HERNANDEZ &
JOSE C. HERNANDEZ, Minor Children,
MAYRA C. HERRERA, *As Next Friend of*
LESLIE HERRERA, EDUARDO HERRERA
& CLARISSA HERRERA, Minor Children,
ANTONIA ARAMBUL, *As Next Friend of* CYNDI
ARAMBUL, HERIBERTO ARAMBUL &
NICOLE ARAMBUL, Minor Children,
NORA H. MARTINEZ, *As Next Friend of*
BRYAN LEE MARTINEZ, Minor Child,
ISELA GONZALEZ, *As Next Friend of*
MARITZA GONZALEZ & KARLA A. GONZALEZ,
Minor Children, MARIA SAN JUANA GARZA,
*As Next Friend of* JOSE LUIS GARZA, Minor Child
& FLOR E. CASTRO, *As Next Friend of*
DENISE DEL CARMEN ROJAS & SUSAN E. JACOBO,
Minor Children,
    *Plaintiffs*

FILED ___9:44___ O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK

**NOV 2 6 2001**

DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY

vs.         §    CAMERON COUNTY, TEXAS

CARROLL DUSANG & RAND, Inc.,
D WILSON CONSTRUCTION COMPANY,
STOTLER CONSTRUCTION COMPANY,
VICTORIA AIR CONDITIONING LTD,
CRC ENGINEERING, Inc. & COASTAL
ENGINEERING, Inc.
    *Defendants*     §   197th JUDICIAL DISTRICT

---

PLAINTIFFS' ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

   COMES NOW ANGEL CASTILLO et al., Plaintiffs in the above-styled, and for

cause of action against CARROLL DUSANG & RAND, Inc., D WILSON

CONSTRUCTION COMPANY, STOTLER CONSTRUCTION COMPANY, VICTORIA

CERTIFIED COPY

AIR CONDITIONING LTD, CRC ENGINEERING, Inc. & COASTAL ENGINEERING, Inc., Defendants herein, would show the Court and jury as follows:

I. *Discovery Control Plan*

1.0        Pursuant to Rule 190.1 of the Texas Rules of Civil Procedure, Plaintiffs intend that discovery be conducted in this case pursuant to Rule 190.4 (Level 3) of the Texas Rules of Civil Procedure.

II. *Parties*

2.0        All Plaintiffs reside in and around Brownsville, Cameron County, Texas, and either attend AIKEN ELEMENTARY or BESTEIRO MIDDLE SCHOOLS, are parents of children who attend said schools, teach or are on staff at said schools.

2.1        CARROLL DUSANG & RAND, Inc. is believed to be a corporation upon whom citation and process may be served through its registered agent, Mr. George C. Dusang, Jr., 122 Castellano, El Paso, Texas 79912.

2.2        D WILSON CONSTRUCTION COMPANY is believed to be a corporation upon whom citation and process may be served through its registered agent, Mr. William D. Wilson, 1209 E. Pecan, P.O. Box 3455, McAllen, Texas 78502.

2.3        STOTLER CONSTRUCTION COMPANY is believed to be a corporation upon whom citation and process may be served through its registered agent, Mr. Loyal C. Stotler, 521 Nebraska, San Juan, Texas.

2.4        VICTORIA AIR CONDITIONING LTD. is a company upon whom citation and process may be served through any owner or principal at the company's principal's place of business at Buena Vista Rd, Los Fresnos, Texas.

CERTIFIED COPY

2.5.        CRC ENGINEERING, Inc. is believed to be a corporation upon whom citation and process may be served through its registered agent, Mr. Charles R. Clark, 901 South First Suite 210, Abilene, Texas.

2.6.        COASTAL ENGINEERING, Inc. is believed to be a corporation upon whom citation and process may be served through its registered agent, Mr. J. Nel Murphy, 191 North Travis, San Benito, Texas 78586.

2.7         At all times pertinent hereto, Defendants (and perhaps other defendants and/or later named defendants) were engaged in a partnership, joint venture, joint enterprise, or other common endeavor at the time of the occurrence made the basis of this suit. As a result, they are jointly and severally liable to Plaintiffs for all damages.

III.

3.0         Defendant CARROLL DUSANG & RAND, Inc. was the architectural firm who designed both BRUCE AIKEN Elementary, which opened in 1996, and BESTEIRO Middle School, which opened in 1994-1995. Defendant STOTLER CONSTRUCTION COMPANY was the contractor for AIKEN Elementary and Defendant D WILSON CONSTRUCTION COMPANY was the contractor for BESTEIRO Middle School. Defendant VICTORIA AIR CONDITIONING LTD was the air conditioning contractor for AIKEN Elementary and, on information and belief, for BESTEIRO Middle School.

3.1         AIKEN Elementary has had a longstanding mold problem dating back to 1997, its second year of use. In October 1998, officials with the Texas Department of Health (TDH) inspected AIKEN and conducted indoor air quality surveys. The TDH found "visible mold growth on ceiling tiles on the second floor" and "on some of the desktops, books and in a couple of . . . kindergarten classes on little wooden surfaces of

CERTIFIED COPY

toys that children could touch, and especially areas where children would grab hold." Two types of molds the TDH isolated at AIKEN included Penicillium and Aspergillus, each of which are known to be associated with allergies and the prevalence of allergic symptoms.

3.2        Mold forms as a result of excessive humidity. Humidity levels at AIKEN ranged from 52 – 79%, compared to the recommended standard that humidity not exceed 60%. Officials with the Texas Department of Health attributed the excessive humidity "to the over sizing of the air handling units," noting they were "too big for the school." The oversized units were specified, designed, selected, procured and/or installed by Defendants herein.

3.3        In June 1999, Defendant CRC ENGINEERING explained to the Brownsville Independent School District (BISD) Board of Trustees the cause of the mold problem and what was being done to correct it. In response, the board of trustees authorized payment of up to $144,000 to Defendant COASTAL ENGINEERING, Inc. for mechanical upgrades at AIKEN Elementary intended to eliminate the excessive moisture and humidity problems responsible for the mold.

3.4        In August 1999, officials with the BISD assured approximately 200 parents who had attended a meeting at AIKEN that the longstanding mold and mildew problem had been solved.

3.5        2 years later, in August 2001, mold was discovered in the kitchen, library and computer labs at BESTEIRO Middle School, which forced the closing of those areas before the start of the school year. Since that time the kitchen has reopened but the computer lab and library remain sealed.

# CERTIFIED COPY

3.6          In November 2001, a repeat indoor air quality study found Aspergillus and Penicillium, the very molds first found by the Texas Department of Health over 3 years earlier in 1998. On November 20, the BISD Board of Trustees hired an "environmental remediation firm" and allocated nearly $900,000 for cleanup and removal of the mold.

## IV.

4.0          As a direct and proximate result of Defendants' negligent design, architecture, engineering, selection of materials and construction, AIKEN Elementary and BESTEIRO Middle School are afflicted with 'sick building syndrome,' which in turn has exposed Plaintiffs to inordinately high levels of toxic molds for lengthy and sustained periods of time.

## V. *Damages*

5.0          As a result of prolonged exposure to excessive ambient levels of toxic mold, Plaintiffs have been stricken by a multitude of illnesses, ailments and conditions, including persistent headache, asthma, bronchitis, loss of appetite, dizziness, fever, muscle aches, stomach ache, eye irritation, eye infection, vomiting, rashes, chronic itchiness, sinusitis, persistent cough, nose bleeds, scratchy throat, throat infection, irritability, fatigue, weakness, lethargy, chronic runny nose, chronic sneezing, chest pains, ear infections and diarrhea.     Plaintiffs' damages exceed the minimum jurisdictional limits of this court.

## CERTIFIED COPY

### VI.

6.0        Additionally, Plaintiffs are entitled to prejudgment interest on each element of damage they have suffered as a result of Defendants' negligence herein.

### VII.

7.0        Plaintiffs, individually and by and through their attorneys of record, respectfully reserve the right to amend their petition and to allege with greater specificity any further acts and/or omissions on the part of these and any and all later-identified responsible defendants and to further allege specific damages to Plaintiffs in light of conditions and damages known at the time of the trial of this cause.

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final trial hereof, Plaintiffs have judgment against Defendants jointly and severally for all damages found by the trier of fact, and for such other and further relief to which Plaintiffs may show themselves justly entitled.

Respectfully Submitted,

**THE ZAVALETTA LAW FIRM**
603 E. St. Charles Street
Brownsville, Texas 78520
Telephone  (956) 546-5567
Facsimile  (956) 541-2205
ATTORNEY FOR PLAINTIFFS

By: _____            3A001

PETER M. ZAVALETTA
State Bar No. 22251600

A TRUE COPY I CERTIFY
AURORA DE LA GARZA, CLERK
DISTRICT COURT CAMERON COUNTY, TEXAS
MAY 0 5 2003
BY_____ DEPUTY

05/28/2003 10:14 FAX
11          12:40 FAX 512 8   8010                                    ⌀002
                                                                       ⌀002

# CONSTANT & VELA
## ATTORNEYS AT LAW

ANTHONY F. CONSTANT

BOARD CERTIFIED
TEXAS BOARD OF LEGAL SPECIALIZATION

CIVIL TRIAL LAW
PERSONAL INJURY TRIAL LAW

ALEMON R. VELA, JR.

1570 FROST BANK PLAZA
CORPUS CHRISTI, TEXAS 78470
TELEPHONE (361) 698-8000
FACSIMILE (361) 867-8010
E-MAIL ADDRESSES
afc@constantvela.com
rcv@constantvela.com

November 29, 2001

Royalty Specialty Underwriting, Inc.
945 East Paces Ferry Road; Suite 1890
Atlanta, Georgia 30326
CERTIFIED MAIL RECEIPT NO. 7099 3220 0004 2555 8038

RE:  Your insured:  Brownsville Independent School District
     Policy #:    KHT318271
     NOTICE OF LOSS

Dear Royalty Specialty Underwriting, Inc.:

Please take notice that your insured has suffered a loss covered by your policy of insurance. This notice is sent to you in compliance with the requirements of your policy.

The insured has incurred damages at Besteiro Middle School and Aiken Elementary School (both of which are covered by the above referenced policy issued by you) as the result of occurrences covered under the policy.

I represent the District regarding these claims. Please direct all communications to me.

Please tell me what to do in order to comply with your insurance policy. I intend this letter to be the notice required by the policy. If there is anything else I need to do, please tell me.

Very truly yours,

Anthony F. Constant

cc:  Mr. Jeffrey Roerig
     Roerig, Oliveira & Fisher
     855 W. Price Road
     Brownsville, TX 78520

Contact
Pruett Moore

Received   May-28-2003  10:10     From-                    To-BEIRNE MAYNARD       Page 002



**GAB Robins**
GAB Robins North America, Inc.

632 Ed Carey Drive, Suite 70
Harlingen, TX 78550-7965
T: 956•423•0770
T: 956•383•7541
F: 956•423•2407

December 5, 2001

CONSTANT & VELA
Attorneys at Law
1570 Frost Bank Plaza
Corpus Christi, TX  78470

RE:   Clm. No.        : 1250037684
      GAB File No. : 34718-44038
      Insured         : Brownsville Independent School District
      D/Loss         : Unknown
      Your Client    : Various

Dear Mr. Constant,

Our Company, GAB Robins North America, Inc. has been retained by Royal & Sunalliance, also known as Royal Specialty Underwriting, Inc. and the Brownsville Public Schools to investigate an incident occurring at Besteiro Middle School and Aiken Elementary School in Brownsville, Texas and involving your client(s).

Please be advised that we will re-contact your office at the conclusion of our investigation. If you wish to forward any medical documentation or evidence to support your allegations during this time, please feel free to do so.

If you have any questions or wish to discuss our involvement in this matter, please do not hesitate to contact our office. <u>The adjuster assigned to this loss is Mr. Dennis Nickoloff, General Adjuster.</u>

Sincerely,

Arnold Aguirre
GAB Robins N.A., Inc.
Adjustor

Representing: Royal & Sunalliance, also known as Royal Specialty Underwriting, Inc.

 **GAB**

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report:  Tenth Report*

August 22, 2002

Royal & Sunalliance
945 East Paces Ferry Rd.
Atlanta, GA  30326

Attn:  Mark Schwartz

| | |
|---|---|
| **Policy No.** | KHT318271 |
| **Policy Period** | 04-01-01 to 02 |
| **Claim No.** | 1250037684 |
| **GAB File No.** | 34718-44033 |
| **Insured** | Brownsville ISD |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | Unknown |

---

As we advised in our e-mail of 04-30-02, polices are here in our office.

## ENCLOSURES

1. Letter to Insured's Attorney

## SUGGESTED RESERVES

RCV

Building                    **REDACTED**

** Reserves will be refined after receipt of bids and engineering reports requested from the Insured's Attorney.

## ABSTRACT OF COVERAGE

Blanket Building and Personal Property coverage is in effect to a limit of $371,452,376.00 with a 100% co-insurance clause, Blanket Business Income $100,000, and Extra Expense coverage of $50,000.  A $50,000 deductible is applicable per occurrence.

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 **GAB**

## CAUSE OF LOSS

As of yet, the cause or causes of losses is/are unknown.

We do not know the source(s) of the moisture intrusion. Without an engineering study, it will not be possible to determine the causation of the ongoing problems. The Insured Attorney, Pruett Moore has been made aware that we need their engineering, and mold studies along with their contractor's bids. Without an engineering report, we will not be able to determine if the damages are as a result of a covered peril and/or are excluded.

## SUBROGATION

Based on current information, we believe that subrogation will not be possible, unless some hereto-unknown event has taken place prior to the loss identification.

## SCOPE OF DAMAGE

The library was stripped of its' sheetrock walls and all the contents have been removed. This was done prior to the TRO having been filed. We understand that between 20,000 and 30,000 books were manipulated with the majority having been cleaned. Again, we have asked the Insured's Attorney to provide us with the contractor's bid for remediation.

## ADJUSTMENT

A preliminary inspection was done and we continue to await engineering, mold and cost documentation from the Insured's Attorney.

## SALVAGE

No salvage recovery will be involved.

## FUTURE HANDLING

As of this date, we have not received any documentation from the Insured's Attorney.

We have sent the attached gentle reminder to the Insured's Attorney and await his response.

Next report on or before 09-26-02.

*Dennis Nickoloff*
nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



**GAB Robins**

GAB Robins North America, Inc.

632 Ed Carey Drive, Suite 700
Harlingen, TX 78550-7965
T: 956•423•0770
T: 956•383•7541
F: 956•423•2407

*August 22, 2002*

*Constant & Vela*
*1570 Frost Bank Plaza*
*Corpus Christi, TX  78470*

*Attn:  Pruett Moore III*

RE:  *GAB File No.: 34718-44033*
    *Insured    : Brownsville ISD*
    *Date Of Loss : Unknown*
    *Location:  Besteiro Middle School & Aiken Elementary School*

*Dear Mr. Moore,*

*As you recall from our previous letters and telephone conversations, our Company continues to handle this claim for Royal and SunAlliance.*

*In our 03-20-02 conversation with your office, you informed me that you would be sending us copies of all the engineering, mold and other studies that had been done on the two school buildings. As of this date, we still have not received this material.  Please have these documents forwarded to us at your earliest convenience.*

*Sincerely,*

*Dennis Nickoloff*
*GAB Robins N.A., Inc.*
*Adjuster for Royal and SunAlliance*

*cc: Royal and SunAlliance*



**GAB Robins**
GAB Robins North America, Inc.

632 Ed Carey Drive, Suite 700
Harlingen, TX 78550-7965
T: 956•423•0770
T: 956•383•7541
F: 956•423•2407

*September 26, 2002*

*Constant & Vela*
*1570 Frost Bank Plaza*
*Corpus Christi, TX 78470*

*Attn: Pruett Moore III*

RE:  Clm. No.      : 1250037684
     GAB File No.  : 34718-44038
     Insured       : Brownsville Independent School District
     D/Loss        : Unknown
     Location      : Besteiro Middle School & Aiken Elementary School

*Dear Mr. Moore,*

*As you recall from our previous letters and telephone conversations, our Company continues to handle this claim for Royal & SunAlliance.*

*Pursuant to our previous letters, we still await the copies of the engineering, mold and other studies that were done on the two school buildings.*

Sincerely,

*Dennis Nickoloff*
*GAB Robins N.A., Inc.*
*Adjustor for Royal & SunAlliance*

*cc: Royal & SunAlliance*



GAB Robins North America, Inc.

632 Ed Carey Drive, Suite 700
Harlingen, TX 78550-7965
T: 956•423•0770
T: 956•383•7541
F: 956•423•2407

*October 25, 2002*

*Constant & Vela*
*1570 Frost Bank Plaza*
*Corpus Christi, TX 78470*

RE: GAB File No.: 34718-44033
    Insured      : Brownsville Independent School District
    Date Of Loss : Unknown
    Claim No.: 1250037684
    Location: Besteiro Middle School & Aiken Elementary School

*Dear Mr. Moore,*

*As you recall from our previous letters and telephone conversations, our Company continues to handle this claim for Royal and SunAlliance Insurance Company.*

*Pursuant to our previous letters, we continue to await the copies of the engineering, mold and other studies that were completed on the two buildings.*

Sincerely,

*Dennis Nickoloff*
*GAB Robins N.A., Inc.*
*Adjuster for Royal & SunAlliance*

cc: *Royal & SunAlliance*

   2.   "The development of the general stains is the result of improper
        functioning of the Heating, Ventilation and Air-Conditioning (HVAC)
        systems. The improper functioning of the HVAC systems is a result of
        one or more of the following:"

        a.   "HVAC systems design error(s)."

        b.   "Improper operation of the HVAC systems."

        c.   "Improper maintenance of the HVAC systems."

   3.   "The development of localized stains is the result of one or more of the
        following site specific causes of water intrusion:"

        a.   "Roof leak(s), either at a membrane edge or penetration, roof drain
             hub, on the roof drain pipe (18 locations)."

        b.   "Plumbing leaks, both domestic water supply system and drainage
             system leaks (eight locations)."

        c.   "Dripping and/or leakage of condensate, and/or water from
             components of the HVAC system (27 locations)."

F.   The Center for Toxicology and Environmental Health (CTEH) conducted an
     evaluation of Akin Elementary School from July 8 through July 15, 2002, and on
     November 18 and 19, 2002, with the results detailed in CTEH's Indoor Air
     Quality Report dated January 10, 2002. CTEH makes the following conclusions:

   1.   "Approximately 2,163 $ft^2$ of visible mold is located in the school,
        primarily on the ceiling and chill-water pipe insulation."

   2.   "The airborne concentrations of fungi inside the school are similar to the
        outdoors and less than the fungal concentrations measured in a non-
        complaint school reportedly of similar age and HVAC-type."

   3.   "The fungal growth inside the school has not contaminated the HVAC
        system."

   4.   "The sampling results do not suggest the presence of hidden fungal
        contamination located behind classroom walls."

G.   The Center for Toxicology and Environmental Health (CTEH) conducted an
     evaluation of Besteiro Middle School from July 8 through July 15, 2002, and on
     November 18 and 19, 2002, with the results detailed in CTEH's Indoor Air
     Quality Report dated January 10, 2003. CTEH makes the following conclusions:

RSL 001359

1.  "Approximately 1,381 ft$^2$ of visible mold is located in the school, primarily on the ceiling and room contents."

2.  "The airborne concentrations of fungi inside the school are similar to the outdoors and less than the fungal concentrations measured in a non-complaint school reportedly of similar age and HVAC-type."

3.  "The fungal growth inside the school has not contaminated the HVAC system."

4.  "The sampling results do not suggest the presence of hidden fungal contamination located behind classroom walls."

H.  Engineering and Fire Investigations (EFI) conducted an evaluation of Besteiro Middle School and Aiken Elementary School on November 19 – 22 and December 4 – 5, 2002, with the results being detailed in EFI's Remediation Evaluation Assessment, dated January 20, 2003. EFI makes the following conclusions:

1.  "The results of the biological sampling and field observations conducted at Besteiro Middle School and Aiken Elementary School indicate that fungal contaminants are present in several of the areas tested and that visible mold/water damage is present on select building components, furnishings, supplies and equipment."

2.  "The roof membrane systems serving both schools were observed to be in generally good condition; however, several potential sources of water infiltration were observed, including the following: blocked roof drain strainers, cracked mortar joints between precast concrete copings at parapet walls, cracks and discontinuities at parapet/parapet and parapet/rise wall intersections, deteriorated sealant at wall expansion joints and metal counter flashing assemblies, discontinuities at base flashing materials, and pipe supports and abandoned equipment bearing on aggregate surfacing."

3.  "Besteiro Middle School … A large number of the RTUs have thermostats that are not calibrated and are attempting to control room temperatures in a range of 3 to 5 degrees below or above the setpoint… measured room temperatures were in the range of 68 to 72 degrees F and relative humidity in the range of 55 to 62 percent… the air handling components of the RTUs including cooling coils, drain pans, insulated conditioned air sections contain moderate to heavy deposits of dust, debris, and accumulations of possible mold … Outside air ventilation rates were observed and measured to be less than the design quantities. Condition air

quantities delivered by the RTUs were measured and found to be significantly below and above the design air quantities ... many of the RTUs serving the classrooms and administrative areas are somewhat oversized for the anticipated cooling demands. Consequently, the units that are oversized do not operate a sufficient number of hours to adequately control room temperature ad relative humidity."

4.    "Aiken Elementary ... a large number of the fan coil units which have wall temperature sensors that are not calibrated, or are broken, and are attempting to control room temperatures in a range 3 to 5 degrees below or above the setpoint of the wall mounted temperature sensor... measured temperatures were in a range of 68 to 72 degrees F, and relative humidity in a range of 55 to 62 percent. Fan coil units including cooling coils, drain pans, and insulated conditioned air sections were found to contain moderate to heavy deposits of dust, debris, and accumulations of possible mold ... the quantities of ventilation air were found to be less than the design quantities... conditioned air quantities delivered by the fan coil units were measured and found to be significantly below or above the design air quantities ... the chill water piping revealed that the piping has corroded behind the insulation in a number of areas leading to possible mold growth due to sweating... due to leaks, chilled water flowing in the piping system is heavily corroded and contains air... may of the fan coil units serving the classrooms and administrative areas are oversized for the anticipated cooling demands and consequently do not adequately control room temperature or relative humidity."

5.    "Our observations identified deficient items associated with the site drainage at the identified areas of Besteiro Middle School and Aikens Elementary School."

## II.    CONCLUSIONS

A.    Fungal growth within a building can be generally caused by two types of water moisture events: point source incidents or systemic issues. Point source incidents are incidents that originate in a specific location, and the water damage and fungal growth can be tied to the incident. Examples of point source incidents are plumbing leaks, roof leaks, window leaks, condensate pan overflows, etc. These types of incidents may be small, single occurrence events or large, multiple occurrence events. If the point source incidents are promptly identified, the leak or overflow repaired, then, generally, the building materials can be dried out without the development of fungal growth. Fungal growth from systemic issues cannot be associated with a specific incident. Systemic issues create conditions that allow fungal growth to develop at locations where the nutrient and moisture requirements are met; however, these locations are created due to the overall environmental conditions as opposed to specific events. A building that is not

properly dehumidified is an example of a systemic issue. Fungal growth from systemic issues may not immediately manifest itself, depending on the extent of the issues, even though the conditions that can cause fungal growth exist.

1. It is GHP's opinion that both schools have been impacted from point source incidents and systemic issues, and that both types existed from the time of occupancy. This opinion is based on the review of the documents provided by Brownsville Independent School District (BISD), which also supports the conclusions made in the expert reports reviewed, and detailed above. The combination of point source incidents and systemic issues creates damp, moist atmospheric conditions, which promotes fungal growth.

2. Besteiro Middle School had repeated roof leaks and plumbing leaks, as well as problems with the air-handling system not functioning correctly. Within approximately one year of occupancy, fungi had been identified on diffusers and walls in the Kitchen and on books in the Library, and the district had become aware of humidity problems in the building. The following correspondence documents BISD being aware of these problems.

   a. A letter from Mr. Robert H. Beasley, P.E., RBM Engineering, Inc. to Mr. Jorge Mora, AIA, Carrol, DuSang & Rand, dated December 13, 1994, discusses the presence of "mildew growth on diffusers and walls..." in the Kitchen.

   b. A letter from Mr. Jorge L. Mora, AIA, Carrol, DuSang & Rand, Inc. to Mr. Bill Wilson, Wilson Construction, December 14, 1994, discusses "Lockers G109: Air was very humid; walls and ceiling diffusers have mildew." Also this letter states, "... that all AC units, except Classroom Units, have had the outside air damper screwed shut thus preventing any fresh air into the building. We believe this was done after the deletion of the economizer package per Change Order No. 4."

   c. A letter from Mr. Sabas Lopez, Wilson Construction to Mr. Bill McBride, Sechrist Hall, dated August 22, 1995, discusses the status of the roof leaks.

   d. A document detailing a telephone conversation between Mr. Oscar Tapia, BISD, and Mr. Robert Beasley, RBM Engineering, dated September 19, 1995, states, "Mildew on books – Mold" in the library.

   e. Additional BISD documents indicate that roof leaks and high humidity were an ongoing problem at the school.

2.   Aiken Elementary School had humidity problems within the building immediately upon being occupied, which was tied to the air-handling system not functioning correctly.  Other issues that were reported were roof leaks and site drainage problems that were affecting the interior of the building.  The following correspondence documents BISD being aware of these problems.

    a.   A letter from Mr. George Tamez, BISD, to Mr. Jorge Mora, Carrol, Dusang & Rand, dated August 13, 1996, states, "At 3:00pm today, we received a call that the A/C was not cooling in the entire 2nd floor B wing…The first day of school is August 19th."

    b.   A letter from Mr. Jaime C. Condit, BISD, to Mrs. Jorge Mora, Carrol, Dusang & Rand, dated August 28, 1996, details numerous concerns "over continuous problems…"  The problems detailed were site drainage problems, water stained ceiling tiles, water leaks, air conditioner problems, etc.

    c.   A letter from Mr. George Tamez, BISD, to Mr. Robert Beasley, RBM Engineering, Inc., dated August 28, 1996, states, "We are now in our second week of school in session.  Throughout both weeks our Maintenance Dept. has received repeated complaints that the air conditioning is not cooling and that the humidity levels are too high."  This letter also documents the humidity levels throughout the school, which were consistently above 60%.

    d.   Additional BISD documents indicate that roof leaks, site drainage problems, and high humidity were an ongoing problem at the school.

3.   From approximately January 1999 through May 1999, the air conditioning system at Aiken Elementary was renovated; however, the documents provided by BISD still indicate high humidity levels and mold growth within the school after the renovation activities were completed.  In addition, a letter from the Texas Department of Health, dated August 25, 1999, states, "During the follow-up inspection no visible mold growth was noted within the occupied areas (i.e. Classrooms).  However, it was noted that signs of mold growth was still prevalent on the exterior surfaces of the chilled water lines."  This letter indicates that while fungi clean up had occurred within the classrooms, not all of the known fungal growth was remediated.

4.  In 2001, BISD conducted fungal remediation; however, based on the BISD documents, this remediation occurred only within the Kitchen, Library, and Computer Room, and did not address the fungal growth located in the classrooms, offices, and Common Areas. The issue of fungal growth being identified in areas other than the Kitchen, Library, and Computer Room were detailed in a letter from the Texas Department of Health, dated November 16, 2001. In addition, the underlying cause of the fungal growth was not corrected.

5.  The remediation activities in the Library were not completed when it was decided that these activities should be conducted in conjunction with the remediation of both schools.

6.  Both Besteiro Middle School and Aiken Elementary School has been shut down since January 2002.

B.  Based on GHP's experience, air-handling systems may not adequately reduce indoor relative humidity levels because of one or more of the following conditions.

1.  Cooling coils that are oversized may satisfy the thermostat's setpoint too quickly; and therefore, the system short cycles and adequate dehumidification does not occur.

2.  If the fan speed is set too high, the air flows past the cooling coil without sufficient time for adequate dehumidification.

3.  If the fan speed is set too low, the air can become too cold, which in turn can satisfy the thermostat's setpoint, causing the system to short cycle. Adequate dehumidification is not accomplished.

4.  Outside air intakes that are closed or restricted may cause the building to become negatively pressurized relative to the outside. The reduced interior pressure causes unconditioned outside air infiltration around windows, doors, etc.

5.  Dirty cooling coils restricts the air flow and can cause the supply air to become too cold, which in turn can satisfy the thermostat's setpoint, causing the system to short cycle. Adequate dehumidification is not accomplished.

6.  Thermostats that are not properly calibrated can cause the temperature requirements for the system to be satisfied falsely; therefore, proper dehumidification may not occur.

RSL 001364

7.    All of the conditions described above have been documented to exist at one time or another, based on the BISD documents and other experts' reports.

8.    The conditions described above may be the result of design errors, construction errors, improper operation, or improper maintenance.

C.    GHP makes the following comments regarding fungal remediation at Besteiro Middle School and Aiken Elementary School.

1.    Rimkus' Report of Findings, Sampling for Mold at Aiken Elementary School, July 26, 1999, makes no remediation recommendations. In addition, while fungal growth was identified on building surfaces, Rimkus did not form any conclusion regarding causation, except high humidity, nor did Rimkus provide any quantification.

2.    Assured's Indoor Air Quality Environmental Survey for Besteiro Middle School and Aiken Elementary School, November 9, 2001, makes no remediation recommendations. Assured did indicate areas where water intrusion events had reportedly occurred; however, the type of water intrusion, the date of the event, or the extent of damage was not detailed.

3.    Ambiotec's Mold Investigation report for Besteiro Middle School and Aiken Elementary School, May 2002, did, in general terms, make comments regarding causation; however, the report does not detail the damage associated with any specific cause. In addition, the report does not detail any quantities or provide any specific remediation recommendations.

4.    Rimkus' Report of Findings, Building Water Intrusion Evaluation report, December 20, 2002, does discuss the water damage and fungal growth in terms of causation; however, no quantities were detailed and no dates of occurrences were reported. Finally, no remediation recommendations are given.

5.    CTEH's Indoor Air Quality Report, January 10, 2003, does make remedial recommendations, provides estimated quantities, and cost estimates, however, no opinion regarding causation was detailed. CTEH refers to Rimkus' 2002 report regarding issues of causation.

6.    EFI's Remediation Evaluation Assessment, January 20, 2003, does provide quantities for remediation and cost estimates; however, the report does not detail causation in regards to specific damage.

RSL 001365

7.     GHP attempted to compare the locations, quantities, and causes of water damage or fungal growth between Rimkus' 2002 report, CTEH's 2003 report, and EFI's 2003 report to attempt to form an opinion regarding the estimated costs. In addition, GHP has been informed by our client that extensive remediation activities are being conducted at the schools, including correcting the underlying causes. GHP has also been informed that Beirne, Maynard & Parsons has not been provided with any remediation specifications, bid documents, invoices, etc.; therefore, GHP cannot form an opinion regarding costs. GHP reserves the right to provide opinions regarding cost upon review of the appropriate documents.

D.     It is GHP's opinion that all causes of water intrusions, leaks, and humidity problems should be immediately repaired. In GHP's opinion, the following remediation guidelines should be followed. These guidelines are general in nature, and specific circumstances may need specific solutions.

1.     When fungal growth is observed on ceiling tiles, it is recommended that the ceiling tiles be removed and replaced.

2.     If there is fungal growth on gypsum board wall or ceiling materials and the growth is on the surface only, then the material can be cleaned and reused. If the growth extends into the gypsum board material or if the gypsum board has lost its structural integrity, then the material should be removed and replaced.

3.     Wood construction members with fungal growth can be cleaned and sanded; however, if they have lost their structural integrity, those items should be replaced.

4.     Hard surfaced items, desks, chairs, tables, etc., can be effectively cleaned.

5.     Soft surfaced items, items with fabric upholstery, can be cleaned as long as fungal growth has not developed.

6.     Insulation with fungal growth should be replaced as well as insulation that has become saturated with water.

7.     Carpeting can be cleaned if fungal growth has not developed.

8.     Fiber board air duct systems can be effectively cleaned if fungal growth has not developed.

**Besteiro Middle School/Aiken Elementary School**
**January 21, 2004**
**Page 13 of 16**

If you have any questions regarding this report, please do not hesitate to call me at (210) 824-5600.

Sincerely
**GOBBELL HAYS PARTNERS, INC.** by

Steve M. Hays, CIH
Chairman

Stephen Kenoyer
Environmental Scientist

RSL 001367

Feb 19 03 02:06p   Baltazar Salazar        (713) 807-0930        P.4

JAN-23-2003 THU 02:16 PM GAB ROBINS        FAX NO. 713 270 3800        P. 02

**POLICY NO.** KHT 318271
**$** 371,452,376.°°
**AMOUNT OF POLICY AT TIME OF LOSS**
4/01/82001
**DATE ISSUED**
4/01/2002
**DATE EXPIRES**

**SWORN STATEMENT**
**IN**
**PROOF OF LOSS**

34718-44038
**GAB Robins FILE NO.**
12500037684
**COMPANY CLAIM NO.**
Camron Ins. Agent
**AGENT**
Brownsville, Texas
**AGENCY AT**

To the   adjuster, GAB Robins,
of   Royal Ins. Surplus Lines
At time of loss, by the above indicated policy of insurance, you insured -
the Brownsville Independent School District (BISD)
against loss by   covered causes of losses   to the property described according to the terms and conditions of said policy and of all forms, endorsements, transfers and assignments attached thereto.   at an unknown date and time

**TIME AND**        A   property        loss occurred about the hour of _____ o'clock □ AM □ PM
**ORIGIN**           on the _____ day of _____ yr _____ the cause and origin of the said loss were:
                     mold manifestations

**OCCUPANCY**        The building described, or containing the property described, was occupied at the time of the loss as and for no other purpose whatever:   educational facilities

**TITLE AND**        At the time of the loss, the interest of your insured in the property described therein was   ownership
**INTEREST**         . No other person or persons had any interest therein or encumbrance thereon, except:

**CHANGES**          Since the said policy was issued, there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except
                     educational facilities

**TOTAL INSURANCE**  THE TOTAL AMOUNT OF INSURANCE upon the property described by this policy was, at the time of loss,
                     $ 371,452,376.°° , as more particularly specified in the apportionment attached, besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

**VALUE**            THE ACTUAL CASH VALUE of said property at the time of the loss was     $ 10,000,000.°°
**LOSS**             THE WHOLE LOSS AND DAMAGE was - - - - - - - - - - - - - - - -     $ 10,000,000.°°
**AMOUNT CLAIMED**   THE AMOUNT CLAIMED under the above numbered policy is - - - - - -     $ 10,000,000.°°

**STATEMENTS**       The said loss did not originate by any act, design or procurement on the part of your insured, or
**OF INSURED**       this effort; nothing has been done by or with the privity or consent of your insured or this effort, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.
                     **CAUTION READ BEFORE SIGNING BELOW**

State of   Texas
County of   Harris                    X   Baltazar Salazar, Attorney for B.I.S.D.
                                                        **Insured**
Subscribed and sworn to before me this   23rd   day of   January   (year) 2003

                                                        **Notary Public**

VERONICA REYNA
MY COMMISSION EXPIRES
June 23, 2005

Form PR0765 (Rev.9/98)

CERTIFIED COPY

CAUSE NO. 2003-08-4078-E

| | | |
|---|---|---|
| AMERICAN STANDARD AND | § | IN THE DISTRICT COURT |
| TRANE COMPANY | § | |
| | § | |
| **PLAINTIFF** | § | |
| **COUNTER DEFENDANT** | § | |
| vs. | § | 357th JUDICIAL DISTRICT |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| **DEFENDANT** | § | |
| **COUNTER PLAINTIFF** | § | |
| **THIRD-PARTY PLAINTIFF** | § | OF CAMERON COUNTY |
| | § | |
| | § | |
| AL CARDENAS MASONRY, INC. | § | |
| ALAMO CONTROLS, INC.; | § | |
| CARROL DUSANG AND RAND, INC.; | § | |
| COASTAL ENGINEERING EMPLOYERS, INC§ | |
| COASTAL ENGINEERING, INC.; | § | |
| COUPLAND-MORAND ENGINEERS, INC.; | § | |
| CRC ENGINEERING, INC.; | § | |
| D. WILSON CONSTRUCTION COMPANY | § | |
| H.D. GRANT COMPANY, INC.; | § | |
| LARRY WUNSCH & ASSOCIATES, INC.; | § | |
| MAC'S INSULATION COMPANY, INC.; | § | |
| MIJARES MORA ARCHITECTS, INC; | § | |
| RIO FILTER AND MANUFACTURING | § | |
| SUPPLY, LLC; | § | |
| RIO MECHANICAL, INC. | § | |
| ROBERTO J. RUIZ, ARCHITECT, INC.; | § | |
| SECHRIST-HALL COMPANY; | § | |
| STOTLER CONSTRUCTION COMPANY; | § | |
| SUPERHEAT AIR BALANCING CO. INC.; | § | |
| VICTORIA AIR CONDITIONING, INC. | § | |
| WRIGHTWAY CONSTRUCTION, INC; | § | |
| ZAMORA ENGINEERING, INC.; | § | |
| | § | |
| **THIRD PARTY DEFENDANTS** | § | |

**THIRD PARTY PLAINTIFF'S ORIGINAL THIRD PARTY PETITION**

1

FILED
AURORA DE LA GARZA CLERK
AUG 28 2003
DISTRICT COURT CAMERON COUNTY, TEXAS
DEPUTY

# CERTIFIED COPY

COMES THIRD PARTY PLAINTIFF, THE BROWNSVILLE INDEPENDENT SCHOOL DISTRICT (BISD), complaining of Counter Defendant, AMERICAN STANDARD INC., INDIVIDUALLY AND D/B/A TRANE AND OR TRANE COMMERCIAL SYSTEMS GROUP "TRANE"; AND THIRD PARTY DEFENDANTS, AL CARDENAS MASONRY, INC.; ALAMO CONTROLS, INC.; CARROL DUSANG AND RAND, INC.; COASTAL ENGINEERING EMPLOYERS, INC.; COASTAL ENGINEERING, INC.; COUPLAND-MORAND ENGINEERS, INC.; CRC ENGINEERING, INC.; D. WILSON CONSTRUCTION COMPANY; H.D. GRANT COMPANY, INC.; LARRY WUNSCH & ASSOCIATES, INC.; MAC'S INSULATION COMPANY, INC.; MIJARES MORA ARCHITECTS, INC; RIO FILTER AND MANUFACTURING SUPPLY, LLC; RIO MECHANICAL, INC.; ROBERTO J. RUIZ, ARCHITECT, INC.; SECHRIST-HALL COMPANY; STOTLER CONSTRUCTION COMPANY; SUPERHEAT AIR BALANCING CO. INC.; VICTORIAL AIR CONDITIONING, INC.; WRIGHTWAY CONSTRUCTION, INC.; AND ZAMORA ENGINEERING, INC.; and for cause of actions would show the Court as follows:

## I.

## DISCOVERY CONTROL PLAN-LEVEL 3

1.1   This matter should proceed under Discovery Control Plan Level 3 pursuant to Tex.R.Civ.P. 190.4, and Plaintiff hereby makes this Motion to the Court for a Level 3 Discovery Control Plan.

## II.

## THIRD-PARTY PLAINTIFF

2.01   Third Party Plaintiff, the BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, hereinafter called "BISD," is a political subdivision of Cameron County, Texas.

2

CERTIFIED COPY

## THIRD PARTY DEFENDANTS

2.02     Counter Defendant American Standard Inc., individually and d/b/a Trane and or Trane Commercial Systems Group; is a Texas corporation with its principal place of business in Dallas, Texas and has initiated this suit and does not need to be served as a copy of this Third Party Petition has been sent to Trane's attorney, J.K. Leonard.

2.03     Third Party Defendant **AL CARDENAS MASONRY** is a Texas corporation with its principal place of business in Pharr, Texas and can be served with process by mailing citation to its registered agent, Al Cardenas, 1204 West Bowe, Pharr, Texas 78577, by certified mail, return receipt requested.

2.04     Third Party Defendant **ALAMO CONTROLS, INC.** is a Texas corporation with its principal place of business in Universal City, Texas and can be served with process by mailing citation to its registered agent, Mr. Harry J. Burns at 750 Rittiman Rd., San Antonio, Texas 78209 by certified mail, return receipt requested.

2.05     Third Party Defendant **CARROL DUSANG AND RAND, INC.** is a Texas corporation with its principal place of business in El Paso, Texas and can be served with process by mailing citation to its registered agent, Mr. George C. Dusang, Jr. at 122 Castalleno, El Paso, Texas 777912, by certified mail, return receipt requested.

2.06     Third Party Defendant **COASTAL ENGINEERING, INC.,** is a Texas corporation with its principal place of business in San Benito, Texas and can be served with process by mailing citation to its registered agent, Mr. J. Nel Murphy at 191 N. Travis, San Benito, Texas 78586 by certified mail, return receipt requested.

2.07     Third Party Defendant **COASTAL ENGINEERING EMPLOYERS, INC.,** is a Texas

3

# CERTIFIED COPY

corporation with its principal place of business in San Benito, Texas and can be served with process by mailing citation to its registered agent, Ida Montemayor, 191 N. Travis Street, San Benito, Texas 78586 by certified mail, return receipt requested.

2.08    Third Party Defendant **COUPLAND-MORAN ENGINEERS INCORPORATED**, is a Texas corporation with its principal place of business in El Paso, Texas and can be served with process by mailing citation to its registered agent, G. Robert Moran, 6024 Gateway East, Suite 2C, El Paso, Texas 79905, by certified mail, return receipt requested.

2.09    Third Party Defendant **CRC ENGINEERING, INC.**, is a Texas corporation with it principal place of business in Edinburg, Texas and can be served with process by mailing citation to its registered agent, Mr. Charles Clark at 2001 Industrial, McAllen, Texas 78504 by certified mail, return receipt requested.

2.10    Third Party Defendant **D. WILSON CONSTRUCTION COMPANY, INC.**, is a Texas corporation with its principal place of business in McAllen, Texas and can be served with process by mailing citation to its registered agent, Mr. William D. Wilson at 1209 E. Pecan, Box 3455, McAllen, Texas 78502 by certified mail, return receipt requested.

2.11    Third Party Defendant **HD GRANT COMPANY INC.**, is a Texas corporation with its principal place of business in Houston, Texas and can be served with process by mailing citation to its registered agent, H D Grant Jr., 7123 Atwell Drive, Houston, Texas 77081 by certified mail, return receipt requested.

2.12    Third Party Defendant **LARRY WUNSCH & ASSOCIATES, INC.**, is a Texas corporation with its principal place of business is San Antonio, Texas and can be served with process by mailing citation to its registered agent, Larry Wunsch, 120 Interloop, San Antonio, Texas 78216, by certified

4

# CERTIFIED COPY

mail, return receipt requested.

2.13    Third Party Defendant **MAC'S INSULATION COMPANY, INC.,** is a Texas corporation with its principal place of business is Harlingen, Texas and can be served with process by mailing citation to its registered agent, Edward McCameron, ½ Mile South Palm Drive, Harlingen, Texas, certified mail, return receipt requested.

2.14    Third Party Defendant **MIJARES MORA ARCHITECTS, INC.,** is a Texas corporation with its principal place of business is El Paso, Texas and can be served with process by mailing citation to its registered agent, H L Bert Mijares, Jr., 111 N. Festival Drive, El Paso, Texas  79912, certified mail, return receipt requested.

2.15    Third Party Defendant **RIO FILTER MANUFACTURING AND SUPPLY, LLC,** is a Texas corporation with its principal place of business is Harlingen, Texas and can be served with process by mailing citation to its registered agent, Curtiss Conrad, 210 North Eye, Harlingen, Texas 78550, certified mail, return receipt requested.

2.16    Third Party Defendant **RIO MECHANICAL INC.,** is a Texas corporation with its principal place of business is Harlingen, Texas and can be served with process by mailing citation to its registered agent, Philip Paul Phillips 21815 Harris Road, Harlingen, Texas  78550, certified mail, return receipt requested.

2.17    Third Party Defendant **ROBERT J. RUIZ, ARCHITECT INC.,** is a Texas corporation with its principal place of business is Brownsville, Texas and can be served with process by mailing citation to its registered agent, Roberto J. Ruiz, 1000 Squaw Valley Drive, Brownsville, Texas 78520, certified mail, return receipt requested.

2.18    Third Party Defendant **SECHRIST-HALL COMPANY** is a Texas corporation with its

5

## CERTIFIED COPY

principal place of business is Corpus Christi, Texas and can be served with process by mailing citation to its registered agent, William A. McBride, Jr., 2826 West State Highway 83, Harlingen, Texas 78552, certified mail, return receipt requested.

2.19    Third Party Defendant **STOTLER CONSTRUCTION COMPANY** is a Texas corporation with its principal place of business in Pharr, Texas and can be served with process by mailing citation to its registered agent, Mr. Loyal C. Stotler at 521 Nebraska, San Juan, Texas 78589 by certified mail, return receipt requested.

2.20    Third Party Defendant **SUPERHEAT AIR BALANCING CO. INC.,** is a Texas corporation with its principal place of business in South Houston, Texas and can be served with process by mailing citation to its registered agent, Mrs. Janet W. Powell, at 1122 Genoa, South Houston, Texas 78216 by certified mail, return receipt requested.

2.21    Third Party Defendant **VICTORIA AIR CONDITIONING, LTD.** is a Texas partnership with its principal place of business in Victoria, Texas and can be served with process by mailing citation to its registered agent, Gay Heilker, Jr. at P.O. Box 3882, Victoria, Texas 77930 by certified mail, return receipt requested.

2.22    Third Party Defendant **WRIGHTWAY CONSTRUCTION, INC.** is a Texas partnership with its principal place of business in Harlingen, Texas and can be served with process by mailing citation to its registered agent, Wrightway Construction, Inc., 213 S. Gateway, Harlingen, 78550 by certified mail, return receipt requested.

2.23    Third Party Defendant **ZAMORA ENGINEERING, INC.** is a Texas partnership with its principal place of business in El Paso, Texas and can be served with process by mailing citation to its registered agent, Larry C. Zamora, 7170 Westwind Drive, Suite 301, El Paso, Texas, 79912 by

6

# CERTIFIED COPY

certified mail, return receipt requested.

## III.

### JURISDICTION AND VENUE

3.1   Venue is properly maintained in Cameron County, Texas pursuant to section 15.002, 15.003, and 15.005 of the **Texas Civil Practice and Remedies Code** as the causes of action alleged herein arose in whole or in part in Cameron County, Texas and concern real property located in Cameron County, Texas.  Third Party Defendants are properly joined herein as each Counter Defendant either maintains agents and representatives in and or conducts business in Cameron County, Texas.

3.2   The Court has jurisdiction over this cause as the damages suffered by Third Party Plaintiff is in an amount in excess of the minimum jurisdictional limits of this Court, and liability is established herein pursuant to the laws of the State of Texas.  The facts which support venue in Cameron County, Texas include:

   A.    Besteiro Middle School and Aiken Elementary School were constructed by Third Party Defendants in Cameron County, Texas.

   B.    Third Party Defendants contracted to build the schools in Cameron County, Texas.

   C.    Third Party Defendants negligently designed, constructed, and repaired the schools in Cameron County, Texas.

## IV.

### STATEMENT OF THE CASE

4.1   In 1993 BISD and Third Party Defendant, Carol, Dusang, and Rand, Inc. signed a contract for the design of Besteiro Middle School, hereinafter called "Besteiro," and Third Party Defendant, D. Wilson Construction Company, Inc., signed a contract to serve as construction manager in the construction of Besteiro.  D. Wilson Construction Company, Inc. promised to construct and provide

7

## CERTIFIED COPY

construction management services for Besteiro on Southmost Road, Brownsville, Cameron County, Texas. This action arises from various breaches of duties arising in tort, contract, warranty, equity, and other law by Carrol, Dusang, & Rand, Inc. and others to BISD as alleged herein. These breaches of duty were a legal cause of water damage and contamination of Besteiro by various molds, microbes, and fungi, which has further resulted in this lawsuit for property and other damages and related litigation.

4.2  In 1995 BISD and Third Party Defendant, Carol, Dusang, and Rand, Inc. signed a contract for the design of Aiken Elementary School, hereinafter called "Aiken," and Third Party Defendant, Stotler Construction Company, signed a contract to serve as construction manager in the construction of Aiken.  Stotler Construction Company promised to construct and provide construction management services for Aiken on Southmost Road, Brownsville, Cameron County, Texas.  This action arises from various breaches of duties arising in tort, contract, warranty, equity, and other law by Carrol, Dusang, & Rand, Inc. and all other Third Party Defendants to BISD as alleged herein. These breaches of duty were a legal cause of water damage and contamination of Aiken by various molds, microbes, and fungi, which has further resulted in this lawsuit for property and other damages and related litigation.

4.3    Third Party Defendant's conduct in designing, constructing, and after construction of the schools were defective in the following specifics, including, but not limited to, design, plumbing, improper inspections, roofing systems, building envelope system, structural systems, HVAC (heating, ventilating, air conditioning) systems, electrical, mechanical, air conditioning, condensate drainage, and numerous other design deficiencies and construction deficiencies as set out by BISD's petition.

4.4    BISD seeks recovery for all Third Party Defendants' breaches of promises, agreements,

8

# CERTIFIED COPY

expressed warranties, implied warranties, and violations of the legal duties concerning construction, inspection, design, by specific Third Party Defendants in their respective capacities, and any other aspects of the acquisition, building, repairing, and construction of the schools' systems in question, as well as injunctive relief, inspection costs, evaluation costs, remediation costs, consulting costs, response costs, relocation costs, interest on loans, and attorneys fees based on common law and state statutory causes of action.

## V.

## FACTS

5.1    BISD is a political subdivision of Cameron County, Texas. Over a period of seven years for Besteiro and over a period of six years for Aiken, BISD has maintained these schools as educational facilities for students and the employment for administration, faculty, and staff and as a public building open to the parents and visitors for various school events. As such, Besteiro and Aiken became real property which remained occupied on a daily basis.

5.2    BISD's property has been contaminated with pollution, various molds, mold spores, mildew, bacteria, fungus and other toxic materials, which was caused by the negligent construction, supervision, design, selection, repair, inspection, and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and the use of improper materials in the construction of the schools.

5.3    The various Third Party Defendants in their various capacities failed to adequately and responsibly construct, supervise, inspect, design, and install the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and other defects in construction, repair, and design, which led to the subsequent damages to BISD's property.

9

**CERTIFIED COPY**

5.4  Besteiro was constructed from 1993 to 1994 and Aiken was constructed from 1995 to 1996. As a result of the negligent construction, supervision, inspection, design, and installation of the schools' condensate drain systems, equipment, HVAC systems, roof systems, building envelope systems, drain site systems, plumbing systems, equipment, and the use of improper materials in the construction of the schools, excess moisture has developed throughout the schools resulting in the growth of harmful molds, mold spores, bacteria, fungi, and the resulting harmful products and pollutants of these molds, mold spores, bacteria, and fungi were released into BISD's property. The contamination of these harmful products has spread throughout the schools, including but not limited to HVAC systems, air ducts, classrooms, hallways, gym, ceiling panels, interior walls, exterior walls, stairwells, library, cafeteria, computer rooms, lockers, lounges, auditorium, athletic facilities, band hall, choir halls, mechanical rooms, administrative offices, nurses' offices, storage rooms, closets, and staff offices of both Besteiro and Aiken. These schools are only seven and six years old respectively.

5.5  Upon information and belief, the harmful and toxic, various molds, mildew, fungus, bacteria, and various spores, and or other toxic materials, spread throughout the school via the air conditioning ducts. Due to the elevated levels of moisture in the schools which led to mold, bacteria, and fungal growth, and as a result, these contaminants have caused BISD's property to be damaged. As a result, BISD could not conduct classes in either school beginning December 2001 and has not been able to reopen the schools because of ongoing remediation and testing. BISD has not been able to use these two schools for two years because of the ongoing remediation and reconstruction of the schools which is required as a result of Third Party Defendants' beaches of duties as alleged here. BISD has since relocated approximately 2,000 students, faculty, administrators, and staff to two temporary campuses because of BISD's duty to educate its students.

10

CERTIFIED COPY

## VI.

## BREACH OF CONTRACT

6.1   BISD realleges each and every fact and allegation set forth above.

6.2   BISD entered into Contracts with all Third Party Defendants and Counter Defendant who agreed to build the schools for use of public education. BISD did not warrant the design. All Third Party Defendants also represented they would, and undertook to, and did perform other duties including design, inspection, architectural and other services even though such services were not expressly contemplated under the contract. BISD paid approximately $28 million for both schools and has otherwise with all conditions, covenants, and promises it made under the contracts. BISD did not interfere with any Third Party Defendants' performance.  Pleading alternatively, BISD's performance is excused by Third Party Defendants' misrepresentations, breaches of duties, and material breaches of their contracts. BISD denies ratifying or waiving any apparent or latent failure to comply and asserts any conduct that might be considered waiver or ratification was induced by Third Party Defendants' misrepresentations and failures to disclose.

6.3   Third Party Defendants failed to comply with the conditions, covenants, and promises it made under the contracts and failed to fully or substantially perform, or to perform in a workmanlike manner.  The breaches include failing to use the proper and best efforts or even mediocre efforts to perform services of construction and failure to comply with their duty to accept the risk on non-compliance of subcontractors and their employees. BISD specifically demands that Third Party Defendants live up to their promises and accept financial responsibility for beaches and malfeasance of subcontractors and their employees.  The acts of performance and nonperformance, including the services by all Third Party Defendants were defective, did not comply with the contract, the design documents, authorized alterations, applicable codes, promises, and various standards of care imposed

11

CERTIFIED COPY

by or required by law, including professional standards of care for an architect, inspector, or construction manager. These breaches resulted in Third Party Defendants' failure to deliver a school which complied with the authorized design specifications, American with Disabilities Act (ADA), applicable codes, and other standards. Moreover, these breaches were a legal cause of excessive water in the schools, which in turn foreseeably caused mold, fungi, mold spores, and other biological contaminants to spread throughout the schools causing damage. These breaches also caused BISD to take possession of schools which did not comply with applicable codes, specifications, and law and numerous other defects which caused the schools to lack the qualities of habitable educational facilities, namely Aiken and Besteiro schools. Third Party Defendants' conduct was unjustified.

6.4  Third Party Defendants induced BISD into contracts by making false statements of material fact which were recklessly made or false when made, and were relied upon by BISD and caused damages. Third Party Defendants also induced BISD into contracts by fraudulently failing to disclose material facts or partially disclosed such facts while under a duty to disclose. During and after the construction of Besteiro and Aiken, Third Party Defendants repeatedly made false statements of material fact to BISD and failed to warn. Third Party Defendants are estopped from seeking the benefits of the doctrine of substantial compliance because Third Party Defendants have unclean hands.

6.5  Before, during, and after the contracts were formed, Third Party Defendants undertook obligations to BISD by assuming and performing the duties of an architect, inspector, construction manager, general contractor, sub-contractor, manufacture, installer, and fiduciary. Third Party Defendants breached their duties.

6.6  Third Party Defendants received monetary compensation to oversee the construction, design, and installation of both schools from start to finish as a "turn-key job" for BISD. However, Third

12

# CERTIFIED COPY

Party Defendants failed to adequately insure that the construction, design, and installation of the schools complied with the applicable building codes, applicable school codes, and industry standards. After the construction of the schools, structural, environmental, HVAC, electrical, plumbing, roofing, venting, mechanical and other defects permeated throughout the schools which led to their contamination. As a result, both schools became unhabitable and reasonably dangerous.

6.7  As a direct and proximate result of Third Party Defendants' breach of contract and other legal duties as alleged herein, BISD incurred legally compensable detriments including direct and consequential damages, loan fees, interest, attorneys' fees, costs, investigation, remediation, and other legal injuries as set forth in BISD's petition.

6.8  Third Party Defendants performed duties under these contracts in unworkmanlike manners.

6.9  BISD has presented its claims to Third Party Defendants, but Third Party Defendants have not paid such claims. BISD pleads for reasonable attorneys' fees for necessary trial and appellate services under Tex.Civ.Proc.And Rem.Code 38.001 et Seq.

## VII.

## EXISTENCE OF BREACH OF FIDUCIARY DUTY

7.1  BISD incorporates by reference herein and realleges each and every fact and allegation set forth above as fully set forth herein.

7.2  BISD alleges all Third Party Defendants including Carrol Dusang and Rand, Inc., Stotler Construction Company, D. Wilson Construction Company, Inc., CRC Engineering, Inc.; and Trane owed BISD a fiduciary duty because such arose expressly by the terms of the design contracts, maintenance contracts, and construction management contracts between BISD and Third Party Defendants. Pleading alternatively and in addition to the foregoing, BISD alleges the design, construction, and maintenance contracts between the parties is ambiguous and Third Party

13

CERTIFIED COPY

Defendants owed a fiduciary duty to BISD because 1) the contracts did not negate such a duty, but supported its existence, 2) Third Party Defendants made representations or alternatively fraudulent misrepresentations that they would perform the duties of fiduciary and act as a fiduciary, 3) Third Party Defendants undertook to and did perform duties of a fiduciaries and excluded, usurped, or interfered with performance of duties by other fiduciaries, and 4) under the entirety of the circumstances, which include the existence of a conflict of interest between these design, construction, and maintenance contracts operating under fixed price contracts, a fiduciary duty arose.

7.3  The duties arising from these fiduciary duties included the duty to make a full disclosure of all material facts, the duty to place the interests of BISD ahead of those of Third Party Defendants, the duty to manage design, construction, and maintenance of the schools in a manner to advance the interests of BISD, to give full and fair advice regarding the project to BISD, and the duty to enable and not impede performance of fiduciary and other duties owed to BISD by others.  Third Party Defendants further owed and breached a duty not to misapply fiduciary funds or property.  Third Party Defendants engaged in conduct that was a severe conflict of interest under the guise of "value engineering."

7.4  Third Party Defendants breached their fiduciary duties owed to BISD by among other things, failing to oversee the construction, design, and maintenance of Aiken and Besteiro from start to finish as a "turn-key job" for BISD, misapplying fiduciary property, committing theft of funds from BISD, securing execution of a document by deception, and engaging in fraud.  Third Party Defendants failed to ensure that the construction, design, and maintenance of Aiken and Besteiro complied with applicable school building codes, ADA (American with Disabilities Act) building codes, industry standards, and were performed properly for the protection and safety of occupants and in a good and workmanlike manner so a habitable building would be constructed.  Sometime

14

**CERTIFIED COPY**

after the construction of Aiken and Besteiro schools, structural, environmental, mechanical, electrical, and plumbing defects permeated throughout both schools, which led to the subsequent contamination.

7.5    All Third Party Defendants named in this Petition knowingly participated in the various breaches of fiduciary duties alleged herein by participation, recommendation, and acquiescence with respect to decisions made which resulted in construction deficiencies including mold and contamination problems at Aiken and Besteiro.

7.6    Third Party Defendants' conduct constitutes breach of fiduciary duty owed to BISD by all Third Party Defendants. This breach of fiduciary owed, which breach was aided and assisted by all others herein named Third Party Defendants, directly and proximately caused BISD to suffer damages in excess of the minimum jurisdictional limits of this Honorable Court.

<p align="center">VIII.</p>

<p align="center">**DUTY OF GOOD FAITH AND FAIR DEALING**</p>

8.1    BISD herein realleges each and every fact and allegation set forth above as it fully set forth herein.

8.2    By virtue of the particular agreement entered into by BISD and all Third Party Defendants, a special relationship existed between them. Because of these special relationships, Third Party Defendants owed BISD a duty of good faith and fair dealings.

8.3    BISD placed special confidence in Third Party Defendants and Third Party Defendants thereby obtained a resulting superiority and position and influence with respect to the design, construction, and maintenance of Aiken and Besteiro schools upon which BISD relied.

8.4    All Third Party Defendants named in this petition aided and assisted each other in breaching their "Duty of Good Faith and Fair Dealing" owed to BISD, through among other things, their own

## CERTIFIED COPY

relevant participation, recommendations, and or acquiescence with respect to decisions made which resulted in the design, construction, and maintenance deficiencies and mold contamination at Aiken and Besteiro.

8.5    Third Party Defendants' conducts constitute breach of the "Duty of Good Faith and Fair Dealing" owed to BISD, by all Third Party Defendants. These breaches of "Duty of Good Faith and Fair Dealing" owed, which breaches were aided and assisted by all others herein named Third Party Defendants, directly and proximately caused BISD to suffer damages in excess of the minimum jurisdictional limits of this Honorable Court.

### IX.

### THIRD PARTY DEFENDANTS

9.1    BISD herein realleges each and every fact and allegation set forth above as is fully set forth herein.

9.2    All Third Party Defendants had such duties as alleged herein including, but not limited to: adequately supervise the construction of Aiken and Besteiro, so to ensure construction in a good and workmanlike manner and in accordance with applicable school building codes and industry standards, environmental and safety laws, ADA codes, and the proper plans and proper specifications.

9.3    BISD further contends that all Third Party Defendants had a duty to safely and adequately construct, design, and maintenance Aiken and Besteiro in a manner which was habitable and not to expose BISD to damages. Third Party Defendants also had a duty to select the proper and safe method and means of construction, and installation of materials and mechanical equipment.

9.4    BISD further contends that all Third Party Defendants had a duty to maintain the HVAC system, condensate drain system, HVAC control system, and all other systems in Aiken and Besteiro

16

CERTIFIED COPY

in a condition that would prevent the germination and spread of mold, mold spores, and other biological contaminants and their by products.

9.5  BISD further contends that all Third Party Defendants had a duty to warn BISD of the danger of the property damage and potential future property damage of the contamination which was airborne throughout Aiken and Besteiro when they knew, or should have known of the dangerous and destructive contamination contained in the construction of both schools.

9.6    All Third Party Defendants breached their duties of care and were negligent in at least the following ways:

A.  Failing to take all reasonable and necessary steps to properly construct, supervise, design, select, install, maintain, monitor, repair, and prevent conditions which allowed the contamination to grow and subsequently spread into Aiken and Besteiro, including but not limited to complying with applicable State environmental and safety laws, statutes, regulations, and industry standards.

B.  Failing to exercise reasonable care in the construction, supervision, design, monitoring, inspection, and installation of the systems, which led to the operational defects of the HVAC systems, HVAC control systems, condensate drain systems, plumbing systems, and construction thereof.

C.  Failing to exercise reasonable care in the construction, supervision, design, inspection, selection of materials, monitoring, and installation, which led to the architectural and design defect in Aiken and Besteiro.

D.  Failing to address the spread of contaminants throughout Aiken and Besteiro in a timely manner.

E.  Failing to take steps to prevent the contaminants' growth throughout Aiken and Besteiro.

F.  Failing to disclose to BISD the true extent and nature of the contamination to Aiken and

17

# CERTIFIED COPY

Besteiro.

G.  Failing to properly hire and or train and or educate their employees, suppliers, and or independent contractors in a proper manner so that these employees could properly design, construct, select and install the electrical system, HVAC system, HVAC controls, condensate drain system, environmental, mechanical, plumbing, insulation, building envelope system, roofing system, foundation, parking elevation, site elevation, and monitor the operational defects of the above mentioned systems and their components to prevent the contamination at Aiken and Besteiro.

H.  Failing to comply with State laws, regulations, ADA compliance, and regulations and statutes regulating Third Party Defendants.

I.  Failing to timely notify the proper State and City authorities when Third Party Defendants knew or should have known of the release and spread of the contaminants at Aiken and Besteiro.

J.  Failing to select and inspect safe and proper materials and equipment.

K.  Failing to properly supervise and inspect the construction to ensure the construction met BISD's requirements, that construction was in a good and workmanlike manner and that the construction complied with the plans and specifications and applicable building codes, ADA compliance, appropriate industry standards, and state environmental and safety laws.

9.7  BISD would show that the above described conduct of the Third Party Defendants constitutes negligence because Third Party Defendants failed to exercise due care in the design, selection, installation, supervision, and monitoring or inspection of the electrical systems, HVAC system, condensate drain system, environmental, mechanical, plumbing system, HVAC control systems, insulation, and building envelope system in Aiken and Besteiro and were further negligent in monitoring the operational defects of the above mentioned systems and negligent in failing to warn BISD of the defects when Third Party Defendants knew or should have known of the dangerous

18

CERTIFIED COPY

contaminants at Aiken and Besteiro. Such conduct by Third Party Defendants was a proximate cause of the actual damages suffered by BISD herein for which they sue in an amount in excess of the minimum jurisdictional limits of the Court not to exceed TWENTY-EIGHT MILLION DOLLARS ($28,000,000.00) plus attorneys' fees.

## X.

## NEGLIGENCE-FAILURE TO ACT

10.1  BISD herein realleges each and every fact and allegation set forth above as is fully set forth herein.

10.2  Third Party Defendants had a duty to take affirmative action to control or avoid increasing the damages resulting from the contamination discharged at Aiken and Besteiro and the materials and equipment they installed, selected, maintained, inspected, operated, and supplied, even after they sold and or divested themselves of control of these systems.

10.3  Upon information and belief, Third Party Defendants caused and or allowed the structural and mechanical damages and contamination of Aiken and Besteiro with full knowledge that, without implementation of proper protective measures, the negligent construction, supervision, installation, selection, and monitoring of the schools electrical systems, HVAC system, condensate drain system, environmental, mechanical, plumbing, roofing, HVAC control system, insulation, building envelope system, and foundation which would cause the continued moisture build-up and hazardous contamination which was released throughout Aiken and Besteiro, and Third Party Defendants knew or should have known the contamination would continue to spread.

10.4  Third Party Defendants failed to take affirmative action to control and avoid the damages resulting from the moisture build-up and contamination, thereby breaching their duty.

10.5  As a proximate result of Third Party Defendants' failure and breach, BISD was damaged as

19

**CERTIFIED COPY**

more particularly described in the above and below for the amount for which BISD sues.

## XI.

## NEGLIGENCE-SUPERIOR KNOWLEDGE

11.1  BISD herein realleges each and every fact and allegation set forth above as is fully set forth herein.

11.2  Third Party Defendants in their respective capacities, had a duty to BISD to warn, prevent, contain, and remediate the moisture build-up and subsequent contamination which spread throughout Aiken and Besteiro.  Specific Third Party Defendants in their respective capacities had and have a duty to their superior knowledge of the existence and spreading of moisture and contaminants at Aiken and Besteiro.

11.3  Structural, environmental, mechanical, electrical, and plumbing damages and subsequent contamination being released into Aiken and Besteiro was and is a likely and foreseeable result of Third Party Defendants' specific superior knowledge in their respective capacities as negligent and gross negligence in the construction, maintenance, and design of Aiken and Besteiro.  Third Party Defendant had ready and relatively inexpensive access to the means of warning, preventing, and containing the moisture build-up and subsequent contamination.

11.4  Third Party Defendants breached this duty and this breach proximately caused BISD's damages as described herein with more particularity.

## XII.

## NEGLIGENCE

12.1  BISD herein realleges each and every fact and allegation set forth above as is fully set forth herein.

12.2  BISD would show that all Third Party Defendants along with Counter Defendant, Trane, were

20

CERTIFIED COPY

negligent and treats their negligence as the proximate cause of the damages sustained by BISD.

## XIII.

## STRICT LIABILITY

13.1  Third Party Defendants inspected, installed, and or designed the various materials, equipment, and system products used at Aiken and Besteiro which were meant to be used as a public schools. Third Party Defendants placed their system products, materials, and equipment into the stream of commerce in a manner as to render their systems, products, materials, and equipment unreasonably dangerous and defective, and not fit for their intended and reasonably foreseeable purpose.  Third Party Defendants are strictly liable in its respective capacity for defectively designing manufacturing, and marketing its respective system products, materials, and equipment in the defective and unreasonably dangerous conditions of these system products, materials, and equipment which played a role in producing the damages herein suffered by BISD.

13.2  BISD asserts that the damages suffered by them were caused by a defective condition of the products and equipment in question.  Third Party Defendants were negligent and grossly negligent in designing, manufacturing, and marketing the system products, materials and equipment in question. The negligence and gross negligence of these Third Party Defendants was the proximate cause of the damages herein suffered by BISD.

13.3  Third Party Defendants expressly and impliedly warrantied that the various equipment and system products, equipment, and materials purchased by BISD, were merchantable and fit for its intended use.  Third Party Defendants have breached both expressed and implied warranties of the Texas Business and Commerce Code in the sale and marketing of the various equipment and products in question.

## XIV.

21

## CERTIFIED COPY

### BREACH OF WARRANTY

14.1    Third Party Defendants also breached warranties given in connection with the design and construction of the building.    Third Party Defendants gave an implied warranty of good and workmanlike construction and or good workmanlike performance of its services in connection with the design and construction of Aiken and Besteiro.    These implied warranties have been breached by Third Party Defendants and these breaches have caused or proximately caused damages to BISD. Third Party Defendants also made expressed warranties about the services they provided in connection with the design and construction of Aiken and Besteiro.    These expressed warranties have also been breached by Third Party Defendants and these breaches have caused or proximately caused BISD's damages.

14.2    Third Party Defendants have also provided system products, materials, equipment, goods, and other tangible things to BISD in connection with the design and construction of Aiken and Besteiro. Third Party Defendants gave implied warranties in connection with these products, materials, equipment, goods, and other tangible things, including the implied warranty of merchantability and the implied warranty of fitness.    Third Party Defendants also gave warranties in connection with these products, materials, equipment, goods, and other tangible things, and these breaches of warranty have caused or proximately caused damages to BISD.

14.3    BISD has presented its claim for breach of warranty to Third Party Defendants, but Third Party Defendants have not paid the claims.    Therefore, BISD is entitled to recover from Third Party Defendants reasonable attorneys' fees under Tex.Civ.Prac.&Rem.Code. 38.001 et.seq.

### XV.

### FRAUD

15.1    Third Party Defendants also made false representations to BISD in connection with the

22

CERTIFIED COPY

design and construction of Aiken and Besteiro. These false representations include, but are not limited to, that Third Party Defendants were complying with their contracts, that Aiken and Besteiro were properly constructed, that Aiken and Besteiro were built in accordance with the plans and specifications, applicable building codes, state environmental and safety laws, that Aiken and Besteiro were built in a good and workmanlike manner, that Third Party Defendants were qualified to do the work on the buildings, that Third Party Defendants' work would meet the certain standards of quality, that Third Party Defendants' work would be performed in a good and workmanlike manner, and that Third Party Defendants' work would be performed with professional skill and care. Third Party Defendants made these representations with knowledge of its falsity, and or recklessly without knowledge of the truth and as a positive assertion. Third Party Defendants made these representations with the intention that they should be acted on by BISD. BISD acted in reliance of these representations. As a result or proximate result of BISD's reliance, BISD suffered injuries and damages.

15.2  In addition, Third Party Defendants have concealed or failed to disclose material fact within its knowledge regarding the design and construction of Aiken and Besteiro as stated above.    Third Party Defendants knew BISD was ignorant of these facts and did not have an equal opportunity to discover the truth. Third Party Defendants intended to induce BISD to hire Third Party Defendants for work on the buildings and to pay Third Party Defendants for their improper and defective work at Aiken and Besteiro by concealing or failing to disclose these facts. BISD has suffered injuries and damages as a result or proximate result of acting without knowledge of these undisclosed facts.

## XVI.

## NEGLIGENT MISREPRESENTATION

16.1  In the alternative, the representations described above were made by Third Party Defendants in

CERTIFIED COPY

the course of their business or in a transaction which Third Party Defendants had a pecuniary interest. These representations supplies false information for BISD's guidance in their business. Third Party Defendants did not exercise reasonable care or competence in obtaining or communicating the information. Third Party Defendants' negligent misrepresentation has caused or proximately caused damages to BISD.

## XVII.

### CIVIL CONSPIRACY

17.1    BISD herein alleges each and every fact and allegation set forth above as is fully set forth herein.

17.2    Counter Defendant, TRANE, along with all Third Party Defendants AL CARDENAS MASONRY, INC.; ALAMO CONTROLS, INC.; CARROL DUSANG AND RAND, INC.; COASTAL ENGINEERING EMPLOYERS, INC.; COASTAL ENGINEERING, INC.; COUPLAND-MORAND ENGINEERS, INC.; CRC ENGINEERING, INC.; D. WILSON CONSTRUCTION COMPANY; H.D. GRANT COMPANY, INC.; LARRY WUNSCH & ASSOCIATES, INC.; MAC'S INSULATION COMPANY, INC.; MIJARES MORA ARCHITECTS, INC; RIO FILTER MANUFACTURING SUPPLY, LLC; RIO MECHANICAL, INC.; ROBERTO J. RUIZ, ARCHITECT, INC.; SECHRIST-HALL COMPANY; STOTLER CONSTRUCTION COMPANY; SUPERHEAT AIR BALANCING CO. INC.; VICTORIAL AIR CONDITIONING, INC.; WRIGHTWAY CONSTRUCTION, INC.; AND    ZAMORA ENGINEERING, INC., conspired to perform the wrongful acts described above and throughout this Petition.

17.4    Counter Defendant, TRANE, and Third Party Defendants AL CARDENAS MASONRY, INC.; ALAMO CONTROLS, INC.; CARROL DUSANG AND RAND, INC.; COASTAL

24

## CERTIFIED COPY

ENGINEERING EMPLOYERS, INC.; COASTAL ENGINEERING, INC.; COUPLAND-MORAND ENGINEERS, INC.; CRC ENGINEERING, INC.; D. WILSON CONSTRUCTION COMPANY; H.D. GRANT COMPANY, INC.; LARRY WUNSCH & ASSOCIATES, INC.; MAC'S INSULATION COMPANY, INC.; MIJARES MORA ARCHITECTS, INC; RIO FILTER MANUFACTURING SUPPLY, LLC; RIO MECHANICAL, INC.; ROBERTO J. RUIZ, ARCHITECT, INC.; SECHRIST-HALL COMPANY; STOTLER CONSTRUCTION COMPANY; SUPERHEAT AIR BALANCING CO. INC.; VICTORIAL AIR CONDITIONING, INC.; WRIGHTWAY CONSTRUCTION, INC.; AND ZAMORA ENGINEERING, INC., had knowledge of and agreed to the wrongful acts described herein which resulted in the faulty construction and or contamination of Aiken and Besteiro.

17.5   Counter Defendant, TRANE, and Third Party Defendants AL CARDENAS MASONRY, INC.; ALAMO CONTROLS, INC.; CARROL DUSANG AND RAND, INC.; COASTAL ENGINEERING EMPLOYERS, INC.; COASTAL ENGINEERING, INC.; COUPLAND-MORAND ENGINEERS, INC.; CRC ENGINEERING, INC.; D. WILSON CONSTRUCTION COMPANY; H.D. GRANT COMPANY, INC.; LARRY WUNSCH & ASSOCIATES, INC.; MAC'S INSULATION COMPANY, INC.; MIJARES MORA ARCHITECTS, INC; RIO FILTER MANUFACTURING SUPPLY, LLC; RIO MECHANICAL, INC.; ROBERTO J. RUIZ, ARCHITECT, INC.; SECHRIST-HALL COMPANY; STOTLER CONSTRUCTION COMPANY; SUPERHEAT AIR BALANCING CO. INC.; VICTORIAL AIR CONDITIONING, INC.; WRIGHTWAY CONSTRUCTION, INC.; AND ZAMORA ENGINEERING, INC., are liable to BISD for the damages caused by the wrongful conduct committed in furtherance of the conspiracy.

### XVIII.

### EXEMPLARY DAMAGES

25

## CERTIFIED COPY

18.1  BISD herein alleges each and every fact and allegation set forth above as is set forth herein.

18.2  Third Party Defendants negligently constructed, supervised, designed, selected, and installed Aiken and Besteiro's air conditioning systems, the buildings' roof systems, and the buildings' site and drainage systems in a manner which they knew or should have known would cause a risk of structural damage and contamination.  Third Party Defendants negligently failed to act to reduce such risk of which negligence was a proximate cause of the subsequent injuries to BISD.  Third Party Defendants had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of BISD.

18.3  The conduct of Third Party Defendants constitutes tortuous conduct committed with malice, as the term is defined by Tex.Civ.P.&Rem.Code41.001(7)(b).  Under the provisions of that Chapter, Third Party Defendants are liable to BISD for exemplary damages in an amount to be determined by the discretion of the jury.

18.4  The conduct of Third Party Defendants constitutes fraud.

18.5  The monetary savings which resulted from Third Party Defendants' employing unsafe designs and construction of Aiken and Besteiro and the faulty selection and installation of the faulty air conditioning systems, and the faulty selection and installation of the faulty roof systems, and the faulty selection and implementation of the faulty site drainage system, instead of a correct and safe alternative design, construction, and installation in part formed profits for Third Party Defendants, whose profits were again in part used to remunerate those who made the decision which created the risk which Third Party Defendants knew would result in health, safety risks, property damages, and subsequent damages.

18.6  BISD alleges that the conduct of all Third Party Defendants in question was authorized, requested, commanded, performed, or recklessly tolerated by high managerial agents for Third Party

26

CERTIFIED COPY

Defendants, action on behalf of the corporation within the scope of their employment, whose identities are not yet known to BISD.

18.7   Third Party Defendants' conduct, as described herein, constitutes fraud, gross negligence, and malice which entitles BISD to recovery of exemplary damages in an amount in excess of the minimum jurisdictional limits of this Court, as may be found by the trier of fact.

## XIX.

## DAMAGES

19.1   BISD herein alleges each and every fact and allegation set forth above as is fully set forth herein.

19.2   Due to the acts and omissions of Third Party Defendants, as herein described, including all wrongful and unlawful conduct of Third Party Defendants, and any Counter Defendant, jointly and severally, BISD has suffered serious and substantial damages, including but not limited to the following: As a direct and proximate result of the structural damage, site work, and contamination at Aiken and Besteiro, BISD has incurred, or will incur damages of past, present, and future repair and reconstruction costs; past, present, and future remedial costs to clean up the moisture build-up and contamination spread throughout Aiken and Besteiro and to repair construction defects and compliance with ADA building codes; costs to retain professional architects, professional engineers, and independent contractors; costs for past, present, and future inspections and future mold and humidity testing in the buildings; costs of labor to properly remediate the contaminated schools; equipment replacement costs, relocation costs for temporary facilities for both schools; costs associated with busing students to temporary facilities; loss of funding from the State of Texas based on loss of average daily attendance; attorneys' fees; all other actual damages to be incurred in the future by BISD.

27

**CERTIFIED COPY**

19.3   BISD would show it is entitled to pre-judgment and post-judgment interest at the maximum rate allowed by law.

## XX.

### JURY DEMAND

Plaintiffs make their demand for jury trial in the above-styled and numbered cause in accordance with the Texas Rules of Civil Procedure.  Simultaneous with the making of said demand for jury trial, Plaintiffs hereby have tender their jury fee to the District Clerk of Cameron County, in accordance with the applicable statues and laws of the State of Texas.

## XXI.

### PRAYER

WHEREFORE, PREMISE CONSIDERED, BISD respectfully prays that Third Party Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in their favor against Third Party Defendants.

21.1   Judgment against Third Party Defendants, Counter Defendant, jointly and severally, for all damages incurred by BISD herein, for a sum in excess of the minimum jurisdictional limits of the Court;

21.2   Pre-judgment interest as provided by law, at the highest rate until the time of trial;

22.3   Exemplary damages as to Third Party Defendants as may be found by the trier of fact, together with post-judgment interest at the highest legal rate as provided by law, until paid;

23.4   Interest on the judgment at the highest legal rate provided by law until paid;

24.5   Cost of the suit;

25.6   Attorneys's fees;

26.6   Such other and further relief both in law and in equity to which BISD may be justly entitled.

28

**CERTIFIED COPY**

Respectfully submitted,

Baltazar Salazar
State Bar No. 00791590
1612 Winbern
Houston, Texas 77004
Tel. (713) 655-1300
Fax (713) 807-1930
Ramon Garcia
State Bar No. 07641800
222 W. University
Edinburg, Texas
Tel. (956) 383-7441
Fax (956)

*Attorneys for BISD*

CERTIFICATE OF SERVICE

I, BALTAZAR SALAZAR do hereby certify that on this ___28___ day of August 2003, a true

and correct copy of the above and foregoing  document was sent by certified mail to following

counsel of record:

**VIA CMRRR 7001 0320 0001 1883 92250**
J.K. Leonard
**BALL & WEED, P.C.**
A Professional Corporation
Trinity Plaza II, Suite 500
745 East Mulberry
San Antonio, Texas  78212

A TRUE COPY I CERTIFY
AURORA DE LA GARZA, CLERK
DISTRICT COURT CAMERON COUNTY TEXAS

MAY 05 2004

BY_____
DEPUTY

*Attorneys for American Standard, Inc., and The Trane Company*

BALTAZAR SALAZAR

29

## CAUSE NO. 2003-08-4078-E

| | | |
|---|---|---|
| AMERICAN STANDARD AND THE TRANE COMPANY, ET AL, | § § | IN THE DISTRICT COURT |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | |
| | § | 357ᵀᴴ JUDICIAL DISTRICT |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT | § § | |
| *Defendant/Counter Plaintiff* | § | |
| *Third Party Plaintiff* | § | |
| | § | |
| AL CARDENAS MASONRY, INC., ET AL, | § | |
| *Third Party Defendants* | § | CAMERON COUNTY, TEXAS |

---

### DEFENDANT/COUNTER PLAINTIFF BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S OBJECTIONS, ANSWERS AND RESPONSES TO COUNTER DEFENDANT AMERICAN STANDARD AND THE TRANE COMPANY'S INTERROGATORIES AND REQUESTS FOR PRODUCTION

---

TO:    Counter Defendant American Standard and The Trane Company, by and through its attorney of record Mr. J. K. Leonard, BALL & WEED, P.C., Trinity Plaza II, Suite 500, 745 East Mulberry, San Antonio, Texas 78212.

COMES NOW Defendant/Counter Plaintiff Brownsville Independent School District, in the above-styled and numbered cause and submits these Objections, Answers and Responses to Counter-Defendant American Standard and The Trane Company's Interrogatories and Request for Production as propounded to it by said Defendant's attorney of record.

Respectfully submitted,

By:_____
RAMON GARCIA
State Bar No. 07641800
CATHERINE W. SMITH
State Bar No. 18547080
**LAW OFFICE OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas 78539
(956) 383-7441 and (956) 381-0825 Fax

BALTAZAR SALAZAR
State Bar No. 00791590
**LAW OFFICES OF BALTAZAR SALAZAR**
1612 Winbern
Houston, Texas 77004
(713) 655-1300
(713) 807-1930 (Fax)

## CERTIFICATE OF SERVICE

I, CATHERINE W. SMITH, do hereby certify that on this the _____ day of November, 2003, a true and correct original of the above and foregoing Defendant/Counter Plaintiff Brownsville Independent School District's Objections, Answers and Responses to Counter Defendant American Standard and The Trane Company's Interrogatories and Requests for Production was sent by U. S. Certified Mail, Return, Receipt Requested to the following:

Mr. J. K. Leonard
Mr. William Ford
Mr. Christopher Strawn
Ms. Anna Whorton Schenecker
**BALL & WEED**
Trinity Plaza II, Suite 500
745 East Mulberry
San Antonio, Texas  78212-3191
Counsel for American Standard, Inc. and The Trane Company

and a copy to:

Mr. Baltazar Salazar
**ATTORNEY AT LAW**
1612 Winbern
Houston, Texas  77004
Counsel for BISD

Mr. Moises Hernandez
**GARCIA & HERNANDEZ, L.L.P.**
P.O. Box 5729
McAllen, Texas  78502
Counsel for Al Cardenas Masonry

Mr. Ricardo R. Reyna
Mr. Tom Mailloux
**BROCK & PERSON, P.C.**
1506 Bexar Crossing
San Antonio, Texas  78232-1587
Counsel for Alamo Controls, Inc.

Mr. Robert Guerra
Mr. Rafael Garcia
**THORNTON, SUMMERS, BIECHLIN, DUNHAM & BROWN, L.L.C.**
418 East Dove Avenue
McAllen, Texas  78503
Counsel for Alamo Controls, Inc.



Mr. George H. Lugrin, IV
Ms. N. Jerae Carlson
**WESTMORELAND HALL, P.C.**
Williams Tower, 64th Floor
2800 Post Oak Blvd.
Houston, Texas  77056-6125
Counsel for CRC Engineering, Inc.

Mr. David M. Driscoll
**AINSA HUTSON, L.L.P.**
5809 Acacia Circle
El Paso, Texas  79912
Counsel for Carroll Dusang & Rand, Inc.

Mr. Rollins Koppel
**ATTORNEY AT LAW**
Skaggs & Koppel Building
312 East Van Buren Avenue
P.O. Box 2878
Harlingen, Texas  78551
Counsel for Coastal Engineering Employers, Inc.

Mr. Robert F. Scheihing
Mr. R. Scott Westlund
**ADAMI, GOLDMAN & SCHUFFIELD, INC.**
9311 San Pedro, Suite 900
San Antonio, Texas  78216
Counsel for Coastal Engineering Employers, Inc.

Mr. Jose Gamez
**MEREDITH, DONNELL & ABERNATHY**
Water Tower Centre
612 Nolana, Suite 560
McAllen, Texas  78504
Counsel for Coastal Engineering and Sechrist-Hall Company

Mr. Lino Ochoa
Mr. John Griffith
**GRIFFITH, HILL & OCHOA, L.L.P.**
One Park Place
100 Savannnah, Suite 500
McAllen, Texas  78503
Counsel for D. Wilson Construction Company

Mr. Keith N. Uhles
Mr Ewing Sikes, III
**ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.**

3

55 Cove Circle
P.O. Box 3509
Brownsville, Texas  78523-3509
Counsel for Mac's Insulation, Inc.
Mr. William Luyties
Mr. Paul Goldberg
**LORANCE & THOMPSON**
2900 North Loop West, Suite 500
Houston, Texas  77092
Counsel for Mijares Mora Architects

Mr. Rick Fancher
Ms. Margery Huston
**BARKER, LEON, FANCHER  & MATTHYS, L.L.P.**
Tower II – Suite 1200
555 North Carancahua Street
Corpus Christi, Texas  78478
Counsel for Rio Mechanical, Inc.

Mr. John E. Pipkin
**JOHNSON, FERGUSON, PIPKIN & PHILLIPS**
4900 Woodway, Suite 1100
Houston, Texas  77056
Counsel for Rio Mechanical, Inc.

Mr. Marc Young
**COKINOS, BOSIEN & YOUNG**
1500 Liberty Tower
2919 Allen Parkway
Houston, Texas  77019
Counsel for Rio Filter Supply

Mr. William A. "Rusty" Faulk, Sr.
Mr. Daniel P. Whitworth
**RENTFRO, FAULK & BLAKEMORE, L.L.P.**
185 Ruben M. Torres Boulevard
Brownsville, Texas  78520
Counsel for Roberto J. Ruiz, Architect, Inc.

Mr. David Benjamin
**O'CONNELL & BENJAMIN, L.L.P.**
153 Treeline Park, Suite 200
San Antonio, Texas  78209
Counsel for Sechrist-Hall Company

Ms. Cindy Garcia
**THE GARCIA LAW FIRM, P.C.**
201 North 1st Street
Harlingen, Texas  78550
Counsel for Stotler Construction Company

Mr. Charlie J. Cilfone
**SHELTON & VALADEZ**
600 Navarro, Suite 500
San Antonio, Texas  78205-1860
Counsel for Superheat Air Balancing Co., Inc.

Mr. Robert Martin
**MAGENHEIM, BATEMAN & HELFAND, P.L.L.C.**
3600 One Houston Center
1221 McKinney Street
Houston, Texas  77010
Counsel for Victoria Air Conditioning

Mr. Marcel Notzon, III
**ALVAREZ, NOTZON & GUTIERREZ, L.L.P.**
415 Shiloh Drive
Laredo, Texas  78045
Counsel for Wright Way Construction

Mr. Robert Skipworth
**ATTORNEY AT LAW**
310 North Mesa, Suite 600
El Paso, Texas  79901
Counsel for Zamora Engineering, Inc.



CATHERINE W. SMITH



## OBJECTIONS, ANSWERS, AND RESPONSES
## TO INTERROGATORIES AND REQUESTS FOR PRODUCTION

**INTERROGATORY NO.1:**

Describe any and all inspections of the Building and/or Product at issue in this litigation.  For each inspection, state the name, address and title of each person and/or entity making such inspection, the dates of such inspection, and the results thereof.

**ANSWER:**

Al Cardenas Masonry, Inc.
Alamo Controls, Inc.;
Carroll Dusang And Rand, Inc.;
Coastal Engineering   Employers, Inc.;
Coastal Engineering,  Inc.;
Coupland-Morand Engineers, Inc.;
Crc Engineering, Inc.;
D. Wilson Construction Company;
H. D. Grant Grant Company, Inc.;
Larry Wunsch & Associates, Inc.;
Mac's Insulation Company, Inc.;
Mijares Mora Architects, Inc;
Rio Filter And Manufacturing Supply, L.L.C.;
Rio Mechanical, Inc.;
Roberto J. Ruiz, Architect, Inc.;
Sechrist-Hall Company;
Stotler Construction Co`mpany;
Superheat Air Balancing Co. Inc.;
Victoria Air Conditioning, Inc.;
Wrightway Construction, Inc.;
Zamora Engineering, Inc.
Suntex Mechanical Contractors

The above companies inspected the facilities at varies times from 1993-to present.

Assured Indoor Air Quality, L.P.
6616 Forest Park Road
Dallas, Texas  75235

EFI Report
9700 Richmonds, Suite 201
Houston, Texas  77042

Ambiotec Environmental Consultant, Inc.
P.O. Box 2565
1101 East Harrison Avenue
Harlingen, Texas  78551