IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Cour.
Southern District of Texas
FILED

OCT 0 1 2004

Michael N. M. .
Clerk of Cou.

| | | |
|---|---|---|
| ROYAL SURPLUS LINES INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. B-03-109 JURY DEMANDED |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendant. | § § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

To The Honorable Andrew S. Hanen,
United States District Judge:

Royal Surplus Lines Insurance Company, Plaintiff herein, files this First Amended Complaint for Declaratory Judgment, and in support hereof, respectfully shows the Court as follows:

## I. THE PARTIES

1.      Plaintiff **Royal Surplus Lines Insurance Company** ("Royal") is a foreign corporation, duly incorporated under the laws of the State of Connecticut, with its principal place of business in the State of Georgia.

2.      Defendant **Brownsville Independent School District** ("BISD"), is a Texas governmental entity that has appeared herein and may be served by serving its attorney-in-charge, Mr. Baltazar Salazar, 1612 Winbern, Houston, Texas 77004.  BISD owns and operates Besteiro Middle School ("Besteiro") and Bruce Aiken Elementary School ("Aiken"), which are located in Brownsville, Cameron County, Texas, and were insured under a series of commercial property insurance policies issued to BISD by Plaintiff Royal that were effective between

September 1, 1996 and April 1, 2002. The two schools are adjacent to one another and share some facilities, including the library/media center.

## II. JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201(a) because complete diversity exists between the parties, the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, and Royal seeks declaratory relief pursuant to 28 U.S.C. § 2201, et seq., the Federal Declaratory Judgment Statute, and/or the Texas Uniform Declaratory Judgment Act, Texas Civil Practices & Remedies Code § 37.001 et seq.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Defendant BISD resides in this district and Aiken and Besteiro--the insured properties that are the subject of this action and the underlying claims -- are located in this district.

## III. FACTUAL BACKGROUND

### A.  *Royal Policies and the Long History of Problems at the Subject Schools*

5.      Defendant BISD was the named insured under a series of commercial property policies issued to BISD by Royal that insured the subject properties, Aiken Elementary School and Besteiro Middle School, continuously from September 1, 1996 through April 1, 2002. The policies issued by Royal (the "Royal Policies") are as follows:

> ➤ Royal Policy No. KHT 307564, with effective dates of September 1, 1996 to September 1, 1997 (cancelled effective April 1, 1997);

> ➤ Royal Policy No. KHT 308599, with effective dates of April 1, 1997 to April 1, 1998;

> ➤ Royal Policy No. KHT 310355, with effective dates of April 1, 1998 to April 1, 2001; and

> ➤ Royal Policy No. KHT 318271, with effective dates of April 1, 2001 to April 1, 2002.

6.     Besteiro and Aiken are conjoined schools. They connect via a common cafeteria and library. Besteiro was constructed around 1993-1994 and was completed before the 1994-1995 school year began in August 1994, while Aiken was constructed around 1995-1996 and was completed before the 1996-1997 school year began in August 1996. Both Aiken and Besteiro have suffered from problems associated with high humidity, water intrusion and indoor air quality, including mold/mildew, that began around the time each school opened. "Mildew growth" was discovered in the kitchen at Besteiro in the Fall of 1994. Around September 1995, mold/mildew was also discovered on books in the Besteiro library, where the relative humidity was measured in the 80% range in September-October 1995. Chronic roof leaks began to plague Besteiro in 1995 due to construction defects and continued unresolved for years. Roof leaks at Besteiro were again reported in early 1998 to the construction manager, D. Wilson Construction Company.

7.     Shortly before Aiken Elementary opened for its first school year in August 1996, Aiken began to experience long term chronic problems with its HVAC system. The air conditioning was not cooling, and humidity readings as high as 74% were measured in the school in August 1996. At such time, ceiling tiles already exhibited water stains from condensation forming on, and dripping from HVAC chiller lines. In addition, several areas in Aiken already had wet and mildewed ceiling tiles, roof leaks were reported in hallways, water was penetrating the building's exterior base in several areas, and water was continuously ponding around the building exterior. School maintenance personnel reported, at least as early as November 1996, that the interior walls would "sweat" on Mondays after the HVAC system was shut down for the

weekend. Mold/mildew attributed to condensation was also discovered on chiller lines in the Aiken hallways at such time.

8.     Documents provided by BISD to Royal indicate that mold problems in Aiken classrooms existed in the Summer of 1997, if not earlier. In 1998, an engineering firm hired by BISD (CRC Engineering) attributed the chronic humidity and mold problems at Aiken to a defective HVAC system. The Texas Department of Health ("TDH") visited Aiken in October and November 1998 due to persistent complaints of mold/mildew and excessive humidity problems. The TDH found visible mold growth on ceiling tiles, desks, books, and other areas, as well as humidity levels as high as 68.5%. The TDH concluded that the humidity and mold problems at Aiken were most likely the result of a defectively designed HVAC system. Several other engineering and consulting firms hired by BISD and others have also noted deficiencies with Aiken's HVAC system between 1999 and 2003, and have attributed indoor air quality problems, including mold/mildew, to such deficiencies.

9.     Neither the chronic mold and humidity problems at the schools, nor the continuing causes thereof, had been resolved by the time this lawsuit was filed in June 2003, and may not be fully resolved to date. Mold growth remained on the chill water pipe insulation at Aiken, and possibly in other locations, even *after* repairs were attempted at Aiken around Fall 1999. In August 2001, mold and excessive humidity at Aiken and Besteiro again became a serious concern to BISD when significant mold growth was detected in the Besteiro kitchen (again), in a Besteiro computer room, and in the library/media center (again). The BISD Maintenance Administrator who observed the growth in August 2001 – when the school was being prepared for the upcoming school year – explained that the growth covered approximately 80% of the

kitchen (walls, desks and chairs), approximately 95% of the library shared by the two schools (walls, books, desks, and computers), and approximately 80% of the computer room (desks, walls and equipment). Assured Indoor Air Quality, LP, an expert hired by BISD, advised BISD on August 16, 2001 that the HVAC system's design was defective and "the air conditioning system is the prime suspect of being the cause of the aggressive mold growth."

10.     Engineering firms hired by BISD have attributed the mold and humidity problems at Aiken and Besteiro to excessive moisture from multiple water sources, such as defectively designed, constructed, and maintained HVAC systems, defectively constructed, repaired, and maintained roofs and windows, and chronic condensation on the HVAC system's chill water pipe insulation. One firm hired by BISD also noted that improper drainage of exterior courtyards may have caused water intrusion since the construction of Besteiro in 1994. *None* concluded that any weather events had ever damaged the roof or walls allowing water to enter and damage BISD's property. *Similarly, none identified any accidental discharges or leaks of water directly resulting from broken or cracked pipes containing water.*

11.     Several engineering and consulting firms have issued reports to BISD since 2001 that comment on the cause of the humidity and mold problems at the schools. As noted, most of these firms were hired by or on behalf of BISD. Rimkus Consulting Group, Inc. ("Rimkus"), then working on BISD's account, issued a report dated July 26, 1999. BISD hired Assured Indoor Air Quality, LP ("AIAQ"), who issued various reports in 2001 and 2002. BISD hired Ambiotec Environmental Consultants, Inc. ("Ambiotec"), who issued a report in May 2002. BISD also hired Engineering & Fire Investigations ("EFI"), who issued a report dated January 20, 2003. In addition, Rimkus, then hired by CIGNA, issued a report on December 20, 2002,

#541440

5

and David A. Weeks of the Center for Toxicology and Environmental Health ("CTEH"), also hired by CIGNA, issued a report dated January 10, 2003.

12.     In January 2002, BISD closed the two schools and brought suit in Cameron County against various architects, engineers and contractors (hereinafter, collectively the "construction contractors") involved in the design,  construction and maintenance of the two schools, including their HVAC systems.   (Cause No. 2002-01-000071-B, *BISD v. Stotler Construction Co., Carroll, Dusang & Rand, et al.,* in the 138th District Court of Cameron County, Texas.)   BISD alleged that design and construction defects had caused the property damage that existed at the two schools.   Hundreds of students and staff members at the two schools also sued the construction contractors and BISD in Cameron County for alleged personal injuries they attributed to mold and indoor air quality problems at the schools.  (Cause No. 2001-11-4959-C, *Angel Castillo and Maria Rosalva Castillo, et al. v. Carroll Dusang & Rand, Inc., et al.,* In the 197th District Court of Cameron County, Texas).

**B.     *BISD'S Insurance "Claims" with Royal***

13.     Shortly before the schools were closed, on or around November 29, 2001, BISD for the first time made a "claim" under Royal Policy No. KHT 318271 (policy term 4/1/01 - 4/1/02) for alleged damage and loss to Besteiro and Aiken. The 11/29/01 Notice of Loss letter failed to provide Royal a date, suspected cause or a description of the claimed loss, but instead only stated that BISD had "suffered a loss covered by your policy of insurance...The insured has incurred damages at Besteiro Middle School and Aiken Elementary...as the result of occurrences covered under the policies."   BISD provided Royal no further information about its claim at such

time, such as the type or extent of damages, the cause of the claimed loss, or the timing of such loss.

14.    Royal acknowledged receipt of the BISD claim and began its investigation of the claim. In order to assist with its lengthy investigation, Royal retained an independent adjusting firm, GAB Robins N.A., Inc. ("GAB"), in Harlingen, Texas. By December 5, 2001, GAB began requesting from BISD all materials that BISD claimed supported its sketchy allegations. As part of its investigation, GAB requested many specific items from BISD over the course of many months, including all engineering, mold or other investigative studies related to the problems and claimed damage at the schools.

15.    After numerous oral and written requests of BISD, and many months, a GAB property adjuster was finally permitted to walk through and visually observe the schools on or around February 26, 2002. During the walk through, GAB observed, among other things, ongoing water leaks and standing water on the floors in two Aiken classrooms. During this preliminary walk through of the schools, GAB also noted what appeared to be mold on the Aiken chill water pipes, duct work and nearby sheetrock surfaces.

16.    On or around April 2, 2002, BISD for the first time provided Royal Notice of Loss for damage and loss to Aiken and Besteiro under three *additional* Royal policies: Policy No. KHT 307564 (effective 9/1/96 - 9/1/97, but cancelled effective 4/1/97), Policy No. KHT 308599 (effective 4/1/97 - 4/1/98), and Policy No. KHT 310355 (effective 4/1/98 - 4/1/01). Like the November 29, 2001 notice, the April 2, 2002 notice failed to provide a date, cause or description of BISD's claimed loss, but instead again stated only that BISD had "suffered a loss covered by

the above listed policies of insurance...The insured has incurred damages at Besteiro Middle School and Aiken Elementary...as the result of occurrences covered under the policies."

17.    On January 22, 2003, along with a letter, BISD finally provided Royal for the first time, *some* of the items Royal had requested through GAB beginning as early as December 2001. BISD provided the following items in support of its claim for damage at Aiken and Besteiro, despite the fact that the dates on the documents indicated that some of the material had long been in BISD's possession:

> ➢ Assured Indoor Air Quality Report dated November 9, 2001 and entitled "Indoor Air Quality Environmental Survey,"

> ➢ Ambiotec Environmental Consultants Report dated May 2002 and entitled "Preliminary Mold Investigation,"

> ➢ Engineering & Fire Investigations Report dated January 20, 2003 and entitled "Remediation Evaluation Assessment," and

> ➢ Undated Besteiro/Aiken Project Breakdown Cost Report (for campus relocation expenses).

**C.**    ***Causation Reports from Various Engineers/Experts***

18.    In January 2002, AIAQ had issued at least two reports to its client, BISD:  a January 2, 2002 "Executive Summary" Report and a January 25, 2002 "Status Report."  In its January 2, 2002 Report, AIAQ reported to BISD, among other things, that "the building air conditioning system does not sufficiently condition and/or treat the outside air enough to reduce the increased moisture load in the building...".  At such time, AIAQ recommended that BISD "repair roof leaks by *replacing* the roof" and *"replace* the deficient HVAC system with an appropriate HVAC system which will maintain an appropriate indoor dew point...".  AIAQ also advised at such time that, "If present conditions are not immediately addressed with appropriate

action, the problem will only get worse." AIAQ reiterated its concerns and recommendations in its January 25, 2002 Report to BISD.

19.    In May 2002, Ambiotec advised BISD, among other things, that *Stachybotrys* mold found in Aiken air samples "presented a serious concern" and was "likely the result of airborne spores from the visible mold on the chiller pipe insulation jacket located above the corridor ceiling." Ambiotec also advised that "one principal cause of the moisture intrusion in Aiken is from the chilled water HVAC system, and in Besteiro from plumbing and roof leaks." Ambiotec, however, did *not* identify any cracked or broken pipes containing water at either school.

20.    In EFI's January 20, 2003 report to BISD, EFI reported several potential sources of water infiltration and resulting mold manifestations, including problems with the roofs at both Aiken and Besteiro caused by inadequate maintenance, deterioration of roofing/sealant materials, improper/missing flashing, and improper design/construction of the roofs. Notably, however, EFI did not identify that any weather events had ever damaged the roof, walls or other building structures allowing water to enter and damage BISD's property, nor after extensive study did EFI identify any accidental discharge or leaks of water resulting from broken or cracked pipes containing water.

21.    In its January 2003 report to BISD, with regard to Besteiro, EFI reported out-of-calibration thermostats, poorly maintained HVAC system components, outside air ventilation rates and conditioned air quantities inconsistent with design quantities, and improperly sized roof-top units ("RTUs").    In addition to design defects with the Besteiro HVAC system/equipment, EFI found that "the discharge air temperature, dry bulb and wet bulb, of

#541440

9

several RTUs [at Besteiro were] providing less than the cooling and dehumidification requirements of the original design. . . .Elevated levels of relative humidity in the classrooms and the lack of adequate routine cleaning of the interiors of the RTUs have also led to performance problems with the RTUs and the development of molds on the cooling units of some RTUs. The RTUs are not introducing designed amounts of outside air. Field measurements indicate that outside air ventilation rates are approximately 10 percent of the design outside air intake amount." EFI recommended removing and redesigning certain aspects of the HVAC system, as well as certain HVAC equipment, and properly cleaning and maintaining other equipment. Alternatively, EFI recommended to install all *new* RTUs at Besteiro, despite the 8 year old equipment having an estimated remaining useful life of 6-8 years.

22.    EFI also reported finding corroded chill water piping needing replacement and oversized fan coil units at Aiken. According to EFI, the oversized units were overcooling areas, and not adequately controlling humidity. EFI reported that chilled water leaks had occurred due to galvanic corrosion caused by *poor design or construction* – using steel piping in direct contact with brass and copper fittings. EFI found relative humidity levels well above the 50% design condition and heavy accumulations of dust, debris and possible mold on HVAC equipment resulting from improper maintenance. EFI reported mold staining on chilled water pipe insulation in first and second floor corridors. EFI also noted condensation and rust deterioration of the chilled water piping. EFI also observed numerous instances of poor/inadequate maintenance and inadequate/deficient design and installation of the HVAC system and equipment at Aiken.[1]

---

[1]    Mr. Oscar Tapia, BISD's facilities administrator, provided a sworn statement on June 2, 2003, as

23.    In Rimkus' July 26, 1999 Report to BISD's retained engineer, Mody Boatwright,

Rimkus' observations, conclusions and recommendations included the following:

> Elevated mold spore levels in the air at Aiken stem from sources of mold growth on surfaces inside the school and from inadequate air conditioning;

> Humidity levels in the school are not being maintained below the 60% maximum threshold, allowing mold to grow on walls, doors, and other surfaces inside Aiken;

> The school's climate control system needs to be modified to maintain humidity levels below 60%; and

> The school building should be appropriately remediated for mold and clearance testing should be implemented to verify air and surfaces are acceptable, and to ensure acceptable relative humidity levels.

24.    In Rimkus' December 20, 2002 Report to Cigna's independent adjuster, Rimkus'

conclusions included the following:

> The development of general stains on Aiken and Besteiro building finishing materials that is believed to be mold is the result of improper functioning of HVAC systems, caused by design errors and improper maintenance of the HVAC system.

25.    In CTEH's January 10, 2003 "Indoor Air Quality Report" to Cigna's independent

adjuster, CTEH's observations, conclusions and recommendations included the following:

> The relative humidity in some portions of Besteiro and Aiken exceeds the recommended relative humidity range of 60%;

> There is a strong correlation between rooms with higher relative humidity and extensive fungal growth on contents and surfaces;

> Observed active chill water line leaks in several Aiken classrooms that was damaging contents;

> Chill water lines (routed through ceilings of the Aiken main hallway) exhibited mold growth on insulation;

---

permitted by the Royal Policies. Mr. Tapia testified that BISD hired EFI to determine the cause of the problems at the schools, that BISD is pleased with EFI, BISD believes EFI's report was accurate, and *BISD agrees with all of EFI's findings*. Mr. Tapia also testified that he thought the HVAC system was the "main culprit" of possible moisture sources at the schools, in part because Brownsville had had very little rain.

➢ HVAC system at Aiken is not adequately removing the moisture from the conditioned air;

➢ The roof-top air conditioning unit for Besteiro Room 112 was inspected due to high relative humidity in the classroom, and revealed a pigeon nesting on the coils inside the unit;

➢ The average relative humidity was measured at 84-91% in complaint areas at Besteiro and 54-61% in non-complaint areas at Besteiro; and

➢ The HVAC systems at Besteiro were very dirty; making it impossible to visually differentiate mold growth from dirt and debris in HVAC systems.

26.    Rimkus, who had already investigated the mold in 1999 for BISD's retained engineer and in 2002 for CIGNA, was then retained by Plaintiff Royal in this litigation. Rimkus, after investigating even more thoroughly and reviewing mostly old, albeit newly available, documents from BISD, issued an expert report dated January 26, 2004. In its report, Rimkus' observations, conclusions and recommendations include the following:

➢ The HVAC systems for the school buildings are not functioning properly and, therefore, do not maintain the indoor humidity within industry standards, *i.e.*, the humidity is too high and a damp indoor environment exists.

➢ Documents provided by BISD indicate the HVAC systems have not functioned properly since the schools were constructed for the following reasons:

▪ Improper design,

▪ Improper installation, and

▪ Improper maintenance.

➢ The high humidity in the buildings has caused discomfort to occupants, and caused the development of general mold growth on building finishes and contents.

➢ Localized water stains (and possible mold) on building finishes, caused by the formation of condensation, dripping condensation, or overflowing condensation from HVAC systems components, have occurred at 27 distinct locations. These problems were caused by high indoor humidity, which is condensing on cooled components of

the operating HVAC systems, and inadequate maintenance to keep condensation drain pans/drains clean and functioning properly.

➢ The primary, if not the only, cause of the general mold growth on the building finishes and contents is the high indoor humidity, which has been an ongoing continuous condition since the school opened because of improper functioning of the HVAC systems.

➢ Proper functioning of the HVAC systems must be achieved to eliminate the high indoor humidity.

➢ Localized water leakage because of roof leaks (18 locations), and water supply and drainage pipe systems leaks (7 locations) have caused localized areas of water stains (and possible mold) on building finishes. The water leakage is at building construction joints, and pipe joints and/or fittings. The water leakage is the result of initial construction errors and/or normal wear and tear.

➢ There are no openings or gaps as the result of storm activity. The BISD records indicate this water leakage occurred soon after construction of the 6th grade addition, and occurred because of construction errors....[T]here are minor stains on acoustical ceiling tiles and gypsum board below the construction joint between the east wall of Aiken and the northern wing extending to the east...The sixteen (16) remaining locations of roof leaks are at penetrations through the roofs for the installation of roof drain hubs, rooftop HVAC units, electrical conduits, and mechanical piping....These problems are the result of poor installation of these various items or deteriorated sealant at the roof penetrations or pipe joints. No openings or gaps in the roofs because of storm activity were observed.

27.     Gobbell-Hays Partners ("GHP") was also retained by Royal and issued an expert report in this lawsuit dated January 21, 2004. In its report, GHP's observations, conclusions and recommendations included the following:

➢ Both schools have been impacted from point source incidents and systemic issues; both types existed from the time of occupancy.

➢ Besteiro has experienced repeated roof leaks and plumbing leaks, as well as problems with the air-handling system not functioning correctly.

➢ Aiken experienced humidity problems within the building immediately upon being occupied, which was tied to the air-handling system not functioning correctly.

➢ From approximately January 1999 through May 1999, the air conditioning system at Aiken was renovated; however, the documents provided by BISD indicate excessively

high humidity levels and that mold growth continued within the school even after the renovation activities were completed.

28.     In sum, all of the experts, including BISD's, are in agreement as to the causes of the claimed loss at the schools.  All of the experts attribute the high humidity, moisture, water intrusion and mold problems at Aiken and Besteiro to the initial design and construction defects and deficiencies, defective and deficient repairs, and improper and deficient maintenance – causes of loss not covered under the Royal Policies.  Significantly, no plumbing leaks have been attributed to breaks or cracks in pipe by anyone, and no roof leaks have been attributed to storm activity, such as hail or wind damage.    This voluminous, overwhelming evidence is uncontroverted.

**D.     _BISD's Proof of Loss in Support of Its Claim_**

29.     On January 23, 2003, BISD submitted a $10 million Sworn Statement in Proof of Loss ("Proof of Loss") to Royal.  The Proof of Loss indicated only that BISD was making a claim only under Policy No. KHT 318271 (effective 4/1/01 - 4/1/02) for a "loss by covered causes of loss," and that the property loss occurred "at an unknown date and time."  The Proof of Loss was signed by BISD's attorney, Baltazar Salazar, and  indicated that BISD was making a claim for $10 million "actual cash value."  The proof advised Royal only that the cause and origin of the claimed loss were "mold manifestations."  Although BISD had a duty under the policy to provide a fully complete Proof of Loss, it failed to do so.   The Proof of Loss is a condition precedent under the policy, which provides in pertinent part that the insured will "send [Royal] a signed, sworn proof of loss containing the information we request to investigate the claim."  Royal sent BISD the standard form which requested, _inter alia_, the date and time of the loss and the cause and origin of the loss.  BISD failed to provide any information as to the date of

the loss, despite the fact that BISD had first notified Royal of its claim more than one year earlier, in November 2001. Furthermore, BISD failed to identify the schools at issue and even identify the defects and problems that had been ongoing at the schools for many years. As presented, BISD's Proof of Loss failed to comply with the policy's condition precedent.

30.     Because the January 23, 2003 Proof of Loss failed to provide Royal the required basic information about BISD's claimed loss, Royal advised BISD, on February 21, 2003, that it was rejecting the proof of loss, and requested that BISD resubmit a sworn proof of loss that included the basic information requested by the form (and required by the policy), including the date and time of the loss, and the cause and origin of the claimed "mold manifestations." Royal advised BISD at such time that "This information is necessary for Royal to fully understand and investigate the loss reported by BISD. *I have enclosed another blank proof of loss form for your convenience.*" Despite Royal's request, BISD has refused for more than eighteen (18) months, and continues to refuse, to provide another Proof of Loss to Royal that complies with the policy requirements. This, despite the condition precedent that BISD: "Send [Royal] a signed, sworn proof of loss . . . within 91 days after [Royal's] request."

E.     *Royal's Requests for Materials Needed to Evaluate Claim*

31.     After receiving the initial materials from BISD, on February 21, 2003, Royal sent a letter to counsel for BISD in which Royal requested to take an examination under oath ("EUO") of BISD representatives on certain topics. As permitted by the Royal Policies, Royal took EUOs of three BISD representatives between May 30, 2003 and June 2, 2003, including Oscar Tapia, Raul Vasquez and Tony Fuller. Royal also requested additional materials needed by Royal to evaluate BISD's claim. Despite the fact that numerous additional materials were requested from

#541440

15

BISD by Royal on February 21, 2003, BISD failed to provide all the requested materials before this lawsuit was filed in June 2003, and has since continued its refusal to provide the requested materials.

32.    As set forth above, an actual controversy exists as to, among other issues, whether the damage at Aiken and Besteiro claimed by BISD under the Royal Policies is covered by one or more of the commercial property insurance policies issued to BISD by Royal. The amount in controversy well exceeds $75,000.

## IV. **POLICY PROVISIONS**

33.    Among the provisions of the Royal Policies[2] that may apply to, limit, preclude or otherwise impact coverage for BISD's claims are the following provisions from the Royal Policies:

### COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

[PC 86839 (0187)]

\* \* \*

**COVERAGES PROVIDED**

\* \* \*

| Coverage | Limit of Insurance | Covered Causes of Loss |
|---|---|---|
| Blanket Business Income | $100,000 | Special |

\* \* \*

---

[2] All four of the Royal Policies were previously filed with this Court with Royal's Motion for Summary Judgment and Appendix thereto filed on May 17, 2004. *See* Exhibits 1 - 4 to Royal's Motion for Summary Judgement [Doc. No. 42] (Royal's MSJ I). All four policies are incorporated by reference as if set forth fully herein.

### COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL DECLARATIONS
[PC 86840 (0187)]

\* \* \*

### COVERAGES PROVIDED

| Coverage | Limit of Insurance | Covered Causes of Loss |
|---|---|---|
| Blanket Extra Expense | $50,000 | Special |

\* \* \*

### DEDUCTIBLES
[Endorsement Number 3]

All claims for loss, damage or expense arising out of any one occurrence shall be adjusted as one claim, and from the amount of such adjusted claim, there shall be deducted the sum of:

$50,000          Per occurrence, except . . .

\* \* \*

### CAUSES OF LOSS - SPECIAL FORM[3]
[CP 10 30 06 95]

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** - Definitions.

A.     COVERED CAUSES OF LOSS

When Special is shown in the Declarations,[4] Covered Causes of Loss means RISK OF DIRECT PHYSICAL LOSS unless the loss is:

**1.**     Excluded in Section **B.**, Exclusions, or

**2.**     Limited in Section **C.**, Limitations; that follow.

---

[3] *See* The Causes of Loss - Special Form, Form CP 10 30 06 95 (ISO Commercial Risk Services, Inc. 1994) to the Royal Policies.

[4] "Special" is shown in the Declarations of all four Royal Policies. *See* Royal Policies, Exhibits 1, 2, 3, and 4 to Royal's MSJ I (Doc. No. 42), Form PC 86839.

#541440

17

B.    **EXCLUSIONS**

1.    We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

* * *

c.    **Governmental Action**

Seizure or destruction of property by order of governmental authority.

* * *

g.    **Water**

(1)    Flood, surface water . . ., all whether driven by wind or not;

* * *

(3)    Water that backs up or overflows from a sewer, drain or sump; or

(4)    Water under the ground surface pressing on, or flowing or seeping through:

(a)    Foundations, walls, floors or paved surfaces;

* * *

2.    We will not pay for loss or damage caused by or resulting from any of the following:

* * *

d.    (1)    Wear and tear;

(2)    Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

* * *

(7)    The following causes of loss to personal property:

#541440

18

**(a)**   Dampness or dryness of atmosphere

**(b)**   Changes in or extremes of temperature; or

But if an excluded cause of loss that is listed in **2.d. (1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

* * *

**3.**   We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.**   Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** Above to produce the loss or damage.

**b.**   Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.**   Faulty, inadequate or defective:

**(1)**   Planning, zoning, development, surveying, siting;

**(2)**   Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)**   Materials used in repair, construction, renovation or remodeling; or

**(4)**   Maintenance; of part or all of any property on or off the described premises.

* * *

### C.   LIMITATIONS[5]

The following limitations apply to all policy forms and endorsements, unless otherwise stated. We will not pay for loss or damage to property, as described in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

\* \* \*

5.   We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes.

\* \* \*

### E.   ADDITIONAL COVERAGE EXTENSIONS

\* \* \*

2.   **Water Damage, Other Liquids, Powder or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear Out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

---

[5] The Limitations provision appears, as modified by endorsement, in each of the Royal Policies. *See* Causes of Loss - Special Form , Form CP 10 30 06 95 of the Royal Policies, as amended by the Texas Changes Endorsement, Form CP 01 42 11 00, ¶ D.5. in Royal Policy No. KHT318271, Exhibit 4 to Royal's MSJ I [Doc. No. 42]; as amended by the Texas Changes Endorsement, Form No. CP 01 42 12 92, ¶ D.5. in Royal Policy Nos. KHT308599 and KHT310355, Exhibits 2 and 3 to Royal's MSJ I. Policy KHT307564, Exhibit 1 to Royal's MSJ I, contains the *Limitation Clause* as well, but it is not amended by the *Texas Changes Endorsement*. The only *substantive difference* between the Limitations Clause in KHT307564, and as it appears after amendment in the other three policies, is that before the amendment the Limitation also applied to personal property. In other words, the amendment deleted the reference to personal property. The provision, as it appears in Policy No. KHT307564, is as follows: "We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section. . . . c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless: (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or . . ."

F.   **DEFINITIONS**

"Specific Causes of Loss" means the following:  Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

\* \* \*

3.   Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including is related equipment and parts) containing water or steam.

### BUILDING AND PERSONAL PROPERTY COVERAGE FORM
### [CP 00 10 0695]

\* \* \*

A.   **COVERAGE**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1.   **Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

\* \* \*

2.   **Property Not Covered**

Covered Property does not include:

\* \* \*

d.   Bridges, roadways, walks, patios or other paved surfaces;

\* \* \*

f.    The cost of excavations, grading, backfilling or filling;

* * *

m.    Underground pipes, flues or drains;

* * *

3.    **Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

* * *

B.    **EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

* * *

E.    **LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

* * *

3.    **Duties In The Event Of Loss Or Damage**

a.    You must see that the following are done in the event of loss or damage to Covered Property:

* * *

(2)    Give us prompt notice of the loss or damage.  Include a description of the property involved.

(3)    As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4)    Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim . . .

#541440

[W]e will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss . . .

**(5)**   At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)**   As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)**   Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**(8)**   Cooperate with us in the investigation or settlement of the claim.

**b.**   We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4.**   **Loss Payment**

**a.**   In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)**   Pay the value of lost or damaged property;

**(2)**    Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)**    Take all or any part of the property at an agreed or appraised value; or

**(4)**    Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

\* \* \*

## G.    OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

\* \* \*

**3.    Replacement Cost**

**a.**    Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

\* \* \*

**c.**    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage in this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.**    We will not pay on a replacement cost basis for any loss or damage:

**(1)**    Until the lost or damage property is actually repaired or replaced; and

**(2)**    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**e.**  We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

    **(1)**  The Limit of Insurance applicable to the lost or damaged property;

    **(2)**  The cost to replace, on the same premises, the lost or damaged property with other property:

        **(a)**  Of comparable material and quality; and

        **(b)**  Used for the same purpose; or

    **(3)**  The amount you actually spend that is necessary to repair or replace the lost or damaged property.

\* \* \*

**TEXAS CHANGES**
[CP 01 42 11 00]

\* \* \*

**B.**  The provisions of Items **B.1.** through **B.5.** below apply to the following coverage forms:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM;

\* \* \*

**1.**  Under Additional Coverages, the Debris Removal coverage is deleted and replaced by the following:

**Debris Removal**

We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

\* \* \*

**3.**  Under Additional Coverages, the Pollutant Clean Up And Removal coverage is deleted.

\* \* \*

#541440

25

5.   Under Definitions, the definition of "pollutants" is deleted.

* * *

D.   The provisions of Items **D.1.** through **D.5.** below apply to the Causes of Loss - Special Form.

* * *

2.   Exclusion **B.2.f.,** which pertains to continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more, is deleted. However, all other exclusions pertaining to loss or damage by water continue to apply.

* * *

4.   Exclusion **B.2.l.,** which pertains to pollutants, is deleted.

5.   Limitation **C.1.c.** is replaced by the following:

c.   We will not pay for loss or damage to the interior of any building or structure caused by or resulting from rain, snow, sleet, ice sand or dust, whether driven by wind or not, unless:

(1)   The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

* * *

F.   **Legal Action Against Us**[6]

1.   The **Legal Action Against Us** Commercial Property Condition is replaced by the following . . .

---

[6] *See* Commercial Property Conditions, Form CP 00 90 07 88, Clause D., of the most recent three Royal Policies, as amended by the Texas Changes Endorsement, Form  CP 01 42 11 00, ¶ F. in Royal Policy No. KHT318271 (4/1/01-4/1/02), Exhibit 4 to Royal's MSJ I (Doc. No. 42); as amended by the Texas Changes Endorsement, Form No. CP 01 42 12 92, ¶ F.  in Royal Policy Nos. KHT308599 (4/1/97-4/1/98) and KHT310355 (4/1/98-4/1/01), Exhibits 2 and 3 Royal's MSJ I (Doc. No. 42).

#541440

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

a.    There has been full compliance with all of the terms of this Coverage Part; and

b.    The action is brought within 2 years and one day after the date on which the direct physical loss or damage occurred.

\* \* \*

H.    The provision requiring signed, sworn proof of loss in the Duties In The Event Of Loss Or Damage Loss condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

\* \* \*

**COMMERCIAL PROPERTY**
**CP 04 05 06 95**

**ORDINANCE OR LAW COVERAGE**

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

\* \* \*

**SCHEDULE\***

| Bldg. No./ Prem. No. | Cov. A. | Cov. B Limit of Insur. | Cov. C Limit of Insur. |
|---|---|---|---|
| All/All | [X] | $ 25,000 | $ 50,000 |

\* \* \*

B.    We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

C.    **Coverage**

* * *

3.    **Coverage C - Increased Cost of Construction Coverage**

a.    If a Covered Cause of Loss occurs to the covered Building property, we will pay for the increased cost to:

(1)    Repair or reconstruct damaged portions of that Building property; and/or

(2)    Reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required; when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.

However:

* * *

(2)    We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

* * *

D.    **Loss Payment**

* * *

2.    Unless paragraph **D.4.** applies, loss payment under Coverage B - Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

a.    The amount you actually spend to demolish and clear the site of the described premises; or

b.    The applicable Limit of Insurance shown for Coverage B in the Schedule above.

3.    Unless paragraph **D.4.** applies, loss payment under Coverage **C** - Increased Cost of Construction Coverage will be determined as follows:

a.    We will not pay under Coverage **C**:

(1)    Until the property is actually repaired or replaced, at the same or another premises; and

(2)    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

\* \* \*

**F.**    Under this endorsement we will not pay for loss due to any ordinance or law that:

1.    You were required to comply with before the loss, even if the building was undamaged; and

2.    You failed to comply with.

**BUSINESS INCOME (AND EXTRA EXPENSE)
COVERAGE FORM
[CP 00 30 06 95]**

\* \* \*

**A.**    **COVERAGE**

\* \* \*

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

\* \* \*

#541440

2.    **Covered Causes of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

3.    **Additional Coverages**

a.    **Extra Expense.**

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

\* \* \*

B.    **EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

C.    **LIMITS OF INSURANCE**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

\* \* \*

D.    **LOSS CONDITIONS**[7]

\* \* \*

2.    **Duties In The Event Of Loss**

a.    You must see that the following are done in the event of loss:

\* \* \*

---

[7] *See* Building and Personal Property Coverage Form, Form CP 00 10 06 95 (emphasis added), as amended by the Texas Changes Endorsement, Form CP 01 42 11 00, ¶ H. in Policy No. KHT 318271,Exhibit 4 to Royal's MSJ I; as amended by the Texas Changes Endorsement, Form CP 01 42 12 92, ¶ H. in Royal Policy Nos. KHT308599 and KHT310355, Exhibits 2 and 3 to Royal's MSJ I, Policy No. KHT307564 (effective 9/1/96-4/1/97), Exhibit 1 to Royal's MSJ I does not contain the Texas Changes Endorsement. Therefore, Clause 8 of the provision is slightly different in the oldest policy, Exhibit 1 to Royal's MSJ I, but not in a material way. Clause (7) is also different in Policy No. KHT307564 because the policy does not have the aforementioned Texas Changes Endorsement, which allows 91 days to provide proof of loss.

#541440

**(2)**    Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)**    As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

**(4)**    Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. . . .

**(5)**    As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)**    Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**(7)**    Cooperate with us in the investigation or settlement of the claim.

**(8)**    If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

#541440

**b.**    We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3.    Limitation - Electronic Media And Records**

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

**a.**    60 consecutive days from the date of direct physical loss or damage; or

**b.**    The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

**(1)**    Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

**(2)**    Data stored on such media; or

**(3)**    Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

\* \* \*

**4.    Loss Determination**

\* \* \*

**b.**    The amount of Extra Expense will be determined based on:

**(1)**    All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss

or damage had occurred. We will deduct from the total of such expenses:

(a)     The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b)     Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2)     All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c.      Resumption Of Operations**

We will reduce the amount of your:

\* \* \*

(2)     Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

d.      If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

\* \* \*

**G.     DEFINITIONS**

\* \* \*

**2.       "Operations"** means:

a.      Your business activities occurring at the described premises; and

* * *

3.  **"Period of Restoration"** means the period of time that:

    a.  Begins:

        (1) 72 hours after the time of direct physical loss or damage for Business Income coverage; or

        (2) Immediately after the time of direct physical loss or damage for Extra Expense coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and

    b.  Ends on the earlier of:

        (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        (2) The date when business is resumed at a new permanent location.

    "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

        (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

        (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

    The expiration date of this policy will not cut short the "period of restoration".

* * *

**COMMERCIAL PROPERTY CONDITIONS**
[CP 00 90 07 88]

* * *

**D.    LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1.    There has been full compliance with all of the terms of this Coverage Part; and

2.    The action is brought within 2 years and one day after the date on which the direct physical loss or damage occurred.

* * *

**H.    POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part

1.    We cover loss or damage commencing:

a.    During the policy period shown in the Declarations; and . . .

* * *

**I.    TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.   That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. . . . .

* * *

**TEXAS INFORMATION SYSTEMS PROPERTY COVERAGE PART**
[PC 0027 0996]

* * *

**A.    COVERAGE**

We will pay for direct physical "loss" to Covered Property from any of the Covered Causes of Loss.

#541440

35

1.    **Covered Property**

We cover:

a.    Electronic data processing systems and electronic communications equipment, including component parts and wiring, owned by you and property of others in your care, custody or control for which you are responsible.

We also cover air conditioning equipment used exclusively in the operation of the Covered Property.

b.    "Electronic Media" including converted data owned by you and similar property of others in your care, custody or control and for which you are responsible.

* * *

4.    **Covered Causes of Loss**

We cover risks of direct physical "loss" to Covered Property, including "computer viruses," except those causes of "loss" listed in the Exclusions.

* * *

7.    **Coverage Options**

Coverage applies only to that Coverage Option for which a Limit of Insurance is shown on the Declarations.

a.    **"Extra Expense"**

When a Limit of Insurance is shown on the Declarations we will pay the actual and necessary "Extra Expense" you incur in order to continue your "operations" which are interrupted due to direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover "Extra Expense" you incur:

(1)    If the premises where the property is located is damaged and you are prevented from using the Covered Property.

(2)    If the air conditioning or electrical system necessary for the operation of Covered Property is damaged and this causes a

reduction or suspension of your "operations."

(3)    If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

**What we will pay for "Extra Expense:"**

If "loss" to Covered Property results in "Extra Expense" we will pay up to the Limit of Insurance shown on the Declarations all expenses that exceed normal operating expenses beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property.

We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed.

**b.    Loss of Income**

When a Limit of Insurance is shown on the Declarations we will pay the actual Loss of Income you sustain due to the necessary suspension of your "operations." The suspension must be caused by direct physical "loss" to the Covered Property. The "loss" must be caused by or result from a Covered Cause of Loss.

We will also cover Loss of Income you sustain:

(1)    If the premises where the property is located is damaged and you are prevented from using the Covered Property.

(2)    If the air conditioning or electrical system necessary for the operation of the Covered Property is damaged and this causes a reduction or suspension of your "operations."

(3)    If you are denied access to the premises by action of a civil authority because of damage to adjacent property caused by a Covered Cause of Loss. This coverage will apply for up to two consecutive weeks from the date of that action.

#541440

**What we will pay for Loss of Income:**

If "loss" to Covered Property results in total or partial suspension of your "operations" we will pay up to the Limit of Insurance shown on the Declarations.

(1)     The actual Loss of Income you sustain beginning with the date of "loss" and not limited by the expiration date of this policy as it should reasonably take to rebuild, repair or replace the damaged property. We will deduct from this amount all charges and expenses which do not necessarily continue during the "period of restoration."

(2)     All necessary expenses that you incur to reduce Loss of Income, other than expenses for putting out a fire.

But we will not pay more than the actual amount by which the Loss of Income is reduced.

You must take all reasonable steps to minimize your Loss of Income either by making partial use of your own property or property of others to continue your "operations."

B.     **EXCLUSIONS**

1.     We will not pay for a "loss" caused by or resulting from:

a.     Delay, loss of use, loss of market or any other consequential loss.

b.     Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration or depreciation.

* * *

f.     Corrosion, rust, dampness or dryness, cold or heat, extremes or changes in temperature.

But we will pay for such "loss" resulting from direct physical "loss" to the air conditioning system that services the Covered Property if the damage to such property is caused by a Covered Cause of Loss.

* * *

#541440

e. **Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

\* \* \*

(3) Water that backs up from any sewer or drain;

(4) Water that seeps, leaks or flows from below the surface of the ground; or

\* \* \*

C. **LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

D. **DEDUCTIBLE**

We will not pay for "loss" or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition.

\* \* \*

3. **Duties In The Event of Loss or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

\* \* \*

(2) Give us prompt notice of the loss or damage.    Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss.  If feasible, set the damaged property aside and in the best possible order for examination.  Also keep a

#541440

39

record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

(5)   At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6)   As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7)   Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

(8)   Cooperate with us in the investigation or settlement of the claim.

b.   We may examine any insured under oath, while no the presence of any other insured and at such times as may be reasonably required about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4.   **Loss Payment**

a.   In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1)   Pay the value of lose or damaged property;

(2)   Pay the cost of repairing or replacing the lost or damaged property;

(3)   Take all or any part of the property at an agreed or appraised value; or

(4)   Repair, rebuild or replace the property with other property of like kind and quantity.

* * *

#541440