

Law Office of
Ramon Garcia, P.C.                    Page 1

```
 1   04-M-70790 mkh
 2
 3            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 4                 BROWNSVILLE DIVISION
 5
     ROYAL SURPLUS LINES           *
 6   INSURANCE COMPANY,            *
            Plaintiff,             *
 7                                 *
     VS.                           * CIVIL ACTION NO. B-03-109
 8                                 *
     BROWNSVILLE INDEPENDENT       *
 9   SCHOOL DISTRICT,              *
            Defendant.             *
10
11
12
13
14
            **************************************************
15                 ORAL DEPOSITION OF
                      JAMES BETTIS
16               NOVEMBER 4, 2004
            **************************************************
17
18
19
20   ORAL AND VIDEOTAPED DEPOSITION of JAMES BETTIS, produced
     as a witness at the instance of the Plaintiff, and duly
21   sworn, was taken in the above-styled and numbered cause on
     the 3rd of November, 2004, from 1:38 p.m. to 5:26 p.m.,
22   before Mary Kay Hendricks, CSR in and for the State of
     Texas, reported by machine shorthand, at the offices of
23   Harrison, Bettis, Staff, McFarland & Weems, LLP, 500
     Dallas, Suite 2650, Houston, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the provisions stated
     on the record or attached hereto.
25
```

Royal v. Brownsville ISD                                                James Bettis

---

**Page 2**

```
 1        A P P E A R A N C E S
 2
 3   ATTORNEYS FOR PLAINTIFF:
 4      Beirne, Maynard & Parsons, LLP
        1300 Post Oak Boulevard, Suite 2500
 5      Houston, Texas  77056
        713-960-7349  Fax: 713-960-1527
 6      E-mail: swedemeyer@bmpllp.com
 7      By: Jay Brown, Esquire
 8
 9   ATTORNEYS FOR DEFENDANT:
10      Law Offices of Baltazar Salazar
        1612 Winbern
11      Houston, Texas  77004
        713-655-1300  Fax: 281-749-8104
12
13      By: Baltazar Salazar, Esquire
14
     THE VIDEOGRAPHER:
15
        Mr. Damon Norris
16
17
     REPORTED BY:
18
        Ms. Mary Kay Hendricks, CSR
19
20
21
22
23
24
25
```

**Page 3**

```
 1        EXAMINATION INDEX
 2
 3                        PAGE
 4   BY MR. BROWN.................................    5
 5
 6
 7
 8
 9        EXHIBIT INDEX
10                        PAGE
11   BETTIS EXHIBIT NO. 1...........................   16
        Amended notice of
12      deposition for Mr. Bettis
13   BETTIS EXHIBIT NO. 2...........................   17
        Defendant/Counter Plaintiff,
14      Brownsville Independent School
        District's designation of experts
15
     BETTIS EXHIBIT NO. 3...........................   74
16      Letter to Mr. Salazar and Mr. Garcia
        from Dennis Nickoloff dated 2-21-03
17
     BETTIS EXHIBIT NO. 4...........................  101
18      Reservation of rights letter
19   BETTIS EXHIBIT NO. 5...........................  118
        Report from Duane Swoveland dated 1-19-04
20
     BETTIS EXHIBIT NO. 6...........................  125
21      Copy of insurance policy
22
23
24
25
```

**Page 4**

```
01:33  1        THE VIDEOGRAPHER:  Today's date is November
01:33  2   4th, 2004.  We're now on the record.  It's 1:38.
       3
       4        JAMES BETTIS
       5   was called as a witness and, being first duly sworn by the
       6   notary, testified as follows:
       7
       8        EXAMINATION
01:34  9
01:34 10        Q.  (BY MR. BROWN)  Would you state your name for
01:34 11   the record, please?
01:34 12        A.  James Bettis.
01:34 13        Q.  And, Mr. Bettis, you're a practicing lawyer.  Is
01:34 14   that correct?
01:34 15        A.  That's correct.
01:34 16        Q.  And for how many years have you been practicing?
01:34 17        A.  A little over 15 years.
01:34 18        Q.  You understand you're here today to give a
01:34 19   deposition because you've been designated as an expert
01:34 20   witness in this case.
01:34 21        A.  I do.
01:34 22        Q.  And can you explain generally the areas of
01:34 23   expertise that you bring here today to bear on this case?
01:34 24        A.  Primarily two areas.  One is interpreting
01:34 25   policies and determining whether there's coverage owed
```

**Page 5**

```
01:34  1   under a particular policy.  The second area relates to the
01:34  2   handling of claims by insurance carriers and their
01:34  3   adjustors.
01:34  4        Q.  Policy interpretation and claims handling.  Is
01:34  5   that correct?
01:34  6        A.  Basically, yes.
01:34  7        Q.  I'd like to visit with you a little bit about
01:35  8   your background.  First of all, you've obviously taken
01:35  9   many depositions, I assume.
01:35 10        A.  That's correct.
01:35 11        Q.  You've sat in the same seat that I'm sitting in,
01:35 12   metaphorically speaking, many times.
01:35 13        A.  Many times.
01:35 14        Q.  All right.  And how many times have you
01:35 15   testified in a case?
01:35 16        A.  Other than on attorneys' fees, I don't believe
01:35 17   I've testified in any cases.
01:35 18        Q.  You've testified in cases before on the issue of
01:35 19   what attorneys' fees were appropriate for that particular
01:35 20   case?
01:35 21        A.  Yes, I have.
01:35 22        Q.  Let me ask you about your -- your background,
01:35 23   and let's -- let's start from when you graduated from law
01:35 24   school and sort of work backwards from there.  Where did
01:35 25   you go to law school and when did you graduate?
```

2 (Pages 2 to 5)

Royal v. Brownsville ISD                                          James Bettis

## Page 6

01:35  1      A.  Went to University of Texas School of Law,
01:35  2  graduated in 1989.
01:35  3      Q.  And where did you go to undergraduate school?
01:36  4      A.  University of Texas, graduated in 1986 with an
01:36  5  accounting degree.
01:36  6      Q.  And prior to going to University of Texas
01:36  7  undergraduate, did you -- did you work any, or did you
01:36  8  pretty much go straight through high school on to law
01:36  9  school?
01:36 10      A.  I went straight through.  I worked at Christmas,
01:36 11  summers, during school, but I did not have any full-time
01:36 12  job.
01:36 13      Q.  What part of the country are you from?
01:36 14      A.  I'm from Houston, born and raised.
01:36 15      Q.  And after graduating from University of Texas in
01:36 16  1989, where did you go to work?
01:36 17      A.  I went to work for a firm that was then known as
01:36 18  Liddell, Sapp, Zively, Hill &LaBoon.
01:36 19      Q.  And how long -- how long did you work for that
01:36 20  firm?
01:36 21      A.  I worked for Liddell, Sapp for approximately
01:36 22  five years, right at five years.
01:36 23      Q.  What areas of law did you practice at that time?
01:36 24      A.  Practiced all sorts of litigation, also did a
01:37 25  significant amount of work involving insurance coverage

## Page 7

01:37  1  issues, insurance coverage disputes, insurance litigation
01:37  2  involving insurance code, duty of good faith and fair
01:37  3  dealing and that type of matter.
01:37  4      Q.  Did you write coverage opinions at that time?
01:37  5      A.  Yes, I did.
01:37  6      Q.  Now, what is a coverage opinion in general?
01:37  7      A.  A coverage opinion generally is someone's
01:37  8  opinion, usually in writing, as to whether coverage exists
01:37  9  under a policy for a particular claim.
01:37 10      Q.  And were you retained by insurance carriers to
01:37 11  write coverage opinions?
01:37 12      A.  I've been retained by both insurance carriers
01:37 13  and insureds.  Initially it was more insurance carriers.
01:37 14  Now it's probably 50/50.
01:37 15      Q.  Why would an insurance carrier need someone like
01:37 16  you to explain to him what is covered under the policy?
01:37 17      A.  If they don't have the level of experience and
01:37 18  expertise to interpret it themselves, they may need
01:37 19  somebody to give an opinion.  Some adjustors do it
01:37 20  themselves.  Some hire outside counsel.
01:37 21      Q.  Is it unusual at all for insurance carriers to
01:38 22  hire outside counsel to advise them on the things that
01:38 23  you've advised insurance carriers on over the years?
01:38 24      A.  No.
01:38 25      Q.  You've advised insurance carriers over the years

## Page 8

01:38  1  on issues relating to policy interpretation, correct?
01:38  2      A.  Correct.
01:38  3      Q.  And also you've advised insurance carriers over
01:38  4  the years on issues relating to claims handling.
01:38  5      A.  Correct.
01:38  6      Q.  In those matters where you advised insurance
01:38  7  carriers, the fact that they retained you, does that mean
01:38  8  that there was anything improper or untoward about their
01:38  9  conduct?
01:38 10      A.  It depends on which case.
01:38 11      Q.  Well, I mean, the fact that they retained you in
01:38 12  the cases that you worked on --
13      A.  Well --
01:38 14      Q.  -- did that mere fact alone mean that they were
01:38 15  acting improperly?
01:38 16      A.  Again, it depends on the case.
01:38 17      Q.  If we limit our discussion to the cases that you
01:38 18  worked on, what cases would there be where the mere fact
01:39 19  that the insurance carrier retained you to advise them,
01:39 20  you would view that as improper conduct?
01:39 21      A.  No, I don't think the mere fact they retained me
01:39 22  means they've done anything improper.  If that's what it
01:39 23  sounded like I said, I did not mean that.
01:39 24      Q.  So there's nothing improper about an insurance
01:39 25  carrier retaining a coverage lawyer such as yourself to

## Page 9

01:39  1  advise it.
01:39  2      A.  Oh, no.
01:39  3      Q.  It happens all the time.
01:39  4      A.  Correct.
01:39  5      Q.  Now, have you ever worked as an employee of an
01:39  6  insurance company?
01:39  7      A.  No.
01:39  8      Q.  Have you ever worked as a claims adjustor for an
01:39  9  insurance company?
01:39 10      A.  I have done adjusting work as part of my legal
01:39 11  practice.  Some of the legal issues I'm hired for also
01:39 12  involve adjusting-type issues, but it is, you know, as all
01:39 13  part of providing legal services.
01:39 14      Q.  When you did that work, you worked as a lawyer,
01:40 15  correct?
01:40 16      A.  Yes.
01:40 17      Q.  You charged lawyer rates?
01:40 18      A.  Yes.
01:40 19      Q.  You didn't charge adjustor rates.
01:40 20      A.  No.
01:40 21      Q.  Are you licensed as an insurance adjustor?
01:40 22      A.  No.
01:40 23      Q.  Are you licensed as a lawyer?
01:40 24      A.  Yes.
01:40 25      Q.  So you've never worked as a traditional

Esquire Deposition Services          (713) 524-4951 Fax          (713) 524-4600

Royal v. Brownsville ISD                                                James Bettis

**Page 10**

01:40 1    insurance adjustor adjusting a claimthe way other
01:40 2    insurance adjustors do.
01:40 3        A. I can't really answer that 'yes" or "no."
01:40 4        Q. And why is that?
01:40 5        A. Because as part of some of the cases and files
01:40 6    I've been hired, I have assisted with and worked in the
01:40 7    adjusting process.
01:40 8        Q. Well, is that the way that a traditional
01:40 9    insurance adjustor works, with a law license and $200 an
01:40 10    hour, or do they usually -- the traditional insurance
01:40 11    adjustor usually approaches things differently?
01:40 12        A. They shouldn't approach it differently if
01:40 13    they're doing the adjusting part of it.
01:40 14        Q. In any event, you're not licensed as an
01:40 15    adjustor.
01:40 16        A. Correct.
01:40 17        Q. You've provided your resume or curriculum vitae
01:41 18    in this matter, correct?
01:41 19        A. Yes.
01:41 20        Q. Does it state that you are an insurance
01:41 21    adjustor?
01:41 22        A. No.
01:41 23        Q. Does your website state that you're an insurance
01:41 24    adjustor?
01:41 25        A. No.

**Page 11**

01:41 1        Q. Does the Martindale-Hubbell state that you're an
01:41 2    insurance adjustor?
01:41 3        A. No.
01:41 4        Q. What is the Martindale-Hubbell?
01:41 5        A. Martindale-Hubbell is a directory, like a phone
01:41 6    book for law firms and has listings of their lawyers.
01:41 7        Q. And describes their areas of practice.
01:41 8        A. Correct.
01:41 9        Q. Have you ever -- I take it you don't have any
01:41 10    certifications or other formal qualifications as an
01:41 11    insurance adjustor other than the law license that we've
01:41 12    talked about and the fact that some of your cases have
01:41 13    involved insurance matters.
01:41 14        A. My experience in the practice of law has exposed
01:41 15    me to a tremendous amount of law, policies, procedures of
01:41 16    adjusting.
01:41 17        Q. Have you ever taught adjusting classes to
01:42 18    insurance adjustors that were obtaining their
01:42 19    continuing -- it's not continuing legal education credit,
01:42 20    but continuing adjusting credit?
01:42 21        A. No, I have not.
01:42 22        Q. Now, you've worked --
01:42 23        A. Wait. Let me step back on that. I can't
01:42 24    remember if I have or not. I know I've worked on papers
01:42 25    that -- I can't remember if I've presented some of them or

**Page 12**

01:42 1    other people in my firm, but we have -- the firm has
01:42 2    presented the equivalent of continuing education courses
01:42 3    to adjustors in which they've gotten credit for. I've
01:42 4    worked on papers. I cannot remember if I myself presented
01:42 5    any or not.
01:42 6        Q. Do you recall any specific classes that you've
01:42 7    taught to adjustors, you personally?
01:42 8        A. I can't recall right now.
01:42 9        Q. Do you recall any specific papers that you've
01:42 10    personally authored that were presented to adjustors as
01:43 11    part of their educational process?
01:43 12        A. I have -- I can recall working on several. I
01:43 13    wasn't the sole author, but I've assisted people in the
01:43 14    firm who have presented them.
01:43 15        Q. Do you know if your name is an author on any of
01:43 16    those papers?
01:43 17        A. I don't recall.
01:43 18        Q. In any event, they're not listed on your resume.
01:43 19        A. Correct.
01:43 20        Q. Now, you've worked with Ramon Garcia before,
01:43 21    before this case, correct?
01:43 22        A. Yes, I have.
01:43 23        Q. Would you describe your professional
01:43 24    relationship with Mr. Garcia and how that came about?
01:43 25        A. My firm, including myself, represented an

**Page 13**

01:43 1    insured who had been, for lack of a better word,
01:43 2    victimized by an insurance broker, many improper
01:43 3    practices. We filed a lawsuit -- we didn't file a
01:43 4    lawsuit. We were sued. And we filed claims, a third-
01:43 5    party claimant's (sic) broker down in Hidalgo County, and
01:44 6    we worked with Mr. Garcia on that case.
01:44 7        Q. Have you worked with him or members of his firm
01:44 8    on other cases?
01:44 9        A. I have talked to Mr. Garcia from time to time.
01:44 10    He's called me with questions, typically insurance
01:44 11    questions, but I've not formally been retained on any
01:44 12    other cases. I know that my firm has worked with him on
01:44 13    one or two other cases but not me.
01:44 14        Q. What was the style of the case that you worked
01:44 15    with him on in Hidalgo County?
01:44 16        A. Its Vega Roofing versus Aero Staff (sic) versus
01:44 17    Brown and Brown. That's -- it may not be exactly how
01:44 18    they're styled, but that's the -- basically the parties.
01:44 19        Q. Who was your client?
01:44 20        A. It was Aero Staff.
01:44 21        Q. Did you work in that case as a lawyer?
01:44 22        A. Yes.
01:44 23        Q. Did you testify in that case?
01:44 24        A. No. It did not go to trial, but...
01:45 25        Q. How did you come to be retained in this case?

Esquire Deposition Services        (713) 524-4951 Fax        (713) 524-4600

Royal  v. Brownsville ISD                                                    James Bettis

| | Page 14 |
|---|---|
| 01:45 1 | A. I received a call from Mr. Salazar. |
| 01:45 2 | Q. And when was that? |
| 01:45 3 | A. I don't remember. |
| 01:45 4 | Q. What was the nature of that call? |
| 01:45 5 | A. He just called and told me that he was working |
| 01:45 6 | with Mr. Garcia, Judge Garcia, on a case, insurance case, |
| 01:45 7 | and that -- would I be willing to potentially serve as an |
| 01:45 8 | expert? |
| 01:45 9 | Q. Had you worked before on behalf of BISD? |
| 01:45 10 | A. No. |
| 01:45 11 | Q. Have you been involved in any of the other |
| 01:45 12 | litigation involving BISD? |
| 01:45 13 | A. No. |
| 01:45 14 | Q. Have you worked with Mr. Salazar in other |
| 01:45 15 | matters other than this case? |
| 01:45 16 | A. No. We have talked about working together on |
| 01:45 17 | some things, potential. We've never worked together. |
| 01:46 18 | Q. Have you done prior work on behalf of one of the |
| 01:46 19 | Royal companies? |
| 01:46 20 | A. One of the Royal entities, yes. |
| 01:46 21 | Q. And which entity or which entities is that? |
| 01:46 22 | A. I would have to pull the files. |
| 01:46 23 | Q. It's -- |
| 01:46 24 | A. It's not -- it's not the entity that's a party |
| 01:46 25 | in this lawsuit. |

| | Page 15 |
|---|---|
| 01:46 1 | Q. It's not the insuring entity that's a party in |
| 01:46 2 | this lawsuit? |
| 01:46 3 | A. Correct. |
| 01:46 4 | Q. What type of work did you do for one of the |
| 01:46 5 | Royal entities? |
| 01:46 6 | A. Primarily subrogation work. |
| 01:46 7 | Q. And do you still do subrogation work for that |
| 01:46 8 | entity or for other Royal entities? |
| 01:46 9 | A. No. |
| 01:46 10 | Q. Do you know -- I take it you don't remember the |
| 01:46 11 | name of the insuring entity that you did that work for. |
| 01:46 12 | A. Not off the top of my head, no. |
| 01:46 13 | Q. Do you know if that insuring -- do you know of |
| 01:46 14 | the specific corporate relationship, if any, between that |
| 01:46 15 | entity that you did subrogation work for and the entity |
| 01:46 16 | involved in this case? |
| 01:46 17 | A. No. |
| 01:47 18 | Q. All you know is that they both have Royal in the |
| 01:47 19 | name. |
| 01:47 20 | A. Right. |
| 01:47 21 | Q. How many cases did you handle for that Royal |
| 01:47 22 | entity for whom you did subrogation work? |
| 01:47 23 | A. I don't know for sure, but I'd say probably |
| 01:47 24 | between 30 and 40. |
| 01:47 25 | Q. Do you still have active cases for a Royal |

| | Page 16 |
|---|---|
| 01:47 1 | entity? |
| 01:47 2 | A. I don't think so. I don't. |
| 01:47 3 | Q. And who did you report to at the time at that |
| 01:47 4 | Royal entity? |
| 01:47 5 | A. Tim Dunn. |
| 01:47 6 | Q. And what city was he located in? |
| 01:47 7 | A. Atlanta. |
| 01:47 8 | Q. And I assume he was in their subrogation |
| 01:47 9 | department? |
| 01:47 10 | A. Yes. |
| 01:47 11 | Q. Have you ever advised a Royal entity as to |
| 01:48 12 | coverage interpretation and claims handling? |
| 01:48 13 | A. No. |
| 14 | MR. BROWN: Let me ask that this be marked. |
| 01:48 15 | (Discussion off the record.) |
| 01:48 16 | (Bettis Exhibit No. 1 marked.) |
| 01:48 17 | Q. (BY MR. BROWN) Okay. Yeah. Mr. Bettis, I'm |
| 01:49 18 | showing you Exhibit No. 1. And is that a copy of the |
| 01:49 19 | notice for your deposition and the subpoena duces tecum? |
| 01:49 20 | A. Yes. |
| 01:49 21 | Q. And a subpoena duces tecum is the part of the |
| 01:49 22 | notice that requests you to bring certain documents in |
| 01:49 23 | connection with your work on this case. Is that correct? |
| 01:49 24 | A. Yes. |
| 01:49 25 | Q. Okay. Have you brought any documents here with |

| | Page 17 |
|---|---|
| 01:49 1 | you into this conference room? |
| 01:49 2 | A. No. They're in my office. |
| 01:49 3 | Q. Okay. The -- if we need to refer to the |
| 01:49 4 | documents that you've reviewed as part of your work on |
| 01:49 5 | this case, are they here at your law firm? |
| 01:49 6 | A. Yes. |
| 01:49 7 | Q. And would you take a minute and review the duces |
| 01:49 8 | tecum, which is not very lengthy and just -- after you |
| 01:49 9 | review it, confirm with me that all of that material as it |
| 01:49 10 | pertains to your work on this case would be here at your |
| 01:49 11 | firm? |
| 12 | A. It is. |
| 01:49 13 | Q. And if we need to refer to that during the |
| 01:49 14 | deposition, can you get that? |
| 01:50 15 | A. Yes. |
| 01:50 16 | MR. SALAZAR: Mr. Brown, if you'd like, I |
| 01:50 17 | can bring it in. |
| 01:50 18 | MR. BROWN: We may take a break, yeah, if |
| 01:50 19 | that's -- I mean, but let's wait till we take a break, |
| 01:50 20 | yeah, and just see if I can make some progress here. |
| 01:50 21 | Okay. Let's mark this. |
| 01:50 22 | (Bettis Exhibit No. 2 marked.) |
| 01:50 23 | Q. (BY MR. BROWN) Okay. Mr. Bettis, the court |
| 01:50 24 | reporter has handed you what's been marked as Exhibit |
| 01:50 25 | No. 2 to your deposition. And is that the designation of |

Royal v. Brownsville ISD                                                    James Bettis

**Page 18**

01:50 1 experts filed by BISD in this matter that names you as
01:50 2 well as other experts and that also includes, attached to
01:50 3 it, a copy of the report that you issued in this matter
01:51 4 along with your CV?
01:51 5    A. It appears to be, and the only reason I say that
01:51 6 is: I don't think I've ever seen this before.
01:51 7    Q. You've never seen the -- the designation of you
01:51 8 as an expert.
01:51 9    A. I don't remember seeing this before.
01:51 10    Q. All right. Now, will you turn to that court
01:51 11 paper that BISD has filed and turn to the first page of
01:51 12 your report, please?
01:51 13    A. Okay.
01:51 14    Q. Now, that report -- your report is part of
01:51 15 Exhibit 2 as it's now been marked?
01:51 16    A. Yes, it is.
01:51 17    Q. And following your report is your resume. Is
01:51 18 that correct?
01:51 19    A. Yes, it is. Well, there's actually -- it's
01:51 20 missing one page.
01:51 21    Q. Well, I was curious --
01:51 22    A. No. No, it's not. This is -- I don't know if
01:51 23 I'd call this my resume, but -- I think I've got different
01:52 24 versions.
01:52 25    Q. This is the -- this is the resume that you've

**Page 19**

01:52 1 presented along with your report in this case.
01:52 2    A. Yes.
01:52 3    Q. All right. Let me -- I'm going to come back to
01:52 4 this report. Let me ask you. You've practiced in
01:52 5 Houston, Texas, for a number of years, correct?
01:52 6    A. Based out of Houston. I've practiced all over
01:52 7 the state.
01:52 8    Q. Okay. And do you -- do you know Judge Hanen,
01:52 9 the judge in this case?
01:52 10    A. I know of him, but I do not know him
01:52 11    Q. Okay. Have you ever had cases, you know, that
01:52 12 he was also involved in?
01:52 13    A. No.
01:52 14    Q. Have you ever practiced before him while he's
01:52 15 been a judge?
01:52 16    A. No.
01:52 17    Q. And I take it you've not had -- had any
01:52 18 experience in his court as a witness or as a mediator?
01:52 19    A. That's correct.
01:52 20    Q. There are some adjustors in this case. One is
01:53 21 known as Dennis Nickoloff. Another is known as Roger
01:53 22 Sawyer. Have you had any dealings with either of those
01:53 23 two gentlemen over the years?
01:53 24    A. Not that I can remember.
01:53 25    Q. Do you -- I take it then that you do not know

**Page 20**

01:53 1 them personally.
01:53 2    A. Correct.
01:53 3    Q. Have you had any dealings with Duane Swoveland
01:53 4 over the years?
01:53 5    A. No.
01:53 6    Q. Have you ever worked in another case in which he
01:53 7 was involved?
01:53 8    A. No.
01:53 9    Q. What about GAB Robins? Have you had dealings
01:53 10 with GAB Robins over the years?
01:53 11    A. Yes.
01:53 12    Q. And in what connection was that?
01:53 13    A. They've been adjustors on various cases I've
01:53 14 been involved in.
01:53 15    Q. Have you ever been adverse to them in a case?
01:53 16 And let -- let me start this way. Have you ever
01:53 17 represented a party that was adverse to GAB Robins in that
01:53 18 case in which GAB Robins was also a party?
01:53 19    A. No.
01:53 20    Q. Have you ever represented a party in which a GAB
01:53 21 Robins adjustor was a party and your client was adverse to
01:54 22 that adjustor?
01:54 23    A. No.
01:54 24    Q. Have you ever worked on a case in which your
01:54 25 client's interests -- that you perceived your client's

**Page 21**

01:54 1 interests as disagreeing with something GAB Robins had
01:54 2 said or done?
01:54 3    A. I imagine I have. I can't recall off the top of
01:54 4 my head. It's just that I've been involved in so many
01:54 5 cases. GAB Robins is a big company that's involved in a
01:54 6 lot of cases that -- I imagine it's happened, but I can't
01:54 7 remember any specific instance.
01:54 8    Q. GAB Robins is a national independent adjusting
01:54 9 company.
01:54 10    A. Yes.
01:54 11    Q. All right. And you've -- I take it you don't
01:54 12 have any opinions one way or the other as to GAB Robins in
01:54 13 terms of their honesty or in terms of their competence.
01:54 14    A. That -- that all depends upon the individual
01:54 15 adjustor.
01:55 16    Q. Now, have you had dealings with CIGNA Insurance
01:55 17 before?
01:55 18    A. Yes.
01:55 19    Q. Have you represented CIGNA before?
01:55 20    A. I don't believe so.
01:55 21    Q. What about your dealings with CIGNA been over the
01:55 22 years in general?
01:55 23    A. They've been an insurer in various cases I've
01:55 24 been involved in.
01:55 25    Q. Have you been adverse to CIGNA before?

6 (Pages 18 to 21)

Royal v. Brownsville ISD                                                          James Bettis

Page 22

01:55 1    A.  I don't recall.
01:55 2    Q.  And you have never testified before as an
01:55 3  insurance expert in a case.  Is that correct?
01:55 4    A.  I have not testified, no.  That is correct.
01:56 5    Q.  Okay.  You've testified before on attorneys'
01:56 6  fees but not insurance issues.
01:56 7    A.  Correct.
01:56 8    Q.  The -- your CV indicates there are two cases
01:56 9  here that you were retained as an expert.  Would you turn
01:56 10  to that, please?
01:56 11    A.  Yes.
01:56 12    Q.  The Berry versus Laura Zapata and Kmart
01:56 13  Corporation, what type of expert were you retained as in
01:56 14  that case?
01:56 15    A.  It was on insurance coverage issues.
01:56 16    Q.  I take it you did not testify in that matter
01:56 17  though.
01:56 18    A.  That's correct.
01:56 19    Q.  Did you author a report in that matter?
01:56 20    A.  I don't recall.
01:56 21    Q.  What type of policy was involved in that matter?
01:56 22    A.  I don't recall.
01:56 23    Q.  Do you recall the issues that were involved in
01:56 24  general?
01:56 25    A.  No.

Page 23

01:56 1    Q.  The second matter there is John Cronin and the
01:56 2  Cronin Companies versus Acceptance Insurance Corporation
01:56 3  here in the southern district of Texas.  What was your
01:57 4  involvement in that matter?
01:57 5    A.  I don't remember other than it involved
01:57 6  insurance issues.
01:57 7    Q.  Do you remember if you authored a report in that
01:57 8  matter?
01:57 9    A.  I do not.
01:57 10    Q.  Do you remember what type of policy it involved?
01:57 11    A.  I do not.
01:57 12    Q.  Your CV also indicates there that there are two
01:57 13  published opinions that you -- in which you worked on the
01:57 14  case before the court of appeals?
01:57 15    A.  Correct.
01:57 16    Q.  One of those is a case in which you worked on
01:57 17  behalf of the -- well, then you'll have to pronounce it
01:57 18  for me, the Association Generalis?
01:57 19    A.  It's Assicurazioni Generali.
      20    Q.  Okay.
01:58 21    A.  That's -- general insurance is the
01:58 22  interpretation.  We just call them Generali for shorthand.
01:58 23    Q.  All right.  And they're the Italian insurance
01:58 24  company?
01:58 25    A.  Yes.

Page 24

01:58 1    Q.  And are they a client of your firm's?
01:58 2    A.  Yes.
01:58 3    Q.  And you represented them in that case, correct?
01:58 4    A.  Yes.
01:58 5    Q.  You filed a dec action on their behalf in that
01:58 6  case.
01:58 7    A.  That's correct.
01:58 8    Q.  And you sought a declaration from the Court as
01:58 9  to whether or not coverage existed in that matter.
01:58 10    A.  That's correct.
01:58 11    Q.  And that matter involved the question of whether
01:58 12  coverage existed for an employee that had been injured on
01:58 13  the job?
01:58 14    A.  Yes.
01:58 15    Q.  And as part of that case, there was an issue in
01:58 16  the case as to whether notice had been provided timely,
01:58 17  correct?
01:58 18    A.  That's correct.
01:58 19    Q.  And your position -- your client's position in
01:58 20  the case was that notice was untimely?
01:58 21    A.  Correct.
01:58 22    Q.  Notice in that case was late by a matter of 17
01:58 23  months?
01:58 24    A.  I don't recall.
01:58 25    Q.  Does that sound about right?

Page 25

01:58 1    A.  I don't recall.
01:58 2    Q.  Do you recall that the Court ruled in your
01:58 3  client's favor that notice was untimely?
01:59 4    A.  Yes.
01:59 5    Q.  Now, when notice is untimely, that is a bar to
01:59 6  coverage in general, correct?
01:59 7    A.  No.
01:59 8    Q.  And why is that?
01:59 9    A.  Because there's -- prejudice is required in
01:59 10  order for there to be a bar to coverage.
01:59 11    Q.  In some policies.
01:59 12    A.  I believe in all policies at this time.  The law
01:59 13  has changed.
01:59 14    Q.  The law on surplus lines policies has changed,
01:59 15  correct?
01:59 16    A.  No.
01:59 17    Q.  No?  Well, when -- when you represented
01:59 18  Association Generali, they were a surplus lines carrier,
01:59 19  right?
01:59 20    A.  Correct.
01:59 21    Q.  And Judge Atlas ruled that surplus lines
01:59 22  carriers did not have to show prejudice, right?
01:59 23    A.  Correct.
01:59 24    Q.  Now surplus lines carriers do have to show
01:59 25  prejudice, correct?

Esquire Deposition Services          (713) 524-4951 Fax          (713) 524-4600

Royal v. Brownsville ISD                                    James Bettis

**Page 26**

01:59 1  A. I think all carriers have to show prejudice now.
01:59 2  Q. Are you aware of any law that specifically holds
01:59 3  that a first-party property carrier has to hold -- has to
01:59 4  show prejudice?
01:59 5  A. I believe the law now is that all first-party
01:59 6  and liability carriers must show it under the current law.
01:59 7  Q. What do you base that on? What case or cases?
02:00 8  A. On two cases, Hernandez versus Gulf Lloyds in
02:00 9  the Texas Supreme Court and also the Hansen case in the
02:00 10  fifth circuit.
02:00 11  Q. Are you aware of contrary authority that
02:00 12  prejudice is only an issue with respect to liability
02:00 13  policies?
02:00 14  A. I believe that's old law.
02:00 15  Q. So you base your opinion on Hernandez Gulf
02:00 16  Lloyds.
02:00 17  A. Yes.
02:00 18  Q. And what's the other case?
02:00 19  A. Hansen. I don't remember the other parties to
02:00 20  it.
02:00 21  Q. Fifth -- fifth circuit.
02:00 22  A. Fifth circuit, yes.
02:00 23  Q. Which case is Hernandez Gulf Lloyds? What are
02:00 24  the facts in general?
02:00 25  A. It involved coverage for uninsured motorist.

**Page 27**

02:00 1  Q. Involved an auto policy.
02:00 2  A. Yes.
02:00 3  Q. The Court determined in connection with that
02:00 4  auto policy that prejudice was required.
02:00 5  A. Correct.
02:01 6  Q. And when I say that, make sure it's clear. It
02:01 7  did not directly involve the issue of late notice,
02:01 8  Hernandez?
02:01 9  A. Correct. It applied fundamental contract
02:01 10  principles to an insurance policy to determine whether
02:01 11  violations or failure to comply with provisions require
02:01 12  prejudice in order for the insurer to void coverage, and
02:01 13  the Hansen case took that Hernandez versus Gulf Lloyds and
02:01 14  applied it to a late notice case.
02:01 15  Q. What -- what year is the Hansen case?
02:01 16  A. I don't recall.
02:01 17  Q. A few years?
02:01 18  A. It's been -- I'd probably say five years. I
02:01 19  don't know.
02:01 20  Q. Was your act of -- you've filed declaratory
02:01 21  actions on behalf of insurance companies on many
02:01 22  occasions, right?
02:01 23  A. Yes.
02:01 24  Q. That's something that lawyers do not only that
02:01 25  represent insurance carriers but that also represent

**Page 28**

02:01 1  insureds.
02:02 2  A. Very seldom do insureds file them. They
02:02 3  typically file just a breach of contract case. It's
02:02 4  usually insurance companies that file them
02:02 5  Q. File the declaratory action.
02:02 6  A. Correct.
02:02 7  Q. And is a filing of a declaratory action by an
02:02 8  insurance carrier necessarily bad faith?
02:02 9  A. No.
02:02 10  Q. Was the filing of the declaratory actions on
02:02 11  behalf of the carriers that you filed them bad faith?
02:02 12  A. No.
02:02 13  Q. When you filed those declaratory actions, were
02:02 14  you asking the Courts to -- to answer the questions as to
02:02 15  whether or not coverage existed, and if it did exist, what
02:02 16  would be owed under the policy?
02:02 17  A. Yes.
02:02 18  Q. And is that a lawful right of an insurance
02:02 19  carrier or, for that matter, any party to a contract to
02:02 20  ask a Court to opine on?
02:02 21  A. It is, but it does not get them out of their
02:02 22  responsibilities when their obligations arise.
02:02 23  Q. And would you elaborate on that, please?
02:02 24  A. Well, in many cases, like a liability case, you
02:02 25  have either a duty to defend or to indemnify. You can't

**Page 29**

02:03 1  refuse to defend your client when they've been sued and
02:03 2  based upon -- well, I've got a DJ. I don't know whether I
02:03 3  owe a defense or not. You've got to make a decision.
02:03 4  Either provide a defense or you don't. A court may later
02:03 5  clarify whether you're correct in doing so, or if you
02:03 6  provide a defense, allow you to then get out of the case,
02:03 7  but your obligation to try to defense (sic) arises the
02:03 8  moment your insured requests it, to either provide it or
02:03 9  not provide it, depending on whether it's over or not, but
02:03 10  you can't get out of providing defense by saying, "I filed
02:03 11  a DJ."
02:03 12  Q. The carrier should not just -- when the answer
02:03 13  is clear, a carrier should not just punt the question in
02:03 14  order to avoid the determination?
02:03 15  A. Well, it's not just that. You've got a duty to
02:03 16  step up to the plate and fulfill your obligations and you
02:03 17  can't put off fulfilling them --
02:03 18  Q. Simply by filing a declaratory --
02:03 19  A. Simply by filing it, right.
02:04 20  Q. What did you understand your assignment in this
02:04 21  case to be?
02:04 22  A. To review the policy and determine whether there
02:04 23  was coverage, also to review Royal's expert's opinion to
02:04 24  opine anything in that, then to review the correspondence
02:04 25  and related materials concerning the handling (sic) loss

8 (Pages 26 to 29)

Royal v. Brownsville ISD                                                James Bettis

**Page 30**

02:04  1  claim and to form my opinions.
02:04  2  Q. I take it you've spent some time on that
02:04  3  assignment.
02:04  4  A. Yes.
02:04  5  Q. And I take it you've -- the work that you did
02:05  6  led up to the issuance of your report.
02:05  7  A. The work I had done up until that time, up to
02:05  8  the time of the report.
02:05  9  Q. Right. And the report is dated March 1, 2004.
02:05  10  A. Correct.
02:05  11  Q. And have you done some other work since that
02:05  12  time?
02:05  13  A. Yes, I have.
02:05  14  Q. And what, in general, work has that been?
02:05  15  A. Well, just updating the case -- you know,
02:05  16  reviewing the law, updating, you know, the law, determine
02:05  17  if there's been any changes or any recent -- opinions
02:05  18  aren't necessarily changes, but further provide insight
02:05  19  into coverage issues. I've also reviewed materials that
02:05  20  have been produced by Royal since the time of my opinion.
02:05  21  Q. Have any of your opinions changed?
02:05  22  A. Nothing has changed in that report, but I have,
02:05  23  you know, some additional opinions on the coverage.
02:05  24  Q. And are those opinions set forth anywhere in
02:05  25  writing?

**Page 31**

02:05  1  A. No.
02:05  2  Q. What are those opinions?
02:05  3  A. Well, again, I believe that coverage exists for
02:06  4  these claims, but it's for additional reasons than those
02:06  5  simply -- or not simply -- that are stated in my letter.
02:06  6  In my opinion letter, I address exclusions that were
02:06  7  pointed out by Mr. Swoveland as the basis for there not
02:06  8  being coverage, and my opinion was: There are exceptions
02:06  9  to the exclusions that can apply in this case. But I also
02:06  10  believe, upon further review of the policy -- it's a very
02:06  11  thick and complicated policy, but I believe that those
02:06  12  exclusions don't even come into play. You don't even have
02:06  13  to get to the exceptions to the exclusions.
02:06  14  Q. As I understand it, in your original report you
02:06  15  primarily focused on exclusions and addressed the issue of
02:06  16  exceptions to those exclusions.
      17  A. Yes.
02:06  18  Q. And you today are offering additional opinions
02:06  19  of the nature that you don't necessarily have to even get
02:06  20  to the exclusions in a coverage analysis.
02:07  21  A. Correct.
02:07  22  Q. All right. And what -- would you explain that?
02:07  23  A. Under this policy it doesn't cover particular
02:07  24  types of damages. It covers all damage caused by a
02:07  25  covered cause of loss. And under this policy a covered

**Page 32**

02:07  1  cause of loss is any cause of loss that is not excluded.
02:07  2  The covered -- there are two causes of loss that are --
02:07  3  appear in this case that I do not -- that I believe are
02:07  4  covered causes of loss; that is, they're not excluded.
02:07  5  That is water damage and also humidity. And let me
02:07  6  clarify on the humidity. It is an excluded cause of loss
02:07  7  as to personal property but not real property.
02:07  8  Q. Humidity under the policy is an excluded cause
02:07  9  for personal property?
02:07  10  A. Yes.
02:07  11  Q. But not real property.
02:08  12  A. Correct.
02:08  13  Q. And you're aware that water damage is defined in
02:08  14  the policy.
02:08  15  A. It is not excluded though. There's not an
02:08  16  exclusion for water damage. All causes of loss are
02:08  17  covered under this policy unless specifically excluded,
02:08  18  and there's not a water damage exclusion. There is one,
02:08  19  but it's a -- it's a narrow one about back-up of sewers
02:08  20  and things of that sort. There's not a general exclusion
02:08  21  for damage caused by water.
02:08  22  Q. So are you -- you're of the opinion that water
02:08  23  damage is covered under the policy?
02:08  24  A. Generally, yes. There's certain limited types
02:08  25  that are not.

**Page 33**

02:08  1  Q. How would it -- how would water damage be
02:08  2  covered under the policy? Because it's -- because in your
02:09  3  opinion, it's a covered cause and not excluded?
02:09  4  A. Again, this policy is kind of like an all-risk
02:09  5  policy, meaning all causes of loss are covered. All
02:09  6  physical damage caused by covered cause of loss is covered
02:09  7  unless the covered cause of loss is specifically excluded.
02:09  8  So to put that in more simpler terms, if a cause of loss
02:09  9  isn't specifically excluded, it's covered.
02:09  10  Q. And in your opinion, water damage is covered.
02:09  11  A. Some types of water damage are. Not all water
02:09  12  damage, but water damage is covered unless excluded, and
02:09  13  there -- there are some limited types.
02:09  14  Q. What limited exclusions are you aware of for
02:09  15  water damage without looking at the policy? And we'll get
02:09  16  into that in --
02:09  17  A. It had -- it involves back-up of sewers and
02:09  18  similar things. There may be another one, but...
02:09  19  Q. And do you view humidity as a covered cause of
02:10  20  loss?
02:10  21  A. Not for personal property but, yes, with respect
02:10  22  to real property.
02:10  23  Q. Just any humidity?
02:10  24  A. I don't have the policy in front of me right
02:10  25  now, but...

Esquire Deposition Services          (713) 524-4951 Fax          (713) 524-4600

Royal v. Brownsville ISD                                                    James Bettis

**Page 34**

02:10 1    Q. I mean, does it have to be excessive humidity or
02:10 2    just anything caused by humidity, in your view?
02:10 3    A. In my view it's -- physical damage to covered
02:10 4    property caused by humidity is covered, that being real
02:10 5    property, not personal property, because it is not
02:10 6    excluded.
02:10 7    Q. Are those your -- are those your opinions that
02:10 8    you have reached that are not expressed in your report?
02:10 9    A. Yes.
02:11 10    Q. I take it the bases for those opinions are your
02:11 11    reasoning as to how you view how the policy works as
02:11 12    opposed to any new evidence or new information that you've
02:11 13    suddenly become -- become aware of.
02:11 14    A. Well, certainly it's not based upon any new
02:11 15    evidence, but there is some new case law that, I believe,
02:11 16    brings this issue clear --
02:11 17    Q. What --
02:11 18    A. -- De La Rentis or something like that. An
02:11 19    opinion came out, but it was withdrawn, and the new
02:11 20    opinion came out in September of this year.
02:11 21    Q. Involving the air conditioner in the apartment?
02:11 22    A. It was a water leak in a -- in a house or
02:11 23    apartment. I can't recall. I think it was an air
02:11 24    conditioning leak.
02:11 25    Q. What was the -- any other case law that you can

**Page 35**

02:11 1    point to that would impact your thinking on this issue?
02:12 2    A. That's the only one off the top of my head, but
02:12 3    there's also case law cited in the -- I don't know
02:12 4    again -- the case De La Rentis that's cited therein that
02:12 5    supports it.
02:12 6    Q. And what concept or holding of De La Rentis is
02:12 7    relevant here to you?
02:12 8    A. It's relevant, first of all, that, like this
02:12 9    policy, if it's not excluded, it's covered. And the issue
02:12 10    in that case was: There was -- water caused mold, and the
02:12 11    insurer asserted a mold exclusion in the exclusions for,
02:12 12    you know, damage caused by mold, and the Court ruled that
02:12 13    the cause of the damage was the water, not the mold. The
02:12 14    mold was damage itself, not a cause of damage. In this
02:12 15    case I believe it's the same situation.
02:12 16    Q. "In this case" you mean in our case.
02:12 17    A. Yes, as respect the mold exclusion. It's also
02:13 18    my understanding that there's separate water damage from
02:13 19    mold damage in this case, but with respect to the mold
02:13 20    specifically, the significance of De La Rentis is that the
02:13 21    mold is not the cause of loss. It's the damage; and that
02:13 22    the water in that case was the cause of the loss.
02:13 23    Q. In that case.
02:13 24    A. Yes.
02:13 25    Q. Any other aspects of that case that are relevant

**Page 36**

02:13 1    to your new opinions?
02:13 2    A. That's -- I can't recall any.
02:13 3    Q. Any other new opinions other than the two that
02:13 4    you've offered here; and that is that the -- that in your
02:13 5    opinion, water damage is covered under the policy and also
02:13 6    damage from humidity is covered under the policy?
02:13 7    A. I can't recall any. We did -- we did discuss
02:13 8    the late notice, but that's not a new opinion. It's
02:13 9    something we haven't discussed before. But it's -- it's
02:14 10    nothing different. It's not a change of my opinion. The
02:14 11    other one is not a change. It just, again, was an update
02:14 12    based upon new case law.
02:14 13    Q. All right. And it's not -- these new opinions
02:14 14    are not based upon any new evidence or new facts. Rather,
02:14 15    they're based upon new cases.
02:14 16    A. Yes.
02:14 17    Q. Or -- or really a new case, the De La Rentis
02:14 18    case.
02:14 19    A. Yes.
02:14 20    Q. Have you kept time records in connection with
02:14 21    your work on this case?
02:14 22    A. Yes.
02:14 23    Q. Did you review those time records in preparation
02:14 24    for your deposition?
02:14 25    A. No.

**Page 37**

02:14 1    Q. I'd like to ask you what you've done in order to
02:14 2    learn about and study the issues in this case. You've --
02:15 3    you've reviewed documents obviously.
02:15 4    A. Yes.
02:15 5    Q. All right. What documents have you reviewed in
02:15 6    the case?
02:15 7    A. I reviewed Mr. Swoveland's expert opinion along
02:15 8    with all the attachments. It's two big binders of a lot
02:15 9    of information. I have reviewed communications and
02:15 10    correspondence between BISD and Royal, GAB and the other
02:15 11    entities that are related to Royal in this matter. I've
02:15 12    reviewed the insurance policy. I've reviewed case law.
02:15 13    And I've -- I've reviewed a number of reports from
02:15 14    various -- I don't know what you want to call them, but
02:15 15    people concerning investigation of the building and causes
02:15 16    of the water problems.
02:15 17    Q. Experts and engineers?
02:15 18    A. Yes. Most of those were attached to
02:16 19    Mr. Swoveland's opinion, but there may be one that I've
02:16 20    read independent from his opinion.
02:16 21    Q. Do you know which one that would be?
02:16 22    A. I think it was an opinion that was done for
02:16 23    Royal by someone who basically reviewed all the other
02:16 24    opinions and didn't do their own independent investigation
02:16 25    but just kind of summarized the other opinions and came up

Esquire Deposition Services          (713) 524-4951 Fax          (713) 524-4600

Royal v. Brownsville ISD                                                                James Bettis

**Page 38**

02:16 1  with conclusions. I think that one was not part of
02:16 2  Mr. Swoveland's -- I think that's newer than his opinion.
02:16 3      Q.  What else have you looked at?
02:16 4      A.  The petition, the declaratory judgment,
02:16 5  counterclaim, original answer.
02:16 6      Q.  Are all of the documents that you've looked at
02:16 7  maintained in your file?
02:16 8      A.  Yes. Oh, I might add. Along with the
02:17 9  correspondence between BI -- BISD side and Royal, I've
02:17 10  reviewed some other documents Royal has produced since the
02:17 11  time of my opinion. A lot of it involves their internal
02:17 12  reporting.
02:17 13      Q.  Documents from the Royal file?
02:17 14      A.  It was produced by Royal in this case. I think
02:17 15  it's from the Royal file. It's primarily communications
02:17 16  between Mr. Swoveland to -- I assume it's his supervisor.
02:17 17      Q.  Not Mr. Swoveland but --
02:17 18      A.  Oh, I'm sorry. It's Nickoloff.
02:17 19      Q.  Have -- do you have copies of all the documents
02:17 20  that you've reviewed in connection with this matter?
02:17 21      A.  Yes.
02:17 22      Q.  And I take it you've not gone to Mr. Salazar's
02:17 23  office and reviewed information he has and then not made a
02:17 24  copy for yourself.
02:17 25      A.  I have not.

**Page 39**

02:17 1      Q.  Has all the information that you've reviewed
02:17 2  been information that has been presented by Mr. Salazar?
02:17 3      A.  I requested information -- certain information
02:17 4  from Mr. Salazar and he gave it to me.
02:18 5      Q.  Was there any information that you requested
02:18 6  that was not provided?
02:18 7      A.  No.
02:18 8      Q.  Have you had access to all of the information
02:18 9  that you wanted to have access to?
02:18 10      A.  Yes and no. And what I mean by that is: In
02:18 11  order to reach final conclusions about the file handling
02:18 12  and these -- and the notice issues, it could be necessary
02:18 13  to review Mr. Nickoloff's deposition and some other
02:18 14  depositions in this case that have not all been taken.
02:18 15      Q.  Other than testimony that has not yet occurred,
02:18 16  has your access to any information been restricted?
02:18 17      A.  No.
02:18 18      Q.  Have you undertaken yourself to go out and
02:18 19  ascertain facts or obtain documents or obtain information
02:18 20  about this case other than asking Mr. Salazar for
02:18 21  information?
02:18 22      A.  Nothing other than legal research.
02:18 23      Q.  Have you reviewed any depositions in the case?
02:19 24      A.  No.
02:19 25      Q.  Have you reviewed any portions of testimony in

**Page 40**

02:19 1  the case?
02:19 2      A.  No.
02:19 3      Q.  Have you spoke directly with or interviewed any
02:19 4  witnesses in the case?
02:19 5      A.  No.
02:19 6      Q.  Any experts or consultants?
02:19 7      A.  I believe I met with someone at one time. I
02:19 8  don't remember what it was.
02:19 9      Q.  An ex --
02:19 10      A.  A consultant.
02:19 11      Q.  An expert in this case?
02:19 12      A.  I don't think they are. I don't think so. No.
02:19 13      Q.  Was there --
02:19 14      A.  No. I -- no.
02:19 15      Q.  Okay. There's no witness or expert in this case
02:19 16  that you've met with in connection with your work on this
02:19 17  case.
02:19 18      A.  Correct. There is not.
02:19 19      Q.  Have you interviewed or spoken with
02:19 20  representatives of BISD in this matter?
02:19 21      A.  None other than their attorneys.
02:19 22      Q.  And that would be who?
02:20 23      A.  Mr. Salazar.
02:20 24      Q.  Anybody else?
02:20 25      A.  I can't recall if I've spoken with Judge Garcia

**Page 41**

02:20 1  or not. I don't think I have about this case.
02:20 2      Q.  What other work have you done in order to
02:20 3  present opinions in this case?
02:20 4      A.  I think we've covered most of it.
02:20 5      Q.  What -- there's nothing that -- that you recall
02:20 6  that we haven't covered, I take it.
02:20 7      A.  No.
02:20 8      Q.  In terms of the volume of documentation that
02:20 9  you've reviewed, how many -- how much volume are we
02:20 10  talking about in terms of file space?
02:20 11      A.  A foot.
02:20 12      Q.  If we wanted to have you Bates label that and
02:20 13  obtain copies of that, could we do that, assuming that
02:20 14  Mr. Salazar did not object?
02:20 15      A.  You'd have to discuss with the attorney.
02:20 16      Q.  Right. Well, I mean, are you capable of doing
02:20 17  that?
02:20 18      A.  Yes.
02:20 19      Q.  If you did do that and Bates labeled all the
02:21 20  documents, would that be a faithful record of the
02:21 21  documents that you have reviewed in order to obtain
02:21 22  factual information about the case?
02:21 23      A.  Yes.
02:21 24      Q.  You reviewed some material from the Royal claims
02:21 25  file, correct?

11 (Pages 38 to 41)

Royal v. Brownsville ISD                                          James Bettis

---

**Page 42**

02:21  1    A.  Correct.
02:21  2    Q.  And did you also review some material from the
02:21  3  GAB claims file?
02:21  4    A.  I believe so.  I don't know where they came
02:21  5  from, but I certainly reviewed GAB materials.  I'm kind
02:21  6  of -- I'm kind of including those as one and the same.
02:21  7    Q.  Are the -- all the opinions that you've reached
02:21  8  in this matter are either the -- the new opinions that you
02:21  9  expressed today or they're opinions that are reflected in
02:21 10  your report of March 1, 2004?
02:22 11    A.  Could you repeat the question?
02:22 12    Q.  Sure.  All the opinions that you've reached in
02:22 13  this case are either the opinions you expressed in your
02:22 14  report of March 1, 2004, or they're the two new opinions
02:22 15  that you've discussed with me earlier in this deposition.
02:22 16    A.  Yes.
02:22 17    Q.  And I take it you have no plans to offer any
02:22 18  opinions that are not yet expressed other than opinions
02:22 19  that you might arrive at as a result of the review of new
02:22 20  testimony.
02:22 21    A.  Well, additionally, I would think that if
02:22 22  Mr. Swoveland has any new opinions, I might review those
02:22 23  and consider those, and I might have an opinion on those.
02:22 24  Again, that's probably up to Mr. Salazar as to whether he
02:22 25  asks me to look at that.

---

**Page 43**

02:22  1    Q.  You've obviously formed opinions in this case
02:23  2  that are critical of Royal Surplus Lines Insurance
02:23  3  Company.
02:23  4    A.  Yes.
02:23  5    Q.  I take it you've not offered any opinions that
02:23  6  are critical or adverse to GAB Robins.
02:23  7    A.  Well, again, you know, I kind of view them as
02:23  8  one and the same for purposes of this case.  The claims
02:23  9  handling, it's Royal's responsibility and they hired GAB
02:23 10  Robins to do the work.  So they're one and the same.
02:23 11    Q.  Is it fair to say then though that -- that any
02:23 12  opinions you do have against GAB are those opinions that
02:23 13  are already expressed either here today or in your report?
02:23 14    A.  Well, there's one other thing I've learned about
02:23 15  that I did not -- was not aware of, I don't believe, at
02:23 16  the time I issued that opinion.  It all goes with the
02:23 17  claims handling.  But it's my understanding that GAB
02:23 18  Robins made a representation that they would go with --
02:23 19  would honor a report prepared by EFI, and they have failed
02:24 20  to do so.
02:24 21    Q.  How did you come by that understanding?
02:24 22    A.  It's in the -- it's in the counterclaim, an
02:24 23  amended counterclaim.
02:24 24    Q.  And are there any facts that you're aware of
02:24 25  that support that allegation?

---

**Page 44**

02:24  1    A.  Other than it's been said by BISD.
02:24  2    Q.  It's been said in the papers -- in their lawsuit
02:24  3  papers.
02:24  4    A.  Yes.
02:24  5    Q.  Somebody can say anything they want to in
02:24  6  lawsuit papers, right?
02:24  7    A.  Yes, they can.
02:24  8    Q.  All right.  Are you aware of any testimony to
02:24  9  date that supports that allegation?
02:24 10    A.  I've not read any.
02:24 11    Q.  So I take it you're not aware of any.
02:24 12    A.  I would assume if they've alleged it, there's
02:24 13  some support for it.
02:24 14    Q.  Are you able to identify any support at this
02:24 15  time?
02:24 16    A.  No.
02:24 17    Q.  What is your understanding of the -- I take it
02:25 18  that opinion that you have involving GAB is criticism of
02:25 19  either GAB and/or Royal.
02:25 20    A.  Again, kind of one and the same to me in this
02:25 21  case.
02:25 22    Q.  What is your understanding of what GAB and/or
02:25 23  Royal, in your opinion, did wrong in connection with that
02:25 24  issue?
02:25 25    A.  Well, if you make a representation to an insured

---

**Page 45**

02:25  1  that you're going to provide coverage based upon a report
02:25  2  and then you fail to do so, it's a misrepresentation.
02:25  3    Q.  What is your -- is it your understanding that
02:25  4  someone represented that they would provide coverage in
02:25  5  this case?
02:25  6    A.  Yes.
02:25  7    Q.  And where does that come from?
02:25  8    A.  From the --
02:25  9    Q.  From the lawsuit papers.
02:25 10    A.  Yes.
02:25 11    Q.  But you're not aware of --
02:25 12    A.  I've asked Mr. Salazar also what that related
02:25 13  to, but I'm not aware -- I don't have a document or
02:25 14  testimony I could point to.
02:25 15    Q.  That would support that.
02:25 16    A.  Correct.
02:25 17    Q.  Have you reviewed the EFI report?
02:26 18    A.  Yes.
02:26 19    Q.  Are you aware that BISD, in general, agrees with
02:26 20  the EFI report?
02:26 21    A.  I do not know.
02:26 22        MR. SALAZAR:  Objection, asks for
02:26 23  speculation.
02:26 24    A.  I do not know.
02:26 25    Q.  (BY MR. BROWN)  Are you aware of what BISD's

---

12 (Pages 42 to 45)

Royal v. Brownsville ISD                                                James Bettis

Page 46

02:26  1  opinion is as to the EFI report?
02:26  2          MR. SALAZAR: Object as to form,
02:26  3  speculation.
02:26  4      A. I do not know.
02:26  5      Q. (BY MR. BROWN) Are you aware as to what Royal's
02:26  6  opinion is as to the EFI report?
02:26  7      A. I do not know.
02:26  8      Q. Do you know whether Royal has honored or
02:26  9  dishonored the EFI report?
02:26 10      A. I believe they've dishonored it because they
02:26 11  haven't paid any money yet.
02:26 12      Q. Have you reviewed the EFI report?
02:26 13      A. Yes.
02:26 14      Q. Does it say to pay money?
02:26 15      A. No.
02:26 16      Q. Does it provide a cost estimate of any costs
02:26 17  that are related to any specific cause?
02:26 18      A. I don't recall.
02:27 19      Q. What area of the EFI report has Royal not
02:27 20  honored?
02:27 21      A. My understanding is that Royal represented that
02:27 22  they would provide coverage for the repairs and damages
02:27 23  identified in the report.
02:27 24      Q. Does the EFI report say that anything is
02:27 25  covered?

Page 47

02:27  1      A. No. There are facts in there that apply to the
02:27  2  policy to show there's coverage.
02:27  3      Q. In your opinion.
02:27  4      A. Yes.
02:27  5      Q. Are you aware of what position Royal has taken
02:27  6  with respect to the EFI report to this court?
02:27  7      A. No.
02:27  8      Q. So you don't know whether Royal has agreed with
02:27  9  or disagreed with any portion of the EFI report.
02:27 10      A. Well, I would think if they agreed with it, they
02:27 11  would have paid some money.
02:27 12      Q. But you don't know what position Royal has taken
02:27 13  with respect to the EFI report, do you?
02:27 14      A. By not paying money -- well, I don't know what
02:27 15  their official position is.
02:28 16      Q. And your understanding of this -- what you call
02:28 17  this misrepresentation is that -- is -- can you state it
02:28 18  again, please?
02:28 19      A. My understanding is that Royal represented that
02:28 20  they would provide coverage for the items, damage, repairs
02:28 21  identified in the EFI report.
02:28 22      Q. And -- regardless of cause?
02:28 23      A. Yes. And also at that point I'm not aware of
02:28 24  any sort of detailed or -- or reservation of right letter.
02:28 25      Q. You are aware that a reservation of rights

Page 48

02:28  1  communication was sent prior to that point in time,
02:28  2  correct?
02:28  3      A. I don't believe it was an appropriate one.
02:28  4      Q. But you, nevertheless, are aware that it was
02:29  5  sent, right?
02:29  6      A. I don't think it was effective. So -- a letter
02:29  7  was sent, yes. Okay? Whether they reserved the rights
02:29  8  properly is a different issue.
02:29  9      Q. Are you aware of any evidence or testimony that
02:29 10  would support your view that a representation was made
02:29 11  that damages found by EFI would be paid regardless of
02:29 12  cause?
02:29 13      A. Let me clarify my opinion. It's not my opinion
02:29 14  that representation was made. I wasn't there. But if
02:29 15  that repetation was made -- representation was made, Royal
02:29 16  has failed to honor it and therefore is a
02:29 17  misrepresentation.
02:29 18      Q. If that represen -- misrepresentation was made.
02:29 19      A. Correct.
02:29 20      Q. And what is your -- what is your understanding
02:30 21  of the nature of the hypothetical misrepresentation that
02:30 22  BISD alleges was made?
02:30 23      A. It's what I've already said.
02:30 24      Q. Which, as I understand it, is that the position
02:30 25  is that Royal represented that the EFI report -- that any

Page 49

02:30  1  damages in the EFI report would be paid regardless of
02:30  2  cause.
02:30  3      A. Yes.
02:30  4      Q. Now -- and you're not aware of any facts or
02:30  5  evidence to support the allegation that that
02:30  6  misrepresentation was made, correct?
02:30  7      A. It's my understanding that someone from BS --
02:30  8  BISD has said that that representation was made to them.
02:30  9      Q. And that understanding is just based on what you
02:30 10  read in lawsuit papers.
      11      A. Right.
      12      Q. Not --
02:30 13      A. And a conversation with Mr. Salazar. I don't
02:30 14  have any documents or testimony I could point to.
02:30 15      Q. All right. Now, you said, "and a conversation
02:30 16  with Mr. Salazar." So your understanding -- let me just
02:30 17  make sure I get this right. Your understanding is based
02:30 18  upon the allegations in the lawsuit and discussions with
02:30 19  Mr. Salazar.
02:31 20      A. Correct.
02:31 21      Q. And is there any other source for that
02:31 22  information?
02:31 23      A. No.
02:31 24      Q. Do you have any opinions as to which damages may
02:31 25  have been caused by which causes?

13 (Pages 46 to 49)

Royal v. Brownsville ISD                                    James Bettis

Page 50

02:31 1    A.  No.
02:31 2    Q.  You're aware that the EFI report and many other
02:31 3  expert reports identify many different causes of the
02:31 4  damage, correct?
02:31 5    A.  Yes and no.  I think really the two causes come
02:31 6  down to water and humidity.  So on this -- on a -- the
02:31 7  basic level for coverage purposes, I think that -- that
02:31 8  there really aren't a lot of different causes.  Now, there
02:32 9  are specific items that are addressed, but it ultimately
02:32 10  comes down to water and humidity as the causes of damages.
02:32 11    Q.  Are you aware that the EFI report, for instance,
02:32 12  identified deficiencies and defects with the HVH -- HVAC
02:32 13  system as a cause of damage?
02:32 14    A.  Again, I believe that falls under the humidity
02:32 15  in this -- in --
02:32 16    Q.  You would characterize that differently, I take
02:32 17  it.
02:32 18    A.  Yes, in part based upon the specific language of
02:32 19  the policy.  There is an exclusion for design defects in
02:32 20  the type of matters you're talking about.  However, that
02:32 21  exclusion doesn't apply if it results in a covered cause
02:32 22  of loss, which is humidity.
02:32 23    Q.  Nonetheless, you have read the EFI report,
02:32 24  right?
02:32 25    A.  Yes.

Page 51

02:32 1    Q.  You're aware that they identified defects in the
02:32 2  HVAC system as a cause -- as a cause of BISD's damages in
02:32 3  that report.
02:32 4    A.  I don't know whether they identified it as a
02:32 5  cause of loss, and those are important words because of
02:33 6  the language of the policy.
02:33 7    Q.  But are you aware --
02:33 8    A.  I'm aware they have identified that there are
02:33 9  defects in the HVAC system.
02:33 10    Q.  All right.  In fact, you refer to that in your
02:33 11  report.
02:33 12    A.  Right.
02:33 13    Q.  You're aware that they identify many different
02:33 14  defects in the different aspects of the design and
02:33 15  construction and maintenance of the school, correct?
02:33 16    A.  Primarily my recollection relates to the HVAC as
02:33 17  being design problems.
02:33 18    Q.  And are you aware of the findings by EFI and
02:33 19  others as to improper maintenance of the roof?
02:33 20    A.  I do not have all that information.  There are
02:33 21  some references to it.  There's also a reference by -- I
02:33 22  believe it's Mr. -- I don't remember who it was -- EFI or
02:33 23  GAB that the property appeared to be well maintained.
02:33 24    Q.  You did review the expert reports that are in
02:33 25  your file, correct?

Page 52

02:33 1    A.  Yes.
02:33 2    Q.  And at the time you reviewed them, if those
02:34 3  expert reports identified different causes of the damages
02:34 4  out there, you would have been aware of that, right?
02:34 5    A.  Again, that's -- I think it's the cause of
02:34 6  damage where I'm having a problem with your question.
02:34 7    Q.  Well, you would -- it sounds like you would
02:34 8  disagree then with the -- the characterization of the
02:34 9  cause identified in the report?
02:34 10    A.  No.  It's the words "cause of damage" or "cause
02:34 11  of loss" because they were critical to interpreting this
02:34 12  insurance policy, and that's why I'm having trouble --
02:34 13  when you use that in the context of what EFI said, it
02:34 14  means one thing.  In the context of the policy it's
02:34 15  another thing.
02:34 16    Q.  Well, what did --
02:34 17    A.  They did not address it from a coverage
02:34 18  perspective.
02:34 19    Q.  Let me ask you this.  What different causes are
02:34 20  you aware of that EFI identified in their report?
02:34 21    A.  Again, I would say water and humidity.
02:34 22    Q.  Well, are you aware that EFI addressed
02:34 23  deficiencies in the HVAC?
02:34 24    A.  Yes.
02:34 25    Q.  Are you aware that E -- that EFI addressed

Page 53

02:34 1  deficiencies in other aspects of the design and
02:35 2  construction of the school?
02:35 3    A.  I don't recall, but it sounds familiar.
02:35 4    Q.  Are you aware that EFI addressed issues of
02:35 5  defective maintenance over the years at the school?
02:35 6    A.  Yes.
02:35 7    Q.  It just -- I take it, in your view, all of those
02:35 8  either fall into the category of humidity or fall under
02:35 9  the category of water damage.
02:35 10    A.  Under the policy it's not -- it's not humidity
02:35 11  or water damage.  It's it being a cause of loss.  Again --
02:35 12  and that's why the words, when you're asking a question,
02:35 13  have a different meaning in the report than they would in
02:35 14  the policy.
02:35 15    Q.  In reviewing the EFI report and in the other
02:35 16  expert reports, I take it part of the opinions you're
02:35 17  expressing here today are based upon the factual
02:36 18  information presented in those reports.
02:36 19    A.  Yes.
02:36 20    Q.  Is there anything that you're aware of in those
02:36 21  reports that stands out as something you disagree with?
02:36 22    A.  From a -- you know, a factual standpoint in
02:36 23  their report --
02:36 24    Q.  Yes.
02:36 25    A.  -- no.  I don't necessarily agree or disagree.

14 (Pages 50 to 53)

Royal v. Brownsville ISD                                                                                    James Bettis

**Page 54**

02:36 1   So I don't -- I haven't been out there and inspected the
02:36 2   properties and those type of things.
02:36 3       Q.  All right.  I take it in order to -- I want to
02:36 4   understand your opinion and not mangle it in my expression
02:36 5   of it.  Is it fair to say that you don't disagree with any
02:36 6   of the facts recited by EFI and the other experts?  You
02:36 7   take those facts and, in your opinion, reach the opinions
02:37 8   that you've reached as to coverage under the policy.
02:37 9       A.  Yes.
02:37 10      Q.  Is that a fair sort of generalization of your
02:37 11  approach?
02:37 12      A.  Yes.
02:37 13      Q.  Now, your report indicates that some of the
02:37 14  damage out there at the school is not covered, correct?
02:37 15      A.  I don't recall that.  Can I look at my report?
02:37 16      Q.  Sure.
02:37 17      A.  I don't believe I said that in there.
02:38 18      Q.  Well, let's -- let me ask you to --
02:38 19      A.  Plus, there's -- well, additionally -- my
02:38 20  additional opinion is based upon the new case that came
02:38 21  out that somewhat modified this.
02:38 22      Q.  Let me see if I understand what you were saying
02:38 23  at the time and ask you to review the second paragraph on
02:38 24  page 2.
02:38 25      A.  Yes.  Okay.

**Page 55**

02:38 1       Q.  Okay.  Now, as I understand it, you're saying
02:38 2   there that some of the damages or all of the damages may
02:38 3   come within the exceptions to the exclusions.
02:38 4       A.  Yes.
02:38 5       Q.  Are you stating an opinion there that all of
02:38 6   that damage is covered?
02:38 7       A.  If it comes within -- first, if you get past the
02:39 8   applicable exclusions I discussed earlier, if those
02:39 9   exclusions do apply and that I'm incorrect as to how to
02:39 10  interpret the policy, then there still can be coverage if
02:39 11  there is an exception to the exclusion.
02:39 12      Q.  And is it your opinion that -- that if you --
02:39 13  if -- once we get into the realm of the exclusions and
02:39 14  then we get into your realm of the exceptions to the
02:39 15  exclusions, is it your opinion at that point that all of
02:39 16  the damage is therefore covered or at least some of the
02:39 17  damage is therefore covered?
02:39 18      A.  Some or all, depending upon the causes.
02:39 19      Q.  Are you able to express an opinion here today as
02:39 20  to whether it's all or some?
02:39 21      A.  No.
02:39 22      Q.  It's just -- in your opinion, if it qualifies
02:39 23  for coverage, either some of it does or all of it does,
02:39 24  depending upon the causes and how those causes relate to
02:39 25  the exclusions and the exceptions.

**Page 56**

02:40 1       A.  Correct.  Again, this is if you get to the
02:40 2   exclusions, which, based upon the newer cases, I don't
02:40 3   believe you get to them.
02:40 4       Q.  If you get to the exclusions and then if you get
02:40 5   to the exceptions to the exclusions, the -- the question
02:40 6   of what may or may not qualify for coverage is dependent
02:40 7   upon the cause of that particular damage, correct?
02:40 8       A.  Yes.
02:40 9       Q.  And at this point you don't identify, nor does
02:40 10  any other expert, what specific areas of damage would
02:40 11  relate to what specific causes.
02:40 12      A.  Again, that's if we get to the exclusions
02:40 13  because I believe the causes are water and humidity which
02:40 14  caused all the damage.
02:40 15      Q.  All right.  But --
02:40 16      A.  But -- but if we get past that and exclusions do
02:40 17  apply, we have to look at the exceptions.  I don't know
02:40 18  whether any experts have identified an amount of water or
02:41 19  mold damage that applies to any particular event, any
02:41 20  defect or source water.
02:41 21      Q.  If we get to the exclusions, isn't that
02:41 22  necessary for somebody to do in order to determine what
02:41 23  areas of damage and what amount of money may qualify for
02:41 24  coverage?
02:41 25      A.  Can you rephrase that?

**Page 57**

02:41 1       Q.  Sure.  If we get to the exclusions and then we
02:41 2   get to the exceptions, in your view, isn't it necessary
02:41 3   for somebody to identify what specific damage is caused by
02:41 4   a specific cause in order to quantify the amount of money
02:41 5   that may be payable under the policy?
02:41 6       A.  I'm not really sure I follow exactly.
02:42 7       Q.  Well, what would you view as a -- if you get to
02:42 8   the exclusions, what would you view as a covered cause
02:42 9   that would be an exception, just an example?
02:42 10      A.  Well, a covered cause, again -- an exception to
02:42 11  the design problems is a covered cause of loss, which
02:42 12  is -- goes back to humidity and water.
02:42 13      Q.  All right.  And what's -- just give me an
02:42 14  example for discussion purposes.
02:42 15      A.  Well, the -- my understanding of the report is
02:42 16  that humidity was a -- one of the problems at the school
02:42 17  and one of the causes of the mold.
02:42 18      Q.  Okay.  Before we get there though, I'm wanting
02:42 19  to talk about the applications and the exceptions --
02:42 20      A.  That is an exception though.  An exception to
02:42 21  the faulty design -- there's an exclusion -- if you get to
02:42 22  the exclusion, there's an exclusion for the faulty design,
02:42 23  and one exception to that exclusion is if the faulty
02:43 24  design results in any covered cause of loss.  That's the
02:43 25  exception itself, is any covered -- if it results in any

15 (Pages 54 to 57)

Royal v. Brownsville ISD                                              James Bettis

Page 58

02:43  1   covered cause of loss, and a covered cause of loss
02:43  2   includes humidity, which was caused by the design
02:43  3   problems. That is an exception to the exclusion. You've
02:43  4   got to revert back to any covered cause of loss.
02:43  5       Q. In -- in your opinion. Are you of the opinion
02:43  6   that a broken pipe would qualify for coverage under this
02:43  7   policy under the traditional view of applying exceptions
02:43  8   and exclusions?
02:43  9       A. Again, I -- I think it's covered because you
02:43 10   don't even get to the exclusion.
02:43 11       Q. Okay. I understand that, but you've -- for
02:43 12   discussion purposes, you've expressed one methodology in
02:43 13   your report and you're expressing another methodology here
02:43 14   to me today, correct?
02:43 15       A. Well, they're both potentially applicable.
02:44 16       Q. All right. But for our discussion purposes,
02:44 17   you've -- you've come -- come forward with one methodology
02:44 18   in your report, a rather traditional approach to
02:44 19   coverage -- would you agree with that -- in the sense that
02:44 20   you look at the policy and you apply exclusions and then
02:44 21   exceptions?
02:44 22       A. No.
02:44 23       Q. Okay. Well, would you agree that the
02:44 24   methodology expressed in your report is different than the
02:44 25   methodology you've expressed here today?

Page 59

02:44  1       A. No, it's not a different methodology.
02:44  2       Q. Okay. How is it not a different methodology?
02:44  3       A. It's not.
02:44  4       Q. Okay. Well, how would you distinguish between
02:44  5   the two just for discussion purposes?
02:44  6       A. This report focused on exclusions asserted by
02:44  7   Mr. Swoveland in the exception to the exclusion. Upon
02:44  8   further review of the policy and review of new cases that
02:44  9   have come out, I believe you never get to the exclusions.
02:44 10       Q. Okay. So is it -- if I ask you about the
02:44 11   opinions you expressed in your report, you understand I'm
02:44 12   asking about those opinions as opposed to your new
02:44 13   opinions.
02:45 14       A. These opinions are -- you only get into these
02:45 15   opinions if exclusions do apply and my reading of the
02:45 16   current case law is incorrect.
02:45 17       Q. Now, can I ask you about these opinions in your
02:45 18   report?
02:45 19       A. Yes.
02:45 20       Q. I take it as to the opinions expressed in your
02:45 21   report, you're not aware of any witness or expert who has
02:45 22   tied in certain areas of damages to certain causes.
02:45 23       A. Can you repeat that?
02:45 24       Q. Sure. As to the opinions in your report, you're
02:45 25   not aware of any evidence that specifically ties in to any

Page 60

02:45  1   area of damage at the school with any specific cause. I'm
02:46  2   asking now just about your report.
02:46  3       A. And I think -- I'm not aware of any expert who
02:46  4   has quantified the amount of damages that fall under an
02:46  5   exception to the exclusion versus the exclusion, assuming
02:46  6   exclusions apply. I think that's what you're asking me.
02:46  7       Q. If you view the -- in your report as you address
02:46  8   it, what do you view there that would qualify as a covered
02:46  9   cause of loss?
02:46 10       A. As an exception to exclusion?
02:46 11       Q. Right. Basically your report says Mr. Swoveland
02:46 12   just looked at exclusions. He needs to go farther and
02:47 13   look at exceptions to exclusions.
02:47 14       A. Yes.
02:47 15       Q. And if he looks at exceptions to the exclusions,
02:47 16   according to you, that either all or some of the damages
02:47 17   are covered according to you.
02:47 18       A. Yes.
02:47 19       Q. Okay. And my question is simply what is there
02:47 20   in the factual record that would qualify as a covered
02:47 21   cause that would run the gauntlet of those exclusions and
02:47 22   exceptions?
02:47 23       A. I'd have to get the policy out and compare the
02:47 24   language to the facts stated in my opinion.
02:47 25       Q. You mention here HVAC piping leaks.

Page 61

02:47  1       A. Yes.
02:47  2       Q. Do you know if that would qualify as a covered
02:47  3   cause that would run the gauntlet of the exclusions and
02:47  4   exceptions?
02:47  5       A. Again, I'd need to get the policy.
02:47  6       Q. You need to see what the actual wording of the
02:47  7   policy was.
02:47  8       A. I've looked at it, but I -- sitting here I don't
02:48  9   remember the exact wording of, for instance, specified
02:48 10   cause of loss, which is an exception to some of the
02:48 11   exclusions asserted by Mr. Swoveland. I knew it at the
02:48 12   time I reviewed it, but as we sit here today I don't
02:48 13   recall it.
02:48 14       Q. Did you reach any opinions -- and I don't see
02:48 15   any expressed here, but did you reach any opinions as to
02:48 16   when certain damage out there at the school commenced?
02:48 17       A. No.
02:48 18       Q. Do you recall reviewing any opinions of the
02:48 19   experts or the others that have looked at the -- at the
02:48 20   school as to when certain areas of damages commenced?
02:48 21       A. I believe there are some, but I cannot recall
02:48 22   them off the top of my head.
02:48 23       Q. You talk about -- you're critical of Royal for
02:49 24   not doing what you would call an independent
02:49 25   investigation?

16 (Pages 58 to 61)

Royal v. Brownsville ISD                                                                  James Bettis

Page 62

02:49  1    A. Correct.
02:49  2    Q. What is that criticism?
02:49  3    A. When the claim was reported, I believe that
02:49  4  Royal should have hired an engineer to go inspect to
02:49  5  determine causes of losses. Instead they just kept
02:49  6  demanding that BISD provide this information. I think a
02:49  7  proper investigation includes, if you cannot determine the
02:49  8  sources of a loss and whether they're covered, I think the
02:49  9  insurance carrier has a duty to hire an engineer or -- in
02:49 10  this case engineer, but hire an appropriate person to
02:49 11  advise them.
02:49 12    Q. Now, who should Royal have hired, in your
02:49 13  opinion?
02:49 14    A. There's a host of people that could have been
      15  qualified.
02:49 16    Q. Such as who?
02:49 17    A. Off the top of my head I can't even say one.
02:49 18  You call -- there's just a number of experts in
02:49 19  construction that relate to determining sources or points
02:50 20  of infiltration of water.
02:50 21    Q. You're aware that a number of experts had
02:50 22  already examined the schools beginning in about 1996,
02:50 23  right?
02:50 24    A. Yes.
02:50 25    Q. That -- you're aware that a whole series of

Page 63

02:50  1  engineers and construction experts had been hired by BISD
02:50  2  to examine the school for that very purpose, to determine
02:50  3  the sources of water infiltration, correct?
02:50  4    A. Yes.
02:50  5    Q. How do you know if Royal would have hired yet
02:50  6  another expert, that that expert would have reached
02:50  7  opinions any different than all the other experts in --
02:50  8    A. I do not know whether they would have.
02:50  9    Q. You don't know one way or the other what
02:50 10  opinions that -- if Royal had hired yet another expert,
02:50 11  what opinions that expert would have reached, correct?
02:50 12        MR. SALAZAR: Object.
02:50 13    Q. (BY MR. BROWN) Is it fair to say then that you
02:51 14  don't know what effect, if any, that would have had on
02:51 15  this claim?
02:51 16        MR. SALAZAR: Object as to form,
02:51 17  speculation.
02:51 18    A. Correct.
02:51 19        MR. SALAZAR: You want to take a break?
02:51 20        MR. BROWN: Yeah, we can.
02:51 21        THE VIDEOGRAPHER: Going off the record.
02:51 22  It's 2:55.
      23        (Brief recess.)
03:02 24        THE VIDEOGRAPHER: We're now back on the
03:02 25  record. It's 3:06.

Page 64

03:02  1    Q. (BY MR. BROWN) Okay. We're back on the record
03:02  2  after a short break, Mr. Bettis, and let me -- we're
03:02  3  focusing here on this -- the approach you brought to bear
03:03  4  in this -- in your report of March 1, 2004.
03:03  5    A. Yes.
03:03  6    Q. And is it -- can we agree on this just as a
03:03  7  general matter, that not all water leaks or plumbing leaks
03:03  8  or roof leaks are necessarily covered; it depends upon the
03:03  9  cause of those leaks and how that cause relates to the
03:03 10  insurance policy?
03:03 11    A. No, that's not correct.
03:03 12    Q. Okay. Is it correct insofar as the approach
03:03 13  that you brought to bear in your report?
03:03 14    A. What I can say -- maybe this can explain it. It
03:03 15  is correct that not all of those sources of water come
03:03 16  within the exceptions to the exclusion.
03:03 17    Q. Okay. And it is -- in order to get there, it's
03:03 18  correct that those sources of water, many of them,
03:03 19  depending upon the facts, may well come within the
03:04 20  exclusion.
03:04 21    A. If we get to the exclusions.
03:04 22    Q. Okay. And you're saying that if -- if we get to
03:04 23  the exclusions and they come into the exclusions, we can
03:04 24  agree that whether or not the exception applies depends
03:04 25  upon the specific factual cause of that leak and basically

Page 65

03:04  1  what we're dealing with.
03:04  2    A. Yes.
03:04  3    Q. You have obviously reviewed many engineering
03:04  4  reports and expert reports about the school.
03:04  5    A. Yes.
03:04  6    Q. You saw that there were many different causes
03:05  7  identified as to sources of water in the school.
03:05  8    A. Yes.
03:05  9    Q. Is -- are those the water sources that, in your
03:05 10  view, led to the high humidity?
03:05 11    A. I do not have an opinion on what led to the high
03:05 12  level of humidity. I know the reports do refer to the
03:05 13  HVAC as being part of the cause of the humidity.
03:05 14    Q. Part of the cause of the high humidity within
03:05 15  the school.
03:05 16    A. Yes.
03:05 17    Q. Is it your opinion that damage from high
03:05 18  humidity is covered under the policy in question
03:05 19  regardless of the cause of that humidity?
03:05 20    A. Yes.
03:05 21    Q. So if that humidity is, for instance, caused by
03:05 22  a combination of roof leaks, leaks around the windows,
03:06 23  HVAC system defects and those sources of water intrusion
03:06 24  all lead to high humidity, in your view, that high
03:06 25  humidity would be covered under the policy.

17 (Pages 62 to 65)

Royal v. Brownsville ISD                                        James Bettis

**Page 66**

03:06 1    A. Yes, assuming -- well, if the humidity causes
03:06 2    damage to the physical -- physical damage --
      3    Q. Any damage --
03:06 4    A. -- to the property.
03:06 5    Q. Any damage caused by the humidity would be
03:06 6    covered under the policy, in your view.
03:06 7    A. Yes.
03:06 8    Q. Regardless of the cause of the humidity.
03:06 9    A. Yes.
03:06 10   Q. What if the cause of the humidity is simply that
03:06 11   it's humid in South Texas?
03:06 12   A. That would still be covered.
03:06 13   Q. Under the policy.
03:06 14   A. Yes.
03:06 15   Q. Would that be fortuitous?
03:06 16   A. Yes.
03:06 17   Q. The high humidity would be fortuitous?
03:07 18   A. Well, how do you define "fortuitous"?
03:07 19   Q. Chance, risk as opposed to something that's
03:07 20   known.
03:07 21   A. It's a chance, risk that that will cause damage.
03:07 22   Q. Doesn't that run afoul of the fortuity doctrine?
03:07 23   A. The fortuity doctrine requires that you know
03:07 24   that there will be damage, not that there's a chance.
03:07 25   Q. As far as the -- are you aware -- we spoke about

**Page 67**

03:07 1    this issue of -- that you identified as the
03:07 2    misrepresentation issue alleged in the complaint about the
03:07 3    EFI report. Are you aware of the -- and I don't know that
03:07 4    it's in -- in complaint. I don't know that it's not.
03:07 5    But are you aware of the contention as to the corporate
03:08 6    relationship between EFI and GAB?
03:08 7    A. Yes.
03:08 8    Q. All right. What is your awareness of that
03:08 9    contention? Where does that come from?
03:08 10   A. I think it's mentioned in the petition but also
03:08 11   from Mr. Salazar.
03:08 12   Q. All right. Do you have any opinions to offer as
03:08 13   to that contention?
03:08 14   A. Well, I don't have any final opinions at this
03:08 15   point because not all the depositions have been taken or
03:08 16   transcribed. I would need to review those before I can
03:08 17   have an opinion.
03:08 18   Q. I take it you don't have any opinion on that
03:08 19   issue here today.
03:08 20   A. Not without looking at the depositions.
03:08 21   Q. And you haven't looked at the depositions.
03:08 22   A. Correct.
03:08 23   Q. What is your understanding, if any, of that
03:08 24   issue?
03:08 25   A. That EFI is wholly owned by GAB.

**Page 68**

03:08 1    Q. And what is your understanding as to how, if
03:08 2    that's true, that would relate to anything in this case?
03:08 3    A. Well, EFI, you know, knowing that they are owned
03:08 4    by GAB Robins and knowing that GAB has been hired by Royal
03:09 5    and hired by them on a regular basis, may be biased in a
03:09 6    report in trying to shift the blame, so to speak, to
03:09 7    uncovered areas versus covered areas.
03:09 8    Q. That who may be biased?
03:09 9    A. That EFI might be biased.
03:09 10   Q. Because of the -- because of what?
03:09 11   A. Because they want to please their boss, their
03:09 12   boss being GAB.
03:09 13   Q. The theory would be that EFI would be biased
03:09 14   because they are owned by GAB.
03:09 15   A. Potentially.
03:09 16   Q. Are you aware of any facts or evidence to
03:09 17   support that view?
03:09 18   A. Just that it could be a natural conflict of
03:09 19   interest. You know, in my understanding, some of the EFI
03:09 20   employees are actually paid by GAB.
03:09 21   Q. Where does that understanding come from?
03:09 22   A. Mr. Salazar.
03:09 23   Q. Have you reviewed any independent evidence of
03:09 24   that?
03:10 25   A. No. My understanding is that the depos have

**Page 69**

03:10 1    all -- I think the last one was completed yesterday of EFI
03:10 2    and that it wouldn't be transcribed yet.
03:10 3    Q. How is -- do you know how GAB is traditionally
03:10 4    compensated?
03:10 5    A. I would think by the hour.
03:10 6    Q. Does it matter to GAB whether or not coverage is
03:10 7    found or not found in a matter?
03:10 8    A. It could.
03:10 9    Q. GAB stands to make more money if the coverage
03:10 10   issues are somewhat murky. Do you agree with that just as
03:10 11   a --
03:10 12   A. Maybe on a -- on a case-by-case basis, but long
03:10 13   term they make more money by being repeatedly hired.
03:10 14   Q. Do you have any evidence to suggest that EFI was
03:10 15   biased?
03:10 16   A. That EFI was biased? I don't have any evidence
03:10 17   they were.
03:10 18   Q. Are you aware of the testimony of the BI -- BISD
03:10 19   representatives as to their view of EFI's work?
03:10 20   A. No.
03:11 21   Q. Are you aware -- can you identify any damages
03:11 22   that may have allegedly been caused to BISD as a result of
03:11 23   this -- as you described it, this conflict of interest?
03:11 24   A. No.
03:11 25   Q. Are you aware of any damage --

Esquire Deposition Services        (713) 524-4951 Fax        (713) 524-4600

Royal v. Brownsville ISD                                                James Bettis

**Page 70**

03:11 1    A. Well, let me take that back. It's my
03:11 2  understanding that EFI's report underestimated the amount
03:11 3  in cost for remediation and all by almost 100 percent.
03:11 4    Q. It's your understanding that EFI underestimated
03:11 5  how much it would actually cost BISD. Is that --
03:11 6    A. Yes.
03:11 7    Q. And how did that damage BISD?
03:11 8    A. I'm not sure. And also -- and they paid for the
03:11 9  report. There's damage from having hired them to
03:11 10 investigate it and have a report that comes up that
03:12 11 incorrect.
03:12 12   Q. Are you aware that BISD is very complimentary of
03:12 13 EFI in their testimony?
03:12 14       MR. SALAZAR: Object, assumes facts not in
03:12 15 evidence. Clearly the testimony has been that they're not
03:12 16 complimentary of EFI.
03:12 17   A. I don't know. I've not read the depositions.
03:12 18   Q. (BY MR. BROWN) You've not read the depositions.
03:12 19 So you're not in a position to agree or disagree with
03:12 20 Mr. Salazar's coaching, are you?
03:12 21   A. I'm not in a position to agree or disagree with
03:12 22 your question.
03:12 23   Q. Are you aware of any damage out there at the
03:12 24 schools that has not been repaired to date?
03:12 25   A. I don't know what's been repaired or not

**Page 71**

03:12 1  repaired.
03:12 2    Q. You're not aware of any damage that BISD could
03:12 3  not afford to repair, are you?
03:12 4    A. I do not know.
03:12 5    Q. Are you aware of any communications between
03:12 6  Royal and EFI?
03:12 7    A. Through GAB.
03:12 8    Q. Are you aware of any communications between GAB
03:12 9  and EFI in connection with this claim?
03:13 10   A. Other than they received the reports, and that's
03:13 11 communication, but...
03:13 12   Q. Other than that GAB received EFI's report.
03:13 13   A. I do not know whether there's been any other
        14 communications.
03:13 15   Q. Now, are you aware that BISD provided GAB with
03:13 16 EFI's report?
03:13 17   A. I do not know.
03:13 18   Q. Do you have an opinion as to when Royal's
03:13 19 liability may have become reasonably clear?
03:13 20   A. I think that certainly once the reports came
        21 out.
03:13 22   Q. Once -- well, now, several reports were written
03:13 23 before Royal was even notified, right?
03:13 24   A. Right.
03:13 25   Q. Several reports were written before the -- at

**Page 72**

03:13 1  least the 4-1-01 to 4-1-02 policy incepted --
03:14 2    A. Correct.
03:14 3    Q. -- correct? So what is your opinion as to when,
03:14 4  if ever, liability became reasonably clear for Royal?
03:14 5    A. I don't have a date in mind. I would have to go
03:14 6  back and look through the file again. I just haven't
03:14 7  looked at the file, and I don't have an exact date.
03:14 8    Q. Do you -- can you testify as to which specific
03:14 9  property damage Royal became -- Royal's liability became
03:14 10 reasonably clear for?
03:14 11   A. Property damage caused by humidity or water.
03:14 12   Q. Are you -- do you have a dollar amount for that?
03:14 13   A. No, but I think that everything in this case or
03:14 14 just about everything -- I don't know about everything --
03:14 15 would be caused by mold -- not mold but caused by water or
03:15 16 humidity.
03:15 17   Q. Are you aware of BISD ever coming forward with
03:15 18 the identification of a potential covered cause of loss in
03:15 19 their presentation of the claim?
03:15 20   A. I'm not sure I understand. I don't know about a
03:15 21 presentation or --
03:15 22   Q. Well, you've -- you've identified here today
03:15 23 water damage and humidity.
03:15 24   A. Yes.
03:15 25   Q. Are you aware of any letter or position taken by

**Page 73**

03:15 1  BISD as to what causes might qualify for coverage under
03:15 2  the policy?
03:15 3    A. No.
03:15 4    Q. Are you aware that in the proof of loss that was
03:15 5  incomplete and rejected by Royal that BISD contended that
03:15 6  the damage was caused by mold?
03:15 7    A. I don't know if there was something that was
03:15 8  rejected or incomplete. So --
03:15 9    Q. You're not familiar with that issue.
03:15 10   A. I'm familiar with the issue.
03:16 11   Q. Okay. Are you familiar --
03:16 12   A. To some degree, but I don't know the details. I
03:16 13 know there's a dispute as to whether proof of loss was
03:16 14 proper.
03:16 15   Q. Are you aware that in the proof of loss that was
03:16 16 submitted and rejected -- that BISD contended in that
03:16 17 proof of loss that their damage was caused by mold?
03:16 18   A. I do not know.
03:16 19   Q. Is damage that is caused by mold covered under
03:16 20 the policy?
03:16 21   A. It depends whether there's an exception -- it
03:16 22 falls within the exception to the exclusion.
03:16 23   Q. Why -- why wouldn't it just be covered as being
03:16 24 caused by humidity?
03:16 25   A. Well, you asked if it's damage caused by mold --

19 (Pages 70 to 73)

Royal v. Brownsville ISD                                                James Bettis

---

**Page 74**

03:16 1  Q. Right.

03:16 2  A. -- which is different than damage caused by

03:16 3  humidity.

03:16 4  Q. How, in your view, is that different?

03:16 5  A. Damage caused by humidity -- the damage is the

03:16 6  mold. The damage isn't caused by the mold. The damage is

03:17 7  the mold. And there was not an exclusion for mold damage.

03:17 8  There's an exclusion for damage caused by mold. And

03:17 9  that's the distinction made in the -- again, I don't

03:17 10  remember how to pronounce that case. There's -- there's

03:17 11  other cases that have followed similar reasoning. It's

03:17 12  just the newest and clearest one.

03:17 13  Q. Do you have an opinion as to how much Royal

03:17 14  should have paid on this claim in terms of dollar amount?

03:17 15  A. They should pay for all the damage caused by

03:17 16  water and mold.

03:17 17  Q. But no specific -- you've not reached any

03:17 18  specific dollar amount.

03:17 19  A. No, I've not determined a dollar amount.

03:18 20  MR. BROWN: Let's mark this, please.

03:18 21  (Bettis Exhibit No. 3 marked.)

03:18 22  Q. (BY MR. BROWN) Let me show you what's been

03:18 23  marked as Deposition Exhibit No. 3, and this is a document

03:18 24  that's been produced by Royal in the case and it's part of

03:18 25  the file. And is this a letter from GAB Robins dated

---

**Page 75**

03:19 1  February 21, 2003, to BISD's attorneys in this case?

03:19 2  A. Appears to be.

03:19 3  Q. And this is sent by Dennis Nickoloff with GAB?

03:19 4  A. It actually looks like someone else signed it

03:19 5  and sent it on his behalf.

03:19 6  Q. It was sent by -- by someone at GAB that signed

03:19 7  it for Dennis Nickoloff.

03:19 8  A. Actually it looks like they signed their own

03:19 9  name, but it was -- you know, his name is printed under

03:19 10  the signature.

03:19 11  Q. In any event, it's a letter from -- from Dennis

03:19 12  Nickoloff at GAB or from someone at GAB.

03:19 13  A. Yes.

03:19 14  Q. And in this letter Mr. Nickoloff acknowledges

03:19 15  receiving certain reports on January 22, 2003?

03:19 16  A. Yes.

03:20 17  Q. And beginning on page 2 of the letter in this --

03:20 18  in the second paragraph, Mr. Nickoloff explains why he

03:20 19  needs additional information?

03:20 20  A. I'll have to look at this. He states, "to

03:20 21  determine whether (sic) portions of the claim, if any, may

03:20 22  qualify for coverage."

03:20 23  Q. All right. And does an insurance company have

03:20 24  the right to ask for information about a claim?

03:20 25  A. As long as it's a reasonable request.

---

**Page 76**

03:20 1  Q. Is there anything in the policy that says that

03:20 2  the request must be reasonable?

03:20 3  A. You have a duty in good faith and fair dealing.

03:20 4  You also have a duty to undertake a reasonable

03:20 5  investigation. Requesting information that is not

03:20 6  reasonable to delay things just to continue not making a

03:20 7  decision is neither reasonable investigation, nor does it

03:20 8  comply with the duty of good faith and fair dealing.

03:21 9  Q. If the information is necessary in order to

03:21 10  determine coverage, is -- is it not reasonable -- is it

03:21 11  not a reasonable request?

03:21 12  A. That's correct.

03:21 13  Q. If it's -- I take it if it -- if the insurance

03:21 14  company needs the information in order to determine

03:21 15  coverage, it would, in general, be reasonable, but

03:21 16  something that's undertaken merely for delay or for -- to

03:21 17  burden the insured would not be reasonable.

03:21 18  A. As a general rule that would be correct.

03:21 19  Q. Do you have any reason to believe that

03:21 20  Mr. Nickoloff did not actually want this information in

03:21 21  order to assist with the coverage analysis?

03:21 22  A. I don't know. I'd have to review all these

03:21 23  categories and also understand from-- I'd also have to

03:21 24  see Mr. Nickoloff's deposition to testify why he needed

03:21 25  certain of these documents.

---

**Page 77**

03:21 1  Q. Do you know when he -- when, if ever, he may

03:21 2  have been provided with any of these documents he

03:21 3  requested?

03:21 4  A. I do not know.

03:22 5  Q. So you don't know if he was ever provided with

03:22 6  the documents and information he requested in order to

03:22 7  determine coverage.

03:22 8  A. I don't know if he was ever provided the

03:22 9  documents requested herein.

03:22 10  Q. And you don't know whether -- in this letter he

03:22 11  indicates he wants the documents in order to determine

03:22 12  what portions of the claim may be covered, if any, right?

03:22 13  A. That's what he says, yes.

03:22 14  Q. All right. And you don't know whether or not --

03:22 15  you have no reason to disagree with him because you

03:22 16  haven't looked at this issue. Is that fair?

03:22 17  A. He hasn't been deposed yet. So I don't know

03:22 18  what he will say about why he needed some of this.

03:22 19  There's -- I can't form an opinion at this time.

03:22 20  Q. All right. But the letter says he needs it in

03:22 21  order to assess coverage.

03:22 22  A. Yes.

03:22 23  Q. And you're not aware of when, if ever, he was

03:22 24  ever provided with the information.

03:22 25  A. Correct.

---

20 (Pages 74 to 77)

Royal v. Brownsville ISD                                                                 James Bettis

Page 78

03:22 1     Q. Now, let me direct your attention to page 5 of
03:23 2   the letter in the -- looks like the center paragraph. He
03:23 3   asks BISD to re-submit a sworn proof of loss that includes
03:23 4   the information requested by the form. Do you see that?
03:23 5     A. Yes.
03:23 6     Q. And he states that the information is necessary
03:23 7   for Royal to fully understand and investigate the loss.
03:23 8   Do you see that?
03:23 9     A. Yes.
03:23 10    Q. And he encloses another blank proof of loss form
03:23 11  for BISD to fill out.
03:23 12    A. Correct.
03:23 13    Q. And are you aware if BISD ever complied with
03:23 14  that request?
03:23 15    A. It's my understanding that they have not because
03:23 16  they cannot.
03:23 17    Q. And what is your understanding that they have
03:23 18  not, that they cannot -- what is your understanding based
03:23 19  on that they cannot?
03:24 20    A. I don't know that there is any way to
03:24 21  specifically state a date and time -- an exact date and
03:24 22  time of this type of loss. Also I don't think BISD as an
03:24 23  insured is in a position to identify the cause and origin
03:24 24  of mold damage. That is for experts.
03:24 25    Q. Did -- did not BISD retain several experts?

Page 79

03:24 1     A. They did.
03:24 2     Q. And did not BISD retain those experts in order
03:24 3   to determine the cause and origin of their mold problem at
03:24 4   the school?
03:24 5     A. In part.
03:24 6     Q. The insurance policy has -- has certain duties
03:24 7   for an insured to comply with, correct?
03:24 8     A. Correct.
03:24 9     Q. And among those duties are the duties to
03:24 10  describe the loss and to state when, how and where the
03:24 11  loss occurred in general.
03:25 12    A. I'd have to look at the policy.
03:25 13    Q. Well, don't all insurance policies -- all
03:25 14  property policies contain provisions of that nature?
03:25 15    A. Of that nature, yes.
03:25 16    Q. Is it -- if the policy contains such provisions,
03:25 17  does the insured have the duty to comply with those
03:25 18  provisions?
03:25 19    A. If they can.
03:25 20    Q. They have the duty to comply with those
03:25 21  provisions as best they can.
03:25 22    A. Yes.
03:25 23    Q. Is it reasonable for an insurance company to ask
03:25 24  for and require information as to the timing and the
03:25 25  nature and the cause of a loss in order to find out what

Page 80

03:25 1   the insured can tell them?
03:25 2     A. It depends on the type of loss as to whether
03:25 3   it's reasonable to request and demand that information.
03:25 4     Q. The policy allows the insurance carrier to
03:25 5   request that information, correct?
03:25 6     A. They can't -- yes, but they can't require an
03:25 7   impossibility.
03:25 8     Q. The policy requires the insured to provide that
03:25 9   information if the insured -- the policy requires the
03:26 10  insured to -- to do its best job in providing that
03:26 11  information. Can --
03:26 12    A. Yes.
03:26 13    Q. -- we agree on that?
03:26 14    A. Yes.
03:26 15    Q. Are you aware of any case law that -- or other
03:26 16  law that would have required Royal to retain experts to do
03:26 17  the same sorts of things that the previous experts had
03:26 18  done out there at the school?
03:26 19    A. I'm not aware exactly which experts you're
03:26 20  talking about and what period of time they've previously
03:26 21  been retained.
03:26 22    Q. All right. You're critical of Royal, as you
03:26 23  say, for not hiring independent experts to do their own
03:26 24  investigation.
03:26 25    A. Correct.

Page 81

03:26 1     Q. All right. And this is at a time when many,
03:26 2   many experts have already gone out to the school and
03:26 3   investigated.
03:27 4     A. Some had investigated prior instances that are
03:27 5   not -- were not the current claim. So I don't know that
03:27 6   there's many, many.
03:27 7     Q. Well, there's certainly a whole slew of experts
03:27 8   that have been retained by BISD, like -- such as EFI and
03:27 9   others, correct?
03:27 10    A. Again, it depends on what point in time.
03:27 11  Just -- the problem is "a slew." There was an expert
03:27 12  retained, but as far as a slew and many, many, I don't
03:27 13  know --
03:27 14    Q. All right. There were several experts retained
03:27 15  by BISD over the years to go out and investigate their
03:27 16  mold problems.
03:27 17    A. Yes.
03:27 18    Q. All right. Are you aware of any law or legal
03:27 19  obligation that would require Royal to hire yet another
03:27 20  expert to go out and investigate these issues?
03:27 21    A. I think that they are obligated to perform a
03:27 22  full investigation, which would include retaining an
03:27 23  expert to identify the sources.
03:27 24    Q. All right. Even though other experts have
03:27 25  already done that.

21 (Pages 78 to 81)

Royal v. Brownsville ISD                                                James Bettis

Page 82

03:27 1    A. I think they have an obligation to do their own
2    investigation.
03:27 3    Q. Okay. And I understand that. Are you aware of
03:27 4    any case that holds that?
03:28 5    A. No.
03:28 6    Q. Are you aware of any other legal principle from
03:28 7    which you derive that?
03:28 8    A. Just general practice in the industry.
03:28 9    Q. Let me go through some issues in your report,
03:28 10   some specifics. Okay. Let me refer you to page 2 of your
03:28 11   report.
03:28 12   A. Okay.
03:28 13   Q. There's a -- you refer in here to the -- the
03:28 14   Ambiotec report?
03:29 15   A. Let's see. Which paragraph is that in?
03:29 16   Q. Well, I don't know.
03:29 17   A. I think it's paragraph -- it's the middle
03:29 18   para -- second paragraph. Yes.
03:29 19   Q. Yeah. You say, "the mold investigation (sic)
03:29 20   report by Ambiotec Group dated May 22, 2002."
21   A. All right.
03:29 22   Q. Do you -- where does that date come from on that
03:29 23   report?
03:29 24   A. I don't have it in front of me. So I don't
03:29 25   recall.

Page 83

03:29 1    Q. All right. Can you -- I will need you to get
03:29 2    that and bring it in here along with the rest of the
03:29 3    materials.
03:29 4    A. They're right over on the counter. I've already
03:29 5    brought them all in here.
03:29 6    Q. Oh, okay.
03:29 7           MR. SALAZAR: And I believe it's Ambiotec
8    report.
03:29 9           MR. BROWN: Ambiotec report. I stand
03:29 10   corrected.
03:29 11   Q. (BY MR. BROWN) Can you -- I want to make sure
03:29 12   that we have the same report. And there may be a typo.
03:29 13   There may not be. You may have a different report. So
03:29 14   that's -- that's the nature of my question. Let me -- I
03:29 15   can bring that stuff over to you if you'd like.
03:29 16   A. Go over here and look at it.
03:29 17   Q. Okay. That's fine.
03:29 18          THE VIDEOGRAPHER: Do you want to go off
03:29 19   the record?
03:29 20          MR. BROWN: We can stay on the record.
03:30 21   A. Without looking on -- I can't recall
03:30 22   specifically which report I got that from at this time,
03:30 23   but I do see an Ambiotec report dated May, 2002. As far
03:30 24   as where I got the May 22nd date, I don't know.
03:30 25   Q. (BY MR. BROWN) You quote from the Ambiotec

Page 84

03:30 1    report.
03:30 2    A. Yes.
03:30 3    Q. Can you find those pages that you quote from?
03:31 4    A. I can't without going through this page by page.
03:31 5    I do see some similar references.
03:31 6    Q. You've obviously read the Ambiotec report and
03:31 7    either highlighted portions of it or marked it with yellow
03:31 8    tabs?
03:31 9    A. Correct.
03:31 10   Q. What are the Bates numbers on your Ambiotec
03:31 11   report?
03:31 12   A. This one begins with -- it's RSL 000048.
03:31 13   Q. And through what?
03:31 14   A. That, I'm not really sure without -- I'm not
03:31 15   sure which -- where it ends. I'm not sure which part is
03:31 16   Ambiotec or not because there's a lot of charts and
03:32 17   similar information attached to it and I --
03:32 18   Q. The last page of my report looks like this,
03:32 19   Aerotech.
03:32 20   A. There's something behind it that was grouped
03:32 21   together with it that appears to -- it's an executive
03:32 22   summary prepared by Assured Indoor Air Quality, LP, but as
03:32 23   this was grouped and received from Royal -- and what I
03:32 24   mean by that: This is Mr. Swoveland's report. There are
03:32 25   yellow dividers between the various reports, and after the

Page 85

03:32 1    end of what you've shown me here, there's an executive
03:33 2    summary for Assured Indoor Air Quality, LP. It's about a
03:33 3    five-page report.
03:33 4    Q. What is the last page before the Assured Indoor
03:33 5    Quality? What's the document number of that page?
03:33 6    A. It ends with 158.
03:33 7    Q. And that is a -- will you hold that page up for
03:33 8    the camera just so we can get a visual on it?
03:33 9           MR. BROWN: I'll tell him to get that.
03:33 10   Q. (BY MR. BROWN) Okay. And are you aware,
03:33 11   Mr. Bettis, of any other Ambiotec report that you've
03:33 12   reviewed other than the one that you've just identified?
03:33 13   A. I do not know. I'd have to go through these.
03:33 14   Q. Let me ask you to do that, and at the same time
03:33 15   let me ask you if you are aware of a particular report
03:34 16   from EFI -- and let me -- just bear with me and I'll find
03:34 17   the date of that. Well, let me ask you to ascertain
03:34 18   whether you have another report or communication from
03:34 19   Ambiotec and then also ask you to identify those reports
03:34 20   or communications you have from EFI. And we can -- if
03:35 21   you'd like, you can move those in front of you and do it
03:35 22   here or we can take a break if you'd like.
03:35 23   A. There's -- there's a bunch over there too --
03:35 24   Q. Yeah, whatever you want to do.
03:35 25   A. -- I'd have to go through and then -- I mean,

22 (Pages 82 to 85)

Royal  v. Brownsville ISD                                                                 James Bettis

Page 86

03:35  1    this could take a long time to go through these pages in
03:35  2    detail --
03:35  3        Q.  Well, I understand, but I need to -- there's a
03:35  4    discrepancy as to what we've got and what we don't have.
03:35  5    So I just -- I need to see what your -- what the basis for
03:35  6    your --
03:35  7        A.  For these quotes?
03:35  8        Q.  Well, no, no, no.
03:35  9        A.  And if we could, I could perhaps find those in
03:35 10    here.
03:35 11        Q.  My question is this.  I want to see if there is
03:35 12    another Ambiotec report that you based your opinions on
03:35 13    other than the one that you've -- we've just discussed.
      14    Okay?
03:35 15        A.  Okay.
03:35 16        Q.  And the other question I'd like to know is:
03:35 17    Which EFI reports are you in possession of, the dates of
03:35 18    those reports?  I'll be looking over my notes and see if I
03:36 19    can save us some time on some of this other stuff.
03:36 20        A.  Well, maybe I can short-circuit it this way, and
03:36 21    that is:  What I'm -- what I have in my possession,
03:36 22    looking through these, are the documents provided by your
03:36 23    firm to BISD's counsel consisting of two folders from --
03:36 24    supporting Mr. Swoveland's opinion, and whatever was in
03:36 25    there is in these, and the other information -- there

Page 87

03:36  1    would be nothing -- if it's not in there, I'll --
      2        THE COURT REPORTER:  I'm sorry.  I didn't
      3    hear the last part.
03:36  4        A.  If -- I will also look through the other
03:37  5    documents to see if there's any separate and apart from
03:37  6    what was in Mr. Swove --
      7        Q.  (BY MR. BROWN)  Sure.
03:37  8        A.  Swoveland's...  And you're looking for Ambiotec
03:37  9    or --
03:37 10        Q.  Or EFI.
03:39 11        A.  Okay.  In addition to what's in Mr. Swoveland's
03:39 12    binders, I've got two copies of Ambiotec reports, which
03:39 13    appear all to be the same, and I've got an EFI report
03:39 14    dated January 20th, 2003.
03:39 15        Q.  An EFI report dated -- the date again, please?
03:40 16        A.  January 20th, 2003.
03:40 17        Q.  January 20th, 2003.
03:40 18        A.  Right.
03:40 19        Q.  And do you have any other reports from EFI of
03:40 20    other dates?
03:40 21        A.  I'll have to look through that binder.
03:40 22        MR. SALAZAR:  And for the record, that's
03:40 23    the only report that's ever been produced by EFI, but the
03:40 24    school district can --
03:40 25        Q.  (BY MR. BROWN)  And that's -- all right.  That's

Page 88

03:40  1    the EFI report of January 20, 2003.
03:40  2        A.  Yes.
03:40  3        Q.  And is that report Bates stamped?
03:40  4        A.  No.
03:40  5        Q.  Is the report that was provided to you by BISD?
03:40  6        A.  I believe it was.
03:40  7        Q.  There's not another EFI report dated July 17,
03:40  8    2003, that you're aware of, is there?
03:40  9        A.  I don't know.
03:40 10        Q.  There's certainly not one that you're aware of.
03:40 11    I'll tell you there's not one that I'm aware of, but
      12    it's...
03:41 13        A.  I don't know whether such a report exists.
03:41 14        Q.  Okay.  In any event, it's certainly not in your
03:41 15    file.
03:41 16        A.  No.
03:41 17        Q.  Okay.  And that's, "no," it's not in your file.
03:41 18        A.  Correct.
03:41 19        Q.  All right.  Now, the Ambiotec reports -- have
03:41 20    you got several copies of the same report?
03:41 21        A.  Appears to be, but they don't appear to -- these
03:41 22    appear -- the two copies I'm looking at here were produced
03:41 23    by Royal.  There's a Bates stamps number.  It's marked
03:41 24    Exhibit 25, but it does not appear to be as complete as
03:41 25    the one that was in the folder.

Page 89

03:41  1        Q.  What are the Bates -- are -- are those two that
03:41  2    you have in front of you -- are those copies?  One is a
03:41  3    copy of the other?
03:41  4        A.  It appears to be, yes.
03:41  5        Q.  Same Bates numbers?
03:41  6        A.  Well, there's actually -- yes, they're the same.
03:42  7        Q.  All right.  Would you identify for the record
03:42  8    the Bates numbers of those reports?
03:42  9        A.  Two Bates numbers.  One is -- begins with
03:42 10    RSL 000048 through 65.  The other Bates labels on here is
03:42 11    RSL 00002264 through 2282.
03:42 12        Q.  Okay.  Thank you.  Okay.  Let me refer you back
03:42 13    to your report on page 2.
03:42 14        A.  All right.
03:42 15        Q.  And let me go through some portions of that with
03:42 16    you.
03:42 17        A.  I probably need to get the other Ambiotec report
03:42 18    because it has different information.  It has additional
03:42 19    information, attachments than this.
03:42 20        Q.  The other Ambiotec report in Mr. Swoveland's
03:42 21    materials appear to be more voluminous than those?
03:43 22        A.  Yes.
03:43 23        Q.  That's the report that you identified previously
03:43 24    on the record?
      25        A.  Yes.

23 (Pages 86 to 89)

Royal v. Brownsville ISD                                                    James Bettis

---

**Page 90**

03:43  1     Q. Is it --

03:43  2         MR. SALAZAR: And for the record, it's

03:43  3   Ambiotec.

03:43  4         MR. BROWN: Mr. Salazar is correcting my

03:43  5   pronunciation again, which I apologize.

03:43  6         MR. SALAZAR: It doesn't have anything to

03:43  7   do with the pronunciation. It has to do with the

       8   spelling. And I don't mean to --

03:43  9         MR. BROWN: I never was -- I never was a

03:43 10   very good speller.

03:43 11     Q. (BY MR. BROWN) The -- on the two smaller

03:43 12   versions of the Ambiotec report that you have in front of

03:43 13   you, are there any dates on those other than the May,

03:43 14   2004, date?

03:43 15     A. May, 2002? No.

03:43 16     Q. May, 2002.

03:43 17     A. Not on the cover.

03:43 18     Q. You don't see anywhere where the May 22, 2002,

03:43 19   came from, do you?

03:43 20     A. Well --

03:44 21     Q. Okay.

03:44 22     A. There is a reference, just looking very quickly,

03:44 23   in the executive summary about -- for an -- air samples

03:44 24   collected on May 21, 2002. I don't know if I used that as

03:44 25   just the next day after the latest reference in here.

---

**Page 91**

03:44  1     Q. In any event, you -- you've designated the

03:44  2   reports for the record that you've seen.

03:44  3     A. Yes.

03:44  4     Q. Okay. In your report -- let me refer you to the

03:44  5   second paragraph on page 2 of your report, and you talk

03:44  6   there about Mr. Swoveland, and you state there in the

03:44  7   second sentence -- and this is a quote from him. I think

03:44  8   it's a quote from him. Yeah. It's -- you say there,

03:44  9   "Each one attributed most of the damage occurring as a

03:44 10   result of the faulty design of the HVAC system." Do you

03:45 11   see that?

03:45 12     A. Yes.

03:45 13     Q. And you're quoting from Mr. Swoveland, who is

03:45 14   discussing the expert reports.

03:45 15     A. Right.

03:45 16     Q. Do you disagree with that factual rendition? I

03:45 17   take it -- I'm not asking for your opinion on coverage

03:45 18   here, but -- I mean, do you disagree with the basic

03:45 19   factual premise that each of those expert reports

03:45 20   attributed most of the damage occurring as a result of the

03:45 21   faulty design of the HVAC system?

03:45 22     A. I just don't recall. I do recall that they

03:45 23   all -- most or all of the reports attributed some of the

03:45 24   cause to the HVAC system, but as to whether they

03:45 25   attributed most of the damage, I just don't remember.

---

**Page 92**

03:45  1     Q. All right. So you don't -- I take it you don't

03:45  2   know whether you disagree with that factual assertion or

03:45  3   not, but if you do disagree, it doesn't form the basis of

03:46  4   your coverage opinions.

03:46  5     A. Correct.

03:46  6     Q. All right.

03:46  7         MR. BROWN: Let's -- be needs to change the

03:46  8   tape.

03:46  9         THE VIDEOGRAPHER: Going off the record.

03:46 10   End of tape 1. It's 3:50.

       11        (Brief recess.)

03:47 12         THE VIDEOGRAPHER: Back on the record.

03:47 13   Beginning of tape 2. It's 3:51.

03:47 14     Q. (BY MR. BROWN) All right. Mr. Bettis, you

03:47 15   refer there going -- reading further in that same

03:47 16   paragraph that -- referring to the causes identified by

03:47 17   EFI, and one of those is HVAC plumbing leaks -- or HVAC

03:47 18   piping leaks rather.

03:47 19     A. Correct.

03:47 20     Q. All right. And I take it whether or not that

03:47 21   qualifies for coverage depends upon the facts in

03:47 22   relationship to that particular leak or not.

03:47 23     A. No.

03:47 24     Q. Okay. Even in your sort of broad view of

03:47 25   humidity being covered, doesn't that depend upon whether

---

**Page 93**

03:47  1   that HVAC piping leak caused an increase in humidity?

03:47  2     A. I'm not sure I follow.

03:47  3     Q. Okay. I guess what I'm -- you're not contending

03:47  4   that every HVAC piping leak is necessarily covered, are

03:48  5   you?

03:48  6     A. I'm saying that the water damage that comes from

03:48  7   those leaks are covered because, again, it goes back to my

03:48  8   belief that you never get to the exclusions because the

03:48  9   water damage, except for limited circumstances, is not --

03:48 10   is a covered claim.

03:48 11     Q. The water damage --

03:48 12     A. Not water -- water damage or damage caused by

03:48 13   water.

03:48 14     Q. The -- so there has to be water damage in order

03:48 15   for there to be coverage.

03:48 16     A. No, damage caused by water.

03:48 17     Q. Are you using that different than water damage?

03:48 18     A. Yes.

03:48 19     Q. You understand that water damage is the defined

03:48 20   term under the policy.

03:48 21     A. And I'm not -- and I'm not referring to water

03:48 22   damage. It must be damage caused by water, which is

03:48 23   different than water damage.

03:48 24     Q. So your -- your opinion is that water -- that

03:48 25   damage caused by water is different than the defined term

---

24 (Pages 90 to 93)

Royal v. Brownsville ISD                                                    James Bettis

---

**Page 94**

03:49 1   of water damage under the policy.
03:49 2        A. It can be. Any naturally flowing consequences
03:49 3   caused by water are considered water dama -- or not water
03:49 4   damage -- damages caused by water.
03:49 5        Q. The -- if you look at HVAC piping leaks in the
03:49 6   context of how you looked at that concept in your report
03:49 7   dealing with the exclusions and then the exceptions --
03:49 8        A. Yes.
03:49 9        Q. -- then in that event, you agree that whether or
03:49 10  not those qualify for coverage depends upon the particular
03:49 11  facts relating to those leaks.
03:49 12       A. Whether they come in in the exception to the
03:49 13  exclusion depends upon the specific facts.
03:49 14       Q. So just because there's an HVAC piping leak does
03:49 15  not necessarily mean it comes within the exception of the
03:49 16  exclusion --
03:49 17       A. Correct.
03:49 18       Q. -- correct? What is the purpose of a
03:50 19  reservation of rights letter?
03:50 20       A. To properly and fully inform the insured of any
03:50 21  coverage issues that may exist and to apprise of any
03:50 22  potential conflicts that may exist between their interests
03:50 23  and the insured's interests because of a potential lack of
03:50 24  coverage.
03:50 25       Q. Reservation of rights letters are issued in

---

**Page 95**

03:50 1   third-party claims, correct?
03:50 2        A. Yes.
03:50 3        Q. And they are also sometimes issued in first-
03:50 4   party claims.
03:50 5        A. Yes.
03:50 6        Q. And for -- the difference between -- how would
03:50 7   you describe generally the difference between a third-
03:50 8   party versus a first-party claim?
03:50 9        A. A third-party claim is some outside party suing
03:51 10  an insured for damages to that outside party or that third
03:51 11  party. It's not the insured's own damages. A first-party
03:51 12  claim would be damages suffered directly by the insured
03:51 13  for things such as damage to their property.
03:51 14       Q. Under -- like, for instance, a claim made under
03:51 15  a property policy.
03:51 16       A. Generally, yes.
03:51 17       Q. Would be -- generally that's a first-party
03:51 18  claim.
03:51 19       A. Yes.
03:51 20       Q. And the claim in this case is a first-party
03:51 21  claim --
03:51 22       A. Yes.
03:51 23       Q. Now, what is the purpose of a reservation of
03:51 24  rights in the context of a first-party claim?
03:51 25       A. Again, to apprise -- to fully apprise the

---

**Page 96**

03:51 1   insured of what's going on, what potential coverage issues
03:51 2   may exist and also so they may be aware that there's
03:51 3   potential conflicts between their interests and the
03:51 4   insurance company's interests.
03:51 5        Q. How would there be a conflict in the first-party
03:51 6   context between a conflict of interest between the
03:51 7   insurance company's interests and the insured's interests?
03:51 8        A. There can be many different ways.
03:51 9        Q. What -- I mean, can you give me an example --
03:52 10       A. An example? Well, the insured may prepare
03:52 11  documents -- the insured could prepare documents that
03:52 12  could assist them in trying to void coverage and the
03:52 13  insured doesn't understand the significance of the
03:52 14  documents and therefore signs them or doesn't react the
03:52 15  way they could to properly put the information out there.
03:52 16  They don't realize the insurance company is actually
03:52 17  trying to find a way to deny coverage.
03:52 18            There also could be in -- you know, some
03:52 19  words are, you know, kind of terms of art in these
03:52 20  insurance policies. An insured may not realize these are
03:52 21  issues that are out there, may use it as a -- you know, an
03:52 22  unsophisticated -- you know, with respect to insurance
03:52 23  policy matters, these words that actually have key
03:52 24  meanings in the policy and that's not how they intended
03:52 25  it. If they're apprised that there are potential problems

---

**Page 97**

03:52 1   and apprised of what they are, that would give them the
03:52 2   opportunity to hire an insurance expert, whether it's an
03:52 3   attorney or their -- like a public adjustor or someone to
03:52 4   represent their interests.
03:52 5        Q. The -- I take it then that the -- the potential
03:53 6   conflict of interest that you're identifying is the -- the
03:53 7   issue that always exists or that always may exist if
03:53 8   there's a coverage issue; in other words, that the insured
03:53 9   is going to want everything to be covered and the
03:53 10  insurance company may seek to apply the contract as it's
03:53 11  written even if that results in things that are not
03:53 12  covered.
03:53 13       A. The insurance company may try to apply it how
03:53 14  it's not written also. So I can't agree with that
03:53 15  characterization.
03:53 16       Q. Well, there can be other conflicts that exist in
03:53 17  the third-party context -- right -- such as who gets to
03:53 18  defend the case and --
03:53 19       A. But that only arises because there is a conflict
03:53 20  as to whether there's coverage or not. That's the only
03:53 21  reason you can -- that's -- that's the -- the conflict is
03:53 22  whether coverage will or won't exist in the third-party
03:53 23  situation, and because of the conflict, that the insured
03:53 24  is advised they have a right to hire their own counsel to
03:54 25  protect their interests because they've been advised of

---

25 (Pages 94 to 97)

Royal v. Brownsville ISD                                                James Bettis

Page 98

03:54 1    this conflict. It's the same conflict, coverage versus
03:54 2    noncoverage.
03:54 3        Q. Okay. Basically I'm -- I'm just trying to
03:54 4    understand what you're saying. It sounds like what you're
03:54 5    saying is that in the first-party context, the purpose of
03:54 6    a reservation of rights is to illuminate the issues that
03:54 7    may exist as to whether things are covered or not covered.
03:54 8        A. I don't think that eliminates the issues. It's
03:54 9    just to --
03:54 10       Q. No, to illuminate, to address the issues.
03:54 11       A. And apprise the insured so they can, if
03:54 12   necessary or if appropriate, hire someone to look after
03:54 13   their interests.
03:54 14       Q. Someone such as a lawyer or a public adjustor.
03:54 15       A. That would be examples.
03:54 16       Q. And are there any other purposes of a
03:54 17   reservation of rights letter in the first-party context
03:54 18   that you're aware of?
03:54 19       A. Well, another potential example would be how the
03:54 20   insured might handle a claim. If they're -- if they're
03:54 21   apprised that there may well not be coverage, they may not
03:55 22   wait for the insurance company to finish its
03:55 23   investigation, and to take care of the problem, they may
03:55 24   take care of it themself, or they may take care of it in a
03:55 25   different way. If they believe there isn't going to be

Page 99

03:55 1    coverage, they may say, you know, "We're not repairing
03:55 2    this car. If they're not going to cover my car, I'm not
03:55 3    going to go to the expense of repairing it myself. I'll
03:55 4    just buy a new one." Because, you know, an insurance
03:55 5    company may not buy them a new one, but if they're going
03:55 6    to pay for (sic) their own nickel, they may not want to
03:55 7    repair the car and instead just buy a new one.
03:55 8        Q. I mean, basically that -- that relates to the
03:55 9    issue of whether something is covered or not covered.
03:55 10       A. Yes.
03:55 11       Q. All right. You are critical, I take it, of the
03:55 12   reservation of rights letter issued in this case --
03:55 13       A. Yes.
03:55 14       Q. -- right? All right. Do you know anything --
03:55 15   can you identify anything that BISD did or did not do in
03:55 16   reliance upon that letter?
03:55 17       A. I don't know one way or the other.
03:55 18       Q. At the time you know that -- at the time that
03:56 19   BISD made its initial claim under the one policy, BISD was
03:56 20   represented by counsel, correct?
03:56 21       A. Yes.
03:56 22       Q. Are you aware that BISD was represented by
03:56 23   Anthony Constant's office at that time?
03:56 24       A. Yes.
03:56 25       Q. And would you agree that Anthony Constant and

Page 100

03:56 1    his office are competent insurance lawyers?
03:56 2        A. I don't have any idea if they have any
03:56 3    experience in insurance.
03:56 4        Q. You really don't?
03:56 5        A. I don't.
03:56 6        Q. So I take it that you don't have any reason to
03:56 7    believe that they are not competent insurance lawyers.
03:56 8        A. I can't -- I don't have reason to believe one
03:56 9    way or the other.
       10       Q. Okay.
03:56 11       A. It's not a knock on their firm in general. I
03:56 12   just don't know if they have expertise in that area.
03:56 13       Q. You've not had the pleasure of trying a case --
03:56 14   an insurance case against Anthony Constant?
03:56 15       A. No.
03:56 16       Q. Later Mr. Constant was -- do you recall who
03:56 17   received Royal's res -- who that letter was directed to?
03:56 18       A. No.
03:57 19       Q. Are you aware that it was directed to BISD's
03:57 20   counsel the same --
03:57 21       A. I don't know.
03:57 22       Q. Okay. Has BISD -- anyone from BISD brought any
03:57 23   criticism of that letter to your attention?
03:57 24       A. No.
03:57 25           MR. BROWN: Let's mark that.

Page 101

03:57 1            (Bettis Exhibit No. 4 marked.)
03:57 2        A. One thing to clarify. You asked about
03:57 3    Constant & Vela. Again, I have no knowledge of their
03:57 4    experience in that area, but I do know in this case it
03:57 5    appears that Royal is criticizing how they handled it. So
03:58 6    that relates to your question of: Do you have any reason
03:58 7    to believe? And Royal in this case has criticized, it
03:58 8    appears, how Constant & Vela handled this.
03:58 9        Q. (BY MR. BROWN) How they have handled it or how
03:58 10   BISD has handled it?
03:58 11       A. Well, there was criticism of supposedly not
03:58 12   responding to letters, and I don't know who was
03:58 13   responsible for that, if that happened.
03:58 14       Q. You don't know of anything that -- I take it you
03:58 15   don't know whether that criticism relates to BISD or to
03:58 16   BISD's lawyers.
03:58 17       A. Right. And I'm not criticizing them myself.
03:58 18   I'm simply pointing out that Royal has made this.
03:58 19       Q. Well, I mean, you're not aware that Royal has
03:58 20   criticized Mr. Constant's firm, are you?
03:58 21       A. I'm aware you criticized the failure to respond.
03:58 22   Whoever would be responsible for that, if it's accurate, I
03:58 23   would take it you're criticizing, whether that's BISD or
03:58 24   the law firm or whoever.
03:58 25       Q. So -- I mean --

Esquire Deposition Services         (713) 524-4951 Fax              (713) 524-4600

Royal v. Brownsville ISD                                             James Bettis

---

**Page 102**

03:58 1     A. I don't have an opinion that -- I am not
03:58 2 criticizing them.
03:58 3     Q. All right. And where -- can you point to
03:58 4 anywhere in the record where Royal has criticized that
03:59 5 firm?
03:59 6     A. I can point to many places in the record where
03:59 7 they have criticized the failure to respond to
03:59 8 correspondence that was sent to Constant & Vela.
03:59 9     Q. Criticizing BISD's failure to respond, correct?
03:59 10     A. We don't -- I don't know. I've not talked to
03:59 11 BISD or Constant & Vela to know who didn't respond --
03:59 12     Q. All right. My question is --
13     A. -- why they didn't get it.
03:59 14     Q. All right. I'm sorry. My question does not
03:59 15 relate to the ultimate inquiry of who didn't respond. You
03:59 16 addressed something that you said Royal criticized. So my
03:59 17 question simply relates to what Royal said. And it's
03:59 18 true, is it, that -- that Royal has never criticized in
03:59 19 the record anybody from Constant & Vela?
03:59 20     A. They have not used those words. They've
03:59 21 criticized actions that occurred while Constant & Vela was
03:59 22 the attorney for BISD. Whoever would be responsible for
03:59 23 those actions would be who you're criticizing.
03:59 24     Q. All right. And they didn't express it in those
25 terms either, did they?

---

**Page 103**

03:59 1     A. They have expressed in the terms that --
04:00 2 criticizing BISD for not responding to letters that were
04:00 3 sent to Constant & Vela.
04:00 4     Q. For not providing information that Royal had
04:00 5 requested of -- of its insured. Isn't that what it
04:00 6 relates to?
04:00 7     A. I don't recall the substance of each of those
04:00 8 letters, but it was letters addressed to Constant & Vela
04:00 9 that y'all criticized not being responded to.
04:00 10     Q. What letters are you aware of that were
04:00 11 addressed to Constant & Vela where -- where anybody was
04:00 12 criticized?
04:00 13     A. The letters themself did not. There are
04:00 14 subsequent criticisms overall for the failure to respond
04:00 15 to letters. Some of those occurred while Constant & Vela
04:00 16 was the attorney for BISD.
04:00 17     Q. Some of the failures to respond occurred at
04:00 18 that --
04:00 19     A. Some of the allegations of failure to respond.
04:00 20 I don't --
04:00 21     Q. Well, I guess we'll just have to disagree about
04:00 22 the record as far as that goes.
04:00 23     The -- okay. You're -- you're looking at
04:00 24 an exhibit that's marked what? What's the -- help me with
04:01 25 the exhibit.

---

**Page 104**

04:01 1     A. Bettis Exhibit 4.
04:01 2     Q. Okay. And that's the reservation of rights
04:01 3 letter that we've been discussing, correct?
04:01 4     A. Yes.
04:01 5     Q. All right. And in that letter -- that was sent
04:01 6 by Mr. Schwartz of Royal to Pruett Moore, III of
04:01 7 Constant & Vela, correct?
04:01 8     A. That's what it shows.
04:01 9     Q. And at that time Constant & Vela represented
04:01 10 BISD on this claim, correct?
04:01 11     A. I don't know.
04:01 12     Q. Isn't that what you just testified to?
04:01 13     A. There was a point in time. I'm just not sure at
04:01 14 what point in time they were -- whether they had been --
04:01 15 changed attorneys by that specific date or not. I just
04:01 16 don't know.
04:01 17     Q. Okay. The -- and that letter enclosed the page
04:01 18 of the policy that explained the insured's duties under
04:01 19 the policy, correct?
04:01 20     A. Correct.
04:01 21     Q. And those are found under number 3 there under
04:02 22 "E," "Loss Conditions," on the second page?
04:02 23     A. Yes.
04:02 24     Q. And those duties of the insured, those are the
04:02 25 typical duties that are found in most first-party property

---

**Page 105**

04:02 1 policies, correct?
04:02 2     A. Something -- either this or something very
3 similar.
04:02 4     Q. All right. I mean, there may be some difference
04:02 5 in the wording here and there, but basically this is the
04:02 6 sort of thing that coverage lawyers such as yourself
04:02 7 frequently see in first-party property policies.
04:02 8     A. Yes.
04:02 9     Q. The -- and among those duties that the insured
04:02 10 needs to comply with is to provide prompt notice of the
04:02 11 loss or damage, correct?
04:02 12     A. Yes.
04:02 13     Q. And then number 3 there is, "As soon as
04:02 14 possible, give us a description of how, when and where the
04:02 15 loss or damage occurred."
04:02 16     A. Yes.
04:02 17     Q. Number 4 is, "Take all reasonable steps to
04:02 18 protect the covered property from further damage."
04:02 19     A. Yes.
04:02 20     Q. And number 7 talks of the requirement to send a
04:03 21 signed sworn proof of loss containing the information
04:03 22 requested, correct?
04:03 23     A. Yes.
04:03 24     Q. And number 8 requires the insured to cooperate
04:03 25 with the insurance company in investigating the claim.

---

27 (Pages 102 to 105)

Royal v. Brownsville ISD                                          James Bettis

---

Page 106

04:03 1    A. Correct.
04:03 2    Q. The — now, Mr. Schwartz in his — in his fax
04:03 3  notes that he's attaching the conditions that explains the
04:03 4  insured's duties. Do you see that?
04:03 5    A. Yes.
04:03 6    Q. And is it clear from this communication that he
04:03 7  is advising the insured that they need to comply with
04:03 8  those duties?
04:03 9    A. It doesn't use those exact words, but —
04:03 10   Q. Is it clear from the context of the
04:04 11 communication that he's — he's pointing out the duties
04:04 12 that the insured needs to comply with?
04:04 13   A. Yes.
04:04 14   Q. And he asks there that — he points out that
04:04 15 Dennis Nickoloff of GAB Robins is representing Royal in
04:04 16 the investigation of the claim.
04:04 17   A. Right.
04:04 18   Q. And he asks there — he states that
04:04 19 Mr. Nickoloff is awaiting the engineering reports to be
04:04 20 sent by BISD.
04:04 21   A. Correct.
04:04 22   Q. And then he says there, "When we have had an
04:04 23 opportunity to ascertain the amounts and causes of loss,
04:04 24 we will be able to respond as to applicable coverages."
04:04 25   A. Correct.

---

Page 107

04:04 1    Q. And then he goes on to say that — meanwhile
04:04 2  that Royal "reserves its rights under the provisions,
04:04 3  conditions, exclusions endorsements of each of the
04:04 4  policies, as they may prove to apply upon receipt of
04:04 5  further information," correct?
04:04 6    A. Correct.
04:04 7    Q. Now, there's no question here that M. Schwartz
04:04 8  communicates that he is reserving his rights under the
04:05 9  applicable policies. I mean, that's what he says, right?
04:05 10   A. He uses those words but does not explain what
04:05 11 that means.
04:05 12   Q. Well, there's no question that he uses the words
04:05 13 he does.
04:05 14   A. He uses the buzz words, "reserves its rights."
04:05 15   Q. At this — does he also say that he's not able
04:05 16 to determine whether anything is covered or not covered
04:05 17 because he needs further information?
04:05 18   A. Let's see. No, he doesn't say that.
04:05 19   Q. He says there that he — when he has an
04:05 20 opportunity to ascertain the amounts and causes of loss
04:05 21 that he will be able to respond as to applicable
04:05 22 coverages?
04:05 23   A. Correct.
04:05 24   Q. He asks for the engineering reports.
04:05 25   A. Yes.

---

Page 108

04:05 1    Q. Is it clear from that that he needs to have that
04:05 2  information before he can determine coverages? Isn't that
04:05 3  what he's saying?
04:05 4    A. Me, having experience in this area, would
04:05 5  understand that. I don't know that every person would
04:06 6  understand that.
04:06 7    Q. You, having experience in that — in this area,
04:06 8  understand that that's what he's saying.
04:06 9    A. That's how I would interpret it.
04:06 10   Q. I mean, as — as a practical matter, BISD has
04:06 11 had all these engineering reports done of the problems at
04:06 12 his school, and Mr. Schwartz is awaiting that information
04:06 13 in order — so he can look at it in order to determine
04:06 14 coverages.
04:06 15      MR. SALAZAR: Objection as to form, assumes
04:06 16 facts not in evidence.
04:06 17   A. I don't know when they had the expert reports.
04:06 18   Q. (BY MR. BROWN) Well —
04:06 19   A. The engineering — specifically the engineering
04:06 20 reports were requested. I do not know when BISD had
04:06 21 those.
04:06 22   Q. What you understand — I mean, according to the
04:06 23 letter, Royal is awaiting engineering reports from BISD.
04:06 24   A. Yes.
04:06 25   Q. According to the letter, Mr. Schwartz needs that

---

Page 109

04:06 1  information in order to ascertain the amounts and causes
04:06 2  of loss.
04:06 3    A. That's what he says.
04:06 4    Q. All right. And you would understand that,
04:06 5  right?
04:07 6    A. Yes.
04:07 7    Q. And you understand that from this, there's some
04:07 8  coverage issues.
04:07 9    A. I would.
04:07 10   Q. All right. And you understand that he's
04:07 11 advising the insured that the insured needs to comply with
04:07 12 the insured's duties under the policy.
04:07 13   A. That's how I would interpret it. I don't — I'm
04:07 14 not sure how — I'm not sure an insured would interpret
04:07 15 all this like that.
04:07 16   Q. Do you have any reason to believe that Mr. —
04:07 17 that an insurance lawyer with Constant & Vela would
04:07 18 interpret it any different than you would interpret it?
04:07 19   A. I have no knowledge of Mr. Moore.
04:07 20   Q. Do you have any knowledge that anybody at BISD
04:07 21 took any action in reliance upon this communication?
04:07 22   A. No, I don't know one way or the other.
04:07 23   Q. Do you have any knowledge as to whether this
04:07 24 communication marked Exhibit No. 4 harmed BISD in any way?
04:08 25   A. I would say it's an incomplete reservation of

---

28 (Pages 106 to 109)

Royal v. Brownsville ISD                                    James Bettis

## Page 110

04:08  1   rights letter --
04:08  2       Q.  In your opinion.
04:08  3       A.  -- and by not fully -- yes, in my opinion -- by
04:08  4   not fully and properly informing BISD they -- whether they
04:08  5   took actual reliance upon it or didn't do something
04:08  6   because of it, it's possible, but I don't know.
04:08  7       Q.  My question is:  Are you aware of any harm that
04:08  8   the letter is alleged to have caused?
04:08  9       A.  I don't know.
04:08 10       Q.  Now, your -- you say that Article 2155 applies
04:08 11   to this claim, correct?
04:08 12       A.  Correct.
04:08 13       Q.  How does Article 2155 work in general?
04:08 14       A.  Basically it sets timetables for the insurance
04:08 15   company to respond to claims, and they've got just -- it's
04:09 16   various timetables, and they can request information
04:09 17   within certain periods of time.  Then based upon that
04:09 18   request to receive information, they have deadlines by
04:09 19   which they must further respond, the insurance company.
04:09 20       Q.  Does the insurance company -- or do you have any
04:09 21   opinions that Royal did not request information timely in
04:09 22   this matter?
04:09 23       A.  No.
04:09 24       Q.  What is the basis for your opinion that Royal
04:09 25   violated Article 2155?

## Page 111

04:09  1       A.  I think they re -- they repeatedly requested
04:09  2   more and more information after they had sufficient
04:09  3   information to analyze this claim.  You can't just --
04:09  4   under 2155 you can't just ask and ask and ask.  Just
04:09  5   because you ask doesn't protect you.
04:09  6       Q.  Are you aware of any information that Royal
04:10  7   asked for that it did not genuinely want and need?
04:10  8       A.  I do not know why they asked for certain things.
04:10  9   I do think at this -- as we sit here today, they've had
04:10 10   plenty of information and still haven't paid a claim.
04:10 11       Q.  What is your -- you're critical of Royal for
04:10 12   continuing to ask for information.  I understand that.
04:10 13       A.  After, I believe, they had sufficient
04:10 14   information to make a decision.
04:10 15       Q.  To make a decision, meaning to make a coverage
04:10 16   determination.
04:10 17       A.  Yes.
04:10 18       Q.  Is there any other basis for your view that
04:10 19   Royal violated Article 2155?
04:10 20       A.  No.  Well, that they didn't pay the claim.
04:10 21       Q.  In order to pay the claim, they first need to
04:11 22   make a coverage determination, right?
04:11 23       A.  Right.  But the bottom line, my opinion on it
04:11 24   is:  They have sufficient information to determine whether
04:11 25   to pay the claim and have still failed to do so.

## Page 112

04:11  1       Q.  And I take it you don't have a specific opinion
04:11  2   as to when they should have determined that they owed the
04:11  3   claim.
04:11  4       A.  I don't have an exact date.  Certainly, as I
04:11  5   say, as of today -- certainly sometime before today they
04:11  6   had plenty of information.
04:11  7       Q.  If an insured -- if an insurance company
04:11  8   requests information that it needs in order to determine a
04:11  9   claim and an insured has that information and does not
04:11 10   provide it, does the insurance company still violate
04:11 11   Article 2155 by waiting for that information?
04:12 12       A.  No.
04:12 13       Q.  And why is that?
04:12 14       A.  If it's something that's in the possession of
04:12 15   the insured and the insurance company has no other source
04:12 16   for it and they need it to reach an opinion, they can't
04:12 17   reach their opinion.
04:12 18       Q.  And if they can't reach their opinion, they
04:12 19   shouldn't be penalized for not reaching their opinion, I
04:12 20   take it.
04:12 21       A.  If they legitimately cannot because the insured
04:12 22   is withholding information from them, then they should not
04:12 23   be penalized.  They still may owe coverage, but they
04:12 24   should not be penalized under 2155.
04:12 25       Q.  How many different -- do you contend there's

## Page 113

04:12  1   more than one covered event or covered occurrences at the
04:12  2   different schools?
04:12  3       A.  I have not analyzed that issue.
04:12  4       Q.  You do agree that if there -- if we're talking
04:13  5   in terms of coverage and if you contend that coverage
04:13  6   exists, then for every different coverage event or
04:13  7   coverage occurrence, there should be the application of a
04:13  8   separate deductible.
04:13  9       A.  I would have to look at the deductible clause in
04:13 10   the policy.
04:13 11       Q.  And have you done that or --
04:13 12       A.  No.
04:13 13       Q.  Were the -- do you know when the --
04:13 14       A.  By the way, just -- whenever you get to a
04:13 15   breaking point, I'd like to take a short break.
04:13 16       Q.  Sure.
04:13 17       A.  I don't have to right now.  Just when we get to
04:13 18   an appropriate stopping point.
04:13 19       Q.  What is the difference, in general, between a
04:13 20   notice of loss and the other sorts of information that an
04:13 21   insurance company may later ask for?
04:14 22       A.  A notice of loss is typically the first
04:14 23   notification to the insurance company that there has been
04:14 24   a loss, to apprise them that there is a loss and a
04:14 25   potential claim.

Royal v. Brownsville ISD                                           James Bettis

**Page 114**

04:14 1    Q. Have you examined the issue of whether the
04:14 2    notice of loss provided by BISD was provided timely or
04:14 3    not?
04:14 4    A. I have not.
04:14 5    Q. So I take it you have no opinions in that
04:14 6    regard.
04:14 7    A. That's correct. I also need to have -- to do
04:14 8    that review -- I have no opinions, but I'd have to review
04:14 9    depositions of BISD personnel.
04:14 10   Q. And to date those have not been -- excuse me --
04:14 11   provided to you?
04:14 12   A. Correct.
04:14 13       MR. BROWN: We can take a break.
04:14 14       THE VIDEOGRAPHER: Going off the record.
04:14 15   It's 4:18.
04:21 16       (Brief recess.)
04:21 17       THE VIDEOGRAPHER: Back on the record.
04:21 18   It's 4:25.
04:21 19   Q. (BY MR. BROWN) Now, Mr. Bettis, what are you
04:21 20   charging in this case?
04:21 21   A. $225 an hour.
04:21 22   Q. And is that your normal -- normal hourly charge?
04:22 23   A. For any new client. I have a few old clients
04:22 24   that I charge clients -- when I get retained or hired for
04:22 25   a case in any other matter, I have a few old clients that

**Page 115**

04:22 1    I've kept at a little bit lower rate just because they let
04:22 2    me start my firm ten years ago.
04:22 3    Q. And what have you been paid to date on this
        4  matter?
04:22 5    A. I have no idea.
04:22 6    Q. Do you know if you've been paid anything?
04:22 7    A. I know I've sent bills. I don't know whether
04:22 8    it's been paid.
04:22 9    Q. Do you know approximately how much you've sent
04:22 10   bills for?
04:22 11   A. No.
04:22 12   Q. Do you know how many bills you've sent?
04:22 13   A. No.
04:22 14   Q. You don't -- you don't know whether you've
04:22 15   billed $5,000 or $10,000 or $50,000.
04:22 16   A. I'd say it's probably somewhere in the middle --
04:22 17   or somewhere between those. I would guess it's more than
04:22 18   5,000. I would guess it's less than 50.
04:22 19   Q. I take it that your bills are -- your firm
04:23 20   maintains copies of your bills.
04:23 21   A. Yes.
04:23 22   Q. You opine in your report that Royal violated
04:23 23   Article 2121.
04:23 24   A. Yes.
04:23 25   Q. What is the factual bases for that opinion?

**Page 116**

04:23 1    A. Let me look at my report first. It is -- no,
04:23 2    it's not there. It's here. The report, I believe,
04:23 3    without -- it's based upon failure to make -- failure to
04:23 4    conduct a reasonable and prompt investigation, failure to
04:23 5    make reasonable efforts to settle.
04:23 6    Q. In your opinion, failure to make reasonable
04:24 7    efforts to settle.
04:24 8    A. Yes.
04:24 9    Q. And what else?
04:24 10   A. Failure to conduct a, you know, reasonable,
04:24 11   prompt investigation.
04:24 12   Q. And anything else?
04:24 13   A. Well, the -- it's not part of my report because
04:24 14   I was not aware of it at the time, but the -- the
04:24 15   representation to Royal that they -- by Royal that they
04:24 16   would, you know, provide coverage for the -- for the
04:24 17   findings in EFI's report would be a violation of the
04:24 18   insurance code.
04:24 19   Q. The alleged representation?
04:24 20   A. Yes.
04:24 21   Q. And any other factual bases for your opinions
04:24 22   that Royal violated 2121?
04:24 23   A. I wrote this a while back, but the primary part
04:24 24   of it was failing to make a reasonable, timely, prompt
04:25 25   investigation, failure to make reasonable efforts to

**Page 117**

04:25 1    settle. Also I cannot recall if part of it was their
04:25 2    failure to advise the insured of the covered and uncovered
04:25 3    portions of the claim or at least what Royal perceived to
04:25 4    be covered and not covered.
04:25 5    Q. What facts -- what facts would that relate to if
04:25 6    it was part of your opinion?
04:25 7    A. I'm not sure what you mean by "what facts."
04:25 8    Q. I'm just trying to figure out how that's
04:25 9    different from what you said before.
04:25 10   A. Well, not providing an explanation as to -- a
04:25 11   reasonable explanation as to what would be covered and not
04:25 12   covered.
04:25 13   Q. Now, that is not -- what you just stated is not
04:25 14   expressed in your report, is it?
04:25 15   A. Well -- "did not provide BISD with an
04:25 16   explanation of its conclusions." That -- that is stated
04:25 17   in my report.
04:25 18   Q. All right. And that -- in your opinion, that is
04:26 19   the factual basis for the violation of 2121 that relates
04:26 20   to the failure to provide an explanation as to what is
04:26 21   covered and not covered under the policy.
04:26 22   A. Yes.
04:26 23   Q. You've identified that. You've identified the
04:26 24   alleged representation about EFI, and you've identified
04:26 25   failure to make reasonable efforts to settle, and you've

30 (Pages 114 to 117)

Royal  v. Brownsville ISD                                                                James Bettis

**Page 118**

04:26  1    identified failure to conduct a reasonably prompt
04:26  2    investigation. Are there any other bases for your opinion
04:26  3    that Royal violated Article 2121?
04:26  4         A. I think that's it. Oh, by the way, when you
04:26  5    asked about whether -- the part about not telling what was
04:26  6    covered and what -- not covered, was that mentioned in
04:26  7    here? And I pointed to the part about BISD; they didn't
04:27  8    provide an explanation of conclusions. Actually a
04:27  9    sentence or two above that I say that RS -- Royal, RSL,
04:27 10   should have, among other things, provided its findings to
04:27 11   BISD with an explanation as to what RSL believed was
04:27 12   covered.
04:27 13        Q. Part of your work included review of
04:27 14   Mr. Swoveland's report, correct?
        15        A. Yes.
04:27 16        Q. And I take it -- I apologize if I've asked this
04:27 17   before, but you've never -- you don't have an opinion
04:27 18   about Mr. Swoveland in general as to his competence or
04:27 19   expertise apart from the opinions that you've reached in
04:27 20   this case, correct?
04:27 21        A. Correct.
04:27 22             MR. BROWN: Let me mark this, please.
        23            (Bettis Exhibit No. 5 marked.)
04:28 24        Q. (BY MR. BROWN) And what exhibit is that?
04:28 25        A. This is Bettis Exhibit No. 5.

**Page 119**

04:28  1        Q. All right. Mr. Swoveland's report has been
04:28  2    marked as Bettis Exhibit No. 5. Is that correct?
04:28  3        A. Yes.
04:28  4        Q. Let me refer you to Mr. Swoveland's factual
04:28  5    rendition on page 2 of his report.
04:28  6        A. Okay.
04:28  7        Q. And do you see there where he says, "The facts
04:28  8    are as follows"? It's basically the second --
04:28  9        A. Yes.
04:28 10        Q. -- paragraph? And I'd like to ask you about the
04:28 11   things that he states after that in terms of the --
04:28 12   whether you have any basis to disagree with the facts as
04:28 13   he has stated them. And I'm not asking whether there's
04:28 14   any other facts out there. I'm just limiting my question
04:28 15   to what's stated here. As to the second fact where he
04:28 16   says, "On December 5, 2001, GAB (Royal adjustor) requested
04:29 17   the engineering and other mold studies and continued
04:29 18   monthly (in writing) to request same. It is noted that
04:29 19   Royal did not receive these reports until January 22,
04:29 20   2003," you read that obviously when you first reviewed
04:29 21   Mr. Swoveland's report, correct?
04:29 22        A. Yes.
04:29 23        Q. Do you know of any facts that are -- that refute
04:29 24   that?
04:29 25        A. Well, the only thing that I can think of is -- I

**Page 120**

04:29  1    don't know whether these -- where it says, "and continued
04:29  2    monthly (in writing) to request same," whether that
04:29  3    actually was done. I've seen copies in Royal's file or
04:29  4    GAB's file of that, but I don't know whether those were
04:29  5    actually sent.
04:29  6        Q. You don't -- you've seen copies of the letters
04:29  7    though, right?
04:29  8        A. I've seen copies from Royal's file.
04:29  9        Q. So you don't know -- you're not disagreeing that
04:30 10   those letters were sent. You're just saying you have no
04:30 11   personal knowledge that they were actually sent.
04:30 12        A. Well, actually my understanding is:
04:30 13   Constant & Vela did not have those letters.
04:30 14        Q. Did not have what letters?
04:30 15        A. All these repeated requests.
04:30 16        Q. By GAB.
04:30 17        A. Right.
04:30 18        Q. Do you know -- do you recall who they were
04:30 19   addressed to?
04:30 20        A. Appeared to -- to Pruett Moore.
04:30 21        Q. Do you -- what -- upon what basis do you say
04:30 22   that Constant & Vela did not have copies of those letters?
04:30 23        A. I asked for all copies of correspondence between
04:30 24   Royal -- I'm including GAB as Royal -- from Royal to BISD,
04:30 25   and I was told that Constant & Vela did not -- had

**Page 121**

04:30  1    produced -- it was, like, one or two letters and that was
04:30  2    it.
04:30  3        Q. Okay. I apologize. I'm confused as to the
04:30  4    source of your information. You've -- you've seen copies
04:30  5    of the letters that were in Royal or GAB's file.
04:30  6        A. Yes.
04:30  7        Q. All right. And yet you say that you have an
04:31  8    understanding that the same copies were not in the -- in
04:31  9    the law firm's file that represented BISD at the time,
04:31 10   Constant & Vela.
04:31 11        A. Correct.
04:31 12        Q. All right. And how did you come by that
04:31 13   understanding that the -- that Constant & Vela did not
04:31 14   have copies of those letters in its file?
04:31 15        A. Mr. Salazar.
04:31 16        Q. That he told you that.
04:31 17        A. Yes.
04:31 18        Q. Have you actually reviewed the Constant & Vela
04:31 19   file?
04:31 20        A. I was asked to be -- have it sent to me, all of
04:31 21   it, and it was not in there.
04:31 22        Q. And this is -- you asked Mr. Salazar to send it
04:31 23   to you, correct?
04:31 24        A. Yes.
04:31 25        Q. I take it you don't have any knowledge one way

31 (Pages 118 to 121)

Royal v. Brownsville ISD                                      James Bettis

**Page 122**

04:31 1 or the other then as to whether or not those letters were
04:31 2 sent.
04:31 3     A. Correct.
04:31 4     Q. Other than that issue, is there anything in here
04:31 5 that you disagree with?
04:31 6     A. I mean, I can't agree or disagree as to when
04:31 7 Royal received the engineering report, as to whether it
04:31 8 was January 22nd, 2003.
04:31 9     Q. All right.
04:31 10    A. I mean, I don't -- I can't agree or disagree.
04:32 11    Q. The -- and is that all of your observations as
04:32 12 to facts that might be inconsistent with that sentence
04:32 13 that begins with, "On December 5, 2001"?
04:32 14    A. Yes.
04:32 15    Q. Let's go to the next paragraph, the one that
04:32 16 starts with "All of the experts hired by the insured."
04:32 17 Would you read that paragraph, which consists of two
04:32 18 sentences?
04:32 19    A. Yes.
04:32 20    Q. Do you disagree with the way Mr. Swoveland has
04:32 21 stated those facts?
04:32 22    A. Yes.
04:32 23    Q. And what is the basis for your disagreement?
04:32 24    A. Well, the first sentence, "All of the experts
04:32 25 hired by the insured opined that the mold problems arose

**Page 123**

04:32 1 from roof leaks, window leaks and the HVAC system." There
04:32 2 were additional sources of the water that were identified
04:32 3 in various expert reports.
04:32 4     Q. What -- what additional sources of water were
04:32 5 identified in other expert reports as to the experts that
04:32 6 were hired by BISD?
04:33 7     A. Well, I don't have an inclusive list, but my
04:33 8 report references a couple of them.  My expert report
04:33 9 references several, such as HVAC piping leaks, breaches in
04:33 10 the chilled water pipe insulation, plumbing leaks, chilled
04:33 11 water line leaks.  Those are some of them.
04:33 12    Q. Are you disagreeing with the facts stated by
04:33 13 Mr. Swoveland or just how he states those facts?
04:33 14    A. Disagree with the facts.
04:33 15    Q. And any other basis for your disagreement other
04:33 16 than what you just said?
04:33 17    A. Just the reports themself.
04:33 18    Q. Well, doesn't he address -- doesn't he address
04:33 19 the HVAC system?
04:33 20    A. He does.
04:33 21    Q. Doesn't that include components of the HVAC
04:33 22 system?
04:33 23    A. The way he wrote it here in conjunction with the
04:34 24 reports, I don't think so.
04:34 25    Q. Would you not consider the chilled water

**Page 124**

04:34 1 pipelines that are necessary to run the HVAC system part
04:34 2 of the HVAC system?
04:34 3     A. Not in the context of this paragraph in
04:34 4 conjunction with the second sentence that refers to the
04:34 5 faulty design of the HVAC system.
04:34 6     Q. Let me refer you to the third paragraph there,
04:34 7 the one that starts with "The insured's own maintenance
04:34 8 supervisor opines in his EUO."  Do you disagree with the
04:34 9 facts as stated there by Mr. Swoveland in that paragraph?
04:34 10    A. I can neither agree nor disagree because I
04:34 11 haven't seen Mr. Vasquez's opinions.
04:34 12    Q. You are aware that Mr. Vasquez of BISD provided
04:34 13 a sworn EUO in this matter.
04:34 14    A. Yes.
04:34 15    Q. The -- let me refer you to the paragraph after
04:35 16 that that -- where Mr. Swoveland starts the sentence with
04:35 17 "The claim file reflects numerous requests (both verbally
04:35 18 and in writing) by the adjustor to obtain entry to the
04:35 19 property to inspect the damages."  And it goes on from
04:35 20 there for another two sentences.  Do you disagree with the
04:35 21 facts there as stated by Mr. Swoveland?
04:35 22    A. That is what the claim file reflects as -- I
04:35 23 don't recall though.  I can't agree or disagree as to when
04:35 24 he was permitted to enter the premises.
04:35 25    Q. And you don't have any independent knowledge of

**Page 125**

04:35 1 that issue, I take it?
04:35 2     A. Correct.
04:36 3     Q. Let me refer you to the insurance policy.
04:36 4         MR. BROWN:  And let's have this marked.
04:36 5         (Bettis Exhibit No. 6 marked.)
04:36 6     Q. (BY MR. BROWN) All right.  Let me show you
04:36 7 what's been marked as Bettis No. 6 and -- which is the
04:36 8 Royal policy -- that is the Royal policy of which dates?
04:36 9     A. This is Royal policy of April 1st, 2001, through
04:36 10 April 1st, 2002.
04:37 11    Q. What is your understanding, if any, of how the
04:37 12 terms and provisions in the Royal policies may differ from
04:37 13 year to year and whether that is material to your
04:37 14 analysis?
04:37 15    A. I don't -- do not know how they differ.
04:37 16    Q. So I take it that to the extent they may differ,
04:37 17 that that's not material to your analysis.
04:37 18    A. It's not material as to whether there's coverage
04:37 19 under this particular policy.
04:37 20    Q. Have you -- go ahead.  Have you examined this
04:37 21 particular policy for coverage?
04:37 22    A. Yes.
04:37 23    Q. Let me -- okay.  Let's do this.  Let me start
04:37 24 with -- this particular policy has a causes of loss
04:38 25 special form that you identified in your report?

32 (Pages 122 to 125)

Royal v. Brownsville ISD                                                                James Bettis

---

Page 126

04:38 1    A. Yes.
04:38 2    Q. Okay. And let me refer you to -- it's --
04:38 3    A. The Bates label? Do you not have it on there?
04:38 4    Let's see if there's an index. Is there an index?
04:38 5    Q. It's about halfway down through it. Let's see
04:38 6    if I can find it in this other one.
04:38 7    A. "Causes of Loss -- Special Form," I found it.
04:39 8    Q. Okay. And what's the -- how would you identify
04:39 9    that form in terms of the CP number?
04:39 10    A. CP 10300695.
04:39 11    Q. Now, that form provides in -- under "Covered
04:39 12    Causes of Loss," explain how you view that -- that to work
04:39 13    conceptually under Part "A," "Covered Causes of Loss."
04:39 14    A. Basically any physical damage to covered
04:39 15    property is covered unless the cause of it is specifically
04:39 16    excluded or limited.
04:39 17    Q. Unless the cause is excluded or the loss is
04:39 18    otherwise limited, correct?
04:39 19    A. Unless the -- yes.
04:40 20    Q. And let's refer first to the limitations in
04:40 21    Section C, and that's found on page 4 of 7.
04:40 22    A. Okay.
04:40 23    Q. And that part of the policy describes certain
04:40 24    things that will not be covered in -- in any event if
04:40 25    those limitations apply. Would you agree with that just

Page 127

04:40 1    as a -- as a general observation?
04:40 2    A. As a general observation.
04:40 3    Q. Do you agree with that as a general observation?
04:40 4    A. Yes.
04:40 5    Q. Okay. Let me refer you specifically,
04:41 6    Mr. Bettis, to limitation "c" at the top of page 5 of 7.
04:41 7    A. Okay.
04:41 8    Q. And take a -- take a minute and review that, if
04:41 9    you will, or take as long as you need.
04:41 10    A. Okay.
04:41 11    Q. How does that limitation -- that limitation
04:41 12    deals with the interior of any building or structure,
04:41 13    correct?
04:41 14    A. Uh-huh, yes.
04:41 15    Q. And it limits a coverage depending upon how that
04:41 16    damage may be caused.
04:41 17    A. Yes.
04:41 18    Q. And what does it say there as to in what
04:41 19    circumstances damage that results from rain, whether
04:41 20    driven by wind or not, is limited? Can you explain that?
04:41 21    A. I've not looked at that specific exclusion
04:41 22    because Mr. Swoveland didn't assert it. So I haven't
04:42 23    analyzed it, and I'd have to analyze and look through the
04:42 24    policy to see if there's anything that modifies it. So I
04:42 25    don't have an opinion right now on this.

Page 128

04:42 1    Q. Okay. You do know how to read an insurance
04:42 2    policy and interpret it, don't you?
04:42 3    A. Yes.
04:42 4    Q. All right. I take it that you can -- that
04:42 5    you're called upon all the time to read insurance policies
04:42 6    and interpret them.
04:42 7    A. Yes.
04:42 8    Q. I take it though that -- in fairness that you --
04:42 9    you have not examined this provision prior to this time in
04:42 10    connection with how it may relate to this case. Is
04:42 11    that --
04:42 12    A. I have looked at it, but I have not focused on
04:42 13    it because Mr. Swoveland did not assert that as an
04:42 14    exclusion that would preclude coverage. In order to give
04:42 15    an opinion, I would do some research on the case law
04:42 16    interpreting this exclusion along with looking to see --
04:42 17    through the whole policy because it is a complicated
04:42 18    policy that has endorsements to change the main coverage,
04:42 19    endorsements to change the endorsements.
04:43 20    Q. There might even be endorsements that change the
04:43 21    endorsements that change the endorsements.
04:43 22    A. They do.
04:43 23    Q. What is your observation just from reading it as
04:43 24    to what it may mean, subject to your further work on this
04:43 25    issue and research and further study of the policy, in

Page 129

04:43 1    terms of limitation "c"?
04:43 2    A. Will not -- will not provide coverage for damage
04:43 3    to the interior of any building or structure, or to
04:43 4    personal property in the building or structure, caused by
04:43 5    or resulting from, among other things, rain unless it
04:43 6    falls within Exceptions 1 or 2.
04:43 7    Q. And Exception 1 deals with basically the
04:44 8    situation where a covered cause of loss knocks a hole or
04:44 9    otherwise cause -- causes damage through which the rain
04:44 10    enters.
04:44 11    A. Yes.
04:44 12    Q. Like a tornado or a hurricane or something.
04:44 13    A. Any covered cause of loss.
04:44 14    Q. But unless the exception applies, then the
04:44 15    limitation provides that the damage from rain to the
04:44 16    interior of the building or structure is not covered.
04:44 17    A. Well, again, that's just based upon me reading
04:44 18    it right here and not having done the kind of work I would
04:44 19    normally do to determine the applicability of such an
04:44 20    exclusion.
04:44 21    Q. Okay. Let's look at the exclusions now, and
04:44 22    let's start on page 2 of 7, and at the bottom of the first
04:45 23    column on page 2 it states, "We will not pay for loss or
04:45 24    damage caused by or resulting from any of the following,"
04:45 25    and then under "d," that's where you have your exclusions

---

33 (Pages 126 to 129)

Royal v. Brownsville ISD                                                James Bettis

---

**Page 130**

04:45  1   such as wear and tear, corrosion, fungus, deterioration --
04:45  2      A. Correct.
04:45  3      Q. -- mechanical breakdown and the following causes
04:45  4   of loss to personal property, dampness or dryness of
04:45  5   atmosphere.
04:45  6      A. Yes.
04:45  7      Q. All right. And then that -- those exclusions
04:45  8   have what's known as an exception, correct?
04:45  9      A. That's correct.
04:45 10      Q. And how does that exception work there?
04:45 11      A. Well, if the exclusion applies in any given
04:45 12   situation, then there's not coverage unless the claim
04:45 13   falls within an exception to the exclusion, kind of a
04:45 14   subcategory of that exclusion.
04:46 15      Q. And the way this particular exception works is
04:46 16   that if one of those exclusions itself causes a specified
04:46 17   cause of loss, then there is coverage from that specified
04:46 18   cause of loss.
04:46 19      A. Correct.
04:46 20      Q. And "specified cause of loss" is a defined term
04:46 21   under the policy.
04:46 22      A. Correct.
04:46 23      Q. Now, let's refer -- let me refer you to that
04:46 24   area of the policy that defines specified causes of loss,
04:46 25   and that's on page 7 of 7 of that form.

---

**Page 131**

04:46  1      A. Got it.
04:46  2      Q. And specified causes of loss -- and there's
04:46  3   certain losses described there specifically, correct?
04:46  4      A. Correct.
04:46  5      Q. It starts with fire, lightning, explosion,
04:46  6   windstorm and goes on from there.
04:46  7      A. Right.
04:46  8      Q. And then the last one mentioned is water damage.
04:46  9      A. Right.
04:46 10      Q. Water damage is also a defined term defined
04:47 11   below that in sub-part 3.
04:47 12      A. It's defined within the specified causes of
04:47 13   loss, yes.
04:47 14      Q. Within that -- it's defined under "f" for
04:47 15   "Definitions."
04:47 16      A. Correct.
04:47 17      Q. And water damage is defined as "accidental
04:47 18   discharge or leakage of water or steam as the direct
04:47 19   result of the breaking apart or cracking of any system or
04:47 20   appliance," and it goes on from there.
04:47 21      A. Correct.
04:47 22      Q. And in order for there to be water damage under
04:47 23   the policy, must -- if we're talking about a pipe, must
04:47 24   that pipe actually break apart or crack?
04:47 25      A. No, that's not correct.

---

**Page 132**

04:47  1      Q. And why is that?
04:47  2      A. Because this -- if water damage is caused by a
04:48  3   covered cause of loss, it is not excluded. So water
04:48  4   damage covered by a covered cause of loss is covered.
04:48  5   There's no exclusion for it. All this does is define
04:48  6   water damage. It does not create an exclusion for it.
04:48  7      Q. This defines water damage.
04:48  8      A. Within the context of specified causes of loss,
04:48  9   it does.
04:48 10      Q. Is there another meaning that you think water
04:48 11   damage should be accorded under the policy other than how
04:48 12   it's defined here?
04:48 13      A. I think that if a covered cause of loss results
04:48 14   in water damage or mold damage, it's covered because
04:48 15   you -- this focuses on the cause of it. Likewise, you
04:48 16   know, you've got two -- two things you can't reconcile
04:49 17   that way.
04:49 18      Q. I'm not sure I follow you, but I think I've
04:49 19   followed you up till now.
04:49 20      A. I don't think this definition creates an
04:49 21   exclusion for any water damage other than that's specified
04:49 22   there because there's no exclusion for water damage.
04:49 23      Q. The definition though defines water damage,
04:49 24   right?
04:49 25      A. Within the context of a specified cause of loss.

---

**Page 133**

04:49  1      Q. So is it your view that -- when you say that --
04:49  2   when you add that last part, is it your view that water
04:49  3   damage has other meanings within this policy other than
04:49  4   how it's defined here?
04:49  5      A. I think that --
04:49  6      Q. Let me approach it this way. Let me see if this
04:49  7   helps. You view in certain situations, speaking
04:49  8   hypothetically, water damage would be covered under the
04:49  9   policy.
04:49 10      A. Yes.
04:49 11      Q. Okay. In your view that water damage would be
04:50 12   covered under the policy, what -- does that water damage
04:50 13   fit within this definition? Just talking about the
04:50 14   definition under part 3.
04:50 15      A. Some of it may.
04:50 16      Q. And some of it may not?
04:50 17      A. Correct.
04:50 18      Q. So in your view, the water damage does not have
04:50 19   to result from the breaking apart or cracking in order to
04:50 20   be considered water damage under this policy.
04:50 21      A. No. You're using a fine term. There are
04:50 22   other -- that doesn't apply to whether there's coverage
04:50 23   for damage covered by a covered cause of loss. There's no
04:50 24   exclusion for water damage other than some specified ones.
04:50 25   And to interpret it the way you're -- you're alluding to,

---

34 (Pages 130 to 133)

Royal v. Brownsville ISD                                                                    James Bettis

---

**Page 134**

04:50  1   it would wipe out, for instance, exclusion "g," which
04:50  2   excludes certain specified types of water that cause
04:51  3   damage.
04:51  4        Q.   Well, let -- let me stay for the purposes of my
04:51  5   question within the confines of the exception to the
04:51  6   exclusion.
04:51  7        A.   Okay.
04:51  8        Q.   And -- okay.  We were talking about the
04:51  9   exclusions on page 2 of 7 --
04:51  10       A.   Correct.
04:51  11       Q.   -- that have an exception that deals with
04:51  12  specified cause of loss.
04:51  13       A.   Yes.
04:51  14       Q.   Okay.  Let's assume for my question that we are
04:51  15  into one of those exclusions.
04:51  16       A.   Okay.
04:51  17       Q.   And so therefore in order to examine coverage,
04:51  18  we look at the exception of specified cause of loss.
04:51  19       A.   Correct.
04:51  20       Q.   And the way that exclusion works is that it's
04:51  21  excluded unless that thing which is excluded itself causes
04:51  22  a specified cause of loss.
04:51  23       A.   Correct.
04:51  24       Q.   And specified causes of loss is specifically
04:51  25  defined to include water damage.

---

**Page 135**

04:51  1        A.   Correct.
04:51  2        Q.   And within the context of that definition,
04:52  3   within the context of a specified cause of loss, would you
04:52  4   agree that the water damage in that context must include a
04:52  5   breaking apart or cracking?
04:52  6        A.   Yes.
04:52  7        Q.   In other words, it must comply with this
04:52  8   definition for water damage --
04:52  9        A.   For it to be an exception to the exclusion.
04:52  10  Assuming the exclusion applies, it's got to come up in
04:52  11  that definition.
04:52  12       Q.   Of water damage.
       13        A.   Yes.
04:52  14       Q.   And I take it your -- you have an additional
04:52  15  opinion that there can be types of water damage that do
04:52  16  not comport with that definition that are otherwise
04:52  17  covered under the policy.
04:52  18       A.   Yes.  Again, we're...
04:53  19       Q.   What water damage are you aware of that -- if
04:53  20  any, that you can point to in the evidence that does
04:53  21  comport with that definition that does qualify as a
04:53  22  specified cause of loss?
04:53  23       A.   I can point to certain items that -- that may or
04:53  24  may not, depending upon the specific facts of them.  Those
04:53  25  are the types of things I point out in my letter, certain

---

**Page 136**

04:53  1   leaks, certain other things that may be caused by that
04:53  2   type of a breakage.
04:53  3        Q.   All right.  Now, whether or not those qualify
04:53  4   for coverage though -- as I take it, you've pointed those
04:53  5   out as possible candidates for coverage.
       6        A.   Yes.
04:53  7        Q.   And whether or not they actually qualify for
04:53  8   coverage under the areas that we've been discussing --
04:53  9        A.   Come within the exception to the exclusion.
04:53  10       Q.   It depends upon whether or not they comply with
04:53  11  the definition here for water damage under "Specified
04:54  12  Cause of Loss."
04:54  13       A.   Assuming we get into the exceptions, yes.
04:54  14       Q.   Are you aware of any evidence in the record
04:54  15  where any of those specific leaks or other occurrences
04:54  16  that you've seen in the various reports does, in fact, in
04:54  17  your opinion, qualify under the definition 3 for water
04:54  18  damage?
04:54  19       A.   There are none of them that specifically state
04:54  20  come within that.  There are some that may.  I would need
04:54  21  more information or somebody else -- an engineer or
04:54  22  someone else would have to come up with a more definitive
04:54  23  cause than just some of the statements that are made in
04:54  24  the reports.
04:54  25       Q.   Based upon the facts presented to you and all

---

**Page 137**

04:54  1   the facts that were cited in the reports and the
04:54  2   evidentiary record that you've reviewed, you cannot
04:54  3   identify any that, in your opinion, do come within this
04:55  4   definition of number 3 of specified cause of loss.  Is
04:55  5   that correct?
04:55  6        A.   I cannot determine one way or the other.  And
04:55  7   what I mean by that is:  There are some that may, but you
04:55  8   would need more information.
04:55  9        Q.   I take it there are some that you cannot rule
04:55  10  out as -- as potential candidates for water damage as
04:55  11  defined in the policy.
04:55  12       A.   As defined under "Specified Causes of Loss."
04:55  13       Q.   But you're not aware of any evidence that
04:55  14  establishes that to be water damage as defined as
04:55  15  specified cause of loss.  You just say you need more
04:55  16  information.
04:55  17       A.   Correct.
04:55  18       Q.   What water damage -- using that term the way you
04:55  19  use it, not as a defined term, but just as a general term,
04:55  20  water damage, what water damage are you aware of that, in
04:56  21  your opinion, has caused covered damage at the schools?
04:56  22       A.   I don't have a breakdown or a chart, but there's
04:56  23  multiple references to damage from water, whether it's
04:56  24  water stains on ceiling tile or various things of that
04:56  25  sort.  I can't quantify it in any way, but there's reports

---

35 (Pages 134 to 137)

Royal v. Brownsville ISD

James Bettis

**Page 138**

04:56 1  replete with talk about water stains, things like that.

04:56 2  Q. And the reports also identify the factual causes

04:56 3  of that water, the sources of that water, correct?

04:56 4  A. Yes.

04:56 5  Q. The reports, for instance, attribute some of

04:56 6  that water to the defectively designed HVAC system and

04:57 7  some of the water to possible roof leaks and some of the

04:56 8  water to possible -- to other possible leaks, for example.

04:56 9  A. Yes.

04:56 10  Q. And do I understand it that, in your opinion,

04:56 11  the cause of the water doesn't make any difference? It's

04:56 12  still covered, in your view.

04:57 13  A. Yes.

04:57 14  Q. And this is an opinion that you did not hold

04:57 15  when you first authored your report.

04:57 16  A. I don't know that I looked at it from that angle

04:57 17  because I was more working off Mr. Swoveland's report,

04:57 18  believing his exclusions didn't exist.

04:57 19  Q. But I -- when did you first come by this opinion

04:57 20  as far as you know?

04:57 21  A. Just over time. It started with, you know,

04:57 22  starting to do research on -- in cleaning (sic) out some

04:57 23  other cases about ensuing loss under policies that have

04:57 24  somewhat different but similar language in it. It

04:57 25  probably, you know, kind of cemented my thoughts when I

**Page 139**

04:57 1  saw the newest case that I've referred to a couple of

04:57 2  times.

04:57 3  Q. The newest case being the De La Rentis case?

04:57 4  A. Yes.

04:57 5  Q. The one that was -- it came out in 2004 and then

04:58 6  was withdrawn and substituted in -- in August. Is that --

04:58 7  A. I think that's right.

04:58 8  Q. Let me call your attention to an endorsement

04:59 9  that is -- it's a "Texas Changes" endorsement, and on page

04:59 10  2 of 5 it refers to that limitation C.1.c.

04:59 11  A. Hold on. Let me look at the one you're talking

04:59 12  about. I've got to find it. "Texas Changes"? Okay. Let

04:59 13  me keep my C.1's -- okay.

04:59 14  Q. Okay. You see -- let me direct your attention

04:59 15  to page 2, left-hand column about the middle.

04:59 16  A. Okay.

04:59 17  Q. It talks about -- it has some language there

04:59 18  that purports to change the limitation language as to the

05:00 19  limitation as damage from rain.

05:00 20  A. Wait, wait. Where is this again?

05:00 21  Q. This is, like, right here on the page.

05:00 22  A. Well, maybe I'm looking at the wrong thing. I

05:00 23  mean, the Texas Changes, that's -- oh, that's commercial

05:00 24  inland Texas Changes. That's not the right one. I missed

05:00 25  it somehow. Was it before the causes of loss?

**Page 140**

05:00 1  Q. It's before.

05:00 2  A. Oh, okay. I was looking -- "Texas Changes -

05:00 3  Cancellation and Nonrenewal," no. Texas Changes. How

05:00 4  about -- is it CP 01421100?

05:01 5  Q. Correct.

05:01 6  A. I've got it.

05:01 7  Q. Okay. And then --

05:01 8  A. I was looking behind it. That's how it gets

05:01 9  confusing. This changes the endorsements behind it.

05:01 10  Q. On -- and then I'm referring to page 2.

05:01 11  A. Okay.

05:01 12  Q. My question is just this -- and I understand

05:01 13  that you've stated that you would like additional time to

05:01 14  research the issue on the limitation. Do you -- I just

05:01 15  wanted to call this -- changes to your attention and see

05:01 16  if you see anything at this reading as to whether that

05:01 17  would change --

05:01 18  A. Let me look back --

05:01 19  Q. -- our previous reading of the limitation.

05:01 20  A. -- and try to compare the difference.

05:01 21  Q. And, candidly, I don't remember as I sit here

05:01 22  what the difference is, but it's fairly...

05:02 23  A. Just looking at it quickly, I don't see any

05:02 24  difference whatsoever. Well, hold on. I think there is

05:02 25  now.

**Page 141**

05:02 1  Q. It's under "Personal Property."

05:02 2  A. No. It's more than that. Limitation C that

05:02 3  was -- before it was modified says, "We won't pay for loss

05:02 4  or damage to properties described in this section. In

05:02 5  addition, we will not pay for any loss that is a

05:02 6  consequence of a loss or damage described." And C.1.

05:03 7  doesn't talk about -- the new C.1. doesn't refer to

05:03 8  consequence of the loss, consequential loss being

05:03 9  excluded. So actually it -- it would appear to have

05:03 10  brought more coverage.

05:03 11  Q. Where is the -- where's the language that you're

05:03 12  referring to?

05:03 13  A. If you go on the original form, "C," it's, like,

05:03 14  the second paragraph where it describes, "We will not pay

05:03 15  for loss, damage," et cetera. And the second sentence

05:03 16  there -- the second sentence in there says, "In addition,

05:03 17  we will not pay for loss as a consequence of loss." So

05:03 18  that certainly implies and suggests and says to me that if

05:03 19  it hadn't -- but for saying, "In addition, we will not pay

05:03 20  for consequential loss," consequential loss is covered but

05:03 21  for that sentence. The new exclusion doesn't have a

05:03 22  consequential loss exclusion.

05:03 23  Q. The consequential -- what you're referring to

05:04 24  there is that in concept, it says: We won't pay for

05:04 25  certain loss or damages as it is described, and in

Royal v. Brownsville ISD

James Bettis

**Page 142**

05:04 1  addition, we won't pay for loss or damage that is caused
05:04 2  by that loss or damage.
05:04 3      A. That's what I read, the original exclusion, but
05:04 4  the new exclusion, by getting rid of the consequence, I
05:04 5  think, is saying that it does -- we'll pay for that
05:04 6  damage, but we'll cause -- pay for damage caused by that,
05:04 7  the consequences of it.
05:04 8      Q. Doesn't this only -- I may be confused as to
05:04 9  what you're saying. Doesn't this only refer to, by its
05:04 10  terms, Limitation C.1.c.?
05:04 11      A. Correct.
05:04 12      Q. And C.1.c. is not in that language you're --
05:04 13  you're discussing, the consequential --
05:04 14      A. It talks about what damages they will pay for.
05:05 15  C.1.c. -- to interpret -- to look at C.1.c., you've got to
05:05 16  see what that "C" applies to. It said: We won't pay for
05:05 17  any damage of this type and including consequential. And
05:05 18  then it has a variety of items that fall within -- you
05:05 19  know, that are limited by that exclusion. And the other
05:05 20  one has a very different clause as to what it will not pay
05:05 21  for.
05:05 22      Q. What were you looking for as to that
05:05 23  information?
05:05 24      A. What's that?
05:05 25      Q. You said the other one has a very different

**Page 143**

05:05 1  clause as to what it will -- what it will not pay --
05:05 2      A. Well, it just doesn't have that sentence about
05:05 3  the consequence.
05:05 4      Q. Where do you not find that sentence? I just
05:05 5  want to make sure I understand what you're saying.
05:05 6      A. "C.1.c. is replaced by the following: We will
05:05 7  not pay for loss or damage to the interior" -- this is on
05:05 8  page 2 of 5 of the Texas Change endorsement. "C.1.c. is
05:05 9  replaced by the following: We will not pay for loss or
05:05 10  damage to the interior of any building or structure caused
05:06 11  by or resulting from rain, snow, sleet, ice, sand or dust,
05:06 12  whether wind driven or not, unless." It does not contain
05:06 13  that same sentence in the original C.1 -- it says as a --
05:06 14  "In addition."
05:06 15      Q. All right. Let me ask you this. Let's refer to
05:06 16  the beginning of "Limitations" in the special form, which
05:06 17  is on page 4.
05:06 18      A. The beginning of "Limitations" in --
05:06 19      Q. Just go back to our original "Limitations."
05:06 20      A. Okay.
05:06 21      Q. Okay. And the "Limitations" provisions begin on
05:06 22  page 4. Do you see that? Page 4 of 7.
05:06 23      A. Maybe I'm looking at the -- is this in the
05:06 24  "Cause of Loss - Special Form?
05:06 25      Q. Yeah.

**Page 144**

05:06 1      A. Okay. "Limitations," yes.
05:06 2      Q. Okay. And the second paragraph under
05:06 3  "Limitations," that's the paragraph that has the
05:06 4  consequentia --
05:06 5      A. Right.
05:06 6      Q. -- that you're referring to.
05:07 7      A. Right.
05:07 8      Q. Now, the way the endorsement reads though, it
05:07 9  doesn't change that paragraph, does it?
05:07 10      A. Yes, it does because it adds, "We will not pay
05:07 11  for loss or damage to the interior of any building." The
05:07 12  way you're wanting to interpret it, you would inject that
05:07 13  direct into "C," and it would have had two places where it
05:07 14  talks about what kind of damages are covered. It would
05:07 15  be -- it would render meaningless that first preamble in
05:07 16  this replacement. There would be no reason for it.
05:07 17  "C" --
05:07 18      Q. Can we agree that the endorsement only changes
05:07 19  paragraph C.1.c.?
05:07 20      A. Only changes C.1.c., but C.1.c., to read it --
05:07 21  to make any sense of it, it's got to be read in
05:07 22  conjunction with that loss -- that damage limitation above
05:07 23  it. It means nothing by itself without that damage
05:07 24  limitation or exclusion, and that has been changed in the
05:07 25  other form.

**Page 145**

05:07 1      Q. All right. Let me just --
05:07 2      A. I mean, because you would have to read it, "We
05:07 3  will not pay for" -- in the C.1. -- in the original
05:07 4  policy, "We will not pay for damage or loss caused by --
05:08 5  including consequential damages, we will not pay for loss
05:08 6  or damage." You'd have to repeat it again. That makes no
05:08 7  sense.
05:08 8      Q. Let me do this so I can understand what you're
05:08 9  talking about six months from now. Would you take that --
05:08 10      A. Okay.
05:08 11      Q. All right. Now, let's go to the original
05:08 12  language in -- on page 4 of 7, the consequential language
05:08 13  that starts with, "We will not pay for."
05:08 14      A. Okay.
05:08 15      Q. And would you highlight that language there that
05:08 16  you believe at this juncture is changed by the functioning
05:08 17  of the endorsement?
05:08 18      MR. SALAZAR: And, Mr. Brown, I think it
05:08 19  would be four months from now. Trial is set for March.
05:08 20      MR. BROWN: Whenever. Off the record. I
05:08 21  won't remember something next week. So I need to nail it
05:08 22  down.
05:08 23      A. I believe that there's a few other words that
05:09 24  are changed also. I mean, the whole preamble is changed.
05:09 25      Q. (BY MR. BROWN) Okay. You've highlighted some

37 (Pages 142 to 145)

Royal v. Brownsville ISD                  James Bettis

**Page 146**

05:09 1   words on page 4 of 7.
05:09 2   A. The whole thing has changed. Okay. Yes.
05:09 3   Q. Okay. And I take it your opinion is that the
05:09 4   functioning of those words is changed by the -- even
05:09 5   though the words themselves aren't replaced, the
05:09 6   functioning of those words are changed by the application
05:09 7   of the Texas Changes endorsement.
05:09 8   A. Well, the words are deleted, not just changed,
05:09 9   deleted. The Texas Change endorsement doesn't have
05:09 10   consequence of loss.
05:09 11   Q. Okay. Well, that's -- let me see what you've
05:09 12   highlighted there.
05:09 13   A. That whole thing has been changed as respect to
05:09 14   the limitation in C.1.c.
05:09 15   Q. Okay. Now, this is under Paragraph "C," no sub-
05:09 16   part, right?
05:09 17   A. Correct.
05:09 18   Q. The language you've highlighted.
05:09 19   A. Right.
05:09 20   Q. And what language does the endorsement say that
05:09 21   it changes?
05:09 22   A. It's replaced. It doesn't say, "This changes
05:09 23   it." It replaces it with other language. I mean, to
05:10 24   interpret it any differently, it's a -- that's a
05:10 25   meaningless endorsement change, and you're not to

**Page 147**

05:10 1   interpret policies in such a way that you render portions
05:10 2   of them meaningless, and the only reasonable explanation
05:10 3   is, say, it got rid of the consequential loss limitation.
05:10 4   Q. And that's what you view --
05:10 5   A. That's just my opinion without doing research.
05:10 6   Q. I understand. I just want to nail it down for
05:10 7   the record. And on page -- the endorsement that so
05:10 8   functions is found on page 2 of 5 of Texas Changes.
05:10 9   A. What's that?
05:10 10   Q. The endorsement that so functions to do that, in
05:10 11   your opinion.
05:10 12   A. Right.
05:10 13   Q. And what's the Bates number of that?
05:10 14   A. 2 of 5, RSL 001734.
05:10 15   Q. Okay. Let me see the language you've
05:10 16   highlighted there. And in your view, that's the -- that
05:11 17   language replaces the language that you highlighted --
05:11 18   A. As to C.1.c., not to the other limitations under
05:11 19   that, but only as to C.1.c.
05:11 20   Q. All right. Now, as far as you can tell, does
05:11 21   that make any difference in this case?
05:11 22   A. Yes.
05:11 23   Q. All right. And how would it make a difference
05:11 24   in this case?
05:11 25   A. Consequential damages covered by rain.

**Page 148**

05:11 1   Consequential damages include mold damage.
05:11 2   Q. Does not there first have to be a covered cause
05:11 3   of loss through which the rain enters in either
05:11 4   application?
05:11 5   A. No, because there's not an exclusion for the
05:11 6   consequences of this, and that is -- it goes back to the
05:11 7   whole point about this -- whatever case we've been talking
05:12 8   about today, that there's a distinction between damage and
05:12 9   causes of damage.
05:12 10   Q. Well, let me ask you this --
05:12 11   A. And that's the consequence. It's similar to --
05:12 12   but, again, I'm doing this without having researched it.
05:12 13   Q. I understand. Let me ask you this. On page 2
05:12 14   of the Texas Changes underneath the language you
05:12 15   highlighted, would you read that?
05:12 16   A. "First sustains damage by covered cause of
05:12 17   loss." Yes.
05:12 18   Q. What does that mean?
05:12 19   A. That means in order for you to pay for loss or
05:12 20   damage to the interior of a building caused by, resulting
05:12 21   from sleet, ice, it must be a covered cause of loss, but
05:12 22   it does not -- it does not apply to consequential damages.
05:12 23   Q. Does that have any meaning in your application?
05:12 24   A. Yes. It applies to damages caused by or
05:12 25   resulting from rain, snow, sleet, ice, sand or dust

**Page 149**

05:13 1   unless, but the exclusion, which is what I've just read,
05:13 2   does not exclude consequences, as did the prior version,
05:13 3   and the change must have some meaning.
05:13 4   Q. Are you aware of the building or structure
05:13 5   sustaining any damage from a covered cause of loss through
05:13 6   which rain entered?
05:13 7   A. I'd have to read through this, but rain is not
05:13 8   per se -- consequences of rain are not excluded.
05:13 9   Q. Okay. My question is this. It's -- it's going
05:13 10   up the causation chain. Are you aware in the factual
05:13 11   record of any damage to the structure by a covered cause
05:13 12   of loss through which the rain entered?
05:13 13   A. No.
05:13 14   Q. All right.
05:13 15   MR. BROWN: Can we take a break and let me
05:14 16   review things and see -- see if I can wrap things up?
05:14 17   THE VIDEOGRAPHER: Going off the record.
05:14 18   It's 5:18.
05:21 19   (Brief recess.)
05:21 20   THE VIDEOGRAPHER: Back on the record.
05:21 21   It's 5:25.
05:21 22   Q. (BY MR. BROWN) That's all the questions I have
05:21 23   today. Have you understood all my questions?
05:21 24   A. I believe so.
25   Q. All right.

38 (Pages 146 to 149)

Royal v. Brownsville ISD                                              James Bettis

---

**Page 150**

```
05:21  1          MR. BROWN: And I'll pass the witness at
05:21  2   this time.
05:21  3          MR. SALAZAR: On behalf of the Brownsville
05:21  4   School District, we'd like to reserve our right to re-call
05:21  5   Mr. Bettis at trial. In addition, we also want Mr. Bettis
05:22  6   to go ahead and review his deposition and sign it with any
05:22  7   additions or subtractions. So we're not waiving that
05:22  8   right on Mr. Bettis.
05:22  9          THE VIDEOGRAPHER: Going off the record.
05:22 10   It's 5:26.
      11
      12
      13
      14
      15
      16
      17
      18
      19
      20
      21
      22
      23
      24
      25
```

---

**Page 152**

```
 1
 2
 3
                 _____
 4                        JAMES BETTIS
 5
 6
 7
 8
 9   The State of Texas  )
10   County of Harris  )
11
12          Subscribed and sworn to before me, the
13   undersigned authority, by the witness, JAMES BETTIS, this
14   the   day of        , 2004.
15
16
17
18
                 NOTARY PUBLIC IN AND FOR
19               _____ COUNTY, T E X A S
20
21
22
23
24
25
```

---

**Page 151**

```
 1          CHANGES AND SIGNATURE
 2
     PAGE   LINE   CHANGE      REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25
```

---

**Page 153**

```
 1   STATE OF TEXAS        *
 2   COUNTY OF HARRIS      *
 3
 4          I, the undersigned certified shorthand
 5   reporter and notary public in and for the State of Texas,
 6   certify that the facts stated in the foregoing pages are
 7   true and correct.
 8
 9          I further certify that I am neither
10   attorney or counsel for, nor related to or employed by,
11   any of the parties to the action in which this deposition
12   is taken and, further, that I am not a relative or
13   employee of any counsel employed by the parties hereto, or
14   financially interest in the action.
15
16          SUBSCRIBED AND SWORN TO under my hand
17   and seal of office on this the _____ day of _____,
18   2004.
19
20          _____
             Mary Kay Hendricks, CSR
21          Certified Shorthand Reporter and
             Notary Public in and for
22          the State of Texas
23   Notary Expires:  9/8/04
        Certificate No.  2602
24   Expiration date:  12/31/04
25
```

Esquire Deposition Services          (713) 524-4951 Fax          (713) 524-4600