# PRIVILEGE LOG FOR CLAIM FILE OF DENNIS NICKOLOFF (GAB ROBINS)

*Royal Surplus v. BISD*

July 27, 2004

| Date | Document | From | To | Description | Privilege |
|---|---|---|---|---|---|
| 12/03/01 - 06/23/04 | GAB Activity Report (detailed invoice to Royal) | D. Nickoloff (GAB independent adjuster) | Royal | Detailed summary of the independent adjuster's activities; discloses work product (after 6/9/03); also discloses substance of communications with Royal's counsel. | Attorney-Client, Work Product. Royal produced redacted report for entries up until 6/9/03. All entries after lawsuit was filed on 6/9/03 have been redacted. |
| 03/22/02 | GAB Status Report #4 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Adjuster's claim investigation; discloses communications with Royal's outside counsel. | Redacted version produced. Attorney-Client. Contains irrelevant reserve information. |
| 03/27/02 | Fax/letter | Outside counsel | D. Nickoloff (GAB) | Claim analysis. | Withheld. Attorney-Client. |
| 04/11/02 | Fax | M. Schwartz (Royal) | Outside counsel, cc: D. Nickoloff (GAB) | Letter forwarded to Royal's outside counsel. | Withheld. Attorney-Client. |
| 04/17/02 | Fax | M. Schwartz (Royal) | Pruett Moore (BISD counsel), bcc: D. Nickoloff (GAB) bcc: outside counsel | Re: Royal's claim investigation and policy conditions. Discloses substantive communications with Royal's outside counsel. | Redacted version produced. Attorney-Client (bcc: portion). |
| 04/22/02 | GAB Status Report #5 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. Discloses substance of Royal's communications with outside counsel. | Redacted version produced. Contains irrelevant reserve information. Attorney-Client. |
| 04/25/02 | Letter | Outside counsel | M. Schwartz (Royal), cc: D. Nickoloff (GAB) | Re: claim analysis | Withheld. Attorney-Client. |
| 04/29/02 | E-mail | D. Nickoloff (GAB) | M. Schwartz (Royal) | Re: claim analysis. | Redacted version produced. Attorney-Client. |

27926.1

Pg. 1 of 4

RSL 005509

| | | | | |
|---|---|---|---|---|
| 04/30/02 | E-mail | M. Schwartz (Royal) | D. Nickoloff (GAB) | Re: claim analysis. Discloses substance of communications with Royal's counsel. | Redacted version produced. Attorney-Client. |
| 05/22/02 | GAB Status Report #6 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 06/20/02 | GAB Status Report #7 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 07/24/02 | GAB Status Report #8 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 07/29/02 | Handwritten notes faxed on GAB Status Report #8 | M. Schwartz (Royal) | D. Nickoloff (GAB) | M. Schwartz responds to questions in GAB's 7/24/02 Status Report (#8). | Redacted version produced. Contains irrelevant reserve information. |
| 8/22/02 | GAB Status Report #10 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 09/26/02 | GAB Status Report #11 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 10/25/02 | GAB Status Report #12 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 10/25/02 | GAB Status Report #12 (Duplicate) | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |

#527926.1

Pg. 2 of 4

RSL 005510

| | | | | | |
|---|---|---|---|---|---|
| 11/26/02 | GAB Status Report #13 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 12/23/02 | GAB Status Report #14 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 01/24/03 | GAB Status Report #15 | D. Nickoloff (GAB) | M. Schwartz (Royal) | Status report on claim investigation. | Redacted version produced. Contains irrelevant reserve information. |
| 02/21/03 | Fax Cover Sheet | GAB | S. Wedemeyer (BMP) | Re: claim investigation. | Redacted version produced. Attorney-Client. |
| 02/24/03 | GAB Status Report #16 (mis-marked #11) | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on claim investigation; discloses substance of Royal's communications with outside counsel. | Redacted version produced. Attorney-Client. Contains irrelevant reserve information. |
| 03/25/03 | GAB Status Report #17 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on claim investigation; discloses substance of communications with Royal's outside counsel. | Redacted version produced. Contains irrelevant reserve information. Attorney-Client. |
| 04/24/03 | GAB Status Report #18 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on claim investigation; discloses substance of communications with Royal's outside counsel. | Redacted version produced. Contains irrelevant reserve information. Attorney-Client. |
| 05/16/03 | GAB Status Report #19 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on claim investigation; discloses substance of communications with Royal's outside counsel. | Redacted version produced. Attorney-Client; also contains irrelevant reserve and reinsurance information. |
| 07/21/03 | GAB Status Report #20 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on ongoing claim/litigation; discloses communications with Royal's outside counsel. | Withheld. Attorney-Client; also contains irrelevant reserve information. |

#527926.1

RSL 005511

| | | | | |
|---|---|---|---|---|
| 09/24/03 | GAB Status Report #21 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | Status report on ongoing claim/litigation; discloses communications with Royal's outside counsel. | Withheld. Attorney-Client; also contains irrelevant reserve information. |
| 12/23/03 | GAB Status Report #22 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | GAB status report on claim/ongoing litigation; discloses substance of communications with Royal's outside counsel. | Withheld. Attorney-Client; Work Product; contains irrelevant reserve information. |
| 03/24/04 | GAB Status Report #23 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | GAB status report on claim/ongoing litigation; discloses substance of communications with Royal's outside counsel. | Withheld. Attorney-Client; Work Product; contains irrelevant reserve information. |
| 03/25/04 | GAB (independent adjuster) Service Invoice | GAB | Royal | GAB invoice to Royal; includes services provided by GAB during litigation. | Withheld. Work Product. |
| 06/24/04 | GAB Status Report #24 | D. Nickoloff (GAB) | M. Schwartz (Royal), cc: J. Brown (BMP), cc: S. Wedemeyer (BMP) | GAB status update re: ongoing claim/litigation. Report/enclosures disclose substance of communications with Royal's counsel. | Withheld. Attorney-Client; Work Product; also contains irrelevant reserve information. |

RSL 005512

#527926.1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ROYAL SURPLUS LINES            *
INSURANCE COMPANY,             *
                Plaintiff,     *
                               *
VS.                            *   CIVIL ACTION
                               *      NO. B-03-109
BROWNSVILLE INDEPENDENT        *
SCHOOL DISTRICT,               *
                Defendant.     *


**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

DENNIS NICKOLOFF

APRIL 26, 2005

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF DENNIS NICKOLOFF, produced

as a witness at the instance of the Defendant, and duly

sworn, was taken in the above-styled and numbered cause on

the 26th day of April, 2005, from 9:19 a.m. to 2:11 p.m.,

before LaRita J. Cormier, Certified Shorthand Reporter in

and for the State of Texas, reported by stenographic means,

at the law offices of HAYS, McCONN, RICE & PICKERING, Two

Allen Center, 1200 Smith Street, Suite 400, Houston, Texas

77002, pursuant to the Federal Rules of Civil Procedure and

the provisions stated on the record or attached hereto.



NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

---

**Page 2**

```
 1           A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
      Mr. Jay W. Brown
 4    BEIRNE, MAYNARD & PARSONS, L.L.P.
      1300 Post Oak Boulevard, Suite 2500
 5    Houston, Texas  77056
      Phone:  713.623.0887
 6    Fax:   713.960.1527
 7
 8  FOR THE DEFENDANT:
 9    Mr. Baltazar Salazar
      LAW OFFICES OF RAMON GARCIA, P.C.
10    1612 Winbern
      Houston, Texas  77004
11    Phone:  713.655.1300
      Fax:   281.749.8104
12
13
14  FOR GAB ROBINS NORTH AMERICA, INC.:
      Mr. Bruce C. Gaible
15    HAYS, McCONN, RICE & PICKERING
      400 Two Allen Center
16    1200 Smith Street
      Houston, Texas  77002
17    Phone:  713.654.1111
      Fax:   713.650.0027
18
19
      VIDEOGRAPHER:
20    Mr. Gregory A. Zajac, CLVS
21
22
23
24
25
```

---

**Page 3**

```
 1              I N D E X
 2                            PAGE
    APPEARANCES...................   02
 3  EXAMINATION
      By Mr. Salazar................    04
 4    By Mr. Brown..................   129
    FURTHER EXAMINATION
 5    By Mr. Salazar................   137
      By Mr. Brown..................   141
 6    By Mr. Salazar................   143
    CHANGES.......................   146
 7  SIGNATURE.....................   147
    REPORTER'S CERTIFICATE........         148
 8
 9        E X H I B I T   I N D E X
    NO.   DESCRIPTION           PAGE
10  1.........................    05
      Notice of Deposition of D. Nickoloff
11
    2.........................    26
12    Opinion of Duane Swoveland
13  3.........................    26
      First Report by D. Nickoloff to Royal, 12-21-01
14
    3.5.......................   122
15    Second Report by D. Nickoloff to Royal, 1-21-02
16  4.........................    40
      Third Report by D. Nickoloff to Royal, 2-19-02
17
    5.........................    41
18    Fourth Report by D. Nickoloff to Royal, 3-22-02
19  6.........................    51
      Fifth Report by D. Nickoloff to Royal, 4-22-02
20
    7.........................    52
21    Sixth Report by D. Nickoloff to Royal, 5-22-02
22  8.........................    54
      Seventh Report by D. Nickoloff to Royal, 6-20-02
23
    9.........................    56
24    Eighth Report by D. Nickoloff to Royal, 7-24-02
25  10........................    60
      10th Report by D. Nickoloff to Royal, 8-22-02
```

---

**Page 4**

```
 1          E X H I B I T S, cont'd
    NO.   DESCRIPTION           PAGE
 2  11........................    61
      11th Report by D. Nickoloff to Royal, 9-26-02
 3
    12........................    65
 4    12th Report by D. Nickoloff to Royal, 10-25-02
 5  13........................    67
      13th Report by D. Nickoloff to Royal, 11-26-02
 6
    14........................    87
 7    14th Report by D. Nickoloff to Royal, 12-12-02
 8  15........................    89
      15th Report by D. Nickoloff to Royal, 1-22-03
 9
    16........................   111
10    11th Report by D. Nickoloff to Royal, 2-24-03
11  17........................   110
      17th Report by D. Nickoloff to Royal, 3-25-03
12
    18........................   110
13    18th Report by D. Nickoloff to Royal, 4-24-03
14  19........................   110
      19th Report by D. Nickoloff to Royal, 5-16-03
15
      THERE ARE NO EXHIBITS NUMBERED 20 THROUGH 23
16
    24........................    72
17    Article in the Insurance Journal 7-11-01, titled
      "GAB Robins Enhances Mold Assessment Services"
18
    25........................    98
19    Activity Reports
20  26........................   109
      E-mail between S. Wedemeyer to B. Salazar
21    re:  BISD
22
23
24
25
```

---

**Page 5**

```
 1            P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  Good morning.  Today is
 3  the 26th of April, 2005.  It's 9:15 a.m.  We're now on the
 4  record.
 5            DENNIS NICKOLOFF,
 6  having been first duly sworn, testified as follows:
 7            EXAMINATION
 8  BY MR. SALAZAR:
 9       Q.  Could you please introduce yourself to the ladies
10  and gentlemen of the jury, sir.
11       A.  My name is Dennis Nickoloff.
12       Q.  Mr. Nickoloff, I'm going to hand you what we're
13  going to mark as Nickoloff Exhibit No. 1 and ask you if
14  you've seen that document.
15       A.  Yes, I have.
16       Q.  And you understand that there was -- that we had
17  originally requested that some documents be brought as part
18  of that subpoena, and that as of yesterday we've dropped
19  that request for the documents; correct?
20       A.  That's my understanding.
21       Q.  And you've brought some documents anyway; correct?
22       A.  No, sir.  I have only the case file documents that
23  were --
24       Q.  Okay.  And that case file documents, there are
25  parts that are redacted; correct?
```

2  (Pages 2 to 5)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

| Page 6 |
|---|
| 1    A.  That's correct. |
| 2    Q.  And could you tell the ladies and gentlemen of the |
| 3  jury what "redacted" means? |
| 4    A.  Means they were taken out, removed. |
| 5    Q.  So they were whited out or inked out? |
| 6    A.  That's correct. |
| 7    Q.  Okay. |
| 8        MR. BROWN:  And I'd like to say for the |
| 9  record that they've been redacted pursuant to the Rules, |
| 10  that that has been ruled upon by the court, and they've been |
| 11  redacted in accordance with that judge's ruling. |
| 12    Q.  (BY MR. SALAZAR)  Mr. Nickoloff, have you ever |
| 13  been deposed? |
| 14    A.  Yes, sir. |
| 15    Q.  And do you know -- how many times have you been |
| 16  deposed? |
| 17    A.  It's hard to tell.  Maybe eight or 12 times. |
| 18    Q.  Eight or 12 times? |
| 19    A.  Uh-huh. |
| 20    Q.  You understand that in order for you -- for the |
| 21  court reporter to record your responses, it must be a yes or |
| 22  a no and not any uh-huhs or nodding of the head because the |
| 23  court reporter cannot write down the nodding of the heads. |
| 24  Do you understand that? |
| 25    A.  I understand that. |

| Page 7 |
|---|
| 1    Q.  Okay.  You also understand that you have -- |
| 2  you're -- you've got your attorney here present today; |
| 3  correct? |
| 4    A.  That's correct. |
| 5    Q.  Mr. Bruce -- |
| 6    A.  Gaible. |
| 7    Q.  -- Gaible; correct?  And you've had plenty of time |
| 8  to visit with your attorney prior to being deposed today? |
| 9    A.  That's correct. |
| 10    Q.  If any -- at any time during the deposition you |
| 11  wish to take a break, whether you need to stand up and |
| 12  stretch or speak with your attorney, please let me know. |
| 13    A.  Yes, sir. |
| 14    Q.  If at any time you do not understand my question, |
| 15  please also let me know, and I will repeat that or clarify |
| 16  the question for you; okay? |
| 17    A.  Yes, sir. |
| 18    Q.  Your attorney has also indicated that he would |
| 19  like for you to review the deposition after you -- after |
| 20  it's been taken, which means that you will have an |
| 21  opportunity to look at the deposition and correct any |
| 22  changes or any misspellings on there.  Do you understand |
| 23  that? |
| 24    A.  Yes, sir. |
| 25    Q.  And that will be done through your attorney; |

| Page 8 |
|---|
| 1  correct? |
| 2    A.  That's correct. |
| 3    Q.  Okay.  Mr. -- Mr. Nickoloff, could you please tell |
| 4  us where you're employed and how long you've been employed? |
| 5    A.  I'm employed by GAB Robins NA, Inc. |
| 6    Q.  Okay. |
| 7    A.  I've been employed by them as an insurance |
| 8  adjuster for the last 28 and a half years. |
| 9    Q.  Okay.  Could you tell the ladies and gentlemen of |
| 10  the jury a little bit about your academic background, |
| 11  starting with high school. |
| 12    A.  Sure.  I graduated from high school in Niagara |
| 13  Falls, New York.  I attended a two-year college, received an |
| 14  A.A. degree.  Attended a state university at Brockport. |
| 15  Received a four-year degree there, teaching certificate. |
| 16  And I took 30 hours of postgraduate work at Niagara |
| 17  University and began a teaching career in Niagara Falls, New |
| 18  York, where I taught for about five years. |
| 19    Q.  Where did you teach? |
| 20    A.  In Niagara Falls, New York, public school system. |
| 21    Q.  What year was that, sir? |
| 22    A.  1971 through 1976. |
| 23    Q.  And after you taught for five years, what did you |
| 24  do? |
| 25    A.  I began working for GAB Robins. |

| Page 9 |
|---|
| 1    Q.  Okay.  So the highest degree that you've got is a |
| 2  bachelor? |
| 3    A.  I have a bachelor's degree with 30 hours of |
| 4  postgraduate work. |
| 5    Q.  Okay.  Did you complete your graduate work? |
| 6    A.  No, I did not. |
| 7    Q.  Okay.  And what was the postgraduate work, in what |
| 8  field was it in? |
| 9    A.  It was in school administration. |
| 10    Q.  Okay.  Do you have any training in engineering, |
| 11  any formal training, academic training? |
| 12    A.  No, sir. |
| 13    Q.  Do you have any formal training in mold |
| 14  remediation? |
| 15    A.  No, sir. |
| 16    Q.  Do you have any formal training in structural |
| 17  engineering? |
| 18    A.  No, sir. |
| 19    Q.  Do you have any formal training in air sampling? |
| 20    A.  No, sir. |
| 21    Q.  So in 1976 you -- you went to work for GAB Robins; |
| 22  correct? |
| 23    A.  Yes, that's correct. |
| 24    Q.  And where -- where did you move to or did you stay |
| 25  in Niagara? |

3 (Pages 6 to 9)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

Page 10

1    A.  I was living in Niagara Falls and working in the
2  Buffalo, New York, office of GAB.  It was called GAB
3  Business Services at the time.
4    Q.  Okay.  During that time was there a part of GAB
5  that was Engineering and Fire Investigators, EFI?
6    A.  I don't believe it was named that at the time,
7  sir.  It was -- it's changed names several times over the
8  years.
9    Q.  Well, did the entity EFI exist, Engineering and
10  Fire Investigations?
11    A.  In another name, yes, sir, I believe it did.
12    Q.  Okay.  And how long were you in Buffalo, New York?
13    A.  About seven years, I believe.
14    Q.  Okay.  And what were your responsibilities in
15  Buffalo?
16    A.  I was a casualty insurance adjuster.
17    Q.  Property casualty or --
18    A.  No.  Casualty only.
19    Q.  Okay.  And could you explain to the ladies and
20  gentlemen of the jury what casualty means?
21    A.  We generally work on auto claims, general
22  liability, slip and fall claims, generally liability claims
23  of any nature.
24    Q.  So how long were you in the casualty department of
25  GAB Robins?

Page 11

1    A.  I was there seven years.
2    Q.  That would bring us up to what year?
3    A.  About 1983.
4    Q.  What did you do in 1983?
5    A.  We moved to South Texas.
6    Q.  What part of South Texas?
7    A.  Brownsville, actually, is where I relocated to.
8    Q.  Was there already an existing GAB office in
9  Harlingen?
10    A.  Yes, there was.
11    Q.  Have you ever been employed by EFI, Engineer Fire
12  Investigators?
13    A.  No, sir.
14    Q.  Have you ever been part of their corporate
15  umbrella?
16    A.  No, sir.
17    Q.  Now, when you moved to Brownsville in 1983, what
18  type of work did you do?  Were you still in the casualty
19  business?
20    A.  I came here primarily as a casualty adjuster, but
21  the existing adjuster that was here -- it was a one-man
22  office -- left, and I had to take over the duties of both
23  property and casualty, which meant I had to learn how to do
24  property losses --
25    Q.  When did --

Page 12

1    A.  -- when we had property losses.
2    Q.  -- when did you begin on property losses?
3    A.  It would have been 1983.
4    Q.  Okay.  And did you continue on the casualty part,
5  do you still do casualty and property?
6    A.  Yes, sir.
7    Q.  So it's fair to say that from 1983 to the present
8  you've been working on both casualty and property?
9    A.  That's correct.
10    Q.  And when I say "property," I talk about property
11  damage; correct?
12    A.  Correct.
13    Q.  And could you explain to the ladies and gentlemen
14  of the jury what the -- the role of an adjuster is in a
15  property claim?
16    A.  In a typical property claim, because there are --
17  it would depend on the assignment provided by the -- the
18  customer.  But a typical role is to make contact with the
19  insured, or claimant in some cases; in some cases we're
20  inspecting property for damage done to other third party
21  property.  We would inspect the property, photograph it.  If
22  it's within our scope, we would prepare an estimate for
23  repairs, obtain an agreed figure with the owner of that
24  property, and send that information to our customer.
25    Q.  Okay.  You said that that would be a typical case;

Page 13

1  right?
2    A.  Yes, sir.
3    Q.  Okay.  And what would be an atypical case or
4  catastrophic case?
5        MR. BROWN:  Object to the form.
6    A.  You'll have to be a little more specific.  Are you
7  talking about what -- what type of catastrophe, because we
8  deal with many kinds.
9    Q.  (BY MR. SALAZAR)  Well, I'm talking about
10  specifically a mold infestation.
11    A.  Okay.  Are you talking about a commercial mold
12  infestation case or a residential mold infest --
13    Q.  I'm talking about a commercial mold.
14    A.  Okay.
15    Q.  Such as the one present with the Brownsville
16  School District.
17    A.  Okay.  Again, it also depends on what the customer
18  is asking us to do.  And -- and these assignments that we
19  receive come in many forms.  The customer asks us to do an
20  investigation for them or an inspection for them, then
21  that's what we would do.  If they ask us to do more, then we
22  will do exactly what they ask us to do.
23    Q.  Okay.  And when you say customer, you're talking
24  about the insurance company; in this case it would be Royal
25  Insurance; correct?

4 (Pages 10 to 13)

NEW   CENTURY   REPORTING
(713)  626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF    -    April 26, 2005

| Page 14 |
|---|
| 1    A.  That's correct. |
| 2    Q.  You get your instructions and your marching |
| 3  orders, your directions from Royal Insurance; correct? |
| 4          MR. BROWN: Objection. Form. |
| 5    A.  That's correct. |
| 6    Q.  (BY MR. SALAZAR) Okay.  And Mr. Nickoloff, who do |
| 7  you owe loyalty to, to the insurance company, the person |
| 8  that's giving you directions, or to the insured, in this |
| 9  case the Brownsville School District? |
| 10          MR. BROWN: Objection. Form. |
| 11          MR. GAIBLE: Objection. Form. |
| 12    A.  I'm not sure what you mean by loyalty.  Would you |
| 13  explain that? |
| 14    Q.  (BY MR. SALAZAR) Well, who -- who's paying you |
| 15  for the adjustment, the -- Royal Insurance or the |
| 16  Brownsville School District? |
| 17    A.  Royal Insurance is. |
| 18    Q.  So in a case that -- that you're unsure of, do you |
| 19  have a tendency to lead toward -- lean toward the insurance |
| 20  carrier versus the insured? |
| 21    A.  No, sir, I do not. |
| 22    Q.  Okay.  Do you do any -- do you do any work for |
| 23  insured people, or do you do all of your business for |
| 24  insurance companies? |
| 25          MR. BROWN: Objection to form. |

| Page 15 |
|---|
| 1    A.  Do you mean self-insured people, sir? |
| 2    Q.  (BY MR. SALAZAR) Well, let me -- there's two |
| 3  types of people that are involved in the insurance industry, |
| 4  correct, the insured, which is the person that has a -- a |
| 5  damage or a catastrophe; correct? |
| 6    A.  Correct. |
| 7    Q.  And then there's the insured, which would be the |
| 8  insurance company; correct? |
| 9    A.  That's correct. |
| 10    Q.  How many insurance companies do you represent? |
| 11    A.  I really couldn't tell you.  Many.  I work for |
| 12  many; is that what you mean? |
| 13    Q.  Hundreds, maybe? |
| 14    A.  Possibly. |
| 15    Q.  Okay.  How many insured, how many victims or how |
| 16  many people that make claims, claimants do you -- do you |
| 17  represent? |
| 18    A.  Do I work directly for? |
| 19    Q.  Yes, sir. |
| 20    A.  None. |
| 21    Q.  Okay.  So it's fair to say you're on the insurance |
| 22  side of -- of adjusting, on the insurance company's side, in |
| 23  this case Royal, versus the insured, the Brownsville School |
| 24  District; correct? |
| 25          MR. BROWN: Objection. Form. |

| Page 16 |
|---|
| 1          MR. GAIBLE: Objection. Form. |
| 2    A.  Am I employed by Royal Insurance in this case? |
| 3  Yes, sir, I am. |
| 4    Q.  (BY MR. SALAZAR) Okay.  So who would your |
| 5  loyalties be to, to -- to Royal Insurance or to the |
| 6  Brownsville School District? |
| 7          MR. BROWN: Objection to form. |
| 8          MR. GAIBLE: Objection. Form. |
| 9    A.  My loyalties, sir? |
| 10    Q.  (BY MR. SALAZAR) Correct. |
| 11    A.  I'm not sure what you mean by that. |
| 12    Q.  You agree with me, Mr. -- Mr. Nickoloff, that |
| 13  when -- that a mold claim such as the one at the Brownsville |
| 14  School District, I'm talking about Aiken Elementary and |
| 15  Besteiro Middle School, is not your typical property claim; |
| 16  correct? |
| 17    A.  That's correct. |
| 18    Q.  And could you tell the ladies and gentlemen of the |
| 19  jury what an adjuster's duties and responsibilities are in a |
| 20  catastrophic claim such as the one with the Brownsville |
| 21  School District? |
| 22          MR. BROWN: Objection to form. |
| 23          MR. GAIBLE: Objection. Form. |
| 24          MR. BROWN: Object to the characterization. |
| 25    A.  Again, I'm going to go back to it would depend on |

| Page 17 |
|---|
| 1  what I was asked to -- to do in this case, each case being |
| 2  different. |
| 3    Q.  (BY MR. SALAZAR) Okay.  Are you saying that your |
| 4  duties and responsibilities as an adjuster in a mold case |
| 5  vary depending on what your marching orders are from the |
| 6  insurance company? |
| 7          MR. BROWN: Objection. Form. |
| 8    A.  I'm saying that what I'm asked to do varies from |
| 9  case to case, yes. |
| 10    Q.  (BY MR. SALAZAR) Okay.  Well, in this case, for |
| 11  Royal Insurance Company, you were asked to adjust a claim; |
| 12  correct? |
| 13    A.  We were asked to adjust a claim based on their |
| 14  criteria, yes. |
| 15    Q.  And what is that criteria? |
| 16    A.  They asked us to gather documentation, perform a |
| 17  basic inspection of the building, secure photographs, and |
| 18  provide them with the information that we gathered. |
| 19    Q.  And at the time that you received the claim for |
| 20  the Brownsville School District, you knew by that time that |
| 21  there were some health concerns at the school; correct? |
| 22    A.  I read in the newspaper with everyone else that |
| 23  there were some problems at the schools, yes, that's |
| 24  correct. |
| 25    Q.  Okay.  It was common knowledge that there was mold |

5 (Pages 14 to 17)

NEW    CENTURY    REPORTING
(713)    626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

---

Page 18

1 at Aiken and Besteiro; correct?
2    A.  Based on newspaper articles, yes, sir, that's
3 correct.
4    Q.  And you live in Brownsville and you subscribe to
5 the Brownsville Herald; correct?
6    A.  That's correct.
7    Q.  And did the fact that there was some health
8 concerns out at Aiken and Besteiro make this a typical mold
9 claim, or was this a little more important of a mold claim?
10        MR. BROWN:  Objection.  Form.
11    A.  I'm not -- I'm not sure how to answer that.  I
12 don't know what the question is.  Do you mean is it -- was
13 it more significant because there were health issues
14 involved?
15    Q.  (BY MR. SALAZAR)  Yes, sir.
16    A.  I'm not sure I can answer that.  I -- no, I
17 don't -- I didn't give it any more credence because there
18 were health issues.  I mean, mold claims and health issues
19 were kind of running hand in hand at that time.  Did I pay
20 more attention to it because it was a mold claim involving
21 health issues, no, I did not.
22    Q.  So you were indifferent whether there was children
23 at the school with mold and teachers at the school with
24 mold, to you it was a property claim, and it made no
25 difference whether there was children or not?

---

Page 19

1    A.  Well, I --
2        MR. BROWN:  Objection to form.
3    A.  -- I'm not sure I'd say I was indifferent to the
4 children being in the school and harmed by mold, if that's
5 what you're saying, or there was some -- are you saying did
6 I give it a priority because of that?  No, I did not.
7    Q.  (BY MR. SALAZAR)  Okay.  So you didn't prioritize
8 the children of Brownsville and the teachers of the
9 Brownsville Independent School District?
10        MR. BROWN:  Objection to form.
11 Argumentative.
12    A.  Was I concerned about the children of Brownsville?
13 Of course.
14    Q.  (BY MR. SALAZAR)  My question is, did you give
15 them priority?
16        MR. BROWN:  Objection.  Form.
17    A.  In what form, sir?
18    Q.  (BY MR. SALAZAR)  Well, there was -- you knew that
19 there was some health concerns out at the schools.  Did you
20 give this case -- this claim a priority, yes or no?
21    A.  No, I did not.
22        MR. BROWN:  Objection to form.
23    Q.  (BY MR. SALAZAR)  And did you give the Brownsville
24 School District and the -- Brownsville School District and
25 the taxpayers of Brownsville any priority because it was a

---

Page 20

1 public institution?
2        MR. BROWN:  Objection.  Form.
3    A.  I handled the claim as I handle all claims in the
4 order that I received it and in a fashion as best I could.
5    Q.  (BY MR. SALAZAR)  But my question is, did you give
6 it any priority because it was the Brownsville School
7 District?
8    A.  No, sir.
9    Q.  Okay.  You've reviewed the file probably many
10 times, correct, your file?
11    A.  This file, yes, sir.
12    Q.  And you say "this file," you've produced some
13 documents which consist of your reports and summaries;
14 correct?
15    A.  That's correct.
16    Q.  Is there anything else -- when -- when you get a
17 file, is there any other documentation that you write other
18 than what you have provided us today?
19    A.  No, sir.
20    Q.  Do you keep any electronic folders for this file?
21    A.  No, sir.
22    Q.  Do you keep any folders with e-mails having to do
23 with correspondence in -- of this file?
24    A.  No, sir.  There were random e-mails, and they were
25 produced for you.

---

Page 21

1    Q.  Okay.  Other than the e-mails that were produced
2 for me, for the Brownsville School District, were there any
3 other e-mails?
4    A.  No, sir.
5    Q.  Okay.  Do you agree with me, Mr. -- Mr. Nickoloff,
6 that the insured, in this case Royal -- which you represent;
7 correct?  Do you agree with me that -- that Royal has to act
8 in a manner which is in the best interest of the insured, of
9 the Brownsville School District?
10        MR. GAIBLE:  Objection.  Form.
11        MR. BROWN:  Objection.  Form.
12    A.  Yes, sir.
13    Q.  (BY MR. SALAZAR)  Okay.  So you have to weigh --
14 at some point you have to weigh the interest of the insured,
15 which is the Brownsville School District, against the
16 interest of Royal Insurance; correct?
17        MR. BROWN:  Objection.  Form.
18        MR. GAIBLE:  Objection.  Form.
19    A.  Do I have to weigh that interest?
20    Q.  (BY MR. SALAZAR)  Yes, sir.
21    A.  In this case?
22    Q.  Yes, sir.
23    A.  No, sir.
24    Q.  Again, is that something that you just are
25 indifferent about and you don't -- it's not part of your

6 (Pages 18 to 21)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

## Page 22

1 scope to -- to analyze and to -- to give any priority to
2 Royal or to the Brownsville School District?
3    A.  That's correct.
4         MR. BROWN: Objection to form.
5         MR. BROWN: Wait just a minute,
6 Mr. Nickoloff, so I can object on the record --
7         THE WITNESS: I'm sorry.
8         MR. BROWN: -- before you answer.
9         THE WITNESS: Yes, sir.
10    Q.  (BY MR. SALAZAR) Does an adjuster such as
11 yourself in a case such as the one at hand have a duty and a
12 responsibility to give the insured, the Brownsville School
13 District, immediate direction and guidance?
14         MR. GAIBLE: Objection. Form.
15         MR. BROWN: Objection. Form.
16    A.  I'm not sure I know what you -- what you're
17 asking, sir.
18    Q.  (BY MR. SALAZAR) Okay. Well, when you first get
19 the file -- when you first got the file from Royal; correct?
20    A.  Yes, sir.
21    Q.  Do you have a duty to the Brownsville School
22 District, in this case the insured, and a responsibility --
23 did you have a duty to give the school district some
24 guidance and directions as to the claim process?
25         MR. BROWN: Objection to form.

## Page 23

1         MR. GAIBLE: Objection. Form.
2    A.  Well, at the time I received the claim file, the
3 school district was represented by counsel; and it was my
4 opinion that they were getting their direction from their
5 counsel. I did make contact with their counsel. That was
6 my duty at the time. As far as their direction and
7 guidance, I thought that their attorney would be doing that
8 for them, or their law firm would be doing that for them.
9    Q.  (BY MR. SALAZAR) So you didn't feel any duty or
10 responsibility to give the -- the insured, the Brownsville
11 School District, any guidance as to the process of the -- of
12 the claim?
13         MR. BROWN: Objection to form.
14         MR. GAIBLE: Objection. Form.
15    A.  Their counsel was communicating directly with
16 Royal Insurance by the time I was involved in the claim.
17    Q.  (BY MR. SALAZAR) So is it your position that
18 if -- if an insured such as the Brownsville School District
19 has an attorney, then your duties and responsibilities
20 disappear as to guidance and direction in the -- in the
21 process of the claim?
22         MR. BROWN: Objection. Form.
23         MR. GAIBLE: Objection. Form.
24    A.  That's not what I said.
25    Q.  (BY MR. SALAZAR) Well, you stated that the school

## Page 24

1 district had attorneys, and you felt like they were --
2 that -- that your -- you did not have any duties or
3 responsibilities because the school district had attorneys.
4    A.  Well, you made a general --
5         MR. BROWN: Objection to form.
6         THE WITNESS: Excuse me.
7         MR. BROWN: Hold on. Just slow down.
8 Objection to form. Misstates the testimony.
9    A.  You made a generalization based on my response.
10 If you'd like to read it back, that'd be fine.
11    Q.  (BY MR. SALAZAR) Did you give any guidance
12 initially to the Brownsville Independent School District as
13 to what the claim -- the process of the claim would be?
14    A.  No, sir.
15         MR. BROWN: Objection to form.
16         THE WITNESS: Sorry.
17    Q.  (BY MR. SALAZAR) That's no, sir?
18    A.  No, sir, I did not.
19    Q.  Okay. Did you give the Brownsville School
20 District any guidance in how to process this -- this mold
21 claim?
22         MR. BROWN: Objection to form.
23    A.  No, sir.
24    Q.  (BY MR. SALAZAR) Okay. Did you give the
25 Brownsville School District any immediate direction or

## Page 25

1 guidance --
2         MR. BROWN: Objection to form.
3    Q.  (BY MR. SALAZAR) -- within a week of being
4 notified of the claim?
5         MR. BROWN: Objection to form.
6    A.  Our initial contact with their attorneys of record
7 at the time was the only contact I had with the Brownsville
8 Independent School District.
9    Q.  (BY MR. SALAZAR) Okay. And what date would that
10 be approximately?
11    A.  I would have to look through the file notes if you
12 want the exact date.
13    Q.  Okay. It's fair to say that was sometime in
14 December of 2001; correct?
15    A.  Yes, sir.
16    Q.  And I'm going to go ahead and show you the -- the
17 documents which you provided, and you can at any time review
18 those documents to refresh your memory. And I'm going to
19 hand you what we're going to mark as a first report, which
20 is dated December 21st, 2001. Do you have that first report
21 in front of you, sir?
22    A.  Yes, sir.
23    Q.  Okay. And could you tell the ladies and gentlemen
24 of the jury when you were first contacted to open up a file
25 for Royal Insurance?

7 (Pages 22 to 25)

NEW   CENTURY   REPORTING
(713)  626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

Page 26

1        MR. SALAZAR: And I'm going to mark this
2  as -- as Nickoloff 3.
3        MR. GAIBLE: What was 2? Do we have 2 yet.
4        MR. SALAZAR: We'll -- we'll have 2 later.
5        MR. BROWN: Wait a minute, Baltazar. Don't
6  do that. You'll screw us all up. Let's go in numerical
7  order. I don't mean to be difficult, but I get all messed
8  up. 1 is the notice.
9        MR. SALAZAR: Okay. That's fine.
10        MR. BROWN: Okay.
11        MR. SALAZAR: You're fine, you're right.
12        MR. BROWN: Okay.
13        MR. GAIBLE: All right. Just so we're
14  clear --
15        MR. SALAZAR: Mr. Jay Brown is correct.
16        MR. BROWN: Just that once.
17        MR. SALAZAR: According to Mr. Salazar.
18        MR. GAIBLE: The first report, which is
19  12-21-01, is Exhibit No. 2?
20        MR. SALAZAR: No. 3. The second exhibit is
21  going to be the opinion of Mr. Duane Swoveland.
22        MR. GAIBLE: Okay. What are you looking for
23  now?
24        THE WITNESS: The assignment page or the --
25  my first file notes where I indicate when we received the

Page 27

1  file. It'll take me a second.
2        MR. BROWN: Take your time. Off the record.
3        (Discussion off the record.)
4        THE WITNESS: Back on the record, please.
5    A.  I have a date for you. The assignment -- we
6  received the assignment from Royal and Sunalliance by
7  facsimile on 12-3, 2001.
8    Q.  (BY MR. SALAZAR) Okay. And on December 3rd -- on
9  December 3rd, did you -- at that point, December 3rd, 2003,
10  you were already aware of problems at Aiken and Besteiro and
11  that the schools had been vacated; correct?
12    A.  I'm not sure I was aware on that day, sir.
13    Q.  Okay. And on -- I'm going to refer you to
14  Nickoloff Exhibit No. 3, which is your first report.
15    A.  Yes, sir.
16    Q.  It's dated December 21st, 2001; correct?
17    A.  Yes, sir.
18    Q.  Did you -- you agree me that documentation is
19  important on a file as extensive as this file?
20    A.  Yes, sir.
21    Q.  Did you document anywhere on -- on your first
22  report on December 21st, which would have been approximately
23  two weeks after your initial notice, did you document
24  anywhere where you gave the school district any guidance or
25  direction as to how the claim was going to be processed?

Page 28

1    A.  No, sir, I did not.
2    Q.  Okay. Did you indicate on your first report that
3  you had made -- strike that.
4        On December 21st, 2001, when your first report was
5  done, did you at that point feel that -- that you had a
6  responsibility to investigate the claim?
7    A.  In terms of information gathering, yes, sir.
8    Q.  Okay. How about in terms of investigating the
9  claim other than information gathering, doing something
10  proactive?
11    A.  For example?
12        MR. GAIBLE: Objection. Form.
13    Q.  (BY MR. SALAZAR) For example, going into the
14  building and doing an environmental study. On December 21st
15  of 2001, had you made any decision as to what needed to be
16  done if any experts had to be brought in?
17        MR. BROWN: Objection to form. What --
18  would you restate your question?
19    A.  Would you, please, because I'm confused.
20    Q.  (BY MR. SALAZAR) Okay. On December 21st, 2001,
21  you knew that this was not a typical claim; correct?
22        MR. BROWN: Objection to form.
23    A.  Did I understand that it was -- what type of
24  claim, sir? I'm sorry.
25    Q.  (BY MR. SALAZAR) On December 21st, 2001, did you

Page 29

1  know that this was a mold claim?
2    A.  Yes, sir.
3    Q.  Okay. And would you call this a typical claim or
4  would this be more of a significant claim?
5        MR. BROWN: Objection to form.
6    A.  I wouldn't categorize it as either. Maybe
7  atypical.
8    Q.  (BY MR. SALAZAR) Okay. Was it a substantial
9  claim, at this point?
10    A.  I assume so, yes, sir, uh-huh.
11    Q.  Okay. And you agree with me that an adjuster has
12  a duty and a responsibility to both the insured and the
13  insurer to bring in the appropriate experts to find out what
14  the causes of the claim are; correct?
15        MR. BROWN: Objection. Form.
16    A.  If asked to do so, yes.
17    Q.  (BY MR. SALAZAR) Okay. And if you're not asked
18  to do so, if you're not asked to bring in engineers or
19  experts into a claim, you don't do it?
20    A.  That's correct.
21    Q.  Would you make that decision, or would Royal make
22  that decision in this case?
23    A.  That's a -- what decision?
24    Q.  Who was making the decisions as to how much
25  investigation or what the scope of your investigation was?

8 (Pages 26 to 29)

NEW    CENTURY    REPORTING
(713)    626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

## Page 30

1  Was that your decision or was that Royal's decision?
2      MR. BROWN: Objection to form.
3      A.  That would be Royal's decision.
4      Q.  (BY MR. SALAZAR) Okay.  And who at Royal was
5  making the decision?
6      A.  My contact person at Royal was Mark Schwartz.
7      Q.  Do you know whether Mark Schwartz was making that
8  decision?
9      A.  Sir?
10     Q.  Do you know whether Mark Schwartz was making the
11  decision as to your scope of employment?
12         MR. BROWN: Objection. Form.
13     A.  Yeah.  Yes, sir.
14     Q.  (BY MR. SALAZAR) Okay.  And on December 21st,
15  2001, did you receive any instructions or direction from
16  Mr. -- from Royal Insurance directing you to hire an expert
17  to evaluate the claim?
18     A.  No, sir.
19     Q.  Okay.  I'm going to direct your attention to a
20  letter which is dated December the 5th, 2001, from yourself
21  to Constant & Vela.  Do you have that, sir, in front of you?
22     A.  Yes, sir.  Correction, though.  It is not from
23  myself.
24     Q.  Okay.  That is from Arnold Aguirre, who is in your
25  office; correct?

## Page 31

1      A.  That's correct.
2      Q.  And does Mr. Aguirre work under you, under your
3  supervision, sir?
4      A.  Yes, sir.
5      Q.  Okay.  So you -- did you approve this letter that
6  went out on December the 5th, 2001?
7      A.  No, sir.
8      Q.  Okay.  When is the first time that you saw this
9  letter?
10     A.  When I returned to the office.  I was on vacation
11  when this letter went out.
12     Q.  Okay.  And -- and I'm going to -- that continues
13  to be Nickoloff Exhibit No. 3.  It is a page right after the
14  first report; correct?
15     A.  That's correct.
16         MR. BROWN:  Why don't you for the record,
17  since you're not marking it, Baltazar, would you identify
18  the pages that consist of Nickoloff No. 3?  Are they each
19  and every page that consist of Swoveland's?
20         MR. SALAZAR:  It is one page -- oh.
21  Nickoloff No. 3 would be page No. 1, which would be the
22  First Report, dated December 21st, 2001; a December 5th,
23  2001, letter authored by Arnold Aguirre; and a cover sheet
24  from Constant & Vela, which would be the third page.  Again,
25  it's a letter or a fax cover sheet from Constant & Vela to

## Page 32

1  Mr. Aguirre.  And the fourth page would be a letter dated
2  December the 6th, 2001, from Constant & Vela to Mr. Aguirre.
3         MR. BROWN:  Thank you.
4         MR. SALAZAR:  And that would be all of
5  Exhibit No. 3, Nickoloff 3.
6         MR. BROWN:  Thanks.
7      Q.  (BY MR. SALAZAR) Mr. Nickoloff, on the December
8  5th, 2001, letter, your office, Mr. Aguirre says, and I
9  quote, "Please be advised that we will recontact your office
10  at the conclusion of our investigation"; correct?
11     A.  Is that what it says, yes, sir, uh-huh.
12     Q.  Well, you have the document in front of you, sir.
13  Does it say that?  Yes or no?
14     A.  Yes, sir.
15     Q.  Okay.
16     A.  Yes, uh-huh.
17     Q.  What type of investigation, from -- from December
18  5th to December 2001 did you -- did you initiate, or
19  Mr. Aguirre?
20     A.  None, sir.
21     Q.  No investigation?
22     A.  From the date that we received it to the date of
23  this letter?
24     Q.  From the date that you received it to the date --
25  to December 21st, 2001, which would be the date of the first

## Page 33

1  report.
2      A.  Right.  What investigation did we do?
3      Q.  Yes, sir.
4      A.  None.
5      Q.  Okay.  So do you agree with me that two weeks
6  passed by and no investigation was done on behalf of -- on
7  behalf of Royal?
8         MR. BROWN:  Objection to form.
9      A.  That's correct.
10     Q.  (BY MR. SALAZAR) Okay.  Now, did Royal give you
11  instructions to investigate the claim, to hire experts as of
12  December 21st, 2001?
13         MR. BROWN:  Objection. Form.
14     A.  They asked us to investigate the claim by
15  gathering documents for them, yes, sir.
16     Q.  (BY MR. SALAZAR) My question is, did they ask you
17  to proactively hire any experts to find out the causes of
18  the -- cause of the loss?
19     A.  No, sir.
20     Q.  Okay.  On December 21st, 2001, which would have
21  been two weeks after the initial claim, did you provide the
22  Brownsville Independent School District with a -- a proof of
23  loss claim?
24     A.  No, sir.
25     Q.  Could you tell the ladies and gentlemen of the

9 (Pages 30 to 33)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

| Page 34 |
| --- |

1  jury what a proof of loss claim is?
2      A.  Proof of loss form is a form that's submitted by
3  the insured to the insurance company stating their claim.
4      Q.  How -- how soon after a claim is filed is it
5  normal for you to -- to send a proof of claim to the
6  insured, in this case -- or at any time?
7      A.  Well, usually there's a period of 15 days.  Is
8  that what you're asking, sir?
9      Q.  Yes, sir.
10      A.  There's usually a period of 15 days where we're --
11  to do our investigation and request further documentation
12  from the insured.  After that point in time, then another
13  15 -- if the documentation is received, another 15-day
14  period before a decision is to be made by the insurance
15  company on to pay or deny the claim, or ask for an
16  additional extension of 45 days in the event of an arson.
17  And then there's a five-day period that follows that for
18  payment of the claim.  That all stops in the middle if the
19  documentation that's requested is not provided.
20      Q.  But that -- but you agree with me that the
21  insurance company, Royal, has a duty to investigate this
22  claim; correct?
23      A.  Yes, sir.  And by that --
24      Q.  Correct?
25      A.  Yes, that's correct.

| Page 35 |
| --- |

1      Q.  Okay.  Now --
2          MR. BROWN:  Hold on.  The witness is
3  entitled to finish his answers.  Let's not cut him off.
4          MR. GAIBLE:  Have you completed your answer?
5          THE WITNESS:  No, sir.
6          MR. GAIBLE:  Okay.  Well, go ahead and
7  finish your answer.
8      A.  The investigation that they were asking us to do
9  was to gather the documents that had been -- that we were
10  told were -- were being held by the Brownsville Independent
11  School District through their attorney.  Those were mold
12  studies, engineering investigations that had been done
13  previous to our assignment of the claim.
14      Q.  (BY MR. SALAZAR)  So you agree with me that on
15  December the 21st, 2001, 15 days after the initial claim,
16  that you did not provide the school district with a proof of
17  loss form; correct?
18      A.  Correct.
19      Q.  And you agree with me that this was not an arson
20  case; correct?
21      A.  Correct.
22      Q.  Mr. Nickoloff, I'm going to direct your attention
23  to Exhibit 3.5, Nickoloff 3.5, which is entitled second
24  report; and it's dated January the 21st, 2002.  Do you have
25  that in front of you, sir?

| Page 36 |
| --- |

1      A.  Yes, sir.
2      Q.  On January the 21st, 2002, that would be
3  approximately six weeks after the initial claim; correct?
4      A.  That's correct.
5      Q.  Did Royal, six weeks after the initial claim,
6  instruct you to hire any experts to find out the causes of
7  the loss?
8          MR. BROWN:  Objection.  Form.
9      A.  No, sir.
10      Q.  (BY MR. SALAZAR)  Did -- six weeks after the
11  initial claim on January 21st, 2002, did you provide the
12  Brownsville Independent School District with a proof of loss
13  claim form?
14      A.  No, sir.
15      Q.  Could you tell the ladies and gentlemen of the
16  jury what the -- what the coverage is on this file, on this
17  file, what the maximum coverage Royal would be responsible
18  for?
19          MR. GAIBLE:  Objection.  Form.
20          MR. BROWN:  Objection.  Form.
21      A.  I have no idea, sir.
22      Q.  (BY MR. SALAZAR)  Well, if you look at the exhibit
23  in front of you, it says commercial policy, and it has
24  buildings.  What is the amount of insurance that the
25  Brownsville District paid for?

| Page 37 |
| --- |

1      A.  I'm sorry.  Correct.  That was the amount that's
2  shown on the cover page of the initial probably documents we
3  received, 371,452,376.
4      Q.  Okay.  On January 21st, of 2002, your second
5  report, did the Brownsville Independent School District at
6  that time ever deny entrance into the school, deny you
7  access to the school?
8      A.  Did BISD ever deny me?  Is that what you're
9  asking?
10      Q.  Yes, sir.
11      A.  I had no conversations with BISD.  I had contact
12  with their attorneys.
13      Q.  Did the attorneys ever deny you entrance into the
14  school district as of -- from December the 5th to January
15  21st, 2002?
16      A.  Did they specifically deny me entrance to the
17  school, no.  Did they allow me entrance to the school, no.
18      Q.  Well, did you ever call up and say I need to
19  show -- go and do a walk-through of the schools and the --
20  the school district or the school district's attorney, did
21  they ever say, "No, Mr. Nickoloff, you can't go to the
22  schools"?
23      A.  They said they were scheduling the appointment for
24  me, as you can see from the reports.
25      Q.  My question is, did they ever deny you access to

10 (Pages 34 to 37)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

Page 38

1  the schools?  Yes or no?
2        MR. GAIBLE:  Objection.  Form.
3        MR. BROWN:  Objection.  Form.
4     A.  No, they didn't deny me access to the schools.
5     Q.  (BY MR. SALAZAR)  Okay.  On your second report
6  dated January the 21st, 2002, did you document anywhere on
7  this report where you're giving the school district guidance
8  or direction as to the process in -- in the claim file?
9     A.  No, sir.  I certainly wouldn't do that with their
10  attorneys present.  I mean, I would assume their attorneys
11  were giving them all the guidance they needed.
12     Q.  Mr. Nickoloff, I'm going to ask you to turn to the
13  third report, which we're labeling as Nickoloff Exhibit
14  No. 4.  It's dated February the 19th, 2002.  Do you see that
15  document, sir?
16     A.  Yes, sir.
17     Q.  February the 19th would have been approximately
18  two months after -- over two months after you got your
19  initial claim submitted; correct?
20     A.  That's correct.
21     Q.  And on February the 19th, 2002, did Royal
22  Insurance give you any instructions as to hiring anybody to
23  investigate -- any experts to investigate the cause of the
24  loss at the Brownsville School District?
25     A.  No, sir.  It was my understanding that was already

Page 39

1  done, as I said earlier, by their own engineering firm and
2  their own mold specialist.
3     Q.  But my question is, did Royal give you any
4  instructions to hire anybody to give you a better feel as to
5  what the cause of the loss was?
6     A.  No, sir.
7     Q.  Did -- approximately two and a half months later,
8  February 19th, did you provide the Brownsville Independent
9  School District with a proof of loss claim form?
10     A.  No, sir.
11     Q.  Did you provide the Brownsville School District
12  with any guidance or direction as to how the process of the
13  claim was going to be handled?
14     A.  I think you've asked and I've answered that
15  already, sir.
16     Q.  Is that a yes or no?
17        MR. BROWN:  Objection.  Form.  It's been
18  asked and answered several times, now.
19     Q.  (BY MR. SALAZAR)  Sir, I'm talking about February
20  the 19th, 2002.
21     A.  Same answer as before, sir.  I assumed their
22  attorneys were giving them all the guidance they needed.
23     Q.  But you never gave any guidance to the school
24  district; correct?
25     A.  No, sir.  I would not certainly assume to know

Page 40

1  more than their attorneys.
2     Q.  By February the 19th, 2002, you were aware of --
3  of the school district being involved in litigation;
4  correct?
5     A.  That's correct.  From what news articles that were
6  in the newspaper, yes, sir.
7     Q.  And at this point you already knew that the
8  schools had been vacated by February 19th, 2002; correct?
9     A.  I believe so, yes, sir.
10     Q.  You have a newspaper article, which is page 2 of
11  Nickoloff Exhibit No. 4, which is titled "BISD told to halt
12  work at moldy schools"; correct?
13     A.  That's correct.
14     Q.  And at this point you knew that the school
15  district didn't have the authority to enter into the schools
16  without a court order; correct?
17        MR. BROWN:  Objection.  Form.
18     A.  I'm sorry?
19     Q.  (BY MR. SALAZAR)  You knew at this point that
20  there was a temporary restraining order against the school
21  district for the school district did not have the -- the
22  opportunity to go into their own schools; correct?
23        MR. BROWN:  Objection.  Form.
24     A.  That's correct, based on the news article, yes,
25  sir.

Page 41

1     Q.  (BY MR. SALAZAR)  Okay.  Now, by February the
2  19th, 2002, had you done any initial walk-throughs to the
3  school?
4     A.  No, sir.
5     Q.  And on February the 19th, 2002, from December 2001
6  to February of 2002, had the school district ever denied you
7  access to the schools?
8     A.  No, sir.
9     Q.  Mr. Nickoloff, I'm going to direct your attention
10  to what's going to be marked as Nickoloff Exhibit No. 5, and
11  that is entitled your fourth report dated March 22nd, 2002.
12  Do you have that document in front of you, sir?
13     A.  Yes, sir.
14     Q.  By March 22nd, 2002, you had already done a
15  walk-through of the schools, Aiken and Besteiro; correct?
16     A.  Yes, sir.
17     Q.  And by March 2002 had you provided the school
18  district with a proof of claim form?
19        MR. BROWN:  Objection to form.
20     A.  You mean proof of loss form?
21     Q.  (BY MR. SALAZAR)  Proof of loss form.
22     A.  No, sir.
23     Q.  Had you provided the school district with any
24  guidance or direction as to what the -- the process of the
25  claim would be?

11 (Pages 38 to 41)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

Page 42

1   A.  No, sir.
2   Q.  Okay.  On the second page of Exhibit No. 5, we
3   talk about the temporary restraining order, correct, the
4   TRO.  It says "a TRO was filed by attorneys representing
5   parties who have brought legal action against the insured."
6   That would be the school district; correct?  That would be
7   the second paragraph, second -- first sentence.
8   A.  That's correct.
9   Q.  Okay.  And on the third paragraph under cause of
10  loss, could you tell the ladies and gentlemen of the jury
11  what you found when you -- what you observed when you went
12  into the school district.
13  A.  I was walked in a rather rapid fashion.  I think
14  that -- if I'm not incorrect, I believe the TRO was still in
15  effect when I was walked through the buildings, and I was
16  instructed that the inspection had to be quick and that I
17  was not allowed to touch anything in the building or
18  actually go anywhere near anywhere there had been some
19  construction work done.  So the things I'm talking about in
20  that paragraph, the classrooms B111 and B202 in Aiken, there
21  was water standing on the floors in those rooms that the
22  janitorial person that walked me through the building was
23  unaware of.  As we walked past the room, we both stuck our
24  head in the room, and there was water on the floor.  The
25  source of the water was unknown.  There was wet ceiling

Page 43

1   tiles.  In some cases the ceiling tiles had collapsed.  I
2   can't remember exactly what they looked like, but there was
3   water standing, looked like fresh water standing on the
4   floors in those two rooms.  The custodian said that he would
5   call it in and -- but he could -- was not allowed to do
6   anything with it right at that moment because of the TRO.
7   So we passed those building -- those rooms and we went on
8   with the inspection.
9   Q.  Did you take photographs on that day that you
10  went -- walked through the -- Aiken and Besteiro?
11  A.  Yes, sir.  They're part of the file.
12  Q.  Did you anywhere on your -- on your report did you
13  document anything that said that you had to be -- that you
14  were whisked through or had to go through in a rapid
15  fashion?  Did you document that, sir?
16  A.  Did I write it in the report?
17  Q.  Yes, sir.
18  A.  No, sir, I don't believe it appears in the report.
19  Q.  Did anywhere in your report did you state that you
20  didn't have enough time to observe or enough time to walk
21  through the schools?
22  A.  No, sir.
23  Q.  Were you given a time constraint by the school
24  district to say you have to be out of here in 15 minutes or
25  20 minutes?

Page 44

1   A.  Well, as you see from the report there, the tour
2   guide does say he'd report the water that we saw on the
3   floors but that he couldn't touch it without checking with
4   the BISD attorneys.  The implication there was that we
5   couldn't touch anything in the building.  Are you saying did
6   I report that to Royal in my reports in that exact fashion,
7   no, sir.
8   Q.  No.  My question is, did you anywhere in your --
9   in your report state that you did not have enough time to do
10  a walk-through or that you were hurried or you were moved
11  through rapidly through the school, through the schools?
12  A.  Does that appear in the report anywhere?  Is that
13  what --
14  Q.  Yes.
15  A.  -- you're asking?  No, sir.
16  Q.  Okay.  And are you saying that you didn't have
17  enough time to do a walk-through on -- on the date that you
18  walked through the school district?
19  A.  Yes.
20      MR. BROWN:  Objection to form.
21  Q.  (BY MR. SALAZAR)  Sorry?
22  A.  I'm sorry.  The objection -- yes, sir, that's
23  correct.
24  Q.  You did not have enough time?
25  A.  No, sir, I did not.

Page 45

1   Q.  Did you ask anybody at the school district for
2   more time to walk through?
3   A.  There was no one to ask.
4   Q.  Well, there was someone that was guiding you
5   through the schools; correct?
6   A.  A custodian.
7   Q.  Did the custodian tell you we have to get out of
8   here quickly or we have all the time in the world?  What did
9   he tell you?
10  A.  The custodian said we had to do a fast
11  walk-through.
12  Q.  Do you remember the custodian's name?
13  A.  No, sir.  He was sent on behalf of Mr. Vasquez,
14  who did not appear for the appointment.
15  Q.  Okay.
16  A.  And the gentleman that appeared didn't have a key
17  initially.  He had to go back and find a key for the
18  building.
19  Q.  Did -- did you notice any water leaks in the
20  building?
21  A.  Other than that water standing on the floor in
22  those two rooms, sir, no.
23  Q.  Okay.  Well, your report on paragraph No. 3 says
24  in two Aiken classrooms, B11 [sic] and B202, we discovered
25  ongoing water leaks.  So my question is, did you see any

12  (Pages 42 to 45)

NEW   CENTURY   REPORTING
(713)  626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

| | |
|---|---|
| Page 46 | Page 48 |

**Page 46**

1  water leaks? Yes or no?
2      MR. BROWN:  Objection.
3      A.  Did I see water leaking is your question?
4      Q.  (BY MR. SALAZAR)  Water leaks.
5      MR. BROWN:  Objection to form.
6      A.  I don't know the source of the water, if that's
7  what you're asking.  I saw water standing on the floor, as
8  I've stated.
9      Q.  (BY MR. SALAZAR)  Right.  But you stated in your
10  report, you agree with me it says two Aiken classrooms, B11
11  [sic] and B202, we discovered ongoing water leaks.
12      A.  Right, which meant they were fresh.  It was fresh
13  water that was on the floor.  It was a surprise to the
14  custodian, and it looked like it was fresh water that had
15  just arrived on the floor, it hadn't been standing and
16  dried.  So we assumed there were from some ongoing current
17  problem.  That's what that meant.
18      Q.  Well, you don't -- you don't call it an ongoing
19  problem on your report.  You call it water leaks; correct?
20      A.  Water leaks from or drips or condenses from some
21  point in place.  I mean, I don't know where it was coming
22  from.  I assumed it was a leak.  No one had poured water on
23  the floor from a pail or, you know, spilled water from a
24  glass.  It was a large amount of water, so I assumed that
25  there was a water leak of some type ongoing.

**Page 47**

1      Q.  Okay.  On March 22nd, 2002, do you make a
2  recommendation to Royal Insurance as to what type of experts
3  Royal should bring in?
4      A.  No, sir.
5      Q.  Okay.  On your -- on your fourth paragraph under
6  cause of losses on Exhibit No. 5, you talk about, and I
7  quote you, "We do not know the sources of the moisture
8  intrusion.  Without an engineering study -- engineering
9  study, it will not be possible to determine the causation of
10  the ongoing problems"; correct?
11      A.  Correct.
12      Q.  So -- and then you -- you mention that again in
13  the last sentence of the same paragraph, without an
14  engineering report, we will not be able to determine if the
15  damages are a result of a covered peril or -- or excluded;
16  correct?
17      A.  Correct.
18      Q.  So at this point, on March 22, 2002, did you feel
19  that -- that an engineering report was necessary to find out
20  the cause of the damage?
21      A.  Yes.  And I understood there was one already done.
22      Q.  My question is, did you feel that an engineering
23  report had to be done to find out the cause of the damages?
24      MR. BROWN:  Objection.  Form.
25      MR. GAIBLE:  Objection.  Form.

**Page 48**

1      A.  Yes, sir.
2      Q.  (BY MR. SALAZAR)  And did -- is -- was that a
3  recommendation that you were making to Royal?
4      MR. BROWN:  Objection to form.
5      A.  No, sir.
6      Q.  (BY MR. SALAZAR)  Who was this report sent to?
7      A.  Mark Schwartz at Royal and Sunalliance.
8      Q.  Okay.  So you're not telling Mr. Schwartz we need
9  an engineering report here at some point?
10      A.  It's saying without an engineering report, we will
11  only -- we will be unable to determine if the damages are a
12  result of a covered peril or excluded.
13      Q.  Now, at this point you already knew that the
14  school district had gone in and remediated the library and
15  part of the cafeteria; correct?
16      A.  From my observation?
17      Q.  Yes, sir.
18      A.  It appeared that some remediation work was
19  ongoing, yes, sir.  In the library there was some work that
20  was ongoing.  To what extent I couldn't tell with -- with a
21  quick walk-through.
22      Q.  And you took pictures of this ongoing remediation;
23  correct?
24      A.  I believe I took two or three pictures in the
25  library area, which I believe connects the two buildings.

**Page 49**

1      Q.  And you were also made aware that there was a
2  company out there called Assured Indoor Air Quality which
3  was doing the remediation; correct?
4      A.  Part of that is correct.  I -- I knew there was a
5  company by that name that was involved; to what extent, I
6  didn't know at that time.
7      Q.  From December the 5th to the date of March 22nd,
8  2002, did you ever sit down with the Brownsville School
9  District or the Brownsville School District's attorney and
10  ever explain to them what coverage was available under the
11  policy?
12      A.  No, sir.
13      Q.  Did you ever sit down and talk to the Brownsville
14  School District and their attorneys or their attorneys and
15  discuss a possibility of lack of coverage?
16      A.  No, sir.  I was not asked to do any of that.
17      Q.  By March 22nd, 2002, had you had any face-to-face
18  meetings with either the Brownsville Independent School
19  District or their attorneys to discuss the claim?
20      A.  No, sir.
21      Q.  Part of your report -- and I'm talking about
22  Nickoloff Exhibit No. 5, which is your fourth report dated
23  March 22nd, has some photographs; correct?
24      A.  That's correct.
25      Q.  And could you tell the ladies and gentlemen of the

13 (Pages 46 to 49)

DENNIS NICKOLOFF - April 26, 2005

Page 50

1   jury whether there's any leaks in any of these photographs?
2   And I'm talking about water leaks.
3       A.  We have, I mentioned in photograph No. 19, where I
4   wrote the same basic thing that I had in the report, that
5   there appeared to be ongoing water leaks standing, there was
6   water standing on floors in these rooms.
7       Q.  And you also documented the library on photograph
8   No. 20 which shows --
9       A.  "Hall in Aiken to library."
10      Q.  Okay.  Now at this point after you've gone through
11  and taken pictures and documented the two schools, did you
12  at this point decide that the school claim was a priority?
13          MR. BROWN:  Objection to form.
14      Q.  (BY MR. SALAZAR) I'm talking about March 22nd,
15  2002.
16      A.  Again, I don't -- I'm not sure I understand what
17  you mean by a priority.  Was it an important file?  Was it
18  an important claim?  Yes.
19      Q.  (BY MR. SALAZAR) Was it a priority?
20          MR. BROWN:  Objection.  Form.  Vague,
21  ambiguous.
22      A.  Yeah.  You'll have to define that for me, sir.
23  I'm sorry, I don't --
24      Q.  (BY MR. SALAZAR) I'm going to refer you over
25  to -- well, let me -- let me go back real quick.  You stated

Page 51

1   you did not have any academic background in engineering;
2   correct?
3       A.  Correct.
4       Q.  After you did your walk-through and took all the
5   pictures at Aiken and Besteiro, did you feel you were
6   qualified to -- to address the causes of the loss at the
7   schools?
8       A.  No, sir.
9       Q.  Who do you think at that point would be more
10  appropriate to figure out the causes of the losses at the
11  schools?
12      A.  An engineering firm.
13      Q.  I want to refer you to Nickoloff Exhibit No. 6,
14  which is titled the fifth report, dated April 22nd, 2002.
15  Do you see that document, sir?
16      A.  Yes, I do.
17      Q.  Okay.
18          MR. BROWN:  Can you identify how many pages
19  that exhibit is?
20          MR. SALAZAR:  That is two pages.
21          MR. BROWN:  Okay.
22      Q.  (BY MR. SALAZAR) On April 22nd, 2002, did
23  anything change between March 22nd, 2002, and April 22nd?
24  And by what -- when I say did anything change, did -- did
25  Royal hire any engineering firms to come in and assess the

Page 52

1   cause of the losses?
2       A.  No, sir.
3       Q.  Did they direct you to hire any engineering firms
4   to assess the cause of loss?
5       A.  No, sir.  As I stated, it was my understanding
6   that was already done.
7       Q.  Okay.  And on April 22nd, 2002, had you provided
8   the school district with any guidance or direction as to how
9   to process a claim?
10      A.  No, sir.
11      Q.  On April 22nd, 2002, had you provided the school
12  district with a proof of loss --
13      A.  No, sir.
14      Q.  -- claim form?
15      A.  No, sir, I did not.
16      Q.  I'm going to turn your attention to Nickoloff
17  Exhibit No. 7, which is entitled sixth report.  Do you see
18  that?
19      A.  Yes, sir.
20      Q.  Okay.  And for clarification, Mr. Nickoloff, the
21  prior report was, which I'm going to -- is titled fifth
22  report on April 22nd, 2002.  Do you see that?
23      A.  Yes, sir.
24      Q.  And then the next report is sixth report,
25  approximately May 22nd, 2002?

Page 53

1       A.  Yes, sir.
2       Q.  Could you tell the ladies and gentlemen of the
3   jury if you were making a report every month?
4       A.  Every 30 days, yes, sir.
5       Q.  Okay.  And that report was being sent out to Royal
6   Insurance?
7       A.  Royal and Sunalliance, yes, sir.
8       Q.  On your sixth report, which I'm going to mark as
9   Nickoloff Exhibit No. 7, did you on this report again talk
10  about or make a recommendation under cause of loss, did you
11  make a recommendation that an engineering firm be hired?
12      A.  No, sir.  I made the statement.
13      Q.  You made a statement that without an engineering
14  study, really -- we don't really know what the cause of loss
15  is; correct?
16      A.  That's correct.
17      Q.  And that statement you're making it to Royal
18  Insurance; correct?
19      A.  That's correct.
20      Q.  And at this point it's fair to say that you did
21  not -- you had not provided the Brownsville School District
22  with any guidance or direction as to how to process a claim;
23  correct?
24      A.  That's correct.
25      Q.  And it's fair to say that May 22nd, approximately

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

Page 54

1   six months after the initial claim, or five and a half
2   months after the initial claim, you still had not provided
3   the Brownsville School District with a proof of loss claim
4   form; correct?
5       A.  That's correct.
6       Q.  And as of May the 22nd, 2002, had the school
7   district ever denied you entrance or access to the schools?
8       A.  No, sir.
9       Q.  Okay. I'm going to turn your attention to what
10  I'm going to mark as Nickoloff Exhibit No. 8, which is
11  titled seventh report, June 20th, 2002.  Do you see that
12  document there, sir?
13      A.  Yes, I do.
14      Q.  Again, on June the 20th, 2002, on your seventh
15  report, again you're -- you're sending this letter or this
16  summary to Royal Insurance, telling them that without an
17  engineering report, you really can't find out the cause of
18  loss; correct?
19      A.  That's correct.
20      Q.  And to this point had Royal instructed you to hire
21  an engineering firm to find out the cause of loss?
22      A.  No.  We were awaiting those documents from the
23  insured's attorney.
24      Q.  Right. But my question is, had you been
25  instructed by Royal Insurance to hire an engineering firm to

Page 55

1   find out the cause of losses?
2       A.  No, sir.
3       Q.  Do you feel that as an adjuster, if Royal was not
4   involved in this, at this point, you, as an adjuster with
5   20-something years of experience, would you have brought in
6   an engineering firm if you had nothing else to depend on?
7           MR. BROWN:  Objection to the form.
8       A.  Yes, most probably.
9       Q.  (BY MR. SALAZAR)  Okay. And again, on June 20th,
10  2002, nothing had changed from the prior month, you had not
11  given the school district a proof of loss claim form;
12  correct?
13      A.  That's correct.
14      Q.  You had not been given any instructions by Royal
15  Insurance to hire an engineering firm; correct?
16      A.  That's correct.
17      Q.  You had not done any investigation on your own,
18  other than the walk-through and the documentation a couple
19  of months prior; correct?
20      A.  That's correct.
21      Q.  And you had not given the school district or
22  provided the school district with a proof of loss claim
23  form; correct?
24      A.  That's correct.
25      Q.  Okay. I'm going to turn your attention to

Page 56

1   Nickoloff Exhibit No. 8, which is dated July 24th, 2002,
2   which consists of two pages.  Do you see that document,
3   Mr. Nickoloff?
4       A.  Yes.
5           MR. BROWN:  You're calling that -- what did
6   you call the previous one?
7           MR. SALAZAR:  Nickoloff 8.
8           MR. BROWN:  You misspoke, then.
9           MR. SALAZAR:  Okay.  Then this would be
10  Nickoloff 9, Nickoloff Exhibit No. 9.
11          MR. BROWN:  July 24th, 2002.
12          MR. SALAZAR:  Correct.
13          MR. BROWN:  And that's a two-page document?
14          MR. SALAZAR:  Yes, sir, it is.
15      Q.  (BY MR. SALAZAR)  Again, July 24th, that would be
16  approximately six and a half months after the initial claim.
17  You would agree with me that -- that Royal Insurance had not
18  hired an engineering firm to investigate the cause of loss;
19  correct?
20      A.  Yes.
21      Q.  You agree with me that you had not provided the
22  Brownsville School District with a proof of loss claim form;
23  correct?
24      A.  Correct.
25      Q.  And you agree with me that you had given the

Page 57

1   school district no direction or guidance as to the claim
2   process; correct?
3       A.  Correct.
4       Q.  Now, earlier you stated that normally you -- you
5   sent out the proof of loss within 15 days; correct?
6           MR. BROWN:  Objection. Form.
7       A.  No, sir, that's not what I said.
8       Q.  (BY MR. SALAZAR)  Well, you talked about normally
9   after you get a claim, that you do an initial investigation,
10  and unless arson is involved, that you send out proof of
11  claims within 15 days.
12          MR. BROWN:  Objection. Form.
13      A.  That's not correct either.  I said that within 15
14  days an investigation is done.  At that point if
15  documentation is requested from an insured, and I'll give
16  you a typical example if that helps you.  When you have a
17  homeowner's claim with some damage to some contents, the
18  homeowner tells me that they have some receipts and
19  documentation they'd like to submit for the values of those
20  items, then the clock continues to run until those documents
21  are received by my office.
22      Q.  (BY MR. SALAZAR)  Whose duty is it to investigate
23  the loss at an insured's property?  Is that the insured or
24  the insurer?  The insurance company or the claimant?
25          MR. BROWN:  Objection to the form.

15 (Pages 54 to 57)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

Page 58

1    A.  That's the insurer's.
2    Q.  (BY MR. SALAZAR)  In this case it would be Royal's
3  responsibility to investigate; correct?
4    A.  That's correct.
5    Q.  And as of July of 2002 Royal had not investigated
6  this claim; correct?  Or they had not -- they had not
7  instructed you to investigate this claim other than
8  gathering documents?
9        MR. BROWN:  Objection to the form.  The
10  witness -- he's testified he's done a whole lot of
11  investigation by this point.
12    Q.  (BY MR. SALAZAR)  Is that correct, sir?
13        MR. BROWN:  Well, hold on, Baltazar.  I'm
14  objecting to the question.  It misstates the evidence.  If
15  you want to distinguish between what he's doing in the
16  investigation and what experts are doing, that's fine.  But
17  you're mixing the two together, and it's confusing.
18    Q.  (BY MR. SALAZAR)  You agree with me, sir, that as
19  of July 24th, 2002, that the duty to investigate this claim
20  was the duty of Royal Insurance; correct?
21    A.  Yes, sir.
22    Q.  And you agree with me that as of July 24th, 2002,
23  Royal had not given you any authority or had not -- had not
24  given you -- given you any guidance for part of your scope
25  of employment to do those investigations; correct?

Page 59

1        MR. BROWN:  Objection.  Form.
2    A.  That's correct.  I believe it was their
3  understanding that those studies had already been performed.
4    Q.  (BY MR. SALAZAR)  Mr. Nickoloff, I'm going to --
5  I'm going to refer you to Nickoloff Exhibit No. 10, which is
6  dated August 22nd, 2002.
7    A.  Yes, sir, that's correct.
8    Q.  And the July 24th, 2002, is Report No. 8;
9  and the August 22nd, 2002, is Report No. 10?
10    A.  Yes, sir.
11    Q.  All right.  Is that just a typographical error?
12    A.  Yes, sir.  I have no problem with the number 9.
13  What happened was our computer at this time had manual
14  rollovers.  So if I didn't manually roll over that report
15  number, it didn't roll over automatically.  We've since
16  corrected that problem, but you'll find that prevalent
17  through this -- this report -- these reports.
18    Q.  So was there a ninth report?
19    A.  No, sir.  This is the ninth report.
20    Q.  Okay.
21    A.  They -- they follow in 30-day sequence.  I'd
22  recommend you follow the dates rather than the numbers on
23  the reports.
24    Q.  Okay.  I'm going to go ahead and follow the dates.
25    A.  Yes, sir.

Page 60

1    Q.  And I'm going to call that Nickoloff Exhibit
2  No. 10.
3    A.  Report of August 22nd.  Is that the one you're
4  referring to?
5    Q.  That's it, sir.
6    A.  All right.
7    Q.  On August 22nd, 2002, as an adjuster had you
8  made -- had you made a determination as to whether there was
9  any coverage on this file?
10    A.  No, sir.  That was not my job to do.
11    Q.  Okay.  Normally whose job is it to -- to decide
12  whether -- whether there's coverage or not?
13    A.  It's the job of the insurer.
14    Q.  Okay.  Which would be Royal Insurance; correct?
15    A.  Yes, sir.
16    Q.  Okay.  Were you asked to give an opinion as to
17  whether there was coverage in this claim by Royal Insurance?
18    A.  No, sir.
19    Q.  And you agree with me that on Nickoloff Exhibit
20  No. 10, which is two pages, and then the third page is a
21  letter dated August 22nd, 2002, this document here, as of --
22  as of August 22nd, 2002, you agree with me that you had not
23  provided the Brownsville School District with a proof of
24  loss claim form; correct?
25    A.  Correct.

Page 61

1    Q.  And you agree with me that Royal had not given you
2  any instructions to hire any engineering firm to assess the
3  cause of losses; correct?
4    A.  Correct.
5    Q.  And you agree with me that you had given the
6  Brownsville School District no guidance or direction as
7  to -- as to the processing of the claim?
8    A.  That's correct.
9    Q.  I'm going to direct your attention to what I'm
10  going to mark as deposi- -- Nickoloff Exhibit No. 11, which
11  is titled 11th report, dated September 26, 2002.  Do you
12  have that document in front of you, Mr. Nickoloff?
13    A.  No, I don't.  These are out of order.  You'll have
14  to give me time to find it.
15    Q.  Okay.
16        MR. BROWN:  What is the date?
17        MR. SALAZAR:  September 22nd, 2002.
18        MR. BROWN:  September 26th.
19        THE WITNESS:  26th.
20        MR. SALAZAR:  26th.  I'm sorry.
21        MR. GAIBLE:  Baltazar, have you got the
22  Bates stamp numbers for that?
23        THE WITNESS:  That would help.
24        MR. SALAZAR:  Yeah.  RSL004148.
25        MR. GAIBLE:  What were the last four digits?

16 (Pages 58 to 61)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

**Page 62**

1    MR. SALAZAR: 4148.
2    THE WITNESS: I don't have it here. These
3 jump from 2377 to 5246.
4    MR. BROWN: I've got 2362 to 2364 for that
5 document.
6    MR. SALAZAR: I think what happened is that
7 there's been different discoveries, and it's just a
8 different document.
9    THE WITNESS: I don't have a 2362, but there
10 are pages missing. I have 2363.
11    Q.  (BY MR. SALAZAR) Do you have the date on there,
12 Mr. Nickoloff, September 26, 2002?
13    A.  No. That's what I'm trying to tell you, 002 --
14 Bates No. 002362 is missing. That's the first page, I
15 believe, of the report you're referring to. The second page
16 is here.
17    Q.  Okay.
18    A.  I believe it's the second page.
19    Q.  Mr. Nickoloff, I'm going to hand what you I'm
20 going to mark as Nickoloff Exhibit No. 11.
21    A.  Yes, sir.
22    Q.  And represent to you that that is the first page
23 and have you review it.
24    A.  Okay.
25    Q.  Okay. Is that consistent with your September 26,

**Page 63**

1 2002, report to Royal Insurance?
2    A.  I assume so. I don't have a -- copy here to --
3 I assume that's my -- this is my report. I mean, it's -- it
4 follows the fashion of all the others.
5    Q.  And you agree with me that -- that at this -- on
6 this August or September 26, 2002, report, again, you
7 mentioned that -- to Royal Insurance that without an
8 engineering study, that you can't figure out the cause of
9 loss; correct?
10    A.  That's correct. It says, "Without an engineering
11 reporting, we will not be able to determine if the damages
12 are a result of a covered peril and/or are excluded," same
13 as the previous reports.
14    Q.  Okay. And you would agree with me that by this
15 point, September 2002, Royal Insurance had not given you any
16 instructions to hire any experts to find out the cause of
17 loss; correct?
18    A.  That's correct.
19    Q.  And you agree with me that September 26th, 2002,
20 you had not provided the school district with any guidance
21 or direction as to how to process the claim; correct?
22    A.  Correct.
23    Q.  And you agree with me that as of September 26th,
24 2002, you had not provided the school district with a proof
25 of loss claim form; correct?

**Page 64**

1    A.  Correct.
2    Q.  And again, I'm assuming that if you did not have
3 Royal Insurance involved, Dennis Nickoloff as an adjuster,
4 at this point, I think you mentioned earlier as a
5 professional you would have hired an independent engineering
6 firm to do a study; correct?
7    MR. BROWN: Objection. Form. The testimony
8 was not if Royal had not been involved. The testimony was
9 if other experts had not already done the same work.
10    Q.  (BY MR. SALAZAR) My question was, if Royal was
11 not involved. If Dennis Nickoloff, if you had this
12 identical file in front of you, Mr. Nickoloff, and you had
13 the resources, would you, Dennis Nickoloff, as a
14 professional, hire an engineering firm to figure out the
15 cause of loss ten months after the proof of claim?
16    MR. GAIBLE: Objection. Form.
17    MR. BROWN: Objection. Form. Calls for
18 speculation.
19    A.  Possibly. It, again, circumstantially will vary,
20 but yes.
21    Q.  (BY MR. SALAZAR) Okay. Okay. Mr. Nickoloff, I'm
22 going to turn your attention to --
23    A.  We'll have to share that because these are --
24    Q.  Mr. Nickoloff, we'll make a copy of this; and then
25 if you don't have that, I've got another copy.

**Page 65**

1    A.  We're okay. I have no problem following you.
2    Q.  So that you can have your file complete.
3    A.  Okay.
4    Q.  Okay.
5    A.  If -- if you give me the Bates number on it, it
6 might help a little bit, and I'll try and follow along.
7    MR. SALAZAR: It's 4148, if you want to
8 write that down there.
9    MR. GAIBLE: 4148?
10    MR. SALAZAR: September 26th.
11    MR. GAIBLE: Okay.
12    Q.  (BY MR. SALAZAR) Mr. Nickoloff, I'm going to
13 direct your attention to what I'm marking as Nickoloff
14 Exhibit No. 12, which is entitled report -- 12th Report,
15 October 25th, 2002. Do you have that document in front of
16 you, sir?
17    A.  What's the Bates number? If you'll give me the
18 Bates number, I'll try and find it.
19    Q.  4145.
20    MR. BROWN: I've got 2365 through 2367.
21    A.  I have 65 through 67.
22    Q.  (BY MR. SALAZAR) Okay. Is that your 12th report
23 dated October 25th, 2002?
24    A.  Whatever number it is, yes, sir. It's the October
25 25th report.

17 (Pages 62 to 65)

DENNIS NICKOLOFF - April 26, 2005

Page 66

1    Q. Okay. And -- well, it says 12 report on top;
2  correct?
3    A. That's how it's titled, yes, sir.
4    Q. Okay. And -- and we're going to mark that as
5  Nickoloff Exhibit No. 12. On Nickoloff Exhibit No. 12,
6  Mr. Nickoloff, it's two pages, and then a third page with
7  a -- a letter from yourself to Constant & Vela; correct?
8    A. Yes, sir, that's correct.
9    Q. Okay. And do you agree with me that October 25th,
10  2002, Royal Insurance had not given you any instructions to
11  hire any engineering firm to figure out the cause of loss
12  for this claim; correct?
13    A. That's correct. We're continuing to request those
14  studies from Constant & Vela at that time.
15    Q. Right. And you're also making on your report to
16  Royal, talking about that without an engineering study, that
17  the cause of loss is going to be difficult to assess;
18  correct?
19    A. That's correct.
20    Q. And you agree with me that on October 25th, 2002,
21  you had not provided the Brownsville School District with a
22  proof of loss claim form; correct?
23    A. That's correct.
24    Q. And you agree with me that on October the 25th,
25  2002, you had not provided the Brownsville School District

Page 67

1  with any guidance or direction as to the process of filing a
2  claim; correct?
3    A. That's correct.
4    Q. Mr. Nickoloff, I'm going to direct your attention
5  to Nickoloff Exhibit No. 13, which is dated November 26th,
6  2002.
7    A. Bates numbered? I'm sorry?
8        MR. GAIBLE: 2368.
9        THE WITNESS: 2368. Not here. You have it.
10  Okay.
11    Q. (BY MR. SALAZAR) Do you have that document, sir?
12    A. Yes, sir, I do.
13    Q. Okay. And that would be two pages; correct?
14    A. Correct.
15    Q. And then the third page is a letter dated
16  November 8th, 2002, from the Law Office of Miguel Saldana;
17  correct?
18    A. Correct.
19    Q. And your understanding is that Mr. Miguel Saldana
20  is or was at that time the general counsel for the
21  Brownsville School District; correct?
22    A. That's what he says on his audit, yes, sir.
23    Q. Okay. And the last page is just a fax cover sheet
24  from Mr. Saldana; correct?
25    A. Correct.

Page 68

1        MR. BROWN: What exhibit again is that,
2  Baltazar?
3        MR. SALAZAR: Nickoloff 13, and it's titled
4  November 26th, 2002.
5        MR. BROWN: Thanks.
6    Q. (BY MR. SALAZAR) Mr. Nickoloff, this is -- on
7  November 26th, 2002, this is approximately a year after the
8  initial claim was made from the Brownsville School District
9  to Royal Insurance; correct?
10    A. That is correct.
11    Q. And a year later you're still sending letters to
12  Royal Insurance telling them that without an engineering
13  study, the cause of damage is still -- is going to be
14  undetermined; correct?
15    A. That's correct.
16    Q. And at this point, a year later, had you provided
17  the school district with a proof of loss claim?
18    A. No, sir.
19    Q. At this time, a year later, had you provided the
20  school district with any guidance or direction as to the
21  process of -- of -- of a claim?
22    A. No, sir, I had not.
23    Q. And a year later had Royal Insurance instructed
24  you to hire an engineering firm to figure out the cause of
25  loss on this -- on this claim?

Page 69

1    A. No, sir.
2    Q. Okay. Now, at this point you're made aware
3  that -- or at some point you're made aware that EFI,
4  Engineering and Fire Investigators, was somehow involved in
5  this claim; correct?
6    A. That's correct.
7    Q. Could you tell the ladies and gentlemen of the
8  jury who EFI is?
9    A. Yeah. It's an engineering firm.
10    Q. Is there any relationship between EFI and GAB
11  Robins?
12    A. I've learned since that time that GAB -- EFI is a
13  wholly-owned subsidiary of GAB. Apparently that's common
14  knowledge on our website, which is where I went to locate
15  that information.
16    Q. And what -- is it your testimony that -- when did
17  you find this out?
18    A. After this lawsuit.
19    Q. You didn't know that GAB Robins owned EFI on -- on
20  November 26th, 2002?
21    A. That's correct. I knew there was some affiliation
22  between the two firms; but legally, I didn't know what
23  their -- who owned who or if anyone owned anybody, if one
24  was a subsidiary of the other. I had no idea what their
25  technical connection was with one another.

18 (Pages 66 to 69)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF     -     April 26, 2005

Page 70

1    Q.  Well, earlier you testified that when you started
2  with GAB, that there was an entity that had been renamed
3  eventually to EFI; correct?
4    A.  That's correct.
5    Q.  So are you saying that you just had forgotten 28
6  years of working with the company and did not know the
7  corporate structure --
8        MR. BROWN:  Objection.
9    Q.  (BY MR. SALAZAR)  -- of GAB Robins?
10       MR. GAIBLE:  Objection.  Form.
11   A.  That's exactly what I'm telling you.
12   Q.  (BY MR. SALAZAR)  At some point you knew that EFI
13  was owned by GAB Robins; correct?
14   A.  After this lawsuit was filed, yes, sir.
15   Q.  Okay.  And did -- did you find -- did you tell,
16  did you advise Mr. Saldana on November 26th, 2002, that EFI
17  was affiliated with GAB Robins?
18   A.  No, sir, I did not.  It was not an issue.
19   Q.  Okay.  But you didn't tell Mr. Saldana or anybody
20  at the school district or the school district's attorney we
21  own GA- -- we own EFI, they're a corporate affiliate of
22  ours?
23   A.  As I told you, I didn't have any idea what the
24  connection was between the companies at that time.  I knew
25  that they were somehow affiliated, but I didn't know what

Page 71

1  the legal, you know, construction was between the companies.
2    Q.  And are you familiar with -- are you familiar with
3  the website of GAB Robins, sir?
4    A.  Yes, sir; uh-huh.
5    Q.  You work on it every day?
6    A.  No.  I do work on their website, but not at the
7  information website I believe you're talking about.  You're
8  talking about the general information website?
9    Q.  Yes, sir.
10   A.  I do not work on that website.  We work on a
11  closed website for internal office billing and that kind of
12  thing.
13   Q.  Well, does a closed website have a link to EFI?
14       MR. BROWN:  Objection.  Form.  Calls for
15  speculation.
16   A.  No, sir, it does not.
17   Q.  (BY MR. SALAZAR)  Are you sure about that?
18   A.  No, I'm not.
19   Q.  Are you familiar with a gentleman by the name of
20  Robert K. Meyers?
21   A.  No, sir.
22   Q.  Mr. Nickoloff, I'm going to hand you what I'm
23  going to mark as Nickoloff Exhibit No. 24.
24       MR. BROWN:  Let me see it, Baltazar.  I take
25  it that has not been produced in the case?

Page 72

1        MR. SALAZAR:  It has not.  And I'll
2  represent to you that I underlined the pen marks on there.
3        MR. BROWN:  Let the record reflect that
4  Exhibit No. 24 has not been produced in this case.
5        (Exhibit No. 24 was marked for
6        identification and is attached hereto.)
7    Q.  (BY MR. SALAZAR)  Mr. Nickoloff --
8        MR. GAIBLE:  Go ahead and read it.
9    Q.  (BY MR. SALAZAR)  -- I'm going to hand you Exhibit
10  No. 24 and ask you to review it and see if you've ever seen
11  that document before.  Take your time.
12       (Discussion off the record.)
13   A.  I don't -- okay.  Is this okay?  Are we all right
14  with this?
15       MR. BROWN:  Well, I mean, he can --
16   Q.  (BY MR. SALAZAR)  Have you had a chance to review
17  Nickoloff Exhibit No. 24?
18   A.  Yes, sir.  I just read it, uh-huh.
19   Q.  Okay.  And could you tell the ladies and gentlemen
20  of the jury what that appears to be?
21   A.  It appears to be an article in the Insurance
22  Journal regarding "GAB Robins Enhances Mold Assessment
23  Services" is what it's titled.  And it goes on to explain
24  that GAB, "New Jersey-based independent loss adjusting and
25  investigating service provider GAB announced that it was

Page 73

1  responding to the increasing number of claims involving mold
2  by offering" -- sorry -- "a package of services through its
3  Engineering and Fire Investigations unit, EFI, to, quote,
4  'identify, analyze and assess mold-related losses for
5  residential and commercial properties.'"  And then it goes
6  on to explain mold becoming an increasing problem in the
7  insurance industry and so on.  It's not -- it's -- it's
8  dated, looks like, 11-7-01 and was printed on 4-25-05.  So
9  the original article looks like it was probably -- well,
10  it's dated July 11th of 2001.
11   Q.  Okay.  So --
12   A.  Did that help you with this?
13   Q.  Yes.  On July 11th, 2001, basically GAB Robins is
14  providing a package along with EFI to do adjustments on mold
15  claims; correct?
16       MR. BROWN:  Objection to form.  Calls for
17  speculation.  No foundation.
18   A.  I don't understand what you mean.
19   Q.  (BY MR. SALAZAR)  Well, the document that you just
20  read from an -- from an insurance magazine; correct?
21   A.  Uh-huh.
22   Q.  Talks about GAB Robins, which is a company that
23  you worked for 20-something years; correct?
24   A.  Yes, sir.
25   Q.  Presenting a package, along with EFI, the

19  (Pages 70 to 73)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

## Page 74

1  subsidiary company, to assess mold damages; correct?
2  A. That's what it says in the opening paragraph that
3  I read, yes, sir.
4  Q. Okay. And this was July 2001; that would have
5  been approximately six months before this -- this claim from
6  the Brownsville School District was ever made; correct?
7  A. Yes.
8  Q. Okay. Do you keep up with the insurance industry,
9  Mr. Nickoloff?
10 A. Somewhat. Did I see this article is what you're
11 asking me?
12 Q. Yes.
13 A. Have I seen this before? No, sir, I have not.
14 Q. How often do you meet with your GAB supervisors
15 and national managers or district managers?
16 A. I never meet with the national managers. District
17 managers we only have one, my manager, immediate manager
18 John Hinz, and I see him maybe once a year.
19 Q. So over the past 28 years you met with somebody at
20 least 28 times; correct?
21 A. Yes, sir, I -- I assume, probably more than that.
22 I don't mean to mislead you. It's probably more than that.
23 Sometimes he's down twice a year or three times a year.
24 Q. Do you know a gentleman by the name of Roger
25 Sawyer?

## Page 75

1  A. I do.
2  Q. When did you work with Mr. Roger Sawyer?
3  A. I've never worked with Roger Sawyer.
4  Q. You've never worked in the same office with
5  Mr. Sawyer?
6  A. No, sir.
7  Q. Have you worked cases with Mr. Sawyer?
8  A. No, sir -- I -- I may have, in the distant -- I
9  can't remember too far back, but I mean, we're going back a
10 few years. Roger Sawyer may have been working on a claim in
11 his office in Houston and requested that we do something for
12 him in our area in the Rio Grande Valley. Or he may need a
13 document picked up or a photograph taken of something. So
14 we may have assisted Roger Sawyer in that fashion, in what
15 we call a branch assist fashion where one adjuster asks
16 another adjuster to assist him on some claim he's working
17 on.
18 Q. Well, he's not a stranger to you; you know who he
19 is; right?
20 A. Yes, sir.
21 Q. How long have you known Mr. Sawyer?
22 A. I don't know. Probably 20 years.
23    MR. BROWN: Do you mind if we take a short
24 break?
25    MR. SALAZAR: That's fine.

## Page 76

1     THE VIDEOGRAPHER: 10:41 a.m. We're off the
2  record.
3        (Short recess.)
4     MR. BROWN: We're just making an agreement
5  on the record that there's been some subpoenas issued for
6  witnesses for this week and motions to quash associated with
7  those subpoenas. The witnesses this week are Dennis
8  Nickoloff, who is being deposed now; is it John Hinz?
9     MR. GAIBLE: John Hinz
10    MR. BROWN: -- John Hinz, whose deposition
11 is scheduled for tomorrow, with GAB; and Roger Sawyer, whose
12 deposition is scheduled for Thursday. And the issues with
13 respect to Mr. Nickoloff's subpoena have been worked out,
14 and the subpoena is -- can be considered to be withdrawn,
15 although we're in a deposition now and Mr. Salazar hasn't
16 had time to do that. And the issues have been worked out
17 with respect to Mr. Hinz's deposition, his subpoena; is that
18 right?
19    MR. SALAZAR: That is correct.
20    MR. BROWN: Okay. And right now we still
21 have the dispute as to the subpoena on Mr. Sawyer's
22 deposition.
23    MR. SALAZAR: That is correct.
24    MR. BROWN: Okay. Correct?
25    MR. GAIBLE: That is correct.

## Page 77

1     MR. SALAZAR: And so we'll all be on notice,
2  I'd like to take Mr. Sawyer's deposition if we can either
3  work out the details of the documents -- I spoke with Bruce
4  the other day, and you were going to get back with me as far
5  as what documents you could produce. If we can't come to an
6  agreement, then I'd like a hearing before taking
7  Mr. Sawyer's deposition.
8     MR. GAIBLE: That is fine. And I have
9  communicated with Beth Taylor of Taylor & Taylor. She
10 represents Cigna, ACE, whatever the correct name of the
11 entity is. And my understanding is that she is reviewing
12 those documents that might be responsive to Roger Sawyer's
13 subpoena duces tecum for his deposition, and I intend on
14 talking with Beth Taylor as soon as possible with respect to
15 that issue.
16    MR. SALAZAR: Okay.
17    THE VIDEOGRAPHER: It's 11:08 a.m. We're
18 back on the record.
19 A. Mr. Salazar, did you want anything else on this
20 Insurance Journal article? Did you have any other questions
21 on this?
22 Q. (BY MR. SALAZAR) No, sir.
23    MR. GAIBLE: Wait for his question.
24    THE WITNESS: I'm sorry. I just don't know
25 whether to turn it over or not.

20 (Pages 74 to 77)

NEW CENTURY REPORTING
(713) 626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

Page 78

1    MR. GAIBLE: Turn it over.
2    THE WITNESS: Okay.
3    MR. GAIBLE: She needs the exhibits.
4    THE WITNESS: Sorry.
5    Q. (BY MR. SALAZAR) Mr. Nickoloff, I'm going to turn
6  your attention to Nickoloff Exhibit No. 13, which is report
7  No. 13, dated November 26th, 2002.
8    A. The Bates number on that, sir?
9    Q. My Bates numbers are different than yours.
10    A. I'm sorry.
11    MR. GAIBLE: November 22nd?
12    A. 26th did you say?
13    Q. (BY MR. SALAZAR) November 26th, 2002.
14    A. Okay. I found it.
15    MR. BROWN: I have 2368 --
16    MR. GAIBLE: He's got it.
17    MR. BROWN: -- through 2371.
18    A. Go ahead, sir.
19    Q. (BY MR. SALAZAR) Okay. And I think I've already
20  asked you my questions as to what had happened about a year
21  later -- this was about a year later, correct, after the
22  claim was filed?
23    A. That's correct.
24    Q. And you indicated to me that basically nothing had
25  changed from the initial claim to November 26th, 2002;

Page 79

1  correct?
2    MR. BROWN: Objection. Form.
3    Q. (BY MR. SALAZAR) Is that correct, sir?
4    A. That's correct. As I said, we were still waiting
5  for engineering reports to come from insured's counsel.
6    Q. Okay. The third page of that report, there's a
7  letter from the Law Office of Miguel Saldana; correct?
8    A. That's correct.
9    Q. Dated November 8th, 2002; correct?
10    A. Correct.
11    Q. And in this letter Mr. Saldana is telling you that
12  he is general counsel for the Brownsville School District;
13  correct?
14    A. Correct.
15    Q. And you had a discussion with Mr. Saldana on
16  November the 8th over the phone, or maybe the day before
17  that?
18    A. I have it as a different date, but it's very close
19  to it.
20    Q. Okay. Where is that date documented in your file,
21  in which report?
22    A. It -- does it appear in a report? Is that your
23  question, does that conversation appear in a report?
24    Q. Which report, yes, sir.
25    A. It's in the same report, November 26th, second

Page 80

1  page, under Adjustment, second paragraph. "We were
2  contacted by Attorney Saldana and advised that for this
3  matter, he is now attorney of record for BISD."
4    Q. Okay. And at this -- at -- at this point, a year
5  later, Mr. Saldana informed you that the district is either
6  negotiating or has negotiated with EFI to do an engineering
7  report; correct?
8    A. His statement was that an engineering report was
9  prepared. He was waiting for the final draft and would send
10  it to me.
11    Q. Okay. And --
12    A. I said okay.
13    Q. Did Mr. Saldana ask you about -- did Mr. Saldana
14  ask you about EFI, if you knew who they were?
15    A. No, sir. We had no conversation about EFI
16  whatsoever.
17    Q. Mr. Saldana -- you never told Mr. Saldana that --
18  that you were familiar with EFI's work?
19    A. No, sir.
20    Q. And you that you didn't have a problem with their
21  findings?
22    A. No, sir. I may have said that I -- I know of EFI,
23  I've heard -- and I've heard of EFI, but that's as far as it
24  went.
25    Q. You had heard of them just as a company?

Page 81

1    A. Right. They had been involved in other claims
2  I've worked on, we've used them, they've been competent,
3  they're engineering firms. I didn't go into any of that
4  with Mr. Saldana. I just said yes, I'm familiar with them,
5  and we left it at that.
6    Q. And all the times that you used EFI before you've
7  never known that they were part of your same company, GAB
8  Robins?
9    MR. GAIBLE: Objection. Form.
10    A. That's not what I said previously. I knew they
11  were affiliated somehow, but I did not know at what level.
12  I didn't know whether -- what the corporate structure was.
13    Q. (BY MR. SALAZAR) Well, earlier I asked you if --
14  if you knew of EFI prior to that, if they were related in
15  any way to GAB Robins, and you said the first time you found
16  out was after the suit was filed; correct?
17    A. No.
18    MR. BROWN: Objection. Form.
19    MR. GAIBLE: Objection. Form.
20    A. That's incorrect. You asked me about ownership.
21  That's what I was talking about. I did not know the
22  ownership situation until after the lawsuit was filed.
23    Q. (BY MR. SALAZAR) But you knew that EFI was
24  affiliated with GAB Robins somehow; correct?
25    A. Somehow, yes, sir.

21 (Pages 78 to 81)

DENNIS NICKOLOFF  -  April 26, 2005

## Page 82

1    Q. Because you had been working with them for the
2  past 27 or 28 years --
3        MR. BROWN: Objection. Form.
4    Q. (BY MR. SALAZAR) -- correct?
5    A. That's correct.
6    Q. Okay. So EFI was not a stranger, they're not like
7  a company you just said, oh, I don't know who they are, I'm
8  not sure about them; correct?
9    A. No, sir, that's correct, no -- no more than they
10  were a stranger than Rimkus or Haig Engineering or Seal
11  Engineering or --
12    Q. So when you spoke with Mr. -- Mr. Saldana, you
13  didn't have any problems with EFI doing an engineering
14  report; correct?
15    A. No, sir.
16    Q. And as a matter of fact, you didn't say, well,
17  I've heard of them, they're a bad company, I don't want -- I
18  don't want to have anything to do with their findings?
19    A. Certainly wasn't my place. It was -- it appeared
20  that the school district had hired them to do their work,
21  and I didn't think it was appropriate for me to comment,
22  even if I was going to make a comment, on my opinion of the
23  engineering firm. I certainly wouldn't have done that. It
24  was a firm that was retained by Mr. Saldana or the board or
25  whoever may have hired them.

## Page 83

1    Q. At this point did you -- and I say you, did you as
2  an adjuster for GAB Robins and as a representative for Royal
3  Insurance, did Royal Insurance offer to pay for the
4  engineering studies that were going to be done by EFI?
5    A. No, sir.
6    Q. Okay. You knew there was going to be some costs
7  involved in that investigation; correct?
8    A. Well, I would assume so, yes, sir.
9    Q. Okay. And did you at this point on November the
10  8th of 2002 or thereafter, did you discuss with Mr. Saldana
11  the affiliation between GAB Robins and EFI?
12    A. No, sir. Basically, I -- as I said, I wouldn't
13  have known what the affiliation is at that time. I didn't
14  know that -- that it was a wholly-owned subsidiary of GAB at
15  that point in time.
16    Q. But you knew that GAB Robins and EFI were somehow
17  loosely associated; correct?
18    A. Yes, sir, that's correct.
19    Q. And you knew that their corporate structures were
20  somehow tied together?
21    A. That, I didn't know. At what level I didn't know.
22  That's what I said, I don't know what level.
23    Q. But you did know that at some level EFI and GAB
24  were associated?
25    A. Yes, sir.

## Page 84

1    Q. Corporately; correct?
2    A. I would assume so, yes, sir.
3    Q. Okay. And at that point, when you knew that EFI
4  and GAB Robins were affiliated or associated as a
5  corporation, did you disclose that to Mr. Saldana?
6    A. No. It didn't seem to be an issue.
7    Q. Okay. Did you disclose that to anybody at the
8  Brownsville Independent School District?
9    A. No, sir. As I said, it didn't seem to be an
10  issue.
11    Q. Okay. The next page was a letter from Mr. Saldana
12  dated November 8th, 2002.
13    A. Uh-huh.
14    Q. Do you see that document, sir?
15    A. I do.
16    Q. Okay. Mr. Saldana says that he had a conversation
17  with you on November 7th, 2002. Do you remember that
18  conversation, sir?
19    A. I do. I -- as I said, I'm not sure if that's the
20  correct date, but --
21    Q. Okay. And he tells you that he's going to take
22  over representation of the claim, and now we're talking
23  about the insurance claim with Royal; correct?
24    A. That's correct.
25    Q. At this point did you -- did you offer to provide

## Page 85

1  Mr. Saldana, as the attorney for the school district, a
2  proof of loss claim form?
3    A. No. And he didn't request one either.
4    Q. My question is, did you provide him with a proof
5  of loss claim form?
6    A. No. As I said, none was requested either.
7    Q. Okay. And did you -- the next paragraph,
8  Mr. Saldana says, "Additionally, as we discussed, you agree
9  to accept and I agree to make available the final report of
10  EFI, Inc." Do you see that sentence, sir?
11    A. I certainly do.
12    Q. Did you agree to accept the final form of EFI?
13    A. I --
14    Q. The final -- I'm sorry.
15        MR. BROWN: Hold on.
16    Q. (BY MR. SALAZAR) Let -- let me -- let me rephrase
17  that.
18        MR. BROWN: Ask your question, and then let
19  me object; okay?
20        MR. GAIBLE: So hold on for the objection.
21        THE WITNESS: You bet.
22    Q. (BY MR. SALAZAR) Did you agree to accept EFI's
23  engineering report on behalf of the school district?
24        MR. BROWN: Objection. Vague and ambiguous.
25    A. I have to agree. I'm sorry. I don't understand.

22 (Pages 82 to 85)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

Page 86

1  I -- I thought I understood the question the first time you
2  asked it, but would you try again, please? Are you saying
3  did I accept it for the school district? Would you just
4  rephrase the question. Maybe that would help.
5      Q. (BY MR. SALAZAR) Did you agree to accept EFI's
6  engineering report?
7          MR. BROWN: Objection. Vague and ambiguous.
8      A. Yes, I agreed to accept the report as offered.
9      Q. (BY MR. SALAZAR) And Mr. Saldana, the Brownsville
10 School District, agreed to provide the report; correct?
11     A. He agreed to provide the report. Are you asking
12 did he -- did I agree to accept the content of the report or
13 the report itself?
14     Q. My question is, did you -- did you agree to accept
15 the report?
16     A. Yes.
17     Q. Okay.
18         MR. BROWN: Objection to the form.
19     Q. (BY MR. SALAZAR) Now --
20         MR. BROWN: The witness can explain his
21 answer.
22     Q. (BY MR. SALAZAR) Now --
23         MR. SALAZAR: And I'm going to object to
24 opposing counsel leading the witness and coaching the
25 witness.

Page 87

1      Q. (BY MR. SALAZAR) Mr. Nickoloff, you can answer
2  the questions; and if you need to explain them, explain
3  them; okay?
4      A. Yes, sir.
5      Q. But some of these questions are yes or no answers.
6      A. Yes, sir.
7          MR. BROWN: And some of them aren't.
8      A. Did we thoroughly kick that around enough? I want
9  to make sure you understand that I accepted the -- the
10 report being offered.
11     Q. (BY MR. SALAZAR) Okay.
12     A. Not the content of the report.
13     Q. Mr. Nickoloff, I'm going to -- I'm going to refer
14 you to report No. 14, which is dated December 23rd, 2002.
15 We're going to mark that as --
16     A. I'm sorry. What date again, sir?
17     Q. December 23rd, 2002, Nickoloff Exhibit No. 14.
18     A. Okay.
19     Q. And this is over a year after the claim had been
20 made by the Brownsville School District; correct?
21     A. That's correct.
22     Q. And a year later had you provided the Brownsville
23 Independent School District with a proof of loss claim form?
24     A. No, sir.
25     Q. A year later had Royal Insurance directed you to

Page 88

1  hire an engineering firm to investigate the cause of the
2  loss?
3      A. No, sir. We were still waiting for the reports to
4  come from BISD.
5      Q. Did -- a year later did you provide the
6  Brownsville School District with any guidance or direction
7  as to the claim process?
8      A. No, sir. As I said earlier, I assumed their
9  attorney would be providing any guidance they needed.
10     Q. And again, a year later, you're telling -- on your
11 report to Royal you're telling -- you're telling Royal that
12 an -- that you need an engineering study, that without an
13 engineering study that the -- it will be impossible to -- it
14 would not be possible to determine the causation of the
15 ongoing problem; correct?
16         MR. BROWN: Objection. Form.
17     Q. (BY MR. SALAZAR) Is that correct?
18     A. That is correct. We also suggested that we were
19 waiting for original reports and inspections that were done
20 months prior to that.
21     Q. Do you know whether -- whether reports had been
22 done prior to that?
23     A. At that point in time I only knew what I was
24 reading in the newspaper articles, that studies had been
25 done and that they were somewhere. We didn't know where.

Page 89

1  That's why I kept requesting them from Mr. Saldana,
2  Constant & Vela.
3      Q. And again, whose duty and responsibility is it to
4  investigate a claim? Is it the insured, like Brownsville
5  Independent School District, or the insurer, like Royal?
6          MR. BROWN: Objection to form.
7      A. It would be the insurer.
8      Q. (BY MR. SALAZAR) That would be Royal?
9      A. Right.
10     Q. So it would be Royal's duty and responsibility to
11 investigate a claim such as this; correct?
12     A. Right.
13         MR. GAIBLE: Objection. Form.
14     A. And part of that investigation would be to request
15 the documents that the insured currently was holding.
16     Q. (BY MR. SALAZAR) Mr. Nickoloff, I'm going to
17 direct your attention to Nickoloff Exhibit No. 15, which is
18 report No. 15, dated January 22nd, 2003.
19     A. Okay. Thank you.
20     Q. Do you see that document, sir?
21     A. Yes, sir.
22     Q. Okay. On January 22nd, 2003 -- no. Is this the
23 first time that you provided the Brownsville Independent
24 School District with a proof of loss claim form?
25     A. I'm not sure of the date. What was the date, sir?

23 (Pages 86 to 89)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

# DENNIS NICKOLOFF — April 26, 2005

Page 90

1  Are you reading from --
2      Q.  January 22nd, 2003.
3      A.  -- you're reading from the last paragraph of
4  the -- or the second -- or the first paragraph in the
5  adjustment caption where it says they have requested a proof
6  of loss and we are currently forwarding it to them?  Is that
7  what your question is based on?  I'm sorry.
8          MR. BROWN:  It's on the --
9      Q.  (BY MR. SALAZAR)  What page are you --
10     A.  Third page, sir.
11     Q.  Third page.
12     A.  Adjustment caption, first paragraph, last
13 sentence.
14     Q.  That's correct, on page 3.  Is this the first time
15 that -- that you were going to provide the Brownsville
16 School District with a proof of loss claim form?
17     A.  Yes.  I believe Ramon Garcia requested a proof of
18 loss form, and we faxed it immediately to his office.
19     Q.  Prior to this date, approximately a year and a
20 month -- a year and two months later, you had not provided a
21 proof of loss claim to the Brownsville School District;
22 correct?
23     A.  No.  Had it been requested at that time, at any
24 time between now and then, I would have certainly done so.
25     Q.  Whose duty is it to provide a proof of loss claim,

Page 91

1  is it the insured, the Brownsville School District, or was
2  that Royal's responsibility to provide a proof of loss claim
3  form?
4          MR. BROWN:  Objection to form.
5      A.  I believe that would be Royal's duty to provide
6  them a blank form.
7      Q.  (BY MR. SALAZAR)  And would you agree with me that
8  Royal breached their duty in not providing a form in -- in
9  over a year?
10         MR. BROWN:  Objection to form.
11     A.  I'm not sure I can answer that.
12     Q.  (BY MR. SALAZAR)  Okay.  Now, when Mr. Garcia and
13 my office got involved, approximately January of 2003, the
14 school district provided you with all the reports that it
15 had at that time; correct?
16         MR. BROWN:  Objection to form.
17     A.  I don't know -- I -- I don't know the answer to
18 that.  I picked up -- let me answer it this way.  I picked
19 up the forms that you provided at Mr. Garcia's office.  If
20 those were all the reports, if you are representing those
21 were all the reports, then yes, I'll answer your question
22 yes, I picked up all the reports.
23         MR. BROWN:  I would just point out that's
24 somewhat in dispute.
25         THE WITNESS:  Okay.

Page 92

1      Q.  (BY MR. SALAZAR)  Is -- at this point when you met
2  with Mr. Garcia and myself, Mr. Garcia also handed you a
3  demand for the loss; correct?
4      A.  Yes.  I believe that was on one of the cover pages
5  that was on top of the pile of --
6      Q.  Right.  If you look at Nickoloff Exhibit No. 15,
7  if you look at the fourth page --
8      A.  Stop.  I'm -- all I have is the report.
9      Q.  Okay.
10     A.  I don't have the enclosures that were attached to
11 it; so...
12         MR. BROWN:  Let me just -- I don't think you
13 marked that, Baltazar.  I don't know if you meant to.
14         MR. SALAZAR:  I left that as Exhibit No. 15.
15         MR. BROWN:  Okay.  You never -- I mean, am I
16 wrong?  Correct me.  I don't think you ever said that I want
17 this to be marked.  You need to identify it for the record.
18     Q.  (BY MR. SALAZAR)  Mr. Nickoloff, I previously
19 asked you to review the 15th report, which is dated January
20 22nd, 2003; correct?
21     A.  Correct.
22     Q.  And part of that report has, after the end of the
23 report there is a letter dated January 22nd, 2002; and I
24 believe that's a misprint.  It should be January 22nd, 2003,
25 from Mr. Garcia; correct?

Page 93

1      A.  I've just been handed that letter, yes, sir.
2      Q.  Okay.  You agree with me that that should have
3  been 2003, not 2002?
4      A.  Correct.
5      Q.  Okay.  And in that letter Mr. Garcia tells you
6  about the documents and any studies that he has provided on
7  that day; correct?  And there's four documents that he
8  provided; correct?
9      A.  Yes.
10         MR. BROWN:  Objection to form.
11     A.  He lists the documents and makes a conservative
12 figure demand in this third paragraph of $10 million.
13     Q.  (BY MR. BALTAZAR)  Okay.
14     A.  It's listed as an enclosure on that 15th report
15 and January 22nd, 2003.
16     Q.  At this point did you have a recommendation as to
17 Royal as to whether Royal should accept or deny the
18 10-million-dollar demand?
19     A.  No, sir.
20     Q.  Was that part of your scope?
21     A.  No, sir.
22     Q.  Okay.  At this point was part of your scope
23 reviewing what may or may not be covered in the policy?
24         MR. BROWN:  Objection to form.
25     A.  No, sir.

24  (Pages 90 to 93)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

| Page 94 | Page 96 |
|---|---|

**Page 94**

1    Q.  (BY MR. SALAZAR) And when I say covered, I mean a
2  covered loss within the policy. Were you ever asked by
3  Royal to make that assessment?
4    A.  No, sir.
5    Q.  Okay. And up until this point, had you had any
6  communication with Royal's attorneys? When I'm talking --
7  and I'm talking about this point, January 22nd, 2003.
8       MR. BROWN: Objection to form.
9    A.  I can't remember the date, so I'd have to look for
10  the activity notes in order to answer that question
11  properly.
12       MR. BROWN: Yeah. I'll state that that will
13  be reflected on the privilege log that we've produced.
14    Q.  (BY MR. SALAZAR) Do you have a copy of -- of
15  where your entries would be where you spoke to an attorney?
16  And I'm not asking you to tell me what they said, but my
17  question is, could you show me where you documented that you
18  spoke to an attorney for Royal or for Beirne, Maynard &
19  Parsons?
20    A.  I'll look through my file.
21    Q.  Okay. That's fine.
22    A.  Give me a second.
23       MR. BROWN: Go off the record for a second.
24       (Discussion off the record.)
25    A.  All I can tell you is there's a date between

**Page 95**

1  January 24th and Decem- -- February 18th.
2    Q.  (BY MR. SALAZAR) January 24th of what year, sir?
3    A.  2003. And 2-18 of 2003. There's some redacted
4  material there, and that's probably contacting -- our
5  contact with attorneys representing Royal.
6    Q.  Do you have your complete, I guess, entry -- entry
7  sheet? Is that your complete entry sheet for this file?
8    A.  Yes, sir, it is.
9       MR. GAIBLE: No. It's --
10    A.  It's redacted, but, I mean, this is the --
11    Q.  (BY MR. SALAZAR) Right. I mean, other than
12  redacted part --
13    A.  Is this it? Is this what you're asking me, is
14  this all of the activity notes that I generated?
15    Q.  Yes, sir.
16    A.  Yes, it is.
17    Q.  And that would be from the very first date to the
18  very last date? And I'll say the very first date would be
19  around December the 5th, 2001, to sometime in 2003?
20    A.  Now, are you asking me are they -- are all those
21  pages in this pile?
22    Q.  Well, my question is, did you have a -- did you
23  have a ledger where you would write down separate from the
24  reports where you'd say -- an activity log, say on this date
25  I received a report, and maybe not write, maybe just --

**Page 96**

1  maybe one sentence. Do you have a document like that?
2    A.  Yes, sir. That's what you're looking at here.
3  These activity notes represent that.
4    Q.  And those activity notes, may I -- may I look at
5  them, please? Are there any other activity notes other than
6  the three pages that you have handed over to me?
7    A.  Well, yes. They're in here.
8    Q.  Okay. Could you pull all the activity notes,
9  please, that you've got in this file.
10    A.  Sure.
11    Q.  Starting from Day One.
12       MR. GAIBLE: Put this over here.
13       THE WITNESS: Yeah, because that's not part
14  of this file.
15       MR. BROWN: I've got 5240 through 5248.
16       MR. GAIBLE: I've got 5246.
17       THE VIDEOGRAPHER: Mr. Salazar, I'm down to
18  less than 10 minutes of tape.
19       MR. SALAZAR: Let's get off the record.
20       THE VIDEOGRAPHER: It's 11:31 a.m. We're
21  off the record.
22       (Short recess.)
23       MR. BROWN: Just as a housekeeping matter,
24  just to make sure, we have agreed that the GAB report
25  No. 14, the 14th report dated December 23, 2002, which is a

**Page 97**

1  two-page document, is to be marked and to be considered
2  Exhibit No. 14.
3       MR. SALAZAR: Correct.
4       MR. BROWN: And then similarly, GAB report
5  entitled 15th report and dated January 22nd, 2003, is to be
6  considered Exhibit No. 15, and that that is a four-page
7  document, the last page of which is RSL 2377, which is the
8  letter from Ramon Garcia that was misdated January 22nd,
9  2002, and should have been January 22nd, 2003.
10       MR. SALAZAR: That is correct.
11       MR. BROWN: Okay. And then did you want
12  to -- we haven't gotten into this next one, have we, or did
13  we?
14       MR. SALAZAR: I don't believe so.
15       MR. BROWN: Okay.
16       THE VIDEOGRAPHER: It's 11:39 a.m. We're
17  back on the record.
18    Q.  (BY MR. SALAZAR) Mr. Nickoloff, the last time
19  before we went off the record, I asked you to review all of
20  your entries, starting from December the 5th, 2001, to your
21  last entry. Do you have those entries, sir?
22    A.  Yes, I do.
23    Q.  Could you please hand those to me.
24    A.  Uh-huh.
25    Q.  Mr. Nickoloff, I'm going to mark these as

25 (Pages 94 to 97)

NEW   CENTURY   REPORTING
(713)  626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

Page 98

1   Nickoloff Exhibit No. 25; and that will be one, two, three,
2   four, five, six, seven, eight, nine pages which are entitled
3   activity report; okay?
4           MR. BROWN:  Okay.  And let the record
5   reflect that we've now jumped from Exhibit 14 to Exhibit 25.
6           MR. SALAZAR:  That's correct.  But we have
7   a -- we had a prior Exhibit 24.  We will get to --
8           (Exhibit No. 25 was marked for
9           identification and is attached hereto.)
10  Q.  (BY MR. SALAZAR)  Mr. Nickoloff, Exhibit --
11  Nickoloff Exhibit No. 25, are -- are those entries in
12  chronological order from the very first entry to the very
13  last entry?
14  A.  Back to front, yes, sir, they are.
15  Q.  Okay.  And do you have any dates on -- on your
16  first activity report?
17  A.  The first activity note, is that what you're
18  asking for?
19  Q.  Yes, sir.
20  A.  12-3-01.
21  Q.  Okay.  So on 12-3-01, had you been contacted by
22  any of Royal's Insurance -- by any of the attorneys for
23  Royal Insurance?
24  A.  No, sir.
25  Q.  Okay.  Had you been in contact with Mr. Jay Brown

Page 99

1   or Stephen Wedemeyer with -- with Beirne, Maynard & Parsons?
2   A.  No, sir.
3   Q.  Had you been in contact with anybody from Hays,
4   McConn and --
5           MR. GAIBLE:  Rice & Pickering.
6   Q.  (BY MR. SALAZAR) -- Rice & Pickering?
7   A.  No, sir.
8   Q.  Okay.  When was the first time that an attorney
9   other than the attorney for the school district were
10  involved in sending you a letter or talking to you in
11  reference to this case?
12  A.  May I?
13  Q.  Yes, sir.
14  A.  I can't answer that question.  Because of the
15  redactions, I can't tell when the date was.
16  Q.  Okay.  Was it -- had you been in contact with any
17  attorneys on behalf of Royal on January 22nd, 2003, for the
18  time that -- that Mr. Garcia presented you a package?
19  A.  I was in contact with Mr. Brown's firm at that
20  time.
21  Q.  Okay.
22  A.  Is that what you're asking?
23  Q.  Yes, sir.
24  A.  Yes, sir.
25  Q.  That was in January of 2003; correct?

Page 100

1   A.  Correct.
2   Q.  Okay.  When was the first time that you spoke with
3   Mr. Brown or anybody from Beirne, Maynard & Parsons?
4   A.  I could -- I can't tell you, sir.  The redactions
5   make it impossible for me to tell what the date was.  If
6   you're asking approximately, I -- I really can't even
7   approximate it.
8   Q.  Had you been talking to Mr. Jay Brown in -- in
9   2001?
10  A.  I don't think so.
11  Q.  How about in 2002, before the EFI report was
12  presented to you?
13  A.  I don't think so.  There was another law firm
14  involved that we were talking to, Willette & Guerra in
15  Brownsville at some point in time, but I don't remember when
16  that was either.
17  Q.  In your summaries, in your reports prior to
18  January of 2003, are there any indications on there that you
19  talked to an attorney in reference to either defending this
20  case or anticipating litigation?
21  A.  Are you asking if there's any reflections of that
22  in my file notes?
23  Q.  Yes, sir.
24  A.  These activity notes?
25  Q.  Yes, sir.

Page 101

1   A.  Not that I can see, because of the redactions.
2   Q.  How about in your reports?
3   A.  We'd have to go through them and look at what's
4   mentioned in the reports.  I don't know.  We'd have to
5   physically go through them to --
6   Q.  Okay.
7   A.  -- answer that question for you.
8   Q.  Could you physically go through them and tell me
9   when the first time an attorney is mentioned or -- and
10  again, I don't want to know the content of what went on.
11  And I know it's redacted, but at what point were attorneys
12  involved in this file?
13          MR. BROWN:  You mean attorneys other than
14  BISD attorneys?
15          MR. SALAZAR:  Yes.
16  Q.  (BY MR. SALAZAR)  Attorneys for -- at what point
17  were attorneys for Royal Insurance first involved in this
18  case?
19  A.  Just so you know, it's going to take a while,
20  because these are out of order.  I'll have to go through
21  them.  And I don't mind doing it for you.  That's not a
22  problem.
23  Q.  That's fine.
24  A.  But make sure it's still -- okay.
25          MR. GAIBLE:  Have you got them in order that

26 (Pages 98 to 101)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

| | |
|---|---|
| **Page 102** | **Page 104** |

**Page 102**

1 he can look at? If he can look through that --
2          THE WITNESS: That might help.
3          MR. GAIBLE: -- it might save some time.
4          THE WITNESS: Yes, sir. Exactly.
5          MR. BROWN: Let's go -- can we go off the
6  record, Baltazar?
7          THE VIDEOGRAPHER: It's 11:45 a.m. We're
8  off the record.
9             (Brief interruption.)
10         THE VIDEOGRAPHER: It's 11:46 a.m. We're
11 back on the record.
12    A. I'll answer this as best I can for you.
13    Q. (BY MR. SALAZAR) Okay. Let me -- and let me
14 repeat the question so we're clear.
15    A. Go ahead.
16    Q. After having reviewed your -- your reports, your
17 monthly reports, when was the first time that you can
18 remember, based on your reports, that Royal's attorneys were
19 involved in this case?
20    A. That's another question. I'm going to say
21 sometime prior to January of 2003, but it's speculative. I
22 don't know -- I can't tell you the exact date.
23    Q. If --
24    A. Let me finish answering. My February 24th report
25 has a redaction on the heading, which indicates I was

**Page 103**

1  copying probably Mr. Brown's firm or someone with my report
2  at that point in time. But I know that we had conversations
3  prior to that, but I can't tell you the dates.
4          MR. BROWN: Let me point something out just
5  for the record and also if this helps. The -- and it -- and
6  it may not. This is on your January 22nd report at the end.
7          THE WITNESS: Yes, sir.
8          MR. BROWN: You ask Mr. Schwartz to advise
9  if you now wish to seek out defense counsel for policy
10 interpretation and recommendations. I don't know if that
11 helps or not.
12    A. So it would be sometime between the January 22nd
13 date, Mr. Brown is saying, and the February 24th date when
14 their firm was consulted.
15    Q. (BY MR. SALAZAR) Okay. So --
16    A. That doesn't mean we didn't have prior
17 consultations with other attorneys.
18    Q. Right. But prior -- prior to January --
19 approximately January 22nd, 2003, you were not given any
20 direction by Beirne, Maynard & Parsons, Mr. Jay Brown or
21 Mr. Steve Wedemeyer, as to how to handle this claim;
22 correct?
23    A. That's correct.
24    Q. And prior to January 2003 you weren't given any
25 direction by Royal's attorneys as to what was covered and

**Page 104**

1  what was not covered and what the policy language included;
2  correct?
3    A. That's correct.
4    Q. And prior to January 2003 -- 22nd, 2003, you were
5  not given any direction as to how to handle this case in
6  case of litigation on behalf of Royal's attorneys; correct?
7    A. That's correct.
8    Q. Okay. And sometime after January 22nd, 2003,
9  which would have been at the point where Mr. Garcia
10 requested a proof of claim; correct?
11   A. Proof of loss, yes, sir.
12   Q. Proof of loss. And at the point that Mr. Garcia
13 made a 10-million-dollar demand; correct?
14   A. That's correct.
15   Q. At that point, you as a professional adjuster,
16 make a notation to Royal Insurance, telling them do you
17 think it would be prudent to bring in some attorneys to
18 review this file; correct?
19   A. Right. We had asked them previous to this about
20 defense counsel, and they were considering selecting the
21 defense counsel. When the final document -- when the
22 documentation was finally submitted by Mr. Garcia's office,
23 along with the demand letter and the proof of loss I think
24 which followed on the following day or two, whatever it was,
25 that information was then sent to this firm that was

**Page 105**

1  selected by Royal Insurance, which was Mr. Brown's firm.
2    Q. Okay. And what was Mr. Brown's -- what was the
3  scope of Mr. Brown's firm in assisting you, if you know?
4    A. I don't know.
5    Q. Okay. Did -- was Mr. Brown and Mr. Wedemeyer with
6  Beirne, Maynard & Parsons, were they going to assist you in
7  investigating this -- this claim for the Brownsville School
8  District?
9    A. It was my understanding they were going to assist
10 Royal. I don't know to what capacity, though.
11   Q. Okay. And that's again January 2003; correct?
12   A. Yes, sir.
13   Q. At what point did you realize that there may be
14 litigation involving this file? And if you could go back
15 and review your reports, at what point did you think there
16 may be litigation?
17   A. I'm not sure you're going to find any reflection
18 of any litigation in -- in my reports.
19   Q. In any of your reports?
20   A. I don't think so. Let me look back through them.
21 I have to --
22   Q. Okay.
23   A. Let me be sure.
24         MR. BROWN: There was not litigation
25 until -- was it June, Baltazar, of 2003?

27 (Pages 102 to 105)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF   -   April 26, 2005

Page 106

1      MR. SALAZAR: Yes.
2      A. I don't think there's any reports that reflect
3   anything after that time. That's what I'm trying to say.
4      Q. (BY MR. SALAZAR) Before that time.
5      MR. BROWN: Before that time there wasn't
6   any litigation.
7      A. Any litigation, right.
8      Q. (BY MR. SALAZAR) Okay. Well -- so you were
9   not -- as an adjuster, you weren't anticipating any
10  litigation from -- from Royal's point of view as to being
11  sued by the school district at any point; correct?
12     A. No, sir, that's correct.
13     Q. And even after you found out that -- that the
14  attorneys representing Royal had requested examinations
15  under oath, even at that point you didn't believe that there
16  was litigation; correct?
17     A. Well, I had no part in it. I had no part in the
18  claim process after that point.
19     Q. At what point did you cease to be the claims
20  adjuster for Royal on this file?
21     A. I continued to have an open file on this matter;
22  but as far as active handling of the claim or providing any
23  more information, that ceased around the same date that the
24  submission of the proof of loss was made.
25     Q. And that would be?

Page 107

1      A. Somewhere around January of '03, sir.
2      Q. Somewhere between January of -- January 22nd,
3   2003, and February 22nd, 2003; correct?
4      A. Probably so, yes, sir, that area.
5      Q. And at that point is when a law firm took over the
6   investigation and the handling of the claim, as far as you
7   knew; correct?
8      MR. BROWN: Objection to form.
9      A. As far as I know, yes, sir.
10     Q. (BY MR. SALAZAR) Okay. Were you ever told by any
11  attorney on either side that there was going to be a lawsuit
12  filed?
13     A. No, sir.
14     Q. Were you ever told that by the Royal Insurance
15  attorneys, that a lawsuit was going to be filed against the
16  school district?
17     MR. GAIBLE: Let me -- let me object. Jay,
18  I don't know to what extent we've got attorney-client
19  communications.
20     MR. BROWN: Let me object to the extent the
21  question calls for attorney-client discussions, and it
22  appears to call for attorney-client discussions. However, I
23  also advise that Mr. Nickoloff was never advised in any way
24  about the declaratory action until -- I guess he learned of
25  it in some -- at some point after it was filed.

Page 108

1      Q. (BY MR. SALAZAR) So it's fair to say that you
2   were never advised by Mr. Jay Brown or Steve Wedemeyer that
3   a lawsuit was pending; correct?
4      A. That's correct.
5      Q. When did you first find out that there was a
6   lawsuit involved with the Brownsville School District? And
7   I'm talking about a lawsuit involving Royal Insurance.
8      A. I don't know if I can answer that. If I dig
9   through paperwork -- see, these -- these reports end at a
10  certain date.
11     Q. What is -- what is the last report that you
12  actively submitted?
13     A. You're talking about the last report in your
14  material here?
15     Q. Or in your material.
16     A. Okay. The last report that you have here is -- is
17  numbered my 19th report, which may be incorrect, dated May
18  16 of '03. And the adjustment caption indicates that we
19  received a copy of an e-mail confirming EUOs to be taken on
20  May 29th and 30th. That's pretty much the last activity I
21  had of any merit. I mean, the file was still open
22  technically, but --
23     THE WITNESS: Do we have reports beyond that
24  point in time?
25     MR. BROWN: Beyond that point in time there

Page 109

1   were dec actions filed and matters making it privileged.
2      THE WITNESS: Okay.
3      Q. (BY MR. SALAZAR) Mr. Nickoloff, I'm going to hand
4   you what I'm going to mark as Nickoloff Exhibit No. 26.
5      (Exhibit No. 26 was marked for
6      identification and is attached hereto.)
7      MR. BROWN: Using both hands in the same
8   song?
9      MR. SALAZAR: That has nothing to do with
10  it.
11     MR. BROWN: Exhibit 26 is the first two
12  pages of Exhibit 26 and has nothing to do with the back of
13  that first page --
14     MR. SALAZAR: That's correct.
15     MR. BROWN: -- is that correct?
16     THE WITNESS: Mr. Brown, you were asking
17  about No. 24. This is No. 24.
18     MR. BROWN: Thank you.
19     THE WITNESS: Okay.
20     Q. (BY MR. SALAZAR) Mr. Nickoloff --
21     A. Yes, sir. Sorry, I had to look.
22     Q. -- you've had a chance to review Nickoloff Exhibit
23  No. 26. Do you recognize that document?
24     A. Yes. I believe it was a copy sent to me by e-mail
25  of communication.

28  (Pages 106 to 109)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

Page 110

1    Q.  Okay.  And that -- that e-mail is from Mr. Brown's
2  office, Beirne, Maynard & Parsons, to my office requesting
3  more documentation to continue the investigation of the
4  schools; correct?
5        MR. BROWN:  I need to object to the form.
6    A.  That's what it appears to be, yes, sir.
7    Q.  (BY MR. SALAZAR)  Okay.  And earlier you said that
8  there was a -- the last report that you have in your file is
9  the 19th report, dated May 16th, 2003; correct?
10   A.  I believe that's the last one that we have in the
11  file; yes, sir.
12   Q.  And that would be a month after -- a month and a
13  half after Nickoloff Exhibit No. 26; correct?
14   A.  Well, this is dated 4-1, and the last
15  communication --
16   Q.  -- was 5-16 of '03.
17   A.  You're saying the last report I had was 5-16?
18   Q.  Yes, sir.
19   A.  Okay.  Oh, yes, sir.  I'll agree with that, yes,
20  sir.
21   Q.  Okay.  Now, I've marked your last report.  It's
22  marked as Nickoloff Exhibit No. 19; and it's, again, the
23  May 16th, 2003.  And I've also marked Nickoloff Exhibit
24  No. 18, marked -- marked April 24th, 2003, 18th report.
25  I've also marked Nickoloff Exhibit No. 17, which is dated

Page 111

1  March 25th, 2003.  And I've also marked Nickoloff 16, which
2  is dated February 24th, 2003.  Again, it's the 11th report.
3  Going through all of those reports, Exhibit No. 17
4  through -- through -- through 19, which would be basically
5  all of your reports after January 22nd, 2003, to May 16th,
6  2003, roughly, you made a report every month; correct?
7    A.  Correct.
8    Q.  Okay.  The last report on May 16th, 2003, would
9  have been approximately a year and six months after the
10  initial claim; correct?
11   A.  Okay.
12   Q.  A year and six months after the initial
13  claim, did Royal Insurance ever ask you to hire an
14  engineering firm to find the cause of loss for this claim?
15   A.  No.  I think we were submitting the documents that
16  you provided for that purpose.
17   Q.  So they did not?
18   A.  They did not.
19   Q.  Okay.  And --
20       MR. BROWN:  I need to -- we need to nail
21  down what is in Exhibit No. 16 whenever you get to that
22  point.
23   Q.  (BY MR. SALAZAR)  And from -- from December the
24  5th, 2001, all the way to May 16th, 2003, you agree with me
25  that you had not provided any guidance and direction for the

Page 112

1  Brownsville School District as to how to process this claim?
2    A.  No.  As I've said, they were represented by
3  counsel the entire time.  I certainly wouldn't supersede
4  their instructions or recommendations from their own
5  attorneys.
6    Q.  And from December the 5th, 2001, through May 16th,
7  2003, did Royal instruct you to hire a certified industrial
8  hygienist?
9    A.  No, sir, they did not.
10   Q.  Did -- from December the 5th, 2001, to May 16th,
11  2003, did Royal ask you to hire any roof experts to -- to
12  find the possible cause of loss?
13   A.  No, sir.  We -- I -- guess what they assumed, as I
14  did, that those -- that information would be contained in
15  the engineering reports that they had done.
16   Q.  Right.  But they -- but they did not instruct you
17  to hire any roof expert -- experts; right?
18   A.  That's correct.
19   Q.  Now, did Royal Insurance from December the 5th,
20  2001, to May 16th, 2003, instruct you to hire an embolo
21  [phonetic] or structural engineer to assess the cause of
22  loss at Aiken and Besteiro?
23   A.  No, sir.
24   Q.  Did Royal Insurance from December the 5th, 2001,
25  to May 16th, 2003, ever instruct you to hire any

Page 113

1  construction company to get an estimate for the loss
2  involved?
3    A.  No.  Again, we assumed that would be contained in
4  the package that was going to be provided by BISD.
5    Q.  Okay.  Did Royal Insurance, from May -- from --
6  from December the 5th, 2001, to May 16th, 2003, ever offer
7  to pay for the engineering reports which were produced by
8  EFI?
9    A.  Not that I'm aware of, sir.
10   Q.  Okay.  And do you know whether Royal Insurance or
11  yourself at any time sat down and discussed with the
12  Brownsville School District the relationship between -- and
13  I'm talking about the relationship as you know it -- the
14  relationship between GAB Robins and EFI, Engineering and
15  Fire Investigation -- Investigators?
16   A.  I did not.  I don't know if -- if Royal did or
17  not.  You asked both, the same question.
18   Q.  Right.  Do you -- would that -- is -- is that
19  communication reflected on any of your 19 reports?
20   A.  I'm sorry.  Is what?
21   Q.  Is the communication between Royal and the
22  Brownsville School District advising the school district of
23  the relationship between GAB Robins and EFI, is that
24  documented anywhere in your 19 reports?
25   A.  No, it's not.

29 (Pages 110 to 113)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

Page 114

1    Q.  During this approximately a year and a half, a
2  year and six months from your first report to your last
3  report, did you ever provide the Brownsville School
4  Districts with a -- with a status letter?
5    A.  No, sir.
6    Q.  At some point you -- you realized that the
7  Brownsville School District was going to remediate Aiken and
8  Besteiro; correct?
9    A.  From what I was reading in the newspaper, yes,
10  sir, that's correct.
11    Q.  Okay.  Did you make any attempts to contact the
12  school district and ask them about what was going on in the
13  schools?
14    A.  Well, they were --
15        MR. BROWN:  Objection to form.
16    A.  Most certainly.  They were represented by counsel
17  the entire time.  I would not call BISD in violation of
18  that.  So I would contact their attorneys, and I assume
19  their attorneys would contact me if they wanted to tell me
20  something.
21    Q.  (BY MR. SALAZAR)  And again, throughout this whole
22  period of time, December 5th, 2001, and May 16th, 2003, you
23  agree with me that the responsibility and the duty to
24  investigate this claim and to find out the cause of loss was
25  on Royal Insurance; correct?

Page 115

1        MR. BROWN:  Objection. Form.
2    A.  Yes.
3    Q.  (BY MR. SALAZAR)  Did you write any memos to
4  Royal's legal department at any time?
5        MR. BROWN:  Objection to form.
6    A.  I don't -- I don't know what you mean. I'm sorry.
7    Q.  (BY MR. SALAZAR)  Did you ever get a letter and
8  direct it to Royal Insurance -- to the attorneys for Royal
9  Insurance?
10    A.  Did I prepare a letter --
11    Q.  Yes.
12    A.  -- sending it to Royal Insurance's attorneys?
13    Q.  Yes.
14    A.  Is that what you're saying?
15    Q.  At any time.
16        MR. BROWN:  Objection. Form. I'm not sure
17  I understand your question, Baltazar.
18    A.  I'm not sure I understand -- I'm not sure if I
19  remember I did that or not.
20        MR. BROWN:  All of his communications that
21  are producible but not privileged have been produced.
22    A.  Is that what you're asking?
23    Q.  (BY MR. SALAZAR)  My question is, did you ever sit
24  down and write a memo to address to Royal's legal counsel?
25  Yes or no?

Page 116

1        MR. BROWN:  Objection. Form.
2    A.  I don't recall doing so.
3    Q.  (BY MR. SALAZAR)  Okay.  Do you ever remember
4  Royal's legal counsel sending you a letter or a memorandum
5  as to how to handle the claim, at any time?
6        MR. BROWN:  Objection. Form.
7    A.  Not that I recall, no, sir.
8    Q.  (BY MR. SALAZAR)  And that would be the time --
9  the time period I'm talking about is from December the 5th,
10  2001, to May the 16th, 2003.  You never remember a letter
11  coming from Royal Insurance's attorneys directing you on how
12  to handle the claim; correct?
13        MR. BROWN:  Objection. Form.
14    A.  That's correct.
15    Q.  (BY MR. SALAZAR)  Do you ever remember any letters
16  that you received from -- and I don't want to know the
17  content, but any letters from Mr. Jay Brown's office or
18  Steve Wedemeyer's office with Beirne, Maynard & Parsons, do
19  you remember them -- these attorneys sending you a letter
20  advising you how to handle the claim?
21        MR. BROWN:  Objection. Form.
22    A.  No, sir.  Are you talking about this e-mail?
23  These are copies of an e-mail.  That's the only thing I
24  would -- I can think that would even vaguely match your
25  description.

Page 117

1    Q.  (BY MR. SALAZAR)  Would you still have that e-mail
2  saved somewhere on your computer, Mr. Nickoloff?
3    A.  Possibly.
4    Q.  What is the policy, your office policy as far as
5  keeping e-mails on a separate -- on a file?
6    A.  We have no computer policy.  My policy is I don't
7  delete e-mails on any active or open files.
8    Q.  So if --
9    A.  Or pending litigation.
10    Q.  Right.  So, for example, this case, you still
11  have -- you would still have open e-mails --
12    A.  Yes, sir.
13    Q.  -- on this file; correct?
14        MR. BROWN:  Objection to form. Calls for
15  speculation.
16    A.  I would assume they're still there, yes, sir.
17    Q.  (BY MR. SALAZAR)  Okay.  And if -- if I were to in
18  the near future ask you to produce those e-mails, you
19  wouldn't have a problem with that, assuming that they're not
20  privileged by attorney-client privilege?
21    A.  I believe I've already done that.
22    Q.  You've provided all the e-mails, sir?
23    A.  I believe we've already done that, yes, sir.
24    Q.  Would you keep a separate -- when you open up a
25  file, Mr. Nickoloff, would you keep a separate folder, a

30 (Pages 114 to 117)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

| Page 118 |
|---|
| 1  separate pouch with legal correspondence versus your regular |
| 2  file? |
| 3      A.  No, sir. |
| 4      Q.  At what point -- and you may have already answered |
| 5  this, but at what point did you conclude your investigation |
| 6  on behalf of Royal Insurance? |
| 7      A.  In my opinion? |
| 8      Q.  Yes, sir. |
| 9      A.  Would have been after I forwarded the documents to |
| 10  Mr. Brown's office for analysis or whatever was going to |
| 11  happen to them. |
| 12      Q.  (BY MR. SALAZAR)  That would be sometime between |
| 13  January 22nd, 2003, and February 2003; correct? |
| 14      A.  Somewhere in that time period, yes, sir. |
| 15      Q.  Would it -- that have extended over to April of |
| 16  2003 as the e-mail suggests? |
| 17      MR. BROWN:  Objection.  Form. |
| 18      Q.  (BY MR. SALAZAR)  And I'm talking about Exhibit |
| 19  No. 26. |
| 20      MR. GAIBLE:  Objection.  Form. |
| 21      A.  I don't know what you mean.  I don't know why I |
| 22  was copied on this.  I was not actively doing anything on |
| 23  the file at that time, so if you want to rephrase your |
| 24  question, I'll try and answer it better. |
| 25      Q.  (BY MR. SALAZAR)  Well, that e-mail was documented |

| Page 119 |
|---|
| 1  in one of your reports; correct? |
| 2      A.  Probably so.  I don't know.  I'll have to -- do |
| 3  you know which report it was?  I may have mentioned |
| 4  receiving it in the report, as I did with the examinations |
| 5  under oath. |
| 6      Q.  And I'm talking about Nickoloff Exhibit No. 18, |
| 7  the second page.  You go in and you document the e-mail |
| 8  under adjustment; correct? |
| 9      A.  Correct. |
| 10      Q.  And I'm talking about you document the e-mail |
| 11  which is Exhibit No. 26? |
| 12      A.  Yes, sir. |
| 13      Q.  Okay.  Now, on your next report, which is |
| 14  Nickoloff Exhibit No. 19, is your final report, correct, the |
| 15  May 16th, 2003, report? |
| 16      A.  No, it's not my final report.  It's the final |
| 17  report that was produced. |
| 18      Q.  Do you have a -- more reports that have not been |
| 19  produced? |
| 20      A.  There are -- |
| 21      MR. BROWN:  Let me just say that every |
| 22  matter not produced has been described in the privilege log |
| 23  that's been produced in this case, and those objections have |
| 24  been ruled upon and sustained by Judge Hanen. |
| 25      Q.  (BY MR. SALAZAR)  I don't want to know about the |

| Page 120 |
|---|
| 1  content.  I just want to know is there more reports past the |
| 2  May 16, 2003. |
| 3      A.  I believe there are. |
| 4      Q.  Would there be a continued monthly report to date? |
| 5      A.  I believe there is. |
| 6      Q.  So from May -- |
| 7      MR. BROWN:  Let me object to the form and |
| 8  caution the witness not to speculate.  The witness does not |
| 9  have the -- |
| 10      MR. SALAZAR:  I object to counsel coaching |
| 11  the witness. |
| 12      MR. BROWN:  Well, I mean, really, Baltazar, |
| 13  it's all spelled out in the privilege log, and you're asking |
| 14  him to speculate and he doesn't have that stuff before him. |
| 15  The privilege log indicates that you've got report No. 20 in |
| 16  July and then it goes up through -- |
| 17      THE WITNESS:  This is dated May 16th. |
| 18      MR. BROWN:  And that there are a few more. |
| 19      Q.  (BY MR. SALAZAR)  So there is more reports other |
| 20  than report No. 19; correct? |
| 21      A.  I -- I don't -- I don't know what we -- what else |
| 22  is here in this pile or if this is all the reports.  I don't |
| 23  know. |
| 24      Q.  Is there any way -- |
| 25      A.  I just don't know. |

| Page 121 |
|---|
| 1      Q.  -- you could check on your file that you brought |
| 2  today to find out if that's all? |
| 3      A.  I didn't bring a file.  All I have is what's |
| 4  produced. |
| 5      Q.  Okay.  But you agree that there's other reports |
| 6  after the report 19? |
| 7      A.  They may be here in this pile.  I don't -- I don't |
| 8  know.  Do you want me to look through here? |
| 9      Q.  Please. |
| 10      A.  Okay. |
| 11      MR. GAIBLE:  And Baltazar, just so we're |
| 12  clear, what -- what I have produced here today is a redacted |
| 13  claim file that Royal's counsel has provided to me.  So -- |
| 14  and I don't know what's in here.  I would imagine both sides |
| 15  of the lawsuit would know. |
| 16      Q.  (BY MR. SALAZAR)  Mr. Nickoloff, before you -- |
| 17  before you go looking at those documents, I'm going to ask |
| 18  you one more question on Nickoloff Exhibit No. 19. |
| 19      A.  Uh-huh. |
| 20      Q.  On the -- on the second page of Nickoloff Exhibit |
| 21  No. 19, on adjustments, and that's -- you talk about an |
| 22  e-mail that was sent on 5-21-03 requesting examinations |
| 23  under oath. |
| 24      A.  Okay. |
| 25      Q.  Do you have that e-mail?  Do you have a copy of |

31 (Pages 118 to 121)

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

## Page 122

1  that, sir?
2      A.  I don't know if it's in here.
3      Q.  While you look at -- for the other reports past
4  May 16th --
5      A.  Uh-huh.
6      Q.  -- could you please see if you have that --
7      A.  Sure.
8      Q.  -- e-mail?
9      A.  Sure.
10         MR. BROWN:  You're looking for an e-mail
11  that's dated --
12         THE WITNESS:  5-12-03.
13         MR. GAIBLE:  Okay.  So the dates we're
14  looking at are 5-12 and 5-16.
15         THE WITNESS:  And any reports after -- these
16  are so badly out of order I'm going to have to go through
17  these a page at a time because I just don't know.  I'm going
18  to go right past one page.
19         THE VIDEOGRAPHER:  It's 12:15 p.m.  We're
20  off the record.
21         (Lunch recess.)
22         THE VIDEOGRAPHER:  It's 1:41 p.m.  We're
23  back on the record.
24      Q.  (BY MR. SALAZAR)  Mr. Nickoloff, I'm going to
25  direct your attention to Exhibit No. 3-5, and it's -- I'll

## Page 123

1  hand it to you so you don't have to look for it.
2      A.  Okay.
3      Q.  It's a letter that's from your office to the
4  attorneys for the Brownsville School District.  It's dated
5  December 2001.
6      A.  Uh-huh.
7      Q.  And ask you to review that letter.
8         MR. BROWN:  Tell me what exhibit that is.
9         MR. SALAZAR:  That's Exhibit No. 3.  I'm
10  sorry.  That is the third page of Exhibit No. 3.
11         MR. BROWN:  Let me just see it.
12      Q.  (BY MR. SALAZAR)  This letter was produced out of
13  your office; correct?
14      A.  Yes.
15      Q.  And this is kind of the first document that was
16  produced from your office to the Brownsville School District
17  or their attorneys; correct?
18      A.  Their attorneys, yes, sir.
19      Q.  Okay.  And in that document your office states
20  that you will be conducting an investigation; correct?
21      A.  That's what it states, yes, sir.
22      Q.  Okay.  And that upon termination of the
23  investigation, that you would recontact the school district;
24  correct?
25      A.  Yes, that's what it says.

## Page 124

1      Q.  Okay.  And also -- and you agree with me that that
2  duty, I think I've asked you maybe four or five times, the
3  duty to investigate falls within Royal Insurance; correct?
4         MR. BROWN:  Objection to the form.  The
5  question has been asked, objected to, and answered probably
6  about a half a dozen times at this time, Baltazar.
7      Q.  (BY MR. SALAZAR)  Right.  But, specifically,
8  Mr. -- Mr. Sawyer, I'm going to ask it to you -- I'm sorry,
9  Mr. Nickoloff.  The reason I'm asking you this question
10  again is because it directs -- it relates directly to the
11  document that I'm talking about.  The second sentence on the
12  second paragraph, it states, "If you wish to forward any
13  medical documentation or evidence to support your
14  allegations during this time, please feel free to do so"; is
15  that correct?  That's what your office sent out?
16      A.  That's what -- that's what it reads, yes, sir.
17      Q.  Okay.  So that is not imposing a duty on the
18  school district to investigate the claim; correct?
19         MR. BROWN:  Objection to the form.
20      A.  I'm sorry?
21      Q.  (BY MR. SALAZAR)  This letter is not telling the
22  Brownsville School District that the school district has a
23  duty or a responsibility to investigate the claim; correct?
24      A.  No, it doesn't say that.
25      Q.  Okay.  As a matter of fact, it's saying if you

## Page 125

1  wish, it's saying it's an option, if the school district
2  wants to send documents, it may; correct?
3         MR. BROWN:  Objection to the form.
4      A.  True.
5         MR. BROWN:  The letter speaks for itself.
6      A.  You will notice that this letter is not signed by
7  me.
8      Q.  (BY MR. SALAZAR)  Right.  But it's out of your
9  office by someone that works under you; correct?
10      A.  That's correct.
11      Q.  And you don't have any problems with this letter,
12  do you?
13      A.  Oh, I have a lot of problems with the letter.
14      Q.  Okay.  And what are the problems?
15      A.  Well, it was sent out by one of my junior
16  adjusters while I was out on vacation, as the loss came in
17  while I was out.  And he took it upon himself to send out
18  what we call a basic contact letter to either an insured or
19  to their representative, in this case Constant & Vela.  And
20  what he did here was he used a template that we use on
21  other -- other claims for another organization and just put
22  the different names at the top of this and signed his name
23  to it, and he added this little thing at the bottom here
24  about Dennis Nickoloff will be handling this as the
25  adjuster.  So yes, this -- this text in here has absolutely

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  nothing to do with this claim. It just was a form letter
2  that he used to try and make some kind of a contact for us.
3  You know, his intent was good, but the letter was not.
4  Okay. And we followed it up with a letter afterwards, I
5  think, explaining that to Constant & Vela. So, yes, I -- we
6  sent the letter out, it went out of our office. It was
7  signed by my -- one of my junior adjusters, who was trying
8  to help out while I was out of the office.
9      Q. But that doesn't change -- I mean, even if you had
10  written a letter, if you had authored that same letter,
11  would you have shifted the duty and responsibility to
12  investigate the claim on the school district?
13          MR. BROWN: Objection to the form.
14      A. No. I would have asked them to produce the
15  documents that we continued to ask for for months and months
16  after that, after this and all the other letters that went
17  out. It would have just been rephrased -- it probably would
18  have been phrased differently.
19      Q. (BY MR. SALAZAR) Okay. During any time of your
20  adjusting for Royal Insurance, was your scope ever to
21  interpret -- interpret the coverage issues in this case?
22      A. No, sir.
23      Q. Are you familiar with the good faith and fair
24  dealings in the Texas Insurance Code?
25      A. Yes, sir.

**Page 127**

1      Q. Could you explain that to the ladies and gentlemen
2  of the jury?
3          MR. BROWN: Objection to the form.
4      Q. (BY MR. SALAZAR) What your understanding is.
5          MR. GAIBLE: I'm going to object to the form
6  of that question and instruct the witness that he is not a
7  lawyer and he's not here to testify about the law. If he
8  can answer your question, fine. But we're not producing him
9  here as an expert witness on what Texas law is.
10          MR. BROWN: Yeah. Let me just say the
11  witness is here as the -- as any claims adjuster, as a fact
12  witness. He's not here as an expert, and both sides have
13  designated and produced bad faith experts.
14      Q. (BY MR. SALAZAR) And Mr. Nickoloff, I'm not
15  asking you to answer that as an expert in the Texas
16  Insurance Code. I'm just asking you as a professional
17  adjuster what your interpretation is, and I'm not going to
18  hold you to it, what your interpretation is of good faith
19  and fair dealings under the Texas insurance code.
20          MR. BROWN: I'm going to object to the form.
21  Same objections as last time.
22          MR. GAIBLE: Same objections. And again,
23  I'll instruct the witness that if he doesn't understand the
24  question or he doesn't feel comfortable -- that's a legal
25  question. That's clearly a legal question.

**Page 128**

1          MR. BROWN: Fairly overbroad question too.
2      Q. (BY MR. SALAZAR) Could you answer it, sir?
3      A. I really can't.
4      Q. So you don't know what good faith is in adjusting
5  a claim, sir?
6          MR. BROWN: Objection to form.
7  Argumentative.
8          MR. GAIBLE: Same objection. Calls for a
9  legal opinion, a legal conclusion.
10      Q. (BY MR. SALAZAR) You can answer.
11      A. No, I -- sorry. I don't know what you're asking.
12      Q. Okay. You don't know what good faith is in
13  adjusting a claim?
14          MR. GAIBLE: Objection. Form.
15          MR. BROWN: Same -- same objections.
16          MR. GAIBLE: Same objections. Requires a
17  legal opinion and a legal conclusion.
18      A. No, I don't.
19      Q. (BY MR. SALAZAR) Okay. Do you know what fair
20  dealings is, as an adjuster?
21      A. Are you looking for a legal definition?
22          MR. BROWN: Objection. Form.
23      Q. (BY MR. SALAZAR) I'm asking you for your -- your
24  interpretation of what fair dealings is as an adjuster, not
25  under the insurance code, but what is fair dealings?

**Page 129**

1          MR. BROWN: Objection. Form. It's vague
2  and ambiguous.
3          MR. GAIBLE: The same objection I've
4  asserted as to the other prior questions. It calls for a
5  legal conclusion and a legal opinion.
6      A. I'm not comfortable answering that.
7      Q. (BY MR. SALAZAR) Is it that you're not
8  comfortable with it or you just don't want to answer it?
9      A. I'm not comfortable answering it.
10          MR. SALAZAR: Pass the witness.
11          MR. BROWN: Let's take a minute or so.
12          THE VIDEOGRAPHER: It's 1:50 p.m. We're off
13  the record.
14          (Short recess.)
15          THE VIDEOGRAPHER: It's 1:53 p.m. We're
16  back on the record.
17              EXAMINATION
18  BY MR. BROWN:
19      Q. Mr. Nickoloff, my name is Jay Brown; and I have a
20  few questions for you in order to clarify some earlier
21  discussion that you had with Mr. Salazar.
22      A. Okay.
23      Q. He asked you quite a few questions about whether
24  you had sat down with the -- with BISD and advised them
25  about the claim, about the claim process, about what to

33 (Pages 126 to 129)

NEW  CENTURY  REPORTING
(713)  626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

| | |
|---|---|
| **Page 130** | **Page 132** |

**Page 130**

1  expect. Do you remember those questions?
2      A.  Yes, sir.
3      Q.  I'd like to ask you about that. When you were
4  first involved in this matter and you first made contact
5  with BISD, were you able to speak to BISD directly or did
6  you have to speak to their attorney?
7      A.  Their attorney.
8      Q.  And did you continue to deal with BISD by and
9  through their attorney?
10     A.  That's correct.
11     Q.  And who was that attorney initially, what firm?
12     A.  It was the law firm of Constant & Vela.
13     Q.  And they were there representing BISD and speaking
14  for BISD in this claim?
15     A.  That's correct. They were in communication with
16  Royal, and then we were in communication with them.
17     Q.  Right. And you would assume that they would be in
18  communication with their client BISD as well?
19     A.  I would assume so, yes.
20     Q.  Now, why is it that you would not advise BISD how
21  to pursue their claim under those circumstances?
22     A.  I assume that they were adequately represented by
23  their legal counsel to give them all the recommendations and
24  guidance that they needed.
25     Q.  And after all, that was why they retained an

**Page 131**

1  attorney was to help them with that claim, at least was that
2  your understanding?
3      A.  That was my assumption, yes, sir.
4      Q.  Now, would it be proper for you, as an adjuster,
5  to go around an insured's attorney and bypass them and
6  contact the insured directly without that attorney's
7  knowledge?
8      A.  We would not do that.
9      Q.  When the attorney is involved on behalf of an
10  insured, you're expected to deal with the attorney or at
11  least to have the attorney's consent for communications with
12  the insured?
13     A.  That's correct.
14     Q.  Do you recall that you were asked questions as to
15  whether in all these many months that you had wanted to
16  inspect the school as to whether BISD had ever denied access
17  to the school?
18     A.  I remember those questions, yes.
19     Q.  Okay. Let me ask you this: In all those months
20  that you were waiting to examine the school, did BISD ever
21  allow access to the school?
22     A.  Through their counsel, no, they did not.
23     Q.  Okay. Did you make clear to him that you wanted
24  to examine the school?
25     A.  I think the record shows there are letters to

**Page 132**

1  Constant & Vela requesting that.
2      Q.  That you be able to examine the school?
3      A.  That's correct.
4      Q.  And you were not able to examine the school for
5  many months; correct?
6      A.  Correct.
7      Q.  And when you were able to examine the school, how
8  was that examination limited?
9      A.  And as I explained, that was -- it was my
10  understanding that there was still a TRO in effect, and I
11  went to the school with -- having an appointment with
12  Mr. Vasquez, who I understood was head of maintenance or had
13  some higher position with the school district. When I
14  arrived at the appointment time, at 9 o'clock in the
15  morning, I think it was, I waited for him and no one -- no
16  one appeared. The parking lots were empty, of course,
17  schools were empty. I believe there was a guard in a guard
18  shack nearby who I think walked over and asked what I was
19  doing there, since I was on property that he was apparently
20  watching. I told him I had an appointment with Mr. Vasquez.
21       And I believe I called Mr. Vasquez on my cell
22  phone and asked if he was on his way or should I wait for
23  him or did he have some problems. His secretary said he was
24  in a meeting. And I asked her if she could possibly slip
25  him a note reminding him that I was waiting for him. She

**Page 133**

1  came back on the phone and said he's very sorry; he'll send
2  someone else over. A matter of 20 minutes or so went by.
3  Someone did appear in a BISD pickup truck. A gentleman
4  arrived and identified himself. I assumed he was a
5  maintenance worker. He was wearing a BISD, you know, shirt
6  kind of deal. He didn't have a key to the building. He
7  asked the guard if he had a key to the building. The guard
8  did not. I waited another 10 or 15 minutes, and they
9  produced a key. I don't know where it actually came from,
10  but he came back to my car and said, "I have a key. Now, we
11  have to go through the building, but you can't touch
12  anything. The TRO is still in effect and I've been -- you
13  know, we need to just kind of walk through the building with
14  you."
15       I said, "Okay." So we walked through the building
16  at a rather rapid rate. I was following him, since I didn't
17  know where we were going. And periodically I asked him to
18  stop for a moment, and I would take a picture, and then he
19  would start walking again, I would start following him. On
20  the occasion where I asked him a question about something in
21  general, he really had no knowledge of the -- what was going
22  on in the -- in the building itself. And so I just took my
23  pictures. We went through the two buildings that are
24  adjoined by the library and out the opposite door. And I
25  went back to my office. So that's how the inspection was

34  (Pages 130 to 133)

NEW   CENTURY   REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF - April 26, 2005

Page 134

1 conducted.
2     Q. Rather rapidly?
3     A. Yes, sir.
4     Q. Now, you had several questions about whether you
5 had provided a proof of loss form to BISD's lawyers?
6     A. Uh-huh.
7     Q. And do you remember those questions?
8     A. Yes, sir.
9     Q. Did BISD's lawyers, in all these months that you
10 were requesting the -- their investigation reports and their
11 engineering reports, in all those months did they ever ask
12 you for a proof of loss form?
13     A. No, sir.
14     Q. And finally, when did they ask you for a proof of
15 loss form?
16     A. I believe when Ramon Garcia's office became
17 involved, and that was a year and a half later or two years
18 later whenever it was, when the proof of loss form was
19 requested, we promptly faxed them a proof of loss form.
20 It's my understanding until that time, I'm not sure they
21 knew what the dollar amount of their loss was, is what it
22 appeared to be.
23     Q. Then they would have no way to -- or at least they
24 had not told you even the amount of money that they were
25 claiming?

Page 135

1     A. Until that day of that meeting, I had no idea what
2 their claim was or would be.
3     Q. And they -- had they ever told you what their
4 claim was?
5     A. No.
6     Q. In dollars amount?
7     A. No.
8     Q. To fill out a proof of loss form, aren't you
9 supposed to fill out the amount of the claim?
10     A. Yes.
11     Q. That's some of the information that's requested?
12     A. Absolutely.
13     Q. So as soon as Mr. Garcia asked you for the proof
14 of loss form, did you provide him one?
15     A. Yes. We faxed it to his office that same day.
16     Q. As part of your investigation, were you expecting
17 to ask for and obtain information from BISD?
18     A. The instructions I received were to ask for the
19 reports that had been done prior to my being involved in the
20 claim. I understood there was a group of -- of reports that
21 were prepared, and that was the assignment was to collect
22 those reports and forward those to Royal for their review.
23     Q. The engineering reports that BISD had -- had done
24 over the years, really?
25     A. Mold studies, engineering reports, whatever they

Page 136

1 might have to -- to help Royal understand their claims.
2     Q. And that was part of the investigation that you
3 were hired to do?
4     A. That's correct.
5     Q. Did you ever refuse to retain an expert?
6     A. No, sir.
7     Q. Did Royal ever ask you to retain an expert?
8     A. No, they did not.
9     Q. Did BISD ever ask you to retain an expert?
10     A. No, they did not.
11     Q. And did you finally, after you finally received
12 some of the information in terms of expert reports that you
13 had requested, did you in fact send that information on to
14 Royal?
15     A. Yes, I did.
16     Q. Now, you made several requests for information as
17 part of your investigation?
18     A. Correct.
19     Q. And did you ever receive all of the information
20 that you requested?
21     A. No.
22     Q. And were you still waiting to receive that
23 information up until the time that the matter was put before
24 the court in the declaratory action?
25     A. Correct.

Page 137

1     Q. And if you had received that information that you
2 had asked for previously, what would you have done with it?
3     A. I would have forwarded it to Royal or their
4 counsel.
5     Q. For their consideration?
6     A. Absolutely.
7     Q. Did BISD ever request of you that you come meet
8 with them for a face-to-face meeting with the BISD
9 representatives?
10     A. No, sir.
11     Q. Did BISD's lawyers ever request to you that you
12 come meet with BISD personnel for a face-to-face meeting?
13     A. No, sir.
14     Q. If BISD's lawyers had requested that, would you
15 have entertained it?
16     A. Of course.
17         MR. BROWN: I pass the witness.
18         FURTHER EXAMINATION
19 BY MR. SALAZAR:
20     Q. Mr. Nickoloff, in fact, BISD's layers, Mr. Garcia
21 and myself, did request a face-to-face meeting with you;
22 correct?
23     A. That's correct.
24     Q. So the statement that we never requested a
25 face-to-face meeting is incorrect?

35 (Pages 134 to 137)

NEW CENTURY REPORTING
(713) 626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992

DENNIS NICKOLOFF  -  April 26, 2005

Page 138

1        MR. BROWN: Objection to form.
2     A.  Would -- could we revisit that question because I
3  thought it was did we meet -- did -- did someone from BISD
4  request a meeting.
5     Q.  (BY MR. SALAZAR) The question was I think Mr. --
6  Mr. Brown asked you did BISD ask you to meet face to face at
7  any time, and you said no.
8        MR. BROWN:  That was not the question.
9        THE WITNESS:  I think we need to read the
10 question back if we could.
11    Q.  (BY MR. SALAZAR)  Well, hold on.  The question is
12 I'm asking you, the question that Mr. Brown asked you was
13 did BISD ever ask to meet with you face to face.
14    A.  Did BISD, no.
15    Q.  Or their attorneys?
16    A.  Your -- you, yes.
17    Q.  Okay.  So we --
18    A.  You and Ramon Garcia, yes.
19    Q.  So Ramon Garcia and my office asked to meet with
20 you face to face on one occasion; correct?
21    A.  That's correct.
22    Q.  Okay.  In your experience of being an adjuster,
23 how often does an insured ask for an expert?
24    A.  Are you looking for a number, a percentage?
25    Q.  Well, first of all, whose duty is it to hire an

Page 139

1  expert to adjust a claim?
2        MR. BROWN:  Objection.
3     Q.  (BY MR. SALAZAR)  Is it the insured or the
4  insurer?
5        MR. BROWN:  Objection to form.
6     A.  In most cases it would be the insured -- insurer,
7  excuse me.
8     Q.  (BY MR. SALAZAR)  The insurer.  So in this case,
9  the duty -- I think you've answered this several times --
10 the duty would still lie and the responsibility to
11 investigate the case and to hire experts would be on Royal
12 Insurance; correct?
13    A.  That's correct, if they felt that there wasn't
14 adequate reporting or some sort of problem with the reports
15 that existed in this case.
16    Q.  Right.  But BISD has no duty or any responsibility
17 to request from Royal an expert to be assigned to their
18 case; correct?
19        MR. BROWN:  Objection to form.
20    A.  Okay.  I agree to that.
21    Q.  (BY MR. SALAZAR)  Okay.  Was BISD cooperative with
22 you in providing documentation in the reports that they had
23 at the time?
24    A.  I never received any reports from BISD or their
25 counsel until you became involved.

Page 140

1     Q.  Right.  But when -- when -- when Ramon Garcia and
2  my office became involved, all the documents that you had
3  requested were -- that we had in hand were given to you as
4  far as you know?
5     A.  That was a year and a half after the claim had
6  been sent to my office, yes.
7     Q.  Right.
8     A.  But yes, the answer to your question is yes.
9     Q.  Okay.  But you agree that there was no duty on
10 behalf of the school district to provide those reports?
11        MR. BROWN:  Objection to form.  There's a
12 duty of cooperation, Baltazar.
13    A.  The duty of the -- I'm sorry.  Would you repeat
14 the question?
15    Q.  (BY MR. SALAZAR)  You agree that the duty, the
16 duty to produce expert reports was not BISD's duty; it was
17 Royal's duty; correct?
18        MR. BROWN:  Objection to form.
19    A.  I think they owe a duty to provide what documents
20 they have, if requested.
21    Q.  (BY MR. SALAZAR)  But the duty to hire experts and
22 to do the investigation is not BISD's; that's Royal's;
23 correct?
24        MR. BROWN:  Objection to form.
25    A.  I'll agree to that.

Page 141

1     Q.  (BY MR. SALAZAR)  Now, was it the -- was it the
2  duty of Brownsville Independent School District to request a
3  proof of loss claim form?
4        MR. BROWN:  Objection to form.
5     A.  I don't believe so.
6     Q.  (BY MR. SALAZAR)  Whose duty was it to supply a
7  proof of loss claim form?
8        MR. BROWN:  Objection to form.
9     A.  It would be Royal Insurance's.
10        MR. SALAZAR:  I have nothing further.
11        FURTHER EXAMINATION
12 BY MR. BROWN:
13    Q.  I need to ask you a few questions, Mr. Nickoloff,
14 about your investigation activities in the first -- first
15 weeks of your assignment.  The -- and I'm referring to your
16 activity log, Nickoloff 25.  You received the assignment and
17 you acknowledged the assignment on the same day?
18    A.  That's correct.
19    Q.  And that would be December --
20    A.  3rd.
21    Q.  -- 3rd.  And then on December 5th, is that when
22 you sent communications to BISD's lawyer?
23    A.  Yes.
24    Q.  And were those communications designed to obtain
25 information to -- basically to begin investigating the

36 (Pages 138 to 141)

NEW    CENTURY    REPORTING
(713)   626-0170

c9bcc917-32f3-46fa-a6d4-c2d248f67992